**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VISUAL SEMICONDUCTOR, INC., | : |
| | : |
| Appellant, | : |
| | : |
| | : Civil No. 2:24-cv-06397-JMG |
| v. | : |
| | : |
| STREAM TV NETWOR  S, INC. *et al.*, | : |
| | : |
| Debtors-in-Posess. | : |
| | : |
| AND | : |
| | : |
| WILLIAM A. HOMONY, *et al.*, | : |
| | : |
| Trustees. | : |
| | : |

**APPELLEE'S DESIGNATION OF ADDITIONAL ITEMS**
**TO BE INCLUDED IN THE RECORD ON APPEAL**

Pursuant to Federal Rule of Bankruptcy Procedure 8009, William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative") (when referred to with Stream, the "Debtors"), appellee in the appeal noticed by Visual Semiconductor, Inc. ("VSI" or the "Appellant"), on November 27, 2024 (the "Appeal"), files this Designation of Additional Items to be Included in the Record on Appeal (the "Designation") in the above-captioned case and requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with the Appeal.

## DESIGNATION

1.      On June 6, 2024, the Court entered the Order Granting a Motion to Approve Compromise under Rule 9019 [D.I. 653]. On June 20, 2024, the Appellant filed a Motion to Reconsider the Order Granting a Motion to Approve Compromise under Rule 9019 [D.I. 686]. On November 14, 2024, the Court entered an Order Denying the Appellant's Motion to Reconsider [D.I. 805]. On December 11, 2024, the Appellant filed the Appellant's Statement of Issues and Designation of Items to be Included in the Record on Appeal [D.I. 883].

2.      The Trustee respectfully designates the following additional items to be included in the appellate record pursuant to Bankruptcy Rule 8009:[1]

| Bankruptcy Docket Number | Date Entered in the Bankruptcy Docket | Brief Description of the Document or Transcript |
|---|---|---|
| 548 | 1/5/2024 | Memorandum Opinion Regarding Appointment of Chapter 11 Trustee |
| 549 | 1/5/2024 | Order Granting Motion to Appoint Chapter 11 Trustee |
| 554 | 1/9/2024 | Notice of Appointment of William A. Homony, CIRA as Chapter 11 Trustee |
| 825 | 11/27/2024 | Rembrandt's Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion Seeking (I) Enforcement of the Temporary Restraining Order, (II) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (III) Injunctive Relief |
| 826 | 11/27/2024 | VSI's Motion to Reconsider and/or Clarify November 14, 2024, Order   uashing the Remaining VSI Discovery |
| 827 | 11/27/2024 | VSI's Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion to Reconsider and/or Clarify November 14, 2024, Order   uashing the Remaining VSI Discovery |
| 832 | 11/29/2024 | Trustee's Objection to Rembrandt's Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion Seeking (I) |

---

[1] Unless otherwise indicated, all designated items include attached exhibits and declarations.

2

| | | |
|---|---|---|
| | | Enforcement of the Temporary Restraining Order, (II) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (III) Injunctive Relief |
| 834 | 11/29/2024 | Trustee's Objection to VSI's Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion to Reconsider and/or Clarify November 14, 2024, Order uashing the Remaining VSI Discovery |
| 835 | 11/29/2024 | Trustee's Omnibus Response to VSI and Rembrandt's Objections to the Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief |
| 836 | 11/29/2024 | Hawk's Joinder to Trustee's Omnibus Response to VSI and Rembrandt's Objections to the Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief |
| 837 | 11/30/2024 | SeeCubic's Joinder to Trustee's Omnibus Response to VSI and Rembrandt's Objections to the Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief |
| 843 | 12/2/2024 | Order Denying VSI's Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion to Reconsider and/or Clarify November 14, 2024, Order uashing the Remaining VSI Discovery |
| 844 | 12/2/2024 | Order Denying Motion for Expedited Consideration, Shortened Time, and Limited |

| | | Notice of Motion Seeking (I) Enforcement of the Temporary Restraining Order, (II) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (III) Injunctive Relief |
|---|---|---|
| 845 | 12/2/2024 | Trustee's Notice of No Auction to be Held and Selection of Successful Bidder |
| 850 | 12/3/2024 | Trustee's Declaration in Support of Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief |
| 852 | 12/3/2024 | J. Scott Victor's Declaration in Support of Trustee's Motion for, inter alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief |
| 876 | 12/9/2024 | Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief |
| 878 | 12/11/2024 <br><br> *Transcript Attached as Exhibit "A"* | Transcript of Hearing Held on December 4, 2024 |

**ADVERSARY PROCEEDING (*In Re: Stream TV Networks, Inc. And Technovative Media, Inc. v. Shadron L. Stastney, et al.,* ADV. NO. 23-00057-MDC)**

| Bankruptcy Docket Number | Date Entered in the Bankruptcy Docket | Brief Description of the Document or Transcript |
|---|---|---|
| 154 | 12/2/2024 | Order Denying Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion Seeking (I) Enforcement of the Temporary Restraining Order, (II) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (III) Injunctive Relief |

## <u>RESERVATION OF RIGHTS</u>

The Trustee expressly reserves his right to amend or supplement this Designation and/or to object, or otherwise supplement or move to strike or modify, some or all of any designation filed by any other party to this appeal. This filing is made expressly subject to and without waiver of any and all rights, remedies, challenges, and objections.

Respectfully submitted,

<u> s  Michael D. Vagnoni </u>
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail addresses:
edmond.george@obermayer.com
michael.vagnoni@obermayer.com
*Counsel to William Homony, Chapter 11 Trustee*

and

Steven M. Coren, Esquire

4902-8462-3113 v2

Andrew J. Belli, Esquire
COREN & RESS, P.C.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
abelli@kcr-law.com
*Special Counsel to William Homony, Chapter 11*
*Trustee*

Dated:  December 26, 2024

4902-8462-3113 v2

**PlnDue, JNTADMN, LEAD, MEDIATION, JMDC, APPEAL**

# U.S. Bankruptcy Court
## Eastern District of Pennsylvania (Philadelphia)
## Bankruptcy Petition #: 23−10763−amc

|  |  |
|---|---|
| *Date filed:* | 03/15/2023 |
| *341 meeting:* | 05/05/2023 |
| *Deadline for filing claims:* | 05/24/2023 |
| *Deadline for filing claims (govt.):* | 09/11/2023 |

*Assigned to:* Chief Judge Ashely M. Chan
Chapter 11
Voluntary
Asset

**Debtor**
**Stream TV Networks, Inc.**
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
PHILADELPHIA−PA
Tax ID / EIN: 27−1224092

represented by **VINCENT F. ALEXANDER**
Shutts & Bowen LLP
201 East Las Olas Blvd.
Suite 2200
Fort Lauderdale, FL 33301
954−524−5505
Fax : 954−524−5506
Email: valexander@shutts.com
*TERMINATED: 11/01/2023*

**SEAN M. BRENNECKE**
Lewis Brisbois Bisgaard & Smith, LLP
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
(302) 985−6009
Fax : (302) 985−6001
Email: Sean.Brennecke@lewisbrisbois.com

**SCOTT D. COUSINS**
1201 Orange Street
P.O. Box 491
Wilmington, DE 19899−0391
(302) 571−6600

**BENNETT G. FISHER**
Lewis Brisbois Bisgaard & Smith LLP
24 Greenway Plaza, Suite 1400
Houston, TX 77046
(346) 241−0495
Fax : (713) 759−6830
Email: Bennett.Fisher@lewisbrisbois.com

**MICHAEL D. VAGNONI**
Obermayer Rebmann Maxwell & Hippel
LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
(215) 665−3066
Fax : (215) 665−3165
Email: michael.vagnoni@obermayer.com

**RAFAEL X. ZAHRALDDIN**
Lewis Brisbois
500 Delaware Avenue

1

Ste 700
Wilmington, DE 19801
302−985−6004
Email: Rafael.Zahralddin@lewisbrisbois.com

**_Debtor_**
**Technovative Media, Inc.**
2009 Chestnut Street
3rd Floor
Philadephia, PA 19103
PHILADELPHIA−PA
Tax ID / EIN: 45−4345015

represented by **SCOTT D. COUSINS**
(See above for address)

**MICHAEL D. VAGNONI**
(See above for address)

**RAFAEL X. ZAHRALDDIN**
(See above for address)

**_Trustee_**
**WILLIAM A. HOMONY**
MILLER COFFEY TATE LLP
1628 JOHN F. KENNEDY BLVD STE 950
PHILADELPHIA, PA 19103
610−986−5375

represented by **ANDREW J. BELLI**
Coren & Ress, PC
2001 Market Street
Suite 3900
Philadelphia, PA 19103
215−735−8700
Fax : 215−735−5170
Email: abelli@kcr−law.com

**STEVEN M. COREN**
Coren & Ress, P.C.
2001 Market Street
Two Commerce Square
Suite 3900
Philadelphia, PA 19103
215−735−8700
Fax : 215−735−5170
Email: scoren@kcr−law.com

**MICHAEL D. VAGNONI**
(See above for address)

**_U.S. Trustee_**
**United States Trustee**
Office of United States Trustee
Robert N.C. Nix Federal Building
900 Market Street
Suite 320
Philadelphia, PA 19107
(215)597−4411

represented by **KEVIN P. CALLAHAN**
DOJ−Ust
Robert N.C. Nix Federal Building
900 Market Street
Ste. 320
Philadelphia, PA 19107
215−597−4411
Email: kevin.p.callahan@usdoj.gov

**JOHN HENRY SCHANNE**
DOJ−Ust
Office of The United States Trustee
Robert N.C. Nix Federal Building
900 Market Street, Suite 320
Philadelphia, PA 19107
202−934−4154
Email: John.Schanne@usdoj.gov

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 01/05/2024 | | 548 | Memorandum Re:The Motion of Section 1102/1104 and the Motion for Relief from Stay file by Hawk Investment Holdings LTD. An order consistent with this Memorandum shall be entered. (related document(s)16, 83). (R., Donna) (Entered: 01/05/2024) |

2

| | | 549 | Ordered: The Section 1112/1104 Motion is GRANTED solely to the extent it requests that a trustee be appointed in the Debtors bankruptcy cases pursuant §1104(a) of the Bankruptcy Code. The Hawk Stay Relief Motion is GRANTED to permit the Section 225 Action to proceed solely with respect to the Technovative Director Issue and the Debt Conversion Issue. Status Hearing scheduled 1/24/2024 at 02:00 PM at Courtroom #2. (related document(s)16, 83). (R., Donna) (Entered: 01/05/2024) |
|---|---|---|---|
| 01/05/2024 | | | |
| 01/09/2024 | | 554 | Notice of Appointment of William A. Homony to serve as the chapter 11 trustee Filed by United States Trustee Represented by JOHN HENRY SCHANNE (Counsel). (SCHANNE, JOHN) Modified on 1/10/2024 (R., Donna). (Entered: 01/09/2024) |
| 11/27/2024 | | 825 | Motion to Expedite Hearing (related documents Motion for Sanctions) Filed by Rembrandt 3D Holding Ltd. Represented by ANDREW PETER DEMARCO (Counsel) (related document(s)824). (DEMARCO, ANDREW) (Entered: 11/27/2024) |
| 11/27/2024 | | 827 | Motion to Expedite Hearing (related documents Motion to Reconsider) Filed by Visual Semiconductor, Inc. Represented by RANDALL ADAM SWICK (Counsel) (related document(s)826). (Attachments: # 1 Exhibit A – Proposed Order) (SWICK, RANDALL) (Entered: 11/27/2024) |
| 11/29/2024 | | 832 | Objection to Motion to Expedite Hearing filed by Creditor Rembrandt 3D Holding Ltd. Filed by WILLIAM A. HOMONY (related document(s)825). (VAGNONI, MICHAEL) (Entered: 11/29/2024) |
| 11/29/2024 | | 834 | Objection to Motion to Expedite Hearing filed by Creditor Visual Semiconductor, Inc. Filed by WILLIAM A. HOMONY (related document(s)827). (VAGNONI, MICHAEL) (Entered: 11/29/2024) |
| 11/29/2024 | | 835 | Response filed by Trustee WILLIAM A. HOMONY *Omnibus Response of Chapter 11 Trustee to Objections:* Objection filed by Creditor Visual Semiconductor, Inc.; Objection filed by Creditor Rembrandt 3D Holding Ltd. (related document(s)815, 816, 750). (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit) (VAGNONI, MICHAEL) (Entered: 11/29/2024) |
| 11/29/2024 | | 836 | Joinder *Hawk Investment Holdings Ltd.'s (i) Joinder to the Omnibus Response of William A. Homony, In His Capacity As Chapter 11 Trustee, to the Objections to the Trustees Motion for, Inter Alia, An Order (A) Approving the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief; (ii) Brief in Support of Sale; and (iii) Request for Related Relief* Filed by Steven Caponi on behalf of Hawk Investment Holdings Ltd. (related document(s)835). (Caponi, Steven) (Entered: 11/29/2024) |
| 11/30/2024 | | 837 | Joinder *of SeeCubic, Inc. to Responses in Support of the Trustee's Motion for, Inter Alia, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts Related Thereto, and (C) Granting Related Relief* Filed by Joseph Oliver Larkin on behalf of SeeCubic, Inc. (related document(s)815, 750, 836, 835, 816). (Attachments: # 1 Certificate of Service) (Larkin, Joseph) (Entered: 11/30/2024) |
| 12/02/2024 | | 843 | |

| | | | |
|---|---|---|---|
| | | | Order Denying ([827](#)) Motion for an Expedited Hearing on ([826](#)) Motion to Reconsider Order Dated November 14, 2024 Filed by Visual Semiconductor, Inc. represented by RANDALL ADAM SWICK (Counsel). VSI is directed, to the extent it wishes to prosecute the Reconsideration Motion, to follow the Court's hearing scheduling procedures set forth in Local Rule 9014–3(c) to obtain a hearing date on the motion no sooner than January 2025. (Barbetta, John) (Entered: 12/02/2024) |
| 12/02/2024 | | 844 | Order Denying ([825](#)) Motion for an Expedited Hearing on ([824](#)) Motion For Sanctions *Against Parties who Violated the Temporary Restraining Order, Enforcement of the Temporary Restraining Order, and For Injunctive Relief* filed by Rembrandt 3D Holding Ltd. represented by ANDREW PETER DEMARCO (Counsel). Rembrandt is directed to re–file the TRO Motion in Adversary Proceeding 23–00057 where the TRO was entered, and shall follow the Court's hearing scheduling procedures set forth in Local Rule 9014–3(c), made applicable to the Adversary Proceeding by Local Rule 7005–1, to obtain a hearing date on the motion no sooner than January 2025. (Barbetta, John) (Entered: 12/02/2024) |
| 12/02/2024 | | 845 | Document in re: *Notice of No Auction to be Held and Selection of Successful Bidder* Filed by MICHAEL D. VAGNONI on behalf of WILLIAM A. HOMONY. (VAGNONI, MICHAEL) (Entered: 12/02/2024) |
| 12/03/2024 | | 850 | Declaration re: *Declaration of William A. Homony in His Capacity as Chapter 11 Trustee, in Support of the Motion for Entry of an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* Filed by MICHAEL D. VAGNONI on behalf of WILLIAM A. HOMONY. (VAGNONI, MICHAEL) (Entered: 12/03/2024) |
| 12/03/2024 | | 852 | Declaration re: *Declaration Of J. Scott Victor In Support Of Chapter 11 Trustees Motion For Entry Of An Order (i) Authorizing And Approving, But Not Directing, The Sale Of The Assets, In Each Case With Such Sale Being Free And Clear Of Any And All Liens, Claims, Encumbrances And Interests, (ii) The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection With The Sale, And (iii) Granting Related Relief* Filed by MICHAEL D. VAGNONI on behalf of WILLIAM A. HOMONY (related document(s)[750](#), [835](#)). (VAGNONI, MICHAEL) (Entered: 12/03/2024) |
| 12/09/2024 | | 876 | ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORSASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (B) AUTHORIZING THE TRUSTEE TO ENTER INTO AND PERFORM DEBTORS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (C) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF (Related Doc # [750](#)) (D., Tasha) (Entered: 12/09/2024) |
| 12/11/2024 | | 878 | Transcript regarding Hearing Held on 12/4/24 Re: Motion to Approve. TRanscribed by The Record Xchange 78 pages. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, call the Clerk's Office] (related document(s) 860 ). Notice of Intent to Request Redaction Deadline Due |

4

| | | | By 12/18/2024. Redaction Request Due By 1/2/2025. Redacted Transcript Submission Due By 1/13/2025. Transcript access will be restricted through 3/11/2025. (D., Tasha) (Entered: 12/11/2024) |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>        Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,<br><br>        Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered)[1] |

# <u>MEMORANDUM</u>

## I.    INTRODUCTION

Before the Court for disposition are two motions by Hawk Investment Holdings Ltd. ("Hawk").  The first motion (the "Hawk Stay Relief Motion")[2] seeks relief from the automatic stay in order to proceed with an action in the Delaware Court of Chancery (the "Delaware Chancery Court") seeking relief pursuant to §225 of Title 8 of the Delaware Code (the "Section 225 Action") against debtors Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and together with Stream, the "Debtors").  The second motion (the "Section 1112/1104 Motion") seeks an order, pursuant to §1112(b) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), converting the Debtors' chapter 11 bankruptcy cases to cases under chapter 7 of the Bankruptcy Code or dismissing them, or

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases.  Bankr. Docket No. 81.

[2] Bankr. Docket No. 16.

1

alternatively, appointing a trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the Bankruptcy Code.

For the reasons set forth herein, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed, as set forth below.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND[3]

The history of the Debtors, their relationship with their creditors, and, in particular from the Court's perspective, the events during these bankruptcy cases, are convoluted, and for the most part, riddled with strife.  The docket in the Debtors' main case spans over 500 entries, telling a story of near-endless conflict.[4]  The Court has spent an inordinate amount of time dealing with expedited motion practice, emergency hearings, and drawn-out contested matters. While the Court does not typically summarize the major activity in a case in order to explain a decision, here it believes a lengthy summary is necessary in order to paint the picture of the acrimony, relative lack of progress, and overlapping and simultaneous controversies these cases have endured over the nearly ten months they have been pending.  Set forth below, therefore, is a summary of the major events not only that led to the Debtors' bankruptcy cases, but also that have transpired before this Court since the Debtors filed their bankruptcy petitions.

---

[3] The factual background recited herein is drawn from various pleadings filed on the docket as well as the testimony and evidence adduced at Trial (as defined *infra*).  The Court notes, however, that to the extent such facts as set forth in the parties' various pleadings are disputed, such disputes are irrelevant to the Court's resolution of the pending motions, as the Court has drawn its conclusions from the record at Trial and the procedural history of these cases.

[4] This does not even account for the approximately 120 docket entries in the adversary action the Debtors filed in August 2023 against various parties, discussed *infra*.  *See* Adv. Pro. No. 23-00057.

### A.    Pre-Petition Events

#### 1.    Formation of the Debtors

Stream was founded in 2009 by Mathu Rajan ("Mr. Rajan") and Raja Rajan (together

with Mr. Rajan, "the Rajans").  The company was founded to develop and commercialize a

proprietary technology for viewing three-dimensional content without the need for 3D glasses or

goggles ("Ultra-D").  Stream created Technovative, a wholly owned subsidiary, which in turn

directly or indirectly owns various subsidiaries, including SeeCubic B.V. ("SCBV"), an entity

formed under the laws of the Netherlands and which functions as the primary research and

development engine for the business.[5]  Together, these subsidiaries own and hold rights in

technology including Ultra-D.  Stream's Ultra-D technology was developed, in part, based on

certain intellectual property, including a portfolio of glasses-free 3D patents licensed from

Koninklijke Philips Electronics ("Philips").  Stream also has a technology license from

Rembrandt 3d Holding Ltd. ("Rembrandt"), which allows it to use the Rembrandt technology

incorporated into Stream's Ultra-D products (the "Rembrandt Licensing Agreement").

#### 2.    Funding from SLS and Hawk

From 2011 to 2020, Stream's senior secured creditor, SLS Holdings VI, LCC ("SLS"),

loaned Stream $6 million through a series of secured promissory notes (the "SLS Notes").  In

return, Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as

security for the SLS Notes. Stream and SLS executed a security agreement which authorized

SLS to take control of Stream's assets to satisfy the SLS Notes in the event Stream defaulted.

Between 2011 and 2014, Shadron Stastney ("Mr. Stastney"), the principal of SLS, served as an

outside director of Stream.  He rejoined the board as Vice Chairman in 2018 in a strategic role

---

[5] *See* Exhibit D-5.

until resigning in January 2020.

Between 2014 and 2020, Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million through a series of junior secured notes (the "Hawk Notes", and together with the SLS Notes, the "Notes"). Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted. On January 29, 2018, Stream entered into a conversion agreement with Hawk, whereby the parties agreed to terms pursuant to which Stream would be permitted to convert the outstanding portion of the Hawk Notes to Stream equity (the "Hawk Conversion Agreement"). Stream and SLS contemporaneously entered into a parallel agreement with respect to conversion of the SLS Notes to Stream equity (the "SLS Conversion Agreement" and together with the Hawk Conversion Agreement, the "Conversion Agreements").

### 3. Omnibus Agreement

In March 2020, Stream was notified it was in default under the SLS and Hawk Notes. In May 2020, Stream, Hawk, SLS, and 52 of its stockholders entered into an Omnibus Agreement whereby Stream would transfer all of its assets to a newly formed entity, SeeCubic Inc. ("SeeCubic"), and in exchange, SLS and Hawk would no longer pursue a foreclosure, and their claims under the Notes would be entirely extinguished. Mr. Stastney, who by then had left Stream, formed SeeCubic as a Delaware corporation to acquire Stream's assets pursuant to the Omnibus Agreement.

### 4. Litigation Over the Omnibus Agreement

In September 2020, Stream filed suit against SeeCubic in the Delaware Chancery Court to invalidate the Omnibus Agreement. Both Stream and SeeCubic moved for preliminary

4

injunctions whereby Stream sought to prevent SeeCubic from taking any actions to enforce the

Omnibus Agreement, and SeeCubic sought to compel Stream's compliance therewith.  In

December 2020, the Delaware Chancery Court issued an opinion finding that SeeCubic was

entitled to injunctive relief and barring Stream from failing to comply with the Omnibus

Agreement.  In September 2021, the Delaware Chancery Court granted SeeCubic's motion for

summary judgment (the "Summary Judgment Order"), declaring the Omnibus Agreement to be

valid and entering a permanent injunction preventing Stream from interfering with the

agreement.

In November 2021 Stream appealed the Delaware Chancery Court's ruling,[6] alleging that

the Delaware Chancery Court erred because Stream's unambiguous certificate of incorporation

required the approval of Stream's Class B stockholders for Stream's entry into the Omnibus

Agreement.  In June 2022, the Delaware Supreme Court vacated the Summary Judgment Order

on the grounds that the Omnibus Agreement was invalid without the approval of Stream's Class

B Stockholders.  The Delaware Supreme Court also found that (1) Hawk was a secured creditor

of Stream, (2) Stream had pledged all of its assets as security for the more than $50 million

Hawk lent to Stream, and (3) the Hawk Notes were executed in conjunction with security

agreements authorizing Hawk to take control of Stream's assets to satisfy the Hawk Notes if

Stream defaulted.

On remand, in September 2022, the Delaware Chancery Court ordered the parties to

unwind the Omnibus Agreement but confirmed that Hawk's and SLS's rights remained intact.

---

[6] On November 10, 2021, the Delaware Chancery Court issued an Order Entering Partial Final Judgment
Under Rule 54(b) (the "Partial Final Judgment Order"), effectively making the rulings in the Summary
Judgment Order final in order to permit appeal, finding that even though SeeCubic's conversion claim
remained unresolved, there was "no risk that after addressing [whether the Omnibus Agreement was
valid] on appeal, the Delaware Supreme Court might have to revisit the same issue in an appeal from a
final trial-level adjudication." *See* First Day Declaration, at Exhibit X.

In its opinion, the Court held that because the Omnibus Agreement did not validly transfer legal

title of Stream's assets to SeeCubic and that SeeCubic would be required to transfer back to

Stream the equity placed in the operating subsidiary, Technovative.

### 5.        Stream's Prior Bankruptcies

While the Omnibus Agreement litigation was playing out, on February 24, 2021, Stream

filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the

District of Delaware (the "Delaware Bankruptcy Court").  On May 17, 2021, the Delaware

Bankruptcy Court dismissed the case as a bad faith filing.  After dismissal, on May 23, 2021,

three of Stream's purported unsecured creditors, including Rembrandt, filed an involuntary

Chapter 7 bankruptcy petition against Stream.  On June 10, 2021, the Delaware Bankruptcy

Court again dismissed the involuntary bankruptcy action as a bad faith filing, and imposed a

twelve-month bar on Stream re-filing for bankruptcy.

### 6.        Mr. Rajan's Formation of VSI

Mr. Rajan formed Visual Semiconductor, Inc. ("VSI") in 2022, purportedly as a vehicle

to raise new capital and support Stream.  Upon formation, Mr. Rajan was the CEO of VSI.  Mr.

Rajan and members of his family are minority economic shareholders in VSI but have the

majority of voting stock.

### 7.        The Proxy Notice, Marshaling Directive and Section 225 Action

On October 17, 2022, after ownership of the Technovative shares was transferred to

Stream, in furtherance of the unwinding of the Omnibus Agreement, Hawk issued a Proxy

Notice, purportedly pursuant to its rights under the Hawk Notes, to remove Mr. Rajan as the sole

director of Technovative and replace him with Mr. Stastney. Hawk further directed Stream to

marshal its collateral to prepare for a sale under the Uniform Commercial Code in order to

satisfy the outstanding indebtedness (the "Marshaling Directive"). Stream refused to comply with the Proxy Notice and Marshaling Directive, arguing that it had converted Hawk's secured debt to Stream equity pursuant to the Hawk Conversion Agreement, and therefore Hawk no longer possessed secured creditor rights pursuant to which it could issue the Proxy Notice or the Marshaling Directive.

On the same date, Hawk responded by filing the Section 225 Action to resolve whether Hawk validly appointed Mr. Stastney as the sole director of Technovative as of October 17, 2022. On October 20, 2022, the Delaware Chancery Court entered an order providing that, pending resolution of the Section 225 Action, Technovative was to operate according to the status quo, and by separate order, appointing a receiver to operate Technovative on a day-to-day basis (the "Receiver").

On November 13, 2022, Hawk moved for summary judgment in the Section 225 Action on the issue of whether Stream defaulted under the Hawk Notes. On November 29, 2022, the Delaware Chancery Court issued a decision finding that, notwithstanding the Supreme Court Opinion's reversal of the legal determination that the Omnibus Agreement was valid, the underlying factual findings were undisturbed, such that Stream was collaterally estopped from challenging whether (1) the Notes are valid and binding obligations of Stream; (2) Stream is in default under the Notes; (3) Hawk may exercise the "Secured Creditor Rights" under the Notes, including issuance of the Proxy Notice; (4) as of November 10, 2021, the Hawk Notes had not been converted or satisfied; and (5) any conversion of the Hawk Notes must be supported by new money, which had not occurred as of November 10, 2021 (the "Collateral Estoppel Opinion").

Trial in the Section 225 Action was scheduled to commence on March 23, 2023, but was stayed by the filing of the Debtors' instant bankruptcy petitions.

B.      **Debtors' Pending Bankruptcy Cases**

1.      **The Filing of the Petitions**

The Debtors each filed voluntary bankruptcy petitions (each, a "Petition" and together, the "Petitions") under chapter 11 of the Bankruptcy Code on March 15, 2023.[7]  Notwithstanding the dispute to be litigated over who is the rightful director of Technovative, Mr. Rajan signed both Stream's Petition and Technovative's Petition as Director.[8]  The Corporate Resolutions attached to each of the Petitions identified Mr. Rajan as a Director, Secretary and Chief Executive Officer of Stream and Technovative, respectively, and he executed the Corporate Resolutions as Secretary of each entity.

Attached to Stream's Petition was Official Form 204, setting forth a list of its 20 largest non-insider unsecured creditors.  Those creditors held purported claims totaling over $14 million.[9]  Attached to Technovative's petition was its Official Form 204, which listed only Rembrandt, with a claim purported claim of $10,000,000.00.

2.      **Hawk's Stay Relief Motion**

Less than one week after the Petitions were filed, on March 20, 2023, Hawk filed the Hawk Stay Relief Motion.  Hawk seeks relief from stay to proceed with the Section 225 Action against the Debtors in the Delaware Chancery Court.  Hawk argues the Section 225 Action was

---

[7] Bankr. Docket No. 1; Bankr. Case No. 23-17064, Docket No. 1.

[8] On May 4, 2023, Stream filed an amended bankruptcy Petition, executed by Mr. Rajan as CEO and Director.  Bankr. Docket No. 186.  The amended Petition made two changes to the initial Petition.  First, it responded in the affirmative to Question 12, asking whether the debtor owns or has possession of any real property or personal property that needs immediate attention, and by attachment references the Bonding Equipment (defined *infra*) located in China.  Second, in response to Question 15 regarding its estimated assets, it reduced the range of value from $500,000,001-$1 billion to $100,000,001-$500,000,000.

[9] On April 12, 2023, the Office of the United States Trustee (the "U.S. Trustee") filed a statement stating that an unsecured creditors' committee had not been appointed due to lack of response from unsecured creditors regarding serving on a committee.  Bankr. Docket No. 100.

days away from trial when the Petitions were filed, and the Delaware Chancery Court is already intimately familiar with the dispute between Hawk and the Debtors and the governing Delaware law. Hawk asserts that the Section 225 Action will resolve issues of state law that, while fundamental to the Debtors' bankruptcy cases, are most efficiently and appropriately resolved by the Delaware Chancery Court, including (i) who was the rightful director of Technovative pre-petition, and therefore whether Technovative's bankruptcy filing was authorized (the "Technovative Director Issue"), and (ii) whether Stream's secured debt to Hawk was converted to equity pre-petition (the "Debt Conversion Issue").[10]

On April 5, 2023, the Debtors objected to the Hawk Stay Relief Motion (the "Debtors' Stay Relief Objection").[11] The Debtors argue that Hawk's purpose in prosecuting the Section 225 Action is to obtain a declaration that it can exercise rights as a purported secured creditor of Technovative, enabling it to conduct a sale of Technovative's assets under Article 9 of the Uniform Commercial Code (and "Article 9 Sale"). The Debtors argue that even if Hawk were to obtain such a declaration, it would be prohibited by the automatic stay from exercising any such rights absent further stay relief, and that such a sale would eviscerate the Debtors' primary assets, consisting of intellectual property held by their subsidiaries. Rembrandt filed a joinder to the Debtors' Stay Relief Objection.[12]

On April 14, 2023, the Court held an initial hearing on the Hawk Stay Relief Motion and

---

[10] Hawk argues that rulings by the Delaware Chancery Court will "result in a complete resolution of issues surrounding (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any current defense to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes," which Hawk asserts are "all critical to the resolution of these Chapter 11 cases." Hawk Stay Relief Motion, at 21.

[11] Bankr. Docket No. 78.

[12] Bankr. Docket No. 101.

determined that disputed facts would require an evidentiary trial.  That trial (the "Trial") was initially scheduled to commence on May 22, but was then rescheduled to June 26.

### 3.    Debtors' Stay Violation Motion

On March 28, 2023, the Debtors filed an emergency motion seeking enforcement of the automatic stay (the "Stay Violation Motion")[13] and imposition of related sanctions against SeeCubic and SCBV, as well as certain entities and individuals purportedly acting on their behalf (the "SeeCubic Parties").  In general, the Debtors asserted that SeeCubic and SCBV were exercising possession and/or control over certain bonding equipment (the "Bonding Equipment") of the Debtors located at a warehouse in China, which the Debtors asserted was essential to their ability to receive client orders and commence production of their Ultra-D products.  The Stay Violation Motion asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were interfering with the Debtors' repossession and relocation of the Bonding Equipment, in violation of the automatic stay and the Delaware Supreme Court's decision directing the unwinding of the Omnibus Agreement.  The Stay Violation Motion also asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were exercising possession and control over other Stream assets (the "Other Stream Assets"), including Ultra-D demonstrator samples, engineering assets, laptops, and intellectual property and software, in violation of the automatic stay.

On April 5, 2023, the Debtors filed an amended stay violation motion (the "Amended Stay Violation Motion").[14]  In addition to their assertions regarding SeeCubic and SCBV's interference with and control over the Bonding Equipment and Other Stream Assets, the Debtors asserted that Mr. Stastney, SLS, SeeCubic, and Hawk had initiated proceedings in Amsterdam

---

[13] Bankr. Docket No. 49.

[14] Bankr. Docket No. 76.

"to take certain measures preventing Debtors from managing its subsidiaries." The Debtors sought a directive from the Court that the SeeCubic Parties' possession and control over the Bonding Equipment and Other Stream Assets was to cease, and such estate property was to be turned over to the Debtors.[15]

On April 7, 2023, Debtors filed a supplement to the Amended Stay Violation Motion (the "Stay Violation Supplement"),[16] asserting that Mr. Stastney, SLS, SeeCubic, and Hawk had filed a joint legal action (the "Amsterdam Action"), apparently different from the summary proceeding described in the Amended Stay Violation Motion, seeking the removal of Mr. Rajan as a director and CEO of Stream's Dutch subsidiaries, in further violation of the automatic stay.

On April 12, 2023, SeeCubic objected to the Stay Violation Motion and the Amended Stay Violation Motion,[17] asserting that the Bonding Equipment and Other Stream Assets were not property of Debtors' estates, and even if they are, mere possession did not constitute violation of the automatic stay because it does not apply to the non-debtor Dutch subsidiaries. Hawk filed a joinder in support of SeeCubic's objection.[18]

The Court held an initial hearing on the Stay Violation Motion on April 14, 2023. With respect to the portions of that motion related to the Other Stream Assets and the Amsterdam Action, the Court reserved ruling pending additional information and evidence.[19] With respect to the Bonding Equipment, on July 13, 2023, the Court entered an order appointing my colleague,

---

[15] The Amended Stay Violation Motion did not seek specific relief with respect to the Amsterdam proceedings that were assumedly the reason for the amendment.

[16] Bankr. Docket No. 90.

[17] Bankr. Docket No. 105.

[18] Bankr. Docket No. 106.

[19] The Debtors followed with another emergency motion on April 18, 2023, seeking withdrawal of the Amsterdam Action in advance of a scheduled April 20 hearing in the Netherlands. Bankr. Docket No. 125. The Amsterdam court, however, thereafter postponed the scheduled hearing.

Judge Mayer, to mediate that dispute.[20]  To the Court's knowledge, this dispute remains in mediation.

### 4.    Hawk's Section 1112/1104 Motion

On April 6, 2023, Hawk filed the Section 1112/1104 Motion.  As noted *supra* and discussed in greater detail *infra,* the motion seeks either conversion or dismissal of the Debtors' bankruptcy cases pursuant to §1112(b) of the Bankruptcy Code, or alternatively, the appointment of a chapter 11 trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the Bankruptcy Code.

With respect to conversion or dismissal, Hawk argues that there are three statutorily-grounded bases for converting or dismissing the cases under §1112(b) of the Bankruptcy Code.  First, Hawk argues there has been substantial and continuing loss to the Debtors' bankruptcy estates without likelihood of rehabilitation, as contemplated by §1112(b)(4)(A).  Second, Hawk argues there has been gross mismanagement of the estates, as contemplated by §1112(b)(4)(B).  Third, Hawk argues the Debtors have engaged in the unauthorized use of cash collateral, as contemplated by §1112(b)(4)(D).[21]  In addition to these statutory grounds for finding cause to convert or dismiss, Hawk argues the Debtors lacked good faith in filing their bankruptcy cases, providing an alternate grounds for dismissal under §1112(b).  Finally, Hawk argues that Technovative's bankruptcy filing was unauthorized because Mr. Rajan was replaced as a director of Technovative prior to its Petition being filed, and therefore could not have authorized the filing on behalf of the entity.  After asserting that multiple grounds exist for conversion or dismissal, Hawk argues in the Section 1112/1104 Motion that the Court should dismiss the

---

[20] Bankr. Docket No. 294.

[21] As discussed *infra,* Hawk did not address the unauthorized use of cash collateral in its post-trial brief, and therefore the Court understands Hawk to no longer be asserting this basis for conversion or dismissal.

Debtors' cases with prejudice, rather than convert them, because it would alleviate any fears of the Debtors refiling, the Debtors are non-operational, and the both conversion and dismissal will likely conclude with the sale of the Debtors' equity in their subsidiaries.[22]

With respect to the appointment of a chapter 11 trustee, Hawk asserts that even if the Court is not inclined to convert or dismiss the Debtors' cases, cause exists to appoint a trustee based on the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of the Debtors' businesses.  Hawk further argues that Mr. Rajan has engaged in self-dealing for the benefit of VSI that has led to irreconcilable acrimony between the Debtors' management and several stakeholders.

On May 8, 2023, the Debtors filed an opposition to the Section 1112/1104 Motion (the "Debtors' Section 1112/1104 Opposition").[23]  Rembrandt also filed an opposition to the Section 1112/1104 Motion (the "Rembrandt Section 1112/1104 Opposition").[24]

As was the case with the Hawk Stay Relief Motion, the Section 1112/1104 Motion was scheduled to be heard at the Trial commencing on May 22, and subsequently rescheduled to June 26.

### 5.    Debtors' Expedited Motion to Approve Employee Obligations

On April 21, 2023, the Debtors filed an expedited motion (the "Employee Obligations

---

[22] As discussed *infra,* since filing the Section 1112/1104 Motion, Hawk's position has evolved, in that it now seeks conversion of the Debtors' cases rather than dismissal.

[23] Bankr. Docket 196.  The Debtors filed an initial response to the Section 1112/1104 Motion on April 10, 2023, *see* Bankr. Docket No. 94, based on and contesting Hawk's request that the motion be heard on an expedited basis.  The Court held an initial hearing on the motion on April 14, 2023, at which time it set a briefing schedule and a trial date.  The Debtors' Section 1112/1104 Opposition was filed in accordance with that briefing schedule.

[24] Bankr. Docket No. 193.

Motion")[25] seeking authority to make certain payments the Debtors characterized as employee obligations.

First, the Debtors sought authority to pay various obligations in connection with the employees of SCBV, including payroll, taxes, paid leave, benefits payments, etc.[26]  According to the motion, there were 28 full-time, salaried employees of SCBV at the time of filing.  The Debtors claimed that there were no pre-petition amounts owing to these employees, but that post-petition payroll was about $180,000 per month.  The motion also sought to pay (a) six independent contractors $193,000 for pre-petition services, as well ongoing post-petition fees of $46,000 per month, (b) post-petition payroll taxes of $149,000 per month, (c) payroll processing fees of $9,000 per month, and (d) pension contributions of $43,000 per month.  The Debtors also sought to pay approximately $20,000 in pre-petition reimbursable business expenses to SCBV employees.

The Employee Obligations Motion, however, sought additional relief unrelated to current employee and independent contractor obligations.  It also sought authority to re-hire nine U.S.-based Stream employees that purportedly left after the Delaware Chancery Court's Omnibus Agreement decision in 2020, and who are now employed by VSI.  In connection with re-hiring them, the Debtors sought to pay those employees approximately $30,000 in pre-petition wages owed (subject to the $15,150 cap on pre-petition wages under §507(a)(4)).  The Debtors also sought to pay certain independent service providers both pre-petition amounts owed, in the amount of approximately $30,000 owed to one provider, and ongoing post-petition amounts of approximately $10,000 per month.  The Debtors further sought to pay the re-hired employees'

---

[25] Bankr. Docket No. 134.

[26] The motion required expedited treatment because the post-petition compensation Debtors sought to pay SCBV employees was coming due just four days later, on April 25.

post-petition payroll taxes of approximately $10,000 to $12,000 per month, as well as the pre-petition payroll taxes owing as necessary, up to $178,000.  The Debtors also sought to reinstate their paid leave program and benefit plans at a cost of approximately $23,000 per month, as well as pay approximately $267,000 in unreimbursed pre-petition business expenses.

In addition to the U.S.-based former Stream employees, the Debtors also sought to re-hire three Taiwan-based Stream employees who purportedly left after the Delaware Chancery Court's 2020 Omnibus Agreement decision as well, and who are also now employed by VSI.  In connection with these former employees, the Debtors sought authority to pay post-petition payroll costs of $7,000 and medical plan costs of about $3,000, but did not believe there were any pre-petition amounts owed.  The Debtors also sought authority to pay approximately $3,000 in unreimbursed pre-petition business expenses.

Finally, the Debtors stated that they had been using 15 independent contractors in China for various services through an entity called ST4M, Inc.  The Debtors sought authority to establish a Beijing-based subsidiary to employ these 15 individuals as full-time employees.  The gross payroll would be approximately $22,000 monthly, and the Debtors would also be required to pay approximately $29,000 quarterly for a state-sponsored health-plan.

As discussed *infra,* the Court held an emergency hearing on the Employee Obligations Motion on April 24, but limited its consideration to whether and what payments to current SCBV employees were needed on an expedited basis.

### 6.    Debtors' Expedited Stock Sale Motion

On the same day that they filed the expedited Employee Obligations Motion, the Debtors filed an expedited motion for authority to sell up to $10 million in unissued shares of Stream's

15

20

Class A common stock to VSI to fund their post-petition operations (the "Stock Sale Motion").[27]

The Stock Sale Motion represented that VSI, formed by Mr. Rajan as a vehicle to raise new

capital for Stream and to support Stream while fighting the transfer of Stream's assets pursuant

to the Omnibus Agreement, had made pre-petition strategic investments in Stream, in addition to

having engaged key Stream employees.  Per the Stock Sale Motion, VSI was prepared to fund

the Debtors' post-petition product development and supply chain, but "as compensation for this

support" Stream had entered into an exclusive distribution agreement (the "Distribution

Agreement") whereby VSI would accept orders from and make delivery to third-party

customers, issue a purchase order to Stream for 90% of the value of the third-party order, and

retain the 10% difference as "margin for funding technical, business, and sales development."

The Debtors represented that VSI would also assist with "productization of electronics," and

asserted that the 10% fee was "industry standard for distribution agreements."

Together with the Debtor's expedited Employee Obligations Motion, the Court held an

emergency hearing on the Stock Sale Motion on April 24, as discussed *infra.*

### 7. Debtors' Emergency Financing Motion and Seecubic's Proposed Alternative Funding

As will be discussed in further detail *infra,* on April 25, 2023, the Debtors filed an

emergency motion for the approval of debtor-in-possession financing from VSI as an alternative

to the proposed sale of stock to VSI, in order to fund the SCBV payroll obligations coming due

the following day.[28]  On the same day, SeeCubic filed an alternative funding motion that would

have compelled SCBV, or alternatively the Debtors, to borrow under an existing line of credit

from SeeCubic that had been put in place while the Receiver was managing Technovative and its

---

[27] Bankr. Docket No. 135.

[28] Bankr. Docket No. 156.

subsidiaries, including SCBV.[29]  Later that day, the Court held an eight-hour emergency hearing

on the alternative funding proposals that ended at approximately 11:00 p.m., after which it

determined that neither proposal would be approved.

### 8. Debtors' Motion to Retain Thomas Park as Chief Financial Officer

On June 14, 2023, the Debtors filed a motion seeking authority to enter into an

employment agreement with Thomas Jung Ho Park ("Mr. Park") as Chief Financial Officer to

the Debtors (the "Park Retention Motion").[30]  The Debtors asserted in the Park Retention Motion

that, given their need to raise capital and the complexity of their businesses and structure of their

debt, it was necessary to have an experienced CFO to support the Debtors' financial operations

and successfully navigate the Debtors' businesses during their Chapter 11 cases and post-

emergence from bankruptcy.  Although the Debtors asserted that their entry into the employment

agreement with Mr. Park was within the ordinary course of their business, and therefore did not

require approval of the Court, after discussions with the United States Trustee the Debtors filed a

revised motion to employ Mr. Park on July 18, 2023.[31]

On July 25, 2023, Hawk filed an objection to the Park Retention Motion. In its objection,

Hawk argued that the Debtors neither provided a basis justifying the need for Mr. Park's

employment nor have the Debtors established that Mr. Park is not a disinterested person for the

purposes of §327 of the Bankruptcy Code. A hearing on the Park Retention Motion was

originally scheduled for August 16, 2023, but has been continued a number of times to allow for

Trial and other more pressing contested matters to go forward.

---

[29] Bankr. Docket No. 155.

[30] Bankr. Docket No. 234.

[31] Bankr. Docket No. 298.

**9.     Debtors' Motion to Continue Trial Due to Mr. Rajan's Hospitalization**

On June 16, 2023, the Debtors filed an expedited motion to continue the Trial on the Hawk Stay Relief Motion and the Section 1112/1104 Motion, scheduled to commence on June 26.[32]  The Debtors represented that Mr. Rajan was hospitalized after suffering a recent injury, and upon his medical provider's instruction, would be unable to participate in or attend Trial, whether remotely or in-person, nor would he be able to attend, remotely or in-person, his deposition.  The Debtors therefore sought a continuation of the commencement of Trial for 45 days to allow Mr. Rajan to recuperate sufficiently to participate.  Hawk objected to the continuation request, citing the prejudice a further delay would cause, and asserting that Mr. Rajan's absence would not affect the outcome to the extent the pending motions entailed strictly legal issues, as opposed to factual issues requiring testimony from Mr. Rajan.   On June 21, 2023, the Court held an expedited hearing on the Debtors' continuance request, at which time it determined that Trial would proceed on June 26 to allow the parties to commence with the presentation of evidence, but that Trial would need to be continued to allow Mr. Rajan to recuperate sufficiently to be deposed and testify.

Trial then commenced from June 26 to June 29, and was subsequently continued on August 15 and 17, and again on September 22 and 25, to permit Mr. Rajan's recuperation and participation.

**10.     Debtors' Amendment to Stock Sale Motion**

On June 23, 2023, the Debtors filed an amendment to their Stock Sale Motion (the "Stock Sale Motion Amendment").[33]  The Debtors informed the Court that they had continued to

---

[32] Bankr. Docket No. 236.

[33] Bankr. Docket No. 258.

18

explore the sale of Class A common stock of Stream to third parties, one of which was a Chinese company named Zhongsheng Group Holdings Ltd. ("Zhongsheng"). As a result, the Debtors had entered into a non-binding term sheet with Zhongsheng on June 6, 2023 (the "Zhongsheng Term Sheet"), pursuant to which Zhongsheng would invest $300 million in Stream through the purchase of Stream Class A shares.

As discussed in further detail *infra*, a wave of motion practice followed the Stock Sale Motion Amendment, and it later became one of the primary issues in the Trial.

### 11. Debtors' Adversary Proceeding and TRO Motion

On August 12, 2023, with the resumption of Trial days away and in the midst of contested hearings regarding discovery over the Zhongsheng Term Sheet, the Debtors filed an adversary action ( the "Adversary Action") against a host of parties, including, among others, Hawk, SLS, SeeCubic, and Mr. Stastney (collectively, the "Defendants").[34] In their Complaint in the Adversary Action, the Debtors allege that the Defendants have engaged in an effort to (a) sabotage the Debtors' exercise of certain debt-to-equity conversion rights held against the secured debtholders, (b) vitiate the Debtors' recapitalization, which would have rendered certain Defendants' debt instruments obsolete; (c) restrict and/or interfere with the Debtors' ability to raise funds and sell products, and (d) use their status as secured lenders to deny Stream the assets and other business resources essential to its successful reorganization.

On September 1, 2023, the Debtors filed a motion in the United States District Court for the Eastern District of Pennsylvania (the "District Court") to withdraw reference of the Adversary Action from this Court.[35] The Debtors followed that on September 28, 2023 with an

---

[34] Bankr. Docket No. 335; Adv. Pro. Docket No. 1.

[35] On November 16, 2023, the District Court denied the Debtors' request to withdraw the reference. *See* Case No. 23-mc-135, at Docket No. 18.

emergency motion in the District Court (the "TRO Motion") for a temporary restraining order, preliminary injunction, and permanent injunction.  The District Court denied the motion on the grounds that it was not properly filed in the District Court absent withdrawal of the reference of the Adversary Action.  Therefore on September 30, 2023, the Debtors refiled the TRO Motion in the Adversary Action before this Court.[36]

By the TRO Motion, the Debtors assert that Mr. Stastney testified in mid-September in the Amsterdam Action, during which he admitted that SeeCubic is in direct competition with Stream, and is currently working with twelve or thirteen customers using the Ultra-D technology developed by Stream.  Stream alleges that this action by SeeCubic puts its technology licenses with Philips and Rembrandt at risk because they strictly prohibit sub-licensing.  The Debtors further argue that SeeCubic's unauthorized use of the Philips and Rembrandt technology, as embedded in Stream's technology, violates the Philips and Rembrandt licenses and presents the potential of irreparable harm to Stream should Philips and Rembrandt decide to revoke their respective licenses.

The Court held a contested evidentiary hearing on the TRO Motion over the course of multiple days in October and November, after which the Court provided the parties certain dates in December that were available for the conclusion of the hearing, and directed that they confer regarding their mutual availability.  The parties thereafter advised the Court that they had agreed to postpone continuation of the TRO hearing, as well as multiple other matters that were scheduled for hearing in December, until late January or early February to pursue settlement discussions.  On December 14, the Court held a status hearing with the parties to discuss the impact of the proposed continuation on the status of the TRO hearing.  The Court determined

---

[36] Adv. Pro. Docket No. 27.

that the entry of a limited temporary restraining order was warranted, based strictly on the

evidence presented at the TRO hearing to that point and in light of the lengthy delay that

continuation of the hearing would cause to the Court's final resolution of the matter.  The Court

directed Debtors' counsel to prepare an agreed form of order reflecting the Court's ruling at the

status hearing.  Indicative of the acrimony that has stalled progress in this case at nearly every

turn, the parties subsequently advised the Court that they were unable to reach agreement

regarding the terms of a proposed order.  The Court therefore prepared an Order consistent with

its ruling at the December 14 status hearing, which was entered on January 4, 2024.[37]

### 12.    Trial on the Pending Motions

Commencing on June 26, the Court held Trial over eight days, concluding on September

25.  During the Trial, the Court heard testimony from Mr. Stastney, Mr. Park, Mr. Rajan, and

Christopher Michaels of Rembrandt.  Approximately 130 exhibits were admitted into evidence.[38]

### 13.    The Parties' Positions After Trial

At the Court's direction, Hawk, the Debtors, and Rembrandt submitted post-trial briefs

(each a "Post-Trial Brief") setting forth their positions in light of the evidence presented at

Trial.[39]

### a.    The Section 1112/1104 Motion

---

[37] Adv. Pro. Docket No. 119.

[38] The transcripts of the Trial span nearly 2,000 pages, which is merely a fraction of the pages of transcripts that have accumulated from all of the contested hearings the Court has had to hold in these cases.

[39] Although Rembrandt submitted post-trial briefing in opposition to the two pending motions, the arguments therein relate largely to Rembrandt's history with the Debtors and its position with respect to the Rembrandt license.  Although the Rembrandt license is a central feature of these cases, it does not factor into the Court's analysis below regarding whether conversion, dismissal, or appointment of a trustee is warranted and whether cause exists to grant Hawk stay relief for resolution of the Technovative Director Issue and the Debt Conversion Issue.  The Court therefore will not summarize Rembrandt's arguments here.

Hawk argues that the Court should order conversion of the Debtors' cases to chapter 7 for any of three independent reasons.[40]

First, Hawk argues that the evidence established that conversion is warranted under §1112(b)(4)(A), based on the substantial or continuing losses to the Debtors' estates and no reasonable prospect at rehabilitation.[41]  According to Hawk, the record evidence established that the Debtors are incurring substantial losses during the pendency of these cases in the form of accruing administrative expenses and post-petition payment obligations to Rembrandt, without any offsetting revenue, and have no reasonable likelihood of rehabilitation because they have never had any operations, as all of the value lies in their non-debtor operating subsidiaries (and to the extent Mr. Rajan testified regarding the Debtors' operations, these are actually taking place at the VSI level).

Next, Hawk argues that the evidence established conversion is warranted under §1112(b)(4)(B), based on the Debtors' gross mismanagement of the estates.[42]  Hawk argues that the evidence at Trial established the Debtors' gross mismanagement in a number of ways: (a) Mr. Rajan's breach of his fiduciary duties and conflicts of interest; (b) the Debtors' lack of

---

[40] In its Post-Trial Brief, Bankr. Docket No. 431, Hawk does not address its argument in the Section 1112/1104 Motion that conversion or dismissal is warranted under §1112(b)(4)(D), based on the Debtors' unauthorized use of cash collateral.  *See* Hawk Post-Trial Brief, at 42 (arguing that there are three bases under §1112(b) under which the Court can order conversion here: (i) substantial or continuing loss or diminution of the estate and absence of reasonable likelihood of rehabilitation under §1112(b)(4)(A); (b) gross mismanagement of the estate under §1112(b)(4)(B); and (c) lack of good faith in filing the Petitions).  In its Post-Trial Reply Brief, Bankr. Docket No. 436, Hawk acknowledges that it has not identified any cash collateral the Debtors used without permission, but attributes that to the Debtors' failure to adhere to their financial reporting and disclosure obligations.  *Id.* at 14. While the Court is not clear that Hawk is even advancing this basis for conversion or dismissal given its omission from the Hawk Post-Trial Brief, Hawk's concession in its reply brief seems to end the inquiry, and the Court therefore does not address it further herein.

[41] Hawk Post-Trial Brief, at 44-47.

[42] *Id.* at 48-57.

candor to the Court and interested parties; (c) the Debtors' "blatant gamesmanship" in their requests for relief in this Court and the litigation that has ensued; and (d) likely fraud in the fabrication of a purported funding transaction.

Finally, Hawk argues that the evidence established conversion is warranted based on the Debtors' bad faith in commencing these cases.[43]  Hawk argues that the timing of the Debtors' Petitions alone establishes *per se* bad faith because they were filed on the eve of trial in the Section 225 Action as a bad faith litigation tactic.  Hawk further argues that under the totality of the circumstances test used in the Third Circuit, twelve of the fourteen factors used support a finding of bad faith.

Hawk argues that conversion of the Debtors' cases, rather than dismissal, is warranted so that the Court may continue to oversee them but curtail Mr. Rajan's influence in administering them.[44]  Barring conversion, Hawk argues that dismissal is appropriate because the existence of cause has been established under §1112.  If, however, the Court is not inclined to either convert or dismiss, Hawk argues the evidence establishes that appointment of a trustee is proper based on Mr. Rajan's pattern of fraud and dishonesty in managing the Debtors, his gross mismanagement not only of the estates, but also of the pre-petition Debtors, and the conflicts of interest between Mr. Rajan and his roles with and interests in the Debtors and VSI that have revealed themselves through the administration of these cases.[45]  Hawk argues that the costs of appointing a trustee "are effectively nil" because Mr. Rajan's administration of the estates to date has been so

---

[43] *Id.* at 57-61.

[44] *Id.* at 62.  The Court notes Hawk's request for conversion rather than dismissal represents a change from its preference for dismissal with prejudice as stated in the Section 1112/1104 Motion, but is consistent with the evolved position Hawk took in its pre-trial brief filed in May.  *See* Bankr. Docket No. 195, at ¶¶23 to 42.

[45] *Id.* at 64-67.

harmful to creditors' prospects for recovery.

The Debtors argue that Hawk has failed to establish by a preponderance of the evidence that cause exists for conversion, dismissal, or the appointment of a trustee.[46]

First, the Debtors argue the evidence does not establish the absence of a reasonable likelihood of rehabilitation.  The Debtors assert that their proposed plan of reorganization,[47] the post-petition purchase orders they have procured, and Mr. Rajan's testimony at Trial regarding expected revenues to be generated from new and existing Stream customers belie Hawk's narrative of a non-operating entity that has no ability to rehabilitate.[48]  Moreover, the Debtors argue, the evidence does not establish substantial or continuing loss to the estates because operating expenses are being funded by VSI in exchange for Stream shares.[49]

The Debtors also argue that the evidence does not establish gross mismanagement of the estates supporting conversion or dismissal.  The Debtors assert that their efforts to obtain financing from VSI to fund operations pursuant to the Debtor DIP Motion were the subject of "extreme resistance" that ultimately resulted in the Court declining to approve the financing, and that they have retained Mr. Park to provide independent oversight of the Debtors' post-petition finances and internal systems, thereby buffering management of the estates with "another layer of independence to the Debtors' management team."[50]

With respect to Hawk's argument that the Petitions were filed in bad faith, thereby providing another basis for conversion or dismissal, the Debtors argue that the cases were filed to

---

[46] Debtors Post-Trial Brief, Bankr. Docket No. 432, at 2-3.

[47] *See* Bankr. Docket No. 293.

[48] Debtors Post-Trial Brief, at 11-16.

[49] *Id.* at 17-19.

[50] *Id.* at 19-21.

provide breathing room and to develop a plan of reorganization, not as a litigation tactic solely for purposes of staying the Section 225 Action.[51]

Just as they argue there is no basis for conversion or dismissal, the Debtors argue there is no basis for the appointment of a trustee. The Debtors cite Mr. Rajan's experience as a businessman, his intimate familiarity with the Debtors' business and related technology, and the post-petition retention of Mr. Park as reasons for finding that the Debtors' estates are better administered by current management.[52]

### b.    The Hawk Stay Relief Motion

Hawk argues that cause exists to grant relief from stay to allow the Section 225 Action to proceed because its resolution "will determine: (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any available defense(s) to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes – all critical to the resolution of these Chapter 11 cases."[53] Relying on Mr. Stastney's Trial testimony regarding the late stage at which the Section 225 Action was when the Petitions were filed, the expenses that had been incurred getting to that point, and the extensive discovery that had been undertaken, Hawk argues that a quick resolution by the Delaware Chancery Court would be efficient and conserve judicial and estate resources.

The Debtors, in response, argue that relief from stay is not warranted. The Debtors first argue that Hawk has failed to articulate the exact relief and specific matters that it seeks to

---

[51] *Id.* at 22-26 (arguing that "virtually none" of the factors set forth in *Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.),* 272 B.R. 554, 557 (D.De. 2002) for analyzing whether a filing was in bad faith are present here).

[52] *Id.* at 27.

[53] Hawk Post-Trial Brief, at 62-63.

pursue in the Section 225 Action.[54]  Furthermore, they argue, the ultimate relief sought in that

action is to authorize Hawk to exercise rights under the Hawk Notes and the SLS Notes,

including pursuit of an Article 9 Sale of their purported collateral.[55]  Hawk cannot do so, the

Debtors argue, without resolution of the dispute regarding Stream's rights in connection with

ownership of 100% of Technovative shares, which are undisputedly estate property and therefore

subject to resolution by this Court rather than the Delaware Chancery Court.[56]  The Debtors

further argue that allowing the Section 225 Action to proceed would greatly prejudice the

Debtors by allowing Hawk to move forward with its plans to effectuate a sale of downstream

assets, thereby inflicting irreparable harm on the Debtors' ability to effectuate an orderly

reorganization process.  The Debtors also argue that they have strong defenses in the Section 225

Action, militating against relief.

## III.    DISCUSSION

### A.    Cause Exists and It Is In the Best Interest of Creditors and the Estates at This Stage to Appoint a Chapter 11 Trustee

#### 1.    Legal Standard for Dismissal or Conversion Under §1112(b)

Section 1112(b)(1) of the Bankruptcy Code sets forth the Court's power to convert or

dismiss a chapter 11 bankruptcy case:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest,
> and after notice and a hearing, the court shall convert a case under this chapter to a case
> under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of
> creditors and the estate, for cause unless the court determines that the appointment under
> section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. §1112(b).  The movant bears the initial burden to demonstrate cause by a

---

[54] Debtors Post-Trial Brief, at 28.

[55] *Id.*

[56] *Id.* at 29.

preponderance of the evidence, and once shown, the burden shifts to the debtor to establish an

exception under §1112(b)(2).[57]  *In re Dr. R.C. Samanta Roy Institute of Science Technology,* 465

Fed. Appx. 93, 96-97 (3d Cir. 2011) ("[O]nce cause is found, the burden shifts to the opposing

party to show why dismissal or conversion would not be in the best interests of the estate and the

creditors."); *In re Mann Realty Assocs.,* 2019 WL 4780937, at *6 (M.D. Pa. Sept. 30, 2019)

("After cause is established, the burden shifts to the opposing party to identify unusual

circumstances that suggest conversion would not be in the best interests of the estate and its

creditors, and that there is a reasonable likelihood that a reorganization plan will be confirmed in

a reasonable time.");  *In re Vascular Access Centers, L.P.,* 611 B.R. 742, 761 (Bankr. E.D. Pa.

2020) (citing cases).

The Bankruptcy Code sets forth a non-exclusive list of circumstances that constitute

"cause" for conversion or dismissal.  11 U.S.C. §1112(b)(4).  As discussed *supra,* Hawk's Post-

Trial Brief focuses on two of these circumstances: (A) substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (B)

gross mismanagement of the estate.

A motion filed under §1112(b) necessitates a two-step analysis: (1) to determine if cause

exists to either dismiss the case or convert it to chapter 7, and (2) if so, which option is in the

best interests of creditors and the estate (unless appointment of a trustee under §1104 is in the

best interests).  *Camden Ordnance*, 245 B.R. at 798.  In considering whether to convert or

---

[57] Section 1112(b)(2) provides that the court may not convert or dismiss a case if the court finds and
identifies unusual circumstances establishing that converting or dismissing the case is not in the best
interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable
likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or,
if not applicable, within a reasonable period and (2) the grounds for converting or dismissing the case
include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a
reasonable justification for the act or omission; and that will be cured within a reasonable period of time
fixed by the court.

dismiss, a bankruptcy court may consider a variety of factors, including:

(1)     whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

(2)     whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

(3)     whether the debtor would simply file a further case upon dismissal;

(4)     the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

(5)     in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

(6)     whether any remaining issues would be better resolved outside the bankruptcy forum;

(7)     whether the estate consists of a "single asset";

(8)     whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

(9)     whether a plan has been confirmed and whether any property remains in the estate to be administered;

(10)    whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

(11)    consideration of the effect of dismissal under §349 of the Bankruptcy Code.

*In re Ramreddy, Inc.,* 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009) (citing 7 COLLIER ON

BANKRUPTCY ¶1112.04[6]).

Although §1112(b)(4)'s enumerated circumstances constituting cause are wide-ranging, a

court may consider other factors as they arise and may use its equitable powers to reach an

appropriate result in individual cases.  *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.,* 245

B.R. 794, 798 (E.D. Pa. 2000) (quoting *Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D.

Pa. 1991)).  For example, it is well-settled that a debtor's inability to achieve confirmation of a

28

plan, by itself, provides sufficient cause for dismissal or conversion of a chapter 11 case. *See,
e.g., 1121 Pier Village LLC,* 635 B.R. at 137 n.14; *In re 3 Ram, Inc.,* 343 B.R. 113, 117 n.14
(Bankr. E.D. Pa. 2006).

     Importantly, good faith is an implicit requirement in the filing of a chapter 11 bankruptcy
case, and a case not filed in good faith is subject to dismissal under §1112(b). *See, e.g., In re
SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999) (chapter 11 petitions are subject to
dismissal unless filed in good faith); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661
(Bankr. E.D. Pa. 2009) (citing *SGL Carbon*).  The debtor bears the burden of proving good faith.
*Id.* (citing *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir. 2003)).  In the business
bankruptcy context, the preservation and rehabilitation of a going concern or the maximizing of
the value of a debtor's estate for the benefit of creditors through an orderly liquidation are valid
bankruptcy purposes supporting a finding of good faith.  *Id.* (citing *In re Integrated Telecom
Express, Inc.,* 384 F.3d 108 (3d Cir. 2004)); *In re Team Systems International LLC,* 640 B.R.
296, 311 (Bankr. D. Del. 2022) ("The ultimate touchstone is whether the case is being used to
accomplish one of the basic purposes of chapter 11 – to preserve a going concern and/or to
maximize the property available to satisfy creditor claims.").  Whether a case should be
dismissed for lack of good faith is committed to the discretion of the bankruptcy court, and the
determination is a fact-intensive inquiry based on the totality of the circumstances.  *Id.* at 662
(citing *Integrated Telecom*).  The inquiry is facilitated, however, by factors courts use, the
presence of which suggests a case was not filed in good faith:

    (1)    the debtor has few or no unsecured creditors;

    (2)    there has been a previous bankruptcy petition by the debtor or a related entity;

    (3)    the prepetition conduct of the debtor has been improper;

(4)     the petition effectively allows the debtor to evade court orders;

(5)     there are few debts to non-moving creditors;

(6)     the petition was filed on the eve of foreclosure;

(7)     the foreclosed property is the sole or major asset of the debtor;

(8)     the debtor has no ongoing business or employees;

(9)     there is no possibility of reorganization;

(10)    the debtor's income is not sufficient to operate;

(11)    there was no pressure from non-moving creditors;

(12)    reorganization essentially involves the resolution of a two-party dispute;

(13)    a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14)    the debtor filed solely to create the automatic stay.

*Id.* (citing *In re SB Properties, Inc.,* 185 B.R. 198, 204 (E.D. Pa. 1995)).

As discussed *supra,* the preservation and rehabilitation of a going concern is a valid bankruptcy purpose supporting a finding of good faith, and the determination of whether a case should be dismissed for lack of good faith is a fact-intensive inquiry based on the totality of circumstances.

  **2.**  **It Has Been Established by a Preponderance of the Evidence and the History of These Cases that Current Management's Actions and Inactions Constitute Gross Mismanagement of the Estates**

Section 1112(b)(4)(B) provides that cause for conversion or dismissal exists where there has been gross mismanagement of the estate.  11 U.S.C. §1112(b)(4)(B).  A debtor-in-possession owes a fiduciary duty to its creditors, and gross mismanagement is a breach of that duty.  *In re Ozcelebi,* 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022).  Section 1112(b)(4)(B) focuses on the conduct of the *estate's* affairs, not the pre-petition debtor's, and requires that the mismanagement

be gross in character, meaning that it is "'glaringly noticeable usually because of inexcusable badness or objectionableness.'" *In re 210 West Liberty Holdings, LLC,* 2009 WL 1522047, at *5 (Bankr. N.D. W.Va. May 29, 2009) (citing *Webster's Ninth New Collegiate Dictionary* 538 (1991)); see also *Ozcelebi,* 639 B.R. at 388 ("[W]hile 'gross mismanagement' is not defined by the Bankruptcy Code, Black's Law Dictionary defines 'gross' as 'beyond all reasonable measure; flagrant.' Given the plain language, a debtor's mismanagement must be beyond all reasonable measure.").

The above summary outlining the major activity in these cases, which have been pending for months, evidences the acrimony and overall lack of progress that has plagued these cases from their inception. Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtors' operations moving forward, these cases have stalled at virtually every turn. The Court has expressed its concern with the cases' lack of progress and direction on multiple occasions. Furthermore, the evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtors' cases to date, *i.e.,* the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management. There are many examples, large and small, that highlight (a) the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court, (b) the relatively directionless nature of these cases to date, and (c) the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date. The Court discusses the most glaring examples below.

### a. All Indications Are That the Purported $300 Million Transaction with Zhongsheng Was Not Real

From the early days of these cases, the Court repeatedly raised concerns about how the Debtors were being funded. Although the Debtors attempted to answer that question in part with an ill-conceived emergency financing through the sale of stock to VSI, they later proposed a $300 million transaction for the sale of Stream Class A stock to Zhongsheng. That transaction was suspect from the start given its timing on the eve of Trial, lack of detail, and non-binding nature, but the dearth and opacity of information the Debtors provided about it at Trial when pressed, together with their abandonment of the proposed transaction, leads this Court to believe it never truly existed, and either embellished or fabricated to portray the Debtors' cases and operations as sufficiently progressing.

The Debtors filed the purported Zhongsheng Term Sheet on the evening of June 23, i.e., the Friday prior to the start of the Trial on the pending Hawk Motions.[58] That term sheet, which states that it is non-binding, provides that Zhongsheng will invest $300 million in exchange for Class A Common Stock in Stream, resulting in Zhongsheng holding a 35% equity stake in Stream.[59] Attached to the Term Sheet was a draft Subscription Agreement providing for Zhongsheng's purchase of the Stream shares, with an initial $15 million tranche to be sold by an unspecified date in July 2023, and the balance of the sale to occur by December 31, 2023. According to the Debtors, they intended to use the first $30 million received from the sale of

---

[58] The Term Sheet was filed as an attachment to a two-page pleading styled as an amendment to the Stock Sale Motion. Incredibly to the Court, the Debtors stated their position therein that they believed the relief sought by the Stock Sale Motion was broad enough to cover the sale of $300 million in Stream shares to Zhongsheng, but were filing the amendment out of an abundance of caution. The Court questions whether the post-petition sale of $300 million in equity in a debtor could ever be covered under an ordinary course of business concept, but it is enough to say that it certainly is not here.

[59] *See* Bankr. Docket No. 258-1.

Stream's Class A shares to fund their operations through confirmation. As such, the Zhongsheng transaction was to fund the Debtors through the issuance of Stream securities rather than the incurrence of debt.

The authenticity of this transaction, however, quickly began to grow murky, particularly in light of the amount of the purported investment and its importance to the Debtors' cases. Mr. Park testified at Trial less than a week later, on June 29, that he understood Zhongsheng to be a publicly traded entity on Hong Kong's Hang Seng Index, involved in the high-end auto dealership business but with a finance arm as well.[60] Mr. Park wanted to make clear, however, that he was not involved in any negotiations with Zhongsheng related to the Term Sheet, despite serving as CFO and being tasked with raising capital for the Debtors. Instead, the negotiations were handled by Mr. Rajan, and Mr. Park had not discussed the proposed deal with Mr. Rajan notwithstanding its enormous size and implications for the Debtors' finances.[61]

Following Mr. Park's testimony, Hawk sought more information about the Zhongsheng Term Sheet through discovery, and ultimately filed a motion to compel the Debtors to produce information sufficient to permit Hawk to depose a Zhongsheng representative about the purported transaction (the "Motion to Compel").[62] By the Motion to Compel, Hawk made clear that it sought the information in order to, among other things, "evaluate the veracity of the Term Sheet."[63] Although the Court denied the Motion to Compel, it entered an order (the "Discovery

---

[60] June 29, 2020 Hearing Transcript, 55:5 to 55:15.

[61] *Id.* at 55:21 to 56:9. The idea that Mr. Park, as CFO, would not even discuss the proposed deal with Mr. Rajan, let alone be involved in the negotiations, is indicative of its specious nature, or otherwise speaks to the marginal role Mr. Park plays with the Debtors despite Mr. Rajan being their only other employee.

[62] CR-242.

[63] *See* Motion to Compel, at ¶17.

Order")[64] directing the Debtors to produce contact information for the individuals at Zhongsheng who negotiated the Zhongsheng Term Sheet, as well as documents and communications with Zhongsheng or any affiliate of Zhongsheng "including but not limited to letters of intent, proposals, and diligence materials between the Debtors and Zhongsheng Group Holdings Ltd. or any affiliate thereof."  After the Discovery Order was entered, Mr. Rajan submitted a Declaration in support of the legitimacy of the Zhongsheng Term Sheet (the "Zhongsheng Declaration").[65]  It is unnecessary to fully summarize the Zhongsheng Declaration, but in it Mr. Rajan states, *inter alia,* that (a) the Zhongsheng Term Sheet was the product of negotiations with William Wang and Tea Lee, both of Zhongzhi Enterprise Group ("ZEG"), an affiliate of Zhongsheng, and (b) contrary to Mr. Park's testimony, the Zhongsheng entity that is party to the Zhongsheng Term Sheet is a privately held company of the People's Republic of China, and is not the Zhongsheng entity publicly traded on the Hong Kong stock exchange.[66]

What came next was a motion by Hawk to hold the Debtors in contempt for failing to produce the information and documents required by the Discovery Order (the "Contempt Motion").[67]  Hawk alleged in the Contempt Motion that the Debtors only produced business cards in Mandarin for William Wang and Tea Lee, and that of the 4,300 pages of mostly unresponsive documents produced, only one document related to the Zhongsheng Term Sheet: a mobile phone or tablet screenshot of the Term Sheet's signature block, purportedly signed by Tea Lee on behalf of Zhongsheng, which was emailed from Jeff Shammah ("Mr. Shammah") of

---

[64] Bankr. Docket No. 322.

[65] CR-237.

[66] Although the Declaration is not entirely clear, the Court reads it to say that both the publicly-traded Zhongsheng and the privately-held Zhongsheng are affiliates of ZEG.

[67] Bankr. Docket No. 328.

Blue Ocean Partners Ltd.[68] to a Mark Savarese,[69] who then forwarded it to Mr. Rajan.  Hawk
argued that the Debtors' failure to produce any communications or other documents related to
the Zhongsheng Term Sheet violated the Discovery Order and the Debtors' obligations under the
federal discovery rules.  The Court heard the Contempt Motion at the start of the continued Trial
on August 15, but took the matter under advisement in order to proceed with evidence.[70]

Mr. Rajan testified in August at the continued Trial that the Zhongsheng Term Sheet
evolved from a November 2022 term sheet Zhongsheng had entered into with VSI, and that once
Stream filed for bankruptcy the parties simply agreed to revise the agreement to make Stream,
rather than VSI, the counterparty.[71]  During his cross-examination in September, however, Mr.
Rajan was pressed on the legitimacy of the Zhongsheng Term Sheet.  The Court found his
testimony regarding his dealings with Zhongsheng difficult to believe.  For example:

- Although Mr. Rajan had stated on direct examination in August that he was
  meeting with William Wang in Boston that weekend to work on the Zhongsheng
  transaction,[72] by his cross-examination in September he testified that
  Zhongsheng's trip was delayed and would be occurring in October.[73]  Mr. Rajan
  gave no explanation for why the trip was delayed, and admitted he did not ask
  anyone from Zhongsheng to testify in support of the transaction's authenticity.  In

---

[68] Mr. Rajan testified that the Debtors retained Mr. Shammah, an investment banker, post-petition to
negotiate the transaction with Zhongsheng, but acknowledged that no court approval for the retention was
sought or granted.  *See* September 25, 2023 Hearing Transcript, at 32:17 to 33:12.

[69] As will be discussed *infra,* Mr. Savarese evidently holds a role with VSI, but none with the Debtors of
which the Court has been made aware.

[70] Bankr. Docket No. 354.

[71] See August 17, 2023 Hearing Transcript, at 88:4 to 95:20; 99:25 to 100:7.

[72] *Id.* at 101:9 to 101:22.

[73] September 25, 2023 Hearing Transcript, at 60:13 to 60:23.

light of the questions Hawk was raising and the enormous amount of capital to be

infused into Stream under the proposed transaction, the Court finds it incredible

that Mr. Rajan would not (a) dig deeper into why Zhongsheng would was not able

to negotiate the transaction in August 2023, whether in Boston or otherwise, and

(b) at least request that a representative of Zhongsheng or ZEG testify at Trial in

support of the transaction.[74]

- WeChat messages were the only documentation Mr. Rajan had supporting his
  claim that William Wang and Tea Lee, as purported employees of ZEG, were
  nonetheless authorized to negotiate a $300 million deal on behalf of
  Zhongsheng.[75]

- Mr. Rajan confirmed his testimony given on direct examination that
  Zhongsheng's preferred method of communication was WeChat, but when
  pressed as to why no WeChat messages were produced evidencing those
  communications, Mr. Rajan hedged, testifying that he "[didn't] know if it was
  WeChat or if it was photographs and those various programs."[76]

- When asked whether he had received any financial information from Zhongsheng,
  Mr. Rajan responded that he wasn't sure and would have to "go back and check,"
  but acknowledged that as of his deposition on August 14 he had not received any
  financial information from Zhongsheng, did not know its gross revenues, did not

---

[74] The Debtors gave no reason why a purported $300 million transaction could only be negotiated in-person in Boston and only at some uncertain date in the future, nor why it would be too much to ask a Zhongsheng or ZEG representative to travel to the United States to testify.

[75] Presumably these are the same WeChat messages attached to his Zhongsheng Declaration.

[76] September 25, 2023 Heating Transcript, at 74:21 to 75:17.

know how many auto dealerships it operated, or even what make of car it sold.[77]

- Mr. Rajan was pressed on his statements in the Zhongsheng Declaration that the privately-held Zhongsheng entity that signed the Term Sheet is distinct from the publicly-traded Zhongsheng entity. When asked for an explanation as to why the same address in Dalian, China was given by both the publicly-traded entity in its 2021 Annual Report[78] for its corporate headquarters and by the privately-held entity in the Zhongsheng Term Sheet for its principal place of business, Mr. Rajan provided a convoluted response that provided no explanation at all.[79]

- Notwithstanding the enormity of the proposed transaction, which would infuse $300 million of funding into Stream for a 35% stake in the company, Mr. Rajan disclaimed its importance to the Debtors, testifying in September that funding is now not needed to implement the Debtors' proposed plan because Stream was receiving financing from VSI instead.[80]

The Court finds the entire picture that Mr. Rajan painted of the Zhongsheng transaction to be not credible. The Court finds the almost complete lack of documentation and communications related to a purported $300 million transaction to be most damning and suggests

---

[77] *Id.* at 70:2 to 72:9.

[78] *See* CR-254 (page 2).

[79] September 25, 2023 Hearing Transcript, 146:14 to 147:8 ("The way it works in China is if you want to do business in China, you need a company in China where you do all your operations. And what Stream TV believes from its understanding, is some of the shares from the China company were put into a Hong Kong company, traded on the Hong Kong Exchange. The Hong Kong Exchange company is just a holding company, and Zhongsheng has shares and investments in the private company and no liquidity because they don't have no shares in the Hong Kong company. They wanted shares in Stream TV, because we have all these POs, on the hope that we could eventually get Zhongsheng some liquidity. They're two separate companies."). The Court finds this response to be non-responsive and, in the context of the question asked, largely nonsensical.

[80] September 25, 2023 Hearing Transcript, at 191:22 to 192:2.

that the transaction was not real.  In light of that lack of documentation, and Hawk putting the Debtors on notice in the Motion to Compel (if not earlier) that it questioned the existence of an actual deal with Zhongsheng, it was incumbent upon the Debtors to substantiate the transaction's existence and legitimacy.  Moreover, if the Zhongsheng transaction was both legitimate and intended, even as an alternate source of funding, the Court concludes that the Debtors would or should have viewed it as being of the utmost importance to have someone other than Mr. Rajan, whether an individual from Zhongsheng, Mr. Shammah, or someone else, testify in support of its authenticity.  They did not, and the Court finds Mr. Rajan's testimony was not believable and was instead suggestive that the transaction was never real to begin with.[81]

The Court views this as an enormous problem for the Debtors.  Particularly in a case where funding for the Debtors has been a stated concern from the outset, the Court's trust in the Debtors' management was severely undermined both by their failure to satisfactorily substantiate the Zhongsheng transaction after submitting it to the Court, and their willingness to walk away from it after its bona fides came into doubt.[82]

### b. The Debtors' Self-Imposed April Funding Crisis Nearly Left SCBV's Payroll Unfunded

Early in these cases, the Debtors' management created a funding fiasco that greatly

---

[81] The Court notes, anecdotally, that despite the authenticity of the Zhongsheng transaction being the subject of motion practice, hearings, and a significant portion of Mr. Rajan's trial testimony, the Debtors' Post-Trial Brief does not address the transaction at all, let alone why the evidence supports a finding that it was legitimate.

[82] On this, the Court agrees with Hawk's point in its Reply Brief that the logic of the alternative funding from VSI under the Debtors' proposed plan is difficult to square if the Zhongsheng transaction was real: "In other words, instead of waiting a few weeks for an investor to allegedly provide a $300 million investment for only a 35% share of the company, Mr. Rajan has opted to pursue an investment from his other company, VSI of $25 million (*i.e.*, nearly 1/10th that amount) for a 90% share of the company (*i.e.,* nearly three times the equity share).  In other words, if the Zhongsheng Term Sheet is genuine, Mr. Rajan has robbed these Debtors and their estates of $736.4 million in order to ensure that his other company, VSI, obtains voting control over the Debtors."  Hawk Post-Trial Reply Brief, at §B.5.

diminished the Court's confidence in Mr. Rajan's ability to guide the Debtors successfully in

bankruptcy, and as importantly, in his ability to do so given his interest in and role with VSI.

Stream's Schedule A/B disclosed $2,362.50 in cash on hand as of the date its Petition

was filed.[83]  The Debtors did not file a financing motion at the time their Petitions were filed, nor

in the weeks thereafter.  The issue of how the Debtors were funding their cases was raised from

an early stage by Hawk, and by no later than April 14, the Court raised the issue with the Debtors

in light of the fact that April payroll was coming due for SCBV by the end of the month.[84]  At

that time, the Court was advised that the Debtors had the means to fund their estates at a rate of

at least $250,000 per month with cash from VSI, and that they would "have the appropriate

documentation on file when we know how much money we actually need to do it."[85]  The Court

advised the Debtors, given that §364(b) requires a motion and a hearing for debtor-in-possession

financing, that "somebody needs to do something" to obtain funding for April payroll.[86]

On April 21, *i.e.,* one week after the Court raised its concerns as to case funding, the

Debtors filed the expedited Stock Sale Motion.  The motion sought, among other things,

authority to engage in what the Debtors asserted was the ordinary course sale of unissued Stream

stock to VSI on an as-needed basis to fund their business operations.  In connection with that

request for authority, the Debtors also sought authority to enter into a stock purchase agreement

with VSI for the sale of up to $10 million in Stream stock.  According to the Debtors, they

routinely sold shares of stock pre-petition to fund operations, and therefore did not need

authority from the Court to do so post-petition, but did so "out of an abundance of caution to

---

[83] *See* Bankr. Docket No. 52.

[84] *See* April 14, 2023 Hearing Transcript, at 145:9 to 145:15; 163:2 to 163:6.

[85] *Id.* at 164:12 to 166:5.

[86] *Id.* at 173:5 to 173:10.

ensure their ability to continue selling and issuing new shares in Stream consistent with its pre-

bankruptcy practices in order to bring valuable and necessary funds into these chapter 11

cases."[87]

Given what it understood to be a funding crisis with respect to payroll obligations at the

SCBV level due on April 25, the Court heard the Stock Sale Motion on an emergency basis on

April 24. It was clear to the Court from the outset, as the Court advised the Debtors on the

record at the hearing, that the circumstances creating a funding crisis with respect to the SCBV

payroll was a self-created emergency, was foreseeable at the time the Petitions were filed, and

should have been the subject of a first-day motion, rather than a motion filed days before payroll

was coming due and packaged with a request for expedited approval of matters entirely

irrelevant to funding SCBV and independent contracor payroll.[88] Moreover, as the Court

expressed at the hearing, the Debtors were only advising the Court for the first time on an

emergency basis that they were proposing to sell shares to VSI to fund their post-petition

operations, which the Court was not going to approve on an expedited basis.[89]

At that point in the April 24 hearing, the Debtors pivoted on-the-fly, seeking approval for

emergency debtor-in-possession financing from VSI.[90] It was unclear, however, whether VSI

even had sufficient funds to cover the payroll-related amounts.[91] Meanwhile, SeeCubic advised

the Court that it was willing to fund the SCBV payroll under a pre-petition facility used to fund

---

[87] Stock Sale Motion, at ¶56.

[88] See April 24, 2023 Hearing Transcript, 6:19 to 6:25; 22:16 to 23:6.

[89] *Id.* at 38:23 to 39:3; 40:1 to 40:7.

[90] This was done only after the Debtors suggested the payroll be funded with money they were holding from pre-petition subscription agreements, which upon the Court's inquiry, was revealed to be funds not reported in the Debtors' filed Schedules. *Id.* at 43:5 to 44:5.

[91] *Id.* at 55:19 to 56:1; 57:11 to 57:16.

SCBV while the Receiver was in place.[92]  The Court concluded that it was not going to choose between the two alternatives without evidence, and expressed concern over whether the Debtors were even the entity that had an obligation to fund SCBV's payroll in the first place.[93]  The Court therefore required the Debtors to file a financing motion by the end of the day with the proposed terms, and allowed SeeCubic to file a proposed alternative financing, both of which would be considered at an emergency evidentiary hearing the following day.

The Debtors filed their financing motion the following morning (the "Debtor DIP Motion"),[94] and SeeCubic filed its motion for approval of alternative funding (the "Seecubic Alternative Funding Motion").[95]  The Debtor DIP Motion sought authority either for (a) the Debtors to borrow approximately €872,000 from VSI on an unsecured basis to fund SCBV payroll obligations or, alternatively, (b) VSI's issuance of one or more unsecured senior promissory notes to SCBV directly, with either option being in exchange for Stream's entry into the Distribution Agreement with VSI, whereby VSI would accept orders and make delivery of Stream's products to customers and retain a 10% margin.  The SeeCubic Alternative Funding Motion proposed to fund SCBV's payroll obligations with a loan directly to SCBV under the pre-existing unsecured facility with SeeCubic, or alternatively, with an unsecured loan to the Debtors for the purpose of funding the SCBV payroll obligations.

The Court held a lengthy emergency evidentiary hearing on the alternative proposals later that day, at which Mr. Rajan testified on behalf of the Debtors and Mr. Stastney testified on behalf of SeeCubic.  Indicative of the Court's chief concern with the Debtors' proposal to obtain

---

[92] *Id.* at 66:18 to 67:13.

[93] *Id.* at 80:23 to 81:2.

[94] Bankr. Docket No. 156.

[95] Bankr. Docket No. 155.

financing from VSI, Mr. Rajan was also purporting to testify on behalf of VSI.[96]  Although the
Debtors ultimately withdrew Mr. Rajan as a representative of VSI when the Court questioned
how that could be, Mr. Rajan's dual role was indicative of the Court's trouble with the Debtors'
emergency financing proposal:  the evidence at the hearing made clear to the Court that the
proposal to have the Debtors incur $1 million in post-petition administrative debt to VSI was not
only unnecessary given the availability of approximately €700,000 in funding directly from
SeeCubic to non-debtor SCBV, but was also fatally flawed because Mr. Rajan was on both sides
of the proposed transaction.[97]  As such, the Court denied the Debtor DIP Motion.  With respect
to the SeeCubic Alternative Funding Motion, because SCBV was a non-debtor foreign company,
the Court held that it could not direct SCBV to borrow from SeeCubic, but also would not
approve an alternative debt financing from SeeCubic to the Debtors to fund payroll because the
incurrence of such debt by the estates was unnecessary given the availability of the existing
SeeCubic facility directly with SCBV.  The Court made clear to Mr. Rajan, however, that his
fiduciary duties to the Debtors, their estates, and SCBV were implicated by the funding crisis,
and recommended that he act consistent with them in approving SCBV's borrowing from
SeeCubic under the pre-existing facility.[98]

 The funding crisis in April was entirely of Debtors' management's own making.  As the
Court observed on multiple occasions during the April 24 and 25 hearings, the Debtors knew
when they filed their petitions that SCBV payroll would need to be funded in April.  They did
not file a traditional financing motion at any point in the first month the cases were pending, and

---

[96] April 25, 2023 Hearing Transcript, at 52:14 to 54:9.

[97] *Id.* at 248:12 to 248:25.

[98] *Id.* at 253:15-17.

inexplicably waited until just days before the SCBV payroll was coming due to seek authority

for what they asserted was the ordinary course sale of $10 million in Stream shares to an entity

owned by Mr. Rajan, while also seeking other relief that was entirely unrelated to the funding

crisis.  When the Court made clear that no such transaction would be approved absent a full

opportunity for all parties and the Court to vet it, the Debtors proposed an insider financing

transaction with no notice to other parties in interest.  This necessitated an eleventh hour, full-

day hearing, only for the Court to conclude that there was no need for the financing at all.

Particularly given the Debtors' acknowledgement in seeking such relief of the value SCBV holds

and the calamitous effect its employees leaving would have, this funding crisis is further

evidence that the Debtors' management, and specifically Mr. Rajan, cannot be entrusted with the

management of the Debtors' estates.

> ### c. The Debtors Have Financed their Post-Petition Operations by the Transfer of Stream Shares to VSI Without Adequate Disclosure or Court Permission

At the April 24 hearing on the Stock Sale Motion, given that the Debtors proposed to

fund their cases through the sale of Stream shares to VSI, the Court expressly asked whether the

Debtors had done so post-petition.  The Court was advised that they had not, and were waiting

for Court permission to do so.[99]  In fact, counsel for the Debtors acknowledged that "[W]e're

coming to you because we know that there are grave consequences to not getting permission

from the court.  So even when things are in the ordinary course people come to get permission,

and that's what we did."[100]  As discussed *supra,* the Court did not give that permission.

---

[99] See April 24, 2023 Hearing Transcript, at 28:10 to 28:15.

[100] *Id.* at 31:22 to 32:1.

Without approval of the Stock Sale Motion, and with no revenue and no financing, how the Debtors were funding their cases and operations remained opaque to the Court. It became more clear, however, with Mr. Rajan's testimony at Trial. Mr. Rajan testified that VSI had been paying all expenses of the Debtors since the inception of their bankruptcy cases, in exchange for shares in Stream.[101] According to Mr. Rajan, Stream had been issuing shares to VSI every week or two since the Debtors' Petitions were filed.[102] In connection therewith, the Debtors had pre-petition subscription agreements with VSI, but also had entered into new, post-petition agreements.[103] Mr. Rajan was not sure how many Stream shares had been issued to VSI since the filings, but believed all were pursuant to pre-petition, rather than post-petition, subscription agreements.[104] Mr. Rajan was aware there was a motion pending by which the Debtors were seeking approval of post-petition subscription agreements the Debtors had already entered into with VSI, but claimed to not be sure if the post-petition subscription agreements were related to VSI's proposed role as plan sponsor or were the agreements proposed pursuant to the pending motion.[105]

As of Mr. Rajan's testimony in August, neither VSI's funding of the Debtors' post-petition operations nor the post-petition issuance of shares to VSI, whether pursuant to pre- or post-petition subscription agreements, had been disclosed in the Stream's monthly operating reports or otherwise.[106] Mr. Rajan claimed that the failure to make these disclosures was an

---

[101] August 17, 2023 Hearing Transcript, at 205:21 to 206:1.

[102] *Id.* at 212:25 to 213:3.

[103] *Id.* at 206:2 to 206:8.

[104] *Id.* at 206:12 to 207:1.

[105] *Id.* at 246:19 to 247:2.

[106] *See* Bankr. Docket Nos. 224, 253, 300 (April, May, and June 2023 Monthly Operating Reports); August 17, 2023 Hearing Transcript, at 219:9 to 219:24; 224:6 to 224:13.

oversight due to his hospitalization, and would be corrected promptly, but as of his testimony at Trial in late September, no such corrections had been made.[107]

The Court found Mr. Rajan's testimony regarding the Debtors' post-petition issuance of shares to VSI to be evasive, and as a result, untrustworthy.[108]  Mr. Rajan was pressed on whether VSI had been issued shares pursuant to post-petition subscription agreements,  and was shown his deposition testimony stating that Stream was issuing new shares to VSI every two weeks or so pursuant to post-petition subscription agreements.[109]  In response, Mr. Rajan asserted he was talking about pre-petition subscription agreements.[110]  This is not believable and is belied by his testimony.  Mr. Rajan admitted he attended the April hearing where representations were made to the Court that Stream shares were not being issued to VSI post-petition, but he nonetheless allowed Stream to do so.  Mr. Rajan cannot fall back on a supposed belief that all shares issued were pursuant to pre-petition subscription agreements, because even if that was authorized or did not require authorization, he could not say with certainty that this is, in fact, what had happened.  Moreover, his failure to promptly amend the Debtors' monthly operating reports to reflect both VSI's post-petition funding of the Debtors' operations and the issuance of shares to VSI is unacceptable and was without any legitimate excuse.[111]  This casual approach to what was clearly a highlighted concern of the Court at the outset of the case is further evidence that Mr. Rajan has administered these estates with an eye towards what he personally wants to

---

[107] See September 25, 2023 Hearing Transcript, at 14:12 to 15:12.

[108] *See, e.g.,* August 17, 2023 Hearing Transcript, at 252:4 to 252:11; 253:23 to 254:4.

[109] *See* CR-231, at 140:10 to 141:13.

[110] August 17, 2023 Hearing Transcript, at 254:6 to 254:17.

[111] Given the Debtors' proposed retention of Mr. Park dating back to May 2023, Mr. Rajan's hospitalization in June and July cannot serve as a basis for failing to amend the Debtors' schedules by late September.

accomplish and disclose, rather than acting consistent with his obligations to the Court and the

estates' creditors.

### d. The Debtors Have Proposed Certain Major Transactions in these Cases Benefitting VSI without Clear Benefit to the Debtors or the Estates

The Court has had concerns nearly from the inception of these cases about the

relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain

transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra,*

the proposed funding transaction with VSI in April would have unnecessarily either issued

Stream equity to VSI or created $1 million of administrative debt to VSI.  It was therefore

denied.  The unauthorized post-petition issuance of shares in Stream to VSI also raises serious

questions about the administration of these cases for the benefit of VSI.  These, however, were

not the only instances where the Court's trust in the Debtor's management has deteriorated in

light of transactions the Debtors have proposed either at the eleventh hour or under cover of

more innocuous requests for relief that seem to benefit VSI without justification.

### i. The Distribution Agreement

A central feature of the Stock Sale Motion, and subsequently the Debtor DIP Motion, that

created serious questions about how and for whose benefit these cases are being administered

was the request for approval of the Distribution Agreement to be given to VSI, purportedly in

exchange for its financial support in funding the Debtors' product development and supply chain.

As stated in the Stock Sale Motion, under the agreement, VSI "will accept orders from and make

delivery to third-party customers … VSI will then issue back-to-back purchase orders to Stream

for 90% of the value of those third-party orders, retaining a 10% margin for funding technical,

business, and sales development.  In essence, VSI will act as a distributor for Stream to these

customers."[112]  This was not the first time, however, that the Court was hearing about the

proposed Distribution Agreement.  In a declaration filed in support of the Debtors' Stay

Enforcement Motion, filed on April 13 (the "Stay Enforcement Declaration"),[113] Mr. Rajan

disclosed VSI's willingness to fund the Debtors' post-petition operations in exchange for the

Distribution Agreement.[114]  At a hearing on April 14 on the Stay Enforcement Motion, the Court

questioned why the Debtors need a distributor for their product.  However, the Distribution

Agreement was not the focus of that hearing, which, as discussed *supra,* was largely the urgent

need for the Debtors' to fund their cases.

      In response to the Court's admonition at that hearing to the Debtors that funding needed

to be procured, the Debtors filed the Stock Sale Motion a week later, and it was there that they

sought (on an expedited basis) approval of the Distribution Agreement.  The agreement was then

the subject of Mr. Rajan's testimony at the hearing on the Debtor DIP Motion on April 25.  Mr.

Rajan was asked directly whether the Distribution Agreement was part of the compensation VSI

was to receive for providing post-petition funding to the Debtors.[115]  Mr. Rajan evaded,

responding that the Distribution Agreement "is an aspirational hope.  The Court has to – we

submitted it for approval to the Court."[116]  Only upon the Court's inquiry did Mr. Rajan affirm

that the Distribution Agreement was part of VSI's proposed compensation to fund the Debtors.

---

[112] See Stock Sale Motion at ¶¶25, 26 (internal paragraph numbering omitted).  The motion goes on to
represent that "In addition to financial support, VSI will assist Debtors with productization of electronics,
an area in which Stream needs support.  VSI will also assist Debtors with translating computer software
and hardware code, designing chips for use in end-user products, and supporting Debtors' customers with
integration of those chips into end-user products."  *Id.* at ¶27.

[113] Bankr. Docket No. 114-1.

[114] Bankr. Docket No. 114-1, at ¶12.

[115] April 25, 2023 Hearing Transcript, at 93:11 to 93:13.

[116] *Id.* at 93:14 to 93:16.

Notwithstanding that the Debtors ultimately filed the motion seeking approval of the
Distribution Agreement, the Court found the way it was done disconcerting. The agreement was
disclosed in a declaration from Mr. Rajan in support of the Stay Enforcement Motion, wholly
unrelated to the Debtors' funding proposal. Only when the Court questioned its necessity was
the Stock Sale Motion filed, which sought the agreement's approval on an expedited basis.
When that relief was denied, the Debtors pivoted to include it in the Debtor DIP Motion. At no
point during Mr. Rajan's testimony in connection with that motion did the Debtors present a
cogent business justification for VSI acting as a distributor of the Debtors' product for a 10%
share of the sales. In the end, the Court was left with the distinct impression that the Debtors
sought to enter into the Distribution Agreement while attracting little attention to it, and once
attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the
Debtors' product sales. The Debtors argue that the Distribution Agreement is "beneficial to the
Estates because VSI can provide support to the Debtors in terms of funding, customer contracts,
technical know-how in the areas of electronic productization, translating computer software and
hardware code, designing chips for use in end-user products, and integration of those chips into
end-user products."[117] They cite to a portion of Mr. Rajan's Trial testimony that does not touch
on any of those supposed benefits, but even if it did, the Court is troubled by (a) the Debtors'
failure to explain why VSI's proposed financing was not subject to a note with market-rate
interest, rather than a significant cut of the Debtors' product sales, and (b) the Debtors seeking
approval of the agreement on an expedited basis and in a landscape where other emergencies the
Debtors had created were the focus of the Court and other interested parties.

---

[117] Debtors' Post-Trial Brief, at ¶27.

## ii.      The Licensing Covenant

The Court also has concerns regarding the Debtors' post-petition Licensing Covenant with Rembrandt, entered into post-petition in August.[118]  Pursuant to the Licensing Covenant, Rembrandt agreed that it would not issue a license to the Rembrandt IP (a defined term) to Hawk, SeeCubic, Mr. Stastney, or a host of related entities and parties.  The Court understands the Debtors' desire for such an agreement, given those parties' adversarial relationship with the Debtors' and their competing interests.  Importantly, however, it also bars the licensing of the Rembrandt IP to any current or former subsidiary of Stream as well.[119]  In exchange, Stream and VSI[120] agreed to pay Rembrandt $3.6 million, payable in several installments.[121]  The Licensing Covenant addressed Stream and VSI's motivation to enter into it: "[T]he VSI Parties want the plan for reorganization to have an optimal chance of success and to ensure that it is clear that the VSI Parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors and shareholders of Stream … [T]he VSI Parties would like to enter into a Licensing Covenant with Rembrandt to prevent certain lenders, creditors, and shareholders of Stream [from] attempting to commercialize the technology and products developed by Stream."[122]

---

[118] CR-222.

[119] Licensing Covenant, at §B.2.

[120] Reinforcing their lock-step alliance under the Licensing Covenant and the interrelationship between them, Stream and VSI are defined together under the agreement as the VSI Parties.

[121] *Id.* at §C.2.  Those installments were to commence on September 1, 2023.  At Trial, Mr. Rajan confirmed that Stream and VSI are jointly and severally liable for the payments under the Licensing Covenant.  Stream and VSI also agreed to an increase in the number of units Rembrandt can obtain.  *Id.* at §D.1 to D.3.

[122] *Id.* at fifth, sixth Whereas clauses.

The Court recognizes VSI's proposed role as plan sponsor, and as Mr. Rajan acknowledged during his testimony, if the Debtors' proposed plan is confirmed VSI will own 90% of Stream's equity.[123]  The Court is nonetheless alarmed about the propriety and motivations of Stream entering into a post-petition transaction that is intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries.  The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia,* Stream's subsidiaries.  While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology by companies who do not own our technology, specifically SeeCubic of Delaware, to stop the use of our technology to compete against us,"[124] the Licensing Covenant goes beyond that, precluding the issuance of a license to any Stream subsidiary notwithstanding the possibility that there may be a business reason for doing so at some point in the future.[125]  Rather than simply preventing SeeCubic from competing with the Debtors, the Licensing Covenant benefits a non-debtor insider third-party while requiring the Debtors to make significant post-petition payments to Rembrandt.  Moreover, not only did Mr. Rajan confirm that Stream is jointly and severally liable for the payments under the Licensing Covenant,[126] but as Hawk notes, the obligation to make payments under the Licensing Covenant is not conditioned on confirmation of the proposed plan, and in fact the agreement contemplates its effectiveness even if a plan is not confirmed.[127]

---

[123] September 25, 2023 Hearing Transcript, at 51:10 to 51:12.

[124] *Id.* at 51:1 to 51:5.

[125] As Hawk argues, the Licensing Covenant limits the potential avenues to capitalize on the Debtors' assets by foreclosing the issuance of a license to a downstream subsidiary.  Hawk Post-Trial Brief, at 50.

[126] *Id.* at 41:8 to 41:10.

[127] Licensing Covenant, at §C.5.

Each of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them without being able to articulate how they are a reasonable exercise of his business judgment.

### e. There Has Been Little to Substantiate Mr. Rajan's Claims of Hundreds of Millions of Dollars in Nascent Purchase Orders Coming to Stream

From the outset, Mr. Rajan has been touting the numerous deals and purchase orders the Debtors are on the verge of obtaining. Like the Zhongsheng transaction, however, there has been precious little evidence, other than Mr. Rajan's self-serving testimony, offered to verify the existence of these deals, or even the negotiation of such deals. After listening to Mr. Rajan's testimony, and having almost no other evidence against which to measure the veracity of his claims, the Court was left with the firm impression that Mr. Rajan was engaging in hyperbole at best, or fabrication at worst, in testifying regarding Stream being on the verge of obtaining customer commitments worth hundreds of millions of dollars.

### i. The VSI Purchase Orders Were Not Substantiated by Anything Other than Mr. Rajan's Testimony

On April 13, the Debtors filed Mr. Rajan's Stay Enforcement Declaration, in which he represented that Stream had secured two post-petition purchase orders totaling $138,600,000 in gross revenues, and attached the purchase orders as exhibits.[128] The securing of those purchase orders was given as a primary reason the Debtors needed to repossess the Bonding Equipment as soon as possible. Both orders are from VSI, the first dated March 20, 2023, in the amount of $12,600,000 ("VSI Purchase Order #1"), and the second dated April 11, 2023, in the amount of

---

[128] Stay Violation Declaration, at ¶8. Mr. Rajan stated his opinion that revenues to be derived from these two purchase orders will allow the Debtors to successfully reorganize. *Id.* at ¶15.

$126,000,000 ("VSI Purchase Order #2" and together with the VSI Purchase Order #1, the "VSI Purchase Orders").  Joseph Corso ("Mr. Corso"), under limited power of attorney, executed the VSI Purchase Order #1 on behalf of VSI, and Mr. Savarese, under limited power of attorney, executed the VSI Purchase Order #2 on behalf of VSI.

During the Trial, Mr. Rajan testified that the VSI Purchase Order #1 is for Cystar International Limited ("Cystar") as the third-party customer.[129]  A purchase order from Cystar to VSI was issued on the same date as VSI Purchase Order #1, which Mr. Rajan testified he negotiated on behalf of VSI.[130]  Mr. Rajan testified that the VSI Purchase Order #2 is for Southern Telecom as the third-party customer.[131]

Mr. Rajan also testified at Trial about the role an entity he referred to as BOE had in the VSI Purchase Orders.  According to Mr. Rajan, BOE is the "number 1 panel company in the world," and BOE introduced Stream to a number of BOE's customers, "and those customers have become customers of Stream TV."[132]  Two of those customers, according to Mr. Rajan, are Cystar and Southern Telecom.[133]  Mr. Rajan testified that under an August 2018 agreement between Stream and BOE's factory entity by the name of Hefei Xinsheng Optoelectronics Technology Co. Ltd. ("BOE"),[134] BOE agreed to introduce Stream to customers, vendors, and suppliers, as well as providing purchase order financing to Stream.[135]  Mr. Rajan testified that the

---

[129] August 17, 2023 Hearing Transcript, 47:7 to 47:16; Exhibit D-18.  As noted *supra*, Mr. Rajan also disclosed in his Stay Violation Declaration the Distribution Agreement with VSI. The VSI Purchase Orders were made in connection with this Distribution Agreement.  *See* Stay Violation Declaration, at ¶12.

[130] August 17, 2023 Hearing Transcript, 53:6 to 53:11.

[131] *Id.* at 63:23 to 65:14; Exhibit D-19; Exhibit D-21.

[132] August 15, 2023 Hearing Transcript at 201:3 to 201:7.

[133] *Id.* at 201:9; 205:24 to 206:1.

[134] Exhibit D-3.

[135] August 15, 2023 Hearing Transcript, 205:8 to 206:2; September 25, 2023 Hearing Transcript, 154:8 to

2018 agreement is still in effect, and that Stream "has calls with BOE at least three to four times

a week [and] meetings, at least once to twice a week, either in China or the United States."[136]

According to Mr. Rajan, BOE "help[s] us with customers. They help us with vendors. They're

helping us with supply chain finance. They're ramping up more introductions and they're also

working on their own sales activities."[137]

      The VSI Purchase Orders are, on their face, clearly for a considerable sum and require

considerable production from Stream.[138] The Debtors have repeatedly stated that the importance

of these purported deals to the Debtors' reorganization and success going forward is

fundamental, but it is beyond dispute that the VSI Purchase Orders are not traditional contracts

with the panoply of provisions governing performance of the parties' agreement. They also do

not provide for any further commitment by Cystar and Southern Telecom. At Trial, however,

Mr. Rajan testified that Cystar wants to increase its order from the 10,000 units under the VSI

Purchase Order #1 to "about 75 to 100,000 once he gets the bonding machine, which is about

$140 million in revenue if he goes up to 100,000."[139] Likewise, Mr. Rajan testified that Southern

---

155:15. Mr. Rajan pointed to Articles 4 and 5 of the BOE agreement as binding them to provide purchase order financing. August 17, 2023 Hearing Transcript, at 189:2 to 192:2.

[136] August 15, 2023 Hearing Transcript, at 208:25 to 209:6.

[137] *Id.* at 209:4 to 209:10.

[138] Mr. Rajan testified that, without the Bonding Equipment, it had made arrangements with an entity called Fuji-Prem to provide the bonding services needed to meet the production requirement under the VSI Purchase Orders and "for most of our customers." August 15, 2023 Hearing Transcript, at 193:6 to 193:19; August 17, 2023 Hearing Transcript, at 28:21 to 28:23.

[139] August 15, 2023 Hearing Transcript, 201:15 to 201:17. Consistent with the Court's concern regarding Mr. Rajan's tendency to be loose with the purported sales he expects, he later testified that Cystar's "plan, once they receive the bonding machine is to increase their order to 75 to 100,000 units, which is over 100 million in revenue." *See* September 25, 2023 Hearing Transcript, at 31:2 to 31:6. He also testified that the VSI Purchase Order #1 was for "14 million, but Stream TV believes it's going to be increased to about 75 million." *Id.,* at 156:1 to 156:3.

Telecom wants to increase its order from the 100,000 units under the VSI Purchase Order #2 to "about 300,000 TVs."[140]

SeeCubic signaled almost immediately that it questioned the legitimacy of the VSI Purchase Orders.[141] Beyond Mr. Rajan's testimony, however, the Debtors did nothing to establish their bona fides. It seemingly would have been both very easy and very urgent for the Debtors, given the consequences if Hawk is successful in obtaining dismissal, conversion, or appointment of a trustee, to provide witness testimony from Cystar, Southern Telecom, and/or BOE to substantiate, at the very least, the VSI Purchase Orders, if not the asserted interest of Cystar and Southern Telecom in greatly increasing purchases going forward. This is particularly true with respect to Southern Telecom, as Mr. Rajan testified that it is a "big supporter" of Stream, and in addition to allegedly placing an order for 100,000 units, is interested in a merger or acquisition as well as cross-marketing activity.[142] Despite that level of purported support and interest in Stream, however, the Debtors did not bring anyone from Southern Telecom to substantiate the VSI Purchase Order #2. At a bare minimum, the Court would have expected the Debtors to put on the testimony of Mr. Corso and/or Mr. Savarese, each of whom purportedly bound VSI, to establish that the VSI Purchase Orders are legitimate.[143] The Debtors instead

---

[140] *Id.* at 202:1 to 202:10; *see also id.* at 194:3 to 194:6 ("Southern Telecom has indicated that they are going to increase their order from 100,000 TVs, which is $140 million in revenues to about 300,000, which would push us to 400 million in revenue.").

[141] April 14, 2023 Hearing Transcript, 64:23 to 66:17.

[142] August 15, 2023 Hearing Transcript, 202:12 to 203:8.

[143] In their post-trial reply brief, *see* Bankr. Docket No. 437, the Debtors argue that it is disingenuous for Hawk to point out that VSI did not appear at Trial to provide supporting testimony. *Id.* at 19. It is true that the Debtors attempted, at the eleventh hour, to add Tom Sego, a purported independent board member of VSI, and Bud Robertson, a current VSI employee, to their witness list in advance of the resumption of the Trial on August 15. *See* Bankr. Docket No. 334. It is also true that Hawk requested that neither witness be permitted to testify given the late notice and extremely limited windows of time the Debtors were proposing to make Mr. Sego and Mr. Robertson available for depositions. *See* Bankr. Docket No. 327. After a hearing the Court barred both Mr. Sego and Mr. Robertson from testifying.

relied only Mr. Rajan, whose credibility with this Court has been greatly diminished.  While the

Debtors may have had their reasons for doing so, that gap in substantiation left the Court with the

unanswered questions regarding the veracity of the VSI Purchase Orders and Mr. Rajan's claims

that Cystar and Southern Telecom intend to exponentially increase the amount of product

purchased from Stream.  Unfortunately, in the context of so many other instances where the

Court has concerns regarding Mr. Rajan's truthfulness, this is just another example.

### ii. The Debtors Offered No Supporting Evidence for the Other Potential Customers and Deals Mr. Rajan Touted During Trial

Mr. Rajan testified at Trial regarding a host of other deals and partnerships on which he

alleged the Debtors were working and/or were imminent:

- Mr. Rajan testified at Trial on August 15 that there are "eight or nine" other customers interested in the same unit that Cystar is ordering, including Google, and that a company from Thailand would be making an offer that morning.[144]

- Mr. Rajan alluded to other deals with "Hisense and some other brands, like Chunghwa Telecom, which will be ordering once we get the samples from [Fuji-Prem]."[145]  Mr. Rajan subsequently testified that Chunghwa Telecom wants to purchase 60,000 units.[146]

---

Bankr. Docket No. 343.  Even if the Court had permitted their testimony, however, neither VSI witness was proposed to testify regarding the legitimacy of the VSI Purchase Orders.  *See* Bankr. Docket No. 327-1 (Exhibit A).

[144] *Id.* at 201:18 to 201:24.

[145] *Id.* at 203:5 to 203:8.

[146] *Id.* at 217:6 to 217:12.

- Mr. Rajan testified that the Debtors were in negotiations with Lenovo, Sony, and Samsung, and had just received a request for a price quotation from LG.[147]  Mr. Rajan subsequently testified that he was in negotiations with LG for the sale of 5,000,000 units.[148]

- Mr. Rajan also named other potential customers Skyworth, Highsense, Huawei, and Vizio.[149]  According to Mr. Rajan, Skyworth is "expected to order TVs in the two to three million unit range."[150]

- Mr. Rajan testified that Stream was in discussions with Bosch, with which it had a pre-petition deal for an automotive-based product that allegedly fell apart once SeeCubic took control of Stream's assets under the Omnibus Agreement.[151]  Mr. Rajan acknowledged, however, that Bosch is not a current customer of Stream.[152]

- Mr. Rajan testified that in addition to Bosch, Stream was in discussions with other potential customers for an automotive-based product, including Geely, Honda, Nissan, and Toyota.

- Mr. Rajan testified about certain other expressions of interest Stream has received for its product from Cystar, IQH3D, BBack Inc., and Sunny Hill Technology Ltd. ("Sunny Hill"), and the Debtor introduced into evidence letters from each of those

---

[147] *Id.* at 203:22 to 204:6.

[148] *Id.* at 219:8 to 219:10.

[149] *Id.* at 217:15 to 217:24.

[150] August 17, 2023 Hearing Transcript, at 30:7 to 30:13.

[151] August 15, 2023 Hearing Transcript, at 219:21 to 220:12.  The pre-petition agreement with Bosch was admitted as Exhibit D-4.

[152] August 17, 2023 Hearing Transcript, at 25:6 to 25:14.

companies purportedly expressing such interest.[153]  Three of four of these letters, however, were issued pre-petition, and the fourth, from Sunny Hill, was dated only days after the Debtors filed for bankruptcy.[154]

- Mr. Rajan testified that he understood, based on a February 2023 discussion with Google, that once Stream provides Google with a lens sample Google had ordered pre-petition but that was never provided, Google would be interested in resuming discussions on acquisition of various sizes of Stream's units, which Mr. Rajan stated are both "very high margin type" and "very easy to do, very easy to make, and it's a very easy project."[155]

- Mr. Rajan testified regarding his post-petition negotiations with "various large content companies and sports leagues" on cross-marketing deals, but asserted he was subject to a strict non-disclosure agreement and could not reveal the names of the sports leagues.[156]

- Mr. Rajan testified that he had "probably 100 customer meetings" since the Debtors' Petitions were filed, but provided no additional detail.[157]

After listening to Mr. Rajan's testimony regarding these purported customers and relationships, the Court found his testimony not credible.  Rather, it appeared to the Court that Mr. Rajan was "name-dropping" large players in the television and panel space, but had nothing to verify that Stream has had any post-petition discussions or negotiations with these parties, let

---

[153] *Id.* at 68:25 to 77:3

[154] Exhibits D-44 to D-47s D-44 to D-47.

[155] August 15, 2023 Hearing Transcript, 214:7 to 217:1.

[156] August 17, 2023 Hearing Transcript, at 120:1 to 120:22.

[157] *Id.* at 121:6 to 121:10.

alone is on the precipice of transactions with them.  Rather, on cross-examination, despite having

referred to many of these parties as customers of Stream, Mr. Rajan acknowledged that Stream

was not "at a contract stage yet" with respect to any of the parties about which he testified.[158]

Moreover, although the Debtors have repeatedly stressed the need to regain the Bonding

Equipment so that they may begin meeting production requirements. Mr. Rajan testified that

alternative bonding arrangements had been made with Fuji-Prem to meet production needs, and

therefore that the yet-unresolved dispute over the Bonding Equipment would not seem to be an

impediment to at least some of these purported deals having come to fruition.[159]  Particularly

where Mr. Rajan represented that the deals in the works would result in hundreds of millions, if

not billions, of dollars of revenue for the Debtors, the Court is confounded that the Debtors did

not produce *any* potential contract-counterparty to corroborate Mr. Rajan's claims.  In that void,

the Court was left with only Mr. Rajan's assertions, which the Court found not credible.

> **f.      The Net Effect of the Debtors' Conduct in These Cases, By and
> Through Mr. Rajan, Is That the Court Has No Faith in the
> Debtors' Ability to Effectively Manage These Bankruptcy
> Cases**

The Court's discussion of the general procedural history of these cases, specific events

that have transpired, and representations the Debtors, and specifically Mr. Rajan, have made, is

intended to illustrate the cloud of mistrust and mystery that has hung over these cases virtually

from the beginning.  In arguing that Mr. Rajan has engaged in gross mismanagement of the

estates, Hawk points to much of the same conduct and actions by the Debtors during these cases

that the Court has cited above, including (a) the Debtors' proposed entry into the Distribution

---

[158] August 17, 2023 Hearing Transcript at 164:13 to 165:11.

[159] The Court notes that the Debtors did not provide any agreement or other documentary evidence of an agreement with Fuji-Prem.

Agreement with VSI, (b) the VSI Purchase Orders using VSI as an intermediary with customers
for a 10% fee, (c) the transfer of Stream shares to VSI in exchange for funding the Debtors' post-
petition operations without Court approval, (d) the entry into the Rembrandt License Covenant
for the purpose of steering licensed intellectual property from Rembrandt to VSI, and (e) the
failure to file accurate monthly operating reports, and the failure to timely correct them.[160]  Hawk
asserts that Mr. Rajan has administered these cases for the benefit of VSI, rather than creditors,
and that this blatant breach of fiduciary duty, together with failing to disclose proposed
agreements and transactions until the eleventh hour, and in the case of the Zhongsheng Term
Sheet, fabricating the transaction entirely, constitutes gross mismanagement of the Debtors'
estates warranting conversion or dismissal.

The already-discussed transactions and requested relief that appear to be primarily for the
benefit of VSI are reason enough to find that Mr. Rajan has engaged in gross mismanagement of
the Debtors' estates.  Another glaring example, however, is the Debtors' failure to revise
knowingly false monthly operating reports, on which the Court and all interested parties rely in
assessing the Debtors' post-petition performance and prospects, until December, months after the
initial MORs were filed.  Furthermore, as discussed *infra*, the Revised MORs (as defined herein)
appear to represent facts regarding payments VSI has made on behalf of Stream that contradicts
Mr. Rajan's testimony at Trial, leaving the Court and interested parties unclear as to the Debtors'
post-petition operations and finances.  A debtor-in-possession's fiduciary duties include the duty
to keep the Court and creditors informed about the status and condition of its business.  *See In re
Gateway Access Solutions, Inc.,* 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007).  Monthly operating
reports are "the lifeblood of Chapter 11, enabling creditors to keep tabs on the debtor's post-

---

[160] Hawk Post-Trial Brief, at 49-56.

petition operations." *In re Kholyakva,* 2008 WL 3887653, at *4 (Bankr. E.D. Pa. 2008). They are designed to allow the U.S. Trustee and creditors to monitor business operations during chapter 11 and to avoid continued business operations that generate losses and administrative insolvency. *In re Domiano,* 442 B.R. 97, 106 (Bankr. M.D. Pa. 2010). Importantly in the context of these cases, the failure of a debtor to properly report income and expenses constitutes evidence of gross mismanagement under §1112(b)(4)(B). In *Domiano,* the court found the debtor's monthly operating reports had been completed in cursory, if not casual fashion, omitted significant information, and were completed "in such a summary fashion that creditors are left to guess as to much of the Debtors' operations and financial results … The MORs have not been completed in a fashion consistent with the Debtors' fiduciary duties." *Id.* The *Domiano* court found that this was grounds for conversion due to the debtor's gross mismanagement of the estate.

Mr. Rajan's flippant explanation for why VSI's millions of dollars in payments on behalf of Stream in exchange for Stream shares was not disclosed on its MORs is unacceptable. The Court does not attribute any credibility to Mr. Rajan's explanation that this lack of disclosure was due to an oversight or attributable to his hospitalization. There is no reason that Mr. Park, as the nominal CFO of the Debtors, or someone else with knowledge of the Debtors' operations and finances should not have ensured the disclosure of the funding arrangement with VSI in the MORs. The fact that it was not done, that it became clear only at Trial, and that the Debtors did not file the Revised MORs until *December* is a breach of the Debtors' fiduciary duties to the estates' creditors and its disclosure obligations to the Court. The Court simply does not believe Mr. Rajan that the lack of disclosure was an oversight.[161]

---

[161] On September 28, 2023, the U.S. Trustee submitted a proposed Rule 2004 consent order (the "Rule 2004 Order"), providing for, *inter alia,* authorization to examine the Debtors regarding post-petition

In sum, apart from this fundamental breach of the Debtors' disclosure obligations and the Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI. Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at Trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinction between the entities and his roles with each.[162] It has consistently appeared that he cannot, and the Debtors' transactions and requested relief outlined herein are indicative of his inherent conflict of interest. The result has been delay, confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship.

Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness. *See In re 210 West Liberty Holdings, LLC,*

---

payments made by or on behalf of the Debtors, the issuance of shares from Stream and/or Technovative to VSI, and any post-petition agreement between the Debtors and VSI for VSI to fund the Debtors' subsidiaries, including SCBV. Bankr. Docket No. 428. On October 3, 2023, the Court entered the Rule 2004 Order. Bankr. Docket No. 433. On December 29, 2023, the U.S. Trustee filed a motion to dismiss the Debtors' bankruptcy cases (the "UST Dismissal Motion"), based on their failure to file timely and complete monthly operating reports and other required reports, failure to provide accurate information in the initial MORs or the Revised MORs, and failure to comply with the Rule 2004 Order's terms regarding document production and appearing for examination. *See* Bankr. Docket No. 534. While the Debtors have not yet had opportunity to respond to the UST Dismissal Motion, and the Court has not yet held a hearing on it, its filing in and of itself is further evidence of the lack of cooperation and conflict that has permeated these cases, and only reinforces the Court's conclusion that Mr. Rajan cannot serve as a productive and responsible steward of the Debtors' bankruptcy estates.

[162] *See, e.g.,* August 17, 2023 Hearing Transcript, at 151:14 to 153:25.

2009 WL 1522047, at *5. The nearly ten months since the Debtors filed their Petitions have

been marred by delay, conflict, suspect proposals, lack of transparency, and lack of candor.

While the delay has been the result of numerous circumstances, the Court will not permit this to

continue under Mr. Rajan's watch. The only question for the Court is whether the Debtors' cases

should be dismissed, converted, or a trustee should be appointed to determine what value the

Debtors' operations hold, and what claims, if any, should be pursued, and how the cases move

expeditiously to reorganization or liquidation. As discussed *infra*, notwithstanding current

management's gross mismanagement of the Debtors' estates, the Court believes conversion or

dismissal is not in the best interests of creditors at this time.

### 3. It Has Not Been Established by a Preponderance of Evidence That There is Both Substantial or Continuing Loss to the Debtors' Estates and No Reasonable Likelihood of Rehabilitation

Section 1112(b)(4)(A) of the Bankruptcy Code provides that cause for conversion or

dismissal exists where there is substantial or continuing loss to or diminution of the estate **and**

the absence of a reasonable likelihood of rehabilitation. It is written in the conjunctive, and

therefore both components must be shown. *See, e.g., In re 1121 Pier Village LLC,* 635 B.R. 127,

137 n.14 (Bankr. E.D. Pa. 2022); *In re Northeast Family Eyecare, P.C.,* 2002 WL 1836307, at *3

(Bankr. E.D. Pa. July 22, 2002) (stating that the subsection codifies a "two-prong test"); *In re

Route 202 Corp.,* 37 B.R. 367, 372 (Bankr. E.D. Pa. 1984).

In determining whether a loss to, or diminution of, the estate exists, a court must make a

full evaluation of the present condition of the estate, not merely look at the debtor's financial

statements. *In re Plasterer*, 2023 WL 6217801, at *6 (Bankr. E.D.N.Y. Sept. 25, 2023) (stating

that even where a debtor shows positive cash flow, continuing loss to or diminution of the estate

can also be established by an actual depreciation in the value of property of the estate).

Importantly, §1112(b)(4)(A) requires not only a consideration of whether a debtor is suffering continuing losses but whether the debtor's business prospects justify continuing the chapter 11 case. *In re EnCap Golf Holdings, LLC,* 2008 WL 4200324, at *9 (D.N.J. Sept. 4, 2008); *see also In re Andover Covered Bridge, LLC,* 553 B.R. 162, 175 (B.A.P. 1st 2016) ("'Rehabilitation' in this context means whether the debtor will be able to reestablish its business.").

Hawk argues that the Debtors have no operations, no expenses, and no sources of financing, and the Debtors' own filings prove the estates are suffering catastrophic losses during these cases based on over $7 million in administrative expenses incurred.[163]  Hawk further argues that to the extent there are any operations, they are at the VSI level, and without operations the Debtors cannot establish a business plan based on future operations, and therefore are *per se* unable to rehabilitate.[164]

The Court agrees with Hawk that, based on the Debtors' originally-filed monthly operating reports (the "MORs") from March through June, it would appear that Stream has no expenses, employees, or financing.  Stream's originally-filed April, May, and June MORs reflect little cash on hand, no full-time employees, no receipts, very little in disbursements, and no disbursements made by a third party for the benefit of the estate.[165]  Mr. Rajan had his explanation for that at Trial.  With respect to employees, Mr. Rajan testified in August that the Debtors had retained independent contractors through VSI to work on its projects.[166]  Mr. Rajan

---

[163] Hawk Post-Trial Brief, at 45-46 (citing $750,000 in legal fees incurred, approximately $75,000 in salary for Mr. Park, and $6 million in post-petition obligations to Rembrandt under the Licensing Covenant and related subscription agreement).

[164] *Id.* at 46.

[165] Bankr. Docket Nos. 224, 253, 300; August 17, 2023 Hearing Transcript, at 196:20 to 200:3.

[166] August 17, 2023 Hearing Transcript, at 202:18 to 205:2.  While the Court cannot verify that based only on Mr. Rajan's testimony, it is consistent with representations made in the Employee Obligation Motion.

alleged that the failure to make this clarification in the MORs was "an oversight" that would be revised by the following week.[167]  With respect to expenses and financing, Mr. Rajan testified, as discussed *supra,* that VSI was paying all expenses of Stream since its bankruptcy was filed, in exchange for Stream shares.[168]  Mr. Rajan acknowledged, however, that none of the $1.5 to $2 million in expenses that VSI had allegedly paid on behalf of Stream were disclosed in the April, May, or June MORs.[169]  Mr. Rajan again claimed that this was an oversight that would be corrected the following week.[170]

On December 8, 2023, the Debtors *finally* filed revised Stream MORs for March, April, May, and June 2023 (the "Revised MORs").[171]  Those Revised MORs still reflect no full-time employees, as do subsequent MORs.  Attached to the Revised MORs, however, are letters from a Daniel Rink, Director of VSI, to Mr. Park, asserting the expenses VSI paid on behalf of Stream during the months of March, April, May, and June.  According to those letters,[172] and as reflected in the Revised MORs, VSI paid expenses, and asserted it was entitled to Stream Class A shares, in the following amounts: (a) $85,161.53 in expenses for March, in exchange for 56,774 Stream shares; (b) $331,134.30 in expenses for April, in exchange for 220,756 Stream

---

[167] No amended or corrected MORs had been filed as of late September, which Mr. Rajan attributed to "going back and forth with the trustee."  September 25, 2023 Hearing Transcript, 14:24 to 15:12.

[168] *Id.* at 205:21 to 206:4.

[169] *Id.* at 214:14 to 219:14.

[170] Mr. Rajan seemed to claim that the reason for this oversight was his three-month hospitalization, but also acknowledged that he was not the only individual involved with the Debtors that was aware of the expenses being paid by VSI.  *Id.* at 219:22 to 219:24.  The Court therefore attributes very little weight to Mr. Rajan's explanation.

[171] Bankr. Docket Nos. 502, 503, 505, 512.

[172] Each of the letters is dated December 7, 2023, the day before the Revised MORs were filed and months after the expenses were purportedly paid.  No explanation is provided for why the letters were not issued substantially contemporaneously with the end of each month, particularly where the subject of the letters has been a hot-button issue in the case since Trial.

shares; (c) $200,910.46 in expenses for May, in exchange for 133,940 Stream shares; and (d)
$243,871.98 in expense for June, in exchange for 162,581 Stream shares.  This totals
approximately $861,078 in expenses purportedly paid by VSI, which is the cumulative total
Stream discloses in its Revised June MOR for disbursements made by a third party.  Attached to
each letter is a breakdown of the general categories of expenses purportedly paid.

 The July MOR, filed after Mr. Rajan's August testimony, reflects approximately
$750,000 in July third-party disbursements.[173]  No letter from VSI is attached to the July MOR.
Furthermore, the July MOR confusingly disclosed roughly the same figure for a cumulative total,
seemingly in contradiction to Mr. Rajan's testimony in August that VSI had paid $1.5 to $2
million in expenses on behalf of Stream, and certainly in contradiction to the Revised MORs that
represent over $861,000 in third-party disbursements for the three-and-a-half months prior to
July.  In September, Mr. Rajan testified that the cumulative total as of the end of July being the
same as the figure for July alone could be harmonized because disbursements through the end of
July had been approximately $750,000, whereas by the time he testified in mid-August the
disbursements had apparently grown to $1.5 to $3 million.[174]  This testimony is clearly
contradicted by the Revised MORs, and is just another example of what the Court perceives as
Mr. Rajan's propensity to come up with justifications or explanations on-the-fly when
confronted with facts or information that seemed to contradict his prior statements.
The August MOR discloses only $556 in third-party payments,[175] while the September MOR
discloses approximately $104,000 in third-party payments.[176]

---

[173] Bankr. Docket No. 399.

[174] September 25, 2023 Hearing Transcript, at 31:3 to 32:16.

[175] Bankr. Docket No. 459.

[176] Bankr. Docket No. 460.  Perhaps even more confusingly, the Debtors separately filed a supplement
(the "MOR Supplement") to the August and September MORs, which among other things, attached

Hawk's point is well-taken that Stream's original MORs for April, May, and June, reflecting no employees, no post-petition receipts, and little cash on hand, are indicative of a non-operating entity.[177]  Moreover, the Court agrees with Hawk that the Debtors' estates have continued to incur significant administrative expenses, not the least of which are asserted counsel fees, while the MORs reflect no post-petition revenue.  However, notwithstanding that it is being done without having first obtained the Court's permission, the unrefuted testimony from Mr. Rajan is that the Debtors' post-petition operating expenses are being paid by VSI in exchange for Stream shares rather than debt.  Moreover, Mr. Rajan testified as to the nature of the $750,000 in disbursements VSI made on behalf of the estate in August: "That's money for payroll.  That's money for electronics to get ready for production.  Also, we had to get a backup [bonding] deal put in place so we can get the production started on the TVs.  So it's mainly operational expenses to get things started."[178]  Mr. Rajan also testified that the purported work is being done by independent contractors rather than Stream employees, and the letters from VSI attached to the Revised MORs purport to identify consultant payroll expenses totaling approximately $434,000.  Hawk cites to no rule prohibiting a debtor from executing its business model with independent contractors, rather than full-time employees.

_____

letters from VSI to Mr. Park stating that VSI had identified $2,000 and $219,000 in transfers from VSI to Stream in August and September, respectively, pursuant to a stock purchase agreement dated July 10, 2023, and as a result directed Stream to issue 1,333 and 146,000 shares of Stream Class A shares to VSI. Bankr. Docket No. 463.  The MOR Supplement also includes a statement that payments were made by VSI on Stream's behalf in August that were not included in the August MOR, that shares were issued to VSI in November in exchange for those payments, and that such payments will be reflected in the November MOR.  No explanation was given as to why they would not be reflected in an amended August MOR.

[177] In its Post-Trial Brief Hawk also argues that Stream is a non-operating entity based on the First Day Declaration and the Debtors' corporate organizational chart reflecting that Stream owns 99.9% of Technovative shares.  Hawk Post-Trial Brief at 2.  This fact alone does not establish that Stream is not an operating entity.

[178] September 25, 2023 Hearing Transcript, 162:22 to 163:2; *see also id.* at 173:18 to 174:3.

Therefore, with some indication of operational activity and financing by Stream, the Court cannot conclude that the Debtors are *per se* unable to rehabilitate. The Court is keenly aware of the fact that the Revised MORs, on which the Court places some reliance in arriving at this conclusion, were filed two-and-a-half months *after* the Trial concluded and appear to conflict with Mr. Rajan's testimony at Trial. Hawk has had no opportunity to probe the veracity of the representations made in the Revised MORs, which represents a considerable handicap in Hawk being able to meet its evidentiary burden. However, as discussed *infra*, the timing of the Revised MORs and their seeming contradiction to Mr. Rajan's testimony is simply more grounds for the Court's determination that Mr. Rajan cannot continue to administer these estates. While the Court found not credible Mr. Rajan's testimony regarding the Debtors' current and prospective deals, where the Court is required to evaluate both the present condition of the estates and the Debtors' business prospects going forward, it simply does not believe there has been sufficient and transparent information from the Debtors' management to determine at this stage that there is no reasonable likelihood of rehabilitation.

### 4. It Has Not Been Established by a Preponderance of the Evidence that the Debtors' Petitions Were Filed in Bad Faith

As a general matter, Hawk's argument is that the Debtors filed their bankruptcy cases on the eve of trial in the Section 225 Action with no other impetus for filing, but rather simply as a litigation tactic to stay what Hawk believes will be an adverse ruling from the Delaware Chancery Court. Hawk asserts that not only is this *per se* bad faith, but that under the Third Circuit's fourteen-factor analysis for bad faith filings, twelve of the factors support a finding of lack of good faith here.[179]

---

[179] Hawk Post-Trial Brief, at 59-60.

It is beyond dispute that the Debtors filed their Petitions with trial in the Section 225 Action imminent.  Hawk goes too far, however, in arguing that Mr. Rajan "confirmed the 225 Action was the reason for filing," citing to his First Day Declaration[180] as evidence.  That declaration explained, from Mr. Rajan's perspective, the history of the Omnibus Agreement, its invalidation by the Delaware Supreme Court, the failure of Hawk and SeeCubic to comply with the return of the Debtors' assets, and the events leading to the Section 225 Action.  When Mr. Rajan states in his First Day Declaration that "[t]he irreparable harm" of this chain of events necessitated the Debtors' bankruptcy filings, he did not confirm that the Section 225 Action was the reason for filing.[181]  He clearly was referencing a broader series of events, of which the Section 225 Action was only the most recent.  As such, there is no grounds for a finding of *per se* bad faith based on the timing of the Debtors' Petitions alone.

The Court also disagrees that Hawk has established by a preponderance of the evidence that a majority of the factors used in the Third Circuit to analyze whether a filing was in bad faith are present here.  Clearly the Debtors have previously filed for bankruptcy.  The Delaware Bankruptcy Court's reasoning in dismissing those prior cases, however, is not a matter of record in these proceedings.  Furthermore, while the current cases were filed on the eve of trial in the Section 225 Action and imposed a stay on that proceeding, the Court cannot conclude that the Debtors filed these cases solely to evade a Chancery Court order that would wrest control of Technovative from the Debtors.  The Debtors have significant creditors other than Hawk, SeeCubic, and SLS,[182] and as Hawk and SeeCubic have noted a number of times during these

---

[180] *See* Bankr. Docket No. 48 (the "First Day Declaration").

[181] *Id.* at ¶¶90 to 94.

[182] Although the claims of Hawk, SeeCubic, and SLS, as well as Rembrandt's asserted claim of over $1.2 billion, dominate the claims register, other claims of sizeable amounts have also been filed.  Moreover, as discussed above, Stream's Petition was accompanied by Official Form 204, representing that Stream's

cases, Stream had virtually no funds of its own at the time of its Petition with which to satisfy

claims.  Mr. Rajan testified regarding the Stream assets to be used in obtaining and fulfilling

potential post-petition product orders,[183] as well as the Debtors' need to regain possession of the

Bonding Equipment.[184]  Together these reflect a need for the breathing spell afforded debtors and

an intention to use bankruptcy for a purpose other than avoiding an adverse judgment in the

Section 225 Action.  Moreover, although Hawk argues that the Section 225 Action the Debtors

seek to avoid will determine who can control Technovative and the operating subsidiaries, and

therefore the majority of the value of the enterprise, Mr. Rajan asserts that the Debtors do not

need SCBV to execute the Debtors' business plan because they have their own electronics and

bonding arrangements.[185]  Therefore, assuming that is accurate, an adverse ruling in the 225

Action would not necessarily torpedo the Debtors' ability to reorganize.  Finally, as discussed

herein, the Court is not prepared at this stage, based on the evidence before it and the history of

these cases, to conclude that there is no possibility of reorganization.  The lack of clarity the

Debtors' management has created regarding the Debtors' operations, future prospects, and

sources of funding leaves this Court unable to determine whether the Debtors have the assets and

operations to successfully reorganize, but the Court will not foreclose that possibility at this

stage.

     Based on the evidence and in consideration of the factors used to determine whether a

case has been filed in bad faith, the Court finds Hawk has not established by a preponderance of

the evidence that the Debtors lacked good faith in filing their Petitions.

---

unsecured creditors held over $14 million is asserted claims.

[183] August 17, 2023 Hearing Transcript, at 128:6 to 129:23.

[184] *Id.* at 191:6 to 191:20.

[185] August 17, 2023 Hearing Transcript, 138:25 to 138:6.

5.    **The Court Will Not Dismiss or Convert the Debtors' Chapter 11
Cases at this Stage Because a Chapter 11 Trustee is Needed to
Administer the Debtors' Cases**

Having found that the Debtors' have grossly mismanaged the estates, cause exists to

convert or dismiss the cases under §1112(b) of the Bankruptcy Code.  As discussed *supra,*

however, that provision requires conversion or dismissal unless the Court determines the

appointment of a trustee is in the best interests of the estate under §1104(a).  Section 1104(a) of

the Bankruptcy Code governs the appointment of a trustee in chapter 11 cases, providing that the

court **shall** order the appointment of a trustee:

(1)    For cause, including fraud, dishonesty, incompetence, or gross mismanagement of
the affairs of the debtor by current management, either before or after the
commencement of the case, or similar cause … or

(2)    If such appointment is in the interests of creditors, any equity security holders,
and other interests of the estate….

11 U.S.C. §1104(a) (emphasis added).  The appointment of a trustee is an extraordinary remedy,

representing a rare exception to the rule that the debtor remains in possession throughout its

reorganization because current management "is generally best suited to orchestrate the process of

rehabilitation for the benefit of creditors and other interests in the estate."  *In re Marvel*

*Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 2004).  As such, the party moving for

appointment of a trustee under §1104(a) must overcome that presumption by clear and

convincing evidence, and the determination is made on a case-by-case basis.  *BELFOR USA*

*Grp., Inc. v. Salem Consumer Square OH LLC (In re Salem Consumer Square OH LLC),* 629

B.R. 562, 575 (Bankr. W.D. Pa. 2021).  Once the movant establishes cause for the appointment

of a trustee, however, the burden shifts to the debtor to establish an exception under §1112(b)(2)

of the Bankruptcy Code.[186]

---

[186] Under §1112(b)(2), the court may not convert or dismiss a case if the court finds and identifies unusual

That said, a chapter 11 debtor's invocation of the protections afforded under the
Bankruptcy Code comes with a trade-off: "in exchange for the authority to continue to manage
the affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the
estate, including the duty of care to safeguard assets, the duty of loyalty, and the duty of
impartiality." *In re Morningstar Marketplace, Ltd.,* 544 B.R. 297, 303 (Bankr. W.D. Pa. 2016)
(citing *Marvel Entertainment*). And because the rights of a debtor to manage the reorganization
process are not absolute, they may be forfeited if these fiduciary duties are neglected. *Id.* (citing
*In re Eurospark Industries, Inc.,* 424 B.R. 621 (Bankr. E.D.N.Y. 2010)). The willingness of
courts to leave debtors in possession is premised upon an assurance that the officers and
managing employees can be depended upon to carry out the fiduciary responsibilities of a
trustee, and where a debtor-in-possession is unwilling or unable to do so, it is necessary to
appoint an independent trustee who will. *See, e.g., In re Vascular Access Centers, L.P.,* 611 B.R.
742, 764 (Bankr. E.D. Pa. 2020) (citing *Fifth Third Bank v. Circulatory Ctrs. of Am., LLC (In re
Circulatory Ctrs. of Am., LLC*, 579 B.R. 752 (Bankr. W.D. Pa. 2017) and *Marvel
Entertainment*).

The list of situations in §1104(a)(1) is not an exclusive list of what constitutes cause to
appoint a trustee, and situations that have been found to support a finding of cause for the
appointment of a trustee include conflicts of interest, misuse of assets and funds, inadequate
recordkeeping and reporting, failure to file required documents, lack of adequate disclosure, lack

---

circumstances establishing that converting or dismissing the case is not in the best interests of creditors
and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan
will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable,
within a reasonable period and (2) the grounds for converting or dismissing the case include an act or
omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification
for the act or omission; and that will be cured within a reasonable period of time fixed by the court. The
Debtors have not established any such unusual circumstances, although as discussed *infra,* the Court
concludes that the appointment of a trustee, rather than conversion or dismissal, is proper at this stage.

of appropriate cost controls, transgressions related to taxes, failure to make required payments,

lack of credibility and creditor confidence, and breaches of fiduciary duty. *Id.*; *see also*

*Morningstar Marketplace,* 544 B.R. at 303; *Marvel Entertainment,* 140 F.3d at 471 (finding the

district court did not err in appointing trustee where the debtor's management was unable to

resolve conflicts with estate creditors). Appointment of a trustee is mandatory if cause is found

under §1104(a)(1), but a bankruptcy court has wide discretion to determine what specific

conduct establishes cause. *Morningstar Marketplace,* 544 B.R. at 303. By contrast, §1104(a)(2)

envisions a flexible standard giving discretion to appoint a trustee when doing so would serve the

estate's and parties' interests. *Vascular Access Centers,* 611 B.R. at 765 (*citing Marvel*

*Entertainment*). Among the factors which may be considered in appointing a trustee under

§1104(a)(2) are (a) the untrustworthiness of the debtor, (b) the debtor-in-possession's past and

present performance and prospects for rehabilitation, (c) the confidence – or lack thereof – of the

business community and of creditors in present management, and (d) the benefits derived from

the appointment of a trustee balanced against the cost of the appointment. *Id.; see also*

*Morningstar Marketplace,* at 304 (citing *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir.

1989)).

Without needing to address whether the Debtors mismanaged their affairs pre-petition, as

Hawk asserts, clear and convincing evidence of the Debtors' gross mismanagement of their

estates, through Mr. Rajan, has resulted in a situation where the Court has no faith in Mr. Rajan

administering the Debtors' estates consistent with his fiduciary duties and obligations to this

Court. Simply put, based on the history of these cases outlined above, the conflicted role of Mr.

Rajan with both the Debtors and VSI, and the Court's assessment of Mr. Rajan's credibility

throughout this case, the Court does not trust Mr. Rajan's interest in or ability to maintain the

integrity of these bankruptcy proceedings. Months into the case, the Court lacks confidence that it has been given transparent information regarding what the Debtors are actually doing, who is doing it, at what stage those efforts are, and how that is being accomplished, and the evidence the Court has that the Debtors are operating is Mr. Rajan's testimony and the Revised MORs and July MOR, themselves in conflict, representing that VSI funded certain unspecified Stream expenses in the first months of the case, none of which instills confidence in the Court. While the Court is not ready to wholly discount these meager signs of a path toward reorganization, it has reached the point where it needs more clarity and more progress, far more quickly, and does not believe this is possible with Mr. Rajan in charge of the estates. Therefore the appointment of a trustee pursuant to both §§1104(a)(1) and (a)(2) is warranted. *See Vascular Access Centers,,* 611 B.R. at 769 (finding appointment of trustee was appropriate under both §§1104(a)(1) and (a)(2) based on the Court's determination that the debtor's principal and manager lacked credibility and trustworthiness and had engaged in self-serving conduct both before and during the debtor's bankruptcy case).

      The Court is not convinced conversion or dismissal is appropriate at this stage. Because of the dearth of information, transparency, and relief sought by the Debtors to date, the Court remains unclear what assets and potential value the Debtors' operations hold. The replacement of Mr. Rajan at the helm of the Debtors' estates and the appointment of a trustee to evaluate the Debtors' assets, potential deals, potential claims, etc. is needed. It is clear there needs to be a neutral, unconflicted party to deal with VSI at arms-length, including determining if there are pre- or post-petition claims that lie against VSI. A trustee is also needed to evaluate, resolve, and/or litigate the claims of Hawk, SLS, SeeCubic, Rembrandt, and others. If these cases have any chance of succeeding, it will be because there is transparency to the Court and creditors and

an impartial third-party evaluating assets, claims, and the Debtors' reorganizational prospects. A

trustee will obviously come with a cost, but the Court believes the value of an unconflicted,

third-party neutral to assess the state of the Debtors' operations, potential transactions, and

claims, and efficiently determine whether and how the Debtors can achieve reorganization, more

than offsets these costs. *See Vascular Access Centers,* 611 B.R. at 769 (finding that the cost of

appointment of a chapter 11 trustee would be greatly outweighed by the benefits derived from

such appointment and would result in a more efficient reorganization while ensuring the integrity

of the process).

Although cause exists under §1112(b)(4)(B) to convert or dismiss the Debtors' cases, the

Court believes the appointment of a trustee to evaluate the Debtors' operations, prospects, and

ability to successfully reorganize, and to implement such reorganization if possible, is in the best

interests of creditors and the estate at this time. The Court will therefore exercise the

extraordinary remedy of appointing a chapter 11 trustee pursuant to §1104(a) of the Bankruptcy

Code.

**B.     Cause Exists to Grant Hawk Relief from Stay to Allow the Section 225
        Action to Resolve Certain Issues Critical to the Debtors' Bankruptcy Cases**

The Court may grant relief from the stay under §362(d)(1) for cause, including the lack of

adequate protection of an interest in property. 11 U.S.C. § 362(d)(1). Cause is an intentionally

broad and flexible concept which must be determined on a case-by-case basis. *In re Brown*, 311

B.R. 409, 412-413 (E.D. Pa. 2004) (citing *In re Marchant,* 256 B.R. 572, 576 (Bankr. W.D. Pa.

2000)). As such, the test to be applied is a totality of the circumstances test based upon the

particular facts of the case. *Buncher Co. v. Flaberg Solar US Corp. (In re Flaberg Solar US

Corp.)*, 499 B.R. 475, 482-83 (Bankr. W.D. Pa. 2013) (citing *O'Neal Steel, Inc. v. Chatkin (In re

Chatkin)*, 465 B.R. 54, 59 (Bankr. W.D. Pa. 2012)). In applying the test, courts in this district

74

have employed a variety of factors to determine whether cause exists to permit a non-debtor

party to proceed with litigation in another forum:

> Given the broad discretion accorded to the bankruptcy court as described
> in *Brown*, it is therefore, not surprising that some courts have designed
> lists of "factors" to be considered in determining whether "cause" exists
> under §362(d)(1). For example, in *In re Granati*, the court identified four
> (4) factors to be considered:
>
> (1)    whether only issues of state law are involved;
>
> (2)    whether judicial economy will be promoted;
>
> (3)    whether the litigation will interfere with the bankruptcy case; and
>
> (4)    whether the estate can be protected by requiring that any judgment
>        obtained be enforced only through the bankruptcy court.
>
> 271 B.R. 89, 93 (Bankr.E.D.Va. 2001) (citing *In re Robbins*, 964 F.2d 342
> (4th Cir.1992)).
>
> Other courts have developed a checklist of twelve (12) factors to be
> considered:
>
> (1)    Whether the relief will result in a partial or complete resolution of
>        the issues.
>
> (2)    The lack of any connection with or interference with the
>        bankruptcy case.
>
> (3)    Whether the non-bankruptcy proceeding involves the debtor as a
>        fiduciary.
>
> (4)    Whether a specialized tribunal has been established to hear the
>        particular cause of action and that tribunal has the expertise to hear
>        such cases.
>
> (5)    Whether the debtor's insurance carrier has assumed full financial
>        responsibility for defending the litigation.
>
> (6)    Whether the action primarily involves third parties.
>
> (7)    Whether litigation in another forum would prejudice the interests
>        of other creditors, the creditors' committee or other interested
>        parties.

(8)     Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c).

(9)     Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f).

(10)    The interest of judicial economy and the expeditious and economical determination of litigation for the parties.

(11)    Whether the non-bankruptcy proceedings have progressed to the point where the parties are prepared for trial.

(12)    The impact of the stay on the parties and the "balance of hurt."

*See In re Sonnax Industries, Inc.,* 907 F.2d 1280 (2d Cir.1990); *In re Curtis,* 40 B.R. 795, 800 (Bankr. D. Utah 1984) (citations omitted). *See also In re Brown,* 311 B.R. at 413 (approving bankruptcy court's use of factors set forth in *Sonnax* in ruling on § 362(d) motion).

The relevance and weight of the various overlapping factors outlined above will depend upon the circumstances of the particular bankruptcy case involved. Not all of the factors may be relevant in a particular case; the factors that are relevant may not be entitled to equal weight. Thus, the decision whether to grant relief from the automatic stay to an unsecured creditor is not a mechanical or mathematical exercise.

*In re Chan*, 355 B.R. 494, 499–500 (Bankr. E.D. Pa. 2006).[187]

---

[187] The Debtors have cited to *In re Tribune Co.,* 418 B.R. 116, 126 (Bankr. D. Del. 2009) for the following three-prong test for determining whether cause exists to lift the stay to continue litigation: (1) whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of the civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor, and (3) whether the creditor has a probability of prevailing on the merits.  The *Tribune* decision cited the test as being generally relied upon in that district. *Id.*  A "balancing of the harms" analysis has been recognized in this district as well.  *See In re Cinelli,* 2014 WL 4106030, at *2 (E.D. Pa. Aug. 21, 2014) ("The first step to consider is whether there will be prejudice to either the estate or the debtor if the stay is lifted on the one hand and hardship to the movant if the stay continues on the other hand.  Then, these two potential harms are weighed.  The decision to lift the stay depends on where the scale tips."); *In re Glunk,* 342 B.R. 717 (Bankr. E.D. Pa. 2006) (recognizing the "balancing of the harms" analysis used by courts).   The *Chan* decision recognized that underlying guidepost, but employed the "different, more multi-faceted" approach for determining whether cause exists that looks to multiple factors.  355 B.R. at 499.  That approach has been cited by decisions rendered since *Chan* was decided*, see, e.g., In re Schaffer,* 597 B.R. 777, 791, n.18 (Bankr. E.D. Pa. 2019), and it is the approach this Court takes as well.

Hawk filed the Stay Relief Motion at the outset of the case, but the Court determined it needed an evidentiary record to resolve it. The path to obtaining that record has been tortured at times, but the circumstances that Hawk argued warranted stay relief early in the case have not changed – the Section 225 Action is ripe to be heard. It will resolve the Technovative Director Issue and the Debt Conversion Issue, two issues critical to these bankruptcy cases going forward but governed by Delaware law for which the Delaware Chancery Court, while not a specialized tribunal *per se,* certainly has unique and established expertise. If Hawk were successful with respect to both of those issues, it has acknowledged that it will still need to return to this Court for permission to proceed with an Article 9 Sale of its collateral under the Notes. As such, resolution of the Technovative Director Issue and the Debt Conversion Issue will not prejudice the interests of other estate creditors by allowing Hawk to foreclose on Technovative assets without this Court's authority. On the other hand, resolution of those will greatly advance resolution of the Debtors' bankruptcy cases by providing clarity regarding the status of the Technovative filing and whether, and to what extent, Hawk is a secured creditor of the Debtors.

As such, based on consideration of the factors used to determine whether causes exists to permit non-bankruptcy litigation to proceed, the Court finds Hawk has established, and the Debtors have not rebutted, that allowing the Section 225 Action to proceed to resolution with respect to the Technovative Director Issue and the Debt Conversion Issue will aid in administration of the Debtors' bankruptcy cases. Relief from stay will therefore be granted to permit the parties to proceed before the Delaware Chancery Court on those two issues.

## IV.    CONCLUSION

For the reasons discussed above, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy

cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed

solely with respect to the Technovative Director Issue and the Debt Conversion Issue.  The U.S.

Trustee will be directed to immediately begin the process for appointing a chapter 11 trustee, and

in the interim, Mr. Rajan is no longer authorized to take any action on behalf of the Debtors'

estates.  To the extent the Debtors must take any urgent action, the Debtors shall identify any

such actions needed to the U.S. Trustee, who may confer with Mr. Rajan in addressing such

matters but who is not obligated to act in conformity with Mr. Rajan's instruction or desired

outcome.

      An Order consistent with this Memorandum shall be entered.


Dated:  January 5, 2024

_____

MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered)[1] |

## <u>ORDER</u>

**AND NOW**, for the reasons set forth in the accompanying Memorandum.[2]

**IT IS HEREBY ORDERED** that:

1.     The Section 1112/1104 Motion is **GRANTED** solely to the extent it requests that a trustee be appointed in the Debtors' bankruptcy cases pursuant §1104(a) of the Bankruptcy Code.

2.     The Hawk Stay Relief Motion is **GRANTED** to permit the Section 225 Action to proceed solely with respect to the Technovative Director Issue and the Debt Conversion Issue.

3.     The U.S. Trustee is directed to immediately begin the process for appointing a chapter 11 trustee (the "Chapter 11 Trustee"), and shall file notice on the docket upon appointment.

4.     Mr. Rajan is no longer authorized to take any action on behalf of the Debtors' estates.  To the extent the Debtors must take any urgent action pending the appointment of a Chapter 11 Trustee, the Debtors shall identify any such actions needed to the U.S. Trustee, who may

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases. Bankr. Docket No. 81.

[2] Capitalized terms used but not defined shall have the meaning given to them in the accompanying Memorandum.

confer with Mr. Rajan in addressing such matters but who is not obligated to act in conformity with

Mr. Rajan's instruction or desired outcome.

5.      A status hearing shall be held in these cases on **anuary 24, 2024 at 2 00 p.m.**, in

**Bankruptcy Courtroom No. 2, Robert N.C. Nix Federal Building    Courthouse, 900 Market**

**Street, 2nd Floor, Philadelphia, Pennsylvania.**[3]

Dated: January 5, 2024

Magdeline D. Coleman
Chief U.S. Bankruptcy Judge

---

[3] Parties may appear telephonically if necessary, and with prior authorization of the Court.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | |
| STREAM TV NETWORKS, INC. | Chapter 11 |
| Debtor. | |
| and | Case No. 23-10763 (MDC) |
| IN RE: | |
| TECHNOVATIVE MEDIA, INC. | Case No. 23- 10764 (MDC) |
| Debtor | |
| | (Jointly Administered) |

**<u>NOTICE OF APPOINTMENT OF CHAPTER 11 TRUSTEE</u>**

To: William A. Homony, CIRA
    Miller Coffey Tate LLP
    1628 John F. Kennedy Boulevard
    Suite 950
    Philadelphia, PA 19103
    Email: bhomony mctllp.com

Pursuant to the Order of this Court entered on January 5, 2024 (the "Order") directing the United States Trustee to appoint a chapter 11 trustee in the above-captioned case, the United States Trustee hereby appoints William A. Homony to serve as the chapter 11 trustee.

The chapter 11 trustee bond is initially set at $41,000. The bond may require adjustment as the trustee collects and liquidates assets of the estate, and the trustee is directed to inform the Office of the United States Trustee when changes to the bond amount are required or made.

This appointment is made the 9th day of January 2024

Andrew R. Vara
UNITED STATES TRUSTEE

BY: */s/ John Schanne*
John Schanne
Trial Attorney

86

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,  (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,  (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |
| STREAM TV NETWORKS, INC. and<br>TECHNOVATIVE MEDIA, INC.<br><br>Plaintiffs,<br><br>  -v.-<br><br>SHADRON L. STASTNEY, *et al.,*<br><br>Defendants. | Adversary No. 23-00057 |

**REMBRANDT 3D HOLDING LTD.'S MOTION FOR EXPEDITED**
**CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE OF**
**MOTION SEEKING (I) ENFORCEMENT OF THE TEMPORARY RESTRAINING**
**ORDER, (II) SANCTIONS AGAINST PARTIES WHO VIOLATED THE TEMPORARY**
**RESTRAINING ORDER, AND (III) INJUNCTIVE RELIEF(ECF NO. 824)**

**TO THE HONORABLE ASHLEY M. CHAN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Rembrandt 3D Holding Ltd. ("**Rembrandt**"), by and through his undersigned counsel,

files this Motion for Expedited Consideration, Shortened Time, and Limited Notice of its Motion

87

seeking (1) enforcement of the Temporary Restraining Order (the "**TRO**") issued January 4, 2024[1]

and extended through December 9, 2024[2]; (2) sanctions against parties who have violated the TRO

or were complicit in such violations; and (3) injunctive relief preventing the sale of the assets held

by Stream TV Networks, Inc. ("**Stream**") and Technovative Media, Inc. ("**Technovative**," and

with Stream, the "**Debtors**") which include the intellectual property of Rembrandt (Docket No.

824) ("Motion to Enforce TRO"). In support of this Motion for Expedited Consideration,

Rembrandt respectfully represents to the Court as follows:

## Jurisdiction & Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This Motion constitutes a core proceeding as defined under 28 U.S.C. §
157(b)(2)(A) and constitutes a contested matter pursuant to Bankruptcy Rules 9014 and 9020.

## General Background

3.      On September 30, 2024 William A. Homony, in his capacity as Chapter 11 Trustee

of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc

("Technovative" or in conjunction with Stream, the "Debtors") (the "Trustee") filed a *Motion for

(I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement for the Sale

of Substantially all of the Debtor's Assets Including Approval of the Provisions for Designation of

a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of

Notice Thereof and scheduling and Auction, (C) Approving Procedures for Assumption and

Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling a Sale Hearing,*

---

[1] Adversary Case 23-00057-amc, docket no. 119
[2] Adversary Case 23-00057-amc, docket no. 152

*and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-
1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale of the Debtors
Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving
the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related
Thereto and (C) Granting Related Relief* [ECF No. 750] (the "<u>Sale Motion</u>").

4.      On November 20, 2024  the Court issued an Order granting the Sale Motion,
granting the proposed Bidding Procedures,  and scheduling a Sale Hearing on December 4, 2024
(Docket No. 811) ("Sale Procedures Order").

5.      On November 26, 2024 Rembrandt filed its Motion to Enforce TRO, which in turn
seeks relief that if granted will significantly affect the Trustee's proposed sale, which seeks, in
Rembrandt's view, to sell its IP in violation of the agreement between itself and the Debtors.

<center><u>**Grounds for Relief**</u></center>

6.      In accordance with L.B.R. 5070-1(f) and 9014-1, Rembrandt seeks expedited
consideration of its Motion to Enforce TRO. Rembrandt requests approval of the request for
expedited consideration pursuant to L.B.R. 9014-2.

7.      Rembrandt respectfully submits that expedited consideration of the Motion to
Enforce TRO is required well in advance of the Sale Hearing because of the relief sought, which
significantly affects the Trustee's proposed sale.

8.      Rembrandt further believes that an expedited hearing of its Motion to Enforce TRO
will not prejudice the Trustee or any of the Debtors' creditors and is, in fact, in the best interest of
all effected parties and creditors as Rembrandt believes if the Trustee's proposed sale goes forward,
the value of Debtors' IP will be destroyed.

9. Rembrandt further requests (a) that this Court permit notice of the hearing to be served via facsimile, hand delivery, next day air, or by electronic means upon (i) the Office of the United States Trustee; (ii) to the Chapter 11 Trustee; and (iii) all parties who have timely filed requests for notice under Bankruptcy Rule 2002, and (b) that this Court limit the notice period accordingly.

10. Rembrandt believes that such notice is sufficient under the circumstances for the expedited hearing.

11. Reduction of the time periods in question is not prohibited under Fed. R. Bankr. P. 9006(c )(2) and the rules listed therein.

## **CONCLUSION**

**WHEREFORE**, Rembrandt respectfully requests that this Court enter an Order, in the form annexed hereto as **Exhibit "A"**, granting this Motion and (i) allowing Rembrandt 's Motion Enforce TRO to be heard on an expedited basis well in advance of the Sale Hearing; and (ii) granting such other and further relief as the Court deems just and proper under the circumstances.


Dated: November 27, 2024

_/s/ Andrew DeMarco_
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

_Attorneys for Rembrandt 3D Holding Ltd._

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on November 27, 2024 with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that counsel for Rembrandt met and conferred with the

Trustee's counsel regarding this expedited request. The Trustee's counsel did not agree to the

expedited setting of Rembrandt 's Motion to Enforce TRO.

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)

EXHIBIT A
PROPOSED ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re

STREAM TV NETWORKS, INC.,

      Debtors.

Chapter 11

Case No.: 23-10763  (AMC)
(Jointly Administered)[3]

## ORDER GRANTING REMBRANDT 3D HOLDING LTD'S MOTION FOR EXPEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE
## [re: DOCKET NO. 824]

Upon consideration of Rembrandt 3D Holding Ltd. ("**Rembrandt**") Motion for Expedited Consideration, Shortened Time, and Limited Notice  (the "**Motion**") of its Motion seeking (1) enforcement of the Temporary Restraining Order (the "**TRO**") issued January 4, 2024[4] and extended through December 9, 2024[5]; (2) sanctions against parties who have violated the TRO or were complicit in such violations; and (3) injunctive relief preventing the sale of the assets held by Stream TV Networks, Inc. ("**Stream**") and Technovative Media, Inc. ("**Technovative**," and with Stream, the "**Debtors**") which include the intellectual property of Rembrandt (Docket No. 824) (the "**Motion to Enforce TRO**"). The Court having reviewed the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

---

[3] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[4] Adversary Case 23-00057-amc, docket no. 119.
[5] Adversary Case 23-00057-amc, docket no. 152.

§ 157 and 1334, and this Court having found that this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2);

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. The Court shall hold a hearing on Rembrandt's Motion to Enforce TRO (Docket No. 824)

   on _____

3. Rembrandt is to file its Notice of Motion as it relates to its Motion to Enforce TRO, in

   accordance with Local Bankruptcy Rules.

Dated: November ___, 2024.

_____

ASHLEY M. CHAN
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re | Chapter 11 |
| STREAM TV NETWORKS, INC., | Case No.: 23-10763 (AMC) |
| Debtors. | (Jointly Administered)[1] |

**VISUAL SEMICONDUCTOR, INC. S MOTION FOR E PEDITED
CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE OF
MOTION TO RECONSIDER AND/OR CLARIFY NOVEMBER 14, 2024 ORDER
UASHING THE REMAINING VSI DISCOVERY (ECF No. 805)**

**TO THE HONORABLE ASHLEY M. CHAN,
UNITED STATES BANKRUPTCY UDGE**

Visual Semiconductor, Inc. ("VSI") by and through his undersigned counsel, files this

Motion for Expedited Consideration, Shortened Time, and Limited Notice of VSI's Motion to

Reconsider and/or Clarify November 14, 2024 Order Quashing the Remaining VSI Discovery

[ECF No. 826] ("Motion to Reconsider"). In support of this Motion for Expedited Consideration,

VSI respectfully represents to the Court as follows:

**urisdiction Venue**

1.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       This Motion constitutes a core proceeding as defined under 28 U.S.C. §

157(b)(2)(A) and constitutes a contested matter pursuant to Bankruptcy Rules 9014 and 9020.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

## General Background

3.    On November 14, 2024, the Court entered an Order denying VSI's Motion for Reconsideration of the Order Granting the Trustee's Settlement Agreement with Hawk and all the "Additional Topics" in a Subpoena Duces Tecum directed at the Trustee (the "Second Subpoena Duces Tecum") (ECF No. 761).

4.    Additional Topic 3 and Additional Topic 4 in the Second Subpoena Duces Tecum, which the Court denied, are solely related to the Trustee's proposed sale and sale process, which matter is still outstanding.

5.    On November 20, 2024 the Court issued an Order granting the Trustee's Sale Motion, granting the proposed Bidding Procedures, and scheduling a Sale Hearing on December 4, 2024 (Docket No. 811) ("Sale Procedures Order"). The discovery sought by VSI was in preparation for the scheduled Sale Hearing which has yet to take place.

6.    VSI now seeks an expedited hearing on its Motion to Reconsider in advance of the scheduled Sale Hearing so as not to jeopardize VSI's due process rights in these proceedings.

## Grounds for Relief

7.    In accordance with L.B.R. 5070-1(f) and 9014-1, VSI seeks expedited consideration of its Motion to Reconsider. VSI requests approval of the request for expedited consideration pursuant to L.B.R. 9014-2.

8.    VSI respectfully submits that expedited consideration of the Motion to Reconsider is required well in advance of the Sale Hearing because of the relief sought, which entitles VSI to discovery before the Sale Hearing.

9.    Rembrandt further believes that an expedited hearing of its Motion to Reconsider will not prejudice the Trustee or any of the Debtors' creditors and is, in fact, in the best interest of

all effected parties and creditors as VSI is trying to prevent the Trustee from destroying the value in the estates' IP.

10.     VSI further requests (a) that this Court permit notice of the hearing to be served via facsimile, hand delivery, next day air, or by electronic means upon (i) the Office of the United States Trustee; (ii) to the Chapter 11 Trustee; and (iii) all parties who have timely filed requests for notice under Bankruptcy Rule 2002, and (b) that this Court limit the notice period accordingly.

11.     VSI believes that such notice is sufficient under the circumstances for the expedited hearing.

12.     Reduction of the time periods in question is not prohibited under Fed. R. Bankr. P. 9006(c )(2) and the rules listed therein.

## Conclusion

**WHEREFORE**, VSI respectfully requests that this Court enter an Order, in the form annexed hereto as **Exhibit  A**  , granting this Motion and (i) allowing VSI's Motion to Reconsider to be heard on an expedited basis in advance of the Sale Hearing; and (ii) granting such other and further relief as the Court deems just and proper under the circumstances.


Dated: November 27,  2024                    Respectfully submitted,

                                             AKERMAN LLP


                                             /s  R. Adam Swick
                                             Donald N. David, SBN: 304846
                                             Mark S. Lichtenstein (Admitted *Pro Hac Vice*)
                                             1251 Avenue of the Americas
                                             37th Floor
                                             New York, NY 10020
                                             Telephone: (212) 880-3800
                                             Facsimile: (212) 880-8965
                                             Email: donald.david   akerman.com
                                                    mark.lichtenstein   akerman.com

77988089;1

97

-and-

R. Adam Swick (Admitted *Pro Hac Vice*)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7103
Facsimile:   (512) 623-6701
Email: adam.swick    akerman.com

-and-

John H. Thompson *(Admitted Pro Hac Vice)*
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson    akerman.com

-and-

Leif M Clark (Admitted *Pro Hac Vice*)
Leif M Clark Consulting PLLC
1105 Bonner
Houston, TX 77007
Telephone: (210) 663-5183
Email: lmclark    leifmclark.com

*Attorneys for Visual Semiconductor, Inc.*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on November 27, 2024, counsel for VSI conferred with Trustee's Counsel, regarding this expedited request. The Trustee's counsel did not agree to the expedited setting of VSI's Motion to Reconsider.

    s    ohn H. Thompson
    John H. Thompson

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on November 27, 2024 with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.


 /s/ R. Adam Swick
R. Adam Swick

77988089;1

**Exhibit A**
**Proposed Order**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| In re | Chapter 11 |
| STREAM TV NETWORKS, INC., | Case No.: 23-10763  (AMC) |
| Debtors. | (Jointly Administered)[2] |

## ORDER GRANTING VISUAL SEMICONDUCTOR INC S MOTION FOR E PEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE re ECF NO. 826

Upon consideration of Visual Semiconductor Inc's ("VSI") Motion for Expedited Consideration, Shortened Time, and Limited Notice (the "Motion") of VSI's Motion to Reconsider and/or Clarify November 14, 2024 Order Quashing the Remaining VSI Discovery [ECF No. ] ("Motion to Reconsider"); the Court having reviewed the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C § 157 AND 1334, and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2);

IT IS HEREBY ORDERED THAT:

1. The  Motion is GRANTED.

2. The Court shall hold a hearing on VSI's Motion to Reconsider [ECF No. ] on

3. VSI is to file its Notice of Motion as it relates to its Motion to Reconsider in accordance with Local Bankruptcy Rules.

Dated: November      , 2024.

_____
ASHLEY M. CHAN
United States Bankruptcy Judge

---

[2] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

77988089;1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.**, *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)**[1] |
|  | : |  |
|  | : |  |
| **STREAM TV NETWORKS, INC. and** | : | **Adversary No. 23-00057** |
| **TECHNOVATIVE MEDIA, INC.,** | : |  |
|  | : |  |
| **Plaintiffs** | : |  |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **SHADRON STASTNERY, et al.,** | : |  |
|  | : |  |
| **Defendants** | : |  |

## OBJECTION OF WILLIAM A. HOMONY, CHAPTER 11 TRUSTEE, TO REMBRANDT 3D HOLDING LTD.'S MOTION FOR EXPEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE OF MOTION SEEKING (I) ENFORCEMENT OF THE TEMPORARY RESTRAINING ORDER, (II) SANCTIONS AGAINST PARTIES WHO VIOLATED THE TEMPORARY RESTRAINING ORDER, AND (III) INJUNCTIVE RELIEF (D.I. #824)

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the

bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc.

("Technovative", or collectively with Stream, the "Debtors"), by and through his counsel,

Obermayer Rebmann Maxwell & Hippel LLP, files this objection ("Objection") to Rembrandt 3D

Holding Ltd.'s ("Rembrandt") Motion for Expedited Consideration, Shortened Time, and Limited

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

Notice (the "Motion to Expedite") of Motion Seeking (I) Enforcement of the Temporary Restraining Order, (II) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (III) Injunctive Relief (the "Motion to Enforce") (D.I. #824). In support thereof, the Trustee respectfully represents as follows:

## I.    **BACKGROUND**

1.     On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

2.     After almost a year of "acrimony" and "relative lack of progress", on January 5, 2024, this Court entered a Memorandum and Order which, among other things, appointed a Chapter 11 trustee and granted the Debtors' secured creditor Hawk Investment Holdings Limited ("Hawk") relief from the automatic stay to permit litigation against the Debtors pending in the Delaware Court of Chancery under § 225 of Title 8 of the Delaware Code (the "225 Action") to proceed (the "Trustee Order" and "Trustee Opinion") (D.I. #549 and #548, respectively).

3.     On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date") as well as an Application for the Entry of an Order Approving the Appointment of the Trustee. (D.I. #554 and #553 respectively).

4.     On January 12, 2024, the Bankruptcy Court entered an Order granting the Application to Appoint the Trustee (D.I. #558).

5.     Prior to the Trustee's appointment, the Debtors filed the above-captioned adversary proceeding (the "Adversary Proceeding") to, *inter alia*, enjoin the Debtors' secured lenders,

2

individuals associated with the secured lenders, the Debtors' research and development subsidiary in the Netherlands, SeeCubic, B.V. ("SCBV") and its head of technology, Patric Theune.

6.　　After significant and lengthy investigation and consultations with his professionals, certain of the Debtors' subsidiaries, Mathu Rajan ("Rajan"), Visual Semiconductor, Inc. ("VSI"), Rembrandt, and the Debtors' secured creditors, and further considering the significant legal and factual challenges involved in the 225 Action, the risk it posed to the Debtors' assets and any creditor recovery, and the ongoing need to fund the operations of its research and development subsidiary, SCBV, the Trustee decided that, in his reasonable business judgment, settling the disputes with the Debtors' secured creditors including, but not limited to, the 225 Action and the Adversary Proceeding and providing a process to market and sell the Debtors' Assets was in the best interest of the Debtors' creditors and stakeholders.

7.　　Through the Trustee's substantial efforts, the Trustee reached a settlement with Hawk, as collateral agent for the secured creditors (collectively, the "Secured Creditors"), resolving several disputes between  the parties and providing for a carve-out valued in the minimum amount of $9,000,000.00 for the Debtors' estates, and a mechanism for the Debtor's assets to be exposed to a sale process, whereby the true value of the assets could be assessed by exposing them to the market (the "Hawk Settlement").

8.　　On May 6, 2024, the Trustee filed a Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the Hawk Settlement (the "9019 Motion") (D.I. #630).

9.　　This Court conducted an evidentiary hearing on the 9019 Motion on June 5, 2024, in which the Trustee testified at length and was cross examined by both VSI and Rembrandt, and ultimately approved the Hawk Settlement (D.I. #653) over the objections of VSI and Rembrandt (D.I. #642 and #643, respectively).

<div align="center">3</div>

10. Pursuant to the Hawk Settlement, on September 30, 2024, the Trustee filed a Sale Motion with this Court seeking authorization and approval of the Stalking Horse APA and the Bid Procedures in connection with the sale of substantially all of the Debtors' assets on an "as is", "where as" basis, without any warranty of any kind, express or implied (the "Sale Motion").

11. Further, the Sale Motion explicitly stated that the Trustee does not intend to sell or assign the Rembrandt License as a part of the Stalking Horse APA and intends to object to the Rembrandt claims in the Debtors' bankruptcy cases and raise counterclaims in connection therewith.

12. Thereafter, on November 13, 2024, the Court held a hearing and approved the Bidding Procedures and the Stalking Horse APA with SeeCubic Inc. ("SeeCubic"), once again, over the objections of VSI and Rembrandt (D.I. #788 and #789, respectively).

13. The order approving the Bidding Procedures was entered on November 20, 2024 (the "Bidding Procedures Order") (D.I. #811).

14. The Bidding Procedures Order, *inter alia*, set a Bid Deadline of December 2, 2024, at 12:00 p.m. (EST), the Auction for December 3, 2024, and the Sale Hearing for December 4, 2024. *See Id.*

15. Now, on November 27, 2024, less than one (1) week before the Sale Hearing and on the evening before the Thanksgiving holiday, Rembrandt filed the Motion to Enforce and the Motion to Expedite.

16. Rembrandt reached out to the Trustee seeking his consent for the Expedited Consideration of the Motion to Enforce, and the Trustee declined to consent for a number of reasons as explained below.

4

## II.   **ARGUMENT**

17.    Though the Motion to Expedite does not clearly state, the Motion to Enforce is actually a motion to enjoin the sale scheduled for hearing on December 4, 2024.

18.    The Motion to Expedite is nothing more than Rembrandt and VSI's latest desperate attempt to stall the sale of the Debtors' assets and postpone the Sale Hearing and should be denied on multiple grounds.

19.    The Debtors', now controlled through the Trustee, are the Plaintiffs in the Adversary Proceeding and there is no TRO against the Debtors or the Trustee. The Motion to Expedite seeks to expedite a hearing on a Motion that turns the Debtor and Trustee into defendants and seeks separate and unjustified relief by a nonparty.

20.    It is difficult to explain procedurally how inappropriate the Motion to Enforce actually is. The Trustee will respond appropriately when required.  However, the request for expedited consideration must be denied.

21.    First, Rembrandt lacks standing to enforce the Preliminary TRO entered in this case, as Rembrandt is not party to the proceedings. Rembrandt has made no effort to intervene in the Adversary Proceeding pursuant to Federal Rule of Bankruptcy procedure 7024.  In order to seek relief in the adversary Rembrandt would have to intervene, which it has not done. Rembrandt has no standing to raise the issue of enforcement of the TRO.

22.    The Adversary Proceeding and related Preliminary TRO are the Trustee's to prosecute - the Preliminary TRO was entered not to protect Rembrandt, but to protect the Debtors.

23.    Second, Rembrandt has failed to articulate why, less than one (1) week before the Sale Hearing and at 3:00 p.m. on Thanksgiving eve, the instant emergency came into existence and why the Motion to Enforce and the Motion to Expedite needed to be filed at this time.

5

24.    Rembrandt has failed to meet the procedural requirements for expedited consideration.

25.    L.B.R. 5070-1(g)(A) requires Rembrandt to state with particularity the reasons why expedited consideration is needed.

26.    Rembrandt has been complaining of the alleged behavior they seek to address in the Motion to Enforce (though they lack standing to do so) for an extended period.  By its own admission, it has known of the alleged facts supporting this claim since at least early May of 2024.

27.    The controversy only became an emergency when Rembrandt chose to raise an issue intended to derail the Trustee's preparation for the hearing on the Sale Motion, and thwart the sale of the Debtors' assets.

28.    The Motion to Expedite baselessly states in a conclusory fashion, that "if the Trustee's proposed sale goes forward, the value of Debtors' IP will be destroyed." (D.I. #825, ¶ 8).

29.    This claim is unsupported and entirely unfounded; Rembrandt's alleged concern is entirely disingenuous as the proposed Stalking Horse APA will provide substantial value to the Debtors' and their creditors.

30.    Rembrandt states in conclusory fashion that the relief sought, "significantly affects the Trustee's proposed sale." – however, Rembrandt fails to explain how this is so, failing to provide any factual or other support for this proposition (D.I. #825, ¶ 7).

31.    The Trustee avers that the Motion to Enforce and the Motion to Expedite are frivolous and without merit and being filed by a party without standing.

32.    Further, upon information and belief Rembrandt has failed to contact the United States Trustee concerning its availability and the request for expedited consideration as required pursuant to L.B.R. 5070-1(f)(1).

4897-8195-5073 v3

33. Indeed, there is no statement in the Motion to Expedite that Rembrandt reached out to the United States Trustee, or more importantly, to the Defendants who are parties in interest in the Adversary Proceeding.

34. Finally, the issues raised in the Motion to Enforce concerning the Preliminary TRO are irrelevant at this juncture – a fact of which Rembrandt is keenly aware.

35. The Adversary Proceeding and Preliminary TRO were resolved as part of the Hawk Settlement Agreement which stays the matter. Section 8 of the Hawk Settlement provides as follows with respect to the Pending Litigation Matters, which is inclusive of the Adversary Proceeding and Preliminary TRO:

Dismissal of Pending Litigation Matters.

    a) As of the date hereof, the Debtors are party to the Pending Litigation Matters, including but not limited to:
        i. The 225 Action;
        ii. **The Adversary Proceeding**;
        iii. The District Court Action; and
        iv. Any other pending litigation matters currently pending in any federal or state court (or analogous foreign jurisdiction), including, but not limited to, any actions pending in the Netherlands with respect to control of SCBV.
    **b) Upon the entry of the 9019 Order, the Pending Litigation Matters will be or will remain stayed indefinitely while the Parties pursue the consummation of the Sale.**
    c) On or within 14 calendar days of the Closing, the Trustee and/or Hawk as appropriate, shall obtain dismissal with prejudice of each of the Pending Litigation Matters.

(D.I. #630, Exhibit A, ¶ 8) [emphasis added]. The Preliminary TRO was entered in the Adversary Proceeding.

36. No party has sought to dissolve this stay, and Rembrandt lacks standing to do so. The Trustee does not consent to dissolving the court ordered stay.

### III.    <u>CONCLUSION</u>

WHEREFORE, and for the foregoing reasons, the Trustee respectfully requests this Court

deny the Motion to Expedite and grant such other relief as it deems equitable and just.


Respectfully Submitted,


Dated: November 29, 2024        By: */s/ Michael D. Vagnoni*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail:  edmond.george@obermayer.com
michael.vagnoni@obermayer.com

*Counsel to William A. Homony Chapter 11 Trustee*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **In re** | **Chapter 11** |
| **Stream TV Networks, Inc.,** *et al*. | **Bankruptcy No. 23-10763 (AMC)** |
| **Debtors.** | **(Jointly Administered)**[1] |

## OBJECTION OF WILLIAM A. HOMONY, CHAPTER 11 TRUSTEE, TO VISUAL SEMICONDUCTOR, INC.'S MOTION FOR EXPEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE OF MOTION TO RECONSIDER AND/OR CLARIFY NOVEMBER 14, 2024 ORDER QUASHING THE REMAINING VSI DISCOVERY (D.I. #805)

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", or collectively with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann Maxwell & Hippel LLP, files this objection ("Objection") to Visual Semiconductor, Inc.'s ("VSI") Motion for Expedited Consideration, Shortened Time, and Limited Notice (the "Motion to Expedite") of Motion to Reconsider and/or Clarify November 14, 2024, Order Quashing the Remaining VSI Discovery (the "Motion to Reconsider") (D.I. #805). In support thereof, the Trustee respectfully represents as follows:

## I.     BACKGROUND

1.      On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *Technovative Media Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

2. After almost a year of "acrimony" and "relative lack of progress", on January 5, 2024, this Court entered a Memorandum and Order which, among other things, appointed a Chapter 11 trustee and granted the Debtors' secured creditor Hawk Investment Holdings Limited ("Hawk") relief from the automatic stay to permit litigation against the Debtors pending in the Delaware Court of Chancery under § 225 of Title 8 of the Delaware Code (the "225 Action") to proceed (the "Trustee Order" and "Trustee Opinion") (D.I. #549 and #548, respectively).

3. On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date") as well as an Application for the Entry of an Order Approving the Appointment of the Trustee. (D.I. #554 and #553 respectively).

4. On January 12, 2024, the Bankruptcy Court entered an Order granting the Application to Appoint the Trustee (D.I. #558).

5. After significant and lengthy investigation and consultations with his professionals, certain of the Debtor's subsidiaries, Mathu Rajan ("Rajan"), VSI, Rembrandt 3D Holding Ltd. ("Rembrandt"), and the Debtors' secured creditors, and further considering the significant legal and factual challenges involved in the 225 Action, the risk it posed to the Debtors' assets and any creditor recovery, and the ongoing need to fund the operations of its research and development subsidiary, SCBV, the Trustee decided that, in his reasonable business judgment, settling the disputes with the Debtors' secured creditors including, but not limited to, the 225 Action and the Adversary Proceeding and providing a process to market and sell the Debtors' Assets was in the best interest of the Debtors' creditors and stakeholders.

6. Through the Trustee's substantial efforts, the Trustee reached a settlement with Hawk as collateral agent for the secured creditors (collectively, the "Secured Creditors"), resolving

2

several disputes between the parties and providing for a carve-out valued in the minimum amount of $9,000,000.00 for the Debtors' estates, and a mechanism for the Debtor's assets to be exposed to a sale process, whereby the true value of the assets could be assessed by exposing them to the market (the "Hawk Settlement").

7.    On May 6, 2024, the Trustee filed a Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the Hawk Settlement (the "9019 Motion") (D.I. #630).

8.    This Court conducted an evidentiary hearing on the 9019 Motion on June 5, 2024, in which the Trustee testified at length and was cross-examined by both VSI and Rembrandt and ultimately approved the Hawk Settlement (the "9019 Order") (D.I. #653) over the objections of VSI and Rembrandt (D.I. #642 and #643, respectively).

9.    Subsequently, on July 10, 2024, VSI filed a Motion to Reconsider the 9019 Order (the "9019 Reconsideration Motion") (D.I. #702).

10.    On July 26, 2024, VSI filed a Notice of Oral Deposition Subpoena Duces Tecum for the Trustee, seeking the deposition of the Trustee on August 9, 2024, and the production of certain documents relating to,    *r*    , the 9019 Motion and the Settlement with Hawk (D.I. #712).

11.    On August 24, 2024, VSI filed an Amended Notice of Oral Deposition Subpoena Duces Tecum for the Trustee, seeking the deposition of the Trustee on September 3, 2024, and the production of certain documents relating to,    *r*    , the 9019 Motion and the Settlement with Hawk (D.I. #718).

12.    Thereafter, on August 29, 2024, the Trustee filed a Motion to Quash and for Protective Order, seeking to quash the July 26th and August 24th Subpoena Duces Tecum for the Trustee (the "Motion to Quash") (D.I. #724).

4934-9427-6866 v1

13.     Pursuant to the Hawk Settlement, on September 30, 2024, the Trustee filed a Sale Motion with this Court seeking authorization and approval of the Stalking Horse APA and the Bid Procedures in connection with the sale of substantially all of the Debtors' assets on an "as is," "where as" basis, without any warranty of any kind, express or implied (the "Sale Motion").

14.     October 11, 2024, VSI filed another Subpoena Duces Tecum directed at the Trustee (the "October Subpoena") that set a deposition date of October 29, 2024, and required document production by October 24, 2024 (D.I. #761).

15.     October 30, 2024, the Court held a hearing on the Motion to Quash and entered an order that,     *r*    , suspended a ruling on topics and documents sought through the October Subpoena pending a resolution of the 9019 Reconsideration Motion (D.I. #777).

16.     Thereafter, on November 13, 2024, the Court held a hearing and approved the Bidding Procedures and the Stalking Horse APA with SeeCubic, Inc. ("SeeCubic"), once again, over the objections of VSI and Rembrandt (D.I. #788 and #789, respectively).

17.     On November 14, 2024, the Court entered an order denying the 9019 Reconsideration Motion and quashing the discovery sought through the October Subpoena (D.I. #805).

18.     The order approving the Bidding Procedures was entered on November 20, 2024 (the "Bidding Procedures Order") (D.I. #811).

19.     The Bidding Procedures Order,     *r*    , set a Bid Deadline of December 2, 2024, at 12:00 p.m. (EST), the Auction for December 3, 2024, and the Sale Hearing for December 4, 2024.     *d*

20.     Now, on November 27, 2024, less than one (1) week before the Sale Hearing and on the evening before the Thanksgiving holiday, VSI filed the Motion to Reconsider and the Motion to Expedite (D.I. #826 and #827, respectively).

21.     VSI reached out to the Trustee seeking his consent for the Expedited Consideration of the Motion to Enforce, and the Trustee declined to consent for a number of reasons, as explained below.

## II.     **<u>ARGUMENT</u>**

22.     Though the Motion to Expedite does not clearly state, the Motion to Reconsider is actually a motion to enjoin the sale scheduled for hearing on December 4, 2024.

23.     The Motion to Expedite is nothing more than VSI's latest desperate attempt to stall the sale of the Debtors' assets and postpone the Sale Hearing, which should be denied on multiple grounds.

24.     VSI's efforts to date, including the various discovery requests, are indicative of its ultimate goal – to delay the Debtors' Chapter 11 cases and prevent the sale of the Debtors' assets to anyone other than VSI.

25.     It is difficult to explain procedurally how inappropriate the Motion to Reconsider actually is - the Trustee will respond appropriately when required.  However, the request for expedited consideration must be denied.

26.     First, VSI has failed to articulate why, less than one (1) week before the Sale Hearing and at 3:00 p.m. on Thanksgiving eve, the instant emergency came into existence and why the Motion to Reconsider and the Motion to Expedite needed to be filed at this time.

27.     Indeed, the need for expedited consideration of the Motion to Reconsider has been entirely fabricated by VSI.

4934-9427-6866 v1

28.     The Court entered the order denying the 9019 Reconsideration Motion and quashing the discovery sought through the October Subpoena on November 14, 2024 (D.I. #805), yet it took VSI nearly two (2) weeks to file the Motion to Reconsider.

29.     If the Motion to Reconsider was so urgent as to require an expedited hearing, VSI should have filed it weeks ago.

30.     Clearly, VSI did not see the Motion Reconsider as urgent until they needed it to be; when it would serve VSI best and directly threaten the Sale Hearing.

31.     Second, VSI has failed to meet the procedural requirements for expedited consideration.

32.     L.B.R. 5070-1(g)(A) requires VSI to state with particularity the reasons why expedited consideration is needed.

33.     The controversy only became an emergency when VSI chose to raise an issue intended to derail the Trustee's preparation for the hearing on the Sale Motion and thwart the sale of the Debtors' assets.

34.     VSI asserts that expedited consideration of the Motion to Reconsider is needed "so as not to jeopardize VSI's due process rights in these proceedings." - however, VSI fails to explain how this is so, failing to provide any factual or other support for this proposition (D.I. #827, ¶ 6).

35.     The Motion to Expedite goes on to confusingly state that it must be granted because the relief sought at the Sale Hearing "entitles VSI to discovery before the Sale Hearing" but, once again, fails to explain why this is the case (D.I. #827, ¶ 8).

36.     Further, the Motion to Expedite baselessly states in a conclusory fashion, that the Motion to Reconsider being heard on an expedited basis is "in the best interest of all effected

4934-9427-6866 v1

parties and creditors as VSI is trying to prevent the Trustee from destroying the value' IP will be destroyed." (D.I. #827, ¶ 9).

37.     This claim is unsupported and entirely unfounded; VSI's alleged concern is entirely disingenuous as the proposed Stalking Horse APA will provide substantial value to the Debtors and their creditors.

38.     Finally, upon information and belief, VSI has failed to contact the United States Trustee concerning its availability and the request for expedited consideration as required pursuant to L.B.R. 5070-1(f)(1).

39.     Indeed, there is no statement in the Motion to Expedite that VSI reached out to the United States Trustee.

## III.    <u>CONCLUSION</u>

WHEREFORE, and for the foregoing reasons, the Trustee respectfully requests this Court deny the Motion to Expedite and grant such other relief as it deems equitable and just.

Respectfully Submitted,

Dated: November 29, 2024     By:  ___*M*_____
                                Edmond M. George, Esquire
                                Michael D. Vagnoni, Esquire
                                OBERMAYER REBMANN MAXWELL    HIPPEL LLP
                                Centre Square West
                                1500 Market Street, Suite 3400
                                Philadelphia, PA 19102
                                Telephone: (215) 665-3066
                                Facsimile: (215) 665-3165
                                E-mail:  edmond.george   obermayer.com
                                         michael.vagnoni   obermayer.com

7

8

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **In re** | **Chapter 11** |
| **Stream TV Networks, Inc.,** *et al*. | **Bankruptcy No. 23-10763 (AMC)** |
| **Debtors.** | **(Jointly Administered)[1]** |

## OMNIBUS RESPONSE OF WILLIAM A. HOMONY, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE, TO THE OBJECTIONS TO THE TRUSTEE'S MOTION FOR, *INTER ALIA*, AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and collectively with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann Maxwell & Hippel LLP, files this omnibus response (the "Response") to the Objections of Visual Semiconductor, Inc. ("VSI") (the "VSI Objection") and Rembrandt 3D Holding Ltd. ("Rembrandt") (the "Rembrandt Objection" and, collectively with the VSI Objection, the "Objections") to the Trustee's Motion for, *inter alia*, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief (the "Sale Motion") (D.I. #750)[2]. In support thereof, the Trustee respectfully states as follows:

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

## I. **PRELIMINARY STATEMENT**

1.     As more fully described in the Sale Motion and below, the Trustee intends to conduct a Sale of substantially all of the Debtors' assets consisting of the Stream assets identified in the asset purchase agreement filed in connection with the Sale Motion (the "APA") and the ownership interests of Technovative in its downstream subsidiaries, Technology Holdings Delaware LLC, Media Holdings Co, LLC, and Ultra-D Ventures C.V. (D.I. #791-1) (the "Non-Debtor Subsidiaries", collectively the "Assets") for the benefit of the Debtors' estates and their creditors.

2.     To be clear, the Trustee is not transferring any property owned by the Non-Debtor Subsidiaries, including any intellectual property rights (as those assets are not the property of the Debtors' estates); only Technovative's equity interest in the Non-Debtor Subsidiaries.

3.     The Debtors themselves own no intellectual property rights as is made clear by the Debtors' Schedules of Assets and Liabilities, signed under penalty of perjury by the Debtors' former CEO Mathu Rajan ("Rajan") (now ironically in control of VSI taking completely contrary positions).

4.     Since his appointment, the Trustee and his professionals have spent significant time evaluating the Debtors' options in accordance with his duties under the Bankruptcy Code and the mandate contained in the order appointing him and, with the absence of any real operations or revenue, determined that a settlement of claims against the Debtors' secured creditors and an orderly sale of the Debtors' Assets best serves the interests of all stakeholders in the Debtors' bankruptcy cases.

5.     The Sale and the sale process approved by this Court is necessary to maximize the value of the Debtors' Assets by exposing them to the market.

6.     To that effect, the Court has already approved the procedures related to the marketing, bidding, and sale process for the Debtors' Assets.

7.     Despite this, VSI and Rembrandt filed the Objections as desperate, last-ditch attempts to undermine the Trustee's objective, good faith efforts to bring order to the Debtors' bankruptcy cases and secure funds to make distributions to creditors for the sole purpose of putting the Debtors back in the control of Rajan through VSI. As this Court has already made clear, Rajan has engaged in self-dealing, has grossly mismanaged the Debtors' estates, and has been an impediment to any proposed rehabilitation or reorganization of the Debtors.

8.     The Objections are primarily an attempt to reargue the merits of the Trustee's settlement which gives rise to the sale the Trustee now seeks approval of – a settlement which this Court approved over VSI and Rembrandt's objection, not to mention the denial of VSI's motion to reconsider the approval of that settlement.

9.     Indeed, the integrity of the Objections must also be called into question due to this Court's lengthy findings in the Trustee Opinion, as defined below, which established, and as set forth in greater detail below, that Rajan, VSI, and Rembrandt have engaged in numerous efforts to orchestrate a way, by any means possible, to maintain Rajan's control over the Debtors.  Rajan and VSI have demonstrated over and over that they have a complicated relationship with the truth and are not to be trusted.

10.     In short, the Objections are nothing more than the latest in a long history of concentrated efforts by Rajan, VSI, and Rembrandt to prevent the sale of the Debtors' assets and further drag out the Debtors' cases.

4889-9066-4446 v5

## II.    **BACKGROUND**

11.    The factual and procedural background of these cases are well known to this Court, and to the extent not stated herein, the Trustee incorporates the factual and procedural background contained in the Trustee Opinion, as defined below, and the Sale Motion.

### A.    **Procedural History**

12.    On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").[3]

13.    After almost a year of "acrimony" and "relative lack of progress", on January 5, 2024, this Court entered a Memorandum and Order which, among other things, appointed a Chapter 11 trustee and granted the Debtors' secured creditor Hawk Investment Holdings Limited ("Hawk") relief from the automatic stay to permit litigation against the Debtors pending in the Delaware Court of Chancery under § 225 of Title 8 of the Delaware Code (the "225 Action") to proceed (the "Trustee Order" and "Trustee Opinion") (D.I. #549 and #548, respectively). A true and correct copy of the Trustee Opinion is attached as Exhibit "A" hereto.

14.    As described in further detail below, this Court held, in relevant part, that, due to the gross mismanagement and lack of transparency under Rajan's leadership, (i) a Chapter 11 trustee must be appointed to administer the Debtors' cases, and (ii) Rajan was no longer authorized to act on behalf of the Debtors' estates. (D.I. #548).

---

[3] As set forth in greater detail below, these bankruptcy cases are not Rajan's first attempt to use the Bankruptcy Courts to regain control of the Debtors' assets.  Stream was involved in two prior bankruptcy cases, the first being a Chapter 11 case initiated by the Stream TV Debtor on February 24, 2021 and docketed at In re: Stream TV Networks, Inc., Bankr. D. Del. No. 21-10433-KBO (the "Delaware Voluntary Bankruptcy Case") and the second being an involuntary Chapter 7 case initiated on May 23, 2021 by, inter alia, purported creditor Rembrandt 3D Holding Ltd. ("Rembrandt"), docketed at In re Stream TV Networks, Inc., Bankr. D. Del. 21-10848 (the "Delaware Involuntary Bankruptcy Case").

4

15.     Despite its concerns with Rajan and the general administration of the Debtors'

cases, the Court opted not to dismiss the Debtors' cases and instead decided to appoint a trustee:

> The Court is not convinced conversion or dismissal is appropriate at
> this stage… The replacement of Mr. Rajan at the helm of the
> Debtors' estates and the appointment of a trustee to evaluate the
> Debtors' assets, potential deals, potential claims, etc., is needed… <u>If
> these cases have any chance of succeeding, it will be because there
> is transparency to the Court and creditors and an impartial third-
> party evaluating assets, claims, and the Debtors' reorganizational
> prospects.</u> A trustee will obviously come with a cost, but the Court
> believes the value of an unconflicted, third-party neutral to assess
> the state of the Debtors' operations, potential transactions, and
> claims and efficiently determine whether and how the Debtors can
> achieve reorganization, more than offsets these costs.

Trustee Opinion, at 73-74 (emphasis added).

16.     On January 9, 2024, the Office of the United States Trustee filed a Notice of

Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date")

as well as an Application for the Entry of an Order Approving the Appointment of the Trustee (the

"Application") (D.I. #554 and #553 respectively).

17.     On January 12, 2024, the Bankruptcy Court entered an Order granting the

Application to appoint the Trustee (D.I. #558).

18.     After significant and lengthy investigation and consultations with his professionals,

certain of the Debtors' subsidiaries, Rajan, VSI, Rembrandt, and the Debtors' secured creditors,

and further considering the significant legal and factual challenges involved in the 225 Action, the

risk it posed to the Debtors' assets and any creditor recovery, and the ongoing need to fund the

operations of its research and development subsidiary, SeeCubic BV ("SCBV"), the Trustee

decided that, in his reasonable business judgment, settling the disputes with the Debtors' secured

creditors including, but not limited to, the 225 Action and the adversary proceeding initiated by

the Debtors to, *inter alia*, enjoin the Debtors' secured lenders, individuals associated with the

secured lenders and SCBV (the "Adversary Proceeding") and providing a process to market and sell the Debtors' Assets was in the best interest of the Debtors' creditors and stakeholders.

19.     Through the Trustee's substantial efforts, the Trustee reached a settlement with Hawk, as collateral agent for the secured creditors (collectively, the "Secured Creditors"), resolving several disputes between the parties and providing for carve out valued in the minimum amount of $9,000,000.00 for the Debtors' estates, and a mechanism for the Debtors' Assets to be exposed to a sale process, whereby the true value of the assets could be assessed by exposing them to the market (the "Hawk Settlement").[4]

20.     On May 6, 2024, the Trustee filed a Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the Hawk Settlement (the "9019 Motion") (D.I. #630).

21.     This Court conducted an evidentiary hearing on the 9019 Motion on June 5, 2024, during which the Trustee presented evidence that the Hawk Settlement satisfied the *Martin* factors[5], established the facts and reasoning that had informed his decision, making a sound business judgment in entering into the Hawk Settlement and was cross-examined by both VSI and Rembrandt.  Ultimately, this Court approved the Hawk Settlement (the "9019 Order") (D.I. #653) over the objections of VSI and Rembrandt (D.I. #642 and #643, respectively).

22.     Pursuant to the Hawk Settlement, on September 30, 2024, the Trustee filed the Sale Motion with this Court seeking authorization and approval of the Stalking Horse APA and the Bid Procedures in connection with the sale of substantially all of the Debtors' assets on an "as is", "where is" basis, without any warranty of any kind, express or implied.

---

[4] The salient terms of the Hawk Settlement are set forth in the Sale Motion. See Sale Motion at ¶ 30.
[5] *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

23.     The Sale Motion explicitly stated that the Trustee does not intend to sell or assign the Rembrandt License as a part of the Stalking Horse APA and intends to object to the Rembrandt claims in the Debtors' bankruptcy cases and raise counterclaims in connection therewith.

24.     Thereafter, on November 13, 2024, the Court held a hearing and approved the Bidding Procedures and the Stalking Horse APA with SeeCubic Inc. ("SeeCubic"), once again, over the objections of VSI and Rembrandt (D.I. #788 and #789, respectively).

25.     The order approving the Bidding Procedures was entered on November 20, 2024 (D.I. #811).

26.     The Bidding Procedures Order also set a deadline of November 22, 2024, at 4:00 p.m. (EST) for the filing of objections specifically to the sale of the Debtor's Assets and a deadline of November 29, 2024, for the filing of responses to any objections. (D.I. #811).[6]

27.     On November 22, 2024, VSI and Rembrandt filed the Objections, which incredibly attempt to reargue the merits of the Hawk Settlement and spend an inordinate amount of time attempting to deflect attention from the conspiratorial and collusive actions of Rajan, VSI and Rembrandt, ignoring this Court's observations about Rajan's spectacular failures as a fiduciary as reflected in the Trustee Opinion.

**B.     Rajan, VSI, and Rembrandt's Collusive Actions**

28.     The Objections, along with the statements and arguments contained therein, stand in stark contrast to the Court's findings in the Trustee Opinion and the history of the Debtors' cases, which established that Rajan, VSI, and Rembrandt have a long history of obfuscating the truth and acting in their own interest – not in the interest of the Debtors' bankruptcy estates.

---

[6] Additionally, the Bidding Procedures Order set a deadline of the Sale Hearing, December 4, 2024, for objections, and responses thereto, based solely on the identity of the Successful Bidder at the Auction.

29.     In the Trustee Opinion, this Court found, *inter alia*, that: (i) the Debtors, under the watch and leadership of Rajan, breached their fiduciary duties to creditors and disclosure obligations to the Court in failing to disclose that VSI had made millions of dollars of payments on behalf of the Debtors in return for Debtor stock; (ii) Debtors' management, specifically Rajan, contemporaneously and improperly acted as a fiduciary of the Debtors and VSI; (iii) "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinctions between the Debtors and VSI and his roles with each"; and (iv) "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness." Trustee Opinion at 60-61.

30.     Throughout these cases, there have been particular concerns with the integrity of Rajan's dealings with VSI and Rembrandt:

> [T]he Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and <u>whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI.</u>

Trustee Opinion at 56 (emphasis added).

31.     The Court explicitly noted that VSI's actions and involvement in the Debtors' cases were a driving force behind appointing the Trustee. Trustee Opinion at 46-51.

32.     Rajan's alignment with VSI and Rembrandt to the detriment of the Debtors has continued, unabated, since the entry of the Trustee Opinion and has been in full display before this Court as VSI and Rembrandt attempt to seize any opportunity to throw roadblocks in the Trustee's

4889-9066-4446 v5

path to selling the Assets in order to pay creditors. Simply put, Rajan has continued to engage in the same conduct the Court found so troubling in the Trustee Opinion.

### i.    VSI's Control Over the Debtors

33.    It is well established that Rajan served as the controlling force of both VSI and the Debtors.

34.    Despite having control over VSI and the Debtors, Rajan used the Debtors' bankruptcies to avoid the realities of the 225 Action and then to actively advance the interests of VSI at the expense of the real creditors, the Debtors, and their estates.

35.    It is clear from documents produced by the Debtors' bankruptcy counsel that VSI exhibited control over the Debtors even in the early stages of the Debtors' bankruptcy cases.

36.    For example, on July 8, 2023, the Debtors' bankruptcy counsel emailed VSI's attorneys at Akerman LLP attaching template documents for formulation of a Chapter 11 plan and related agreements, which they aptly described as "really VSI's deal."   True and correct copies of the emails are attached as Exhibit "B" hereto.

37.    VSI's control over the Debtors included VSI's Akerman attorneys issuing instructions to the Debtors' counsel concerning an adversary proceeding filed by the Debtors against certain of the Debtors' secured creditors and equity holders.  *See* Exhibit "C" attached hereto. (July 2023 email chain between Debtors' attorneys and VSI's attorneys at Akerman in which an Akerman attorney states that delay in drafting the complaint "is ridiculous.  Client [i.e., VSI,] wants i[t] filed tomorrow"); *see also, e.g.,* Exhibit "D" attached hereto (8/4/23 email from Debtors' attorney to various Debtor principals, VSI principals, Debtor attorneys, and Akerman attorneys stating that "Mathu and Bud tell me that VSI wants to have relief ASAP on several fronts – we need to get that list and make sure we are asking for injunctive relief").

38.     Upon information and belief, the "Bud" in the August 8, 2023 e-mail is Charles M.

"Bud" Robertson ("Mr. Robertson"), the same individual who submitted the declaration in support

of VSI's Objection in which he stated he has served in various roles with Stream, SCBV, and for

most of 2024 provided executive consulting services for VSI, while at the same time, from

"January 2024 until the present . . . provided contract services to Stream" after the Trustee's

appointment.  See Declaration of Charles M. Robinson, D.I #815-1 at pp. 1-2.  It is unknown under

what "contract" Mr. Robinson was performing those services or who was paying him for those

services.

39.     What Mr. Robinson fails to disclose in his Declaration is that he is currently listed

as the Executive Vice President for Visual Technology Innovations, Inc. ("VTI") (see https://vti-

global.com/team/), which the Delaware Bankruptcy Court found explicitly existed for the purpose

of wrongfully usurping the resources of the Debtor for the benefit of Mr. Rajan.

40.     As a result, the Delaware Bankruptcy Court dismissed the Delaware Voluntary

Bankruptcy Case as having been filed in bad faith:

> Mr. Rajan established VTI of which he is the controlling
> shareholder, president, and until recently the sole director.  Using
> VTI he began to fundraise using Stream's assets despite the
> injunction.
>
> It is clear, through documentary evidence, that Mr. Rajan intended
> to use a Stream bankruptcy as a mechanism by which he could, via
> Stream, regain the Ultra-D assets from the secured lenders and then
> through VTI obtain them at a fraction of what he believed was the
> assets' value.

Delaware Voluntary Bankruptcy Case at D.I. #200, 14:20-15:4; *id.* at D.I. #198 (order dismissing

bankruptcy).

41.     The level of control VSI had over the Debtors became explicitly clear when, on

April 3, 2023, the Debtors filed an Application Pursuant to 11 U.S.C. § 327(a) of the Bankruptcy

Code for Authority to Employ their prior counsel, which was accompanied by a declaration from counsel in which it was represented that "Before filing these cases, Visual Semiconductor, Inc. ('VSI'), an investor in the Debtor, paid a flat non-refundable fee payment on behalf of the Debtors in the amount of $50,000.00 in preparation for filing the Chapter 11 bankruptcies. VSI has been advancing payments for Stream TV Networks, Inc's [sic] expenses in exchange for equity in Stream TV Networks, Inc." (D.I. #70).

42.     As it turns out, VSI continued funding the Debtors' post-petition operations in exchange for equity in Stream and, through VSI, solicited money from investors pursuant to an agreement for which the Debtors never obtained court approval.

43.     While taking the position that such transfers were not outside Stream's ordinary course of business (and thus did not require prior court approval), in support of the Stock Sale Motion (defined below), the Debtors represented to the Court that they were nonetheless seeking such approval out of an "abundance of caution," had not made any such transfers post-petition, and were awaiting Court permission to do so. Trustee Opinion at 39-40 (citing Stock Sale Motion ¶ 56) and 43 (citing April 24, 2023 Hrg. Tr. at 28:10-15, 31:22-32:1). "[T]he Court did not give that permission." *Id.* At trial, Mr. Rajan's testimony revealed to the Court that Stream – then under his control – had been issuing shares to VSI "every week or two since the Debtors' Petitions were filed." *Id.* at 44 (citing August 17, 2023 Hrg. Tr. at 205:21-206:1, 212:25-213:3).

### ii.     Rembrandt's Suspect Claims

44.     The collusive and conspiratorial relationship between the Debtors and Rembrandt began well before the Debtors' bankruptcy cases were filed.

45.     On May 23, 2021, Stream, Rajan, Rajan's brother Raja, an attorney, and Rembrandt executed a collusive and self-serving settlement agreement (the "Settlement Agreement") that

11

granted Rembrandt creditor status in a ruse to circumvent the dismissal of the Delaware Voluntary
Bankruptcy Case. A true and correct copy of the Settlement Agreement is attached as Exhibit "E"
hereto.

46.    The **same day** that Stream and Rembrandt entered into the Settlement Agreement,
Rembrandt, as one of three (3) petitioning creditors, filed the Delaware Involuntary Bankruptcy
Case against Stream.

47.    While the filing was ultimately dismissed, the timing of the filing substantiated the
concern that the Settlement Agreement was a sham concocted by Rajan and Rembrandt to
manufacture a contrived claim for Rembrandt to end-run the Delaware Bankruptcy Court's
dismissal of the Delaware Voluntary Bankruptcy Case.

48.    On the Petition Date, Technovative filed its List of Creditors Who have the 20
Largest Unsecured Claims and are not Insiders (the "Top 20 List") and scheduled Rembrandt as
its only creditor having a "breach of contract" claim in the amount of $10 million ( ) and listed
the claim as contingent, unliquidated and disputed and thus, not an allowed claim (Technovative
Bankruptcy Docket, D.I. #1 and #3).

49.    Then, mysteriously and without explanation, a mere two (2) weeks later, when
Technovative filed its Schedules of Assets and Liabilities, Rembrandt's claim ballooned to $100
million dollars, more than ten (10) times the original amount, and listed by Rajan as underlined,
noncontingent, and liquidated and therefore, an "allowed" claim for "goods and services."
(Technovative Bankruptcy Docket, D.I. #50).

50.    To make matters worse, less than a month prior to the Petition Date, Rembrandt
filed a complaint in the Delaware District Court against, *inter alia*, Technovative in which the only
count asserted against Technovative was a request for injunctive relief and no monetary damages;

12

and yet Rajan listed Rembrandt as having an undisputed, non-contingent and liquidated claim of $100 million in its Schedules, ten times its original claim.

51.    How Technovative, a holding company, whose only assets were the interests in Media Holdings Co. LLC and Ultra D Ventures C.V. valued at $2,000.00 as of the petition date, incurred $100 million of undisputed, noncontingent, and unliquidated debt without explanation and with nothing to show for it reported on its Schedules defies comprehension, and blatantly signals collusion. *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #47).

52.    Emails between counsel for Rembrandt and the Debtors concerning the "Plan for Rembrandt" all but confirm that the schedules were being manipulated:

> [Rembrandt Attorney:]  We have read Stream's latest motion papers and note that Stream was asking to have a number of employees and vendors paid to allow production to start but did not include any payment to Rembrandt. While I understand the list of vendors will not be paid, we expected to be included in the list of vendors that needed to be paid to restart production.  Coupled with Stream's failure to list Rembrandt as either a creditor or as having an executory contract with Stream, we are having a hard time reconciling your filings with your statements that Rembrandt will both be paid and treated as an administrative claim.  If VSI has $10,000,000 to invest in Stream, there are funds to pay Rembrandt, but we see no plan to do so. . . .
>
> [Debtors' Attorney]:   We have to update the schedules.
>
> Right now we are trying to deal with the secured lenders.
>
> Do your funding sources want to supply a DIP
>
> Might be better optics.
>
> VSI isn't putting in $10 million - the purchase orders plus investors are the source of those funds.

True and correct copies of the emails are attached as Exhibit "F" hereto.

4889-9066-4446 v5

53.     Even more suspect is that Stream, who Rembrandt alleges is the counterparty to the Settlement Agreement, failed to even include a claim for Rembrandt in its Schedules and initially did not identify the collusive Rembrandt Agreement as an executory contract in its Schedules (the Stream Schedule G was ultimately amended to include the Settlement Agreement).

54.     Thereafter, on October 10, 2024, the Trustee filed an amendment to the Technovative Schedules to list the Rembrandt claim in the correct amount: $0.00. In response, Rembrandt falsely filed a nearly identical proof of claim against Technovative to the claim it filed against Stream for $1.2 billion based on the claimed Settlement Agreement, to which Technovative is not even a party.  A copy of Rembrandt's Claim No. 26-1 filed against Technovative in the Stream bankruptcy is attached as Exhibit "G" hereto.

55.     The Trustee is investigating Rembrandt's proofs of claim with the intention of objecting to the Rembrandt claims in the Debtors' bankruptcy cases and raising counterclaims in connection therewith.  The Trustee vehemently disputes the bona fides of this claimed debt.

### iii.     Transactions that Benefitted VSI and Rembrandt

56.     In addition to the transactions detailed above, there are a number of other problematic transactions between the Debtors, VSI, and Rembrandt – all of which have the taint of Rajan's involvement.

57.     Of particular concern were the proposed major transactions benefitting VSI, which this Court has also taken issue with:

> The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra*, the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI.  It was, therefore, denied.  The unauthorized post-petition issuance of shares in Stream to VSI also

14

raises serious questions about the administration of these cases for the benefit of VSI. These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

Trustee Opinion at 46.

58.     The proposed funding transactions with VSI that so concerned the Court first took the form of an expedited motion seeking court approval to sell $10 million of unissued Stream shares to VSI in exchange for funding of their post-petition operations. (D.I #135) ("Stock Sale Motion").

59.     The Stock Sale Motion stated that VSI and Stream had entered into an exclusive distribution agreement (the "Distribution Agreement") "as compensation for [VSI's] support" pursuant to which VSI would accept orders from and deliver products to third-party customers. Upon receiving an order, VSI would issue a purchase order to Stream for 90% of the order total and would keep 10% for itself.  *Id*.

60.     While taking the position that such transfers were not outside Stream's ordinary course of business (and thus did not require prior court approval), in support of the Stock Sale Motion, the Debtors represented to the Court that they were nonetheless seeking such approval out of an "abundance of caution", had not made any such transfers post-petition, and were awaiting Court permission to do so. Trustee Opinion at 39-40 (citing Stock Sale Motion ¶ 56) and 43 (citing April 24, 2023 Hrg. Tr. at 28:10-15, 31:22-32:1).

61.     Even more troubling, Mr. Rajan's later testimony revealed to the Court that Stream – then under his control – had been issuing shares to VSI "every week or two since the Debtors' Petitions were filed." *Id.* at 44 (citing August 17, 2023 Hrg. Tr. at 205:21-206:1, 212:25-213:3).

15

62.    After the Court informed the Debtors that it would not approve the sale of Stream shares to VSI on an expedited basis, the Debtors sought approval of emergency debtor-in-possession financing the following day (D.I #155) ("DIP Financing Motion") in which the Debtors proposed two funding options: a) the Debtors could borrow roughly €872,000.00 from VSI on an unsecured basis to fund SCBV payroll, or b) Stream could enter into the Distribution Agreement with VSI and, in exchange, VSI would issue one or more unsecured SCBV promissory notes directly to SCBV.

63.    Approval of the DIP Financing Motion was also denied, as this Court specifically found that either the Stock Sale Motion or the DIP Financing Motion "would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI." Trustee Opinion at 46.

64.    Transactions, such as the Distribution Agreement with VSI and the Rembrandt License Covenant, appeared to benefit VSI primarily and raised additional concerns about conflicts of interest and Rajan's ability to act in the best interest of the Debtors' estates. Trustee Opinion at pp. 46-51.

65.    The Rembrandt License Covenant, like the Distribution Agreement, is especially of concern, as it was entered into by Rajan without court approval.

66.    The Rembrandt License Covenant clearly prioritized VSI's interests over the interests of the Debtors and their subsidiaries by expressly barring Rembrandt from issuing licenses to any of Stream's subsidiaries. Trustee Opinion at 49-50.

67.    Indeed, the Rembrandt License Covenant was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries. The Licensing

16

Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries." Trustee Opinion at 50.

68.     The concerns with the Rembrandt License Covenant also apply to the August 12, 2023, Settlement Amendment between Stream and Rembrandt, which was also entered into without the approval of the Court (the "Settlement Amendment").

69.     The Settlement Amendment served to amend the May 23, 2021, Settlement Agreement between Stream and Rembrandt.

70.     Like the Rembrandt License Covenant, the Settlement Amendment served to align Stream and VSI with respect to licensing the technology of Rembrandt, as it contained, *inter alia*, a clause stating that in the event there was a change of control in Stream, Rembrandt would transfer all licenses from Stream to VSI.

71.     This clause was essentially a "poison pill" that served to keep the Rembrandt licenses in Rajan's hands and to cause Stream to implode in the event Rajan was removed from control.

72.     There were also serious concerns with the Distribution Agreement. This Court stated: "In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales." Trustee Opinion at 46-48.

73.     With regard to these transactions, each "had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them

4889-9066-4446 v5

without being able to articulate how they are a reasonable exercise of his business judgment." Trustee Opinion at 51.

### iv.    Rajan's History of Untrustworthiness

74.    Throughout the pendency of these bankruptcy cases, it has been made clear that Rajan and the parties he controls cannot and should not be trusted.

75.    This Court went to great lengths in the Trustee Opinion to stress that it was highly concerned with Rajan's "plans, trustworthiness, and motivations… in his role as, for all intents and purposes, the singular figure in the Debtors' management." Trustee Opinion at p. 31.

76.    There were numerous issues with Rajan's leadership, including, but not limited to (i) his lack of "ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court," (ii) "the relatively directionless nature of these cases to date," and (ii) "the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date." Trustee Opinion at p. 31.

77.    In the Trustee Opinion, the Court pointed directly to events that highlighted Rajan's lack of leadership and untrustworthiness, including:

   a.    Rajan's purported deal with Zhongsheng Group Holdings Ltd. ("Zhongsheng"). The Court called its very existence into question and stated it did not believe the deal was real. Trustee Opinion at 35-38.

   b.    The self-imposed funding crisis that nearly left SCBV's payroll unfunded. The Court took significant issue with the foreseeability of the funding crisis, and the Debtors', as managed by Rajan, attempt to solve the crisis by proposing the sale of shares of the Debtors to VSI on an expedited basis. Trustee Opinion at 42-43.

4889-9066-4446 v5

c. Rajan's claims that there were "hundreds of millions of dollars" in purchase orders coming to Stream and numerous deals/partnerships in the works. The Court stated it had concerns with the veracity of the alleged purchase orders from VSI, stating there was nothing to substantiate them other than Rajan's meritless testimony. Trustee Opinion at 51-58.

d. The Debtors' lack of transparency in post-petition operations and financing while under Rajan's leadership. The Court was alarmed by "the Debtors' failure to revise knowingly false monthly operating reports…" and the fact that the revised monthly operating reports filed by the Debtors revealed that there were payments VSI made on behalf of Stream, a fact that is directly contradicted by Rajan's testimony.

Trustee Opinion at 59-60.

78.     Ultimately, the net result of Rajan's administration of the Debtors was "confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship." Trustee Opinion at 61.

79.     VSI complains that the Trustee ignored better offers made by VSI. The Trustee could not establish that any of VSI's proposals were credible or likely to produce the promised results.

### C.      The Continued, Unapproved Use of the Debtors' Assets

80.     After his appointment, the Trustee became aware that VSI was acting without his approval and was attempting to raise capital using and/or selling either Stream technology or products incorporating that technology in violation of the Trustee Order.

19

81.     VSI was acting like and holding itself out to be an affiliate of the Debtors, even though it is not.

82.     Indeed, despite the Court entering the Trustee Opinion and Order, Rajan, through VSI, continued to act on behalf of and exert control over the Debtors' assets by acting without the Court or the Trustee's approval, demonstrating Debtor technology and attempting to raise capital using and/or selling either Stream technology or products incorporating that technology. VSI has explicitly admitted this. *See* Case No. 23-00057-AMC, D.I. #135 at ¶ 10.

83.     VSI even admitted that it was finalizing the plans to take control of Stream's bonding equipment in order to deliver it to an unnamed strategic partner. *See id.* at ¶ 9.

84.     Further, the Trustee has recently been made aware that VSI and Rajan performed a "panel demonstration" on November 8, 2024 in Pennsylvania for a potential investor, Continental Advisory Services, LLC., in order to raise investment funds in an attempt to propose a Plan.

85.     Rajan's actions are part of his pattern to go to any lengths to regain control of the Debtors and is clearly willing to violate not only the Trustee Order and Opinion, but his duty of loyalty and fiduciary duties owed to the Debtors.

**D.     VSI and Rembrandt's Prior  Offers**

86.     As set forth in detail in the Trustee's Declaration in Support of the Sale Motion, from the outset of the Trustee's appointment, in good faith, the Trustee solicited and entertained proposals from VSI and Rembrandt to fund SCBV's operations, fund a Plan, and/or acquire the Debtors' assets; however, the "offers" presented were illusory at best and without any verified or committed source of funding.

87.     The Trustee and his advisors have been given no reason to believe that VSI's proposals were feasible - VSI has repeatedly failed to show that it has the money or backing to

4889-9066-4446 v5

consummate any proposal, instead relying on purchase orders already dismissed by this Court as hyperbole at best, or fabrication at worst.

88.     Further, VSI's proposals have relied on the same purchase orders the Court previously held were unsubstantiated in the Trustee Opinion. Trustee Opinion at 55. Rajan continues to trot out the purchase orders to show claimed customer interest.

89.     At VSI's request, the Trustee personally met with VSI's alleged principal investor, Mr. Jacob Yahinian ("Yahinian") to discuss the Debtors' status and a potential path forward. Having engaged with Yahinian on numerous subsequent occasions, Yahinian is similarly more interested in renegotiating the terms of the Hawk Settlement than finding a viable path forward with VSI.

90.     Further, Yahinian has make it clear that he sees little value in the Debtors' assets and is troubled by the minimal progress the Debtors' have made despite having raised over $100 million during their history.

91.     Rembrandt's proposals have been even more ethereal than VSI's, as it has never made a true purchase offer.

92.     Indeed, Rembrandt repeatedly failed to present the Trustee with firm terms, commit to hard numbers, or present a valuation of the Debtors' Assets. While Christopher Michaels, Rembrandt's CFO and sometime lawyer ("Michaels"), initially claimed its investors had $70 million to invest in Stream, no offer was ever made by Rembrandt.

93.     Further, despite Rembrandt's allegedly continued interest, it has neither looked at the Assets nor gone into the Debtors' data room.

94.     The Trustee has continually urged VSI and Rembrandt to submit formal proposals and even meet with Hawk, yet neither has and, to that extent, neither has submitted a bid for the

4889-9066-4446 v5

Debtors' Assets.

## III.   **ARGUMENT**

### A.    **The Objections**

95.    Despite the myriad of holdings by this Court to the contrary, including the Trustee Opinion, VSI and Rembrandt attempt to recast these cases and paint themselves as the aggrieved parties, and wrongfully portray the Trustee as the party acting in bad faith.

96.    As stated earlier, the Objections in large part boil down to attempts to either (i) re-litigate claims already resolved in the Hawk Settlement or reargue the objections to the 9019 Motion, both of which were made final with the entry of the 9019 Order; or (ii) reargue their objections to the Bid Procedures Motion, which have all been overruled by the Court.

97.    Those Objections can be categorized as complaints that (1) the sale process is unfair as it favors insiders and the Hawk Parties; (2) the Trustee has not provided a clear inventory of assets to be sold or resolved ownership issues; (3) insiders have misappropriated assets; (4) conflicts of interest exist among insiders; and (5) the sale is an improper sub rosa plan.

#### i.    **VSI's Objection**

98.    VSI offers the same argument it has used to no avail throughout these Chapter 11 cases: that the sale process was unfair and not contemplated in good faith as the Stalking Horse Bidder, SeeCubic, is an insider, and thus, the sale was not negotiated at arm's length.

99.    The VSI Objection specifically alleges that sale and solicitation materials were incomplete as they omitted alleged purchased orders from VSI, agreements with Phillips and Rembrandt, and financial and operational data for Stream's research and development subsidiary.

100.    Further, VSI alleges that the Trustee failed to establish that all assets included in the sale are part of the Debtor's bankruptcy estates or ensure assets would be transferred free of encumbrances.

101.    All of the above, VSI argues, establishes *de facto* reorganization terms without complying with Chapter 11 requirements under the Bankruptcy Code.

### ii.    Rembrandt's Objection

102.    While the Trustee has filed numerous schedules detailing what exactly is being sold through the sale of the Debtors' Assets, Rembrandt's Objection chooses not to believe them and alleges that certain items are being sold when they are not.

103.    Further, the Rembrandt Objection argues on behalf of Phillips despite Rembrandt having no standing or authority to do so.

104.    Rembrandt's Objection requests the Court deny the approval of the sale of the Assets until the Trustee identifies assets belonging to the bankruptcy estate and removes third-party IP, including Philips' and allegedly Rembrandt's technology, from the Assets.

105.    The entirety of Rembrandt's Objection is centered around its allegation that the sale includes Rembrandt's and Phillip's intellectual property, which the Trustee has no authority to sell.  This allegation is untrue.

106.    Rembrandt's Objection alleges that there are numerous issues with the Sale Motion and the Debtors' cases in general that are harming the value of the Rembrandt and Phillips IP, including: (1) Hawk, SeeCubic, and SCBV violating the TRO; (2) the Trustee's lack of transparency with respect to information regarding estate assets and intellectual property; (3) discovery motions by Rembrandt and others having been quashed – raising questions about

23

accountability; (4) SeeCubic's alleged history of improper IP use; and (5) the perceived "late" employment of Panitch Schwarze Belisario  Nadel LLP ("Panitch").

107.     Rembrandt argues and threatens that if the sale of the Assets is approved as is, the sale of the Rembrandt and Phillips IP would violate existing licenses, exposing potential buyers to claims of patent infringement and trade secret misappropriation and, consequently, heavy fines and imprisonment.  It is hard to imagine how this threat stimulated interest.  More likely, the opposite is true.

108.     Through the Objection, Rembrandt once again proposes alternatives to the sale of the Assets. However, these alternatives are illusory at best and contain minimal terms.

109.     Indeed, the most the Rembrandt Objection says is that Rembrandt and other investors have a willingness to fund a reorganization rather than pursue a sale. The Trustee is not sure what they are waiting for.

**B.     Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code**

110.     The Trustee submits that the Sale requested by the Sale Motion is authorized under section 363(b) of the Bankruptcy Code governing sales outside of the ordinary course of a debtor's business.

111.     Section 363(b) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

112.     This Court's power under section 363 is augmented by section 105(a), which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. As set forth below, the

Trustee submits he has satisfied the requirements of sections 105, 363, and 365 of the Bankruptcy Code.

113.    Courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del.    Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

114.    Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. *See Lionel Corp.*, 722 F.2d at 1071; *Del.    Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

115.    Consideration of the above factors here unequivocally establishes that the Sale should be approved.  As set forth in greater detail above and in the 9019 Motion, the Trustee has demonstrated sound business reasons for the sale in that after a lengthy investigation and consultation with his professionals, the Trustee concluded that a reorganization of the Debtors was not feasible and after soliciting proposals and negotiating with all of the salient parties in this case, the Hawk Settlement was the only viable option to produce a stalking horse bid.

116.    The Trustee, through his investment banker, SSG Capital Advisors ("SSG"), has marketed the Assets since early October and solicited more than 550 potential strategic and financial targets for the purchase of the Assets. Based on the Trustee's and SSG's marketing efforts, the Trustee has amply marketed the Assets.

117.    The approved Bidding Procedures were designed to maximize the purchase price for the Debtors' Assets and allowed for sale of all or part of the Debtors' Assets to various purchasers. The Bidding Procedures and Sale Notice were served in accordance with the Bidding Procedures Order and ensured that all interested parties received adequate notice of the Bid Deadline and Auction.

118.    Further, the Trustee is poised to file a Plan shortly after the closing on the Sale and based upon the Hawk Settlement or any successful bidder who makes a qualified bid in excess of the Stalking Horse Bid. A distribution to unsecured creditors is assured.

119.    For all these reasons, the Trustee respectfully submits that the Sale of the Assets is supported by sound business reasons and is in the best interests of the Debtors and their respective estates. Accordingly, the Trustee requests approval of the Sale pursuant to Section 363(b) of the Bankruptcy Code.

## C.      **The Trustee can Sell the Stream Debtor's Assets and the Equity in Technovative's Downstream Entities Under the Bankruptcy Code**

120.    VSI and Rembrandt both devote considerable portions of the Objections incorrectly contending that the Sale Motion seeks to sell property, specifically intellectual property in which the Debtors do not have an interest.  VSI and Rembrandt argue that (i) the Trustee may not sell Debtors' property that is not property of the estate and (ii) before approving a sale, the Court must first determine whether such property constitutes property of the estate.

26

121.    The Trustee is only selling assets owned directly by the Debtors.  To be clear, the Assets being transferred by the Trustee are limited to the Stream assets identified in the asset purchase agreement filed in connection with the Sale Motion (the "APA") and the ownership interests of Technovative in the Non-Debtor Subsidiaries (D.I. #791-1).  The Trustee is NOT transferring title to any property owned by the Non-Debtor Subsidiaries.

122.    For the reasons set forth herein, the arguments of VSI and Rembrandt fail.

123.    It is axiomatic that the Bankruptcy Code, particularly Section 363, which provides for the sale of estate assets, does not expand the property rights of the estate beyond the parameters of nonbankruptcy law that creates the property right in the first place.

124.    Section 541(a)(1) of the Bankruptcy Code provides that the filing of a voluntary bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." *See* 11 U.S.C. § 541(a)(1).

125.    Without question, section 541(a)(1) of the Bankruptcy Code is given broad application and includes "all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property. . . ." *Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233, 241 (3d Cir. 2001) (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)). See also *Burgess v. Sikes (In re Burgess),* 392 F.3d 782, 785 (5th Cir. 2004) (noting that the "'scope of property rights and interests included in a bankruptcy estate is very broad: the conditional, future, speculative or equitable nature of an interest does not prevent it from being property of the bankruptcy estate") (citations omitted); *In re Lock,* 329 B.R. 856, 858 (Bankr. S.D. Ill. 2005) ("The scope of estate property is very broad and includes every conceivable interest held by the debtor in property") (citation omitted).

4889-9066-4446 v5

126. Section 363(b) of the Bankruptcy Code allows a trustee to sell property of the estate outside the debtor's ordinary course of business after notice and a hearing. 11 U.S.C. 363(b)(1). Implicit within the statutory grant of authority to sell property under section 363, however, is the requirement that the estate actually have an interest in the property to be sold. *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001) (noting that, before the trustee could sell estate property under section 363(b)(1), the estate was required to have an interest in that property); *Gorka v. oseph (In re Atl. Gulf Cmtys. Corp.)*, 326 B.R. 294, 299 (Bankr. D. Del. 2005) (under bankruptcy law, even speculative litigation claims are property of the estate) (citations omitted).

127. Under section 363(f) of the Bankruptcy Code, a trustee can sell property of the estate free and clear of any interest in such property of an entity other than the estate, provided that one of five conditions is met: "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) **such interest is in bona fide dispute**; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f) (emphasis added); *In re Scimeca Found., Inc.*, 497 B.R. 753, 772 (Bankr. E.D.Pa. 2013).

128. Section 363(f) is drafted in the disjunctive; that is, the sale free of the claimed interest can occur if any one of the conditions specified in the subsection has been satisfied. *In re N Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 Bankr. LEXIS 4498, *37-38 (Bankr. D.N.J. June 29, 2006); *Scimeca Found.*, 497 B.R. at 772 ("[a]s section 363(f) is written in the disjunctive, a bankruptcy trustee can 'sell property free and clear of an interest in the property provided that one or more of the provisions under Section 363(f) is satisfied.'") *quoting In re Messina*, 687 F.3d 74, 77 n.4 (3d Cir. 2012). 3 Collier on Bankruptcy ¶ 363.06 (15th ed. rev. 2005).

28

129.    Furthermore, section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate. 3 Collier on Bankruptcy ¶ 363.06[1] (15th ed. rev. 2005).

130.    The phrase "bona fide dispute" is not defined in the Bankruptcy Code. Nonetheless, courts applying section 363(f)(4) of the Bankruptcy Code have developed a standard for determining whether a "bona fide dispute" exists; that is, courts will inquire "whether there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest." *N  Affordable Homes*, 2006 Bankr. LEXIS at *41 (citing, *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996)).

131.    The court in *N  Affordable Homes Corp.* noted that the evidentiary record required to support a finding of a "bona fide dispute" for purposes of section 363(f)(4) of the Bankruptcy Code depends upon a case-by-case consideration of the following: (i) the procedural posture of the case; (ii) the need to expedite the sale; and (iii) the nature of the basis for determining that a dispute exists. *Id. at* *41-42 (citing *In re Robotic Vision Sys., Inc.*, 322 B.R. 502, 506 (Bankr. D.N.H. 2005).

132.    The purpose behind §363(f)(4) "*is* to allow the sale of property of the estate free and clear of disputed interests so the liquidation of the assets is not unnecessarily delayed while the disputes are being litigated. See, *Robotic Vision*, 322 B.R. at 506 (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001)). Succinctly, this is the concept behind § 363(f). *N  Affordable Homes*, 2006 Bankr. LEXIS at *40.

133.    Like the standard for the assumption of executory contracts, the standard for sales of estate property is one of business judgment. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2d Cir. 1983) (a sale under section 363 requires "some articulated business justification"). Thus, in connection with a Section 363 sale, the central issue

is the reasonableness of the trustee's business judgment to sell property whose ownership may be disputed, and this does not require a definitive determination of ownership rights.

134.     11 U.S.C.S. § 363(f)(4) permits a sale of property of the estate free and clear of a third party's interest therein if the interest is in bona fide dispute. Although § 363(f)(4) is most commonly applied when the entity's "interest" is a lien or security interest, the plain language of the provision would include an ownership "interest." See, *e.g.*, *In re Olympia Holding Corp.*, 129 B.R. 679, 681 (Bankr. M.D. Fla. 1991); *N  Affordable Homes*, 2006 Bankr. LEXIS 4498. This result is also strongly supported by the wording of  *3 3(h)*, setting forth provisions for the sale of a co-owner's "interest" and using the word "interest" to mean an ownership rather than a lien or security interest. *See In re Spain,* 831 F.2d 236, 240 (11th Cir. 1987).

135.     Although implicit within the statutory grant of authority to sell property under 11 U.S.C.S. § 363 is the requirement that the estate have an interest in the property to be sold, "property of the estate" as defined by 11 U.S.C.S. § 541(a) includes contingent and disputed property interests of a debtor. Thus, an estate can normally convey its ownership interest in property, subject to the claims of a third party. *In re Kane,* 628 F.3d 631, 641 n.7 (3d Cir.  2010); *Gorka v.  oseph (In re Atlantic Gulf Communities, Corp.)*, 326 B.R. 294, 299 (Bankr. D. Del. 2005). Thus, an estate can normally convey its ownership interest in property, subject to the claims of a third party. *See, e.g., Atlantic Gulf Communities*, 326 B.R. 294 (regardless of whether the estate had ownership of the property at issue, the estate did have a claim to ownership, which the trustee could sell outside the ordinary course of business by executing quitclaim deed in sale agreement).

136.     Finally, both VSI and Rembrandt rely heavily in their Objections upon the case of *In re Whitehall  ewelers Holdings, Inc*., Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr.

30

D. Del. July 28, 2008) for their central tenet that a debtor or trustee may not sell property through a 363 sale unless that property constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must determine whether the property the debtor proposes to sell constitutes property of the estate. The Objectors' reliance on *Whitehall* is misplaced based on the underlying facts of this case.

137.    In *Whitehall*, the debtors who were seeking to sell consigned goods did not even attempt to make a *prima facie* showing that the goods to be sold were property of the estate. Id. However, in contrast to facts of *Whitehall,* the Trustee here is not seeking to sell any assets that are not property of the estate. As has been made abundantly clear in the Trustee's Omnibus Response, the APA specifically excludes from the sale the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property. As such, *Whitehall* is distinguishable on its facts and is not an impediment to the approval of the Sale.

138.    First, it is important to note the Trustee is not proposing to sell the intellectual property, contracts or any other assets owned directly by the Non-Debtor Subsidiaries.  To be clear, the Trustee is transferring the Stream assets identified in the asset purchase agreement and the ownership interests of Technovative in the Non-Debtor Subsidiaries (D.I. #791-1).

139.    It is also important to note that the Schedules of Assets and Liabilities filed by both Stream and Technovative under penalty of perjury affirmatively state that neither of the Debtor entities own any intellectual property.  See Stream D.I. #52; Technovative D.I. #47.

140.    Therefore, Rembrandt does not have an "interest" in the Non-Debtor Subsidiaries' property; the only thing that Rembrandt has at this juncture is a "claim" that something owned or controlled by another foreign subsidiary that is indirectly owned by one of the Non-Debtor Subsidiaries contains Rembrandt "know how" or trade secrets (the "Rembrandt Claim").  No

31

evidence has been provided to show that the Debtors actually received "know how" from Rembrandt or that the Trustee is transferring any assets containing any Rembrandt, technology, "know how" or intellectual property. In fact, the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.[7]

141. The Rembrandt Claim is the subject of a bona fide dispute because of the following facts.

142. The problematic incestuous relationship between Rajan, VSI, and Rembrandt is well documented. *See* ¶¶ 44 through 55 above.

143. The Rembrandt Claim is hotly disputed and is the subject of ongoing litigation, currently stayed against Technovative. The Rembrandt Claim originally arose out of the Settlement Agreement and must be viewed critically, especially in light of the Rembrandt License Covenant and the Settlement Amendment, which Rembrandt and VSI attempted to enter into with Stream post-petition without Court authority and which this Court found so favored Rajan, VSI and Rembrandt. The Trustee believes the Settlement Agreement and any ancillary documents resulting therefrom are fraudulent transfers and will be challenged at the appropriate time by the Trustee.

---

[7] The specific language in section 2.2 (Excluded Assets) of the APA reads:

(j) any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;

(k) any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction

144.     In fact, less than a month prior to the Petition Date, Rembrandt filed a complaint in the Delaware District Court against Hawk, SeeCubic and Technovative, docketed as *Rembrandt 3D Holding Ltd v. Technovative Media, Inc. et al.*, C.A. No. 1:23-cv-00193-JLH (D. Del.), in which the only count asserted against Technovative was a request for injunctive relief (the "District Court Case").  The District Court Case is in its very early stages and is stayed as to Technovative, therefore, Rembrandt's "claims," while far from being proven, will ultimately be determined in the District Court Case.

145.     In addition, under the APA, SeeCubic or any Successful Purchaser "assumes any liability to the extent that there is any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement." (D.I. #795, Section 2.3).

146.     Upon information and belief, the Settlement Agreement is a contrivance that was "dead on arrival" and entered into to manufacture a claim so Rembrandt could serve as a petitioning creditor in Stream's second Delaware bankruptcy proceeding found to have been filed in bad faith.  Stream never paid the initial $1,528,000.00 **due on execution, the same date as the involuntary petition was filed,** Stream never provided Warrants, which is a condition to the effectiveness of the Settlement Agreement. **Stream never paid a single monthly fee** (originally at $28,000.00 per month), and more importantly at the time of execution, Stream had no ability to do so.  Stream never produced a single TV for Rembrandt under the Settlement Agreement, or provided a prototype for Rembrandt. Importantly, nowhere in the initial Settlement Agreement is there any admission that Stream violated Rembrandt's rights.

147.    Rajan conspired with Rembrandt to allow it to become a non-contingent creditor for $100,000,000.00 against the Technovative bankruptcy estate without any indication as to how Mr. Rajan arrived at that contrived and phony claim.

148.    Michaels has, however, continued to allege rights created under the Settlement Agreement and to threaten the Trustee, his professional, and potential purchasers with "imprisonment" for violation of patent laws when the Trustee is not conveying finished televisions or any property containing Rembrandt's alleged intellectual property.

149.    Even though there was no compliance by the Debtor with any of the monetary or production obligations under Rembrandt Settlement Agreement, there was no effort by Rembrandt for over two years to (a) enforce the Rembrandt Settlement; (b) collect on the monetary obligations under the Rembrandt Settlement; (c) cancel the alleged license issued under the Rembrandt Settlement; or (c) regain whatever technology it asserts it transferred under and pursuant to the Rembrandt Settlement.   How valuable were the obligations under the Rembrandt Settlement Agreement if Rembrandt did nothing to enforce them for over two (2) years

150.    The Settlement Amendment fails to reflect the missed payments, and includes other additional terms to coincide with agreements between Rembrandt and Rajan contained in the Debtors' proposed plan of reorganization filed July 13, 2023.   The Settlement Amendment contains another "poison pill" providing that the alleged Rembrandt IP may be used solely for the benefit of Stream.

151.    The License Covenant entered in the same time period, also cut out the Stream subsidiaries from any use of any license purportedly granted to Stream.  How this freeze out served the Debtors' interest is impossible to understand.  Clearly the prohibition, which extends not only

34

to Hawk and SLS, but to all of the Stream Debtor's downstream subsidiaries provides no benefit to Stream.

152.    This court has already opined on the nature of the Licensing Covenant in the Trustee Opinion:

> The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt**, to the exclusion of, *inter alia*, Stream's subsidiaries.**  While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology of Rembrandt by companies who do not own our technology, specifically See Cubic of Delaware, to stop the use of our technology to compete against us," the Licensing Covenant goes beyond it, **precluding the issuance of a license to any Stream subsidiaries. . . . Each of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates.**

Trustee Opinion at 50.

153.    Furthermore, a sale is clearly necessary considering that the outside closing date is December 10, 2024, under the APA and that the Trustee has only secured funding of SCBV (which holds substantial value) thru that date, not to mention that this case will have been pending for two years this coming March 2025 and the marketing campaign undertaken by the Trustee has, to date, not produced any other interested parties, let alone potential Purchasers.

154.    Similarly, the VSI and Rembrandt make seem to be under the impression that the Trustee is selling the Philips License, which is not accurate.  The Philips License is property of one the Debtors' downstream subsidiaries, whose assets are not being transferred.

155.    The Trustee has clearly demonstrated that he is only transferring property that belongs to the Debtors, including Technovative's interest in the Non-Debtor Subsidiaries, none of which include Rembrandt's alleged technology.

4889-9066-4446 v5

156.     Under the circumstances, for all of the reasons set forth above, of this case, the Trustee has met his burden of setting forth sufficient evidence demonstrating that a "bona fide dispute" for the purposes of section 363(f)(4) of the Bankruptcy Code, therefore to the extent that there is any question as to whether any Rembrandt property is in some way implicated in the sale, the Trustee can still transfer the assets free and clear to SeeCubic.

### D.     Rembrandt's Interests, if any, Are Adequately Protected

157.     To be clear, through this sale process, the Trustee is transferring Technovative's equity interests in the Non-Debtor Subsidiaries that has its own intellectual property, namely the 3d technology and source code.  Rembrandt has alleged a "claim" that some know how it provided was incorporated in part into the source code; a position that is subject to dispute in the Delaware Litigation, and if far from established fact.

158.     No court had ever determined that Rembrandt had an "interest" in the the Non-Debtor Subsidiaries' assets.  In fact, Rembrandt has known since at least the time of the filing of the 9019 Motion that it was the intention of the Trustee to sell the Debtors' assets and until very recently, Rembrandt has chosen to do nothing to protect its alleged rights.

159.     Rembrandt could have filed an adversary proceeding or affirmatively moved before this Court to attempt to establish its "claim" or other rights, instead it chose to appeal the 9019 Order, failed to request any stay of these proceedings and allowed the appeal to languish by missing the date to file its appellate brief by over three (3) months.

160.     Moreover, even the collusive and contrived Settlement Agreement does not in any way concede that the Debtors in fact used or received any know how or other Rembrandt technology.  In fact, the Settlement Agreement specifically provides for no admission of liability.

4889-9066-4446 v5

161.    In this case, the Trustee is transferring Technovative's equity ownership interests in the Non-Debtor Subsidiaries, in which Rembrandt has NO interest.  It has not established legal or equitable ownership or even an interest in any assets being sold by the Trustee pursuant to the Sale Motion.

162.    Rembrandt merely has an outstanding litigation claims against Technovative in which it claims it's "know how" or trade secrets were incorporated into SCBV's source Code; a position the Trustee vehemently disputes.

163.    As set forth above, section 363(f)(4) of the Bankruptcy Code specifically provides for the transfer of property free of any alleged "interest", include the alleged interest of Rembrandt which is subject to a bona fide dispute.

164.    Rembrandt attempts to confuse the Court by claiming that the Debtor is transferring Rembrandt's property.  The alleged property amounts to nothing more than a disputed "claim" in the downstream entities' source code which is not in the Debtor's possession to sell.

165.    However, the Trustee can sell the equity interests the Non-Debtor Subsidiaries over the disputed "claim" or interest of Rembrandt, if any, in the <u>assets</u> of the downstream subsidiary, provided that the "interests" are the subject of a bona fide dispute and are adequately protected. Rembrandt is entitled to adequate protection only to the extent its interest would be extinguished by virtue of the Sale Order.  That is not the case.

166.    Section 361 of the Bankruptcy Code provides for "adequate protection" to be provided to a party whose property is being used sold, used or leased.  Assuming an interest entitled to adequate protection exists in favor of Rembrandt, that interest is adequately protected.

167.    Section 361 provides in relevant part that: "[w]hen adequate protection is required under section [363] of this title . . . such adequate protection may be provided by . . . (2) providing

37

to *such entity* an additional or replacement lien to the extent that such [sale] results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." [Emphasis added]. Paragraph (3) of 361 allows this court to have flexibility in fashioning the provision of adequate protection.

168. Here, Rembrandt's interest is not in the nature of a security interest, but in the nature of an unliquidated, disputed unsecured claim.

169. It is respectfully submitted that Rembrandt's interests, whatever they may ultimately be determined to be, are adequately protected in a number of ways.

170. First, any claim alleged by Rembrandt that its IP is in some way transferred as a part of the sale which the Trustee disputes, is an assumed liability by SeeCubic, who Rembrandt is already suing in the Delaware Action. See Section 2.3 of the APA.

171. Second, any rights of Rembrandt to pursue the nonbankrupt Debtor subsidiary SCBV is preserved. Following the Closing, Rembrandt is free to pursue its state court litigation against both Hawk and See Cubic BV to attempt to have determined its interest in the source code of the downstream entity.

172. Also, the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.

173. In fact, Rembrandt's ability to protect its rights will not be altered in any way.

174. It may in fact be determined in the District Court Case court that Rembrandt has no interest in the downstream Debtor's source code. However, all of those rights are fully preserved as adequate protection of any claimed interest in the assets being transferred pursuant to the Sale Motion.

4889-9066-4446 v5

175.     The transfer of the equity interests in the Non-Debtor Subsidiaries will not alter in any way Rembrandt's litigation rights against SCBV or SeeCubic.  Nothing in the Sale Motion attempts to deprive Rembrandt of its alleged "interests" which are limited to the ability to assert its claims that the source code in SCBV incorporates its claimed know how.

### D.     SeeCubic is an Appropriate Purchaser and has Acted in Good Faith During the Course of the Sale Proceeding

176.     VSI goes to great lengths to detail its lengthy history with SeeCubic, which can only be characterized as complicated by persistent disputes over the Secured Creditors' efforts to exercise their rights to over their collateral, whether the secured debt had been converted and the Rajan's efforts to retain or regain control over the Debtors – efforts that continue to this day through is control over VSI.

177.     VSI's argument that SeeCubic is an inappropriate purchaser because of its bad acts ultimately fails because, under Third Circuit Law, the good faith of a purchaser is measured by the purchaser's conduct during the course of the sale proceedings.

178.     VSI also fails to cite to a single case in support of this argument because applicable case law supports SeeCubic as a good faith purchaser.

179.     The Bankruptcy Code does not define "good faith;" however, the Court of Appeals for the Third Circuit has held that the requirement that a purchaser act in good faith … speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986).

4889-9066-4446 v5

180.    Neither VSI nor Rembrandt point to a single instance where SeeCubic or the Trustee have engaged in fraud or collusion with other bidders during the sale process, again because no such conduct took place.

181.    Here, rather than attempt to take gross advantage of other bidders, the credit bid of SeeCubic was approved by this Court as the Stalking Horse Bid as part of the Hawk Settlement after notice and a hearing and over VSI and Rembrandt's objection.

182.    The objections over whether SeeCubic was an appropriate stalking horse bidder either were or should have been raised in the objections to the 9019 Motion, wherein the Trustee sought to have SeeCubic approved as the stalking horse bidder, which the 9019 Order ultimately accomplished.

183.    All of the bad conduct complained of in Mr. Robertson's declaration occurred pre-petition during the course of years long litigation between the Debtors, Rajan, and the Secured Creditors or are vague allegations that SeeCubic failed to return assets  - allegations that are unsupported except by Mr. Robertson, who freely admits in his declaration that he has a conflict of interest, even after the Trustee's appointment, when he worked for both VSI and the Debtors without the Trustee's knowledge or consent.

184.    As to the allegations that the Trustee did not secure the return of assets of the Debtors, it is important to consider the years prior to the Trustee's appointment, both pre and post-petition, that the Debtors and Rajan, who were in a far better position to know where those assets were kept, were unable to accomplish the very thing they complain the Trustee did not do.

185.    Upon his appointment, the Trustee inherited bankruptcy estates that Rajan left in complete disarray with no money, no operations, and in active and unstayed litigation with Hawk. To expect the Trustee, with almost no resources to secure the return of alleged assets such as the

40

Bonding Equipment, the Trustee would have had to first locate the assets in places as far away as China and the Netherlands, pay storage costs or landlord liens for the release of the assets, and safely package, ship and again store those assets – feats Rajan had been unable to achieve over a period of years, including with the protection of three separate bankruptcy proceedings.

186.    Rather than attempt to spend money he did not have in pursuing VSI and Rembrandt's proposed quixotic quest, the Trustee solicited proposals from VSI, Rembrandt and the Secured Creditors to purchase the Debtors' assets or fund a Plan, and in an exercise of his business judgment approved by this Court, entered into the Hawk Settlement which included exposing the Assets to the open market and permitting interested parties, including VSI and Rembrandt, to bid on those Assets.  Rather than do so, VSI and Rembrandt chose to use carefully coordinated efforts to block the sale by filing expedited motions and taking unsupportable, bad faith positions, filing multiple appeals that were either left to languish or filed in the eleventh hour, or attempting to relitigate issues already decided by this Court. These last-ditch efforts are solely to scuttle the Trustee's attempt to bring order to the chaos of these bankruptcy cases.

187.    The trustee has fulfilled his duties under the Bankruptcy Code and the mandates of the Trustee Order and Opinion.

188.    For the reasons set forth herein, in the 9019 Motion and the Procedures Motion, SeeCubic is an appropriate purchaser and it or such other qualified bidder that is selected as the Successful Bidder by the Trustee, should be approved by this Court along with the sale of the Assets to that Successful Bidder.

**E.**     **The Solicitation and Due Diligence Materials Offered by the Trustee and SSG are Not Misleading or Inadequate**

189.     In its objection, VSI attempts to reargue, as it did in its objection to the Procedures Motion, that the solicitation and due diligence materials offered by the Trustee and SSG are misleading and inadequate.

190.     VSI specifically complains that the Trustee was not transparent in his disclosure of the Assets being sold.

191.     Again, nothing could be farther from the truth.

192.      As is typical in a Chapter 11 sale process, SSG sent a one (1) page "Teaser" including a description of the Assets to more than 550 prospective strategic and financial targets, inviting interested parties to contact SSG to get access to its data room only after signing a nondisclosure agreement ("NDA").  The data room set up by SSG contains detailed information about the assets owned by Stream and Technovative and the assets, liabilities and financial condition of the Non-Debtor Subsidiaries and their foreign subsidiaries.

193.     Thus far, the only entity that contacted SSG to access the data room is VSI.

194.     This Court has already heard, considered, and dismissed VSI's arguments about the data room and Teaser and in so doing, directed the Trustee, in addition to the Assets being sold pursuant to the APA, to prepare and send to VSI and Rembrandt, a list of assets owned by the subsidiaries whose equity was being sold pursuant to the APA.

195.     The Trustee readily complied with the Court's direction and, on November 14, 2024, provided a list of the assets housed in downstream subsidiaries for VSI and Rembrandt to review and comment on.  To be clear, the list forwarded to VSI and Rembrandt included assets not owned by the Debtors and not being transferred pursuant to the APA.  By Rembrandt and VSI's

4889-9066-4446 v5

own arguments, the Trustee cannot transfer the assets in the downstream subsidiaries because the Debtors do not own those assets.

196.     Rembrandt and VSI annotated the list of assets prepared by the Trustee, including various admonitions and overt threats that any purchaser of the Assets would be subject to the continued wrath of VSI and Rembrandt, despite the fact that the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.

197.     Despite the fact that such language would clearly have the effect of chilling any interest in the acquisition of the Assets, the Trustee filed the list on the docket as directed by the Court as supplied by VSI and Rembrandt and without change (D.I #810).

198.     Ironically, even if the data room was in some way deficient, which the Trustee and SSG continue to dispute, it couldn't have any effect on the sale process because no one signed an NDA or accessed the data room to obtain more information except for VSI who has affirmatively stated that it does not intend to submit a qualified bid for the Assets.

199.     In many cases, interested parties that engage in any level of diligence have questions and inquiries, often asking for additional documents, support, and the ability to discuss issues with parties that have firsthand knowledge of the assets.  This was no different.  VSI requested, and Rembrandt, prior to the Hawk Settlement, requested and was provided direct access to SCBV personnel, including the Head of Technology and engineers involved in the development of the underlying 3D technology.

200.     Instead, VSI clearly visited the data room in an effort to gather information it could use in yet another attempt to manufacture reasons the sale should not be approved and not participate in the process in good faith.

**F.** **The Proposed Sale Does Not Constitute an Improper Sub Rosa Plan of Reorganization and Should be Approved**

201.    VSI argues that the Sale Motion should be denied because the 9019 Agreement and proposed sale process constitute an impermissible sub rosa plan that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent. (D.I. #815, ¶60).

202.    VSI alleges that the sale process, here, "short circuits" the requirements of Chapter 11 by dictating the terms of the plan sub rosa in connection with a sale of assets. VSI Objection to Sale Motion, D.I. #815, ¶61. VSI argues that the Trustee's sale process seeks to improperly channel consideration to specific creditor groups, is blatantly at the expense of the Debtors' other creditors, and will somehow "essentially ensure" that general unsecured creditors and perhaps administrative claimants will receive "only pennies on the dollar." (D.I. #815, ¶63).

203.    VSI erroneously asserts that the proposed sale is a sub rosa plan intended to bypass the confirmation requirements of the Bankruptcy Code. Courts have consistently acknowledged that assets of an estate can be sold prior to the confirmation or filing of a plan. *See In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) (citing *In re Chateaugay Corp.*, 973 F.2d 141, 145 (2d Cir. 1992)); *In re Equity Mgt. Sys.*, 149 B.R. 120, 124 (Bankr. S.D. Iowa 1993); *In re Naron Wagner Chartered*, 88 B.R. 85, 87-88 (Bankr. D. Md. 1988); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, *25 (D. Del. May 20, 2002).

204.    A bankruptcy trustee is authorized by statute to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). However, Section 363(b) does not authorize the trustee to enter a settlement or engage in a sale if the result amounts to a sub rosa plan of reorganization.

44

205.     A transaction amounts to a sub rosa plan of reorganization if it: 1) specifies the terms of any future reorganization plan; 2) restructures creditors' rights; and 3) requires that all parties release claims against the Debtor, its officers and directors, and its secured creditors. *Matter of Ca un Elec. Power CO OP., Inc.*, 119 F.3d 349, 354 (5th Cir. 1997) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).

206.     When a transaction or settlement in bankruptcy has the effect of "dictating some of the terms of any future reorganization plan," a court deems the transaction impermissible because it "short circuits the requirements of Chapter 11 . . . by establishing the terms of the plan sub rosa in connection with a sale of assets." *In re  evic Holding Corp.*, 787 F.3d 173, 187 (3d Cir. 2015) (Scirica, J., concurring in part and dissenting in part) (quoting *Braniff*, 700 F.2d at 940). The "hallmark of such a plan is that it dictates the terms of a reorganization plan." *Id.* at 188.

207.     To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote. *Ca un Elec.*, 119 F.3d at 354-55 (finding that the instant settlement is not a sub rosa reorganization of the type disapproved in *Braniff* in that it does not dispose of all claims against the debtor, does not restrict creditors' right to vote as they deem fit on a proposed reorganization plan and does not dispose of virtually all of the debtor's assets, leaving "little prospect or occasion for further reorganization"). See also, *In re Chrysler LLC*, 405 B.R. 84, 106 (Bankr. S.D.N.Y. 2009) (holding that the sale did not constitute a sub rosa plan of reorganization because, following the sale, the debtors would continue to administer their estates and seek to confirm a plan that would provide for the distribution of the value of remaining assets).

4889-9066-4446 v5

208.    A settlement agreement, which is a "necessary step toward, or building block of, a plan of reorganization," does not constitute an improper sub rosa plan. *In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014); *see also Ca un Elec.,* 119 F.3d at 355; *In re Tower Automotive Inc.*, 241 F.R.D. 162, 169-70 (S.D.N.Y. 2006).

209.    Courts have approved even large and important settlements prior to confirmation of a plan, notwithstanding a "sub rosa plan" objection, where the settlements did not dispose of all of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization or dictate the terms of a plan of reorganization. *Tower Automotive*, 241 F.R.D. at 169 (internal citations omitted).

210.    A pre-confirmation approval of a settlement does not amount to a sub rosa plan where it does not deprive any party of critical protections in a Chapter 11 confirmation process as the settlement could have been proposed in the context of a Chapter 11 plan process, and the confirmation hearing would have been conducted (and the settlement would have been considered) in exactly the same manner as it was at the sale hearing. *In re Capmark Fin. Group Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2012).

211.    Even releases contained in a settlement do not transform it into a sub rosa plan as releases are a necessary and expected term in a settlement agreement. The point of settlement is to finally and fully resolve outstanding disputes between the parties, and without such releases, a settlement would be ineffective. This is especially true where the settlement neither releases direct claims held by any third parties nor any claims held by the debtors against their officers and directors. *Capmark*, 438 B.R. at 514.

212.    An objector arguing that a proposed sale constitutes a sub rosa plan must clearly articulate the rights and benefits the unsecured creditor is being deprived of through the sale that

it would gain through a Chapter 11 plan. *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *42 (Bankr. D.N.J. Mar. 26, 2008).

213.     Here, VSI's inability to establish its detriment through the sale and the Trustee's satisfaction of the sound business judgment and good faith requirements given the current demonstrated need to sell the Debtors' Assets mandate a finding that the proposed asset sale does not constitute a sub rosa plan.

214.     The factors that led the Fifth Circuit in *Braniff* to conclude that the transaction was a sub rosa plan simply do not exist here. The Court in *Braniff* reasoned that the proposed transaction encroached upon the plan confirmation process because it (a) "changed the composition of Braniff's assets," with the practical effect of dictating some of the terms of any future reorganization plan, (b) dictated that the secured creditors vote their deficiency claim in favor of any proposed plan approved by a majority of the unsecured creditors' committee, effectively placing restrictions on creditors' plan voting rights, and (c) would grant the debtor, its officers, its directors and the secured creditors a release of all claims by all parties, thereby altering creditors' rights. *Braniff*, 700 F.2d at 939-40.

215.     The settlement and sale process here do not constitute a sub rosa plan. There is no indication, and VSI has provided no evidence showing, that any other creditor's recovery is adversely impacted by the settlement, or that any requirement of Chapter 11 is subverted by the plan. Because the settlement neither subverts the bankruptcy process nor impermissibly dictates the outcome to other creditors, the Sale it is not a sub rosa plan.

**G.     VSI Lacks Standing to Object to the Sale as its   Equity   is out of the Money.**

216.     VSI's only interest in the Debtors' cases is as an investor or equity holder.  VSI holds no monetary claims against either of the Debtor estates. *See Stream TV Networks, Inc.*, Case No. 23-10763-amc, Claims No. 1-26; *Technovative Media, Inc.*, Case No. 23-10764-amc, Claims

47

No. 1-4; *see also*, Stream TV Networks, Inc. Advanced Claims Search, https://www.bmcgroup.com/restructuring/Claims.aspx_ClientID_496 (last visited Nov. 26, 2024).

217.    Bankruptcy courts have historically used a "person aggrieved" standard in determining standing; however, in recent years, courts have been requiring constitutional or Article III standing. *See Varma v.    uorum Health Corp. (In re    uorum Health Corp.)*, 2023 Bankr. LEXIS 62, at *11-15 (Bankr. D. Del. Jan. 12, 2023) (granting a reorganized debtor's motion to dismiss an amended complaint as it failed to establish cognizable harm to, or the personal stakes of, the plaintiff; and therefore, lacked constitutional standing under Article III).

218.    The issue of constitutional standing was also addressed in *In re Diocese of Camden*, Case No. 20-21257 (JNP), 2022 Bankr. LEXIS 814 at *26-27 (Bankr. D. N.J. Mar. 24, 2022).  In the *Diocese* case, the New Jersey Bankruptcy Court refined the requirements for constitutional standing.

219.    The *Diocese* court held that to have standing in bankruptcy court, a party must meet three requirements: (1) Article III's Constitutional requirements; (2) federal court prudential standing requirements; and (3) the "party in interest" requirements under Bankruptcy Code section 1109(b). *In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (citing *Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.*), 677 F.3d 869, 884 (9th Cir. 2012)); *In re Saratoga    N. Creek Ry., LLC*, 635 B.R. 581, 602-03 (Bankr. D. Colo. 2022). A party seeking constitutional standing must demonstrate an "injury in fact" that is "concrete," "distinct and palpable," and "actual or imminent," and that such injury "fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *In re Glob. Indus. Techs., Inc.,* 645 F.3d at 210 (citing Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L.

48

Ed. 2d 135 (1990)).  *In re Diocese of Camden*, Case No. 20-21257 (JNP), 2022 Bankr. LEXIS 814 at *9.

220.    Here, VSI's equity in Stream has no value.  With over $180 million in allowed secured debt and over $1.2 billion in alleged claims under the Bankruptcy Code's priority scheme, VSI's alleged equity value does not exist.  While section 1109(b) of the Bankruptcy Code has been construed broadly to encourage participation in Chapter 11 cases, the Plaintiff must still demonstrate sufficient constitutional standing. See *Varma,* 2023 Bankr. LEXIS at *12 (section 1109(b) construed broadly to encourage participation in Chapter 11 cases; however, plaintiff must demonstrate sufficient constitutional standing to bring the amended complaint).  Therefore, any harm claimed by VSI to its equity in the Debtors' bankruptcy cases is illusory.

221.    Though clearly a party in interest for purposes of section 1109 of the Bankruptcy Code, the definition is not constitutional and requires the court to determine if constitutional or prudential standing exists.

222.    VSI cannot claim that it has suffered an injury in fact, because its equity was worthless on the Petition Date and with the secured claims and unsecured claims, there is no value for the VSI claimed equity interests.

223.    Moreover, VSI has no interest in the transfer of the Assets as contemplated in the Sale Motion, as the Sale does not in any way change the value of VSI's alleged equity in the Debtors.

224.    Further VSI fails to show how those equity interests will be impacted by the sale. The interests were valueless at the Petition Date, and they continue to be.

225.    More importantly, it is unknown whether the equity interests belong to VSI or investors in VSI.  Considering it was Rajan who filed the Schedules during a time when he held

49

competing dual roles with both VSI and Stream, this Court should be skeptical of his statements, even under oath, based upon his history of self-dealing and untruths. *See* Trustee Opinion at p. 31 (Court expressed concern with Rajan's "plans, trustworthiness, and motivations… in his role as, for all intents and purposes, the singular figure in the Debtors' management."); 56 ("the Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI."); and 60-61("Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness.").

226.    Likewise, even if VSI's equity in Stream did have any value, the unauthorized transfer of equity in Stream to VSI or its investors is avoidable pursuant to Section 549 of the Bankruptcy Code.

## RESERVATION OF RIGHTS

227.    Nothing in this Response should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation of the Trustee's ability to contest same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; or (d) granting third-party-beneficiary status or bestowing any additional rights on any third party.

## IV.    CONCLUSION

The Trustee respectfully requests that this Court: (i) order the Objections overruled; (ii) approve the sale of the Debtors' Assets free and clear of all liens, claims, encumbrances, and other interests; (iii) approve the assumption and assignment of certain executory contracts and unexpired

4889-9066-4446 v5

leases related thereto; and (iv) grant such other relief requested in the Sale Motion and such other

and further relief as may be just and proper.

                              Respectfully Submitted,

Dated: November 29, 2024        By:  *s  Michael D. Vagnoni*
                                Edmond M. George, Esquire
                                Michael D. Vagnoni, Esquire
                                OBERMAYER REBMANN MAXWELL    HIPPEL LLP
                                Centre Square West
                                1500 Market Street, Suite 3400
                                Philadelphia, PA 19102
                                Telephone: (215) 665-3066
                                Facsimile: (215) 665-3165
                                E-mail:  edmond.george   obermayer.com
                                         michael.vagnoni   obermayer.com

                                *Counsel to William A. Homony Chapter 11 Trustee*

4889-9066-4446 v5

# **EXHIBIT A**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered)[1] |

# MEMORANDUM

## I.    INTRODUCTION

Before the Court for disposition are two motions by Hawk Investment Holdings Ltd. ("Hawk").  The first motion (the "Hawk Stay Relief Motion")[2] seeks relief from the automatic stay in order to proceed with an action in the Delaware Court of Chancery (the "Delaware Chancery Court") seeking relief pursuant to §225 of Title 8 of the Delaware Code (the "Section 225 Action") against debtors Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and together with Stream, the "Debtors").  The second motion (the "Section 1112/1104 Motion") seeks an order, pursuant to §1112(b) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), converting the Debtors' chapter 11 bankruptcy cases to cases under chapter 7 of the Bankruptcy Code or dismissing them, or

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases.  Bankr. Docket No. 81.

[2] Bankr. Docket No. 16.

1

alternatively, appointing a trustee to administer the Debtors' bankruptcy cases pursuant to
§1104(a) of the Bankruptcy Code.

For the reasons set forth herein, the Court will (i) grant the Section 1112/1104 Motion to
the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy
cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed, as
set forth below.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND[3]

The history of the Debtors, their relationship with their creditors, and, in particular from
the Court's perspective, the events during these bankruptcy cases, are convoluted, and for the
most part, riddled with strife.  The docket in the Debtors' main case spans over 500 entries,
telling a story of near-endless conflict.[4]  The Court has spent an inordinate amount of time
dealing with expedited motion practice, emergency hearings, and drawn-out contested matters.
While the Court does not typically summarize the major activity in a case in order to explain a
decision, here it believes a lengthy summary is necessary in order to paint the picture of the
acrimony, relative lack of progress, and overlapping and simultaneous controversies these cases
have endured over the nearly ten months they have been pending.  Set forth below, therefore, is a
summary of the major events not only that led to the Debtors' bankruptcy cases, but also that
have transpired before this Court since the Debtors filed their bankruptcy petitions.

---

[3] The factual background recited herein is drawn from various pleadings filed on the docket as well as the
testimony and evidence adduced at Trial (as defined *infra*).  The Court notes, however, that to the extent
such facts as set forth in the parties' various pleadings are disputed, such disputes are irrelevant to the
Court's resolution of the pending motions, as the Court has drawn its conclusions from the record at Trial
and the procedural history of these cases.

[4] This does not even account for the approximately 120 docket entries in the adversary action the Debtors
filed in August 2023 against various parties, discussed *infra*.  *See* Adv. Pro. No. 23-00057.

## A. Pre-Petition Events

### 1. Formation of the Debtors

Stream was founded in 2009 by Mathu Rajan ("Mr. Rajan") and Raja Rajan (together with Mr. Rajan, "the Rajans"). The company was founded to develop and commercialize a proprietary technology for viewing three-dimensional content without the need for 3D glasses or goggles ("Ultra-D"). Stream created Technovative, a wholly owned subsidiary, which in turn directly or indirectly owns various subsidiaries, including SeeCubic B.V. ("SCBV"), an entity formed under the laws of the Netherlands and which functions as the primary research and development engine for the business.[5] Together, these subsidiaries own and hold rights in technology including Ultra-D. Stream's Ultra-D technology was developed, in part, based on certain intellectual property, including a portfolio of glasses-free 3D patents licensed from Koninklijke Philips Electronics ("Philips"). Stream also has a technology license from Rembrandt 3d Holding Ltd. ("Rembrandt"), which allows it to use the Rembrandt technology incorporated into Stream's Ultra-D products (the "Rembrandt Licensing Agreement").

### 2. Funding from SLS and Hawk

From 2011 to 2020, Stream's senior secured creditor, SLS Holdings VI, LCC ("SLS"), loaned Stream $6 million through a series of secured promissory notes (the "SLS Notes"). In return, Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as security for the SLS Notes. Stream and SLS executed a security agreement which authorized SLS to take control of Stream's assets to satisfy the SLS Notes in the event Stream defaulted. Between 2011 and 2014, Shadron Stastney ("Mr. Stastney"), the principal of SLS, served as an outside director of Stream. He rejoined the board as Vice Chairman in 2018 in a strategic role

---

[5] *See* Exhibit D-5.

3

until resigning in January 2020.

Between 2014 and 2020, Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million through a series of junior secured notes (the "Hawk Notes", and together with the SLS Notes, the "Notes"). Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted. On January 29, 2018, Stream entered into a conversion agreement with Hawk, whereby the parties agreed to terms pursuant to which Stream would be permitted to convert the outstanding portion of the Hawk Notes to Stream equity (the "Hawk Conversion Agreement"). Stream and SLS contemporaneously entered into a parallel agreement with respect to conversion of the SLS Notes to Stream equity (the "SLS Conversion Agreement" and together with the Hawk Conversion Agreement, the "Conversion Agreements").

### 3. Omnibus Agreement

In March 2020, Stream was notified it was in default under the SLS and Hawk Notes. In May 2020, Stream, Hawk, SLS, and 52 of its stockholders entered into an Omnibus Agreement whereby Stream would transfer all of its assets to a newly formed entity, SeeCubic Inc. ("SeeCubic"), and in exchange, SLS and Hawk would no longer pursue a foreclosure, and their claims under the Notes would be entirely extinguished. Mr. Stastney, who by then had left Stream, formed SeeCubic as a Delaware corporation to acquire Stream's assets pursuant to the Omnibus Agreement.

### 4. Litigation Over the Omnibus Agreement

In September 2020, Stream filed suit against SeeCubic in the Delaware Chancery Court to invalidate the Omnibus Agreement. Both Stream and SeeCubic moved for preliminary

injunctions whereby Stream sought to prevent SeeCubic from taking any actions to enforce the
Omnibus Agreement, and SeeCubic sought to compel Stream's compliance therewith. In
December 2020, the Delaware Chancery Court issued an opinion finding that SeeCubic was
entitled to injunctive relief and barring Stream from failing to comply with the Omnibus
Agreement. In September 2021, the Delaware Chancery Court granted SeeCubic's motion for
summary judgment (the "Summary Judgment Order"), declaring the Omnibus Agreement to be
valid and entering a permanent injunction preventing Stream from interfering with the
agreement.

In November 2021 Stream appealed the Delaware Chancery Court's ruling,[6] alleging that
the Delaware Chancery Court erred because Stream's unambiguous certificate of incorporation
required the approval of Stream's Class B stockholders for Stream's entry into the Omnibus
Agreement. In June 2022, the Delaware Supreme Court vacated the Summary Judgment Order
on the grounds that the Omnibus Agreement was invalid without the approval of Stream's Class
B Stockholders. The Delaware Supreme Court also found that (1) Hawk was a secured creditor
of Stream, (2) Stream had pledged all of its assets as security for the more than $50 million
Hawk lent to Stream, and (3) the Hawk Notes were executed in conjunction with security
agreements authorizing Hawk to take control of Stream's assets to satisfy the Hawk Notes if
Stream defaulted.

On remand, in September 2022, the Delaware Chancery Court ordered the parties to
unwind the Omnibus Agreement but confirmed that Hawk's and SLS's rights remained intact.

---

[6] On November 10, 2021, the Delaware Chancery Court issued an Order Entering Partial Final Judgment
Under Rule 54(b) (the "Partial Final Judgment Order"), effectively making the rulings in the Summary
Judgment Order final in order to permit appeal, finding that even though SeeCubic's conversion claim
remained unresolved, there was "no risk that after addressing [whether the Omnibus Agreement was
valid] on appeal, the Delaware Supreme Court might have to revisit the same issue in an appeal from a
final trial-level adjudication." *See* First Day Declaration, at Exhibit X.

In its opinion, the Court held that because the Omnibus Agreement did not validly transfer legal title of Stream's assets to SeeCubic and that SeeCubic would be required to transfer back to Stream the equity placed in the operating subsidiary, Technovative.

### 5. Stream's Prior Bankruptcies

While the Omnibus Agreement litigation was playing out, on February 24, 2021, Stream filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On May 17, 2021, the Delaware Bankruptcy Court dismissed the case as a bad faith filing. After dismissal, on May 23, 2021, three of Stream's purported unsecured creditors, including Rembrandt, filed an involuntary Chapter 7 bankruptcy petition against Stream. On June 10, 2021, the Delaware Bankruptcy Court again dismissed the involuntary bankruptcy action as a bad faith filing, and imposed a twelve-month bar on Stream re-filing for bankruptcy.

### 6. Mr. Rajan's Formation of VSI

Mr. Rajan formed Visual Semiconductor, Inc. ("VSI") in 2022, purportedly as a vehicle to raise new capital and support Stream. Upon formation, Mr. Rajan was the CEO of VSI. Mr. Rajan and members of his family are minority economic shareholders in VSI but have the majority of voting stock.

### 7. The Proxy Notice, Marshaling Directive and Section 225 Action

On October 17, 2022, after ownership of the Technovative shares was transferred to Stream, in furtherance of the unwinding of the Omnibus Agreement, Hawk issued a Proxy Notice, purportedly pursuant to its rights under the Hawk Notes, to remove Mr. Rajan as the sole director of Technovative and replace him with Mr. Stastney. Hawk further directed Stream to marshal its collateral to prepare for a sale under the Uniform Commercial Code in order to

satisfy the outstanding indebtedness (the "Marshaling Directive"). Stream refused to comply

with the Proxy Notice and Marshaling Directive, arguing that it had converted Hawk's secured

debt to Stream equity pursuant to the Hawk Conversion Agreement, and therefore Hawk no

longer possessed secured creditor rights pursuant to which it could issue the Proxy Notice or the

Marshaling Directive.

On the same date, Hawk responded by filing the Section 225 Action to resolve whether

Hawk validly appointed Mr. Stastney as the sole director of Technovative as of October 17,

2022. On October 20, 2022, the Delaware Chancery Court entered an order providing that,

pending resolution of the Section 225 Action, Technovative was to operate according to the

status quo, and by separate order, appointing a receiver to operate Technovative on a day-to-day

basis (the "Receiver").

On November 13, 2022, Hawk moved for summary judgment in the Section 225 Action

on the issue of whether Stream defaulted under the Hawk Notes. On November 29, 2022, the

Delaware Chancery Court issued a decision finding that, notwithstanding the Supreme Court

Opinion's reversal of the legal determination that the Omnibus Agreement was valid, the

underlying factual findings were undisturbed, such that Stream was collaterally estopped from

challenging whether (1) the Notes are valid and binding obligations of Stream; (2) Stream is in

default under the Notes; (3) Hawk may exercise the "Secured Creditor Rights" under the Notes,

including issuance of the Proxy Notice; (4) as of November 10, 2021, the Hawk Notes had not

been converted or satisfied; and (5) any conversion of the Hawk Notes must be supported by new

money, which had not occurred as of November 10, 2021 (the "Collateral Estoppel Opinion").

Trial in the Section 225 Action was scheduled to commence on March 23, 2023, but was

stayed by the filing of the Debtors' instant bankruptcy petitions.

## B. Debtors' Pending Bankruptcy Cases

### 1. The Filing of the Petitions

The Debtors each filed voluntary bankruptcy petitions (each, a "Petition" and together, the "Petitions") under chapter 11 of the Bankruptcy Code on March 15, 2023.[7] Notwithstanding the dispute to be litigated over who is the rightful director of Technovative, Mr. Rajan signed both Stream's Petition and Technovative's Petition as Director.[8] The Corporate Resolutions attached to each of the Petitions identified Mr. Rajan as a Director, Secretary and Chief Executive Officer of Stream and Technovative, respectively, and he executed the Corporate Resolutions as Secretary of each entity.

Attached to Stream's Petition was Official Form 204, setting forth a list of its 20 largest non-insider unsecured creditors. Those creditors held purported claims totaling over $14 million.[9] Attached to Technovative's petition was its Official Form 204, which listed only Rembrandt, with a claim purported claim of $10,000,000.00.

### 2. Hawk's Stay Relief Motion

Less than one week after the Petitions were filed, on March 20, 2023, Hawk filed the Hawk Stay Relief Motion. Hawk seeks relief from stay to proceed with the Section 225 Action against the Debtors in the Delaware Chancery Court. Hawk argues the Section 225 Action was

---

[7] Bankr. Docket No. 1; Bankr. Case No. 23-17064, Docket No. 1.

[8] On May 4, 2023, Stream filed an amended bankruptcy Petition, executed by Mr. Rajan as CEO and Director. Bankr. Docket No. 186. The amended Petition made two changes to the initial Petition. First, it responded in the affirmative to Question 12, asking whether the debtor owns or has possession of any real property or personal property that needs immediate attention, and by attachment references the Bonding Equipment (defined *infra*) located in China. Second, in response to Question 15 regarding its estimated assets, it reduced the range of value from $500,000,001-$1 billion to $100,000,001-$500,000,000.

[9] On April 12, 2023, the Office of the United States Trustee (the "U.S. Trustee") filed a statement stating that an unsecured creditors' committee had not been appointed due to lack of response from unsecured creditors regarding serving on a committee. Bankr. Docket No. 100.

days away from trial when the Petitions were filed, and the Delaware Chancery Court is already

intimately familiar with the dispute between Hawk and the Debtors and the governing Delaware

law.  Hawk asserts that the Section 225 Action will resolve issues of state law that, while

fundamental to the Debtors' bankruptcy cases, are most efficiently and appropriately resolved by

the Delaware Chancery Court, including (i) who was the rightful director of Technovative pre-

petition, and therefore whether Technovative's bankruptcy filing was authorized (the

"Technovative Director Issue"), and (ii) whether Stream's secured debt to Hawk was converted

to equity pre-petition (the "Debt Conversion Issue").[10]

On April 5, 2023, the Debtors objected to the Hawk Stay Relief Motion (the "Debtors'

Stay Relief Objection").[11]  The Debtors argue that Hawk's purpose in prosecuting the Section

225 Action is to obtain a declaration that it can exercise rights as a purported secured creditor of

Technovative, enabling it to conduct a sale of Technovative's assets under Article 9 of the

Uniform Commercial Code (and "Article 9 Sale").  The Debtors argue that even if Hawk were to

obtain such a declaration, it would be prohibited by the automatic stay from exercising any such

rights absent further stay relief, and that such a sale would eviscerate the Debtors' primary

assets, consisting of intellectual property held by their subsidiaries.  Rembrandt filed a joinder to

the Debtors' Stay Relief Objection.[12]

On April 14, 2023, the Court held an initial hearing on the Hawk Stay Relief Motion and

---

[10] Hawk argues that rulings by the Delaware Chancery Court will "result in a complete resolution of
issues surrounding (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS
Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any
current defense to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future
conversion of the Hawk Notes," which Hawk asserts are "all critical to the resolution of these Chapter 11
cases."  Hawk Stay Relief Motion, at 21.

[11] Bankr. Docket No. 78.

[12] Bankr. Docket No. 101.

determined that disputed facts would require an evidentiary trial. That trial (the "Trial") was initially scheduled to commence on May 22, but was then rescheduled to June 26.

### 3.  Debtors' Stay Violation Motion

On March 28, 2023, the Debtors filed an emergency motion seeking enforcement of the automatic stay (the "Stay Violation Motion")[13] and imposition of related sanctions against SeeCubic and SCBV, as well as certain entities and individuals purportedly acting on their behalf (the "SeeCubic Parties"). In general, the Debtors asserted that SeeCubic and SCBV were exercising possession and/or control over certain bonding equipment (the "Bonding Equipment") of the Debtors located at a warehouse in China, which the Debtors asserted was essential to their ability to receive client orders and commence production of their Ultra-D products. The Stay Violation Motion asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were interfering with the Debtors' repossession and relocation of the Bonding Equipment, in violation of the automatic stay and the Delaware Supreme Court's decision directing the unwinding of the Omnibus Agreement. The Stay Violation Motion also asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were exercising possession and control over other Stream assets (the "Other Stream Assets"), including Ultra-D demonstrator samples, engineering assets, laptops, and intellectual property and software, in violation of the automatic stay.

On April 5, 2023, the Debtors filed an amended stay violation motion (the "Amended Stay Violation Motion").[14] In addition to their assertions regarding SeeCubic and SCBV's interference with and control over the Bonding Equipment and Other Stream Assets, the Debtors asserted that Mr. Stastney, SLS, SeeCubic, and Hawk had initiated proceedings in Amsterdam

---

[13] Bankr. Docket No. 49.

[14] Bankr. Docket No. 76.

"to take certain measures preventing Debtors from managing its subsidiaries." The Debtors sought a directive from the Court that the SeeCubic Parties' possession and control over the Bonding Equipment and Other Stream Assets was to cease, and such estate property was to be turned over to the Debtors.[15]

On April 7, 2023, Debtors filed a supplement to the Amended Stay Violation Motion (the "Stay Violation Supplement"),[16] asserting that Mr. Stastney, SLS, SeeCubic, and Hawk had filed a joint legal action (the "Amsterdam Action"), apparently different from the summary proceeding described in the Amended Stay Violation Motion, seeking the removal of Mr. Rajan as a director and CEO of Stream's Dutch subsidiaries, in further violation of the automatic stay.

On April 12, 2023, SeeCubic objected to the Stay Violation Motion and the Amended Stay Violation Motion,[17] asserting that the Bonding Equipment and Other Stream Assets were not property of Debtors' estates, and even if they are, mere possession did not constitute violation of the automatic stay because it does not apply to the non-debtor Dutch subsidiaries. Hawk filed a joinder in support of SeeCubic's objection.[18]

The Court held an initial hearing on the Stay Violation Motion on April 14, 2023. With respect to the portions of that motion related to the Other Stream Assets and the Amsterdam Action, the Court reserved ruling pending additional information and evidence.[19] With respect to the Bonding Equipment, on July 13, 2023, the Court entered an order appointing my colleague,

---

[15] The Amended Stay Violation Motion did not seek specific relief with respect to the Amsterdam proceedings that were assumedly the reason for the amendment.

[16] Bankr. Docket No. 90.

[17] Bankr. Docket No. 105.

[18] Bankr. Docket No. 106.

[19] The Debtors followed with another emergency motion on April 18, 2023, seeking withdrawal of the Amsterdam Action in advance of a scheduled April 20 hearing in the Netherlands. Bankr. Docket No. 125. The Amsterdam court, however, thereafter postponed the scheduled hearing.

11

Judge Mayer, to mediate that dispute.[20]  To the Court's knowledge, this dispute remains in
mediation.

### 4.    Hawk's Section 1112/1104 Motion

On April 6, 2023, Hawk filed the Section 1112/1104 Motion.  As noted *supra* and
discussed in greater detail *infra,* the motion seeks either conversion or dismissal of the Debtors'
bankruptcy cases pursuant to §1112(b) of the Bankruptcy Code, or alternatively, the appointment
of a chapter 11 trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the
Bankruptcy Code.

With respect to conversion or dismissal, Hawk argues that there are three statutorily-
grounded bases for converting or dismissing the cases under §1112(b) of the Bankruptcy Code.
First, Hawk argues there has been substantial and continuing loss to the Debtors' bankruptcy
estates without likelihood of rehabilitation, as contemplated by §1112(b)(4)(A).  Second, Hawk
argues there has been gross mismanagement of the estates, as contemplated by §1112(b)(4)(B).
Third, Hawk argues the Debtors have engaged in the unauthorized use of cash collateral, as
contemplated by §1112(b)(4)(D).[21]  In addition to these statutory grounds for finding cause to
convert or dismiss, Hawk argues the Debtors lacked good faith in filing their bankruptcy cases,
providing an alternate grounds for dismissal under §1112(b).  Finally, Hawk argues that
Technovative's bankruptcy filing was unauthorized because Mr. Rajan was replaced as a director
of Technovative prior to its Petition being filed, and therefore could not have authorized the
filing on behalf of the entity.  After asserting that multiple grounds exist for conversion or
dismissal, Hawk argues in the Section 1112/1104 Motion that the Court should dismiss the

---

[20] Bankr. Docket No. 294.

[21] As discussed *infra,* Hawk did not address the unauthorized use of cash collateral in its post-trial brief,
and therefore the Court understands Hawk to no longer be asserting this basis for conversion or dismissal.

Debtors' cases with prejudice, rather than convert them, because it would alleviate any fears of the Debtors refiling, the Debtors are non-operational, and the both conversion and dismissal will likely conclude with the sale of the Debtors' equity in their subsidiaries.[22]

With respect to the appointment of a chapter 11 trustee, Hawk asserts that even if the Court is not inclined to convert or dismiss the Debtors' cases, cause exists to appoint a trustee based on the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of the Debtors' businesses. Hawk further argues that Mr. Rajan has engaged in self-dealing for the benefit of VSI that has led to irreconcilable acrimony between the Debtors' management and several stakeholders.

On May 8, 2023, the Debtors filed an opposition to the Section 1112/1104 Motion (the "Debtors' Section 1112/1104 Opposition").[23] Rembrandt also filed an opposition to the Section 1112/1104 Motion (the "Rembrandt Section 1112/1104 Opposition").[24]

As was the case with the Hawk Stay Relief Motion, the Section 1112/1104 Motion was scheduled to be heard at the Trial commencing on May 22, and subsequently rescheduled to June 26.

5.    **Debtors' Expedited Motion to Approve Employee Obligations**

On April 21, 2023, the Debtors filed an expedited motion (the "Employee Obligations

---

[22] As discussed *infra,* since filing the Section 1112/1104 Motion, Hawk's position has evolved, in that it now seeks conversion of the Debtors' cases rather than dismissal.

[23] Bankr. Docket 196. The Debtors filed an initial response to the Section 1112/1104 Motion on April 10, 2023, *see* Bankr. Docket No. 94, based on and contesting Hawk's request that the motion be heard on an expedited basis. The Court held an initial hearing on the motion on April 14, 2023, at which time it set a briefing schedule and a trial date. The Debtors' Section 1112/1104 Opposition was filed in accordance with that briefing schedule.

[24] Bankr. Docket No. 193.

Motion")[25] seeking authority to make certain payments the Debtors characterized as employee obligations.

First, the Debtors sought authority to pay various obligations in connection with the employees of SCBV, including payroll, taxes, paid leave, benefits payments, etc.[26]  According to the motion, there were 28 full-time, salaried employees of SCBV at the time of filing.  The Debtors claimed that there were no pre-petition amounts owing to these employees, but that post-petition payroll was about $180,000 per month.  The motion also sought to pay (a) six independent contractors $193,000 for pre-petition services, as well ongoing post-petition fees of $46,000 per month, (b) post-petition payroll taxes of $149,000 per month, (c) payroll processing fees of $9,000 per month, and (d) pension contributions of $43,000 per month.  The Debtors also sought to pay approximately $20,000 in pre-petition reimbursable business expenses to SCBV employees.

The Employee Obligations Motion, however, sought additional relief unrelated to current employee and independent contractor obligations.  It also sought authority to re-hire nine U.S.-based Stream employees that purportedly left after the Delaware Chancery Court's Omnibus Agreement decision in 2020, and who are now employed by VSI.  In connection with re-hiring them, the Debtors sought to pay those employees approximately $30,000 in pre-petition wages owed (subject to the $15,150 cap on pre-petition wages under §507(a)(4)).  The Debtors also sought to pay certain independent service providers both pre-petition amounts owed, in the amount of approximately $30,000 owed to one provider, and ongoing post-petition amounts of approximately $10,000 per month.  The Debtors further sought to pay the re-hired employees'

---

[25] Bankr. Docket No. 134.

[26] The motion required expedited treatment because the post-petition compensation Debtors sought to pay SCBV employees was coming due just four days later, on April 25.

14

post-petition payroll taxes of approximately $10,000 to $12,000 per month, as well as the pre-petition payroll taxes owing as necessary, up to $178,000. The Debtors also sought to reinstate their paid leave program and benefit plans at a cost of approximately $23,000 per month, as well as pay approximately $267,000 in unreimbursed pre-petition business expenses.

In addition to the U.S.-based former Stream employees, the Debtors also sought to re-hire three Taiwan-based Stream employees who purportedly left after the Delaware Chancery Court's 2020 Omnibus Agreement decision as well, and who are also now employed by VSI. In connection with these former employees, the Debtors sought authority to pay post-petition payroll costs of $7,000 and medical plan costs of about $3,000, but did not believe there were any pre-petition amounts owed. The Debtors also sought authority to pay approximately $3,000 in unreimbursed pre-petition business expenses.

Finally, the Debtors stated that they had been using 15 independent contractors in China for various services through an entity called ST4M, Inc. The Debtors sought authority to establish a Beijing-based subsidiary to employ these 15 individuals as full-time employees. The gross payroll would be approximately $22,000 monthly, and the Debtors would also be required to pay approximately $29,000 quarterly for a state-sponsored health-plan.

As discussed *infra,* the Court held an emergency hearing on the Employee Obligations Motion on April 24, but limited its consideration to whether and what payments to current SCBV employees were needed on an expedited basis.

### 6. Debtors' Expedited Stock Sale Motion

On the same day that they filed the expedited Employee Obligations Motion, the Debtors filed an expedited motion for authority to sell up to $10 million in unissued shares of Stream's

15

Class A common stock to VSI to fund their post-petition operations (the "Stock Sale Motion").[27]

The Stock Sale Motion represented that VSI, formed by Mr. Rajan as a vehicle to raise new

capital for Stream and to support Stream while fighting the transfer of Stream's assets pursuant

to the Omnibus Agreement, had made pre-petition strategic investments in Stream, in addition to

having engaged key Stream employees. Per the Stock Sale Motion, VSI was prepared to fund

the Debtors' post-petition product development and supply chain, but "as compensation for this

support" Stream had entered into an exclusive distribution agreement (the "Distribution

Agreement") whereby VSI would accept orders from and make delivery to third-party

customers, issue a purchase order to Stream for 90% of the value of the third-party order, and

retain the 10% difference as "margin for funding technical, business, and sales development."

The Debtors represented that VSI would also assist with "productization of electronics," and

asserted that the 10% fee was "industry standard for distribution agreements."

Together with the Debtor's expedited Employee Obligations Motion, the Court held an

emergency hearing on the Stock Sale Motion on April 24, as discussed *infra.*

### 7. Debtors' Emergency Financing Motion and Seecubic's Proposed Alternative Funding

As will be discussed in further detail *infra,* on April 25, 2023, the Debtors filed an

emergency motion for the approval of debtor-in-possession financing from VSI as an alternative

to the proposed sale of stock to VSI, in order to fund the SCBV payroll obligations coming due

the following day.[28] On the same day, SeeCubic filed an alternative funding motion that would

have compelled SCBV, or alternatively the Debtors, to borrow under an existing line of credit

from SeeCubic that had been put in place while the Receiver was managing Technovative and its

---

[27] Bankr. Docket No. 135.

[28] Bankr. Docket No. 156.

subsidiaries, including SCBV.[29]  Later that day, the Court held an eight-hour emergency hearing on the alternative funding proposals that ended at approximately 11:00 p.m., after which it determined that neither proposal would be approved.

### 8. Debtors' Motion to Retain Thomas Park as Chief Financial Officer

On June 14, 2023, the Debtors filed a motion seeking authority to enter into an employment agreement with Thomas Jung Ho Park ("Mr. Park") as Chief Financial Officer to the Debtors (the "Park Retention Motion").[30]  The Debtors asserted in the Park Retention Motion that, given their need to raise capital and the complexity of their businesses and structure of their debt, it was necessary to have an experienced CFO to support the Debtors' financial operations and successfully navigate the Debtors' businesses during their Chapter 11 cases and post-emergence from bankruptcy.  Although the Debtors asserted that their entry into the employment agreement with Mr. Park was within the ordinary course of their business, and therefore did not require approval of the Court, after discussions with the United States Trustee the Debtors filed a revised motion to employ Mr. Park on July 18, 2023.[31]

On July 25, 2023, Hawk filed an objection to the Park Retention Motion. In its objection, Hawk argued that the Debtors neither provided a basis justifying the need for Mr. Park's employment nor have the Debtors established that Mr. Park is not a disinterested person for the purposes of §327 of the Bankruptcy Code. A hearing on the Park Retention Motion was originally scheduled for August 16, 2023, but has been continued a number of times to allow for Trial and other more pressing contested matters to go forward.

---

[29] Bankr. Docket No. 155.

[30] Bankr. Docket No. 234.

[31] Bankr. Docket No. 298.

### 9. Debtors' Motion to Continue Trial Due to Mr. Rajan's Hospitalization

On June 16, 2023, the Debtors filed an expedited motion to continue the Trial on the Hawk Stay Relief Motion and the Section 1112/1104 Motion, scheduled to commence on June 26.[32] The Debtors represented that Mr. Rajan was hospitalized after suffering a recent injury, and upon his medical provider's instruction, would be unable to participate in or attend Trial, whether remotely or in-person, nor would he be able to attend, remotely or in-person, his deposition. The Debtors therefore sought a continuation of the commencement of Trial for 45 days to allow Mr. Rajan to recuperate sufficiently to participate. Hawk objected to the continuation request, citing the prejudice a further delay would cause, and asserting that Mr. Rajan's absence would not affect the outcome to the extent the pending motions entailed strictly legal issues, as opposed to factual issues requiring testimony from Mr. Rajan. On June 21, 2023, the Court held an expedited hearing on the Debtors' continuance request, at which time it determined that Trial would proceed on June 26 to allow the parties to commence with the presentation of evidence, but that Trial would need to be continued to allow Mr. Rajan to recuperate sufficiently to be deposed and testify.

Trial then commenced from June 26 to June 29, and was subsequently continued on August 15 and 17, and again on September 22 and 25, to permit Mr. Rajan's recuperation and participation.

### 10. Debtors' Amendment to Stock Sale Motion

On June 23, 2023, the Debtors filed an amendment to their Stock Sale Motion (the "Stock Sale Motion Amendment").[33] The Debtors informed the Court that they had continued to

---

[32] Bankr. Docket No. 236.

[33] Bankr. Docket No. 258.

explore the sale of Class A common stock of Stream to third parties, one of which was a Chinese company named Zhongsheng Group Holdings Ltd. ("Zhongsheng"). As a result, the Debtors had entered into a non-binding term sheet with Zhongsheng on June 6, 2023 (the "Zhongsheng Term Sheet"), pursuant to which Zhongsheng would invest $300 million in Stream through the purchase of Stream Class A shares.

As discussed in further detail *infra*, a wave of motion practice followed the Stock Sale Motion Amendment, and it later became one of the primary issues in the Trial.

### 11. Debtors' Adversary Proceeding and TRO Motion

On August 12, 2023, with the resumption of Trial days away and in the midst of contested hearings regarding discovery over the Zhongsheng Term Sheet, the Debtors filed an adversary action ( the "Adversary Action") against a host of parties, including, among others, Hawk, SLS, SeeCubic, and Mr. Stastney (collectively, the "Defendants").[34] In their Complaint in the Adversary Action, the Debtors allege that the Defendants have engaged in an effort to (a) sabotage the Debtors' exercise of certain debt-to-equity conversion rights held against the secured debtholders, (b) vitiate the Debtors' recapitalization, which would have rendered certain Defendants' debt instruments obsolete; (c) restrict and/or interfere with the Debtors' ability to raise funds and sell products, and (d) use their status as secured lenders to deny Stream the assets and other business resources essential to its successful reorganization.

On September 1, 2023, the Debtors filed a motion in the United States District Court for the Eastern District of Pennsylvania (the "District Court") to withdraw reference of the Adversary Action from this Court.[35] The Debtors followed that on September 28, 2023 with an

---

[34] Bankr. Docket No. 335; Adv. Pro. Docket No. 1.

[35] On November 16, 2023, the District Court denied the Debtors' request to withdraw the reference. *See* Case No. 23-mc-135, at Docket No. 18.

emergency motion in the District Court (the "TRO Motion") for a temporary restraining order,

preliminary injunction, and permanent injunction. The District Court denied the motion on the

grounds that it was not properly filed in the District Court absent withdrawal of the reference of

the Adversary Action. Therefore on September 30, 2023, the Debtors refiled the TRO Motion in

the Adversary Action before this Court.[36]

By the TRO Motion, the Debtors assert that Mr. Stastney testified in mid-September in

the Amsterdam Action, during which he admitted that SeeCubic is in direct competition with

Stream, and is currently working with twelve or thirteen customers using the Ultra-D technology

developed by Stream. Stream alleges that this action by SeeCubic puts its technology licenses

with Philips and Rembrandt at risk because they strictly prohibit sub-licensing. The Debtors

further argue that SeeCubic's unauthorized use of the Philips and Rembrandt technology, as

embedded in Stream's technology, violates the Philips and Rembrandt licenses and presents the

potential of irreparable harm to Stream should Philips and Rembrandt decide to revoke their

respective licenses.

The Court held a contested evidentiary hearing on the TRO Motion over the course of

multiple days in October and November, after which the Court provided the parties certain dates

in December that were available for the conclusion of the hearing, and directed that they confer

regarding their mutual availability. The parties thereafter advised the Court that they had agreed

to postpone continuation of the TRO hearing, as well as multiple other matters that were

scheduled for hearing in December, until late January or early February to pursue settlement

discussions. On December 14, the Court held a status hearing with the parties to discuss the

impact of the proposed continuation on the status of the TRO hearing. The Court determined

---

[36] Adv. Pro. Docket No. 27.

that the entry of a limited temporary restraining order was warranted, based strictly on the evidence presented at the TRO hearing to that point and in light of the lengthy delay that continuation of the hearing would cause to the Court's final resolution of the matter. The Court directed Debtors' counsel to prepare an agreed form of order reflecting the Court's ruling at the status hearing. Indicative of the acrimony that has stalled progress in this case at nearly every turn, the parties subsequently advised the Court that they were unable to reach agreement regarding the terms of a proposed order. The Court therefore prepared an Order consistent with its ruling at the December 14 status hearing, which was entered on January 4, 2024.[37]

### 12. Trial on the Pending Motions

Commencing on June 26, the Court held Trial over eight days, concluding on September 25. During the Trial, the Court heard testimony from Mr. Stastney, Mr. Park, Mr. Rajan, and Christopher Michaels of Rembrandt. Approximately 130 exhibits were admitted into evidence.[38]

### 13. The Parties' Positions After Trial

At the Court's direction, Hawk, the Debtors, and Rembrandt submitted post-trial briefs (each a "Post-Trial Brief") setting forth their positions in light of the evidence presented at Trial.[39]

#### a. The Section 1112/1104 Motion

---

[37] Adv. Pro. Docket No. 119.

[38] The transcripts of the Trial span nearly 2,000 pages, which is merely a fraction of the pages of transcripts that have accumulated from all of the contested hearings the Court has had to hold in these cases.

[39] Although Rembrandt submitted post-trial briefing in opposition to the two pending motions, the arguments therein relate largely to Rembrandt's history with the Debtors and its position with respect to the Rembrandt license. Although the Rembrandt license is a central feature of these cases, it does not factor into the Court's analysis below regarding whether conversion, dismissal, or appointment of a trustee is warranted and whether cause exists to grant Hawk stay relief for resolution of the Technovative Director Issue and the Debt Conversion Issue. The Court therefore will not summarize Rembrandt's arguments here.

Hawk argues that the Court should order conversion of the Debtors' cases to chapter 7 for any of three independent reasons.[40]

First, Hawk argues that the evidence established that conversion is warranted under §1112(b)(4)(A), based on the substantial or continuing losses to the Debtors' estates and no reasonable prospect at rehabilitation.[41] According to Hawk, the record evidence established that the Debtors are incurring substantial losses during the pendency of these cases in the form of accruing administrative expenses and post-petition payment obligations to Rembrandt, without any offsetting revenue, and have no reasonable likelihood of rehabilitation because they have never had any operations, as all of the value lies in their non-debtor operating subsidiaries (and to the extent Mr. Rajan testified regarding the Debtors' operations, these are actually taking place at the VSI level).

Next, Hawk argues that the evidence established conversion is warranted under §1112(b)(4)(B), based on the Debtors' gross mismanagement of the estates.[42] Hawk argues that the evidence at Trial established the Debtors' gross mismanagement in a number of ways: (a) Mr. Rajan's breach of his fiduciary duties and conflicts of interest; (b) the Debtors' lack of

---

[40] In its Post-Trial Brief, Bankr. Docket No. 431, Hawk does not address its argument in the Section 1112/1104 Motion that conversion or dismissal is warranted under §1112(b)(4)(D), based on the Debtors' unauthorized use of cash collateral. *See* Hawk Post-Trial Brief, at 42 (arguing that there are three bases under §1112(b) under which the Court can order conversion here: (i) substantial or continuing loss or diminution of the estate and absence of reasonable likelihood of rehabilitation under §1112(b)(4)(A); (b) gross mismanagement of the estate under §1112(b)(4)(B); and (c) lack of good faith in filing the Petitions). In its Post-Trial Reply Brief, Bankr. Docket No. 436, Hawk acknowledges that it has not identified any cash collateral the Debtors used without permission, but attributes that to the Debtors' failure to adhere to their financial reporting and disclosure obligations. *Id.* at 14. While the Court is not clear that Hawk is even advancing this basis for conversion or dismissal given its omission from the Hawk Post-Trial Brief, Hawk's concession in its reply brief seems to end the inquiry, and the Court therefore does not address it further herein.

[41] Hawk Post-Trial Brief, at 44-47.

[42] *Id.* at 48-57.

22

candor to the Court and interested parties; (c) the Debtors' "blatant gamesmanship" in their requests for relief in this Court and the litigation that has ensued; and (d) likely fraud in the fabrication of a purported funding transaction.

Finally, Hawk argues that the evidence established conversion is warranted based on the Debtors' bad faith in commencing these cases.[43]  Hawk argues that the timing of the Debtors' Petitions alone establishes *per se* bad faith because they were filed on the eve of trial in the Section 225 Action as a bad faith litigation tactic.  Hawk further argues that under the totality of the circumstances test used in the Third Circuit, twelve of the fourteen factors used support a finding of bad faith.

Hawk argues that conversion of the Debtors' cases, rather than dismissal, is warranted so that the Court may continue to oversee them but curtail Mr. Rajan's influence in administering them.[44]  Barring conversion, Hawk argues that dismissal is appropriate because the existence of cause has been established under §1112.  If, however, the Court is not inclined to either convert or dismiss, Hawk argues the evidence establishes that appointment of a trustee is proper based on Mr. Rajan's pattern of fraud and dishonesty in managing the Debtors, his gross mismanagement not only of the estates, but also of the pre-petition Debtors, and the conflicts of interest between Mr. Rajan and his roles with and interests in the Debtors and VSI that have revealed themselves through the administration of these cases.[45]  Hawk argues that the costs of appointing a trustee "are effectively nil" because Mr. Rajan's administration of the estates to date has been so

---

[43] *Id.* at 57-61.

[44] *Id.* at 62.  The Court notes Hawk's request for conversion rather than dismissal represents a change from its preference for dismissal with prejudice as stated in the Section 1112/1104 Motion, but is consistent with the evolved position Hawk took in its pre-trial brief filed in May.  *See* Bankr. Docket No. 195, at ¶¶23 to 42.

[45] *Id.* at 64-67.

harmful to creditors' prospects for recovery.

The Debtors argue that Hawk has failed to establish by a preponderance of the evidence that cause exists for conversion, dismissal, or the appointment of a trustee.[46]

First, the Debtors argue the evidence does not establish the absence of a reasonable likelihood of rehabilitation. The Debtors assert that their proposed plan of reorganization,[47] the post-petition purchase orders they have procured, and Mr. Rajan's testimony at Trial regarding expected revenues to be generated from new and existing Stream customers belie Hawk's narrative of a non-operating entity that has no ability to rehabilitate.[48] Moreover, the Debtors argue, the evidence does not establish substantial or continuing loss to the estates because operating expenses are being funded by VSI in exchange for Stream shares.[49]

The Debtors also argue that the evidence does not establish gross mismanagement of the estates supporting conversion or dismissal. The Debtors assert that their efforts to obtain financing from VSI to fund operations pursuant to the Debtor DIP Motion were the subject of "extreme resistance" that ultimately resulted in the Court declining to approve the financing, and that they have retained Mr. Park to provide independent oversight of the Debtors' post-petition finances and internal systems, thereby buffering management of the estates with "another layer of independence to the Debtors' management team."[50]

With respect to Hawk's argument that the Petitions were filed in bad faith, thereby providing another basis for conversion or dismissal, the Debtors argue that the cases were filed to

---

[46] Debtors Post-Trial Brief, Bankr. Docket No. 432, at 2-3.

[47] *See* Bankr. Docket No. 293.

[48] Debtors Post-Trial Brief, at 11-16.

[49] *Id*. at 17-19.

[50] *Id.* at 19-21.

24

provide breathing room and to develop a plan of reorganization, not as a litigation tactic solely for purposes of staying the Section 225 Action.[51]

Just as they argue there is no basis for conversion or dismissal, the Debtors argue there is no basis for the appointment of a trustee. The Debtors cite Mr. Rajan's experience as a businessman, his intimate familiarity with the Debtors' business and related technology, and the post-petition retention of Mr. Park as reasons for finding that the Debtors' estates are better administered by current management.[52]

### b. The Hawk Stay Relief Motion

Hawk argues that cause exists to grant relief from stay to allow the Section 225 Action to proceed because its resolution "will determine: (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any available defense(s) to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes – all critical to the resolution of these Chapter 11 cases."[53] Relying on Mr. Stastney's Trial testimony regarding the late stage at which the Section 225 Action was when the Petitions were filed, the expenses that had been incurred getting to that point, and the extensive discovery that had been undertaken, Hawk argues that a quick resolution by the Delaware Chancery Court would be efficient and conserve judicial and estate resources.

The Debtors, in response, argue that relief from stay is not warranted. The Debtors first argue that Hawk has failed to articulate the exact relief and specific matters that it seeks to

---

[51] *Id.* at 22-26 (arguing that "virtually none" of the factors set forth in *Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.),* 272 B.R. 554, 557 (D.De. 2002) for analyzing whether a filing was in bad faith are present here).

[52] *Id.* at 27.

[53] Hawk Post-Trial Brief, at 62-63.

pursue in the Section 225 Action.[54]  Furthermore, they argue, the ultimate relief sought in that action is to authorize Hawk to exercise rights under the Hawk Notes and the SLS Notes, including pursuit of an Article 9 Sale of their purported collateral.[55]  Hawk cannot do so, the Debtors argue, without resolution of the dispute regarding Stream's rights in connection with ownership of 100% of Technovative shares, which are undisputedly estate property and therefore subject to resolution by this Court rather than the Delaware Chancery Court.[56]  The Debtors further argue that allowing the Section 225 Action to proceed would greatly prejudice the Debtors by allowing Hawk to move forward with its plans to effectuate a sale of downstream assets, thereby inflicting irreparable harm on the Debtors' ability to effectuate an orderly reorganization process.  The Debtors also argue that they have strong defenses in the Section 225 Action, militating against relief.

## III.     DISCUSSION

### A.     Cause Exists and It Is In the Best Interest of Creditors and the Estates at This Stage to Appoint a Chapter 11 Trustee

#### 1.     Legal Standard for Dismissal or Conversion Under §1112(b)

Section 1112(b)(1) of the Bankruptcy Code sets forth the Court's power to convert or dismiss a chapter 11 bankruptcy case:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. §1112(b).  The movant bears the initial burden to demonstrate cause by a

---

[54] Debtors Post-Trial Brief, at 28.

[55] *Id.*

[56] *Id.* at 29.

preponderance of the evidence, and once shown, the burden shifts to the debtor to establish an exception under §1112(b)(2).[57] *In re Dr. R.C. Samanta Roy Institute of Science Technology,* 465 Fed. Appx. 93, 96-97 (3d Cir. 2011) ("[O]nce cause is found, the burden shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors."); *In re Mann Realty Assocs.,* 2019 WL 4780937, at *6 (M.D. Pa. Sept. 30, 2019) ("After cause is established, the burden shifts to the opposing party to identify unusual circumstances that suggest conversion would not be in the best interests of the estate and its creditors, and that there is a reasonable likelihood that a reorganization plan will be confirmed in a reasonable time."); *In re Vascular Access Centers, L.P.,* 611 B.R. 742, 761 (Bankr. E.D. Pa. 2020) (citing cases).

The Bankruptcy Code sets forth a non-exclusive list of circumstances that constitute "cause" for conversion or dismissal. 11 U.S.C. §1112(b)(4). As discussed *supra,* Hawk's Post-Trial Brief focuses on two of these circumstances: (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (B) gross mismanagement of the estate.

A motion filed under §1112(b) necessitates a two-step analysis: (1) to determine if cause exists to either dismiss the case or convert it to chapter 7, and (2) if so, which option is in the best interests of creditors and the estate (unless appointment of a trustee under §1104 is in the best interests). *Camden Ordnance,* 245 B.R. at 798. In considering whether to convert or

---

[57] Section 1112(b)(2) provides that the court may not convert or dismiss a case if the court finds and identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable, within a reasonable period and (2) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification for the act or omission; and that will be cured within a reasonable period of time fixed by the court.

dismiss, a bankruptcy court may consider a variety of factors, including:

    (1)    whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

    (2)    whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

    (3)    whether the debtor would simply file a further case upon dismissal;

    (4)    the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

    (5)    in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

    (6)    whether any remaining issues would be better resolved outside the bankruptcy forum;

    (7)    whether the estate consists of a "single asset";

    (8)    whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

    (9)    whether a plan has been confirmed and whether any property remains in the estate to be administered;

    (10)    whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

    (11)    consideration of the effect of dismissal under §349 of the Bankruptcy Code.

*In re Ramreddy, Inc.,* 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009) (citing 7 COLLIER ON BANKRUPTCY ¶1112.04[6]).

Although §1112(b)(4)'s enumerated circumstances constituting cause are wide-ranging, a court may consider other factors as they arise and may use its equitable powers to reach an appropriate result in individual cases. *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.,* 245 B.R. 794, 798 (E.D. Pa. 2000) (quoting *Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D. Pa. 1991)). For example, it is well-settled that a debtor's inability to achieve confirmation of a

plan, by itself, provides sufficient cause for dismissal or conversion of a chapter 11 case.  *See,
e.g., 1121 Pier Village LLC,* 635 B.R. at 137 n.14; *In re 3 Ram, Inc.,* 343 B.R. 113, 117 n.14
(Bankr. E.D. Pa. 2006).

  Importantly, good faith is an implicit requirement in the filing of a chapter 11 bankruptcy
case, and a case not filed in good faith is subject to dismissal under §1112(b).  *See, e.g., In re
SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999) (chapter 11 petitions are subject to
dismissal unless filed in good faith); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661
(Bankr. E.D. Pa. 2009) (citing *SGL Carbon*).  The debtor bears the burden of proving good faith.
*Id.* (citing *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir. 2003)).  In the business
bankruptcy context, the preservation and rehabilitation of a going concern or the maximizing of
the value of a debtor's estate for the benefit of creditors through an orderly liquidation are valid
bankruptcy purposes supporting a finding of good faith.  *Id.* (citing *In re Integrated Telecom
Express, Inc.,* 384 F.3d 108 (3d Cir. 2004)); *In re Team Systems International LLC,* 640 B.R.
296, 311 (Bankr. D. Del. 2022) ("The ultimate touchstone is whether the case is being used to
accomplish one of the basic purposes of chapter 11 – to preserve a going concern and/or to
maximize the property available to satisfy creditor claims.").  Whether a case should be
dismissed for lack of good faith is committed to the discretion of the bankruptcy court, and the
determination is a fact-intensive inquiry based on the totality of the circumstances.  *Id.* at 662
(citing *Integrated Telecom*).  The inquiry is facilitated, however, by factors courts use, the
presence of which suggests a case was not filed in good faith:

   (1)   the debtor has few or no unsecured creditors;

   (2)   there has been a previous bankruptcy petition by the debtor or a related entity;

   (3)   the prepetition conduct of the debtor has been improper;

<div align="center">29</div>

(4)     the petition effectively allows the debtor to evade court orders;

(5)     there are few debts to non-moving creditors;

(6)     the petition was filed on the eve of foreclosure;

(7)     the foreclosed property is the sole or major asset of the debtor;

(8)     the debtor has no ongoing business or employees;

(9)     there is no possibility of reorganization;

(10)    the debtor's income is not sufficient to operate;

(11)    there was no pressure from non-moving creditors;

(12)    reorganization essentially involves the resolution of a two-party dispute;

(13)    a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14)    the debtor filed solely to create the automatic stay.

*Id.* (citing *In re SB Properties, Inc.,* 185 B.R. 198, 204 (E.D. Pa. 1995)).

As discussed *supra,* the preservation and rehabilitation of a going concern is a valid bankruptcy purpose supporting a finding of good faith, and the determination of whether a case should be dismissed for lack of good faith is a fact-intensive inquiry based on the totality of circumstances.

> **2.     It Has Been Established by a Preponderance of the Evidence and the History of These Cases that Current Management's Actions and Inactions Constitute Gross Mismanagement of the Estates**

Section 1112(b)(4)(B) provides that cause for conversion or dismissal exists where there has been gross mismanagement of the estate.  11 U.S.C. §1112(b)(4)(B).  A debtor-in-possession owes a fiduciary duty to its creditors, and gross mismanagement is a breach of that duty.  *In re Ozcelebi,* 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022).  Section 1112(b)(4)(B) focuses on the conduct of the *estate's* affairs, not the pre-petition debtor's, and requires that the mismanagement

<center>30</center>

be gross in character, meaning that it is "'glaringly noticeable usually because of inexcusable badness or objectionableness.'" *In re 210 West Liberty Holdings, LLC,* 2009 WL 1522047, at *5 (Bankr. N.D. W.Va. May 29, 2009) (citing *Webster's Ninth New Collegiate Dictionary* 538 (1991)); see also *Ozcelebi,* 639 B.R. at 388 ("[W]hile 'gross mismanagement' is not defined by the Bankruptcy Code, Black's Law Dictionary defines 'gross' as 'beyond all reasonable measure; flagrant.' Given the plain language, a debtor's mismanagement must be beyond all reasonable measure.").

The above summary outlining the major activity in these cases, which have been pending for months, evidences the acrimony and overall lack of progress that has plagued these cases from their inception. Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtors' operations moving forward, these cases have stalled at virtually every turn. The Court has expressed its concern with the cases' lack of progress and direction on multiple occasions. Furthermore, the evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtors' cases to date, *i.e.,* the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management. There are many examples, large and small, that highlight (a) the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court, (b) the relatively directionless nature of these cases to date, and (c) the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date. The Court discusses the most glaring examples below.

### a.   All Indications Are That the Purported $300 Million Transaction with Zhongsheng Was Not Real

From the early days of these cases, the Court repeatedly raised concerns about how the Debtors were being funded.  Although the Debtors attempted to answer that question in part with an ill-conceived emergency financing through the sale of stock to VSI, they later proposed a $300 million transaction for the sale of Stream Class A stock to Zhongsheng.  That transaction was suspect from the start given its timing on the eve of Trial, lack of detail, and non-binding nature, but the dearth and opacity of information the Debtors provided about it at Trial when pressed, together with their abandonment of the proposed transaction, leads this Court to believe it never truly existed, and either embellished or fabricated to portray the Debtors' cases and operations as sufficiently progressing.

The Debtors filed the purported Zhongsheng Term Sheet on the evening of June 23, i.e., the Friday prior to the start of the Trial on the pending Hawk Motions.[58]  That term sheet, which states that it is non-binding, provides that Zhongsheng will invest $300 million in exchange for Class A Common Stock in Stream, resulting in Zhongsheng holding a 35% equity stake in Stream.[59]  Attached to the Term Sheet was a draft Subscription Agreement providing for Zhongsheng's purchase of the Stream shares, with an initial $15 million tranche to be sold by an unspecified date in July 2023, and the balance of the sale to occur by December 31, 2023.  According to the Debtors, they intended to use the first $30 million received from the sale of

---

[58] The Term Sheet was filed as an attachment to a two-page pleading styled as an amendment to the Stock Sale Motion.  Incredibly to the Court, the Debtors stated their position therein that they believed the relief sought by the Stock Sale Motion was broad enough to cover the sale of $300 million in Stream shares to Zhongsheng, but were filing the amendment out of an abundance of caution.  The Court questions whether the post-petition sale of $300 million in equity in a debtor could ever be covered under an ordinary course of business concept, but it is enough to say that it certainly is not here.

[59] *See* Bankr. Docket No. 258-1.

Stream's Class A shares to fund their operations through confirmation. As such, the Zhongsheng transaction was to fund the Debtors through the issuance of Stream securities rather than the incurrence of debt.

The authenticity of this transaction, however, quickly began to grow murky, particularly in light of the amount of the purported investment and its importance to the Debtors' cases. Mr. Park testified at Trial less than a week later, on June 29, that he understood Zhongsheng to be a publicly traded entity on Hong Kong's Hang Seng Index, involved in the high-end auto dealership business but with a finance arm as well.[60] Mr. Park wanted to make clear, however, that he was not involved in any negotiations with Zhongsheng related to the Term Sheet, despite serving as CFO and being tasked with raising capital for the Debtors. Instead, the negotiations were handled by Mr. Rajan, and Mr. Park had not discussed the proposed deal with Mr. Rajan notwithstanding its enormous size and implications for the Debtors' finances.[61]

Following Mr. Park's testimony, Hawk sought more information about the Zhongsheng Term Sheet through discovery, and ultimately filed a motion to compel the Debtors to produce information sufficient to permit Hawk to depose a Zhongsheng representative about the purported transaction (the "Motion to Compel").[62] By the Motion to Compel, Hawk made clear that it sought the information in order to, among other things, "evaluate the veracity of the Term Sheet."[63] Although the Court denied the Motion to Compel, it entered an order (the "Discovery

---

[60] June 29, 2020 Hearing Transcript, 55:5 to 55:15.

[61] *Id.* at 55:21 to 56:9. The idea that Mr. Park, as CFO, would not even discuss the proposed deal with Mr. Rajan, let alone be involved in the negotiations, is indicative of its specious nature, or otherwise speaks to the marginal role Mr. Park plays with the Debtors despite Mr. Rajan being their only other employee.

[62] CR-242.

[63] *See* Motion to Compel, at ¶17.

33

Order")[64] directing the Debtors to produce contact information for the individuals at Zhongsheng who negotiated the Zhongsheng Term Sheet, as well as documents and communications with Zhongsheng or any affiliate of Zhongsheng "including but not limited to letters of intent, proposals, and diligence materials between the Debtors and Zhongsheng Group Holdings Ltd. or any affiliate thereof."  After the Discovery Order was entered, Mr. Rajan submitted a Declaration in support of the legitimacy of the Zhongsheng Term Sheet (the "Zhongsheng Declaration").[65]  It is unnecessary to fully summarize the Zhongsheng Declaration, but in it Mr. Rajan states, *inter alia,* that (a) the Zhongsheng Term Sheet was the product of negotiations with William Wang and Tea Lee, both of Zhongzhi Enterprise Group ("ZEG"), an affiliate of Zhongsheng, and (b) contrary to Mr. Park's testimony, the Zhongsheng entity that is party to the Zhongsheng Term Sheet is a privately held company of the People's Republic of China, and is not the Zhongsheng entity publicly traded on the Hong Kong stock exchange.[66]

What came next was a motion by Hawk to hold the Debtors in contempt for failing to produce the information and documents required by the Discovery Order (the "Contempt Motion").[67]  Hawk alleged in the Contempt Motion that the Debtors only produced business cards in Mandarin for William Wang and Tea Lee, and that of the 4,300 pages of mostly unresponsive documents produced, only one document related to the Zhongsheng Term Sheet: a mobile phone or tablet screenshot of the Term Sheet's signature block, purportedly signed by Tea Lee on behalf of Zhongsheng, which was emailed from Jeff Shammah ("Mr. Shammah") of

---

[64] Bankr. Docket No. 322.

[65] CR-237.

[66] Although the Declaration is not entirely clear, the Court reads it to say that both the publicly-traded Zhongsheng and the privately-held Zhongsheng are affiliates of ZEG.

[67] Bankr. Docket No. 328.

Blue Ocean Partners Ltd.[68] to a Mark Savarese,[69] who then forwarded it to Mr. Rajan. Hawk argued that the Debtors' failure to produce any communications or other documents related to the Zhongsheng Term Sheet violated the Discovery Order and the Debtors' obligations under the federal discovery rules. The Court heard the Contempt Motion at the start of the continued Trial on August 15, but took the matter under advisement in order to proceed with evidence.[70]

Mr. Rajan testified in August at the continued Trial that the Zhongsheng Term Sheet evolved from a November 2022 term sheet Zhongsheng had entered into with VSI, and that once Stream filed for bankruptcy the parties simply agreed to revise the agreement to make Stream, rather than VSI, the counterparty.[71] During his cross-examination in September, however, Mr. Rajan was pressed on the legitimacy of the Zhongsheng Term Sheet. The Court found his testimony regarding his dealings with Zhongsheng difficult to believe. For example:

- Although Mr. Rajan had stated on direct examination in August that he was meeting with William Wang in Boston that weekend to work on the Zhongsheng transaction,[72] by his cross-examination in September he testified that Zhongsheng's trip was delayed and would be occurring in October.[73] Mr. Rajan gave no explanation for why the trip was delayed, and admitted he did not ask anyone from Zhongsheng to testify in support of the transaction's authenticity. In

---

[68] Mr. Rajan testified that the Debtors retained Mr. Shammah, an investment banker, post-petition to negotiate the transaction with Zhongsheng, but acknowledged that no court approval for the retention was sought or granted. *See* September 25, 2023 Hearing Transcript, at 32:17 to 33:12.

[69] As will be discussed *infra,* Mr. Savarese evidently holds a role with VSI, but none with the Debtors of which the Court has been made aware.

[70] Bankr. Docket No. 354.

[71] See August 17, 2023 Hearing Transcript, at 88:4 to 95:20; 99:25 to 100:7.

[72] *Id.* at 101:9 to 101:22.

[73] September 25, 2023 Hearing Transcript, at 60:13 to 60:23.

light of the questions Hawk was raising and the enormous amount of capital to be infused into Stream under the proposed transaction, the Court finds it incredible that Mr. Rajan would not (a) dig deeper into why Zhongsheng would was not able to negotiate the transaction in August 2023, whether in Boston or otherwise, and (b) at least request that a representative of Zhongsheng or ZEG testify at Trial in support of the transaction.[74]

- WeChat messages were the only documentation Mr. Rajan had supporting his claim that William Wang and Tea Lee, as purported employees of ZEG, were nonetheless authorized to negotiate a $300 million deal on behalf of Zhongsheng.[75]

- Mr. Rajan confirmed his testimony given on direct examination that Zhongsheng's preferred method of communication was WeChat, but when pressed as to why no WeChat messages were produced evidencing those communications, Mr. Rajan hedged, testifying that he "[didn't] know if it was WeChat or if it was photographs and those various programs."[76]

- When asked whether he had received any financial information from Zhongsheng, Mr. Rajan responded that he wasn't sure and would have to "go back and check," but acknowledged that as of his deposition on August 14 he had not received any financial information from Zhongsheng, did not know its gross revenues, did not

---

[74] The Debtors gave no reason why a purported $300 million transaction could only be negotiated in-person in Boston and only at some uncertain date in the future, nor why it would be too much to ask a Zhongsheng or ZEG representative to travel to the United States to testify.

[75] Presumably these are the same WeChat messages attached to his Zhongsheng Declaration.

[76] September 25, 2023 Heating Transcript, at 74:21 to 75:17.

36

know how many auto dealerships it operated, or even what make of car it sold.[77]

- Mr. Rajan was pressed on his statements in the Zhongsheng Declaration that the privately-held Zhongsheng entity that signed the Term Sheet is distinct from the publicly-traded Zhongsheng entity. When asked for an explanation as to why the same address in Dalian, China was given by both the publicly-traded entity in its 2021 Annual Report[78] for its corporate headquarters and by the privately-held entity in the Zhongsheng Term Sheet for its principal place of business, Mr. Rajan provided a convoluted response that provided no explanation at all.[79]

- Notwithstanding the enormity of the proposed transaction, which would infuse $300 million of funding into Stream for a 35% stake in the company, Mr. Rajan disclaimed its importance to the Debtors, testifying in September that funding is now not needed to implement the Debtors' proposed plan because Stream was receiving financing from VSI instead.[80]

The Court finds the entire picture that Mr. Rajan painted of the Zhongsheng transaction to be not credible. The Court finds the almost complete lack of documentation and communications related to a purported $300 million transaction to be most damning and suggests

---

[77] *Id.* at 70:2 to 72:9.

[78] *See* CR-254 (page 2).

[79] September 25, 2023 Hearing Transcript, 146:14 to 147:8 ("The way it works in China is if you want to do business in China, you need a company in China where you do all your operations. And what Stream TV believes from its understanding, is some of the shares from the China company were put into a Hong Kong company, traded on the Hong Kong Exchange. The Hong Kong Exchange company is just a holding company, and Zhongsheng has shares and investments in the private company and no liquidity because they don't have no shares in the Hong Kong company. They wanted shares in Stream TV, because we have all these POs, on the hope that we could eventually get Zhongsheng some liquidity. They're two separate companies."). The Court finds this response to be non-responsive and, in the context of the question asked, largely nonsensical.

[80] September 25, 2023 Hearing Transcript, at 191:22 to 192:2.

that the transaction was not real. In light of that lack of documentation, and Hawk putting the Debtors on notice in the Motion to Compel (if not earlier) that it questioned the existence of an actual deal with Zhongsheng, it was incumbent upon the Debtors to substantiate the transaction's existence and legitimacy. Moreover, if the Zhongsheng transaction was both legitimate and intended, even as an alternate source of funding, the Court concludes that the Debtors would or should have viewed it as being of the utmost importance to have someone other than Mr. Rajan, whether an individual from Zhongsheng, Mr. Shammah, or someone else, testify in support of its authenticity. They did not, and the Court finds Mr. Rajan's testimony was not believable and was instead suggestive that the transaction was never real to begin with.[81]

The Court views this as an enormous problem for the Debtors. Particularly in a case where funding for the Debtors has been a stated concern from the outset, the Court's trust in the Debtors' management was severely undermined both by their failure to satisfactorily substantiate the Zhongsheng transaction after submitting it to the Court, and their willingness to walk away from it after its bona fides came into doubt.[82]

### b. The Debtors' Self-Imposed April Funding Crisis Nearly Left SCBV's Payroll Unfunded

Early in these cases, the Debtors' management created a funding fiasco that greatly

---

[81] The Court notes, anecdotally, that despite the authenticity of the Zhongsheng transaction being the subject of motion practice, hearings, and a significant portion of Mr. Rajan's trial testimony, the Debtors' Post-Trial Brief does not address the transaction at all, let alone why the evidence supports a finding that it was legitimate.

[82] On this, the Court agrees with Hawk's point in its Reply Brief that the logic of the alternative funding from VSI under the Debtors' proposed plan is difficult to square if the Zhongsheng transaction was real: "In other words, instead of waiting a few weeks for an investor to allegedly provide a $300 million investment for only a 35% share of the company, Mr. Rajan has opted to pursue an investment from his other company, VSI of $25 million (i.e., nearly 1/10th that amount) for a 90% share of the company (i.e., nearly three times the equity share). In other words, if the Zhongsheng Term Sheet is genuine, Mr. Rajan has robbed these Debtors and their estates of $736.4 million in order to ensure that his other company, VSI, obtains voting control over the Debtors." Hawk Post-Trial Reply Brief, at §B.5.

diminished the Court's confidence in Mr. Rajan's ability to guide the Debtors successfully in bankruptcy, and as importantly, in his ability to do so given his interest in and role with VSI.

Stream's Schedule A/B disclosed $2,362.50 in cash on hand as of the date its Petition was filed.[83]  The Debtors did not file a financing motion at the time their Petitions were filed, nor in the weeks thereafter.  The issue of how the Debtors were funding their cases was raised from an early stage by Hawk, and by no later than April 14, the Court raised the issue with the Debtors in light of the fact that April payroll was coming due for SCBV by the end of the month.[84]  At that time, the Court was advised that the Debtors had the means to fund their estates at a rate of at least $250,000 per month with cash from VSI, and that they would "have the appropriate documentation on file when we know how much money we actually need to do it."[85]  The Court advised the Debtors, given that §364(b) requires a motion and a hearing for debtor-in-possession financing, that "somebody needs to do something" to obtain funding for April payroll.[86]

On April 21, *i.e.,* one week after the Court raised its concerns as to case funding, the Debtors filed the expedited Stock Sale Motion.  The motion sought, among other things, authority to engage in what the Debtors asserted was the ordinary course sale of unissued Stream stock to VSI on an as-needed basis to fund their business operations.  In connection with that request for authority, the Debtors also sought authority to enter into a stock purchase agreement with VSI for the sale of up to $10 million in Stream stock.  According to the Debtors, they routinely sold shares of stock pre-petition to fund operations, and therefore did not need authority from the Court to do so post-petition, but did so "out of an abundance of caution to

---

[83] *See* Bankr. Docket No. 52.

[84] *See* April 14, 2023 Hearing Transcript, at 145:9 to 145:15; 163:2 to 163:6.

[85] *Id.* at 164:12 to 166:5.

[86] *Id.* at 173:5 to 173:10.

ensure their ability to continue selling and issuing new shares in Stream consistent with its pre-bankruptcy practices in order to bring valuable and necessary funds into these chapter 11 cases."[87]

Given what it understood to be a funding crisis with respect to payroll obligations at the SCBV level due on April 25, the Court heard the Stock Sale Motion on an emergency basis on April 24. It was clear to the Court from the outset, as the Court advised the Debtors on the record at the hearing, that the circumstances creating a funding crisis with respect to the SCBV payroll was a self-created emergency, was foreseeable at the time the Petitions were filed, and should have been the subject of a first-day motion, rather than a motion filed days before payroll was coming due and packaged with a request for expedited approval of matters entirely irrelevant to funding SCBV and independent contracor payroll.[88] Moreover, as the Court expressed at the hearing, the Debtors were only advising the Court for the first time on an emergency basis that they were proposing to sell shares to VSI to fund their post-petition operations, which the Court was not going to approve on an expedited basis.[89]

At that point in the April 24 hearing, the Debtors pivoted on-the-fly, seeking approval for emergency debtor-in-possession financing from VSI.[90] It was unclear, however, whether VSI even had sufficient funds to cover the payroll-related amounts.[91] Meanwhile, SeeCubic advised the Court that it was willing to fund the SCBV payroll under a pre-petition facility used to fund

---

[87] Stock Sale Motion, at ¶56.

[88] See April 24, 2023 Hearing Transcript, 6:19 to 6:25; 22:16 to 23:6.

[89] *Id.* at 38:23 to 39:3; 40:1 to 40:7.

[90] This was done only after the Debtors suggested the payroll be funded with money they were holding from pre-petition subscription agreements, which upon the Court's inquiry, was revealed to be funds not reported in the Debtors' filed Schedules. *Id.* at 43:5 to 44:5.

[91] *Id.* at 55:19 to 56:1; 57:11 to 57:16.

SCBV while the Receiver was in place.[92]  The Court concluded that it was not going to choose

between the two alternatives without evidence, and expressed concern over whether the Debtors

were even the entity that had an obligation to fund SCBV's payroll in the first place.[93]  The

Court therefore required the Debtors to file a financing motion by the end of the day with the

proposed terms, and allowed SeeCubic to file a proposed alternative financing, both of which

would be considered at an emergency evidentiary hearing the following day.

The Debtors filed their financing motion the following morning (the "Debtor DIP

Motion"),[94] and SeeCubic filed its motion for approval of alternative funding (the "Seecubic

Alternative Funding Motion").[95]  The Debtor DIP Motion sought authority either for (a) the

Debtors to borrow approximately €872,000 from VSI on an unsecured basis to fund SCBV

payroll obligations or, alternatively, (b) VSI's issuance of one or more unsecured senior

promissory notes to SCBV directly, with either option being in exchange for Stream's entry into

the Distribution Agreement with VSI, whereby VSI would accept orders and make delivery of

Stream's products to customers and retain a 10% margin.  The SeeCubic Alternative Funding

Motion proposed to fund SCBV's payroll obligations with a loan directly to SCBV under the

pre-existing unsecured facility with SeeCubic, or alternatively, with an unsecured loan to the

Debtors for the purpose of funding the SCBV payroll obligations.

The Court held a lengthy emergency evidentiary hearing on the alternative proposals later

that day, at which Mr. Rajan testified on behalf of the Debtors and Mr. Stastney testified on

behalf of SeeCubic.  Indicative of the Court's chief concern with the Debtors' proposal to obtain

---

[92] *Id.* at 66:18 to 67:13.

[93] *Id.* at 80:23 to 81:2.

[94] Bankr. Docket No. 156.

[95] Bankr. Docket No. 155.

41

financing from VSI, Mr. Rajan was also purporting to testify on behalf of VSI.[96]  Although the

Debtors ultimately withdrew Mr. Rajan as a representative of VSI when the Court questioned

how that could be, Mr. Rajan's dual role was indicative of the Court's trouble with the Debtors'

emergency financing proposal:  the evidence at the hearing made clear to the Court that the

proposal to have the Debtors incur $1 million in post-petition administrative debt to VSI was not

only unnecessary given the availability of approximately €700,000 in funding directly from

SeeCubic to non-debtor SCBV, but was also fatally flawed because Mr. Rajan was on both sides

of the proposed transaction.[97]  As such, the Court denied the Debtor DIP Motion.  With respect

to the SeeCubic Alternative Funding Motion, because SCBV was a non-debtor foreign company,

the Court held that it could not direct SCBV to borrow from SeeCubic, but also would not

approve an alternative debt financing from SeeCubic to the Debtors to fund payroll because the

incurrence of such debt by the estates was unnecessary given the availability of the existing

SeeCubic facility directly with SCBV.  The Court made clear to Mr. Rajan, however, that his

fiduciary duties to the Debtors, their estates, and SCBV were implicated by the funding crisis,

and recommended that he act consistent with them in approving SCBV's borrowing from

SeeCubic under the pre-existing facility.[98]

      The funding crisis in April was entirely of Debtors' management's own making.  As the

Court observed on multiple occasions during the April 24 and 25 hearings, the Debtors knew

when they filed their petitions that SCBV payroll would need to be funded in April.  They did

not file a traditional financing motion at any point in the first month the cases were pending, and

---

[96] April 25, 2023 Hearing Transcript, at 52:14 to 54:9.

[97] *Id.* at 248:12 to 248:25.

[98] *Id.* at 253:15-17.

42

inexplicably waited until just days before the SCBV payroll was coming due to seek authority for what they asserted was the ordinary course sale of $10 million in Stream shares to an entity owned by Mr. Rajan, while also seeking other relief that was entirely unrelated to the funding crisis. When the Court made clear that no such transaction would be approved absent a full opportunity for all parties and the Court to vet it, the Debtors proposed an insider financing transaction with no notice to other parties in interest. This necessitated an eleventh hour, full-day hearing, only for the Court to conclude that there was no need for the financing at all. Particularly given the Debtors' acknowledgement in seeking such relief of the value SCBV holds and the calamitous effect its employees leaving would have, this funding crisis is further evidence that the Debtors' management, and specifically Mr. Rajan, cannot be entrusted with the management of the Debtors' estates.

      **c.**     **The Debtors Have Financed their Post-Petition Operations by the Transfer of Stream Shares to VSI Without Adequate Disclosure or Court Permission**

At the April 24 hearing on the Stock Sale Motion, given that the Debtors proposed to fund their cases through the sale of Stream shares to VSI, the Court expressly asked whether the Debtors had done so post-petition. The Court was advised that they had not, and were waiting for Court permission to do so.[99] In fact, counsel for the Debtors acknowledged that "[W]e're coming to you because we know that there are grave consequences to not getting permission from the court. So even when things are in the ordinary course people come to get permission, and that's what we did."[100] As discussed *supra,* the Court did not give that permission.

---

[99] See April 24, 2023 Hearing Transcript, at 28:10 to 28:15.

[100] *Id.* at 31:22 to 32:1.

Without approval of the Stock Sale Motion, and with no revenue and no financing, how the Debtors were funding their cases and operations remained opaque to the Court. It became more clear, however, with Mr. Rajan's testimony at Trial. Mr. Rajan testified that VSI had been paying all expenses of the Debtors since the inception of their bankruptcy cases, in exchange for shares in Stream.[101] According to Mr. Rajan, Stream had been issuing shares to VSI every week or two since the Debtors' Petitions were filed.[102] In connection therewith, the Debtors had pre-petition subscription agreements with VSI, but also had entered into new, post-petition agreements.[103] Mr. Rajan was not sure how many Stream shares had been issued to VSI since the filings, but believed all were pursuant to pre-petition, rather than post-petition, subscription agreements.[104] Mr. Rajan was aware there was a motion pending by which the Debtors were seeking approval of post-petition subscription agreements the Debtors had already entered into with VSI, but claimed to not be sure if the post-petition subscription agreements were related to VSI's proposed role as plan sponsor or were the agreements proposed pursuant to the pending motion.[105]

As of Mr. Rajan's testimony in August, neither VSI's funding of the Debtors' post-petition operations nor the post-petition issuance of shares to VSI, whether pursuant to pre- or post-petition subscription agreements, had been disclosed in the Stream's monthly operating reports or otherwise.[106] Mr. Rajan claimed that the failure to make these disclosures was an

---

[101] August 17, 2023 Hearing Transcript, at 205:21 to 206:1.

[102] *Id.* at 212:25 to 213:3.

[103] *Id.* at 206:2 to 206:8.

[104] *Id.* at 206:12 to 207:1.

[105] *Id.* at 246:19 to 247:2.

[106] *See* Bankr. Docket Nos. 224, 253, 300 (April, May, and June 2023 Monthly Operating Reports); August 17, 2023 Hearing Transcript, at 219:9 to 219:24; 224:6 to 224:13.

oversight due to his hospitalization, and would be corrected promptly, but as of his testimony at

Trial in late September, no such corrections had been made.[107]

The Court found Mr. Rajan's testimony regarding the Debtors' post-petition issuance of

shares to VSI to be evasive, and as a result, untrustworthy.[108]  Mr. Rajan was pressed on whether

VSI had been issued shares pursuant to post-petition subscription agreements,  and was shown

his deposition testimony stating that Stream was issuing new shares to VSI every two weeks or

so pursuant to post-petition subscription agreements.[109]  In response, Mr. Rajan asserted he was

talking about pre-petition subscription agreements.[110]  This is not believable and is belied by his

testimony.  Mr. Rajan admitted he attended the April hearing where representations were made

to the Court that Stream shares were not being issued to VSI post-petition, but he nonetheless

allowed Stream to do so.  Mr. Rajan cannot fall back on a supposed belief that all shares issued

were pursuant to pre-petition subscription agreements, because even if that was authorized or did

not require authorization, he could not say with certainty that this is, in fact, what had happened.

Moreover, his failure to promptly amend the Debtors' monthly operating reports to reflect both

VSI's post-petition funding of the Debtors' operations and the issuance of shares to VSI is

unacceptable and was without any legitimate excuse.[111]  This casual approach to what was

clearly a highlighted concern of the Court at the outset of the case is further evidence that Mr.

Rajan has administered these estates with an eye towards what he personally wants to

---

[107] See September 25, 2023 Hearing Transcript, at 14:12 to 15:12.

[108] *See, e.g.,* August 17, 2023 Hearing Transcript, at 252:4 to 252:11; 253:23 to 254:4.

[109] *See* CR-231, at 140:10 to 141:13.

[110] August 17, 2023 Hearing Transcript, at 254:6 to 254:17.

[111] Given the Debtors' proposed retention of Mr. Park dating back to May 2023, Mr. Rajan's
hospitalization in June and July cannot serve as a basis for failing to amend the Debtors' schedules by late
September.

accomplish and disclose, rather than acting consistent with his obligations to the Court and the estates' creditors.

### d. The Debtors Have Proposed Certain Major Transactions in these Cases Benefitting VSI without Clear Benefit to the Debtors or the Estates

The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles. Certain transactions the Debtors have proposed have only reinforced that concern. As discussed *supra,* the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI. It was therefore denied. The unauthorized post-petition issuance of shares in Stream to VSI also raises serious questions about the administration of these cases for the benefit of VSI. These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

### i. The Distribution Agreement

A central feature of the Stock Sale Motion, and subsequently the Debtor DIP Motion, that created serious questions about how and for whose benefit these cases are being administered was the request for approval of the Distribution Agreement to be given to VSI, purportedly in exchange for its financial support in funding the Debtors' product development and supply chain. As stated in the Stock Sale Motion, under the agreement, VSI "will accept orders from and make delivery to third-party customers … VSI will then issue back-to-back purchase orders to Stream for 90% of the value of those third-party orders, retaining a 10% margin for funding technical, business, and sales development. In essence, VSI will act as a distributor for Stream to these

46

customers."[112]  This was not the first time, however, that the Court was hearing about the

proposed Distribution Agreement.  In a declaration filed in support of the Debtors' Stay

Enforcement Motion, filed on April 13 (the "Stay Enforcement Declaration"),[113]  Mr. Rajan

disclosed VSI's willingness to fund the Debtors' post-petition operations in exchange for the

Distribution Agreement.[114]  At a hearing on April 14 on the Stay Enforcement Motion, the Court

questioned why the Debtors need a distributor for their product.  However, the Distribution

Agreement was not the focus of that hearing, which, as discussed *supra,* was largely the urgent

need for the Debtors' to fund their cases.

In response to the Court's admonition at that hearing to the Debtors that funding needed

to be procured, the Debtors filed the Stock Sale Motion a week later, and it was there that they

sought (on an expedited basis) approval of the Distribution Agreement.  The agreement was then

the subject of Mr. Rajan's testimony at the hearing on the Debtor DIP Motion on April 25.  Mr.

Rajan was asked directly whether the Distribution Agreement was part of the compensation VSI

was to receive for providing post-petition funding to the Debtors.[115]  Mr. Rajan evaded,

responding that the Distribution Agreement "is an aspirational hope.  The Court has to – we

submitted it for approval to the Court."[116]  Only upon the Court's inquiry did Mr. Rajan affirm

that the Distribution Agreement was part of VSI's proposed compensation to fund the Debtors.

---

[112] See Stock Sale Motion at ¶¶25, 26 (internal paragraph numbering omitted).  The motion goes on to represent that "In addition to financial support, VSI will assist Debtors with productization of electronics, an area in which Stream needs support.  VSI will also assist Debtors with translating computer software and hardware code, designing chips for use in end-user products, and supporting Debtors' customers with integration of those chips into end-user products."  *Id.* at ¶27.

[113] Bankr. Docket No. 114-1.

[114] Bankr. Docket No. 114-1, at ¶12.

[115] April 25, 2023 Hearing Transcript, at 93:11 to 93:13.

[116] *Id.* at 93:14 to 93:16.

Notwithstanding that the Debtors ultimately filed the motion seeking approval of the Distribution Agreement, the Court found the way it was done disconcerting. The agreement was disclosed in a declaration from Mr. Rajan in support of the Stay Enforcement Motion, wholly unrelated to the Debtors' funding proposal. Only when the Court questioned its necessity was the Stock Sale Motion filed, which sought the agreement's approval on an expedited basis. When that relief was denied, the Debtors pivoted to include it in the Debtor DIP Motion. At no point during Mr. Rajan's testimony in connection with that motion did the Debtors present a cogent business justification for VSI acting as a distributor of the Debtors' product for a 10% share of the sales. In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales. The Debtors argue that the Distribution Agreement is "beneficial to the Estates because VSI can provide support to the Debtors in terms of funding, customer contracts, technical know-how in the areas of electronic productization, translating computer software and hardware code, designing chips for use in end-user products, and integration of those chips into end-user products."[117] They cite to a portion of Mr. Rajan's Trial testimony that does not touch on any of those supposed benefits, but even if it did, the Court is troubled by (a) the Debtors' failure to explain why VSI's proposed financing was not subject to a note with market-rate interest, rather than a significant cut of the Debtors' product sales, and (b) the Debtors seeking approval of the agreement on an expedited basis and in a landscape where other emergencies the Debtors had created were the focus of the Court and other interested parties.

---

[117] Debtors' Post-Trial Brief, at ¶27.

ii.      The Licensing Covenant

The Court also has concerns regarding the Debtors' post-petition Licensing Covenant

with Rembrandt, entered into post-petition in August.[118]  Pursuant to the Licensing Covenant,

Rembrandt agreed that it would not issue a license to the Rembrandt IP (a defined term) to

Hawk, SeeCubic, Mr. Stastney, or a host of related entities and parties.  The Court understands

the Debtors' desire for such an agreement, given those parties' adversarial relationship with the

Debtors' and their competing interests.  Importantly, however, it also bars the licensing of the

Rembrandt IP to any current or former subsidiary of Stream as well.[119]  In exchange, Stream and

VSI[120] agreed to pay Rembrandt $3.6 million, payable in several installments.[121]  The Licensing

Covenant addressed Stream and VSI's motivation to enter into it: "[T]he VSI Parties want the

plan for reorganization to have an optimal chance of success and to ensure that it is clear that the

VSI Parties will have the sole right to commercialize the technology and products developed by

Stream among the lenders, creditors and shareholders of Stream … [T]he VSI Parties would like

to enter into a Licensing Covenant with Rembrandt to prevent certain lenders, creditors, and

shareholders of Stream [from] attempting to commercialize the technology and products

developed by Stream."[122]

---

[118] CR-222.

[119] Licensing Covenant, at §B.2.

[120] Reinforcing their lock-step alliance under the Licensing Covenant and the interrelationship between them, Stream and VSI are defined together under the agreement as the VSI Parties.

[121] *Id.* at §C.2.  Those installments were to commence on September 1, 2023.  At Trial, Mr. Rajan confirmed that Stream and VSI are jointly and severally liable for the payments under the Licensing Covenant.  Stream and VSI also agreed to an increase in the number of units Rembrandt can obtain.  *Id.* at §D.1 to D.3.

[122] *Id.* at fifth, sixth Whereas clauses.

49

The Court recognizes VSI's proposed role as plan sponsor, and as Mr. Rajan acknowledged during his testimony, if the Debtors' proposed plan is confirmed VSI will own 90% of Stream's equity.[123]  The Court is nonetheless alarmed about the propriety and motivations of Stream entering into a post-petition transaction that is intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries.  The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia,* Stream's subsidiaries.  While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology by companies who do not own our technology, specifically SeeCubic of Delaware, to stop the use of our technology to compete against us,"[124] the Licensing Covenant goes beyond that, precluding the issuance of a license to any Stream subsidiary notwithstanding the possibility that there may be a business reason for doing so at some point in the future.[125]  Rather than simply preventing SeeCubic from competing with the Debtors, the Licensing Covenant benefits a non-debtor insider third-party while requiring the Debtors to make significant post-petition payments to Rembrandt.  Moreover, not only did Mr. Rajan confirm that Stream is jointly and severally liable for the payments under the Licensing Covenant,[126] but as Hawk notes, the obligation to make payments under the Licensing Covenant is not conditioned on confirmation of the proposed plan, and in fact the agreement contemplates its effectiveness even if a plan is not confirmed.[127]

---

[123] September 25, 2023 Hearing Transcript, at 51:10 to 51:12.

[124] *Id.* at 51:1 to 51:5.

[125] As Hawk argues, the Licensing Covenant limits the potential avenues to capitalize on the Debtors' assets by foreclosing the issuance of a license to a downstream subsidiary.  Hawk Post-Trial Brief, at 50.

[126] *Id.* at 41:8 to 41:10.

[127] Licensing Covenant, at §C.5.

Each of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them without being able to articulate how they are a reasonable exercise of his business judgment.

### e. There Has Been Little to Substantiate Mr. Rajan's Claims of Hundreds of Millions of Dollars in Nascent Purchase Orders Coming to Stream

From the outset, Mr. Rajan has been touting the numerous deals and purchase orders the Debtors are on the verge of obtaining. Like the Zhongsheng transaction, however, there has been precious little evidence, other than Mr. Rajan's self-serving testimony, offered to verify the existence of these deals, or even the negotiation of such deals. After listening to Mr. Rajan's testimony, and having almost no other evidence against which to measure the veracity of his claims, the Court was left with the firm impression that Mr. Rajan was engaging in hyperbole at best, or fabrication at worst, in testifying regarding Stream being on the verge of obtaining customer commitments worth hundreds of millions of dollars.

### i. The VSI Purchase Orders Were Not Substantiated by Anything Other than Mr. Rajan's Testimony

On April 13, the Debtors filed Mr. Rajan's Stay Enforcement Declaration, in which he represented that Stream had secured two post-petition purchase orders totaling $138,600,000 in gross revenues, and attached the purchase orders as exhibits.[128] The securing of those purchase orders was given as a primary reason the Debtors needed to repossess the Bonding Equipment as soon as possible. Both orders are from VSI, the first dated March 20, 2023, in the amount of $12,600,000 ("VSI Purchase Order #1"), and the second dated April 11, 2023, in the amount of

---

[128] Stay Violation Declaration, at ¶8. Mr. Rajan stated his opinion that revenues to be derived from these two purchase orders will allow the Debtors to successfully reorganize. *Id.* at ¶15.

$126,000,000 ("VSI Purchase Order #2" and together with the VSI Purchase Order #1, the "VSI Purchase Orders"). Joseph Corso ("Mr. Corso"), under limited power of attorney, executed the VSI Purchase Order #1 on behalf of VSI, and Mr. Savarese, under limited power of attorney, executed the VSI Purchase Order #2 on behalf of VSI.

During the Trial, Mr. Rajan testified that the VSI Purchase Order #1 is for Cystar International Limited ("Cystar") as the third-party customer.[129] A purchase order from Cystar to VSI was issued on the same date as VSI Purchase Order #1, which Mr. Rajan testified he negotiated on behalf of VSI.[130] Mr. Rajan testified that the VSI Purchase Order #2 is for Southern Telecom as the third-party customer.[131]

Mr. Rajan also testified at Trial about the role an entity he referred to as BOE had in the VSI Purchase Orders. According to Mr. Rajan, BOE is the "number 1 panel company in the world," and BOE introduced Stream to a number of BOE's customers, "and those customers have become customers of Stream TV."[132] Two of those customers, according to Mr. Rajan, are Cystar and Southern Telecom.[133] Mr. Rajan testified that under an August 2018 agreement between Stream and BOE's factory entity by the name of Hefei Xinsheng Optoelectronics Technology Co. Ltd. ("BOE"),[134] BOE agreed to introduce Stream to customers, vendors, and suppliers, as well as providing purchase order financing to Stream.[135] Mr. Rajan testified that the

---

[129] August 17, 2023 Hearing Transcript, 47:7 to 47:16; Exhibit D-18. As noted *supra*, Mr. Rajan also disclosed in his Stay Violation Declaration the Distribution Agreement with VSI. The VSI Purchase Orders were made in connection with this Distribution Agreement. *See* Stay Violation Declaration, at ¶12.

[130] August 17, 2023 Hearing Transcript, 53:6 to 53:11.

[131] *Id.* at 63:23 to 65:14; Exhibit D-19; Exhibit D-21.

[132] August 15, 2023 Hearing Transcript at 201:3 to 201:7.

[133] *Id.* at 201:9; 205:24 to 206:1.

[134] Exhibit D-3.

[135] August 15, 2023 Hearing Transcript, 205:8 to 206:2; September 25, 2023 Hearing Transcript, 154:8 to

2018 agreement is still in effect, and that Stream "has calls with BOE at least three to four times a week [and] meetings, at least once to twice a week, either in China or the United States."[136] According to Mr. Rajan, BOE "help[s] us with customers. They help us with vendors. They're helping us with supply chain finance. They're ramping up more introductions and they're also working on their own sales activities."[137]

The VSI Purchase Orders are, on their face, clearly for a considerable sum and require considerable production from Stream.[138] The Debtors have repeatedly stated that the importance of these purported deals to the Debtors' reorganization and success going forward is fundamental, but it is beyond dispute that the VSI Purchase Orders are not traditional contracts with the panoply of provisions governing performance of the parties' agreement. They also do not provide for any further commitment by Cystar and Southern Telecom. At Trial, however, Mr. Rajan testified that Cystar wants to increase its order from the 10,000 units under the VSI Purchase Order #1 to "about 75 to 100,000 once he gets the bonding machine, which is about $140 million in revenue if he goes up to 100,000."[139] Likewise, Mr. Rajan testified that Southern

---

155:15. Mr. Rajan pointed to Articles 4 and 5 of the BOE agreement as binding them to provide purchase order financing. August 17, 2023 Hearing Transcript, at 189:2 to 192:2.

[136] August 15, 2023 Hearing Transcript, at 208:25 to 209:6.

[137] *Id.* at 209:4 to 209:10.

[138] Mr. Rajan testified that, without the Bonding Equipment, it had made arrangements with an entity called Fuji-Prem to provide the bonding services needed to meet the production requirement under the VSI Purchase Orders and "for most of our customers." August 15, 2023 Hearing Transcript, at 193:6 to 193:19; August 17, 2023 Hearing Transcript, at 28:21 to 28:23.

[139] August 15, 2023 Hearing Transcript, 201:15 to 201:17. Consistent with the Court's concern regarding Mr. Rajan's tendency to be loose with the purported sales he expects, he later testified that Cystar's "plan, once they receive the bonding machine is to increase their order to 75 to 100,000 units, which is over 100 million in revenue." *See* September 25, 2023 Hearing Transcript, at 31:2 to 31:6. He also testified that the VSI Purchase Order #1 was for "14 million, but Stream TV believes it's going to be increased to about 75 million." *Id.,* at 156:1 to 156:3.

Telecom wants to increase its order from the 100,000 units under the VSI Purchase Order #2 to "about 300,000 TVs."[140]

SeeCubic signaled almost immediately that it questioned the legitimacy of the VSI Purchase Orders.[141] Beyond Mr. Rajan's testimony, however, the Debtors did nothing to establish their bona fides. It seemingly would have been both very easy and very urgent for the Debtors, given the consequences if Hawk is successful in obtaining dismissal, conversion, or appointment of a trustee, to provide witness testimony from Cystar, Southern Telecom, and/or BOE to substantiate, at the very least, the VSI Purchase Orders, if not the asserted interest of Cystar and Southern Telecom in greatly increasing purchases going forward. This is particularly true with respect to Southern Telecom, as Mr. Rajan testified that it is a "big supporter" of Stream, and in addition to allegedly placing an order for 100,000 units, is interested in a merger or acquisition as well as cross-marketing activity.[142] Despite that level of purported support and interest in Stream, however, the Debtors did not bring anyone from Southern Telecom to substantiate the VSI Purchase Order #2. At a bare minimum, the Court would have expected the Debtors to put on the testimony of Mr. Corso and/or Mr. Savarese, each of whom purportedly bound VSI, to establish that the VSI Purchase Orders are legitimate.[143] The Debtors instead

---

[140] *Id.* at 202:1 to 202:10; *see also id.* at 194:3 to 194:6 ("Southern Telecom has indicated that they are going to increase their order from 100,000 TVs, which is $140 million in revenues to about 300,000, which would push us to 400 million in revenue.").

[141] April 14, 2023 Hearing Transcript, 64:23 to 66:17.

[142] August 15, 2023 Hearing Transcript, 202:12 to 203:8.

[143] In their post-trial reply brief, *see* Bankr. Docket No. 437, the Debtors argue that it is disingenuous for Hawk to point out that VSI did not appear at Trial to provide supporting testimony. *Id.* at 19. It is true that the Debtors attempted, at the eleventh hour, to add Tom Sego, a purported independent board member of VSI, and Bud Robertson, a current VSI employee, to their witness list in advance of the resumption of the Trial on August 15. *See* Bankr. Docket No. 334. It is also true that Hawk requested that neither witness be permitted to testify given the late notice and extremely limited windows of time the Debtors were proposing to make Mr. Sego and Mr. Robertson available for depositions. *See* Bankr. Docket No. 327. After a hearing the Court barred both Mr. Sego and Mr. Robertson from testifying.

relied only Mr. Rajan, whose credibility with this Court has been greatly diminished.  While the Debtors may have had their reasons for doing so, that gap in substantiation left the Court with the unanswered questions regarding the veracity of the VSI Purchase Orders and Mr. Rajan's claims that Cystar and Southern Telecom intend to exponentially increase the amount of product purchased from Stream.  Unfortunately, in the context of so many other instances where the Court has concerns regarding Mr. Rajan's truthfulness, this is just another example.

### ii. The Debtors Offered No Supporting Evidence for the Other Potential Customers and Deals Mr. Rajan Touted During Trial

Mr. Rajan testified at Trial regarding a host of other deals and partnerships on which he alleged the Debtors were working and/or were imminent:

- Mr. Rajan testified at Trial on August 15 that there are "eight or nine" other customers interested in the same unit that Cystar is ordering, including Google, and that a company from Thailand would be making an offer that morning.[144]

- Mr. Rajan alluded to other deals with "Hisense and some other brands, like Chunghwa Telecom, which will be ordering once we get the samples from [Fuji-Prem]."[145]  Mr. Rajan subsequently testified that Chunghwa Telecom wants to purchase 60,000 units.[146]

---

Bankr. Docket No. 343.  Even if the Court had permitted their testimony, however, neither VSI witness was proposed to testify regarding the legitimacy of the VSI Purchase Orders.  *See* Bankr. Docket No. 327-1 (Exhibit A).

[144] *Id.* at 201:18 to 201:24.

[145] *Id.* at 203:5 to 203:8.

[146] *Id.* at 217:6 to 217:12.

- Mr. Rajan testified that the Debtors were in negotiations with Lenovo, Sony, and Samsung, and had just received a request for a price quotation from LG.[147] Mr. Rajan subsequently testified that he was in negotiations with LG for the sale of 5,000,000 units.[148]

- Mr. Rajan also named other potential customers Skyworth, Highsense, Huawei, and Vizio.[149] According to Mr. Rajan, Skyworth is "expected to order TVs in the two to three million unit range."[150]

- Mr. Rajan testified that Stream was in discussions with Bosch, with which it had a pre-petition deal for an automotive-based product that allegedly fell apart once SeeCubic took control of Stream's assets under the Omnibus Agreement.[151] Mr. Rajan acknowledged, however, that Bosch is not a current customer of Stream.[152]

- Mr. Rajan testified that in addition to Bosch, Stream was in discussions with other potential customers for an automotive-based product, including Geely, Honda, Nissan, and Toyota.

- Mr. Rajan testified about certain other expressions of interest Stream has received for its product from Cystar, IQH3D, BBack Inc., and Sunny Hill Technology Ltd. ("Sunny Hill"), and the Debtor introduced into evidence letters from each of those

---

[147] *Id.* at 203:22 to 204:6.

[148] *Id.* at 219:8 to 219:10.

[149] *Id.* at 217:15 to 217:24.

[150] August 17, 2023 Hearing Transcript, at 30:7 to 30:13.

[151] August 15, 2023 Hearing Transcript, at 219:21 to 220:12. The pre-petition agreement with Bosch was admitted as Exhibit D-4.

[152] August 17, 2023 Hearing Transcript, at 25:6 to 25:14.

companies purportedly expressing such interest.[153]  Three of four of these letters, however, were issued pre-petition, and the fourth, from Sunny Hill, was dated only days after the Debtors filed for bankruptcy.[154]

- Mr. Rajan testified that he understood, based on a February 2023 discussion with Google, that once Stream provides Google with a lens sample Google had ordered pre-petition but that was never provided, Google would be interested in resuming discussions on acquisition of various sizes of Stream's units, which Mr. Rajan stated are both "very high margin type" and "very easy to do, very easy to make, and it's a very easy project."[155]

- Mr. Rajan testified regarding his post-petition negotiations with "various large content companies and sports leagues" on cross-marketing deals, but asserted he was subject to a strict non-disclosure agreement and could not reveal the names of the sports leagues.[156]

- Mr. Rajan testified that he had "probably 100 customer meetings" since the Debtors' Petitions were filed, but provided no additional detail.[157]

After listening to Mr. Rajan's testimony regarding these purported customers and relationships, the Court found his testimony not credible.  Rather, it appeared to the Court that Mr. Rajan was "name-dropping" large players in the television and panel space, but had nothing to verify that Stream has had any post-petition discussions or negotiations with these parties, let

---

[153] *Id.* at 68:25 to 77:3

[154] Exhibits D-44 to D-47s D-44 to D-47.

[155] August 15, 2023 Hearing Transcript, 214:7 to 217:1.

[156] August 17, 2023 Hearing Transcript, at 120:1 to 120:22.

[157] *Id.* at 121:6 to 121:10.

alone is on the precipice of transactions with them. Rather, on cross-examination, despite having referred to many of these parties as customers of Stream, Mr. Rajan acknowledged that Stream was not "at a contract stage yet" with respect to any of the parties about which he testified.[158] Moreover, although the Debtors have repeatedly stressed the need to regain the Bonding Equipment so that they may begin meeting production requirements. Mr. Rajan testified that alternative bonding arrangements had been made with Fuji-Prem to meet production needs, and therefore that the yet-unresolved dispute over the Bonding Equipment would not seem to be an impediment to at least some of these purported deals having come to fruition.[159] Particularly where Mr. Rajan represented that the deals in the works would result in hundreds of millions, if not billions, of dollars of revenue for the Debtors, the Court is confounded that the Debtors did not produce *any* potential contract-counterparty to corroborate Mr. Rajan's claims. In that void, the Court was left with only Mr. Rajan's assertions, which the Court found not credible.

> **f.** **The Net Effect of the Debtors' Conduct in These Cases, By and Through Mr. Rajan, Is That the Court Has No Faith in the Debtors' Ability to Effectively Manage These Bankruptcy Cases**

The Court's discussion of the general procedural history of these cases, specific events that have transpired, and representations the Debtors, and specifically Mr. Rajan, have made, is intended to illustrate the cloud of mistrust and mystery that has hung over these cases virtually from the beginning. In arguing that Mr. Rajan has engaged in gross mismanagement of the estates, Hawk points to much of the same conduct and actions by the Debtors during these cases that the Court has cited above, including (a) the Debtors' proposed entry into the Distribution

---

[158] August 17, 2023 Hearing Transcript at 164:13 to 165:11.

[159] The Court notes that the Debtors did not provide any agreement or other documentary evidence of an agreement with Fuji-Prem.

Agreement with VSI, (b) the VSI Purchase Orders using VSI as an intermediary with customers for a 10% fee, (c) the transfer of Stream shares to VSI in exchange for funding the Debtors' post-petition operations without Court approval, (d) the entry into the Rembrandt License Covenant for the purpose of steering licensed intellectual property from Rembrandt to VSI, and (e) the failure to file accurate monthly operating reports, and the failure to timely correct them.[160]  Hawk asserts that Mr. Rajan has administered these cases for the benefit of VSI, rather than creditors, and that this blatant breach of fiduciary duty, together with failing to disclose proposed agreements and transactions until the eleventh hour, and in the case of the Zhongsheng Term Sheet, fabricating the transaction entirely, constitutes gross mismanagement of the Debtors' estates warranting conversion or dismissal.

The already-discussed transactions and requested relief that appear to be primarily for the benefit of VSI are reason enough to find that Mr. Rajan has engaged in gross mismanagement of the Debtors' estates.  Another glaring example, however, is the Debtors' failure to revise knowingly false monthly operating reports, on which the Court and all interested parties rely in assessing the Debtors' post-petition performance and prospects, until December, months after the initial MORs were filed.  Furthermore, as discussed *infra*, the Revised MORs (as defined herein) appear to represent facts regarding payments VSI has made on behalf of Stream that contradicts Mr. Rajan's testimony at Trial, leaving the Court and interested parties unclear as to the Debtors' post-petition operations and finances.  A debtor-in-possession's fiduciary duties include the duty to keep the Court and creditors informed about the status and condition of its business.  *See In re Gateway Access Solutions, Inc.,* 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007).  Monthly operating reports are "the lifeblood of Chapter 11, enabling creditors to keep tabs on the debtor's post-

---

[160] Hawk Post-Trial Brief, at 49-56.

petition operations." *In re Kholyakva,* 2008 WL 3887653, at *4 (Bankr. E.D. Pa. 2008). They are designed to allow the U.S. Trustee and creditors to monitor business operations during chapter 11 and to avoid continued business operations that generate losses and administrative insolvency. *In re Domiano,* 442 B.R. 97, 106 (Bankr. M.D. Pa. 2010). Importantly in the context of these cases, the failure of a debtor to properly report income and expenses constitutes evidence of gross mismanagement under §1112(b)(4)(B). In *Domiano,* the court found the debtor's monthly operating reports had been completed in cursory, if not casual fashion, omitted significant information, and were completed "in such a summary fashion that creditors are left to guess as to much of the Debtors' operations and financial results … The MORs have not been completed in a fashion consistent with the Debtors' fiduciary duties." *Id.* The *Domiano* court found that this was grounds for conversion due to the debtor's gross mismanagement of the estate.

Mr. Rajan's flippant explanation for why VSI's millions of dollars in payments on behalf of Stream in exchange for Stream shares was not disclosed on its MORs is unacceptable. The Court does not attribute any credibility to Mr. Rajan's explanation that this lack of disclosure was due to an oversight or attributable to his hospitalization. There is no reason that Mr. Park, as the nominal CFO of the Debtors, or someone else with knowledge of the Debtors' operations and finances should not have ensured the disclosure of the funding arrangement with VSI in the MORs. The fact that it was not done, that it became clear only at Trial, and that the Debtors did not file the Revised MORs until *December* is a breach of the Debtors' fiduciary duties to the estates' creditors and its disclosure obligations to the Court. The Court simply does not believe Mr. Rajan that the lack of disclosure was an oversight.[161]

---

[161] On September 28, 2023, the U.S. Trustee submitted a proposed Rule 2004 consent order (the "Rule 2004 Order"), providing for, *inter alia,* authorization to examine the Debtors regarding post-petition

In sum, apart from this fundamental breach of the Debtors' disclosure obligations and the Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI.  Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at Trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinction between the entities and his roles with each.[162]  It has consistently appeared that he cannot, and the Debtors' transactions and requested relief outlined herein are indicative of his inherent conflict of interest.  The result has been delay, confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship.

Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness.  *See In re 210 West Liberty Holdings, LLC,*

---

payments made by or on behalf of the Debtors, the issuance of shares from Stream and/or Technovative to VSI, and any post-petition agreement between the Debtors and VSI for VSI to fund the Debtors' subsidiaries, including SCBV.  Bankr. Docket No. 428.  On October 3, 2023, the Court entered the Rule 2004 Order.  Bankr. Docket No. 433.  On December 29, 2023, the U.S. Trustee filed a motion to dismiss the Debtors' bankruptcy cases (the "UST Dismissal Motion"), based on their failure to file timely and complete monthly operating reports and other required reports, failure to provide accurate information in the initial MORs or the Revised MORs, and failure to comply with the Rule 2004 Order's terms regarding document production and appearing for examination.  *See* Bankr. Docket No. 534.  While the Debtors have not yet had opportunity to respond to the UST Dismissal Motion, and the Court has not yet held a hearing on it, its filing in and of itself is further evidence of the lack of cooperation and conflict that has permeated these cases, and only reinforces the Court's conclusion that Mr. Rajan cannot serve as a productive and responsible steward of the Debtors' bankruptcy estates.

[162] *See, e.g.,* August 17, 2023 Hearing Transcript, at 151:14 to 153:25.

2009 WL 1522047, at *5. The nearly ten months since the Debtors filed their Petitions have
been marred by delay, conflict, suspect proposals, lack of transparency, and lack of candor.
While the delay has been the result of numerous circumstances, the Court will not permit this to
continue under Mr. Rajan's watch. The only question for the Court is whether the Debtors' cases
should be dismissed, converted, or a trustee should be appointed to determine what value the
Debtors' operations hold, and what claims, if any, should be pursued, and how the cases move
expeditiously to reorganization or liquidation. As discussed *infra*, notwithstanding current
management's gross mismanagement of the Debtors' estates, the Court believes conversion or
dismissal is not in the best interests of creditors at this time.

### 3. It Has Not Been Established by a Preponderance of Evidence That There is Both Substantial or Continuing Loss to the Debtors' Estates and No Reasonable Likelihood of Rehabilitation

Section 1112(b)(4)(A) of the Bankruptcy Code provides that cause for conversion or
dismissal exists where there is substantial or continuing loss to or diminution of the estate **and**
the absence of a reasonable likelihood of rehabilitation. It is written in the conjunctive, and
therefore both components must be shown. *See, e.g., In re 1121 Pier Village LLC,* 635 B.R. 127,
137 n.14 (Bankr. E.D. Pa. 2022); *In re Northeast Family Eyecare, P.C.,* 2002 WL 1836307, at *3
(Bankr. E.D. Pa. July 22, 2002) (stating that the subsection codifies a "two-prong test"); *In re
Route 202 Corp.,* 37 B.R. 367, 372 (Bankr. E.D. Pa. 1984).

In determining whether a loss to, or diminution of, the estate exists, a court must make a
full evaluation of the present condition of the estate, not merely look at the debtor's financial
statements. *In re Plasterer*, 2023 WL 6217801, at *6 (Bankr. E.D.N.Y. Sept. 25, 2023) (stating
that even where a debtor shows positive cash flow, continuing loss to or diminution of the estate
can also be established by an actual depreciation in the value of property of the estate).

Importantly, §1112(b)(4)(A) requires not only a consideration of whether a debtor is suffering continuing losses but whether the debtor's business prospects justify continuing the chapter 11 case. *In re EnCap Golf Holdings, LLC,* 2008 WL 4200324, at *9 (D.N.J. Sept. 4, 2008); *see also In re Andover Covered Bridge, LLC,* 553 B.R. 162, 175 (B.A.P. 1ˢᵗ 2016) ("'Rehabilitation' in this context means whether the debtor will be able to reestablish its business.").

Hawk argues that the Debtors have no operations, no expenses, and no sources of financing, and the Debtors' own filings prove the estates are suffering catastrophic losses during these cases based on over $7 million in administrative expenses incurred.[163] Hawk further argues that to the extent there are any operations, they are at the VSI level, and without operations the Debtors cannot establish a business plan based on future operations, and therefore are *per se* unable to rehabilitate.[164]

The Court agrees with Hawk that, based on the Debtors' originally-filed monthly operating reports (the "MORs") from March through June, it would appear that Stream has no expenses, employees, or financing. Stream's originally-filed April, May, and June MORs reflect little cash on hand, no full-time employees, no receipts, very little in disbursements, and no disbursements made by a third party for the benefit of the estate.[165] Mr. Rajan had his explanation for that at Trial. With respect to employees, Mr. Rajan testified in August that the Debtors had retained independent contractors through VSI to work on its projects.[166] Mr. Rajan

---

[163] Hawk Post-Trial Brief, at 45-46 (citing $750,000 in legal fees incurred, approximately $75,000 in salary for Mr. Park, and $6 million in post-petition obligations to Rembrandt under the Licensing Covenant and related subscription agreement).

[164] *Id.* at 46.

[165] Bankr. Docket Nos. 224, 253, 300; August 17, 2023 Hearing Transcript, at 196:20 to 200:3.

[166] August 17, 2023 Hearing Transcript, at 202:18 to 205:2. While the Court cannot verify that based only on Mr. Rajan's testimony, it is consistent with representations made in the Employee Obligation Motion.

alleged that the failure to make this clarification in the MORs was "an oversight" that would be revised by the following week.[167]  With respect to expenses and financing, Mr. Rajan testified, as discussed *supra,* that VSI was paying all expenses of Stream since its bankruptcy was filed, in exchange for Stream shares.[168]  Mr. Rajan acknowledged, however, that none of the $1.5 to $2 million in expenses that VSI had allegedly paid on behalf of Stream were disclosed in the April, May, or June MORs.[169]  Mr. Rajan again claimed that this was an oversight that would be corrected the following week.[170]

On December 8, 2023, the Debtors *finally* filed revised Stream MORs for March, April, May, and June 2023 (the "Revised MORs").[171]  Those Revised MORs still reflect no full-time employees, as do subsequent MORs.  Attached to the Revised MORs, however, are letters from a Daniel Rink, Director of VSI, to Mr. Park, asserting the expenses VSI paid on behalf of Stream during the months of March, April, May, and June.  According to those letters,[172] and as reflected in the Revised MORs, VSI paid expenses, and asserted it was entitled to Stream Class A shares, in the following amounts: (a) $85,161.53 in expenses for March, in exchange for 56,774 Stream shares; (b) $331,134.30 in expenses for April, in exchange for 220,756 Stream

---

[167] No amended or corrected MORs had been filed as of late September, which Mr. Rajan attributed to "going back and forth with the trustee."  September 25, 2023 Hearing Transcript, 14:24 to 15:12.

[168] *Id.* at 205:21 to 206:4.

[169] *Id.* at 214:14 to 219:14.

[170] Mr. Rajan seemed to claim that the reason for this oversight was his three-month hospitalization, but also acknowledged that he was not the only individual involved with the Debtors that was aware of the expenses being paid by VSI.  *Id.* at 219:22 to 219:24.  The Court therefore attributes very little weight to Mr. Rajan's explanation.

[171] Bankr. Docket Nos. 502, 503, 505, 512.

[172] Each of the letters is dated December 7, 2023, the day before the Revised MORs were filed and months after the expenses were purportedly paid.  No explanation is provided for why the letters were not issued substantially contemporaneously with the end of each month, particularly where the subject of the letters has been a hot-button issue in the case since Trial.

shares; (c) $200,910.46 in expenses for May, in exchange for 133,940 Stream shares; and (d) $243,871.98 in expense for June, in exchange for 162,581 Stream shares. This totals approximately $861,078 in expenses purportedly paid by VSI, which is the cumulative total Stream discloses in its Revised June MOR for disbursements made by a third party. Attached to each letter is a breakdown of the general categories of expenses purportedly paid.

The July MOR, filed after Mr. Rajan's August testimony, reflects approximately $750,000 in July third-party disbursements.[173] No letter from VSI is attached to the July MOR. Furthermore, the July MOR confusingly disclosed roughly the same figure for a cumulative total, seemingly in contradiction to Mr. Rajan's testimony in August that VSI had paid $1.5 to $2 million in expenses on behalf of Stream, and certainly in contradiction to the Revised MORs that represent over $861,000 in third-party disbursements for the three-and-a-half months prior to July. In September, Mr. Rajan testified that the cumulative total as of the end of July being the same as the figure for July alone could be harmonized because disbursements through the end of July had been approximately $750,000, whereas by the time he testified in mid-August the disbursements had apparently grown to $1.5 to $3 million.[174] This testimony is clearly contradicted by the Revised MORs, and is just another example of what the Court perceives as Mr. Rajan's propensity to come up with justifications or explanations on-the-fly when confronted with facts or information that seemed to contradict his prior statements.
The August MOR discloses only $556 in third-party payments,[175] while the September MOR discloses approximately $104,000 in third-party payments.[176]

---

[173] Bankr. Docket No. 399.

[174] September 25, 2023 Hearing Transcript, at 31:3 to 32:16.

[175] Bankr. Docket No. 459.

[176] Bankr. Docket No. 460. Perhaps even more confusingly, the Debtors separately filed a supplement (the "MOR Supplement") to the August and September MORs, which among other things, attached

Hawk's point is well-taken that Stream's original MORs for April, May, and June, reflecting no employees, no post-petition receipts, and little cash on hand, are indicative of a non-operating entity.[177]  Moreover, the Court agrees with Hawk that the Debtors' estates have continued to incur significant administrative expenses, not the least of which are asserted counsel fees, while the MORs reflect no post-petition revenue.  However, notwithstanding that it is being done without having first obtained the Court's permission, the unrefuted testimony from Mr. Rajan is that the Debtors' post-petition operating expenses are being paid by VSI in exchange for Stream shares rather than debt.  Moreover, Mr. Rajan testified as to the nature of the $750,000 in disbursements VSI made on behalf of the estate in August: "That's money for payroll.  That's money for electronics to get ready for production.  Also, we had to get a backup [bonding] deal put in place so we can get the production started on the TVs.  So it's mainly operational expenses to get things started."[178]  Mr. Rajan also testified that the purported work is being done by independent contractors rather than Stream employees, and the letters from VSI attached to the Revised MORs purport to identify consultant payroll expenses totaling approximately $434,000.  Hawk cites to no rule prohibiting a debtor from executing its business model with independent contractors, rather than full-time employees.

---

letters from VSI to Mr. Park stating that VSI had identified $2,000 and $219,000 in transfers from VSI to Stream in August and September, respectively, pursuant to a stock purchase agreement dated July 10, 2023, and as a result directed Stream to issue 1,333 and 146,000 shares of Stream Class A shares to VSI. Bankr. Docket No. 463.  The MOR Supplement also includes a statement that payments were made by VSI on Stream's behalf in August that were not included in the August MOR, that shares were issued to VSI in November in exchange for those payments, and that such payments will be reflected in the November MOR.  No explanation was given as to why they would not be reflected in an amended August MOR.

[177] In its Post-Trial Brief Hawk also argues that Stream is a non-operating entity based on the First Day Declaration and the Debtors' corporate organizational chart reflecting that Stream owns 99.9% of Technovative shares.  Hawk Post-Trial Brief at 2.  This fact alone does not establish that Stream is not an operating entity.

[178] September 25, 2023 Hearing Transcript, 162:22 to 163:2; *see also id.* at 173:18 to 174:3.

Therefore, with some indication of operational activity and financing by Stream, the Court cannot conclude that the Debtors are *per se* unable to rehabilitate. The Court is keenly aware of the fact that the Revised MORs, on which the Court places some reliance in arriving at this conclusion, were filed two-and-a-half months *after* the Trial concluded and appear to conflict with Mr. Rajan's testimony at Trial. Hawk has had no opportunity to probe the veracity of the representations made in the Revised MORs, which represents a considerable handicap in Hawk being able to meet its evidentiary burden. However, as discussed *infra*, the timing of the Revised MORs and their seeming contradiction to Mr. Rajan's testimony is simply more grounds for the Court's determination that Mr. Rajan cannot continue to administer these estates. While the Court found not credible Mr. Rajan's testimony regarding the Debtors' current and prospective deals, where the Court is required to evaluate both the present condition of the estates and the Debtors' business prospects going forward, it simply does not believe there has been sufficient and transparent information from the Debtors' management to determine at this stage that there is no reasonable likelihood of rehabilitation.

### 4. It Has Not Been Established by a Preponderance of the Evidence that the Debtors' Petitions Were Filed in Bad Faith

As a general matter, Hawk's argument is that the Debtors filed their bankruptcy cases on the eve of trial in the Section 225 Action with no other impetus for filing, but rather simply as a litigation tactic to stay what Hawk believes will be an adverse ruling from the Delaware Chancery Court. Hawk asserts that not only is this *per se* bad faith, but that under the Third Circuit's fourteen-factor analysis for bad faith filings, twelve of the factors support a finding of lack of good faith here.[179]

---

[179] Hawk Post-Trial Brief, at 59-60.

It is beyond dispute that the Debtors filed their Petitions with trial in the Section 225 Action imminent. Hawk goes too far, however, in arguing that Mr. Rajan "confirmed the 225 Action was the reason for filing," citing to his First Day Declaration[180] as evidence. That declaration explained, from Mr. Rajan's perspective, the history of the Omnibus Agreement, its invalidation by the Delaware Supreme Court, the failure of Hawk and SeeCubic to comply with the return of the Debtors' assets, and the events leading to the Section 225 Action. When Mr. Rajan states in his First Day Declaration that "[t]he irreparable harm" of this chain of events necessitated the Debtors' bankruptcy filings, he did not confirm that the Section 225 Action was the reason for filing.[181] He clearly was referencing a broader series of events, of which the Section 225 Action was only the most recent. As such, there is no grounds for a finding of *per se* bad faith based on the timing of the Debtors' Petitions alone.

The Court also disagrees that Hawk has established by a preponderance of the evidence that a majority of the factors used in the Third Circuit to analyze whether a filing was in bad faith are present here. Clearly the Debtors have previously filed for bankruptcy. The Delaware Bankruptcy Court's reasoning in dismissing those prior cases, however, is not a matter of record in these proceedings. Furthermore, while the current cases were filed on the eve of trial in the Section 225 Action and imposed a stay on that proceeding, the Court cannot conclude that the Debtors filed these cases solely to evade a Chancery Court order that would wrest control of Technovative from the Debtors. The Debtors have significant creditors other than Hawk, SeeCubic, and SLS,[182] and as Hawk and SeeCubic have noted a number of times during these

---

[180] *See* Bankr. Docket No. 48 (the "First Day Declaration").

[181] *Id.* at ¶¶90 to 94.

[182] Although the claims of Hawk, SeeCubic, and SLS, as well as Rembrandt's asserted claim of over $1.2 billion, dominate the claims register, other claims of sizeable amounts have also been filed. Moreover, as discussed above, Stream's Petition was accompanied by Official Form 204, representing that Stream's

68

cases, Stream had virtually no funds of its own at the time of its Petition with which to satisfy claims. Mr. Rajan testified regarding the Stream assets to be used in obtaining and fulfilling potential post-petition product orders,[183] as well as the Debtors' need to regain possession of the Bonding Equipment.[184] Together these reflect a need for the breathing spell afforded debtors and an intention to use bankruptcy for a purpose other than avoiding an adverse judgment in the Section 225 Action. Moreover, although Hawk argues that the Section 225 Action the Debtors seek to avoid will determine who can control Technovative and the operating subsidiaries, and therefore the majority of the value of the enterprise, Mr. Rajan asserts that the Debtors do not need SCBV to execute the Debtors' business plan because they have their own electronics and bonding arrangements.[185] Therefore, assuming that is accurate, an adverse ruling in the 225 Action would not necessarily torpedo the Debtors' ability to reorganize. Finally, as discussed herein, the Court is not prepared at this stage, based on the evidence before it and the history of these cases, to conclude that there is no possibility of reorganization. The lack of clarity the Debtors' management has created regarding the Debtors' operations, future prospects, and sources of funding leaves this Court unable to determine whether the Debtors have the assets and operations to successfully reorganize, but the Court will not foreclose that possibility at this stage.

Based on the evidence and in consideration of the factors used to determine whether a case has been filed in bad faith, the Court finds Hawk has not established by a preponderance of the evidence that the Debtors lacked good faith in filing their Petitions.

---

unsecured creditors held over $14 million is asserted claims.

[183] August 17, 2023 Hearing Transcript, at 128:6 to 129:23.

[184] *Id.* at 191:6 to 191:20.

[185] August 17, 2023 Hearing Transcript, 138:25 to 138:6.

     **5.**     **The Court Will Not Dismiss or Convert the Debtors' Chapter 11 Cases at this Stage Because a Chapter 11 Trustee is Needed to Administer the Debtors' Cases**

Having found that the Debtors' have grossly mismanaged the estates, cause exists to convert or dismiss the cases under §1112(b) of the Bankruptcy Code. As discussed *supra,* however, that provision requires conversion or dismissal unless the Court determines the appointment of a trustee is in the best interests of the estate under §1104(a). Section 1104(a) of the Bankruptcy Code governs the appointment of a trustee in chapter 11 cases, providing that the court **shall** order the appointment of a trustee:

    (1)    For cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause … or

    (2)    If such appointment is in the interests of creditors, any equity security holders, and other interests of the estate….

11 U.S.C. §1104(a) (emphasis added). The appointment of a trustee is an extraordinary remedy, representing a rare exception to the rule that the debtor remains in possession throughout its reorganization because current management "is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests in the estate." *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 2004). As such, the party moving for appointment of a trustee under §1104(a) must overcome that presumption by clear and convincing evidence, and the determination is made on a case-by-case basis. *BELFOR USA Grp., Inc. v. Salem Consumer Square OH LLC (In re Salem Consumer Square OH LLC),* 629 B.R. 562, 575 (Bankr. W.D. Pa. 2021). Once the movant establishes cause for the appointment of a trustee, however, the burden shifts to the debtor to establish an exception under §1112(b)(2) of the Bankruptcy Code.[186]

---

[186] Under §1112(b)(2), the court may not convert or dismiss a case if the court finds and identifies unusual

That said, a chapter 11 debtor's invocation of the protections afforded under the
Bankruptcy Code comes with a trade-off: "in exchange for the authority to continue to manage
the affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the
estate, including the duty of care to safeguard assets, the duty of loyalty, and the duty of
impartiality." *In re Morningstar Marketplace, Ltd.,* 544 B.R. 297, 303 (Bankr. W.D. Pa. 2016)
(citing *Marvel Entertainment*). And because the rights of a debtor to manage the reorganization
process are not absolute, they may be forfeited if these fiduciary duties are neglected. *Id.* (citing
*In re Eurospark Industries, Inc.,* 424 B.R. 621 (Bankr. E.D.N.Y. 2010)). The willingness of
courts to leave debtors in possession is premised upon an assurance that the officers and
managing employees can be depended upon to carry out the fiduciary responsibilities of a
trustee, and where a debtor-in-possession is unwilling or unable to do so, it is necessary to
appoint an independent trustee who will. *See, e.g., In re Vascular Access Centers, L.P.,* 611 B.R.
742, 764 (Bankr. E.D. Pa. 2020) (citing *Fifth Third Bank v. Circulatory Ctrs. of Am., LLC (In re
Circulatory Ctrs. of Am., LLC*, 579 B.R. 752 (Bankr. W.D. Pa. 2017) and *Marvel
Entertainment*).

The list of situations in §1104(a)(1) is not an exclusive list of what constitutes cause to
appoint a trustee, and situations that have been found to support a finding of cause for the
appointment of a trustee include conflicts of interest, misuse of assets and funds, inadequate
recordkeeping and reporting, failure to file required documents, lack of adequate disclosure, lack

---

circumstances establishing that converting or dismissing the case is not in the best interests of creditors
and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan
will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable,
within a reasonable period and (2) the grounds for converting or dismissing the case include an act or
omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification
for the act or omission; and that will be cured within a reasonable period of time fixed by the court. The
Debtors have not established any such unusual circumstances, although as discussed *infra,* the Court
concludes that the appointment of a trustee, rather than conversion or dismissal, is proper at this stage.

of appropriate cost controls, transgressions related to taxes, failure to make required payments,
lack of credibility and creditor confidence, and breaches of fiduciary duty. *Id.*; *see also
Morningstar Marketplace,* 544 B.R. at 303; *Marvel Entertainment,* 140 F.3d at 471 (finding the
district court did not err in appointing trustee where the debtor's management was unable to
resolve conflicts with estate creditors). Appointment of a trustee is mandatory if cause is found
under §1104(a)(1), but a bankruptcy court has wide discretion to determine what specific
conduct establishes cause. *Morningstar Marketplace,* 544 B.R. at 303. By contrast, §1104(a)(2)
envisions a flexible standard giving discretion to appoint a trustee when doing so would serve the
estate's and parties' interests. *Vascular Access Centers,* 611 B.R. at 765 (*citing Marvel
Entertainment*). Among the factors which may be considered in appointing a trustee under
§1104(a)(2) are (a) the untrustworthiness of the debtor, (b) the debtor-in-possession's past and
present performance and prospects for rehabilitation, (c) the confidence – or lack thereof – of the
business community and of creditors in present management, and (d) the benefits derived from
the appointment of a trustee balanced against the cost of the appointment. *Id.; see also
Morningstar Marketplace,* at 304 (citing *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir.
1989)).

Without needing to address whether the Debtors mismanaged their affairs pre-petition, as
Hawk asserts, clear and convincing evidence of the Debtors' gross mismanagement of their
estates, through Mr. Rajan, has resulted in a situation where the Court has no faith in Mr. Rajan
administering the Debtors' estates consistent with his fiduciary duties and obligations to this
Court. Simply put, based on the history of these cases outlined above, the conflicted role of Mr.
Rajan with both the Debtors and VSI, and the Court's assessment of Mr. Rajan's credibility
throughout this case, the Court does not trust Mr. Rajan's interest in or ability to maintain the

integrity of these bankruptcy proceedings.  Months into the case, the Court lacks confidence that it has been given transparent information regarding what the Debtors are actually doing, who is doing it, at what stage those efforts are, and how that is being accomplished, and the evidence the Court has that the Debtors are operating is Mr. Rajan's testimony and the Revised MORs and July MOR, themselves in conflict, representing that VSI funded certain unspecified Stream expenses in the first months of the case, none of which instills confidence in the Court.  While the Court is not ready to wholly discount these meager signs of a path toward reorganization, it has reached the point where it needs more clarity and more progress, far more quickly, and does not believe this is possible with Mr. Rajan in charge of the estates.  Therefore the appointment of a trustee pursuant to both §§1104(a)(1) and (a)(2) is warranted.  *See Vascular Access Centers,,* 611 B.R. at 769 (finding appointment of trustee was appropriate under both §§1104(a)(1) and (a)(2) based on the Court's determination that the debtor's principal and manager lacked credibility and trustworthiness and had engaged in self-serving conduct both before and during the debtor's bankruptcy case).

The Court is not convinced conversion or dismissal is appropriate at this stage.  Because of the dearth of information, transparency, and relief sought by the Debtors to date, the Court remains unclear what assets and potential value the Debtors' operations hold.  The replacement of Mr. Rajan at the helm of the Debtors' estates and the appointment of a trustee to evaluate the Debtors' assets, potential deals, potential claims, etc. is needed.  It is clear there needs to be a neutral, unconflicted party to deal with VSI at arms-length, including determining if there are pre- or post-petition claims that lie against VSI.  A trustee is also needed to evaluate, resolve, and/or litigate the claims of Hawk, SLS, SeeCubic, Rembrandt, and others.  If these cases have any chance of succeeding, it will be because there is transparency to the Court and creditors and

73

an impartial third-party evaluating assets, claims, and the Debtors' reorganizational prospects. A

trustee will obviously come with a cost, but the Court believes the value of an unconflicted,

third-party neutral to assess the state of the Debtors' operations, potential transactions, and

claims, and efficiently determine whether and how the Debtors can achieve reorganization, more

than offsets these costs. *See Vascular Access Centers,* 611 B.R. at 769 (finding that the cost of

appointment of a chapter 11 trustee would be greatly outweighed by the benefits derived from

such appointment and would result in a more efficient reorganization while ensuring the integrity

of the process).

Although cause exists under §1112(b)(4)(B) to convert or dismiss the Debtors' cases, the

Court believes the appointment of a trustee to evaluate the Debtors' operations, prospects, and

ability to successfully reorganize, and to implement such reorganization if possible, is in the best

interests of creditors and the estate at this time. The Court will therefore exercise the

extraordinary remedy of appointing a chapter 11 trustee pursuant to §1104(a) of the Bankruptcy

Code.

**B.      Cause Exists to Grant Hawk Relief from Stay to Allow the Section 225
         Action to Resolve Certain Issues Critical to the Debtors' Bankruptcy Cases**

The Court may grant relief from the stay under §362(d)(1) for cause, including the lack of

adequate protection of an interest in property. 11 U.S.C. § 362(d)(1). Cause is an intentionally

broad and flexible concept which must be determined on a case-by-case basis. *In re Brown*, 311

B.R. 409, 412-413 (E.D. Pa. 2004) (citing *In re Marchant,* 256 B.R. 572, 576 (Bankr. W.D. Pa.

2000)). As such, the test to be applied is a totality of the circumstances test based upon the

particular facts of the case. *Buncher Co. v. Flaberg Solar US Corp. (In re Flaberg Solar US

Corp.)*, 499 B.R. 475, 482-83 (Bankr. W.D. Pa. 2013) (citing *O'Neal Steel, Inc. v. Chatkin (In re

Chatkin)*, 465 B.R. 54, 59 (Bankr. W.D. Pa. 2012)). In applying the test, courts in this district

have employed a variety of factors to determine whether cause exists to permit a non-debtor

party to proceed with litigation in another forum:

> Given the broad discretion accorded to the bankruptcy court as described in *Brown,* it is therefore, not surprising that some courts have designed lists of "factors" to be considered in determining whether "cause" exists under §362(d)(1). For example, in *In re Granati,* the court identified four (4) factors to be considered:
>
> (1)     whether only issues of state law are involved;
>
> (2)     whether judicial economy will be promoted;
>
> (3)     whether the litigation will interfere with the bankruptcy case; and
>
> (4)     whether the estate can be protected by requiring that any judgment obtained be enforced only through the bankruptcy court.
>
> 271 B.R. 89, 93 (Bankr.E.D.Va. 2001) (citing *In re Robbins,* 964 F.2d 342 (4th Cir.1992)).
>
> Other courts have developed a checklist of twelve (12) factors to be considered:
>
> (1)     Whether the relief will result in a partial or complete resolution of the issues.
>
> (2)     The lack of any connection with or interference with the bankruptcy case.
>
> (3)     Whether the non-bankruptcy proceeding involves the debtor as a fiduciary.
>
> (4)     Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.
>
> (5)     Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation.
>
> (6)     Whether the action primarily involves third parties.
>
> (7)     Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee or other interested parties.

(8)     Whether the judgment claim arising from the foreign action is
        subject to equitable subordination under Section 510(c).

(9)     Whether movant's success in the foreign proceeding would result
        in a judicial lien avoidable by the debtor under Section 522(f).

(10)    The interest of judicial economy and the expeditious and
        economical determination of litigation for the parties.

(11)    Whether the non-bankruptcy proceedings have progressed to the
        point where the parties are prepared for trial.

(12)    The impact of the stay on the parties and the "balance of hurt."

See In re Sonnax Industries, Inc., 907 F.2d 1280 (2d Cir.1990); In re
Curtis, 40 B.R. 795, 800 (Bankr. D. Utah 1984) (citations omitted). See
also In re Brown, 311 B.R. at 413 (approving bankruptcy court's use of
factors set forth in Sonnax in ruling on § 362(d) motion).

The relevance and weight of the various overlapping factors outlined
above will depend upon the circumstances of the particular bankruptcy
case involved. Not all of the factors may be relevant in a particular case;
the factors that are relevant may not be entitled to equal weight. Thus, the
decision whether to grant relief from the automatic stay to an unsecured
creditor is not a mechanical or mathematical exercise.

In re Chan, 355 B.R. 494, 499–500 (Bankr. E.D. Pa. 2006).[187]

---

[187] The Debtors have cited to In re Tribune Co., 418 B.R. 116, 126 (Bankr. D. Del. 2009) for the
following three-prong test for determining whether cause exists to lift the stay to continue litigation: (1)
whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of
the civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably
outweighs the hardship to the debtor, and (3) whether the creditor has a probability of prevailing on the
merits. The Tribune decision cited the test as being generally relied upon in that district. Id. A
"balancing of the harms" analysis has been recognized in this district as well. See In re Cinelli, 2014 WL
4106030, at *2 (E.D. Pa. Aug. 21, 2014) ("The first step to consider is whether there will be prejudice to
either the estate or the debtor if the stay is lifted on the one hand and hardship to the movant if the stay
continues on the other hand. Then, these two potential harms are weighed. The decision to lift the stay
depends on where the scale tips."); In re Glunk, 342 B.R. 717 (Bankr. E.D. Pa. 2006) (recognizing the
"balancing of the harms" analysis used by courts). The Chan decision recognized that underlying
guidepost, but employed the "different, more multi-faceted" approach for determining whether cause
exists that looks to multiple factors. 355 B.R. at 499. That approach has been cited by decisions rendered
since Chan was decided, see, e.g., In re Schaffer, 597 B.R. 777, 791, n.18 (Bankr. E.D. Pa. 2019), and it
is the approach this Court takes as well.

Hawk filed the Stay Relief Motion at the outset of the case, but the Court determined it needed an evidentiary record to resolve it. The path to obtaining that record has been tortured at times, but the circumstances that Hawk argued warranted stay relief early in the case have not changed – the Section 225 Action is ripe to be heard. It will resolve the Technovative Director Issue and the Debt Conversion Issue, two issues critical to these bankruptcy cases going forward but governed by Delaware law for which the Delaware Chancery Court, while not a specialized tribunal *per se,* certainly has unique and established expertise. If Hawk were successful with respect to both of those issues, it has acknowledged that it will still need to return to this Court for permission to proceed with an Article 9 Sale of its collateral under the Notes. As such, resolution of the Technovative Director Issue and the Debt Conversion Issue will not prejudice the interests of other estate creditors by allowing Hawk to foreclose on Technovative assets without this Court's authority. On the other hand, resolution of those will greatly advance resolution of the Debtors' bankruptcy cases by providing clarity regarding the status of the Technovative filing and whether, and to what extent, Hawk is a secured creditor of the Debtors.

As such, based on consideration of the factors used to determine whether causes exists to permit non-bankruptcy litigation to proceed, the Court finds Hawk has established, and the Debtors have not rebutted, that allowing the Section 225 Action to proceed to resolution with respect to the Technovative Director Issue and the Debt Conversion Issue will aid in administration of the Debtors' bankruptcy cases. Relief from stay will therefore be granted to permit the parties to proceed before the Delaware Chancery Court on those two issues.

## IV.    CONCLUSION

For the reasons discussed above, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy

77

cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed

solely with respect to the Technovative Director Issue and the Debt Conversion Issue. The U.S.

Trustee will be directed to immediately begin the process for appointing a chapter 11 trustee, and

in the interim, Mr. Rajan is no longer authorized to take any action on behalf of the Debtors'

estates. To the extent the Debtors must take any urgent action, the Debtors shall identify any

such actions needed to the U.S. Trustee, who may confer with Mr. Rajan in addressing such

matters but who is not obligated to act in conformity with Mr. Rajan's instruction or desired

outcome.

An Order consistent with this Memorandum shall be entered.

Dated: January 5, 2024

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

# EXHIBIT B

**From:** Zahraldin, Rafael <Rafael.Zahraldin@lewisbrisbois.com>
**Sent:** Saturday, July 08, 2023 10:21 PM EDT
**To:** adam.swick@akerman.com <adam.swick@akerman.com>
**CC:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Christopher Michaels <michaels@bpmlegal.com>; Poppel, Karen <Karen.Poppel@lewisbrisbois.com>; David, Daniel <Daniel.David@lewisbrisbois.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>
**Subject:** FW: Zahraldin, Rafael has shared a document with you : STREAM TV rxza update to plan first draft.docx (140.5 KB)
**Attachment(s):** "Revlon Inc._SDNY #22-10760_Backstop Commitment_Debt Commitment Ltr_Admin Exp_Rights Offering.pdf","Revlon Inc._SDNY #22-10760_Backstop Order.pdf","Revlon Inc._SDNY #22-10760_Revised Rights Offering Procedures and Subscription Form.pdf","Revlon Inc._SDNY #22-10760_Notice of Entry Into Exit Financing Comm Documents.pdf","PAEB Local Rules - effective 06-14-2021 (updated 04-12-2023).pdf","Revlon Inc._SDNY #22-10760_Notice of Hrg_Motion for Order Approv Discl Stmt_Solicitation_Voting Procedures_Form of Ballots.pdf"

Dear Adam,

Thanks for the call and or letting me know that the NDA and Joint Defense documents are coming (thanks Chris Michaels as well).

Here are the Revlon agreements which we will need to modify.   This is really VSI's deal, so I am sending to you directly.

I will get the latest version of the Plan and Disclosure Statement – do you guys have a SharePoint account where we can all access the documents?


**From:** Freeman, Christina <Christina.Freeman@lewisbrisbois.com>
**Sent:** Thursday, July 6, 2023 12:05 PM
**To:** Zahraldin, Rafael <Rafael.Zahraldin@lewisbrisbois.com>; Poppel, Karen <Karen.Poppel@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**Subject:** RE: Zahraldin, Rafael has shared a document with you : STREAM TV rxza update to plan first draft.docx (140.5 KB)

Good Afternoon,

I believe I've covered all the requests for me so far. Let me know what else is needed.

See pg 24 of the local rules regarding interim compensation.

**Christina Freeman**
**Paralegal**
Fort Lauderdale
954.628.5598 or x9545598

**From:** Zahraldin, Rafael <Rafael.Zahraldin@lewisbrisbois.com>
**Sent:** Thursday, July 6, 2023 2:43 AM
**To:** Poppel, Karen <Karen.Poppel@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>
**Subject:** Zahraldin, Rafael has shared a document with you : STREAM TV rxza update to plan first draft.docx (140.5 KB)

Here is the link to the updated document with comments in Imanage.

### iManage LLC

**Zahraldin, Rafael** has shared a document with you.

**You must double-click the __attachment__ to "open" the document for editing.**

Use the link below to see a read-only "preview" of the document:

[STREAM TV rxza update to plan first draft.docx](140.5 KB)

*Please note:  You __cannot__ edit the document from the preview window.*

LEGAL NOTICE: This e-mail is from iManage LLC, and may contain confidential and/or legally privileged information. This e-mail is intended solely for the use of the individual(s) to whom it is addressed.

If you have received this e-mail in error, please notify the sender by reply e-mail, delete the e-mail from your computer and do not copy or disclose it to anyone else. Any disclosure, copying, distribution, reliance or use of the contents or information received in error is strictly prohibited. Neither this e-mail message nor its attachment(s) may be construed as establishing an attorney-client relationship, constituting an electronic signature or providing consent to contract electronically, unless expressly so stated by a iManage LLC attorney in the body of this e-mail or an attachment.

Powered by iManage

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

# EXHIBIT C

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 2:41 PM EDT
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; adam.swick@akerman.com <adam.swick@akerman.com>
**CC:** Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** RE: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

Dan – when is the ETA for the update to the complaint?

We are looking at it and need to know where you are – my last email from you said you would get this done this morning – now its afternoon.

Now, it's this evening?

I am sorry if you are going through some issues, but we need communication on exactly where you are so the rest of us can try and salvage this?

---

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 1:44 PM
**To:** adam.swick@akerman.com
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

All, I'm sorry. I had no intention to cause a delay or be last minute. After our conference call on Friday morning, I was under the impression that filing was to happen later than tomorrow. I apologize for any position I have put anyone in and take responsibility for having unexpected personal emergencies happen this weekend.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

---

**From:** adam.swick@akerman.com <adam.swick@akerman.com>
**Sent:** Sunday, July 30, 2023 12:39:53 PM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

This is ridiculous. Client wants if filed tomorrow. We maybe can hold until Tuesday but Dan you have really put everyone in a bad position. John, Ralph and whoever else from LB can attend let's look at the draft and determine next steps. Let's have a call at 2:00 eastern.

Sent from my iPhone

On Jul 30, 2023, at 11:25 AM, David, Daniel <Daniel.David@lewisbrisbois.com> wrote:

**[External to Akerman]**

I had it offline from imanage to separate that working draft from the previous drafts that were saved and named differently.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

&lt;Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png&gt;

**Daniel David**
**Attorney**
Daniel.David@lewisbrisbois.com

**T:** 713.324.0107 **F:** 713.759.6830

24 Greenway Plaza, Suite 1400, Houston, Texas 77046 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<80pctcolor_2022mansfieldcertificationbadge_492244a7-2944-454d-8270-3a8a522bf068.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 11:23:57 AM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; adam.swick@akerman.com <adam.swick@akerman.com>
**Cc:** Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>;
Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

You said you would send it this morning.

You didn't save this to IManage?

Get Outlook for iOS

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 12:22:14 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; adam.swick@akerman.com
<adam.swick@akerman.com>
**Cc:** Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>; john.thompson@akerman.com <john.thompson@akerman.com>;
Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

I am not near my laptop right now.  The update I can give you is I have included the Jane Doe, John Doe, investment bankers, and law firms references in the complaint.  I need to finish plugging in the lender liability claim and applicable counts to that claim and connect facts which I will have this evening.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, July 30, 2023 11:00:09 AM
**To:** adam.swick@akerman.com <adam.swick@akerman.com>; David, Daniel <Daniel.David@lewisbrisbois.com>
**Cc:** David, Daniel <Daniel.David@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>;
john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent
<Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits)(126091682.2).DOCX

I sent the most up to date I could find.

Dan - you need to get us the most recent version now.

You are holding up another firm, our firm, and the client.

It is now noon on the East Coast and I need you to respond and clearly explain where we are.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

> On Jul 30, 2023, at 11:28 AM, adam.swick@akerman.com wrote:
>
>
> Please send the updated version.
>
> Sent from my iPhone
>
>> On Jul 29, 2023, at 4:16 PM, Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com> wrote:

**[External to Akerman]**

That was all I could find - please try and get your updates circulated.

Get Outlook for iOS

<Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png>

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

<80pctcolor_2022mansfieldcertificationbadge_492244a7-2944-454d-8270-3a8a522bf068.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 5:15:30 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits) (126091682.2).DOCX

I had a version I was working in and was making a separate one. If it doesn't have lender liability but I'd dated yesterday it was one I started in but not the most up to date.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 4:14:03 PM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits) (126091682.2).DOCX

I will keep looking

Get Outlook for iOS

**From:** David, Daniel <Daniel.David@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 5:12:46 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023) (akerman edits) (126091682.2).DOCX

I am not at a computer or at home right now. I can send tonight when I am back home.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 4:02:27 PM
**To:** David, Daniel <Daniel.David@lewisbrisbois.com>; Nguyen, Anh <Anh.Nguyen@lewisbrisbois.com>
**Cc:** adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>

**Subject:** Re: [EXT] 7.27.2023 REDLINE Stream Complaint (DRAFT 7.26.2023) (akerman edits)
(126091682.2).DOCX

Ok - I am in a new client - but who has already sent us our retainer and signed an agreement with
an emergency next week- and I am looking through IManage for the complaint and can't find the
latest version.

I see a version locked out by Anh.

I don't see this version saved in our system- so family engagement or not - I need you to send
whatever you have done please right now.

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

> On Jul 29, 2023, at 1:49 PM, Zahralddin, Rafael
> <Rafael.Zahralddin@lewisbrisbois.com> wrote:
>
>  The issue is that the client was waiting for it.  I understand family commitments but we
> need to communicate and coordinate with our client's and co-counsel's schedules as
> well.
>
> Can you please given me an update on the following:
>
> I was on site with another client yesterday and Adam said he was with a child at his
> doctors so I have no idea what the status is and which document is the most recent.
>
> Did you work with JT as instructed and recommended?  I think that was in order to deal
> with the structure/organization and your comment that you had some trouble combining
> the procedural and other fact sections?
>
> Did you get in the new counts? The lender liability, John and Jane Does, and the trade
> secret issues?
>
> Just need to understand where we are substantively.
>
> The client, Mathu, said that Akerman was waiting for us to circulate a document to
> them. I want copies on any emails so I have a blind spot on that issue.
>
> Can you just send the most recent version to Bud and Mathu to start reviewing and
> give them a definite time as to when the update will come to them?
>
> That might help.
>
> Bud has set our time to work on the document this weekend.
>
> Rafael X. Zahralddin
> 302.545.2888
> Sent from my iPhone
>
> <Logo_e6253148-26a1-47a9-
> b861-6ac0ff0bc3c4.png>

**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | LewisBrisbois.com

**Representing clients from coast to coast. View our locations nationwide.**

<80pctcolor_2022mansfieldcertificationbadge_492244a7-2944-454d-8270-3a8a522bf068.png>

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you
are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify
the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

> On Jul 29, 2023, at 1:32 PM, David, Daniel
> <Daniel.David@lewisbrisbois.com> wrote:
>
>
> I am finishing it up tomorrow morning and will send a revised version.  I

have a family obligation I am at today.

**Daniel David**
**Attorney**
Houston
713.324.0107 or x7130107

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Saturday, July 29, 2023 12:25:26 PM
**To:** adam.swick@akerman.com <adam.swick@akerman.com>
**Cc:** David, Daniel <Daniel.David@lewisbrisbois.com>;
john.thompson@akerman.com <john.thompson@akerman.com>;
Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>
**Subject:** Re: [EXT] 7.27.2023 REDLINE - Stream Complain (DRAFT
7.26.2023) (akerman edits)(126091682.2).DOCX

Is this supposed to be worked on by Daniel?

Is this supposed to go to client?

Rafael X. Zahralddin
302.545.2888
Sent from my iPhone

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

> On Jul 28, 2023, at 10:36 AM, adam.swick@akerman.com
> wrote:
>
>
> Current draft
>
>
> **Adam Swick**
>
> Special Counsel
>
> Akerman LLP | 500 West 5th Street, Suite 1210 | Austin, TX
> 78701
>
> D: 737-999-7103
>
> adam.swick@akerman.com
>
>
> Profile
>
> Akerman Logo
>
> CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged
> and confidential, and is intended only for the use of the individual or entity named above. If the
> reader of this message is not the intended recipient, you are hereby notified that any
> dissemination, distribution or copying of this communication is strictly prohibited. If you have
> received this transmission in error, please immediately reply to the sender that you have
> received this communication in error and then delete it. Thank you.
>
> <7.27.2023 REDLINE - Stream Complain (DRAFT 7.26.2023)
> (akerman edits)(126091682.2).DOCX>

# EXHIBIT D

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Friday, August 04, 2023 9:44 PM EDT
**CC:** Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Mathu <mathu@streamacquisitiongroup.com>; dan@streamacquisitiongroup.com <dan@streamacquisitiongroup.com>; Curry, Josh <Josh.Curry@lewisbrisbois.com>; amanda@streamacquisitiongroup.com <amanda@streamacquisitiongroup.com>; nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>; adam.swick@akerman.com <adam.swick@akerman.com>; john.thompson@akerman.com <john.thompson@akerman.com>; luis.casasmeyer@akerman.com <luis.casasmeyer@akerman.com>; eduardo.espinosa@akerman.com <eduardo.espinosa@akerman.com>; bradley.henry@akerman.com <bradley.henry@akerman.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Freeman, Christina <Christina.Freeman@lewisbrisbois.com>; bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**Subject:** Zahralddin, Rafael has shared a document with you : motion to withdraw the reference order brief and certificate of service.docx (49.6 KB)
**Attachment(s):** "motion to withdraw the reference order brief and certificate of service(127777894.1).docx.nrl","motion to withdraw the reference order brief and certificate of service(127777894.1).docx"

Bennett/Adam/JT,

This is just a template to hold onto in the event we need to file a motion to withdraw the reference.

It would help if you three could focus on the issue of the withdrawal of the reference and if that is appropriate under what we have so far.

The jury trial is another strategic issue – I think Adam's initial reaction was to do request it.

I also think we have to figure out of the District Court will move quickly on this injunction or whether she will move quickly.  I have doubts that she will, and want to discuss as a group.

Mathu and Bud tell me that VSI wants to have relief ASAP on several fronts  - we need to get that list and make sure we are asking for injunctive relief.

I think they want injunctive relief for  - the turnover, the trade secrets, and tortious interference.

---

| iManage LLC |
| --- |

**Zahralddin, Rafael** has shared a document with you.

**You must double-click the attachment to "open" the document for editing.**

Use the link below to see a read-only "preview" of the document:

motion to withdraw the reference order brief and certificate of service.docx(49.6 KB)

*Please note:  You cannot edit the document from the preview window.*

LEGAL NOTICE: This e-mail is from iManage LLC, and may contain confidential and/or legally privileged information. This e-mail is intended solely for the use of the individual(s) to whom it is addressed.

If you have received this e-mail in error, please notify the sender by reply e-mail, delete the e-mail from your computer and do not copy or disclose it to anyone else. Any disclosure, copying, distribution, reliance or use of the contents or information received in error is strictly prohibited. Neither this e-mail message nor its attachment(s) may be construed as establishing an attorney-client relationship, constituting an electronic signature or providing consent to contract electronically, unless expressly so stated by a iManage LLC attorney in the body of this e-mail or an attachment.

Powered by iManage

**Rafael Zahralddin**
**Partner**
Wilmington
302.985.6004 or x3026004

# EXHIBIT E

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (this "Agreement") is entered into as of May 23, 2021 (the "Effective Date"), by and among, **Stream TV Networks, Inc.**, a Delaware corporation (the "Company" or "Stream TV"), **Mathu Rajan** ("M. Rajan"), and **Raja Rajan** ("R. Rajan," and, together with the Company and M. Rajan, collectively, the "Company Parties"), on the one side, and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt") on the other side. Each of the Company Parties and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party".

## BACKGROUND

Stream TV is a Philadelphia-based new media company created to serve a consumer market seeking enhanced entertainment and communications experiences through devices with unlimited accessibility and superior quality;

Rembrandt is the successor to 3DFusion Corp. ("3D Fusion");

On January 6, 2017, Rembrandt filed suit against the Company in the Supreme Court of New York, New York County, which the Company removed to the U.S. District Court for the Southern District of New York captioned Rembrandt 3D Holding LTD v. Stream TV Network, Inc., et al., No. 17 Civ. 00882 (RA) (KHP) (S.D.N.Y.) (the "Litigation");

This Agreement details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, existing as of the effective date of May 23, 2021 ("Effective Date"). This Agreement is subject to the Protective Order (Docket No. 60) signed by the Parties in the Litigation.

Without admitting liability for any claim or damages, the Parties to this Agreement desire to settle the Litigation and agree to enter this Settlement Agreement and Mutual Release.

NOW THEREFORE, in consideration of the mutual promises, covenants, undertakings and agreements set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Confidentiality:      The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Agreement.

2. Costs and Expenses      Each Party shall be responsible for its own costs and expenses in negotiating the terms of this Agreement.

3. Law:      This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles.

4. Commencement      Commencement of this intended settlement shall be triggered upon the execution of this Agreement and the Warrant

{00843971.DOCX 1}

259

Agreement (Exhibit A) (which is incorporated herein by reference) and the attached Stipulation Of Voluntary Dismissal Pursuant To F.R.C.P. 41(a)(1)(A)(ii) (Exhibit B) which will be executed immediately after execution of this Agreement.

5. General Release

a. Each of the Company Parties and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys do hereby fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises, obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have, or have had, past, present, or future, against Rembrandt and its predecessors, successors, affiliates, subsidiaries, agents, officers, directors, members, managers, employees, owners and shareholders, relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

b. Upon payment of all payments under Section 15. Consideration, each of Rembrandt and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys agree to fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have,

or have had, past, present, or future, against any of the Company Parties and their respective predecessors, successors, affiliates, subsidiaries, agents, officers, directors, employees, and shareholders (and, in the case of M. Rajan and R. Rajan, their respective heirs, personal representatives, executors, and administrators) relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

6. Products

(a) Provision of 4K Units – Stream TV will ship to Rembrandt 100 of the following units: Display/Monitor Model: SC65D21Q-4K 65" Ultra-D Display (the "4K Units"). It is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice. Stream will pay transportation and all importation costs of these units. Upon execution of this Agreement Stream TV will notify Rembrandt if it will not be able to deliver any of the 4K Units and $5,250.00 will be added to the consideration under Section 15. A. for each 4K Unit that Stream TV can not provide upon execution or Stream TV will agree to provide additional 8K prototype units as a replacement for the 4K units to be delivered at up to 10 units/month starting seven months after Prototype Commencement.

(b) High Resolution Units
(1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with eight prototypes as follows:
i) the first unit within one month of the first prototype created by Stream TV of an 8K resolution unit after execution of this Agreement ("Prototype Commencement");
ii) 2 units on or before three months from Prototype Commencement;
iii) 2 units on or before four months from Prototype Commencement; and
iv) 3 units on or before six months from

Prototype Commencement.

Stream TV will warehouse such 4K and 8K units (for the 4K units and prototypes of the 8K) in facilities until shipping is requested by Rembrandt to a destination within the United States.   Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes.  Stream TV will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream TV is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream TV may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, and otherwise at standard commercial terms, the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus and 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of term.

Such minimum right of first refusal is cumulative and if Stream TV is not in production or Rembrandt does not use such right within a given month it carries over to future months. Rembrandt may purchase additional units by paying standard commercial terms with most favored nation status on a per unit price basis and similar shipping terms.   At present the following products defined in the attached specification sheets provided by Stream TV on June 13, 2019 are Standard Products attached hereto as Exhibit B, which is incorporated herein by reference.)

(3) Title for each of the Units shall transfer to Rembrandt, and risk of loss will be assumed by Rembrandt, upon delivery of each such Unit.

(4) Tax Matters.  Rembrandt shall be solely responsible for any taxes chargeable to the purchaser of goods in connection with or arising out of the transfer of the Units. Stream TV shall be solely responsible for any taxes chargeable to the seller of goods in connection with or arising out of the transfer of the Units.

| | |
|---|---|
| 7.  OEM | Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications. |
| | White Label - Rembrandt may brand product purchased from Stream TV with Rembrandt trademarks.  Rembrandt will not remove any patent number marking applied by Stream. |
| 8.  Term | The Term of the Agreement shall continue through December 31, 2030. |
| 9.  Rembrandt Grant of Rights | Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A to this |

Agreement for Rembrandt.

| | |
|---|---|
| 10. Stream Grant of Rights | Stream TV hereby grants Rembrandt a non-exclusive license to any existing Stream technologies that Stream TV has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein.  Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable. |
| 11. Field | The licensed field of use from Rembrandt to Stream TV is all applications |
| | The licensed field of use from Stream TV to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed.  Sale to any distributor in any territory is permitted for the Field. |
| 13. Co-Marketing | Rembrandt and Stream TV shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party. |
| | Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration: |

a) Upon execution of this Agreement, Stream TV agrees to pay to Rembrandt the lump sum of one million five hundred twenty eight thousand ($1,528,000) USD and is due immediately.

b) Stream TV is providing  warrants equal to X% of the outstanding stock in Stream TV after Stream TV has raised at least sixty million dollars in capital in excess of all outstanding debt and currently liabilities, with provision of a cashless exercise price at a $$Y value per warrant, pursuant to the attached Warrant Agreement (Exhibit A), which is incorporated herein by reference.

{00843971.DOCX 1}

"X%" shall be equal to the 2,000,000/(the number of shares in Stream TV outstanding on April 9, 2019). "$Y value" shall be equal to (the book equity value of Stream TV at issuance)/(the number of shares in Stream TV outstanding at issuance)

c) Stream TV will pay Rembrandt a monthly fee ("Monthly Payment") beginning with the execution of the Agreement for the full Term of this Agreement, according to the following schedule:

    a. 12 months @ $28,000/per month
    b. 12 months @ $32,000/per month
    c. 12 months @ $36,000/per month
    d. 79 months @ $40,000/per month

    The monthly payments shall be accelerated upon a merger, acquisition, or change of control. No acceleration by IPO.

**16. Payments**

Stream TV shall pay each Installment and Monthly Payment by wire transfer of immediately available funds to an account designated by Rembrandt in writing below, or otherwise designated by Rembrandt in writing and delivered to mathu@streamacquistiongroup.com:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

**17. Representations and Warranties**

The Parties represent and warrant to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed of learned during the pendency of the Litigation.

Stream TV represents and warrants that it has not revived and will not revive any abandoned patents or patent applications that were abandoned prior to the Effective Date.

Each of the Parties hereby represents and warrants to the others that, as of the Effective Date, (i) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate or company action on its behalf, (iii) this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with the terms

{00843971.DOCX 1}

of this Agreement, (iv) each individual signing this Agreement in a representative capacity acknowledges and represents that he/she is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated Party; and (v) the agreements and understandings identified herein constitute all of the agreements and understandings between and among the Parties with respect to the subject matter hereof.

18. Notices

Notices required by this Agreement shall be submitted either by any form of overnight courier or by hand delivery, and simultaneously by e-mail, as follows:

To Stream TV, ~~Raja Rajan &~~ Mathu Rajan:
Stream TV Networks, Inc
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
~~Attention:~~ General Counsel, Mathu and/or Raja Rajan individually

and

XXX

To Rembrandt:
128 Bull Hill Road
Newfield, New York  14867
Attention: Stephen Blumenthal
Email:  Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York  10017
Attention: Chi Eng
Email:  chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St, 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

{00843971.DOCX 1}

19. Advice of Counsel

Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys.

20. Entire Agreement

It is expressly understood and agreed that this Agreement along with all of the following documents: 1) the Warrant Agreement; and 2) the Protective Order in the Litigation (Docket No. 60) constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement. Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement.

21. Severability

If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired,  and shall remain in full force and effect.

22. Binding Effect

This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, shareholders, members, partners, general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, directors, members or shareholders of

any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns.

23. Waiver and Amendment

No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto.

24. Further Assurances

Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement.

25. Costs

The Parties acknowledge that each Party is to bear its own costs, fees, and expenses, including attorneys' fees, incurred in connection with the dispute giving rise to this Agreement.

26. Dispute Resolution

In the event of a dispute arising from this Settlement Agreement, the parties agree to resolve such dispute in good faith within fifteen (15) business days of receipt of notice of such dispute. If the parties fail to resolve such dispute, the parties consent to initially seek mediation by the Court in the Litigation, which Court the parties also agree shall maintain jurisdiction over any dispute arising from this Agreement.

27. Right to Attorney's Fees in Case of Breach

In the event of any dispute or litigation arising out of or concerning this Agreement, the prevailing Party shall be entitled to an award against the non-prevailing Party of its reasonable attorney's fees and costs.

28. Headings

The various headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

{00843971.DOCX 1}

| 29. Counterparts and Transmission of Signatures | This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Original signatures transmitted by electronic mail or facsimile shall be deemed to be original signatures. No Party shall be bound hereby unless and until all other Parties have executed this Agreement. |
|---|---|
| 30. Authorized Signature | Each individual signing this Agreement in a representative capacity acknowledges and represents that he is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated corporation, partnership, limited liability company, trust or other entity. |
| 31. Joint Preparation | This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements. |

{00843971.DOCX 1}

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of Defendants:**          **Signed for and on behalf of Plaintiff:**

_____                    _____
Signature                                           Signature
STREAM TV NETWORK, INC.,                            REMBRANDT 3D HOLDING LTD

By: Mathu Rajan, Chief Executive Officer            By: Stephen Blumenthal, President/CEO

Date: May 23, 2021                                  Date: May 23, 2021


_____
Signature
Mathu Rajan, Individually

Date: May 23, 2021


_____
Signature
Raja Rajan, Individually

Date: May 23, 2021

**SCHEDULE A**

1. Know how and trade secrets related to methodology for:
    a. efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology
    b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
    c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. The patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

**Exhibit A**


**(Warrant Agreement)**

**Exhibit B**

**(Standard Products)**

{00843971.DOCX 1}

# EXHIBIT F

**From:** Zahralddin, Rafael on behalf of Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Monday, April 24, 2023 4:15 PM EDT
**To:** Christopher Michaels <michaels@bpmlegal.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>
**BCC:** Chapter 11 _ 54493_2 _Email Official <{F11698191}.LEWIS_BRISBOIS@mail.cloudimanage.com>
**Subject:** RE: Plan for Rembrandt

First we have to revise the schedules to include you.  We will get that sorted out this week.  Copying Bennett to start that process.

---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Monday, April 24, 2023 4:02 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] RE: Plan for Rembrandt


Our investors are primarily interested in product purchases and investment in long term production and distribution agreements with Rembrandt.  I doubt that they would be interested in DIP lending, but if they were, I am guessing their attorneys would expect secured lending options.

With SeeCubic offering unsecured debt, I can't see a way that any investment proposal for secured debt would get consideration at this stage.  I am not sure what SeeCubic and Hawk are demanding to honor their statements in their papers, but I read SeeCubic's papers and it seemed that they were offering funding on fairly favorable terms as unsecured debt.

While we are talking to a lot of money, we are not pitching to "dumb money." They are well represented and advised with a great deal of sophistication in their markets and ours.  I think you can appreciate the types of agreements and conditions their counsel will request prior to any investment. We are not going to be able to pull something together quickly, but it is a good longer term option at the right terms.

While I understand that you have an immediate cash flow issue to solve, we need clarification regarding Stream's plan for paying Rembrandt for its license.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Monday, April 24, 2023 3:35 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Subject:** Re: Plan for Rembrandt

We have to update the schedules.

Right now we are trying to deal with the secured lenders.

Do your funding sources want to supply a DIP?

Might be better optics.

VSI isn't putting in $10 million - the purchase orders plus investors are the source of those funds.

Get Outlook for iOS



**Rafael Zahralddin**
Partner
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Monday, April 24, 2023 3:31:58 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] Plan for Rembrandt

Rafael:

We have read Stream's latest motion papers and note that Stream was asking to have a number of employees and vendors paid to allow production to start but did not include any payment to Rembrandt. While I understand the list of vendors will not be paid, we expected to be included in the list of vendors that needed to be paid to restart production.  Coupled with Stream's failure to list Rembrandt as either a creditor or as having an executory contract with Stream, we are having a hard time reconciling your filings with your statements that Rembrandt will both be paid and treated as an administrative claim.

If VSI has $10,000,000 to invest in Stream, there are funds to pay Rembrandt, but we see no plan to do so.

We are working with bankruptcy counsel, planning next steps, and talking to all parties. We need immediate clarification regarding Stream's plan for paying Rembrandt for its license.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

# EXHIBIT G

Fill in this information to identify the case:

Debtor 1    TECHNOVATIVE MEDIA INC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Eastern District of Pennsylvania

Case number  23-10764

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. **Who is the current creditor?** | Rembrandt 3D Holding, Ltd<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ | |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ | |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Andrew DeMarco, Esq. (PA Bar No. 326294)<br>Name<br>1526 Gilpin Avenue<br>Number    Street<br>Wilmington    DE    19806<br>City    State    ZIP Code<br><br>Contact phone (302 ) 449-9010<br>Contact email ademarco@devlinlawfirm.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ | **Where should payments to the creditor be sent?** (if different)<br><br>_____<br>Name<br>_____<br>Number    Street<br>_____<br>City    State    ZIP Code<br><br>Contact phone _____<br>Contact email _____ |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____ | Filed on _____<br>MM  / DD   / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ | |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**     $_____1,212,407,000.00_. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

**(See Addendum to Proof of Claim and other attachments)**

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                           $_____

**Amount of the claim that is secured:**         $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**  A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No |  |
|---|---|---|
|  | ☐ Yes. *Check one:* | **Amount entitled to priority** |
|  | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
|  | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
|  | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
|  | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
|  | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
|  | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
|  | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. |  |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/21/2024
　　　　　　　　　　MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Stephen | K | Blumenthal |
|---|---|---|---|
|  | First name | Middle name | Last name |

| Title | President & CEO |
|---|---|

| Company | Rembrandt 3D Holding Ltd. |
|---|---|
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 128 Bull Hill Road |  |  |
|---|---|---|---|
|  | Number        Street |  |  |
|  | Newfield | NY | 14867 |
|  | City | State | ZIP Code |

| Contact phone | 607-327-2645 | Email | steve@rembrandt3d.com |
|---|---|---|---|

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.*[1] | Bky Case No. 23-10763 (AMC) (Jointly Administered) |
| The Debtors. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky Case No. 23-10764 (AMC) |
| Debtor. | |

## ADDENDUM TO PROOF OF CLAIM

Claimant Rembrandt 3D Holding Ltd. ("Rembrandt") a Nevis corporation, by and through its attorneys, and in further support of its Proof of Claim ("PoC") against the Debtor Technovative Media, Inc. ("Technovative") states:

1.   Rembrandt holds title to certain patents and trade secrets developed by its President and CEO, Stephen Blumenthal, and his former company 3DFusion Corp ("3DFusion") that form the basis for the litigation and claims outlined below and this PoC, including but not limited to its improved Philip's 3DASD technology (or glasses-free 3D autostereoscopic display technology).

2.   On February 21, 2023, Rembrandt filed a complaint (the "Complaint") in the United States District Court for the District of Delaware against Technovative, Hawk Investment Holdings Ltd., and SeeCubic, Inc. (collectively, the "Defendants") for misappropriation of trade secrets and injunctive relief. The litigation commenced by the Complaint was stayed with respect to

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

Technovative as a result of its bankruptcy filing on March 15, 2023, however Rembrandt's claims with respect to the infringement of its patents and misappropriation of its trade secrets are set forth in detail in the Complaint, which is incorporated by reference into this PoC and attached hereto as Exhibit A.

3.  While total amount of Rembrandt's claim is difficult to calculate at the present time, Rembrandt's damages are estimated in an amount not less than $1,212,407,000.

4.  Rembrandt-Holding filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Network, Inc. ("Stream"), Raja Rajan, and Mathu Rajan among others (Stream, Raja Rajan, and Mathu Rajan, collectively referred to as the "Defendants"). Defendants removed the state action to the United States District Court for the Southern District Of New York, which was unopposed by Defendants. Defendants were served with the FAC on June 23, 2017 (Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc. et al, No. 17-CV-882-RA, D.I. 1-1)).

5.  The May 23, 2021 settlement agreement with Stream provided Stream a complete resolution of the litigation through a license to the technology and an expectation of large purchases from Rembrandt- Holding. Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost.

6.  Rembrandt-Delaware previously purchased a Stream for $5,250, so we estimated the value of the no charge TVs and the 8K prototypes to be about $567,000.

7. Based on Shadron Stastney's statements, we estimated at Stream's margin was approximately $400/unit so the ability to purchase 3,015,000 units at cost was worth approximately $400/unit x 3,015,000 units = $1,206,000,000.

8.   While Stream was licensed under the May 23, 2021 settlement agreement, Technovative was not unless it was engaged in making product for Stream.  However, as alleged in the Complaint (Exhibit A), Technovative engaged in misappropriate of Rembrandt's technology and was engaged in activities for the benefit of entities that were not licensed under the May 23, 2021 settlement agreement. Given that the products and services that were being offered by Technovative and the intellectual property owned by Rembrandt are identical, it is reasonable to value the claim against Technovative at a similar value to the value of the settlement with Stream.

9.   By virtue of the filing of this claim, Rembrandt does not waive, and hereby expressly reserves, Rembrandt's right to pursue any and all claims and requests for payment including, but not limited to, the claims and requests for payment described herein against the Debtor based on the facts and circumstances giving rise to any indemnification claim or under any other alternative legal theories. In addition, certain of Rembrandt's claims cannot at this time be reasonably calculated in all respects, and Rembrandt does not waive any of its rights to any and all such claims by not ascribing a specific dollar amount thereto at this time.

10. Rembrandt reserves all rights to (i) amend, clarify, modify, update or supplement this PoC at any time and in any respect, including without limitation to assert additional claims and requests for payment or additional grounds for Rembrandt's claim; (ii) file additional proofs of claim at any time and in any respect; (iii) file separate proofs of claim as: (a) permitted by any order entered in this case establishing a deadline to file proofs of claim; (b) required or permitted by law; or (c) otherwise ordered by the Bankruptcy Court; and/or (iv) file a request for payment of an administrative expense or priority claim in accordance with 11 U.S.C. §§ 503(b) and 507(a).  By virtue of the filing of this PoC, Rembrandt does not waive, and hereby expressly reserves Rembrandt's rights to pursue any and all claims and requests for payment, including but not limited

to, the claims and requests for payment described herein against the Debtor based on the facts and circumstances giving rise to the claims asserted in this PoC or any other alternative legal theories.

11. All reservations of rights and benefits set forth in this PoC apply to the indebtedness and claims set forth herein.

12. No judgment has been rendered on this PoC.

13. The execution and filing of this PoC is not and shall not be deemed or construed as: (a) a waiver or release of Rembrandt's rights against any person, entity, or property, which may be liable for all or any part of the claims asserted herein, including but not limited to guarantors or co-debtors; (b) a consent by Rembrandt to the jurisdiction or venue of the Bankruptcy Court with respect to proceedings, if any, commenced in the Debtors' Chapter 11 cases against or otherwise involving Rembrandt; (c) a waiver or release of Rembrandt's right to trial by jury in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a waiver or release of Rembrandt's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (e) a waiver of the right to move or to withdraw the reference with respect to the subject matter of this PoC, any objection thereto or other proceeding which may be commenced in the Debtors' Chapter 11 cases against or otherwise involving Rembrandt; (f) an election of remedies; or (g) a waiver or limitation of any procedural or substantive rights or defenses to any claim that may be asserted against Rembrandt by the Debtor, trustee or examiner appointed in this case or any subsequent case, or any other party.

78352255;3

284

14. All notices concerning this PoC should be sent to counsel for Rembrandt at Devlin Law Firm LLC, 1526 Gilpin Avenue, Wilmington DE 19806.

Date: October 21, 2024                         Respectfully submitted,

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
ademarco@devlinlawfirm.com

*Attorneys for Rembrandt 3D Holding Ltd.*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| STREAM TV NETWORKS, INC., | CASE NO.: 23-10763 MDC |
| Debtor, | |
| IN RE: | CHAPTER 11 |
| TECHNOVATIVE MEDIA, INC., | CASE NO.: 23-10764 MDC |
| Debtor. | (Jointly Administered) |

**HAWK INVESTMENT HOLDINGS LTD.'S (I) JOINDER TO THE OMNIBUS RESPONSE OF WILLIAM A. HOMONY, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE, TO THE OBJECTIONS TO THE TRUSTEE'S MOTION FOR, *INTER ALIA*, AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF; (II) BRIEF IN SUPPORT OF SALE; AND (III) <u>REQUEST FOR RELATED RELIEF</u>**

Hawk Investment Holdings Ltd. ("<u>Hawk</u>"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("<u>SeeCubic</u>"), a secured creditor of Stream TV Networks, Inc. ("<u>Stream</u>") and Technovative Media Inc. ("<u>Technovative</u>" and, together with Stream, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (together, the "<u>Chapter 11 Cases</u>"), by and through its undersigned counsel, K&L Gates LLP, respectfully submits this (i) joinder (the "<u>Joinder</u>") to the Omnibus Response of William A. Homony, In His Capacity As Chapter 11 Trustee, to the Objections to the Trustee's Motion for, *Inter Alia*, An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief (the "<u>Omnibus Response</u>"

1

[ECF No. 835])[1] of William A. Homony, in his capacity as chapter 11 trustee for the Debtors' estates (the "Trustee") in support of the proposed sale of the Debtors' assets to SeeCubic (the "Sale Transaction") and replying to Visual Semiconductor, Inc. ("VSI") [ECF No. 815] (the "VSI Objection") and Rembrandt 3D Holding Ltd. ("Rembrandt" and, together with VSI, the "Objectors") [ECF No. 816] (the "Rembrandt Objection" and, together with the VSI Objection, the "Objections"), and (ii) further responds to the Objections as set forth below. Hawk respectfully submits as follows:

## JOINDER AND ARGUMENT

### A.  Joinder to the Omnibus Response

1.      As the Court noted at the last hearing, the Objectors continue to engage in unproductive conduct designed to scare away potential third-party bidders and to preordain the very outcome they purportedly wish to avoid. The current objection is more of the same and there is little that requires a response, as the Objectors largely restate—nearly word-for-word—their respective objections to the Bidding Procedures Motion. As such, the Court has previously considered each of the arguments raised in the Objections and overruled them. Nevertheless, out of an abundance of caution, Hawk restates and incorporates its reply in support of the Bidding Procedures Motion [ECF No. 801] herein, and to the extent any arguments in the Objections endure, the Trustee has aptly addressed them in the Omnibus Response, which Hawk also joins in its entirety.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Omnibus Response.

**B.**    **SeeCubic Holds the Secured Debt, but Hawk Can Exercise Its Rights**

2.      Additionally, Hawk wishes to clarify the roles of the various so-called "Hawk Parties" that the Objectors have used throughout these cases in a vague and misleading manner.[2] Though the Objections are meritless and moot, the Objectors continually confuse the record with unnecessary and irrelevant personal attacks, where they intentionally obfuscate the roles of the various parties.

3.      As explained in detail below, as of the date hereof: (a) SeeCubic is the secured creditor with respect to the Debtors, which is a corporation separate and apart from Hawk; (b) Hawk is a financial investor in SeeCubic, but also acts as collateral agent on behalf of SeeCubic's secured lenders (of which Hawk is one), and is here exercising its collateral rights against SeeCubic; and (c) Mr. Shadron Stastney is the CEO of SeeCubic but is otherwise unrelated to Hawk.

4.      Prior to the commencement of these cases, Vice Chancellor Laster required extensive briefing on, and oral argument with respect to, the parties' various relationships after the Debtors challenged Hawk's standing in the "225 Action"—an action contesting the right to control the equity of Debtor Technovative, styled as *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc.*, Case No. 2022-0930-JTL (Ch. Del.).  The briefing and argument resulted in Vice

---

[2] For example, only two days ago Rembrandt filed a motion seeking sanctions for alleged violations of the temporary restraining order [ECF No. 824], to which VSI joined [ECF No. 828] (together, the "Sanctions Motions"), in which the Objectors make sweeping, broad-based allegations purportedly implicating all of the "Hawk Parties" in offensive conduct.  Though the entirety of the Sanctions Motions are meritless, they are particularly meritless with respect to Hawk, which as discussed below, is merely a passive investor and acts as collateral agent with no operational or decision-making authority. To the extent a response to the Sanctions Motion is necessary, Hawk adopts the arguments raised by the Trustee in his Objection of William A. Homony, Chapter 11 Trustee, to Rembrandt 3D Holding Ltd.'s Motion for Expedited Consideration, Shortened Time, and Limited Notice of Motion Seeking (I) Enforcement of the Temporary Restraining Order, (II) Sanctions Against Parties Who Violated the Temporary Restraining Order, and (III) Injunctive Relief [ECF No. 832].

Chancellor Laster issuing a fulsome and well-reasoned opinion on the issue, which remains binding on the parties today—*i.e.*, the Standing Opinion.

5.      The Standing Opinion determined that SeeCubic holds the secured debt Stream issued to Hawk and SLS Holdings VI, LLC ("SLS"), respectively (the "Secured Debt"), as the result of a complete assignment of such debt during the timeframe in which the Omnibus Agreement was effective.  *See* Standing Opinion, at \*\*4, 10.  During this time, however, SeeCubic had issued secured notes to various other parties (including Hawk and SLS) pursuant to a Note Purchase Agreement, dated July 11, 2022 (the "NPA").  *See id.* at \*4.  Hawk serves as collateral agent with respect to such secured notes pursuant to the Guarantee and Collateral Agreement dated even with the NPA (the "Collateral Agreement").  *See id.*  SeeCubic's collateral over which Hawk serves as collateral agent includes the enforcement rights to the Secured Debt owed by Stream.  *See id.*  Upon the Delaware Supreme Court's invalidation of the Omnibus Agreement there was an event of default under the NPA.  That default triggered Hawk's right under the NPA and Collateral Agreement in its capacity as the collateral agent to pursue enforcement of the Secured Debt against Stream—either in Hawk's name or in the name of SeeCubic.  *See id.* at \*\*4, 10.

6.      In its capacity as Collateral Agent on behalf of SeeCubic's noteholders, Hawk has taken the lead in pursuing relief against the Debtors in these Chapter 11 Cases, including seeking—and obtaining—appointment of the Trustee and filing a master proof of claim (the "Secured Claim") with respect to the Secured Debt.  Moreover, as Collateral Agent, Hawk has spearheaded the negotiations with the Trustee related to the Settlement Agreement and the compromise of the Secured Claim in connection therewith.  Nevertheless, SeeCubic will serve as buyer in the Sale Transaction, because it is the nominal holder of the Secured Debt.

7. Though complex, these roles—*i.e.*, Hawk as negotiator and administrator of the Secured Claim and SeeCubic as buyer and holder of the Secured Claim—are perfectly in line with Vice Chancelor Laster's decision in the Standing Opinion and proper considering the Standing Opinion is binding authority on the parties' rights as of today. Hawk and SeeCubic are separate parties with their own interests and roles; however, their interests have been aligned in pursuit of recovery on the Secured Claim.

## **<u>CONCLUSION</u>**

As discussed above and in the Omnibus Response, the Sale Transaction is the only viable path forward and for the reasons set forth above should be approved.

Dated: November 29, 2024        **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi, Esq. (No. 91881)
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: Steven.caponi@klgates.com

- and -

Margaret R. Westbrook, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone: (704) 331-7400
Email: margaret.westbrook@klgates.com

- and -

Aaron S. Rothman, Esq.
Jonathan N. Edel, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone: (704) 331-7400
Email: aaron.rothman@klgates.com
      jon.edel@klgates.com

5

- and -

Thomas A. Warns, Esq.
K&L Gates LLP
599 Lexington Aenue
New York, NY 10022
Telephone: (212) 536-3900
Email: tom.warns@klgates.com

*Attorneys for Hawk Investment Holdings Ltd.*

6

## CERTIFICATE OF SERVICE

I, Steven L. Caponi, certify that on November 29, 2024, I caused a copy of the foregoing

*Hawk Investment Holdings Ltd.'s (I) Joinder to the Omnibus Response of William A. Homony, In*

*His Capacity As Chapter 11 Trustee, to the Objections to the Trustee's Motion for,* inter alia, *An*

*Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims,*

*Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief; (II)*

*Brief in Support of Sale; and (III) Request for Related Relief* to be served on those persons

receiving notice through CM/ECF.

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 91881)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **STREAM TV NETWORKS, INC.,** *et al.* | Case No. 23-10763 (MDC) |
| **Debtors.**[1] | (Jointly Administered) |

**JOINDER OF SEECUBIC INC. TO RESPONSES IN SUPPORT OF THE TRUSTEE'S MOTION FOR,** *INTER ALIA*, **AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

SeeCubic, Inc. ("**SeeCubic**"), a secured creditor of the debtors Stream TV Networks, Inc. ("**Stream**") and Technovative Media, Inc. ("**Technovative**" and, together with Stream, the "**Debtors**"), in the above-captioned chapter 11 cases (together, the "**Chapter 11 Cases**"), and the Stalking Horse Bidder[2] for the Debtors' Assets, by and through its undersigned counsel, hereby submits this joinder to the (I) *Omnibus Response of William A. Homony, in His Capacity as Chapter 11 Trustee, to the Objections to the Trustee's Motion For,* Inter Alia*, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances,*

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Motion of William A. Homony in His Capacity as Chapter 11 Trustee For (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of substantially All of the Debtors' Assets Including Approval of Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling an Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief, and (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 750] (the "**Sale Motion**").

*and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No.

835] (the "**Trustee's Response**") filed by William A. Hominy, in his capacity as Chapter 11

Trustee (the "**Trustee**"), and (II) *Hawk Investment Holdings Ltd.'s (I) Joinder to the Omnibus*

*Response of William A. Homony, in His Capacity as Chapter 11 Trustee, to the Objections to the*

*Trustee's Motion for,* Inter Alia*, an Order (A) Approving the Sale of the Debtors' Assets Free and*

*Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C)*

*Granting Related Relief; (II) Brief in Support of Sale; and (III) Request for Related Relief* [Docket

No. 836] (the "**Hawk Response**" and together with the Trustee's Response, the "**Responses**"),

filed by Hawk Investment Holdings Ltd. ("**Hawk**")  in support of the Sale and in response to the

objections filed by Visual Semiconductor, Inc. ("**VSI**") [Docket No. 815] (the "**VSI Objection**")

and Rembrandt 3D Holding Ltd. ("**Rembrandt**" and, together with VSI, the "**Objectors**") [Docket

No. 816] (the "**Rembrandt Objection**" and, together with the VSI Objection, the "**Objections**"),

and respectfully submits as follows:

## <u>JOINDER</u>

1.       By their Objections, the Objectors improperly attempt to relitigate the findings of

this Court, as reflected in the Bidding Procedures Order entered on November 20, 2024 [Docket

No. 811], and otherwise raise meritless arguments with respect to the Sale in their continued effort

to frustrate any recoveries by the secured creditors in these Chapter 11 Cases. As such, SeeCubic

joins in the Responses filed by the Trustee and Hawk in their entirety and respectfully request that

this Court overrule the Objections and approve the Sale.

2

## **CONCLUSION**

SeeCubic respectfully requests that this Court overrule the Objections and enter an order

approving the Sale and providing for such other relief as the Court may deem proper.

Dated: November 30, 2024

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/      Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 206047)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Fax: (302) 651-3001
Joseph.Larkin@skadden.com

- and -

James J. Mazza, Jr. (admitted *pro hac vice*)
Justin M. Winerman (admitted *pro hac vice*)
320 South Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411
James.Mazza@skadden.com
Justin.Winerman@skadden.com

- and –

Eben P. Colby (admitted *pro hac vice*)
Marley Ann Brumme (admitted *pro hac vice*)
500 Boylston Street, 23rd Floor
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Fax: (617) 573-4822
Eben.Colby@skadden.com
Marley.Brumme@skadden.com

*Counsel to SeeCubic, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on November 30, 2024, with notice sent electronically to all parties receiving electronic notices in this case pursuant to the local rules of this Court, and that no further notice or service is necessary.

                          */s/ Joseph O. Larkin*
                          Joseph O. Larkin

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF PENNSYLVANIA

In re:

STREAM TV NETWORKS, INC., *et al.*,

Debtors.[1]

Chapter 11

Bky. No. 23-10763 (AMC)

# <u>ORDER</u>

**AND NOW**, on November 27, 2024, Visual Semiconductor, Inc. ("VSI") filed a motion (the "Reconsideration Motion")[2] seeking reconsideration of the Court's November 14, 2024 Order (the "Discovery Order")[3] quashing certain discovery VSI sought from William Homony (the "Trustee"), in his capacity as chapter 11 trustee in the above-captioned bankruptcy case.

**AND**, also on November 27, 2024, VSI filed a motion seeking expedited consideration of the Reconsideration Motion (the "Motion to Expedite").[4]

**AND**, on November 29, 2024, William Homony (the "Trustee"), in his capacity as chapter 11 trustee in the Bankruptcy Case, filed an objection to the Motion to Expedite (the "Trustee Objection").[5]

**AND**, upon consideration of the Motion to Expedite and the Trustee Objection thereto.

**IT IS HEREBY ORDERED** that:

1.      The Motion to Expedite is **DENIED**.[6]

---

[1] This case is being jointly administered with the case of *In re Technovative Media, Inc.* (Case No. 23-10764) (AMC).

[2] Bankr. Docket No. 826.

[3] Bankr. Docket No. 805.

[4] Bankr. Docket No. 827.

[5] Bankr. Docket No. 834.

[6] The Motion to Expedite asserts that expedited consideration of the Reconsideration Motion is required in advance of the hearing on a sale of the Debtors' assets, scheduled for December 4, 2024 (the "Sale Hearing"), because the relief sought "entitles VSI to discovery before the Sale Hearing." Motion to Expedite, at ¶8. Local Rule 5070-1(g)(2) requires that a motion for expedited consideration, *inter alia,* "set forth *with particularity* the reasons expedited consideration is necessary and appropriate." L.B.R. 5070-1(g)(2) (emphasis added). The Motion to Expedite fails to do

2.      VSI is directed, to the extent it wishes to prosecute the Reconsideration Motion, to

follow the Court's hearing scheduling procedures set forth in Local Rule 9014-3(c) to obtain a

hearing date on the Reconsideration Motion no sooner than January 2025.


Dated: December 2, 2024

_____
Honorable Ashely M. Chan
Chief United States Bankruptcy Judge

---

so, particularly given that the Reconsideration Motion was not filed until Thanksgiving Eve, *nearly two weeks* after the
Discovery Order was entered on November 14, 2024.  Where VSI asserts it needs discovery in advance of the Sale
Hearing but filed the Reconsideration Motion nearly two weeks later than it could have, less than a week before the Sale
Hearing, and on a date that predictably necessitated even further delay, it has not made the case for expedited
consideration.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>　　　　　Debtors.[1] | Chapter 11<br><br>Bky. No. 23-10763 (AMC) |
| STREAM TV NETWORKS, INC. and<br>TECHNOVATIVE MEDIA, INC.,<br><br>Plaintiffs,<br>v.<br><br>SHADRON L. STASTNEY, SLS HOLDINGS VI,<br>LLC, HAWK INVESTMENT HOLDINGS<br>LIMITED, ARTHUR LEONARD ROBERT<br>"BOB" MORTON, SEECUBIC, INC.,<br>ALASTAIR CRAWFORD, KRZYSZTOF<br>KABACINSKI, KEVIN GOLLOP, ASAF GOLA,<br>JOHN DOE(S),<br><br>　　　　　Defendants. | Adv. Case No. 23-00057 (AMC) |

## **ORDER**

　　**AND NOW**, on November 27, 2024, Rembrandt 3D Holding Ltd. ("Rembrandt") filed a

motion (the "TRO Motion")[2] in the above-captioned bankruptcy case (the "Bankruptcy Case"),

seeking enforcement of the Temporary Restraining Order (the "TRO") the Court entered in the

above-captioned adversary proceeding (the "Adversary Proceeding"), as well as sanctions against

the alleged infringing parties and injunctive relief preventing the contemplated sale of the Debtors'

assets (the "Sale").

　　**AND**, also on November 27, 2024, Rembrandt filed a motion in the Bankruptcy Case

---

[1] This case is being jointly administered with the case of *In re Technovative Media, Inc.* (Case No. 23-10764) (AMC).

[2] Bankr. Docket No. 824.

seeking expedited consideration of the TRO Motion (the "Motion to Expedite").[3]

**AND**, on November 29, 2024, William Homony (the "Trustee"), in his capacity as chapter 11 trustee in the Bankruptcy Case, filed an objection to the Motion to Expedite (the "Trustee Objection").[4]

**AND**, upon consideration of the Motion to Expedite and the Trustee Objection thereto.

**IT IS HEREBY ORDERED** that:

1. The Motion to Expedite is **DENIED**.[5]

2. Rembrandt is directed to refile the TRO Motion in the Adversary Proceeding, where the TRO was entered, and shall follow the Court's hearing scheduling procedures set forth in Local Rule 9014-3(c), made applicable to the Adversary Proceeding by Local Rule 7005-1, to obtain a hearing date on the TRO Motion no sooner than January 2025.

Dated: December 2, 2024

_____
Honorable Ashely M. Chan
Chief United States Bankruptcy Judge

---

[3] Bankr. Docket No. 825.

[4] Bankr. Docket No. 832.

[5] The Motion to Expedite asserts that expedited consideration of the TRO Motion is required in advance of the hearing on the Sale, scheduled for December 4, 2024, because the relief sought "significantly affects the Trustee's proposed sale." Motion to Expedite, at ¶7. Beyond that vague and conclusory reasoning, the Motion to Expedite provides no further explanation or justification for expedited treatment. Local Rule 5070-1(g)(2) requires that a motion for expedited consideration, *inter alia,* "set forth *with particularity* the reasons expedited consideration is necessary and appropriate." L.B.R. 5070-1(g)(2) (emphasis added). The Motion to Expedite fails to do so, a deficiency made more glaring in light of the TRO Motion's assertion that, no later than May 6, 2024, Rembrandt was asserting to alleged infringing parties that the TRO was being violated. TRO Motion, at ¶33.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al*. | : | **Bankruptcy No. 23-10763 (MDC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)[1]** |
|  | : |  |

## NOTICE OF NO AUCTION TO BE HELD
## AND SELECTION OF SUCCESSFUL BIDDER

**To: ALL PARTIES IN INTEREST**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On September 30, 2024, William A. Homony (the "Trustee")[2] in his capacity of Chapter 11 Trustee of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and collectively with Stream, the "Debtors"), filed a motion seeking entry of an order, (a) authorizing and approving the bidding procedures (the "Bidding Procedures") in connection with the sale of the Assets of the Debtors, the Stalking Horse APA, and form of Asset Purchase Agreement in connection with the Sale, (b) approving the form and manner of notice of the Auction and the Sale Hearing, (c) scheduling the Sale Hearing and setting other related dates, (d) approving procedures for the assumption and assignment of executory contracts and unexpired leases and noticing of related Cure Payments, (e) granting the Sale Motion, and (f) granting related relief (the "Sale Motion").

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases. (D.I. #81).
[2] Capitalized terms used in this Notice but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order [D.I. #811].

4899-4660-3778 v1

2.      On November 20, 2024, the Court entered an order authorizing and approving the Bidding Procedures. [DI #811].  The Trustee served all interested parties with the Sale Notice and Bidding Procedures prior to the Bid Deadline.

3.      The Trustee did not receive any Qualified Bids prior to the Bid Deadline of December 2, 2024, at 12:00 P.M. (EST).  Accordingly, the Auction scheduled to take place on December 3, 2024, is **CANCELLED**.

4.      The Stalking Horse Bidder is declared as the Successful Bidder for the Assets.

5.      The Debtor will seek approval of a Sale to SeeCubic, Inc. as the Successful Bidder at the Sale Hearing scheduled to commence on December 4, 2024, at 1:00 P.M. (prevailing Eastern Standard Time) before the Honorable Ashely M. Chan, United States Bankruptcy Judge, in the United States Bankruptcy Court, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA, 19107, in Courtroom No. 4.

<div style="text-align:center">Respectfully Submitted,</div>

Dated: December 2, 2024          By: */s/ Michael D. Vagnoni*
                                 Edmond M. George, Esquire
                                 Michael D. Vagnoni, Esquire
                                 OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                 Centre Square West
                                 1500 Market Street, Suite 3400
                                 Philadelphia, PA 19102
                                 Telephone: (215) 665-3066
                                 Facsimile: (215) 665-3165
                                 E-mail:  edmond.george@obermayer.com
                                          michael.vagnoni@obermayer.com

                                 *Counsel to William A. Homony Chapter 11 Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)[1]** |
| | : | |

## DECLARATION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE, IN SUPPORT OF THE MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF

I, William A. Homony, make this declaration (the "Declaration") under 28 U.S.C. § 1746 in support of my Motion for Entry of an Order (i) authorizing and approving, but not directing, the sale of the Assets, in each case with such Sale being free and clear of any and all liens, claims, encumbrances, and interests, (ii) and the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale, and (iii) granting related relief,[2] and in response to the Objections of Visual Semiconductor, Inc. ("VSI") and Rembrandt 3D Holding Ltd. ("Rembrandt").

     1.     I am the duly appointed Chapter 11 Trustee in the jointly administered Chapter 11 bankruptcy cases of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative," and together with Stream, the "Debtors").

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases. (D.I. #81).
[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2.      I am a Certified Insolvency and Restructuring Advisor with over twenty-three (23) years of experience.  I also serve as a Subchapter V Trustee in the District of Delaware and have been appointed as a Liquidating Trustee and Plan Administrator in numerous bankruptcy cases.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with my professionals and advisors, my communications with the salient parties in these bankruptcy cases as set forth in greater detail below, and my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

## I.     BACKGROUND

4.      On January 5, 2024, the Court entered an order, which, among other things, (i) granted Hawk's motion for relief from the automatic stay to proceed in the 225 Action; and (ii) instructed the United States Trustee's Office to immediately begin the process of appointing a Chapter 11 trustee over these bankruptcy cases (the "Trustee Order"). (D.I. #549).

5.      In addition to the Trustee Order, the Court also issued a written opinion, which, among other things, went to great lengths to explain why a trustee was being appointed over the Debtors' bankruptcy estates (the "Trustee Opinion"). (D.I. #548).

6.      In the Trustee Opinion, the Court specifically held that a neutral, unconflicted trustee was needed in these cases to "… deal with VSI at arms-length, including determining if there are pre- or post-petition claims that lie against VSI" and to "…evaluate, resolve, and/or litigate the claims of Hawk, SLS, SeeCubic, Rembrandt, and others" and went on to detail the facts and reasoning it held supported the appointment of a trustee. Trustee Opinion at p. 73.

7.      On January 9, 2024, the Office of the United States Trustee filed a notice of my appointment to serve as the Chapter 11 Trustee in this case, as well as an Application for the entry of an Order approving my appointment. (D.I. #554 and #553 respectively).

8.      On January 12, 2024, the Bankruptcy Court entered an Order approving my appointment (D.I. #558).

9.      As the Chapter 11 Trustee, I am the representative of the Debtors' bankruptcy estates and have been vested with the exclusive authority to manage the property of the Debtors' bankruptcy estates and have the duties enumerated under the Bankruptcy Code.

10.     Further, as a Chapter 11 trustee, I have a duty "to evaluate the Debtors' operations, prospects, and ability to successfully reorganize, and to implement such reorganization if possible." Trustee Opinion at p. 74.

11.     Since my appointment, I have done precisely that.

12.     In my early assessment of the Debtors' bankruptcy estates, I was able to determine that the Debtors were not operating and had not operated for several years and had no manufacturing capabilities or finished goods that could be sold.

13.     As part of my duties as Trustee, I met with and evaluated proposals from VSI, Rembrandt, and Hawk with the goal of maximizing recoveries for creditors. Notwithstanding the complaints of Mathu Rajan ("Rajan"), VSI, and Rembrandt, I have fairly evaluated every proposal presented to me.

14.     After consideration of all the facts and circumstances surrounding the Debtors' status and prospects, I ultimately negotiated a settlement agreement with the Debtors' secured creditors (the "Hawk Settlement") that provided for the resolution of significant litigation between

the parties and provided a mechanism to expose the Debtors' assets to the market for sale in an effort to monetize the Debtors' assets and provide a recovery for creditors.

### A.  The Hawk Settlement and the Sale Process

15.     For the reasons set forth in the 9019 Motion and the 9019 Order, both of which are incorporated herein at length, the Court approved the Hawk Settlement as a reasonable exercise of my business judgment, and I commenced the sale process outlined in the Hawk Settlement immediately.

16.     I first filed an application to employ Capstone Capital Markets, LLC ("Capstone") as my investment banker, but after objections by VSI and Rembrandt (which were overruled) and the office of the United States Trustee, which Capstone attempted to resolve without success, on or about July 26, 2024, Capstone withdrew from consideration as my investment banker.

17.     In the wake of Capstone's withdrawal, I filed an application to employ SSG Capital Advisors, LLC ("SSG") as my investment banker, and after VSI voluntarily withdrew its objection to SSG's retention, the application to employ SSG was approved by this Court on or about September 20, 2024.  Shortly thereafter, on September 30, 2024, I filed the Bidding Procedures Motion, but not before a two-week period during which I agreed to postpone filing the Bid Procedures Motion in one  last effort to provide VSI an opportunity to present a viable proposal that would provide for an alternative path forward for the Debtors and a better result for creditors. In spite of my ongoing efforts to engage with parties in an effort to maximize creditor recoveries, VSI never made a proposal to buy the Assets being sold under the Stalking Horse APA (defined below).

18.     The assets of the Debtors I am selling consist of all Stream assets identified in the asset purchase agreement filed in connection with the Sale Motion (the "Stalking Horse APA")

including the ownership interests of Technovative in its subsidiaries: Technology Holdings Delaware LLC; Media Holdings Co, LLC; and Ultra-D Ventures C.V. [D.N. 791-1] (the "Assets").

19.    As part of the Court approved Hawk Settlement and the Bidding Procedures Order, SSG sent a "Teaser" containing relevant information about the Debtors and the Assets to over 550 potential financial and strategic targets with the intention of creating interest in the Assets and to get interested parties to engage in a diligence process upon the execution of a non-disclosure agreement, which would provide more detailed information from SSG's data room regarding the Assets and the ability to ask questions of parties with more familiarity with the Assets, their capabilities and prospects.

20.    SSG followed up with potential targets for a period of weeks after the Teaser was sent out but received limited responses, and only one NDA was signed by VSI. As a result, only VSI viewed the information in the data room, and as of the bid deadline on December 2, 2024, at 12:00 p.m., no bids were submitted.

21.    The Stalking Horse Bid, as the only bid submitted by the Bid Deadline, constitutes the highest and best offer for the Assets, and therefore, I authorized the cancellation of the Auction in accordance with the Bid Procedures Order.

22.    The bid procedures, sale process, and relief being requested from this Court in connection with the sale of the Debtors' Assets are consistent with numerous other cases I have been involved with throughout my professional career and are appropriate under the circumstances of these bankruptcy cases.

23.    In my business judgment, I believe the Court should authorize the sale of the Debtors' Assets free and clear of all liens claims and interests pursuant to 11 U.S.C. §363 and enter the proposed Sale Order.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury the above to be true

and correct.

Dated: 12/3/24

By: _____

William A. Homony

Chapter 11 Trustee

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)[1]** |
|  | : |  |

**DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF CHAPTER 11
TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING, BUT NOT DIRECTING, THE SALE OF THE ASSETS, IN EACH CASE
WITH SUCH SALE BEING FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE SALE, AND (III) GRANTING RELATED RELIEF.**

Pursuant to 28 U.S.C. § 1746, I, J. Scott Victor, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1.         I am a founding partner and Managing Director at SSG Advisors, LLC ("SSG"), an investment banking firm that maintains offices at Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, PA 19428, and I am duly authorized to make this declaration on behalf of SSG.  I have over 40 years of experience in the restructuring industry and extensive experience: (i) marketing companies or their assets for sale, including experience marketing companies in distress and debtors in bankruptcy cases; (ii) raising capital for special situation transactions; and (iii) restructuring companies' balance sheets both in court and out of court.  SSG was engaged by the Chapter 11 Trustee to aid in the effectuation of a marketing and sale process.  Together with my team at SSG, I have served as investment banker to the Trustee since September of 2024.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases. (D.I. #81).

2.      I am authorized to submit this declaration (the "Declaration") in support of the
Motion of William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the
bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc.
("Technovative", or collectively with Stream, the "Debtors"), for Entry of an Order (i) authorizing
and approving, but not directing, the sale of the assets, in each case with such Sale being free and
clear of any and all liens, claims, encumbrances and interests, (ii) and the assumption and
assignment of certain executory contracts and unexpired leases in connection with the Sale, and
(iii) granting related relief (the "Motion")[2] and in response to the Objections of Visual
Semiconductor, Inc. ("VSI") and Rembrandt 3D Holding Ltd. ("Rembrandt") (collectively, the
"Objections").

3.      Unless otherwise indicated herein, the statements in this Declaration are based on
my personal knowledge or my opinion based on my experience, on information that I received
from the Debtors, on information that I received from the Trustee, on information that I have
received from my colleagues at SSG working directly with me or under my supervision, direction,
or control, or on my review of relevant documents including public filings.  If called upon to
testify, I would testify competently to the facts and opinions set forth herein.

**Professional Background and Qualifications**

4.      I founded SSG in 2001.  Prior to joining SSG, I was a partner and a senior member
of the bankruptcy and restructuring group at Saul Ewing LLP.

5.      I hold a BA from the University of Pennsylvania, and a JD from the University of
Miami School of Law.  I have more than 40 years of restructuring experience, 17 years as a

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

bankruptcy attorney and 24 years as a special situation investment banker. I am authorized to execute this declaration on behalf of SSG.

6. SSG is an independent boutique investment banking firm that assists middle-market companies and their stakeholders in completing special situation transactions. SSG provides its clients with comprehensive investment banking services in the areas of mergers and acquisitions, private placements, financial restructurings, valuations, litigation, and strategic advisory. Since its inception, SSG has completed over 450 investment banking assignments in North America and Europe and is a leader in the industry.

7. SSG's professionals have extensive experience working with financially distressed companies in and out of Chapter 11, including section 363 sales and plans of reorganization.

**The SSG Appointment**

8. On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date") as well as an Application for the Entry of an Order Approving the Appointment of the Trustee (the "Application") (D.I. #554 and #553 respectively).

9. The Trustee contacted me following the decision by Capstone Advisors LLC not to proceed with its retention based in part on objections filed by the United States Trustee to its retention.

10. Initially, VSI objected to my retention.

11. I met with VSI representatives who, after an extensive discussion of SSG's approach to marketing the Debtors' assets, were satisfied that I could perform the services of an investment banker fully and without conflicts. VSI withdrew its objections to SSG's retention.

12. SSG has been engaged as the investment banker to the Trustee and members of my

team and I have been working closely with the Trustee and his advisors on this engagement since September 20, 2024 (the "SSG Appointment Date") (D.I. #741).

13.    Since the Appointment Date, SSG has become highly familiar with the Debtors' corporate and capital structure, management, and assets.

14.    The Debtors had not been operating for a substantial period of time and had been through two (2) previous bankruptcy proceedings, as well as years of litigation in the Delaware Chancery Court and Delaware Supreme Court. SSG relied on the review of substantial pre and post-petition litigation pleadings, and discussions with the management and engineering teams at SeeCubic BV ("SCBV") in the Netherlands to try to fully understand the asset picture for the Debtors and its subsidiaries, and to determine the assets for sale.

15.    As of the Appointment Date, the Debtors had no operations, no factories, no workers, no inventory, no raw materials.  The Debtors and its subsidiaries have a bonding machine warehoused on pallets in China.

### The Marketing of the Assets

16.    SSG began marketing the Debtors' assets in October of 2024.

17.    The Court-approved Hawk Settlement provided for a credit bid in the amount of $150 million that served as the floor for an alternate purchaser to submit a bid and participate in a sale process to be set forth in bidding procedures, which were subsequently approved by the Court.

18.    As part of this process, among other things, SSG drafted and circulated a "Teaser" containing relevant information about the Debtors, and also organized a virtual data room ("VDR").

4

19.     A Teaser is a one-page overview intended to attract interest, not to detail every issue related to the assets being sold.  The Teaser draws people to the data room, and potentially further discussion with SSG and management.

20.     Since the start of the marketing process, SSG has reached out to approximately 550 prospective buyers around the world. SSG's contact with potential buyers included taking steps necessary to enable such parties to conduct due diligence through the execution of a non-disclosure agreement.

21.      The worldwide parties SSG contacted included both operational and strategic parties, as well as financial buyers who may have been interested in acquiring the Debtors' assets, as set forth in the Stalking Horse APA.

22.     Two (2) parties executed the non-disclosure agreement required to access confidential information in the VDR.  Those parties were VSI and Continental Advisory Services, LLC ("Continental").   VSI identified the principal of Continental as a VSI investor and a committed capital source for a potential Stream transaction.

23.     Continental was the alleged new investor to VSI.  Though the VSI team had indicated the VSI "investor was prepared to move forward," that never happened.

24.     Continental reviewed the VDR materials and participated in multiple calls and emails with SSG, as well as a call with SSG and the engineers at SCBV to discuss the opportunity. Subsequent to that discussion, Continental made it clear to SSG that they were not moving forward with an investment in VSI and spent the majority of their time questioning the Hawk Settlement and the Hawk secured claim.

25.     Continental never provided any indication that it or VSI was actually prepared to bid for the Debtors' assets.

26.     SSG was responsible for complying with the Court's directive to prepare a full list of assets available in the sale process, including intellectual property owned by the Debtors' subsidiaries, and to allow VSI and Rembrandt to add additional information to the list of assets. The list, inclusive of the VSI and Rembrandt comments, was filed with the Court and on the Docket.

27.     Thereafter, SSG again reached out to all of the potential buyers previously contacted, stating that the list of assets for sale had been filed on the Docket and was available for review.  SSG also provided confirmation of the bid deadline and sale hearing dates.  No party responded.

28.     It is important to note that the Trustee and SSG never offered the assets of the Debtors' subsidiaries to anyone free and clear of any interests, as those assets do not constitute property of the Debtors' estates.

29.     Rather, the equity interests in the downstream entities are assets of the Debtors' estates and are being sold as part of this sale process.

30.     Any rights Rembrandt may have as to its alleged intellectual property are preserved against the proposed Stalking Horse Bidder; and further, Rembrandt has a suit pending in Delaware, where those issues are currently being litigated against the Stalking Horse Bidder.

31.     Based upon my experience, the Stalking Horse Bid represents the highest and best bid for the Debtors' assets.

32.     Further, based on my efforts and those of my team at SSG, the sale process was fair, honest, and generated the highest and best value that could be obtained for the Debtors' assets under the circumstances.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury the above to be true

and correct.

Dated: December 3, 2024

_____
J. Scott Victor
Managing Director
SSG Capital Advisors, LLC

315

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)**[1] |
| | : | |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS, (B) AUTHORIZING THE TRUSTEE TO ENTER INTO AND PERFORM
DEBTORS' OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (C)
APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**"),[2] of the Chapter 11 Trustee, William A.

Homony (the "**Trustee**") of the estates of Stream TV Networks, Inc. ("**Stream**") and Technovative

Media, LLC (**"Technovative"**, or with Stream, each a "**Debtor**", and collectively, the "**Debtors**")

for *inter alia*, entry of an order (this "**Sale Order**") (a) authorizing and approving the entry into

and performance under the terms and conditions of that certain Asset Purchase Agreement,

substantially in the form attached hereto as **Exhibit 1** (as may be amended, supplemented or

restated, the "**Asset Purchase Agreement**"), and all other ancillary agreements (collectively, the

"**Transaction Documents**"),[3] by and among the Debtors and SeeCubic, Inc. (the "**Buyer**"), (b)

authorizing and approving the sale (the "**Sale**") of those Transferred Assets set forth in the Asset

Purchase Agreement (the "**Assets**") free and clear of all liens, claims, encumbrances, and other

interests, except to the extent set forth in the Asset Purchase Agreement, and the assumption of

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Motion, the Asset Purchase Agreement or the Bidding Procedures Order (as defined herein), as applicable.
[3] For the avoidance of doubt, the term "Transaction Documents" shall include the Hawk Settlement (as defined in the Bidding Procedures).

certain assumed liabilities set forth in the Asset Purchase Agreement (the "**Assumed Liabilities**")

pursuant to the Asset Purchase Agreement upon the closing of the Sale (the "**Closing**"), (c)

authorizing the assumption and assignment of executory contracts and unexpired leases set forth

on **Exhibit 2** attached hereto, as the same may be subsequently modified pursuant to the terms of

the Asset Purchase Agreement (each, an "**Assigned Contract**," and, collectively, the "**Assigned**

**Contracts**"), upon the Closing, subject to the payment by the Buyer of any payments to cure any

defaults arising under any Assigned Contract (the "**Cure Payments**"), the provision of adequate

assurance by the Buyer, as applicable, that it will promptly cure any non-monetary defaults

existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance

of future performance by the Buyer under the Assigned Contracts, and (d) granting related relief,

all as more fully set forth in the Motion; and this Court having entered the *Order (A) Approving*

*the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B)*

*Approving Procedures for the Assignment and Assumption of Executory Contracts and Unexpired*

*Leases, and (C) Granting Related Relief* [Docket No. 811] (the "**Bidding Procedures Order**");[4]

and the Trustee having canceled the auction (the "**Auction**") for the Assets Scheduled for

December 3, 2024 because no bids other than the Stalking Horse Bid of the Buyer was received

by the Bid Deadline; and the Trustee having determined that the Buyer has submitted the highest

or otherwise best bid for the Assets and determined that the Buyer is the Successful Bidder and

that there is no Back-Up Bidder (as defined in the Bidding Procedures), in accordance with the

Bidding Procedures; and the Court having conducted a hearing on the Motion (the "**Sale**

**Hearing**"), at which time all interested parties were offered an opportunity to be heard with respect

to the Motion; and the Court having reviewed and considered the Motion, the Asset Purchase

---

[4] All references herein to the Bidding Procedures Order shall also be deemed to be references to the bidding procedures approved thereby (the "**Bidding Procedures**").

Agreement, and any and all objections to the Sale and the Transaction Documents filed in accordance with the Bidding Procedures Order and all responses thereto; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing and in the Declaration of J. Scott Victor of SSG, the Trustee's Investment Bankers, submitted in support of the Sale (the "**Victor Declaration**") and the Declaration of the Trustee submitted in support of the Sale (the "**Trustee Declaration**"); and upon consideration of the Hawk Settlement, which provided for, among other things, Buyer's stalking horse credit bid (the "**Credit Bid**") of $150 million (the "**Credit Bid Amount**") for the Assets, the Sale of the Assets to the Buyer, and the stay and eventual dismissal with prejudice of the Pending Litigation Matters (as defined in the Settlement Agreement), as further described in the Motion of William A. Homony in his Capacity as Chapter 11 Trustee for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd., as Collateral Agent for the Secured Noteholders of SeeCubic, Inc., Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) [Docket No. 630] (the "**9019 Motion**"); and upon the consideration of the Order approving the 9019 Motion, entered on June 7, 2024 [Docket No. 653] (the "**9019 Order**"); and it appearing that due notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, the Sale, and all relief related thereto, has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their respective estates, stakeholders, and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby FOUND, CONCLUDED, AND DETERMINED THAT:

**Jurisdiction, Venue, and Final Order**

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

C.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

D.      The findings of fact and conclusions of law set forth herein, in addition to any findings of fact and conclusions of law stated by the Court at the Sale Hearing, constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Motion pursuant to Bankruptcy Rule 9014. To the extent any findings of fact later shall be determined to be conclusions of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

**Notice of the Motion, Auction, Sale Hearing, Asset Purchase Agreement, Sale Hearing and the Cure Payments**

E.      As evidenced by the affidavits of service and publication previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion and the relief requested therein, the Auction, the Sale Hearing, the Asset Purchase Agreement, and the Sale has been provided by

4

the Trustee in accordance with all applicable provisions of the Bankruptcy Code, the Bankruptcy

Rules, and the Local Rules, including sections 102(1), 363, and 365 of the Bankruptcy Code and

Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014. The disclosures made by the Trustee

concerning the Auction, the Asset Purchase Agreement, the Sale, and the Sale Hearing were good,

complete, and adequate. The Trustee has complied with all obligations to provide notice of the

Motion, the Auction, the Sale Hearing, the Asset Purchase Agreement, and the Sale as required by

the Bidding Procedures Order. The foregoing notice was good, sufficient, and appropriate under

the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the

Asset Purchase Agreement, or the Sale is required.

F.      A reasonable opportunity to object or to be heard regarding the relief requested in

the Motion and of the Sale Hearing was afforded to all interested persons and entities.

G.      In accordance with the Bidding Procedures Order, the Trustee has filed a Notice of

Assumption or Assignment of Executory Contracts and Unexpired Leases. The service and

provision of such notice was good, sufficient, and appropriate under the circumstances and no

further notice need be given in respect of the assumption and assignment of the Assigned Contracts

or establishing a Cure Payment for any Assigned Contracts.

### Highest and Best Offer

H.      As demonstrated by the Victor Declaration and the Trustee Declaration, the

evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the

record at the Sale Hearing, the Trustee conducted a sale process in accordance with, and has, along

with the Buyer, complied in all respects with, the Bidding Procedures Order and afforded a full,

fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer

to purchase the Assets and assume any Assumed Liabilities.

I. The Trustee and his advisors engaged in a robust and extensive marketing and sale process in accordance with the Bidding Procedures Order and the sound exercise of the Trustee's business judgment.

J. The Trustee and the Buyer have negotiated and undertaken their roles leading to the entry into the Asset Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner and at arms' length.

K. The Trustee conducted a fair and open sale process and the sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Business or Assets, or who the Trustee believed may have had an interest in acquiring the Assets, to make an offer to purchase the Debtors' Assets.

L. The sale process conducted by the Trustee pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Assets for the Trustee and the Debtors' estates, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

M. The Trustee has demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of its obligations under the Asset Purchase Agreement. The consummation of the Sale contemplated by the Asset Purchase Agreement is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

N. The Buyer is a secured creditor of the Sellers. Hawk filed a proof of claim (the "**Proof of Claim**") asserting a secured claim held by Buyer secured by substantially all of the

Debtors' assets, which the Debtors owed to the Buyer.[5] The Proof of Claim asserted that the Debtors were indebted to SeeCubic in the amount of no less than $178,432,069.68, subject to additional accruing interest, fees, and expenses. The Proof of Claim was allowed in the amount of $180,000,000 as part of the Hawk Settlement and under the 9019 Order. Under the Hawk Settlement, approved by this Court, Buyer was permitted to credit bid up to $150,000,000 of its allowed, secured claim.

O.      The Trustee has also determined that no other Qualified Bid (as defined in the Bidding Procedures) was submitted and therefore there is no Back-Up Bid.

P.      The consummation of the Sale outside a plan of reorganization pursuant to the Asset Purchase Agreement and the transactions contemplated thereby neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors. The Sale does not constitute a *sub rosa* plan for which approval has been sought without the protections that a disclosure statement would afford.

Q.      Entry of an order approving the Asset Purchase Agreement, and all the provisions thereof, is a necessary condition precedent to Buyer's consummation of the Sale, as set forth in and pursuant to the Asset Purchase Agreement.

R.      **Credit Bid**.  Pursuant to the Asset Purchase Agreement, and as authorized by the Bidding Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code, the Buyer, in addition to the other consideration offered under the Asset Purchase Agreement, credit bid an amount equal to the Credit Bid Amount.  With respect to the Credit Bid, the Court finds and determines that:

---

[5]      Hawk was authorized to file the Proof of Claim on behalf of SeeCubic, pursuant to authority granted to it by the power of attorney included in that certain Guarantee and Collateral Agreement between SeeCubic and Hawk, dated as of June 11, 2022.

7

         i.      The Credit Bid was a valid and proper offer pursuant to the Bidding Procedures Order;

         ii.      There is no cause to limit the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code; and

         iii.      The Trustee valued each dollar of the Credit Bid Amount as equivalent to one dollar of cash, and such valuation was appropriate and represents a reasonable exercise of the Trustee's business judgment in accordance with the Bid Procedures Order.

### Personal Identifiable Information

S.      The Debtors do not use personal information and therefore a confidential information ombudsman is not necessary or required.

### Good Faith of Buyer

T.      The Asset Purchase Agreement and the consideration to be paid by the Buyer under the Asset Purchase Agreement were negotiated, proposed, and entered into, at arm's-length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration for the Assets. The Buyer is, therefore, entitled to the full protections of section 363(m) and otherwise has proceeded in good faith in all respects in connection with the Sale. Specifically: (i) the Buyer recognizes that the Trustee was free to deal with any other party interested in purchasing the Assets; (ii) the Buyer complied in all respects with the provisions in the Bidding Procedures Order in negotiating and entering into the Transaction Documents, and the transactions described therein comply with the Bidding Procedures Order; (iii) the Buyer agreed to subject any bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made by the Buyer in connection with the Sale have been disclosed in the Asset Purchase Agreement; (v) no common

8

323

identity of directors, officers, or controlling member exists among the Buyer, the Trustee, and the Debtors; (vi) the negotiation and execution of the Asset Purchase Agreement and the other Transaction Documents were at arm's-length and in good faith, and at all times each of the Buyer and the Trustee were represented by competent counsel of their choosing; (vii) the Buyer did not in any way induce or cause the chapter 11 filing of the Debtors; and (viii) the Buyer has not acted in a collusive manner with any person with respect to the Sale process or Auction. The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents.

U.      The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws. Neither the Trustee, the Buyer, nor any affiliate of either have engaged in any action or inaction that would cause or permit the Asset Purchase Agreement or transaction thereunder to be avoided or impose any costs or damages under section 363(n) of the Bankruptcy Code.

V.      The Sale does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and, other than with respect to the Assumed Liabilities, does not and will not subject the Buyer to any liability whatsoever with respect to the Debtors' operation prior to the Closing.

W.      The Debtors, through the Trustee, and the Buyer, through its management, boards of directors, members, officers, directors, managers, employees, agents, and representatives, have acted in good faith. The Asset Purchase Agreement and the other Transaction Documents, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the

Trustee and the Buyer in good faith, without collusion or fraud, and from arm's-length bargaining positions. Neither the Buyer nor any of its affiliates, officers, directors, members, partners, principals, shareholders (or equivalent), or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor. The Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

### No Fraudulent Transfer

X.    The consideration provided by the Buyer pursuant to the Asset Purchase Agreement for its purchase of the Assets and the assumption of the Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the Commonwealth of Pennsylvania. The Trustee, on behalf of the Debtors and their estates, waives and relinquishes any and all rights to assert in any forum whatsoever that his entry into or consummation of the Asset Purchase Agreement constituted a fraudulent conveyance or fraudulent transfer under any of the foregoing statutory regimes. None of the Debtors, the Buyer, nor any of their respective  affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Sale or other transactions contemplated by the Asset Purchase Agreement to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

### Buyer Not Successor

Y.    Neither the Buyer nor its past and present subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their

325

respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (each, a "**Buyer Party**" and collectively, the "**Buyer Parties**") is a continuation of the Debtors or their estates and no Buyer Party is holding itself out to the public as a continuation of the Debtors or their estates simply by closing the Sale, and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer (or any other Buyer Party) and the Debtors' estates.

Z.    The transfer of the Assets to the Buyer, will not subject the Buyer or any of its affiliates or designees to any liability whatsoever, other than with respect to Assumed Liabilities, that arises prior to the Closing or by any reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability, or any similar theory and/or applicable state or federal law or otherwise.

<u>**Validity of Transfer**</u>

AA.    The Trustee has authorized the execution and delivery of the Asset Purchase Agreement and the Sale of the Assets to the Buyer (or its designee). Pursuant to, among other things, the Bankruptcy Code, including sections 105, 1106, 1107, and 1108, the Order entered on January 5, 2024, which, among other things, granted the motion seeking the appointment of a Chapter 11 trustee, and the Order Approving Appointment of Trustee [Docket No. 558], the Trustee, on behalf of each Debtor, has all of the power and authority necessary to (i) execute and deliver the Asset Purchase Agreement and all other documents to consummate the Sale, and (ii) consummate the Sale, and no further consents or approvals, other than those expressly provided

for in the Asset Purchase Agreement, are required for the Trustee to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement. The Assets constitute property of the Debtors' respective estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

BB.     The Trustee has demonstrated a sufficient basis and compelling circumstances warranting his to (i) entry into the Asset Purchase Agreement, and (ii) sale of the Assets, and such actions are an appropriate exercise of the Trustee's business judgment and in the best interests of the Debtors, their estates, and their creditors. Such business reasons include that (i) the Asset Purchase Agreement constitutes the highest and best offer for the Assets; (ii) the Asset Purchase Agreement presents the best opportunity to maximize and realize the value of the Assets for the benefit of the Debtors, their estates, and their creditors; and (iii) unless the Sale contemplated by the Asset Purchase Agreement is concluded expeditiously, creditor recoveries are likely to be adversely affected.

CC.     The Asset Purchase Agreement is a valid and binding contract between the Trustee and the Buyer and shall be enforceable pursuant to its terms.

### Section 363(f) of the Bankruptcy Code is Satisfied

DD.     The Sale of the Assets to the Buyer (or its designee) under the terms of the Asset Purchase Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Assets will be free and clear of any and all liens, claims, encumbrances, and interests, and will not subject any Buyer Party to any liability for any pre-Closing liens, claims, encumbrances, and interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the

Asset Purchase Agreement with respect to the Assumed Liabilities (as defined in the Asset Purchase Agreement). All holders of any such liens, claims, encumbrances, and interests who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of any such liens, claims, encumbrances, and interests are adequately protected thereby satisfying section 363(e) of the Bankruptcy Code by having their liens, claims, encumbrances, and interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, encumbrances, and interests, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable. Those holders of any such claims who did object and that have an interest in the Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

EE.    The transfer of the Assets to the Buyer (or its designee) under the Asset Purchase Agreement will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Assets free and clear of all liens, claims, encumbrances, and interests, except as expressly provided in the Asset Purchase Agreement with respect to the Assumed Liabilities. The Buyer, its property, its successors or assigns and their respective property, and the Assets will not have any liability whatsoever with respect to, or be required to satisfy in any manner (whether at law or in equity, whether by payment, setoff, or otherwise), directly or indirectly, any claim or lien, or any successor or transferee ability for either of the Debtors other than the Assumed Liabilities.

FF.    The Trustee may sell interests in the Assets free and clear of all liens, claims, encumbrances, and interests because, in each case, one or more standards set forth in section 363(f)

13

328

have been satisfied. The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale, (i) if the transfer of the Assets were not free and clear of all liens, claims, encumbrances, and interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or (ii) if the Buyer or any of its affiliates or designees would, or in the future could, be liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities. Not transferring the Assets free and clear of all interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise (subject only to the Assumed Liabilities), would adversely impact the Trustee's efforts to maximize the value of the Debtors' estates.

### No Assumption or Assignment of Assigned Contracts

GG.     The Sellers are not assuming and the Buyer is not taking an assignment of any executory contracts or unexpired leases pursuant to the Asset Purchase Agreement, therefore there are no Assigned Contracts and the Trustee retains all rights to assume or reject all of the Debtors' remaining executory contracts or unexpired leases under section 365 of the Bankruptcy Code.

HH.     At any time prior to the rejection of an executory contract or unexpired lease, the Debtors shall have the right, in accordance with the Bidding Procedures Order, to serve a Supplemental Assumption Notice upon any non-Debtor counterparty thereto indicating the Debtors' intent to assume and assign such executory contract or unexpired lease. Objections, if

14

any, to the proposed assumption and assignment or the Cure Payment proposed in any Supplemental Assumption Notice with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by, counsel to the Trustee and counsel to the Buyer. If the parties cannot agree on a resolution, the Trustee will seek an expedited hearing before the Court to determine the Cure Payment and approve the assumption and assignment to Buyer. If there is no objection prior to the applicable objection deadline, then the counterparties will be deemed to have consented to the assumption and assignment to Buyer and the Cure Payment, and such assumption and assignment to Buyer and the Cure Payment shall be deemed approved by this Sale Order without further order of this Court.

II.     The (i) transfer of the Assets to the Buyer, will not subject the Buyer or any of its affiliates or designees to any liability whatsoever that arises prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the Commonwealth of Pennsylvania, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, except for the Assumed Liabilities.

## Consummation of the Sale

JJ.     Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale of the Assets must be approved and consummated promptly to preserve

the value of the Assets. Time, therefore, is of the essence in effectuating the Asset Purchase Agreement. As such, the Trustee and the Buyer intend to close the Sale of the Assets as soon as reasonably practicable. The Trustee has demonstrated (i) compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Asset Purchase Agreement and the Sale under Bankruptcy Code section 363(b) and (ii) that the Sale is fair, reasonable, and in the best interests of the Debtors' estates and creditors. Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and 6006(d).

KK.    The Trustee has demonstrated that the Assets Purchase Agreement and the closing thereon is necessary, appropriate, and presents the best opportunity to realize the value of the Assets and maximize the value of the Debtors' estates.  The Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and its powers and duties under applicable law and should be approved.

### NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

### General Provisions

1.    The Motion is GRANTED and approved as set forth herein.

2.    Any and all objections to or reservation of rights with respect to the Motion, the Sale, or other related relief that have not been withdrawn or resolved are overruled on the merits with prejudice. All persons and entities who did not object or withdraw their objections to the Motion, Sale, or other related relief are deemed to have consented to the relief granted herein, including for purposes of section 363(f)(2) of the Bankruptcy Code.

3.    The Asset Purchase Agreement and the other Transaction Documents, and all terms and conditions thereof, are hereby approved in their entirety, and the Trustee is authorized to take

any and all steps to consummate the Sale under and in accordance with the terms and conditions of the Asset Purchase Agreement, and attain the Closing.

**Transfer of the Assets as set forth in the Asset Purchase Agreement**

4.     The Asset Purchase Agreement, all of the terms and conditions thereof, and the transactions contemplated thereby, including the Sale, are approved in all respects.  The failure specifically to include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intention of the Court that the Asset Purchase Agreement and the Sale be authorized and approved in their entireties.  The Sale of the Assets by the Trustee to the Buyer shall be a legal, valid, and effective transfer of the Assets.  The consummation of the Sale of the Assets is hereby approved and authorized under section 363(b) of the Bankruptcy Code.

5.     Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Trustee is authorized, empowered, and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the Asset Purchase Agreement, Transaction Documents and this Sale Order, and (b) take all further actions and execute, deliver, perform under, and implement the Asset Purchase Agreement, the Transaction Documents and any and all additional instruments and documents that may be necessary or appropriate to implement or perform any of the obligations contemplated by the Asset Purchase Agreement and the other Transaction Documents and relating to the Sale in accordance with the terms thereof, all without further order of the Court.

6.     The Buyer is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities (as defined in the Asset Purchase Agreement).

7.      All persons, entities, and interested parties are prohibited and enjoined from taking any action that would in any way adversely affect or interfere with, or which would be inconsistent with, the ability of the Trustee to transfer the Assets to the Buyer (or its designee) in accordance with the Asset Purchase Agreement, the other Transaction Documents, and this Sale Order.

8.      At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Assets shall be immediately vested in the Buyer (or its designee) pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Assets. All persons or entities, presently or at or after the Closing, in possession of some or all of the Assets, are directed to surrender possession of any and all portions of the Assets to the Buyer (or its designee) or its respective designees on the Closing or at such time thereafter as the Buyer (or its designee) may request.

9.      To the maximum extent permitted by applicable law, the Buyer (or its designee) shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval with respect to the Assets (the "**Licenses**"), and, subject to Section 2.2 of the Asset Purchase Agreement, all Licenses are deemed to have been transferred to the Buyer (or its designee) as of the Closing Date.

10.      This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no pre-Closing claims other than the Assumed Liabilities will be assertable against any Buyer Party or any of their respective assets (including, without limitation, the Assets), property, affiliates, successors, or assigns, (ii) the Assets shall have been transferred to the Buyer (or its designee) free and clear of all liens, claims, encumbrances, and interests, subject only to the Assumed Liabilities, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing

18

agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,

registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative

agencies, governmental departments, secretaries of state, federal and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or contract,

to accept, file, register, or otherwise record or release any documents or instruments, or who may

be required to report or insure any title or state of title in or to any lease; and each of the foregoing

persons and entities is hereby directed to accept for filing any and all of the documents and

instruments necessary and appropriate to consummate the transactions contemplated by the Asset

Purchase Agreement and the other Transaction Documents. The Assets are sold free and clear of

any reclamation rights. All liens, claims, encumbrances, and interests on the Assets shall attach to

the proceeds of the Sale ultimately attributable to the property against which such liens, claims,

encumbrances, and interests applied or other specifically dedicated funds, in the same order of

priority and with the same validity, force, and effect that such liens, claims, encumbrances, and

interests applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their

estates, as applicable, or as otherwise provided herein.

11.     Notwithstanding anything to the contrary in this Order, the Asset Purchase

Agreement, or any related agreements, documents, or other instruments, or otherwise all cash

proceeds of the Sale, up to the amount of the Secured Claims (as defined in the Bidding

Procedures) shall be paid at the time of Closing to the Secured Creditors until such time as all

Secured Claims have been fully repaid and satisfied in full, subject to the terms of the Hawk

Settlement and the Carve-Out (as defined in the Bidding Procedures).

**12.     Except as otherwise provided in the Asset Purchase Agreement (including with**

**respect to the Assumed Liabilities), all persons and entities (and their respective successors**

and assigns), including, but not limited to, all debt holders, equity holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, and the ownership, sale, or operation of the Assets prior to Closing or the transfer of the Assets to the Buyer (or its designee) (collectively, the "Enjoined Parties," and such claims, the "Released Claims"), are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Buyer Party, their successors and assigns, their respective property, and the Assets (collectively, and together with the Debtors and Trustee, the "Protected Parties"). All persons and entities are forever enjoined and prohibited from taking any action to (or that could) adversely affect or interfere with the ability of the Debtors or the Trustee to transfer the Assets to the Buyer (or its designee) in accordance with the terms of the Asset Purchase Agreement and this Sale Order. For the avoidance of doubt, Rembrandt 3D Holding Ltd. is not an Enjoined Party with respect to claims it purports to have against the Buyer related to Rembrandt Intellectual Property alleged to be part of the Transferred Assets.

13.      Following the Closing, no person or entity, including the holder of a lien, claim, right, encumbrance or interest, shall take or cause to be taken any action that would adversely affect or interfere with (a) the Buyer's (or its designee's) title to or use and enjoyment of the Assets based on or related to any such claim or interest, or based on any action the Debtors (or the Trustee) may take in their respective Chapter 11 case, or (b) the Trustee to take any and all other actions necessary or appropriate to execute, deliver, perform under, consummate, implement, and effectuate the Asset Purchase Agreement and this Order.

14.    **All persons and entities having liens, claims, rights, encumbrances, or interests of any kind or nature whatsoever against the Assets shall be forever barred, estopped, and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such liens, claims, rights, encumbrances, or interests against the Buyer (or its designee), any Buyer Party or any of their respective assets (including, without limitation, the Assets), property, affiliates, successors, or assigns.**

15.    If any person or entity that has filed financing statements, mortgages, mechanic's claims, *lis pendens*, or other documents or agreements evidencing claims against the Debtors or in the Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all liens, claims, encumbrances, and interests that the person or entity has with respect to the Debtors or the Assets or otherwise, then only with regard to the Assets that are purchased by the Buyer (or its designee) pursuant to the Asset Purchase Agreement and this Sale Order, (a) the Trustee and/or Buyer is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets, (b) the Buyer (or its designee) is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, interests, and encumbrances against the Buyer and the Assets, and (c) upon consummation of the Sale, the Buyer (or its designee) may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all liens, claims, encumbrances and interests that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the

21

Assets. This Sale Order is deemed to be in a recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Assets free and clear of liens, claims, encumbrances and interests shall be self-executing and neither the Trustee nor the Buyer (or its designee) shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

### No Successor or Transferee Liability

16.     No Buyer Party shall be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale contemplated by the Asset Purchase Agreement, or the transfer, operation, or use of the Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Buyer (or its designee), with respect to any Assumed Liabilities), (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("**ERISA**"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation.

17.     Other than as expressly set forth in the Asset Purchase Agreement (including with respect to the Assumed Liabilities), no Buyer Party shall have any responsibility for (a) any liability or other obligation of the Debtors or related to the Assets or (b) any claims against the

22

Debtors or any of their predecessors or affiliates. Except as expressly provided in the Asset Purchase Agreement (including with respect to the Assumed Liabilities) with respect to the Buyer, no Buyer Party shall have any liability whatsoever with respect to the Debtors operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "**Successor Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation or other employee benefits which is or has been sponsored, maintained or contributed to by the Debtors or with respect to which the Debtors have any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which the Debtors have at any time contributed, or had any obligation to contribute. Except to the extent expressly included in the Assumed Liabilities with respect to the Buyer or as otherwise expressly set forth in the Asset Purchase Agreement, no Buyer Party shall have any liability or obligation under any applicable law, including, without limitation, (a) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor

23

Relations Act, 29 U.S.C. § 151 et seq. (the "**NLRA**"), or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Buyer's purchase of the Assets, assumption of the Assumed Liabilities, or hiring of certain employees of the Debtors pursuant to the terms of the Asset Purchase Agreement. Without limiting the foregoing, no Buyer Party shall have any liability or obligation with respect to any environmental liabilities of the Debtors or any environmental liabilities associated with the Assets except to the extent they are Assumed Liabilities set forth in the Asset Purchase Agreement.

18.    Immediately prior to the Closing, the Buyer was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or controlling members existed between the Buyer and the Debtors.

19.    Effective upon the Closing, to the greatest extent under applicable law, other than with respect to the Assumed Liabilities, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Buyer Party or their respective assets (including, without limitation, the Assets), property, affiliates, successors, or assigns, with respect to any (a) claim in these Chapter 11 cases or in connection with or related to the Sale or the Debtors or (b) Successor Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the

agreements or actions contemplated or taken in respect hereof; (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Assets or conduct any of the businesses operated with respect to such assets, or (vii) attempting or encouraging any other person to do any of the foregoing, or taking any action in furtherance thereof. For the avoidance of doubt, nothing in this paragraph shall affect the post-Closing rights and remedies of counterparties to Assigned Contracts.

### **Good Faith of Buyer**

20.    The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections thereof.  The Sale contemplated by the Asset Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code. The Buyer is a good faith purchaser of the Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of the Assigned Contracts) to the Buyer.

21.    Neither the Trustee, the Debtors, nor any Buyer Party has engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code or otherwise.  The consideration provided by the Buyer for the Assets represents the highest or otherwise best bid received for the Assets and, therefore, is fair and reasonable and is not less than the value of such assets, and the transaction may not be avoided under section 363(n) of the Bankruptcy Code.

### **Supplemental Assumption and Assignment of Assigned Contracts**

22.     If the Trustee serves a Supplemental Assumption Notice upon any non-Debtor counterparty to any executory contract or unexpired lease indicating the Debtors' intent to assume and assign such executory contract or unexpired lease, pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Payments, the provision of adequate assurance by the Buyer (or its designee), as applicable, that it will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Buyer under the Assigned Contracts, the Assigned Contracts to be assumed and assigned under the Asset Purchase Agreement shall be assigned and transferred to and remain in full force and effect for the benefit of, the Buyer (or its designee) notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer. Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract to the Buyer (or its designee) or allow the counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract to the Buyer (or its designee), constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer (or its designee) of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer (or its designee) shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assigned Contracts, and such Assigned Contracts shall remain in full force and effect for the benefit of the Buyer (or its designee). Each counterparty to the Assigned Contracts shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or any Buyer Party or their respective property any assignment fee, acceleration,

26

default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including, without limitation, any breach related to or arising out of change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts and (b) asserting against any Buyer Party (or its respective property, including, without limitation, the Assets) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

23.     Upon the Closing and the payment of the relevant Cure Payments, if any, the provision of adequate assurance by the Debtors or the Buyer (or its designee), as applicable, that it will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Buyer (or its designee) under the Assigned Contracts, the Buyer (or its designee) shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts. The failure of the Debtors or the Buyer (or its designee) to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of the right of the Debtors or the Buyer (or its designee), as the case may be, to enforce every term and condition of such Assigned Contract. Any party that may have had the right to consent to the assignment of any Assigned Contract is deemed to have consented for the purposes of section 365(e)(2)(A) of the Bankruptcy Code.

24.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing after the Sale Objection Deadline and prior to the Closing (without giving effect

to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing, or as soon thereafter as reasonably practicable.

25.     The assignments of each of the Assigned Contracts are made in good faith under sections 363(b) and 363(m) of the Bankruptcy Code.

26.     Nothing in this Order, the Sale Motion, or in any notice or any other document is or shall be deemed an admission by the Trustee, the Debtors or the Buyer (or its designee) that any Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

27.     The failure of the Trustee, the Debtors or the Buyer (or its designee) to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions of their respective rights to enforce every term and condition of the Assigned Contracts.

### Other Miscellaneous Provisions

28.     Buyer (or its designee) shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its rights or remedies under the Asset Purchase Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, *provided*, *however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

29.     The terms and provisions of the Asset Purchase Agreement, the other Transaction Documents, and this Sale Order, shall be binding in all respects upon the Debtors, their respective estates, all creditors of (whether known or unknown) and holders of equity or member interests in the Debtors, any holders of claims against or on all or any portion of the Assets, all counterparties

to the Assigned Contracts, and the Buyer (or its designee), and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' Chapter 11 cases or upon conversion to Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The Asset Purchase Agreement shall not be subject to rejection or avoidance by the Trustee or Debtors, their respective estates, their creditors, members, or any trustee(s), examiner(s), or receiver(s) that may currently exist or are hereinafter appointed.

30.    Buyer (or any Designated Buyer) shall indemnify and hold harmless the Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors and/or employees for any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Order including the defense thereof and the indemnity provided for herein shall be broadly construed to include but shall not be limited to the reimbursement of all costs, professional fees and expenses including legal fees, when incurred by the Trustee, and all expert fees, court costs, and expenses and, in the event that the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees are sued by any third party as a consequence of (i) the Closing, (ii) the transfer of the Transferred Assets, or (iii) the utilization of the Transferred Assets, including but not limited to, the Rembrandt Intellectual Property, Buyer (or any Designated Buyer) will immediately enter a defense on behalf of the Sellers, the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees and Buyers (or any Designated Buyer) may join any lawsuit with any other proceeding involving the

same or affiliated plaintiffs. Notwithstanding any other provision contained herein, paragraph 32 shall survive Closing. Buyer (or any Designated Buyer) shall have the right to assume control of or direct the defense against any claim, cause of action, or lawsuit covered by paragraph 32 and to select counsel to represent Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees (the "**<u>Indemnified Parties</u>**") with respect to any claim, cause of action, or lawsuit covered by this paragraph 32 and shall use its reasonable efforts in any such defense and the Indemnified Parties shall have the right to approve or reject any counsel proposed by Buyer (or any Designated Buyer), which approval shall not be unreasonably withheld and Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees shall use reasonable efforts to cooperate with Buyer (or any Designated Buyer) and its chosen counsel in the defense of any such claim, cause of action, or lawsuit.

31.     For the avoidance of doubt, and notwithstanding any other provision in this Sale Order, all terms of the Hawk Settlement shall remain in full force and effect through and after the entry of this Sale Order and the occurrence of the Closing, including, but not limited to, the Releases included in Section 7 of the Hawk Settlement to the fullest extent available under applicable law and the obligations in Section 8 of the Hawk Settlement to dismiss the Pending Litigation Matters (as defined in the Hawk Settlement). Nothing herein changes or modifies the Releases included in the Hawk Settlement which are approved in their entirety and shall become effective upon the occurrence of the Closing.

32.     The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these Chapter 11 Cases; (b) converting either or both of these Chapter 11 Cases to a case under

chapter 7 of the Bankruptcy Code; (c) dismissing these Chapter 11 Cases; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases. The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in these Chapter 11 Cases, or following dismissal of these Chapter 11 Cases.

33.    Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept (i) this Order in lieu of any document necessary to consummate the transactions contemplated by the Asset Purchase Agreement and this Order and (ii) any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and this Order.

34.    The Asset Purchase Agreement (and any related agreements, documents, or other instruments) may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, *provided that* any such modification, amendment, or supplement does not, based on the Trustee's business judgment, constitute a material change to the relief sought in the Motion and approved by this Order, that would have a material adverse effect on the Debtors' estates or their creditors. The Trustee shall provide the Secured Creditors with notice of any such modification, amendment, or supplement of the Asset Purchase Agreement, and any such modification shall remain subject to the terms set forth in the Hawk Settlement. For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

35.    The Asset Purchase Agreement and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

36.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

37.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Trustee and the Buyer are authorized to close the Sale immediately upon entry of this Sale Order.

38.     To the extent there is any conflict between the terms of this Sale Order and the Asset Purchase Agreement, the terms of this Sale Order shall control. Nothing contained in any chapter 11 plan hereinafter confirmed in the Chapter 11 Cases or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or any other Transaction Document or the terms of this Sale Order.

39.     The Court shall retain exclusive jurisdiction with respect to the terms and provisions of this Sale Order and the Asset Purchase Agreement (including any amendments thereto), including to : (a) compel delivery of the Assets to the Buyer in accordance with the terms of the Asset Purchase Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Asset Purchase Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

40.     Nothing contained in any plan confirmed in the Bankruptcy Cases or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

32

BY THE COURT:

Dated:  December 9, 2024

_____

Honorable Ashely M. Chan
Chief United States Bankruptcy Judge

# Exhibit 1

**Asset Purchase Agreement**

4930-9184-7171 v1

M

by and among

M

and

M

as Sellers,

and

as Buyer

Dated as of November [   ], 2024

Page

ARTICLE I DEFINITIONS ...............................................................................................3

    Section 1.1    Certain Defined Terms..........................................................................3
    Section 1.2    Other Definitions ...............................................................................11

ARTICLE II PURCHASE AND SALE .............................................................................12

    Section 2.1    Purchase and Sale of Transferred Assets ...........................................12
    Section 2.2    Excluded Assets .................................................................................15
    Section 2.3    Assumed Liabilities ...........................................................................16
    Section 2.4    Excluded Liabilities ...........................................................................17
    Section 2.5    Seller Maintained Transferred Assets ................................................18
    Section 2.6    Consideration ....................................................................................19
    Section 2.7    Closing ..............................................................................................19
    Section 2.8    Tax Allocation ...................................................................................20
    Section 2.9    Withholding ......................................................................................20

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ......................21

    Section 3.1    Organization ......................................................................................21
    Section 3.2    Authority ...........................................................................................21
    Section 3.3    No Conflict; Filings and Consents ....................................................21
    Section 3.4    Transferred Assets .............................................................................23
    Section 3.5    Brokers ..............................................................................................23
    Section 3.6    Exclusivity of Representations and Warranties .................................23

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER...............................24

    Section 4.1    Organization ......................................................................................24
    Section 4.2    Authority ...........................................................................................24
    Section 4.3    No Conflict; Filings and Consents ....................................................24
    Section 4.4    No Third Party Intellectual Property Rights .....................................25
    Section 4.5    Brokers ..............................................................................................26
    Section 4.5    Exclusivity of Representations and Warranties .................................26

ARTICLE V COVENANTS...............................................................................................26

    Section 5.1    Conduct of Business Prior to the Closing ..........................................26
    Section 5.2    Access to Information ........................................................................27
    Section 5.3    Notification of Certain Matters ..........................................................28
    Section 5.4    Consents and Filings; Further Assurances .........................................28
    Section 5.5    Refunds and Remittances...................................................................29
    Section 5.6    No Successor Liability .......................................................................29
    Section 5.7    Sale Free and Clear ...........................................................................29

Section 5.8 Bankruptcy Court Milestones; Alternative Transactions..........................30
Section 5.9 Intellectual Property Registrations...............................................................31
Section 5.10 Name Change.................................................................................................31

ARTICLE VI TAX MATTERS..............................................................................................32

Section 6.1 Transfer Taxes ..............................................................................................32
Section 6.2 Tax Cooperation............................................................................................32
Section 6.3 Straddle Periods ............................................................................................32
Section 6.4 Tax Treatment...............................................................................................34
Section 6.5 Tax Elections.................................................................................................34
Section 6.6 Bulk Sales .....................................................................................................34

ARTICLE VII CONDITIONS TO THE CLOSING ..............................................................35

Section 7.1 Mutual Conditions ........................................................................................35
Section 7.2 Conditions to Obligations of Sellers ............................................................35
Section 7.3 Conditions to Obligations of Buyer ..............................................................35

ARTICLE VIII TERMINATION ...........................................................................................36

Section 8.1 Termination Rights .......................................................................................36
Section 8.2 Effect and Manner of Termination ...............................................................37

ARTICLE IX GENERAL PROVISIONS ..............................................................................38

Section 9.1 Nonsurvival of Representations, Warranties and Covenants....................38
Section 9.2 Indemnification ...........................................................................................38
Section 9.2 Fees and Expenses.......................................................................................38
Section 9.3 Transition of Permits...................................................................................38
Section 9.4 Amendment and Modification .....................................................................38
Section 9.5 Waiver..........................................................................................................38
Section 9.6 Notices .........................................................................................................39
Section 9.7 Interpretation................................................................................................40
Section 9.8 Entire Agreement .........................................................................................41
Section 9.9 Parties in Interest..........................................................................................41
Section 9.10 Governing Law .............................................................................................41
Section 9.11 Submission to Jurisdiction; Waiver of Jury Trial .......................................42
Section 9.12 No Recourse .................................................................................................42
Section 9.13 Assignment; Successors...............................................................................42
Section 9.14 Enforcement.................................................................................................43
Section 9.15 Severability..................................................................................................43
Section 9.16 Counterparts.................................................................................................43
Section 9.17 Publicity.......................................................................................................43

Exhibit A      Form of Sale Order

ii

Exhibit B      Form of Bid Procedures Order
Exhibit C      Form of Assignment Agreement
Exhibit D      Form of IP Assignment Agreement
Exhibit E      Form of Domain Transfer Agreement

d

Schedule A    Disclosure Schedules

M

This M , dated as of November [●], 2024
(this "<u>Agreement</u>"), is by and among Stream TV Networks, Inc., a Delaware corporation
("<u>Stream</u>"), Technovative Media Inc., a Delaware corporation ("<u>Technovative</u>" and, together
with Stream, the "<u>Debtors</u>" or "<u>Sellers</u>"), by and through William A. Homony, solely in his
capacity as Chapter 11 trustee of the bankruptcy estates of Stream and Technovative (the
"<u>Trustee</u>") and not individually, and SeeCubic, Inc., a Delaware corporation, or its designee
("<u>SeeCubic</u>" or "<u>Buyer</u>" and, together with Sellers, the "<u>Parties</u>").

WHEREAS, on March 15, 2023 (the "<u>Petition Date</u>"), the Debtors filed voluntary
petitions for relief under Chapter 11 of the Bankruptcy Code commencing cases that are being
jointly administered under Case No. 23-10763 (the "<u>Bankruptcy Cases</u>") in the United States
Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

WHEREAS, on March 20, 2023, Hawk Investment Holdings, Ltd. ("<u>Hawk</u>") filed
a motion for relief from the automatic stay (the "<u>Hawk Stay Relief Motion</u>") to proceed with an
action against the Debtors in the Delaware Court of Chancery (the "<u>Delaware Chancery Court</u>")
under § 225 of Title 8 of the Delaware Code (the "<u>225 Action</u>");

WHEREAS, on April 6, 2023, Hawk, as Collateral Agent for the secured
noteholders of SeeCubic, filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code,
seeking dismissal or conversion of the Bankruptcy Cases, or, alternatively, the appointment of a
Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "<u>1112/1104
Motion</u>");

WHEREAS, on May 19, 2023, Hawk filed proof of claim No. 6-1 on the Official
Proof of Claim Docket (the "<u>Hawk Claim</u>") asserting a claim secured by substantially all of the
Debtor's property (the "<u>Collateral</u>") and asserting the Debtors were indebted to SeeCubic in at
least the amount of $178,432,069.68, subject to additional accruing interest, fees, and expenses;

WHEREAS, in the 1112/1104 Motion, Hawk argued that cause existed to appoint
a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty,
incompetence, and gross mismanagement of their businesses;

WHEREAS, on January 5, 2024 (the "<u>Appointment Date</u>"), the Bankruptcy Court
entered an order, which, among other things, (i) granted the 1112/1104 Motion solely with
respect to the appointment of a Chapter 11 trustee, and (ii) granted the Hawk Stay Relief Motion
to allow the Section 225 Action to proceed [<u>Docket No. 549</u>] (the "<u>Trustee Order</u>");

WHEREAS, the Trustee Order instructed the United States Trustee's Office to
immediately begin the process of appointing a Chapter 11 trustee;

WHEREAS, on January 9, 2024, the Office of the United States Trustee filed a
notice of appointment of William A. Homony to serve as the Chapter 11 trustee as well as an
application for the entry of an Order approving the appointment of the Trustee;

WHEREAS the Trustee has, since the Appointment Date, been performing the duties of a trustee for the Debtors in accordance with Section 1106 and the applicable provisions of Section 704 of the Bankruptcy Code;

WHEREAS, on January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee and the Trustee accepted such appointment;

WHEREAS, pursuant to Sections 105, 1106, and 1108 of the Bankruptcy Code and Bankruptcy Rule 9019, the Trustee may operate the Debtors' businesses and file a motion seeking approval of a compromise or settlement;

WHEREAS, on May 6, 2024, the Trustee filed a motion under Bankruptcy Rule 9019 and section 105 of the Bankruptcy Code (the "Settlement Motion") seeking entry of an order approving that certain Sharing and Carve-Out Agreement, dated May 6, 2024, by and between Trustee, Buyer, Hawk, in its capacity as collateral agent for the secured noteholders of Buyer and certain other parties thereto, Case 23-10763, Doc 630-1 (the "Settlement Agreement"), pursuant to which, Trustee shall, among other things, use his best efforts to consummate a "as-is-where-is" sale of the Collateral by auction, if needed under the Bid Procedures, under Section 363 of the Bankruptcy Code and the Trustee shall endeavor to close by August 2, 2024;

WHEREAS, on June 5, 2024, the Bankruptcy Court entered an order granting the Settlement Motion, approving the Settlement Agreement, and authorizing the Trustee's entry into the Settlement Agreement and certain Carve-Out Advance payments have been made thereunder;

WHEREAS, the Settlement Agreement provides, among other things, that, the Buyer shall act as the Stalking Horse Bidder (as defined in the Settlement Agreement), and the Hawk Claim shall be deemed an allowed, secured claim, secured by the Collateral in the amount of $180,000,000, subject to increase as provided herein (the "Allowed Secured Claim");

WHEREAS, the Settlement Agreement further provides, among other things, that, the stalking horse bid ("Stalking Horse Bid") shall consist of a credit bid by SeeCubic of the Allowed Secured Claim in the amount of $150,000,000 (the "Credit Bid Amount");

WHEREAS, Trustee believes, after consultation with his professionals and consideration of available alternatives, that, in light of the current circumstances, that entering into an agreement for the Stalking Horse Bid for the sale of the Debtors' right, title, and interest, if any, in substantially all of the Debtors' assets, on an "as is, where is" basis as provided herein, is necessary to preserve and maximize value and is in the best interest of the Debtors, and their respective estates;

WHEREAS, Sellers desire to sell to Buyer (or any Designated Buyers) all of the Transferred Assets, and Buyer (or any such Designated Buyers) desires to purchase from Sellers the Transferred Assets, other than the Excluded Assets, free and clear of any and all Encumbrances, on the terms and subject to the conditions hereof, on an "as is, where is" basis, without any warranty of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6;

2

355

WHEREAS, the execution and delivery hereof and Sellers' ability to consummate the transactions contemplated hereby are subject to, among other things, the Bankruptcy Court's entry of the Sale Order under, among others, Sections 105, 363, and 365 of the Bankruptcy Code, as further set forth herein;

WHEREAS, the Parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements hereunder, and intending to be legally bound hereby, the Parties agree as follows:

Section 1.1    Certain Defined Terms. As used herein, each of the following underlined terms has the meaning specified in this Section 1.1:

"Action" means any action, arbitration, audit, charge, claim, complaint, demand, dispute, investigation, notice of violation, legal proceeding, litigation or similar proceeding (whether civil, criminal, administrative, arbitral or investigative), petition, subpoena or suit, by or before any Governmental Authority relating to the Transferred Assets.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Affiliate Claim" means any General Claim held, owned, or assertible by or on behalf of any the Debtors or either or both of the Debtor's estates against Buyer or any other Affiliate of any Seller.

"Alternative Sale Action" means (i) accepting or entering into any contract, agreement, arrangement or understanding (whether or not legally binding) with any Person relating to, or that would be reasonably expected to lead to, an Alternative Transaction or (ii) committing to (conditionally or otherwise) enter into or consummate any Alternative Transaction.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, consolidation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of a material portion of Sellers' assets, in a transaction or series of transactions with one (1) or more Persons other than Buyer (or any Designated Buyer), in each case, except as set forth in the Bid Procedures.

3

"Ancillary Agreements" means, collectively, the Contracts to be executed in connection with the transactions contemplated hereby, including the Assignment Agreement, the IP Assignment Agreement, the Domain Transfer Agreement, and the Settlement Agreement.

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated hereby.

"Auction" has the meaning set forth in the Bid Procedures.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 et seq., as in effect or as may be amended from time to time.

"Bid Procedures" means the bidding procedures set forth and approved in the Bid Procedures Order, as entered by the Bankruptcy Court.

"Bid Procedures Hearing" means the hearing conducted by the Bankruptcy Court to approve the Bid Procedures Order.

"Bid Procedures Order" means an Order of the Bankruptcy Court approving the Bid Procedures, substantially in the form of Exhibit B, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to Buyer.

"Books and Records" means all documents of, or otherwise in the possession, custody or control of, or used by, any Seller and turned over to the Trustee, including all files, instruments, papers, books, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, lists of past, present and/or prospective customers, supplier lists, regulatory filings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, reports (including environmental reports and assessments), plans, mailing lists, price lists, marketing information and procedures, advertising and promotional materials, books and records and papers relating to Taxes (including Tax Returns), equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), in each case, whether or not in electronic form.

"Business" means any business conducted by the Debtors or any of their Subsidiaries.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by applicable Law to be closed in the city of New York, New York.

4

357

"Buyer Material Adverse Effect" means with respect to the Transferred Assets, any event, change, circumstance, development, effect, occurrence that would prevent, or materially impede Buyer's consummation of the transactions contemplated hereby or by the Ancillary Agreements.

"Claim" shall have the meaning ascribed to such term under Section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any written or oral contract, agreement, insurance policy, lease, license, sublicense, sales order, purchase order, instrument, indenture, note, bond or other evidence of indebtedness, or other commitment, that is binding on any Person or any part of its assets or properties under applicable Law.

"Controlled Group Liability" means any and all Liabilities of Sellers and their ERISA Affiliates, if any (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 or 4971 of the Code, (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code, (v) under any a "multiemployer plan," as defined in Section 3(37) or 40001(a)(3) of ERISA, or (vi) under corresponding or similar provisions of non-U.S. Laws.

"Designated Buyer" means any Affiliate of Buyer designated by Buyer to Sellers at least seven (7) Business Days prior to the Closing Date.

"Employee Benefit Plans" if any such plan or plans exist, means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which Stream is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement, plan, practice, policy, contract, program and arrangement, in each case, (1) which is sponsored or maintained by Stream or any of its ERISA Affiliates, if any in respect of any current or former employees, directors, independent contractors, consultants or leased employees of Stream or (2) with respect to which Stream has any actual or contingent Liability.

"Encumbrance" means any lien, pledge, Claim, interest, encumbrance, right, Liability, security interest, mortgage, deed of trust, hypothecation, preference, debt, suit, license, option, right of first refusal, right of way, encroachment, occupancy right, preemptive right, community property interest, easement, and judgment, order, and decree of any court, tax (including foreign, state, and local tax), covenant, and restriction of any nature, against any Person or its assets, including, without limitation, any debt arising under or out of, in connection with, or in any way relating to, any act or omissions, obligation, demand, guarantee, de facto

5

merger claim, cause of action (whether in law or in equity, under any law), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases or the facts and legal theories giving rise thereto or asserted therein, whether known or unknown, contingent, or matured, perfected or unperfected, liquidated, or unliquidated, statutory or non-statutory, legal, or equitable, or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Transferred Assets, the operation of any of the Debtors' businesses before the effective time of the Closing.

"Environmental Law" means any Law related to pollution, the protection of, restoration or remediation of or prevention of harm to the environment or natural resources, or the protection of human health and safety, ecological planning or zoning including Laws related to: (i) the exposure to Hazardous Materials, (ii) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials or (iii) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means all employers, trades or businesses (whether or not incorporated) that would be treated together with Sellers as a single employer for purposes of Section 4001 of ERISA or Section 414 of the Code.

"Excluded Assets" means those Assets reasonably identified in Section 2.2 hereof and listed in Section 2.2(k) of the Disclosure Schedules.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (ii) if a timely appeal shall have been filed or sought, either (1) no stay of the Order shall be in effect, (2) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied or (3) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by Buyer.

6

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any government, court (including the Bankruptcy Court), regulatory or administrative agency, commission or authority or other governmental instrumentality, whether federal, state or local, domestic, non-U.S. or multinational, or any contractor acting on behalf of such agency, commission, authority or governmental instrumentality.

"Hazardous Materials" means any material, substance, chemical or waste (or combination thereof) that (i) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Law related to pollution, waste, or the environment or (ii) can form the basis of any Liability under any Law related to pollution, waste or the environment.

"Intellectual Property" means all intellectual property and intellectual property rights and rights in confidential information of every kind and description throughout the world, including all U.S. and non-U.S (i) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"), (ii) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions and extensions thereof ("Patents"), (iii) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"), (iv) rights in computer programs (whether in source code, object code or other form) and software systems, algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing ("Software"), (v) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies, (vi) rights of publicity, privacy rights, and rights to personal information, (vii) all rights in the foregoing and in other similar intangible assets, (viii) all applications and registrations for any of the foregoing and (ix) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation related to any of the foregoing.

"IRS" means the Internal Revenue Service of the United States.

"Law" means any laws (statutory, common or otherwise), constitutions, treaties, conventions, ordinances, codes, rules, regulations, Orders or other similar requirements enacted, adopted, promulgated or applied by a Governmental Authority.

"Lease" means with respect to the Transferred Assets, a lease, sublease, sub-sublease, license, or purchase option with respect to any Asset to which a Seller is a party as lessee, sublessee, sub-sublessee, option holder or other similar capacity.

"Leased Real Property" means each parcel of real property subject to a Lease.

"Liability" means any assessment, Claim of any kind or nature, commitment, damage, deficiency, demand, fine, interest, liability (including any indebtedness), obligation,

360

penalty, loss, charges, damages, Orders, cost or expenses, in each case, whether accrued, absolute, contingent or otherwise, known or unknown, or due or to become due, and whether or not required to be recorded or reflected on a balance sheet under GAAP.

"Material Adverse Effect" means with respect to the Transferred Assets, any event, change, or occurrence or state of facts that, individually or in the aggregate, (i) has had, or would reasonably be expected to have, a material adverse effect on the Transferred Assets, each taken as a whole, or (ii) prevents, or materially impedes Sellers' consummation of the transactions contemplated hereby or by the Ancillary Agreements; provided that, in the case of the foregoing clause (i), any event, change, circumstance, development, effect, occurrence or state of facts arising from any of the following shall not be a Material Adverse Effect and shall not be considered in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur:

     (1)    general changes or developments in the industry in which the Business operates;

     (2)    changes in general economic, financial market or geopolitical conditions;

     (3)    natural disasters, acts of terrorism, sabotages, military actions or wars;

     (4)    changes in any applicable Laws or GAAP or interpretations thereof;

     (5)    the announcement, pendency or consummation of the transactions contemplated hereby;

     (6)    the filing of the Bankruptcy Cases and any actions approved by the Bankruptcy Court;

     (7)    any action taken by Sellers which is required hereby (except for compliance with Section 5.1); or

     (8)    changes with respect to the identification of the Transferred Assets.

"Order" means any judgment, decree, injunction, rule, order, decision, decree, ruling, settlement, mediation agreement, arbitration decision, corporate integrity agreement or assessment of any arbitrator or Governmental Authority.

"Permit" means any franchise, grant, authorization, business license, permit, easement, variance, exception, consent, certificate, approval, registration, clearance, order or provider number issued or granted by any Governmental Authority or pursuant to any applicable Law.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"Retained Causes of Action" means Actions that are Excluded Assets that arise under the Bankruptcy Code, as provided in Section 2.2(e), or applicable state law, including but not limited to the Chapter 5 Causes of Action and any Action(s) against third parties, including but not limited to, the Debtors' principals (including but not limited to Mathu Rajan), officers, directors, stockholders, agents, employees, or affiliates and any Action(s) against any entity owned or controlled by the Debtors' principals, officers, directors, stockholders, agents, employees, or affiliates. For the avoidance of doubt, Retained Causes of Action shall not include any Actions, Claims or Causes of Actions that have been released or waived under the Settlement Agreement.

"Required Approvals" means any Consent, whether from any Governmental Authority or Contract counterparty, that Buyer determines (and communicates in writing to Sellers) is required in connection with the transactions contemplated hereby following the Closing.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the Sale Order and the transactions contemplated hereby.

"Sale Motion" means a motion filed with the Bankruptcy Court seeking, among other things, approval of the Bidding Procedures Order and the Sale Order, which shall be in form and substance acceptable to Buyer in its sole discretion.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit A, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to Buyer in its sole and absolute discretion.

"Seller Benefit Plan" means each Employee Benefit Plan that is solely sponsored or maintained by Stream.

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing related to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

9

"Tax" or "Taxes" means (i) any and all U.S. federal, state and local, non-U.S. and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, withholding, payroll, employment, pension plan, social security, fringe, fringe benefits, health, disability, excise, estimated, severance, stamp, occupation, premium, property, capital stock, unclaimed property, escheat, inventory, windfall profits, wealth, net wealth, net worth, export and import fees and charges, registration fees, tonnage, vessel, deposits, alternative or add-on minimum or estimated taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls or charges imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed with respect thereto, or related thereto, wherever and whenever imposed, (ii) any and all liability for the payment of any items described in clause (i) above arising from, through, with respect to or attributable to, a place of business, permanent establishment or a branch, or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary or other similar group (or being included) in any Tax Return related to such group, (iii) any and all liability for the payment of any amounts as a result of any successor or transferee liability, in respect of any items described in clause (i) or (ii) above and (iv) any and all liability for the payment of any items described in clause (i) or (ii) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"Third Party" means any Person who is not a Party or an Affiliate thereof.

Section 1.2    Other Definitions. As used herein, each capitalized term listed below has the meaning identified in the Section set forth opposite such term below.

1112/1104 Motion ................................................................. Recitals
225 Action ............................................................................ Recitals
245A Election ..................................................................... Section 6.5(a)(ii)
245A Election Agreement .................................................. Section 6.5(a)(ii)
245A Subsidiary .................................................................. Section 6.5(a)(i)
Acquired Subsidiaries ......................................................... Section 2.1(c)
Agreement ........................................................................... Preamble
Allocation ............................................................................ Section 2.8
Allocation Statement .......................................................... Section 2.8
Allowed Secured Claim ...................................................... Recitals
Assignment Agreement ....................................................... Section 2.7(b)(i)
Bankruptcy and Equitable Exceptions ................................. Section 3.2
Bankruptcy Cases ............................................................... Recitals
Bankruptcy Court ................................................................ Recitals
Buyer .................................................................................... Preamble
Carve-Out ............................................................................ Recitals
Closing ................................................................................. Section 2.7(a)
Closing Date ........................................................................ Section 2.7(a)
Collateral ............................................................................. Recitals
Consent ................................................................................ Section 3.3(b)

10

Credit Bid Amount.................................................................Recitals
Debtors....................................................................................Preamble
Delaware Chancery Court....................................................Recitals
Disclosure Schedules ...........................................................Article III
Domain Transfer Agreement ..............................................Section 2.7(b)(ii)
End Date.................................................................................Section 8.1(c)(i)
Excluded Assets.....................................................................Section 2.2
Excluded Liabilities ..............................................................Section 2.4
Filing .......................................................................................Section 3.3(b)
General Claims.......................................................................Section 2.1(b)(i)
Governed Claims ...................................................................Section 9.10
Hawk........................................................................................Recitals
Hawk Claim ...........................................................................Recitals
Hawk Stay Relief Motion ....................................................Recitals
Inventory.................................................................................Section 2.1(a)(xiv)
IP Assignment Agreement ...................................................Section 2.7(b)(ii)
Legal Restraint ......................................................................Section 7.1(a)
Milestones...............................................................................Section 5.8(b)
Non-Periodic Taxes ..............................................................Section 6.3
Parties......................................................................................Preamble
Periodic Taxes .......................................................................Section 6.3
Petition Date...........................................................................Recitals
Purchase Price .......................................................................Section 2.6
Rembrandt...............................................................................Section 2.2(k)
SeeCubic..................................................................................Preamble
Seller Maintained Transferred Asset ................................Section 2.5(a)
Sellers......................................................................................Preamble
Settlement Agreement ..........................................................Recitals
Settlement Motion ................................................................Recitals
Specified Consents................................................................Section 3.3(b)(ii)
Specified Filings ...................................................................Section 3.3(b)(ii)
Straddle Period ......................................................................Section 6.3
Stream .....................................................................................Preamble
Technovative...........................................................................Preamble
Transfer Taxes .......................................................................Section 6.1
Transferred Assets ................................................................Section 2.1
Transferred Interests ............................................................Section 2.1(c)
Trustee.....................................................................................Preamble
Trustee Order .........................................................................Recitals
U.S. Tax Resident .................................................................Section 6.5(a)(i)

Section 2.1    Purchase and Sale of Transferred Assets. On the terms and subject to the conditions hereof and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, each Seller, as applicable, shall sell, assign, transfer, convey and deliver to Buyer (or any Designated Buyers), and Buyer (or any such Designated Buyers) shall purchase and accept, all of such Sellers' right, title and interest in, to or under the Transferred Assets, other than the Excluded Assets, free and clear of any Encumbrances, on an "as is, where is" basis, without any warranties of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6. Buyer acknowledges and accepts that neither the Sellers nor the Trustee have the ability to deliver to Buyer, the bonding equipment presently located in a warehouse in China or other Transferred Assets not in the Sellers' or the Trustee's possession or control. As used herein, "Transferred Assets" means:

(a)    all rights, properties and assets of Stream of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used, held for use or claimed by Stream, as the same shall exist on the Closing Date, including the following (in each case, to the extent owned, leased, licensed, used or held for use by Stream):

(i)    all accounts receivables (whether current or noncurrent), notes receivables or other receivables, including any security, Action (exclusive of Retained Causes of Action), General Claim, remedy or other right related thereto, including all accounts receivables as to which any Subsidiary of Stream is an obligor or is otherwise responsible or liable and which are owed or payable to Stream;

(ii)    all promissory notes, chattel paper, letter-of-credit rights and related instruments;

(iii)    all investment property;

(iv)    all credits, prepaid expenses, security deposits, other deposits, refunds, claims for refunds, prepaid assets or charges, rebates, setoffs and recoupments;

(v)    all Intellectual Property, with the exception of any Intellectual Property included as an Excluded Asset identified in Section 2.2 hereof and listed in Section 2.2(k) of the Disclosure Schedules hereof, including Intellectual Property listed in Section 2.1(a)(vi) of the Disclosure Schedules, and all rights of Stream including all rights to sue for and recover and retain damages for present and past infringement thereof, and in the case of any trademarks, all goodwill appurtenant thereto, and all other intangible property;

(vi)    all tangible assets and personal property, including all machinery, equipment, apparatus, appliances, implements, computers and computer-related hardware, files, documents, network and internet and information technology systems-related equipment, including all servers and computers used to develop and maintain code in various operating environments and all development environments and software currently residing on such

12

computers, wherever located, including the items listed in Section 2.1(a)(i) of the Disclosure Schedules;

(vii)   all rights and interests of Stream under nondisclosure or confidentiality invention and Intellectual Property assignment covenants executed for the benefit of Stream with current or former employees, consultants or contractors of Stream, noncompete or nonsolicitation agreements with employees and agents of Stream or with third parties;

(viii)   all Books and Records of Stream or related to the other Transferred Assets;

(ix)   all insurance benefits, including any right, claim or proceeds, of Stream or related to any other Transferred Asset, including all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any of the Transferred Assets and all rights and claims of Stream to any such insurance proceeds, condemnation awards or other compensation related thereto;

(x)   all general intangibles, goodwill and other intangible assets associated with the Business or the Transferred Assets;

(xi)   all Permits to the extent the transfer thereof to Buyer (or any Designated Buyer) is not prohibited by applicable Law;

(xii)   all inventory, raw materials, work-in-process, finished goods, supplies, samples (including samples held by any sales representatives or agents), components, packaging materials and other inventories ("Inventory");

(xiii)   all telephone, telex and telephonic facsimile numbers, email address, post-office box number and other directory listings used by Stream; and

(xiv)   all rights, assets and properties listed in Section 2.1(a)(xvi) of the Disclosure Schedules; and

(b)   all rights, properties and assets of Stream in the following (in each case, to the extent owned, leased, licensed, used or held for use by Stream):

(i)   all direct, indirect, or derivative Actions (other than the Retained Causes of Action), rights, claims, rebates, refunds, causes of action, hearings, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution, defenses and other similar rights against any Person, including Buyer or any of its Affiliates (whether known and unknown, matured and unmatured, accrued or contingent, regardless of whether any of the foregoing are currently exercisable or arise from or relate to events, changes, circumstances, developments, effects, occurrences or states of facts occurring or existing as of or prior to the Petition Date), including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) (collectively, "General Claims"), which shall include (1) any General Claims for past infringement or misappropriation of Intellectual Property, (2) any General Claims arising under or related to the other Transferred

Assets or the Business and (3) all accounts receivables, notes receivables or other receivables owed to a Seller by Buyer or any of its Affiliates; and

(ii) prior to the Appointment Date, any and all legal privileges owned by Stream, any communications privileged under the attorney–client privilege, the attorney work-product doctrine or any self-auditing privilege or policy of a Governmental Authority, however, to the extent that any pre Appointment Date privileged communications or other documents are required by the Trustee to defend the Trustee or the Sellers' bankruptcy estates, the Trustee shall be permitted to use such privileged communications for that purpose;

(c) all shares of capital stock, equity interests, or other ownership interests (including any securities convertible into, exchangeable or exercisable for any such interests) in any Person directly owned or otherwise held by Technovative, including all of the outstanding equity, membership, partnership or other ownership interests in Technology Holdings Delaware LLC, a Delaware limited liability company, Media Holdings Co, LLC, a Delaware limited liability company and Ultra-D Ventures C.V., a Commanditaire Vennootschap under the laws of Curacao (the "Acquired Subsidiaries" and such interests, the "Transferred Interests");

provided, however, that (x) notwithstanding the foregoing, Transferred Assets shall not include any Excluded Assets and (y) a single right, asset or property may be within more than one (1) of Sections 2.1(a) - 2.1(d) and such fact does not imply that such right, asset or property shall be transferred more than once or that any duplication of such right, asset or property is required.

Section 2.2    Excluded Assets. As used herein, "Excluded Assets" means the following:

(a) All cash and cash equivalents including but not limited to the Carve-Out;

(b) any right, property or asset set forth as an Excluded Asset in a written notice delivered by Buyer to Sellers prior to the Closing Date;

(c) any shares of capital stock, equity interests or other ownership interests in Technovative beneficially owned or otherwise held by Stream;

(d) the $1 million bond posted by or on behalf of the Debtors in the 225 Action;

(e) all avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 510, 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law and any claims against third parties including but not limited to Debtors' directors, officers, owners, members or shareholders, and any causes of action against any entity owned or controlled by the Debtors' directors, officers, owners, members or shareholders relating to conduct prior to the Closing and any resulting proceeds from such claims or causes of action;

(f) copies of any Books and Records that any Seller is required by applicable Law to retain;

14

(g)    except as set forth in Section 2.1(d)(ii) all Tax assets (including Tax refunds, Tax rebates, Tax credits, prepaid Taxes, Tax attributes or other Tax benefits) of Sellers related to the other Excluded Assets or the Excluded Liabilities;

(h)    all Third Party General Claims to the extent related to any Excluded Asset or any Excluded Liability;

(i)    all Contracts (including all Seller Benefit Plans and Leases) of Stream and all assets, trusts and funding arrangements related thereto;

(j)    any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;

(k)    any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction; and

(l)    [the rights, assets and properties listed in Section 2.2(m) of the Disclosure Schedules.]

Section 2.3    Assumed Liabilities. Except as otherwise set forth herein, in accordance with 363(f) of the Bankruptcy Code, at the Closing, notwithstanding any provision in this Agreement, the Ancillary Agreements or any other writing to the contrary, Buyer (or any Designated Buyer) shall not assume any Liability of Sellers (or any predecessor of Sellers, or any prior owner of all or part of the Business or Transferred Assets) of whatever nature, whether absolute, accrued, contingent or otherwise, and whether presently in existence or arising hereafter, whether or not relating to the Transferred Assets. For the avoidance of doubt, Buyer (or any Designated Buyer) shall not assume or agree to pay, perform or discharge the Excluded Liabilities, however, the Buyer (or any Designated Buyer) assumes any liability to the extent that there is any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement.

Section 2.4    Excluded Liabilities. As used herein, "Excluded Liabilities" means all Liabilities of each Seller, whether arising on, prior to or after the Closing Date, including the following:

(a)    All Liabilities for Taxes solely related to or arising from or with respect to (i) the Transferred Assets or the operation of the Business, in each case, that are incurred in, or attributable to, any taxable period, or portion thereof (in accordance with Section 6.3), ending on or prior to the Closing Date, including any such Taxes which are not due or assessed until after the Closing Date but which relate to a pre-Closing Date taxable period, (ii) the transactions

contemplated hereby, including any Transfer Taxes for which any Seller is responsible pursuant to Section 6.1 or (iii) the Excluded Assets or Excluded Liabilities;

(b)     all Liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(c)     unless otherwise assumed under this Agreement, all Liabilities under any Contract or Permit of Sellers, whether accruing prior to, at, or after the Closing Date, in each case;

(d)     except as otherwise set forth herein, all Liabilities under or relating to any grant of rights or license by Rembrandt or Affiliates of Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable;

(e)     all Liabilities arising from, resulting from or related to (i) the employment or service or termination of employment or service of any current or former employees, officers, directors or service providers of Sellers by Sellers or their respective Affiliates, whenever arising, (ii) any Seller Benefit Plans, whenever arising (including pension or retirement Liability of Sellers to their current or former employees) and (iii) any Controlled Group Liability, whenever arising;

(f)     all Liabilities of Sellers arising in the Bankruptcy Cases;

(g)     all indebtedness of Sellers for borrowed money, or guarantees thereof, including Liabilities with respect to notes, bonds, indentures, letters of credit or similar Contracts or instruments of Sellers;

(h)     all Liabilities to distribute to any Seller's equity holders or otherwise apply all or any part of the consideration received hereunder;

(i)     all Liabilities in respect of obligations for indemnification or advancement of expenses, of any current or former officer or director of any Seller;

(j)     all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters, including any such Liability arising from or related to (i) the ownership or operation of the Business or the Transferred Assets on or before the Closing Date, (ii) any action or inaction of Sellers or any other Person related to the Business or Transferred Assets, (iii) any formerly owned, leased or operated properties of Sellers or (iv) any condition first occurring or arising on or before the Closing Date with respect to the Business or the Transferred Assets;

(k)     except as specifically provided in the Settlement Agreement, all Liabilities for (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers, and any

16

official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Cases), (ii) costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated hereby or by the Ancillary Agreements and (iii) except as otherwise set forth in this Agreement, including in Section 2.3, all costs and expenses arising from or related to any third-party claims against Sellers, pending or threatened, including any warranty or product claims;

(l)     any Liabilities hereunder or under the Ancillary Agreements;

(m)    all drafts or checks outstanding at the Closing under which Sellers are obligated; and

(n)     except as otherwise set forth herein, and unless related to or caused by Buyer, all Liabilities arising from or related to any Action, claim, investigation, cause of action or dispute brought, commended, arising or threatened against any Seller or arising from or related to the ownership or operation of the Transferred Assets or the Business prior to the Closing.

Section 2.5     Seller Maintained Transferred Assets.

(a)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, Sellers shall sell, assign, transfer, convey and to the extent possible, deliver to Buyer (or any Designated Buyers) all of the Transferred Assets and Buyer (or any such Designated Buyers) shall assume and accept all of the Transferred Assets from Sellers on and "as is, where is" basis, pursuant to Section 3.6, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of any Encumbrance. Notwithstanding any other provision hereof or of any Ancillary Agreement to the contrary, this Agreement shall not constitute an agreement to sell, assign, transfer, convey or deliver any right, asset or property if such sale, assignment, transfer, conveyance or delivery would, after giving effect to the Sale Order and the Bankruptcy Code, (i) without the Consent of a Third Party, which Consent has not been obtained prior to the Closing, constitute a breach of any Contract to which Seller is a party or to which such right, asset or property is bound or would in any way adversely affect the rights of Buyer or Sellers with respect thereto or (ii) would violate any applicable Law (any such right, asset or property, a "Seller Maintained Transferred Asset").

(b)     If the Closing is consummated and there are any Seller Maintained Transferred Assets, (i) Sellers shall use their commercially reasonable efforts, and Buyer shall use commercially reasonable efforts to cooperate with Sellers, to obtain any applicable Consent or to remove any restriction under applicable Law, as applicable, to the sale, assignment, transfer, conveyance or delivery to Buyer (or any Designated Buyers) of each such Seller Maintained Transferred Asset, and (ii) subject to the approval of the Bankruptcy Court, Sellers and Buyer (or any Designated Buyer) shall enter into a Contract under which (1) Buyer (or any Designated Buyer) would obtain, through a subcontracting, sublicensing or subleasing arrangement or otherwise, the claims, rights and benefits of Sellers under such Seller Maintained Transferred Asset, (2) Sellers would enforce for the benefit of Buyer (or any Designated Buyer), any and all claims, causes of action, rights and benefits of Sellers against any Person with respect

17

to such Seller Maintained Transferred Asset and (3) Sellers shall promptly pay to Buyer (or any Designated Buyer) when received all monies received by Sellers with respect to such Seller Maintained Transferred Asset. If and when such Consent is obtained or such restriction under applicable Law is removed, such Seller Maintained Transferred Asset shall be deemed sold, assigned, transferred, conveyed and delivered to Buyer (or any Designated Buyer) in accordance herewith. The Parties shall treat any Seller Maintained Transferred Asset as having been sold to Buyer (or any Designated Buyer) as of the Closing for all applicable Tax purposes to the extent permitted by applicable Law. Each of Sellers and Buyer agrees to notify the other parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Buyer pursuant to this Section 2.5(b)) is not permitted for any Tax purposes under applicable Law. Where such treatment is not so permitted, and subject to the terms of any relevant arrangement agreed to by Sellers and Buyer pursuant to this Section 2.5(b) (and without duplication of any such Taxes economically borne by Buyer or any of its Affiliates pursuant thereto), (i) Buyer (or any Designated Buyer) shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Seller Maintained Transferred Asset for any taxable period or portion thereof (in accordance with Section 6.3) beginning after the Closing Date (determined on a "with and without" basis) and (ii) Seller and its Affiliates shall promptly pay to Buyer (or any Designated Buyer) any Tax refund or credit received with respect to any such Seller Maintained Transferred Asset for any taxable period beginning after the Closing Date or portion thereof (in accordance with Section 6.3) (determined on a "with and without" basis).

Section 2.6    Consideration. The consideration for the sale and transfer of the Transferred Assets from Sellers to Buyer (or any Designated Buyers), shall be the sum of (i) the Credit Bid Amount, plus (ii) any Cure Costs (the "Purchase Price").

Section 2.7    Closing.

(a)    Buyer and Sellers shall consummate the transactions contemplated hereunder (the "Closing") electronically (including by email) by the exchange of required closing deliveries at 9:00 a.m. on the third (3rd) Business Day after the entry of the Sale Order or on such other date, and time and at such other place as Buyer and Sellers may mutually agree in writing. As used herein, the "Closing Date" means the date on which the Closing occurs.

(b)    At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer (and any Designated Buyers):[1]

(i)    a bill of sale, assignment and assumption agreement, substantially in the form of Exhibit C (the "Assignment Agreement"), duly executed by Sellers or the Trustee on behalf of the Debtors;

(ii)    (1) an Intellectual Property assignment agreement, substantially in the form of Exhibit D (the "IP Assignment Agreement"), and (B) a domain transfer agreement

---

[1]    _____r_: Subject to further discussions.

18

371

substantially in the form of <u>Exhibit E</u> (the "<u>Domain Transfer Agreement</u>"), in each case duly executed by the applicable Sellers;

        (iii)    a certified copy of the Sale Order;

        (iv)    a valid IRS Form W-9 duly executed by each Debtor;

        (v)    a duly executed certificate of the Trustee certifying the satisfaction of the conditions set forth in <u>Section 7.3(a)</u>, <u>Section 7.3(b)</u> and <u>Section 7.3(d)</u>;

        (vi)    the Transferred Assets by making the Transferred Assets available to Buyer (or any Designated Buyers) at their present location, except for any demonstration units which shall be delivered as directed in writing by Buyer;

        (vii)    assignments of the Transferred Interests; and

        (viii)    all other documents, instruments or writings of conveyance as Buyer may reasonably request to consummate the transactions contemplated hereby and by the Ancillary Agreements.

        (c)    At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

        (i)    payment of the remaining balance of the Carve-Out to Trustee pursuant to and in accordance with Section 4I(i) of the Settlement Agreement;

        (ii)    the Assignment Agreement, duly executed by Buyer (or any Designated Buyers);

        (iii)    the IP Assignment Agreement and the Domain Transfer Agreement, in each case duly executed by Buyer (or any Designated Buyers); and

        (iv)    a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in <u>Section 7.2(a)</u>.

        Section 2.8    <u>Tax Allocation</u>. The Purchase Price (plus any other amounts to the extent properly taken into account as consideration under the Code) shall be allocated among the [applicable Transferred Assets][2] in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (any such allocation, an "<u>Allocation</u>"). Buyer shall prepare and deliver to the Debtors a statement (the "<u>Allocation Statement</u>") setting forth the Allocation as promptly as reasonably practicable following the Closing Date. The Trustee shall have thirty (30) days following their receipt of the Allocation Statement to review and provide comments to Buyer and Buyer agrees to consider in good faith any reasonable comments provided by the Trustee. Buyer shall not be obligated to incorporate the Trustee's comments and revise the Allocation Statement unless Buyer, in its reasonable discretion, determines that such

---

[2]         r   : Subject to ongoing review.

<div align="center">19</div>

incorporation is necessary or appropriate. If the Trustee does not provide any comments within such period, Sellers shall be deemed to have accepted the Allocation Statement as prepared by Buyer. The Allocation shall be adjusted, as necessary, by Buyer to reflect any subsequent adjustments to the portion of the Purchase Price and any other consideration payable to any Seller pursuant to this Agreement, to the extent properly taken into account under the Code. Buyer and each Seller agrees to (a) timely file in a manner consistent with the Allocation with each relevant Governmental Authority all forms and Tax Returns required to be filed in connection with the applicable Allocation (including the filing of IRS Form 8594 with a U.S. federal income Tax Return for the taxable year that includes the date of the Closing), (b) be bound by the applicable Allocation for the purpose of determining Taxes, (c) prepare and file all Tax Returns on a basis consistent with the applicable Allocation, and (d) not take any position inconsistent with the applicable Allocation in any Tax Return, in any audit or proceeding related to Taxes before any Governmental Authority or in any report made for Tax purposes; provided, however, that notwithstanding anything in this Section 2.8 to the contrary, (a) the Sellers and the Buyer (and any Designated Buyers) shall be permitted to take a position inconsistent with the applicable Allocation if required to do so by a "determination" within the meaning of Section 1313 of the Code and (b) the Buyer (and any Designated Buyers) or the Sellers shall be permitted to settle, solely on its own behalf, any proposed Tax deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation.

[Except as disclosed in Schedule A (collectively, the "Disclosure Schedules"), in each case, subject to Section 9.7(k),] Sellers represent and warrant to Buyer as follows:

Section 3.1  Organization. Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization or formation.

Section 3.2  Authority. Trustee on behalf of itself and each Seller has all necessary entity power and authority (a) to execute and deliver this Agreement and each Ancillary Agreement to which it is or shall be a party and (b) subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, to perform and comply with its covenants and agreements hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Each Seller's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party, such Seller's performance and compliance with its covenants and agreements hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on such Seller's part, and no other proceedings on such Seller's part are necessary to authorize this Agreement or any Ancillary Agreement to which it is or shall be a party, such Seller's performance of or compliance with its covenants and agreements hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby. Subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, each Seller has duly executed and delivered this Agreement and each Ancillary Agreement to which it is or shall be a party and, assuming Buyer's due authorization, execution and delivery hereof and thereof, as applicable, this Agreement and each Ancillary Agreement to which it is or shall be a party is such Seller's

20

legal, valid and binding obligation, enforceable against it in accordance with the terms hereof or thereof, except as limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally, by general equitable principles (regardless of whether enforcement is sought in a proceeding of law or in equity) or by the discretion of any Governmental Authority before which any Action seeking enforcement may be brought (the "Bankruptcy and Equitable Exceptions").

Section 3.3    No Conflict; Filings and Consents.

(a)    Each Seller's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, such Seller's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, require such Seller to make any registration, declaration, notice, report, submission or other filing (each, a "Filing") with or to, or to obtain any consent, approval, waiver, license, permit, franchise, authorization or Order ("Consent") of, any Governmental Authority, except for the following:

(i)    any Filings with or to or Consents of the Bankruptcy Court;

(ii)    [the Filings and Consents listed in Section 3.3(b)(ii) of the Disclosure Schedules (respectively, the "Specified Filings" and the "Specified Consents"); and]³

(iii)    any Filings or Consents the failure of which to make or obtain would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.4    Transferred Assets.

(a)    Each Debtor, as applicable, unless stated otherwise, has good, valid, marketable and indefeasible title to the Transferred Assets and owns and possesses all interests in, including the right to use, each of the Transferred Assets (or, with respect to licensed Transferred Assets a valid license to use), in each case, the transfer shall be free and clear of any and all Encumbrances, on an "as is, where is" basis, without any warranty of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6. Buyers acknowledge that certain Intellectual Property may be subject to superior rights of Rembrandt as Licensor, and that Sellers cannot transfer any interest in the Transferred Assets that is not owned by the Sellers.

(b)    Subject to the Sale Order, at the Closing, (i) Sellers, as applicable, shall transfer to Buyer (or any Designated Buyers) all of their respective right, title and interest in, to and under the Transferred Assets and (ii) and Buyer (or any such Designated Buyers) shall acquire good, valid, marketable and indefeasible title to the Transferred Assets, in each case, free and clear of any Encumbrance.

---

³    _____r___: Subject to ongoing discussion.

Section 3.5   Brokers. Except as set forth in Section 3.5 of the Disclosure Schedules, no other broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers. SSG Capital Advisors, LLC, as the Trustee's Investment Banker, is entitled to a commission for the conduct of the Sale as provided in its engagement with the Trustee.

Section 3.6   Exclusivity of Representations and Warranties. SELLERS ARE CONVEYING THE TRANSFERRED ASSETS AS IS, WHERE IS, AND WITH ALL FAULTS, AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE III, NONE OF SELLERS OR ANY OF THEIR AFFILIATES OR REPRESENTATIVES IS MAKING ANY REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, ORAL OR WRITTEN, EXPRESS OR IMPLIED (ALL OF WHICH SELLER HEREBY DISCLAIMS) AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, DESIGN, QUALITY, LAYOUT, PHYSICAL CONDITION, OPERATION, COMPLIANCE WITH SPECIFICATIONS, ABSENCE OF LATENT DEFECTS, OR COMPLIANCE WITH LAWS AND REGULATIONS (INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY AND THE ENVIRONMENT), OR ANY OTHER MATTER AFFECTING OR RELATING TO THE CONDITION OF THE ASSETS. BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE TRANSFERRED ASSETS BY BUYER AND BUYER WILL HAVE NO RIGHT TO BE INDEMNIFIED BY OR OTHERWISE BRING ANY ACTION AGAINST SELLERS WITH RESPECT TO ANY MATTER AFFECTING OR RELATING TO THE CONDITION OF THE TRANSFERRED ASSETS, OR ANY PORTION THEREOF. THE PROVISIONS OF THIS SECTION 3.6 SHALL SURVIVE CLOSING AND THE TERMINATION OF THIS AGREEMENT.

Buyer represents and warrants to Sellers as follows:

Section 4.1   Organization. Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization or formation and has all necessary entity power and authority to own, lease and operate its properties and assets and to carry on its businesses as currently conducted.

Section 4.2   Authority. Buyer has all necessary entity power and authority and financial ability (a) to execute and deliver this Agreement and each Ancillary Agreement to which it is or shall be a party and (b) subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, to perform and comply with its covenants and agreements hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party, Buyer's performance and compliance with its covenants and agreements hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been

22

375

duly authorized by all necessary action on Buyer's part, and no other proceedings on Buyer's part are necessary to authorize this Agreement or any Ancillary Agreement to which it is or shall be a party, Buyer's performance of or compliance with its covenants and agreements hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby. Subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, Buyer has duly executed and delivered this Agreement and each Ancillary Agreement to which it is or shall be a party and, assuming Buyer's due authorization, execution and delivery hereof and thereof, as applicable, this Agreement and each Ancillary Agreement to which it is or shall be a party is Buyer's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof or thereof, except as limited by the Bankruptcy and Equitable Exceptions.

Section 4.3    No Conflict; Filings and Consents.

(a)    Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, Buyer's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, (i) violate the constituent documents of Buyer, (ii) subject to making the Filings and obtaining the Consents contemplated by Section 4.3(b), violate any Law or (iii) breach, result in the loss of any benefit under, be a default (or an event that, with or without notice or lapse of time, or both, would be a default) under, result in the termination, cancelation or amendment of or a right of termination, cancelation or amendment under, accelerate the performance required by, or result in the creation of any Encumbrance on any of the respective properties or assets of Buyer under, any Contract to which Buyer is a party or by which any asset of Buyer is bound or affected, except, in the case of the foregoing clauses (ii) and (iii), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

(b)    Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, Buyer's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, require Buyer make any Filing with or to, or to obtain any Consent of, any Governmental Authority, except for the following:

(i)    any Filings with or to or Consents of the Bankruptcy Court;

(ii)    [the Specified Filings and the Required Approvals (including the Specified Consents); and]

(iii)    any Filings or Consents the failure of which to make or obtain would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

Section 4.4    Third Party Intellectual Property Rights.

(a)    Buyer has reviewed all of the Sellers' Intellectual Property and has confirmed, and hereby represents, that neither the Intellectual Property nor any of the Transferred Assets contain any Intellectual Property rights or other rights of a third party.

23

376

(b)  Pursuant to Section 3.6 hereof, Buyer is relying solely upon Buyer's own inspection, examination, and evaluation of the Transferred Assets, including but not limited to the Intellectual Property. Buyer acknowledges and agrees that Buyer will have no right to be indemnified by or otherwise bring any action against Sellers with respect to any matter affecting or relating to third party Intellectual Property rights or other third party rights in the Transferred Assets.

(c)  The provisions of this Section 4.4 shall survive closing and the termination of this agreement.

Section 4.5   Brokers. SSG Capital Advisors, LLC as investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer. No other broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

Section 4.6   Exclusivity of Representations and Warranties. Neither Buyer nor any of its Affiliates or Representatives is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Article IV, and Buyer hereby disclaims any such other representations or warranties.

Section 5.1   Conduct of Business Prior to the Closing.

(a)  Except (x) as otherwise expressly required hereby, (y) as required by applicable Law (including an Order of the Bankruptcy Court) or (z) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), prior to the Closing, Sellers shall not:

(i)  fail to maintain, or allow to lapse, or abandon any Intellectual Property owned by or registered to, licensed to or held for use by a Seller or enter into or become bound by, terminate or materially amend or modify any Contract relating to the acquisition or disposition or granting of any license with respect to any such Intellectual Property, or otherwise subject to an Encumbrance any such Intellectual Property (including by the granting of any covenant-not-to-sue or covenant-not-to-assert);

(ii)  (1) enter into any Contract or (2) modify, amend, extend or terminate any Contract which is identified as a Transferred Asset in Section 2.2 of the Disclosure Schedules, or waive, release or assign any rights or claims thereunder;

(iii)  (1) enter into agreements or arrangements providing for capital expenditure or expenditures or otherwise commit to do so, or (2) fail to make any capital expenditure or expenditures in accordance with such capital budget;

24

(iv)     commence, waive, release, assign, compromise or settle any Action (other than the Retained Causes of Action) (for the avoidance of doubt, including with respect to matters in which a Seller is a plaintiff, or in which any of their officers or directors in their capacities as such are parties) affecting the Business or the Transferred Assets that is not a Retained Cause of Action;

(v)     cancel or fail to use commercially reasonable efforts to maintain any of insurance policy covering the Transferred Assets, if any, any right, asset or property that would be a Transferred Asset if existing on the Closing Date;

(vi)     pursue or seek, or fail to use commercially reasonable efforts to oppose any Person in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, the appointment of a trustee under Chapter 11 (other than the Trustee) or Chapter 7 of the Bankruptcy Code or the appointment of an examiner with enlarged powers;

(vii)     take or cause to be taken any action that would reasonably be expected to materially delay, materially impede or prevent the consummation of the transactions contemplated hereunder;

(viii)     (1) reject or terminate any Contract or seek Bankruptcy Court approval to do so or (2) fail to use commercially reasonable efforts to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any such Contract;

(ix)     with respect to any Transferred Asset, (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases or (2) fail to use reasonable best efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(x)     settle, pursue, monetize, relinquish, or otherwise dispose of or seek to dispose of the Affiliate Claims other than in accordance with the terms hereof; or

(xi)     agree or authorize, in writing or otherwise, to take any of the foregoing actions.

Section 5.2     Access to Information. Upon reasonable notice, each Seller shall provide Buyer and its Representatives reasonable access, during normal business hours throughout the period prior to the Closing, to such Seller's properties, books, records, Tax Returns (and all Tax Books and Records, including note papers and work papers, related thereto), personnel and Representatives, and during such period, such Seller shall cause to be furnished promptly to Buyer and its Representatives all readily available information concerning the Business as Buyer may reasonably request; provided, however, that such access and disclosure shall not be required to the extent it would violate any applicable Law or would jeopardize any attorney client privilege or the attorney work product doctrine; provided, further, that, if any such access or disclosure is limited for the reasons described in the foregoing proviso, such Seller shall use commercially reasonable efforts to find a way to allow such access and disclosure to the extent doing so would not be (in the good faith belief of Sellers after

25

consultation with outside counsel) reasonably be likely to cause a violation of applicable Law or such privilege to be jeopardized with respect to such information.

Section 5.3    Notification of Certain Matters. Each Party shall promptly notify the other Parties in writing of any event, change, circumstance, development, effect, occurrence or state of facts of which it becomes aware that would or is reasonably likely to result in any of the conditions set forth in Article VII becoming incapable of being satisfied prior to the End Date.

Section 5.4    Consents and Filings; Further Assurances.[4]

(a)    Each Party shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated hereby and by the Ancillary Agreements and to confirm Buyer's (or any Designated Buyer's) ownership of the Transferred Assets as promptly as reasonably practicable, including using commercially reasonable efforts to obtain all Consents of Governmental Authorities or other Third Parties necessary, proper or advisable in connection therewith. Without limiting the generality of the foregoing, the Parties shall use commercially reasonable efforts to (i) obtain from Governmental Authorities all Consents that are necessary for the consummation of the transactions contemplated hereby and by the Ancillary Agreements and Buyer's (or any Designated Buyer's) operation of the Business and the Transferred Assets, (ii) promptly make all necessary Filings with or to Governmental Authorities that are related hereto or to the Ancillary Agreements or the transactions contemplated hereby or thereby, (iii) comply at the earliest reasonably practicable date with any request by a Governmental Authority for additional information, documents or other materials received by each of them or any of their Affiliates, (iv) reasonably cooperate with each other in connection with any such Filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith). This Section 5.4(a) does not apply with respect to Taxes.

(b)    Each Party shall promptly notify the other Parties of any communication it or any of its Affiliates receives from any Governmental Authority related to the matters that are the subject hereof and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority. No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting. Subject to applicable Law, the Parties shall provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby. This Section 5.4(b) does not apply with respect to Taxes, however, notwithstanding the foregoing, to the extent the Buyer

---

[4]    ___r__: Subject to update.

receives communication from any Governmental Authority related to Taxes attributable to or associated with a pre-Closing Date taxable period, or to the extent the Sellers receive communication from any Governmental Authority related to Taxes attributable to or associated with a post-Closing Date taxable period, either Party shall timely share such correspondence with the other Party.

(c)     From time to time after the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer (or any Designated Buyers) all the right, title and interest in, to or under the Transferred Assets, to provide Buyer (or any Designated Buyers) and Sellers all rights and obligations to which they are entitled.

Section 5.5     Refunds and Remittances.

(a)     After the Closing, if Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to Buyer (or any Designated Buyers) in accordance with the terms hereof, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer (or any Designated Buyers).

(b)     In the event that, after the Closing Date, either Party reasonably believes Sellers or any of their Affiliates have retained ownership of an asset intended to be conveyed to Buyer (or any Designated Buyers) as a Transferred Asset as contemplated hereby, for no additional consideration to Sellers or any of their Affiliates, Sellers shall convey, assign or transfer promptly such Transferred Asset to Buyer (or any Designated Buyers), and the Parties hereto shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Transferred Asset to Buyer (or any Designated Buyers).

Section 5.6     No Successor Liability. The Parties intend that, to the fullest extent permitted by Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Buyer (or any Designated Buyers) shall not be deemed to: (i) be the successor of any Seller, (ii) have, *de facto*, or otherwise, merged with or into any Seller, (iii) be a mere continuation or substantial continuation of any Seller or its enterprise(s) or (iv) be liable for any acts or omissions of any Seller in the conduct of the Business or arising under or related to the Transferred Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer (or any Designated Buyers) shall not be liable for any Encumbrance against any Seller or any of any Seller's predecessors or Affiliates, and Buyer (or any Designated Buyers) shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets or any Liabilities of Sellers arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 5.6 shall be reflected in the Sale Order.

Section 5.7     Sale Free and Clear. Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and

27

concurrently with the Closing, all then existing or thereafter arising Encumbrances against or created by Sellers,, or the bankruptcy estates, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets, and (b) Buyer (or any Designated Buyer) is not successor to any Seller or the bankruptcy estates by reason of any theory of law or equity, and Buyer (or any Designated Buyer) shall not assume or in any way be responsible for any Liability or Claim of Sellers, any of their Affiliates and/or the bankruptcy estates, except as expressly provided in this Agreement. On the Closing Date, the Transferred Assets shall be transferred to Buyer (or any Designated Buyers) free and clear of all Encumbrances to the fullest extent permitted by Section 363 of the Bankruptcy Code.

Section 5.8    Bankruptcy Court Milestones; Alternative Transactions.

(a)    Sellers shall consult with Buyer and Hawk regarding the Bankruptcy Cases, including regarding the Sale Motion, the Bid Procedures Hearing, the Bid Procedures Order, the Sale Hearing, the Sale Order, and any other Filings with or to the Bankruptcy Court, any hearing before the Bankruptcy Court and any Order of the Bankruptcy Court related to the transactions contemplated hereby or by the Ancillary Agreements and the Bankruptcy Cases in connection therewith, and Sellers shall provide Buyer and Hawk with copies of any material Filings to be filed by Sellers in the Bankruptcy Cases that are related to in any way to this Agreement, the Ancillary Agreements or any transaction contemplated hereby or thereby at least three (3) Business Days prior to the making of any such Filing. Sellers shall provide Buyer and Hawk with prompt notice of (i) the filing of any objection to (or any threat or notice of intention of any Person to file any objection to) this Agreement, the Ancillary Agreements, any transaction contemplated hereby or thereby, the Bid Procedures or Buyer or (ii) the commencement of (or any threat or notice of intention of any Person to commence), any Action that relates in any way to this Agreement, the Ancillary Agreements, any transaction contemplated hereby or thereby, the Bid Procedures or Buyer.

(b)    The Parties agree that the following are the milestones (the "Milestones") to be satisfied in connection with the Bankruptcy Cases, and Sellers shall use reasonable efforts to cause the Milestones to be satisfied:

(i)    not later than November 13, 2024, the Bankruptcy Court shall have held the Bid Procedures Hearing and entered the Bid Procedures Order;

(ii)    the deadline for submission of Qualified Bids (as defined in the Bid Procedures) shall be no later than November 15, 2024;

(iii)    if any other Qualified Bid (as defined in the Bid Procedures) is submitted prior to the bid deadline set forth in the Bid Procedures, Sellers shall have commenced the Auction on or before November 18, 2024; and

(iv)    not later than December 7, 2024, the Bankruptcy Court shall have entered the Sale Order.

(c)    Sellers shall promptly (and in no event later than twenty-four (24) hours after receipt) advise Buyer in writing if either Seller or any of such Seller's Affiliates or Representatives receives any inquiry, request for nonpublic information, discussion or

28

negotiation that is reasonably expected to lead to or that contemplates or relates to, or any proposal that is for, an Alternative Transaction, in each case, together with a written summary of the material terms and conditions thereof, the identity of the Person making any such inquiry, request for nonpublic information, discussion, negotiation or proposal and any draft agreement provided by such Person. Buyer as Secured Creditor shall have only consultation rights, and shall have no ability to object to or impede any Alternate Transaction, but retains the right to assert its Allowed Secured Claim and negotiate with the sponsor of the Alternate Transaction for the treatment of its Allowed Secured Claim.

(d)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from such orders. Sellers agree to take all action as may be reasonable and appropriate to defend against such appeal or stay request and Sellers and Buyer agree to use their commercially reasonable efforts to obtain an expedited resolution of such appeal or stay request; provided that nothing herein shall preclude the Parties from consummating the transactions contemplated hereby if the Sale Order shall have been entered and has not been stayed and Buyer, in its sole and absolute discretion, waives in writing the condition that the Sale Order be a Final Order.

(e)     After the Bankruptcy Court's entry of the Sale Order, neither Buyer nor Sellers shall take any action which is intended to or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

(f)     None of Sellers or Buyer shall file any pleading or take any other action in the Bankruptcy Court with respect hereto or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby that is inconsistent with performing and carrying out the provisions hereof or thereof in accordance with the terms and subject to the conditions herein and therein; provided, however, that the foregoing shall not limit Buyer's rights and remedies hereunder or Buyer's right to advocate for the approval hereof and against any Alternative Transaction.

Section 5.9     Intellectual Property Registrations. After the Closing Date, Sellers shall use commercially reasonable efforts to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (a) where Intellectual Property of Stream is still recorded in the name of legal predecessors of Stream or any Person other than Stream or (b) where the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to Stream Intellectual Property, are materially incorrect for any other reason.

Section 5.10     Name Change. Sellers shall, as promptly as practicable (but in no event later than twenty (20) Business Days) after the Closing, cease using and displaying their existing corporate names or any trademarks that are included in the Transferred Assets (including, for the avoidance of doubt, any trademarks held by Subsidiaries of Sellers), and in furtherance of such requirement, Debtors shall use commercially reasonable efforts to, no later than twenty (20) Business Days after the Closing, legally change their corporate and business

names to names that are not confusingly similar to such trademarks or existing names of the Debtors, and file notices of such name changes with the Bankruptcy Court. Subject to the approval of the Bankruptcy Court to change such Debtor's name for purposes of the Bankruptcy Cases (which approval the Sellers shall seek and use commercially reasonable efforts to obtain promptly following the Closing), under no circumstance shall Sellers, after the Closing, use or otherwise exploit the trademarks included in the Transferred Asset or any other indicia confusingly similar to the trademarks included in the Transferred Assets, copyrights included in the Transferred Assets, or any work substantially similar to the copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.

<div align="center">M</div>

Section 6.1    Transfer Taxes. Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable in connection with the sale or transfer of the Transferred Assets pursuant to this Agreement (such Taxes, "Transfer Taxes") shall (to the extent not subject to an exemption under the Bankruptcy Code, including Section 1146(a) of the Bankruptcy Code) be borne and split equally between Buyer and Sellers. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce or eliminate any such Transfer Taxes, and shall each sign and file (or cause its respective Affiliates to sign and file) all documentation with the relevant Governmental Authority related to such Transfer Taxes as it may be required to sign or file under applicable Law. The Party responsible under applicable Law for filing the Tax Returns with respect to such Transfer Taxes shall prepare and file all necessary Tax Returns or other documents with respect thereto and shall promptly provide a copy of any such Tax Returns or other documents to the other Parties.

Section 6.2    Tax Cooperation. Buyer (or any Designated Buyers) and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as reasonably practicable, such information (including access to Books and Records related to Taxes) and assistance related to the Business, the Transferred Assets as is reasonably necessary for determining any Liability for Taxes, the filing of all Tax Returns, the making of any election related to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding related to any Tax; provided, however, that Buyer and its Affiliates (or Designated Buyers and their Affiliates) shall not be required to disclose the contents of their Tax Returns to any Person. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 6.2 shall be borne by the Party requesting it.

Section 6.3    Straddle Periods. For purposes hereof, with respect to any Transferred Asset or the Business, Sellers and Buyer shall apportion the liability for property Taxes, ad valorem Taxes and similar Taxes imposed on a periodic basis ("Periodic Taxes") and for Taxes that are either (i) based upon or related to income or receipts, (ii) imposed in connection with any sale, transfer or assignment or any deemed sale, transfer or assignment of property (real or personal, tangible or intangible), or (iii) payroll or similar Taxes with respect to any employee, or independent contractor associated with any Transferred Asset or the Business

<div align="center">30</div>

("Non-Periodic Taxes") for any taxable period which begins on or before, and ends after, the Closing Date (a "Straddle Period") applicable to any Transferred Asset or the Business in accordance with this Section 6.3. Periodic Taxes shall be apportioned between Sellers and Buyer (or any Designated Buyers) as of the Closing Date, with Buyer (or any Designated Buyer) liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period beginning after the Closing Date) equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. The Non-Periodic Taxes shall be apportioned between Sellers and Buyer (or any Designated Buyers) as of the Closing Date, with Buyer (or any Designated Buyer) liable for that portion of the Non-Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period beginning after the Closing Date) equal to the amount that would be payable in the portion of the Straddle Period beginning after the Closing Date if the taxable year or period ended at the end of the day on the Closing Date; provided, however, that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for amortization or depreciation, shall be allocated to the portion of the Straddle Period beginning after the Closing Date (notwithstanding that such exemptions, allowances or deductions may under applicable Law be determined solely at the end of the Straddle Period) by multiplying the total amount of such exemption, allowance, or deduction for such Straddle Period by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. Sellers shall be liable for that portion of the Periodic Taxes and Non-Periodic Taxes for a Straddle Period for which Buyer (or any Designated Buyer) is not liable under the preceding sentences (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period ending on the Closing Date). The party hereto responsible under applicable Law for paying a Tax described in this Section 6.3 shall be responsible for administering the payment of such Tax. With respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to any Transferred Asset or the Business that are allocable to Buyer (or any Designated Buyer) under this Agreement, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by any Seller or any Affiliate thereof, Buyer (or any Designated Buyer) shall pay to Sellers such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from Sellers; and with respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to any Transferred Asset, or the Business that are allocable to Sellers under this Agreement, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by Buyer or any Affiliate thereof, Sellers shall pay to Buyer (or any Designated Buyer) such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from Buyer (or any Designated Buyers).

Section 6.4    Tax Treatment. Buyer and Sellers shall, consistently treat the transactions hereunder for all Tax purposes as a fully taxable disposition of the Transferred Assets.

Section 6.5    Tax Elections.

(a)     At Buyer's sole option, but only as would not be reasonably anticipated to generate a material Tax liability for which Debtors would be liable under the terms of this Agreement:

(i)     for any Subsidiary of Technovative that is treated as a foreign corporation for U.S. federal income Tax purposes (each, a "245A Subsidiary"), Buyer, Debtor and their respective Affiliates shall cooperate in good faith to determine each "U.S. tax resident" within the meaning of Treasury Regulations Section 1.245A-5(i)(29) that will be a "United States shareholder" within the meaning of Section 951(b) of the Code at the end of the Closing Date that owns directly or indirectly stock of such 245A Subsidiary and is described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(1) (each, a "U.S. Tax Resident");

(ii)    Buyer shall enter into and shall use reasonable best efforts to cause all U.S. Tax Residents to enter into (and take all steps necessary to enter into), a written, binding agreement as described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(2) (a "245A Election Agreement") with applicable Debtors and their relevant Affiliates to make an election pursuant to Treasury Regulations Section 1.245A-5(e)(3) to close the taxable year of such 245A Subsidiary, effective as of the Closing Date (such an election, a "245A Election"). Buyer shall prepare a form of a 245A Election Agreement and shall consider in good faith any reasonable comments or proposed changes by Debtors. To the extent able to do so under applicable Law, Buyer shall represent that the information provided is complete and that the U.S. Tax Residents identified are the only direct or indirect shareholders of the 245A Subsidiary that are required for purposes of making a valid 245A Election; and

(iii)   Debtors and their Affiliates shall timely file, or cause to be timely filed, valid 245A Elections.

(b)     In the event that Debtors and their Affiliates file the 245 Election, Debtors, Buyer and their respective Affiliates shall not take any position inconsistent with the taxable year of the applicable 245A Subsidiary as closing for all purposes of the Code and Treasury Regulations thereunder on the date of the "extraordinary reduction amount" or "tiered extraordinary reduction amount" (as each are defined in Treasury Regulations Section 1.245A-5) on any Tax Return or in any in any audit or proceeding related to Taxes before any Governmental Authority or otherwise.

Section 6.6   Bulk Sales. Notwithstanding any other provisions herein, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer (or any Designated Buyer).

Section 7.1   Mutual Conditions. The respective obligations of each Party to consummate the Closing shall be subject to the satisfaction (or waiver by Buyer and Sellers, if permissible under applicable Laws) of the following conditions:

32

(a)    no Governmental Authority shall have issued a preliminary, temporary or permanent Order that is in effect and prevents, makes illegal or prohibits the consummation of any of the transaction contemplated hereby (any such Law or Order, a "Legal Restraint");

(b)    [(1) all Specified Filings shall have been made in accordance with applicable Law and (2) all Specified Consents, shall have been obtained in form and substance reasonably acceptable to Buyer;]

(c)    the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each of the Bid Procedures Order and the Sale Order shall be a Final Order.

Section 7.2    Conditions to Obligations of Sellers. The obligation of Sellers to consummate the Closing are further subject to the satisfaction (or waiver by Sellers, if permissible under applicable Law) of the following conditions:

(a)    Each representation and warranty in Article IV (read, for purposes of this Section 7.2(a) only, without giving effect to any qualifier as to materiality, "material" or "Buyer Material Adverse Effect") shall be true and correct in all respects as of the Closing as if made as of the Closing (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been true and correct in all respects as of such date), except where the failure of such representation and warranty to be true and correct at such time has not, individually or in the aggregate, resulted in a Buyer Material Adverse Effect;

(b)    Buyer shall have performed or complied in all material respects (in all respects with respect to any covenant or agreement that is qualified by materiality) with each covenant or agreement required to be performed or complied with by it hereunder at or prior to the Closing; and

(c)    Sellers shall have received the documents listed in Section 2.7(c)(ii) – Section 2.7(c)(iv).

Section 7.3    Conditions to Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated hereby shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a)    each representation and warranty in Article III (read, for purposes of this Section 7.3(a) only, without giving effect to any qualifier as to materiality, "material" or "Material Adverse Effect") shall be true and correct in all respects as of the Closing as if made as of the Closing (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been true and correct in all material respects as of such date), except where the failure of such representation and warranty to be true and correct at such time has not, individually or in the aggregate, resulted in a Material Adverse Effect;

(b)    each Seller shall have performed or complied in all material respects (in all respects with respect to any covenant or agreement that is qualified by materiality) with each

33

covenant or agreement required to be performed or complied with by it hereunder at or prior to the Closing;

(c)     all Required Approvals shall have been obtained in form and substance reasonably acceptable to Buyer;

(d)     there shall not have occurred a Material Adverse Effect in connection with the Transferred Assets;

(e)     Buyer shall have received the documents listed in <u>Section 2.7(b)</u>; and

(f)     Sellers shall have received the Consents of the Third Parties set forth in <u>Section 7.3(f)</u> of the Disclosure Schedules and delivered to Buyer evidence thereof, in form and substance reasonably acceptable to Buyer.

<div align="center">M</div>

Section 8.1     <u>Termination Rights</u>.

(a)     <u>Termination by Mutual Consent</u>. Buyer and Sellers shall have the right to terminate this Agreement at any time prior to the Closing by mutual written consent.

(b)     <u>Termination by Either Buyer or Sellers</u>. Buyer, on the one hand, or Sellers, on the other hand, shall have the right to terminate this Agreement at any time prior to the Closing if:

(i)     a Legal Restraint is in effect that has become final and nonappealable;

(ii)     the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; or

(iii)     Buyer is not the [Winning Bidder].

(c)     <u>Termination by Buyer</u>. Buyer shall have the right to terminate this Agreement at any time prior to the Closing if:

(i)     the Closing shall not have been consummated prior to 5:00 p.m. on December 10, 2024 (the "<u>End Date</u>"), subject to extension by written consent of Hawk and the Trustee; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 8.1(c)(i) shall not be available to Buyer if the failure of the Closing to have occurred prior to 5:00 p.m. on the End Date was primarily caused by, or primarily resulted from, Buyer's breach of any of its covenants or agreements hereunder;

(ii)     any Seller breaches any of its covenants or agreements hereunder or violates the terms of the Settlement Agreement or Sale Order, or if any of the representations or warranties in <u>Article III</u> fails to be true and correct, which breach or failure (1) would give rise

<div align="center">34</div>

to the failure of a condition in <u>Section 7.1</u> or <u>Section 7.3</u> and (2) is not reasonably capable of being cured by such Seller within ten (10) days after receipt by such Seller of written notice from Buyer of such breach or failure or, if reasonably capable of being cured during such ten (10) day period, is not cured by such Seller within such ten (10) day period;

(iii)     any Seller or any of its Affiliates or Representatives takes any Alternative Sale Action;

(iv)     any Milestone is not satisfied;

(v)      a Material Adverse Effect has occurred;

(vi)     any Required Approvals are denied;

(vii)    any Seller withdraws or seeks authority to withdraw the Sale Motion; or

(viii)   for any reason (including an Order of the Bankruptcy Court) Buyer is unable or legally prohibited, pursuant to Section 363(k) of the Bankruptcy Code or otherwise, to credit bid the amount agreed in the Settlement Agreement.

(d)     <u>Termination by Sellers</u>. Sellers shall have the right to terminate this Agreement at any time prior to the Closing if Buyer violates the terms of the Settlement Agreement or breaches any of its covenants or agreements hereunder, or if any of the representations or warranties in <u>Article IV</u> fails to be true and correct, which breach or failure (i) would give rise to the failure of a condition in <u>Section 7.1</u> or <u>Section 7.2</u> and (ii) is not reasonably capable of being cured by Buyer within ten (10) days after receipt by Buyer of written notice from Sellers of such breach or failure or, if reasonably capable of being cured during such ten (10) day period, is not cured by Buyer within such ten (10) day period.

Section 8.2     <u>Effect and Manner of Termination</u>.

(a)     If this Agreement is terminated under <u>Section 8.1</u>, this Agreement shall be void and of no force or effect, without any Liability on the part of any Party, whether arising prior to or after such termination, based on or related to this Agreement or the negotiation, execution, performance or subject matter hereof (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity); <u>provided</u>, <u>however</u>, that this <u>Section 8.2</u> and <u>Article IX</u> shall survive any such termination and remain in full force and effect and no such termination shall relieve any Party of any willful, knowing and material breach hereof occurring prior to such termination.

(b)     This Agreement may be terminated only pursuant to <u>Section 8.1</u>. In order to terminate this Agreement under <u>Section 8.1</u> (except for <u>Section 8.1(a)</u>), the Party desiring to terminate this Agreement shall give written notice of such termination to the other Parties, specifying the provision hereof pursuant to which such termination is effected.

35

Section 9.1    Nonsurvival of Representations, Warranties and Covenants. The respective representations, warranties and covenants of Sellers and Buyer contained herein and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 9.1 shall not limit any covenant or agreement of the Parties that by its terms requires performance after the Closing.

Section 9.2    Indemnification. Buyer (or any Designated Buyer) shall indemnify and hold harmless the Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors and/or employees for any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement including the defense thereof. The indemnity provided for herein shall be broadly construed to include but shall not be limited to the reimbursement of all costs, professional fees and expenses including legal fees, when incurred by the Trustee, and all expert fees, court costs, and expenses. In addition, in the event that the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees are sued by any third party as a consequence of (i) the Closing, (ii) the transfer of the Transferred Assets, or (iii) the utilization of the Transferred Assets, including but not limited to, the Rembrandt Intellectual Property, Buyer (or any Designated Buyer) will immediately enter a defense on behalf of the Sellers, the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees. Buyers (or any Designated Buyer) may join any lawsuit with any other proceeding involving the same or affiliated plaintiffs. Notwithstanding any other provision contained herein, this Section 9.2 shall survive Closing. Buyer (or any Designated Buyer) shall have the right to assume control of or direct the defense against any claim, cause of action, or lawsuit covered by this Section 9.2 and to select counsel to represent Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees (the "Indemnified Parties") with respect to any claim, cause of action, or lawsuit covered by this Section 9.2 and shall use its reasonable efforts in any such defense. The Indemnified Parties shall have the right to approve or reject any counsel proposed by Buyer (or any Designated Buyer) selects, which approval shall not be unreasonably withheld. Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees shall use reasonable efforts to cooperate with Buyer (or any Designated Buyer) and its chosen counsel in the defense of any such claim, cause of action, or lawsuit.

Section 9.3    Fees and Expenses. Except as otherwise provided herein (including Section 5.4(a) and Section 6.1), all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be borne and paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 9.4    Transition of Permits. To the extent that Buyer (or any Designated Buyer) has not obtained all of the Permits that are necessary for Buyer (or any Designated

36

Buyer) to take title to all of the Transferred Assets at the Closing and thereafter operate all aspects of the Business at the Closing, Sellers shall, to the extent permitted by applicable Laws, use commercially reasonable efforts to maintain after the Closing such Permits that Buyer reasonably requests, at Buyer's sole expense, until Buyer (or any Designated Buyer) has obtained such Permits.

Section 9.5    Amendment and Modification. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 9.6    Waiver. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 9.7    Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day after the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent by email during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day after the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid, in each case, at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Parties under this Section 9.6):

(i)  if to Sellers, to:

William A. Homony, Chapter 11 Trustee
8 Penn Center, Suite 950
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
Email:            bhomony@mctllp.com

with a copy (which shall not constitute notice) to:

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400

Philadelphia, PA  19102
Attention:     Michael D. Vagnoni
Email:           michael.vagnoni@obermayer.com

37

(ii) if to Buyer and/or Hawk, to:

SeeCubic, Inc.
1732A Marsh Road, Suite 124
Wilmington, Delaware 19810
Attention:     Shad L. Stastney
Email:          shadron.stastney@seecubic.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
320 South Canal Street
Chicago, Illinois 60606
Attention:     James J. Mazza, Jr.
Email:          james.mazza@skadden.com

and

K&L Gates LLP
301 Hillsborough St, Ste. 1200
Raleigh, North Carolina 27603
Attention:     Margaret R. Westbrook
Email           margaret.westbrook@klgates.com

Section 9.8     Interpretation.

(a)     No Strict Construction. The Parties have been represented by counsel during the negotiation and execution hereof and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in a Contract or other document shall be construed against the Party drafting such Contract or document. Each Party has participated in the drafting and negotiation hereof. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any of the provisions hereof.

(b)     Time Periods. When calculating the period of time prior to which, within which or after which any act is to be done or step taken pursuant hereto, (i) the date that is the reference date in calculating such period shall be excluded and (ii) if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Unless expressly provided otherwise, the measure of a period of a month(s) or a year(s) for purposes hereof shall be that date of the following month or year corresponding to the starting date; provided that if no corresponding date exists, the measure shall be that date of the following month or year corresponding to the next day following the starting date.

(c)     Dollars. Unless otherwise specifically indicated, any reference herein to "$" means U.S. dollars.

(d) <u>Gender and Number</u>. Any reference herein to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e) <u>Articles, Sections and Headings</u>. When a reference is made herein to an Article or a Section, such reference shall be to an Article or a Section hereof unless otherwise indicated. The table of contents and headings herein are for reference purposes only and shall not affect in any way the meaning or interpretation hereof.

(f) <u>Include</u>. Whenever the words "include," "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation."

(g) <u>Hereof</u>. The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used herein shall refer to this Agreement as a whole and not to any particular provision hereof.

(h) <u>Extent; Or</u>. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." The word "or" shall not be exclusive.

(i) <u>Laws</u>. Any Law defined or referred to herein means such Law as from time to time amended, modified or supplemented prior to the date hereof, and includes all rules and regulations promulgated under such Law.

(j) <u>Persons</u>. References to a person are also to its successors and permitted assigns.

(k) <u>Exhibits and Disclosure Schedule</u>. The Exhibits hereto and the Disclosure Schedules are incorporated and made a part hereof and are an integral part hereof. Each capitalized term used in any Exhibit or in the Disclosure Schedules but not otherwise defined therein has the meaning given to such term herein. The Disclosure Schedules shall be organized, for purposes of convenience only, into sections that correspond to the Sections hereof. Any item in any section of the Disclosure Schedule that corresponds to a Section in <u>Article III</u> shall apply to and qualify such Section and any other Section in <u>Article III</u> if such item's relevance to such other Section is reasonably apparent.

(l) <u>Time</u>. Unless specified otherwise herein, any reference herein to a specific time shall be to such time in the North American Eastern Time Zone.

Section 9.9  <u>Entire Agreement</u>. This Agreement, the Settlement Agreement and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor the Settlement Agreement or any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

39

Section 9.10 <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of each Party hereto, and nothing herein, express or implied, is intended to or shall confer upon any Person (including employees of Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason hereof.

Section 9.11 <u>Governing Law</u>. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement, and all Actions, claims and causes of action (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity) that may be based on, arise out of or relate hereto or the negotiation, execution, performance or subject matter hereof (collectively, "<u>Governed Claims</u>") shall be governed by the Laws of the State of [Delaware] applicable to agreements made and to be performed solely therein, without giving effect to principles of conflicts of law.

Section 9.12 <u>Submission to Jurisdiction; Waiver of Jury Trial</u>. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms hereof and to decide any Governed Claims and (b) any and all Governed Claims shall be filed and maintained only in the Bankruptcy Court. The Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court for, and irrevocably waive the defense of an inconvenient forum to the maintenance of, any Governed Claim; <u>provided</u>, <u>however</u>, that, if the Bankruptcy Case is closed, (i) each Party irrevocably agrees that any Governed Claim shall be heard and determined in the Court of Chancery of the State of Delaware or, to the extent such court does not have subject matter jurisdiction, the U.S. District Court for the District of Delaware or, to the extent such court does not have subject matter jurisdiction, the Superior Court of the State of Delaware and (ii) each Party hereby irrevocably submits to the exclusive jurisdiction and venue of the courts set forth in the foregoing clause (i) for, and irrevocably waives the defense of an inconvenient forum to the maintenance of, any Governed Claim. Each Party further agrees that notice provided under <u>Section 9.6</u> shall constitute sufficient service of process and waives any argument that such service is insufficient. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Governed Claim, (1) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (2) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (3) that (A) the suit, action or proceeding in any such court is brought in an inconvenient forum, (B) the venue of such suit, action or proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

M

M

Section 9.13 <u>No Recourse</u>. Notwithstanding any provision hereof or of any Ancillary Agreement, by its acceptance of the benefits hereof, each Party agrees and acknowledges on its own behalf and on behalf of its respective Affiliates that (a) no Person, other than the Parties, have Liabilities hereunder, (b) this Agreement and the Ancillary Agreements may be enforced only against the Parties, (c) no Governed Claim may be brought against any Person that is not a Party and (d) no Party shall have any right of recovery related to

40

a Governed Claim against any former, current, or future direct or indirect equity holders, controlling persons, directors, officers, employees, agents, Affiliates, members, managers, general or limited partners, Representatives or assignees of any Party.

Section 9.14 <u>Assignment; Successors</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers, and any such assignment without such prior written consent shall be null and void; <u>provided</u>, <u>however</u>, that no assignment shall limit Buyer's obligations hereunder. Notwithstanding the foregoing, Buyer may assign any of its rights or delegate any of its obligations hereunder to any of its Affiliates without obtaining the prior written consent of any Person. This Agreement shall be binding on, inure to the benefit of and be enforceable by, the Parties and their respective successors and permitted assigns.

Section 9.15 <u>Enforcement</u>. The Parties agree that irreparable damage would occur in the event that any of the provisions hereof were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each Party shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches hereof and to enforce specifically the terms and provisions hereof. Each Party hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

Section 9.16 <u>Severability</u>. Whenever possible, each provision or portion of any provision hereof shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision hereof is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 9.17 <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall be one (1) and the same instrument. Delivery of an executed counterpart hereof by facsimile or other electronic transmission (including email or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) shall be effective as delivery of an original counterpart hereof.

Section 9.18 <u>Publicity</u>. Except with respect to any dispute between or among the Parties regarding this Agreement or the transactions contemplated hereby, from and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither Buyer nor Sellers shall make any press release or any public statement prior to obtaining Sellers' (in the case of Buyer) or Buyer's (in the case of Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure may be required by applicable Law.

41

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed as of the date first written above by a duly authorized person thereof.

By: _____
     Name:


M


By: _____
     Name:
     Title:


M


By: _____
     Name:
     Title:


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed as of the date first written above by a duly authorized officer thereof.

By: _____

       Name:

       Title:

# Exhibit

### ist Execut r ntracts and nex ired eases t be Assumed and Assigned

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| | : |
| IN RE: | : Case No.  23-10763-amc |
| | : |
| STREAM TV NETWORKS, INC.  CH: 11 | : |
| AND NETWORKS, INC. AND | : Philadelphia, Pennsylvania |
| TECHNOVATIVE MEDIA, INC. | : December 4, 2024 |
| | : 12:53 p.m. |
| . . . . . . . . . . . . . . . . . . | : |

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Chapter 11 Trustee: | Michael D. Vagnoni, Esq. |
| | Edmond M. George, Esq. |
| | Obermayer Rebmann Maxwell & |
| | Hippel LLP |
| | Centre Square West |
| | 1500 Market Street, Suite 3400 |
| | Philadelphia, PA 19102 |
| | 215-665-3066 |
| | |
| | Steven M. Coren, Esq. |
| | Kaufman Coren & Ress, P.C. |
| | Two Commerce Square |
| | Suite 3900 |
| | 2001 Market Street |
| | Philadelphia, PA 19103-2713 |
| | 215-735-8700 |
| | |
| For Visual Semiconductor, | John H. Thompson. Esq. |
| Inc.: | Akerman |
| | 750 Ninth Street, N.W. |
| | Washington, D.C. 20001 |
| | 202-824-1760 |
| | |
| | R. Adam Swick, Esq. |
| | Akerman |
| | 500 West 5th Street, Suite 1210 |
| | Austin, TX 8701 |
| | 737-999-7103 |

```
For Rembrandt:                     Andrew Peter Demarco
                                   Devlin Law Firm, LLC
                                   1526 Gilpin Avenue
                                   Wilmington, DE 19806
                                   302-449-9010


For Leia Inc.:                     Keri P. Ebeck
                                   Michael Watters
                                   Bernstein & Berkley, Attorneys
                                   at Law
                                   601 Grant Street, 9th Floor
                                   Pittsburgh, PA 15219
                                   412-456-8100


SeeCubic, Inc.:                    Marley Brumme, Esq.
                                   Skadden Arps Slate Meagher &
                                   Flom, LLP
                                   500 Boylston Street, 23rd Floor
                                   Boston, MA 021116
                                   617-573-4800


Also Appearing:                    Rediah Braham
```

```
Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.
```

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES: |  |  |  |  |
|  |  |  |  |  |
| William Homony |  |  |  |  |
| (By Mr. Thompson) | 24 |  |  |  |
| (By Mr. Michaels) |  | 52 |  |  |
| J. Scott Victor |  |  |  |  |
| (By Mr. Swick) | 61 |  |  |  |
| (By Mr. Vagnoni) | 71 |  |  |  |

```
 1  DECEMBER 4, 2024                              12:53 P.M.

 2            THE COURT:  The 1:00 matter is the matter of Stream

 3  TV Networks.  It is a motion to approve a sale.

 4            I know we have several parties in the courtroom.  We

 5  will take their appearances first, and then we will go to the

 6  people on the phone.

 7            MR. GEORGE:  Good morning, Your Honor.  Ed, Edmond

 8  George.

 9            THE COURT:  It is afternoon.  I always say --

10            MR. GEORGE:  Good afternoon, Your Honor.

11            Edmond George and Michael Vagnoni from the Obermayer

12  firm on behalf of William Homony, the Chapter 11 Trustee.

13            MR. COREN:  Good afternoon, Your Honor.

14            Steve Coren, Special Counsel for the Trustee.

15            THE COURT:  Okay.

16            MR. THOMPSON:  Good afternoon, Your Honor.  John

17  Thompson, as well as my colleague, Adam Swick, from Akerman.

18  On behalf, excuse me, on behalf of VSI.

19            MR. DEMARCO:  Good morning, Your Honor.

20            Andrew DeMarco from the Devlin Law Firm, here on

21  behalf of Rembrandt, with my co-counsel, Chris Michaels, also

22  from Rembrandt.

23            THE COURT:  Sir, do you want to put your name of the

24  record?  Come on up to the podium.

25            MR. BRAHAM:  My name is Rediah Braham (phonetic).
```

```
 1    I'm a creditor from Stream TV.

 2              THE COURT:  Okay.

 3              MR. BRAHAM:  They owe me a lot of money.

 4              THE COURT:  Okay.

 5              MR. BRAHAM:  I'm a very poor guy.  I cannot afford to

 6    get --

 7              THE COURT:  Oh.

 8              MR. BRAHAM:  -- a lawyer or anybody.

 9              THE COURT:  Okay.

10              MR. BRAHAM:  But right now, Mathu is offering us 90

11    cents to a dollar.  I am very humbly requesting to kindly give

12    the company back to Mathu and let him pay everybody so we can

13    survive.

14              THE COURT:  Okay.

15              MR. BRAHAM:  I just wanted to say that.

16              THE COURT:  No problem.

17              MR. BRAHAM:  Thank you.

18              THE COURT:  Thanks for letting us know.

19              MR. BRAHAM:  Thank you.

20              THE COURT:  Okay.  All right.  So I thought perhaps

21    you would -- did you want to say something?  Pam is giving me a

22    look.

23              Yeah, go ahead.  What is your thought?

24              THE CLERK:  There might be people on the phone.

25              THE COURT:  Oh, I forgot.  I am sorry.  Yeah, people
```

1   on the phone.

2           Would you please put your appearance on?

3           MS. EBECK:  Good afternoon, Your Honor.  Keri Ebeck

4   on behalf of Leia Inc.  I also have my co-counsel Michael

5   Watters on the phone.  If any -- we are basically here to

6   listen, but if anything comes up, Mr. Watters will be handling.

7           THE COURT:  All right.  Thanks, Ms. Ebeck.

8           Anyone else on the phone?

9           Good.  Okay.  That was easy.

10          All right.  Mr. George, I thought perhaps you could

11  do a proffer.  Would you want to do a proffer?

12          MR. GEORGE:  I will, Your Honor.  DO you want to --

13          THE COURT:  Unless you guys --

14          All right.  Well, you do the proffering, and we will

15  see what they say.

16          MR. GEORGE:  Okay.

17          THE COURT:  Okay.

18          MR. GEORGE:  Your Honor, I will deal with the other

19  exhibits and things after I am done with the proffer.

20          We have two witnesses today, Mr. Homony who is the

21  Chapter 11 Trustee, and Mr. Victor.  They have both filed

22  declarations in this case which we have marked in our Exhibit

23  Book as 1 and 2.  We have asked that those be moved into the

24  record.

25          If called to the stand, Mr. Homony would testify

1    consistent with his declaration;

2            That he was retained as a Chapter 11 Trustee in this

3    case after the management was removed pursuant to a motion to

4    appoint a Chapter 11 Trustee;

5            That he retained SSG Capital advisors to conduct the

6    sale process for the assets;

7            That he has experience as a trustee in this vicinage;

8            That he had robust and good-faith negotiations with

9    Hawke and SLS that resulted in the Hawe settlement;

10           That he approved putting the Debtor's assets up for

11   sale;

12           He approved the stalking horse bid and designated the

13   stalking horse bidder as the successful or winning bidder,

14   there having been no parties expressing any interest in the

15   purchase of the assets, even following the subsequent and

16   additional teaser information that Your Honor directed at the

17   hearing on the bidding protections;

18           That his decision to sell was grounded in business

19   judgment based on the fact that when he took over the case,

20   there was no money in the case.  The Estates were

21   administratively insolvent.  The Estates have been in a

22   protracted fight with the secured creditors for a number of

23   years.  There had been three previous bankruptcies, two of

24   which were dismissed on the basis of bad faith;

25           That the Bankruptcy Court provided a very limited

1    extension of time within which the Trustee could find a

2    purchaser for the property, or for the assets;

3             That he applied to the Bankruptcy Court for an

4    extension of the automatic stay, and was given until July 15th

5    to effectuate the transfer or the settlement, with a July 15th

6    scheduled hearing date in the Delaware 225 action;

7             The Trustee made a decision that selling the assets

8    pursuant to the sharing and settlement agreement with Hawk was

9    in the best interest of the creditors;

10            That at the time, there was a lawsuit that gave the

11   secured creditors relief to go back to Delaware to redo the

12   Board of the Debtor's;

13            That there were no business activities, no workers,

14   no factory, no raw materials, no finished goods, no WIP, a

15   bonding machine that was palleted and located in China, and no

16   accounts receivable, as well as $3 million in purported

17   administrative expenses in favor of the Lewis Brisbois firm.

18            Accordingly, the Trustee, based on those factors,

19   made a decision to sell the assets of the property.

20            The Trustee did meet with and tried to work with Mr.

21   Rajan and VSI to entertain legitimate proposals from VSI to buy

22   or restructure the operations of the Debtor.  Neither VSI or

23   Mr. Rajan ever demonstrated a viable proposal that was

24   supported by a commitment of a financial nature that would

25   allow the Trustee to make a decision to make an arrangement

1   with Mr. Rajan or VSI.

2          That he requested VSI fund a DIP in order to fund

3   litigation in the case, which VSI failed to do, and the Trustee

4   eventually settled with Hawk.

5          And even after the Hawk settlement, the Trustee

6   continued to discuss potential acquisitions with the VSI

7   parties, so much so that he held off on filing the procedures

8   motion for about ten days while he continued to communicate

9   with the Hawk parties, or I mean the VSI parties, but within

10  that time, there was no proposal that was made;

11         That the Trustee authorized the sale motion and

12  procedures motions, that he reviewed the results of SSG's

13  efforts and believes that a robust and full marketing of the

14  assets have occurred.

15         He has reviewed the results of the sale process, and

16  having received no bids, has concluded in the exercise of

17  business judgment, that the stalking horse bid in the highest,

18  best, and only bid for the assets of the Estate.  And that was

19  all Mr. that Homony would testify.

20         THE COURT:  Okay. All right.  Did you gentlemen want

21  to respond to the proffer that was made?

22         MR. THOMPSON:  Well, Your Honor, on behalf of VSI, I

23  would object to the timing and sufficiency of the testimony

24  that has been put in by proffer.  But we will, of course, get

25  an opportunity to cross-examine both witnesses.

```
 1            I think there is a preliminary matter though, Your
 2   Honor, that I think we need to take up based upon these
 3   proffers and the declarations that were filed yesterday for
 4   something that was filed this morning, which was an amended
 5   order, form of order, for this sale.
 6            Your Honor, I guess, let me take the podium, because
 7   it is going to be a minute.
 8            THE COURT:  Okay.
 9            MR. THOMPSON:  Your Honor, I have been doing this a
10   while.  And to say that this is one of the more exceptional
11   last-minute orders I have seen would be putting it graciously.
12            This sale order demonstrably changes the terms of the
13   agreement, and ultimately, the sale, that this Trustee purports
14   to want to do with this stalking horse.  It bears very little
15   resemblance to what this Court approved in the 9019 sale or
16   9019 settlement agreement providing for a sale.
17            It includes unconstitutional releases, injunctions,
18   gatekeeper provisions, a whole ration of relief.  And it is all
19   being granted, I guess, at the 11th hour by the Trustee and
20   asking this Court to bless it, because this stalking horse
21   bidder will not go forward on the agreement that they struck in
22   May and ultimately had approved in June.  They have been
23   telling us for months and months as we tried to propose
24   alternatives and ask this Court to reconsider that 9019
25   settlement agreement.
```

```
 1              It is not -- there is nothing we can do about it.  It
 2    is too -- it is binding.  So if it is binding, it is also
 3    binding upon the Hawk parties.  This stalking horse bidder came
 4    to this process saying that they would abide by the agreement
 5    that was struck in June and that this Court approved.  They are
 6    not doing that.
 7              This Trustee is now saying that because they might
 8    back out and they will not agree without the Court blessing
 9    this additional relief.  It is quite a red line.  Unless they
10    do that, excuse me --
11              THE COURT:  Let's listen to Mr. George.
12              MR. THOMPSON:  Unless they do that, this sale isn't
13    going through, at least that is what we read.  And I don't
14    think it is very complicated, Your Honor.
15              THE COURT:  Let's just drill down to the specifics.
16    The one provision of the revised sale order that I had a
17    question about was that all along, it was my understanding that
18    Hawk was taking the position that if I agreed to the sale, that
19    whatever litigation you may face by VSI and Rembrandt, you were
20    going to face.
21              But when I read the paragraphs 13, 14, and 15 of the
22    sale order, it sort of purports now to making me a gatekeeper
23    to any kind of litigation.  That was my understanding of that,
24    of those provisions.  And the concern I had about those
25    provisions are that I don't care to be that gatekeeper.  If I
```

```
1    do authorize the sale, then whatever litigation they may want

2    to bring, they are going to bring.

3              MR. GEORGE:  Well, Your Honor, first of all, let me

4    just say two things.  I think Mr. Thompson is a little over his

5    skis what he says that --

6              THE COURT:  All right.  Well, let's just assume

7    everyone is emotional.  I know, I mean, you guys are all going

8    to count, you know --

9              MR. GEORGE:  But that is just -- yeah.  But to say --

10             THE COURT:  -- paint the other person as, you know.

11             MR. GEORGE:  Understood.  But to say that there is

12   any indication that Hawk isn't going to close, it is just wrong

13   and improper.

14             THE COURT:  Well, but what they are saying is that --

15             MR. GEORGE:  It's a form of --

16             THE COURT:  -- what they are saying is that it is --

17   let's do this.  Let's not respond, and preferably, let's not

18   state things emotively.  All right?  So let's just take away

19   what he was saying.  He was saying that there are provisions in

20   there that are either unconstitutional, that there is a lot of

21   changes.  And I would have to agree with him, Mr. George, there

22   are a lot of changes.  We had to review these changes today.

23             MR. GEORGE:  Understood, Judge.

24             THE COURT:  But specifically, the point that I just

25   raised is something that is near and dear to their heart, that
```

1  they have been hopping mad since the beginning of time about

2  what you guys want to do here with regard to their licensing

3  rights.  And they do seem to want to sue someone.

4          So I am not going to be the gatekeeper of that

5  litigation.  I am not going to decide if something is

6  meritorious.  So at this point, I am not really interested in

7  making those revisions to the sale or that you suggested.

8          So you could respond to that point.

9          MR. GEORGE:  No, that is fair enough, Your Honor.

10  Because I think the Trustee's intention, and I think we have

11  said all along is that we are selling interests in these

12  downstream entities.  And if the parties on that side of the

13  table feel like they have claims, nothing we are doing is going

14  to change that because we don't own those downstream assets.

15          THE COURT:  Okay.  So reconcile what these new

16  paragraphs say though.

17          MR. GEORGE:  Well --

18          THE COURT:  These new paragraphs now say that I'm

19  supposed to be a gatekeeper.

20          MR. GEORGE:  -- sure.  I can work on this with the

21  counsel to Hawk, and maybe we can address that.

22          THE COURT:  Okay.

23          MR. COREN:  Thank you, Your Honor.  Yes.  We just

24  confirmed, their -- the litigation and the claims of SeeCubic

25  or of Rembrandt that are going on in the District of Delaware

1   right now, and any claim that intellectual property litigation

2   is going to move forward against the Debtors an assumed

3   liability under the asset purchase agreement, as is made clear

4   in the order.  That is not subject to the gatekeeper provision.

5   That is going to go forward and that litigation is going to be

6   able to move forward.  And if that needs to be made more clear

7   here, we absolutely will.

8               THE COURT:  Okay.  I just want to clarify that VSI

9   and Rembrandt are going to have the right to pursue all of

10  their arguments with regards to the infringements.  Okay?

11              MR. MICHAELS:  That is absolutely, correct, Your

12  Honor.

13              THE COURT:  And right now, I don't feel like that

14  language is clear.

15              MR. GEORGE:  Your Honor?

16              THE COURT:  Yeah?

17              MR. MICHAELS:  With respect --

18              MR. GEORGE:  Before Mr. Michaels starts --

19              THE COURT:  Uh-huh.

20              MR. GEORGE:  -- is he a witness or a lawyer?  Because

21  the last time he sat at that table and he testified.  I know

22  you said don't be emotive.

23              MR. MICHAELS:  I am a lawyer.

24              MR. GEORGE:  I am doing everything I could do.  Mr.

25  Coren left a dent in my knee from kicking me because I sat

 1   while Mr. Michaels testified and advocated at the same time.

 2   So I would like that clarification.  Why is he here, is he a

 3   witness?  If he is, he can't make presentations.

 4          THE COURT:  I thought he was a lawyer.

 5          Are you a lawyer, sir?

 6          MR. MICHAELS:  Yeah, I am serving as an attorney for

 7   Rembrandt 3D.

 8          THE COURT:  Okay.  He is serving as an attorney, so

 9   he is making argument.

10          MR. GEORGE:  Fair enough.

11          THE COURT:  Okay.

12          MR. MICHAELS:  Your Honor, I would like to read, not

13   -- no -- you said, let's get to what the facts are rather than

14   emotive response.  Well, the language they added to Section EE

15   in the proposed order states the Buyer asserts that it will --

16          THE COURT:  Yeah, I read that.

17          MR. MICHAELS:  -- not consummate the transaction.

18          THE COURT:  Okay.  So they are going to take

19   responsibility for assumed liabilities, at the assumed

20   liabilities are your litigation.  We looked at the defined term

21   of assumed liabilities, and that is part of it.

22          Let's just all agree to the concept.  I am telling

23   you right now that I am not approving any sale order unless

24   they preserve their rights to go after Hawk in connect

25          MR. MICHAELS:  Understood, Judge.

```
1            THE COURT:  Okay.  Hawk, would you like to say

2   something?

3            MR. CAPONI:  Yes, Your Honor.  Just to be clear, Hawk

4   is not the purchaser or the stalking horse.  Hawk is the

5   collateral agent SeeCubic, so --

6            THE COURT:  Okay.  When I say Hawk --

7            MR. CAPONI:  -- if we are going after somebody --

8            THE COURT:  -- it's like the umbrella.

9            MR. CAPONI:  -- like, let's try to drop Hawk if we

10  don't --

11           THE COURT:  Sure.

12           -- we can be a little clearer about that, that is

13  all.

14           THE COURT:  Yeah, whoever the Buyer is, they are --

15           MR. CAPONI:  We are going to buy it.

16           THE COURT:  -- going to face all of this litigation.

17           MR. CAPONI:  That is correct, Judge.

18           THE COURT:  Okay.

19           MR. THOMPSON:  So Your Honor, to be clear, and we can

20  submit testimony and we are here with witness of our own, the

21  action that initiates the right to sue, the transfer, is the

22  closing.  Right?  Stream has a license from Rembrandt and it is

23  perfectly valid.  They have not committed any IP infringement.

24  I asked them to clarify, is Scott Victor running around

25  providing offering for sale assets of the company covered by
```

1   our license.  Right?  We believe they are.

2          Rembrandt's position is actually, we don't have the

3   right to sue Stream and its executives because they have a

4   valid license to our technology. What they don't have the right

5   to do is to transfer our trade secrets to another party --

6          THE COURT:  I understand.

7          MR. THOMPSON:  -- and effectively, what they are

8   doing.

9          THE COURT:  I understand.

10          MR. MICHAELS:  And so what I am saying is the day of

11  the closing, SCBV, Stream, all of its officers, are violating

12  1830 -- U.S.C. 1832, right?  Not the day before, not the

13  minute.  That is the transaction that does it.  And those that

14  are receiving it are likewise violating that statute.  And SCBV

15  is implicated, Stream, all of the executives involved.

16          And this is purporting, the reason I started reading

17  this clause is I think it is the most important thing that they

18  have submitted.  The Buyer is unwilling to proceed.  There was

19  an asset purchase agreement that was submitted for everybody

20  to, you know, to get approved, and there was a 9019 settlement.

21  And they are not willing to proceed, that is what they have

22  said.  Unless we get these unique protections that you are just

23  providing five minutes before I got in my car to drive to this

24  hearing today, they are not going to proceed.

25          So they have told us everything we need to know.

 1    This sale isn't happening.  I would move, at the beginning of

 2    this, to say this sale is no longer before this Court, the

 3    Buyer won't go.

 4              THE COURT:  I just clarified that if the sale does go

 5    through, you will be able to sue the Buyer.

 6              MR. MICHAELS:  With respect, Your Honor.  That is an

 7    issue I certainly care deeply about.  The issue I am bringing

 8    before, the nuance of what I am stating today is that there was

 9    a motion to approve the (audio interference) purchase and the

10    sale.  And the Buyer has told the Trustee they are unwilling to

11    proceed unless the deal that they sought approval for changes,

12    right?  They are calling off the sale.

13              My request is that the motion be denied and they come

14    back again when they have worked out what their asset purchase

15    agreement is going to be and we have a time to actually respond

16    to the asset purchase agreement being asked for approval for

17    this Court.

18              THE COURT:  I am confused by how you are

19    characterizing this.  They did make a lot of changes.  But the

20    assumed liabilities definition includes the litigation you guys

21    have, so the Buyer is agreeing to still be on the hook for

22    that.  So what changes are they asking for that makes this sale

23    not able to go forward?

24              MR. MICHAELS:  They have -- I mean, I am looking

25    right at Section EE, and it says, specifically, unless the

1  asset purchase agreement specifically provides, and this Court

2  specifically orders, that the Buyer, its properties, its

3  successors and assigned and their respective property and the

4  assets will not have any liability whatsoever with respect to

5  require to satisfy in a manner whether in law and equity,

6  whether by payment, setoff or otherwise, directly or

7  indirectly, any claim or lien or any successor or transfer

8  liability, excuse me, ability for either of the Debtors, other

9  than the assumed liabilities.

10          THE COURT:  Other than the assumed liabilities.  So

11  they are in the assumed liabilities.

12          MR. MICHAELS:  I understand Rembrandt is in the

13  assumed liabilities.  That, and I do appreciate that your

14  statements with regard to Rembrandt's claims. But Your Honor --

15          THE COURT:  The Debtor can't get sued anymore, right?

16          MR. MICHAELS:  -- what I am raising --

17          THE COURT:  Uh-huh.

18          MR. MICHAELS:  -- is that this is not the asset

19  purchase agreement that they moved for approval.  They have

20  radically changed it.

21          THE COURT:  In what way have they radically changed

22  it?

23          MR. MICHAELS:  Well, I am looking at a redline

24  agreement which I have had five minutes to read.  So I would

25  ask for a continuance for the opportunity to answer that

```
 1   question fulsome.

 2            THE COURT:  Summarize for me, give me, like, the

 3   biggest ticket item --

 4            MR. MICHAELS:  The point is, Your Honor, five minutes

 5   was insufficient time for me to review all of the changes.

 6            THE COURT:  You said the purchase agreement has

 7   changed.  I agree that there were revisions, but I had time to

 8   look at the blackline.  I had concerns, and I just raised my

 9   concerns with them to clarify that your litigation will go

10   forward.  But other than that, can you even point to something

11   that is --

12            MR. MICHAELS:  Your Honor, I can, right?

13            THE COURT:  Yeah?

14            MR. MICHAELS:  Your Honor pointed to the gatekeeper

15   provision.

16            THE COURT:  Right.

17            MR. MICHAELS:  I will point to the injunction.

18            THE COURT:  And I am striking that.  There is -- you

19   are going to be able to go after the Buyer.

20            MR. MICHAELS:  And the injunction, the injunctive

21   relief that they have got in -- that they are suggesting in 14?

22            THE COURT:  The injunctive relief --

23            MR. MICHAELS:  -- right?  They are looking for

24   injunctive relief for these stalking horse bidders as protected

25   parties under this revised agreement, which basically --
```

| 1 | THE COURT:  All right.  Let me just make this clear. |
| 2 | MR. MICHAELS:  Okay. |
| 3 | THE COURT:  You guys, Rembrandt and VSI, you can go |
| 4 | crazy with whatever litigation you want against the Buyer. |
| 5 | Period.  End of story. |
| 6 | I will make sure that if I do enter the sale order |
| 7 | you have got those rights.  Okay? |
| 8 | MR. MICHAELS:  Your Honor, the problem is, they are, |
| 9 | the stalking horse bidder, through the Trustee, is now making |
| 10 | this as Mr. Michaels clearly pointed out in their own language, |
| 11 | the contingency for their participation in this sale. |
| 12 | THE COURT:  But they have asked for things in the |
| 13 | blackline proposed sale order that I am not going to give them. |
| 14 | It seemed to me that were asking me to be a gatekeeper for your |
| 15 | litigation against them.  I am not going to do that. |
| 16 | So what other changes are there to the proposed sale |
| 17 | order that you think is so dramatic? |
| 18 | MR. MICHAELS:  Well, I think it is exceptional that |
| 19 | they are actually suggesting that they are not prepared unless |
| 20 | they get it.  Which means, if Your Honor is not going to give |
| 21 | it, they are not prepared to close. |
| 22 | THE COURT:  Okay.  Well, I just told them that I am |
| 23 | not going to give it to them, and they said okay. |
| 24 | MR. MICHAELS:  So I think what we need is a |
| 25 | representation from the stalking horse bidder today and now |

```
 1   that they will close, notwithstanding the fact that Your Honor

 2   will not provide that relief.

 3           THE COURT:  Go ahead, Ms. Brumme.

 4           MS. BRUMME:  Good afternoon, Your Honor.

 5           Marley Brumme from Skadden Arps for the Buyer, the

 6   stalking horse bidder, SeeCubic Inc.

 7           I am not sure where Counsel has gotten the idea that

 8   we are backing out of this as a purchase agreement or the sale

 9   in any way, shape, or form.  And I am certainly not sure where

10   they have gotten the idea that there has been discussions of

11   that that they haven't been a part of between our client and

12   the Trustee.

13           But to be clear, yes, my client is prepared to move

14   forward with the sale, fully understanding that the Counsel on

15   this side of the table over here is going to probably, as you

16   said, sue us every which way to Sunday --

17           THE COURT:  Uh-huh.

18           MS. BRUMME:  -- on violations --

19           THE COURT:  Yep.

20           MS. BRUMME:  -- so.

21           THE COURT:  Thank you.  All right.  Now let's do

22   this.  So we have two witnesses for today.  Who do you -- do

23   you need to cross-examine both of them?

24           MR. THOMPSON:  Yes.  And --

25           THE COURT:  All right.  And let's just be absolutely
```

1  crystal clear about what kind of cross-examination questions I

2  am going to permit today.  I am not going to permit any cross-

3  examination questions about issues that I have already

4  resolved.  I don't want to hear them.  We have already heard

5  all of them.  So the extent that you are questioning the 9019

6  order and the fact that Hawk has been approved as, you know,

7  the person under that 9019 order.  And that they have --

8  whether they have acted in good faith in this case or not, I

9  don't want to hear any questions.  I have already heard all of

10  them.

11        I just want to hear questions about whatever they

12  have said in the affidavits that they just recently filed that

13  have to do with my sale today.  Those are the only questions

14  that I feel like entertaining today.  Okay?

15        All right.  So do you want to bring up the Trustee

16  first?

17        MR. GEORGE:  Mr. Homony.

18        THE COURT:  Yeah.  Yep, that is fine.

19        You can go ahead and start.

20     (Trustee sworn)

21        THE CLERK:  Can you please state your name and spell

22  your last name for the record?

23        MR. HOMONY:  William A. Homony, H-O-M-O-N-Y.

24        THE CLERK:  Okay.  Thank you.

25        MR. HOMONY:  Sure.  1730 Maple Avenue, Hatfield,

```
 1   Pennsylvania, 19440.

 2         (Audio interference)

 3            MR. GEORGE:  -- 1 through 6.

 4            MR. THOMPSON:  Thank you.  John Thompson on behalf of

 5   VSI.

 6                        DIRECT EXAMINATION

 7   BY MR. THOMPSON:

 8   Q    Good afternoon, Mr. Homony.

 9   A    Good afternoon.

10   Q    Mr. Homony, how long have you been a Chapter 11 Trustee?

11   A    Well, this is my first engagement as a Chapter 11 Trustee,

12   and it began in January of 2024.

13   Q    Okay.  Mr. Homony, do you remember a meeting or a set of

14   communications that you had with the VSI constituents'

15   principals?

16   A    I've had many, so.

17   Q    Do you remember having them shortly after your appointment

18   in January?

19   A    Sure.

20   Q    Did you ask those principals for assistance in

21   understanding the Stream TV case?

22   A    Yes.

23   Q    Did you exchange email with them?

24   A    Sure, yes.

25   Q    Did you give them directions?
```

```
1   A     Did I give them direction?

2   Q     Did you give them directions?

3   A     I think I asked for documents in support for positions

4   that they wanted me to advocate.

5   Q     Okay.  Did you ever do an inventory of the assets of

6   Stream TV?

7   A     Well, that was one of the issues in the case that is not

8   typical in a Chapter 11 Trustee case.  There were no operations

9   and it was unclear at the time, and remains unclear, exactly

10  which entities of Mr. Rajan's have possession of tangible

11  assets, records, et cetera.  So I don't believe Stream TV has

12  certainly any significant tangible assets.  And if they do, I

13  have not been aware -- made aware of them or know their

14  location or who is in control of them.

15  Q     That was a long example, Mr. Homony.  So I am going to

16  break it down.  I asked you the question did you do an

17  inventory of Stream's assets; yes or no?

18  A     I would say generally, yes.

19  Q     You did?

20  A     Yes.

21  Q     How did you do that inventory?

22  A     Through reading through various materials, the case

23  filings, the various adversary matters, the history of the

24  case, the filings in the Chapter 11 case up through my

25  appointment, and other records I obtained from either Stream or
```

```
 1   VSI personnel.

 2   Q    Did you talk to other parties?

 3   A    Yes.

 4   Q    Who were those parties?

 5   A    Those parties were, again, Mr. Rajan, Nicole Maneen, the

 6   employees of SeeCubic, B.V. in the Netherlands.  I certainly

 7   spoke to Mr. Stastney over time, his counsel, Hawk's counsel,

 8   all of the relevant parties and interests that you would think

 9   a Chapter 11 Trustee would talk to in this situation.

10   Q    And did you accumulate an asset list from all of those

11   communications in that investigation?

12   A    Again, I think the assets that I identified through my

13   investigation are included in the APA, both those that are

14   being purchased as well as the excluded assets.

15   Q    All of the assets are identified in the APA?

16   A    I believe, generally, the assets of Stream are identified

17   in the APA, yes.

18   Q    And those assets are assets that are being transferred

19   under this sale, correct?

20   A    Stream is identifying a, certainly, a set of assets to the

21   Buyer, yes.

22   Q    If you were to look at the APA, which is on the docket --

23   A    Uh-huh.

24   Q    -- and certainly, we can have you take a look at it, but

25   it describes all of the assets that Stream TV holds or may
```

```
 1  hold, correct?

 2  A    Yes, except for the specifically identified excluded

 3  assets, yes.

 4  Q    Okay.  That includes, among other things, physical

 5  property, intellectual property, yes?

 6  A    I would suggest that they are -- I don't believe I am

 7  transferring any tangible property of Stream, and I don't

 8  believe I am transferring any intellectual property that is

 9  owned by Stream.

10  Q    You don't believe that you are actually transferring any

11  intellectual property owned by Stream?

12  A    No.

13  Q    You are doing this as an as is where is sale, right?

14  A    That's correct.

15  Q    What does that mean, Mr. Homony?

16  A    That means, buyer beware.  The Buyer gets the assets in

17  any condition, in any form, no reps or warranties.  They can't

18  come back.  There is no recourse to the Estate.

19  Q    Wherever they are, right?

20  A    Correct.

21  Q    Does the location, possession, or circumstance, right,

22  change who owns that property?

23  A    Can you repeat that?  I am sorry.

24  Q    Does the location, you said as is and where is, right?

25  A    Uh-huh.
```

```
 1  Q    Does the location or the condition change who owns the
 2  property?
 3  A    No.
 4  Q    It is the Debtor's, it is part of the Debtor's Estate,
 5  right?
 6  A    Well, certain assets are a part of the Debtor's Estate.
 7  Q    So for instance, the bonding machine that is in Asia is a
 8  Debtor asset, right?
 9  A    Well, as I have testified before, there is certainly a
10  cloud over the title in the way in which it was -- the way it
11  was explained to me as being addressed when a Receiver was
12  appointed over Technovative before this bankruptcy case was
13  initiated.  I do believe it is listed as an asset of Stream on
14  Stream's Schedules.  So the extent it is owned by the Debtor,
15  and I misspoke previously, this is the only tangible piece of
16  equipment that the Debtor's Estate may own.  However, it may be
17  titled already in the Netherlands under the SCBV.  Either way,
18  in this proposed sale, it is being conveyed to the Buyer.
19  Q    But the only document that you have ever seen is a receipt
20  that tells you that Stream TV is the owner of that; is that
21  correct?
22          MR. GEORGE:  Objection to form, Your Honor.
23          MR. THOMPSON:  Excuse me, I will rephrase.
24  BY MR. THOMPSON:
25  Q    Is the owner of the bonding machine located in Asia is
```

1    Stream TV?

2    A    I am not sure I have ever seen a bill of sale or anything

3    like that.  I think it was manufactured over time, many, many

4    years ago.  And my understanding is it has been in China for

5    over a decade.  So I don't know that I have seen a specific

6    document that you just referenced.

7    Q    You suggested that somebody had told you that there might

8    be cloud over that title to the bonding machine; is that right?

9    A    That is correct.

10   Q    Who told you that?

11   A    I think -- I think I've read it many things, and I believe

12   that SCBV personnel have referenced the fact that, I believe,

13   the Receiver may have put it in SCB's name in order to pay for

14   the storage, et cetera, in China for a period of time.

15   Q    You said that the SCBV Receiver would have put it in

16   SCBV's name?

17   A    He may have titled it in their name for it.

18   Q    So how would the SCBV Receiver have retitled a piece of

19   property that the Stream Estate owned?

20   A    I don't know how he did it.

21   Q    You wouldn't know how he did it. Have you seen any

22   document that establishes any right, title, or interests over

23   the bonding machine in SCBV, aside from what people have told

24   you?

25   A    Not that comes to mind.

1  Q     Nothing, huh?  Okay.  But nevertheless, your asset purchase

2  agreement and the documents that you have filed in favor of

3  this sale suggest that there is some potential that the bidder

4  or the Buyer would not actually receive title of that; is that

5  right?

6  A     No, not at all.  I think it is very clear that the Buyer

7  will get title, regardless of how it is currently titled.  They

8  are either going to get it if Stream owns it or if SCBV owns

9  it.  They are going to get it through the equity interest of

10  SCBV.  So they will have control over that asset regardless of

11  who currently has title.

12  Q     That is important.  So they do have control if they buy

13  these assets?

14  A     Control over what?

15  Q     Over SCBV.

16  A     Well, ultimately I am transferring what I believe, the

17  defined term, transferred interests, in the APA, which

18  constitutes three subsidiaries of Technovative, which is one of

19  the Debtor entities.  And so they will be the economic interest

20  holder in Ultra-d Ventures, which is a non-Debtor foreign

21  subsidiary.  That entity ultimately, I believe, indirectly owns

22  SCBV.  So I would suggest that ultimately they will have

23  control should they choose to exercise it over SCBV.

24  Q     SCBV ultimately is owned by the Topco's Technovative and

25  Stream TV that are Debtors in this case, right?

```
 1              MR. GEORGE:  Objection, Your Honor.
 2              THE COURT:  Okay.  What was your objection, Mr.
 3    George?
 4              MR. GEORGE:  I think he said that it was owned by
 5    Technovative and Stream TV.  Oh, I am sorry.
 6              MR. THOMPSON:  Let me rephrase.
 7              THE WITNESS:  Yes, sir.
 8    BY MR. THOMPSON:
 9    Q    Does the ownership interest of SCBV, wherever it is in the
10    stack, ultimately run up through Technovative at the first
11    level and Stream TV at the second?
12    A    Well, I wouldn't say the first level.  There are many
13    foreign subsidiary levels before you get to the U.S. Debtor
14    Technovative.  So as I just described, I believe it is
15    Technovative, which is a U.S. Debtor.  It is Ultra-d Ventures,
16    which is a non-Debtor foreign subsidiary who then owns another
17    foreign subsidiary, Ultra D cooperative who then owns SCBV.
18    It's a chain.
19    Q    Yes, I understand, and I thought my question was
20    accounting for it.  Perhaps it wasn't, but thank you for the
21    clarification, Mr. Homony. The question really is who controls
22    all of those subsidiaries, including SCBV?
23    A    Ultimately, I believe the buyer will be able to exercise
24    control of them.
25    Q    The buyer.  Who does right now?
```

```
 1   A    Who does right now?

 2   Q    Yes.

 3   A    Exercise control over SCBV?

 4   Q    All of the subsidiaries below Technovative.

 5   A    Well, I have -- the Debtor's Estates have an ownership

 6   interest in Ultra-d Ventures.

 7   Q    They control everything below Technovative, do they not?

 8   A    I wouldn't -- I wouldn't, I mean, the facts and

 9   circumstances change depending on what a particular entity

10   would want to do.

11   Q    Well, does the sale process, Mr. Homony, who has control?

12   Because we just talked about the Hawk parties, if they are the

13   successful Buyers, they would have control for purposes of the

14   bonding machine we talked about.  Does that change the process

15   from what exists right now?

16   A    Well, obviously --

17   Q    In a case where you sit as the Trustee to these Debtors?

18   A    Well, I guess, maybe I am speculating.  I would suggest

19   that the Buyer is going to exercise control over all of those

20   entities post-closing.

21   Q    And they would do so because?

22   A    Because of the legal ownership interest in the corporate

23   structure I just described.

24   Q    Right.  And right now, who has control of the legal

25   ownership interests?
```

```
 1   A    Well, ultimately, Technovative has ownership interest, an
 2   economic ownership interest in, as I described.
 3   Q    And who has control over Technovative --
 4   A    I do.
 5   Q    -- and the Stream Debtors?
 6   A    Okay.
 7   Q    Thank you.  That is where I was really going, Mr. Homony.
 8   A    Okay.  Uh-huh.
 9   Q    Right.  You have control, right?
10   A    I have an ownership interest in --
11   Q    You can control, right?
12   A    Well, that is a -- to me, that is a legal conclusion, that
13   is a different determination.
14   Q    Okay.
15   A    I don't think I have control over SCBV.
16   Q    You don't think you have control?
17   A    I do not have it right now, no.
18   Q    Did you ever review any of the court proceedings or orders
19   out of the Netherlands Court?
20   A    I don't know specifically.  I do know that there was a
21   dispute as to who could exercise, I guess, control as the
22   director of SCBV.  And I believe the Court in Netherlands, over
23   Stream's objection, appointed Mr. Stastney as the director of
24   See -- SCBV, I believe.  That is a recollection from months
25   ago.
```

```
 1   Q    So is Mr. Stastney in control?

 2              MR. GEORGE:  Your Honor, I object.  Control is a

 3   label --

 4              THE COURT:  I am really confused about all of this.

 5              MR. GEORGE:  -- matters.  I am sorry.

 6              THE COURT:  He has got whatever he has got.  And

 7   there is a corporate structure.  It sounds like he owns certain

 8   equity interests.  And term, if you are asking about, like,

 9   daily operations, it sounds like he is not in control of those.

10              What is the point of all of this questioning?

11              MR. THOMPSON:  Your Honor, I am getting there, right?

12   I am asking for --

13              THE COURT:  What is your point?

14              MR. THOMPSON:  My point is that there is control of

15   certain assets that ultimately are, that run to the benefit of

16   at a minimum, or are controlled by the Stream TV and

17   Technovative Debtors.

18              THE COURT:  And?

19              MR. THOMPSON:  And that matters for purposes of this

20   sale for reasons --

21              THE COURT:  Why?  Right.  So it is what it is.  I

22   mean, they own the equity interests.  They have the rights that

23   they have.  You are not the Buyer, so you are not asking about

24   clarification, so what is the objection?  What is the concern

25   here?
```

```
1              MR. THOMPSON:  Well, I am getting there, Your Honor.
2    I am trying to show that Mr. Homony has control over all of the
3    subsidiaries, and could take control so that he could actually
4    realize the assets and the value of those assets.  And control,
5    in this particular instance, the transfer of those assets.
6              THE COURT:  Yes, Mr. George?
7              MR. GEORGE:  Your Honor, I think this is all
8    irrelevant.  I am going to move to strike the testimony related
9    to this issue of control.
10             THE COURT:  I happen to agree.  I think it is
11   irrelevant.  I mean, you are trying to ask him questions that
12   would suggest that the Trustee has certain powers that you
13   would like to see him exercise, that he doesn't appear to
14   choose to exercise.  He wants to sell the assets that he has.
15   He wants to sell the shares of the subsidiaries as part of the
16   sale, so.
17             MR. THOMPSON:  Fine, Your Honor.  I will move on and
18   we will talk about the assets that he has.
19             THE COURT:  Okay.
20             MR. THOMPSON:  Your Honor, may I speak to this
21   objection?
22             THE COURT:  Excuse me?
23             MR. THOMPSON:  May I speak to this objection?
24             THE COURT:  Okay.
25             MR. THOMPSON:  The relevance, Your Honor, is that the
```

```
 1    Trustee and the stalking horse bidder have routinely and
 2    consistently made the point that this is an asset sale only of
 3    stock in corporations.  And we just came across testimony that
 4    the Trustee provided that there is bonding equipment that the
 5    Buyer is getting by either directly the asset being owned by
 6    Stream or by taking control of the entity SeeCubic B.V., which
 7    owns the bonding equipment.  And either way, it affects a
 8    transfer of ownership of the bonding equipment.  This concept
 9    is going to be incredibly relevant throughout all of
10    Rembrandt's claims.
11            THE COURT:  Sure.  Well they wouldn't --
12            MR. THOMPSON:  We would --
13            THE COURT:  -- the bonding equipment for a while.
14    The bonding equipment is going to the Buyer, that is no
15    surprise.  He just clarified that is really the only hard
16    tangible property that is going to the Buyer that Stream owns,
17    correct, sir?
18            THE WITNESS:  Yes, correct.
19            THE COURT:  Yeah.  So yeah, okay.
20            MR. GEORGE:  And Your Honor, I think that further,
21    that this is just an effort to try to make it look like the
22    Trustee didn't do his job.  It is really an attack on him as a
23    person --
24            THE COURT:  Yeah.
25            MR. GEORGE:  -- and the job that he did here.
```

```
 1              THE COURT:  And I don't see its relevance to the line

 2   of questioning that you are pursuing with the Trustee right now

 3   about, you know, who is the corporate structure or who is

 4   controlling the daily operations.  I don't think any of that is

 5   relevant.

 6              MR. THOMPSON:  Your Honor, I have heard it and I will

 7   move on.

 8              THE COURT:  Thank you.

 9              MR. THOMPSON:  I would only suggest that they will

10   become readily apparent why.

11              THE COURT:  Okay.

12              MR. THOMPSON:  All right.  So --

13              MR. GEORGE:  But Your Honor, if they become relevant,

14   it will be on another day, it won't be today because none of

15   this (simultaneous speech).

16              THE COURT:  All right, Mr. George.  Mr. George, I

17   understand.  Let's go.

18   BY MR. THOMPSON:

19   Q    Mr. Homony, you are familiar with the Stream operations

20   prior to the bankruptcy, correct?

21   A    Well, I wouldn't call them operations.  I am certainly

22   familiar with -- I don't believe Stream has really operated

23   since the omnibus agreement in 2020.

24   Q    So it did operate?

25   A    Prior to the omnibus date, they had operations --
```

```
 1   Q    They had operations.

 2   A    -- as far as I know.  Yes.

 3   Q    Did they have operations in California?

 4   A    I'm not sure that I paid much attention to the location of

 5   the operations, et cetera.  It really was not a factor in my

 6   evaluation of where we are today in 2024, and how to best move

 7   these cases forward and provide a recovery for assets, so.

 8   Q    Do they have assets in California?

 9   A    When?

10   Q    Anytime.

11   A    Well, I --

12            THE COURT:  Well, who cares?  All that we care about

13   are assets now.  All right?  Are you asking questions --

14            MR. THOMPSON:  Well --

15            THE COURT:  -- about assets now in California?

16            MR. THOMPSON:  -- Your Honor, this is relevant.

17            THE COURT:  Okay.  So what is your point?

18            MR. THOMPSON:  I promise you it is relevant.

19            THE COURT:  Just tell me your point, sir.

20            MR. THOMPSON:  My point is that there were assets in

21   California.

22            THE COURT:  Uh-huh.

23            MR. THOMPSON:  There were servers in California.

24            THE COURT:  Uh-huh.

25   BY MR. THOMPSON:
```

1    Q    They were in -- they were Stream's servers and they had

2    Stream's production code on them.  Do you know about that, Mr.

3    Homony?

4    A    When?

5    Q    They had the -- this, they were on these servers in 2020.

6    They were as recently, I believe, as 2021.

7            MR. GEORGE:  Your Honor, is that testimony?  Because

8    that doesn't sound like a question.

9            MR. THOMPSON:  Well, again, I can't --

10           THE COURT:  Well, he was asking about what I asked

11   him.

12           MR. THOMPSON:  -- be asked to do it both ways, right?

13           THE COURT:  Okay.  But so why do we care about the

14   servers in California at some prior date that is no longer --

15           MR. THOMPSON:  Because it has property of the Stream

16   Estate on it, on those servers.  And there is source code,

17   there is production code created by Stream TV, Stream TV's

18   employees, Stream TV's engineers, and that was done with

19   Rembrandt's IT and trade secrets.

20           THE COURT:  Okay.  So -- yeah.  Yeah.  So this sounds

21   like a legal argument.  It doesn't sounds like --

22           MR. THOMPSON:  It -- I -- Your Honor, I am simply

23   trying to establish what this trustee, who is just represented

24   to this Court, there's only item of -- of -- one asset, a hard

25   asset.  There's more than one asset, and it --

```
 1              THE COURT:  Okay.  Well --

 2              MR. THOMPSON:  -- and --

 3              THE COURT:  -- he just said that there's only one.

 4     If you disagree, then we'll have to agree to disagree.

 5              MR. THOMPSON:  I think I need to establish whether

 6     this trustee -- I'll use Mr. George's words -- did his job to

 7     investigate and marshal the assets, and I'm trying to probe

 8     that.  I'm trying to test that proposition.  He suggested he

 9     did.

10              THE COURT:  Well, he's -- you're talking about some

11     servers from California.  I don't really understand how it's

12     relevant.

13              Yes, Mr. George?

14              MR. GEORGE:  Your Honor, in addition, if there -- as

15     Mr. Homony testified -- if there are assets, wherever they are,

16     they're going to belong to the purchaser, and -- and that's the

17     facts of the matter.

18              There hasn't been a single fact established that

19     there are servers in California -- that there's anything on

20     them that's relevant to the hearing on approval of the sale

21     motion.  That's what we're here for today.

22              MR. THOMPSON:  Your Honor, I'm trying to find out

23     where -- what assets Mr. Homony knows about, and he's only told

24     us one.

25              THE COURT:  Yes.
```

```
 1            MR. THOMPSON:  And if that's -- if his answer is --

 2            THE COURT:  That's the one --

 3            MR. THOMPSON:  -- I didn't investigate --

 4            THE COURT:  -- that's the one.

 5   BY MR. THOMPSON:

 6   Q    Did you do any investigation of any other assets, hard

 7   assets or intellectual property assets, for the -- for the

 8   estate.

 9            MR. GEORGE:  Objection to form, Judge.  It's

10   compounded because he lists the two together.  He already

11   testified there wasn't any, like, intellectual --

12            THE COURT:  I think you've already asked him, and he

13   already said the only tangible property that he's investigated

14   is the bonding equipment.  That's it.

15            MR. THOMPSON:  Okay.  So that's the only

16   investigation.

17   BY MR. THOMPSON:

18   Q    Mr. Homony, did you have a meeting with Mr. Rajan, Ms.

19   Menine and their former counsel from Lewis Brisbois, who is no

20   longer counsel at the time, in -- on March 7th, 2024?

21            MR. GEORGE:  Objection, Your Honor, to the extent

22   that there's facts that are stated in that question that aren't

23   in evidence.  He's saying that Lewis Brisbois was not VSI's

24   attorney.  We disagree with that wholly.

25            THE COURT:  Okay.  Do you have any recollection of
```

```
 1    this March meeting, sir?

 2              THE WITNESS:  I do.  I believe it's the -- yes.  I

 3    do.

 4    BY MR. THOMPSON:

 5    Q    During that meeting, did you make representations to the

 6    VSI team that they were the subject of a civil conspiracy?

 7    A    No.

 8    Q    You didn't say that?

 9    A    Absolutely not.

10    Q    Okay.  Were you shown a list of assets that needed to be

11    returned to Stream TV?

12    A    I believe they identified certain assets they -- they

13    believe were not returned in connection with the Delaware

14    Chancery Court matter.

15    Q    They included displays; did they not?

16              THE COURT:  If you don't remember, it's okay.

17              THE WITNESS:  I don't recall.

18    BY MR. THOMPSON:

19    Q    Phones?

20    A    I don't recall specific assets that they may have

21    identified.

22    Q    You don't remember any of the assets on that list?

23    A    I remember they provided a list.  I just don't remember

24    today the specificity.

25    Q    Were you -- were you aware that there was an obligation to
```

  1   return assets to the Stream TV estate from Hawk and -- and

  2   SeeCubic.  SeeCubic, Inc. -- excuse me -- to be more precise.

  3   A    I try -- I'm trying to recall exactly the legal position

  4   of the -- of -- of the Delaware Chancery Court matter when I

  5   was appointed as a trustee here.  I know there was an order

  6   that required, I believe, the return of assets that SeeCubic

  7   had under the prior omnibus that was ultimately overturned.  So

  8   again, I know -- I know VSI's argument was there were assets

  9   that were never returned to Stream that should have been.

 10   Q    What did you do with that list of assets that they had

 11   given you?

 12   A    Well, I think I took it under advisement.  I mean, at the

 13   time, you have to appreciate this case and -- and the -- the

 14   fighting and the unknowns at the time that I was appointed and

 15   trying to figure out where the most valuable assets are.

 16   Right?  And so there can be assets, some of which have the

 17   minimus value, some have no value, some are a burden, and so, I

 18   think, I identified the most valuable assets and have proposed

 19   to sell them.  And so could there be other assets out there

 20   that are not specifically identified?  Of course.  And that --

 21   that is under the broader description in the APA that provides

 22   for a sale of both known and unknown assets to the extent they

 23   fall in those categories described in the APA.

 24   Q    You don't quite remember what was on that list, but could

 25   it have had software?

```
 1              MR. GEORGE:  Objection, Your Honor.  He asked him to

 2   speculate.

 3              THE COURT:  Yeah.  He's already answered the

 4   question.

 5              MR. THOMPSON:  Okay.

 6   BY MR. THOMPSON:

 7   Q    So I think what you said in response to my question about

 8   what you did was to find the -- was to identify the most

 9   valuable assets.  Do you not think that software code for a

10   technology company was a value asset -- valuable asset?

11              THE COURT:  Okay.  He --

12              MR. GEORGE:  Your Honor, objection.

13              THE COURT:  -- already answered the question.

14              MR. GEORGE:  It hasn't been established that --

15              MR. THOMPSON:  I -- I didn't ask that question, and

16   I --

17              THE COURT:  You asked him --

18              MR. THOMPSON:  Asked him to --

19              THE COURT:  -- if he identified the most valuable

20   assets and if there's something there that, you know, that

21   he -- that wasn't on that, then he didn't conclude that it was

22   very valuable.

23              I have to admit, sir, I really feel like what you're

24   doing here is you're trying to make legal argument, and I

25   simply don't want to hear it.  What are the factual questions
```

```
 1    that you have --

 2            MR. THOMPSON:  I'm trying to establish --

 3            THE COURT:  -- related to this --

 4            MR. THOMPSON:  -- Your Honor, what assets this

 5    trustee knew about and did not know about.

 6            MR. GEORGE:  And -- and why is that relevant, Judge,

 7    if all of the assets are being transferred?  Wherever they are

 8    in an --

 9            THE COURT:  I agree with Mr. George.

10            MR. THOMPSON:  It matters.  It matters because the

11    condition of those assets, if they are encumbered by licenses,

12    that --

13            THE COURT:  Yes.

14            MR. THOMPSON:  -- the trustee does not --

15            THE COURT:  -- and you're going to sue them.  I get

16    the point, yes.

17            MR. THOMPSON:  Your Honor, I think it's more than

18    that, but --

19            THE COURT:  Yeah.  So what is it?  You want to sue

20    them.  I get it.

21            MR. THOMPSON:  It's -- it's not --

22            THE COURT:  But what's --

23            MR. THOMPSON:  -- it's -- it's not about that.

24    It's --

25            THE COURT:  It's a sale issue, just tell me --
```

```
 1              MR. THOMPSON:  Because Your Honor, it cannot be sold

 2    free and clear that way.  They do not have 363(f) rights, and

 3    they certainly don't have it to -- for this stalking horse.

 4              THE COURT:  And that's your legal argument, and I

 5    will take that under advisement.

 6              MR. THOMPSON:  Your Honor, I understand.  I am trying

 7    to adduce the facts that demonstrate that.  That's all.

 8              THE COURT:  No.  Okay.  It's not facts.  It's legal

 9    argument.  I completely disagree with you, sir.  Okay.  So --

10              MR. THOMPSON:  I -- you know, I -- okay.  I -- I've

11    heard -- I've heard the Court, and I will try to move on.

12              THE COURT:  Okay.

13              MR. THOMPSON:  All right.

14    BY MR. THOMPSON:

15    Q   Mr. Homony, during that meeting, were you presented with

16    purchase orders that were --

17              THE COURT:  Why are we talking about this?  Why are

18    we talking about what was discussed at the meeting?

19              MR. THOMPSON:  Your Honor, that would have been an

20    asset of the estate.

21              THE COURT:  Okay.  So all of the assets that they own

22    are being transferred to the buyer, so I don't understand how

23    it's relevant to talk about what assets were discussed at that

24    meeting or were not.  Explain that to me.  Why is that

25    relevant?
```

```
 1              MR. THOMPSON:  Because this trustee had an obligation

 2   to maximize the value for all state creditors.

 3              THE COURT:  Right.  And he said he identified the

 4   most valuable assets.  And --

 5              MR. THOMPSON:  Okay.  Your Honor, if I have -- may

 6   have a moment, maybe we can --

 7              THE COURT:  Yeah.

 8              MR. THOMPSON:  -- cut this short, and let Mister --

 9              THE COURT:  Great. Thanks.

10              MR. THOMPSON:  Your Honor, in the -- in the interest

11   of trying to be briefer.  We will -- I'm -- I will pass to

12   Mr. Michaels.  Thank you.

13              MR. MICHAELS:  Just -- our exhibits, we have binders

14   and -- and copies that we provided opposing counsel.  I can

15   give them to the Court.  Some of these are not premarked

16   because we had to print them this morning, and I just had them

17   in a hurry because they dealt with cross for the -- for the

18   decks, but I'll -- I'll come hand them up if that's okay, if I

19   can approach?

20              THE COURT:  Okay.

21              MR. MICHAELS:  And there's -- there's a couple here

22   that I think we'll just hand up when we bring them up --

23              THE COURT:  Okay.

24              MR. MICHAELS:  -- if that's okay.  They're not in

25   this.
```

```
 1              MR. GEORGE:  Your Honor, I just want to point out
 2   that Mr. Michaels is listed as a witness in the witness list,
 3   so I -- who's telling the truth here?  Is he a lawyer?  Is he a
 4   witness?  Is he both?  I mean, you know, this game that's being
 5   played here --
 6              THE COURT:  Well, who's being called as a witness?  I
 7   thought we're --
 8              MR. GEORGE:  In the -- in the witness list in the
 9   documents that we just received.
10              THE COURT:  We have him and we have Scott Victor.
11   Those are the witnesses for today.
12              MR. MICHAELS:  Your Honor, we brought witnesses
13   today.  That's what you --
14              THE COURT:  I don't -- okay.  So why do I need to
15   hear from any witnesses from your side?
16              MR. MICHAELS:  What's that?
17              THE COURT:  Who am I hearing from?  Give me an
18   example.
19              MR. MICHAELS:  Stephen Blumenthal.
20              THE COURT:  And why do I need to hear from him?
21              MR. MICHAELS:  Your Honor, we were told at the June
22   5th hearing by you that -- that the timeframe for discussing
23   our assets that are being -- attempted to be included in the
24   transfer and sale, that this was the hearing that we should
25   prepare for and bring our arguments.
```

```
 1              THE COURT:  All right.  But I'm just talking about
 2   legal argument.  I don't need to hear from witnesses.  You've
 3   briefed all of your legal arguments.  That's what I care about.
 4              Thanks.
 5              UNIDENTIFIED SPEAKER:  Okay.
 6              MR. GEORGE:  And Your Honor, Mr. Blumenthal is not on
 7   the list of witnesses.  Mr. Michaels is, the lawyer, but
 8   Mr. Blumenthal --
 9              MR. MICHAELS:  All right.  I mean --
10              MR. GEORGE:  -- which one is he here today?
11              THE COURT:  All right.  All right.
12              MR. MICHAELS:  Your Honor, I'm not going to be able
13   to scream over Mr. George.  Can I --
14              MR. GEORGE:  I'm not screaming.  I'm just making a
15   point.
16              THE COURT:  Yeah.
17              MR. MICHAELS:  Okay.  What he's referring to is a set
18   of documents handed to him by VSI.  That's not our witness
19   list.  We -- we're calling one witness.
20              THE COURT:  Yeah.  Okay.
21              MR. MICHAELS:  Stephen Blumenthal.
22              THE COURT:  I don't really -- so who's the witness
23   that you want to call, sir?
24              MR. MICHAELS:  Stephen Blumenthal.
25              THE COURT:  Yeah.  And what is he going to testify
```

1   to?

2          MR. MICHAELS:  He's going to testify to the assets

3   that we have in this estate and how easy it is to determine

4   that our assets are being transferred and where they're found.

5          THE COURT:  Okay.  And I don't need to hear from that

6   witness today, and I'm not going to hear from him today.  I'm

7   happy to hear all the arguments that you've listed in your

8   briefs, but I'm not taking testimony from that gentleman.  I

9   don't need that for part of the sale process.

10         The assets are what they are.  They've listed them.

11  I mean, let's face it.  The assets are mostly equity, right?

12  There's one piece of hard asset.  The rest of this is -- deal

13  is equity.

14         MR. MICHAELS:  Your Honor, with respect, we followed

15  your instructions in understanding that this was going to be

16  our day to bring our evidence, and the rug's being pulled out

17  from under us.

18         I -- I -- I stand dumbfounded that we couldn't rely

19  on this Court's statements that this was going to be our --

20         MR. GEORGE:  Well, Your Honor --

21         THE COURT:  But the statements I made in the prior

22  hearing specifically were that you should put in your brief to

23  the objection to the sale every legal argument you have about

24  the licenses.  This is like your main argument, right?  So you

25  did that.  You gave the briefing, and we're looking at the

```
 1   briefing, and we've seen their responses, and we're going to

 2   take everything under advisement.

 3           So it's a legal issue.  I don't understand how this

 4   is a --

 5           MR. MICHAELS:  Let me ask just a procedural question.

 6   Are you saying that our declaration submission by Stephen

 7   Blumenthal is being taken into evidence?

 8           THE COURT:  I will take that into evidence.

 9           MR. MICHAELS:  All right.  Can I proceed with --

10           THE COURT:  Yes.

11           MR. MICHAELS:  -- cross?  Okay.

12           MR. MICHAELS:  This is -- again, I -- we received

13   their declarations at past 5:00 p.m.  I'd already arrived --

14           THE COURT:  Okay.  It can't be a surprise, right?

15           MR. MICHAELS:  What's that?

16           THE COURT:  We all -- it can't be a surprise.  We

17   know the sale process, right?  We understand what happened.

18           MR. MICHAELS:  Your Honor, I'm only apologizing for

19   not marking the exhibits.

20           THE COURT:  Okay.  That's fine, not a problem.

21           MR. MICHAELS:  Right.

22           MR. GEORGE:  What are you marking it?

23           MR. MICHAELS:  This is --

24           MR. GEORGE:  No.  What are you calling it?  The

25   number.
```

```
 1              MR. MICHAELS:  What?

 2              MR. GEORGE:  Just call it Rem.

 3              MR. MICHAELS:  Rembrandt Exhibit 1.

 4              THE COURT:  Okay.  We'll do --

 5                      CROSS-EXAMINATION

 6  BY MR. MICHAELS:

 7  Q    Mr. Homony, do you recognize the document we've put before

 8  you?

 9  A    Yes.  It looks like the teaser sent out by my investment

10  banker, SSG.

11  Q    Okay.  Can you jump to the assets overview?

12  A    Okay.

13  Q    In that section, does it describe that the assets include

14  Ultra-D technology?

15  A    Yes.

16  Q    Does it provide a list of the features and diverse

17  applications of the technology?

18  A    There's a -- a heading that describes the unique features

19  in diverse applications of technology, yes.

20  Q    And are the things listed under that heading, would you

21  agree that those are features and diverse applications of the

22  technology?

23              MR. GEORGE:  Objection to form, Your Honor.  To the

24  extent he knows.

25              THE COURT:  Okay.
```

```
 1              MR. MICHAELS:  I -- I am --
 2              THE COURT:  Well, it says what is says, so what is
 3   the question?
 4   BY MR. MICHAELS:
 5   Q    Do you agree with what it says?
 6   A    I -- I don't know the technology at -- at the, kind of,
 7   level that would --
 8              THE COURT:  Wasn't this prepared by Scott Victor?
 9   Right -- was this?  Yeah.  Okay.  So --
10              MR. GEORGE:  So he's going to be a witness.
11              THE COURT:  Yeah.
12              MR. MICHAELS:  I mean, he can say, I don't know.  I
13   had no -- no hand in preparing this.
14              THE COURT:  Okay.  Fine.
15              MR. MICHAELS:  That -- that's the answer.
16              THE COURT:  So you didn't --
17              THE WITNESS:  No.  No.  I -- I did not prepare it.
18              THE COURT:  Yeah.  Okay.
19              THE WITNESS:  I reviewed it before it went out.
20   BY MR. MICHAELS:
21   Q    Do you recall getting lists of questions from Rembrandt
22   regarding the status of certain software?
23   A    I -- I know we've engaged with Rembrandt numerous times
24   since my appointment.  I know Rembrandt has provided certainly
25   lots of things with respect to their position in -- in terms of
```

1    their alleged intellectual property.  We certainly met with

2    Rembrandt.  We even put Rembrandt in direct contact with SEBV's

3    engineering team.

4    Q    Uh-huh.

5    A    I was a party to that meeting in which there was a lot of

6    back and forth, questions about the source code the technology,

7    how it's housed, et cetera.

8    Q    So you brought up the very next thing I was going to, so I

9    appreciate that.  In that meeting, do you recall Rembrandt

10   questioning the Eindhoven (phonetic) team whether they were

11   using a modern version controlled software management system?

12   A    I don't recall that specifically, no.

13   Q    So when you set up that meeting, did you feel that you, in

14   your power as trustee, that you had authority to ask the

15   Eindhoven team to meet with Rembrandt at your direction?

16   A    I have authority to task anybody to -- to meet with

17   anybody.

18   Q    Okay.  So was it within your authority to ask them to

19   provide further information:  Number of files, file names,

20   etcetera, for the source code that was on the secure server

21   that you've listed in your asset list?

22         MR. GEORGE:  Objection to form, Your Honor.  It

23   assumes facts not in evidence.  There's no indication that

24   there was source code on any of those servers that Rembrandt

25   has an interest in.

```
 1            MR. MICHAELS:  You're -- with respect, the APA lists
 2   the -- that as an asset.  It's -- the exact words are, Source
 3   code on a secure server.
 4            THE COURT:  Okay.
 5            MR. MICHAELS:  I mean, if he doesn't know that, then
 6   the asset list is inaccurate.
 7            THE COURT:  Okay.  And what --
 8            MR. GEORGE:  I believe that's --
 9            THE COURT:  -- my questions are --
10            MR. GEORGE:  I'm sorry, Your Honor.
11            THE COURT:  I just -- I'm so confused because, I
12   mean, the assets are what they are.  Are you trying to make the
13   same point that he was trying to make about, you know, what is
14   the point about the assets?  The assets have been listed on the
15   schedule to the assets of purchase agreement, so what is the
16   relevance of your line of questioning, sir?
17            MR. MICHAELS:  The -- the relevance is whether he --
18   if there's an asset listed, does he know where is, as is, for
19   that -- for that asset, right?
20            UNIDENTIFIED SPEAKER:  Your Honor --
21            MR. GEORGE:  Your Honor, I -- I just want to object
22   to this because the only source code and -- and -- and servers
23   are in SeeCubic B.V. a non-debtor.  Stream doesn't have any of
24   those assets, and they weren't listed.  There was no scheduled
25   source code.
```

         1              MR. THOMPSON:  Objection.  He's testifying, Your

         2    Honor.

         3              THE COURT:  Okay.  Well, I'm going to clarify that

         4    the assets that are being sold are on the schedules.  They're

         5    either on there or they're not, so I don't want to talk about

         6    it.  It's there or not, right?

         7              MR. GEORGE:  But what I -- and what I'm objecting to

         8    specifically is Mr. Michaels trying to make it appear that

         9    we're selling assets in SeeCubic B.V.

        10              THE COURT:  Right.  They're only -- you're only

        11    saying they're shares.  Yeah.  Right.

        12              MR. GEORGE:  And the assets that were -- excuse me --

        13    the assets that were listed as to B.V. were listed at the

        14    Court's instruction that we list the downstream assets, so the

        15    question was inappropriate.  He knows it is, but he asked it

        16    anyway.

        17              MR. MICHAELS:  With respect, I don't believe it's

        18    inappropriate.  We are asking about an asset listing on their

        19    schedule.

        20              THE COURT:  Okay.  But --

        21              MR. MICHAELS:  And -- and -- and if I may, Your

        22    Honor.  The -- the asset isn't shares in a corporation that may

        23    have control of some software.  Stream listed as its asset,

        24    Source code on a secure server, not held in some other

        25    corporate entity, Source code on a secure server, and I'm

1   asking, what is that?  What -- where is it?  What is it?  And

2   that's -- I think that's a perfectly valid question about the

3   assets that are subject to this asset.

4           MR. GEORGE:  If he has a document that reflects that,

5   he should show the witness because I don't believe there's any

6   such doc.

7           UNIDENTIFIED SPEAKER:  Do you guys have the APM?  Is

8   that in the -- in the folder you have there?

9           MR. MICHAELS:  It's on the list of assets on the

10  beginning of the schedule --

11          UNIDENTIFIED SPEAKER:  Okay.  Well, if we're just --

12          THE COURT:  She's trying to understand what you're

13  asking.

14          MR. MICHAELS:  I'm asking --

15          THE COURT:  I know, just show us the document.

16          MR. MICHAELS:  We have -- we have an electronic --

17          UNIDENTIFIED SPEAKER:  You don't have an APA in

18  printed form; do you not?

19          MR. MICHAELS:  No.  Okay.

20          THE COURT:  So --

21          MS. RUSSELL:  Your Honor?

22          THE COURT:  Yes.  Who is this speaking?

23          MS. RUSSELL:  This -- this is Alyssa Russell from --

24  from Skadden along with -- with Marley.  I'm on the phone here

25  representing SeeCubic.

```
 1              I was just -- further the objection here to the
 2    relevance as the APA makes clear Rembrandt's IP and any
 3    physical assets that contain its IP to the extent it's found
 4    valid and existing and enforceable, they're excluded assets.
 5    We -- we don't think any of this is relevant here today.
 6              MR. MICHAELS:  We certainly care about Rembrandt's
 7    assets, but I'm asking about their schedule on the APA that is
 8    here to be approved in the sale to be approved, and asking,
 9    What is the source code?  Where is the source code?  With
10    respect, they've said that they're --
11              MS. RUSSELL:  The -- we appreciate your effort to --
12    to conduct this diligence, but -- but the stalking horse
13    purchaser has conducted their diligence and we are comfortable
14    taking these assets on an as is, where is basis, and, again,
15    don't -- don't believe this line of questioning is relevant.
16              THE COURT:  I'm inclined to agree with her.
17    BY MR. MICHAELS:
18    Q    The -- how is it that you determined that intellectual
19    property belonging to Rembrandt, Phillips, or any other third
20    party were not on the source code on a secure server --
21              THE COURT:  Okay.  I'm -- this is the legal argument.
22    You're talking about, you know, the fact that you think that
23    the sale is impermissible because it's infringing upon your
24    rights.  I get that.  It's a legal argument.
25              I don't want to hear any questions about that.  The
```

```
 1   assets are what they are.  The only person who's bid upon them
 2   has done their due diligence, and to the extent that you
 3   believe that the sale is going to violate your rights, you can
 4   bring whatever litigation you want.  We simply are going to
 5   have to agree to disagree on this matter, sir.
 6              I don't want to hear any more questions about the
 7   assets.  The assets are what they are.  They're on the
 8   schedules.  The buyer has done their due diligence, and you can
 9   make whatever legal argument you want to make, but I don't need
10   to hear any questions about it.  It's simply not relevant.
11              Okay.  So I think we're done with you, sir.
12              Mr. Victor, do you want to come up here?
13              MR. GEORGE:  Your Honor, do you want to proffer or
14   just --
15              THE COURT:  On Mr. Victor?
16              MR. GEORGE:  Yeah.
17              THE COURT:  Quickly.
18              MR. GEORGE:  Okay.
19              THE COURT:  Come on, Mr. Victor.  Come on up here.
20              Thanks, sir.
21              THE WITNESS:  Would you like --
22              THE COURT:  You can leave that.
23              MR. GEORGE:  Your Honor, in accordance with this
24   declaration, he would testify that SSG was retained to market
25   the stream assets, as well as the equity interest held by
```

 1   Technovative Media in the following companies:  Technology

 2   Holdings Delaware LLC, Media Holdings Company LLC, Ultra-D

 3   Ventures CV a Kirkcow (phonetic) entity that pers retention

 4   approved by this Court, SSG conducted a robust marketing of the

 5   assets, contacted over 500 potential purchasers, solicitation

 6   including everyone from television networks to OEM

 7   manufacturers, to financial purchasers, that SSG and its staff

 8   created a data room and in it was sales information populated

 9   by documentation for the veteran trustee.

10          The following in a procedures hearing, SSG sent out a

11   second teaser with the comments of Rembrandt and BSI contained

12   and that the additional teaser did not generate any additional

13   interest in the assets being sold.  Only one party accessed the

14   data room as of December 2nd, '24; there have been no other

15   bids on the assets, that the stalking horse offer provides

16   substantial benefit to the estate and in his opinion, the

17   stalking horse offer ties to the best offer that could be

18   obtained, under the circumstances, for the asset.

19          THE COURT:  Thanks, Mr. George.

20          Tashay, can you swear our witness in?

21              J. SCOTT VICTOR, WITNESS, SWORN

22          THE COURT:  Okay.  You want to ask Mr. Victor -- oh,

23   sorry.

24          THE WITNESS:  Yes, J. Scott Victor, V-I-C-T-O-R.

25          THE CLERK:  Thank you.

```
 1              THE WITNESS:  300 Bar Harbor Drive, West Conshohocken

 2   in Pennsylvania, 19428.

 3                        DIRECT EXAMINATION

 4   BY MR. SWICK:

 5   Q    Good afternoon, Mr. Victor.  How are you?

 6   A    Good, how are you?

 7   Q    Good.  I'm Adam Swick with Akerman on behalf of VSI.  Talk

 8   about your role; how are you retained in this matter?

 9   A    I was retained by the Chapter 11 Trustee, on behalf of my

10   firm, SSG advisors, to run a sale process for the debtor's

11   assets.

12   Q    All right.  How did you become familiar with the debtor's

13   assets?

14   A    We were first aware of the debtor's assets when we were

15   hired by the secured creditor in the fall of 2022, to run an

16   Article IX process which was stayed by order of the Chancery

17   Court of Delaware.

18   Q    I -- and who was the secured creditor that you referred

19   to?

20   A    Hawk and SeeCubic.

21   Q    Okay.  And that's -- SeeCubic is the purchaser for here

22   today, correct?

23   A    One of them.  Yes.

24   Q    Let's -- so when you were engaged, what were your duties

25   when you were engaged?
```

1  A     By the trustee?

2  Q     Correct.  Yes.

3  A     To reengage, understand the -- what was going on since our

4  engagement with the secured creditor terminated in January of

5  2023.  We became familiar, we read up on all the litigation

6  that had occurred since our termination.  And our job was to

7  put together a sale process for the assets of the debtor,

8  including the equity interest of the subsidiaries, held by

9  Technovative, and to put together a teaser, get information to

10  populate a data room, and to come up with a world-wide buyer

11  list to maximize the value of these assets.

12  Q     All right.  So how did you come up with your world-wide

13  buyer list?

14  A     I had my team do research, as they do on every deal, and

15  come up with a buyer's list of strategic, operational financial

16  buyers that may be interested in this technology.

17  Q     All right.  We're going to do --

18            MR. SWICK:  Did that work, Your Honor?

19            THE COURT:  Yeah.

20            MR. SWICK:  All right.  Let's just label it VSI

21  Exhibit 1, it's Mr. Victor's declaration that was filed last

22  night.

23            Mr. THOMPSON:  It's also --

24            MR. SWICK:  Huh?

25            Mr. THOMPSON:  It's also RT2.

```
 1                    MR. SWICK:  Oh.

 2                    Mr. THOMPSON: Scott's declaration.

 3                    THE COURT:  No.

 4                    MR. THOMPSON:  This seat's really low, Your Honor.

 5                    MR. SWICK:  My seat's really low, too, if that's what

 6      you're saying.

 7      BY MR. SWICK:

 8      Q     All right.  Would you please take a look at paragraph 20?

 9      A     Paragraph 20, you say?

10      Q     Yes.

11      A     Yes.

12      Q     All right.  So it says that you reached out to 550

13      prospective buyers around the world; what does "reached out"

14      mean?

15      A     It means that the teaser that we prepared, that I believe

16      you showed Mr. Homony here, which was Rembrandt 1, was sent out

17      to these 550 buyers that we came up with that we reviewed with

18      the trustee and his team as potential buyers.  So that teaser,

19      along with an email, was sent out to those 550 and follow-up

20      calls to all of them.  That's how we reach out in the sale

21      process.

22      Q     Okay.  And did -- and no one expressed any interest

23      besides VSI and Jacob -- I forgot his last name, but at

24      Continental?

25      A     Continental Energy, yes.  So no one signed an NDA other
```

```
 1   than VSI and Continental advisors, which was an alleged

 2   investor into VSI; but we had multiple conversations with

 3   multiple potential strategic buyers who ultimately passed

 4   without even signing an NDA.

 5   Q    So how many -- you said multiple, can you give me an

 6   approximation of how many?

 7   A    Dozens.

 8   Q    Dozens.  But no one went the next step for an NDA?

 9   A    No one.

10   Q    Did Rembrandt ever express any interest in purchasing the

11   debtor's assets?

12   A    Not to us directly, but I believe maybe to the trustee and

13   trustee's counsel, but no, I never had any direct reach-out by

14   Rembrandt, ever.

15   Q    Okay.  So even though they reached out to, at least, the

16   trustee or trustee's counsel, did you send them that teaser

17   went you sent it out to the 550 people?

18   A    I don't know.

19   Q    Did you send the teaser to VSI when you sent it out to

20   those 550 people?

21   A    Well, VSI was already under NDA and we gave VSI access to

22   the data room and provided additional diligence to VSI's

23   representative, Bud -- I can't remember his last name at this

24   moment, but he requested several additional pieces of

25   information including the cash burn rate at SeeCubic BV, which
```

```
 1   we gave him, literally, up until the last minute.

 2   Q    No, I understand that.  But my question was, did you

 3   provide VSI with the teaser when you sent it out to the 550

 4   parties?

 5   A    I don't think so.

 6   Q    Okay.

 7   A    But I can't be sure.

 8   Q    So the Continental Advisory firm that we talked about, did

 9   you send the teaser to them?

10   A    We did send the teaser to them, as well as the NDA, which

11   they signed.

12   Q    But did you send the teaser to them when you sent it out

13   to the 550?

14   A    They were not included in the 550, no.

15   Q    And then we've -- there's been a plan on file now, it has

16   just been for a couple of days, but the plan sponsor is an XD

17   called CanAm Financial in Canada.  Have you ever heard of them

18   before?

19   A    What's the name?

20   Q    Can -- C-A-N-A-M.

21   A    No.

22        MR. GEORGE:  Your Honor, can we just have an offer of

23   proof of the relevance of what's in that plan?

24        THE COURT:  Yeah, I don't -- well, the plan is not at

25   issue for today.
```

```
1              MR. GEORGE:  Right.
2              MR. SWICK:  Well, we have some -- it's -- all I want
3    to prove is there was an entity that has interest in these
4    debtor's assets, that I don't think got the teaser or was
5    contacted by Mr. Victor.
6              THE COURT:  Did you -- sounds like you know them,
7    though, because they're part of the plan?
8              MR. SWICK:  They're the plan sponsor.  Yeah.
9              THE COURT:  Did you not give them the teaser?
10             MR. SWICK:  I -- well, we have now.  Into this
11   process.
12             THE COURT:  Okay.  Well, are you saying that they're
13   a potential interested bidder on these assets?
14             MR. SWICK:  They're not going to -- we don't want a
15   bid, we have a plan on file.
16             THE COURT:  Oh, okay. All right.
17             MR. SWICK:  Yeah.
18             THE COURT:  So but what's the relevance of Mr.
19   Victor's --
20             MR. SWICK:  Because CanAm is interested in spending,
21   like, $300 million on these debtors.
22             THE COURT:  How is that relevant to what Mr. Victor
23   was hired to do?
24             MR. SWICK:  Well, he was hired to go find people who
25   want to spend money on the assets and he didn't contact them or
```

 1    know who they were --

 2              THE COURT:  Mr. Victor --

 3              MR. SWICK:  -- or another part of the bids --

 4              THE COURT:  -- contacted over 500 people, I think

 5    that's pretty impressive.

 6              MR. SWICK:  No, and not only that, Your Honor --

 7              THE COURT:  And if you knew of someone that might be

 8    a potential interested buyer, I would think you'd forward all

 9    that information along to them.

10              If your point is that Mr. Victor didn't send a teaser

11    to this person who is part of your plan, I don't really see how

12    that's relevant if you, you know, he -- he did a good job.  He

13    sent it out to 500 people, and he didn't get any response.  So

14    any other questions?

15              MR. SWICK:  Yeah, I have more questions, Your Honor.

16              THE COURT:  Okay.

17    BY MR. SWICK:

18    Q   All right.  Mr. Victor, let's look at paragraph -- I'm

19    sorry, just give me one second.  Go to paragraph 11.

20    A   Yes.

21    Q   All right.  So we're just going to read it out loud, it's

22    a short paragraph, just to save time.

23              "I met with VSI representatives who, after an

24              extensive discussion of SSG's approach to marketing

25              the debtor's assets, were satisfied that I could

1              perform the services of an investment banker fully

2              and without conflicts.  VSI withdrew its objections

3              to SSG's retention."

4         Did I read that correctly?

5    A    Yes, you did.

6    Q    All right.  Is that totally correct, Mr. Victor?

7    A    It is correct because I spoke with counsel for VSI who's

8    here at the table today, along with his colleagues.  They had

9    objected to our retention, claiming that we had a conflict

10   because we were retained in the fall of 2022 to do an Article

11   IX sale for the secured lender; they objected; we had a phone

12   call, probably two; and they withdrew the objection.

13             MR. SWICK:  May I approach, Your Honor?

14             THE COURT:  Yep.  Thank you.

15   BY MR. SWICK:

16   Q    So Mr. Victor, this is an email from Mr. Thompson to Mr.

17   Coren, Michael Vagnoni, and Ed George.  I want to direct your

18   attention to paragraph 2.  Okay?  I'm going to read this out

19   loud, too.

20             "Moreover, we believe we, in the trustee, were

21             negotiating good faith regarding VSI's proposed plan

22             of reorganization.  And thus, we agree to one,

23             withdraw VSI's objection to SSG's engagement; two,

24             postpone the hearing on our motion to compel and your

25             motion to quash originally set for September 18th to

```
 1              November 7th, simultaneously resetting the trustee's

 2              motion to withdraw and VSI's motion for

 3              reconsideration.

 4              "However, within a few short days of postponing the

 5              hearing, the trustee reversed its prior commitments

 6              with respect to VSI's plan, rejected VSI's proposed

 7              full payment plan, and filed an expedited sale and

 8              good procedures motion."

 9              Did I read that correctly?

10              MR. GEORGE:  Your Honor, I'm going to object.  This

11    is a hearsay document; Mr. Victor's not copied on it.

12              THE WITNESS:  I'm not copied.

13              THE COURT:  Yeah.  Well --

14              THE WITNESS:  I don't know if I've ever seen this.

15    But okay, you've read it.

16              THE COURT:  Okay.  So I'm going to sustain that

17    objection.  He's not part of this.

18              MR. SWICK:  Okay.

19    BY MR. SWICK:

20    Q    Were you part of any conversations where the attorneys in

21    this case and you were involved and mentioned and said hey,

22    we're going to withdraw this objection under certain conditions

23    that weren't just based on your qualifications?

24    A    No.

25    Q    No recollection whatsoever?
```

```
 1   A     None.
 2   Q     Okay.  Let's go back just a little bit and talk about your
 3   previous retention involving these parties and these assets,
 4   back in -- I think you said it was 2020 for SeeCubic and Hawk?
 5   A     The fall of 2022.
 6   Q     Oh, 2022.  Okay.  How were you approached for that
 7   representation?
 8              MR. GEORGE:  Your Honor, I'm going to object to the
 9   relevance of this.
10              THE COURT:  Yeah.  What's the relevance of this?
11              MR. SWICK:  The relevance, Your Honor, is that we
12   have a sale process where no one has expressed any real
13   interest, the assets are going to the entity that held all of
14   the assets, weren't retained by the trustee, and no one could
15   even bid on the assets.  And so -- and then the investment
16   banker who did all of the solicitation was previously hired by
17   the Hawk parties and that's who these assets are going to
18   who've always retained them this entire time.
19              So the process -- this is going into legal argument
20   so I know exactly where you're going to go --
21              THE COURT:  I know.  Uh-huh.  That's right.
22              MR. SWICK:  -- so I'm going to -- that is, once
23   again, factual predicate for the legal argument, which is where
24   we are.
25              THE COURT:  Okay.  I'm going to sustain the
```

```
 1    objection.

 2              MR. SWICK:  All right.

 3              No further questions.

 4              THE COURT:  All right.  Anyone else?

 5              MR. VAGNONI:  Can we go off of Rembrandt Exhibit 1,

 6    the market excel sheet.  Do you have that up there?

 7              THE WITNESS:  I have it.

 8              THE COURT:  Okay.

 9              MR. VAGNONI:  All set?

10              THE WITNESS:  Yes.

11                        CROSS-EXAMINATION

12    BY MR. VAGNONI:

13    Q    Okay.  So this document, can you describe for me how it

14    was created?

15    A    Yes.  My team created this one-page teaser which is

16    standard operating procedure to sell a company.

17    Q    Okay.

18    A    Or to finance a company, or whatever.  But a one-page

19    teaser is standard operating procedure in the hundreds and

20    hundreds of sales that I have done.

21    Q    Okay.  Thank you.  The assets overview section, who

22    provided you the information to write that section of the

23    teaser?

24    A    My team put it together, speaking with, specifically, the

25    engineering team in the Netherlands.
```

1    Q     Okay.

2    A     At SeeCubic BV.

3    Q     So this mentions the license with Phillips; do you see

4    that reference?

5    A     Yes.

6    Q     Did your team read the Phillips licensing agreement?

7    A     We had it, yes.

8    Q     But in the 550 --

9    A     In fact, it's in the data room.

10   Q     Right.  So in terms of the 550 companies, or entities,

11   that you contacted, did you reach out to the 23 or so licensees

12   in that Phillips agreement that are basically working in the

13   same technology?

14         MR. GEORGE:  Your Honor, I have an objection here.

15   He doesn't represent Phillips.  Leia, who, I understand is a

16   successor to Phillips is on the telephone.  So I don't

17   understand what standing he has to raise questions about the

18   Phillips license.  He's not the licensor, doesn't have any

19   interest in it.  He may -- his company may be a licensee, but

20   there are many of them out there.

21         THE COURT:  Sustained.

22         MR. VAGNONI:  Your Honor, I'm not asking about -- I'm

23   asking -- the companies he contacted, there's a list of

24   companies that have licensed the Phillips technology already.

25   They would be the prime companies to reach out to to sell these

```
 1   assets.  I'm asking if he reached out to any of those 23.
 2           THE COURT:  Okay.
 3   BY MR. VAGNONI:
 4   A    I don't know the answer.
 5   Q    Did you --
 6   A    As I sit here.
 7   Q    Did you reach out to Leia?
 8   A    I don't know.
 9   Q    Did you reach out to Dimenco?  Dimenco.
10   A    I don't know.
11   Q    How about Magnetic 3D?
12   A    Do not know.
13   Q    All right.  So having listed some of the major players in
14   no glasses 3D TV, you're --
15           MR. GEORGE:  Objection, Your Honor.  He's testifying.
16           THE COURT:  Yeah.
17           MR. GEORGE:  He's calling -- we haven't even heard
18   these names until he just said them, now he's testifying --
19           MR. VAGNONI:  Well, that's telling.
20           THE COURT:  He hasn't -- so he hasn't asked these
21   people.  So any other questions for Mr. Victor?
22           MR. VAGNONI:  Let me just take a second here and look
23   at my notes.
24           No.  I'm all set.  Thank you.
25           THE COURT:  Okay.  All right.  No more questions for
```

1  Mr. Victor then?

2          Okay.  You may step down, sir.  Thank you.

3          THE WITNESS:  Thank you.

4          MR. THOMPSON:  Your Honor, before you move on --

5          THE COURT:  Yeah.

6          MR. THOMPSON:  -- I may be able to -- I have some

7  suspicion of where this may go, but we had also, a witness list

8  and expected to be able to call witnesses on behalf of VSI and

9  our case-in-chief and that included -- that includes Mr.

10 Charles Bud Roberston (phonetic), Ms. Nicole Menine, Matthu

11 Rajan, among others.  And I want to know whether we're going to

12 have that opportunity.

13         THE COURT:  I don't have any need to hear from any

14 witnesses about the sale.  What I was interested -- if there

15 were any concerns.  Like, the concerns I was interested in

16 hearing about today was the sale process, if you thought that

17 there was something that Mr. Victor should have done or if you

18 had questions for the trustee.  And I've heard all of your

19 questions, and I don't have any concerns about this sale.  I

20 don't.

21         So that doesn't leave me to have any questions or

22 need to hear from your witnesses.  Okay?

23         MR. THOMPSON:  Our witnesses are going to testify

24 about the disposition of the assets that this trustee says he's

25 selling.

```
 1              THE COURT:  Right.  And I think that the assets are
 2    what they are and the buyer has reviewed the schedules and has
 3    done their due diligence and is going to accept the assets as
 4    is, wherever they are.
 5              MR. THOMPSON:  But the disposition of those assets
 6    matters, Your Honor.
 7              THE COURT:  The disposition?  There's going to be a
 8    sale and the buyer's going to get the assets.
 9              MR. THOMPSON:  The assets that are Stream TV assets
10    that remain in the hands of the now winning bidder, the
11    stalking horse.
12              THE COURT:  The buyer's going to get the assets on
13    the schedules.  Okay?
14              MR. GEORGE:  Will we have an opportunity to respond
15    to their filing of this morning, requesting a new order?  And
16    then changes to the asset purchase agreement.
17              THE COURT:  I'm going to give you 48 hours.  If you
18    guys have any response to that, then -- okay.  Would you like
19    72 hours?
20              MR. GEORGE:  Is Monday morning -- what's the
21    difference --
22              THE COURT:  Monday morning is fine.  You can have
23    Monday morning to respond to the blackline order.
24              MR. WATTERS:  Your Honor, this is Michael Watters,
25    for Shepherd Mullen, I'm counsel to Leia, Inc.  I -- I have
```

```
 1    some concerns about the sale order as well.  I am sitting here
 2    listening to the characterization of the sale, you know, your
 3    characterization of the sale, I think, is inconsistent with the
 4    redline order.  I don't know if it's appropriate to raise that
 5    now --
 6              THE COURT:  Okay.  No.  Yeah.
 7              MR. WATTERS:  -- order.  All right.
 8              THE COURT:  Yeah.  All right.  I hear you.
 9              So Pam, just mark on the docket --
10              MR. WATTERS:  Yeah.
11              THE COURT:  -- that any concerns with the blackline
12    order should be filed Monday close of business, 5:00 p.m.
13              Okay?  Anything else?
14              MR. WATTERS:  Okay.
15              MR. SWICK:  I guess I just want to raise it formally,
16    and then to say we wanted to bring Matthu Rajan, Bud Roberston,
17    Nicole Menine, to testify, that's been denied.
18              THE COURT:  Yeah.  I find it totally irrelevant.
19    Thank you.
20              MR. GEORGE:  Your Honor, I would move into evidence
21    our exhibits 1 through 6 and ask the Court to take judicial
22    notice of the motion to approve the Hawk settlement which is
23    docket number 630; the evidentiary record from that hearing,
24    which is 670; the 9019 order which is 653; the trustee opinion
25    which is 548; the order granting Hawk relief from stay, which
```

```
 1   is 549; and the reservation of rights by Leia which is 841.

 2           THE COURT:  Okay.  So moved.

 3           MS. RUSSEL:  Your Honor, Alyssa Russel from Skinner &

 4   Skinner on behalf of SeeCubic.  Regarding the request to

 5   respond to the redline order, the APA contemplates an outside

 6   date for answering the order of December 7th and our client has

 7   a target closing -- outside date for closing of December 10th.

 8           THE COURT:  Yep.  I'm going to resolve --

 9           MS. RUSSEL:  Your Honor has already --

10           THE COURT:  -- everything before the 10th.

11           MS. RUSSEL:  Okay.  I was going to say --

12           MR. THOMPSON:  Your Honor, no one put them here -- no

13   one put them here but them.

14           THE COURT:  Huh?  Yeah.  Okay.  I'm going to enter an

15   order prior to the 10th.  All right.  I think that concludes

16   our business here today.

17           MR. THOMPSON:  Thank you, Your Honor.

18           MS. RUSSEL:  Thank you, very much.  Ma'am?  Thanks.

19       (Proceedings adjourned)

20

21

22

23

24

25
```

<u>C E R T I F I C A T E</u>

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_John Buckley_____
John Buckley, CET-623
Digital Court Proofreader

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:                                                    : Chapter 11

Stream TV Networks, Inc. and Technovative Media,
Inc.                                                     : Bankruptcy 23–10763–amc

                    Debtor(s)

*NOTICE OF FILING OF TRANSCRIPT*
*AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on 12/4/24 was filed on 12/11/24.

The following deadlines apply:

The parties have until 12/18/24 (seven (7) calendar days from the date of filing of the transcript) to file with the
court a Notice of Intent to request Redaction of this transcript. The deadline for filing a request for redaction is
1/2/25 (21 days from the date of filing of the transcript).

If a Request for redaction is filed, the redacted transcript is due 1/13/25 (31 days from the date of filing of the
transcript).

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the
restriction period, which is 3/11/25 (90 calendar days from the date of filing of the transcript) unless extended by
court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (contact the court for
contact information) or you may view the document at the clerk's office public terminal.

                                        For the Court

Date: 12/11/24                          Timothy B. McGrath
                                        Clerk of Court

                                        By:Tasha Dawsonia
                                                Deputy Clerk

477