# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VISUAL SEMICONDUCTOR, INC.,<br><br>                    Appellant,<br>v.<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>                    Debtors-in-Posess.<br><br>and<br><br>WILLIAM HOMONY, *et al.,*<br><br>                    Trustees. | Bankruptcy Appeal<br><br>Civil No. 2:24-cv-06397-JMG |
| VISUAL SEMICONDUCTOR, INC.,<br><br>                    Appellant,<br>v.<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>                    Debtors-in-Posess.<br><br>and<br><br>WILLIAM HOMONY, *et al.,*<br><br>                    Trustees. | Civil No. 2:24-cv-06498-JMG |
| VISUAL SEMICONDUCTOR, INC., *et al.*,<br><br>                    Appellants,<br>v.<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>                    Debtors-in-Posess.<br><br>and<br><br>WILLIAM HOMONY, *et al.,*<br><br>                  Trustees. | Civil No. 2:24-cv-06617-JMG<br><br>Appeal Related to Case No. 23-10763-AMC in the United States Bankruptcy Court for the Eastern District of Pennsylvania |

79394277;10

## <u>APPELLANT'S OPENING BRIEF ON APPEAL</u>

R. Adam Swick (Admitted *Pro Hac Vice*)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX  78701
Telephone: (737) 999-7103
Facsimile:   (512) 623-6701
Email: adam.swick@akerman.com

Donald N. David, SBN: 304846
Mark S. Lichtenstein (Admitted *Pro Hac Vice*)
AKERMAN LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
Telephone: (212) 880-3800
Facsimile: (212) 880-8965
Email: donald.david@akerman.com
         mark.lichtenstein@akerman.com

John H. Thompson (Admitted *Pro Hac Vice*)
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson@akerman.com

Leif M Clark (Admitted *Pro Hac Vice*)
Leif M Clark Consulting PLLC
1105 Bonner
Houston, TX 77007
Telephone: (210) 663-5183
Email: lmclark@leifmclark.com

*Attorneys for Appellant Visual Semiconductor, Inc.*

79394277;10

# TABLE OF CONTENT

**Page**

STATEMENT OF JURISDICTION AND TIMELINESS OF APPEAL ................................- 1 -

STATEMENT OF THE ISSUES ON APPEAL  AND STANDARD OF REVIEW ................- 2 -

STANDARD OF REVIEW ..........................................................................................- 3 -

STATEMENT OF RELATED CASES .............................................................................- 4 -

STATEMENT OF THE CASE.........................................................................................- 4 -

       A.      The 9019 Agreement........................................................................- 5 -

       B.      The Sale Process ...........................................................................- 8 -

       C.      The Sale Hearing and Order ......................................................- 13 -

ARGUMENTS.........................................................................................................- 15 -

       I.      9019 AGREEMENT .....................................................................- 15 -

       II.      BID PROCEDURES ORDER ...........................................................- 21 -

       III.      SALE ORDER .............................................................................- 25 -

CONCLUSION.......................................................................................................- 40 -

79394277;10

# TABLE OF AUTHORITIES

<u>Pages</u>

**Cases**

*Anderson v. Conine (In re Robertson)*,
  203 F.3d 855 (5th Cir. 2000) ..................................................29

*ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*,
  650 F.3d 593 (5th Cir. 2011) ...............................................3, 27

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*,
  211 B.R. 813 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) .......................................24

*Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*,
  415 B.R. 86 (Bankr. D. Del. 2009) .........................................24

*Darby v. Zimmerman (In re Popp)*,
  323 B.R. 260 (B.A.P. 9th Cir.2005)........................................29

*Energy Future Holdings Corp. v. Del. Tr. Co.*,
  648 F. App'x 277 (3d Cir. 2016) ............................................20

*First Fid. Bank v. McAteer*,
  985 F.2d 114 (3d Cir. 1993)..................................................28

*Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*,
  2013 WL 4804816 (D.N.J. Sept. 9, 2013) ..............................29

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986)......................................22, 34, 35, 36

*In re Aloha Airlines, Inc.*,
  2009 WL 1371950 (Bankr. D. Hawaii 2009) ........................18

*In re American Safety Razor Co., LLC*,
  Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) ..................................23

*In re Bidermann Indus. U.S.A.*,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997)...............................24, 25

*In re Blixseth*,
  No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) ............................24

*In re Braniff Airways, Inc.*,
  700 F.2d 935 (5th Cir. 1983) .............................................20, 21

*In re Coburn*,
    250 B.R. 401 (Bankr. M.D. Fla. 1999) ...............................................................29

*In re Colony Hill Assocs.*,
    111 F.3d 269 (2d Cir. 1997)..............................................................................35

*In re Crowthers McCall Pattern, Inc.*,
    114 B.R. 877 (Bankr. S.D.N.Y. 1990) ...............................................................20

*In re Daufuskie Island Properties, LLC*,
    441 B.R. 60 (Bankr. D.S.C. 2010) .....................................................................18

*In re Edwards*,
    228 B.R. 552 (Bankr. E.D. Pa. 1998) .................................................................22

*In re Filtercorp Partners, L.P.*,
    163 F.3d 570 (9th Cir. 1998) .............................................................................35

*In re Fisker Automotive Holdings., Inc.*,
    510 B.R. 55 (Bankr. D. Del. 2014) ...............................................................17, 18

*In re Food Barn Stores, Inc.*,
    107 F.3d 558 (8th Cir. 1997) .............................................................................22

*In re Free Lance-Star Publishing Co.*,
    512 B.R. 798 (Bankr. E.D. Va. 2014) ................................................................17

*In re The Free-Lance Star Publishing Co.*,
    2014 WL 2505627 (Bankr. E.D. Va. 2014) ........................................................18

*In re Friedman's, Inc.*,
    336 B.R. 891 (Bankr. S.D. Ga. 2005) .............................................................3, 27

*In re Innkeepers USA Trust*,
    442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...............................................................25

*In re Interiors of Yesterday, LLC*,
    Case No. 02-30356 (LMW), 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007)...................29

*In re NJ Affordable Homes Corp.*,
    No. 05-60442 (DHS), 2006 WL 2128624 (Bankr. D.N.J. June 29, 2006) ............................17

*In re Philadelphia Newspapers, LLC*,
    599 F.3d 298 (3d Cir. 2010)................................................................................17

*In re Revel AC, Inc.*,
    802 F.3d 558 (3d Cir. 2015)...............................................................................30

*In re Rock Industry Machine Corporation*,
  572 F.2d 1195 (7th Cir. 1978) ...................................................................35

*In re SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*
  2008 WL 2498048 (3d Cir. June 24, 2008) ....................................28, 29, 39

*In re Stearns Holdings, LLC*,
  607 B.R. 781 (Bankr. S.D.N.Y. 2019) ......................................................3, 27

*In re Summit Global Logistics, Inc.*,
  2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008) ............................24

*In re Theroux*,
  169 B.R. 498 (Bankr. D.R.I. 1994) ..............................................................18

*In re Univ. Heights Ass'n*,
  2007 Bankr. LEXIS 1200 (Bankr. N.D.N.Y. Jan. 22, 2007) .......................24

*In re Westpoint Stevens Inc.*,
  333 B.R. 30 (S.D.N.Y. 2005) ........................................................................21

*In re Whitehall Jewelers Holdings, Inc.*,
  Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) .............. passim

*In re Williamsburg Boutique LLC*,
  663 B.R. 217 (Bankr. S.D.N.Y. Oct. 9, 2024) ............................................30

*In re Williamson*,
  327 B.R. 578 (Bankr. E.D. Va. 2005) ..........................................................22

*In re Worcester Country Club Acres, LLC*,
  655 B.R. 41 (Bankr. D. Mass. 2023) ............................................................29

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc.*
  *(In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223 (5th Cir. 1986) ...................21

*Jones v. GE Capital Mortgage Co. (In re Jones)*,
  179 B.R. 450 (Bankr. E.D. Pa. 1995) ..........................................................28

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors*,
  141 F.3d 490 (3d Cir. 1998) .........................................................................35

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) .................................................28

*Moldo v. Clark (In re Clark)*,
  266 B.R. 163 (9th Cir. B.A.P. 2001) .........................................................4, 27

79394277;10

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984), cert denied, 469 U.S. 982 (1984) ...........................................28

*Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase*
    *(In re Iridium Operating LLC),* 478 F.3d 452 (2d Cir. 2007)............................................20, 21

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.*
    *Chinery*,
    330 F.3d 548 (3d Cir. 2003)............................................................................................22

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re*
    *Cajun Elec. Power Coop.),*
    119 F.3d 349 (5th Cir. 1997) .........................................................................................20

*Ross v. A V Car & Home, LLC (In re Brown)*,
    Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625 (Bankr.
    D.C. Jan. 30, 2019) .......................................................................................................30

*Warnick v. Yassian (In re Rodeo Canon Dev. Corp.),*
    362 F.3d 603 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir.
    2005)
    ..................................................................................................................................29

**Statutes**

11 U.S.C.S. § 363(b) ................................................................................................ passim

11 U.S.C. 363(k) ...........................................................................................................17

18 U.S.C. 1832...............................................................................................................26

18 U.S.C. 1832(a)(3)......................................................................................................26

28 U.S.C. § 157(b)(2)(A)................................................................................................2

28 U.S.C. § 158(a) ..........................................................................................................1

28 U.S.C. § 158(a)(1)...................................................................................................1, 2

28 U.S.C. §§ 158(a) and 1334 .......................................................................................1

28 U.S.C. §§ 158(a) and (c)(2) ...................................................................................1, 2

28 U.S.C. §§ 1334(a) and 157(a) ...................................................................................2

§ 206(2) of the Advisers Act...........................................................................................6

§ 206(3) of the Advisers Act...........................................................................................6

§ 363(b)(1) of the Bankruptcy Code ............................................................................3, 27

§ 363(f) of the Bankruptcy Code ...........................................................................3, 29, 39

§§ 363(f) and 363(m) of the Bankruptcy Code.......................................................................4

§ 363(m) of the Bankruptcy Code .................................................................2, 34, 35, 36

§ 541 of the Bankruptcy Code ...........................................................................................31

UCC Article 9 ..................................................................................................................37

**Rules**

Bankruptcy Rule 6004(h)................................................................................................13

Fed. R. Bankr. P. Rule 8002 .......................................................................................1, 2

Fed. R. Bankr. P. 8018 .....................................................................................................1

Fed. R. Bankr. P. 9019(a) ...............................................................................................19

## STATEMENT OF JURISDICTION AND TIMELINESS OF APPEAL

The Bankruptcy Court had subject-matter jurisdiction over this case under 28 U.S.C. §§ 158(a) and 1334 and the *Standing Orders of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**"), dated July 25, 1984 and November 8, 1990.

This Court has appellate jurisdiction over the Order under 28 U.S.C. § 158(a), which states in relevant part that district courts "shall have jurisdiction to hear appeals . . . (1) from final judgments, orders, and decrees" of a bankruptcy court.

This appeal is timely because the Orders appealed from were entered as follows:

i.  *Order* approving settlement between Trustee, Hawk Investment Holdings, Ltd., SeeCubic, Inc. (the "**9019 Order**") (A-802-806)[1] entered on November 14, 2024. On November 27, 2024, Appellant timely filed their notice of appeal of the 9019 Order under 28 U.S.C. §§ 158(a) and (c)(2) and Rule 8002, of the Federal Rules of Bankruptcy Procedure ("**Fed. R. Bankr. P.**").  This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1).

ii.  *Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement in Connection with the Sale of Substantially all of the Debtors' Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Approving Procedures for Selection of Stalking Horse Bidder and Bid Protections, and (D) Granting Related Relief* (the "**Bid Procedures Order**") (A-891-926) entered on November 20, 2024.  On December 4, 2024, Appellant timely filed their notice of appeal of the Bid Procedures Order under 28 U.S.C. §§ 158(a) and (c)(2) and Fed. R. Bankr. P. Rule 8002.  This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1).

i.  *Order (a Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances and Interests, (b) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchaser Agreement, (c) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (d) Granting Related Relief* (the "**Sale**

---

[1] Record references are as follows: "A-___" refers to pages in the accompanying Appendix to Appellant's Opening Brief; "Bankr. Doc. ____" refers to a document in the Bankruptcy Court's docket in Case No. 23-10763 (JMG). "Doc. ____" refers to a document in this Court's docket for this case. Unless otherwise stated, references to citations are to the relevant entries in the bankruptcy docket. *See* Fed. R. Bankr. P. 8018.

**Order**") (A-1218-1300) entered on December 4, 2024.  On December 9, 2024, as amended on December 10, 2024, Appellant timely filed their notice of appeal of the Sale Order under 28 U.S.C. §§ 158(a) and (c)(2) and Fed. R. Bankr. P. Rule 8002.  This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1).

Jurisdiction initially vested in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

## STATEMENT OF THE ISSUES ON APPEAL
## AND STANDARD OF REVIEW

### Statement of Issues - 9019 Order

- Whether the Bankruptcy Court erred in (i) approving the settlement, (ii) finding that the settlement was in the best interest of the Debtors' estates, creditors, and equity, (iii) allowing a $180 million secured claim of Hawk Investment Holdings, Ltd. and SeeCubic, Inc., and (iv) granting the Hawk and SeeCubic parties the right to credit bid as the "stalking horse" for the sale of the Debtors' assets, notwithstanding their demonstrated misconduct in the case.

### Statement of Issues - Bid Procedures Order

- Whether the Bankruptcy Court erred in approving the bidding procedures, without evidence or an evidentiary hearing, and finding the sale process and the Bidding Procedures were fair, reasonable, and appropriate under the circumstances and designed to maximize the value of the Assets, without evidence or an evidentiary hearing.

- Whether the Bankruptcy Court erred in finding, without evidence or an evidentiary hearing, that the Bidding Procedures and Asset Purchase Agreement were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets.

### Statement of Issues - Sale Order

- Whether the Bankruptcy Court erred in approving the sale of substantially all of the Debtors' assets without first determining, in an adversary proceeding, whether the assets made available for sale by the Trustee were property of the estate.

- Whether the Bankruptcy Court erred in approving the sale of the Debtors' assets without (i) sufficient evidence or a complete evidentiary hearing or (ii) a reasonable opportunity to object or be heard regarding the relief requested in the Motion.

- Whether the Bankruptcy Court erred in finding that (i) the Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and (ii) the Trustee and the Buyer negotiated and undertook their roles leading to the entry into the Asset Purchase Agreement in a diligent, non-exclusive, fair, reasonable, and good faith manner at arms' length.

- Whether the Bankruptcy Court erred in finding that the sale of the Assets to the Buyer under the terms of the Asset Purchase Agreement met the requirements of section 363(f) of the Bankruptcy Code to sell the Assets free and clear of liens, claims, encumbrances, and interests.

## **STANDARD OF REVIEW**

Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts generally apply some form of a business judgment test in determining whether to approve a proposed use, sale, or lease of estate property under section 363(b)(1). *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.),* 650 F.3d 593, 601 (5th Cir. 2011); *In re Stearns Holdings, LLC*, 607 B.R. 781, 792 (Bankr. S.D.N.Y. 2019); *In re Friedman's, Inc*., 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005); *see generally* Collier on Bankruptcy ("**Collier**") ¶ 363.02 (16th ed. 2020).

Section 363(f) of the Bankruptcy Code authorizes a trustee to sell property "free and clear of any interest in such property of an entity other than the estate," but *only if*: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

The assets the Trustee proposes to sell and transfer contain property owned by non-debtor third parties, and thus the sale does not qualify for 363(f) treatment and cannot be approved as an assignment/transfer "free and clear" of the claims and encumbrances under the Bankruptcy Code. Moreover, the Buyer is not a "good faith" purchaser, and as such, the sale of the Debtors' assets to the Buyer works an injustice upon unsecured creditors, undermines confidence in the

bankruptcy sales process, and should be disallowed. The Bankruptcy Court's repeated dismissal of Visual Semiconductor, Inc.'s (the "**Appellant**" or "**VSI**"), arguments and requests throughout the bankruptcy proceedings violated VSI's due process rights and ignored applicable and controlling case law regarding sections 363(f) and 363(m) of the Bankruptcy Code.

Here, the Trustee clearly failed to meet the required elements under the statutes. As discussed at length below, a trustee is not empowered to sell anything *unless* it constitutes property of the debtor's bankruptcy estate. Moreover, before approving any sale of property that is allegedly owned by a third party, the Bankruptcy Court must determine whether the property the Trustee proposes to sell constitutes property of the estate – in an adversary proceeding, not a contested matter. *In re Whitehall Jewelers Holdings, Inc.,* Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark),* 266 B.R. 163, 172 (9th Cir. B.A.P. 2001)). In addition, the Trustee does not contest that Rembrandt's intellectual property is not property of the debtors' estate.

## STATEMENT OF RELATED CASES

Currently pending before this Honorable Court is Rembrandt 3D Holding Ltd.'s appeal relating to the Bankruptcy Court Order granting motion to approve compromise under Rule 9019. *In re: Rembrandt v. Stream TV Networks, Inc. and Technovative Media, Inc., et al.*, Civil Action No. 24-cv-02727.

## STATEMENT OF THE CASE

This case arises out of a Chapter 11 bankruptcy petition filed on March 14, 2023 by Stream TV Networks, Inc. and Technovative Media, Inc. (collectively, the "**Debtors**").

This matter revolves around the Trustee's attempts to sell the Debtors' assets to the Hawk Parties (as defined below), and involves the appeal of three orders issued by the Bankruptcy Court: the 9019 Order, the Bidding Procedures Order, and the Sale Order. Shortly after his appointment,

the Trustee was determined (indeed desperate) to finance the case and did so by agreeing to an objectively terrible deal with the Hawk Parties, which resulted in sale at issue in this appeal.

## A.     The 9019 Agreement

On June 7, 2024, the Bankruptcy Court entered an order approving the Trustee's Settlement (the "**9019 Agreement**") with Hawk Investment Holdings, Ltd., in its capacity as Collateral Agent for the allegedly secured noteholders of SeeCubic, Inc., SLS Holdings VI, LLC, and various individuals who received releases, including Arthur Leonard, Robert Morton, Shadron L. Stastney, Alastair Crawford, Asaf Gola, Kevin Gollop, Patrick Miles, Patric Theune[2], and Krzysztof Kabacinski (collectively, the "**Hawk Parties**"). The Bankruptcy Court entered the 9019 Agreement despite the obvious weakness of the evidentiary record in support of the settlement, an exceptionally large claim allowance, and clear conflicts between the Debtors' estates and the Hawk Parties, specifically SeeCubic, Inc. and its principal, Shadron Stastney.

As part of the Trustee's agreement with the Hawk Parties, the Trustee granted the Hawk Parties a $180 million secured claim, despite the fact that their actual principle investment was $45 million. This outsized claim allowance alone presented a significant chilling effect on all future bids for the Debtors' assets. Indeed, aside from VSI and its investors, no other party even executed a non-disclosure agreement to review the Debtors' assets. The 9019 Agreement eliminated any realistic prospect of recovery for unsecured creditors and locked in the Hawk Parties as the only buyers, making it an impermissible *sub rosa* plan.

The Hawk Parties have a dubious history and have conspired to appropriate the Debtors' businesses for years – first in an ill-fated and illegal foreclosure in Delaware state court and now

---

[2] Curiously, SeeCubic, Inc.'s CEO, Shadron Stastney, and the Hawk Parties insisted upon obtaining a release for Mr. Theune, even though he is currently an employee and senior manager of a debtor subsidiary, SCBV.

through these bankruptcy proceedings.  The Hawk Parties and Buyer in these cases consist of two entities: (i) Hawk Investment, Ltd., the primary principal of which is Robert Morton, and (ii) SeeCubic, Inc., whose primary principal is Shadron Stastney.  Robert Morton, was the subject of an English Cold Shoulder Order issued by the United Kingdom's Financial Conduct Authority (FCA) for especially egregious conduct involving securities.[3] He was also "barred from association with any investment adviser, broker, dealer, municipal securities dealer, or transfer agent, and (ii) prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter, with the right to apply for reentry after eighteen (18) months." (see www.sec.gov/files/litigation/admin/2013/ia-3671.pdf).

In addition to their questionable actions, the Hawk Parties violated numerous court orders in in concerted efforts to misappropriate the Debtors' assets.  On January 4, 2024 the Debtor, in Adv. Case No 23-00057-AMC, obtained a Temporary Restraining Order ("**Bankruptcy TRO**") (A-1665-1661) preventing the Hawk Parties from using the Debtors' technology to compete with the Debtors. Prior to the entry of the Bankruptcy TRO, in August 2022, the Delaware Chancery Court issued its own temporary restraining order, enjoining SeeCubic, Inc. from selling Stream's assets and ordering the return of the StreamTV assets in accordance with the Delaware Supreme Court's mandate – notably, the same StreamTV assets the Hawk Parties have unlawfully possessed

---

[3] In fact, only 13 Cold Shoulder Orders have ever been entered by the FCA. Under the Cold Shoulder, Robert Morton was prohibited from working with investment bankers or soliciting investments from December 21, 2016 to December 21, 2022.  Shadron Stastney was sanctioned by the U.S. Securities and Exchange Commission for Breach of Fiduciary Duty related to an undisclosed insider transaction.  Mr. Stastney was the subject of a cease and desist and sanctions order imposing nearly $3 million in disgorgement, prejudgment interest, and civil penalties.

since August 2022 (the "**Delaware TRO**" together with the Bankruptcy TRO, the "**TROs**").

The Hawk Parties' efforts to take control of the Debtors' property preceded and precipitated the filing of the Chapter 11 Cases, continued throughout this case in violation of the automatic stay and a Worldwide Stay Order (defined below)[4], and continued after entry of the Bankruptcy TRO. Since entry of the TROs, the Debtors, Rembrandt, and VSI have, at various points throughout the case sought to enforce the automatic stay, the Worldwide Stay Order, and the TROs against the ultra vires actions of the Hawk Parties to take control of the Debtors assets, which efforts became the responsibility of the Chapter 11 Trustee upon his appointment. Unfortunately, the Trustee abdicated his responsibility to inventory, marshal, and reclaim the estates' assets. *See* A-1325, December 4, 2024 Hearing Transcript at 25:7-14.[5]

Of course, the Trustee did not have to choose the Hawk Parties as a settlement partner. Rembrandt made an offer to purchase the Debtors' assets. And VSI had a history of funding the Debtors' bankruptcy cases. Indeed, VSI invested millions of dollars on a post-petition basis to help fund StreamTV's operations prior to the Trustee's appointment, and then it provided several hundred thousand dollars to the Trustee to pay for StreamTV employee wages. In July 2024 and after the Trustee entered his improvident 9019 Settlement with the Hawk Parties, VSI presented a

---

[4] On December 14, 2023, in light of the Hawk Parties' extra-territorial misconduct and misappropriation, possession, and control of Debtors' assets, the predecessor judge in the bankruptcy proceeding (Judge Magdeline D. Coleman) recognized the ongoing damage to the Debtors' estates and potential harm to third parties (*e.g.* Rembrandt) and issued a Stipulated Order Restating and Enforcing the Worldwide Automatic Stay (the "**Worldwide Stay Order**") (A-105-107, Bankr. Doc. #517).

[5] ("Question: Did you ever do an inventory of the assets of Stream TV? Answer: Well, that was one of the issues in the case that is not typical in a Chapter 11 Trustee case. There were no operations and it was unclear at the time, and remains unclear, exactly which entities of Mr. Rajan's have possession of tangible assets, records, et cetera. So I don't believe Stream TV has certainly any significant tangible assets. And if they do, I have not been aware -- made aware of them or know their location or who is in control of them.")

$170 million proof of funds in a good faith effort to obtain simple due diligence in order to propose and sponsor a reorganization plan. But the Trustee was so disinterested that he took six weeks to even respond to the proof of funds – rejecting the overture and refusing the diligence request. Despite numerous red flags, the Bankruptcy Court approved the 9019 Agreement over the objections of VSI and Rembrandt – locking in the sale transaction as a *fait accompli* and rendering any future opposition futile. The Hawk Parties' sale train had left the station. Notwithstanding VSI's best efforts, the Trustee and Hawk Parties systematically refused to provide any other interested party a meaningful opportunity to conduct discovery related to the 9019 Agreement or sale process, and the Bankruptcy Court ratified those efforts through multiple orders quashing discovery and denying VSI and Rembrandt the right to present evidence at contested hearings.

Most glaringly, the Trustee attempted to intimidate VSI by filing a retaliatory motion for sanctions based upon exhibit documents that appear to have been manipulated/altered to create the impression that VSI was engaged in automatic stay violations (a projection of the actual misconduct being perpetrated by the Hawk Parties – the Trustee's 9019 Settlement partner). *See* A-006-073, Bankr. Doc. No. 678. When VSI exposed the Trustee for these misrepresentation and dubious exhibits, the Trustee withdrew the motion and sought to quash VSI's discovery requests regarding the falsified documents. The Bankruptcy Court *allowed* the withdrawal of the sanctions motion and *denied* VSI the ability to conduct discovery, even on the Trustee's questionable and manipulated exhibit documents. These actions deprived parties of a fair opportunity to challenge the Trustee's conduct and further undermined the integrity of the process. Meanwhile, the Trustee preserved a level of credibility notwithstanding his cynical and ethically dubious filings and representations. *See* A-006-073, Bankr. Doc. No. 678.

**B.     The Sale Process**

On September 30, 2024, four months after the 9019 Agreement was entered, the Trustee

filed the Sale Motion, despite a multitude of alternative funding, purchase, and plan proposals from VSI and Rembrandt that would have achieved a better outcome for all stakeholders, including for unsecured creditors. The process contemplated disproportionately benefited the Hawk Parties at the expense of all other stakeholders.

As anticipated, the sales process produced no bids beyond that of SeeCubic as proposed stalking horse bidder (the "**Buyer**"). In fact, the investment banker hired to sell the Debtors' assets, SSG (defined below), stated on the record at the November 13, 2024 hearing on the Trustee's motion to approve the Bidding Procedures, no other party expressed any interest whatsoever.[6] Indeed, as the Court heard from the Trustee and his advisors at the November 13, 2024 hearing, after the Trustee's marketing efforts, no prospective bidder was sufficiently interested in the Debtors' assets to sign a simple NDA to access the sale data room. Only VSI and its interested investors signed an NDA, but the Trustee's investment banker did not even bother sending VSI the teaser used to market the Debtors' assets. Given the issues and legal defects regarding the sale, the likelihood of VSI  placing a bid was  non-existent, and no other party could reasonably have been expected to submit a bid under the circumstances. In light of the asset value involved, the fact that no contacted party was interested enough to sign a NDA is an indictment of the Trustee's marketing and sale process, reinforced by the inexplicable fact that Trustee and SSG failed to contact or send teasers to any of the most-likely bidders for the 3-D glasses technology (i.e. Ultra-D technology).[7] Had the Court allowed VSI and Rembrandt discovery on the sale process, both

---

[6] Which statements were reinforced by SSG's testimony at the December 4, 2024 sale hearing. See December 4, 2024 Hearing Transcript (A-1363-1364 at 63:22-25, 64:1-4).

[7] *See* December 4, 2024 Hearing Transcript (A-1372-1373 at 72:10, 73:21) for cross-examination transcript testimony of SSG's Scott Victor regarding the 23 licensees identified in the Philips License Agreement and whether those most likely bidders for the Ultra-D technology were contacted.

79394277;10

parties believe they would have found many more glaring issues.

The Trustee failed to properly assess or disclose  the assets being sold by the Debtors' estates and does not appear to understand what he is actually selling – let alone how those assets may be encumbered. *See* December 4, 2024 Hearing Transcript, A-1325 at 25:7-14. In contravention of his duties to inventory and marshal the estates' assets, the Trustee refused to recover millions of dollars in the Debtors' property from the Hawk Parties or wrest control of high-value assets from SeeCubic, Inc. and its principal, Mr. Stastney.  Indeed, during the limited cross-examination that the Bankruptcy Court permitted at the sale hearing, the Trustee admitted that he made no effort to inventory or marshal the estates' assets (*see* December 4, 2024 Hearing Transcript, A-1325 at 25:7-14), nor did he make an effort to determine whether the assets implicated by the proposed sale (and identified by the Asset Purchase Agreement) are actually property of the Debtors' estates (see A-1326-1329, *Id.* Pages 26-29).

Meanwhile, the Trustee willfully ignored the conduct and conflicts of interest presented by Mr. Stastney occupying both sides of the Trustee's purported "363 sale" transaction – actively controlling SeeCubic, B.V. and its assets (as sole director) while serving as "stalking horse bidder" for assets already in his possession, custody, or control. *see* Bankr. Doc. No. 815.  Even if a third-party were to purchase the assets, the Trustee failed to obtain any assurance that the Hawk Parties would relinquish the Debtors' property or cease their unauthorized use of the Debtors' intellectual property. In open defiance of multiple court orders, the Hawk Parties refused to turn over the Debtors' assets for years, further undermining the viability of the sale. *see* A-927-1059, Bankr. Doc. No. 815.

Bizarrely, the Bankruptcy Court allowed the Trustee's counsel to unilaterally withdraw (without prejudice) a sanctions motion against VSI that contained a fraudulent and altered exhibit

79394277;10

and misrepresentations by counsel and even forced VSI and Rembrandt to help "fix" the Trustee's failure to adequately disclose the assets being sold pursuant to the 363 sale by annotating a late-filed and deficient asset listing. *See* A-114-132, Bankr. Doc No. 724; A-242-244, Bankr. Doc. No. 776, *Order Granting Motion to Withdraw Turnover Action.*

VSI repeatedly emphasized that allowing such credit bid was inappropriate on its face. The Buyer should not have been permitted to credit bid in light of the history, facts and circumstances of these cases, the disputes surrounding the legitimacy of its claims, and – most importantly – the stalking horse's theft and control of the Debtors' assets before and during the pendency of this bankruptcy case. *See* VSI's objection to sale at A-935, 985, Bankr. Doc. No. 815 at ¶¶ 9, 65; *see also* VSI's objection to Bid Procedures at A-287, Bankr. Doc. No. 788 at Section III.F. Designating such a malevolent insider as the stalking horse was wholly inequitable to legitimate creditors and constitutes "cause" to deny credit bidding rights. Additionally, in these Chapter 11 cases, the credit bid also inevitably chilled bidding, rather than providing any value to the estates, which courts have found to be cause enough to deny the right to credit bid.

At the hearing to approve the bidding procedures on November 13, 2024, the Bankruptcy Court did not hear testimony or receive other evidence in support of the Trustee's proposed bidding procedures, and the Trustee never filed nor otherwise offered evidence to buttress or rationalize the relief sought in his Bidding Procedures Order (defined below). Indeed, the hearing to approve the Trustee's proposed bidding procedures was not an evidentiary hearing at all.[8] Rather, at the close of the hearing the Court informed VSI and other parties in interest that the sale hearing to be held on December 4, 2024 to approve the sale transaction would be their opportunity to make their cases. See November 13, 2024 Hearing Transcript, (A-889 at 83:12-18) ("THE COURT: Okay.

---

[8] See generally the November 13, 2024 Bidding Procedures hearing transcript (A-807-890).

So I'll hear from all of you. Just make sure you put in those briefs. My law clerk is waiting with baited breath to see all of your sale objections because he's got to do a lot of research. So next Friday, okay. We'll be taking a close look at all of that. So please include all of your arguments then"). Notwithstanding the lack of an evidentiary hearing and the absence of any evidentiary support of any kind from the Trustee, the proposed order approving the bidding procedures (A-891-926, Bankr. Doc. 811) (the "**Bidding Procedures Order**"), was signed by the Bankruptcy Court and granted exceptional, unsupported, and unwarranted findings and relief that included:

    i.    findings that "the Trustee has articulated good and sufficient reasons for authorizing the Bidding Procedures," that such procedures "are fair, reasonable, and appropriate under the circumstances and designed to maximize value of the Assets" (Bidding Procedures Order, A-892 ⁋ B);

    ii.    finding that "the Bidding Procedures were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets" (Bidding Procedures Order A-892 ⁋ B);

    iii.    finding that the Asset Purchase Agreement "was negotiated in good faith an at arm's length between the parties and may serve as a reasonable and appropriate baseline for soliciting other bids for the Assets" (Bidding Procedures Order A-893 ⁋ C); and

    iv.    ordering related relief that "the Trustee shall have no personal liability for any obligations of the Debtors' estates" (Bidding Procedures Order A-902 ⁋ 21), and "notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry" (Bidding Procedures Order A-902 ⁋ 23).

Mysteriously, the Bankruptcy Court was able to make all of the foregoing findings of fact and conclusions of law and issue the sweeping relief contained in the Bidding Procedures Order without a single piece of evidence. Indeed, neither the Trustee nor his advisors provided any live testimony at the November 13, 2024 hearing, and no declarations nor other evidentiary support was filed with the Trustee's Motion to approve the Bidding Procedures. *See* A-133-241, Bankr. Doc. No. 750.  At the November 13, 2024 bid procedures hearing, neither the Trustee nor his counsel offered any evidence whatsoever, and the Trustee certainly did not meet his burden of

- 12 -

proof to justify the relief requested and received in accordance with the Federal Rules and due process requirements.

## C.     The Sale Hearing and Order

At the ensuing hearing, on December 4, 2024, VSI and Rembrandt came prepared to present their witnesses and arguments in accordance with the Bankruptcy Court's promise that the sale hearing would be their opportunity to present their case in chief. *See* November 13, 2024 Hearing Transcript, (A-889 at 83:12-18) ("THE COURT: Okay. So I'll hear from all of you. Just make sure you put in those briefs. My law clerk is waiting with baited breath to see all of your sale objections because he's got to do a lot of research. . . . We'll be taking a close look at all of that. So please include all of your arguments then"). However, the Bankruptcy Court denied VSI and Rembrandt this opportunity. *See* December 4, 2024 Sale Hearing Transcript, (A-1374-1376 at 74:6, 75:13, 76:15-19). First, the Bankruptcy Court severely limited and then curtailed VSI cross-examination of the only two witnesses offered by the Trustee in support of his Sale Motion – the Trustee himself and his investment banker at SSG. Thereafter, the Court denied VSI and Rembrandt the right to put on witnesses or other evidence in support of their case in chief. *Id.*

Notably, during the Trustee's brief cross-examination, he testified falsely about certain representations he had made during a March 7, 2024 in person meeting with members of the VSI team and StreamTV's former bankruptcy counsel. Specifically, the exchange with Mr. Homony on cross-examination from VSI's counsel (Mr. Thompson) went as follows:

> Q: "During that meeting, did you make representations to the VSI team that they were the subject of a civil conspiracy."
> A: "No."
> Q: "You didn't say that?"
> A: "Absolutely not."

The Trustee's responses on the stand, in open court, and under oath were clear and unequivocal; they were also false. Unfortunately, the Bankruptcy Court denied VSI the right to call any of the

three fact witnesses (Nichol Maneen, Rafael Zahallardin, and Mathu Rajan) whose testimony would have put the lie to Mr. Homony's knowing falsehoods. *See* December 4, 2024 Sale Hearing Transcript, A-1374-1376, 74:6, 75:13, 76:15-19.

Finally, the Court cut the hearing off without the opportunity for any oral argument, suggesting "she had heard all she needed to hear" and would read the briefs. A-1350, *Id.* at 50:5-9 ("Okay. And I don't need to hear from that witness today, and I'm not going to hear from him today. I'm happy to hear all the arguments that you've listed in your briefs, but I'm not taking testimony from that gentleman. I don't need that for part of the sale process."); A-1374, *Id.* 74:13-20 ("I don't have any need to hear from any witnesses about the sale. What I was interested -- if there were any concerns. Like, the concerns I was interested in hearing about today was the sale process, . . . And I've heard all of your questions, and I don't have any concerns about this sale. I don't.").

This "sale hearing" failed to meet the standard for an "evidentiary hearing" or afford VSI and Rembrandt any material due process. The Court constricted cross examination of the Trustee's only two witnesses in such a manner as to deny any meaningful exposure of the most important facts underlying the proposed sale (i.e. "free and clear" transfer, and "good faith purchaser" status) – and the relief sought most by the Trustee and Buyer.

Moreover, at the same December 4, 2024 hearing, the Bankruptcy Court permitted the Trustee to file a materially different form of Sale Order (which modified the "deal terms" originally set forth in the 9019 Agreement) less than three hours before the hearing without opportunity for sufficient review, let alone adequate opposition or discovery. *See* A-1096-1217, Bankr. Doc. No. 853, *Praecipe to Substitute Exhibit "C" to Sale Motion*, filed at 10:10 a.m., prior to 1:00 p.m. (ET) sale hearing.

- 14 -

Entering the proposed sale order that permits the transfer of non-estate property "free and clear" of liens, claims, and encumbrances and confers "good faith purchaser" status on the stalking horse bidder without an evidentiary record permitting the Court to grant such relief is clearly problematic – indeed, it is fatal to the requested relief. The only evidence the Trustee submitted in support of his requested sale order relief were two declarations (one from the Trustee and one from SSG Advisors, LLC ("**SSG**") as investment banker), and neither established any facts in support of (i) free and clear transfer or (ii) good faith purchaser status. As noted above, no material cross-examination was permitted by the Court. To the contrary, the Bankruptcy Court repeatedly interrupted VSI's and Rembrandt's cross-examination of the Trustee with incremental objections and demands that the cross-examining attorney explain the reasons for his questions – effectively forcing counsel to reveal his examination strategy and indirectly coaching the witness. Also as noted above, the Bankruptcy Court denied VSI's and Rembrandt's request to put on evidence to contest the "free and clear" and "good faith" findings.

## **ARGUMENTS**

**I.    9019 AGREEMENT**

    **a.    The Bankruptcy Court erred in approving the 9019 Agreement (a) as being in the best interest of the Debtors' estates, creditors and equity and maximizing the benefit to the Debtors' estates; and (b) in granting the Buyer the right to credit bid as the "stalking horse", notwithstanding their demonstrated misconduct in the case.**

        1.    The Bankruptcy Court erred in approving the 9019 Agreement as being in the best interest of the Debtors' estates, creditors and equity and maximizing the benefit to the Debtors' estates.

As described herein, on June 6, 2024, this Court entered an order approving the 9019 Agreement between the Trustee and the Hawk Parties, which included, amongst others, the following deal terms:

- Hawk received a $180 million secured claim, $150 million of which can be credit bid in a

sale of the Debtors' assets;

- A $7.5 million carve out to pay administrative and general unsecured creditors;

- The Trustee will make SeeCubic the proposed stalking horse in a 363 Sale of the Debtors' assets;

- Qualified bids in the sale process must include a minimum $120 million cash component; and

- If a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until the Hawk Parties' asserted $180 million claim is paid in full.

The 9019 Agreement all but guaranteed that unsecured creditors and perhaps even administrative expenses would receive only a pittance. Notably, the 9019 Agreement did not contain a fiduciary out and VSI strongly believed it (or a third-party) could provide the Debtors' with a much better offer.

The Bankruptcy Court erred in approving the 9019 Agreement as being in the best interest of the Debtors' estates, creditors and equity and maximizing the benefit to the Debtors' estates. VSI repeatedly expressed, as detailed more fully in their *Motion To Reconsider and/or Clarify Order Approving Settlement Agreement Between Chapter 11 Trustee And Hawk Investment Holdings, Ltd* [A-074-113, Bankr. Doc. No. 686] (the "**Motion to Reconsider**"), its concern that both Hawk and the Trustee were not acting in the best interest of the Debtors' estates, creditors, and equity and that the 9019 Agreement cemented Hawk's inflated secured claim. Despite these repeated pleas, the Bankruptcy Court approved the 9019 Agreement without allowing VSI to put on testimony or evidence.

        2.      <u>The Bankruptcy Court erred in approving the 9019 Agreement in granting the Buyer the right to credit bid as the "stalking horse", notwithstanding their demonstrated misconduct in the case.</u>

Further, the Bankruptcy Court erred in granting the Buyer the right to credit bid as the

- 16 -

"stalking horse", notwithstanding their demonstrated misconduct in the case. Whether cause exists

to allow for a credit bid under 11 U.S.C. 363(k) is a determination to be made on a case-by-case

basis. *In* re *NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr.

D.N.J. June 29, 2006) (limiting credit bid rights "for cause" is a flexible concept to be considered

on a case-by-case basis); See *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, at n.14 (3d Cir.

2010) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by

the Code, such as to ensure the success of the reorganization or to foster a competitive bidding

environment.")

As a more general matter, courts have held that the desire to foster a competitive bidding

environment might constitute cause sufficient to limit credit bidding rights. *See In re Fisker

Automotive Holdings., Inc.*, 510 B.R. 55 (Bankr. D. Del. 2014) (stopping a right to credit bid where

"to do otherwise would freeze bidding."); *In re Free Lance-Star Publishing Co.*, 512 B.R. 798

(Bankr. E.D. Va. 2014) (eliminating the secured creditor's right to credit bid where the creditor

had engaged in inequitable conduct, and "limiting the amount of the credit bid in this case will

restore enthusiasm for the sale and foster a robust bidding process.")

Further, courts have also denied credit bids for cause where there is inequitable conduct

harming the debtor or its estate. *See In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr. D.

Hawaii 2009) (denying right to credit bid where creditor had engaged in inequitable conduct

harming the debtor); *In re The Free-Lance Star Publishing Co*., 2014 WL 2505627 at *7 (Bankr.

E.D. Va. 2014) (denying secured lender the right to credit bid because it leveraged its position as

a secured lender to acquire additional collateral prior to the bankruptcy filing for the purpose of

purchasing assets with credit in a bankruptcy case); *and In re Theroux*, 169 B.R. 498 (Bankr. D.R.I.

1994) (denying credit bid where the sale price grossly undervalued the assets). Nothing is more

applicable to this case than the line of cases cited above.

Courts have found cause to deny credit bidding when a sufficient dispute exists regarding the validity of the claim forming the basis for the credit bid. *In re Fisker Automotive Holdings, Inc.*, 510 B.R. at 61 ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien."); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 63-64 (Bankr. D.S.C. 2010) (denying secured creditor the right to credit bid because its mortgage and claim were subject to dispute).

All three of these circumstances can be found in this case. (1) The desire to foster a competitive bidding environment might constitute cause sufficient to limit credit bidding rights – here, allowing the Buyer to credit bid clearly chilled bidding, and this was something the Bankruptcy Court was alerted to throughout the proceedings in VSI's pleadings and statements in the courtroom. (2) Denial of credit bid for cause where there is inequitable conduct harming the debtor or its estate – here, as discussed at length herein and in prior pleadings, the Buyer's behavior has repeatedly harmed the Debtors and their estates, both in terms of chilling bidding, as discussed, and also through the various TRO violations and unlawful possession of the Debtors' assets. (3) Sufficient dispute exists regarding the validity of the claim forming the basis for the credit bid. As detailed herein and throughout the bankruptcy record, (i) the Hawk Parties' notes were converted to equity and thus incapable of allowance as secured claims, (ii) key StreamTV estate assets purportedly being "transferred" pursuant to the Sale Order remain (illegally) in the hands of SeeCubic, Inc. and the other Hawk Parties, and (iii) the intellectual property belongs to Rembrandt. In sum, because the StreamTV Debtor assets were taken and continuously (and illegally) possessed for years after the Delaware Supreme Court and Chancery Court orders requiring their return, the Trustee's proposed "sale transaction" is simply an exercise in Kabuki theater providing for the

- 18 -

"transfer of title" over Debtor assets that were never returned.  Unfortunately, the Bankruptcy Court's imprimatur upon this theatrical transfer places the color of law upon more than a simple sale of debtor assets; it effectively converts Rembrandt's trade secrets and other intellectual property rights that reside within those StreamTV assets (including software code) that was never return to the Debtors' estate.

As such, no credit bidding should have been permitted. The Buyer should not have been permitted to credit bid given the facts and circumstances of this case. This is wholly inequitable to the legitimate creditors and constituted "cause" to deny credit bidding rights. Despite these clear arguments, the Bankruptcy Court allowed the Buyer to credit bid.

> 3.      Taken together, the 9019 Agreement and the Sale Order constituted an impermissible *sub rosa* plan of reorganization that was impermissibly approved by the Bankruptcy Court.

The sale process constituted an impermissible *sub rosa* plan of reorganization that stripped the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempted to extinguish their rights without their consent. It is well known that a bankruptcy court has the authority to approve a compromise or settlement of a claim after notice to the debtor, trustee, and creditors and a hearing on the compromise. Fed. R. Bankr. P. 9019(a). It is also accepted knowledge that under 11 U.S.C.S. § 363(b), a debtor may use estate property outside the ordinary course of business, upon notice and hearing, to settle claims with approval of the bankruptcy court.

However, when a sale process and/or settlement in bankruptcy has the ultimate effect of dictating the terms of any future reorganization plan, the bankruptcy court must deem the transaction impermissible because it short circuits the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. "The hallmark of such a plan is that it dictates the terms of a reorganization plan." E*nergy Future Holdings Corp. v. Del. Tr. Co.*, 648 F. App'x 277 (3d Cir. 2016). This is because it "short circuits" the requirements of Chapter

11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

Thus, *sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir. 2007); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted."). Where a settlement circumvents creditors' rights to vote on key provisions, that settlement can be said to dictate the terms of a plan. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

This is precisely the circumstance of this case. The terms of the sale, as outlined in the 9019 Agreement and in the Bidding Procedures Motion, and ultimately included in the Sale Order, clearly constituted a *sub rosa* plan of reorganization. Among other things, the sale improperly channeled consideration to specific creditor groups –the Trustee selected the Hawk Parties as the stalking horse and gave them an allowed secured claim of $180 million, $150 million to be used as a credit bid. This was blatantly at the expense of the Debtors' other creditors – pursuant to the 9019 Agreement, $7,500,000 would be carved out to pay administrative and general unsecured creditors. Notably, pursuant to the procedures, if a bid had been accepted over the stalking horse bid, only 10% of that overbid would have gone to administrative or unsecured creditors until Hawk's $180 million claim would be paid in full. As such, it essentially ensured that the Debtors' unsecured creditors, and perhaps even administrative expense claimants, receive pennies on the dollar. Such a restructuring of creditors' rights and diversion of value is impermissible in the context of a 363 sale. *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d

- 20 -

935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

Further, the Debtors impermissibly sought to use the sale process to bind the Debtors' creditors to a treatment of their claims without having that proposed treatment tested by the standards of the Bankruptcy Code. Such a proposed sale cannot proceed. See, e.g., *In re Westpoint Stevens Inc.,* 333 B.R. 30, 52 (S.D.N.Y. 2005) ("Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved[.]"); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226-28 (5th Cir. 1986) (same).

Quite simply, a 363 sale is not a substitute for a plan of reorganization. *See Westpoint Stevens Inc*., 333 B.R. at 52 (noting when a proposed transaction specifies terms for a reorganization plan, the parties and the court "must scale the hurdles erected in Chapter 11") (citation omitted); *see also In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (The "trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization."); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (finding that section 363 does not permit a debtor to abrogate the protections afforded creditors by section 1129 and the plan confirmation process).

The Debtors bear the burden to prove that the proposed sale is fair, equitable, in the interest of the estates, and not unfair to the creditors. The proposed sale fails each of these requirements.

## II.    <u>BID PROCEDURES ORDER</u>

      **a.**    **The Bankruptcy Court erred in approving the bidding procedures, without evidence or an evidentiary hearing, and finding the sale process and the Bidding Procedures were fair, reasonable, and appropriate under the**

> **circumstances and designed to maximize the value of the Assets, without evidence or an evidentiary hearing.**

The Bankruptcy Court erred in approving the bidding procedures, without evidence or an evidentiary hearing, and finding the sale process and the Bidding Procedures were fair, reasonable, and appropriate under the circumstances and designed to maximize the value of the Assets, without evidence or an evidentiary hearing.  It is axiomatic that parties seeking relief under the Bankruptcy Code (including under section 363 with respect to the disposition of debtor assets) bears the burden of proof of showing – with evidence – that the relief sought is supported by the facts and warranted as a matter of law.  One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003). To further this purpose, sale procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value); *see also In re Williamson*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.")

In this regard, the Court must assess the fairness and reasonableness of the proposed bidding procedures. *See In re American Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) Tr. at 132-33 ("I don't think . . . that my consideration of bid procedures is based on the business judgment rule . . . The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all that matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case; to determine what is fair for

79394277;10

all the parties.")

> **b.**  **The Bankruptcy Court erred in finding, without evidence or an evidentiary hearing, that the Bidding Procedures and Asset Purchase Agreement were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets.**

There is nothing fair about the proposed "process" approved by the Bidding Procedures Motion and the ensuing Asset Purchase Agreement. In fact, the process (if it even can be called that) succeeded in handing the Debtors' most valuable assets to SeeCubic, an insider with a long history of improperly possessing and controlling the Debtors' property, as Stalking Horse Bidder pursuant to an improper credit bid.

SeeCubic is undeniably an insider with respect to the these cases. Indeed, SeeCubic exerted an inordinate amount of control over the Debtors' assets and sale process, and has time and time again violated the automatic stay and the Bankruptcy TRO in place. Control of SeeCubic rests with Stastney, who was both Vice Chairman of the Board of Directors and Chief Financial Officer of Debtor Stream shortly before he orchestrated an asset takeover with the Hawk Parties through the invalidated Omnibus Agreement. Stastney had access to the Debtors' financials, sensitive customer information, investor database, and other critical data. He siphoned key personnel from the Debtors and ultimately used the Dutch court system to install himself as director of the Debtors' R&D subsidiary, a position he uses today to exert control over the Debtors' engineering development activities.

Transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), aff'd,

- 23 -

160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, 26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required for insider transactions"); *In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders . . . the proposed sale is subject to heightened scrutiny.").

This heightened scrutiny also applies to a sale proposed by a trustee, rather than a debtor in possession. *In re Blixseth*, No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010). In *Blixseth*, the court refused to approve a sale of property as proposed by the trustee to a secured creditor credit-bid. The court found that the creditor had "very close ties to the debtor" and refused to apply the standard applicable to non-insider sales or to give deference to the trustee's business judgment. Instead, the court applied the more rigorous *Bidermann* standard for evaluating insider transactions. As such, the court denied the bidding procedures proposed by the trustee. In applying heightened scrutiny, courts are concerned with "the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

This transaction does not withstand heightened scrutiny. As in *Bidermann*, SeeCubic and the Hawk Parties clearly have "very close ties" to the Trustee. As detailed herein, the Hawk Parties

have a long history of improperly possessing the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this Court's orders, specifically including the TRO that remains in effect through November 12, 2024.

## III.    <u>SALE ORDER</u>

As a general matter, the Bankruptcy Court erred by improperly punting valid allegations of patent infringement and trade secret misappropriation liability down the line.  The Bankruptcy Court consistently approached issues of patent infringement and trade secret misappropriation by stating that the issues could be addressed at a later date by another court (e.g., Delaware in SeeCubic's case, where Rembrandt could get its "remedy" against the purchaser because the estate was essentially sold "as-is" with a carve out of the estate's license from Rembrandt) (*See Hearing Transcript*, A-1318, December 4, 2024 at 18:4-5 ("I just clarified that if the sale does go through, you will be able to sue the Buyer."); A-1314, *Id* at 14:8-10 ("VSI and Rembrandt are going to have the right to pursue all of their arguments with regards to the infringements.") The glaring problem with this rationale is that, in the case of intellectual property disputes, it's only chance of success is with regards to situations involving patent law, where infringement disputes are adjudicated between private parties in civil court: A purchaser can knowingly buy a company that has a patent infringement problem and deal with it later.

However, such approach is not possible here: a purchaser cannot buy a company that has a trade secret ownership problem. Federal trade secret law (i.e., DTSA) criminalizes transactions of third party trade secrets. Under 18 U.S.C. 1832, it is considered a criminal act to sell the trade secrets of a third party. Not only does criminal liability accrue to the seller, but it is also considered a crime as to the purchaser. 18 U.S.C. 1832(a)(3) ("receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization."). The Debtors' estates included trade secret assets owned by Rembrandt and

embodied in, for example, physical media of source code. Neither the Trustee nor the Bankruptcy Court made any effort to separate out those assets, let alone assess whether the trade secrets were indeed part of the estate or not. The sale therefore was, on its face, prohibited by federal trade secret law. The Trustee, as seller, in conducting a sale of trade secrets, committed a criminal act. So did SeeCubic Inc., as purchaser.  And worse still, the seller and buyer engaged in this criminal conduct knowingly. Throughout the sale process and bankruptcy proceedings, Rembrandt repeatedly cried foul. The Trustee and the Bankruptcy Court failed to appreciate the inclusion of criminal provisions in federal trade secret law reflecting the serious nature of corporate espionage and its impact on national economic security.

This bares striking resemblance to *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at \*9 (Bankr. D. Del. July 28, 2008), a case discussed extensively herein. *Whitehall* emphasized the importance of determining ownership before selling assets in bankruptcy: Here, the 'consigned goods' are Rembrandt's trade secrets. In this case, it was crucial to establish clear ownership of the trade secrets before proceeding with the sale. Obtaining Rembrandt's explicit consent was essential to avoid legal complications including criminal liability. The *Whitehall* case highlights the need for thorough due diligence. The Bankruptcy Court essentially conducted no due diligence despite Rembrandt's repeated ownership claims and the existence of its license to the estate that would terminate automatically upon a sale.

a.  **The Bankruptcy Court erred in approving the sale of the Debtors' assets without first determining, in an adversary proceeding, whether the assets to be sold were property of the estate.**

Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts generally apply some form of a business judgment test in determining whether to approve a proposed use, sale, or lease of estate property under section 363(b)(1). *See*

*ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Stearns Holdings, LLC*, 607 B.R. 781, 792 (Bankr. S.D.N.Y. 2019); *In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005); *see generally* Collier ¶ 363.02 (16th ed. 2020).

As stated above and throughout this brief, a debtor (or in this case, the Trustee), cannot sell property unless that property constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must determine whether the property the debtor proposes to sell constitutes property of the estate – *in an adversary proceeding, not a contested matter. In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. B.A.P. 2001)). In addition, it is not contested that Rembrandt's intellectual property clearly does not constitute property of the estates. It is the trustee who bears the burden of establishing that the property to be sold is property of the estate under Section 363(b). *See, e.g., In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet their burden of establishing that the assets were property of the estate, and therefore were not permitted to sell the goods under Section 363(f)(4)).

Here, it is evident that, the trustee attempted to sell the assets on an "as-is, where-is" basis, without understanding (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to a third-party has been completed.

Moreover, the Bankruptcy Court could not determine whether the assets are (i) property of the estate or (ii) Rembrandt's intellectual property incorporated into the Debtor's technology through a simple contested matter (such as the contested Sale Motion). Rather that determination

requires an adversary proceeding in order to afford the third-party non-debtor the full panoply of due process rights *in advance* of depriving them of their property through a court-ordered 363 sale. See *Id.* (citing *In re SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)* 2008 WL 2498048 (3d Cir. June 24, 2008) at *12). Accordingly, legal precedent, due process, and fundamental fairness militate against permitting the Bankruptcy Court to enter the Sale Order, particularly upon the paucity of evidence on the record and in support of the Trustee's order.

It is widely accepted, in addition to being firmly intuitive, that the Bankruptcy Code does not expand a debtor's interests in property beyond what such interests were at the petition date. *Jones v. GE Capital Mortgage Co. (In re Jones)*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition") (*citing First Fid. Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993)); *See also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of the case continue in bankruptcy -- no more, no less."), cert denied, 469 U.S. 982 (1984); *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663, 203 L. Ed. 2d 876 (2019) (recognizing the "general bankruptcy rule [that] the estate cannot possess anything more than the debtor itself did outside bankruptcy" and that "[a] debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.").

This is controlling Third Circuit law. *See SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin),* 2008 WL 2498048 (3d Cir. June 24, 2008) at *1,*6 (holding that "the adversary proceeding Rule at issue here is mandatory and establishes a right to specific process that must be afforded. Its mandatory nature is grounded in principles of due process that trump 'finality.'"). Bankruptcy courts have consistently made this finding. *See also Anderson v. Conine (In re*

- 28 -

*Robertson)*, 203 F.3d 855 (5th Cir. 2000) (holding that Section 363(f) does not allow a trustee to sell property that is not property of the estate); *In re Worcester Country Club Acres, LLC*, 655 B.R. 41, 47 (Bankr. D. Mass. 2023) (holding that because the ownership of the land was disputed, it "must be adjudicated in order to determine if they are property of the Debtor's bankruptcy estate, they cannot be sold under § 363(b) or (c) and pursuant to § 363(f)(4) prior to a resolution of those issues."); *In re Coburn*, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (it was necessary to determine whether an asset was property of the estate in order to then decide whether the trustee was entitled to sell the asset pursuant to Section 363(f))); *Darby v. Zimmerman (In re Popp)*, 323 B.R. 260, 266 (B.A.P. 9th Cir.2005); *Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*, 2013 WL 4804816, at *3 (D.N.J. Sept. 9, 2013) ("it is well-settled that a 'bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property"). A sale under Section 363 "cannot be had when there is an unresolved issue of whether the subject property is 'property of the estate' . . . ." *In re Interiors of Yesterday, LLC*, Case No. 02-30356 (LMW) , 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007). *See also Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 605–06 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005) (this Court "may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property."); *Ross v. A V Car & Home, LLC (In re Brown)*, Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625, at *3 (Bankr. D.C. Jan. 30, 2019) (court may not authorize sale of property where ownership of a portion of the property is in dispute).

Further, it is the trustee who bears the burden of establishing that the property to be sold is property of the estate under Section 363(b). *See, e.g., In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet their

burden of establishing that the assets were property of the estate, and therefore were not permitted to sell the goods under Section 363(f)(4).

Notably, in the January 8, 2025 opinion filed by the Bankruptcy Court (A-1379-1399, Bankr. Doc. 916), the Bankruptcy Court included a single and reductive argument as to why a sale was permitted under 363(f), citing to one Second Circuit case:

> "Relevant to the Sale here, § 363(f)(4) permits a sale if a third party's interest is in bona fide dispute, meaning "there is an objective basis for either a factual or legal dispute as to the validity of the debt." *See, e.g., In re Williamsburg Boutique LLC,* 663 B.R. 217, 225 (Bankr. S.D.N.Y. Oct. 9, 2024) (quoting and citing cases). It is not for the bankruptcy court, however, to actually resolve the dispute; it must only determine whether a bone fide dispute exists." *Id.*

See A-1393, Bankr. Doc. 916, page 15. The Bankruptcy Court further argued that per *In re Revel AC, Inc.,* 802 F.3d 558, 573 (3d Cir. 2015), a *bona fide* dispute in the § 363(f)(4) context means that there is an objective basis, either in law or fact, to cast doubt on the asserted interest, and as such, here, whether the assets containing Rembrandt's intellectual property are property of the estates is the subject of *bona fide* dispute because it only includes all legal or equitable interests of the debtor in the property.

Clearly, this argument is flawed because it misinterprets both the scope of 541(a)(1) and the implications of "*bona fide* dispute" under 363(f)(4). The Court's reliance on the "*bona fide* dispute" standard is insufficient to justify the sale of assets that directly impact third-party intellectual property rights. The intellectual property in question is not property of the Debtors' estates under 541(a)(1), and the sale effectively circumvents the protections provided to third parties under bankruptcy law, as discussed throughout herein.

The Trustee did not even attempt to meet the burden required: In the December 4, 2024 hearing on the Sale Motion, VSI repeatedly asked the Trustee whether an extensive inventory had ever been conducted regarding the Debtors' assets and those that might belong to VSI. The Trustee

provided vague responses (*See e.g.* A-1325, Hearing Transcript December 4, 2024 25:5-13 (Q: Did you ever do an inventory of the assets of Stream TV? A: Well, that was one of the issues in the case that is not typical in a Chapter 11 Trustee case. There were no operations and it was unclear at the time, and remains unclear, exactly which entities of Mr. Rajan's have possession of tangible assets, records, et cetera. So I don't believe Stream TV has certainly any significant tangible assets. And if they do, I have not been aware -- made aware of them or know their location or who is in control of them.")). The Trustee mischaracterizes "*as is, where is*" to absolve himself of his obligations to the estate. "As is, where is" describes the assets condition, not the estate's title or the Trustee's authority to convey.

Despite all the evidence to the contrary, the Bankruptcy Court failed to properly address whether the property is that of the Debtors' estates under section 541 of the Bankruptcy Code. In fact, faced with this issue at the December 4, 2024 hearing, the Bankruptcy Court repeatedly stated that the inquiry was not "relevant." *See e.g.* A-1338, Hearing Transcript December 4, 2024 38:3-24 (when cross-examining the Trustee about certain critical Debtor software assets (i.e. Stream production code embedded with Rembrandt source code house on servers in California), the Court interjected "Well, who cares? All that we care about are assets now. All right?" and went on to declare "you're talking about some servers from California. I don't really understand how its relevant." A-1340, Hearing Transcript December 4, 2024 40:10-12).

**b.    The Bankruptcy Court erred in approving the sale of the Debtors' assets without (i) sufficient evidence or a complete evidentiary hearing, or (ii) a reasonable opportunity to object or be heard regarding the relief requested in the Motion to all interested persons and entities.**

Throughout the bankruptcy proceedings, the Bankruptcy Court turned a blind eye to the points and cautions that VSI and Rembrandt repeatedly attempted to raise, opting instead to serially deny them the ability to make a proper evidentiary record.

At the Sale Hearing to approve the Sale Motion, on December 4, 2024, VSI and Rembrandt, came prepared to present their witnesses and arguments in accordance with the Bankruptcy Court's promise that the sale hearing would be their opportunity to present their case in chief.  However, the Bankruptcy Court denied VSI and Rembrandt this opportunity. First, the Bankruptcy Court severely limited and then curtailed VSI cross-examination of the only two witnesses offered by the Trustee in support of his Sale Motion – the Trustee himself and his investment banker at SSG (defined below).[9]  Thereafter, the Court denied VSI and Rembrandt the right to put on witnesses or other evidence in support of their case in chief.[10]  Finally, the Court cut the hearing off without the opportunity for any oral argument, suggesting that "she had heard all she needed to hear" and would read the briefs.  *See e.g.* December 4, 2024 Hearing Transcript, A-1350 at 50:5-9 ("Okay. And I don't need to hear from that witness today, and I'm not going to hear from him today. I'm happy to hear all the arguments that you've listed in your  briefs, but I'm not taking testimony from that gentleman. I don't need that for part of the sale process."); A-1374, *Id.* 74:13-20 ("I don't have any need to hear from any witnesses about the sale. What I was interested -- if there were any concerns. Like, the concerns I was interested in hearing about today was the sale process, . . . And I've heard all of your questions, and I don't have any concerns about this sale. I don't.").

This "sale hearing" failed to meet the standard for an "evidentiary hearing" or afford VSI and Rembrandt any material due process.  The Court constricted cross-examination of the Trustee's only two witnesses in such a manner as to deny any meaningful exposure of the most important facts underlying the proposed sale (i.e. "free and clear" transfer, and "good faith purchaser" status) – and the relief sought most by the Trustee and Buyer.

---

[9] *See* December 4, 2024 Sale Hearing Transcript, A-1322-1323, 22:25, 23:14.
[10] *See* December 4, 2024 Sale Hearing Transcript, A-1374-1376, 74:6, 75:13, 76:15-19.

79394277;10

Moreover, at the same December 4, 2024 hearing, the Bankruptcy Court permitted the Trustee to file a materially different form of Sale Order (which modified the "deal terms" originally set forth in the 9019 Agreement) less than three hours before the hearing without opportunity for sufficient review, let alone adequate opposition or discovery.

Entering the proposed sale order that permits the transfer of non-estate property "free and clear" of liens, claims, and encumbrances and confers "good faith purchaser" status on the stalking horse bidder without an evidentiary record permitting the Court to grant such relief is clearly problematic – indeed, it is fatal to the requested relief. The only evidence the Trustee submitted in support of his requested sale order relief were two declarations (one from the Trustee and one from SSG as investment banker), and neither established any facts in support of (i) free and clear transfer or (ii) good faith purchaser status. No material cross-examination was permitted by the Court. Also as noted above, the Bankruptcy Court denied requests by VSI and Rembrandt to put on evidence to contest the "free and clear" and "good faith" findings.

        **c.**      **The Bankruptcy Court erred in finding that (i) the Buyer was a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and (ii) the Trustee and the Buyer negotiated and undertook their roles leading to the entry into the Asset Purchase Agreement in a diligent, non-exclusive, fair, reasonable, and good faith manner at arms' length leading to the entry into the Asset Purchase Agreement.**

Section 363(m) articulates the "good faith" requirement of a Section 363 asset sale. *Abbotts Dairies*, 788 F.2d at 149–50. A court may not find good faith if fraud, collusion or unfair advantages are determined. *Id.* at 147. A good faith purchaser under the Bankruptcy Code is one who purchases assets for value, in good faith, and without notice of adverse claims. *Abbotts Dairies*, 788 F.2d at 147. In determining whether an asset purchaser is entitled to such protections, courts examine "the integrity of his conduct in the course of the sale proceedings." *Abbotts Dairies*, 788 F.2d at 148.

In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee. See *Abbotts Dairies*, 788 F.2d at 147-48. Ironically, the Sale Motion relies heavily on *Abbott Dairies* and cites the types of misconduct that would destroy a purchaser's good faith status. *Sale Motion* ₱ 64. SeeCubic and the Hawk Parties would fail this test at every level: (1) the sale was not negotiated at arm's length, made particularly evident by SGG's historical relationship with Hawk; (2) Stastney, as chief executive of the SeeCubic as the Stalking Horse Bidder is also the sole director of the Debtors' R&D subsidiary; and (3) as discussed throughout the Declaration and this Objection, there has been collusion between the Trustee and the proposed Stalking Horse Bidder throughout this process.

In reviewing the applicability of section 363(m) to a sale of property of the debtor's estate, the question of whether the Hawk Parties are a good faith purchaser is a mixed question of law and fact. See *In re Abbotts Dairies of Pennsylvania, Inc.* 788 F.2d 143, 147 (3d Cir. 1986) (stating standard of review regarding "the question of whether [purchaser] was a good faith purchaser . . . is mixed").

Section 363(m) reads in relevant part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.
> 11 U.S.C. § 363(m) (emphasis added).

Section 363(m) renders moot any appeal of an order approving sale of property to a good faith purchaser if "(1) the underlying sale or lease was not stayed pending the appeal, and (2) the

- 34 -

court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors*, Inc., 141 F.3d 490, 499 (3d Cir. 1998).

Under section 363(m), a sale of assets may not be reversed or modified if the property was sold to an "entity that purchased . . . [the] property in good faith." 11 U.S.C. § 363(m). Even if a party fails to obtain a stay of a sale order, that party may still challenge the sale on the grounds that the entity who purchased the property did not do so in good faith. See, e.g., *In re Filtercorp Partners, L.P.*, 163 F.3d 570, 576-77 (9th Cir. 1998); *In re Colony Hill Assocs.*, 111 F.3d 269, 272 (2d Cir. 1997). "`The requirement that a purchaser act in good faith . . . speaks to the integ-rity of his conduct in the course of the sale proceedings." *Id.* (*quoting In re Rock Industry Machine Corporation*, 572 F.2d 1195, 1197 (7th Cir. 1978).

Because "neither the Bankruptcy Code nor the Bankruptcy Rules attempt to define `good faith[,]' [c]ourts applying section 363(m) . . . have . . . turned to traditional equitable principles, holding that the phrase encompasses one who purchases in `good faith' and for `value.'" *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). The Third Circuit has determined that, in reviewing the "good faith" of a purchaser, the court must first "determine whether there was any impermissible collusion between the purchaser and the debtor." *Id.* at 151. If there was such collusion, the court "should then determine whether the purchaser paid "value" for the assets purchased." *Id.* Finally, "if the court determines that [the purchaser] did not pay `value,' it [must] . . . determine whether it has the power to undo the sale to [the purchaser]." *Id.*

It is clear that the Buyer – directly or through its Chairman and CEO, Shadron L. Stastney, as an individual – has held wrongful possession and exercised control over the Debtors' assets for more than 4 years. SeeCubic (a) seized those assets prior and pursuant to a settlement agreement

- 35 -

(See A-1062,1064, 1090-1091, 1093-1094, 11/22/24 Robertson Declaration at ¶¶ 12, 15-16, 18, 105-106, 111-114, and 117) that was found to be void *ab initio* by the Delaware Supreme Court (A-1065, *Id* at ¶ 21); (b) retained all significant assets on remand to the Delaware Chancery Court, despite multiple court orders (A-1066, 1067-1069, *Id* at ¶¶ 24-25 and 28-30) arguing that it should not have to return them because the assets had been improved while in SeeCubic's wrongful possession (A-1067-1068, *Id* at ¶ 28); (c) retained computer servers in Silicon Valley that stored not only Stream's valuable source code, but the intellectual property of Philips and Rembrandt as well (A-1067, 1088-1090, *Id* at ¶¶ 27 and 96-102) (d) controlled all aspects of the Debtors' technology in the Netherlands by installing SeeCubic CEO Stastney as director of the Debtors' three Dutch subsidiaries (A-1073-1076, 1090, *Id* at ¶¶ 45, 47-52, 54, and 103); and (e) executed an improper return of Stream's most valuable tangible asset, the optical bonding equipment, by transferring possession to a non-debtor subsidiary which – under the control of SeeCubic CEO Stastney – refused to surrender the property to Stream during the pendency of these Bankruptcy Cases. A-1073-1074, 1077-1078, 1085-1086, *Id* at ¶¶ 45, 47-¶¶ 59 and 86-87.

SeeCubic attempted to sell the Debtors' assets rather than return them to the Debtors, engaging an investment banker to conduct a UCC Article 9 sale of the assets. The sale was stopped only by injunctive relief and a subsequent status quo order. A-1066-1067, 1071, *Id* at ¶¶ 23-24 and 37.

SeeCubic was found in contempt of court (A-1069-1070, 1087, *Id* at ¶¶ 31-32 and 92) for returning the shares of Technovative stock to Stream while simultaneously coordinating with Stream's secured lender to seize immediate control by appointing SeeCubic CEO Stastney director of Technovative through purported proxy rights, violating the spirit of the Chancery Court's order that Stream was entitled to possess its assets and recommence business to satisfy its creditors.

SeeCubic exercised influence wherever possible to ensure that the Debtors' technology was used to develop SeeCubic customer relationships in competition with, and to the detriment of, the Debtors. A-1071, 1075, 1078, *Id* at ¶¶ 38, 51, and 61.

SeeCubic attempted to register a trademark belonging the Debtors during the pendency of the Bankruptcy Cases, and even during the pendency of the Adversary Case. *See* A-1452-1456, 11/27/23 Hearing Transcript at 53:1-57:18.

Despite a Bankruptcy TRO in effect since January 4, 2024 and extended on multiple occasions – most recently until January 13, 2025 (A-1662-1663, Adversary Case 23-00057-amc, ECF 157) – SeeCubic continuously and publicly maintained six public websites stating that SeeCubic is the owner of the Debtors' technology. *See* A-1091, 11/22/24 Robertson Declaration at ¶ 107.

Importantly, the Trustee's conduct and dubious credibility only compounds the deeply-problematic record of the Buyer's misconduct and bad faith in connection with these cases, generally, and the proposed sale transaction, specifically.  As outlined above, the Trustee perjured himself while under cross-examination at the December 4, 2024 sale hearing *See* A-1313-1314, Pages 13-14, above.  This false testimony was central because, as the Bankruptcy Court made abundantly clear at the November 7, 2024 hearing Judge Chan was predisposed to believing and deferring to the Trustee:  "So given that extraordinary event [the appointment of a Chapter 11 Trustee], you know, I'm going to give the Trustee a great deal of deference.  I just am, okay?" *See* November 7, 2024 Hearing Transcript, A-792 at 14.  So, it was, and remains clear, that the Bankruptcy Court's reliance upon the Trustee's credibility is central to the Bankruptcy Court's ultimate finding that the parties acted in good faith to negotiate the sale transaction and that SeeCubic, Inc. should be treated as a good faith purchaser under 363(m).  But the facts outlined

above and Mr. Homony's lies on the stand undermine the very foundation of that finding – credibility. Indeed, the confluence of Mr. Homony's false testimony and the Bankruptcy Court's repeated denial of due process by prohibiting VSI from putting on direct witness testimony compound the error to the breaking point. Despite the Trustee's damaged credibility the Bankruptcy Court granted extraordinary relief based solely upon its belief in and deference to that Trustee, while simultaneously denying VSI any reasonable ability to impeach that credibility through the testimony of three other witnesses who all heard Mr. Homony say the words he denied uttering. Given that the Trustee had just perjured himself on the stand in open court, how much deference could the Bankruptcy Court really have afforded Mr. Homony? And if armed with such critical evidence, how could the Bankruptcy Court have concluded (as it did) that SeeCubic, Inc. should receive "good faith" purchaser status under 363(m) based solely upon Mr. Homony's testimony?

As described above, there are many reasons why the Buyer cannot receive "good faith" purchaser status. But the absence of any evidence at all in support of a "good faith" designation rings the death knell to conferring such relief:

     a.     There was no evidence of "good faith" offered by the Trustee or Buyer at the December 4, 2024 sale hearing;

     b.     There was no evidence of "good faith" offered by the Trustee or Buyer at the November 13, 2024 hearing on the bid procedures (because it was not an evidentiary hearing, and nothing was submitted by any party in support of a "good faith" finding);

     c.     The order entered by the Bankruptcy Court approving the bid procedures was entered without any evidence, and nevertheless made "good faith" findings regarding the proposed sale transaction;

     d.     As described herein, SeeCubic, Inc., Shadron Stastney, and Hawk have all engaged in TRO violations, stay violations, and other inequitable conduct making them ineligible for "good faith" purchaser status;

     e.     Stastney & SeeCubic, Inc. misappropriated and systematically exercised dominion

and control over the Debtors' assets, and thus the "transfer" of assets occurring through the proposed 363 sale is simply a transfer of title.[11]

The Bankruptcy Court failed to examine whether or not the Buyer was a "good faith" purchaser, despite clear evidence that the Buyer was not, and over repeated cries from VSI to do so. Thus, the Bankruptcy Court was clearly erroneous.

> **d.    The Bankruptcy Court erred in finding that the sale of the Assets to the Buyer under the terms of the Asset Purchase Agreement met the requirements of section 363(f) to sell the Assets free and clear of liens, claims, encumbrances, and interests.**

In addition to the above defects with respect to "good faith" purchaser status, there are extensive defects regarding section 363(f) of the Bankruptcy Code, namely that the assets cannot be sold "free and clear". As an initial matter, in the asset purchase agreement proposed by the Trustee, the Trustee proposes to sell all assets of the Debtors' estates (with minor exceptions), but then ignores the fact that Rembrandt's property is embedded within the StreamTV estate property he purports to sell – this is illegal, contrary to controlling legal authority[12], and does not qualify under any of the statutory sections set forth in 363(f). Further, the Trustee has offered no evidence that such proposed 363(f)[13] sale qualifies under any of that Code section's statutory provisions:

---

[11] Stastney, SeeCubic, and Hawk failed to testify or otherwise submit evidence of good faith. The Bankruptcy Court denied any and all efforts to adduce evidence regarding SeeCubic and Stastney's bad faith. The Bankruptcy Court Proceeding record establishes that there is cause to believe that Stastney, SeeCubic, Inc., and Hawk engaged in conduct that (i) violated applicable DE state court orders, (ii) violated the automatic stay, (iii) violated the Bankruptcy Court's December 2023 World-wide Stay, and (iv) violated the Bankruptcy Court's TRO with respect to StreamTV estate property.

[12] *See e.g. In re Whitehall Jewelers Holdings, Inc.,* Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008); *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin),* 2008 WL 2498048(3d Cir. June 24, 2008).

[13] Section 363(f) of the Bankruptcy Code authorizes a trustee or DIP to sell property "free and clear of any interest in such property of an entity other than the estate," but only if: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in *bona fide* dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money

(i) there was no evidence in either the Trustee's declaration or the investment banker's declaration that the assets being sold as part of the 363 sale were property of the Debtors' estates and had no encumbrances by any other party (such as trade secrets and patent licensors, Rembrandt or Philips); and (ii) there was no evidence at the December 4, 2024 sale hearing that the Trustee had any meaningful understanding of the Debtors' assets that the Trustee was purporting to "sell", let alone an understanding for how those assets may be encumbered. Indeed, the limited cross-examination opportunity afforded by the Court demonstrated that the Trustee was not aware of and did not investigate assets in California that were being transferred despite containing non-estate property (specifically Rembrandt's trade secrets and other IP contained within the StreamTV production code housed on the California-based servers).  See A-1338, December 4, 2024 hearing transcript, 38:3–7. Moreover, the limited cross-examination established that the Trustee falsely asserts that the only asset being transferred by StreamTV is the bonding machine (notwithstanding evidence that SeeCubic, Inc. and Shad Stastney previously stole and continue to possess property of the estate (e.g. TVs, tablets, and source code). See A-1328, December 4, 2024 hearing transcript, 28:9–18; *See also* A-1063-1064, 1090-1091, 1093-1094, 11/22/24 Robertson Declaration at ¶¶ 12, 15-16, 18, 105-106, 111-114, and 117.

## CONCLUSION

For the foregoing reasons, the Appellants respectfully requests that the Court (i) vacate or reverse the 9019 Order; (ii) vacate or reverse the Bid Procedure Order; and (iii) reverse the Sale Order.

---

satisfaction of such interest. 11 U.S.C. § 363(f). As discussed herein, none of these elements are met.

Dated: January 15, 2025

**AKERMAN LLP**

By: ___/s/R. Adam Swick___

  R. Adam Swick
  500 West 5th Street, Suite 1210
  Austin, TX 78701
  Telephone: (737) 999-7103
  Facsimile: (512) 623-6701
  Email: adam.swick@akerman.com

  Donald N. David, SBN: 304846
  Mark S. Lichtenstein
  AKERMAN LLLP
  1251 Avenue of the Americas
  37th Floor
  New York, NY 10020
  Telephone: (212) 880-3800
  Facsimile: (212) 880-8965
  Email: donald.david@akerman.com
     mark.lichtenstein@akerman.com

  John H. Thompson
  AKERMAN LLP
  750 Ninth Street, N.W. 750
  Washington, D.C. 20001
  Telephone: (202) 824-1760
  Facsimile: (202) 393-5959
  Email: john.thompson@akerman.com

  *Attorneys for Appellant Visual Semiconductor, Inc.*

79394277;10

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record certifies the following:

1.     The foregoing *Opening Brief of Appellant* (the "**Brief**") complies with: (i) the page limit provided in the *Scheduling Order* of December 18, 2024, at Docket No. 8, because, excluding the parts of the document exempted by the *Policies and Procedures* of Judge John M. Gallagher, it contains 40 pages; and (ii) the typeface and type-style requirements provided in the *Policies and Procedures*, Section B.2, because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman with 12 point font.

2.     On January 15, 2025, I electronically filed the Brief with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania by using the appellate CM/ECF system. The text of the electronic version of the Brief is identical to the text of the hard copies that will be provided.

Dated: January 15, 2025

*/s/ Adam Swick*_____
R. Adam Swick

- 42 -

79394277;10