**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VISUAL SEMICONDUCTOR, INC.,<br><br>        Appellant,<br>v.<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>        Debtors-in-Posess.<br>and<br><br>WILLIAM HOMONY, *et al.*,<br><br>        Trustees. | Bankruptcy Appeal<br><br>Civil No. 2:24-cv-06397-JMG |
| VISUAL SEMICONDUCTOR, INC.,<br><br>        Appellant,<br>v.<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>        Debtors-in-Posess.<br>and<br><br>WILLIAM HOMONY, *et al.*,<br><br>        Trustees. | Civil No. 2:24-cv-06498-JMG |
| VISUAL SEMICONDUCTOR, INC., *et al.*,<br><br>        Appellants,<br>v.<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>        Debtors-in-Posess.<br>and<br><br>WILLIAM HOMONY, *et al.*,<br><br>        Trustees. | Civil No. 2:24-cv-06617-JMG<br><br>Appeal Related to Case No. 23-10763-AMC in the United States Bankruptcy Court for the Eastern District of Pennsylvania |

## APPENDIX TO APPELLANT'S OPENING BRIEF

79560786;2

# TABLE CONTENTS

| ITEM NO. | BANKR. DKT. NO. | DOCKET DATE | TITLE OF DOCUMENT | APPX. PAGES |
|---|---|---|---|---|
| 1. | 517 | 12/14/23 | Stipulated Order Restating and Enforcing the Worldwide Automatic Stay | A-001 to A-005 |
| 2. | 678 | 06/18/24 | Objection of Visual Semiconductor, Inc. to the Motion of William A. Homony in His Capacity as Chapter 11 Trustee for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property | A-006 to A-073 |
| 3. | 686 | 06/20/24 | Visual Semiconductor, Inc.'s Motion to Reconsider and/or Clarify Order Approving Settlement Agreement Between Chapter 11 Trustee and Hawk Investment Holdings, Ltd (ECF No. 653). | A-074 to A-113 |
| 4. | 724 | 08/29/24 | Motion of William A. Homony In His Capacity as Chapter 11 Trustee for Entry of an Order: (I) Granting Expedited Consideration, Shortened Time and Limited Notice; (II) Quashing Subpoena; (III) Entering a Protective Order; and (IV) Granting Related Relief | A-114 to A-132 |
| 5. | 750 | 09/30/24 | Motion Of William A. Homony In His Capacity as Chapter 11 Trustee for (I) An Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets Including Approval of Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling an Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); | A-133 to A-241 |

| | | | | |
|---|---|---|---|---|
| | | | and (F) Granting Related Relief, and (II) an Order (A) Approving The Sale of The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption And Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief | |
| 6. | 776 | 10/30/24 | Order Granting Motion to Withdraw Turnover Action | A-242 to A-244 |
| 7. | 788 | 11/06/24 | Visual Semiconductor, Inc.'s Objection to Motion of William A. Homony In His Capacity as Chapter 11 Trustee for (I) An Order (A) Approving Bidding Procedures And Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling and Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(G); and (F) Granting Related Relief, and (II) An Order Approving (A) the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief | A-245 to A-778 |
| 8. | 796 | 11/12/24 | Transcript of Hearing: re: Hearing held on November 7, 2024 [Page 14] | A-779 to A-801 |
| 9. | 805 | 11/14/24 | Order Approving Settlement Agreement between Chapter 11 Trustee and Hawk Investment Holdings, Ltd. | A-802 to A-806 |

| 10. | 807 | 11/18/24 | Transcript of Hearing re: Hearing held on November 13, 2024 [Page 83:12-18] | A-807 to A-890 |
|---|---|---|---|---|
| 11. | 811 | 11/20/24 | Order (A) Approving Bidding Procedures and Form of Asset Purchase Agreement in Connection with the Sale of Substantially all of the Debtors' Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (C) Approving Procedures for Selection of Stalking Horse Bidder and Bid Protections, and (D) Granting Related Relief | A-891 to A-926 |
| 12. | 815 | 11/22/24 | Visual Semiconductor, Inc's Objection to Motion of William A. Homony in His Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Relating Relief | A-927 to A-1059 |
| 13. | 815-1 | 11/22/24 | Declaration of Charles M. Robertson in Support of Visual Semiconductor, Inc's Objection to Motion of William A. Homony in His Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Relating Relief [¶¶ 12, 15-16, 18, 21, 23-25, 27-32, 37-38, 45, 47-52, 54, 59, 61, 86-87, 92, 96-102, 103, 105-107, 111-114, and 117] | A-1060 to A-1095 |
| 14. | 853 | 12/04/24 | Praecipe to Substitute Exhibit "C" to Motion of William A. Homony In His Capacity As Chapter 11 Trustee for an Order (A) Approving the Sale of Substantially All of the Debtors' Assets | A-1096 to A-1217 |

- 4 -

| | | | Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee To Enter Into and Perform Debtors' Obligations Under The Asset Purchase Agreement, (C) Approving Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (D) Granting Related Relief | |
|---|---|---|---|---|
| 15. | 876 | 12/09/24 | Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Trustee to Enter Into and Perform Debtors' Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief | A-1218 to A-1300 |
| 16. | 878 | 12/11/24 | Transcript of Hearing re: Hearing held on December 4, 2024 [Pages 14:8-10; 18:4-5; 22:25; 23:14; 25:5-13; 25:7-14; 26-29; 28:9-18; 38:3-7; 38:3-24; 40:10-12; 50:5-9; 63:22-25; 64:1-4; 72:10; 73:21; 74:6; 74:13-20; 75:13, 76:15-19] | A-1301 to A-1378 |
| 17. | 916 | 01/08/25 | Opinion on Sale Order | A-1379 to A-1399 |
| 18. | 109 | 11/29/23 | Transcript of Hearing re: Hearing Held on November 27, 2023 [Pages 53:1-57:18] (*In Re:  Stream Tv Networks, Inc. And Technovative Media, Inc. V. Shadron L. Stastney, et al.*, ADV. NO. 23-00057-MDC) | A-1400 to A-1654 |
| 19. | 119 | 01/04/24 | Order Granting Temporary Restraining Order (*In Re:  Stream Tv Networks, Inc. And Technovative Media, Inc. V. Shadron L. Stastney, et al.*, ADV. NO. 23-00057-MDC) | A-1655 to A-1661 |

79560786;2

| 20. | 157 | 12/05/24 | Order extending TRO (***In Re:  Stream Tv Networks, Inc. And Technovative Media, Inc. V. Shadron L. Stastney, et al.***, **ADV. NO. 23-00057-MDC**) | A-1662 to A-1663 |
| --- | --- | --- | --- | --- |

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,[1] | Bky. No. 23-10763 (MDC) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky. No. 23-10764 (MDC) |
| Debtor. | (Jointly Administered) |

### STIPULATED ORDER RESTATING AND ENFORCING THE WORLDWIDE AUTOMATIC STAY

Upon consideration of the *Emergency Motion for Entry of an Order Enforcing the Automatic Stay and for Sanctions for Willful Stay Violation* (D.I. 49) and *Additional Supplement to Debtors' Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations* (D.I. 458) and the *Supplement* filed November 8, 2023, filed by Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"), the above-captioned debtors and debtors-in-possession (collectively, "Debtors"); this Court having jurisdiction with respect to Stream to consider the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334 and the

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (…4092) and Technovative Media, Inc. (…5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

132238519.1
317213620.1

**A-001**

*Amended Standing Order of Reference of the United States District Court for the Eastern District*

*of Pennsylvania*, dated November 8, 1990; and this Court being able to issue a final order

consistent with Article III of the United States Constitution; and venue of the Stream chapter 11

case and venue of the Stream chapter 11 case in this district being proper pursuant to 28 U.S.C. §§

1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and by

agreement of the parties which obviated the need for a hearing; and after due deliberation and

sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT**:

 Pursuant to Section 362, 365, 525, and 541 of the Bankruptcy Code, and subject to the exceptions

to the automatic stay contained in the Bankruptcy Code section (including section 362(b)) and the

right of any party in interest to seek relief from the automatic stay in accordance with Bankruptcy

Code section 362(d), pursuant to Section 362 of the Bankruptcy Code:

(a)    The filing of a petition under the Bankruptcy Code on the petition date,

March 15, 2023, operated as a stay, applicable to all entities,[2] on the following:

(1)    the commencement or continuation, including the issuance
or employment of process, of a judicial, administrative, or other
action or proceeding against the Debtors that was or could have been
commenced before the commencement of these Chapter 11 cases,
or to recover a claim against the Debtors that arose before the
commencement of these Chapter 11 cases;

---

[2] "Entity" is defined in the Bankruptcy Code to include a person, estate, trust, governmental unit,
and United States Trustee. Bankruptcy Code section 101(15). "Person," in turn, is defined in the
Bankruptcy Code to include an individual, partnership, and corporation. Bankruptcy Code
section 101(41).

**A-002**

(2)     the enforcement, against the Debtors or against property of the Debtors' estates, [3] of a judgment obtained before the commencement of these Chapter 11 cases;

(3)     any act to obtain possession of property of the Debtors' estates or of property from the Debtors' estates or to exercise control over property of the Debtors' estates;

(4)     any act to create, perfect, or enforce any lien against property of the Debtors' estates;

(5)     any act to create, perfect, or enforce against property of the Debtors any lien to the extent that such lien secures a claim that arose before the commencement of these Chapter 11 cases;

(6)     any act to collect, assess, or recover a claim against the Debtors that arose before the commencement of these Chapter 11 cases;

(7)     the setoff of any debt owing to the Debtors that arose before the commencement of these Chapter 11 cases against any claim against the Debtors; and

(8)     the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a Debtor that is a corporation for a taxable period the bankruptcy court may determine.

(b)     The commencement of a bankruptcy case creates an estate.  Except as provided in Bankruptcy Code section 541(b) and (c)(2), such estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the bankruptcy case, wherever located and by whomever held.

(c)     Nothing in this Order is intended to, or shall, alter the provisions or modify

---

[3] As used herein, "estate" has the meaning set forth in Bankruptcy Code section 541.

the protections of the Bankruptcy Code, including Bankruptcy Code section 362, nor shall anything in this Order extend the stay to non-debtor property or property that is not property of the Debtors' estates, or determine whether any property is or is not property of the Debtors' estates. Nothing herein shall constitute a determination regarding any pending motions or proceedings (including motions for relief from, or seeking to enforce, the automatic stay) or grant of any injunction or injunctive relief requested or currently pending before the Court, nor shall anything herein constitute a determination whether or not a stay violation has or has not occurred.

(d)     Entry of this Order shall not affect the exceptions to the automatic stay contained in section 362 (including section 362(b)) of the Bankruptcy Code or the right of any party in interest to seek relief from the automatic stay in accordance with section 362(d) of the Bankruptcy Code or the right of any party in interest to assert any rights under 362(e) of the Bankruptcy Code.  This Order is intended to be declarative of and coterminous with, and shall neither abridge, enlarge nor modify, the rights and obligations of any party under sections 362 (including 362(e)), 365, 525, and 541 of the Bankruptcy Code or any other provision of the Bankruptcy Code.  Nothing here constitutes a waiver by any party interest of any rights or defenses under any such sections.

(e)     This Order does not constitute an anti-suit injunction of any pending action brought under the laws of any foreign jurisdiction or any future action directed by such a court or brought before such a court; the parties' rights with respect to such matters are fully reserved, including as to the subject of matters and proceedings currently pending before this Court.

(f)     In accordance with the Bankruptcy Code, the Bankruptcy Rules, and applicable law, upon request of a party in interest, and after notice and a hearing, this Court may grant relief from the restraints imposed herein in the event that is necessary, appropriate, and

132238519.1
317213620.1

warranted to terminate, annul, modify, or condition the injunctive relief herein. To the extent the

stay has been terminated with respect to a party in interest in accordance with the Bankruptcy

Code, the Bankruptcy Rules, and applicable law, nothing herein shall affect that termination.

        (g)     Nothing herein shall constitute a determination that this Court has

jurisdiction over any party.

        (h)     The Debtors are authorized and empowered, but not directed, to serve, and

may use reasonable methods of providing notice of this Order, such as, and including but not

limited to, publication, certified and non-certified mail service.

Dated:__December 14th, 2023

*Magdeline D. Coleman*

MAGDELINE D. COLEMAN
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al*.[1] | Bky Case No. 23-10763 (AMC) |
| The Debtors. | (Jointly Administered) |

## OBJECTION OF VISUAL SEMICONDUCTOR, INC. TO
## THE MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY
## AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER
## ENFORCING THE AUTOMATIC STAY AND
## COMPELLING TURNOVER OF ESTATE PROPERTY

Visual Semiconductor, Inc. ("**VSI**") hereby files its Objection to the Motion of the Chapter

11 Trustee (the "**Trustee**") for Entry of an Order Enforcing the Automatic Stay and Compelling

Turnover of Estate Property (the "**Motion**"), and in support thereof, states as follows:

## PRELIMINARY STATEMENT

The Trustee claims in the Motion [2] that Mathu Rajan and VSI are violating the automatic

stay and interfering with the Trustee's exclusive control over the Debtors and their property. These

allegations are categorically false. Nothing is more illustrative of the Motion's weaknesses than an

examination of its own words.  In a particularly audacious example of chutzpah, the Trustee asserts

that "VSI stunningly admits to directing and 'funding' certain undisclosed contract employees" of

the debtor…*without any authority* and *unbeknownst to the Trustee*…." (emphasis added)[3],

notwithstanding the Trustee's knowledge, authorization, and direction of the VSI payments to

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] D.I. #646 (Bky Case 23-10763-AMC)

[3] Motion at ¶ 31.

**A-006**

contract employees. Indeed, the Trustee paid those contract employees on January 17, 2024, February 8, 2024, and February 22, 2024, knowingly using funds received by Stream from VSI, and as more thoroughly outlined below, the email correspondence between the Trustee and VSI representatives makes the Trustee's knowledge and authorization clear. These are demonstrable facts, and they completely belie the Trustee's baldfaced assertions and misrepresentations of fact. Frankly, such baseless assertions would be humorous if they were not so antithetical to the truth, disparaging to VSI, and disrespectful to this Court and the bankruptcy process. While it has become obvious that the Trustee has adopted the self-serving narratives of other parties in this proceeding bent upon sullying the reputation of Mr. Rajan and VSI, in light of demonstrable falsehoods like the one outlined above, objective observers must ask just how many of the Motion's assertions are to be believed.

VSI was created in 2022 for the purpose of helping the Debtors emerge from insolvency. VSI's purpose was and is two-fold: to fund the operations of the employees of the Debtors, which funding was not only known, but encouraged by the Trustee, and to procure orders for the Debtors to fulfill. None of VSI's activities involve the taking or using of property of the estate or trigger the automatic stay notwithstanding the Trustee's tortured attempts to malign the completely innocuous and known activities of VSI. These attempts also heavily rely on out-of-context statements, as opposed to anything new that has actually happened since the Trustee's appointment.

Through its distribution agreement with Debtor Stream TV Networks, Inc. ("**Stream**"), VSI has secured more than $138 million in customer purchase orders for the benefit of Stream. Since its founding in 2022, VSI has paid Stream's contractor employees to maintain valuable business relationships for the benefit of Stream with customers, manufacturers, critical vendors, original equipment manufacturers, and other strategic partners. The value of the purchase orders,

76870289;1

keeping employees paid, and maintaining the status quo of the Debtor's business relationships have all provided considerable value to the estate. Nothing was taken; to the contrary, value was added.

From the date of the Trustee's appointment on January 12, 2024, Mr. Rajan and VSI have been fully supportive of the Trustee in managing the Debtors' estates and worked hard to provide the Trustee with as much information as possible. Stream contractor employees — whose invoices VSI has been paying (at the direction of the Trustee) — were directed to fully cooperate with the Trustee, and they have done so. Significant effort has been made by the Stream contract employees, Mr. Rajan, and VSI to provide assistance and hundreds of pages of information to the Trustee to facilitate his administration of the Debtors' estates. Neither VSI nor Mr. Rajan are interfering with the Trustee's independent administration of the Debtors' estates, nor are they using Debtors' tangible property to raise funds for VSI as alleged. Indeed, as explained in detail below, VSI neither violated the stay by using any email address or refused to turnover property of the estate. And to the extent the Trustee believes an email address is property of the estate or that VSI is refusing to turnover any property of the estate, VSI is happy to comply with the Trustee's specific, reasonable, and legally-grounded demands. Had the Trustee simply conferred with VSI prior to filing the Motion, it is likely that Court intervention would have been unnecessary. This simple fact makes the Trustee's demands for attorney's fees and costs preposterous and, frankly, disingenuous.

76870289;1

**A-008**

## BACKGROUND

**A.    VSI has supported the Debtors since VSI was founded in 2022**

1.     VSI is a party in interest, equity holder of the Debtor, a proposed plan sponsor of the Debtors (originally), and financier and distributor of the Debtor's Glasses-Free 3D technology. VSI has invested millions of dollars in Stream since VSI's inception in 2022.

2.     VSI was formed in April 2022 when it became clear to Mr. Rajan that Stream would prevail in its Delaware Supreme Court appeal of the Delaware Court of Chancery ruling which validated a settlement agreement (the "**Omnibus Agreement**") that transferred Stream's assets to SeeCubic, Inc. ("**SCI**") on behalf of Stream's alleged secured creditors, SLS Holdings VI, LLC ("**SLS**") and Hawk Investment Holdings Limited ("**Hawk**"). Prior to the Delaware Supreme Court opinion of June 15, 2022, which did indeed find that the Omnibus Agreement was void *ab initio*, Stream was unable to use its own name or maintain any bank account. VSI was formed to retain key Stream personnel so that they could maintain relationships with customers and strategic partners, thus preserving critical human resources for the benefit of Stream.

3.     After the Chancery Court ruling was VACATED and REVERSED, VSI entered into three pre-petition stock purchase agreements with Stream to provide more than $3.7 million in critical funding for Stream's operations. The first stock purchase agreement, dated February 27, 2023, was in the amount of $1,427,355. The second stock purchase agreement, also dated February 27, 2023, was in the amount of $1,525,275. The third stock purchase agreement, dated March 10, 2023, was in the amount of $750,000. VSI made the stock purchase payments by paying Stream's expenses (e.g. vendors, contractor employees, etc.) on behalf of Stream rather than paying Stream directly. Such payments were reported to Stream, which issued shares of its Common Stock to VSI and adjusted its capitalization table accordingly. None of this is being challenged by the Trustee.

4.     Though Stream was able to resume business development and sales activities under its own name again, it struggled financially because SCI, Hawk, and those acting in concert with them refused to return key assets to Stream, including operational control of its Netherlands R&D subsidiary, SeeCubic B.V. ("**SCBV**") and an $8 million optical bonding machine (the "**Bonding Equipment**") critical to fulfilling customer purchase orders.

5.     In February 2023, VSI and Stream began negotiations for a deeper strategic relationship in which VSI would become the exclusive distributor of Stream's technology in exchange for securing purchase order financing for end customers, providing product development financing, coordinating delivery of end products, and providing customer service as necessary. For these services, VSI would receive a ten percent (10%) fee, taking the customer purchase orders directly and issuing "back-to-back" purchase orders to Stream in amounts equal to ninety percent (90%) of the gross customer orders. An initial draft agreement was prepared and agreed on March 9, 2023, a final agreement was executed on March 31, 2023 (the "**Distribution Agreement**") (*See* **Exhibit A**).

6.     As distributor for Stream, VSI worked with Stream's contractor employees to secure two major customer purchase orders in April 2023. Cystar International Limited ("**Cystar**") committed to purchasing 10,000 units of 65-inch 4K-resolution digital signage displays at a total purchase price of $14 million. VSI issued a purchase order to Stream in the amount of $12.6 million pursuant to the Distribution Agreement. Southern Telecom ("**SoTel**") committed to purchasing 100,000 units of 65-inch 8K-resolution televisions at a total purchase price of $140 million. VSI issued a purchase order to Stream in the amount of $126 million pursuant to the Distribution Agreement.

76870289;1

7. Despite having purchase orders in hand, Stream was unable to realize revenue because its Bonding Equipment had still not been returned by SCI and SCBV, over which SCI exercised control through Shadron L. Stastney's directorship.[4] VSI agreed to make additional purchases of Stream Common Stock to provide another $2 million in continued operational funding for Stream. The fourth stock purchase agreement, dated July 10, 2023, was in the amount of $2,000,000. As before, VSI funded the stock purchase by paying Stream's expenses rather than paying Stream directly, and Stream issued shares of its Common Stock to VSI and adjusted its capitalization table accordingly. Payments made on behalf of Stream during the pendency of Stream's bankruptcy case were reflected in Stream's monthly operating reports, as amended. Through the four stock purchase agreements, VSI provided more than $5.7 million in critical operational funding for Stream.

8. Most recently, VSI entered into two additional stock purchase agreements with Stream, both on September 11, 2023 and each in the amount of $5,000,000 to provide an additional $10 million in funding for Stream operations and commencement of production.

**B.   Mathu Rajan, VSI, and the Stream contractor employees provided support to the Trustee to enable his efficient administration of the Debtors' estates**

9. On January 9, 2024, William A. Homony was appointed as the chapter 11 trustee in this case.

10. On January 16, 2024, Stream contract employee Nicole Maneen emailed the Trustee copies of the Hawk debt-to-conversion agreement and amendment thereto. The next day,

---

[4] Shadron L. Stastney is the Chairman and CEO of SCI. During the time that the Omnibus Agreement was in effect, Mr. Stastney assumed the role of director of Stream's Netherlands R&D subsidiary, See Cubic B.V. However, when the Delaware Supreme Court mandated a reversal of the assets transfer, Mr. Stastney refused to relinquish his directorship of SCBV, challenged the authority of Mathu Rajan as the legitimately registered director, and continued to direct SCBV employees for the benefit of SCI and to the detriment of Stream.

76870289;1

she set up a Box cloud folder to hold those contracts and related documentation, giving the Trustee and his team easy access to the information (*See* **Exhibit B**). On January 17, 2024, the Trustee sent an email to Mrs. Maneen requesting "documents and other information that supports Stream's position that the debt was in fact converted to equity." The conversion notices sent by Stream to Hawk were provided as additional documentation, but on February 8, 2024, Edmond George, as counsel to the Trustee, sent an email that stated "we are reviewing and analyzing the documents you have sent us on the conversion issue for Hawk. We are going to need to see proof of deposits of the funds referenced in your documentations…" (*See* **Exhibit C**).

11.     Anticipating the need for documentation with greater and greater detail, Mr. Rajan arranged for the preparation and delivery of several hundred pages of financial information for the Trustee, including (i) stock purchase agreements to verify the source and amount of all new capital raised as well as the equity offered for such new investments, (ii) annotated bank statements confirming receipt of new capital funds, (iii) summary reports showing how such new capital funds satisfied specific promissory note extinguishments, (iv) invoices and receipts for Stream expenses paid by VSI on behalf of Stream, and (v) annotated bank statements showing that the Stream expenses had, in fact, been paid. Satisfying the Trustee request required great transparency of VSI's books and records as well as considerable human resources to prepare and deliver audit-ready documentation. All documents were uploaded to the Box cloud folder for the Trustee's review and analysis.

12.     In a meeting with Mr. Rajan and Mrs. Maneen on March 7, 2024, the Trustee and his counsel discussed the status of Stream, among other things. One of the Trustee's mandates is to marshal the Debtors' assets, and he asked for a definitive list of assets that had not yet been returned to Stream following invalidation of the Omnibus Agreement. The Stream contractor

76870289;1

**A-012**

employees prepared a comprehensive list, which was emailed to the Trustee by Nicole Maneen on March 10, 2024 (*See* **Exhibit D**).

13.     Though the Trustee has no authority to manage the business of VSI and no entitlement to review VSI's sensitive business information, he requested access to significant VSI business data as part of his due diligence in evaluating the Stream-VSI relationship. Nonetheless, VSI provided access to the Trustee. Further, VSI gathered the information in a central cloud location on Box.com and granted access to the Trustee.  VSI has been completely transparent with the Trustee.

**C.     The Trustee knew that the Stream contractor employees were working for the benefit of Stream, directed them, and authorized VSI to pay them**

14.     Under the management of Mr. Rajan, Stream began paying the Stream contractor employees directly in January 2024, making the first such payment on January 4, 2024. The Trustee's appointment was confirmed by Court order on January 12, 2024, and all subsequent accounting for the Debtors was overseen by him.

15.     Upon appointment of the Trustee, VSI informed him that Stream contractor employees in the United States and Asia had been paid for many months by VSI to conduct business development and sales activities on behalf of Stream. He was further informed that Stream had established a debtor-in-possession bank account and had only recently paid those same contractor employees directly. For the next six weeks, Mr. Rajan and Mrs. Maneen provided contract employee data to the Trustee to make him aware of ongoing obligations. The Trustee facilitated Stream's direct payment of those contractor employees, issuing payments on or about January 17, 2024, February 8, 2024, and February 22, 2024, using funds received by Stream from VSI pursuant to the additional stock purchase agreements not yet fulfilled.

76870289;1

**A-013**

16. Having authorized and facilitated payment to the Stream contractor employees, the Trustee was fully aware that they were engaged for the benefit of Stream. As administrator of Stream's estate, he had the ability and duty to direct them, and he did. He requested their assistance in educating him about the Glasses-Free 3D business as well as Stream's legal and financial history. He directed them to gather detailed information about the Hawk debt-to-equity conversion and assets of the Stream estate to be located and marshaled. He directed them to obtain updated confirmations that customer purchase orders issued in 2023 were still valid. Nothing in the Motion contradicts any of this.

17. Stream contractor employees responsible for reporting product sales and making related royalty payments pursuant to an irreplaceable technology license from Koninklijke Philips Electronics ("**Philips**") informed the Trustee on January 25, 2024 that they had been unsuccessful in obtaining sales data from SCBV and Mr. Stastney for the quarter ending December 31, 2023. The Trustee's office requested previous royalty reporting, which Mrs. Maneen obtained from the Stream contractor managing the Philips account and provided the requested documentation to the Trustee. Once informed of the royalty reporting procedure and recent history, the Trustee obtained the necessary sales data from SCBV (via Mr. Stastney) and provided it to Mrs. Maneen via email on January 29, 2024 so that the Philips royalty reporting could be made by the appropriate Stream contract employee prior to the January 31, 2024 deadline (*See* **Exhibit E**).

18. The sales data from Mr. Stastney confirmed that SCBV had sold multiple samples in three different sizes in the 4th quarter of 2023: 10 units of 12.3" displays, 10 units of 15.6" displays, and 6 units of 27" displays. None of these sales were for the benefit of the Debtors; they benefitted only SCBV and SCI, which were cultivating customer relationships of their own using technology owned by the Debtors and built on third-party licenses they did not control. VSI is

76870289;1

unaware of any action the Trustee has taken to prevent this continued customer development at Stream's expense, even though the Trustee knew that SCBV, SCI, and Mr. Stastney (among others) are enjoined by a TRO issued by the Court long before the Trustee received this sales data (and prior to the appointment of the Trustee himself). Instead, the Trustee is going after VSI for generating millions of dollars in purchase orders for the benefit of the Debtors, which VSI has always acknowledged, are the true owners of the relevant display technology.

19.     When Stream depleted the funds on hand from VSI in early March 2024, VSI sent additional funds pursuant to its stock purchase agreement with Stream. On March 8, 2024, Mrs. Maneen sent an email to the Trustee and stated: "Please see attached the pay list for payroll. The wire [transfer payment] is headed your way." The Trustee responded: "I apologize I thought it was communicated that absent an order from the bankruptcy court that I was not going to accept any additional money from VSI. *I will return the wire and ask that VSI directly pay these contractors until further notice."* Mrs. Maneen responded: "That's not a problem, VSI can pay them. We thought it had to go through you and didn't want to break any rules. I misunderstood [Trustee's counsel]'s email and thought he meant nothing without your permission, which at the time, we were coordinating with you. I will pass it on [to VSI] that VSI needs to pay." (*See* **Exhibit F** (emphasis added)).

20.     As requested by the Trustee, VSI resumed making direct payments to the Stream contractor employees and has continued to do so as of the date hereof to preserve the human resources value to the Stream estate. The Trustee continued to direct those contractors after VSI resumed paying them on behalf of Stream, clearly evidencing his understanding and authorization of their engagements.

76870289;1

**D.    The Trustee had full knowledge of the optical bonding strategic partnership with Cystar and authorized Stream contractor employees to arrange transportation of the Bonding Equipment**

21.    After meeting with Mr. Rajan and Mrs. Maneen in person on March 7, 2024, the Trustee engaged Mrs. Maneen to assist with the return of assets to the Debtors' estates. The Trustee was informed that the Bonding Equipment was critical to cost-effective fulfillment of existing customer orders without engaging a third-party bonding vendor which would dramatically reduce the profit margin to the Debtor.

22.    On March 10, 2024, Mrs. Maneen sent an email to the Trustee informing him of details related to a strategic manufacturing partnership that the Stream contractor employees and Mr. Rajan had arranged with Cystar, which had not only issued a purchase order for 10,000 units but had also offered to provide a manufacturing facility, labor, and overhead to expedite order fulfillment. The email from Mrs. Maneen provided the Trustee with a copy of the Cystar contractual agreement for the proposed strategic partnership as well as the address where the Bonding Equipment is currently warehoused (*See* **Exhibit G**).

23.    In a March 11, 2024 follow-up email to the Trustee, Mrs. Maneen stated: "To clarify further, Patric [Theune] has some assets and the bonding machine. Shad [Stastney] controls the assets in the other location offices (London, N[ew] Y[ork], Florida, etc.)." Mr. Theune provides operational management for SCBV (*See* **Exhibit H**).

24.    The Trustee sent a March 11, 2024 email to Mrs. Maneen in which he stated: "Nicole, I'm going to put you in contact with Patric Theune to discuss logistics of moving the bonding equipment and return of other Stream assets." (*See* **Exhibit I**). That same day, the Trustee sent an email to Mr. Theune, stating: "Hello Patric, as reflected in my prior email from earlier today, I am directing the relocation of Stream's bonding equipment as well as the return of assets

76870289;1

identified on the attached itemized list. I've copied Nicole on this email who will be coordinating with you on the logistics." (*See* **Exhibit J**).

25.    Mrs. Maneen sent an email to Mr. Theune on March 11, 2024, with the Trustee copied, in which she stated: "As per [the Trustee]'s instruction below, I will be your contact for asset return." She provided the shipping address for the Bonding Equipment so that it could be made available to satisfy the Cystar strategic manufacturing agreement and the Cystar purchase order (*See* **Exhibit K**).

26.    On March 12, 2024, Mr. Theune sent an email to both the Trustee and Mrs. Maneen in which he stated: "I wish to draw your attention to the fact that I am an employee at SeeCubic B.V., meaning I am not its director. From a Dutch legal perspective I cannot simply ignore Shad [Stastney] and take your instructions instead without his acknowledgement." In that same email, Mr. Theune, wrote: "I note that-if Shad agrees with your request-we are happy to comply." Other than brief deflection of the Trustee's direction to Mr. Stastney, Mr. Theune focused the balance of the email on a request for operational funds, stating: "your request to send products to the U[nited] S[tates] cannot be handled without funding." (*See* **Exhibit L**).

27.    On March 14, 2024, Mr. Theune sent an email to the Trustee and Mrs. Maneen in which he outlined a multi-step process required to move the Bonding Equipment. Rather than facilitate direct communication between the Stream contractor employees and the Chinese warehouse landlord and the Bonding Equipment original manufacturer so that VSI could make the necessary payments on Stream's behalf, Mr. Theune kept himself as the conduit for all such coordination, delaying the process and eliminating any chance of a timely and satisfactory response to the Trustee's demand for turnover of equipment.

76870289;1

28.     Although the Trustee was copied on all communication related to moving the
Bonding Equipment to a new facility where it could generate revenue for the Debtors' estates, and
although the Trustee was initially supportive of the equipment move and the strategic partnership
with Cystar as both a manufacturing partner and a bona fide customer, he ultimately instructed
both the Stream contractor employees and Mr. Theune to leave the Bonding Equipment under
SCBV control rather than pursuing the return of a major asset to the Debtor.,

29.     It is disingenuous for the Trustee to assert that VSI was attempting to seize that
asset for its own purposes. Even more disingenuous is the Trustee's fabrication that (i) the Stream
contractor employees were "undisclosed" (payroll details were provided to the Trustee, who
directly approved payroll for a period of six weeks and instructed VSI to make such future
payments "until further notice"); (ii) the attempt to recover the Bonding Equipment was
"unbeknownst to the Trustee" (he was copied on all communication and was the one who initiated
direct communication between Mrs. Maneen and Mr. Theune); and (iii) the Bonding Equipment
would be delivered to "an undisclosed party" (Mrs. Maneen provided the Cystar strategic
manufacturing agreement and address to the Trustee before the Trustee instructed Mr. Theune to
cooperate with Mrs. Maneen in moving the Bonding Equipment on the Debtor's behalf).

**E.     VSI and Mathu Rajan are not competing with the Debtors**

30.     The Trustee Turnover Motion alleges that "VSI and Rajan are competing with the
Debtors, in brazen and blatant violation of Rajan's fiduciary duty of loyalty as a director of the
Debtors" (D.I. #646 ¶ 18). As proof, the motion cites VSI's website, which uses the same
marketing language that Stream uses. Although VSI does not deny the Trustee's observation, it
refutes his conclusion. VSI's use of Stream's marketing phrase is not coincidental or nefarious as
the motion implies; per the Distribution Agreement, VSI's mandate is to secure customers *on*

76870289;1

**A-018**

*behalf of Stream*, thereby generating revenue for Stream. Consistent messaging between a supplier and a distributor is mere common sense. The Trustee has not sought to reject the Distribution Agreement granting VSI the ability to advertise on behalf of the Debtors or deal with it in this case, but rather seeks to take actions taken by VSI pursuant to this agreement out of context, to, on purpose, paint VSI in a negative light because VSI disagrees with the Trustee's attempts to settle with the secured creditors.

31. A distributor is not a competitor of the company whose products and services it sells. It is precisely this distribution relationship between VSI and Stream that led to securing $138 million in customer purchase orders *for the benefit of Stream* the benefit of which the Trustee has not and cannot refute.

32. There is no doubt that Stream lacks the capital resources to adequately market its technology, commence production, finance its supply chain, or fulfill customer purchase orders. Accordingly, a distributor willing to fund those requirements of revenue generation, taking equity in exchange for what is in essence Debtor-in-Possession financing, is invaluable to these estates.

33. Shortly after accepting his position in January 2024, the Trustee requested that VSI provide updated confirmation letters that the SoTel and Cystar purchase orders issued in April 2023 were still valid. Even though VSI had secured such letters only two months before, in November 2023, VSI nonetheless accommodated the Trustee's request and provided renewed commitment letters from both customers. Additionally, VSI offered to arrange meetings between the Trustee and executives from each of the customer companies in furtherance of confirming the veracity of the orders. Customer contacts and the VSI relationships with them were made very transparent to the Trustee, something that would not be the case if VSI were indeed competing with the Debtor.

76870289;1

**F.    Neither VSI nor Mathu Rajan are taking action that obligates the Debtors without authority or Bankruptcy Court approval**

34.    Despite minimal direction from the Trustee to the Stream contractor employees, they have continued to work with VSI to (i) identify assets and assist in restoring them to the Debtors' estates; (ii) preserve valuable business relationships with customers and strategic partners; (iii) cultivate new business relationships; (iv) generate sales for the benefit of both the Debtors and VSI through the global distribution agreement; and (v) explore options for accelerated and efficient manufacturing for order fulfilment.

35.    Since the January 5, 2024 Bankruptcy Court order restricting his authority, Mr. Rajan has not taken any action, nor allowed or directed VSI or any Stream contract employee to take any action, that would obligate the Debtors in any way without authority or Court approval. No agreements have been signed and no new purchase orders have been accepted. All business and customer development efforts have been strictly exploratory while the Trustee has been evaluating the Debtors' businesses, and the Trustee cites no specific evidence that makes him "justifiably concerned" with regard to this matter.

**G.    Mathu Rajan has not usurped the Trustee's exclusive control over the Debtors' estates**

36.    The Trustee's Motion captions the private Gmail account used by Mathu Rajan as a "Sham Email Account," using a deliberately inflammatory and prejudicial label to imply meaning where there is none (D.I. #646 ¶ 25). Mr. Rajan has used that email from time to time for several years to communicate with interested parties seeking clarification about the maneuverings of various parties engaged in the acrimonious litigation that has been ongoing since 2020.

37.    Mr. Rajan sent the referenced email with links to relevant articles discussing legal precedent as it might impact the settlement agreement with Hawk (the "**Settlement Agreement**").

76870289;1

**A-020**

The information was intended to educate the recipients about potential timelines and outcomes, and although Mr. Rajan offered his opinion on certain aspects as an individual, *not as a Stream representative*, he made it quite clear that his suppositions were only opinions and invited the recipients to draw their own conclusions. The email simply shared  publicly available information and was not an attempt to interfere with the Trustee's control over the Debtors' estates.

38.     The Motion speculates that Mr. Rajan has used and plans to continue using the private Gmail account "to improperly raise money for the sole benefit of VSI…" (D.I. #646 ¶ 27). Nowhere in the referenced email is there any mention of VSI or fundraising. Nowhere in the referenced email does Mr. Rajan indicate he is writing on behalf of Stream. Concern about the potential for impropriety is stated without any evidence or even the rationale behind the concern.

39.     The Motion further speculates, again without evidence, that Mr. Rajan might use the private Gmail account "to delay and derail the Court's consideration of the Trustee's 9019 Motion and the Capstone Application via extrajudicial means…" The idea that any communication – unless sent to and embraced by the Court itself – would impact judicial consideration is ridiculous.

40.     The same is true for the speculation that Mr. Rajan would use the personal Gmail account to interfere with "the Trustee's efforts to maximize the value of the Debtors' assets via a fair sale process." Nothing in Mr. Rajan's communication remotely referenced the concept of asset valuation, which will be determined by an independent third party when and if a sale is approved. To the extent parties in interest oppose relief sought by the Trustee, such free exercise of those parties' business judgment to participate or not in this case however they are legally entitled to, is up to them and not a violation of anything.

76870289;1

**A-021**

41.    However, if the Court finds that the private Gmail account is somehow the property of the Debtor or should be discontinued because of its potential to create confusion for mail recipients, Mr. Rajan is willing to close the email account without objection. There is no intent on his part to speak for Stream or to usurp the Trustee's authority. Had the Trustee conferred with VSI prior to filing the Motion, this matter likely could have been resolved without Court intervention.

**H.    VSI believed it had developed a bona fide relationship with Capstone and did not file its objection to delay the bankruptcy proceedings or interfere with the Trustee's sale efforts**

42.    In September 2022, after the Delaware Supreme Court invalidated the Omnibus Agreement and the Delaware Court of Chancery ordered the return of Stream's assets, investment banker Marc Dannenberg introduced VSI and Stream to Joe Malloy, a former sports executive. VSI's intent was to help Stream reorganize outside of bankruptcy while Stream worked to reclaim its assets and secure customer orders. Mr. Malloy made a subsequent introduction to Capstone Capital Markets LLC ("**Capstone**") and invited Capstone executive Peter Bailey to see Stream's technology.

43.    On September 26, 2022, VSI attended a Zoom meeting with Capstone and discussed the possibility of Capstone raising money for VSI so that VSI could help with Stream's reorganization. During the meeting, VSI made extensive efforts to educate Capstone about the Glasses-Free 3D market, about which it knew very little. After the meeting, VSI provided information about both Stream and VSI for consideration, as well as an update about possible interest from The Masters in seeing a technology demonstration in Augusta. Mr. Bailey seemed enthusiastic about the Glasses-Free 3D market opportunity, the Stream technology, and potential customer/partner interest.

76870289;1

**A-022**

44.     On November 9, 2022, VSI attended a follow up Zoom meeting with Mr. Bailey to update him on certain business developments, and on December 19, 2022, VSI sent an email update to Mr. Bailey with summaries of significant strategic partner meetings that had occurred as well as an overview of plans for upcoming trips to Korea and Japan to solicit customer and manufacturing support. VSI released this information because of the enthusiastic feedback it was receiving from Capstone, and because it believed an engagement letter was imminent.

45.     An engagement letter was not signed at that time, however, because Capstone was not willing to split commissions with Mr. Dannenberg; the relationship between VSI and Capstone was mutually put on hold until and unless VSI's situation changed. By April 2024, Mr. Dannenberg was no longer engaged by VSI and was no longer entitled to fees, and VSI desired to reconnect.

46.     Unaware that the Trustee had filed its motion to employ Capstone (the "**Capstone Motion**") the day before, on May 3, 2024, Mr. Rajan reached out to Capstone to explore a renewed relationship. There was no "nefarious intention" as the Trustee's Motion alleges. Mr. Rajan had simply not imagined that the Trustee would consider Capstone a potential investment banking partner because (i) a conflict check by Capstone should have revealed the VSI history, and (ii) even if Capstone's conflict check revealed no red flag, the Trustee had been given complete access to VSI's cloud-based business records and would have been able to see the extent of VSI' communication and sharing of its business information with Capstone. Nothing was hidden from the Trustee.

47.     On May 8, 2024, VSI attended a follow-up Zoom meeting with Capstone. Based on that meeting, VSI believed that Capstone was once again interested in raising capital for VSI. On May 9, 2024, VSI filed its objection to the Capstone Motion (the "**Capstone Objection**")

18

**A-023**

because it truthfully believed that its 20-month business development efforts with Capstone were sufficiently advanced to warrant the exclusion. Unfortunately, miscommunication between VSI and its counsel led to an incorrect statement in the Capstone Objection that a non-disclosure agreement had been executed between VSI and Capstone.

48.     Although execution of non-disclosure documents has historically been standard procedure before sharing business information, VSI completed a definitive search of its business records and determined that no Capstone NDA exists. Additionally, the declaration of Jamie Lisac, managing director of Capstone, made it clear that Capstone's interest in VSI is not as great as VSI believed it to be. On June 6, 2024, VSI's former counsel notified counsel to the Trustee as well as the United States Trustee that it intended to withdraw the Capstone Objection and, indeed, VSI did so after retaining new counsel.

**I.     VSI does not "wrongfully possess" any assets of the Debtors and is not using them "to solicit and raise money for VSI"**

49.     Following the Delaware Court of Chancery's order that SeeCubic, Inc. return assets wrongfully seized from Stream pursuant to the invalidated Omnibus Agreement, a limited number of assets were, in fact, returned. Stream contractor employees have possession of those few assets in furtherance of the services they are providing *on Stream's behalf*. Such services have included (i) customer service for previously delivered products, (ii) sales presentations in association with VSI as distributor, and (iii) technology demonstrations in association with VSI to maintain and develop strategic partnerships for supply chain support, logistics, and manufacturing.

50.     The Motion states, without any substantiation, that "VSI currently possesses equipment that incorporates the Debtors' Ultra-D technology and is actively using it to demonstrate the Debtors' technology to potential investors" (D.I. #646 ¶ 23). The Trustee offers no evidence because there is none. VSI is not in possession of any assets of the Debtors and has

76870289;1

**A-024**

made no presentations of the Debtors' technology for the purpose of raising capital. All presentations of the Debtors' technology by VSI have been made in association with one or more Stream contractor employees for the purpose of maintaining customer relationships, obtaining new purchase orders, developing strategic partnerships, securing supply chain partners, and similar activities that *directly benefit the Debtors*.

51.    Any assets of the Debtor that are held by Stream contractor employees for the benefit of the Debtor may be collected by the Trustee by simple request since those contractor employees have been and remain willing to take direction from him at any time. The Trustee has made no such request. Once again, had the Trustee conferred with VSI prior to filing the Motion, this matter could have been resolved without Court intervention.

52.    The Trustee's Motion alleges that VSI circulated an investment memorandum (the "**VSI IM**") which represents that the Debtors' Ultra-D technology "belongs to VSI." (D.I. #646 ¶ 21). The motion attaches what it claims is a "true and correct copy" of the VSI IM. However, the motion does not state where the document was obtained, when it was allegedly circulated, or confirm its authenticity in any way.

53.    Irrespective of the document's authenticity, the Motion's supposition that VSI claims ownership of the Debtors' technology is simply false. The Motion states that the VSI IM contains "no less than twenty-one" references to the Ultra-D technology and it cites 10 pages as evidence. On its surface, the number of pages seems to be significant evidence, but a quick review of those pages reveals the claim to be baseless, particularly because of VSI's relationship with Stream *as a distributor*:

> a.  Page 8 – this page consists solely of press testimonials declaring the quality of Ultra-D as a technology – any distributor would want to use material like this for marketing purposes. VSI does not claim ownership, only that it can distribute a world-class solution.

20

b. Page 15 – this page merely states that Ultra-D will be helpful to 2D panel makers looking to increase their sales. Again, this describes market appetite and the potential to generate revenue as a distributor.

c. Page 16 – this page merely illustrates at a simple level how the Ultra-D optics work to create an excellent viewing experience, a selling point for a distributor looking to capture market share for its technology supplier. There is no implication of ownership.

d. Page 17 – similar to page 16, this page merely gives additional illustration to how the Ultra-D technology creates the experience. There is no implication of ownership.

e. Page 18 – similar to page 15, this page merely underscores the benefit of Ultra-D to panel makers, increasing the market opportunity for both distributor and technology supplier.

f. Page 34 – this page merely references success achieved by a previous Ultra-D customer as an illustration of potential market interest. IQH3D, LLC purchased dozens of products from Stream and from SeeCubic, Inc. while it had control of the Ultra-D technology following the improvident Chancery Court ruling. Referencing Ultra-D installations by IQH3D and potential interest generated by IQH3D does not imply ownership by VSI, it merely showcases activity in the Glasses-Free 3D market by an active Ultra-D customer.

g. Page 35 – similar to page 34, this page merely showcases additional activity and success of IQH3D in the medical field as an illustration of market interest. Showing viability in alternative markets is beneficial to both the distributor and the technology provider. Again, there is no implication of technology ownership.

h. Page 36 – as above, this page merely showcases the installation of Ultra-D products *by an existing Stream customer* in yet another viable market, video gaming. The page further presents the potential to generate revenue through content creation. As with every other page cited, there is no implication of technology ownership.

i. Page 37 – similar to pages 34 and 35, this page merely showcases IQH3D activity generating interest from the theme park and hospitality industries. Success by one customer can drive interest with others and is "Marketing 101" for any distributor. There is no claim of technology ownership here either.

j. Page 53 – this page merely quotes highlights of an industry analyst's opinion that Ultra-D is a great value proposition for the digital signage industry. Again, this showcases another market to generate revenue for both distributor and technology provider. And again, there is no implication of technology ownership by VSI.

54.    References to a second VSI document in the Trustee 's Motion are even more selectively misleading. The two-page teaser, attached as Exhibit B to the Motion, described both

21

**A-026**

the Debtors' Ultra-D technology as well as a completely unrelated hologram technology. The document does indeed state that "[c]ornerstone solutions in [VSI's] portfolio include Ultra-D glasses-free 3D," but the portfolio referenced includes the Distribution Agreement by which the technology can be marketed and sold. There is no explicit mention of ownership, and any incorrect impression by a reader would be quickly dispelled by either a simple inquiry or a detailed reading of the relevant documents.

55.    Worse still, the Trustee's Motion blatantly misquotes the teaser document by claiming that the VSI document stated "that VSI 'can bring to market'" the Debtor's technology. A quick review of the teaser document reveals that the "bring to market" quote was in reference to the hologram technology, not the Debtors' Ultra-D technology. Even if this misquote was inadvertent, it's impact is clearly intended to prejudice the Court's perception of VSI's conduct.

56.    Lastly, the Trustee's Motion claims that VSI stated it has "deployed" the Debtors' technology in locations throughout the world. That single word taken out of context is misleading. The full quote in the teaser is "Ultra-D displays have been *deployed* in airports, train stations, museums, movie theaters, automotive dealerships, shopping malls, and a variety of other high-visibility locations." VSI does not claim that it made such deployments; it merely references them as an indication of minimal visibility across a variety of markets and geographies.

57.    VSI has not used, and does not use, the Debtors' technology – either physically or through implied ownership – to raise funds as alleged in the Trustee Turnover Motion.

**J.    It is SeeCubic, Inc., Hawk Investment Holdings Limited, Shadron Stastney, and SeeCubic B.V. that have violated the turnover requirement and are wrongfully using the Debtor's assets to raise capital in violation of a TRO**

58.    On January 4, 2024, following months of evidentiary hearings, this Court issued a Temporary Restraining Order (the "**TRO**") against SCI, Hawk, SCBV, Mr. Stastney, and those

acting in concert with them (the "**Enjoined Parties**") to protect the Debtors, their estates, their creditors, and their shareholders from irreparable harm. The TRO has been in effect continuously since the date of issue and has been extended several times, most recently on June 5, 2024 to remain in effect until July 31, 2024. The enjoined parties are prohibited from "any external or publicly disseminated form of communication" that would

> **describe, reference, display or portray the technology, or any improvements thereon**, or **make any representations with respect to ownership or development of such technology**, purported to be owned and/or developed by Stream and/or its subsidiaries. (*TRO* ¶ 9(b)(ii), emphasis added)

59.     At the request of the Trustee in January 2024, the Stream contractor employees compiled a list of the Debtors' assets to be marshaled from various global locations, including the SCBV R&D facility in the Netherlands, Mr. Stastney's private residence, SCI's offices in New York and London, and Hawk's office in the United Kingdom. Despite the Chancery Court order to return Stream's assets, they retained and continue to retain the Debtors' assets for use in fundraising and sales in direct competition with the Debtors, unlike VSI, who relies on the Debtor's ownership of the technology as per the Distribution Agreement.

60.     Worse still, SCI and Mr. Stastney engaged SCBV to create new demonstrator units that even the Debtors do not have. Based on information and belief, a new Glasses-Free 3D demonstrator featuring a 15" OLED display was created to capitalize on state-of-the-art panel technology. Regardless of any innovations made by SCBV, the technology is still protected and any "reference, display, or portrayal" of the technology through such samples is explicitly restricted by the TRO, which prohibits the Enjoined Parties from using "the technology, *or any improvements thereon*" (*TRO* at ¶ 9(b)(ii), emphasis added). The 15" technology sample was demonstrated by Mr. Stastney to the Trustee in March 2024. Despite acknowledging that the

76870289;1

**A-028**

display features the Debtors' technology and is therefore subject to turnover, SCI retained possession of the display and continues to use it for investor presentations in violation of the TRO. Based on information and belief, such presentations accelerated after the Trustee entered into the Settlement Agreement because SCI must now quickly raise $7.5 million to satisfy the settlement conditions.

61.     Why the Trustee chose to file the Motion against VSI, an entity that has injected millions upon millions of dollars into keeping the Debtors alive and working to ensure its future success, and not various other parties, is unknown to VSI. But VSI should be allowed to compete in any sale process on an equal-playing field, and not be unfairly harassed. VSI's participation in the sale process (as opposed to defending bogus motion practice) will only enhance the Trustee's chances of achieving the highest and best price for the Debtors' assets.

## LEGAL ARGUMENT

### A.   Performance by VSI pursuant to  the Distribution Agreement cannot be a stay violation

62.     The automatic stay protects property of the bankruptcy estate and provides for a broad stay of litigation, lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims. It also stays a wide range of actions that would affect or interfere with property of the estate, property of the debtor or property in the custody of the estate. 11 U.S.C. § 362(a); 3–362 Collier on Bankruptcy ¶ 362.03, (Alan N. Resnick & Henry J. Sommer eds. 16th ed.). The Motion is intentionally vague on what actions VSI or Mr. Rajan took in violation of the automatic stay, because neither took any actions in violation of the automatic stay, interfered with the Trustee's administration of the Debtors or their property, or really did anything other than fund this case, generate assets and opportunities for the Debtors, and express

76870289;1

**A-029**

an opinion as to a motion filed by the Trustee - something that each and every party in interest, including Mr. Rajan, is entitled to do.

63.    Although the Trustee offers numerous unfounded allegations and unsubstantiated factual inferences, the Trustee has not (and cannot) plead any specific facts to negate the fact that VSI is a party to a valid and binding contracts with a Debtor, which contract, to date, has not been rejected. As such, VSI continues to be authorized and entitled to perform under the Distribution Agreement until such time as the agreement is rejected by the Trustee. *See, In re Whitcomb & Kelly Mortgage*, 715 F.2d 375 (7th Cir. 1983) (the contract is generally thought of as remaining "in effect," and the non-debtor parties are bound to honor it and perform); *cf. In re Continental Airlines*, 981 F.2d 1450, 1459-60 (5th Cir. 1993) (court's discussion shows that contract continues to exist post-petition, reasoning that, "[a]n agreement cannot 'exist' for one purpose yet take on a 'nonexistent' quality which works to the advantage of one party or the other."); *In re Modern Textile, Inc.*, 900 F.2d 1184, 1191 (8th Cir. 1990) (executory contracts are "an existing and continuing legal obligation of the debtor," subject to the debtor's right to reject); *In re Thomas Co., Inc.*, 166 B.R. 677 (Bankr. C.D. Ill. 1994) (executory contract remains in existence until rejected); *In re Leslie Fay Companies, Inc.*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994); *In re Consumer Health Servs. of Am.*, 171 B.R. 917, 924 (Bankr. D.C. 1994) (overturned on other grounds by *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390 (D.C. Cir. 1997) ("[A]n unassumed executory contract continues in effect and remains enforceable by the debtor").

64.    VSI and Mr. Rajan are in compliance with the Distribution Agreement and the automatic stay under section 362, as there is no estate property being used or retained by VSI. VSI is only generating assets for the Debtors' estates at no cost to them because both VSI and Mr. Rajan believe so deeply in the Debtors' technology.

76870289;1

**A-030**

## B.    Turnover claims require an adversary proceeding

65.    The Debtors cannot seek turnover pursuant to a motion. Turnover requires an

adversary proceeding under Bankruptcy Rule 7001(1) . *See, e.g., In re Perkins*, 902 F.2d 1254,

1258 (7th Cir. 1990); *In re Wheeler Technology, Inc.*, 139 B.R. 235, 240 (B.A.P. 9th Cir. 1992); *In*

*re Ferguson*, 67 B.R. 246, 250 (D. Kan. 1986); *In re Chapman*, 269 B.R. 201 (Bankr. N.D. Ill.

2001); *In re Mayex II Corp.*, 178 B.R. 464, 467 (Bankr. W.D. Mo. 1995); *In re Dillon*, 148 B.R.

852, 853 (Bankr. E.D. Tenn. 1992); *In re Realty Southwest Assocs.*, 140 B.R. 360, 365 (Bankr.

S.D.N.Y. 1992); *In re Interpictures, Inc.*, 86 B.R. 24, 29 (Bankr. E.D.N.Y. 1988). A turnover

proceeding commenced by motion instead of complaint is due to be dismissed, and any turnover

order entered in an action commenced by a motion shall be vacated. *Perkins*, 902 F.2d at

1258; *Dillon*, 148 B.R. at 852-53; *In re Camdenton United Super, Inc.*, 140 B.R. 523, 526 (Bankr.

W.D. Mo. 1992); *In re Ace Industries, Inc.*, 65 B.R. 199, 200 (Bankr. W.D. Mich. 1986).

66.    Moreover, section 542 does not apply to "any property in which the estate claims

an interest." Rather, the debtor-in-possession's right of turnover is limited to property the debtor

"may use, sell or lease under section 363" of the Bankruptcy Code. To satisfy a claim for turnover,

therefore, the Trustee bears the burden of proving that the estates have the right to use, sell or lease

the subject property, which property, other than an email address[5], is not identified. *In re*

*Moore*, 312 B.R. 902, 909 (Bankr. N.D. Ala. 2004); *In re Barfield*, 261 B.R. 793, 797-98 (Bankr.

M.D. Fla. 2002). The Trustee ultimately fails to allege estate property that VSI is depriving the

Trustee or that is capable of being turned over, notwithstanding the fatal technical deficiency in

which this turnover claim was brought before the Court.

---

[5] Notably, aside from conjecture and innuendo, nothing in the Trustee's Motion establishes that
the allegedly offensive email address is, in fact, property of the Stream estate.

76870289;1

67. State law governs the Debtors' property rights under the Bankruptcy Code. *See Butner v. United States*, 440 U.S. 48, 54-55 (1979). Under the terms of the Distribution Agreement, VSI has the present right to continue obtaining customers on behalf of Stream. Because this contractual right is fully enforceable under state law, VSI is not violating any state law property right of the Debtors protected by the Bankruptcy Code. To the contrary, VSI is acting with the sole purpose of increasing the Debtors' assets. Accordingly, the Motion fails to state a claim under section 542. The Trustee has not alleged, and cannot prove, what specific Debtor property (i) VSI is not entitled to use, (ii) has been taken, (iii) affected, or (iv) is otherwise subject to turnover.

## CONCLUSION

VSI and Mr. Rajan's actions were contractually-sanctioned under an existing contract with the Debtor. Thus, VSI's actions did not, and do not, violate the automatic stay. Additionally, the Trustee had full knowledge of VSI's actions. While VSI is happy to turnover any of the Debtors' property, formal turnover relief requires an adversary proceeding. Finally, notwithstanding lines of communication opened by Mr. Rajan and VSI upon his appointment in January 2024, the Trustee failed to confer VSI and Mr. Rajan and could have resolved many, if not all, matters raised in the Motion. Accordingly, the consequential motion practice was totally within the control of the Trustee, and thus the Trustee's request for fees and costs should be denied.

*[Remainder of page intentionally left blank]*

76870289;1

**A-032**

Dated: June 18, 2024

Respectfully submitted,

AKERMAN LLP

_/s/ Donald N. David_
Donald N. David, SBN: 304846
1251 Avenue of the Americas
37th Floor
New York, NY 10020
Telephone: (212) 880-3800
Facsimile: (212) 880-8965
Email: donald.david@akerman.com

-and-

R. Adam Swick (*pro hac vice pending*)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7103
Facsimile:  (512) 623-6701
Email: adam.swick@akerman.com

-and-

John H. Thompson *(pro hac vice pending)*
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:  (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Visual Semiconductor, Inc.*

28

**A-033**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on June 18, 2024, with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.

_/s/ Donald David_____
Donald David

76870289;1

**A-034**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.*[1] | Bky Case No. 23-10763 (AMC) |
| The Debtors. | (Jointly Administered) |

## DECLARATION OF MATHU RAJAN

I, Mathu Rajan, pursuant to 28 U.S.C § 1746, hereby declare under penalty of perjury:

1. I respectfully submit this declaration with the *Objection of Visual Semiconductor, Inc. to the Motion of William A. Homony in His Capacity as Chapter 11 Trustee for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property* ("Objection"). Other than as set forth expressly herein, this declaration is based upon personal knowledge.

2. Attached as Exhibit A is a true and correct copy of Exclusive Distribution Agreement executed on March 31, 2023.

3. Attached as Exhibit B is a true and correct copy of the January 16, 204 email from Nicole Maneen to the Trustee.

4. Attached as Exhibit C is a true and correct copy of the January 17, 2024 email from the Trustee to Nicole Maneen.

5. Attached as Exhibit D is a true and correct copy of the March 10, 2024 email from Nicole Maneen to the Trustee.

6. Attached as Exhibit E is a true and correct copy of the January 29, 2024 email from William Homony to Nicole Maneen

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

76871418;1

**A-035**

7.   Attached as Exhibit F is a true and correct copy of the March 8, 2024 email exchange between Nicole Maneen and the Trustee.

8.   Attached as Exhibit G is a true and correct copy of the March 10, 2024 email from Nicole Maneen to the Trustee.

9.   Attached as Exhibit H is a true and correct copy of the March 11, 2024 follow-up email from Nicole Maneen to the Trustee.

10. Attached as Exhibit I is a true and correct copy of the March 11, 2024 email from the Trustee to Nicole Maneen.

11. Attached as Exhibit J is a true and correct copy of the March 11, 2024 email from the Trustee to Patric Theune.

12. Attached as Exhibit K is a true and correct copy of the March 11, 2024 email from Nicole Maneen to Patric Theune, with the Trustee copied.

13. Attached as Exhibit L is a true and correct copy of the March 12, 2024 email from Patric Theune to the Trustee and Nicole Maneen.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on June 18, 2024                    Stream TV Networks, Inc.


                                    By: _____
                                            Mathu Rajan
                                    Title:   Chief Executive Officer

## EXCLUSIVE DISTRIBUTION AGREEMENT

**AGREEMENT** (the "Agreement") dated March 31st, 2023 between **VSI Semiconductor, Inc.**, having an office at 1105 William Penn Drive, Bensalem, PA 19020 (the "Distributor"), and **Stream TV Networks, Inc.**, a Delaware Corporation, having an office at 2009 Chestnut Street, Third Floor, Philadelphia, PA 19103 (the "Company").

## W I T N E S S E T H:

**WHEREAS,** the Company produces and sells certain Products (as hereinafter defined), and wishes to sell such Products to the Distributor and to engage the Distributor as its exclusive distributor for the sale of Products in the Territory as hereinafter defined; and

**WHEREAS,** the Distributor wishes to purchase the Products and to act as such exclusive distributor and/or reseller of such Products under the terms and conditions herein.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and obligations contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

As used herein, the terms set forth below shall have the meanings given to them there.

**1.1 "Products"** shall mean those products listed in Exhibit A which Exhibit may be modified from time to time by mutual written agreement of the parties.

**1.2 "Territory"** shall have the meaning described in Exhibit B.

**1.3 "Patents"** shall mean patents, pending patents, claims of patent, design patents, pending design patents, or claims of design patent owned by the Company and/or its Affiliates relating to the Products and in effect in the Territory.

**1.4 (a) "Know-How"** shall mean all production procedures, all design, engineering, production, manufacturing and other technical data, information, specifications, designs,

**EXHIBIT A**

**A-038**

methods, processes, systems, test reports, guidelines and trade secrets relating to the manufacture, use and sale of the Products, which either the Company or the Distributor has separately acquired or may acquire from time to time and reasonably considers confidential, which are not generally known, and which are of material commercial value.

(b) **"Shared Know-How"** shall mean Know-How that is reasonably required to assist the Distributor in the marketing, sales, and support of the Product.

**1.5 "Trademarks"** and **"Trade Names"** shall mean the trade names and trademarks associated with the Products as set forth in Exhibit A, attached hereto and made a part hereof, which Exhibit may be modified from time to time by mutual written agreement of the parties. The Company agrees to follow reasonable Distributor's requirements regarding Distributor's trademarks which are listed on Exhibit A or as may be added to Exhibit A from time to time by mutual agreement.

**1.6 "Confidential Information"** shall mean Know-How and other confidential or proprietary information regarding the Company's or the Distributor's business or any aspect of this Agreement, including, without limitation, customer lists and financial, marketing and other information which either party has acquired or may acquire from time to time from the other party with the understanding that such information and/or data are confidential. Notwithstanding the above, "Confidential Information" shall not include information: i) which the receiving party can demonstrate was in its possession at the time of disclosure and was not acquired by the receiving party directly or indirectly from disclosing party on a confidential basis, ii) which becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party (whether directly or indirectly), and which source to the best of the receiving party's knowledge did not acquire the information on a confidential basis, or iii) which is approved for release or use without restriction by written authorization of an officer of the Party owning the Confidential Information. If Confidential Information is required to be disclosed by any federal or state law, rule or regulation or by any applicable judgment, order or decree of any court or governmental body or agency having jurisdiction the Party required to disclose the Confidential Information will give the Party owning the Confidential Information notice, to the extent reasonably practicable, of the proposed disclosure so as to afford the Party owning the Confidential Information an opportunity to seek prevention of its disclosure. The parties hereto

agree to keep Confidential Information confidential and to continue to be bound by the terms and conditions of any Confidentiality Agreement then in place between the Parties.

**1.7 "Affiliate"** shall mean any other entity (a) that directly or indirectly controls, is under common control with, or is controlled by one of the Parties or (b) is at least 50% beneficially owned by one of the Parties. As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, (whether through ownership of securities or partnership or other ownership interests, by contract, or otherwise).

**ARTICLE II**
**GENERAL APPOINTMENT**

**2.1 Appointment.** The Company hereby appoints the Distributor as its exclusive, distributor for the sale, purchase and resale of the Products in the Territory subject to the terms and conditions of this Agreement. The Distributor accepts the appointment and agrees to purchase the Products from the Company under the terms and conditions of this Agreement and according to specific future Product contracts as may be agreed between the parties on a case-by-case basis.

**2.2 Relationship of the Parties.** The relationship between the Company and the Distributor is that of independent contractor and not that of employer-employee or principal-agent. The Distributor shall not be the agent or legal representative of the Company, nor shall the Company be the agent or legal representative of the Distributor. Neither the Company nor the Distributor shall have the right, power, or authority to assume or undertake any obligation whatsoever or make any representation on behalf of the other unless authorized to do so in writing.

**ARTICLE III**
**GENERAL TERMS OF DISTRIBUTORSHIP**

**3.1 Best Efforts.** the Distributor agrees to use its best efforts to promote the sale of, and to solicit and secure orders for, the Products in the Territory and, subject to the provisions of Section 4.4 below, to purchase the Products from the Company. The Company agrees to sell the

Products to the Distributor as the Company's -exclusive distributor of the Products in the Territory.

**3.2 Promotion and Advertising.** The company shall, at its own expense, supply the Distributor with up-to-date samples, Shared Know-How and technical data, promotional material, and service information as appropriate in order for the Distributor to conduct laboratory and market tests and to promote and develop sales of the Products. The Distributor agrees not to use any such provided material, including Share Know-How, for any purpose other than in furtherance of its obligations and undertakings as set forth in this Agreement.

**3.3 Compliance.** The Company shall, at its own expense, provide the Distributor with all relevant technical information known to the Company as a result of industry standard due diligence and necessary to comply with all statutes, rules and regulations relating to the sale of the Products in the Territory.

**3.4 Promotion and Publicity.** (a) All promotions and advertising of the Products shall be formulated and implemented by the Distributor at its own cost. The Distributor agrees to consult with the Company before implementing any such promotion or advertising campaign and to make any reasonable changes suggested by the Company, provided that the Company agrees to share the costs of any such revisions. All such promotional material shall be accurate and shall be consistent with promotional material used by the Company in its own advertising and promotional campaigns. The Company shall provide the Distributor with its publicity and promotional material with respect to the Products, which the Distributor shall use its best efforts to include in its promotions and advertising; provided, however, that such material shall not be changed in any material respect without the prior written consent of the Company. The Distributor will not materially alter the packaging of the Products without the prior consent of the Company, and each party will cause the labeling of Products sold hereunder to comply with all applicable regulations governing such labeling from time to time; provided, however, the Distributor may add any labeling that it determines is required under applicable law, or otherwise necessary to meet legal or customer requirements.

(b) The Company shall use its best efforts to provide the Distributor and/or its customers with all such information, and technical assistance with respect to the application of the Products as they reasonably request.

**3.5 Non-Infringement.** The Distributor shall not advertise, promote, or sell any Product which infringes any Patent, Trademark, or copyright, or which violates any trade secret of the Company. The provisions of clause 3.5 shall not apply until such time as the Distributor has knowledge, or reasonably should have knowledge, that a Patent, Trademark, copyright, or trade secret is being violated in the manufacture or use of a particular Product.

**ARTICLE IV**
**PRICE, PAYMENT AND DELIVERY TERMS**

**4.1 General Terms.** The Company agrees to sell the Products to the Distributor and the Distributor agrees to purchase the Products from the Company on the terms and conditions set forth in this Agreement.

**4.2 Price.** The Distributor shall purchase the Products for its own account from the Company at the prices in effect, as reflected in Exhibit A at the time the Company chooses to accept the Distributor's order. Initial prices for the Products are listed in Exhibit A. Prices may be changed at any time by the Company on ninety (90) days' prior written notice to the Distributor. Exhibit A may be revised as necessary to reflect the implementation of mutually agreed upon price changes and addition of or changes to the Products. All pricing is required to provide the Distributor at least a ten percent (10%) markup.

**4.3 Payment.** Invoices for sales of Products hereunder shall be prepared by the Company and presented to the Distributor at the time of shipment. The Distributor shall pay each invoice in U.S. dollars within thirty (30) days after receipt of the Products by (i) the Distributor, or (ii) its warehouse, or (iii) its customer, whichever occurs first.

**4.4 Placement of Orders and Shipping.** The Company shall ship the Products within thirty (30) days of receipt of written orders therefore from the Distributor. If the Company is

**A-042**

unable to ship within such period, it will promptly notify the Distributor of the Company's
anticipated shipping date.

**4.5 Delivery.** Delivery of the Products to the Distributor shall be FOB the Distributor's
warehouse, transportation prepaid by the Company. Title to and risk of loss of Products shall
pass from the Company to the Distributor upon delivery to the Distributor, its warehouse or its
customer, whichever occurs first.

**4.6 Product Modification.** Any modification in chemical components, raw materials,
manufacturing sources, manufacturing locations, manufacturing facilities, and/or processes must
be reported to and reasonably agreed to by the Distributor prior to implementation. Any changes
to the specification of any Product must be notified to the Distributor and reasonably agreed to
by the Distributor before any dispatch of any modified Product and a new specification and
safety data sheet must be drafted for any such modified Product. All raw materials and/or
supplies shall in all material respects be chemically consistent, both in nature and concentration,
with the original raw materials and/or supplies used in the Products. All raw materials and/or
supplies shall in all material respects meet the original specifications therein.

**ARTICLE V**

**WARRANTIES, INDEMNIFICATION AND RETURNS**

**5.1 Warranty.** the Company warrants to the Distributor that the Products sold to the
Distributor under this Agreement (including all replacement or modified Products) shall be fit
and sufficient for the purpose intended, merchantable, of good material and workmanship, free
from defect, and in accordance with the Company's specifications shown in Exhibit C. The
Distributor shall notify the Company in writing of any claims of defect or non-conformity
noticeable upon ordinary inspection within two (2) months or the applicable statute of limitation,
whichever is shorter, after a customer's receipt of the Product. The Distributor shall notify the
Company in writing of any hidden defect or non-conformity with the specification shown on
Exhibit C within two (2) months or the applicable statute of limitation, whichever is shorter, after
the Distributor or the customer becomes aware of the hidden defect or non-conformity, but in
any event within the statute of limitations for such claims. If the Company does receive timely
notice, the Company shall arrange for and bear the cost of shipping the defective Product back to

**A-043**

the Company and upon receipt of the Product and upon reasonable confirmation of the existence of such defect or non-conformity, shall, at its election either deliver at its own expense a replacement product to the Distributor or return to the Distributor the purchase price thereof. All costs of disposal of non-conforming or defective Products shall be borne by the Company, provided the Company is notified of such defect or non-conformity within the time periods set forth in this paragraph 5.1.

**THE FOREGOING WARRANTIES ARE THE ONLY WARRANTIES PROVIDED BY THE COMPANY WITH RESPECT TO THE PRODUCTS SOLD BY THE COMPANY TO THE DISTRIBUTOR. THE PROVISIONS OF THE UCC DEALING WITH WARRANTIES ARE EXPRESSLY DISCLAIMED.**

**5.2 Indemnification.** (a) The Company hereby agrees to indemnify the Distributor and hold it harmless from and against all claims, suits, damages, judgments, losses, amounts paid in settlement thereof, and all costs and expenses (including reasonable attorneys' fees and expenses) based upon, relating to, or arising out of (i) non-compliance by the Company with its obligations hereunder or a material breach of any provision herein; (ii) the Company's negligence or willful misconduct; (iii) any personal injury, property damage or product liability claim or third-party claim; and/or (iv) a claim of any Intellectual Property infringement, including, but not limited to Trademark, Patent or Copyright infringement brought against the Distributor based upon the Distributor's promotion or sales of the Product or any other requirements of this Agreement.

(b) Notwithstanding the provisions of paragraph 5.2, the Company shall not be responsible for those damages, claims, or losses which the Distributor or third parties may suffer which are a direct result of modifications to the Product or Trademark without the Company's written consent.

(c) The Distributor hereby agrees to indemnify the Company and hold it harmless from and against all claims, suits, damages, judgments, losses, amounts paid in settlement thereof, and all costs and expenses (including reasonable attorneys' fees and expenses) based upon, relating to, or arising out of (i) non-compliance by the Distributor with its obligations hereunder or breach of any provision herein; (ii) the Distributor's negligence or willful misconduct; (iii) any personal injury, property damage or product liability claim and/or (iv) any third-party claim caused

directly as a result of modifications to the Products by the Distributor or its employees or agents.

**5.3 Customer Returns.** It is the policy of the Distributor to accept the return of any product sold to its customers. The Distributor therefore expects its suppliers to cooperate with the Distributor to effect customer returns quickly, efficiently and safely. Attached hereto as Exhibit D is the Distributor's Customer Return Goods Policy (the "Return Policy"). The Company agrees to cooperate with the Distributor on customer returns of the Product in accordance with the Return Policy.

**ARTICLE VI**
**TRADEMARK, TRADE NAMES, PATENTS, KNOW-HOW**

**6.1 Ownership; No Infringement.** Except as provided in the schedule attached as Exhibit E, the Company represents and warrants to the Distributor that the Trademarks, Trade Names, and Patents are owned by the Company or an Affiliate free and clear of all liens, encumbrances, or claims; that the Company is free to make use of the Trademarks, Trade Names, and Patents; and that the Company knows of no (a) infringement thereof by others, or (b) infringement (or claims of infringement) by the Company of any of the trademarks, trade names, patents, or the intellectual property rights of others.

**6.2 Use of Trademarks and Trade Names.** In connection with the Distributor's appointment as the Company's distributor, the Company and/or its Affiliates grant to the Distributor an exclusive, non-transferable right, without the right to sublicense, to use the Trademarks in the Territory for the limited purpose of marketing and selling the Products. The Distributor may place the Trademarks and Trade Names on its stationery, catalogues, promotional literature, advertising material and signs, but only in connection with the promotion and sale of the Products in the Territory. Any other use of the Trademarks and Trade Names by the Distributor shall be subject to prior written approval by the Company, except that the Distributor may be identified as the distributor of the Products on all labels and promotional materials without any such prior approval. The Distributor agrees to submit samples of proposed marketing materials or trademark usage to the Company for its review and approval, such

approval not to be unreasonably withheld. Any actual usage of such Trademarks in marketing materials, labeling, and otherwise will be consistent with the samples received by the Company. Subject to the foregoing, the Distributor further agrees:

(a) Not to remove the Trademarks or Trade Names from the Products or packages containing the Products;

(b) Not to alter the Trademarks or Trade Names in any way;

(c) Not to apply any Trademarks or Trade Names or any labels, signs or markings of any kind other than additional labeling required by customers or governmental or regulatory authorities to the Products or use the same in connection with the Products, without prior written approval of the Company;

(d) To employ any symbol or notice with the Trademark which may be necessary to identify and protect the interests of the Company in the Trademark;

(e) Not to register or record as a trademark or domain name, or cause to be registered or recorded as a trademark or domain name, any the Company Trademark or Trade Name, in any country;

(f) That any and all goodwill created in any Trademark or Trade Name of the Company belongs to, and is the property of, the Company in every country; and

(g) Indicate that the Trademarks and Trade Names are owned by the Company or its Affiliates as applicable.

**6.3 Infringement.** Should the Distributor discover any infringement of any of the Company's Trademarks, Trade Names, Patents, Copyrights or Trade Secrets, or should the Distributor become aware of any claims of infringement relating thereto, the Distributor shall promptly notify the Company, and the Company shall decide, in its sole discretion, whether to take any action.

## ARTICLE VII
## TERM AND TERMINATION

**7.1 Term; Termination by Either Party.** This Agreement shall commence on the date hereof and terminate six (6) months after either party gives written notice of termination to the other at any time, with or without cause. This Agreement may also be terminated by an aggrieved party immediately upon written notice to the other ("Defaulting Party") in the event that the Defaulting Party:

(a) commits a breach or default under this Agreement, which breach or default is not remedied within thirty (30) days after written notice of the facts surrounding such breach is delivered to the Defaulting Party; or

(b) is unable to meet its debts as they fall due or enters into liquidation or dissolution or becomes bankrupt or insolvent, or if a trustee or receiver is appointed for such party, whether by voluntary act or otherwise, or if any proceeding is instituted by or against such party under the provisions of any bankruptcy act or amendment thereto which results in the entry of any order for relief against it which is not stayed or remains active for a period of sixty (60) days, or if it enters into a voluntary arrangement with its creditors.

**7.2 Cessation of Deliveries.** Upon termination of this Agreement, the Company may restrict or stop deliveries of the Products to the Distributor, other than deliveries on orders already received at the time of the notice of termination; provided, however, that in the event of termination without cause by the Company pursuant to the first sentence of Section 7.1 above, the Company shall make the Products available to the Distributor in order to enable the Distributor to maintain its normal delivery commitments to third parties for up to six (6) months after termination, provided the Distributor so requests within forty-five (45) days of notice of termination and provided further that at all times during the post-termination period the Distributor is current on its uncontested payment obligations to the Company.

**7.3 Disposition of Inventory Upon Termination.** Upon termination of this Agreement, except to the extent otherwise required for continued deliveries pursuant to Section 7.2 above, (a) all of the Distributor's rights with respect to the Trademarks, Trade Names, Shared Know-How, Confidential Information and Patents shall immediately cease, (b) provided the termination is not

based on the Distributor's default, the Company shall i) purchase from the Distributor all advertising and printed matter relating to the Products, and ii) shall repurchase all of the Distributor's inventory of Products. The cost for said advertising, printed matter and inventory shall be the price originally paid by the Distributor including any freight, insurance during shipping, sales tax and import duties.

**7.4 Limitation of Damages.** If either party hereto shall terminate this Agreement in accordance with its terms, the non-terminating party shall have no claim or cause of action by reason of such termination, whether for loss of anticipated profits, loss of good will, or otherwise.

**ARTICLE VIII**
**MISCELLANEOUS PROVISIONS**

**8.1 Entire Agreement.** This Agreement (including Exhibits A through E attached hereto and incorporated herein) constitutes the entire agreement between the parties relating to the distribution of Products in the Territory; it supersedes all prior agreements and understandings between the parties relating to that subject, either oral or written, all of which are hereby expressly terminated; and this Agreement cannot be modified, except in a writing signed by both parties hereto.

**ALL PURCHASE ORDERS AND ACKNOWLEDGMENTS THAT MAY BE USED BY THE PARTIES HERETO TO ORDER OR ACKNOWLEDGE ORDERS FOR PRODUCTS HEREUNDER SHALL BE FOR RECORD PURPOSES ONLY. IN THE EVENT OF ANY DISCREPANCY OR CONFLICT BETWEEN THE TERMS THEREOF AND OF THIS AGREEMENT, THE TERMS OF THIS AGREEMENT SHALL PREVAIL.**

**8.2 Assignment.** This Agreement may not be assigned by either party without the prior written consent of the other party hereto, except that either party may assign this Agreement to a wholly-owned subsidiary or Affiliate without first obtaining the written consent of the other party.

**8.3 No Waiver of Terms.** Neither the failure of either party hereto to require the performance of any term of this Agreement, nor the waiver by either party of any breach under

this Agreement, shall prevent a subsequent enforcement of any such term or be deemed a waiver of any subsequent breach.

**8.4 Headings.** The headings set forth herein are for convenience of reference only and shall not be considered to limit or amplify the terms and provisions hereof, nor shall they be examined or referred to in construing or interpreting this Agreement.

**8.5 Severability.** In the event any one or more of the agreements, provisions or terms contained herein shall be declared invalid, illegal, or unenforceable in any respect, such agreement, provision, or term shall be enforced to the extent permitted by law and the validity of the remaining agreements, provisions, or terms contained herein shall be in no way affected, prejudiced, or disturbed thereby.

**8.6 Force Majeure.** Neither of the parties hereto shall be responsible for or liable to the other party for any damage or loss of any kind, directly or indirectly, resulting from fire, flood, explosion, riot, rebellion, revolution, war, pandemic, labor trouble (whether or not the fault of either party hereto), requirements or acts of any government or subdivision thereof, or any other similar cause beyond the reasonable control of the party. The occurrence and the termination of any such event shall be promptly communicated to the other party.  If after sixty (60) days, Force Majeure events cause default of obligations hereunder by a party, the non-defaulting party may immediately terminate after providing the defaulting party with notice.

**8.7 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflict of law principles of such Commonwealth.

**8.8 Arbitration.** Any and all claims, disputes, controversies, or differences arising out of or in connection with this Agreement, which cannot be settled satisfactorily by means of negotiation between the parties, shall be submitted to arbitration in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association; provided, however, that this clause shall not be construed to preclude either party from bringing any action in any court of competent jurisdiction for injunctive or provisional relief, as necessary or appropriate. The arbitration proceeding shall take place in Philadelphia. The parties shall, in accordance with the Rules, appoint a mutually-agreed-upon arbitrator. The decision of such

arbitrator shall be final and binding upon the parties; judgment thereon may be entered in any court having jurisdiction or application may be made to such court for judicial acceptance of the award or order of enforcement.

**8.9 Notices.** All notices, requests, demands, and other communications made hereunder shall be in writing and shall be deemed duly given on the date of receipt if delivered electronically or in person, or five days after mailing if sent by mail, postage prepaid, to the addresses set forth below or to such other address or person as either party may designate by notice to the other party hereunder:

If to the Distributor, to:

            Visual Semiconductor, Inc.
            1105 William Penn Drive
            Bensalem, PA 19020
            Attention: President

If to Company, to:

            Stream TV Networks, Inc.
            2009 Chestnut Street
            Third Floor
            Philadelphia, PA 19103
            Attention: CEO

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK –*
*SIGNATURE PAGE FOLLOWS]*

**8.10 Counterparts.** This Agreement may be executed in separate counterparts with the same effect as if both parties had executed the same document. All such counterparts shall be construed together and shall constitute one agreement.

**IN WITNESS WHEREOF,** the parties have caused the due execution of this Agreement on the day first above written.

**VISUAL SEMICONDUCTOR, INC.**

By:  Joseph Corso

Title:  Under Limited Power of
Attorney Dated November 30, 2022

**STREAM TV NETWORKS, INC.**

By: Mathu Rajan

Title: President and CEO

**EXHIBIT A**

**PRODUCTS**

Descriptions of specific Products shall be detailed in an amended Exhibit A as available:

1. BONDED OPTICS – consisting of a video panel, a 3D lens, optical glue, and other elements for use in manufacturing glasses-free 3D phones, mobile gaming devices, tablet computers, laptop computers, computer monitors, televisions, large screen monitors, and other devices.

2. 3D COMPUTER CHIPS – for glasses-free 3D rendering and conversion of content from 2D to glasses-free 3D for use in manufacturing glasses-free 3D phones, mobile gaming devices, tablet computers, laptop computers, computer monitors, televisions, large screen monitors, and other devices.

**EXHIBIT B**

**TERRITORY**

Regarding that certain Distribution Agreement between Company and Distributor, the Territory shall be defined as:

Worldwide

**EXHIBIT C**

**SPECIFICATIONS**

Regarding that certain Distribution Agreement between Company and Distributor, the Product Specifications shall be defined as:

1. Bonded Optics – specifications TBD

2. 3D Computer Chips – specifications TBD

# EXHIBIT D

## DISTRIBUTOR'S CUSTOMER RETURN GOODS POLICY

TBD

# EXHIBIT E

## EXCEPTIONS PURSUANT TO SECTION 6.1

TBD

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | William Homony <bhomony@mctllp.com> |
| **Sent:** | Wednesday, January 17, 2024 10:33 AM |
| **To:** | nicole@streamacquisitiongroup.com; Michael.vagnoni@obermayer.com; 'George, Edmond'; Matt Tomlin |
| **Cc:** | mathu rajan; Amanda Gonzalez; Dan Rink; Suby Joseph; Bud |
| **Subject:** | RE: Hawk conversion and amendment information |

Thanks Nicole.  I'm looking to obtain the documents and other information that supports Stream's position that the debt was in fact converted to equity.

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

**From:** nicole@streamacquisitiongroup.com [mailto:nicole@streamacquisitiongroup.com]
**Sent:** Wednesday, January 17, 2024 10:11 AM
**To:** William Homony <bhomony@mctllp.com>; Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>; Matt Tomlin <mtomlin@mctllp.com>
**Cc:** mathu rajan <mathu@streamacquisitiongroup.com>; Amanda Gonzalez <amanda@streamacquisitiongroup.com>; Dan Rink <dan@streamacquisitiongroup.com>; Suby Joseph <suby@streamacquisitiongroup.com>; Bud <bud@streamacquisitiongroup.com>
**Subject:** RE: Hawk conversion and amendment information

You don't often get email from nicole@streamacquisitiongroup.com. Learn why this is important

Good morning,

As a follow up, I've also put these documents in the box folder to which you have access.  Please see the link below should you need to access these documents.

https://app.box.com/s/niqc1r3ihpwwexal0jkd7j0bk6squskv

Thank you,
Nicole

**From:** nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>
**Sent:** Tuesday, January 16, 2024 5:55 PM
**To:** bhomony@mctllp.com; Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>; Matt Tomlin <mtomlin@mctllp.com>
**Cc:** mathu rajan <mathu@streamacquisitiongroup.com>
**Subject:** Hawk conversion and amendment information

Good evening,

**EXHIBIT B**

**A-057**

Please see attached the information about the Hawk conversion and the amendment.

Thank you,
Nicole

**A-058**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | George, Edmond <Edmond.George@obermayer.com> |
| **Sent:** | Thursday, February 8, 2024 10:55 AM |
| **To:** | nicole@streamacquisitiongroup.com; Vagnoni, Michael; bhomony@mctllp.com |
| **Cc:** | Steven Coren; Matt Tomlin |
| **Subject:** | Stream |

Nicole, we are reviewing and analyzing the documents you sent us on the conversion issue for Hawk.  We are going to need to see proof of deposits of the funds referenced in your documentations, as you have asserted that more money was raised than was owed to Hawk.  We were also wondering whether in the conversion calculation you performed, whether you considered the interest which was accruing on the obligations.  It seems that the numbers may not match, but again, we may not have all of the documentation.  If you could provide a list of the deposits and amounts and where deposited, and your interest calculation, that would be very helpful.

Thank you

Ed George






**Edmond M. George, Esquire, LLM**
Chairman, Creditor's Rights and Financial Reorganization Group

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665-3140 tel | 215.665.3165 fax
edmond.george@obermayer.com | www.obermayer.com

Super Lawyers
Pennsylvania: 2014, 2022, 2023
New Jersey: 2013, 2014, 2018, 2019

Best of the Bar 2018
Philadelphia Business Journal




**EXHIBIT C**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | nicole@streamacquisitiongroup.com |
| **Sent:** | Sunday, March 10, 2024 8:28 PM |
| **To:** | bhomony@mctllp.com; Michael.vagnoni@obermayer.com; 'George, Edmond'; Matt Tomlin |
| **Cc:** | Zahralddin, Rafael; 'mathu rajan'; 'mattrajan1471@gmail.com'; mathu rajan |
| **Subject:** | Assets |
| **Attachments:** | 20240310 Stream TV Assets to be Returned.docx |

Good evening, team,

Please see attached the updated missing assets list.

Below is where they should go:

Easy Space Storage
2520 Knights Rd
Bensalem, PA 19020

Unit 

**is the keypad code**

I will send another email with information regarding the bonding machine.

Thank you,
Nicole

**EXHIBIT D**

**A-060**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | William Homony <bhomony@mctllp.com> |
| **Sent:** | Monday, January 29, 2024 12:51 PM |
| **To:** | nicole@streamacquisitiongroup.com; Matt Tomlin; Michael.vagnoni@obermayer.com; 'George, Edmond' |
| **Cc:** | 'Zahralddin, Rafael'; 'mathu rajan'; 'Bud' |
| **Subject:** | RE: 2023 Q4 Philips Royalty Reporting |

We received the below information from Stastney this morning.

12.3" Display:  10
15.6" Display:  10
27" Display:  6

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

---

**From:** nicole@streamacquisitiongroup.com [mailto:nicole@streamacquisitiongroup.com]
**Sent:** Friday, January 26, 2024 3:47 PM
**To:** Matt Tomlin <mtomlin@mctllp.com>; William Homony <bhomony@mctllp.com>;
Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>
**Cc:** 'Zahralddin, Rafael' <Rafael.Zahralddin@lewisbrisbois.com>; 'mathu rajan' <mathu@streamacquisitiongroup.com>;
'Bud' <bud@streamacquisitiongroup.com>
**Subject:** RE: 2023 Q4 Philips Royalty Reporting

> You don't often get email from nicole@streamacquisitiongroup.com. Learn why this is important

Good afternoon,
Please let me know when you get the information needed to give to Phillips.  According to what Patric mentioned in his
reply to Bud, Shad is managing the Netherlands so he should be able to provide this to you.   We don't want to miss the
deadline.

Thank you,
Nicole

---

**From:** nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>
**Sent:** Friday, January 26, 2024 1:12 PM
**To:** 'Matt Tomlin' <mtomlin@mctllp.com>; 'William Homony' <bhomony@mctllp.com>;
Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>
**Cc:** 'Zahralddin, Rafael' <Rafael.Zahralddin@lewisbrisbois.com>; 'mathu rajan' <mathu@streamacquisitiongroup.com>;
'Bud' <bud@streamacquisitiongroup.com>
**Subject:** RE: 2023 Q4 Philips Royalty Reporting

**A-061**

**EXHIBIT E**

Good afternoon,
Please see attached the 3 reports you requested.  When a report is completed, they are uploaded to a secure portal that Phillips gives us access to.

Thank you,
Nicole

---

**From:** Matt Tomlin <mtomlin@mctllp.com>
**Sent:** Thursday, January 25, 2024 4:13 PM
**To:** nicole@streamacquisitiongroup.com; William Homony <bhomony@mctllp.com>;
Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; mathu rajan <mathu@streamacquisitiongroup.com>;
Bud <bud@streamacquisitiongroup.com>
**Subject:** RE: 2023 Q4 Philips Royalty Reporting

Nicole,

Can you send us copies of the 1Q to 3Q reports submitted to Philips?  Apologies if these in the files that have been sent but I do not see them.  I do see the 1Q and 2Q invoices from Philips, but not the reporting.  Thanks.

**Matt Tomlin**
**Miller Coffey Tate LLP**
**p 215-561-0950 ext. 18**
**mtomlin@mctllp.com**

---

**From:** nicole@streamacquisitiongroup.com [mailto:nicole@streamacquisitiongroup.com]
**Sent:** Thursday, January 25, 2024 3:58 PM
**To:** William Homony <bhomony@mctllp.com>; Matt Tomlin <mtomlin@mctllp.com>;
Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; mathu rajan <mathu@streamacquisitiongroup.com>;
Bud <bud@streamacquisitiongroup.com>
**Subject:** FW: 2023 Q4 Philips Royalty Reporting

> You don't often get email from nicole@streamacquisitiongroup.com. Learn why this is important

Good afternoon, Bill,

Please see the information below about the Phillips license.

Stream is required to report quarterly sales data to Philips for calculation of royalties, if any. The reports are due 30 days after the end of each calendar quarter, which means our next report is due on January 30. Although Stream itself has no sales to report for Q4 2023, we are aware that Stream's subsidiary sold prototype samples to Hyundai Mobis during that period. It was part of the overall discussion in bankruptcy court last year, and samples fall under the reporting requirement.

On January 5, 2024, Bud Robertson sent an email to Patric Theune at SCBV requesting the minimal information required to file our royalty report. Mr. Theune replied on January 8 that the request had been forwarded to Shad Stastney, as he is the current registered director of SCBV. Mr. Stastney was copied on that response, so he is aware of the reporting requirement as well as the escalation of our request to him personally. For 2 weeks, there has been no response from Mr. Stastney.

**A-062**

Bud Robertson sent a follow up email directly to Mr. Stastney yesterday to communicate the urgency of the request and underscore the critical deadline.  He has not responded and is not cooperating.  We had hoped he would cooperate, but his lack of any communication in this matter to date is concerning.

We need to get this information quickly so we can file with Phillips before the deadline.

Thank you,
Nicole

---

**From:** bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**Sent:** Thursday, January 25, 2024 3:50 PM
**To:** nicole@streamacquisitiongroup.com
**Subject:** FW: 2023 Q4 Philips Royalty Reporting

Hi Nicole,

Attached is the email thread showing my requests to Patric and Shad for information we need to file our quarterly report to Philips. Our deadline is next week.

Best regards,

Bud Robertson
Stream TV Networks, Inc.

**A-063**

## nicole@streamacquisitiongroup.com

| | |
|---|---|
| **From:** | nicole@streamacquisitiongroup.com |
| **Sent:** | Friday, March 8, 2024 4:23 PM |
| **To:** | 'William Homony' |
| **Subject:** | RE: Payroll |

| | |
|---|---|
| **Flag Status:** | Flagged |

That's not a problem, VSI can pay them.  We thought it had to go through you and didn't want to break any rules.  I misunderstood Michael's email and thought he meant nothing without your permission, which, at the time, we were coordinating with you.  I will pass it on that VSI needs to pay.  I will tell them to look for that wire.

Thank you,
Nicole

**From:** William Homony <bhomony@mctllp.com>
**Sent:** Friday, March 8, 2024 2:58 PM
**To:** nicole@streamacquisitiongroup.com
**Subject:** RE: Payroll

Hi Nicole, I apologize I thought it was communicated that absent an order from the bankruptcy court that I was not going to accept any additional money from VSI.  I will return the wire and ask that VSI directly pay these contractors until further notice.

Thanks.

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

**From:** nicole@streamacquisitiongroup.com [mailto:nicole@streamacquisitiongroup.com]
**Sent:** Friday, March 08, 2024 2:19 PM
**To:** William Homony <bhomony@mctllp.com>
**Subject:** Payroll

Good afternoon,
Please see attached the pay list for payroll.  The wire is headed your way.
Thank you,
Nicole

**EXHIBIT F**

**A-064**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | nicole@streamacquisitiongroup.com |
| **Sent:** | Sunday, March 10, 2024 8:32 PM |
| **To:** | bhomony@mctllp.com; Michael.vagnoni@obermayer.com; 'George, Edmond'; Matt Tomlin; Andrew Belli; Hinson, Philip; 'Steven Coren' |
| **Cc:** | Zahralddin, Rafael; 'mathu rajan'; 'mattrajan1471@gmail.com'; mathu rajan |
| **Subject:** | Bonding machine |
| **Attachments:** | Cystar Agreement.pdf |

Good afternoon,

Please see information below about where the bonding machine is currently being stored.  I've attached the agreement with Cystar for your review.

The machine needs to go to their facility.

Thank you,
Nicole

The address where the equipment is currently stored:

Address: No. 369, Kang Zhuang Road, Kun Shan City, Jiangsu Province
The information about the landlord
Tel.: +8613584870279
Manager Han.

**EXHIBIT G**

**A-065**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | nicole@streamacquisitiongroup.com |
| **Sent:** | Monday, March 11, 2024 11:30 AM |
| **To:** | 'William Homony'; 'Michael.vagnoni@obermayer.com'; 'George, Edmond'; 'Matt Tomlin'; 'Andrew Belli'; 'Hinson, Philip'; 'Steven Coren' |
| **Cc:** | 'Zahralddin, Rafael'; 'mathu rajan'; 'mattrajan1471@gmail.com'; 'mathu rajan' |
| **Subject:** | RE: Bonding machine |

To clarify further, Patric has some assets and the bonding machine. Shad controls the assets in the other location offices (London, NY, Florida, etc). Meetal Gokul (works in London but runs the India team) has the information about the content and potential accounts/companies contacted regarding Stream technology.

Could you please also reach out to Shad and Meetal like you did with Patric so we can get the rest of the assets listed besides what is in the Netherlands?

Thank you,
Nicole

---

**From:** nicole@streamacquisitiongroup.com <nicole@streamacquisitiongroup.com>
**Sent:** Monday, March 11, 2024 10:37 AM
**To:** 'William Homony' <bhomony@mctllp.com>; 'Michael.vagnoni@obermayer.com' <Michael.vagnoni@obermayer.com>; 'George, Edmond' <Edmond.George@obermayer.com>; 'Matt Tomlin' <mtomlin@mctllp.com>; 'Andrew Belli' <ABelli@kcr-law.com>; 'Hinson, Philip' <Philip.Hinson@lewisbrisbois.com>; 'Steven Coren' <SCoren@kcr-law.com>
**Cc:** 'Zahralddin, Rafael' <Rafael.Zahralddin@lewisbrisbois.com>; 'mathu rajan' <mathurajan@icloud.com>; 'mattrajan1471@gmail.com' <mattrajan1471@gmail.com>; 'mathu rajan' <mathu@streamacquisitiongroup.com>
**Subject:** RE: Bonding machine

Good morning!
Thank you. I can coordinate.

In the document, many of the items were listed at locations other than the Netherlands. You may need to reach out to Shad for those.

Thank you,
Nicole

---

**From:** William Homony <bhomony@mctllp.com>
**Sent:** Monday, March 11, 2024 9:38 AM
**To:** nicole@streamacquisitiongroup.com; Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>; Matt Tomlin <mtomlin@mctllp.com>; Andrew Belli <ABelli@kcr-law.com>; Hinson, Philip <Philip.Hinson@lewisbrisbois.com>; 'Steven Coren' <SCoren@kcr-law.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; 'mathu rajan' <mathurajan@icloud.com>; mattrajan1471@gmail.com; mathu rajan <mathu@streamacquisitiongroup.com>
**Subject:** RE: Bonding machine

Nicole, I'm going to put you in contact with Patric Theune to discuss logistics of moving the bonding equipment and return of other Stream assets.

**EXHIBIT H**

**A-066**

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

**From:** nicole@streamacquisitiongroup.com [mailto:nicole@streamacquisitiongroup.com]
**Sent:** Sunday, March 10, 2024 8:32 PM
**To:** William Homony <bhomony@mctllp.com>; Michael.vagnoni@obermayer.com; 'George, Edmond'
<Edmond.George@obermayer.com>; Matt Tomlin <mtomlin@mctllp.com>; Andrew Belli <ABelli@kcr-law.com>;
Hinson, Philip <Philip.Hinson@lewisbrisbois.com>; 'Steven Coren' <SCoren@kcr-law.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; 'mathu rajan' <mathurajan@icloud.com>;
mattrajan1471@gmail.com; mathu rajan <mathu@streamacquisitiongroup.com>
**Subject:** Bonding machine

Good afternoon,

Please see information below about where the bonding machine is currently being stored.  I've attached the
agreement with Cystar for your review.

The machine needs to go to their facility.

Thank you,
Nicole

The address where the equipment is currently stored:

Address: No. 369, Kang Zhuang Road, Kun Shan City, Jiangsu Province
The information about the landlord
Tel.: +8613584870279
Manager Han.

**A-067**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | William Homony <bhomony@mctllp.com> |
| **Sent:** | Monday, March 11, 2024 9:38 AM |
| **To:** | nicole@streamacquisitiongroup.com; Michael.vagnoni@obermayer.com; 'George, Edmond'; Matt Tomlin; Andrew Belli; Hinson, Philip; 'Steven Coren' |
| **Cc:** | Zahralddin, Rafael; 'mathu rajan'; mattrajan1471@gmail.com; mathu rajan |
| **Subject:** | RE: Bonding machine |

Nicole, I'm going to put you in contact with Patric Theune to discuss logistics of moving the bonding equipment and return of other Stream assets.

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

---

**From:** nicole@streamacquisitiongroup.com [mailto:nicole@streamacquisitiongroup.com]
**Sent:** Sunday, March 10, 2024 8:32 PM
**To:** William Homony <bhomony@mctllp.com>; Michael.vagnoni@obermayer.com; 'George, Edmond' <Edmond.George@obermayer.com>; Matt Tomlin <mtomlin@mctllp.com>; Andrew Belli <ABelli@kcr-law.com>; Hinson, Philip <Philip.Hinson@lewisbrisbois.com>; 'Steven Coren' <SCoren@kcr-law.com>
**Cc:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; 'mathu rajan' <mathurajan@icloud.com>; mattrajan1471@gmail.com; mathu rajan <mathu@streamacquisitiongroup.com>
**Subject:** Bonding machine

Good afternoon,

Please see information below about where the bonding machine is currently being stored.  I've attached the agreement with Cystar for your review.

The machine needs to go to their facility.

Thank you,
Nicole

The address where the equipment is currently stored:

Address: No. 369, Kang Zhuang Road, Kun Shan City, Jiangsu Province
The information about the landlord
Tel.: +8613584870279
Manager Han.

1

**EXHIBIT I**

**A-068**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | William Homony <bhomony@mctllp.com> |
| **Sent:** | Monday, March 11, 2024 10:00 AM |
| **To:** | Patric Theune |
| **Cc:** | nicole@streamacquisitiongroup.com |
| **Subject:** | Stream TV |
| **Attachments:** | 20240310 Stream TV Assets to be Returned.docx |
| | |
| **Flag Status:** | Flagged |

Hello Patric, as reflected in my prior email from earlier today, I am directing the relocation of Stream's bonding equipment as well as the return of the assets identified on the attached itemized list.  I've copied Nicole on this email who will be coordinating with you on the logistics.  Please work to accomplish these requests as quickly as possible.

Please let me know if you have any questions.

Regards,

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

**EXHIBIT J**

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | nicole@streamacquisitiongroup.com |
| **Sent:** | Monday, March 11, 2024 12:59 PM |
| **To:** | 'William Homony'; 'Patric Theune' |
| **Subject:** | RE: Stream TV |
| **Attachments:** | 20240311 Stream TV Assets to be Returned.pdf |

Hi Patric,

As per Bill's instruction below, I will be your contact for asset return.  I appreciate your prompt attention to this matter.

I have highlighted in BLUE on the asset list attached what we need you to send to this address:
Easy Space Storage
2520 Knights Rd
Bensalem, PA 19020
Unit 2032

Please send the bonding machine to this address:
No.136 Gangjian Road, Dongguan City, Guangdong Province, China

We need confirmation from you by 5pm CET on Tuesday, March 12th that you are processing this request.  We will assume you are not complying with the request if there is a failure to clearly respond by that time.

Please send me the shipping information and confirmations as soon as possible.

Thank you,
Nicole Maneen

---

**From:** William Homony <bhomony@mctllp.com>
**Sent:** Monday, March 11, 2024 10:00 AM
**To:** Patric Theune <patric.theune@seecubic.com>
**Cc:** nicole@streamacquisitiongroup.com
**Subject:** Stream TV

Hello Patric, as reflected in my prior email from earlier today, I am directing the relocation of Stream's bonding equipment as well as the return of the assets identified on the attached itemized list.  I've copied Nicole on this email who will be coordinating with you on the logistics.  Please work to accomplish these requests as quickly as possible.

Please let me know if you have any questions.

Regards,

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**

**EXHIBIT K**

Philadelphia, PA 19103
p (215) 561-0950 ext. 26
f (215) 561-0330

**nicole@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | Patric Theune <patric.theune@seecubic.com> |
| **Sent:** | Tuesday, March 12, 2024 1:57 PM |
| **To:** | nicole@streamacquisitiongroup.com; bhomony@mctllp.com |
| **Cc:** | Sheeba Rajesh; Annet van Lijssel; Ad Luijks; Bart Barenbrug; Sheeba Rajesh; Shadron Stastney |
| **Subject:** | Requests |

Dear William and Nicole,

Thank you for your updates/inquiry. Although I am happy to work with you, things are going rather fast for me now so I kindly request some clarification/guidance.

1. Status as employee
I wish to draw your attention to the fact that I am an employee at SeeCubic B.V., meaning I am not its director. From a Dutch legal perspective I cannot simply ignore Shad and take your instructions instead without his acknowledgement. I have the lawful obligation as an employee to safeguard the interest of SeeCubic B.V. to the best of my possibilities. This means I require Shad's consent for cooperation/instructions by you as he is the sole director of SeeCubic and registered as such in the Dutch trade registry. I thus have copied Shad in this e-mail, and kindly request him for guidance on what's happening and how to deal with this.

2. Funding
Even if Shad acknowledges your power to instruct me/us at SeeCubic, we have one extremely urgent matter that is of the utmost importance to us: funding. As far as we can tell the promissory note is no longer in play, whereas outstanding and foreseeable debts are accruing. I've provided William last week with a 13-week cashflow prognosis. It illustrates there are immediate funding needs. To clarify I repeat per topic the immediate needs and the risks if these debts cannot be paid. In the mean time I'll work on the 90 day budget as was requested:

- Pension coming Friday, 15 March (!) → The risk of not paying this debt is that the current pension plan providers drops SeeCubic as a client, as we are already behind in the payments. This would result in a significant additional costs as we would need to go for a new pension scheme and compensate the people in the current pension plans for it. It could also lead to nasty legal battles.
- Wage taxes → Until now we have only been able to make part of the tax payment (still open € 3) This results into a liability of about 2 million euro if not paid in time.
- Salaries → These are due on the 20th (next Wednesday), late payments result in the raise of costs and will provide immediate problems over retaining employees.

Additionally, your request to send products to the US cannot be handled without funding. With the utmost respect I repeat that the situation is dire and this cannot be simply ignored. We do not have time for delays, and 14 days is too long for us to float without any funding.

3. Your request for information
I note that -if Shad agrees with your request- we are happy to comply and revert to you on your list. However, I state in advance that the list is not correct as it contains several assumptions of us having certain products that we do not have. Furthermore, some of the information requested was already provided. I sent a harddrive earlier and you acknowledged receipt of the harddrive. Given that acknowledgement, I am rather surprised you want to have the same information again as it should be in your possession.

4. Follow-up

**EXHIBIT L**

**A-072**

I kindly request everyone in this e-mail to act to its best efforts to clarify/remedy the points described above.

Lastly, I request William and Nicole <u>not</u> to send e-mails in bcc to random SeeCubic personnel as it leads to unwanted and unnecessary stress and turmoil. Please send your e-mails to the 'core management team', i.e. myself (patric.theune@seecubic.com), Sheeba Rajesh (sheeba.rajesh@seecubic.com), Annet van Lijssel (annet.vanlijssel@seecubic.com), Ad Luijks <ad.luijks@seecubic.com>, and Bart Barenbrug (bart.barenbrug@seecubic.com).

With kind regards,

Patric Theune


Park Forum 1035 (route 6024)
5657 HJ Eindhoven
The Netherlands
Phone: +31 40 235 1088
Mobile: +31 628929644
www.seecubic.com

Chamber of commerce:  52962911
Rabobank: 1293.40.324 IBAN: NL44RABO0129340324
The information contained in this communication is confidential and may be legally privileged.
It is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it.
If you are not the intended recipient, you are with this notified that any disclosure, copying, distribution, or taking any
action in reliance on the contents of this information is strictly prohibited and may be unlawful.

**A-073**

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al*.[1] | Bky Case No. 23-10763 (AMC) |
| The Debtors. | (Jointly Administered) |

## MOTION TO RECONSIDER AND/OR CLARIFY ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN CHAPTER 11 TRUSTEE AND HAWK INVESTMENT HOLDINGS, LTD (ECF NO. 653)

Visual Semiconductor, Inc. ("VSI") hereby files its Motion to Reconsider and/or Clarify the Court's June 7, 2024 Order Approving Settlement Agreement Between Chapter 11 Trustee (the "Trustee") and Hawk Investment Holdings, LTD ("Hawk") (ECF No. 653) (the "Order") pursuant to Bankruptcy Rules 9023, and 9024 of the Federal Rules of Bankruptcy Procedure, and Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure as made applicable to this proceeding.

### PRELIMINARY STATEMENT

VSI is concerned that both Hawk and the Trustee are not acting in the best interest of the estates, creditors, and equity in these cases and that their settlement agreement (the "Settlement Agreement") further cements Hawk's inflated secured claim, at the expense of everyone else in the case as detailed in VSI's objection to the approval of the Settlement Agreement (ECF No. 642) ("VSI's Objection"). At the very least, VSI respectfully requests that the Court reconsider/clarify the Order to add additional safeguards to avoid prejudice to the impending sale process, which

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

appears primed to chill bidding while ensuring that Hawk will be the prevailing bidder. These safeguards include adding a fiduciary out for the benefit of the Trustee and the Debtors' estates, should it be later determined that entry into the Settlement Agreement and/or execution of the terms of the Settlement Agreement will result in a breach of the Trustee's fiduciary duties in these cases. Given that topic was not addressed by the Settlement Agreement or the Trustee's motion to approve it, adding a fiduciary out should alleviate some of the concerns VSI and other interested parties have about the Trustee's application of his "business judgment" in this case. Further, an additional clarification should be added to the Order that it is without prejudice to the ability of parties in interest to object to the upcoming sale process or bid procedures.

Additionally, key misstatements were made to the Court at the June 5, 2024 hearing to consider approval of the Settlement Agreement. These misrepresentations of fact were fundamental to the Trustee's decision to enter into the Settlement Agreement, the Court's consideration of VSI's objections, and the ultimate approval of the Settlement Agreement.

Because the Order seeks to allow and disallow claims, it is also subject to future motions for reconsideration by parties in interest pursuant to Bankruptcy Rule 3008 and Section 502(j) of the Bankruptcy Code, which motions are not subject to the time constraints of Rule 9023 like this motion is. The Order should therefore be clarified so as to not inadvertently deprive parties, including VSI, of their due process rights to object to the upcoming sale/bid procedures and to the allowance of Hawk's claim at an agreed upon amount to the prejudice of other parties that still have other legal avenues to pursue in this case.

## LEGAL STANDARD

The standard for a motion to reconsider, amend or clarify is well-established. As the Third Circuit Court of Appeals opined in *North River Ins, Co v Cigna Reinsurance Co.,* a proper motion

to amend or clarify a judgment may be based on either: (i) an intervening change in controlling law; (ii) the availability of new evidence; or (iii) the need to correct a clear error of law or to prevent manifest injustice. *See North River Ins, Co v. Cigna Reinsurance Co.,* 52 F 3d 1194, 1218 (3d Cir. 1995), quoting *Natural Resources Defense Council v. United States Environmental Protection Agency,* 705 F. Supp. 698, 702 1989); *see also Harsco Corp. v Zlotnicki,* 779 F.2d 906, 908 (3d Cir. 1985) ("The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence").

## ANALYSIS

It is unclear what relief parties in interest can seek in the future in regards to the validity of the Settlement Agreement as that Settlement Agreement clearly affects other aspects of the case. VSI was certainly not a party to the Settlement Agreement, but the allowance of Hawk's secured claim at an inflated amount surely prejudices VSI, and leaves uncertain what actions VSI and others can take in the future because the relief, which deals with the validity, extent, and amount of a secured proof of claim affecting the entire creditor body, the security of which is at the center of the dispute between VSI and Hawk, was settled through a Rule 9019 process, rather than actually litigated. Indeed, other than his unsupported conclusion that the risks and costs of litigating outweighed the potential benefits to creditors of successfully contesting Hawk's lien, the Trustee offered no evidence at the hearing that the Settlement Agreement was in the best interests of creditors. Further, given the dispute between the Trustee, Hawk, and VSI as to the propriety of the Settlement Agreement, certain safeguards should have been included in the Order to deter manipulation of or prejudice to the upcoming sale process.

Including a fiduciary out will avoid the Trustee's eventual need to justify what is objectively a bad deal, once Hawk's secured claim can be properly objected to and the Court

**A-076**

actually rules on the amount, extent, and priority of the claim. Further, to the extent Hawk's secured claim is later reduced, subordinated, or disallowed, in part or in full, affording the Trustee a fiduciary out of the Settlement Agreement will provide the Trustee the flexibility to react appropriately as conditions change.

To the extent the Settlement Agreement seeks to preclude future objections to the proposed bid procedures and sale process, including Hawk's ability to credit bid on what is a disputed claim at this time, the Order should be clarified to allow for such objections. Additionally, if any of the terms in the Settlement Agreement are intended to preclude VSI or any other party in interest from objecting to the pending sale process or any proposed bid procedures, the Court's ruling should clarify such limitations for appellate purposes.

During the June 5, 2024 hearing to consider approval of the Settlement Agreement, the Court heard multiple misstatements of fact with material impacts upon the hearing's outcome. For example:

- When the Court asked the witness about purchase orders involving Stream procured by VSI, the witness stated: "But they're VSI purchase orders. There is no agreement between VSI and Stream to do anything, nothing."

  - This is false. Attached as **Exhibit B** is a true and correct copy of the Distribution Agreement between VSI and Stream. This Distributor Agreement has been known to all parties for some time. In fact, it was attached as Exhibit C to Docket Entry 135 in this case filed on April 21, 2023.

- When the Trustee's counsel told the Court that "SeeCubic BV is an affiliate of the Debtor. And the Phillips license allows the affiliates of the Debtor to use those license for demonstrations. VSI, on the other hand, is not an affiliate of the Debtor . . . ."[2]

  - This representation is also inaccurate and a distraction. SeeCubic BV is and has been specifically enjoined by a TRO from conducting demonstrations: SeeCubic BV was enjoined from being able to "[d]escribe, reference, display or portray the technology, or any improvements thereon, or make

---

[2] Hr'g Tr. 45:15-19, a true and correct excerpt is attached as **Exhibit A**.

**A-077**

any representations with respect to ownership or development of such technology, purported to be owned and/or developed by Stream and/or its subsidiaries." The TRO is attached as **Exhibit C**.

These misstatements were made on the record and for the specific purpose of crafting a narrative about certain events and actors in order to discredit certain actors, distract from certain events, and buttress the Trustee's argument for approval of the Settlement Agreement. As such, these misrepresentations constitute new information that is critical to the Court's analysis, in that the Trustee did not accurately present them to the Court, and the corrected record justifies reconsideration of the Order.

Finally, because parties in interest, including VSI, can still object to the newly allowed claim of Hawk pursuant to this Settlement Agreement, there should be no doubt that parties in interest are not precluded from objecting to the claim, given the Trustee's failure to even attempt to do so before picking Hawk as the winner of the dispute between Hawk and VSI. *Matter of Zieg*, 194 B.R. 469, 471 (Bankr. D. Neb. 1996), aff'd, 206 B.R. 974 (D. Neb. 1997) ("11 U.S.C. § 502(j) and Federal Bankruptcy Rule 3008 permit the court to reconsider the allowance of claims at anytime for cause."). It is also important to note that neither the Order nor the Trustee's 9019 motion sought relief under Section 502, which governs the validity of proofs of claim in bankruptcy cases.

Accordingly, the Order should be clarified as follows: 1) to allow for a fiduciary out for the benefit of the Trustee in regards to the Settlement Agreement should it later be determined that entry into the Settlement Agreement and/or execution of the Settlement Agreement will result in a violation of the Trustee's fiduciary duties; 2) preserve the rights of parties in interest to object to any upcoming sale and bid procedures motion, including preserving the ability of parties in interest to object to Hawk's ability to credit bid, to the extent the Settlement Agreement seeks to preclude

76902510;1

future objections to Hawks' ability to credit bid; 3) reconsider approving the Settlement Agreement in light of new information and previous misstatements of fact on the record; and 4) preserving the rights of parties in interest to object to the newly created secured claim of Hawk. Failure to amend the Order to allow for such clarifications will result in manifest error and injustice to VSI and other parties in interest who are being railroaded by both Hawk and the Trustee via the Settlement Agreement into resolving all litigation in favor of Hawk without the due process guardrails of that litigation.

WHEREFORE, VSI respectfully requests that the Court enter an order reconsidering/clarifying the Order as requested herein.

*[Remainder of page intentionally left blank]*

76902510;1

Dated: June 20, 2024

Respectfully submitted,

**AKERMAN LLP**

_/s/ Donald N. David_
Donald N. David (SBN # 304846)
1251 Avenue of the Americas
37th Floor
New York, NY 10020
Telephone: (212) 880-3856
Facsimile: (212) 880-8965
Email: donald.david@akerman.com

-and-

R. Adam Swick (*pro hac vice pending*)
500 W. 5th Street, Suite 1210
Austin, TX 78701
Telephone:  (737) 999-7100
Facsimile:   (512) 623-6701
Email: adam.swick@akerman.com

-and-

John H. Thompson (*pro hac vice pending*)
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Telephone: (202) 393-6222
Facsimile: (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Visual Semiconductor Inc.*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2024, I caused the attached **MOTION TO RECONSIDER AND/OR CLARIFY ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN CHAPTER 11 TRUSTEE AND HAWK INVESTMENT HOLDINGS, LTD** to be electronically filed with the Clerk, United States Bankruptcy Court, Eastern District of Pennsylvania, and to be served electronically the Court's CM/ECF and/or by First Class Mail, upon all parties that have requested service.

*/s/ Donald R. David*
Donald N. David

76902510;1

**A-080**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                   :
IN RE:                             : Case No.  23-10763-amc
                                   :
STREAM TV NETWORKS, INC.  CH: 11   :
AND NETWORKS, INC. AND             : Philadelphia, Pennsylvania
TECHNOVATIVE MEDIA, INC.           : June 5, 2024
                                   : 11:17 a.m.
. . . . . . . . . . . . . . . . .  :
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

```
For the  Debtor:              Rafael X. Zahralddin
                              Lewis Brisbois Bisgaard & Smith
                              500 Delaware Avenue, Suite 700
                              Wilmington, DE 19801
                              302-985-6004


For SeeCubic, Inc.:           Eben P. Colby, Esq.
                              Skadden Arps Slate Meagher &
                              Flom, LLP
                              500 Boylston Street, 23rd Floor
                              Boston, MA 021116
                              617-573-4800


For the Chapter 11 Trustee:   Michael D. Vagnoni, Esq.
                              Edmond M. George, Esq.
                              Obermayer Rebmann Maxwell &
                              Hippel LLP
                              Centre Square West
                              1500 Market Street, Suite 3400
                              Philadelphia, PA 19102
                              215-665-3066

                              Steven M. Coren, Esq.
                              Kaufman Coren & Ress, P.C.
                              Two Commerce Square
                              Suite 3900
                              2001 Market Street
                              Philadelphia, PA 19103-2713
                              215-735-8700
```

**EXHIBIT A**

| | |
|---|---|
| For Shadron Stasney: | Terence M. Grugan, Esq.<br>1735 Market Street<br>51st Floor<br>Ballard Spahr<br>Philadelphia, PA 19103<br>215-864-8320 |
| For Rembrandt: | Andrew Peter Demarco<br>Devlin Law Firm, LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010 |
| For Hawk Investment Holdings Ltd.: | Steven Caponi, Esq.<br>K&L Gates<br>600 N King Street<br>Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |
| For SLS Holdings: | Davis Wright, Esq.<br>Robinson Cole<br>1201 North Market Street<br>Suite 1406<br>Wilmington, DE 19801<br>302-516-1701 |
| For the Trustee: | Kevin M. Callahan<br>DOJ-UST<br>Robert N.C. Nix Federal Building<br>900 Market Street<br>Suite 320<br>Philadelphia, PA 19107<br>215-597-4411 |
| For Visual Semiconductor, Inc.: | Leslie Beth Baskin<br>Spector Gadon Rosen Vinci P.C.<br>1635 Market Street<br>Seven Penn Center - 7th Floor<br>Philadelphia, PA 19103<br>(215) 241-8888 |

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

William Homony
   (By Mr. George)          47
   (By Mr. Michaels)                70
   (By Ms. Baskin)                  79

1  say for the record that there is not one modicum of truth as to

2  what Mr. George said as to any threatening emails which I have

3  sent on behalf of VSI.  I will just state on the record that

4  Mr. Michaels and I tried to have a very fair and open

5  discussion, which we tried to do by Zoom with Mr. Vagnoni and

6  Mr. George.

7        Mr. George got to such a point in taking with me or

8  screaming at me on the phone that I told him -- and I will be

9  honest -- that since I turned 67, I do daily affirmations.  And

10 one of my affirmations is I cannot control the behavior of

11 other people.  I can only control my response.  And my response

12 to him talking to me like he was literally a rabid dog was that

13 I choose not to deal with you anymore whereby he immediately

14 hung up.  And then we had a civil conversation with Mr.

15 Vagnoni.  It didn't really move the ball along at all when it

16 came to the merits of the case.  But for him to say that I have

17 sent threatening emails to him is bizarre and totally untrue

18 and I will not let that stand on the record.

19        THE COURT:  Okay.  So I think that I would like at

20 this point to substance of the 9019 motion.  One thing I guess

21 I would like to hear about in whatever proffer is made about

22 that is this allegation that VSI made that Mr. Stastney and

23 SeeCubic are in possession of technology belonging to the

24 Debtors and they have been using that technology to do

25 demonstrations of the glasses 3 3D technology to potential

```
 1    clients.  I just want to hear that whether or not the Trustee
 2    has heard that allegation and what concerns, if any, that they
 3    have about that.  So I would like to hear that.  And I guess I
 4    just wanted to point out a couple of other things before I hear
 5    that proffer.
 6            MR. GEORGE:  So, Your Honor.
 7            THE COURT:  Yeah.
 8            MR. GEORGE:  We received an email from Ms. Baskin --
 9            THE COURT:  Yeah.
10            MR. GEORGE:  -- making allegations.  We asked her for
11    proof of those allegations.
12            THE COURT:  That they were doing that, yeah.
13            MR. GEORGE:  And we never got anything from them.
14            THE COURT:  Okay.
15            MR. GEORGE:  And the fact of the matter, Judge, is
16    that SeeCubic BV is an affiliate of the Debtor.  And the
17    Phillips license allows the affiliates of the Debtor to use
18    those license for demonstrations.  VSI, on the other hand, is
19    not an affiliate of the Debtor, and they've been using that
20    technology and been out demonstrating on it.
21            THE COURT:  That's the subject of the motion to
22    enforce that we'll need to find a hearing date.  That's also
23    another date that we're going to come back to.  Hold on one
24    second.
25            So I didn't see the settlement agreement making a
```

 1   statement about how the claim filed by Hawk is going to be

 2   treated in the Technovative bankruptcy.  So if someone could

 3   just talk to me about that.  And then other things I wanted to

 4   note is that I just saw this discrepancy where it sounds like

 5   the settlement agreement is trying to say that only Hawk will

 6   remain standing at the end of the day with a secured claim, but

 7   I noticed that the stalking horse bidder might be SeeCubic.

 8   And I would just ask that whoever ends up holding a claim at

 9   the end of the day probably ought to be the same name of the

10   stalking horse bidder.

11           MR. GEORGE:  Understood.

12           THE COURT:  So you want to maybe --

13           MR. GEORGE:  Your Honor, I think, in fact, that Hawk

14   is the collateral agent for a number of secured creditors.

15           THE COURT:  I know.  So whatever name you want to

16   call the ultimate holder of the allowed secured claim, just

17   make sure it's the name of the stalking horse bidder.

18           MR. GEORGE:  Fair enough, Judge.

19           THE COURT:  Right.  Okay.  So, I guess at this point,

20   I'd like to hear a proffer or if you wanted to put on testimony

21   --

22           MR. GEORGE:  I'm going to put Mr. Homony on the

23   stand, Your Honor.

24           THE COURT:  Alrighty.  So, sir, come right over here.

25   Mr. Barbado will swear you in.  Yeah.

C E R T I F I C A T E


      I hereby certify that the foregoing is a true and
correct transcript from the electronic sound recording of the
proceedings in the above-entitled matter.




*John Buckley*
_____

John Buckley, CET-623
Digital Court Proofreader

# EXCLUSIVE DISTRIBUTION AGREEMENT

**AGREEMENT** (the "Agreement") dated March 31st, 2023 between **VSI Semiconductor, Inc.**, having an office at 1105 William Penn Drive, Bensalem, PA 19020 (the "Distributor"), and **Stream TV Networks, Inc.**, a Delaware Corporation, having an office at 2009 Chestnut Street, Third Floor, Philadelphia, PA 19103 (the "Company").

**W I T N E S S E T H:**

**WHEREAS,** the Company produces and sells certain Products (as hereinafter defined), and wishes to sell such Products to the Distributor and to engage the Distributor as its exclusive distributor for the sale of Products in the Territory as hereinafter defined; and

**WHEREAS,** the Distributor wishes to purchase the Products and to act as such exclusive distributor and/or reseller of such Products under the terms and conditions herein.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and obligations contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

As used herein, the terms set forth below shall have the meanings given to them there.

**1.1 "Products"** shall mean those products listed in Exhibit A which Exhibit may be modified from time to time by mutual written agreement of the parties.

**1.2 "Territory"** shall have the meaning described in Exhibit B.

**1.3 "Patents"** shall mean patents, pending patents, claims of patent, design patents, pending design patents, or claims of design patent owned by the Company and/or its Affiliates relating to the Products and in effect in the Territory.

**1.4 (a) "Know-How"** shall mean all production procedures, all design, engineering, production, manufacturing and other technical data, information, specifications, designs,

**EXHIBIT B**

A-088

methods, processes, systems, test reports, guidelines and trade secrets relating to the manufacture, use and sale of the Products, which either the Company or the Distributor has separately acquired or may acquire from time to time and reasonably considers confidential, which are not generally known, and which are of material commercial value.

   (b) **"Shared Know-How"** shall mean Know-How that is reasonably required to assist the Distributor in the marketing, sales, and support of the Product.

   **1.5 "Trademarks"** and **"Trade Names"** shall mean the trade names and trademarks associated with the Products as set forth in Exhibit A, attached hereto and made a part hereof, which Exhibit may be modified from time to time by mutual written agreement of the parties. The Company agrees to follow reasonable Distributor's requirements regarding Distributor's trademarks which are listed on Exhibit A or as may be added to Exhibit A from time to time by mutual agreement.

   **1.6 "Confidential Information"** shall mean Know-How and other confidential or proprietary information regarding the Company's or the Distributor's business or any aspect of this Agreement, including, without limitation, customer lists and financial, marketing and other information which either party has acquired or may acquire from time to time from the other party with the understanding that such information and/or data are confidential. Notwithstanding the above, "Confidential Information" shall not include information: i) which the receiving party can demonstrate was in its possession at the time of disclosure and was not acquired by the receiving party directly or indirectly from disclosing party on a confidential basis, ii) which becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party (whether directly or indirectly), and which source to the best of the receiving party's knowledge did not acquire the information on a confidential basis, or iii) which is approved for release or use without restriction by written authorization of an officer of the Party owning the Confidential Information. If Confidential Information is required to be disclosed by any federal or state law, rule or regulation or by any applicable judgment, order or decree of any court or governmental body or agency having jurisdiction the Party required to disclose the Confidential Information will give the Party owning the Confidential Information notice, to the extent reasonably practicable, of the proposed disclosure so as to afford the Party owning the Confidential Information an opportunity to seek prevention of its disclosure. The parties hereto

agree to keep Confidential Information confidential and to continue to be bound by the terms and conditions of any Confidentiality Agreement then in place between the Parties.

    **1.7 "Affiliate"** shall mean any other entity (a) that directly or indirectly controls, is under common control with, or is controlled by one of the Parties or (b) is at least 50% beneficially owned by one of the Parties. As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, (whether through ownership of securities or partnership or other ownership interests, by contract, or otherwise).

## ARTICLE II
## GENERAL APPOINTMENT

    **2.1 Appointment.** The Company hereby appoints the Distributor as its exclusive, distributor for the sale, purchase and resale of the Products in the Territory subject to the terms and conditions of this Agreement. The Distributor accepts the appointment and agrees to purchase the Products from the Company under the terms and conditions of this Agreement and according to specific future Product contracts as may be agreed between the parties on a case-by-case basis.

    **2.2 Relationship of the Parties.** The relationship between the Company and the Distributor is that of independent contractor and not that of employer-employee or principal-agent. The Distributor shall not be the agent or legal representative of the Company, nor shall the Company be the agent or legal representative of the Distributor. Neither the Company nor the Distributor shall have the right, power, or authority to assume or undertake any obligation whatsoever or make any representation on behalf of the other unless authorized to do so in writing.

## ARTICLE III
## GENERAL TERMS OF DISTRIBUTORSHIP

    **3.1 Best Efforts.** the Distributor agrees to use its best efforts to promote the sale of, and to solicit and secure orders for, the Products in the Territory and, subject to the provisions of Section 4.4 below, to purchase the Products from the Company. The Company agrees to sell the

**A-090**

Products to the Distributor as the Company's -exclusive distributor of the Products in the Territory.

**3.2 Promotion and Advertising.** The company shall, at its own expense, supply the Distributor with up-to-date samples, Shared Know-How and technical data, promotional material, and service information as appropriate in order for the Distributor to conduct laboratory and market tests and to promote and develop sales of the Products. The Distributor agrees not to use any such provided material, including Share Know-How, for any purpose other than in furtherance of its obligations and undertakings as set forth in this Agreement.

**3.3 Compliance.** The Company shall, at its own expense, provide the Distributor with all relevant technical information known to the Company as a result of industry standard due diligence and necessary to comply with all statutes, rules and regulations relating to the sale of the Products in the Territory.

**3.4 Promotion and Publicity.** (a) All promotions and advertising of the Products shall be formulated and implemented by the Distributor at its own cost. The Distributor agrees to consult with the Company before implementing any such promotion or advertising campaign and to make any reasonable changes suggested by the Company, provided that the Company agrees to share the costs of any such revisions. All such promotional material shall be accurate and shall be consistent with promotional material used by the Company in its own advertising and promotional campaigns. The Company shall provide the Distributor with its publicity and promotional material with respect to the Products, which the Distributor shall use its best efforts to include in its promotions and advertising; provided, however, that such material shall not be changed in any material respect without the prior written consent of the Company. The Distributor will not materially alter the packaging of the Products without the prior consent of the Company, and each party will cause the labeling of Products sold hereunder to comply with all applicable regulations governing such labeling from time to time; provided, however, the Distributor may add any labeling that it determines is required under applicable law, or otherwise necessary to meet legal or customer requirements.

(b) The Company shall use its best efforts to provide the Distributor and/or its customers with all such information, and technical assistance with respect to the application of the Products as they reasonably request.

**3.5 Non-Infringement.** The Distributor shall not advertise, promote, or sell any Product which infringes any Patent, Trademark, or copyright, or which violates any trade secret of the Company. The provisions of clause 3.5 shall not apply until such time as the Distributor has knowledge, or reasonably should have knowledge, that a Patent, Trademark, copyright, or trade secret is being violated in the manufacture or use of a particular Product.

## ARTICLE IV
## PRICE, PAYMENT AND DELIVERY TERMS

**4.1 General Terms.** The Company agrees to sell the Products to the Distributor and the Distributor agrees to purchase the Products from the Company on the terms and conditions set forth in this Agreement.

**4.2 Price.** The Distributor shall purchase the Products for its own account from the Company at the prices in effect, as reflected in Exhibit A at the time the Company chooses to accept the Distributor's order. Initial prices for the Products are listed in Exhibit A. Prices may be changed at any time by the Company on ninety (90) days' prior written notice to the Distributor. Exhibit A may be revised as necessary to reflect the implementation of mutually agreed upon price changes and addition of or changes to the Products. All pricing is required to provide the Distributor at least a ten percent (10%) markup.

**4.3 Payment.** Invoices for sales of Products hereunder shall be prepared by the Company and presented to the Distributor at the time of shipment. The Distributor shall pay each invoice in U.S. dollars within thirty (30) days after receipt of the Products by (i) the Distributor, or (ii) its warehouse, or (iii) its customer, whichever occurs first.

**4.4 Placement of Orders and Shipping.** The Company shall ship the Products within thirty (30) days of receipt of written orders therefore from the Distributor. If the Company is

**A-092**

unable to ship within such period, it will promptly notify the Distributor of the Company's anticipated shipping date.

    **4.5 Delivery.** Delivery of the Products to the Distributor shall be FOB the Distributor's warehouse, transportation prepaid by the Company. Title to and risk of loss of Products shall pass from the Company to the Distributor upon delivery to the Distributor, its warehouse or its customer, whichever occurs first.

    **4.6 Product Modification.** Any modification in chemical components, raw materials, manufacturing sources, manufacturing locations, manufacturing facilities, and/or processes must be reported to and reasonably agreed to by the Distributor prior to implementation. Any changes to the specification of any Product must be notified to the Distributor and reasonably agreed to by the Distributor before any dispatch of any modified Product and a new specification and safety data sheet must be drafted for any such modified Product. All raw materials and/or supplies shall in all material respects be chemically consistent, both in nature and concentration, with the original raw materials and/or supplies used in the Products. All raw materials and/or supplies shall in all material respects meet the original specifications therein.

**ARTICLE V**

**WARRANTIES, INDEMNIFICATION AND RETURNS**

    **5.1 Warranty.** the Company warrants to the Distributor that the Products sold to the Distributor under this Agreement (including all replacement or modified Products) shall be fit and sufficient for the purpose intended, merchantable, of good material and workmanship, free from defect, and in accordance with the Company's specifications shown in Exhibit C. The Distributor shall notify the Company in writing of any claims of defect or non-conformity noticeable upon ordinary inspection within two (2) months or the applicable statute of limitation, whichever is shorter, after a customer's receipt of the Product. The Distributor shall notify the Company in writing of any hidden defect or non-conformity with the specification shown on Exhibit C within two (2) months or the applicable statute of limitation, whichever is shorter, after the Distributor or the customer becomes aware of the hidden defect or non-conformity, but in any event within the statute of limitations for such claims. If the Company does receive timely notice, the Company shall arrange for and bear the cost of shipping the defective Product back to

the Company and upon receipt of the Product and upon reasonable confirmation of the existence of such defect or non-conformity, shall, at its election either deliver at its own expense a replacement product to the Distributor or return to the Distributor the purchase price thereof. All costs of disposal of non-conforming or defective Products shall be borne by the Company, provided the Company is notified of such defect or non-conformity within the time periods set forth in this paragraph 5.1.

**THE FOREGOING WARRANTIES ARE THE ONLY WARRANTIES PROVIDED BY THE COMPANY WITH RESPECT TO THE PRODUCTS SOLD BY THE COMPANY TO THE DISTRIBUTOR. THE PROVISIONS OF THE UCC DEALING WITH WARRANTIES ARE EXPRESSLY DISCLAIMED.**

**5.2 Indemnification.** (a) The Company hereby agrees to indemnify the Distributor and hold it harmless from and against all claims, suits, damages, judgments, losses, amounts paid in settlement thereof, and all costs and expenses (including reasonable attorneys' fees and expenses) based upon, relating to, or arising out of (i) non-compliance by the Company with its obligations hereunder or a material breach of any provision herein; (ii) the Company's negligence or willful misconduct; (iii) any personal injury, property damage or product liability claim or third-party claim; and/or (iv) a claim of any Intellectual Property infringement, including, but not limited to Trademark, Patent or Copyright infringement brought against the Distributor based upon the Distributor's promotion or sales of the Product or any other requirements of this Agreement.

(b) Notwithstanding the provisions of paragraph 5.2, the Company shall not be responsible for those damages, claims, or losses which the Distributor or third parties may suffer which are a direct result of modifications to the Product or Trademark without the Company's written consent.

(c) The Distributor hereby agrees to indemnify the Company and hold it harmless from and against all claims, suits, damages, judgments, losses, amounts paid in settlement thereof, and all costs and expenses (including reasonable attorneys' fees and expenses) based upon, relating to, or arising out of (i) non-compliance by the Distributor with its obligations hereunder or breach of any provision herein; (ii) the Distributor's negligence or willful misconduct; (iii) any personal injury, property damage or product liability claim and/or (iv) any third-party claim caused

A-094

directly as a result of modifications to the Products by the Distributor or its employees or agents.

**5.3 Customer Returns.** It is the policy of the Distributor to accept the return of any product sold to its customers. The Distributor therefore expects its suppliers to cooperate with the Distributor to effect customer returns quickly, efficiently and safely. Attached hereto as Exhibit D is the Distributor's Customer Return Goods Policy (the "Return Policy"). The Company agrees to cooperate with the Distributor on customer returns of the Product in accordance with the Return Policy.

## ARTICLE VI
## TRADEMARK, TRADE NAMES, PATENTS, KNOW-HOW

**6.1 Ownership; No Infringement.** Except as provided in the schedule attached as Exhibit E, the Company represents and warrants to the Distributor that the Trademarks, Trade Names, and Patents are owned by the Company or an Affiliate free and clear of all liens, encumbrances, or claims; that the Company is free to make use of the Trademarks, Trade Names, and Patents; and that the Company knows of no (a) infringement thereof by others, or (b) infringement (or claims of infringement) by the Company of any of the trademarks, trade names, patents, or the intellectual property rights of others.

**6.2 Use of Trademarks and Trade Names.** In connection with the Distributor's appointment as the Company's distributor, the Company and/or its Affiliates grant to the Distributor an exclusive, non-transferable right, without the right to sublicense, to use the Trademarks in the Territory for the limited purpose of marketing and selling the Products. The Distributor may place the Trademarks and Trade Names on its stationery, catalogues, promotional literature, advertising material and signs, but only in connection with the promotion and sale of the Products in the Territory. Any other use of the Trademarks and Trade Names by the Distributor shall be subject to prior written approval by the Company, except that the Distributor may be identified as the distributor of the Products on all labels and promotional materials without any such prior approval. The Distributor agrees to submit samples of proposed marketing materials or trademark usage to the Company for its review and approval, such

approval not to be unreasonably withheld. Any actual usage of such Trademarks in marketing materials, labeling, and otherwise will be consistent with the samples received by the Company. Subject to the foregoing, the Distributor further agrees:

(a) Not to remove the Trademarks or Trade Names from the Products or packages containing the Products;

(b) Not to alter the Trademarks or Trade Names in any way;

(c) Not to apply any Trademarks or Trade Names or any labels, signs or markings of any kind other than additional labeling required by customers or governmental or regulatory authorities to the Products or use the same in connection with the Products, without prior written approval of the Company;

(d) To employ any symbol or notice with the Trademark which may be necessary to identify and protect the interests of the Company in the Trademark;

(e) Not to register or record as a trademark or domain name, or cause to be registered or recorded as a trademark or domain name, any the Company Trademark or Trade Name, in any country;

(f) That any and all goodwill created in any Trademark or Trade Name of the Company belongs to, and is the property of, the Company in every country; and

(g) Indicate that the Trademarks and Trade Names are owned by the Company or its Affiliates as applicable.

**6.3 Infringement.** Should the Distributor discover any infringement of any of the Company's Trademarks, Trade Names, Patents, Copyrights or Trade Secrets, or should the Distributor become aware of any claims of infringement relating thereto, the Distributor shall promptly notify the Company, and the Company shall decide, in its sole discretion, whether to take any action.

## ARTICLE VII
## TERM AND TERMINATION

**7.1 Term; Termination by Either Party.** This Agreement shall commence on the date hereof and terminate six (6) months after either party gives written notice of termination to the other at any time, with or without cause. This Agreement may also be terminated by an aggrieved party immediately upon written notice to the other ("Defaulting Party") in the event that the Defaulting Party:

(a) commits a breach or default under this Agreement, which breach or default is not remedied within thirty (30) days after written notice of the facts surrounding such breach is delivered to the Defaulting Party; or

(b) is unable to meet its debts as they fall due or enters into liquidation or dissolution or becomes bankrupt or insolvent, or if a trustee or receiver is appointed for such party, whether by voluntary act or otherwise, or if any proceeding is instituted by or against such party under the provisions of any bankruptcy act or amendment thereto which results in the entry of any order for relief against it which is not stayed or remains active for a period of sixty (60) days, or if it enters into a voluntary arrangement with its creditors.

**7.2 Cessation of Deliveries.** Upon termination of this Agreement, the Company may restrict or stop deliveries of the Products to the Distributor, other than deliveries on orders already received at the time of the notice of termination; provided, however, that in the event of termination without cause by the Company pursuant to the first sentence of Section 7.1 above, the Company shall make the Products available to the Distributor in order to enable the Distributor to maintain its normal delivery commitments to third parties for up to six (6) months after termination, provided the Distributor so requests within forty-five (45) days of notice of termination and provided further that at all times during the post-termination period the Distributor is current on its uncontested payment obligations to the Company.

**7.3 Disposition of Inventory Upon Termination.** Upon termination of this Agreement, except to the extent otherwise required for continued deliveries pursuant to Section 7.2 above, (a) all of the Distributor's rights with respect to the Trademarks, Trade Names, Shared Know-How, Confidential Information and Patents shall immediately cease, (b) provided the termination is not

**A-097**

based on the Distributor's default, the Company shall i) purchase from the Distributor all advertising and printed matter relating to the Products, and ii) shall repurchase all of the Distributor's inventory of Products. The cost for said advertising, printed matter and inventory shall be the price originally paid by the Distributor including any freight, insurance during shipping, sales tax and import duties.

**7.4 Limitation of Damages.** If either party hereto shall terminate this Agreement in accordance with its terms, the non-terminating party shall have no claim or cause of action by reason of such termination, whether for loss of anticipated profits, loss of good will, or otherwise.

**ARTICLE VIII**
**MISCELLANEOUS PROVISIONS**

**8.1 Entire Agreement.** This Agreement (including Exhibits A through E attached hereto and incorporated herein) constitutes the entire agreement between the parties relating to the distribution of Products in the Territory; it supersedes all prior agreements and understandings between the parties relating to that subject, either oral or written, all of which are hereby expressly terminated; and this Agreement cannot be modified, except in a writing signed by both parties hereto.

**ALL PURCHASE ORDERS AND ACKNOWLEDGMENTS THAT MAY BE USED BY THE PARTIES HERETO TO ORDER OR ACKNOWLEDGE ORDERS FOR PRODUCTS HEREUNDER SHALL BE FOR RECORD PURPOSES ONLY. IN THE EVENT OF ANY DISCREPANCY OR CONFLICT BETWEEN THE TERMS THEREOF AND OF THIS AGREEMENT, THE TERMS OF THIS AGREEMENT SHALL PREVAIL.**

**8.2 Assignment.** This Agreement may not be assigned by either party without the prior written consent of the other party hereto, except that either party may assign this Agreement to a wholly-owned subsidiary or Affiliate without first obtaining the written consent of the other party.

**8.3 No Waiver of Terms.** Neither the failure of either party hereto to require the performance of any term of this Agreement, nor the waiver by either party of any breach under

**A-098**

this Agreement, shall prevent a subsequent enforcement of any such term or be deemed a waiver of any subsequent breach.

**8.4 Headings.** The headings set forth herein are for convenience of reference only and shall not be considered to limit or amplify the terms and provisions hereof, nor shall they be examined or referred to in construing or interpreting this Agreement.

**8.5 Severability.** In the event any one or more of the agreements, provisions or terms contained herein shall be declared invalid, illegal, or unenforceable in any respect, such agreement, provision, or term shall be enforced to the extent permitted by law and the validity of the remaining agreements, provisions, or terms contained herein shall be in no way affected, prejudiced, or disturbed thereby.

**8.6 Force Majeure.** Neither of the parties hereto shall be responsible for or liable to the other party for any damage or loss of any kind, directly or indirectly, resulting from fire, flood, explosion, riot, rebellion, revolution, war, pandemic, labor trouble (whether or not the fault of either party hereto), requirements or acts of any government or subdivision thereof, or any other similar cause beyond the reasonable control of the party. The occurrence and the termination of any such event shall be promptly communicated to the other party.  If after sixty (60) days, Force Majeure events cause default of obligations hereunder by a party, the non-defaulting party may immediately terminate after providing the defaulting party with notice.

**8.7 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflict of law principles of such Commonwealth.

**8.8 Arbitration.** Any and all claims, disputes, controversies, or differences arising out of or in connection with this Agreement, which cannot be settled satisfactorily by means of negotiation between the parties, shall be submitted to arbitration in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association; provided, however, that this clause shall not be construed to preclude either party from bringing any action in any court of competent jurisdiction for injunctive or provisional relief, as necessary or appropriate. The arbitration proceeding shall take place in Philadelphia. The parties shall, in accordance with the Rules, appoint a mutually-agreed-upon arbitrator. The decision of such

arbitrator shall be final and binding upon the parties; judgment thereon may be entered in any court having jurisdiction or application may be made to such court for judicial acceptance of the award or order of enforcement.

**8.9 Notices.** All notices, requests, demands, and other communications made hereunder shall be in writing and shall be deemed duly given on the date of receipt if delivered electronically or in person, or five days after mailing if sent by mail, postage prepaid, to the addresses set forth below or to such other address or person as either party may designate by notice to the other party hereunder:

If to the Distributor, to:

> Visual Semiconductor, Inc.
> 1105 William Penn Drive
> Bensalem, PA 19020
> Attention: President

If to Company, to:

> Stream TV Networks, Inc.
> 2009 Chestnut Street
> Third Floor
> Philadelphia, PA 19103
> Attention: CEO

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK –*
*SIGNATURE PAGE FOLLOWS]*

**A-100**

**8.10 Counterparts.** This Agreement may be executed in separate counterparts with the same effect as if both parties had executed the same document. All such counterparts shall be construed together and shall constitute one agreement.

**IN WITNESS WHEREOF,** the parties have caused the due execution of this Agreement on the day first above written.

**VISUAL SEMICONDUCTOR, INC.**

By:  Joseph Corso

Title:  Under Limited Power of
Attorney Dated November 30, 2022

**STREAM TV NETWORKS, INC.**

By: Mathu Rajan

Title: President and CEO

**EXHIBIT A**

**PRODUCTS**

Descriptions of specific Products shall be detailed in an amended Exhibit A as available:

1. BONDED OPTICS – consisting of a video panel, a 3D lens, optical glue, and other elements for use in manufacturing glasses-free 3D phones, mobile gaming devices, tablet computers, laptop computers, computer monitors, televisions, large screen monitors, and other devices.

2. 3D COMPUTER CHIPS – for glasses-free 3D rendering and conversion of content from 2D to glasses-free 3D for use in manufacturing glasses-free 3D phones, mobile gaming devices, tablet computers, laptop computers, computer monitors, televisions, large screen monitors, and other devices.

**EXHIBIT B**

**TERRITORY**

Regarding that certain Distribution Agreement between Company and Distributor, the Territory shall be defined as:

Worldwide

**EXHIBIT C**

**SPECIFICATIONS**

Regarding that certain Distribution Agreement between Company and Distributor, the Product Specifications shall be defined as:

1. Bonded Optics – specifications TBD

2. 3D Computer Chips – specifications TBD

## EXHIBIT D

### DISTRIBUTOR'S CUSTOMER RETURN GOODS POLICY

TBD

**EXHIBIT E**

**EXCEPTIONS PURSUANT TO SECTION 6.1**

TBD

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 23-10763 (MDC) |
| STREAM TV NETWORKS, INC. and TECHNOVATIVE MEDIA, INC.,<br><br>        Plaintiffs,<br>    v.<br><br>SHADRON L. STASTNEY, SLS HOLDINGS VI, LLC, HAWK INVESTMENT HOLDINGS LIMITED, ARTHUR LEONARD ROBERT "BOB" MORTON, SEECUBIC, INC., ALASTAIR CRAWFORD, KRZYSZTOF KABACINSKI, KEVIN GOLLOP, ASAF GOLA, JOHN DOE(S), JANE DOE(S), DELAWARE and OTHER LAW FIRMS representing and acting in concert with John Doe(s) and/or Jane Doe(s), INVESTMENT BANKS employed by John Doe(s) and/or Jane Doe(s), PATRIC THEUNE, and SEECUBIC B.V.,<br><br>        Defendants. | Adv. Case No. 23-00057 (MDC) |

# O R D E R

**AND NOW**, on August 12, 2023, Stream TV Networks, Inc. ("Stream") and

Technovative Media, Inc. ("Technovative," and together with Stream, the "Debtors" or the

"Plaintiffs") initiated the above-captioned adversary proceeding (the "Adversary Proceeding").[1]

---

[1] Adv. Pro. Docket No. 1.

**EXHIBIT C**

AND, on September 30, 2023, Debtors filed an *Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction* [sic] (the "TRO Motion"), seeking an order enjoining certain actions by the Defendants. [2]

AND, the Court held evidentiary hearings on the TRO Motion over a four-day period on October 6, 2023; October 16, 2023; October 30, 2023, and November 27, 2023 (the "TRO Hearing").

AND, upon conclusion of the November 27, 2023 hearing, the Court directed the parties to confer and advise the Court regarding their mutual availability for dates in December to conclude the TRO Hearing.

AND, on December 8, 2023, the parties informed the Court they agreed to postpone continuation of the hearing on the TRO, *inter alia*, until late January or early February to permit settlement negotiations between the parties .

AND, on December 14, 2023, the Court held a status hearing (the "TRO Status Hearing"), at which time the Court ruled that, in light of the parties' agreement to  continue the hearing on the TRO  for approximately two months, and based on the evidence presented at the TRO Hearing, to date, the issuance of a Temporary Restraining Order (the "TRO"), limited in scope, was necessary pending the conclusion of a final hearing on the TRO (the "Final Hearing").

AND, the Court directed the parties to prepare and submit an agreed form of order consistent with the Court's ruling at the TRO Status Hearing (the "Proposed Order").

AND, as of the date of entry of this Order, the parties have been unable to agree upon the terms of a Proposed Order, thus necessitating the Court to prepare an Order consistent with its

---

[2] Adv. Pro. Docket No. 27; Adv. Pro Docket No. 28.

**A-108**

ruling at the TRO Status Hearing.

It is hereby **ORDERED** and **DETERMINED** that:

1.     The TRO Motion is **GRANTED** as set forth herein.

2.     The factors considered in granting a motion a for a temporary restraining order or
preliminary injunction are the same: (1) whether irreparable harm is likely to occur if the
injunction is not granted; (2) likelihood of success on the merits; (3) the balance of harms
between parties to the litigation if an injunction is issued or if one is not; and (4) the public
interest. *See Osorio-Martinez v. Attorney Gen.*, 893 F.3d 153, 178 (3d Cir. 2018).  Temporary
restraining orders "typically remain in effect for a maximum of 28 days and cannot extend
indefinitely.  A preliminary injunction, on the other hand, is effective until a decision has been
reached on the merits." *See Corp. Synergies Grp., LLC v. Andrews*, 775 F. App'x 54, 58 n. 5 (3d
Cir. 2019).

3.     As stated at the TRO Status Hearing, in light of the continuation to the Final
Hearing, and the evidence presented to date at the TRO Hearing, the Court finds that based upon
the following, the issuance of a TRO is warranted:

a.     On October 16, 2023, a copy of the SeeCubic, Inc. website was entered
into evidence. The website featured not only SeeCubic B.V. office and contact information, but
also SeeCubic B.V. employees (Sheeba Rajesh, Dr. Bart Barenburg, Andy James, Bram
Riemens, and Patrick Theune), whose pictures and biographies were prominently displayed as
being the leadership team of SeeCubic, Inc.[3] Subsequent testimony on October 30, 2023,
established that the website included inaccurate information regarding (1) fundraising, stating
that over $170 million had been raised solely by SeeCubic, Inc., where such funds had allegedly

---

[3] Debtor's Exhibit 42; October 16, 2023, Hearing Transcript, 197:12 to 201:13; 202:24 to 205:14.

**A-109**

been raised by Stream TV; (2) endorsements obtained by Stream TV and not SeeCubic, Inc.

from various news organizations including Fox Business, Huffington Post, and AVS Forum; and

(3) the development and ownership of theUltra-D technology, which the Debtors allege is owned

by Stream's estate, and not SeeCubic, Inc.[4]

        b.      On November 27, 2023, Mr. Christopher Michaels, Chief Financial

Officer of Rembrandt 3d Holdings Ltd. ("Rembrandt") testified that he had conducted an

investigation into whether Stream's intellectual property assets had been transferred from Stream

to SeeCubic, Inc. Mr. Michaels testified that during his investigation, he discovered an

application, dated October 18, 2023, filed with the United States Patent and Trademark Office

(the "USPTO") and signed by Shadron Stastney, Chief Executive Officer of SeeCubic, Inc., to

register "SeeCubic" as a trademark. Hefurther testified that Stream held a trademark for

"SeeCube" since 2018.[5]

        c.      Although there was conflicting testimony at the TRO Hearing regarding

whether Mr. Stastney and/or SeeCubic, Inc. intended to sublicense or otherwise transfer the

rights under technology licenses held by Stream and/or Stream subsidiaries, including licenses

from Koninklijke Philips Electronics ("Philips") and/or Rembrandt, as noted by the Court at the

TRO Status Hearing, that testimony is sufficient to cause the Court concern that such activity, to

the extent contemplated or intended, could involve property of a debtor's estate and needed to be

enjoined pending the Final Hearing.

        4.      Although the hearing on the TRO is not yet complete, the Court finds that, given

the evidence presented to date and pending the Final Hearing, the Debtors have established the

existence of the four factors necessary for the issuance of a TRO.

---

[4] October 30, 2023, Hearing Transcript, 219:18 to 226:2; October 30, 2023 Hearing Transcript, 218:14 to 219:13.
[5] November 27, 2023 Hearing Transcript, 52:13 to 57:18; 79:16 to 83:17.

**A-110**

5.      With respect to the first factor, a likelihood of success does not require a "more-likely-than-not showing of success of merits, but does require the plaintiff to demonstrate that it can win on the merits, which involves a showing that its chances of establishing each of the elements of the claim are significantly better than negligible." *See Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021).  Given that relatively low threshold in the context of whether a temporary restraining order should issue, the evidence presented to date, as outlined above, support a finding that the Debtor's chances of success are significantly better than negligible.

6.      Second, the Debtors have shown that there is risk of immediate irreparable injury to Stream's alleged intellectual property in the form of possible permanent loss of Stream's rights in the Philips and Rembrandt licenses, confusion in the marketplace regarding Ultra-D technology, the role of SeeCubic, Inc. in developing the technology, and the registration of the "SeeCubic" trademark in potential violation of Stream's rights with respect to the "Seecube" trademark.

7.      Third, weighing the balance of equities, the Court has not, to date, been presented with evidence that the Defendants would be severely prejudiced by the issuance of a TRO pending the Final Hearing.[6] *See Opticians. Ass'n of Am v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (finding that balancing aims "to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the [copyright] owner").

8.      Finally, with respect to whether the issuance of a TRO in this instance serves the public interest, it is well-established that the sanctity of intellectual property rights warrants the issuance of injunctive relief where necessary to protect such rights.  *See, e.g., Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992).

---

[6] The Court notes that Mr. Stastney testified that the Defendants do not intend to transfer or permit the use of the sublicense at issue, which would negate a claim of severe prejudice.

**A-111**

9. Having found that the factors relevant to the issuance of a TRO have been met to date, the Court will enjoin the Defendants as follows:

a. No Defendant shall, prior to the conclusion of the Final Hearing, take any action to sublicense, transfer, assign, or otherwise dispose of or affect any license or technology held or purported to be held by the Debtors' estates, including but not limited to the Ultra- D technology, and the Philips or Rembrandt licenses.

b. SeeCubic, Inc. and Mr. Stastney, or any other person or party acting on either or both of their behalves, shall not on any website or in any external or publicly disseminated form of communication:

i. Identify SeeCubic B.V. employees as SeeCubic, Inc. employees;

ii. Describe, reference, display or portray the technology, or any improvements thereon, or make any representations with respect to ownership or development of such technology, purported to be owned and/or developed by Stream and/or its subsidiaries;

iii. Describe or reference capital raised by the Debtors, endorsements garnered by the Debtors, or any other information that inaccurately portrays SeeCubic, Inc. as having developed the Ultra-D technology from its inception.

c. SeeCubic, Inc. and Mr. Stastney, or any other person or party acting on either or both of their behalves, shall cease all activities with respect to applying for or receipt of a trademark from the USPTO for the "SeeCubic" mark, pending the conclusion of the Final Hearing.

10. The Final Hearing shall be held on February 2, 2024, at 10:30 a.m. (ET) in Bankruptcy Courtroom No. 2, U.S. Bankruptcy Court, 900 Market Street, Philadelphia, PA.

Dated:  January 4, 2024

_____
MAGDELINE D. COLEMAN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**A-113**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc., *et al.*** | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | **(Jointly Administered)[1]** |
| **Debtors.** | : | |
| | : | |

## MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER: (I) GRANTING EXPEDITED CONSIDERATION, SHORTENED TIME AND LIMITED NOTICE; (II) QUASHING SUBPOENA; (III) ENTERING A PROTECTIVE ORDER; AND (IV) GRANTING RELATED RELIEF

William A. Homony, in his capacity as Chapter 11 trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative" or when referred to in conjunction with Stream, the "Debtors"), by and through his counsel, files this Motion for Entry of an Order: (i) Granting Expedited Consideration, Shortened Time and Limited Notice; (ii) Quashing Subpoena; (iii) Entering a Protective Order; and (iv) Granting Related Relief (the "Motion"), and in support thereof, respectfully avers as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) as this matter arises in, under, and is related to a bankruptcy case.

2.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory and legal bases for the relief requested in this Motion are section 105(a) of the Federal Bankruptcy Code (the "Bankruptcy Code"); Federal Rules of Bankruptcy

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

**A-114**

Procedure (the "Bankruptcy Rules") 7026 and 9016; Federal Rules of Civil Procedure (the "Federal Rules") 26 and 45; Federal Rules of Evidence 501 and 1101, and applicable state law.

## II.   **BACKGROUND**

4.      On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

5.      On April 6, 2023, Hawk Investment Holdings, Ltd. ("Hawk"), a secured creditor of the Debtors, filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeking dismissal or conversion of the Debtors' cases, or, alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "1112/1104 Motion") (D.I. #94).

6.      On January 5, 2024, the Court entered a memorandum and order, which, among other things, granted the 1112/1104 Motion with respect to the appointment of a Chapter 11 trustee (the "Trustee Order" and "Trustee Memorandum") (D.I. #549 and #548, respectively).

7.      On January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the Chapter 11 trustee as well as an Application for the entry of an Order approving the appointment of the Trustee (D.I. #554 and #553, respectively), and, on January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee (D.I. #558).

8.      On May 6, 2024, the Trustee filed a motion pursuant to section 9019(a) of the Bankruptcy Code (the "9019 Motion") seeking approval of a settlement agreement with Hawk as collateral agent for itself and other secured creditors (D.I. #360).

9.      This Court, having made its own exhaustive review of the myriad of filings in the bankruptcy case, in the Delaware Court of Chancery, and in the Delaware Supreme Court, and having heard the testimony of the Trustee and examined his compliance with the *Martin* factors,

**A-115**

approved the 9019 Motion (D.I. # 653) (the "9019 Approval Order").

10.    On May 30, 2024, the Trustee filed a Motion for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property (the "Stay Violation Motion") from Visual Semiconductor, Inc. ("VSI") (D.I. #646).

11.    On June 18, 2024, VSI filed an objection to the Stay Violation Motion (the "Objection") (D.I. # 678).

12.    The Stay Violation Motion is a contested matter Federal Rule of Bankruptcy Procedure 9014, to which the rules for adversary proceedings apply.

13.    On June 20, 2024, VSI filed a Motion to Reconsider the entry of the 9019 Approval Oder (D.I. # 686) (the "Motion to Reconsider") but did not file or serve a notice of the Motion to Reconsider until July 10, 2024 (D.I. # 703).

14.    On July 5, 2024, the Trustee filed opposition to the Motion to Reconsider (D.I. # 700).

15.    On July 22, 2024, VSI purported to serve, by e-mail, an unsigned Subpoena Duces Tecum for Rule 2004 Examination with no return date in connection with the Stay Violation Motion and the Motion to Reconsider.

16.    Counsel to the Trustee met and conferred with counsel to VSI and informed counsel to VSI that a Rule 2004 examination is not appropriate in connection with a contested matter.

17.    On July 26, 2024, VSI filed a Notice of Oral Deposition Subpoena Duces Tecum for the Trustee, seeking the deposition of the Trustee on August 9, 2024, and the production of certain documents relating to the 9019 Motion, the Settlement with Hawk, and Stay Violation Motion (D.I. #712).

**A-116**

18.     On August 14, 2024, the Trustee filed an Application to Employ SSG Advisors, LLC ("SSG") as an Investment Banker to the Trustee (the "Application to Employ SSG") (D.I. #715).

19.     Thereafter, on August 24, 2024, VSI filed an Amended Notice of Oral Deposition Subpoena Duces Tecum for the Trustee, seeking the deposition of the Trustee on September 3, 2024, and the production of certain documents relating to the 9019 Motion, the Settlement with Hawk, the Stay Violation Motion, and the Application to Employ SSG (the "Subpoena") (D.I. #718).

20.     VSI's efforts to date, including the various discovery requests, are indicative of its ultimate goal – to delay the Debtors' Chapter 11 cases and prevent the sale of the Debtors' assets to anyone other than VSI.

21.     The Trustee now seeks to withdraw, without prejudice, the Stay Violation Motion, which will render the majority of information sought by the Subpoena irrelevant and outside the scope of discovery.

22.     Pursuant to Bankruptcy Rule 7041 made applicable to the Stay Violation Motion by Bankruptcy Rule 9014, counsel to the Trustee requested VSI's consent to withdraw the Stay Violation Motion without prejudice, which request was denied by counsel to VSI.

23.     Additionally, to address VSI's questions with respect to the Application to Employ SSG, who has retained its own counsel, the Trustee has offered to make a representative of SSG available to VSI for a deposition.

24.     To the extent the Subpoena seeks information and documents concerning the settlement with Hawk and the 9019 Motion, that information and those documents are irrelevant to the only ground cited in Motion to Reconsider; that two (2) alleged misstatements were made

4

**A-117**

on the record which VSI states, in conclusory fashion, constitutes new evidence and should be grounds for reconsideration.

25.     As such, the Subpoena must be quashed as it was improperly issued[2], falls well outside the scope of Rules 26, is overbroad, is intended to harass and delay, is burdensome, and seeks the production of documents that are irrelevant to the pending motions and outside the scope of discovery.

26.     Further, because the information the Subpoena seeks is irrelevant and the Subpoena is only intended to harass and delay, good cause exists to issue a protective order pursuant to Federal Rule of Civil Procedure 26(c) to prevent the Trustee from having to comply with the Subpoena and appear for a deposition on September 3, 2024.

27.     To the extent that the Bankruptcy Court finds that the Subpoena and/or Notices of Deposition are relevant on some level, counsel to the Trustee is not available on September 3, 2024, and request a new date convenient to all parties for the Trustee's deposition in connection with the Application to Employ SSG.

## III.   **RELIEF REQUESTED**

### A.     **The Subpoena Must be Quashed as It Seeks Discovery Outside the Scope of Rules 26 and 45**.

28.     Pursuant to Federal Rule of Civil Procedure 45, as made applicable by Bankruptcy Rule 9016, a subpoenaed party may seek to quash a subpoena. Fed. R. Civ. P. 45; *New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc.*, No. 98–775, 2000 WL 62315, at *4 (E.D. Pa. Jan. 13, 2000).

29.     Parties may also move to quash subpoenas to challenge the "relevance of the information sought" by the subpoenas. *ExteNet Sys., Inc. v. Twp. of N. Bergen*, No. CV2015098MCAMAH, 2021 WL 5782977, at *2 (D.N.J. Dec. 7, 2021).

---

[2] Discovery sought from a party in a contested matter must be sought by proceeding under the discovery rules.

30.     Federal Rule of Civil Procedure 26(b), as made applicable by Bankruptcy Rule 7026, limits the scope of discovery.

31.     Rule 26 specifically provides that:

**Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defenses and proportional to the need of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.**

Fed. R. Civ. P. 26(b)(1).

32.     Under Federal Rule 45(d)(3), the subpoenaing party must demonstrate that it seeks "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *Saller v. QVC, Inc.*, Civil Action No. 15-2279, *6-9 (E.D. Pa. Jun. 24, 2016).

33.     The Subpoena fails to meet every one of the parts outlined in Rule 26, made applicable to contested matters by Bankruptcy Rule 7026.

34.     VSI has not and cannot show that the production of the documents and/or testimony requested by the Subpoena is relevant to any claims or defenses.

35.     Indeed, the majority of topics and documents the Subpoena covers relate directly to the Stay Violation Motion, which the Trustee seeks to withdraw without prejudice.

36.     Due to the Trustee's intent to withdraw the Stay Violation Motion, the majority of the information sought by the Subpoena is no longer relevant and outside the scope of discovery.

37.     This is true for both the Trustee's deposition and the documents sought.

**A-119**

38.     Further, to the extent the Subpoena seeks information and documents concerning the settlement with Hawk and the 9019 Motion, that information and those documents are irrelevant and beyond the scope of discovery as the Court approved the 9019 Motion and the Settlement with Hawk when it entered the 9019 Approval Order.

39.     Courts have found blanket requests to a non-party for "all documents and communications referring or relating to" a particular subject to be impermissibly broad, as opposed to requests for specific categories of documents. *Saller v. QVC, Inc.* at *10-*11.

40.     Here, the Subpoena repeatedly seeks "All documents and communications" on various subjects without limitation; such demands are inherently overbroad.

41.     VSI seeks to go on a fishing expedition through the Trustee's documents and communications without any limitation.

42.     Such a voluminous production will undoubtedly contain thousands of irrelevant documents, which VSI is well aware of.

43.     Moreover, with respect to the information VSI seeks concerning SSG, the Trustee has repeatedly stated that it will make a representative of SSG available to be deposed by VSI.

44.     Nevertheless, VSI remains intent on seeking such information from the Trustee to make the process as burdensome as possible.

45.     To the extent VSI seeks information from or concerning SSG, the proper course of action would be for VSI to seek such information from SSG directly – an option it has been offered.

46.     Clearly, VSI's goal with the Subpoena is to be allowed to dig through irrelevant documents of the Trustee in an effort to harass and preoccupy the Trustee and ultimately further delay the Debtors' Chapter 11 proceedings and the sale of the Debtors' assets.

**A-120**

47.    Therefore, the Subpoena must be quashed as it falls well outside the scope of Rules 26 and 45, is overbroad, is intended to harass and delay, is burdensome, and seeks the production of documents that are irrelevant and outside the scope of discovery.

**B.    A Protective Order Must be Issued to Prevent the Trustee from Having to Comply with the Subpoena.**

48.    Additionally, the Trustee asks that the Court issue a protective order to prevent him from having to comply with the Subpoena and appear for a deposition on September 3, 2024.

49.    Pursuant to Federal Rule of Civil Procedure 26(c)(1), a "court may, for good cause, issue an order to protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense. . . ." Fed. R. Civ. P. 26(c)(1).

50.    "A party seeking a protective order over discovery materials must demonstrate that 'good cause' exists for the protection of that material." *Glennmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir.1995); *Saldi v. Paul Revere Life Ins. Co.*, 224 F.R.D. 169, 175 (E.D. Pa. 2004); *In re Nat'l Med. Imaging, L.L.C.*, No. 05-12714DWS, 2005 WL 3299712, at *1 (Bankr. E.D. Pa. Oct. 31, 2005).

51.    Good cause is shown "by demonstrating a particular need for protection." *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir.1986).

52.    To determine whether good cause exists, courts must balance the requesting party's need against the injury that may result. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994).

53.    "Broad allegations of harm, unsubstantiated by specific examples or articulable reasoning, do not satisfy the Rule 26(c) test." *Cipollone*, 785 F.2d at 1121.

**A-121**

54.    Courts have held that "[i]rrelevancy satisfies the good cause requirement." *McCurdy v. Wedgewood Capital Mgmt Co.*, No. 97-4304, U.S. Dist. LEXIS 18875, at \*13 (E.D. Pa. Nov. 16, 1998).

55.    As discussed above, due to the Trustee's intent to withdraw the Stay Violation Motion, the information sought by the Subpoena is irrelevant and outside the scope of discovery.

56.    Information and documents concerning the settlement with Hawk and the 9019 Motion, are also irrelevant - that information and those documents are irrelevant to the only ground cited in Motion to Reconsider; that two (2) alleged misstatements were made on the record which VSI states, in conclusory fashion, constitutes new evidence and should be grounds for reconsideration.

57.    Further, good cause exists for a protective order to be issued because, as discussed above, the Subpoena is intended to harass and preoccupy the Trustee - ultimately further delaying the Debtors' Chapter 11 proceedings and the sale of the Debtors' assets.

58.    Therefore, as the information the Subpoena seeks is irrelevant and the Subpoena is only intended to harass and delay, a protective order should be issued pursuant to Federal Rule of Civil Procedure 26(c) to prevent the Trustee from having to comply with the Subpoena and appear for a deposition on September 3, 2024.

IV.    **REQUEST FOR EXPEDITED CONSIDERATION**

59.    In accordance with L.B.R. 5070-1(f) and 9014-1, the Trustee seeks expedited consideration of the Motion.  The Trustee requests approval of the request for expedited consideration pursuant to L.B.R. 9014-2.

60.    Pursuant to L.B.R. 5070-1(f)(3), this request for expedited consideration may be stated as part of the Motion.

9

**A-122**

61.     The Trustee respectfully submits that expedited consideration of the Motion is required because, per the Subpoena, the Trustee's deposition is currently scheduled for September 3, 2024, only four (4) days from now.

62.     In addition, on August 29, 2024, the undersigned sent an e-mail to counsel to VSI and the Office of the United States Trustee pursuant to L.B.R. 5070-1(f)(1). VSI's counsel declined to respond to the Trustee's consultation until they better understood the scope and specific purpose for the Motion.  The Office of the United States Trustee does not oppose the request for expedited consideration.

63.     The Trustee further believes that an expedited hearing will not prejudice VSI or any of the Debtors' creditors and is, in fact, in the best interest of the creditors.

64.     The Trustee is seeking to shorten notice of this Motion such that it will be heard on the earliest date available on the Court's calendar.

65.     Furthermore, the Trustee also requests (a) that this Court permit notice of the hearings to be served facsimile, hand delivery, next day mail, or by electronic means upon (i) the Office of the United States Trustee; (ii) to VSI; and (iii) all parties who have timely filed requests for notice under Bankruptcy Rule 2002, and (b) that this Court limit the notice period accordingly.

66.     The Trustee believes that such notice is sufficient under the circumstances for the expedited hearing.

67.     Reduction of the time periods in question is not prohibited under Fed. R. Bankr. P. 9006(c)(2) and the rules listed therein.

## V.    **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, the Trustee respectfully requests that the Court: (i) grant the relief requested in this Motion and enter the Proposed Order quashing the

**A-123**

Subpoena and issuing a protective order pursuant to Federal Rule of Civil Procedure 26(c) to

prevent the Trustee from having to comply with the Subpoena and appear for a deposition on

September 3, 2024; and (ii) grant such other and further relief as is just and proper.

Respectfully submitted,

/s/ Michael D. Vagnoni

Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail addresses:
edmond.george@obertmayer.com
michael.vagnoni@obermayer.com
*Counsel to William Homony, Chapter 11 Trustee*

and

Steven M. Coren, Esquire
Andrew J. Belli, Esquire
COREN & RESS, P.C.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
abelli@kcr-law.com
*Special Counsel to William Homony, Chapter 11 Trustee*

Dated: August 29, 2024

11

**A-124**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc., *et al.*** | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : | **(Jointly Administered)[1]** |
| **Debtors.** | : |  |
|  | : |  |

## ORDER SCHEDULING EXPEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE FOR ENTRY OF AN ORDER: (I) GRANTING EXPEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE; (II) QUASHING SUBPOENA; (III) ENTERING A PROTECTIVE ORDER; AND (IV) GRANTING RELATED RELIEF

AND NOW, this _____ day of _____, 2024, upon consideration of the Motion of William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative") (when referred to with Stream, the "Debtors"), for Entry of an Order: (i) Granting Expedited Consideration, Shortened Time and Limited Notice; (ii) Quashing Subpoena; (iii) Entering a Protective Order; and (iv) Granting Related Relief (the "Motion") [2], and cause therefore having been demonstrated, it is hereby **ORDERED** as follows:

1.      The Trustee's request for an expedited hearing, shortened time, and limited notice on the Motion is **GRANTED**.

2.      A hearing to consider the Motion is scheduled for _____, 2024 _____ a.m./p.m. before the Honorable _____ in the United States Bankruptcy Court, Robert N.C. Nix Courthouse, 900 Market Street, Second Floor, Courtroom No.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms used in this Order but not defined herein shall have the meanings ascribed to such terms in the Motion.

1

**A-125**

_____. Any objection to the Motion must be filed with the Clerk of the Bankruptcy Court and serviced upon counsel for the Trust listed in the Motion and counsel to (i) the United States Trustee, Office of The United States Trustee, Robert NC Nix, Sr. Federal Building, 900 Market Street, Suite 320, Philadelphia, PA 19107 and (ii) all parties in interest requesting notice in the above captioned Bankruptcy Case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure on or before _____, 2024.

3.      A copy of this Order shall be served by counsel for the Trust on or before _____, 2024, at _____ a.m./p.m. by facsimile, hand delivery, next day mail or by electronic means upon (i) the Office of the United States Trustee; (ii) counsel to Centers for Visual Semiconductor, Inc. ("VSI"); and (iii) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedures.

4.      If notice is given in the manner provided above, said notice shall be sufficient and proper and in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, and the Local Rules of this Court.

BY THE COURT:


_____
Honorable
United States Bankruptcy Judge

2

**A-126**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | **(Jointly Administered)[1]** |
| **Debtors.** | : | |
| | : | |

**ORDER GRANTING MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY
AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER: (I) GRANTING
EXPEDITED CONSIDERATION, SHORTENED TIME AND LIMITED NOTICE; (II)
QUASHING SUBPOENA; (III) ENTERING A PROTECTIVE ORDER;
AND (IV) GRANTING RELATED RELIEF**

AND NOW, this _____ day of _____, 2024, upon consideration of the

Motion of William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the

bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc.

("Technovative") (when referred to with Stream, the "Debtors"), for Entry of an Order: (i)

Granting Expedited Consideration, Shortened Time and Limited Notice; (ii) Quashing Subpoena;

(iii) Entering a Protective Order; and (iv) Granting Related Relief (the "Motion")[2], and cause

therefore having been demonstrated, it is hereby

**ORDERED** that the Trustee's Motion is hereby **GRANTED**;

**ORDERED** that the Subpoena is **QUASHED**; and it is further

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re
Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms used in this Order but not defined herein shall have the meanings ascribed to such terms in the
Motion.

1

**A-127**

**ORDERED** that a protective order is hereby issued preventing the Trustee from having to

comply with the Subpoena and appear for a deposition on September 3, 2024.

BY THE COURT

_____

Honorable
United States Bankruptcy Judge

cc:  Attached service list.

**A-128**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | **(Jointly Administered)[1]** |
| **Debtors.** | : | |
| | : | |

### ORDER SCHEDULING EXPEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE FOR ENTRY OF AN ORDER: (I) GRANTING EXPEDITED CONSIDERATION, SHORTENED TIME, AND LIMITED NOTICE; (II) QUASHING SUBPOENA; (III) ENTERING A PROTECTIVE ORDER; AND (IV) GRANTING RELATED RELIEF

AND NOW, this _____ day of _____, 2024, upon consideration of the Motion of William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative") (when referred to with Stream, the "Debtors"), for Entry of an Order: (i) Granting Expedited Consideration, Shortened Time and Limited Notice; (ii) Quashing Subpoena; (iii) Entering a Protective Order; and (iv) Granting Related Relief (the "Motion") [2], and cause therefore having been demonstrated, it is hereby **ORDERED** as follows:

1.     The Trustee's request for an expedited hearing, shortened time, and limited notice on the Motion is **GRANTED**.

2.     A hearing to consider the Motion is scheduled for _____, 2024 _____ a.m./p.m. before the Honorable _____ in the United States Bankruptcy Court, Robert N.C. Nix Courthouse, 900 Market Street, Second Floor, Courtroom No.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms used in this Order but not defined herein shall have the meanings ascribed to such terms in the Motion.

**A-129**

_____. Any objection to the Motion must be filed with the Clerk of the Bankruptcy Court and

serviced upon counsel for the Trust listed in the Motion and counsel to (i) the United States Trustee,

Office of The United States Trustee, Robert NC Nix, Sr. Federal Building, 900 Market Street,

Suite 320, Philadelphia, PA 19107 and (ii) all parties in interest requesting notice in the above

captioned Bankruptcy Case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure

on or before _____, 2024.

    3.    A copy of this Order shall be served by counsel for the Trust on or before

_____, 2024, at _____ a.m./p.m. by facsimile, hand delivery, next day

mail or by electronic means upon (i) the Office of the United States Trustee; (ii) counsel to Centers

for Visual Semiconductor, Inc. ("VSI"); and (iii) all parties who have timely filed requests for

notice under Rule 2002 of the Federal Rules of Bankruptcy Procedures.

    4.    If notice is given in the manner provided above, said notice shall be sufficient and

proper and in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures,

and the Local Rules of this Court.

BY THE COURT:


_____
Honorable
United States Bankruptcy Judge

**A-130**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | :    **Chapter 11** |
| | : |
| **Stream TV Networks, Inc.,** *et al.* | :    **Bankruptcy No. 23-10763 (AMC)** |
| | :    **(Jointly Administered)[1]** |
| **Debtors.** | : |
| | : |

## ORDER GRANTING MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER: (I) GRANTING EXPEDITED CONSIDERATION, SHORTENED TIME AND LIMITED NOTICE; (II) QUASHING SUBPOENA; (III) ENTERING A PROTECTIVE ORDER; AND (IV) GRANTING RELATED RELIEF

AND NOW, this _____ day of _____, 2024, upon consideration of the

Motion of William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the

bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc.

("Technovative") (when referred to with Stream, the "Debtors"), for Entry of an Order: (i)

Granting Expedited Consideration, Shortened Time and Limited Notice; (ii) Quashing Subpoena;

(iii) Entering a Protective Order; and (iv) Granting Related Relief (the "Motion")[2], and cause

therefore having been demonstrated, it is hereby

**ORDERED** that the Trustee's Motion is hereby **GRANTED**;

**ORDERED** that the Subpoena is **QUASHED**; and it is further

### REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms used in this Order but not defined herein shall have the meanings ascribed to such terms in the Motion.

**A-131**

**ORDERED** that a protective order is hereby issued preventing the Trustee from having to

comply with the Subpoena and appear for a deposition on September 3, 2024.

BY THE COURT

_____

Honorable
United States Bankruptcy Judge

cc:  Attached service list.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| **Stream TV Networks, Inc.**, *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| Debtors. | : | (Jointly Administered)[1] |
|  | : |  |

**MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
FOR (I) AN ORDER (A) APPROVING THE BIDDING PROCEDURES AND FORM OF
ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS INCLUDING APPROVAL OF PROVISIONS FOR
DESIGNATION OF A STALKING HORSE, (B) ESTABLISHING THE NOTICE
PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE
THEREOF AND SCHEDULING AN AUCTION, (C) APPROVING PROCEDURES FOR
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING
EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY
PROCEDURE 5070-1(g); AND (F) GRANTING RELATED RELIEF, AND (II) AN
ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B)
APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND
(C) GRANTING RELATED RELIEF**

William A. Homony, in his capacity as Chapter 11 trustee (the "**Trustee**") of the

bankruptcy estates of Stream TV Networks, Inc. ("**Stream**") and Technovative Media Inc.

("**Technovative**", or collectively with Stream the "**Debtors**"), hereby files this motion (the

"**Motion**") (A) for entry an Order, substantially in the form attached hereto as **Exhibit A** (the

"**Bidding Procedures Order**")[2], authorizing and approving (i) the proposed bidding procedures

for soliciting bids for the Debtors' Assets (the "**Bidding Procedures**") in the form attached to the

Bidding Procedures Order as **Exhibit 1**, including provisions authorizing and approving, but not

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures or Bidding Procedures Order.

**A-133**

Case 2:23-cv-06397-JMG    Document 10    Filed 09/30/24    Page 140 of 283
Case 2:23-cv-06397-JMG    Document 10    Filed 01/05/24    Page 2 of 36 Main
Document    Page 2 of 36

directing Debtors' selection and designation of, a stalking horse bidder (the "**Stalking Horse**"), and (ii) the form of Asset Purchase Agreement attached hereto as **Exhibit B** (the "**Asset Purchase Agreement**"), (iii) establishing notice procedures and approving the form of notice and manner of all procedures in connection with the proposed sale of the Debtors' Assets (the "**Sale**"), scheduling an auction (the "**Auction**") (iv) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases, (v) scheduling a hearing (the "**Sale Hearing**") to approve the Sale, (vi) granting Expedited Consideration shortened time and limited notice pursuant to Local Rule of Bankruptcy procedure 5070-1(g), and (vii) granting related relief.  In addition, by this Motion, the Trustee ultimately seeks entry of an order, substantially in the form attached hereto as **Exhibit C** (the "**Sale Order**"), (i) authorizing and approving, but not directing, the sale of the Assets, in each case with such Sale being free and clear of any and all liens, claims, encumbrances and interests, (ii) and the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale, and (iii) granting related relief.

In support of this Motion, the Trustee relies upon and incorporates by reference (i) the *Declaration of William A. Homony in Support of the Sale Motion* filed contemporaneously herewith (the "**Homony Declaration**"). In further support of the Motion, the Trustee respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.     As more fully described below, the Trustee intends to conduct a Sale of substantially all of the Debtors' assets (the "**Assets**") (as defined herein) for the benefit of the Debtors' estates and their creditors.

4880-0354-5067 v1

**A-134**

2.      The Trustee spent significant time evaluating the Debtors' options, and, with the absence of any real operations or revenue, has determined that a sale of the Debtors' Assets best serves the interests of all stakeholders in the Debtors' Cases.

3.      The Sale is necessary to maximize the value of the Debtors' Assets by exposing them to market. By this Motion, the Trustee seeks to establish procedures related to the marketing, bidding and sale process for the Debtors' Assets.

## RELIEF REQUESTED

4.      Pursuant to sections 105, 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Local Bankruptcy Rules**"), the Trustee first seeks entry of the Bidding Procedures Order, which will authorize and approve, but do not direct, among other things: (a) the proposed Bidding Procedures; (b) the provisions approving a Stalking Horse Bidder, without bid protections; (c) the notice procedures and the form of notice and manner of all procedures in connection with the auction (the "**Auction**") and the Sale; (d) the procedures for the assumption and assignment of certain executory contracts and/or unexpired leases; (e) the scheduling of the Sale Hearing to approve the Sale; and (f) related relief. Second, at the Sale Hearing, the Trustee will seek entry of the Sale Order that will approve the sale of the Assets to the Successful Bidder, the assumption and assignment of certain executory contracts and unexpired leases and grant related relief.

5.      For the reasons set forth below and as follow, the Trustee submits that the relief requested herein is in the best interest of the Debtors, their jointly-administered but not

4880-0354-5067 v1

**A-135**

substantively consolidated bankruptcy estates, creditors, stakeholders, and all other parties-in-interest. The Trustee respectfully asserts that the Motion, therefore, should be granted.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the Eastern District of Pennsylvania, dated July 25, 1984, and as amended (Luongo, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

7.     The factual and procedural background of this case are well known to this Court and to the extent not stated herein, the Trustee incorporates the factual and procedural background contained in the Court's Memorandum and Opinion filed on January 5, 2024 (the "**Trustee Opinion**") (D.I. #548).

8.     On March 15, 2023, (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**").

9.     On March 20, 2023, Hawk Investment Holdings Ltd. ("**Hawk**") filed a motion for relief from the automatic stay (the "**Hawk Stay Relief Motion**") seeking relief from the automatic stay in order to proceed with an action in the Delaware Court of Chancery (the "**Delaware Chancery Court**") which, in turn sought relief pursuant to § 225 of Title 8 of the Delaware Code (the "**Section 225 Action**") against the Debtors. (D.I. #16).

10.     On April 5, 2023, the Debtors filed an objection to the Hawk Stay Relief Motion. (D.I. #78).

4880-0354-5067 v1

**A-136**

11. Thereafter, on April 6, 2023, Hawk filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeing dismissal or conversion of the Debtors' cases, or alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "**1112/1104 Motion**"). (D.I. #94).

12. In the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses.

13. The Debtors filed an opposition to the 1112/1104 Motion on May 8, 2023. (D.I. #193).

14. On January 5, 2024, the Court entered an order, which, among other things, granted 1112/1104 Motion with respect to the appointment of a Chapter 11 trustee, and (2) granted the Hawk Stay Relief Motion allowing the Section 225 Action to proceed (the "**Trustee Order**"). (D.I. #549).

15. On January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the chapter 11 trustee (the "**Appointment Date**") as well as an Application for the entry of an Order approving the appointment of the Trustee. (D.I. #554 and #553 respectively).

16. On January 12, 2024, the Bankruptcy Court entered an Order granting the Application to appoint the Trustee.

17. On January 17, 2024, the Trustee filed an Application to Employ Obermayer Rebmann Maxwell & Hippel LLP as his counsel (D.I. #564) and that Application was approved on January 29, 2024 (D.I. # 577).

5

**A-137**

18. On January 17, 2024, the Trustee filed an Application to Employ Miller Coffey Tate LLP as his accountants/advisors (D.I. #566) and that Application was approved on February 15, 2024 (D.I. # 586).

19. On August 14, 2024, the Trustee filed an Application to Employ SSG Advisors, LLC ("**SSG**") (D.I. #715) and on September 6, 2024 the Trustee filed an amended Application to employ SSG (D.I. #732) to provide investment banking services to the Trustee with respect to the marketing and sale of the Debtors' Assets. That amended Application was approved on September 20, 2024 (D.I. #741).

20. Since the Appointment Date, the Trustee and his professionals have reviewed and analyzed *inter alia*, the Debtors' respective Schedules of Assets and Liabilities and the Statement of Financial Affairs ("**Schedules and Statements**"), volumes of documents from the various dockets in connection with the Debtors' Cases, the Adversary Proceeding filed by the Debtors, the Delaware Chancery Court cases, the Delaware Supreme Court case, the Debtors' Monthly Operating Reports, and the volumes of documents supplied by the Debtors and contained in the Debtors' books and records provided by the Debtors, in order for the Trustee to fulfil his obligations under the Trustee Order.

21. After substantial consultations with his professionals, and certain of the professionals retained by the Debtors' to defend the Delaware proceedings, the Trustee has determined that the sale of the Debtors' Assets pursuant to this Motion is in the best interest of the Debtors' creditors and stakeholders.

22. Through the Trustee's substantial efforts, and having reached a settlement with Hawk, as collateral agent for the secured creditors (collectively, the "**Secured Creditors**") resolving objections to the secured claims against the Debtors' estates (the "**Hawk Settlement**"),

4880-0354-5067 v1

**A-138**

the Trustee seeks to move forward with his obligations under the Code and the Hawk Settlement

for approval of the procedures for sale of the Debtors' Assets, and ultimately approval of the Sale

at Auction.

23.     Information regarding the Debtors' Assets, capital structure, and the circumstances

its operations, is set forth in the Debtors' filed Schedules and Statements on file with the clerk of

the Bankruptcy Court.

**II.     The Debtors' Assets.**

24.     The Trustee is seeking authorization and approval of Bid Procedures in connection

with the sale of substantially all of the Debtors' Assets.[3]  The Sale will be on an "as is", "where is"

basis, without any warranty of any kind, express or implied.

25.     Stream was founded to develop and commercialize a proprietary technology for

viewing three-dimensional content without the need for 3D glasses or goggles ("**Ultra-D**"). Stream

created Technovative, a wholly owned subsidiary, which in turn directly or indirectly owns various

subsidiaries, including SeeCubic B.V. ("**SCBV**"), an entity formed under the laws of the

Netherlands and which functions as the primary research and development engine for the business.

Together, these subsidiaries own and hold rights in technology including Ultra-D.

26.     Stream's Ultra-D technology was developed, in part, based on certain intellectual

property, including a portfolio of glasses-free 3D patents licensed from Koninklijke Philips

Electronics. Stream also has an alleged technology license (the "**Rembrandt License**") from

Rembrandt 3d Holding LTD ("**Rembrandt**").

---

[3] Bidders will have access to a data room to be set up for the Sale where relevant information regarding the Debtor's
Assets will be maintain during the Sale process.  The Trustee makes no warranties as to the accuracy of the Debtors'
filed Schedules and Statements and urges each potential bidder to perform their due diligence before bidding.

7

**A-139**

27.     The Trustee does not intend to sell or assign the Rembrandt License and believes there may be claims against Rembrandt that the Trustee is retaining and may pursue in the future.

28.     In certain instances, the Trustee may be asked to sell equity interests in certain downstream entities from the Debtor.

## III.    The Hawk Settlement, the Sale Process, and the Stalking Horse Bid.

29.     On June 5, 2024, the Bankruptcy Court approved the Hawk Settlement.  Pursuant to the Hawk Settlement the Trustee is permitted to expose the Debtors' Assets to sale by Auction, with the Allowed Secured Claims of the Secured Creditors serving as the Stalking Horse bidder for the Assets.

30.     The Salient terms of the Hawk Settlement are as follows:

### I.    Treatment of Secured Claims:

a.  Upon the entry of the order approving the 9019 Motion, the Secured Creditors' claims shall be deemed to have not been converted and the Secured Creditors shall be deemed to have an allowed secured claim against the Debtors' estates in the amount of $180 million plus any additional funds the Secured Creditors advance to SCBV subsequent to the Trustee's appointment ("**Allowed Secured Claim**").

b.  A portion of the Allowed Secured Claim in the amount of $150 million will serve as a stalking horse bid (the "**Stalking Horse Bid**"), subject to approval of the Bankruptcy Court, as part of a Trustee motion for auction bid procedures.  The Stalking Horse Bid will not receive any traditional bid protections, including but not limited to, a break-up fee or expense reimbursement.

c.  The Secured Creditors may participate at any auction but any overbid by the Secured Creditors in excess of the Stalking Horse Bid must be in cash but only to the extent the bid exceeds the amount of the Stalking Horse Bid.

d.  The Secured Creditors through SeeCubic shall continue to fund all costs and expenses of SCBV (incurred in the ordinary course and consistent with SCBV's operations during the pendency of these chapter 11 cases and including any employee claims arising therefrom) for so long as the parties pursue a sale of the Debtors' assets as contemplated by, and in accordance with, the  Agreement, not to exceed 90 days, which advanced amounts will increase the Allowed Secured Claim in accordance with 1(a) above and shall not constitute administrative expense claims against the Debtors' bankruptcy estates.

8

**A-140**

## II. Sale of the Debtors' Assets.

Subject to documentation satisfactory to Hawk (and drafted in consultation with Hawk), SCI shall serve as the stalking horse bidder for the Collateral, with such bid (the "**Stalking Horse Bid**") and Asset Purchase Agreement (the "**Stalking Horse APA**") attached to the Bidding Procedures.

a. Subject to documentation satisfactory to Hawk and the Trustee, the Stalking Horse Bid shall consist of a credit bid of the Allowed Secured Claim in the amount of $150 million.

b. The Secured Creditors waive the right to seek or obtain a "breakup fee" or a "topping fee" or any other bid protections as part of the Stalking Horse Bid. The Bidding Procedures shall specify that in order for a bid to constitute a "Qualifying Bid" such bid shall include:

c. A bid deposit in the amount of 10% of the proposed aggregate purchase price (the "Bid Deposit"), and

d. Evidence satisfactory to the Trustee of its financial wherewithal to consummate a Sale in the amount of the proposed purchase price.

## III. The Bidding Procedures.

The Bid Procedures shall specify that Qualifying Bids may include both cash and non-cash consideration, subject to the following conditions:

a. The cash component shall be no less than $120 million,

b. The non-cash component of the bid shall be backed by a letter of credit or other security, over which Hawk shall have consultation rights as to the sufficiency and form of such security, and

c. The Bid Deposit shall be 10% of the aggregate purchase price, including both the cash component and the non-cash component of the bid.

d. To the extent the Trustee receives any other Qualified Bids (exclusive of the Stalking Horse Bid which will be deemed a Qualified Bid), SCI may participate in the Auction. Any overbid submitted by SCI in excess of the Stalking Horse Bid at the Auction shall be in cash only. For the avoidance of doubt, SCI cannot utilize any of the remaining Allowed Secured Claim as part of any overbid; however, its overbid may include a credit bid up to $150 million.

## IV. Trustee/Estate Carve out.

With respect to any sale that closes as contemplated by, and in accordance with, the terms of the Agreement, the Secured Creditors will provide a carve-out ("Carve-Out") in the form of cash from the sale proceeds of their collateral at Closing, or SeeCubic shall fund the Carve-Out if the Secured Creditors' Stalking Horse Bid or any subsequent overbid is determined to be the winning bid, as follows:

a. $7,500,000.00 and an additional 10% of each dollar in excess of the Stalking Horse Bid for the benefit of the Debtors' estates paid as follows:

    i. $1,000,000.00 paid to the Trustee upon entry of an Order approving the

4880-0354-5067 v1

Agreement (i.e.: the 9019 Motion);
    ii.  $1,500,000.00 paid to the Trustee upon approval of the bidding procedures; and the balance paid at closing.
    iii.  The Trustee shall receive the balance of the Carve-Out (*i.e.*, the Carve-Out minus the Carve-Out Advance) at Closing:
        1.  In the event SCI is the successful bidder, by SCI in cash at Closing.
        2.  In the event a third party is the successful bidder, from the cash proceeds of the purchase price.

b. Trustee to retain rights to the $1 million bond posted by the Debtors in the DE Chancery Court.

c. Trustee to retain all claims and cause of action not released against third-parties including but not limited to Chapter 5 claims and causes of action and any claims against the Debtors' directors and officer (collectively "Litigation Claims") and any resulting proceeds from said Litigation Claims.

d. The bankruptcy estates and/or any trustee or disbursing agent retain the right to object to claims against the bankruptcy estates.

e. The Secured Creditors will provide the Trustee with documentation regarding SeeCubic's financial ability to fund the Carve-Out.

f. The Secured Creditors will be allowed a subordinate unsecured deficiency claim subordinated to all other general unsecured creditors (the "<u>Deficiency Claim</u>") to the extent that the Secured Creditor Distribution is not sufficient to satisfy the Allowed Secured Claim in full. The Secured Creditors' Deficiency Claim will be recognized as an impaired unsecured claim which the Secured Creditor shall be entitled to vote on confirmation of any Trustee Plan.

31.    Since its retention, SSG has begun marketing the Debtors' Assets for sale to potential purchasers in order to solicit the highest and best bid to maximize the value to the Debtors' estates.

32.    SSG will continue to actively market the Assets, to a wide spectrum of interested parties, including potential financial and strategic buyers.

33.    SSG will, with the Trustee's assistance, set up an electronic data room that will be made available for potential bidders subject to their entry into NDAs, and shall prepare and distribute presentations and confidential information memoranda regarding the Assets.

34.    SSG will continue its marketing process, which will afford the Trustee the best opportunity to maximize value for the sale of the Assets at the Auction.

4880-0354-5067 v1

**A-142**

35.     Subject to the Bidding Procedures the Trustee retains the right to pursue any transaction or restructuring strategy that, in the Trustee's business judgment, will maximize the value of the Debtors' estates.

36.     If the Trustee receives multiple offers for the Assets, the Trustee intends to conduct the Auction to determine the highest or best offer for the Assets.

37.     Accordingly, the Trustee believes that the sale of the Debtors' Assets will maximize the value of the Debtors' estates for the benefit of all their creditors, stakeholders, and other parties-in-interest.

**IV.     The Stalking Horse Provisions.**

38.     The Hawk Settlement provides for the Secured Creditors to act as the Stalking Horse Bidder for the sale of the Debtors' Assets.

39.     By this Motion, the Trustee seeks to approve the selection of the Secured Creditors as the Stalking Horse Bidder.

40.     The Stalking Horse is being selected based upon the Trustee's determination that the proposal from the Secured Creditors at this juncture represents the highest and best non-contingent offer for the Debtors' Assets to date.

41.     The Stalking Horse Bidder's offer would constitute the initial Qualified Bid (as defined in the Bidding Procedures).

42.     The Trustee, on behalf of the Debtors has entered into an Asset Purchase Agreement with the Secured Creditors (the "**Stalking Horse APA**").  Attached as Exhibit "B" is a true and correct copy of the Stalking Horse APA between the Debtors and the Secured Creditors.[4]

---

[4] Bidders should expect changes to material terms of the Stalking Horse APA in that the Stalking Horse APA contemplates a credit bid by the Secured Creditors. However, all other material terms of the APA will remain unchanged.

11

4880-0354-5067 v1

**A-143**

43.     The Trustee seeks approval of the Stalking Horse APA as a template for any Asset
purchase with any third party other than the Secured Creditors or for an Alternate Transaction (the
"**Modified APA**").

## V.     Bidding Procedures.

44.     By this Motion, the Trustee seeks approval of the Bidding Procedures. The Bidding
Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale
process consistent with the timeline available to the Trustee, based upon timelines in the Stalking
Horse APA.

45.     The Bidding Procedures describe, among other things, the procedures for interested
parties to access due diligence, the manner in which bidders become Qualified Bidders and bids
become Qualified Bids (each as defined in the Bidding Procedures), the receipt and negotiation of
bids received, the conduct of the Auction, the selection and approval of any ultimately successful
bidders, and the deadlines with respect to accomplishing the foregoing.

46.     The Trustee believes that the Bidding Procedures afford the Trustee a sufficient and
reasonable opportunity to maximize the value of a sale of the Assets for the benefit of the estates.

47.     The Trustee is hopeful that the absence of any bid protections, like a Topping Fee
or Break Up Fee, will encourage and perhaps stimulate additional bids.

48.     The Bidding Procedures establish the following key dates:

     a.      **Hearing on Bid Procedures: October XX, 2024**

     b.      **Bid Deadline**: To participate in the bidding, each Potential Bidder, must
deliver to the notice parties enumerated in the Bidding Procedures a written offer, so as to be
received by no later than November 15, 2024 at 4:00 (EST) (the "Bid Deadline").

4880-0354-5067 v1

**A-144**

c.    **Auction**: If the Trustee receives two or more Qualified Bids, the Trustee will conduct the Auction of the Assets. If the Auction is held, it shall take place on November 18, 2024 at 10:00 a.m. (EST) at the offices of Obermayer Rebmann Maxwell & Hippel LLP, Suite 3400, 1500 Market Street, Philadelphia, PA 19103 or such other place and time as determined by the Trustee.  At the Auction, only those parties that have been designated by the Trustee as Qualified Bidders shall be entitled to attend and participate in the Auction.

d.    **Sale Hearing**: The hearing to approve the sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) is scheduled to take place on November 22, 2024 at 10:00 a.m. (EST) before the Honorable Ashely M. Chan, Bankruptcy Judge, either telephonically through Court Solutions or at the Courtroom 4 at the United States Bankruptcy Court for the Eastern District of Pennsylvania, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA 19107, or at such time thereafter as counsel may be heard.

49.    Key terms of the Bidding Procedures are highlighted below:

a.    **Due Diligence Materials**: Any party that submits to the Trustee an executed confidentiality agreement in such form reasonably satisfactory to the Trustee may be granted access to diligence materials.

b.    **Form and Content of Qualified Bids**: A Qualified Bid is a written offer to purchase the Assets, including but not limited to the Debtors' interests in intellectual property ("IP") in any combinations, submitted to the Trustee and his advisors, so as to be received by the Bid Deadline that satisfies each of the following conditions:

c.    **Good Faith Offer**: Each Bid must constitute a good faith, bona fide, non-contingent offer to purchase substantially all or certain of the Assets or other assets.  The offers

4880-0354-5067 v1

may include a proposal to pay amounts due to the Secured Creditors over time if any Qualified
Bid contains an upfront cash payment of at least $120,000,000.00.

d.      **Good Faith Deposit**: Each Bid must be accompanied by a deposit in the
amount of 10% of the proposed total purchase price which will be held in a non-interest bearing
escrow account.

e.      **Executed Agreement**: Each Bid must include an executed Modified APA
substantially in the form of the Stalking Horse APA as set forth in Exhibit "B" as modified
pursuant to which the potential bidder proposes to effectuate the acquisition of the Debtors' Assets,
and any necessary transaction documents, signed by an authorized representative of such bidder.

f.      Each Bid must also include a copy of the Modified APA **marked against
the Stalking Horse APA attached as Exhibit B hereto, to show all changes requested by the
Potential Bidder** (including those related to the assumption and assignment of executory contracts
and unexpired leases, and other material terms such that the Trustee may determine how such Bid
compares to the terms of the Asset Purchase Agreement and competing Bids) and if less than all
Assets indicate clearly which of the Assets are being bid upon. Each Modified APA must provide
a commitment to close within five (5) business days after all closing conditions are met.  The
Trustee reserves the right to reject any bid that is accompanied by a Modified APA that does not
reasonably meet the terms of the Stalking Horse APA or exceed the Stalking Horse Bid.

g.      **Purchase Price**: Each Bid must clearly identify the purchase price to be
paid (the "Purchase Price").

h.      **Cash Requirements**: Each Bid must provide evidence of the ability to pay
the cash portion of any Purchase Price contained in any Bid, and the Initial Increment (as defined
below), in full, in order to be a Qualified Bid.

14

**A-146**

   i. **Designation of Assigned Contracts and Leases**: Each Bid must identify any and all executory contracts and unexpired leases of the Debtors that the potential bidder wishes to be assumed pursuant to a Sale (the "**Assigned Contracts**"). A Bid must specify whether the Trustee or the potential bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs.

   j. **Designation of Assumed Liabilities**: Each Bid must identify all liabilities which the potential bidder proposes to assume as part of the Sale.

   k. **Corporate Authority**: Each Bid must include written evidence reasonably acceptable to the Trustee demonstrating appropriate corporate authorization to consummate the Sale; provided that, if the potential bidder is an entity specially formed for the purpose of effectuating the Sale, then the potential bidder must furnish written evidence reasonably acceptable to the Trustee of the approval of the Sale by the equity or interest holder(s) of such potential bidder in order to satisfy the potential bidder's obligations under the Modified APA.

   l. **Disclosure of Identity of Potential Bidder**: A Bid must fully disclose the identity of each entity that will be bidding on the Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation.

   m. **Disclosure of Connections**: A Bid must fully disclose any connections or agreements with the Debtors or its affiliates, including any relationships, connections, agreements, arrangements or understandings with the Debtors, Trustee, the Debtors' existing shareholders, members, officers, director, managers or principals, or any other known, potential, prospective bidder, or potential bidder.

   n. **Proof of Financial Ability to Perform**: A Bid must include written evidence reasonably satisfactory to the Trustee in his sole judgment, may reasonably conclude, in

15

**A-147**

consultation with his advisors, that demonstrates that the Potential Bidder has the necessary financial ability to timely consummate a Sale including any Overbids necessary at the Auction and must further contain information that can be publicly filed and/or disseminated providing adequate assurance of future performance of all executory contracts and unexpired leases to be assumed and assigned in such Sale.

o.      **Contingencies**: Except as otherwise provided in the Stalking Horse APA, a Bid must not be subject to material conditions or contingencies to closing, including without limitation, obtaining financing, internal approvals or further due diligence.

p.      **Bid Irrevocable**: A Bid must provide that it is irrevocable until two (2) business days after the Closing of the Sale. Each potential bidder further agrees that its Bid, if not chosen as the Successful Bid (as defined in the Bid Procedures), shall serve, without modification, as a Backup Bid (as defined in the Bid Procedures) as may be designated by the Trustee at the Sale Hearing, in the event the Successful Bidder (as defined in the Bid Procedures) fails to close as provided in the Successful Bidder's APA and the Sale Order.[5]

q.      **As-Is, Where-Is**: A Bid must include the following disclaimer: EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY THE TRUSTEE PURSUANT TO THIS AGREEMENT (I) THE TRUSTEE MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE ASSETS, OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY

---

[5] Pursuant to the Bidding Procedures, the Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final and best Overbid) open and irrevocable until two (2) business days after the closing of the Sale (the "Outside Backup Date").

4880-0354-5067 v1

**A-148**

OTHER MATTER, (II) THE TRUSTEE MAKES NO, AND HEREBY DISCLAIMS ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE BUYER SHALL RELY ONLY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY THE TRUSTEE PURSUANT TO THIS AGREEMENT, THE TRUSTEE MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY ASSET, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

   r. **Time Frame for Closing**: A Qualified Bid by a potential bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a timeframe acceptable to the Trustee, or by November 29, 2024.

   s. **Consent to Jurisdiction**: Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Trustee, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale, (ii) waive any right to a jury trial in connection with any disputes relating to the Trustee, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale, and (iii) commit to the entry of a final order or judgment in any way related to the Trustee, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

t.    **No Bid Protections**: The Stalking Horse bidder shall receive no bid protections.

u.    **Auction and Auction Procedures**: At the Auction, all Qualified Bidders may submit Overbids (as defined in the Bidding Procedures); provided, however, such Overbid shall be made in increments of not less than $250,000.00 ("**Initial Overbid Increment**") above the prior bid (with respect to bids other than the Stalking Horse Bid, the Overbid must exceed the Stalking Horse Bid, plus the Initial Overbid Increment). The Auction shall continue until there is one Qualified Bid that the Trustee determines, in his reasonable business judgment is the highest or otherwise best Qualified Bid at the Auction (the "**Successful Bid**," and the Qualified Bidder submitting such Successful Bid, the "**Successful Bidder**"), which shall be subject to approval by the Bankruptcy Court. In selecting the Successful Bid, the Trustee may consider any factors relevant to the value and viability of the Qualified Bid, including the amount and nature of the consideration, including any assumed liabilities, the timing for Closing, the nature, number and type of changes to the Stalking Horse APA contained in the Modified APA, if any, the extent to which such modifications are likely to delay or impede the Closing of the Sale, the total consideration to be received by the Debtors, the likelihood of each Qualified Bidder's ability to close a transaction and the timing thereof, and the net benefit to the Debtors' estates. Promptly following the Trustee's selection of the Successful Bid and the conclusion of the Auction, the Trustee shall announce the Successful Bid and Successful Bidder at the close of the Auction and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

v.    **Reservation of Rights**: Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Trustee reserves the right as he may reasonably determine to be in the best interest of the Debtors' estates and in the exercise of his fiduciary duties

4880-0354-5067 v1

to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and the estates; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein without consent; and (g) increase subsequent bid increments following the Overbid; or (h) remove any Asset from the auction, or continue or cancel the Auction and/or Sale Hearing in open court without further notice. Notwithstanding anything to the contrary contained in the Bidding Procedures or the Bidding Procedures Order, nothing in the Bidding Procedures will prevent the Trustee from considering any and all transactions. Notwithstanding anything to the contrary contained in the Bidding Procedures or the Bidding Procedures Order, nothing in the Bidding Procedures will prevent the Trustee from exercising his fiduciary duties under applicable law to maximize the value to be obtained for the Assets.

50.    The Bidding Procedures expressly recognize the Trustee's fiduciary obligations to maximize value. Accordingly, the Bidding Procedures preserve the Trustee's right to announce additional procedural rules for conducting the Auction as necessary or appropriate to maximize value for the Debtors' estates and does not impair the Trustee's ability to consider any and all Qualified Bids.

**VI.    Form and Manner of Sale Notice.**

51.    Within three (3) business days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "**Mailing Date**"), the Trustee will cause the notice, substantially in the form attached hereto as **Exhibit D** (the "**Sale Notice**"), to be served on (a) any

party that has filed a notice of appearance in these Chapter 11 cases; (b) any entity on the Master Service List; (c) any parties known or reasonably believed to have expressed interest in the Assets or any portion thereof; (d) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in the Assets; (e) all parties to executory contracts and unexpired leases to be assumed and assigned, as part of the Sale; (f) all applicable state and local taxing authorities; and (g) any governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder (the "**Notice Parties**").

52.       Additionally, on the Mailing Date or as soon as reasonably practicable thereafter, the Trustee proposes to publish the Sale Notice (as may be modified for publication purposes, the "**Publication Notice**"), on one occasion, in a paper of general circulation chosen in consultation with SSG. The Trustee believes that the Publication Notice is sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Trustee.

53.       The Trustee avers that the Sale Notice and Publication Notice are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction; (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Motion and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Assets for the Sale; (v) instructions for obtaining a copy of the Asset Purchase Agreement; (vi) representations describing the Sale as being free and clear of any and all liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching to the sale proceeds with the same validity and priority; and (vii) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder arising from the Auction, if any, and the procedures and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

4880-0354-5067 v1

## VII.    Assumption Procedures.

54.    The Trustee also seeks approval of the procedures for assuming and assigning executory contracts and unexpired leases (the "**Assumption Procedures**") to facilitate the fair and orderly assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale. The key provisions of the Assumption Procedures are:

a.    **Contract Assumption Notice**: No less than seven (7) days prior to the Sale Objection Deadline (the "Assumption and Assignment Service Deadline"), the Trustee shall serve a notice of contract assumption in substantially the form attached hereto as **Exhibit E** (the "Contract Assumption Notice") via overnight delivery on all counterparties to all potential Assigned Contracts and provide a copy of the same to the Secured Creditors. The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or unexpired lease, as applicable, (iii) the Trustee's good faith estimates of the Cure Payments required in connection with the executory contract or unexpired lease, as applicable, and (iv) the Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any contract is an executory contract or unexpired lease, as applicable, or that the stated Cure Payment related to any executory contract or unexpired lease constitutes a claim against the Debtors. Further, the inclusion of an executory contract or unexpired lease, as applicable, on the Contract Assumption Notice is not a guarantee that such executory contract or unexpired lease, as applicable, will ultimately be assumed and assigned.

b.    **Cure Payments and Adequate Assurance of Future Performance**: The payment of the applicable Cure Payments by Successful Bidder, the provision of adequate

21

assurance by the Successful Bidder(s), that they will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Successful Bidder(s) under the Assigned Contracts shall (i) effect a cure of all defaults existing thereunder, and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

       c.    Assumption Notices will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice.

       d.    **Objections**: Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by counsel to the Trustee on or before fourteen (14) days after service of the Contract Assumption Notice (the "**Cure Objection Deadline**"). The deadline to object to assumption and assignment solely with respect to the adequate assurance of future performance from the Successful Bidder, however, is the date that is two days after the conclusion of the Auction, but any such objection must be received before the start of the Sale Hearing, or such deadline set forth in the Supplemental Assumption Notice.

55.    Any party failing to timely file an objection to the cure amount, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, or the Sale is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract

or Additional Assigned Contract (including the adequate assurance of future performance), (c) the relief requested in the Motion, and (d) the Sale. Such party shall forever be barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to the Successful Bidder, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Trustee and the Successful Bidder, as applicable, with respect to such party's Assigned Contract or Additional Assigned Contract.

### BASIS FOR RELIEF REQUESTED

56. The Trustee submits that the Sale requested by this Sale Motion is authorized under section 363(b) of the Bankruptcy Code governing sales outside of the ordinary course of a debtor's business.

57. Section 363(b) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

58. This Court's power under section 363 is augmented by section 105(a), which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. As set forth below, the Trustee submits he has satisfied the requirements of sections 105, 363, and 365 of the Bankruptcy Code.

4880-0354-5067 v1

**A-155**

## VIII.    The Bidding Procedures Are Fair and Designed to Maximize Value for the Assets.

59.    The Trustee submits that the Bidding Procedures as proposed herein, are appropriate under sections 105 and 363 of the Bankruptcy Code, in that they are tailored to ensure that bidding is fair and reasonable and will yield the maximum value for the Debtors' Assets, for the benefit of their respective estates, their creditors, stakeholders, and other parties-in-interest.

60.    The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.

61.    The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire or obtain information necessary to submit a timely and informed bid. Accordingly, the Trustee and all parties-in-interest can be assured that the consideration obtained for the Assets will be fair and reasonable and will achieve the highest or best value. At the same time, the Bidding Procedures provide the Trustee with the opportunity to consider all competing offers and to select, in his discretion, the highest and best offer for the Assets.

62.    Accordingly, the Trustee believes and therefore prays the Court should approve the Bidding Procedures, including the selection of the Stalking Horse as a Qualified Bidder and the Stalking Horse Bid as the initial Qualified Bid.

## IX.    Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code Because a Sound Business Justification Exists.

63.    Although the Bankruptcy Code does not articulate the standard for approving a sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for the Third Circuit in the seminal case of *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the

24

acquirer of a debtor's assets be a good faith purchaser. The Third Circuit construed the "good faith

purchaser" standard to mean one who purchases "in good faith" and for "value." Id. at 147.

64.     As the court in *Abbotts Dairies* opined:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his
> conduct in the course of the sale proceedings. Typically, the misconduct that would
> destroy a purchaser's good faith status at a judicial sale involves fraud, collusion
> between the purchaser and other bidders or the trustee, or an attempt to take grossly
> unfair advantage of other bidders.

*Id.* at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

65.     Traditionally, courts have held that "fair and valuable consideration is given in a

bankruptcy sale when the purchaser pays 75% percent of the appraised value of the assets." *Abbotts

Dairies*, 788 F.2d at 149; *In re Karpe*, 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988).

66.     Respectfully, the sale of the Assets in accordance with the Bidding Procedures

satisfies the *Abbotts Dairies* test. First, the Trustee has fully disclosed and requested the Court's

approval of the Bidding Procedures and all the terms and conditions of the Sale and proposed

Auction and intends to provide comprehensive notice of the sale as discussed above. *See In re

Colony Hill Assoc.*, 111 F.3d 269 (2d Cir. 1997) (determination of "good faith" is based on

traditional equitable principles, including whether there has been full disclosure to the Bankruptcy

Court). The Bid Procedures are specifically tailored to maximize the value to be obtained for the

Assets.

67.     In addition, the Trustee intends to continue to market the Sale of the Assets. The

Trustee and his Advisors at SSG are hopeful that as a result of their intended notice of the Sale to

all potentially interested parties, and ensuing efforts to find other bidders, and the marketing of the

Assets, interested purchasers will be encouraged to submit bids, attend the Auction and generate a

spirited and robust Auction process.

4880-0354-5067 v1

**A-157**

68.     Courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

69.     Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. See *Lionel Corp.*, 722 F.2d at 1071; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

70.     Consideration of the above factors here unequivocally establishes that the Sale should be approved. As discussed above, the Trustee will continue his marketing efforts for the Assets and will solicit proposals for the purchase of the Assets before the proposed bid deadline and, based on the Trustee's and SSG's marketing efforts, the Trustee will have, under the circumstances, amply marketed the Assets before the proposed date of the Sale Hearing.

71.     The Trustee has proposed Bidding Procedures designed to maximize the purchase price for the Debtors' Assets.  The Procedures allow for sale of all or part of the Debtors' Assets to various purchasers. The proposed Bidding Procedures and the form and manner of notice of the

**A-158**

Sale have been submitted for approval to the Court and will ensure that any and all interested

parties will receive adequate notice of the Auction to allow for a competitive Sale process.

72.     Further, based upon the Hawk Settlement a distribution to unsecured creditors is

assured.  An Auction process  provides a mechanism that may yield additional recoveries.

73.     For all these reasons, the Trustee respectfully submits that the Sale of the Assets is

supported by sound business reasons and is in the best interests of the Debtors and their respective

estates. Accordingly, the Trustee requests approval of the Sale pursuant to Section 363(b) of the

Bankruptcy Code.

## X.     The Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of All Liens, Claims, Encumbrances and Interests.

74.     Section 363(f) permits a debtor to sell property free and clear of another party's

interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b)

the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds

the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the

interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of

its interest. See 11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, satisfaction

of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re*

*Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive,

authorizing a trustee or debtor-in-possession to sell property of the estate free and clear of all liens

"if any of the five conditions of § 363(f) are met"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re*

*Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under

section 363(f) as long as one of the five specified exceptions applies).

75.     In this case, the Assets are subject to the claims of the Allowed Secured Claims.

4880-0354-5067 v1

**A-159**

76.     Here, the Trustee avers that sections 363(f)(2) and (5) are satisfied with respect to Allowed Secured Claims. Further, all parties known to have asserted a lien or other encumbrance on the Assets will receive notice of the Sale. To the extent they have not objected to the Sale by the Sale Objection Deadline, they will be deemed to have consented to the Sale free and clear of all liens, claims, encumbrances and interests (other than Assumed Liabilities).

77.     The Trustee proposes to sell the Assets in a commercially reasonable manner and expects that the value of the proceeds from such sale will adequately reflect the value of the property sold.  The Auction will result in proceeds (or a credit bid) paying or satisfying all Allowed Secured Claims.  Second, the Trustee further proposes that upon the Closing, any party with a valid and enforceable lien or other encumbrance shall have a corresponding security interest in the proceeds of the Sale, as such liens and encumbrances will attach to the proceeds of the Sale with the same validity, priority, and force and effect as such lien or encumbrance had immediately prior to the closing of the Sale. In addition, all such persons could be compelled to accept money satisfaction for their security interests. As such, the requirements of section 363(f) of the Bankruptcy Code would be satisfied for the sale of the Assets, free and clear of all liens, claims and encumbrances (other than the Assumed Liabilities).

78.     The Trustee also submits that it is appropriate to sell the Assets free and clear of successor liability relating to the Assets. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtors' estates. If such relief is not granted, the purpose of an Order purporting to authorize the transfer of assets free and clear of encumbrances (other than the Assumed Liabilities) would be thwarted by the potential for holders of claims to

4880-0354-5067 v1

thereafter use the transfer as a basis to assert claims against a buyer arising from the Debtors'
conduct.

79.    Courts have consistently held that a buyer of a debtor's assets pursuant to a section
363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In
Matter of Motors Liquidation Co.*, No. 15-2844-BK(L), 2016 WL 3766237 (2d Cir. July 13, 2016)
*12, *13 ("We agree that successor liability claims can be `interests' when they flow from a
debtor's ownership of transferred assets" and holding that "a bankruptcy court may approve a §
363 sale `free and clear' of successor liability claims if those claims flow from the debtor's
ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose
before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim");
*In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including
any potential state successor or transferee liability claims against New Chrysler, as well as in rem
interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.");
*Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50
(S.D.N.Y. 2005), *rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) ("Where . . . a sale
is to be free and clear of existing liens and interests other than those of the estate, one or more of
the criteria specified in section 363(f) of the statute must also be met.").

80.    For these reasons, the Successful Bidder should not be liable under any theory of
successor liability relating to the Assets, but instead, should receive the Assets free and clear of
claims (other than the Assumed Liabilities) including successor liability claims, and the Sale Order
so provides.

4880-0354-5067 v1

**A-161**

**XI.**   **A Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code and the Sale Does Not Violate Section 363(n).**

81.     Section 363(m) of the Bankruptcy Code provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m).

82.     "Although the Bankruptcy Code does not define the meaning of `good-faith buyer,' . . . most courts have adopted a traditional equitable definition: `one who purchases the assets for value, in good faith and without notice of adverse claims.'"  *Licensing by Paolo v. Sinatra (In Re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997)). The "good faith component of the test under § 363(m) speaks `to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

83.     As will be demonstrated at the Sale Hearing, the Trustee's conduct of the sale process, and the selection of a Successful Bid, shall have been conducted in good faith and at arm's-length in accordance with the Bid Procedures. Accordingly, the Trustee requests that the Sale Order include a provision that the Successful Bidder for the Assets is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code. The Trustee believes that providing the Successful Bidder with such protection will ensure that the maximum price will be achieved for the Assets.

4880-0354-5067 v1

84.    Furthermore, as will be demonstrated at the Sale Hearing, neither the Trustee nor the Successful Bidder, once selected, shall have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. The Trustee will have negotiated the Asset Purchase Agreement in good faith and at arms' length. Moreover, the Bidding Procedures are designed to prevent the Trustee or the Successful Bidder from engaging in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.

## XII.    The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

85.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). A trustee or debtor's decision to assume or reject an executory contract or unexpired lease is governed by the business judgment standard. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (section 365 of the Bankruptcy Code "permits the trustee or debtor in possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide whether ones it would be beneficial to adhere to and which ones it would be beneficial to reject"). Once the debtor (or trustee) states a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

4880-0354-5067 v1

**A-163**

86.     Further, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor or trustee to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1). Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).

87.     The meaning of "adequate assurance of future performance" is dependent on the facts and circumstances of each case. Adequate assurances may be provided, for example, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (quoting *Cinicola*, 248 F.3d at 120 n. 10 (3d Cir. 2001).

88.     The Trustee requests approval under section 365 of the Bankruptcy Code of the Trustee's assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder. The Trustee further requests that the Sale Order provide that the Assigned Contracts will be transferred to and remain in full force and effect for the benefit of the Successful Bidder notwithstanding any provisions in such contracts or leases, including those described in sections 365(b)(2), (f)(1) and (f)(3) of the Bankruptcy Code that prohibit such assignment.

89.     To the extent necessary, the Trustee will present facts at the Sale Hearing to demonstrate the financial wherewithal, willingness, and ability of the Successful Bidder to perform under the Assumed Contracts.

4880-0354-5067 v1

**A-164**

90.    The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate performance under the Assumed Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

91.    Further, the Trustee will give notice to all parties to the potentially Assigned Contracts in substantially the form attached hereto as **Exhibit E**. The Contract Assumption Notice will include the amounts the Trustee believes are necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code.

92.    Accordingly, the Trustee submits that implementation of the proposed contract assumption procedures is appropriate and should be approved by this Court.

## XIII.   The Stalking Horse Will Not Receive Expense Reimbursement or a Breakup Fee.

93.    Pursuant to the Bidding Procedures, the Trustee will not pay the Stalking Horse a Breakup Fee and/or Expense Reimbursement (i.e., the Bid Protections). In the exercise of his judgment, the Trustee, and the Secured Creditors have agreed, that the Stalking Horse Bidder will not receive any Bid Protections.

### IMMEDIATE RELIEF IS NECESSARY/WAIVER OF STAY

94.    The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. In explicating the standards governing preliminary injunctions, courts have instructed that irreparable harm "`is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which `money damages cannot provide adequate compensation.' "*Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). Further, the "harm must be shown to be actual and imminent, not remote or speculative." The Trustee submits that, for the reasons already set forth herein, the relief requested

4880-0354-5067 v1

in this Motion is necessary to avoid immediate and irreparable harm. In that regard the Trustee

will be seeking expedited consideration the Sale Motion and Bid Procedures.

95.    The Trustee also requests that the Court waive the stay imposed by Bankruptcy

Rule 6004(h), which provides that an order authorizing the use, sale, or lease of property other

than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h).

96.    Accordingly, the Trustee respectfully requests that the Court waive the 14-day stay

imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies

immediate relief.

### REQUEST FOR EXPEDITED CONSDIERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g)

97.    In accordance with L.B.R. 5070-1(f), and 9014-1, the Trustee seeks Expedited

Consideration of the instant Motion and further requests approval of the request for expedited

consideration pursuant to L.B.R. 9014-2.

98.    Pursuant to L.B.R. 5070-1(f)(3), this request for expedited consideration may be

stated as part of the Motion.

99.    The Trustee respectfully submits that expedited consideration of the Motion is

required to permit the immediate and timely marketing of the Assets and ensure a Closing by the

end of November 2024 as agreed upon with the Secured Creditors.

100.    The Trustee further believes that expedited consideration will not prejudice the

Debtors or any of the Debtors' creditors or stakeholders when balanced against the Trustee's need

to expeditiously bring the Assets to market.

101.    The undersigned has contacted the office of the United States Trustee and counsel

to the Secured Creditors as required by L.B.R. 5070-1(f)(1). The United States Trustee and the

4880-0354-5067 v1

Secured Creditors have consented to the Motion being heard on an expedited basis consistent with the Court's calendar.

102.     Furthermore, The Trustee also requests (a) that this Court permit notice of the hearings to be served by overnight mail, facsimile transmission, or by electronic means upon (i) the Office of the United States Trustee, (ii) the Debtors' top 20 unsecured creditors, (iii) the Secured Creditors, (iii) the Debtors; and (iv) all parties who have timely filed requests for notice under Bankruptcy Rule 2002, and (b) that this Court limit the notice period accordingly.  The Trustee believes that such notice is sufficient under the circumstances for the expedited hearing.

103.     Reduction of the time periods in question is not prohibited under Fed. R. Bankr. P. 9006(c)(2) and the rules listed therein.

**RESERVATION OF RIGHTS**

104.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation of the Trustee's ability to contest same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; or (d) granting third-party-beneficiary status or bestowing any additional rights on any third party.

**NOTICE**

105.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for Region 3; (ii) the Secured Creditors, (iii) the holders of the twenty (20) largest unsecured claims against the Debtors; and (v) all parties entitled to notice pursuant to Local Bankruptcy Rule 9014-3. The Trustee submits that no other or further notice is required.

35

**A-167**

**NO PRIOR REQUEST**

106.   No previous request for the relief sought herein has been made to this Court or any

other court.

**CONCLUSION**

The Trustee respectfully request that this Court enter the Bidding Procedures Order,

approve the authority of the Trustee to select a Stalking Horse Bidder, and, after the Sale Hearing,

the Sale Order, substantially in the forms annexed hereto, granting the relief requested herein and

such other and further relief as may be just and proper.


Respectfully Submitted,

Dated: September 30, 2024      By: */s/ Michael D. Vagnoni*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail:  edmond.george@obermayer.com
                michael.vagnoni@obermayer.com

*Counsel to William A. Homony Chapter 11 Trustee*

4880-0354-5067 v1

**A-168**

**EXHIBIT A**
**Bidding Procedures Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)**[1] |
|  | : |  |

**ORDER (A) APPROVING BIDDING PROCEDURES AND FORM OF ASSET
PURCHASE AGREEMENT IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) APPROVING
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, (C) APPROVING PROCEDURES FOR
SELECTION OF A STALKING HORSE BIDDER AND BID PROTECTIONS, AND (D)
GRANTING RELATED RELIEF**

Upon the motion (the "**Sale Motion**") of William A. Homony (the "**Trustee**") in his

capacity of Chapter 11 Trustee of Stream TV Networks, Inc. ("**Stream**") and Technovative Media

Inc. ("**Technovative**", or collectively with Stream, the "**Debtors**"), seeking entry of an order (this

**"Order"**), (a) authorizing and approving the bidding procedures attached hereto as Exhibit 1 (the

"**Bidding Procedures**")[2] in connection with the sale of the Assets of the Debtors, and the form of

Asset Purchase Agreement in connection with the Sale, (b) approving the form and manner of

notice of the Auction and the Sale Hearing, (c) scheduling the Sale Hearing and setting other

related dates, (d) approving procedures for the assumption and assignment of executory contracts

and unexpired leases and noticing of related Cure Payments, (e) granting expedited consideration

of the Sale Motion and (f) granting related relief; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having the power to enter a final order

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Declaration of the Trustee in Support of the Motion, as applicable.

4880-0354-5067 v1

**A-170**

consistent with Article III of the United States Constitution; and this Court having found that venue

of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and this Court having found that the Trustee's notice of the Motion and opportunity for a hearing

on the Motion were appropriate under the circumstances and no further notice need be provided;

and this Court having reviewed the Motion and having heard the statements in support of the relief

requested therein at a hearing before this Court; and this Court having determined that the legal

and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted

herein; and this Court having determined that the relief requested by the Motion is in the best

interests of the Debtors, its estate, creditors, and other parties in interest; and upon all of the

proceedings in this Chapter 11 case conducted before this Court; and after due deliberation and

sufficient cause appearing therefor, it is hereby **FOUND, CONCLUDED AND DETERMINED**

**THAT**:

      A.     <u>Bidding Procedures</u>. The Trustee has articulated good and sufficient reasons for

authorizing and approving the Bidding Procedures attached hereto as **Exhibit 1**, which are fair,

reasonable, and appropriate under the circumstances and designed to maximize the value of the

Assets.

      B.     <u>Asset Purchase Agreement</u>. The form of Stalking Horse Asset Purchase Agreement

attached to the Motion as **Exhibit B** (the "**Stalking Horse APA**") is reasonable and appropriate

for soliciting bids for the Assets.

      C.     <u>Sale Notice</u>. The notice, substantially in the form attached hereto as **Exhibit 2**,

provided by the Trustee regarding the Sale of the Assets by the Auction and Sale Hearing (the

"**Sale Notice**") is reasonably calculated to provide all interested parties with timely and proper

notice of the proposed Sale, including: (i) the date, time, and place of the Auction; (ii) the Bidding

2

**A-171**

Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the

Motion and the date, time, and place of the Sale Hearing; (iv) specific identification of the Assets

for sale; (v) instructions for promptly obtaining a copy of the Asset Purchase Agreement; (vi)

representations describing the Sale as being free and clear of liens, claims, interests, and other

encumbrances, with all such liens, claims, interests, and other encumbrances attaching to the sale

proceeds with the same validity and priority; and (vii) notice of the proposed assumption and

assignment of the Assigned Contracts to the Successful Bidder and the right, procedures, and

deadlines for objecting thereto, and no further notice of the Sale shall be required.

D.    <u>Assumption and Assignment Procedures</u>. The Motion and the Contract Assumption

Notice (as defined herein) are reasonably calculated to provide counterparties to the Assigned

Contracts with proper notice of the intended assumption and assignment of their executory

contracts and any Cure Payments (as defined herein). The Assumption Procedures (as defined

herein) are appropriate.

E.    <u>Other Findings</u>. The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the preceding findings of fact

constitute conclusions of law, they are adopted as such. To the extent any of the preceding

conclusions of law constitute findings of fact, they are adopted as such.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT**:

1.    The Motion is GRANTED as set forth herein.

**I.    Important Dates and Deadlines**

2.    **Sale Hearing**. The Sale Hearing will commence on **November 22, 2024,** before

the Honorable Ashely M. Chan, United States Bankruptcy Judge, in the United States Bankruptcy

**A-172**

Court, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA, 19107, in Courtroom No. 4.

3.    **Sale Objection Deadline**. Objections, if any, to the Motion and the Sale of the Assets to a Successful Bidder, except objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by a Successful Bidder, must be made by **November 20, 2024 at 4:00 p.m. (prevailing Eastern Standard Time)** (the "**Sale Objection Deadline**"). Objections solely based on the identity of the Successful Bidder and adequate assurance of future performance must be made by **4:00 p.m.** (**prevailing Eastern Time**) on the date that is two (2) business days before the Sale Hearing (the "**Supplemental Limited Sale Objection Deadline**"). In each case, all objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court no later than the Sale Objection Deadline and served on (i) counsel to the Trustee so as to be received by the applicable objection deadline as set forth in the Procedures Order, and (ii) any other entity on the Master Service List.

4.    **Response Deadline**. Responses or replies, if any, to timely filed objections to entry of the Sale Order approving a Sale to the Successful Bidder must be filed prior to commencement of the Sale Hearing, provided that such deadline may be extended by agreement of the Trustee and the affected objecting party. Responses or replies, if any, to timely filed objections to the identity of the Successful Bidder and/or adequate assurance of future performance may be presented at the Sale Hearing.

5.    **Competitive Bidding**. The following dates regarding the competitive bidding process are hereby established and approved:

4

**A-173**

a. **Bid Deadline: November 15, 2024, at 4:00 p.m. (prevailing Eastern Standard Time)**, the deadline by which all Qualified Bids (as defined in the Bidding Procedures) must be actually received in writing in electronic format by the parties specified in the Bidding Procedures (the "Bid Deadline"); and

b. **Auction: November 18, 2024, at 10:00 a.m. (prevailing Eastern Standard Time)**, is the date and time the Auction, which will be held at the offices of counsel to the Trustee, Obermayer Rebmann Maxwell & Hippel LLP, 1500 Market Street, Suite 3400 Philadelphia, PA, 19102 or such other place and time as the Trustee shall notify all Qualified Bidders that have submitted Qualified Bids, and the Secured Creditors and their counsel.

## II.    Bidding Procedures and Related Relief

### A.    Bidding Procedures.

6.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1** and incorporated by reference as though fully set forth herein, are hereby approved in their entirety. The Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed Sale, and any party desiring to submit an offer for the Assets must comply with the terms of the Bidding Procedures and this Order. The Bidding Procedures shall also govern the terms on which the Trustee will proceed with the Auction and/or the Sale. The Trustee is authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures.

7.    No person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," or other similar bid protections or fee or payment.

8.    The deposits provided by all Qualified Bidders shall be deemed held in escrow in a designated non-interest bearing account by the Trustee and shall not become property of the

Debtors' bankruptcy estate unless and until released from escrow to the Trustee pursuant to an Order of this Court.

**III.    Auction**

9.    The Trustee is authorized, subject to the terms of this Order and the Bidding Procedures, to take actions reasonably necessary, in the discretion of the Trustee, to select a Stalking Horse, and conduct and implement the Auction.

10.    Only the Trustee (and his professionals and advisors), and any Qualified Bidder, in each case, along with their representatives and counsel, or such other parties as the Trustee shall determine, shall attend the Auction and only such Qualified Bidders will be entitled to make Bids at the Auction.  Pursuant to the Hawk Settlement, the Secured Creditors shall be deemed to be a Qualified Bidder for all purposes under the Bid Procedures.

11.    The Trustee and his professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as expressly set forth in this Order or the Bidding Procedures, the Trustee may conduct the Auction in the manner he reasonably determines will result in the highest or otherwise best Qualified Bid.

12.    Each Qualified Bidder participating in the Auction must confirm on the record that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the Assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures; and (c) has consented to the core jurisdiction of this Court and to the entry of a final order by this Court on any matter related to this Order, the Sale, or the Auction if it is determined that this Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

13.    The Trustee may (a) select, in its business judgment, pursuant to the Bidding Procedures, the overall highest or otherwise best Qualified Bid and the Successful Bidder, and (b)

6

**A-175**

reject any bid that, in the Trustee's business judgment, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors, their respective estates, their creditors, and parties-in-interest.

## IV.    Sale Hearing Notice and Related Relief

14.    The Sale Notice is hereby approved.  Within three (3) business days following the entry of this Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Trustee will cause the Sale Notice to be served on: (a) any party that has filed a notice of appearance in these Chapter 11 cases; (b) any entity on the Master Service List; (c) any parties known or reasonably believed to have expressed an interest in the Assets or any portion thereof; (d) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in the Assets; (e) all parties to executory contracts and unexpired leases to be assumed and assigned, or rejected as part of the Sale; (f) all applicable state and local taxing authorities; and (g) any governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder.

15.    In addition, on the Mailing Date, the Trustee shall publish a notice, substantially in the form of the Sale Notice (as may be modified for publication purposes), on one occasion, in the paper of general circulation chosen by the Trustee and its professionals and advisors.  Such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Trustee.

**A-176**

## V.    Assumption and Assignment Procedures

16.    The procedures set forth below regarding the assumption and assignment of the executory contracts and unexpired leases proposed to be assumed by the Successful Bidder pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "**Assumption Procedures**") are hereby approved to the extent set forth herein.

17.    The Assumption Procedures shall govern the assumption and assignment of all of the Debtors' executory contracts and unexpired leases to be assumed and assigned in connection with the Sale under the Asset Purchase Agreement (each, an "**Assigned Contract**," and, collectively, the "**Assigned Contracts**"), subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "**Cure Payments**"), the provision of adequate assurance by the Debtors or the Successful Bidder, as applicable, that Buyer will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Successful Bidder under the Assigned Contracts:

a.    **Contract Assumption Notice**: No less than twenty-one (21) days prior to the Sale Objection Deadline (the "**Assumption and Assignment Service Deadline**"), the Trustee shall serve a notice of contract assumption in substantially the form attached hereto as **Exhibit 3** (the "**Contract Assumption Notice**") via overnight delivery on all counterparties to all potential Assigned Contracts and provide a copy of the same to the Secured Creditors. The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or

unexpired lease, as applicable, (iii) the Trustee's good faith estimates of the Cure Payments required in connection with the executory contract or unexpired lease, as applicable, and (iv) the Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any contract is an executory contract or unexpired lease, as applicable, or that the stated Cure Payment related to any executory contract or unexpired lease constitutes a claim against the Debtors' estates.  Further, the inclusion of an executory contract or unexpired lease, as applicable, on the Contract Assumption Notice is not a guarantee that such executory contract or unexpired lease, as applicable, will ultimately be assumed and assigned.

b.      **Cure Payments and Adequate Assurance of Future Performance**: The payment of the applicable Cure Payments by Successful Bidder, as applicable, the provision of adequate assurance by the Successful Bidder, as applicable, that they will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Successful Bidder under the Assigned Contracts shall (i) effect a cure of all defaults existing thereunder, and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

c.      **Supplemental Contract Assumption Notice**: Pursuant to the terms of the Stalking Horse APA or the Modified APA, as applicable, or as otherwise agreed by the Trustee and the Successful Bidder, at any time after the Assumption and Assignment Service Deadline and prior to one (1) business day before Closing, the Successful Bidder has the right to designate a (i) supplement the list of Assigned Contracts with previously omitted executory contracts and/or unexpired leases ("**Additional Assigned Contracts**"), (ii) remove Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that a Successful Bidder proposes to be assumed and assigned to it in connection with a Sale ("**Removed**

9

**A-178**

Assigned Contracts"), and/or (iii) modify the previously stated Cure Payment associated with any Assigned Contracts.

        d.    **Objections**: Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by counsel to the Trustee on or before 14 days after service of the Contract Assumption Notice (the "**Cure Objection Deadline**"), or such deadline set forth in the Supplemental Assumption Notice. The deadline to object to assumption and assignment solely with respect to the adequate assurance of future performance from the Successful Bidder, however, is the date that is two days after the conclusion of the Auction, but any such objection must be received before the start of the Sale Hearing, or such deadline set forth in the Supplemental Assumption Notice. Any party failing to timely file an objection to the cure amount, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, as applicable, or the Sale is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract (including the adequate assurance of future performance), (c) the related relief requested in the Motion, and (d) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Payment, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law

excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder, as applicable, with respect to such party's Assigned Contract or Additional Assigned Contract.

18.     The Trustee shall have no liability or obligation with respect to defaults relating to the Assigned Contracts arising, accruing, or relating to a period on or after the effective date of assignment, or for the payment of any cure costs.

**VI.     Other Related Relief**

19.     Any objections to the entry of this Order and the relief granted herein that have not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are hereby expressly overruled.

20.     The Trustee shall have no personal liability for any obligations of the Debtors' estates.

21.     Any obligations of the Debtors set forth in this Order and any Asset Purchase Agreement that are intended to be performed by the Trustee prior to the Sale Hearing and/or entry of the Sale Order are authorized as set forth herein.

22.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

23.     To the extent the provisions of this Order are inconsistent with the provisions of any exhibits referenced herein or with the Motion, the provisions of this Order shall control.

24.     The Trustee is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

11

**A-180**

25.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.


BY THE COURT:


_____
Honorable Ashely M. Chan
Chief United States Bankruptcy Judge

**Exhibit 1**
**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)**[1] |
|  | : |  |

## BIDDING PROCEDURES

On March 15, 2023, (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc ("Technovative" collectively with Stream, the "**Debtors**") commenced Chapter 11 cases in the Bankruptcy Court for the Eastern District of Pennsylvania (the "**Court**").

On January 9, 2024 (the "**Appointment Date**"), William A. Homony was appointed as Chapter 11 Trustee of the Debtors' estates (the "Trustee") in order to determine, *inter alia*, if it would be beneficial to pursue a sale of substantially all of the Debtors' Assets.

On XXXXX, 2024, the Court entered an order [Docket No. [WW]] (the "**Bidding Procedures Order**")[2] approving, among other things, these bidding procedures (the "**Bidding Procedures**") and the Stalking Horse Asset Purchase Agreement ("**Stalking Horse APA**") to solicit bids on the Assets.

These Bidding Procedures set forth, among other things, (i) the procedures for bidders to submit bids for an investment in, or other acquisition of, the Debtors' Assets pursuant to an order of the Bankruptcy Court approving such transaction (the "**Sale**"); (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids; (iii) the process for negotiating the bids received; (iv) the process by which the Trustee is authorized to conduct the auction ("**Auction**") for the Sale; (v) the procedure for the ultimate selection of any Successful Bidder; and (vi) the process for approval of a potential Sale at a Sale Hearing (each as defined herein).

Pursuant to these Bidding Procedures, the Trustee and his advisors shall (i) determine whether any person is a Qualified Bidder (as defined below), (ii) coordinate the efforts of Potential Bidders (as defined below) in conducting their due diligence activities, (iii) receive offers from Potential Bidders, and (iv) negotiate any offers made to acquire the Assets.

The key dates for the sale process are as follows:

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] All terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion for approval of the Bidding Procedures (the "**Motion**").

| November 15, 2024 at 4:00 p.m. prevailing Eastern Time | Bid Deadline - Due Date for Bids and Deposits |
| November 18, 2024 at 10:00 a.m. prevailing Eastern Time | Auction |
| November 20, 2024 at 4:00 p.m. prevailing Eastern Time | Sale Objection Deadline[3] |
| November 21, 2024 at 12:00 p.m. prevailing Eastern Time | Sale Objection Response Deadline |
| At the Sale Hearing | Supplemental Limited Sale Objection Response Deadline |
| November 22, 2024 at 10:00 a.m. prevailing Eastern Time | Sale Hearing |
| November 29, 2024 | Closing |

**Due Diligence**

**Access to Diligence Materials**

To participate in the bidding process and to receive access to due diligence (the "**Diligence Materials**"), a party interested in acquiring the Debtors' Assets must submit to the Trustee an executed NDA in such form reasonably satisfactory to the Trustee. A party who qualifies for access to Diligence Materials pursuant to these Bidding Procedures shall be a "**Potential Bidder**."

The Trustee will afford any Potential Bidder the time and opportunity to conduct reasonable due diligence, as determined by the Trustee, access to the electronic data room and other information that a Potential Bidder may reasonably request; provided, however, that the Trustee shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below). The availability of additional due diligence to a Qualified Bidder will cease on the date of the Auction; provided, however, that the Successful Bidder shall be permitted to continue to conduct due diligence until the Closing of the Sale (subject to the terms of the Successful Bidder Asset Purchase Agreement (as defined below)). The Trustee reserves the right to withhold any Diligence Materials that the Trustee determines are not appropriate for disclosure to a Potential Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Trustee nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder.

Each Potential Bidder will be deemed to acknowledge and represent it (a) has had an opportunity to conduct any and all due diligence regarding the Debtors' Assets and liabilities that are the subject of the Auction prior to making any such bid, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise

---

[3] This deadline applies to all objections to the Sale Motion as well as the Sale of the Assets with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder.

4880-0354-5067 v1

regarding the Debtors' assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures.

All due diligence requests must be directed to the Trustee's investment banker, J. Scott Victor, Managing Director, SSG Capital Advisors, LLC; 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428: Direct: 610-940-5802; Mobile: 215-816-8118; jsvictor@ssgca.com.

**Due Diligence from Potential Bidders**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access by the Trustee or his advisors regarding the ability of such Potential Bidder to consummate its transaction.

## Designation of Stalking Horse Bidder

The Trustee is authorized to name the Secured Creditors as the Stalking Horse Bidder, (as defined in the Sale Motion) in connection with the Auction and enter into a stalking horse APA (a "**Stalking Horse APA**") with no bid protections.

Parties interested in becoming a Qualified Bidder for Debtors' Assets are encouraged to submit a Qualifying Bid by forwarding to the Trustee's Investment Banker: J. Scott Victor and Teresa C. Kohl, Managing Directors, SSG Advisors, LLC; 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428: Direct: 610-940-5802; J. Scott Victor Mobile: 215-816-8118 and Teresa C. Kohl Mobile: 215-280-6766; jsvictor@ssgca.com and tkohl@ssgca.com.

## Bid Deadline

The Trustee shall assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and shall accept Bids (as defined below) until **November 15, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**") to acquire the Assets.

**The submission of a bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the assets specified in such bid.** Any party that does not submit a bid by the Bid Deadline will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in any Auction.

No later than the Bid Deadline, a Potential Bidder that desires to make a bid to consummate the Sale shall deliver written copies of its Bid (as defined below) in electronic format to: (i) the Trustee (bhomony@mctllp.com) (ii) counsel to the Trustee, Obermayer Rebmann Maxwell & Hippel LLP (edmond.george@obermayer.com) (iii) investment banker to the Trustee, J. Scott Victor and Teresa C. Kohl, Managing Directors, SSG Capital Advisors, LLC; 300 Barr Harbor Drive, Suite 420 West Conshohocken, PA 19428: Direct: 610-940-5802; J. Scott Victor, Mobile: 215-816-8118 and Teresa C. Kohl Mobile: 215-280-6766; jsvictor@ssgca.com and tkohl@ssgca.com.; and (iv) Office of the United States Trustee.

4880-0354-5067 v1

**A-185**

The Trustee may extend the Bid Deadline without further order of the Bankruptcy Court, subject to providing notice to all Potential Bidders and the Stalking Horse Bidder.

### Determination of Qualified Bid Status

To be eligible for consideration as a Qualified Bid and to participate in the Auction, each Potential Bidder must deliver to the Trustee, his counsel and his advisors, a written, irrevocable, signed offer (each, a "**Bid**") that must be determined by the Trustee, in its business judgment, to satisfy each of the following conditions:[4]

a.   **Good Faith Offer**: Each Bid must constitute a good faith, bona fide offer to purchase all or certain of the Assets.

b.   **Good Faith Deposit**: Each Bid must be accompanied by a deposit in the amount of 10% of the Purchase Price (as defined in the Modified APA (as defined below)), before any reductions for assumed liabilities (the "**Good Faith Deposit**"). The Good Faith Deposit shall come in the form of a wire transfer, certified check or other form acceptable to the Trustee, in his sole and exclusive discretion. Each Good Faith Deposit will be deposited and held in one or more non-interest-bearing accounts by the Trustee but shall not become property of the Debtors' estates absent further Order of the Bankruptcy Court. Wire instructions will be provided by the Trustee upon request.

c.   **Executed Agreement**: Each Bid must include an executed Asset Purchase Agreement (a "**Modified APA**") substantially in the form of the Stalking Horse APA, and any necessary transaction documents, signed by an authorized representative of such Potential Bidder, pursuant to which the Potential Bidder proposes to effectuate the acquisition of substantially all of the assets of the Debtors. Each Bid must also include a copy of the Modified APA marked against the Stalking Horse APA to show all changes requested by the Potential Bidder (including those related to the assumption and assignment of executory contracts and unexpired leases, and other material terms such that the Trustee may determine how such Bid compares to the terms of the Stalking Horse APA and competing Bids). Each Modified APA must provide a commitment to close within two (2) business days after all closing conditions are met.

d.   **Purchase Price**: Each Bid must clearly identify the purchase price to be paid (the "**Purchase Price**") and identify how much of the Bid is being paid in cash. Qualified Bids must bid a minimum consideration equal to the Stalking Horse Bid, plus the increment.

e.   **Cash Requirements**: Each Bid must provide evidence of the ability to pay the cash portion of the bid in cash in full. To the extent the bid contains cash and non-cash

---

[4] The Trustee may, in his sole and exclusive discretion, waive any of the following requirements for a Bid to constitute a Qualified Bid to the extent reasonably necessary to promote bids and a robust Auction so long as any such waiver is not materially inconsistent with these Bidding Procedures.

portions, the allocations shall be identified in the bid.  If a non-cash portion is part of the Bid, the cash portion must be a minimum of $120,000,000.00.

f.  **Designation of Assigned Contracts and Leases**: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Potential Bidder wishes to be assumed pursuant to a Sale. A Bid must specify whether the Debtors or the Potential Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs.

g.  **Designation of Assumed Liabilities**: A Bid must identify all liabilities which the Potential Bidder proposes to assume.

h.  **Corporate Authority**: A Bid must include written evidence reasonably acceptable to the Trustee demonstrating appropriate corporate authorization to consummate the proposed Sale; provided that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the Sale, then the Potential Bidder must furnish written evidence reasonably acceptable to the Trustee of the approval of the Sale by the equity or interest holder(s) of such Potential Bidder.

i.  **Disclosure of Identity of Potential Bidder**: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including the identity of any parent companies of such entity), and the complete terms of any such participation, including any connections, agreements, arrangements or understandings with the Debtors, or any other known, potential, prospective bidder, or Potential Bidder, or any officer, director, shareholder or member of the Debtors.

j.  **Disclosure of Connections**: A Bid must fully disclose any connections or agreements with the Debtors or their affiliates, any other known Potential Bidder and/or any officer or director or member of the Debtors.

k.  **Proof of Financial Ability to Perform**: A Bid must include written evidence that the Trustee may reasonably conclude, in consultation with his advisors, demonstrates that the Potential Bidder has the necessary financial wherewithal to timely consummate a Sale including the amount of any Overbid and must further contain information that can be publicly filed and/or disseminated providing adequate assurance of future performance of all executory contracts and unexpired leases to be assumed and assigned in such Sale. Such information must include the following:

(1)  contact names and numbers for verification of financing sources;

(2)  written evidence of the Potential Bidder's internal resources and proof of any debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors' estates in the

amount of the cash portion of such Bid, in each case, as are needed to close the Sale;

(3)    the Potential Bidder's most current audited (if any) and latest unaudited financial statements or, if the bidder is an entity formed for the purpose of making a bid, the current audited (if any) and latest unaudited financial statements of the equity holder(s) of the bidder or such other form of financial disclosure, and a guaranty from such equity holder(s);

(4)    a description of the Potential Bidder's pro forma capital structure; and

(5)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Trustee demonstrating that such Potential Bidder has the ability to promptly close the Sale.

l.    **Conditions/Contingencies**: Except as provided in the Stalking Horse APA, a Bid must not be subject to material conditions or contingencies to closing, including without limitation obtaining financing, internal approvals or further due diligence.

m.    **Bid Irrevocable**: A Bid must provide that it is irrevocable until two (2) business days after the closing of the Sale. Each Potential Bidder further agrees that its Bid, if not chosen as the Successful Bidder, shall serve, without modification, as a Backup Bidder (as defined below) as may be designated by the Trustee at the Sale Hearing, in the event the Successful Bidder fails to close as provided in the Successful Bidder's Modified APA, if at all, and the Sale Order.

n.    **As-Is, Where-Is**: A Bid must include the following disclaimer: EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY TRUSTEE PURSUANT TO THIS AGREEMENT (I) THE TRUSTEE MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE  ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE TRUSTEE MAKES NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE BUYER SHALL RELY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE TRUSTEE MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY ASSET.

o.    **Time Frame for Closing**: A Bid by a Potential Bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Trustee.

4880-0354-5067 v1

p. **Consent to Jurisdiction**: Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtor, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtors the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale, and (iii) commit to the entry of a final order or judgment in any way related to the Debtors, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

q. **Bid Protections**: A Bid must not entitle the Potential Bidder to any break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of payment or reimbursement and, by submitting a Bid, the Potential Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction. Each Potential Bidder presenting a Bid will bear its own costs and expenses (including legal fees) in connection with any proposed Sale.

r. **Representations and Warranties**: A Bid must include the following representations and warranties:
  i. a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable assets prior to submitting its Bid;
  ii. a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Modified APA ultimately accepted and executed by the Trustee;
  iii. a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable assets;
  iv. a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;
  v. a statement that all proof of financial ability to consummate a Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and
  vi. a statement that the Potential Bidder agrees to be bound by the terms of the Bidding Procedures.

4880-0354-5067 v1

## Review of Bids; Designation of Qualified Bids

A Bid received from a Potential Bidder that meets the above requirements, as determined by the Trustee, shall constitute a "**Qualified Bid**" for such Assets (and such Potential Bidder, a "**Qualified Bidder**"); provided that if the Trustee receives a Bid prior to the Bid Deadline that is not a Qualified Bid, the Trustee may provide the Potential Bidder with the opportunity to cure or remedy any deficiencies prior to the Bid Deadline.

Within two (2) business days after the Bid Deadline, the Trustee and his advisors will determine which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any Bid that is not deemed a Qualified Bid will not be considered by the Trustee. To the extent there is any dispute regarding whether a bidder is a Qualified Bidder, such dispute may be raised with the Bankruptcy Court on an expedited basis prior to the commencement of the Auction.

Prior to the Auction, the Trustee and its advisors will evaluate Qualified Bids and identify the Qualified Bid that is, in the Trustee's reasonable business judgment the highest or otherwise best bid (the "**Starting Bid**"). The Starting Bid may be the bid of the Stalking Horse Bidder or any other higher or better Qualified Bid. In making such determination, the Trustee will take into account, among other things, the execution risk attendant to any submitted bids. Within twenty-four (24) hours of such determination, but in no event later than twenty-four (24) hours before the start of the Auction, the Trustee will (i) notify the Bidder as to which Qualified Bid is the Starting Bid, and (ii) distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

If any Bid is determined by the Trustee not to be a Qualified Bid, the Trustee will refund such Potential Bidder's Good Faith Deposit on or within ten (10) business days after the Bid Deadline.

By submitting its Bid, each Potential Bidder is agreeing with each other Potential Bidder to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after the Auction.

Without the written consent of the Trustee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price or otherwise improve the terms of the Qualified Bid during the period that such Qualified Bid remains binding as specified herein; provided, that any Qualified Bid may be improved at the Auction as set forth in these Bidding Procedures.

## Auction

If two or more Qualified Bids are received by the Bid Deadline, the Trustee will conduct an auction (the "**Auction**") to determine the highest or otherwise best Qualified Bid. This determination shall take into account any factors the Trustee reasonably deems relevant to the value of the Qualified Bid to the estate and may include, but are not limited to, the following: (a)

the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes to the Asset Purchase Agreement requested by each Qualified Bidder; (c) the extent to which such modifications or provisions are likely to delay closing of the sale of the Debtors' Assets and the cost to the Debtor estates of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood the Qualified Bidder can close the transaction timely; and (f) any other qualitative or quantitative factor the Trustee deems reasonably appropriate under the circumstances (collectively, the "**Bid Assessment Criteria**"). Notwithstanding anything herein to the contrary, the Trustee may select a combination of Qualified Bids for the Assets, in any combination that yields the highest or best value for the Debtors' respective estates.

If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Trustee will not conduct the Auction, and shall file a notice with the Bankruptcy Court indicating that no Auction will be held.

## Procedures for Auction

If the Trustee receives two or more Qualified Bids, the Auction shall take place on November 18, 2024 at 10:00 a.m. (EST) at the offices of Obermayer Rebmann Maxwell & Hippel LLP, 1500 Market Street, Suite 3400, Philadelphia, PA 19102, or such other place and time as determined by the Trustee. The Auction may be postponed, adjourned or cancelled as the Trustee deems appropriate, provided the Trustee provides notice of such postponement or adjournment and the time and place for the commencement of the Auction. The Auction shall be conducted according to the following procedures:

**Participation**

Only the Trustee, his Advisors, and any Qualified Bidder that has submitted a Qualified Bid, in each case, along with their representatives and counsel, or such other parties as the Trustee shall determine shall attend the Auction and only such Qualified Bidders will be entitled to make any Bids at the Auction.

**The Trustee Shall Conduct the Auction**

The Trustee and his professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as expressly set forth herein, the Trustee may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid. The Trustee shall provide each participant in the Auction with a copy of the Modified APA associated with the Starting Bid. In addition, at the start of the Auction, the Trustee shall describe the terms of the Starting Bid. Each Qualified Bidder participating in the Auction must confirm, both before and after the Auction, that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, and (b) has reviewed, understands and accepts the Bidding Procedures.

All Qualified Bidders may submit further Bids, along with a markup or a further markup of the applicable Asset Purchase Agreement. The Auction will be conducted in rounds. At any

time, a Qualified Bidder may request that the Trustee announce the current highest and best bid. If requested, the Trustee shall use reasonable efforts to clarify any and all questions any Qualified Bidder may have regarding the Trustee's announcement of the Starting Bid or the then current and highest bid.

The Trustee may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent with the Bidding Procedures.

**Overbids**

An "Overbid" is any bid made at the Auction subsequent to the Trustee's announcement of the respective Starting Bid. Any Overbid for purposes of this Auction must comply with the following conditions:

a.  **Minimum Overbid Increments**: Any Overbid after and above the respective Starting Bid or any subsequent Overbid shall be made in increments valued at not less than $250,000. The Trustee reserves the right to increase or decrease any subsequent increments, after the first Overbid.

b.  **Remaining Terms Are the Same as for Qualified Bids**: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that (i) the Bid Deadline shall not apply and (ii) no additional Good Faith Deposit shall be required beyond the Good Faith Deposit previously submitted by a Qualified Bidder, provided that the Successful Bidder shall be required to make a representation at the end of the Auction that it will provide any additional deposit necessary so that its Good Faith Deposit is equal to the amount of ten percent (10%) of the Purchase Price contained in the Successful Bid. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Qualified Bidder to the Asset Purchase Agreement or a previously submitted Modified APA, in connection therewith (including any changes to the designated assigned executory contracts and unexpired leases and assumed liabilities). Any Overbid must remain open and binding on the Qualified Bidder until and unless the Trustee accepts a higher or otherwise better Overbid from another Qualified Bidder (except, to the extent required hereby, to serve as the Backup Bid). At the Trustee's discretion, to the extent not previously provided, a Qualified Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information reasonably acceptable to the Trustee) reasonably demonstrating such Qualified Bidder's ability to close the Sale proposed by such Overbid.

**Announcement and Consideration of Overbids**

a.  **Announcement of Overbids**: The Trustee shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each

such Overbid, the basis for calculating such total consideration and such other terms as the Trustee reasonably determines will facilitate the Auction.

b.    **Consideration of Overbids**: Subject to the deadlines set forth herein, the Trustee reserves the right in its reasonable business judgment to make one or more continuances of the Auction to, among other things facilitate discussions between the Trustee and Qualified Bidders or allow a Qualified Bidder to consider how it wishes to proceed.

**Closing the Auction**

The Auction shall continue until there is one or more Qualified Bid(s) that the Trustee determines in his reasonable business judgment, is the highest or otherwise best Qualified Bid at the Auction. Thereafter, the Trustee shall select such Qualified Bid as the overall highest or otherwise best Qualified Bid (such Bid, the "**Successful Bid**," the Qualified Bidder submitting such Successful Bid, the "**Successful Bidder**" and the Qualified Bidder's purchase agreement, the "**Successful Bidder Asset Purchase Agreement**"). In making this decision, the Trustee shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents memorializing the terms of the Successful Bid. Promptly following the Trustee's selection of the Successful Bid and the conclusion of the Auction, the Trustee shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

The Trustee shall not consider any Bids submitted after the conclusion of the Auction. For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Trustee from exercising its fiduciary duties under applicable law to maximize the value obtained for the Assets.

**Designation of Backup Bidder**

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Trustee, in the exercise of its business judgment will be designated as the backup bidder (the "**Backup Bidder**"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "**Backup Bid**") open and irrevocable until the date that is two days after the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, the Backup Bidder will be deemed to maintain the new prevailing bid, and the Trustee will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the Sale with the Backup Bidder.

4880-0354-5067 v1

**Sale Is As Is/Where Is**

Except as otherwise provided in the Successful Bidder Asset Purchase Agreement or the Sale Order, the Assets or any other assets of the Debtors sold pursuant to the Bidding Procedures, shall be conveyed at the closing of a transaction with a Successful Bidder in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**" Except as may be set forth in the Successful Bidder Asset Purchase Agreement or the Sale Order, the Assets are sold free and clear of any and all liens, claims, interests, restrictions, charges and encumbrances of any kind or nature to the fullest extent permissible under the Bankruptcy Code, with such liens, claims, interests, restrictions, charges, and encumbrances to attach to the net proceeds of sale with the same validity and with the same priority.

**Sale Objections and Hearing**

A hearing to consider approval of the Successful Bid (the "**Sale Hearing**") is scheduled to take place on November XX 2024 at 11:00 a.m. (EST) before the Honorable Ashely M. Chan, Bankruptcy Judge, either telephonically through Court Solutions or at the Courtroom 4 at the United States Bankruptcy Court for the Eastern District of Pennsylvania, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA 19107, or at such time thereafter as counsel may be heard. At the Sale Hearing, the Trustee will present the Successful Bid to the Bankruptcy Court for approval; provided, however, to the extent that the Successful Bid is to be implemented pursuant to a Plan, the Sale Hearing shall be used as a status conference.

Objections to the Sale (each, a "**Sale Objection**"), shall (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Trustee, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; (v) be filed with the Court (a) by registered users of the Court's case filing system, and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Court; and (vi) be served upon the Objection Notice Parties (as defined in the in the Bidding Procedures Order) by **November XX, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Sale Objection Deadline**"); provided, that the Trustee may extend the Sale Objection Deadline, as the Trustee deems appropriate in the exercise of their reasonable business judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard by the Court at the Sale Hearing.

Each Successful Bidder shall appear at the Sale Hearing and be prepared to have a representative(s) testify in support of its Successful Bid and such Successful Bidder's ability to close in a timely manner and provide adequate assurance of its future performance under any and all executory contracts and unexpired leases to be assumed and/or assigned as part of the proposed transaction.

Any party who fails to file with the Court and serve on the Objection Notice Parties a Sale Objection by the Sale Objection Deadline may be forever barred from asserting, at the Sale Hearing

4880-0354-5067 v1

or thereafter, any Sale Objection to the relief requested in the Motion with regard to a Successful Bidder, or to the consummation and performance of a Sale contemplated by a purchase or investment agreement between the Trustee and each Successful Bidder, including the transfer of the Assets to such Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant to section 1141(c) of the Bankruptcy Code.

## Return of Good Faith Deposits of Qualified Bidders

The Good Faith Deposits of all Qualified Bidders shall be held in one or more non-interest-bearing escrow accounts by the Trustee but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. If the Backup Bidder is not designated the Successful Bidder, the Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder on the date that is the Outside Backup Date. In the case of a breach or failure to perform on the part of the Successful Bidder (including any Backup Bidder designated as a Successful Bidder), the remaining portion of the defaulting Successful Bidder's Good Faith Deposit shall be forfeited to the Trustee as liquidated damages, in addition to any and all rights, remedies and/or causes of action that may be available to the Trustee at law or in equity, and, the Trustee shall be free to consummate the proposed transaction at the next highest price bid at the Auction by a Qualified Bidder, without the need for an additional hearings or orders of the Courts. The Trustee reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures. If the Successful Bidder timely closes the Sale transaction, its Good Faith Deposit shall be credited towards the purchase price.

## Reservation of Rights of the Trustee

Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Trustee reserves the right as it may reasonably determine to be in the best interest of its estate and in the exercise of its fiduciary duty to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reduce the Overbid amount; (e) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (3) contrary to the best interests of the Debtors and their respective estates; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; and (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice.

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Trustee from considering any and all transactions, including, but not limited to, proposals to sponsor a plan of reorganization.

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Trustee from exercising its fiduciary duties under applicable law.

13

4880-0354-5067 v1

**A-195**

**Exhibit 2**
**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)[1]** |
| | : | |

## NOTICE OF AUCTION AND SALE HEARING PLEASE TAKE NOTICE OF THE FOLLOWING:

1.    On, March 15, 2023, the above-captioned Debtors and former debtors in possession (the "**Debtors**"), filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**").

2.    On January 9, 2024 (the "**Appointment Date**"), William A. Homony was appointed as Chapter 11 Trustee of the Debtors' estates (the **"Trustee")** in order to determine, *inter alia*, if it would be beneficial to pursue a sale of substantially all of the Debtors' Assets.

3.    On XXXXXX, 2024, in connection with the proposed sale (the "**Sale**") of the Debtors' Assets (the "**Assets**") at an auction for the Assets (the "**Auction**"), the Trustee filed a motion (the "Motion"), seeking, among other things, (i) entry of an order (the "**Bidding Procedures Order**")[2] approving the bidding procedures (the "**Bidding Procedures**") governing the Sale; (ii) establishing procedures for the assignment and assumption of executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); and (iii) granting related relief [Docket No._____].

4.    On **XXXXXX, 2024**, the Bankruptcy Court entered the Bidding Procedures Order [Docket No._____].  Pursuant to the Bidding Procedures Order, if two or more Qualified Bids are received before the Bid Deadline, the Trustee will conduct the Auction to determine the highest or otherwise best Qualified Bid, beginning on **November 18, 2024** at 10:00 a.m. (EST) at the offices of Obermayer Rebmann Maxwell & Hippel LLP, 1500 Market Street , Suite 3400, Philadelphia, PA 19102 or such other place and time as the Trustee shall notify all Qualified Bidders that have submitted Qualified Bid. Only the Trustee (and his professionals and advisors) and parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, **by no later than November 15, 2024 at 4:00 p.m. (EST)** (the "**Bid Deadline**") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Debtors' Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures Order.

4.      A hearing to approve the Sale (the "**Sale Hearing**") will be held on November 20, 2024 at 10:00 a.m. (EST) before the Honorable Ashely M. Chan, U.S.B.J. at the United States Bankruptcy Court for the Eastern District of Pennsylvania, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA, 19107 in Courtroom No. 4., or at such time thereafter as counsel may be heard, unless otherwise continued by the Trustee pursuant to terms of the Bidding Procedures.

5.      Objections, if any, to the Motion and the Sale of the Assets to a Successful Bidder, except objections related solely to the identity of the Successful Bidder and adequate assurance of future performance by a Successful Bidder, must be made by **November 20, 2024 at 4:00 p.m., prevailing Eastern Time** (the "**Sale Objection Deadline**"). Objections solely to the identity of the Successful Bidder and adequate assurance of future performance must be made by **November 20, 2024, 4:00 p.m., prevailing Eastern Time** on the date that is two (2) business days before the Sale Hearing. In each case, all objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court no later than the Sale Objection Deadline or the Supplemental Limited Sale Objection Deadline, as applicable, and served on (i) counsel for the Trustee, and (ii) any other entity on the Master Service List. *Any party who fails to timely file an objection to entry of the Sale Order (i) shall be forever barred from objecting thereto, (ii) shall be deemed to consent to the sale of the Assets as approved by the Sale Order, and (iii) shall be deemed to "consent" for purposes of Section 363 (f)(2) of the Bankruptcy Code.*

6.      This Notice and the Sale Hearing is subject to the fuller terms and conditions of the Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Trustee encourages parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of all the Assets and/or copies of any related document, including the Motion, or the Bidding Procedures Order, may make a written request to counsel for the Trustee, Obermayer Rebmann Maxwell Hippel LLP, c/o Edmond M George, Esquire (edmond.george@obermayer.com) or Michael D. Vagnoni, Esquire (michael.vagnoni@obermayer.com) In addition, copies of the Motion, the Bidding Procedures Order and this Notice can be found through PACER on the Court's website, https://ecfnjb.uscourts.gov/ (registration required).

Respectfully Submitted,

Dated: September 30, 2024      By: */s/ Michael D. Vagnoni*
                                    Edmond M. George, Esquire
                                    Michael D. Vagnoni, Esquire
                                    OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                    Centre Square West
                                    1500 Market Street, Suite 3400
                                    Philadelphia., PA 19102
                                    Telephone: (215) 665-3066

4880-0354-5067 v1

**A-198**

Facsimile: (215) 665-3165
E-mail:  edmond.george@obermayer.com
          michael.vagnoni@obermayer.com

4880-0354-5067 v1

**A-199**

**Exhibit 3**
**Contract Assumption Notice**

4880-0354-5067 v1

**A-200**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc., *et al.*** | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)[1]** |
| | : | |

## ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

PLEASE TAKE NOTICE THAT:

1.       On March 15, 2023, the above-captioned debtors and former debtors in possession (the "**Debtors**"), filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**").

2.       On January 9, 2024 (the "**Appointment Date**"), William A. Homony was appointed as Chapter 11 Trustee of the Debtors' estates (the **"Trustee"**) in order to determine, *inter alia*, if it would be beneficial to pursue a sale of substantially all of the Debtors' Assets.

1.

3.       On **XXXXX**, in connection with the proposed sale (the "**Sale**") of the Debtors' assets (the "**Assets**") at an auction (the "**Auction**"), the Trustee filed a motion (the "**Motion**"), seeking, among other things, (i) entry of an order (the "**Bidding Procedures Order**")[2] approving the bidding procedures (the "**Bidding Procedures**") governing the Sale; (ii) establishing procedures for the assignment and assumption of executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); and (iii) granting related relief [Docket No. _____].

3.       Pursuant to the Bidding Procedures Order, the Trustee hereby provides notice that they are seeking to assume and assign to the Successful Bidder the executory contracts and/or unexpired leases (each, an "**Assigned Contract**") listed on **Exhibit A** attached hereto.

4.       When the debtor assumes and assigns an Assigned Contract to which you are a party, on the closing date of the Sale, or as soon thereafter as practicable, the Successful Bidder will pay you the amount the Debtors' records reflect is owing for prepetition arrearages as set forth on **Exhibit A** (the "**Cure Payment**"). The Debtors' records reflect that all post-petition amounts owing under your Assigned Contract have been paid and will continue to be paid in the ordinary

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures Order.

1

**A-201**

course of business until the assumption and assignment of the Assigned Contract, and that other than the Cure Payment, there are no other defaults under the Assigned Contract.

5.      Inclusion of an executory contract or unexpired lease as an Assigned Contract on **Exhibit A** is not a guarantee that such executory contract or unexpired lease will ultimately be assumed and assigned to the Successful Bidder. Should it be determined that the Assigned Contract to which you are a party will not be assumed and assigned, you will be notified in writing.

6.      Under the terms of the Bidding Procedures, the Successful Bidder may modify the list of Assigned Contracts on **Exhibit A** at any time prior to three (3) business days before the Sale Hearing (the "**Designation Deadline**"), and the Trustee reserves the right at any time before the closing of a Sale, to (i) supplement the list of Assigned Contracts with previously omitted executory contracts, (ii) remove Assigned Contracts from the list of executory contracts ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale, and/or (iii) modify the previously stated Cure Payment associated with any Assigned Contracts. In the event the Trustee exercises any of these reserved rights, the Trustee will promptly serve a supplemental notice of contract assumption (a "**Supplemental Assumption Notice**"); provided, however, the Trustee may not add an executory contract or unexpired lease to the list of Assigned Contracts that has been previously rejected by the Trustee by Order of the Court.

7.      Objections, if any, to the proposed Cure Payment or assumption and assignment must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by proposed counsel to the Trustee on or before **14 days after service of this Contract Assumption Notice** (the "**Cure Objection Deadline**"), or such deadline set forth in the applicable Supplemental Assumption Notice. The deadline to object to assumption and assignment solely with respect to the adequate assurance of future performance shall be the date that is two (2) business days before the start of the Sale Hearing; provided, however, and for the avoidance of doubt, the deadline to object to the Cure Payment shall not be extended.

8.      If an objection to the Cure Payment or assumption and assignment is timely filed and not resolved by the parties, a hearing with respect to the objection will take place in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA 19107 Courtroom 4, at the Sale Hearing to be held at 10:00 a.m. (prevailing Eastern Time) on November XX, 2024, or at a later hearing, as determined by the Trustee. A hearing regarding the Cure Payment, if any, may be continued at the discretion of the Trustee until after the Closing.

9.      **Any party failing to timely file an objection to the Cure Payment, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, or the Sale will be deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of**

2

**A-202**

**such Assigned Contract or Additional Assigned Contract (including the adequate assurance of future performance), (c) the related relief requested in the Motion, and (d) the Sale. Such party will be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, the adequate assurance of future performance or the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Assigned Contract or Additional Assigned Contract.**

10.    After the Auction, the Trustee will file, but not serve, a notice that identifies the Successful Bidder. The Trustee and/or the Successful Bidder reserve all of their rights, claims and causes of action with respect to the Assigned Contracts listed on **Exhibit A** hereto. Notwithstanding anything to the contrary herein, the proposed assumption and assignment of each of the Assigned Contracts listed on **Exhibit A** hereto (a) shall not be an admission as to whether any such Assigned Contract was executory or unexpired as of the Petition Date or remains executory or unexpired post-petition within the meaning of Bankruptcy Code section 365; and (b) shall be subject to the Trustee's and/or any Successful Bidder's right to conduct further diligence with respect to the Cure Payment of each Assigned Contract and to modify such Cure Payment accordingly. In the event that the Trustee and/or any Successful Bidder determine that your Cure Payment should be modified, you will receive a notice, which will provide for additional time to object to such proposed modification.

Respectfully Submitted,

Dated: September 30, 2024    By: */s/ Michael D. Vagnoni*
                        Edmond M. George, Esquire
                        Michael D. Vagnoni, Esquire
                        OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                        Centre Square West
                        1500 Market Street, Suite 3400
                        Philadelphia, PA 19102
                        Telephone: (215) 665-3066
                        Facsimile: (215) 665-3165
                        E-mail:  edmond.george@obermayer.com
                                  michael.vagnoni@obermayer.com

                        *Counsel to William A. Homony Chapter 11 Trustee*

3

**A-203**

**EXHIBIT B**
**Asset Purchase Agreement**

**Asset Purchase Agreement to be provided**

**EXHIBIT C**
**Sale Order**

4880-0354-5067 v1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| Debtors. | : | **(Jointly Administered)**[1] |
|  | : |  |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (B) AUTHORIZING THE TRUSTEE TO ENTER INTO AND PERFORM DEBTORS' OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (C) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**"),[2] of the Chapter 11 Trustee, William A. Homony (the "Trustee") of the estates of Stream TV Networks, Inc. ("**Stream**") and Technovative Media, LLC ("**Technovative**", or collectively with Stream, the "**Debtors**") for *inter alia*, entry of an order (this "**Sale Order**") (a) authorizing and approving the entry into and performance under the terms and conditions of that certain Asset Purchase Agreement, substantially in the form attached hereto as **Exhibit 1** (as may be amended, supplemented or restated, the "**Asset Purchase Agreement**"), and all other ancillary agreements (collectively, the "**Transaction Documents**"), by and among the Debtors and _____ (the "**Buyer**"), (b) authorizing and approving the sale of those Assets set forth in the Asset Purchase Agreement (the "**Assets**") free and clear of all liens, claims, encumbrances, and other interests, except to the extent set forth in the Asset Purchase Agreement, and the assumption of certain assumed liabilities set forth in the Asset Purchase Agreement (the "**Assumed Liabilities**") pursuant to the Asset Purchase Agreement

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Motion or the Bidding Procedures Order (as defined herein), as applicable.

upon the closing of the Sale (the "**Closing**"), (c) authorizing the assumption and assignment of executory contracts and unexpired leases set forth on <u>**Exhibit 2**</u> attached hereto, as the same may be subsequently modified pursuant to the terms of the Asset Purchase Agreement (each, an "**Assigned Contract**," and, collectively, the "**Assigned Contracts**"), upon the Closing, subject to the payment by the Buyer of any payments to cure any defaults arising under any Assigned Contract (the "**Cure Payments**"), the provision of adequate assurance by the Buyer, as applicable, that it will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Buyer under the Assigned Contracts, and (d) granting related relief, all as more fully set forth in the Motion; and this Court having entered the Order (A) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving Procedures for the Assignment and Assumption of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief [Docket No. ___] (the "**Bidding Procedures Order**");[3] and the Trustee having conducted an auction (the "Auction") for the Assets; and the Trustee having determined that the Buyer has submitted the highest or otherwise best bid for the Assets and determined that the Buyer is the Successful Bidder and that _____ is the Back-Up Bidder (as defined in the Bidding Procedures), in accordance with the Bidding Procedures; and the Court having conducted a hearing on the Motion (the "**Sale Hearing**"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the Asset Purchase Agreement, and any and all objections to the Sale and the Transaction Documents filed in accordance with the Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the

---

[3] All references herein to the Bidding Procedures Order shall also be deemed to be references to the bidding procedures approved thereby (the "**Bidding Procedures**").

relief requested in the Motion at the Sale Hearing and in the Declaration of J. Scott Victor of SSG, the Trustee's Investment Bankers submitted in support of the Sale (the "**Victor Declaration**"); and it appearing that due notice of the Motion, the Sale Hearing, the Asset Purchase Agreement, and the Sale has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their respective estates, stakeholders, and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby FOUND, CONCLUDED, AND DETERMINED THAT:

**Jurisdiction, Venue, and Final Order**

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

<u>**Notice of the Motion, Auction, Sale Hearing, Asset Purchase Agreement and Sale and the Cure Payments**</u>

        D.      As evidenced by the affidavits of service and publication previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Hearing, the Asset Purchase Agreement, and the Sale has been provided by the Trustee in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014. The Trustee has complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, the Asset Purchase Agreement, and the Sale as required by the Bidding Procedures Order. The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Asset Purchase Agreement, or the Sale is required. With respect to entities whose identities are not reasonably ascertained by the Trustee, publication of the Sale Notice (as defined in the Motion) was sufficient and reasonably calculated under the circumstances to reach such entities.

        E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

        F.      In accordance with the Bidding Procedures Order, the Trustee has served a notice of their intent to assume and assign the Assigned Contracts and of the Cure Payments upon each counterparty to an Assigned Contract. The service and provision of such notice was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect of the assumption and assignment of the Assigned Contracts or establishing a Cure Payment for the respective Assigned Contracts. Counterparties to the Assigned Contracts have had an adequate opportunity to object to the assumption and assignment of the applicable Assigned Contracts and the Cure Payments set forth in the notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the counterparty

4

**A-210**

from accepting performance by, or rendering performance to, the Buyer (or its designee) for purposes of section 365(c)(1) of the Bankruptcy Code). All objections, responses, or requests for adequate assurance, if any, have been resolved, overruled, or denied, as applicable.

**Highest and Best Offer**

G.     As demonstrated by the Victor Declaration, the evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the record at the Sale Hearing, the Trustee conducted a sale process in accordance with, and have, along with the Buyer, complied in all respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Assets and assume the Assumed Liabilities.

H.     The Trustee and his advisors engaged in a robust and extensive marketing and sale process in accordance with the Bidding Procedures Order and the sound exercise of the Trustee's business judgment.

I.     The Trustee and the Buyer have negotiated and undertaken their roles leading to the entry into the Asset Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner.

J.     The Trustee conducted a fair and open sale process and the sale process, the Bidding Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Business or Assets, or who the Trustee believed may have had an interest in acquiring the Assets, to make an offer to purchase the Debtors' Assets.

K.     The sale process conducted by the Trustee pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Business

**A-211**

or Assets for the Trustee and its estate, its creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.

L.      The Trustee has demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of its obligations under the Asset Purchase Agreement.

M.      The Trustee has also determined, in a valid and sound exercise of their business judgment that the next highest or otherwise best Qualified Bid (as defined in the Bidding Procedures) (the "**Back-Up Bid**") for all or substantially all of the Assets was _____

_____, as the Back-Up Bidder.

N.      The consummation of the Sale outside a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtor. The Sale does not constitute a sub rosa plan for which approval has been sought without the protections that a disclosure statement would afford.

O.      Entry of an order approving the Asset Purchase Agreement, and all the provisions thereof is a necessary condition precedent to Buyer's consummation of the Sale, as set forth in and pursuant to the Asset Purchase Agreement.

### Personal Identifiable Information

P.      The Debtors do not use personal information and therefore a confidential information ombudsman is not necessary or required.

### Good Faith of Buyer

Q.      The consideration to be paid by the Buyer under the Asset Purchase Agreement was negotiated at arm's-length, in good faith and without collusion pursuant to section 363(m) of the

**A-212**

Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration for the Assets. Specifically: (i) the Buyer recognizes that the Trustee was free to deal with any other party interested in purchasing the Business or Assets; (ii) the Buyer complied in all respects with the provisions in the Bidding Procedures Order in negotiating and entering into the Transaction Documents, and the transactions described therein comply with the Bidding Procedures Order; (iii) the Buyer agreed to subject any bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made by the Buyer in connection with the Sale have been disclosed in the Asset Purchase Agreement; (v) no common identity of directors, officers or controlling member exists among the Buyer and the Debtors; (vi) the negotiation and execution of the Asset Purchase Agreement and the other Transaction Documents were at arm's-length and in good faith, and at all times each of the Buyer and the Trustee were represented by competent counsel of their choosing; (vii) the Buyer did not in any way induce or cause the chapter 11 filing of the Debtors; and (viii) the Buyer has not acted in a collusive manner with any person with respect to the Sale process or Auction. The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents. The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws.

R.    The Debtors, through the Trustee, and the Buyer, through its management, boards of directors, members, officers, directors, managers, employees, agents, and representatives, have acted in good faith. The Asset Purchase Agreement and the other Transaction Documents, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the

**A-213**

Trustee and the Buyer in good faith, without collusion or fraud, and from arm's-length bargaining positions. The Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

### No Fraudulent Transfer

S.      The consideration provided by the Buyer pursuant to the Asset Purchase Agreement for its purchase of the Assets and the assumption of the Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the Commonwealth of Pennsylvania.

T.      Neither the Buyer nor its past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies or partners (each, a "**Buyer Party**" and collectively, the "**Buyer Parties**") is a continuation of the Debtors or its estate and no Buyer Party is holding itself out to the public as a continuation of the Debtors or its estate simply by closing the Sale, and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer (or any other Buyer Party) and the Debtors estates.

### Validity of Transfer

U.      The Trustee has authorized the execution and delivery of the Asset Purchase Agreement and the Sale of the Assets to the Buyer (or its designee). The has all of the power and authority necessary to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtor to

**A-214**

consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement. The Assets constitute property of the Debtors' respective estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates.

### Section 363(f) of the Bankruptcy Code is Satisfied

V.    The Sale of the Assets to the Buyer (or its designee) and the assumption and assignment to the Buyer of the Assigned Contracts under the terms of the Asset Purchase Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the Sale of the Assets will be free and clear of any and all liens, claims, encumbrances, and interests, and will not subject any Buyer Party to any liability for any liens, claims, encumbrances, and interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Asset Purchase Agreement with respect to the Assumed Liabilities (as defined in the Asset Purchase Agreement). All holders of liens, claims, encumbrances, and interests who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, encumbrances, and interests are adequately protected thereby satisfying section 363(e) of the Bankruptcy Code by having their liens, claims, encumbrances, and interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, encumbrances, and interests, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable. Those holders of claims who did object and that have an

**A-215**

interest in the Assets fall within one or more of the other subsections of section 363(f) of the
Bankruptcy Code.

W.      The transfer of the Assets to the Buyer (or its designee) under the Asset Purchase
Agreement will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial
right, title, and interest in and to the Assets free and clear of all liens, claims, encumbrances, and
interests, except as expressly provided in the Asset Purchase Agreement with respect to the
Assumed Liabilities. The Trustee may sell interests in the Assets free and clear of all liens, claims,
encumbrances, and interests because, in each case, one or more of the standards set forth in section
363(f) have been satisfied. The Buyer would not have entered into the Transaction Documents and
would not consummate the transactions contemplated thereby, including, without limitation, the
Sale and the assumption and assignment of the Assigned Contracts (i) if the transfer of the Assets
were not free and clear of all interest of any kind or nature whatsoever, including, without
limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or
any similar theory and/or applicable state or federal law or otherwise or (ii) if the Buyer or any of
its affiliates or designees would, or in the future could, be liable for any interests, including,
without limitation, rights or claims based on any successor, transferee, derivative or vicarious
liability or any similar theory and/or applicable state or federal law or otherwise, in each case
subject only to the Assumed Liabilities. Not transferring the Assets free and clear of all interests
of any kind or nature whatsoever, including, without limitation, rights or claims based on any
successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state
or federal law or otherwise (subject only to the Assumed Liabilities), would adversely impact the
Trustee's efforts to maximize the value of its estate.

**Assumption and Assignment of the Assigned Contracts**

X.        The assumption and assignment of the Assigned Contracts pursuant to the terms of this Sale Order are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their respective estates, creditors, and other parties in interest, and represent the reasonable exercise of sound business judgment by the Trustee.

Y.        The Trustee has met all the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts. The Buyer (or its designee) and/or the Debtors have (i) cured and/or provided adequate assurance of prompt cure of any default existing prior to the Closing under all of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assigned Contracts, and (iii) provided adequate assurance of future performance, all within the meaning of sections 365(b)(1)(B) and (C) of the Bankruptcy Code. The Buyer has provided adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(b)(2)(B) and in accordance with the Bidding Procedures to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts.

Z.        At any time prior to the rejection of an executory contract or unexpired lease, the Debtors shall have the right, in accordance with the Bidding Procedures Order, to serve a Supplemental Assumption Notice upon any non-Debtor counterparty thereto indicating the Debtor's intent to assume and assign such executory contract or unexpired lease. The objection deadline for all Assigned Contracts, other than those subject to a Supplemental Assumption Notice, lapsed on XXXXX, 2024. Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed in any Supplemental Assumption Notice with respect thereto, must (i) be

in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by, counsel to the Trustee. If the parties cannot agree on a resolution, the Trustee will seek an expedited hearing before the Court to determine the Cure Payment and approve the assumption and assignment to Buyer. If there is no objection prior to the applicable objection deadline, then the counterparties will be deemed to have consented to the assumption and assignment to Buyer and the Cure Payment, and such assumption and assignment to Buyer and the Cure Payment shall be deemed approved by this Sale Order without further order of this Court.

AA.    The (i) transfer of the Assets to the Buyer and (ii) assignment to the Buyer of the Assigned Contracts, will not subject the Buyer or any of its affiliates or designees to any liability whatsoever that arises prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the Commonwealth of Pennsylvania, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, except for the Assumed Liabilities.

### Consummation of the Sale

BB.    Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the sale of the Assets must be approved and consummated promptly to preserve the value of the Assets. Time, therefore, is of the essence in effectuating the Asset Purchase

12

**A-218**

Agreement. As such, the Trustee and the Buyer intend to close the sale of the Assets as soon as reasonably practicable. The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Asset Purchase Agreement. Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and 6006(d).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Motion is GRANTED to the extent set forth herein.

2.      All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled. All persons and entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The Asset Purchase Agreement and the other Transaction Documents, and all terms and conditions thereof, are hereby approved, and the Trustee is authorized to take any and all steps to attain Closing.

4.      The Back-Up Bidder is hereby approved as the Back-Up Bidder (as defined in the Bidding Procedures), and the Back-Up Bid is hereby approved and authorized as the Back-Up Bid (as defined in the Bidding Procedures). To the extent necessary, the terms and conditions of the Back-Up Bid will be fully determined and approved at a later date pursuant to a separate sale order consistent with the terms of the Back-Up Bid.

**Transfer of the Assets as set forth in the Asset Purchase Agreement**

5.      The Trustee is authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms

13

**A-219**

and conditions set forth in the Transaction Documents and this Sale Order, (b) assume and assign any and all Assigned Contracts, and (c) take all further actions and execute and deliver the Transaction Documents and any and all additional instruments and documents that may be necessary or appropriate to implement the Asset Purchase Agreement and the other Transaction Documents and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

6.     The Buyer is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities (as defined in the Asset Purchase Agreement).

7.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Trustee to transfer the Assets to the Buyer (or its designee) in accordance with the Asset Purchase Agreement, the other Transaction Documents and this Sale Order.

8.     At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Assets shall be immediately vested in the Buyer (or its designee) pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Assets. All persons or entities, presently or at or after the Closing, in possession of some or all of the Assets, are directed to surrender possession of any and all portions of the Assets to the Buyer (or its designee) or its respective designees on the Closing or at such time thereafter as the Buyer (or its designee) may request.

9.     This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than the Assumed Liabilities will be assertable against any Buyer Party or any of its respective assets, (ii) the Assets shall have been transferred to the Buyer (or its designee) free and clear of all liens, claims, encumbrances and interests, subject only to the Assumed Liabilities,

14

**A-220**

and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents. The Assets are sold free and clear of any reclamation rights. All liens, claims, encumbrances and interests on the Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, encumbrances and interests applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such liens, claims, encumbrances and interests applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or its estate, as applicable, or as otherwise provided herein.  Notwithstanding anything to the contrary in this Order, the Asset Purchase Agreement, or any related agreements, documents, or other instruments, or otherwise all cash proceeds of the Sale, up to the amount of the Secured Claims shall be paid at the time of Closing to the Secured Creditors until such time as all Secured Claims have been fully repaid and satisfied in full.

10.    Except as otherwise provided in the Asset Purchase Agreement (including with respect to the Assumed Liabilities), all persons and entities (and their respective successors and

assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, and the ownership, sale, or operation of the Assets prior to Closing or the transfer of the Assets to the Buyer (or its designee), are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Buyer Party and its property. Following the Closing, no holder of any claim or interest shall interfere with the Buyer's (or its designee's) title to or use and enjoyment of the Assets based on or related to any such claim or interest, or based on any action the Debtors may take in their respective Chapter 11 case.

11.    If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or in the Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all liens, claims, encumbrances and interests that the person or entity has with respect to the Debtors or the Assets or otherwise, then only with regard to the Assets that are purchased by the Buyer (or its designee) pursuant to the Asset Purchase Agreement and this Sale Order, (a) the Trustee is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets, (b) the Buyer (or its designee) is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, interests, and encumbrances against the Buyer and the Assets, and (c) upon consummation of the Sale, the Buyer (or its designee)

16

**A-222**

may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all liens, claims, encumbrances and interests that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Assets. This Sale Order is deemed to be in a recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Assets free and clear of liens, claims, encumbrances and interests shall be self-executing and neither the Trustee nor the Buyer (or its designee) shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

### No Successor or Transferee Liability

12.     No Buyer Party shall be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale contemplated by the Asset Purchase Agreement, or the transfer, operation, or use of the Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Buyer, with respect to any Assumed Liabilities), (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("**ERISA**"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation.

17

**A-223**

13.    Other than as expressly set forth in the Asset Purchase Agreement (including with

respect to the Assumed Liabilities), no Buyer Party shall have any responsibility for (a) any

liability or other obligation of the Debtors or related to the Assets or (b) any claims against the

Debtors. Except as expressly provided in the Asset Purchase Agreement (including with respect

to the Assumed Liabilities) with respect to the Buyer, no Buyer Party shall have any liability

whatsoever with respect to the Debtors operations or any of the Debtors' (or their predecessors' or

affiliates') obligations (as defined herein, "**Successor Liability**") based, in whole or part, directly

or indirectly, on any theory of successor or vicarious liability of any kind or character, or based

upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or

substantial continuity, labor and employment or products liability, whether known or unknown as

of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent,

liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes

arising, accruing, or payable under, out of, in connection with, or in any way relating to the Assets

or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b) any plan,

agreement, practice, policy, or program, whether written or unwritten, providing for pension,

retirement, health, welfare, compensation or other employee benefits which is or has been

sponsored, maintained or contributed to by the Debtors or with respect to which the Debtors have

any liability, whether or not contingent, including, without limitation, any "multiemployer plan"

(as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA)

to which the Debtors have at any time contributed, or had any obligation to contribute. Except to

the extent expressly included in the Assumed Liabilities with respect to the Buyer or as otherwise

expressly set forth in the Asset Purchase Agreement, no Buyer Party shall have any liability or

obligation under any applicable law, including, without limitation, (a) the WARN Act (29 U.S.C.

18

**A-224**

§§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act,
(c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal
Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151
et seq. (the "**NLRA**"), or (f) any foreign, federal, state, or local labor, employment or
environmental law, by virtue of the Buyer's purchase of the Assets, assumption of the Assumed
Liabilities, or hiring of certain employees of the Debtors pursuant to the terms of the Asset
Purchase Agreement. Without limiting the foregoing, no Buyer Party shall have any liability or
obligation with respect to any environmental liabilities of the Debtors or any environmental
liabilities associated with the Assets except to the extent they are Assumed Liabilities set forth in
the Asset Purchase Agreement.

14.     Immediately prior to the Closing, the Buyer was not an "insider" or "affiliate" of
the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of
incorporators, directors or controlling members existed between the Buyer and the Debtors.

15.     Effective upon the Closing, all persons and entities are forever prohibited and
enjoined from commencing or continuing in any manner any action or other proceeding, whether
in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Buyer
Party or their respective assets (including, without limitation, the Assets), with respect to any (a)
claim in these Chapter 11 cases or in connection with or related to the Sale or the Debtors or (b)
Successor Liability including, without limitation, the following actions with respect to clauses (a)
and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii)
enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order;
(iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any
setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action,

in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Assets or conduct any of the businesses operated with respect to such assets. For the avoidance of doubt, nothing in this paragraph shall affect the post-Closing rights and remedies of counterparties to Assigned Contracts.

### Good Faith of Buyer

16.     The Sale contemplated by the Asset Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of the Assigned Contracts), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

17.     Neither the Trustee, the Debtors nor the Buyer have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

### Assumption and Assignment of Assigned Contracts

18.     The Trustee is authorized and directed at the Closing to assume and assign each of the Assigned Contracts to the Buyer (or its designee) pursuant to sections 105(a) and 365 of the Bankruptcy Code and to execute and deliver to the Buyer (or its designee) such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer (or its designee). The payment of the applicable Cure Payments (if any), the provision of adequate assurance by the Buyer, as applicable, that it will promptly cure any non-monetary defaults

**A-226**

existing prior to Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Buyer under the Assigned Contracts shall (a) effect a cure of all defaults existing thereunder as of the Closing and (b) compensate for any actual pecuniary loss to such counterparty resulting from such default.

19.    Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Payments, the provision of adequate assurance by the Buyer, as applicable, that it will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Buyer under the Assigned Contracts, the Assigned Contracts to be assumed and assigned under the Asset Purchase Agreement shall be assigned and transferred to and remain in full force and effect for the benefit of, the Buyer (or its designee) notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer. Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract to the Buyer (or its designee) or allow the counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract to the Buyer (or its designee), constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer (or its designee) of the Assigned Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer (or its designee) shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assigned Contracts, and such Assigned Contracts shall remain in full force and effect for the benefit of the Buyer (or its designee). Each counterparty to the Assigned Contracts shall be forever barred, estopped, and

21

**A-227**

permanently enjoined from (a) asserting against the Debtors or any Buyer Party or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including, without limitation, any breach related to or arising out of change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts and (b) asserting against any Buyer Party (or its respective property, including, without limitation, the Assets) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

20.    Upon the Closing and the payment of the relevant Cure Payments, if any, the provision of adequate assurance by the Debtors or the Buyer, as applicable, that it will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Buyer under the Assigned Contracts, the Buyer (or its designee) shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts. The failure of the Debtors or the Buyer (or its designee) to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of the right of the Debtors or the Buyer (or its designee), as the case may be, to enforce every term and condition of such Assigned Contract. Any party that may have had the right to consent to the assignment of any Assigned Contract is deemed to have consented for the purposes of section 365(e)(2)(A) of the Bankruptcy Code.

21.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing after the Sale Objection Deadline and prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing, or as soon thereafter as reasonably practicable.

22.     The assignments of each of the Assigned Contracts are made in good faith under sections 363(b) and 363(m) of the Bankruptcy Code.

### Other Miscellaneous Provisions

23.     Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

24.     The terms and provisions of the Asset Purchase Agreement, the other Transaction Documents and this Sale Order shall be binding in all respects upon the Debtors, their respective estates, all creditors of (whether known or unknown) and holders of equity or member interests in the Debtors, any holders of claims against or on all or any portion of the Assets, all counterparties to the Assigned Contracts, and the Buyer, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' Chapter 11 cases or upon conversion to Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The Asset Purchase Agreement shall not be subject to rejection or avoidance by the

23

**A-229**

Debtors, their respective estates, their creditors, members, or any trustee(s), examiner(s), or receiver(s).

25.    The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of this Chapter 11 case; (b) converting the Chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 case. The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in this Chapter 11 case, or following dismissal of this Chapter 11 case.

26.    Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

27.    The Asset Purchase Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not, based on the Trustee's business judgment, have a material adverse effect on the Debtors' estates or their creditors. The Trustee shall provide the Secured Creditors with notice of any such modification, amendment, or supplement of the Asset Purchase Agreement. For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

28.    The Asset Purchase Agreement and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

**A-230**

29.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

30.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Trustee and the Buyer are authorized to close the Sale immediately upon entry of this Sale Order.

31.     To the extent there is any conflict between the terms of this Sale Order and the Asset Purchase Agreement, the terms of this Sale Order shall control. Nothing contained in any chapter 11 plan hereinafter confirmed in this Chapter 11 case or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or any other Transaction Document or the terms of this Sale Order.

32.     The Court shall retain exclusive jurisdiction with respect to the terms and provisions of this Sale Order and the Asset Purchase Agreement.

**EXHIBIT D**
**Sale Notice**

**A-232**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.**, *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)**[1] |
| | : | |

## NOTICE OF AUCTION AND SALE HEARING PLEASE TAKE NOTICE OF THE FOLLOWING:

1. On March 15, 2023, the above-captioned Debtors and former debtors in possession (the "**Debtors**"), filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**").

2. On January 9, 2024 (the "**Appointment Date**"), William A. Homony was appointed as Chapter 11 Trustee of the Debtors' estates (the "Trustee") in order to determine, *inter alia*, if it would be beneficial to pursue a sale of substantially all of the Debtors' Assets.

3. On XXXXX, 2024 in connection with the proposed sale (the "**Sale**") of the Debtors' assets (the "**Assets**") at an auction for the Assets (the "**Auction**"), the Trustee filed a motion (the "Motion"), seeking, among other things, (i) entry of an order (the "**Bidding Procedures Order**")[2] approving the bidding procedures (the "**Bidding Procedures**") governing the Sale; (ii) establishing procedures for the assignment and assumption of executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); and (iii) granting related relief [Docket No.___].

4. On _____, 2024, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. ]. Pursuant to the Bidding Procedures Order, if two or more Qualified Bids are received before the Bid Deadline, the Trustee will conduct the Auction to determine the highest or otherwise best Qualified Bid, beginning on November 18, 2024 at 10:00 a.m. (EST) at the offices of Obermayer Rebmann Maxwell & Hippel LLP, 1500 Market Street , Suite 3400, Philadelphia, PA 19102 or such other place and time as the Trustee shall notify all Qualified Bidders that have submitted Qualified Bids. Only the Trustee (and its professionals and advisors and parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, **by no later than November 15, 2024 at 4:00 p.m. (EST)** (the "**Bid Deadline**") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Debtors' Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures Order.

4.      A hearing to approve the Sale (the "**Sale Hearing**") will be held on November 22, 2024 at 10:00 a.m. (EST) before the Honorable Ashely M. Chan, U.S.B.J., at the United States Bankruptcy Court for the Eastern District of Pennsylvania, at the United States Bankruptcy Court for the Eastern District of Pennsylvania, in the United States Bankruptcy Court, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA, 19107 in Courtroom No. 4., or at such time thereafter as counsel may be heard, unless otherwise continued by the Trustee pursuant to terms of the Bidding Procedures.

5.      Objections, if any, to the Motion and the Sale of the Assets to a Successful Bidder, except objections related solely to the identity of the Successful Bidder and adequate assurance of future performance by a Successful Bidder, must be made by **November 20, 2024, at 4:00 p.m., prevailing Eastern Time** (the "**Sale Objection Deadline**"). Objections solely to the identity of the Successful Bidder and adequate assurance of future performance must be made by **4:00 p.m., prevailing Eastern Time** on the date that is two (2) business days before the Sale Hearing. In each case, all objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court no later than the Sale Objection Deadline or the Supplemental Limited Sale Objection Deadline, as applicable, and served on (i) counsel for the Trustee, and (ii) any other entity on the Master Service List. *Any party who fails to timely file an objection to entry of the Sale Order (i) shall be forever barred from objecting thereto, (ii) shall be deemed to consent to the sale of the Assets as approved by the Sale Order, and (iii) shall be deemed to "consent" for purposes of Section 363 (f)(2) of the Bankruptcy Code.*

6.      This Notice and the Sale Hearing is subject to the fuller terms and conditions of the Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Trustee encourages parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of all the Assets and/or copies of any related document, including the Motion, or the Bidding Procedures Order, may make a written request to counsel for the Trustee, Obermayer Rebmann Maxwell Hippel LLP, c/o Edmond M. George, Esquire (edmond.george@obermayer.com) or Michael D. Vagnoni, Esquire (michael.vagnoni@obermayer.com).  In addition, copies of the Motion, the Bidding Procedures Order and this Notice can be found through PACER on the Court's website, https://ecfnjb.uscourts.gov/ (registration required).

Respectfully Submitted,

Dated: September 30, 2024        By: */s/ Michael D. Vagnoni*
                                 Edmond M. George, Esquire
                                 Michael D. Vagnoni, Esquire
                                 OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                 Centre Square West

2

**A-234**

1500 Market Street, Suite 3400
Philadelphia., PA 19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail:  edmond.george@obermayer.com
         michael.vagnoni@obermayer.com

*Counsel to William A. Homony Chapter 11 Trustee*

3

**A-235**

**EXHIBIT E**
**Contract Assumption Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)[1]** |
| | : | |

## NOTICE OF AUCTION AND SALE HEARING PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On March 15, 2023, the above-captioned and former debtors in possession (the "**Debtors**"), filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**").

2.      On January 9, 2024 (the "**Appointment Date**"), William A. Homony was appointed as Chapter 11 Trustee of the Debtors' estates (the "Trustee") in order to determine, inter alia, if it would be beneficial to pursue a sale of substantially all of the Debtors' Assets.

3.      On XXXXXX, in connection with the proposed sale (the "**Sale**") of the Debtors' assets (the "**Assets**") at an auction (the "**Auction**"), the Trustee filed a motion (the "Motion"), seeking, among other things, (i) entry of an order (the "**Bidding Procedures Order**")[2] approving the bidding procedures (the "**Bidding Procedures**") governing the Sale; (ii) establishing procedures for the assignment and assumption of executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); and (iii) granting related relief [Docket No. _____].

3.      On XXXXXX, 2024, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. ]. Pursuant to the Bidding Procedures Order, if two or more Qualified Bids are received before the Bid Deadline, the Trustee will conduct the Auction to determine the highest or otherwise best Qualified Bid, beginning on November 18, 2024 at 10:00 a.m. (EST) at the offices of Obermayer Rebmann Maxwell & Hippel LLP, 1500 Market Street , Suite 3400, Philadelphia, PA 19102 or such other place and time as the Trustee shall notify all Qualified Bidders that have submitted Qualified Bids. Only the Trustee (and his professionals and advisors), and parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, **by no later than November 15, 2024 at 4:00 p.m. (EST)** (the "**Bid Deadline**") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Debtors' Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Bidding Procedures Order.

4892-8152-3940 v1
4880-0354-5067 v1

4.     A hearing to approve the Sale (the "**Sale Hearing**") will be held on November 20, 2024 at 10:00 a.m. (EST) before the Honorable Ashely M. Chan, U.S.B.J. at the United States Bankruptcy Court for the Eastern District of Pennsylvania, in the United States Bankruptcy Court, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA, 19107 in Courtroom No. 4., or at such time thereafter as counsel may be heard, unless otherwise continued by the Trustee pursuant to terms of the Bidding Procedures.

5.     Objections, if any, to the Motion and the Sale of the Assets to a Successful Bidder, except objections related solely to the identity of the Successful Bidder and adequate assurance of future performance by a Successful Bidder, must be made by **XXXXXX, 2024 at 4:00 p.m., prevailing Eastern Time** (the "**Sale Objection Deadline**"). Objections solely to the identity of the Successful Bidder and adequate assurance of future performance must be made by **4:00 p.m., prevailing Eastern Time** on the date that is two (2) business days before the Sale Hearing. In each case, all objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court no later than the Sale Objection Deadline or the Supplemental Limited Sale Objection Deadline, as applicable, and served on (i) counsel for the Trustee, and (ii) any other entity on the Master Service List. *Any party who fails to timely file an objection to entry of the Sale Order (i) shall be forever barred from objecting thereto, (ii) shall be deemed to consent to the sale of the Assets as approved by the Sale Order, and (iii) shall be deemed to "consent" for purposes of Section 363 (f)(2) of the Bankruptcy Code.*

6.     This Notice and the Sale Hearing is subject to the fuller terms and conditions of the Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Trustee encourages parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of all the Assets and/or copies of any related document, including the Motion, or the Bidding Procedures Order, may make a written request to counsel for the Trustee, Obermayer Rebmann Maxwell Hippel LLP, c/o Edmond M. George, Esquire (edmond.george@obermayer.com) or Michael D. Vagnoni, Esquire (michael.vagnoni@obermayer.com). In addition, copies of the Motion, the Bidding Procedures Order and this Notice can be found through PACER on the Court's website, https://ecfnjb.uscourts.gov/ (registration required).

Respectfully Submitted,

Dated: September 30, 2024          By: */s/ Michael D. Vagnoni*
                                                        Edmond M. George, Esquire
                                                        Michael D. Vagnoni, Esquire

4880-0354-5067 v1

**A-238**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)[1]** |
|  | : |  |

**ORDER GRANTING EXPEDITED CONSIDERATION, SHORTENED
TIME AND LIMITED NOTICE ON MOTION OF WILLIAM A. HOMONY IN HIS
CAPACITY AS CHAPTER 11 TRUSTEE FOR (I) AN ORDER (A) APPROVING THE
BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR
THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B)
ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND
MANNER OF NOTICE THEREOF AND SCHEDULING A SALE BY AUCTION, (C)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D)
SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION
PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g), AND (F)
GRANTING RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE SALE
OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
<u>LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF</u>**

AND NOW this _____ day of _____, 2024, upon consideration

of the Motion of William A. Homony in His Capacity as Chapter 11 Trustee for (I) an Order (A)

Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of

Substantially all of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the

Form and Manner of Notice Thereof and Scheduling a Sale by Auction, (C) Approving Procedures

for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D)

Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of

Bankruptcy Procedure 5070-1(g), and (F) Granting Related Relief, and (II) an Order (A)

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief (the "Sale Motion"),[2] and cause therefore having been demonstrated, it is hereby ORDERED as follows:

1.    The Trustee's request for an Expedited Consideration, shortened time, and limited notice on the Motion is GRANTED.

2.    A hearing to consider the Motion is scheduled for _____, 2024 at _____ a.m./p.m. before the Honorable Ashely M. Chan, United States Bankruptcy Judge in the United States Bankruptcy Court, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA, 19107 in Courtroom No. 4.  Any objection to the Motion must be filed with the Clerk of the Bankruptcy Court and served upon counsel on or before _____, 2024.

3.    A copy of this Order shall be served by counsel to the Trustee on or before _____, 2024, at _____ a.m./p.m. by facsimile, next day mail or by electronic means, including the Court's CM/ECF system, upon: (i) Counsel to the Secured Creditors; (ii) the Office of the United States Trustee; (iii) the Debtors' top twenty unsecured creditors (iv) the Debtors; and (v) all parties who have timely filed requests for notice under Bankruptcy Rule 2002.

4.    Prior to the hearing on the Motion, the Trustee shall file a Certificate of Service demonstrating compliance with paragraph 3 above.

_____

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Motion, the Bidding Procedures or the Bidding Procedures Order.

5.      If notice is given in the manner provided above, said notice shall be sufficient and
proper and in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures,
and the Local Rules of this Court.


BY THE COURT:


_____
Honorable Ashely M. Chan
Chief United States Bankruptcy Judge

4880-0354-5067 v1

**A-241**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

In re:                                               Chapter 11

Stream TV Networks, Inc., *et al.*
                                                     Bky. No. 23-10763 (AMC)
            Debtors.[1]

## ORDER

**AND NOW**, on May 30, 2024, William Homony (the "Trustee"), in his capacity as chapter
11 trustee of the bankruptcy estates of Stream TV Networks, Inc. and Technovative Media Inc.
(together, the "Debtors"), filed a motion seeking the entry of an order enforcing the automatic stay
and compelling Mathu Rajan and Visual Semiconductor, Inc. ("VSI") to turnover estate property
(the "Stay Enforcement Motion").[2]

**AND**, on June 18, 2024, VSI filed an objection to the Stay Enforcement and Turnover
Motion (the "Stay Enforcement Objection").[3]

**AND**, on August 29, 2024, the Trustee filed an expedited motion to withdraw the Stay
Enforcement and Turnover Motion (the "Motion to Withdraw"),[4] seeking permission to withdraw
the motion pursuant to Federal Rule of Civil Procedure 41 and Federal Rule of Bankruptcy
Procedure 7041, based on VSI's commitment not to interfere with the Debtors' property, the limited
funds in the Debtors' estates, and the Trustee's current focus on selling the Debtors' assets.[5]

**AND**, on September 4, 2024, VSI filed an objection to the Motion to Withdraw (the

---

[1] This case is being jointly administered with the case of *In re Technovative Media, Inc.* (Case No. 23-10764) (AMC).

[2] Bankr. Docket No. 646.

[3] Bankr. Docket No. 678.

[4] Bankr. Docket No. 725.

[5] Because VSI filed the Stay Enforcement Objection, thereby initiating a contested matter, Bankruptcy Rule 9014(c) and
Rule 41(a)(2) require the Trustee to obtain an order from this Court permitting withdrawal of the Stay Enforcement
Motion.

"Withdrawal Objection").[6]

 **AND**, upon consideration of the Motion to Withdraw and the Withdrawal Objection.

 **IT IS HEREBY ORDERED** that:

 1. The Withdrawal Motion is **GRANTED**.

 2. A motion for voluntary dismissal under Rule 41(a)(2) lies within the sound discretion of the Court. *See, e.g., Kilbride Invests. Ltd. v. Cushman & Wakefield of Penn., Inc.,* 2019 WL 3713878, at *2 (E.D. Pa. Aug. 6, 2019) (citing *Ferguson v. Eakle,* 492 F.2d 26, 28 (3d Cir. 1974). Courts have adopted a liberal policy with respect to Rule 41 motions to withdraw, ordinarily allowing them unless the defendant will suffer some prejudice other the mere prospect of a second lawsuit. *Id.* (citing *Exeter Twp. v. Franckowiak,* 2018 WL 1010626, at *2 (E.D. Pa. Feb. 22, 2018).

 3. VSI, in contesting withdrawal of the Stay Enforcement Motion, argues that the motion made serious allegations against VSI, sought sanctions, and attached as exhibits that, based on their meta-data, appear to be altered or pre-petition documents. VSI argues it is therefore entitled to take discovery on the basis of the Trustee's allegations, and the Trustee cannot avoid that by withdrawing the Stay Enforcement Motion without prejudice. The Court finds that foreclosing VSI's asserted need for discovery regarding the Stay Enforcement Motion's allegations does not constitute prejudice that outweighs Rule 41's liberal policy of permitting voluntary dismissal or withdrawal, particularly where the Trustee has articulated sound reasons for withdrawing the Stay Enforcement Motion. *See, e.g., Sanchez-Velazquez v. Municipality of Carolina,* 2012 WL 5471127, at *3 (D.P.R. Nov. 9, 2012) (granting the plaintiff's voluntary dismissal motion under Rule 41(a)(2) and giving particular weight to the early stage of the discovery proceedings and the plaintiff's need to reduce the costs of litigation).

---

[6] Bankr. Docket No. 728.

4.       Within three business days of the entry of this Order, the Trustee shall file a praecipe

withdrawing the Stay Enforcement Motion on the docket in the above-captioned case.


Dated: October 30, 2024

_____

Honorable Ashely M. Chan
Chief United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.*[1] | Bankr. Case No. 23-10763 (AMC) |
| The Debtors. | (Jointly Administered) |

**VISUAL SEMICONDUCTOR, INC.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS INCLUDING APPROVAL OF THE PROVISIONS FOR DESIGNATION OF A STALKING HORSE, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND SCHEDULING AND AUCTION, (C)APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g); AND (F) GRANTING RELATED RELIEF, AND (II) AN ORDER APPROVING (A) THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO AND (C) GRANTING RELATED RELIEF**

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

78262979;5

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  BACKGROUND .......................................................................................... 5

    A.   Procedural History Relevant to This Motion ....................................... 5

    B.   VSI Negotiates in Good Faith with the Trustee Only to be Stonewalled .............. 8

        i.   July and August 2024 Communications ....................................... 8

        ii.  September 2024 Communications ............................................. 11

    C.   The Trustee's Bidding Procedures are Inherently Flawed................... 12

        i.   SeeCubic is an Inappropriate Stalking Horse Bidder, Especially
             Since the Trustee Retained SSG as the Debtors' Investment Advisor
             ........................................................................ 12

        ii.  The Trustee has Allowed the Hawk Parties to Violate the
             Bankruptcy TRO and has Produced Nothing to Show that the
             Debtors' Assets have been preserved or Returned from the Hawk
             Parties......................................................... 16

    D.   The Solicitation and Due Diligence Materials Offered by the Trustee and
         SSG are Misleading and Woefully Inadequate .................................... 20

        i.   The SSG Solicitation "Teaser" Misled Potential Bidders......................... 21

        ii.  The Data Room Prepared by the Trustee and SSG for Consideration
             and Due Diligence of Potential Bidders Lacks Meaningful
             Information ................................................... 21

III. ARGUMENT ........................................................................................... 26

    A.   The Trustee may not sell the Debtors' property unless that property
         constitutes property of the Debtors' estates and, before approving a sale, the
         Court must first determine whether such property constitutes property of the
         estates. ...................................................................... 26

    B.   The 9019 Agreement and Bidding Procedures Motion taken together
         constitute an improper *sub rosa* plan of reorganization that cannot be
         approved by this Court. ...................................................... 29

    C.   The Bidding Procedures are Neither Fair nor Reasonable and are Fatally
         Flawed in Numerous Ways Such that the Court Should Not Approve Them.
         .................................................................................... 31

    D.   The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to
         a Heightened Scrutiny Standard.............................................. 32

    E.   The Proposed Sale Timeline is Not Adequately Supported..................... 34

    F.   Credit Bid Rights Should Not Be Approved....................................... 36

    G.   There Should Be No Finding of Good Faith as to the Insider Stalking Horse
         Bidder................................................................................... 37

H.     There Should Be No Waiver of Bankruptcy Rules 6004(h) and 6006(d)............. 38

IV.    RESERVATION OF RIGHTS ........................................................................... 39

V.    CONCLUSION................................................................................................... 39

78262979;5

**A-247**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Conine (In re Robertson)*,
    203 F.3d 855 (5th Cir. 2000) ...................................................................................28

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*,
    211 B.R. 813 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ....................................1, 34

*Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*,
    415 B.R. 86 (Bankr. D. Del. 2009) ...........................................................................34

*Darby v. Zimmerman (In re Popp)*,
    323 B.R. 260 (B.A.P. 9th Cir.2005)..........................................................................28

*Energy Future Holdings Corp. v. Del. Tr. Co.*,
    648 F. App'x 277 (3d Cir. 2016) ..............................................................................30

*First Fid. Bank v. McAteer*,
    985 F.2d 114 (3d Cir. 1993).....................................................................................27

*Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*,
    2013 WL 4804816 (D.N.J. Sept. 9, 2013) .................................................................28

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986).........................................................................32, 38, 39

*In re Aloha Airlines, Inc.*,
    2009 WL 1371950 (Bankr. D. Hawaii 2009) ............................................................37

*In re American Safety Razor Co., LLC*,
    Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) .......................................33

*In re Bidermann Indus. U.S.A.*,
    203 B.R. 547 (Bankr. S.D.N.Y. 1997).................................................................34, 35

*In re Blixseth*,
    No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) .....................34

*In re Braniff Airways, Inc.*,
    700 F.2d 935 (5th Cir. 1983) ............................................................................30, 31

*In re Coburn*,
    250 B.R. 401 (Bankr. M.D. Fla. 1999) .....................................................................28

iii

**A-248**

*In re Crowthers McCall Pattern, Inc.*,
   114 B.R. 877 (Bankr. S.D.N.Y. 1990) ...................................................................30

*In re Daufuskie Island Properties, LLC*,
   441 B.R. 60 (Bankr. D.S.C. 2010) .........................................................................38

*In re Edwards*,
   228 B.R. 552 (Bankr. E.D. Pa. 1998) ....................................................................32

*In re Fisker Automotive Holdings., Inc.*,
   510 B.R. 55 (Bankr. D. Del. 2014) ...................................................................37, 38

*In re Food Barn Stores, Inc.*,
   107 F.3d 558 (8th Cir. 1997) .................................................................................32

*In re Free Lance-Star Publishing Co.*,
   512 B.R. 798 (Bankr. E.D. Va. 2014) ....................................................................37

*In re The Free-Lance Star Publishing Co.*,
   2014 WL 2505627 (Bankr. E.D. Va. 2014) ...........................................................37

*In re Innkeepers USA Trust*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................35

*In re Interiors of Yesterday, LLC*,
   Case No. 02-30356 (LMW), 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007)...................28

*In re Philadelphia Newspapers, LLC*,
   599 F.3d 298 (3d Cir. 2010) ..................................................................................37

*In re PSINet, Inc.*,
   268 B.R. 358 (Bankr. S.D.N.Y. 2001) ...................................................................39

*In re Stream TV Networks, Inc. Omnibus Agreement Litig.*,
   Memorandum Opinion, Case No. 2020-0766-JTL (Del. Ch. Sept. 28, 2022).............13, 15, 16

*In re Summit Global Logistics, Inc.*,
   2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008) ........................................34

*In re Theroux*,
   169 B.R. 498 (Bankr. D.R.I. 1994) ........................................................................37

*In re Univ. Heights Ass'n*,
   2007 Bankr. LEXIS 1200 (Bankr. N.D.N.Y. Jan. 22, 2007) ..................................34

*In re Westpoint Stevens Inc.*,
   333 B.R. 30 (S.D.N.Y. 2005)............................................................................31, 32

78262979;5

**A-249**

*In re Whitehall Jewelers Holdings, Inc.*,
  Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) ................28, 29

*In re Williamson*,
  327 B.R. 578 (Bankr. E.D. Va. 2005) ...................................................................................33

*In re Worcester Country Club Acres, LLC*,
  655 B.R. 41 (Bankr. D. Mass. 2023) ...................................................................................28

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
  780 F.2d 1223 (5th Cir. 1986) ...............................................................................................31

*Jones v. GE Capital Mortgage Co. (In re Jones)*,
  179 B.R. 450 (Bankr. E.D. Pa. 1995) ...................................................................................27

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) ..........................................................................27

*Moldo v. Clark (In re Clark)*,
  266 B.R. 163 (9th Cir. B.A.P. 2001)......................................................................................28

*Moody v. Amoco Oil Co.*,
  734 F.2d 1200 (7th Cir. 1984), cert denied, 469 U.S. 982 (1984)...........................................27

*Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007)............................................................................................30, 32

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003)...................................................................................................32

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*,
  119 F.3d 349 (5th Cir. 1997) .................................................................................................30

re *NJ Affordable Homes Corp.*,
  No. 05-60442 (DHS), 2006 WL 2128624 (Bankr. D.N.J. June 29, 2006) ..............................37

*Ross v. A V Car & Home, LLC (In re Brown)*,
  Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625 (Bankr. D.C. Jan. 30, 2019) ..............................................................................................................29

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
  No. 360, 2021 (Del. June 15, 2022)..................................................................................1, 13

78262979;5

*Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*,
    362 F.3d 603 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir.
    2005)
    ........................................................................................................................................29

**Statutes**

11 U.S.C.S. § 363(b) ....................................................................................28, 29, 30, 31

11 U.S.C. 363(k) ...............................................................................................................37

Chapter 11 of Title 11 of the United States Code ................................................... passim

§ 363 of the Bankruptcy Code ........................................................................2, 28, 32, 38

§ 363(m) of the Bankruptcy Code ...........................................................................38, 39

**Rules**

Bankruptcy Rule 6004(h)..............................................................................................39, 40

Bankruptcy Rule 6006(d)..............................................................................................39, 40

Fed R. Bankr. P. 6004(d) ...................................................................................................39

Fed. R. Bankr. P. 9019(a) ..................................................................................................30

Local Bankruptcy Rule 7050-1 .........................................................................................13

Local Rule of Bankruptcy Procedure 5070-1(g)..............................................................1

Rule 54(b) ...........................................................................................................................14

Rules 6004 and 6006..........................................................................................................39

78262979;5

**A-251**

Visual Semiconductor, Inc. ("VSI") hereby files its objection (the "Objection") to the

*Motion for (I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement*

*for the Sale of Substantially all of the Debtor's Assets Including Approval of the Provisions for*

*Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form*

*and Manner of Notice Thereof and scheduling and Auction, (C) Approving Procedures for*

*Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling*

*a Sale Hearing, and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy*

*Procedure 5070-1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale*

*of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests,*

*(B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases Related Thereto and (C) Granting Related Relief* [ECF No. 750] (the "Bidding Procedures

Motion") filed by the Court-appointed chapter 11 trustee (the "Trustee").

## I.    PRELIMINARY STATEMENT

1.       VSI is generally not opposed to a sale of the Debtors' businesses and operating

assets through a fair and robust process that would maximize value. However, the sale process as

proposed by the Trustee is legally impermissible and has been nefariously orchestrated to provide

outsized returns for the benefit of one creditor over all others. This high-speed and flawed sale

process should not be entertained – and it certainly should not be approved - by this Court.

2.       On June 7, 2024, this Court entered an order approving the Trustee's Settlement

(the "9019 Agreement") with Hawk Investment Holdings, Ltd. ("Hawk"), in its capacity as

Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), SLS Holdings VI,

LLC ("SLS"), and various individuals, including Robert Morton, Arthur Leonard, Shadron L.

Stastney ("Stastney"), Alastair Crawford, Asaf Gola, Kevin Gollop, Patrick Miles, Patric Theune,

and Krzysztof Kabacinski (collectively, the "Hawk Parties"). Among other things, the 9019

**A-252**

Agreement outlined the terms of a sale of the Debtors' assets under section 363 of the Bankruptcy Code ("363 Sale") [ECF No. 653].

3.        Nearly *four* months later, on September 30, 2024, the Trustee filed the Bidding Procedures Motion on an expedited basis asking this Court to approve an auction process on an extremely aggressive timeline. The sale process proposed by the Trustee is fundamentally flawed for several reasons, including but not limited to the unreasonably expedited timeline proposed for the auction process. Such an accelerated schedule is not conducive to maximizing value for the Debtors' estates and risks undermining the very purpose of the sale process: to achieve the highest and best return for creditors. The Debtors, Trustee, stakeholders, and potential bidders require adequate time to conduct due diligence, marshal and assess the assets including ownership of applicable intellectual property (IP) rights, and submit and review competitive bids. Rushing this critical process compromises the integrity of the sale, depriving the estates of the opportunity to realize their full value, which is contrary to the best interests and fair treatment of all parties involved and to the Bankruptcy Code's mandate to maximize estate assets.

4.        Additionally, the process contemplated by the Bidding Procedures Motion is structured to disproportionately benefit the Hawk Parties at the expense of all other stakeholders. This approach contravenes the fundamental principles of fairness and equity that govern the bankruptcy process. The motion distorts the competitive bidding landscape and undermines the fiduciary duty to maximize value for the Debtors' estates as a whole. The Bankruptcy Code mandates that all creditors be treated fairly and equitably, yet the proposed procedures, if adopted, would result in an unjust distribution of the Debtors' assets, contrary to the core goal of maximizing creditor recoveries.

78262979;5

5.      Further, the data room compiled by the Trustee and SSG Advisors LLC ("SSG") to satisfy the due diligence of potential bidders in the proposed 363 Sale is woefully incomplete, and SSG solicitation materials are misleading at best. This lack of meaningful documentation provided by SSG and the Trustee on behalf of the Debtors' estates does not and cannot instill confidence in bidders expected to offer a minimum of $120 million in cash for estate assets; there is only a single strategic partner agreement furnished even though there are other strategic partners relevant to the sale;, there is no information about specific customers, there is no information regarding third-party technologies which underlay or are embedded in the Debtors' technology, and there is no information regarding legal action outside the bankruptcy that is not settled by the 9019 Agreement [ECF Nos. 630, 653] that may well impact the ultimate value of the assets being sold.

6.      So what's really going on here? Here is a simple breakdown. The Trustee chose "the Secured Creditors," *a.k.a.,* the Hawk Parties, as the proposed stalking horse bidder and agreed to give them an allowed claim of $180 million (Bidding Procedures Motion ¶ 30(I)(a)), $150 million of which is a secured claim and can be used as a credit bid (Bidding Procedures Motion ¶ 30(I)(b)), notwithstanding the dubious nature and amount of the Hawk Parties' claims and the Trustee's to investigate the conversion of the Hawk Parties' notes.

7.      As an initial matter, the Trustee's deal with the Hawk Parties is disturbing based solely on the identity of the proposed stalking horse bidder: the primary principal of the Hawk Parties, Robert Morton, was the subject of an English Cold Shoulder Order issued by the United Kingdom's Financial Conduct Authority (FCA) for especially egregious conduct involving securities. In fact, only 13 Cold Shoulder Orders have ever been entered by the FCA. Under the Cold Shoulder, Robert Morton was not allowed to work with investment bankers or solicit investments.

78262979;5

**A-254**

8.    Beyond Mr. Morton's individually checkered past, the Hawk Parties' involvement with the Debtors has been egregiously improper and ultimately detrimental to the Debtors' businesses. As detailed in *VSI's Limited Objection of VSI to the Application of the Chapter 11 Trustee to Employ SSG Advisors, LLC as Investment Banker* [ECF No. 717] ("VSI's Objection to Retention of SSG"), the Hawk Parties, including Mr. Morton, have a long history of improperly exercising control over the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this and other court's orders, including but not limited to the Partial Final Judgment issued by the Delaware Chancery Court on August 10, 2022.

9.    The circumstances are made all the more troubling by the Trustee's apparent disregard for this contemptuous behavior. In fact, the Trustee has time and time again turned a blind eye to the Hawk Parties' conduct, even when that conduct results in material damage to the Debtors' estates. The Trustee (i) failed to regain control from the Hawk Parties (or apparently even attempted to regain control) of millions of dollars of the Debtors' property; (ii) failed to enforce the temporary restraining order issued by this court (the "Bankruptcy TRO"); and (iii) hired SSG, a dubious decision in light of the fact that SSG was previously retained by the Hawk Parties as investment banker to sell the Debtors' assets out from under the Debtors for the benefit of the Hawk Parties and was stopped only by temporary restraining and status quo orders issued by the Delaware Court of Chancery.

10.    These acts and omissions demonstrate a pattern and practice of misconduct and negligence, which combine with a final flagrant offense: the proposed sale purports to sell the Debtors' assets on an "as-is, where-is" basis. But it is clear from the record that neither the Trustee nor his agents actually know what the Debtors' assets are, let alone how those assets work or may be encumbered. *See* 6/5/2024 Hearing Transcript 70:9-78:21. And so it's a pretty safe bet that the

78262979;5

**A-255**

Trustee does not know (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to a third-party has been completed. There is no reason to believe that the Hawk Parties will stop pursuing mindless litigation even after a sale process has been completed. Put simply, under these conditions, why would any third-party participate in this process and bid hundreds of millions of dollars for assets that the Trustee neither understands nor is capable of delivering free and clear of claims or encumbrances?

11.     The Trustee has failed to perform his mandate to manage the Debtors' estates in a way that maximizes the recovery to creditors while ensuring a fair and transparent process. VSI would like the Trustee to meet his mandate and fulfill his duties by recovering the Debtors' assets from the Hawk Parties. VSI has emphasized repeatedly that it knows where to locate the Debtors' missing property and has repeatedly offered to assist the Trustee in doing so. VSI has further offered to provide post-petition financing to enable the Trustee to more effectively perform these essential tasks.

12.     As discussed in Section III.B below, the 9019 Agreement and Bidding Procedures Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court. The bidding procedures described in the Bidding Procedures Motion (the "Bidding Procedures") are neither fair nor reasonable and are fatally flawed in numerous ways such that the Court should not approve the Bidding Procedures.

## II.     BACKGROUND

**A.     Procedural History Relevant to This Motion**

78262979;5

13.     On March 15, 2023 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). On January 9, 2024, the Bankruptcy Court entered an order appointing the Trustee.

14.     On May 30, 2024, the Trustee filed a Motion for Turnover of Property and Entry of an Order Enforcing the Automatic Stay [ECF No. 647] (the "<u>Motion for Turnover</u>").

15.     On June 6, 2024, this Court entered an order approving the 9019 Agreement between the Trustee and the Hawk Parties, which included, amongst others, the following deal terms:

- Hawk received a $180 million secured claim, $150 million of which can be credit bid in a sale of the Debtors' assets;

- A $7.5 million carve out to pay administrative and general unsecured creditors;

- The Trustee will make SeeCubic the proposed stalking horse in a 363 Sale of the Debtors' assets;

- Qualified bids in the sale process must include a minimum $120 million cash component; and

- If a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until the Hawk Parties' asserted $180 million claim is paid in full.

16.     The 9019 Agreement all but guarantees that unsecured creditors and perhaps even administrative expenses receive only a pittance.

17.     On June 16, 2024, Akerman LLP filed a Notice of Appearance as counsel for VSI and promptly filed an Objection to the Motion for Turnover [ECF No. 672] (the "<u>Objection to Turnover</u>") and a Motion to Reconsider the order granting the 9019 Agreement [ECF No. 686] (the "<u>Motion to Reconsider</u>"). The Motion to Reconsider was filed for multiple reasons, but chief among them was that the 9019 Agreement did not contain a fiduciary out and VSI strongly believed it (or a third-party) could provide the Debtors' with a much better offer.

6

78262979;5

**A-257**

18.     On July 26, 2024, VSI filed and served a Notice of Deposition Duces Tecum on
the Trustee concerning the issues raised in the Objection to Turnover and Motion to Reconsider
(the "Original Discovery Requests").  Based upon its strong but ultimately unsupported allegations
regarding "VSI's conduct," it appears that the Motion for Turnover was originally intended as an
offensive litigation cudgel against VSI in retaliation for identifying the Hawk Parties' TRO
violations and the Trustee's inaction with respect to the same. Among other things, the Original
Discovery Requests sought information regarding exhibits to the Trustee's Motion for Turnover
that were clearly altered and representations that were demonstrably false and misleading.  Rather
than account for the altered exhibit documents and misleading statements in his Motion for
Turnover, the Trustee moved to quash the Original Discovery Requests, sought entry of a
protective order, and moved to withdraw the offensive Motion for Turnover without prejudice [see
ECF No. 724].

19.     In furtherance of the sale actions contemplated by the 9019 Agreement, on August
14, 2024, the Trustee filed an Application to Employ SSG as the investment banker to market the
Debtors' assets on behalf of the Trustee for the benefit of the Debtors' estates [ECF No. 715]
(the "SSG Application").

20.     The Trustee's decision to hire SSG was (and is) questionable. SSG was previously
hired by the Hawk Parties in furtherance of contemptuous conduct whereby the Hawk Parties,
prior to the Petition Date, attempted to unlawfully retain and sell the Debtors' assets for the Hawk
Parties' exclusive benefit to the direct detriment of the Debtors. These actions are detailed in VSI's
Objection to Retention of SSG and are incorporated herein by reference. It is fairly safe to assume
that selecting the Hawk Parties/SeeCubic as the proposed stalking horse bidder and then hiring its
former investment banker to market the assets chills bidding. Any other bidder, including third

78262979;5

parties as well as VSI and its investors, would reasonably view the sale process to be orchestrated to assure that only the proposed stalking horse bidder will prevail.

21.     On August 27, 2024, VSI amended its Original Discovery Requests to include discovery concerning the issues raised in VSI's Objection to Retention of SSG.

**B.      VSI Negotiates in Good Faith with the Trustee Only to be Stonewalled**

      **i.      July and August 2024 Communications**

22.     As described herein, throughout these chapter 11 cases, VSI has tried vigorously to engage with the Trustee, including with respect to productive avenues by which VSI might participate on a level playing field with the Hawk Parties in either a 363 Sale process or a pure plan process.

23.     To that end, on July 25, 2024, VSI sent $170 million proof of funds documentation (the "Proof of Funds") along with (i) a request for certain due diligence materials within the Trustee's custody, possession, or control, and (ii) a request to discuss the pleadings then pending and discovery timelines (including the Trustee's Motion for Turnover).

24.     On July 29, 2024, only after prompting by VSI, did the Trustee acknowledge receipt of the Proof of Funds. In that same correspondence, the Trustee's counsel represented that the Trustee was exploring hearing dates in mid-September or early October for adjournment and consolidation of the pending motions and specifically noted that, "[o]n your notice of deposition, the Trustee is not available on August 9 and considering that we are adjourning the hearings, we will look at dates later in August and let you know his availability." *See* Exhibit 1 to the Declaration of John Thompson (the "Thompson Declaration"), attached hereto as **Exhibit A**. In light of the foregoing exchanges, the parties agreed to adjourn the pending motions and postpone the Trustee's deposition in order to negotiate in good faith.

25.     On August 2, 2024, VSI's counsel sent Trustee's counsel an email indicating that VSI would be making a formal proposal and clarifying his prior (July 29, 2024) diligence request, limiting the request to two very simple and straightforward items regarding confirmation of Stream's IP assets and engineering. *See* <u>Exhibit 2</u> to the Thompson Declaration.

26.     Counsel to VSI did not receive an immediate response regarding the diligence requests and thus followed up multiple times by email and voicemail. After several additional follow-up emails, the parties agreed to a videoconference call to be held on August 7, 2024. Among other topics covered on that call, Trustee's counsel expressed the need for the Trustee to receive a concrete proposal in the form of a term sheet.

27.     Counsel to VSI expressed the desire to conduct the Trustee's deposition within the last week to ten (10) days in the month of August, to which Trustee's counsel assented. *See* <u>Exhibit 3</u> to Thompson Declaration. Following the meeting, VSI's counsel delivered more unanswered correspondence regarding the need for VSI to receive responses from the Trustee to its limited diligence request.

28.     Finally, on August 12, 2024, Trustee's counsel stated that VSI's diligence requests were being looked into, and they requested a copy of VSI's non-disclosure agreement with the Trustee. <u>Exhibit 3</u> to Thompson Declaration. VSI's counsel provided such document the very same day. <u>Exhibit 4</u> to Thompson Declaration. Later that day, VSI sent over a binding term sheet via DocuSign for an all-cash offer of $115 million. *See* <u>Exhibit 5</u> to the Thompson Declaration.

29.     The next day, Trustee's counsel responded with hostility, stating "the Trustee isn't signing anything until he can digest the terms of this proposal, and determine if it presents something better than what is on the table. *So we are clear, we are not reviewing a Docusign document*." *See* <u>Exhibit 6</u> to the Thompson Declaration (emphasis added).

78262979;5

30.    VSI's counsel responded, explaining that VSI was "working diligently to provide the Trustee with an actionable proposal that is unequivocally better than what is currently on the table from [the Hawk Parties] and time is of the essence," in addition to requesting availability for a call. *See* Exhibit 7 to the Thompson Declaration. Over the following days, VSI continued to follow-up with the Trustee, without any response. On August 14, 2024, VSI's counsel followed up with Trustee's counsel, asking why VSI's communications had been ignored and once again, asking for the Trustee's availability. *See* Exhibit 7 to the Thompson Declaration. A week later, on August 21, 2024, with still no response from the Trustee, VSI's counsel wrote again, formally requesting that the Trustee make himself available for deposition testimony before the end of month of August. *See* Exhibit 8 to the Thompson Declaration. On August 24, 2024, with yet still no response from the Trustee, VSI's counsel wrote again, attaching an amended examination notice and associated subpoena setting the Trustee's deposition for September 3, 2024 with documents to be produced by August 30, 2024.  *See* Exhibit 9 to the Thompson Declaration. Later that day, VSI requested SSG's counsel's information to confer regarding discovery. *See* Exhibit 9 to the Thompson Declaration.

31.    Finally, a response was received, albeit an incomplete one; on August 26, 2024, the Trustee's counsel responded solely with regard to SSG, specifically that Trustee's counsel were in contact with SSG about VSI's objection and the need to conduct discovery. *See* Exhibit 10 to the Thompson Declaration. VSI's counsel responded, summarizing its outstanding requests, including production of documents relevant to the open motions practice and the timing of same and setting the Trustee's deposition in connection with that same motions practice (including with respect to retention of SSG). In addition, VSI requested the date for the hearing regarding the engagement of SSG as investment banker and the name of SSG's counsel. *See* Exhibit 10 to the Thompson

10

Declaration. The Trustee responded with hostility, showing no intention of cooperating on the diligence requests or responding to VSI's offer backed by the $170 Million Proof of Funds, stating "I am not responding to those other issues you raise, which have nothing to do with the SSG application, but are part of your and your client's efforts to delay and drive-up fees." *See* Exhibit 10 to the Thompson Declaration. That same day, VSI's counsel responded with suggested dates for depositions and production. *Id.*

32.     On August 26, 2024, the Trustee's counsel responded that they needed to meet with VSI regarding its offer and discovery. VSI's counsel responded immediately and said they would fly to Philadelphia to meet with the Trustee's counsel immediately. Nonetheless, three days later (the day before discovery was due), the Trustee decided not to pursue the Motion for Turnover (with its apparently manufactured documents in support) in an attempt to avoid any discovery whatsoever—and on August 29, 2024, the Trustee filed the *Motion of William A. Homony in his Capacity as Chapter 11 Trustee for Entry of an Order: (I) Granting Expedited Consideration, Shortened Time and Limited Notice; (II) Quashing Subpoena; (III) Entering a Protective Order; and (IV) Granting Related Relief* [ECF No. 724] (the "Motion to Quash"). The Trustee also filed the *Motion for Entry of an Order: (I) Granting Expedited Consideration, Shortened Time, and Limited Notice; and (II) for Authority to Withdraw the Trustee's Motion for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property without Prejudice* [ECF No. 725] (the "Motion to Withdraw"). This Court denied the expedited request and set a hearing on the Motion to Quash and the Motion to Withdraw on September 18, 2024.

33.     In response, VSI filed its *Motion to Compel and Objections to the Motions to Quash and Withdraw* [ECF No. 728] (the "Motion to Compel").

**ii.     September 2024 Communications**

34.     In September of 2024, VSI informed the Trustee that it intended to submit a near-full payment plan of reorganization. Finally, the Trustee finally started communicating with VSI again and, by mid to late September, the Trustee provided the simple due diligence VSI originally requested nearly two months prior on August 2, 2024. On September 18, 2024, VSI agreed that it would withdraw its Objection to SSG to allow for two weeks of good faith negotiation with the Trustee, who agreed to delay the hearing on the Motion to Withdraw, Motion to Quash, and Motion for Turnover to November 7, 2024.

35.     The good faith negotiation promised by the Trustee never happened, and as soon as the two-week period elapsed, the Trustee immediately filed (*without* conferring with VSI as required by Local Bankruptcy Rule 7050-1), the Bidding Procedures Motion, seeking an expedited hearing to complete the sale by November 15, 2024.

36.     It certainly appears that the Trustee was never serious about his intent to negotiate with VSI since just mere days after getting VSI to delay the hearing on the Motion to Withdraw, Motion to Quash, and Motion for Turnover, and after getting VSI to withdraw its objection to the engagement of SSG in the spirit of cooperation to facilitate good faith negotiation, the Trustee sought to have a hearing on its Bidding Procedures Motion well before November 7, 2024.

37.     VSI filed an objection to the expedited relief sought in the Bidding Procedures Motion, noting the Trustee's behavior. The Court denied the Trustee's requested relief on October 4, 2024.

**C.     The Trustee's Bidding Procedures are Inherently Flawed**

38.     Beyond the legal infirmaries that will be discussed in Section III below, the Bidding Procedures are inherently flawed based exclusively on the facts of this case.

**i.      SeeCubic is an Inappropriate Stalking Horse Bidder, Especially Since the Trustee Retained SSG as the Debtors' Investment Advisor**

12

39.     The history of the Hawk Parties' interference with the Debtors' property is convoluted, complicated, and several years in the making. Nonetheless, some of the history is important; directly relevant to the current situation with the Bidding Procedures Motion in light of the Hawk Parties' repeated course of conduct in this case, and thus merits review. Below is a summary of that relevant history:[2]

a.  On June 15, 2022, the Delaware Supreme Court issued a unanimous *en banc* decision *Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 360, 2021 (Del. June 15, 2022) (the "Supreme Court Decision") reversing and vacating the Chancery Court's November 10, 2021 order confirming the validity of what the parties in this case uniformly refer to as the "Omnibus Agreement." Pursuant to the Omnibus Agreement, the Hawk Parties seized control of Stream away from the controlling shareholders. The Delaware Supreme Court clearly and unequivocally (a) found that the conditions precedent to the Omnibus Agreement were never satisfied (rendering it *void ab initio* under Delaware law), (b) restored control of Stream to its shareholders, and (c) remanded the matter to the Chancery Court with instructions to complete further proceedings *consistent with* the Supreme Court's Decision. A copy of the Supreme Court Decision is attached as Exhibit B.

b.  Despite the Supreme Court Decision, the Hawk Parties refused to return Stream's assets to Stream.

c.  On July 14, 2022, the Delaware Chancery Court entered a letter ruling, attached as Exhibit C, ordering a telephonic hearing for July 20, 2022 (the "7/20/22 Hearing"). In the letter, the Court stated:

> It is also not clear to me why Seecubic would not agree to restore Stream's assets in light of the Delaware Supreme Court's decision, subject to any separate relief that Seecubic might seek here or in the foreclosure action. It is thus not clear to me that a mandatory injunction is necessary. It rather seems to me that the appropriate step is to enter a partial final judgment as to the declaratory relief that flows from the Delaware Supreme Court mandate. If Seecubic fails to respect the implications of the declaratory relief, then an application for mandatory injunctive relief would be a logical next step.

d.  At the 7/20/22 Hearing, the Delaware Chancery Court made clear that the assets that SeeCubic retained should be returned to Stream notwithstanding SeeCubic's assertions of some rights to the assets. A copy of the 7/20/22 Delaware Chancery Court hearing transcript attached as Exhibit D.

---

[2] This timeline is taken mostly directly from VSI's Original Objection. Quotes from the Amended SSG Declaration are added in italics and underlined.

78262979;5

- o "I think, technically, title to the assets never left Stream, and I think, at this point, equitable title to the assets has to be viewed as at Stream." (Tr. 26:20-27:4.)

- o "…the reality is, based on the Delaware Supreme Court decision, SeeCubic, right now, shouldn't have the assets." (*Id.* at 28:11-13.)

- o "I don't think that there's any basis for any type of relief that would leave these assets in SeeCubic's hands." (*Id.* at p. 28:15-29:8.)

- o "I want the parties to try to move forward with some type of Rule 54(b) order that implements the Delaware Supreme Court's decision. I think that order needs to result in these assets being moved back to Stream." (*Id.* at 35:1-5.)

e. Despite the Delaware Chancery Court's clear statements on the record at the 7/20/22 Hearing, SeeCubic sought to engage SSG as an investment banker to sell the very assets that the Delaware Chancery Court had ordered the Hawk Parties to return to Stream.

f. On July 31, 2022, the Hawk Parties' counsel notified Stream's counsel that the Hawk Parties were hiring an investment banker to sell Stream's assets in an Article 9 foreclosure sale, notwithstanding the Chancery Court's orders to the contrary.

g. Once again, in clear defiance of the Delaware Chancery Court's comments at the 7/20/22 hearing, SSG pressed on with the engagement.

h. On August 9, 2022 and based upon Stream's emergency motion, the Delaware Chancery Court issued a temporary restraining order (the "8/9/22 TRO"), attached as Exhibit E, enjoining SeeCubic from selling Stream's assets: "Effective immediately and until further order from this Court, SeeCubic, Inc. ('SeeCubic'), ***including all those acting in concert with SeeCubic***,[3] is hereby ENJOINED from taking any action to sell Stream's Assets . . ." 8/9/22 TRO ¶ 2. (emphasis added).

i. On September 28, 2022, after the Hawk Parties *again* refused to return Stream assets, the Delaware Chancery Court *again* emphasized that the assets must be returned:

> Hawk and SeeCubic have argued that SeeCubic holds some assets that are Disputed Assets, either because they are not Legacy Stream Assets, or because they are not easily segregated from Legacy Stream Assets. SeeCubic's claims on this point seem somewhat exaggerated. In any event, in light of the [Delaware Supreme Court] ***Mandate***, the more important consideration is to require SeeCubic to return Stream's assets expeditiously.

*In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, Memorandum Opinion, Case No. 2020-0766-JTL *(*Del. Ch. Sept. 28, 2022). (emphasis added), attached as Exhibit F.

---

[3] This certainly appears to VSI that this would include SSG.

j.  On September 30, 2022, the Delaware Chancery Court issued a mandatory injunction order (the "Mandatory Injunction Order", attached as Exhibit G.) requiring the Hawk Parties to return certain assets to Stream:[4]

- o  "SeeCubic shall return the Sample Displays to Stream with ten days." ¶ 2

- o  "SeeCubic shall return the Bonding Equipment to Stream within ten days." ¶ 3

k.  Following the Mandatory Injunction Order, the Hawk Parties transferred the shares of Technovative stock to Stream, returning ownership of all the subsidiaries to Stream. But simultaneously, the Hawk Parties issued a notice informing Stream that the Hawk Parties had (i) taken control of Technovative using their Proxy rights and (ii) appointed Stastney, Chairman and CEO of SeeCubic, as director of Technovative and all other Stream subsidiaries.

l.  On September 30, 2022, Stream was forced to file yet another motion seeking injunctive relief.

m.  On October 3, 2022 the Delaware Chancery Court issued an order finding Stastney and the Hawk Parties in contempt (the "Contempt Order" attached hereto as Exhibit H) and holding, among other things, the following:[5]

> This decision holds that SeeCubic and Hawk engaged in contemptuous conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's. (Id. at 1-2.).

> SeeCubic and Hawk planned a series of coordinated acts in which SeeCubic would transfer the Shares to Stream in a manner that would enable Hawk to seize them by acting before Stream could respond. The Shares would end up in the hands of Hawk, just as SeeCubic and Hawk wanted." (Id at 6.)

> Rather than complying with the Transfer Obligation and the Post-Remand Injunction, SeeCubic, Hawk, and Stastney acted in concert to evade those

---

[4] *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, Order Regarding Motion for Mandatory Injunction, Case No. 2020-0766-JTL (Del. Ch. Sept. 28, 2022).

[5] *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, Opinion, Case No. 2020-0766-JTL (Del. Ch. Oct. 3, 2022).

15

**A-266**

obligations. For months, SeeCubic failed to comply [with] the Transfer Obligation. (*Id* at 13-14.)

40.    On January 4, 2024, this Court issued the Bankruptcy TRO, enjoining the Hawk Parties from using Stream's technology for ***any purpose***, including but not limited to raising money for the Hawk Parties' use. *See* ECF No. 119, Adv. Case No. 23-00057. This injunction has been extended several times, most recently through November 12, 2024. *See* ECF No. 150, Adv. Case No. 23-00057.

41.    Upon information and belief, despite all the hearings, admonishments, directives, and orders from the Delaware Supreme Court, the Delaware Chancery Court, and this Bankruptcy Court, the *Hawk Parties returned nothing of real significance (including without limitation, the bonding equipment, lenses, and technology demonstrators, and associated intellectual property) to the Debtors.*

42.    Added on top of all of the above conduct, the effective head of the Hawk Parties, Robert Morton, as the dubious honor of being an infamous recipient of a United Kingdom "Cold Shoulder" Order, attached as <u>Exhibit I</u>. Upon information and belief, only 13 of such orders have ever been issued because of their severe nature. Put simply, Robert Morton was prohibited from seeking investments and all parties were prohibited from working with him. Indeed, Mr. Morton remained subject to the limitations under the Cold Shoulder Order through the commencement of these bankruptcy cases.

ii.    **The Trustee has Allowed the Hawk Parties to Violate the Bankruptcy TRO and has Produced Nothing to Show that the Debtors' Assets have been preserved or Returned from the Hawk Parties**

43.    On April 13, 2024, VSI's counsel sent an email to the Trustee's counsel, stating: "We were just told by reputable contacts from the Netherlands group that they have been making samples and getting them to SeeCubic at SeeCubic's request. We believe that this is in violation

16

of the Bankruptcy TRO and the licenses." The email further stated: "You should also know that
the representatives of SeeCubic are calling Stream shareholders to try to get investment money
and as previously stated, using the 3D technology in which they have no rights. … As aforestated,
they should not be making samples, or making representations, or talking to companies about this
3D technology as if they own the rights. If true, and based upon what has been presented to us, we
believe this is impairing the Estate to which you have a fiduciary duty to protect." *See* Exhibit J.
VSI is unaware of any actions the Trustee took to investigate the allegation.

44.     On May 6, 2024, the Trustee and his counsel were advised that, upon information
and belief, the Hawk Parties had conducted demonstrations of the Debtors' technology in London
in violation of the Bankruptcy TRO and that the enjoined parties had scheduled additional violative
demonstrations in Jersey, UK on May 7, 2024, the following day. *See* Exhibit K. The Trustee and
his counsel failed to acknowledge the email or respond in any way. However, counsel for Hawk
responded on May 9, 2024: "It is up to the Debtors to determine whether they believe a violation
occurred or needs to be addressed. The Debtors have not taken any action or voiced any concerns."
Rembrandt 3D Holding Ltd ("Rembrandt"), whose technology is specifically mentioned in the
Bankruptcy TRO and who filed a memorandum in support of the Debtors' Bankruptcy TRO
motion [ECF No. 44, Adv. Case No. 23-00057], sent an email to Hawk counsel on May 12, 2024,
stating:

> You have certainly had ample time to deny that such a meeting occurred or that
> Stream and Rembrandt technology was shown. You have failed to provide or offer
> any form of declaration or statement denying the substantive issue. That silence
> certainly speaks volumes.
>
> You seem to suggest that the trustee authorized the meeting and use of Stream
> assets for the meeting. I am not aware of any power granted to the trustee that would
> allow him to revoke or modify the TRO to authorize any of the defendants to violate
> an order from the judge. Are you suggesting the trustee participated in the meeting
> or consented to use of Stream technology at the meeting? Even if the trustee was
> able to allow use of Stream's property, I am sure that the trustee has no authority to

have granted permission to use Rembrandt technology outside the license. If Rembrandt's technology was utilized by the estate pursuant to the Rembrandt license then payment of the royalties should be made pursuant to Section 365(n)(2)(B).

45.     Approximately two weeks later, on May 30, 2024, VSI's counsel once again sent an email to the Trustee's counsel, informing them that the Hawk Parties had conducted and recorded a global Zoom meeting on May 28, 2024. The Trustee was encouraged to request a copy of the recording from SeeCubic to explore whether TRO violations had occurred. Based on information and belief, VSI counsel related certain meeting details to the Trustee:

- Stastney stated that there had been improvements in both the technology and the business. Per the TRO, he is not allowed to reference the technology at all.

- Stastney stated that SeeCubic had several running projects and specified two that were particularly exciting: one with Hyundai and one with Dell (for Dell, Stastney announced that they will be showing a human anatomy project at the Consumer Electronics Show in Las Vegas in January 2025). SeeCubic is actively utilizing Stream's technology to secure customers, another flagrant violation of the TRO.

- Stastney invited the Zoom meeting participants to invest in SeeCubic and offered 2 investment options to mitigate dilution. Representing the Ultra-D technology for fundraising purposes is one of the specifically restricted activities.

- Stastney invited the Zoom meeting participants to contact him and schedule an in-person meeting to see demonstrations of the latest technology samples. Displaying the Ultra-D technology is one of the specifically restricted activities.

- Stastney stated that SeeCubic expects new demonstrator units to be assembled by SeeCubic BV and distributed to potential customers for additional upcoming projects. Commissioning SeeCubic B.V. ("SCBV"), which is also enjoined, to create and distribute samples featuring the protected technology is simply unacceptable. The action damages the Debtors and all their stakeholders.

- Patric Theune, manager of SCBV, was on the call to support Stastney from a technology perspective even though Theune is listed personally as one of the enjoined parties.

VSI is unaware of any effort the Trustee made to obtain the Zoom recording or otherwise investigate these likely serious Bankruptcy TRO violations.

18

**A-269**

46.     The reason for the Trustee's unwillingness to investigate alleged Bankruptcy TRO
violations became clear months later, in September 2024. When the Trustee failed to report first
and second quarter 2024 sales data to Koninklijke Philips N.V. ("Philips") as required under the
Philips technology license held by the Debtors' Curaçao subsidiary, triggering a default notice
from Philips, contract employees to the Debtor pressed the Trustee for the information necessary
to file the royalty reports as required. Despite the fact that this Court has continuously extended
the Bankruptcy TRO, most recently until November 12, 2024 as noted above, the Trustee
responded via email to Bud Robertson on September 10, 2024:

> "Bud, **the TRO is no longer in effect. I settled that issue**. During Q1 no displays
> were delivered. As a result, the reporting is empty. During Q2 two (2) 12.3-inch
> display demonstrators were delivered to a customer."

> *See* Exhibit_L (emphasis added)

With his email, the Trustee attached completed royalty reports for submission to Philips by the
Debtors' contract employees via the Philips customer portal. In his email and attached royalty
reports, the Trustee acknowledged that the enjoined parties had manufactured and sold products
in violation of the Bankruptcy TRO. However, from the dismissive opening comment in his email
to Robertson, the Trustee has done little or nothing to protect the estate or the third-party licenses
of Philips and Rembrandt from infringement by the stalking horse and other enjoined parties.

47.     The ongoing violations by the Hawk Parties continue to damage the Debtor's
estates and all parties in interest by (i) poaching investors from the Debtors for their own benefit,
(ii) poaching customers from the Debtors for their own benefit, (iii) putting the irreplaceable
Philips license at risk since the Debtor, not the Hawk Parties, is the Philips licensee, and
(iv) creating additional exposure for damages claims by Rembrandt, who have recently filed a new
claim against Technovative in this bankruptcy case.

19

**A-270**

48.     In addition to allowing or excusing the abovementioned Bankruptcy TRO violations, the Trustee has failed to secure the return of assets to the estates, whether it be the bonding equipment for use in product manufacturing, technology demonstrators for use in securing strategic partners and investors, or components overdue for customer delivery. The Trustee seems to have adopted a status quo attitude regarding the assets, leaving them scattered across the globe and in the illegal possession and control of the enjoined parties.

49.     Upon information and belief, the Trustee was given a presentation of the Debtors' own technology in March 2024 by Stastney, who demonstrated one of the latest samples made by the Debtors' Netherlands R&D engineers. Rather than confiscate the demonstrator sample as estate property since it contained the Debtors' proprietary technology, the Trustee allowed Stastney, a party specifically enjoined by the Bankruptcy TRO, to maintain possession of the unit for use in competition with the Debtors.

50.     There should be an immediate surrender of all Glasses-Free 3D demonstrators by the Hawk Parties to the Trustee on behalf of the Debtors, an action that should have occurred following the Delaware Supreme Court's 5-0 en banc decision of June 15, 2022. That decision found the Omnibus Agreement, which purported to transfer the Debtors' assets SeeCubic, to be invalid and ordered the decision granting SeeCubic ownership and possession of the Debtors' assets to be REVERSED and VACATED.

51.     The assets have never been returned to the Debtor or to the Trustee by the Hawk Parties and those working in concert with them. As a result, they have continued to represent the Debtors' technology for their own benefit, to the detriment of the Debtors, their estates, and other parties in interest.

**D.     The Solicitation and Due Diligence Materials Offered by the Trustee and SSG are Misleading and Woefully Inadequate**

78262979;5

52.     The Trustee has proposed a 363 Sale of the Debtors' assets to maximize recovery for all creditors. To achieve the best outcome in such a sale, the assets must be presented as transparently and completely as possible to secure meaningful bids. However, the solicitation document from SSG does not contain enough support for the value it purports to offer, while the data room omits key value that is likely to exist as well as liabilities that might have meaningful impact. The Trustee and SSG may hope that an "as-is, where-is" sale obviates the need for meaningful disclosure, but VSI believes they have an obligation to provide accurate, relevant documentation known to exist.

### i.     The SSG Solicitation "Teaser" Misled Potential Bidders

53.     In early October 2024, SSG distributed a one-page flyer to solicit interest from potential bidders in the proposed 363 Sale. The flyer stated, "[t]he technology **can be licensed** and embedded into partner hardware, enabling devices to display both native 2D content and immersive 3D content." *See* <u>Exhibit M</u> (emphasis added). The flyer fails to  mention the Philips or Rembrandt technologies, and the sub-licensing restrictions from both companies that would block a successful 363 Sale bidder from actually being able to license the technology for integration into partner hardware as promised. While this misstatement in the solicitation document *might* have been mitigated by disclosure in the data room, no such disclosure was made.

### ii.    The Data Room Prepared by the Trustee and SSG for Consideration and Due Diligence of Potential Bidders Lacks Meaningful Information

54.     If the data room is meant to show potential value in the Debtors' technology, it completely fails to do so. There are no customer contracts, communications, or purchase orders disclosed. There isn't even an overview describing "proof of concept" projects that are either in process or being considered by potential customers.

21

**A-272**

55.     As presented to this Court previously, Stream secured two purchase orders valued at more than $138 million from VSI in 2023 [ECF Nos. 114-2 and 114-3]. The validity of the VSI purchase orders was backed by purchase orders obtained by VSI from end customers: Cystar International Ltd. ("Cystar") and Southern Telecom, Inc. ("STI"). Both end customer purchase orders were also presented to the Court [ECF No. 642, Exhibits D and E] and were reconfirmed at the request of the Trustee shortly after his appointment in January 2024. Although VSI offered to arrange direct communication between the Trustee and the VSI end customers supporting the "back-to-back" purchase orders issued by VSI to Stream, the Trustee never availed himself of the opportunity to do so. Why wouldn't the Trustee, on behalf of the Debtors' estates, seek to establish personal contact with significant customers? To encourage maximum value of the estates, those purchase orders should be disclosed to potential bidders, and if the Trustee opts to disregard evidence that the purchase orders remain valid as claimed by VSI, the Trustee could and should provide his own disclaimer. Not revealing the existence of $138 million in potential revenue downplays the value of the estates and reduces bidder interest, likely leading to a lower bid for the assets than is warranted. The Trustee's solicitation should be aimed at maximizing value, not undervaluing the assets.

56.     VSI purchase orders aside, there is virtually no other documentation indicating any customer interest, despite clear evidence to the contrary. The single document specifying interest in the Debtors' technology is essentially a strategic partner agreement executed on February 28, 2024 by Stastney on behalf of SCBV. The agreement contemplates an arrangement whereby components featuring the Debtors' technology will be provided to a third party for manufacture and integration into products for sale. This agreement was entered into by two parties specifically enjoined by the Bankruptcy TRO from using the Debtors' technology: Stastney, personally, and

SCBV. As this agreement was executed after issuance of the Bankruptcy TRO and well before the 9019 Agreement was executed or approved by the Court, there can be no justification for the Trustee's knowledge and acceptance of this Bankruptcy TRO violative agreement.

57.    Bankruptcy TRO violations aside, there are no other documents reflecting actual customer interest or activity, evidence of which would be critical for asset valuation purposes by potential bidders and which are clearly known to the Trustee. Most obvious of these is the customer relationship with Hyundai Mobis ("Hyundai"). When questioned in Court on October 6, 2023 about contracts that SCBV had executed with customers, Stastney testified that there were two. "One is Hyundai. That's already been made publicly available." *See* Exhibit N, 10/6/23 Hearing Transcript at p.178:6-7. The data room does not mention Hyundai, even though Stastney confirmed that an executed agreement exists, and the Trustee filed a royalty report with Philips on September 10, 2024 declaring that two units of "12.3[inch] Instrument Cluster Display demonstrator" had been sold to a customer. Instrument clusters are a strictly automotive component, perfectly suited to satisfy a customer like Hyundai.

58.    When questioned about customer projects, Stastney testified, as director of SCBV, the Debtors' R&D subsidiary, that "SCBV currently has three projects." *See* 10/6/23 Hearing Transcript at p.93:21. If Hyundai is assumed to be one of those projects, there are two other projects using the Debtors' technology for the benefit of customers, neither of which is disclosed in the data room.

59.    It has been more than a year since Stastney confirmed those projects in Court. Upon information and belief, many more projects have begun since then. In a September 23, 2024 email from Stastney to various stakeholders (including shareholders of Stream, SeeCubic, and VSI), Stastney confirmed "we have successfully delivered the Hyundai Mobis 'concept car' screens"

78262979;5

and further boasted "we have a pipeline of 28 projects across 25 customers, all of whom are moving through some stage of the [proof of concept] intake process." If the pipeline has expanded from three customers to twenty-five customers, where is the evidence of that value to the Debtors' estates for consideration by potential bidders? Either Stastney has failed to disclose project development to the Trustee, or the Trustee has failed to monitor or even inquire about the status of customer development for the benefit of the estates. VSI is concerned that those relationships were developed in defiance of the Bankruptcy TRO and are being kept as secret value for the stalking horse only, as SeeCubic will be the only one to benefit from customers not disclosed to potential bidders.

60.    Besides failing to include significant actual and potential customer information in the data room, SSG fails to mention – let alone include any meaningful documentation regarding – the third-party technology licenses from Philips and Rembrandt.

61.    Stream entered into a license agreement with Philips on December 8, 2011, and an amendment on December 8, 2014. See Exhibit P. These agreements specify the conditions under which the Philips intellectual property was licensed to the Debtors, restricted how it could be used, and the royalty reporting and payment requirements related thereto. As the Philips technology constitutes the foundation upon which the Debtors' technology was founded, the Philips license has material impact on the value of the estates. The Trustee and SSG have not provided the Philips license for potential bidder review, nor have they disclosed that the license exists, nor even that the Philips foundational technology is a factor for consideration.

62.    The data room is also completely silent on the issue of intellectual property claims by Rembrandt. While the Trustee (and therefore SSG as his agent) may dispute the Rembrandt claims, there is nonetheless a fully executed pre-petition settlement agreement dated May 23, 2021

78262979;5

between Stream and Rembrandt which grants Stream the **non-transferable right** to incorporate Rembrandt technology into the Debtors' technology (the "Rembrandt Settlement"), attached as Exhibit P. The terms of the 2021 Rembrandt Settlement were initially negotiated as a settlement term sheet in 2019 by Stastney, Chairman and CEO of the stalking horse, who at the time was an officer and director of Stream. The stalking horse, VSI, and the Trustee are all aware of the Rembrandt Settlement (and a subsequent Amendment dated August 12, 2023), but the data room does not include those executed agreements, nor is there any mention at all of Rembrandt and its claims. Worse still, there is no documentation or disclosure that Rembrandt filed suit against Debtor Technovative, stalking horse SeeCubic, and Stream creditor Hawk in the U.S. District Court for the District of Delaware, seeking injunctive relief for misappropriation of trade secrets[6]. *See* Exhibit Q.

63.     Additionally, there is a general lack of disclosure overall with regard to legal filings that might have relevance to potential bidders. Indeed, there is only a single document of this type in the data room: this Court's memorandum granting the Hawk Parties' request for appointment of a chapter 11 trustee [ECF No. 548]. There is no mention of the Bankruptcy TRO enjoining the stalking horse, no mention of the 9019 Agreement, and no mention of any non-bankruptcy litigation that might impact a successful bidder's use of estate assets after consummation of the 363 Sale. While these omissions may not be dispositive, they refute any notion of transparency and cause further suspicion about the Trustee's intent and ability to conduct a fair and open sale process for the benefit of creditors other than the stalking horse.

64.     Finally, other than 17 detailed job descriptions for personnel at the Debtors' R&D entity in the Netherlands, there is virtually no disclosure regarding the operational needs of this

---

[6] C.A. No. 1:23-cv-00193-GBW

78262979;5

**A-276**

critical subsidiary which would be acquired through the 363 Sale process. A spreadsheet purporting to inform bidders of the "number of employees" contains only 2 entries for total number of people and full-time engineers, without any insight into the financial requirements to support them. The operations spreadsheet includes only 13 lines of data for key expenses and ignores any expense less than Ten Thousand Euros. What are the actual expenses required to operate SCBV as a technology center after acquisition? It's impossible to tell from the available data, and only the stalking horse knows through its appointment of Stastney as director there. The effort at transparency is mere "lip service" at best and offers potential bidders no meaningful data to evaluate.

65.     Given the absence of known customer contracts and other information related to ongoing customer projects confirmed by Stastney as director of the Debtors' R&D subsidiary, given the lack of disclosure of liabilities related to third-party IP, given the lack of financial information related to operating and managing the Debtors' technology center following acquisition of estate assets, and given the Trustee's apparent unwillingness to explore and prosecute Bankruptcy TRO violations by the stalking horse, it appears there has not been a bona fide, good faith effort by the Trustee and SSG to prepare the assets for sale or market them adequately. Without appropriate effort to satisfy a potential bidder's due diligence, no meaningful sale can occur, damaging every creditor but the stalking horse.

## III.    ARGUMENT

**A.    The Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, the Court must first determine whether such property constitutes property of the estates.**

66.     It is widely accepted, in addition to being firmly intuitive, that the Bankruptcy Code does not expand a debtor's interests in property beyond what such interests were at the petition date. *Jones v. GE Capital Mortgage Co. (In re Jones)*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995)

78262979;5

**A-277**