("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy

than he would have under state law by merely filing a bankruptcy petition") (*citing First Fid. Bank

v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993)); *See also Moody v. Amoco Oil Co.*, 734 F.2d 1200,

1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of the case

continue in bankruptcy -- no more, no less."), cert denied, 469 U.S. 982 (1984); *Mission Prod.

Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663, 203 L. Ed. 2d 876 (2019) (recognizing

the "general bankruptcy rule [that] the estate cannot possess anything more than the debtor itself

did outside bankruptcy" and that "[a] debtor's property does not shrink by happenstance of

bankruptcy, but it does not expand, either.").

67.    A debtor (or in this case, the Trustee), may not sell property unless that property

constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy

court must determine whether the property the debtor proposes to sell constitutes property of the

estate. *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at

\*9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir.

B.A.P. 2001)). Bankruptcy courts have consistently made this finding. *See also Anderson v.

Conine (In re Robertson)*, 203 F.3d 855 (5th Cir. 2000) (holding that Section 363(f) does not allow

a trustee to sell property that is not property of the estate); *In re Worcester Country Club Acres,

LLC*, 655 B.R. 41, 47 (Bankr. D. Mass. 2023) (holding that because the ownership of the land was

disputed, it "must be adjudicated in order to determine if they are property of the Debtor's

bankruptcy estate, they cannot be sold under § 363(b) or (c) and pursuant to § 363(f)(4) prior to a

resolution of those issues."); *In re Coburn*, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (it was

necessary to determine whether an asset was property of the estate in order to then decide whether

the trustee was entitled to sell the asset pursuant to Section 363(f))); *Darby v. Zimmerman (In re

*Popp)*, 323 B.R. 260, 266 (B.A.P. 9th Cir.2005); *Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*, 2013 WL 4804816, at *3 (D.N.J. Sept. 9, 2013) ("it is well-settled that a 'bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property"). A sale under Section 363 "cannot be had when there is an unresolved issue of whether the subject property is 'property of the estate' . . . ." *In re Interiors of Yesterday, LLC*, Case No. 02-30356 (LMW) , 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007). *See also Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 605–06 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005) (this Court "may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property."); *Ross v. A V Car & Home, LLC (In re Brown)*, Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625, at *3 (Bankr.D.C. Jan. 30, 2019) (court may not authorize sale of property where ownership of a portion of the property is in dispute).

68.     It is the trustee who bears the burden of establishing that the property to be sold is property of the estate under Section 363(b). *See, e.g., In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet their burden of establishing that the assets were property of the estate, and therefore were not permitted to sell the goods under Section 363(f)(4)). Here, the Trustee clearly has not met that burden. In fact, it is evident that, as described herein, the trustee is attempting to sell the assets on an "as-is, where-is" basis, without understanding (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to a third-party has been completed.

**B.     The 9019 Agreement and Bidding Procedures Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court.**

69.     Separate and apart from the many infirmities in the Bidding Procedures themselves, which are discussed below, the Bidding Procedures Motion should be denied because it seeks approval of a sale that cannot be approved under the Bankruptcy Code. In short, the Court should not permit a patently illegal sales process to go forward. Among other things, the sale process proposed by the Trustee constitutes an impermissible *sub rosa* plan of reorganization that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent. It is well known that a bankruptcy court has the authority to approve a compromise or settlement of a claim after notice to the debtor, trustee, and creditors and a hearing on the compromise. Fed. R. Bankr. P. 9019(a). It is also accepted knowledge that under 11 U.S.C.S. § 363(b), a debtor may use estate property outside the ordinary course of business, upon notice and a hearing, to settle claims with the approval of the bankruptcy court.

70.     However, when a sale process and/or settlement in bankruptcy has the ultimate effect of dictating the terms of any future reorganization plan, the bankruptcy court must deem the transaction impermissible because it short circuits the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. "The hallmark of such a plan is that it dictates the terms of a reorganization plan." E*nergy Future Holdings Corp. v. Del. Tr. Co*., 648 F. App'x 277 (3d Cir. 2016). This is because it "short circuits" the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

71.     Thus, *sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan*

78262979;5

*Chase (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir. 2007); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted."). Where a settlement circumvents creditors' rights to vote on key provisions, that settlement can be said to dictate the terms of a plan. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

72.    This is precisely the circumstance of this case. The terms of the proposed sale process, as outlined in the 9019 Agreement and in the Bidding Procedures Motion, clearly constitute a *sub rosa* plan of reorganization. Among other things, the sale seeks to improperly channel consideration to specific creditor groups – as discussed herein, the Trustee has selected the Hawk Parties as the stalking horse and agreed to give them an allowed secured claim of $180 million, $150 million of which may be used as a credit bid. This is blatantly at the expense of the Debtors' other creditors – pursuant to the 9019 Agreement, $7,500,000 would be carved out to pay administrative and general unsecured creditors. Notably, if a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until Hawk's $180 million claim is paid in full. As such, it essentially ensures that the Debtors' unsecured creditors, and perhaps even administrative expense claimants, receive pennies on the dollar. Such a restructuring of creditors' rights and diversion of value is impermissible in the context of a 363 sale. *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

73.     Further, the Debtors impermissibly seek to use the 363 Sale to bind the Debtors'
creditors to a treatment of their claims without having that proposed treatment tested by the
standards of the Bankruptcy Code. Such a proposed sale cannot proceed. See, e.g., *In re Westpoint
Stevens Inc.,* 333 B.R. 30, 52 (S.D.N.Y. 2005) ("Where it is clear that the terms of a section 363(b)
sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope
of section 363(b) and should not be approved[.]"); *Institutional Creditors of Cont'l Air Lines, Inc.
v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226-28 (5th Cir. 1986)
(same).

74.     Quite simply, a 363 sale is not a substitute for a plan of reorganization. *See
Westpoint Stevens Inc*., 333 B.R. at 52 (noting when a proposed transaction specifies terms for a
reorganization plan, the parties and the court "must scale the hurdles erected in Chapter 11")
(citation omitted); *see also In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (The
"trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of
reorganization."); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (finding that
section 363 does not permit a debtor to abrogate the protections afforded creditors by section 1129
and the plan confirmation process).

75.     The Debtors bear the burden to prove that the proposed sale is fair, equitable, in the
interest of the estates, and not unfair to the creditors. The proposed sale fails each of these
requirements.

**C.     The Bidding Procedures are Neither Fair nor Reasonable and are Fatally Flawed in
Numerous Ways Such that the Court Should Not Approve Them.**

76.     Beyond the simple fact that the Bidding Procedures Motion is part of an improper
*sub rosa* plan of reorganization that cannot be approved, the Bidding Procedures themselves are
inherently impermissible for a number of reasons, chief among them that they are not fair nor

31

reasonable. One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003). To further this purpose, sale procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value); *see also In re Williamson*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.")

77.    In this regard, the Court must assess the fairness and reasonableness of the proposed bidding procedures. *See In re American Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) Tr. at 132-33 ("I don't think . . . that my consideration of bid procedures is based on the business judgment rule . . . The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all that matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case; to determine what is fair for all the parties.")

**D.    The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to a Heightened Scrutiny Standard.**

78.    There is nothing fair about the proposed "process" sought to be approved by the Bidding Procedures Motion. In fact, the process (if it even can be called that) succeeds in handing the Debtors' most valuable assets to SeeCubic, an insider with a long history of improperly

78262979;5

**A-283**

possessing and controlling the Debtors' property, as Stalking Horse Bidder pursuant to an improper credit bid.

79.     And make no mistake, SeeCubic is certainly an insider with respect to the Debtors. Indeed, SeeCubic has exerted an inordinate amount of control over the Debtors' assets and sale process, and has time and time again violated the automatic stay and the Bankruptcy TRO in place.Control of SeeCubic rests with Stastney, who was both Vice Chairman of the Board of Directors and Chief Financial Officer of Debtor Stream shortly before he orchestrated an asset takeover with the Hawk Parties through the invalidated Omnibus Agreement. Stastney had access to the Debtors' financials, sensitive customer information, investor database, and other critical data. He siphoned key personnel from the Debtors and ultimately used the Dutch court system to install himself as director of the Debtors' R&D subsidiary, a position he uses today to exert control over the Debtors' engineering development activities.

80.     Transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS

78262979;5

896, 26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required for insider transactions"); *In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders . . . the proposed sale is subject to heightened scrutiny.").

81.     This heightened scrutiny also applies to a sale proposed by a trustee, rather than a debtor in possession. *In re Blixseth*, No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010). In *Blixseth*, the court refused to approve a sale of property as proposed by the trustee to a secured creditor credit-bid. The court found that the creditor had "very close ties to the debtor" and refused to apply the standard applicable to non-insider sales or to give deference to the trustee's business judgment. Instead, the court applied the more rigorous *Bidermann* standard for evaluating insider transactions. As such, the court denied the  bidding procedures proposed by the trustee. In applying heightened scrutiny, courts are concerned with "the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

82.     This transaction would not withstand heightened scrutiny. As in *Bidermann*, SeeCubic and the Hawk Parties clearly have "very close ties" to the Trustee. As detailed herein and in the SSG Objection, the Hawk Parties have a long history of improperly possessing the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this Court's orders, specifically including the TRO that remains in effect through November 12, 2024.

**E.     The Proposed Sale Timeline is Not Adequately Supported.**

83.     The Trustee seeks approval of an accelerated sale process: a November 15, 2024 bid deadline, with a sale hearing to occur on November 22, 2024. Said differently, this means that

78262979;5

**A-285**

any potential bidder would need to enter into a confidentiality agreement, perform diligence, draft an asset purchase agreement, and designate assigned contracts and leases as well as assumed liabilities, all within 46 days of the filing of the Motion. *See Bidding Procedures Motion* ¶ 49(a)-(j). This seems onerous on its face and is made even more difficult to accomplish in the context of a "bid irrevocable" and "as-is, where-is" sale. This is simply untenable and results in a situation where third-party potential bidders are left with no time to seek, obtain, or review due diligence materials, let alone submit a bid. All parties will agree that the nature of the Debtors' businesses is complicated. The consequence of compressed timing is that only a bidder with an extensive working knowledge of the relevant information regarding the Debtors and their businesses, ongoing litigation, restructuring, capitalization, transactions and governance, could have adequate time to formulate a remotely reasoned bid for the assets.

84.    Additionally, the Trustee's marketing process does not appear to have been sufficiently robust enough to justify the proposed compressed sale timeline. As described herein and in the SSG Objection, the Trustee filed the SSG Application on August 14, 2024. The Bidding Procedures Motion contains very little information about the extent of the marketing process conducted by SSG thus far; it contains no information about the number of parties who have entered into confidentiality agreements or the number of parties that have submitted indications of interest. The Bidding Procedures Motion simply says "Since its retention, SSG has begun marketing the Debtors' Assets for sale to potential purchasers in order to solicit the highest and best bid to maximize the value to the Debtors' estates. SSG will continue to actively market the Assets, to a wide spectrum of interested parties, including potential financial and strategic buyers." *Bidding Procedures Motion* ¶ 31-32. In fact, the Bidding Procedures Motion itself acknowledged

78262979;5

that, as of the date of its filing, no electronic data room had yet been set up. *Bidding Procedures Motion* ¶ 33. This is all but an admission that no serious marketing process has been underway.

85.    The Bidding Procedures Motion does not provide adequate support for the proposed timeline. Rather, it simply asserts that the short timeline is needed. The proposed break-neck pace sought by the Debtors would achieve nothing other than delivering the Debtors' assets to Hawk for grossly inadequate consideration. There is simply no legitimate justification for the process proposed here.

### F.    Credit Bid Rights Should Not Be Approved.

86.    Whether cause exists to allow for a credit bid under 11 U.S.C. 363(k) is a determination to be made on a case-by-case basis. *In* re *NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006) (limiting credit bid rights "for cause" is a flexible concept to be considered on a case-by-case basis); See *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, at n.14 (3d Cir. 2010) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.")

87.    As a more general matter, courts have held that the desire to foster a competitive bidding environment might constitute cause sufficient to limit credit bidding rights. *See In re Fisker Automotive Holdings., Inc.*, 510 B.R. 55 (Bankr. D. Del. 2014) (stopping a right to credit bid where "to do otherwise would freeze bidding."); *In re Free Lance-Star Publishing Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (eliminating the secured creditor's right to credit bid where the creditor had engaged in inequitable conduct, and "limiting the amount of the credit bid in this case will restore enthusiasm for the sale and foster a robust bidding process.")

88.    Further, courts have also denied credit bids for cause where there is inequitable conduct harming the debtor or its estate. *See In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr.

D. Hawaii 2009) (denying right to credit bid where creditor had engaged in inequitable conduct harming the debtor); *In re The Free-Lance Star Publishing Co.*, 2014 WL 2505627 at *7 (Bankr. E.D. Va. 2014) (denying secured lender the right to credit bid because it leveraged its position as a secured lender to acquire additional collateral prior to the bankruptcy filing for the purpose of purchasing assets with credit in a bankruptcy case); *and In re Theroux*, 169 B.R. 498 (Bankr. D.R.I. 1994) (denying credit bid where the sale price grossly undervalued the assets). Nothing is more applicable and on-the-nose than this line of cases.

89.    Courts have found cause to deny credit bidding when a sufficient dispute exists regarding the validity of the claim forming the basis for the credit bid. *In re Fisker Automotive Holdings, Inc.*, 510 B.R. at 61 ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien."); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 63-64 (Bankr. D.S.C. 2010) (denying secured creditor the right to credit bid because its mortgage and claim were subject to dispute).

90.    As such, no credit bidding should be permitted absent further order of the Court. The Insider Stalking Horse should not be permitted to credit bid given the facts and circumstances of this case. This is wholly inequitable to the legitimate creditors and constitutes "cause" to deny credit bidding rights.

**G.    There Should Be No Finding of Good Faith as to the Insider Stalking Horse Bidder.**

91.    Section 363(m) articulates the "good faith" requirement of a Section 363 asset sale. *Abbotts Dairies*, 788 F.2d at 149–50. A court may not find good faith if fraud, collusion or unfair advantages are determined. *Id.* at 147. A good faith purchaser under the Bankruptcy Code is one who purchases assets for value, in good faith, and without notice of adverse claims. *Abbotts Dairies*, 788 F.2d at 147. In determining whether an asset purchaser is entitled to such protections, courts examine "the integrity of his conduct in the course of the sale proceedings." *Abbotts Dairies*,

37

**A-288**

788 F.2d at 148. In assessing the good faith of a purchaser, courts have considered factors such as:
(1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor
holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or
collusion exists among the prospective purchaser, any other bidders or the trustee. See Abbotts
Dairies, 788 F.2d at 147-48.  Ironically, the Bidding Procedures Motion relies heavily on *Abbott
Dairies* and cites the types of misconduct that would destroy a purchaser's good faith status.
*Bidding Procedures Motion* ⁋ 64. SeeCubic and the Hawk Parties would fail this test at every
level: (1) the sale was not negotiated at arm's length, made particularly evident by SGG's historical
relationship with Hawk; (2) Stastney, as chief executive of the SeeCubic as the Stalking Horse
Bidder is also the sole director of the Debtors' R&D subsidiary; and (3) as discussed throughout
this Objection, there has been collusion between the Trustee and the proposed Stalking Horse
Bidder throughout this process.

92.     For the reasons already discussed herein, any acquisition of the Debtors' assets by
SeeCubic and Hawk is not in good faith and should not be afforded the protections of section
363(m) of the Bankruptcy Code.

**H.      There Should Be No Waiver of Bankruptcy Rules 6004(h) and 6006(d).**

93.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time
for an objecting party to request a stay pending appeal before an order can be implemented. *Fed
R. Bankr. P. 6004(d) advisory committee's note*. The stay pursuant to Bankruptcy Rule 6004(h)
may be waived to allow a sale to close immediately "where there has been no objection to the
procedure." Collier on Bankruptcy ¶ 6004.11 (16th ed. 2016). Courts may waive the stays under
rules 6004 and 6006 upon an "evidentiary showing of a business exigency requiring a closing
within 10 days of an approval order." *In re PSINet, Inc*., 268 B.R. 358, 379 (Bankr. S.D.N.Y.
2001).

38

**A-289**

94.     Here, the Trustee has not made a showing of any business exigency constituting cause to waive the fourteen-day stay period. To the contrary, waiving such period could seriously prejudice the Debtors' other creditors, as it could allow this sale to proceed prior to any remotely reasonable investigation of the assets being sold. Since no exigency exists, the fourteen-day stays under Rules 6004(h) and 6006(d) should not be waived.

## IV.    RESERVATION OF RIGHTS

95.     VSI reserves the right to supplement this Objection or to raise additional or further objections to the Bidding Procedures Motion, the order and/or exhibits thereto, including any form term sheets or asset purchase agreements, at or prior to the hearing on the Bidding Procedures Motion, Sale Hearing, or any other relevant hearing.

## V.    CONCLUSION

WHEREFORE, for the reasons stated above, VSI respectfully requests that the Court deny the Bidding Procedures Motion as submitted and grant such other and further relief as this Court deems just and proper.

Dated November 6, 2024                    Respectfully submitted,

                                          AKERMAN LLP

                                          */s/ R. Adam Swick*
                                          Donald N. David, SBN: 304846
                                          Mark Lichtenstein *(pro hac vice to be filed)*
                                          1251 Avenue of the Americas
                                          37th Floor
                                          New York, NY 10020
                                          Telephone: (212) 880-3800
                                          Facsimile: (212) 880-8965
                                          Email: donald.david@akerman.com
                                               mark.lichtenstein@akerman.com

                                          -and-

39

78262979;5

**A-290**

R. Adam Swick (*pro hac vice*)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7103
Facsimile:   (512) 623-6701
Email: adam.swick@akerman.com

-and-

John H. Thompson *(pro hac vice)*
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson@akerman.com

-and-

Leif M. Clark
Leif M Clark Consulting PLLC
1105 Bonner
Houston, TX 77007
Telephone: (210) 663-5183
Email: lmclark@leifmclark.com

*Attorneys for Visual Semiconductor, Inc.*

40

**A-291**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on November 6, 2024 with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.


_/s/ John Thompson_____
John Thompson

78262979;5

**A-292**

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.*[1] | Bankr. Case No. 23-10763 (AMC) (Jointly Administered) |
| The Debtors. | |

## DECLARATION OF JOHN H. THOMPSON

I, John H. Thompson, pursuant to 28 U.S.C § 1746, hereby declare under penalty of perjury under the laws of the United States of America:

1. I respectfully submit this declaration in support of *Visual Semiconductor, Inc.'s Objection to Motion for (I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement for the Sale of Substantially all of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling a Sale Hearing, and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* (the "Objection"). Other than as set forth expressly herein, this declaration is based upon personal knowledge.

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV *Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 360, 2021 (Del. June 15, 2022) (the "Supreme Court Decision") Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

**EXHIBIT A**

Docusign Envelope ID: B394DC3D-7161-486C-965D-BC7B3A8A66C1
Case 28-20468-vam 391 Doc 638-1 Document 11/06/24 Filed 01/15/06/24 age 10:37 27 Desc
Exhibit A - Declaration of John H Thompson    Page 2 of 63

2.  Attached as Exhibits 1-10 are true and correct copies of email communications

I declare under penalty of perjury that the foregoing is true and correct.


Executed on November 6, 2024

By:    John H Thompson

_____

John H. Thompson

**DocuSign**

## Certificate Of Completion

Envelope Id: B394DC3971C1406C965DBC7D3A8A66C1                                     Status: Completed
Subject: Complete with Docusign: Declaration of John Thompson.pdf
Source Envelope:
Document Pages: 2                        Signatures: 1                           Envelope Originator:
Certificate Pages: 2                     Initials: 0                            Valerie Braun
AutoNav: Enabled                                                                495 N Keller Rd Ste 300
EnvelopeId Stamping: Enabled                                                    Maitland,  32751-8656
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                               valerie.braun@akerman.com
                                                                                IP Address: 104.182.26.121

## Record Tracking

Status: Original                         Holder: Valerie Braun                  Location: DocuSign
        11/6/2024 12:25:45 PM                    valerie.braun@akerman.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| John H Thompson<br>John.Thompson@akerman.com<br>Assistant Treasurer<br>Security Level: Email, Account Authentication (None) | *John H Thompson*<br>DocuSigned by:<br>DED51BFAE8CB492...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 204.9.58.194 | Sent: 11/6/2024 12:27:12 PM<br>Viewed: 11/6/2024 12:37:29 PM<br>Signed: 11/6/2024 12:38:23 PM |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Teresa Barrera<br>teresa.barrera@akerman.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 11/6/2024 12:27:13 PM<br>Viewed: 11/6/2024 12:27:50 PM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| Valerie Braun<br>valerie.braun@akerman.com<br>Akerman LLP<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 11/6/2024 12:27:14 PM<br>Resent: 11/6/2024 12:38:26 PM<br>Viewed: 11/6/2024 12:43:53 PM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

**A-295**

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/6/2024 12:27:14 PM |
| Certified Delivered | Security Checked | 11/6/2024 12:37:29 PM |
| Signing Complete | Security Checked | 11/6/2024 12:38:23 PM |
| Completed | Security Checked | 11/6/2024 12:38:23 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**A-296**

| From: | Vagnoni, Michael <Michael.vagnoni@obermayer.com> |
|---|---|
| **Sent:** | Monday, July 29, 2024 2:13 PM |
| **To:** | Thompson, John (Ptnr-DC); George, Edmond |
| **Cc:** | SCarroll@manatt.com; RHartunian@manatt.com; Swick, Adam (Aus) |
| **Subject:** | RE: StreamTV -  Proof of funds from VSI |

**[External to Akerman]**

John:

We have reviewed the Expression of Interest and bank statement you forwarded late last week.  We are happy to schedule another call, however, before we do, we need to see the diligence request from ULAS and we need to know if your client intends to make a qualified bid and participate in the auction of the assets or if you have some alternative plan – if that is the case we need to see the structure and details of that plan.

In light of our discussion about adjourning and consolidating the current hearing dates as well as the associated discovery and briefing, we contacted Judge Chan's courtroom deputy and there may be dates open in mid-September and there are available dates in early October.  I will find out actual dates and let you know what they are.  On your notice of deposition, the Trustee is not available on August 9 and considering that we are adjourning the hearings, we will look at dates later August and let you know his availability.

Michael



  

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Monday, July 29, 2024 12:33 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>; George, Edmond <Edmond.George@obermayer.com>

1

**EXHIBIT 1**

**Cc:** SCarroll@manatt.com; RHartunian@manatt.com; adam.swick@akerman.com
**Subject:** RE: StreamTV - Proof of funds from VSI

> **WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Michael and Ed:

I'm just following up on my email from last Thursday in the hope that we can get a response from you and the Trustee regarding our request for a call and a pathway for managing the due diligence items highlighted below.  Given the outstanding motions practice, discovery requests, and associated calendar we would appreciate the Trustee's response as soon possible.

Many thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com


Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Thursday, July 25, 2024 5:41 PM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>; 'George, Edmond' <Edmond.George@obermayer.com>
**Cc:** 'SCarroll@manatt.com' <SCarroll@manatt.com>; 'RHartunian@manatt.com' <RHartunian@manatt.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** StreamTV - Proof of funds from VSI

Michael and Ed:

Thanks again for our conference call earlier this week.  As promised, attached is the proof of funds from VSI's investment partner, and I have copied the investor's counsel here as well.  Because the investor seeks certain due diligence materials that are only within the custody, possession, or control of the Trustee, we would respectfully request that you and the Trustee help facilitate the diligence requests from Mr. Carroll and Mr. Hartanian on behalf of their client.  In light of the foregoing, please let us know when we can schedule a call early next week to coordinate a path forward.

**A-298**

Finally, consistent with our discussion this week, we are going to notice the Trustee's deposition.  However, in light of the enclosed proof of funds and our shared opinion that it doesn't make sense to litigate these issues if we are going to reach a deal, we should discuss adjourning and consolidating the current hearing dates as well as the associated discovery and briefing.  Please confirm that you are in agreement, advise as to the alternative dates you have received from the Bankruptcy Court, and propose some dates and times for a call early next week.

Best regards,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**A-299**

| | |
|---|---|
| **From:** | Thompson, John (Ptnr-DC) |
| **Sent:** | Friday, August 2, 2024 12:04 PM |
| **To:** | Vagnoni, Michael; George, Edmond |
| **Cc:** | SCarroll@manatt.com; RHartunian@manatt.com; Swick, Adam (Aus) |
| **Subject:** | RE: StreamTV -  Proof of funds from VSI |

Michael:

Apologies for the delayed response.  I wanted to get clarity with respect to the diligence needs before following up.  An outline of the due diligence requests of the Trustee with respect to the Debtors' estate is below, but let me address your other questions and points about scheduling first.

At this juncture, I cannot tell you whether we will be offering a qualified bid for the assets in a 363 sale or an alternative plan, as that determination is dependent upon the successful completion of the due diligence and an exploration of options with the Trustee.  What I can assure you is that any proposal we do make will result in a materially better outcome for all interested parties (and particularly unsecured creditors) than the current bid offered by Hawk & SLS and reflected in your 9019 Settlement with those parties.  After we have had an opportunity to complete the diligence, we will provide a term sheet outlining our proposal(s) for a path forward.

With respect to the motions practice, hearing dates, and pending discovery, I believe we have adjourned those matters to October 4 to provide us some time to reach agreement on a more comprehensive deal and obviate the need for any continued litigation.  To that end, we would agree with you that it makes sense to adjourn the Trustee's deposition to a later date (late August or sometime in September).

Finally, here are the due diligence requirements:

1. A current list of patents owned by Ultra-D Cooperatief on behalf of the Stream group. (Note that the most recent list was provided in December 2022 and is now a year and a half old).
2. The Trustee will need to facilitate technical calls with the Netherlands engineers at SeeCubic B.V. next week.

Obviously, the single most important aspect of any potential deal for VSI/ULAS is the confirmation of Stream's IP assets (i.e. ownership, control, viability, value, etc).  Accordingly, we would appreciate the Trustee's full cooperation in helping our clients obtain this critical information through the due diligence process.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Monday, July 29, 2024 3:13 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>; George, Edmond <Edmond.George@obermayer.com>

EXHIBIT 2

Case 22-10763-amc Doc 1388-1 Filed 11/06/24 Entered 11/06/24 14:37:27 Desc
Case 2:24-cv-06397-JMG Document 11 Filed 01/15/25 Page 24 of 278
Exhibit A - Declaration of John H Thompson    Page 9 of 63

**Cc:** SCarroll@manatt.com; RHartunian@manatt.com; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: StreamTV - Proof of funds from VSI

[External to Akerman]

John:

We have reviewed the Expression of Interest and bank statement you forwarded late last week.  We are happy to schedule another call, however, before we do, we need to see the diligence request from ULAS and we need to know if your client intends to make a qualified bid and participate in the auction of the assets or if you have some alternative plan – if that is the case we need to see the structure and details of that plan.

In light of our discussion about adjourning and consolidating the current hearing dates as well as the associated discovery and briefing, we contacted Judge Chan's courtroom deputy and there may be dates open in mid-September and there are available dates in early October.  I will find out actual dates and let you know what they are.  On your notice of deposition, the Trustee is not available on August 9 and considering that we are adjourning the hearings, we will look at dates later August and let you know his availability.

Michael



  

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Monday, July 29, 2024 12:33 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>; George, Edmond <Edmond.George@obermayer.com>
**Cc:** SCarroll@manatt.com; RHartunian@manatt.com; adam.swick@akerman.com
**Subject:** RE: StreamTV - Proof of funds from VSI

> **WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Michael and Ed:

**A-301**

I'm just following up on my email from last Thursday in the hope that we can get a response from you and the Trustee regarding our request for a call and a pathway for managing the due diligence items highlighted below.  Given the outstanding motions practice, discovery requests, and associated calendar we would appreciate the Trustee's response as soon possible.

Many thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Thompson, John (Ptnr-DC)
**Sent:** Thursday, July 25, 2024 5:41 PM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>; 'George, Edmond' <Edmond.George@obermayer.com>
**Cc:** 'SCarroll@manatt.com' <SCarroll@manatt.com>; 'RHartunian@manatt.com' <RHartunian@manatt.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** StreamTV - Proof of funds from VSI

Michael and Ed:

Thanks again for our conference call earlier this week.  As promised, attached is the proof of funds from VSI's investment partner, and I have copied the investor's counsel here as well.  Because the investor seeks certain due diligence materials that are only within the custody, possession, or control of the Trustee, we would respectfully request that you and the Trustee help facilitate the diligence requests from Mr. Carroll and Mr. Hartanian on behalf of their client.  In light of the foregoing, please let us know when we can schedule a call early next week to coordinate a path forward.

Finally, consistent with our discussion this week, we are going to notice the Trustee's deposition.  However, in light of the enclosed proof of funds and our shared opinion that it doesn't make sense to litigate these issues if we are going to reach a deal, we should discuss adjourning and consolidating the current hearing dates as well as the associated discovery and briefing.  Please confirm that you are in agreement, advise as to the alternative dates you have received from the Bankruptcy Court, and propose some dates and times for a call early next week.

Best regards,
John

**John Thompson**

**A-302**

Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**A-303**

| | |
|---|---|
| **From:** | Vagnoni, Michael <Michael.vagnoni@obermayer.com> |
| **Sent:** | Monday, August 12, 2024 7:30 AM |
| **To:** | Thompson, John (Ptnr-DC) |
| **Cc:** | George, Edmond; Swick, Adam (Aus); Saldutti, William |
| **Subject:** | RE: Stream |

**[External to Akerman]**

We are working on your requests and setting up a meeting with the engineers in the Netherlands. Please let me know your availability this week. I have limited availability tomorrow and an all-day hearing on Wednesday, but Thursday and Friday are generally free.

Do you have a copy of the NDA between VSI and the Trustee? We are also going to need an NDA with ULAS. The expression of interest you sent also mentions a family office called Continental Advisory Services, LLC – are you aware if that company will be receiving the diligence as well – if so, we will need an NDA for them as well.

Michael



  

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Friday, August 9, 2024 10:59 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** Re: Stream

Michael,

I was looking for your email from yesterday afternoon regarding the due diligence follow ups on the IP licenses and calls, however, I didn't see one. Please let me know if I missed something you sent. My understanding was that you were to have a conversation with the engineers in the Netherlands to coordinate. Please let me know when we can expect to receive the updated IP listing and we can schedule the calls the engineers. We really need to get moving on this.

**A-304**

**EXHIBIT 3**

Thanks,
John


> On Aug 6, 2024, at 5:00 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:
>
>
> Michael:
>
> We'd really like to get started with the very limited diligence we requested of the Trustee and to transition  needto negotiations to achieve a consensual path forward as quickly as possible.  So we would appreciate the Trustee's responses to/facilitation of the two diligence requests sometime this evening or tomorrow morning, and we are fully available for a call with you anytime tomorrow.  If tomorrow afternoon is the soonest that you can do a call, please name the time, and we will set it up and circulate the meeting link.
>
> Thanks,
> John
>
> **John Thompson**
> Partner
> Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
> D: 202 824 1760 | C: 202 302 0646
> john.thompson@akerman.com
>
> ---
>
> **From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
> **Sent:** Tuesday, August 6, 2024 4:44 PM
> **To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
> **Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
> **Subject:** RE: Stream
>
> **[External to Akerman]**
>
> John – we are caught up in a bit of a mess – tomorrow is going to be much better for a call – what is your availability in the afternoon?






**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

**A-305**



**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Tuesday, August 6, 2024 1:50 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** RE: Stream

---

**WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Michael:

Just confirming that you received this and that we can speak this afternoon.  We are available now and through the rest of the day.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Thompson, John (Ptnr-DC)
**Sent:** Tuesday, August 6, 2024 11:13 AM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>

**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus)
<adam.swick@akerman.com>
**Subject:** RE: Stream

Michael:

Thanks for your email.  Yes, we have a number of items to address, so a call this afternoon would be
very helpful.  We are available anytime between 1 pm - 5 pm ET.  Let us know what works for you, and
we will circulate a meeting invite and link.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 10:45 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

[External to Akerman]

John:  I got your voice mail from yesterday afternoon – I am in the middle of a hearing.  Is there anything
specific you need to discuss or a specific time that is good for a call this afternoon?  Michael






**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



4

**A-307**

**A-308**

| | |
|---|---|
| **From:** | Thompson, John (Ptnr-DC) |
| **Sent:** | Monday, August 12, 2024 11:41 AM |
| **To:** | Vagnoni, Michael |
| **Cc:** | George, Edmond; Swick, Adam (Aus); Saldutti, William; Espinosa, Eduardo (Ptnr-Dal) |
| **Subject:** | RE: Stream |

Michael,

We are available this afternoon and all day tomorrow at your convenience.  Please let us know what time you can speak.

Yes, we have a copy of the NDA between VSI and the Trustee.  We will share confidential information with ULAS only pursuant to Section 2.2 of the NDA.  Finally, Continental Advisory Services, LLC will not be receiving confidential information.  If such disclosure becomes necessary, we will contact you for your permission to disclose such confidential information in advance.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Monday, August 12, 2024 8:30 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>
**Subject:** RE: Stream

**[External to Akerman]**

We are working on your requests and setting up a meeting with the engineers in the Netherlands.  Please let me know your availability this week.  I have limited availability tomorrow and an all-day hearing on Wednesday, but Thursday and Friday are generally free.

Do you have a copy of the NDA between VSI and the Trustee?  We are also going to need an NDA with ULAS.  The expression of interest you sent also mentions a family office called Continental Advisory Services, LLC – are you aware if that company will be receiving the diligence as well – if so, we will need an NDA for them as well.

Michael

**A-309**

**EXHIBIT 4**



Michael D. Vagnoni
Partner

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

  



---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Friday, August 9, 2024 10:59 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** Re: Stream

Michael,

I was looking for your email from yesterday afternoon regarding the due diligence follow ups on the IP licenses and calls, however, I didn't see one. Please let me know if I missed something you sent. My understanding was that you were to have a conversation with the engineers in the Netherlands to coordinate. Please let me know when we can expect to receive the updated IP listing and we can schedule the calls the engineers. We really need to get moving on this.

Thanks,
John

> On Aug 6, 2024, at 5:00 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:
>
> Michael:
>
> We'd really like to get started with the very limited diligence we requested of the Trustee and to transition needto negotiations to achieve a consensual path forward as quickly as possible. So we would appreciate the Trustee's responses to/facilitation of the two diligence requests sometime this evening or tomorrow morning, and we are fully available for a call with you anytime tomorrow. If tomorrow afternoon is the soonest that you can do a call, please name the time, and we will set it up and circulate the meeting link.
>
> Thanks,
> John
>
> **John Thompson**
> Partner
> Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001

2

**A-310**

D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 4:44 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

[External to Akerman]

John – we are caught up in a bit of a mess – tomorrow is going to be much better for a call – what is your availability in the afternoon?



**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Tuesday, August 6, 2024 1:50 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** RE: Stream

**WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Michael:

Just confirming that you received this and that we can speak this afternoon.  We are available now and through the rest of the day.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Tuesday, August 6, 2024 11:13 AM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

Michael:

Thanks for your email.  Yes, we have a number of items to address, so a call this afternoon would be very helpful.  We are available anytime between 1 pm - 5 pm ET.  Let us know what works for you, and we will circulate a meeting invite and link.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 10:45 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

[External to Akerman]

John:  I got your voice mail from yesterday afternoon – I am in the middle of a hearing.  Is there anything specific you need to discuss or a specific time that is good for a call this afternoon?  Michael

4

**A-312**



  

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



**A-313**

| | |
|---|---|
| **From:** | Thompson, John (Ptnr-DC) |
| **Sent:** | Monday, August 12, 2024 4:13 PM |
| **To:** | Vagnoni, Michael |
| **Cc:** | George, Edmond; Swick, Adam (Aus); Saldutti, William; Espinosa, Eduardo (Ptnr-Dal) |
| **Subject:** | RE: Stream |

Michael:

If you have not seen it already, you should have received a copy of VSI's term sheet outlining its proposal to serve as plan sponsor to provide a $115 million facility for the reorganization of the StreamTV debtors (sent via DocuSign from my partner Eduardo Espinosa).  We look forward to the Trustee's prompt response as well as a follow up from you regarding a time for tomorrow's call.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Monday, August 12, 2024 12:41 PM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

Michael,

We are available this afternoon and all day tomorrow at your convenience.  Please let us know what time you can speak.

Yes, we have a copy of the NDA between VSI and the Trustee.  We will share confidential information with ULAS only pursuant to Section 2.2 of the NDA.  Finally, Continental Advisory Services, LLC will not be receiving confidential information.  If such disclosure becomes necessary, we will contact you for your permission to disclose such confidential information in advance.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**A-314**

**EXHIBIT 5**

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Monday, August 12, 2024 8:30 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>
**Subject:** RE: Stream

[External to Akerman]

We are working on your requests and setting up a meeting with the engineers in the Netherlands. Please let me know your availability this week. I have limited availability tomorrow and an all-day hearing on Wednesday, but Thursday and Friday are generally free.

Do you have a copy of the NDA between VSI and the Trustee? We are also going to need an NDA with ULAS. The expression of interest you sent also mentions a family office called Continental Advisory Services, LLC – are you aware if that company will be receiving the diligence as well – if so, we will need an NDA for them as well.

Michael



Michael D. Vagnoni
Partner

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

  



**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Friday, August 9, 2024 10:59 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** Re: Stream

Michael,

I was looking for your email from yesterday afternoon regarding the due diligence follow ups on the IP licenses and calls, however, I didn't see one. Please let me know if I missed something you sent. My understanding was that you were to have a conversation with the engineers in the Netherlands to coordinate. Please let me know when we can expect to receive the updated IP listing and we can schedule the calls the engineers. We really need to get moving on this.

Thanks,
John

On Aug 6, 2024, at 5:00 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:

Michael:

We'd really like to get started with the very limited diligence we requested of the Trustee and to transition  needto negotiations to achieve a consensual path forward as quickly as possible.  So we would appreciate the Trustee's responses to/facilitation of the two diligence requests sometime this evening or tomorrow morning, and we are fully available for a call with you anytime tomorrow.  If tomorrow afternoon is the soonest that you can do a call, please name the time, and we will set it up and circulate the meeting link.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 4:44 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

[External to Akerman]

John – we are caught up in a bit of a mess – tomorrow is going to be much better for a call – what is your availability in the afternoon?



Michael D. Vagnoni
Partner

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



**A-316**

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Tuesday, August 6, 2024 1:50 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** RE: Stream

> **WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening
> attachments. When in doubt, contact the IT department.

Michael:

Just confirming that you received this and that we can speak this afternoon.  We are available now and
through the rest of the day.

Thanks,
JT


**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com


Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the
individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or
copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have
received this communication in error and then delete it. Thank you.

**From:** Thompson, John (Ptnr-DC)
**Sent:** Tuesday, August 6, 2024 11:13 AM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus)
<adam.swick@akerman.com>
**Subject:** RE: Stream

Michael:

Thanks for your email.  Yes, we have a number of items to address, so a call this afternoon would be
very helpful.  We are available anytime between 1 pm - 5 pm ET.  Let us know what works for you, and
we will circulate a meeting invite and link.

Thanks,
JT

**A-317**

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 10:45 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

---

**[External to Akerman]**

John:  I got your voice mail from yesterday afternoon – I am in the middle of a hearing.  Is there anything specific you need to discuss or a specific time that is good for a call this afternoon?  Michael






**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



| | |
|---|---|
| **From:** | Thompson, John (Ptnr-DC) |
| **Sent:** | Tuesday, August 13, 2024 4:12 PM |
| **To:** | George, Edmond; Vagnoni, Michael |
| **Cc:** | Swick, Adam (Aus); Saldutti, William; Espinosa, Eduardo (Ptnr-Dal) |
| **Subject:** | RE: Stream |
| **Attachments:** | VSI-Stream Binding Term sheet.docx |

Ed:

As we have made clear in multiple communications, we are working diligently to provide the Trustee with an actionable proposal that is unequivocally better than what is currently on the table from Hawk/SLS/SCI and time is of the essence. So, as Michael requested during our call on Aug. 7, our Client provided the Trustee with a formal offer. I'm sure you didn't mean to suggest that you wouldn't entertain a superior offer merely because you don't like the file format in which it was delivered. The content of the offer is the same in Word and PDF. In the interest of expediency, attached is a Word version of the offer. We are prepared to entertain reasonable modifications. Please provide them, if any, promptly. And just to be clear, you can download a pdf version from DocuSign. It's a button at the top.

Finally, please advise as to when you will be available for the call promised by Michael below.

Thank you,
John


**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** George, Edmond <Edmond.George@obermayer.com>
**Sent:** Tuesday, August 13, 2024 3:52 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>; Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

[External to Akerman]

John, we got a term sheet by Docusign. The Trustee isn't signing anything until he can digest the terms of this proposal, and determine if it presents something better than what is on the table. So we are clear, we are not reviewing a Docusign document. Please send a word version of this Document as we don't want any confusion about what is happening here. If you want proof we received it, send it with a return receipt. Not sure why you used Docusign.

Best

EXHIBIT 6

Ed.

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Monday, August 12, 2024 5:13 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com; Saldutti, William <william.saldutti@obermayer.com>; eduardo.espinosa@akerman.com
**Subject:** RE: Stream

Michael:

If you have not seen it already, you should have received a copy of VSI's term sheet outlining its proposal to serve as plan sponsor to provide a $115 million facility for the reorganization of the StreamTV debtors (sent via DocuSign from my partner Eduardo Espinosa). We look forward to the Trustee's prompt response as well as a follow up from you regarding a time for tomorrow's call.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Monday, August 12, 2024 12:41 PM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

Michael,

We are available this afternoon and all day tomorrow at your convenience. Please let us know what time you can speak.

Yes, we have a copy of the NDA between VSI and the Trustee. We will share confidential information with ULAS only pursuant to Section 2.2 of the NDA. Finally, Continental Advisory Services, LLC will not be receiving confidential information. If such disclosure becomes necessary, we will contact you for your permission to disclose such confidential information in advance.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**A-320**

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Monday, August 12, 2024 8:30 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>
**Subject:** RE: Stream

[External to Akerman]

We are working on your requests and setting up a meeting with the engineers in the Netherlands. Please let me know your availability this week. I have limited availability tomorrow and an all-day hearing on Wednesday, but Thursday and Friday are generally free.

Do you have a copy of the NDA between VSI and the Trustee? We are also going to need an NDA with ULAS. The expression of interest you sent also mentions a family office called Continental Advisory Services, LLC – are you aware if that company will be receiving the diligence as well – if so, we will need an NDA for them as well.

Michael



Michael D. Vagnoni
Partner

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Friday, August 9, 2024 10:59 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** Re: Stream

Michael,

I was looking for your email from yesterday afternoon regarding the due diligence follow ups on the IP licenses and calls, however, I didn't see one. Please let me know if I missed something you sent. My understanding was that you were to have a conversation with the engineers in the Netherlands to coordinate. Please let me know when we can expect to receive the updated IP listing and we can schedule the calls the engineers. We really need to get moving on this.

Thanks,
John

On Aug 6, 2024, at 5:00 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:


Michael:

We'd really like to get started with the very limited diligence we requested of the Trustee and to transition needto negotiations to achieve a consensual path forward as quickly as possible.  So we would appreciate the Trustee's responses to/facilitation of the two diligence requests sometime this evening or tomorrow morning, and we are fully available for a call with you anytime tomorrow.  If tomorrow afternoon is the soonest that you can do a call, please name the time, and we will set it up and circulate the meeting link.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 4:44 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream


**[External to Akerman]**

John – we are caught up in a bit of a mess – tomorrow is going to be much better for a call – what is your availability in the afternoon?




Michael D. Vagnoni
Partner

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



4

**A-322**

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Tuesday, August 6, 2024 1:50 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** RE: Stream

> **WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Michael:

Just confirming that you received this and that we can speak this afternoon. We are available now and through the rest of the day.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Thompson, John (Ptnr-DC)
**Sent:** Tuesday, August 6, 2024 11:13 AM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

Michael:

Thanks for your email. Yes, we have a number of items to address, so a call this afternoon would be very helpful. We are available anytime between 1 pm - 5 pm ET. Let us know what works for you, and we will circulate a meeting invite and link.

Thanks,
JT

**A-323**

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 10:45 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

**[External to Akerman]**

John:  I got your voice mail from yesterday afternoon – I am in the middle of a hearing.  Is there anything specific you need to discuss or a specific time that is good for a call this afternoon?  Michael



  



**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

| From: | Thompson, John (Ptnr-DC) |
|---|---|
| Sent: | Wednesday, August 14, 2024 6:02 PM |
| To: | Vagnoni, Michael; George, Edmond |
| Cc: | Swick, Adam (Aus); Saldutti, William; Espinosa, Eduardo (Ptnr-Dal) |
| Subject: | Re: Stream |
| Attachments: | image001.jpg; image002.jpg; image003.jpg; image004.jpg; image005.png; image001.jpg; image002.jpg; image003.jpg; image004.jpg; image005.png; image001.jpg; image002.jpg; image003.jpg; image004.jpg; image005.png; image001.jpg; VSI-Stream Binding Term sheet.docx; image002.jpg; image005.png; image003.jpg; image004.jpg |

Michael:

I appreciate that you have been in a hearing all day today, but we communicated our availability for a call on Monday and Tuesday and received no response.  We further communicated VSI's term sheet to provide a substantial cash facility and sponsor a plan of reorganization with a renewed request for a time do complete a call and advance the due diligence request - no answer.  I don't think it is unreasonable for us to conclude that the Trustee is ignoring and/or slow-walking our reasonable requests.  Please advise as to whether and when the Trustee will engage with VSI and when we can have a call.  If we do not hear back promptly, we will have to conclude that the Trustee is uninterested in entertaining reasonable proposals and consider VSI's alternatives.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

On Aug 13, 2024, at 5:12 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:

Ed:

As we have made clear in multiple communications, we are working diligently to provide the Trustee with an actionable proposal that is unequivocally better than what is currently on the table from Hawk/SLS/SCI and time is of the essence.  So, as Michael requested during our call on Aug. 7, our Client provided the Trustee with a formal offer.  I'm sure you didn't mean to suggest that you wouldn't entertain a superior offer merely because you don't like the file format in which it was delivered.  The content of the offer is the same in Word and PDF.  In the interest of expediency, attached is a Word version of the offer.  We are prepared to entertain reasonable modifications.  Please provide them, if any, promptly.  And just to be clear, you can download a pdf version from DocuSign.  It's a button at the top.

Finally, please advise as to when you will be available for the call promised by Michael below.

Thank you,
John

**EXHIBIT 7**

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** George, Edmond <Edmond.George@obermayer.com>
**Sent:** Tuesday, August 13, 2024 3:52 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>; Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

[External to Akerman]

John, we got a term sheet by Docusign.  The Trustee isn't signing anything until he can digest the terms of this proposal, and determine if it presents something better than what is on the table. So we are clear, we are not reviewing a Docusign document.   Please send a word version of this Document as we don't want any confusion about what is happening here.  If you want proof we received it, send it with a return receipt.    Not sure why you used Docusign.

Best

Ed.

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Monday, August 12, 2024 5:13 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com; Saldutti, William <william.saldutti@obermayer.com>; eduardo.espinosa@akerman.com
**Subject:** RE: Stream

Michael:

If you have not seen it already, you should have received a copy of VSI's term sheet outlining its proposal to serve as plan sponsor to provide a $115 million facility for the reorganization of the StreamTV debtors (sent via DocuSign from my partner Eduardo Espinosa).  We look forward to the Trustee's prompt response as well as a follow up from you regarding a time for tomorrow's call.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

2

**A-326**

**From:** Thompson, John (Ptnr-DC)
**Sent:** Monday, August 12, 2024 12:41 PM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

Michael,

We are available this afternoon and all day tomorrow at your convenience.  Please let us know what time you can speak.

Yes, we have a copy of the NDA between VSI and the Trustee.  We will share confidential information with ULAS only pursuant to Section 2.2 of the NDA.  Finally, Continental Advisory Services, LLC will not be receiving confidential information.  If such disclosure becomes necessary, we will contact you for your permission to disclose such confidential information in advance.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Monday, August 12, 2024 8:30 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>
**Subject:** RE: Stream

[External to Akerman]

We are working on your requests and setting up a meeting with the engineers in the Netherlands.  Please let me know your availability this week.  I have limited availability tomorrow and an all-day hearing on Wednesday, but Thursday and Friday are generally free.

Do you have a copy of the NDA between VSI and the Trustee?  We are also going to need an NDA with ULAS.  The expression of interest you sent also mentions a family office called Continental Advisory Services, LLC – are you aware if that company will be receiving the diligence as well – if so, we will need an NDA for them as well.

Michael

**A-327**

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Friday, August 9, 2024 10:59 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** Re: Stream

Michael,

I was looking for your email from yesterday afternoon regarding the due diligence follow ups on the IP licenses and calls, however, I didn't see one. Please let me know if I missed something you sent. My understanding was that you were to have a conversation with the engineers in the Netherlands to coordinate. Please let me know when we can expect to receive the updated IP listing and we can schedule the calls the engineers. We really need to get moving on this.

Thanks,
John

> On Aug 6, 2024, at 5:00 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:

> Michael:

4

**A-328**

We'd really like to get started with the very limited diligence we requested of the Trustee and to transition needto negotiations to achieve a consensual path forward as quickly as possible.  So we would appreciate the Trustee's responses to/facilitation of the two diligence requests sometime this evening or tomorrow morning, and we are fully available for a call with you anytime tomorrow.  If tomorrow afternoon is the soonest that you can do a call, please name the time, and we will set it up and circulate the meeting link.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 4:44 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

**[External to Akerman]**

John – we are caught up in a bit of a mess – tomorrow is going to be much better for a call – what is your availability in the afternoon?

**A-329**

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Tuesday, August 6, 2024 1:50 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** RE: Stream

> **WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening
> attachments. When in doubt, contact the IT department.

Michael:

Just confirming that you received this and that we can speak this afternoon.  We are available now and through the rest
of the day.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

Profile

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named
above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly

**A-330**

prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Tuesday, August 6, 2024 11:13 AM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

Michael:

Thanks for your email.  Yes, we have a number of items to address, so a call this afternoon would be very helpful.  We are available anytime between 1 pm - 5 pm ET.  Let us know what works for you, and we will circulate a meeting invite and link.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 10:45 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

[External to Akerman]

John:  I got your voice mail from yesterday afternoon – I am in the middle of a hearing.  Is there anything specific you need to discuss or a specific time that is good for a call this afternoon?  Michael

**A-331**

**Michael D. Vagnoni**

Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

**A-332**

| | |
|---|---|
| **From:** | Thompson, John (Ptnr-DC) |
| **Sent:** | Saturday, August 24, 2024 9:47 AM |
| **To:** | Vagnoni, Michael; George, Edmond |
| **Cc:** | Swick, Adam (Aus); Saldutti, William; Espinosa, Eduardo (Ptnr-Dal) |
| **Subject:** | RE: Stream |
| **Attachments:** | Amended Notice of Rule 7030  Examination Duces Tecum to Trustee.pdf |

Michael:

Once again, we have received no response to our correspondence below.  While we hoped and expected that you would honor our verbal agreement to make the Trustee available for his deposition before the end of August, it is clear that you are unwilling to work out a schedule consensually.  Your continued silence is unfortunate, but we have no choice but to move forward with the discovery to which VSI is entitled in light of the current motions practice and contested matters.  Accordingly, attached please find an amended examination notice and associated subpoena setting the Trustee's deposition for September 3, 2024 with documents to be produced by August 30th.

We remain available to discuss VSI's offer and the other multiple open matters.

John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Sent:** Wednesday, August 21, 2024 3:02 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>; George, Edmond <Edmond.George@obermayer.com>
**Cc:** Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** Re: Stream

Michael:

It has now been over a week since we communicated our proposal for a plan sponsorship with a $115 mm restructuring facility and additional $10 mm DIP.  You did not even give us the courtesy of responding, let alone engaging in good faith negotiations.  In addition, it has been more than three weeks since our original request for simple, straightforward, and easily facilitated due diligence to permit VSI and its investment partners to properly assess the value of the Stream assets, as they now sit after months of remaining fallow and subject to continued pilferage notwithstanding the Trustee's statutory duties to protect estate value and the interests of all creditors.  Finally, it has been over a month since we communicated proof of funds for cash and liquid assets well in excess of the trustee is current stocking horse bid proposal. Notwithstanding all of the foregoing, you and the trustee have remained radio, silent and utterly disengaged.

During our initial conversations, we discussed the postponement and consolidation of our respective motions and organization and timing for associated discovery. You asked that we withdraw the VSI Rule 2004 subpoena for the deposition of the Trustee, and we accommodated that request and noticed the deposition at your request and in the spirit of progress and potential resolution.  Thereafter, you explained that the Trustee was not available on August 9

EXHIBIT 8

when we noticed his deposition per your request. We agreed that deposition would take place within the last week of August (this coming week), but consistent with the radio silence outlined above, we have heard nothing from Obermeyer or the Trustee. As such, we are formally requesting that the Trustee make himself available for deposition testimony before the end of month of August. We asked that you respond promptly to this request, or we will have little choice but to approach the Court for appropriate relief.

It is regrettable that the trustee has elected to pursue the path of disengagement and refused to even consider the good faith proposals made by VSI. It is even more disappointing in light of the fact that VSI's offer is clearly superior to what is currently on offer from the Hawk Parties and would undoubtedly yield a better outcome for virtually all stakeholders in this case - particularly unsecured creditors. But as unfortunate as it is, that is the apparent path of the trustee, and it will be his to defend before the Bankruptcy Court.

Please provide us the professional courtesy of a prompt response as we need to get moving on discovery in light of the current motions practices and the Trustee's unwillingness to engage.

Thank you,
John

> On Aug 14, 2024, at 7:02 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:
>
> Michael:
>
> I appreciate that you have been in a hearing all day today, but we communicated our availability for a call on Monday and Tuesday and received no response. We further communicated VSI's term sheet to provide a substantial cash facility and sponsor a plan of reorganization with a renewed request for a time do complete a call and advance the due diligence request - no answer. I don't think it is unreasonable for us to conclude that the Trustee is ignoring and/or slow-walking our reasonable requests. Please advise as to whether and when the Trustee will engage with VSI and when we can have a call. If we do not hear back promptly, we will have to conclude that the Trustee is uninterested in entertaining reasonable proposals and consider VSI's alternatives.
>
> Thank you,
> John
>
> **John Thompson**
> Partner
> Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
> D: 202 824 1760 | C: 202 302 0646
> john.thompson@akerman.com
>
> On Aug 13, 2024, at 5:12 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:
>
>
> Ed:
>
> As we have made clear in multiple communications, we are working diligently to provide the Trustee with an actionable proposal that is unequivocally better than what is currently on the table from Hawk/SLS/SCI and time is of the essence. So, as Michael requested during our call on Aug. 7, our Client provided the Trustee with a formal offer. I'm sure you didn't mean to suggest that you wouldn't entertain a superior offer merely because you don't like the file format in which it was delivered. The content of the offer is the same in Word and PDF. In the interest of expediency, attached is a Word version of the offer. We are prepared to entertain reasonable modifications. Please provide them, if

any, promptly. And just to be clear, you can download a pdf version from DocuSign. It's a button at the top.

Finally, please advise as to when you will be available for the call promised by Michael below.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** George, Edmond <Edmond.George@obermayer.com>
**Sent:** Tuesday, August 13, 2024 3:52 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>; Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

[External to Akerman]

John, we got a term sheet by Docusign. The Trustee isn't signing anything until he can digest the terms of this proposal, and determine if it presents something better than what is on the table. So we are clear, we are not reviewing a Docusign document. Please send a word version of this Document as we don't want any confusion about what is happening here. If you want proof we received it, send it with a return receipt. Not sure why you used Docusign.

Best

Ed.

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Monday, August 12, 2024 5:13 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com; Saldutti, William <william.saldutti@obermayer.com>; eduardo.espinosa@akerman.com
**Subject:** RE: Stream

Michael:

If you have not seen it already, you should have received a copy of VSI's term sheet outlining its proposal to serve as plan sponsor to provide a $115 million facility for the reorganization of the StreamTV debtors (sent via DocuSign from my partner Eduardo Espinosa). We look forward to the Trustee's prompt response as well as a follow up from you regarding a time for tomorrow's call.

3

**A-335**

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Monday, August 12, 2024 12:41 PM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus)
<adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo
(Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

Michael,

We are available this afternoon and all day tomorrow at your convenience.  Please let us know what
time you can speak.

Yes, we have a copy of the NDA between VSI and the Trustee.  We will share confidential information
with ULAS only pursuant to Section 2.2 of the NDA.  Finally, Continental Advisory Services, LLC will not
be receiving confidential information.  If such disclosure becomes necessary, we will contact you for
your permission to disclose such confidential information in advance.

Thanks,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Monday, August 12, 2024 8:30 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus)
<adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>
**Subject:** RE: Stream

[External to Akerman]

We are working on your requests and setting up a meeting with the engineers in the
Netherlands.  Please let me know your availability this week.  I have limited availability tomorrow and an
all-day hearing on Wednesday, but Thursday and Friday are generally free.

Do you have a copy of the NDA between VSI and the Trustee?  We are also going to need an NDA with
ULAS.  The expression of interest you sent also mentions a family office called Continental Advisory

4

**A-336**

Services, LLC – are you aware if that company will be receiving the diligence as well – if so, we will need an NDA for them as well.

Michael

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Friday, August 9, 2024 10:59 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** Re: Stream

Michael,

I was looking for your email from yesterday afternoon regarding the due diligence follow ups on the IP licenses and calls, however, I didn't see one. Please let me know if I missed something you sent. My understanding was that you were to have a conversation with the engineers in the Netherlands to

5

**A-337**

coordinate. Please let me know when we can expect to receive the updated IP listing and we can schedule the calls the engineers. We really need to get moving on this.

Thanks,
John

> On Aug 6, 2024, at 5:00 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:
>
>
> Michael:
>
> We'd really like to get started with the very limited diligence we requested of the Trustee and to transition need to negotiations to achieve a consensual path forward as quickly as possible.  So we would appreciate the Trustee's responses to/facilitation of the two diligence requests sometime this evening or tomorrow morning, and we are fully available for a call with you anytime tomorrow.  If tomorrow afternoon is the soonest that you can do a call, please name the time, and we will set it up and circulate the meeting link.
>
> Thanks,
> John
>
> **John Thompson**
> Partner
> Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
> D: 202 824 1760 | C: 202 302 0646
> john.thompson@akerman.com
>
> ---
>
> **From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
> **Sent:** Tuesday, August 6, 2024 4:44 PM
> **To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
> **Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
> **Subject:** RE: Stream
>
> [External to Akerman]
>
> John – we are caught up in a bit of a mess – tomorrow is going to be much better for a call – what is your availability in the afternoon?

**A-338**

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Tuesday, August 6, 2024 1:50 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** RE: Stream

**WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Michael:

Just confirming that you received this and that we can speak this afternoon.  We are available now and through the rest of the day.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

7

**A-339**

Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Thompson, John (Ptnr-DC)
**Sent:** Tuesday, August 6, 2024 11:13 AM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

Michael:

Thanks for your email.  Yes, we have a number of items to address, so a call this afternoon would be very helpful.  We are available anytime between 1 pm - 5 pm ET.  Let us know what works for you, and we will circulate a meeting invite and link.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 10:45 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

**[External to Akerman]**

John:  I got your voice mail from yesterday afternoon – I am in the middle of a hearing.  Is there anything specific you need to discuss or a specific time that is good for a call this afternoon?  Michael

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

**A-341**

| | |
|---|---|
| **From:** | Swick, Adam (Aus) |
| **Sent:** | Saturday, August 24, 2024 3:13 PM |
| **To:** | Thompson, John (Ptnr-DC); Vagnoni, Michael; George, Edmond |
| **Cc:** | Saldutti, William; Espinosa, Eduardo (Ptnr-Dal) |
| **Subject:** | RE: Stream |

Michael,

We need to seek documents and a depo from SSG.  Please let us know if you have the contact information for SSG's counsel.  If not, we'll subpoena them directly early next week.

Regards,

**R. Adam Swick**
Special Counsel
Akerman LLP | 500 West 5th Street, Suite 1210 | Austin, TX 78701
D: 737 999 7103
adam.swick@akerman.com

---

**From:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Sent:** Saturday, August 24, 2024 9:47 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>; George, Edmond <Edmond.George@obermayer.com>
**Cc:** Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

Michael:

Once again, we have received no response to our correspondence below.  While we hoped and expected that you would honor our verbal agreement to make the Trustee available for his deposition before the end of August, it is clear that you are unwilling to work out a schedule consensually.  Your continued silence is unfortunate, but we have no choice but to move forward with the discovery to which VSI is entitled in light of the current motions practice and contested matters.  Accordingly, attached please find an amended examination notice and associated subpoena setting the Trustee's deposition for September 3, 2024 with documents to be produced by August 30th.

We remain available to discuss VSI's offer and the other multiple open matters.

John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Sent:** Wednesday, August 21, 2024 3:02 PM

1

**A-342**

**EXHIBIT 9**

**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>; George, Edmond <Edmond.George@obermayer.com>
**Cc:** Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** Re: Stream

Michael:

It has now been over a week since we communicated our proposal for a plan sponsorship with a $115 mm restructuring facility and additional $10 mm DIP.  You did not even give us the courtesy of responding, let alone engaging in good faith negotiations.  In addition, it has been more than three weeks since our original request for simple, straightforward, and easily facilitated due diligence to permit VSI and its investment partners to properly assess the value of the Stream assets, as they now sit after months of remaining fallow and subject to continued pilferage notwithstanding the Trustee's statutory duties to protect estate value and the interests of all creditors. Finally, it has been over a month since we communicated proof of funds for cash and liquid assets well in excess of the trustee is current stocking horse bid proposal. Notwithstanding all of the foregoing, you and the trustee have remained radio, silent and utterly disengaged.

During our initial conversations, we discussed the postponement and consolidation of our respective motions and organization and timing for associated discovery. You asked that we withdraw the VSI Rule 2004 subpoena for the deposition of the Trustee, and we accommodated that request and noticed the deposition at your request and in the spirit of progress and potential resolution.  Thereafter, you explained that the Trustee was not available on August 9 when we noticed his deposition per your request. We agreed that that deposition would take place within the last week of August (this coming week), but consistent with the radio silence outlined above, we have heard nothing from Obermeyer or the Trustee. As such, we are formally requesting that the Trustee make himself available for deposition testimony before the end of month of August. We asked that you respond promptly to this request, or we will have little choice but to approach the Court for appropriate relief.

It is regrettable that the trustee has elected to pursue the path of disengagement and refused to even consider the good faith proposals made by VSI. It is even more disappointing in light of the fact that VSI's offer is clearly superior to what is currently on offer from the Hawk Parties and would undoubtedly yield a better outcome for virtually all stakeholders in this case - particularly unsecured creditors. But as unfortunate as it is, that is the apparent path of the trustee, and it will be his to defend before the Bankruptcy Court.

Please provide us the professional courtesy of a prompt response as we need to get moving on discovery in light of the current motions practices and the Trustee's unwillingness to engage.

Thank you,
John

> On Aug 14, 2024, at 7:02 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:
>
>  Michael:
>
> I appreciate that you have been in a hearing all day today, but we communicated our availability for a call on Monday and Tuesday and received no response.  We further communicated VSI's term sheet to provide a substantial cash facility and sponsor a plan of reorganization with a renewed request for a time do complete a call and advance the due diligence request - no answer.  I don't think it is unreasonable for us to conclude that the Trustee is ignoring and/or slow-walking our reasonable requests.  Please advise as to whether and when the Trustee will engage with VSI and when we can have a call.  If we do not hear back promptly, we will have to conclude that the Trustee is uninterested in entertaining reasonable proposals and consider VSI's alternatives.
>
> Thank you,

**A-343**

John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

On Aug 13, 2024, at 5:12 PM, Thompson, John (Ptnr-DC) <john.thompson@akerman.com> wrote:

Ed:

As we have made clear in multiple communications, we are working diligently to provide the Trustee with an actionable proposal that is unequivocally better than what is currently on the table from Hawk/SLS/SCI and time is of the essence.  So, as Michael requested during our call on Aug. 7, our Client provided the Trustee with a formal offer.  I'm sure you didn't mean to suggest that you wouldn't entertain a superior offer merely because you don't like the file format in which it was delivered.  The content of the offer is the same in Word and PDF.  In the interest of expediency, attached is a Word version of the offer.   We are prepared to entertain reasonable modifications.  Please provide them, if any, promptly.  And just to be clear, you can download a pdf version from DocuSign.  It's a button at the top.

Finally, please advise as to when you will be available for the call promised by Michael below.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** George, Edmond <Edmond.George@obermayer.com>
**Sent:** Tuesday, August 13, 2024 3:52 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>; Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

[External to Akerman]

John, we got a term sheet by Docusign.  The Trustee isn't signing anything until he can digest the terms of this proposal, and determine if it presents something better than what is on the table. So we are clear, we are not reviewing a Docusign document.   Please send a word version of this Document as we don't want any confusion about what is happening here.  If you want proof we received it, send it with a return receipt.   Not sure why you used Docusign.

3

**A-344**

Case 22-10745 doc 688 Filed 11/06/24 Entered 11/06/24 08:37:27 Desc
Case 2:24-cv-06397-JMG Document 1-1 Filed 05/25/24 Page 53 of 273 Desc
Exhibit A - Declaration of John H Thompson    Page 53 of 63

Best

Ed.

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Monday, August 12, 2024 5:13 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com; Saldutti, William <william.saldutti@obermayer.com>; eduardo.espinosa@akerman.com
**Subject:** RE: Stream

Michael:

If you have not seen it already, you should have received a copy of VSI's term sheet outlining its proposal to serve as plan sponsor to provide a $115 million facility for the reorganization of the StreamTV debtors (sent via DocuSign from my partner Eduardo Espinosa). We look forward to the Trustee's prompt response as well as a follow up from you regarding a time for tomorrow's call.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Monday, August 12, 2024 12:41 PM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>; Espinosa, Eduardo (Ptnr-Dal) <eduardo.espinosa@akerman.com>
**Subject:** RE: Stream

Michael,

We are available this afternoon and all day tomorrow at your convenience. Please let us know what time you can speak.

Yes, we have a copy of the NDA between VSI and the Trustee. We will share confidential information with ULAS only pursuant to Section 2.2 of the NDA. Finally, Continental Advisory Services, LLC will not be receiving confidential information. If such disclosure becomes necessary, we will contact you for your permission to disclose such confidential information in advance.

Thanks,
John

**John Thompson**
Partner

**A-345**

Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Monday, August 12, 2024 8:30 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus)
<adam.swick@akerman.com>; Saldutti, William <william.saldutti@obermayer.com>
**Subject:** RE: Stream

**[External to Akerman]**

We are working on your requests and setting up a meeting with the engineers in the
Netherlands.  Please let me know your availability this week.  I have limited availability tomorrow and an
all-day hearing on Wednesday, but Thursday and Friday are generally free.

Do you have a copy of the NDA between VSI and the Trustee?  We are also going to need an NDA with
ULAS.  The expression of interest you sent also mentions a family office called Continental Advisory
Services, LLC – are you aware if that company will be receiving the diligence as well – if so, we will need
an NDA for them as well.

Michael

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

5

**A-346**

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Friday, August 9, 2024 10:59 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** Re: Stream

Michael,

I was looking for your email from yesterday afternoon regarding the due diligence follow ups on the IP licenses and calls, however, I didn't see one. Please let me know if I missed something you sent. My understanding was that you were to have a conversation with the engineers in the Netherlands to coordinate. Please let me know when we can expect to receive the updated IP listing and we can schedule the calls the engineers. We really need to get moving on this.

Thanks,
John

> On Aug 6, 2024, at 5:00 PM, Thompson, John (Ptnr-DC)
> <john.thompson@akerman.com> wrote:
>
> Michael:
>
> We'd really like to get started with the very limited diligence we requested of the Trustee and to transition  needto negotiations to achieve a consensual path forward as quickly as possible.  So we would appreciate the Trustee's responses to/facilitation of the two diligence requests sometime this evening or tomorrow morning, and we are fully available for a call with you anytime tomorrow.  If tomorrow afternoon is the soonest that you can do a call, please name the time, and we will set it up and circulate the meeting link.
>
> Thanks,
> John
>
> **John Thompson**
> Partner
> Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
> D: 202 824 1760 | C: 202 302 0646
> john.thompson@akerman.com

6

**A-347**

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 4:44 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

[External to Akerman]

John – we are caught up in a bit of a mess – tomorrow is going to be much better for a call – what is your availability in the afternoon?

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Tuesday, August 6, 2024 1:50 PM

**A-348**

**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; adam.swick@akerman.com
**Subject:** RE: Stream

---

**WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

---

Michael:

Just confirming that you received this and that we can speak this afternoon.  We are available now and through the rest of the day.

Thanks,
JT

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

---

**From:** Thompson, John (Ptnr-DC)
**Sent:** Tuesday, August 6, 2024 11:13 AM
**To:** 'Vagnoni, Michael' <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** RE: Stream

Michael:

Thanks for your email.  Yes, we have a number of items to address, so a call this afternoon would be very helpful.  We are available anytime between 1 pm - 5 pm ET.  Let us know what works for you, and we will circulate a meeting invite and link.

Thanks,
JT

**John Thompson**

**A-349**

Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, August 6, 2024 10:45 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

**[External to Akerman]**

John:  I got your voice mail from yesterday afternoon – I am in the middle of a hearing.  Is there anything specific you need to discuss or a specific time that is good for a call this afternoon?  Michael

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com

**A-350**

---

| | |
|---|---|
| **From:** | Thompson, John (Ptnr-DC) |
| **Sent:** | Monday, August 26, 2024 1:15 PM |
| **To:** | George, Edmond |
| **Cc:** | Vagnoni, Michael; J Scott Victor; Swick, Adam (Aus); Dupre, Andrew (Ptnr-WLM) |
| **Subject:** | RE: SSG deposition |

Ed:

I must ask for your indulgence here, as I am confused by your email below.  I do not understand how providing a $170 million proof of funds and an all cash offer well-over $100 million is an effort to delay and drive-up fees.  I also don't understand how asking for diligence items the Trustee previously agreed to provide and confer about is an effort to delay and drive-up fees.  Finally, I fail to understand how follow-up correspondence with respect to discovery on pending motions practice is an effort to delay and drive-up fees.

If SSG can produce documents on Friday (August 30th) pursuant to a request we can deliver tomorrow, we can take SSG's deposition on Wednesday next week (September 3rd), the day after we will take the Trustee's deposition on Tuesday (September 2nd).  Can you please confirm that the Trustee will produce documents by Friday (August 30th) and we can take his deposition next Tuesday?  If your email below is communicating that the Trustee is not going to produce any documents or appear for a deposition, we need to know immediately.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

---

**From:** George, Edmond <Edmond.George@obermayer.com>
**Sent:** Monday, August 26, 2024 1:02 PM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>; J Scott Victor <jsvictor@ssgca.com>
**Subject:** RE: SSG deposition

**[External to Akerman]**

I need dates from you for deposition so that we can have the SSG hearing without delay.  I am not responding to those other issues you raise, which have nothing to do with the SSG application, but are part of your and your client's efforts to delay and drive-up fees.

What dates do you have to depose Scott?  If you don't provide dates, we will assume you don't want his deposition, are abandoning the Subpoena, and we will do the hearing without it.  I have to be there and I have a busy trial schedule; that's why we need the dates.  We are not delaying any scheduled hearing on your objections.

**EXHIBIT 10**

I am talking to SSG this afternoon about their counsel choices.  I'd like dates by then.

---

**From:** john.thompson@akerman.com <john.thompson@akerman.com>
**Sent:** Monday, August 26, 2024 12:46 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>; George, Edmond <Edmond.George@obermayer.com>; Saldutti, William <william.saldutti@obermayer.com>
**Cc:** adam.swick@akerman.com; eduardo.espinosa@akerman.com; andrew.dupre@akerman.com
**Subject:** RE: SSG deposition

> **WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Ed:

It is clear from your email to Adam below that you and Michael are receiving our emails regarding discovery, due diligence, and VSI's good faith offer in proposal (attached again for your convenience), but for some reason you and the Trustee refuse to respond.  Now, it seems that you are willing to respond to my partner (but not me) with respect to the availability of a witness you do not represent on an accelerated schedule without accounting for document production or the as yet unscheduled hearing to retain SSG as investment banker.  Frankly, this is getting old and I am becoming frustrated.  I am doing everything possible to operate in a open, professional, and courteous manner to be productive in this matter, only to be ignored by the Trustee and his counsel.  Surely, we can achieve better.

In any event, let's address first things first.  We have outstanding requests to you to (i) produce documents relevant to the open motions practice and (ii) set the Trustee's deposition in connection with that same motions practice (now including the retention of SSG as investment banker).  Please first advise as to whether the Trustee will (i) produce documents on or before Friday, August 30, 2024 in response to our requests and (ii) sit for his deposition on September 3, 2024 per our latest notice delivered over the weekend.  In addition, please advise us of the date that the Trustee is seeking and able to obtain from the chambers for the hearing regarding the engagement of SSG as investment banker.  Finally, if you know, please share the name of SSG's counsel or the identity of SSG's representative (if not yet represented), so that we may coordinate the production of documents in advance of the deposition.  And please feel free to advise as to when you, the SSG representative, and his counsel (if retained) will be available for the SSG representative's deposition.

We would greatly appreciate the courtesy of a timely response.

Thank you,
John

**John Thompson**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1760 | C: 202 302 0646
john.thompson@akerman.com

Profile

**A-353**



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Swick, Adam (Aus) <adam.swick@akerman.com>
**Sent:** Monday, August 26, 2024 10:14 AM
**To:** Thompson, John (Ptnr-DC) <john.thompson@akerman.com>
**Cc:** 'mathu rajan' <mathu.rajan@visualsemi.com>
**Subject:** FW: SSG deposition

**From:** George, Edmond <Edmond.George@obermayer.com>
**Sent:** Monday, August 26, 2024 9:12 AM
**To:** Swick, Adam (Aus) <adam.swick@akerman.com>
**Subject:** SSG deposition

[External to Akerman]

Adam, we forwarded your request to SSG. What day this week other than Wednesday could you do his deposition? They are deciding on counsel. Would you be willing to do it by Zoom?

Best,

Ed.



Edmond M. George, Esquire, LLM
Chairman, Creditor's Rights and Financial Reorganization Group

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665-3140 tel | 215.665.3165 fax
edmond.george@obermayer.com | www.obermayer.com

Super Lawyers
Pennsylvania: 2014, 2022-2024
New Jersey: 2013, 2014, 2018, 2019

Best of the Bar 2018
Philadelphia Business Journal

  

**A-354**




**A-355**

EFiled: Jun 15 2022 11:41AM EDT
Filing ID 67727771
Case Number 360,2021

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | § | |
| | § | No. 360, 2021 |
| Plaintiff Below, Appellant, | § | |
| | § | Court Below:  Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| SEECUBIC, INC., | § | C.A. No. 2020-0766 |
| | § | |
| Defendant Below, Appellee, | § | |
| | § | |

---

| | | |
|---|---|---|
| SEECUBIC, INC., | § | |
| | § | |
| Counterclaimant and Third-Party Plaintiff Below, Appellee, | § | |
| | § | |
| v. | § | |
| | § | |
| STREAM TV NETWORKS, INC., | § | |
| | § | |
| Counterclaim Defendant Below, Appellant, | § | |
| | § | |
| and | § | |
| | § | |
| MATHU RAJAN and RAJA RAJAN, | § | |
| | § | |
| Third-Party Defendants Below, Appellants. | § | |

Submitted:  April 6, 2022
Decided:  June 15, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.  **VACATED**, **REVERSED** and **REMANDED**.

Andrew S. Dupre, Esquire (*argued*), Brian R. Lemon, Esquire, Steven P. Wood, Esquire, Sarah E. Delia, Esquire, Stephanie H. Dallaire, Esquire of McCarter & English, LLP, Wilmington, Delaware for Appellants.

Robert S. Saunders, Esquire, Jenness E. Parker, Esquire (*argued*), Bonnie W. David, Esquire, Lilianna Anh P. Townsend, Esquire, Trevor T. Nielson, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. *Of Counsel*: Eben P. Colby, Esquire, Marley Ann Brumme, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Boston, Massachusetts for Appellee.

**VALIHURA**, Justice:

We address whether approval of a corporation's Class B stockholders was required to transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction. Stream TV Network, Inc. ("Stream" or the "Company"), along with Mathu and Raja Rajan,[1] argue that the agreement authorizing the secured creditors to transfer Stream's pledged assets (the "Omnibus Agreement") is invalid because Stream's unambiguous certificate of incorporation (the "Charter") required the approval of Stream's Class B stockholders. Stream's Charter requires a majority vote of Class B stockholders for any "sale, lease or other disposition of all or substantially all of the assets or intellectual property of the company." Stream argues that the court erred by applying a common law insolvency exception to Section 271 in interpreting the Charter, and that the enactment of 8 *Del. C.* § 271 and its predecessor superseded any common law exceptions. It contends that, in any event, such a "board only" common law exception never existed in Delaware.

SeeCubic, Inc. ("SeeCubic") argues that the court correctly found that neither the Charter, nor Section 271, required approval of the Class B shares to effectuate the Omnibus Agreement.

Because we agree that a majority vote of Class B stockholders is required under Stream's charter, we **VACATE** the injunction, **REVERSE** the declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[1] For simplicity, we refer only to Stream when discussing the positions that Stream and the Rajans have advanced in their briefing. Mathu and Raja Rajan are members of Stream's board of directors, corporate officers, and controlling stockholders.

3

**A-358**

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

We focus only on the facts relevant to the issue on appeal which is whether the Class

B stockholders are entitled to a vote in connection with the transactions contemplated by

the Omnibus Agreement.

### A.  Stream.

Stream is a Delaware corporation that was founded in 2009 to develop and

commercialize technology that enables viewers to watch three-dimensional content

without 3D glasses.[3]  Stream hired engineers to develop Stream's technology, which has

been described as promising and revolutionary; however, eleven years after its founding,

Stream remained a pre-revenue, development-stage company.

The Rajan family controlled Stream primarily through an investment vehicle owned

by Mathu Rajan, his brother Raja Rajan, and their parents.  Together, they hold 19,000,000

Class B shares carrying ten votes per share, giving the Rajans a majority of the Class B

common stock and a majority of Stream's outstanding voting power.[4]   The Court of

---

[2] The background facts pertinent to this appeal are drawn primarily from the December 8, 2020 Preliminary Injunction Opinion, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "P.I. Opinion"), the September 23, 2021 Order Granting In Part SeeCubic, Inc's Motion for Summary Judgment, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 4352732 (Del. Ch. Sept. 23, 2021) (the "SJ Order"), the November 10, 2021 Order Entering Partial Final Judgment Under Rule 54(b), *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5240591 (Del. Ch. Nov. 10, 2021) (the "Partial Final Judgment Order"), and the December 8, 2021 Order Denying Stream's Motion to Modify the Injunction, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820 (Del. Ch. Dec. 8, 2021),  (the "Modification Opinion").

[3] *Stream TV*, 250 A.3d at 1022.

[4] *Id.*  At the board level, the Rajan brothers historically have controlled Stream.  There were, however, three outside directors on the board at various times.  From approximately 2015 until 2019, Leo Hindery served as an outside director, but he resigned in July 2019 over disputes with the Rajan brothers.  From approximately 2018 until 2019, Mark Coleman served as a second

Chancery observed that "[d]uring its existence, Stream's corporate governance practices have been virtually nonexistent."[5]  Stream did not hold annual meetings of stockholders or keep regular minutes of Board meetings.

   B.  *Stream's Investors.*

Since Stream's founding in 2009, Stream raised approximately $160 million from third-party investors in the form of a combination of debt and equity.  Stream's senior secured creditor, SLS Holdings VI, LLC ("SLS"), loaned $6 million to Stream through a series of secured notes (the "SLS Notes").  Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as security for the SLS Notes and executed a security agreement which authorized SLS to take control of Stream's assets to satisfy the SLS Notes if Stream defaulted.

Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million, plus $1.336 million, through a series of junior secured notes (the "Hawk Notes").  Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.

---

outside director but resigned in July 2019 over disputes with the Rajan brothers. From 2011 until 2014, Shad Stastney, the principal of Stream's senior secured creditor, served as an outside director. He rejoined the board in 2019 and served as Chief Financial Officer before resigning on January 30, 2020. *Id*. at 1023. The Rajan brothers also dominated Stream at the officer level. Mathu has served as Stream's Chief  Executive Officer since the Company's founding, and Raja served as general counsel and Chief Operating Officer since soon after the Company's founding.

[5] *Id*. at 1023.

C. *Stream's Financial Difficulties.*

In 2019, Alistair Crawford ("Crawford"), a stockholder of Stream and the representative of fifty-two of Stream's stockholders (the "Equity Investors"), engaged in discussions with SLS, Hawk, and the Rajan brothers about restructuring Stream. Crawford proposed forming a "NewCo" that would acquire Stream's assets and have a more transparent and investor-friendly governance structure. In December 2019, Crawford provided the Rajan brothers, SLS, and Hawk with a draft of the Omnibus Agreement and other documents to implement the restructuring. The Rajan brothers refused to agree to the restructuring, and the discussions broke down.

In January 2020, the Equity Investors filed a lawsuit in the Court of Chancery against the Rajan brothers. During the same month, Stream missed payroll at least once.

In February 2020, Stream managed to make payroll, but only due to an emergency infusion of capital from Hawk and a short-term loan from another investor. Stream still furloughed numerous employees, and by the end of February 2020, Stream had defaulted on the SLS Notes and Hawk Notes.

On March 9, 2020, SLS notified Stream that Stream was in default.[6] With the Company failing, SLS, Hawk and Crawford urged the Rajan brothers to appoint outside directors. Three days later, on March 12, 2020, the Board was comprised of the Rajan

---

[6] *Id.* at 1024. In addition to the debts that Stream owed its secured creditors, SLS, and Hawk, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream even failed to make the payments necessary to maintain the patents on its technology. *Id.*

**A-361**

brothers and four independent outside directors:  Krzystof Kabacinski, Asaf Gola, Kevin

Gollop, and Frank Hodgson (collectively, the "Outside Directors").[7]

On March 23, 2020, SLS filed a complaint in Delaware Superior Court against

Stream seeking foreclosure and other relief.

*D. The Resolution Committee.*

From March 2020 through May 2020, the Outside Directors participated in Board

meetings, approved minutes, voted on resolutions, and approved other corporate actions.

When the Outside Directors learned of Stream's financial difficulties, they concluded that

the only path forward was to negotiate a resolution with the Company's secured creditors

and the Equity Investors.  In April 2020, the Outside Directors revisited the restructuring

discussions with the Rajan brothers.  Raja initially participated in the discussions, but his

presence generated tension.  It became clear that the Outside Directors would have to

attempt to broker a resolution.

On May 4, 2020, during a meeting of the Board, Gola proposed three resolutions

for consideration.  Two of Gola's resolutions, and an alternative to Gola's third resolution,

were adopted.  Only Gola's second resolution is relevant to the appeal.  It proposed the

creation of the Resolution Committee with Gola and Gollop as its members.  The

Resolution Committee would have "the full power and authority of the full Board of

---

[7] In the proceedings before the Court of Chancery, Stream and the Rajan brothers challenged whether the Outside Directors were validly appointed.  However, on appeal, Stream does not challenge the Court of Chancery's finding that the Outside Directors were either appointed validly, or in the alternative, that they were *de facto* directors.  Therefore, we do not discuss the facts regarding the appointment of the Outside Directors.

Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of [Stream], without further action being required from the Board of Directors or any executive of the [C]ompany."[8]  The Rajan brothers abstained from the vote; however, the three directors who voted in favor constituted a majority of a quorum, and the motion carried.

E. *The Omnibus Agreement.*

On May 6, 2020, the Resolution Committee approved the Omnibus Agreement. The parties to the Omnibus Agreement were Stream, SLS, Hawk, and certain Equity Investors.[9]

The Omnibus Agreement provided that Stream would assign its assets to SeeCubic in lieu of SLS and Hawk continuing to pursue foreclosure, and SeeCubic would allow Class A common stockholders to exchange their shares.  Specifically, the Omnibus Agreement provided that SLS and Hawk "agreed to stay the [f]oreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to [Stream] assigning all right, title and interest in and to all assets of [Stream] to a newly-formed holding company [SeeCubic] established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes."[10]  Further, the Omnibus Agreement gave holders of Stream's Class A common stock, other than the Rajan Brothers and their affiliates, the right to exchange their shares of Stream's Class A common stock for an identical number of shares of SeeCubic's

---

[8] *Id.* at 1025 (alternations in original) (quoting Dkt. 101 Ex. 56, at 1057).

[9] Stream's authorized signatories were Gola and Gollop.  A150–51 (Omnibus Agreement).

[10] *See* A136 (Omnibus Agreement WHEREAS clause).

common stock at no cost.[11]  The Omnibus Agreement also provided that Stream would receive one million shares of SeeCubic's Class A common stock.[12]

   F. *The Rajan Brothers' Attempt to Nullify the Omnibus Agreement.*

   Soon after the Board created the Resolution Committee, the Rajan brothers attempted to neutralize it.  Initially, the Rajan brothers drafted a written consent of stockholders that purported to remove the Outside Directors.[13]  When that failed, the Rajan brothers developed theories designed to undermine the Resolution Committee, including recruiting Raja's assistant to search for documentation reflecting whether the Outside Directors had accepted their directorships.  Eventually, the Rajan brothers resorted to refusing to comply with the Omnibus Agreement by trying to change who managed certain Stream subsidiaries and attempting to remove prototype technology from a storage facility in the Netherlands.[14]

   Once it became clear that the Rajan brothers intended to challenge the Omnibus Agreement's validity, SLS, Hawk, the Equity Investors, and the Resolution Committee attempted to negotiate with the Rajan family to convince them to support the deal.  SLS,

---

[11] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(d)).

[12] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(f)).

[13] At the time of the P.I. Opinion, Stream alleged that the May Stockholder Consent (a written consent of stockholders drafted by the Rajan brothers dated May 6) removed the Outside Directors prior to the approval of the Omnibus Agreement, thereby causing the Omnibus Agreement to be invalid.  However, the Court of Chancery concluded that the evidence demonstrated that the Rajan brothers executed the May Stockholder Consent later, and possibly during the evening of May 8 or on May 9, and then backdated the document to May 6 in an effort to preempt the Omnibus Agreement.  *Stream TV*, 250 A.3d at 1026.

[14] Mathu went as far as incorporating a new entity named Glasses-Free Technologies, Inc., and purported to grant it a license to use Stream's technology.  *Id.* at 1027.

Hawk, and the Equity Investors offered to amend the Omnibus Agreement to give the Rajan brothers greater consideration, and the Rajan brothers pushed for personal benefits for themselves.[15]  Ultimately, the negotiations failed.

### G. Stream Files Suit in The Court of Chancery.

On September 8, 2020, Stream filed suit and moved for a temporary restraining order ("TRO") to bar SeeCubic from seeking to enforce the Omnibus Agreement. SeeCubic filed counterclaims and third-party claims requesting expedition and a TRO.  The court entered a status quo order and scheduled a hearing on the parties' competing motions for preliminary injunctive relief.  From there on, "[c]reating litigation chaos seemed to be one of the Rajans' strategies."[16]

#### 1. The Preliminary Injunction Opinion.

On December 8, 2020, the court issued the P.I. Opinion, concluding that SeeCubic was entitled to injunctive relief because the Resolution Committee had the authority to bind Stream to the Omnibus Agreement and that the Omnibus Agreement did not require a shareholder vote under Section 271 or the Class Vote Provision in Stream's Charter.  The court concluded that "[n]either [Section 271 nor the Class Vote Provision] applie[d] to the transfer of assets contemplated by the Omnibus Agreement."[17]  Therefore, the court

---

[15] These personal benefits included employment, compensation, and indemnification for litigation expenses.  *Id.*

[16] *Stream TV*, 2021 WL 5816820, at *1.  Stream went through two sets of lawyers (at the time of the Injunction Order, Stream was on its third set of lawyers), and the Rajan brothers' represented themselves during portions of the litigation.

[17] *Stream TV*, 250 A.3d at 1033.  The P.I. Opinion also concludes that the Outside Directors were appointed validly and that the members of the Resolution Committee did not breach their fiduciary

**A-365**

granted SeeCubic's motion for a preliminary injunction and denied Stream's competing motion.[18]

    *a. The Court's Section 271 Analysis at the Preliminary Injunction Stage.*

Starting with Section 271 of the DGCL, the court determined that the question before it was "whether the transfer of Stream's assets to its secured creditors under the circumstances presented [] constitute[d] a sale or exchange within the scope of Section 271."[19] To answer this question, the court stated that although the assignment of Stream's assets to SeeCubic could be classified as a "sale" or an "exchange" under Section 271, the better course of action was to "accept that the language of Section 271 is ambiguous as to whether it applies to transactions like the Omnibus Agreement," and look to principles of statutory interpretation.[20] The court then turned to Section 271's legislative history, applied an insolvency exception *sua sponte*, and made three findings.

First, the court found that the common law rule requiring a board to seek unanimous shareholder approval before selling all of the corporation's assets was subject to an

---

duties, therefore, the Court of Chancery did not enter a mandatory injunction. *See id.* at 1028–31, 1045–47. However, these conclusions are not challenged on appeal.

[18] The court concluded that it was reasonably probable that the Omnibus Agreement was a valid and binding agreement, and prohibited Stream, the Rajans, and anyone acting in concert with them, from interfering with SeeCubic's rights under the Omnibus Agreement.

[19] *Id.* at 1033.

[20] *Id.* at 1041. Specifically, the court noted that "Stream does not cite any dictionary definitions, but argues without support that the plain meaning of the terms 'sale' and 'exchange' must encompass the transfer of all Stream's assets to SeeCubic. In light of the [Black's Law Dictionary] definitions [of 'sale' and 'exchange'] . . . that conclusion *is plausible but not mandated*." *Id.* at 1040 (emphasis added).

insolvency exception, thereby allowing boards to transfer all or substantially all of an insolvent company's assets to creditors without shareholder approval.

Second, the court found that the evolution of Section 271's language, mainly the addition of specific acceptable forms of consideration that did not include "forgiveness of debt," supported allowing an insolvent or failing firm to transfer all or substantially all of its assets to creditors.[21]

Third, the court found that, because Section 272 does not require a shareholder vote for the pledging of corporate assets as collateral (unless the corporate charter specifies otherwise), requiring a shareholder vote under Section 271 before a company could otherwise transfer its assets to a creditor "would be contrary to the plain language of Section 272" and against Delaware public policy.[22]

The Court of Chancery explained that, prior to the General Assembly modernizing Delaware's merger statutes, the preferred transaction vehicle involved the target corporation selling all of its assets and then dissolving and distributing the consideration to its stockholders, *i.e.,* asset transfers.[23]  Further, at common law, the general rule was that the directors only have the power of management in conducting ordinary business affairs. This prevented directors from selling the assets of the business without unanimous stockholder approval.  Thus, the objection of a single shareholder could thwart the efforts to sell a corporation's assets.

---

[21] *Id.* at 1042.

[22] *Id.* at 1043.

[23] *Id.* at 1033–34.

However, the court stated that this strict rule was not without exceptions. "A late nineteenth century treatise noted that for 'a failing company the rule is different, and a sale of the whole property may be made by the directors.'"[24] The court cited to two twentieth-century treatises for the same proposition,[25] and noted that even today, a "Delaware treatise acknowledges the 'failing business' exception to the common law rule."[26] The court also cited a Court of Chancery opinion from 1915 that "acknowledged the general prohibition on selling all of a corporation's assets, as well as the exception for an insolvent or failing firm."[27] After reviewing Section 271's statutory predecessor, Section 64a, the court found that "[t]here is no indication that the General Assembly intended to restrict or eliminate authority that already existed at common law, such as the power of the directors of an insolvent and failing corporation to sell its assets."[28]

Against this common law backdrop, the court reviewed Section 271's revisions. "A 1929 amendment confirmed that the consideration could consist 'in whole or in part [of] shares of stock in, and/or other securities of, any other corporation or corporations.'"[29] In 1967, the General Assembly revised the statute again by expanding the expressly permitted

---

[24] *Id.* at 1035 (quoting 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891)).

[25] *Id.* at 1036 (citing Thomas Conyngton & R. J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927); Henry Winthrop Ballantine, *Ballantine on Corporations* § 281 (1946)).

[26] *Id.* (citing 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* §10.7, 10–34 (3d ed. 1998 & 2011 Supp.)).

[27] *Id.* at 1036 (citing *Butler v. New Keystone Copper Co.*, 93 A. 380, 382 (Del. Ch. 1915)).

[28] *Id.* at 1037.

[29] *Id.* at 1037 (alteration in original) (quoting 36 Del. Laws ch. 135 § 19 (1929)).

13

forms of consideration to include "money or other property."[30]  In addition, the court noted that the 1967 revision made two related changes to the DGCL:  adding a new provision, Section 272, and eliminating a provision that did not require either board approval or a stockholder vote to accomplish a sale of assets to a secured creditor by decree  because that provision was unnecessary given the rights generally available to secured creditors.[31]

The court observed that, today, Section 271 mandates a "two-step process" that first requires board approval, and then requires stockholder approval.[32]    Section 271(a) provides:

> Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors or governing body deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon or, if the corporation is a nonstock corporation, by a majority of the members having the right to vote for the election of the members of the governing body and any other members entitled to vote thereon under the certificate of incorporation or the bylaws of such corporation, at a meeting duly called upon at least 20 days' notice.  The notice of the meeting shall state that such a resolution will be considered.[33]

---

[30] *Id.* at 1037–38.  The revision added the words "substantially all" as well.

[31] *Id.* at 1038; *see also id.* at 1038 n.18 ("The revisions attempted to eliminate redundant and unnecessary provisions.").

[32] *Id.* at 1039.

[33] 8 *Del. C.* § 271(a).

14

**A-369**

The court concluded that interpreting Section 271 as requiring a shareholder vote for the type of transaction contemplated by the Omnibus Agreement would create a conflict with Section 272.  Section 272 provides:

> The authorization or consent of stockholders to the mortgage or pledge of a corporation's property and assets shall not be necessary, except to the extent that the certificate of incorporation otherwise provides.[34]

In explaining the conflict, the court reasoned that:

> [i]nterpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL, which authorizes a corporation to mortgage or pledge all of its assets without complying with Section 271. Section 272 is silent as to whether a secured creditor can foreclose on its security interest in the debtor corporation's assets, but the statutory scheme would not function if the debtor corporation had to comply with Section 271 before the creditor could foreclose. When facing the prospect of foreclosure, the board and stockholders of the debtor corporation would have no incentive to approve the transfer of the corporation's assets.  As a practical matter, any creditor who wanted to ensure that it had the ability to levy on the pledged collateral would have to obtain a stockholder vote when entering into the credit agreement, contrary to the plain language of Section 272.[35]

The court concluded that Section 271 did not apply to the Omnibus Agreement because Stream was insolvent, its stockholders no longer had a "meaningful interest in the firm," and the secured creditors were entitled to its assets.[36]  Therefore, "[u]nder the DGCL, the Omnibus Agreement did not require a stockholder vote."[37]

---

[34] 8 *Del. C.* § 272.

[35] *Stream TV*, 250 A.3d at 1021–22.

[36] *Id.* at 1043.

[37] *Id.*

15

> *b.  The Court of Chancery Interprets the Charter.*

After analyzing Section 271, the court turned to the Charter's Class B stockholder vote provision (the "Class Vote Provision").  The court found that the language in the Class Vote Provision was "parallel" to Section 271 such that the Charter's language warranted the same interpretation as Section 271.

In full, the Charter's Class Vote Provision provides:

> For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummation [sic] an Acquisition or Asset Transfer.[38]

The Charter defines "Acquisition" as:

> (A) any consolidation, stock exchange or merger of [Stream] with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of [Stream] immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; or

> (B) any transaction or series of related transactions to which [Stream] is a party and in which excess of fifty percent (50%) of [Stream's] voting power is transferred; provided that an Acquisition shall not include

> (x) any consolidation or merger effected exclusively to change the domicile of [Stream], or

> (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by [Stream] or any successor or

---

[38] A124 (Charter § IV.D.2(d)).

indebtedness of [Stream] is cancelled or converted or a combination thereof.[39]

The Charter defines "Asset Transfer" as:

a  sale,  lease or  other disposition of all or substantially all of the assets or intellectual property of [Stream] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream].[40]

Although the court did not expressly conclude, at this stage, that the Omnibus Agreement was an "Asset Transfer" as defined under the Charter, the court stated in a footnote that "[t]he Omnibus Agreement involves a transfer of assets, so if any aspect of the Class Vote Provision covered the transaction, it would be the definition of 'Asset Transfer.'"[41]  Starting with the definition of "Asset Transfer," the court determined that "[t]he language of the Class Vote Provision track[ed] Section 271 of the DGCL," and therefore resulted in the same outcome:  "Stream need not obtain stockholder approval under the Class Vote Provision to transfer mortgaged or pledged assets to the secured creditors who hold security interests in those assets."[42]

---

[39] A126 (Charter § IV.D.4(b)(i)).

[40] A126 (Charter § IV.D.4(b)(ii)).

[41] *Stream TV*, 250 A.3d at 1044 n.24.  In contrast, in the court's September 23, 2021 Order Denying The Rajans' Motion to Modify the Preliminary Injunction Under Rule 65, the court states unequivocally that "*The Omnibus Agreement contemplated an Asset Transfer.*  It provided for Stream to transfer all of assets [sic] in exchange for SLS and Hawk 'stay[ing] the [f]oreclosure [of Stream's assets] and satisfy[ing] and extinguish[ing], in their entirety, the SLS Notes and the Hawk Notes, respectively.'"  *Stream TV Networks, Inc. v. Seecubic, Inc*., 2021 WL 4352731, at *2 (Del. Ch. Sept. 23, 2021) (alterations in original) (emphasis added).

[42] *Stream TV*, 250 A.3d at 1043.

17

**A-372**

Comparing Section 271 and the Class Vote Provision, the court found "only two differences."[43]  First, the Class Vote Provision expressly refers to "intellectual property."[44] According to the court, the phrase "intellectual property" "does not enlarge the voting obligation beyond the scope of Section 271, because intellectual property is already a type of asset."[45]

Second, the provision refers to "the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream]."  The court acknowledged that the Omnibus Agreement "does not contemplate an exclusive license," but it concluded that the Class Vote Provision's reference to exclusive licenses shows that the drafters "knew how to define the concept of an 'Asset Sale' to include transactions that Section 271 would not otherwise reach."[46]  It then stated that, "[i]f the drafters of the Class Vote Provision wanted to require a class vote before a secured creditor could foreclose on pledged or mortgaged assets, then the definition of 'Asset Sale' should have referred to that type of transaction."[47]  Accordingly, the court concluded that the reference to "a sale, lease or other disposition" in the Asset Transfer definition tracked the language of Section 271 and "warrants the same

---

[43] *Id.* at 1045.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

**A-373**

interpretation."[48]  The court did not separately address whether the Omnibus Agreement

fell into the "*other disposition*" category within the definition of Asset Transfer.[49]

Accordingly, the court denied Stream's motion for a preliminary injunction and

granted SeeCubic's motion for a preliminary injunction preventing Stream from interfering

with the Omnibus Agreement.

### 2. SeeCubic's Motion for Summary Judgment.

On January 19, 2021, SeeCubic moved for summary judgment and filed its opening

brief.  SeeCubic's motion for summary judgment sought the following relief:  a declaratory

judgment that the Omnibus Agreement is valid and binding, a permanent injunction

ordering Stream and the Rajans to comply with the Omnibus Agreement, and a judgment

against the Rajans for converting the assets identified in the Omnibus Agreement.

Stream filed its answering brief on February 17, 2021, relying exclusively on the

briefs it filed in connection with the parties' cross motions seeking preliminary injunctive

relief.   Before  the  parties  completed  the  briefing,  Stream  and  the  Rajans  filed  for

---

[48] *Id.* (citing *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 969 (Del. Ch.), *aff'd*, 567 A.2d 419, 1989 WL 136971 (Del. Oct. 18, 1989) (TABLE)).

[49] In a footnote, the court addressed Stream's "conclusory" claim that the Omnibus Agreement was an Acquisition under the Charter.  According to the court, "[t]he Omnibus Agreement does not contemplate a consolidation or merger, which are specific types of transactions having independent legal significance," and therefore part (A) of the definition of Acquisition did not apply.  *Id.* at 1044 n.24.  The court reasoned that the Omnibus Agreement also did not "result in the transfer of any of Stream's voting power," and therefore part (B) of the definition of Acquisition did not apply.  *Id.*  "By process of elimination" the court determined that "perhaps Stream [thought] the Omnibus Agreement contemplate[d] a 'reorganization.'"  *Id.*  However, the court determined that "Stream would have to provide authorities delineating the content of the term and why it could encompass the Omnibus Agreement" as well as "explain why that concept would trigger a stockholder vote when the definition of 'Asset Transfer' did not."  *Id.*

bankruptcy, resulting in an automatic stay of the proceedings before the Court of Chancery.[50]  The bankruptcy court dismissed the case as a bad faith filing, and described it as an effort "to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor . . . ."[51]

On September 23, 2021, the Court of Chancery granted, in part, SeeCubic's motion for summary judgment.[52]  The SJ Order granted summary judgment in SeeCubic's favor declaring the Omnibus Agreement to be valid and binding.  The court also granted SeeCubic's motion for a permanent injunction and converted the preliminary injunction into a permanent injunction.  Finally, the court denied SeeCubic's motion as to the conversion claim because the court found that the summary judgment record did not support it.

---

[50] *Stream TV*, 2021 WL 5816820, at *1; A043 (Dkt. 126).

[51] *Stream TV*, 2021 WL 5816820, at *1 (alterations in original); B36–37 (Bankruptcy Ruling at 13–14).  On May 27, 2021, after the bankruptcy stay lifted, Mathu Rajan filed a *pro se* letter application claiming that the P.I. Opinion was the product of fraud.  *Stream TV*, 2021 WL 5816820, at *1; A048 (Dkt. 138).  On June 4, 2021, Mathu filed a formal motion to set aside the P.I. Opinion.  *Stream TV*, 2021 WL 5816820, at *1; A049 (Dkt. 143).  Then, on September 15, 2021, the Rajans had a third-party seek to intervene and file additional motions.  *Stream TV*, 2021 WL 5816820, at *1; A057 (Dkt. 183).  The very next day, on September 16, 2021, the Rajans filed another motion to modify the preliminary injunction.  *Stream TV*, 2021 WL 5816820, at *1; A058 (Dkt. 185).  The court rejected the Rajans' various efforts to set aside the P.I. Opinion, prompting the Court of Chancery's statement that "litigation chaos" seemed to be the Rajans' strategy.  *Stream TV*, 2021 WL 5816820, at *1.

[52] *See generally Stream TV*, 2021 WL 4352732 (granting in part SeeCubic's motion for summary judgment as to the validity of the Omnibus Agreement and its request for a permanent injunction).

> **3.** *Stream and the Rajans Move for Partial Final Judgment, Appeal to This Court, and Move to Modify or Stay the Permanent Injunction Pending Appeal.*

On September 28, 2021, Stream and the Rajans moved to have the Court of Chancery enter the SJ Order as a partial final judgment and to stay SeeCubic's conversion claim, which the court granted on November 10, 2021.[53]

On November 12, 2021, Stream and the Rajans noticed this appeal. On the same day, Stream and the Rajans moved to modify or stay the permanent injunction pending appeal. The court denied both requests.[54] The court denied Stream's request to modify the permanent injunction because "[t]here have not been any significant changes in the status quo" since the court entered comparable relief in the form of a preliminary injunction on December 8, 2020.[55] After analyzing the four factors from *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Commission* that guide a trial court's discretion to grant or deny a stay, the court concluded that a stay was unwarranted.[56] In doing so, the Court of Chancery elaborated on its reasoning that Section 271 did not supersede the common law's recognition that directors could sell the assets of an insolvent firm without stockholder approval.

---

[53] *See generally Stream TV*, 2021 WL 5240591 (entering partial final judgment under Rule 54(b)).

[54] *See Stream TV*, 2021 WL 5816820, at *2.

[55] *Id.*

[56] *Id.* at *15. This Court identified the four factors in *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Comm'n*, 741 A.2d 356 (Del. 1998).

21

**A-376**

## H. The Parties' Contentions on Appeal.

Stream raises four arguments on appeal. First, it contends that the Class Vote Provision unambiguously requires Class B stockholder approval and renders Section 271's default voting rule irrelevant. Second, Stream contends that the Court of Chancery erred by looking first to Section 271 prior to construing the Charter. Stream further asserts that the court bypassed the Charter's plain terms in order to apply a "board only" common law insolvency exception to Section 271. Third, Stream contends that Section 271 superseded any such common law exceptions assuming, *arguendo*, that such an exception did exist. Finally, Stream argues that the ruling, as a matter of public policy, would upset Delaware's contractarian focus and the predictable application of Section 271.

## II.    STANDARD OF REVIEW

This matter involves the interpretation of both a charter provision and a statute. "The construction or interpretation of a corporate certificate or by-law is a question of law subject to *de novo* review by this Court."[57] "Certificates of incorporation are regarded as contracts between the shareholders and the corporation, and are judicially interpreted as such."[58] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[59] "Statutory interpretation is a question of law, which we review *de novo*."[60]

---

[57] *Centaur Partners, IV v. National Intergroup, Inc.*, 582 A.2d 923, 926 (Del. 1990).

[58] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[59] *Id.*

[60] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020) (citing *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015)).

### III.  ANALYSIS

First, we consider whether the Class Vote Provision requires Class B majority stockholder approval of the Omnibus Agreement.  Stream argues that the Court of Chancery analyzed the issue "upside down" by applying its interpretation of Section 271 to a clear and unambiguous charter provision.  Instead, Stream contends, the plain text of the Class Vote Provision controls and Section 271's default rules are irrelevant.[61]  We agree and explain our reasoning below.

In assessing corporate action for legal compliance, the DGCL does outrank a corporation's charter such that a charter provision is invalid if it conflicts with a provision of the DGCL.  As we recognized in *Salzberg v. Sciabacucchi*,[62] Section 102(b)(1) governs the scope of corporate charters, and its scope is "broadly enabling."[63]  But Section 102(b)'s broad authorization "is constrained by the phrase, 'if such provisions are not contrary to the laws of this State.'"[64]  We stated further that:

> in *Sterling v. Mayflower Hotel Corp.*, this Court held that Section 102(b)(1) bars only charter provisions that would "achieve a result forbidden by settled rules of public policy."  Accordingly, "the stockholders of a Delaware corporation may by contract embody in the [certificate of incorporation] a provision departing from the rules of the common law, *provided that it does*

---

[61] To be clear, Stream argued below that "[e]ven if [the] Charter's approval procedures do not govern, the Omnibus Agreement is still void because Section 271 [of the] Delaware Code requires shareholder-approval."  A209 (Pls.' Opening Br. Supp. Mot. Prelim. Inj.).  Stream abandons this argument on appeal and asserts that Section 271 is "irrelevant."  Opening Br. at 14 ("The Charter Unambiguously Controlled The Class B Voting Shareholders' Blocking Rights; Section 271 Was Irrelevant.").

[62] *Salzberg*, 227 A.3d 102.

[63] *Id.* at 115.

[64] *Id.* (citing 8 *Del. C.* § 102(b)(1)).

*not transgress a statutory enactment or a public policy settled by the common law or implicit in the General Corporation Law itself.*"[65]

Thus, we proceed with analyzing whether the Class Vote Provision requires a vote of the Class B stockholders.[66]   Considering the plain and ordinary meaning of the term "disposition," we conclude that it does.  More specifically, the Omnibus Agreement effects an "Asset Transfer" that unambiguously triggers a majority vote of the Class B stockholders.   Therefore, extrinsic evidence is not used to interpret the Class Vote Provision.[67]

Next, because we disagree with the Court of Chancery that the language of the Class Vote provision of the Charter "tracks the text of Section 271,"[68] we do not look to Section 271 as an interpretative guide in construing the provision.  And because we conclude that a vote is required because the Omnibus Agreement falls within the materially broader definition of Asset Transfer, we need not resolve whether such a vote is also required under the plain language of Section 271, *i.e.,* whether the Omnibus Agreement effects a "sale,

---

[65] *Id.* at 115–16 (alteration in original) (emphasis added) (footnotes omitted) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952)).

[66] *See, e.g., Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 840–41 (Del. Ch. 2004) (analyzing first whether Maxwell's charter precluded Maxwell's board from setting the record date in connection with plaintiff's consent solicitation (*i.e.,* the proper interpretation of the charter), and second, determining whether that charter provision was valid under the DGCL), *reprinted in* 30 Del. J. Corp. L. 284, 288–90 (2005).

[67] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[68] *Stream TV*, 250 A.3d at 1044–45; *Stream TV*, 2021 WL 5816820, at *15 ("As explained in the Injunction Decision, the language of [the Asset Transfer] provision 'tracks the text of Section 271 and warrants the same interpretation.'").

24

**A-379**

lease or exchange" within the meaning of Section 271. In sum, we agree with the Vice Chancellor that the Omnibus Agreement effects an Asset Transfer under the Charter. However, because Section 271's language is materially different, our agreement ends there, as does our analysis, as the parties have raised no argument that the Charter violates "a public policy settled by the common law or implicit in the [DGCL] itself."[69]

Finally, although we need not further consider Section 271, we clarify that a common law insolvency exception, if one existed in Delaware, did not survive the enactment of Section 271 and its predecessor. Thus, there is no Delaware common law "board only" insolvency exception under Section 271. Rather, the enactment of Section 271 and its predecessor superseded any such common law exception, to the extent one existed in Delaware.

A. *The Charter Requires a Class B Stockholder Vote Because the Omnibus Agreement Effects an "Asset Transfer" under Stream's Charter.*

Stream argues that the Omnibus Agreement is both an Acquisition and an Asset Transfer, and therefore requires a vote of the Class B stockholders under the Charter. Because we conclude that the Omnibus Agreement effects an "Asset Transfer," we need not decide whether or not it also constitutes an "Acquisition."

"Delaware adheres to an objective theory of contracts, meaning that a 'contract's construction should be that which would be understood by an objective, reasonable third

---

[69] *See Sterling*, 93 A.2d at 118. Rather, the Court of Chancery identified only one public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest." *Stream TV*, 250 A.3d at 1042. Also, no party in this litigation has argued that in the context of judicial foreclosure proceedings, a stockholder vote is required. Rather, the Omnibus Agreement effects a type of privately-structured work-out.

party.'"[70]  We "place[] great weight on the plain terms of a disputed contractual provision,"

and, therefore, we "interpret clear and unambiguous terms according to their ordinary

meaning."[71]   "We do not consider extrinsic evidence unless we find that the text is

ambiguous."[72]   "Ambiguity is present 'only when the provisions in controversy are

reasonably or fairly susceptible of different interpretations or may have two or more

different meanings[,]'"[73] and not "simply because the parties do not agree upon its proper

construction."[74]

An affirmative vote of the holders of a majority of the then-outstanding shares of

Class B stock is necessary to consummate an Asset Transfer.  The Charter defines "Asset

Transfer" as:

> a sale, lease or other disposition of all or substantially all of the assets or
> intellectual property of [Stream] or the granting of one or more exclusive
> licenses which individually or in the aggregate cover all or substantially all
> of the intellectual property of [Stream].[75]

The parties agree that the Omnibus Agreement is not a sale or lease of all of Stream's

assets.  The parties also agree that the Omnibus Agreement addresses all of the assets of

Stream.  Thus, Stream focuses on the phrase "*other disposition*" and argues that the

---

[70] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, --- A.3d ---, ---, 2022 WL 619700, at *5 (Del. Mar. 3, 2022).

[71] *Id.* (quoting *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019)).

[72] *Id.* (citing *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

[73] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[74] *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196.

[75] A126 (Charter § IV.D.4(b)(ii)).

**A-381**

Omnibus Agreement effects an Asset Transfer that requires a vote of Class B stockholders to be effective.

Stream argues that the words, "other disposition," are "broader" than the word "exchange" in Section 271.  Further, Stream argues that the difference in word choice must be seen as "intentional" and reinforces a conclusion that the parties intended for the Charter to have a different meaning than the statute.  We agree and conclude that the Charter's definition of Asset Transfer differs materially from Section 271.  The definition of Asset Transfer changes Section 271's phrase of "sell, lease *or exchange*,"[76] to "sale, lease *or other disposition*."[77]  Further, the Class Vote Provision contains express references to "intellectual property" and the granting of "exclusive licenses."[78]  The drafters "could have simply tracked the language of the statute," but did not.[79]  Accordingly, the Charter's use of the phrase "other disposition" has a meaning that is different, and broader, than the term "exchange."[80]  It follows that, there is no need to look to Section 271 as an interpretative

---

[76] 8 *Del. C.* § 271(a).

[77] A126 (Charter § IV.D.4(b)(ii)).

[78] *Id.*

[79] *See Jones Apparel Grp. Inc*, 883 A.2d at 842 ("[T]he drafters [of a charter] could have simply tracked the language of the statute, but did not.  That choice cannot be seen as anything other than intentional, reinforcing the conclusion that to read a proviso back into [the charter] allowing the board to set the record date would contravene the plain meaning of that provision.").

[80] *See, e.g., Wilmington Trust Co.*, 2008 WL 555914, at *8 (Del. Ch. Feb. 29 2008) ("[T]he words 'transfer' and 'disposition,' in particular, are inherently broad terms generally understood to encompass changes in title or ownership.").

27

**A-382**

guide in construing the language of the Class Vote Provision because the Charter's language does not track Section 271.[81]

That leads us to the key inquiry -- the meaning of "*other disposition*," which is not defined in the Charter.  Corporate charters are contracts, and our rules of contract interpretation apply.[82]  "The Court must first attempt to ascertain the parties' intent from the language of the contract."[83]  Words or phrases used in a bylaw or charter are to be given their commonly accepted meaning, and this Court "often looks to dictionaries to ascertain a term's plain meaning."[84]

Black's Law Dictionary defines "disposition" as "[t]he act of transferring something to another's care or possession," "the relinquishing of property" and as "[a] final settlement or determination," such as a "court's disposition of the case."[85]  Merriam-Webster defines "disposition" as "the act or the power of disposing or the state of being disposed:  such as . . . a final arrangement[] settlement" and "the transfer to the care or possession of

---

[81] The Class Vote Provision is also more specific than Section 271 in function as it requires a majority vote of outstanding Class B shares whereas Section 271 requires a vote of all outstanding shares.

[82] *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 977 (Del. 2020); *Centaur Partners, IV*, 582 A.2d at 928.

[83] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 56 (Del. 1995).

[84] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) (citing *Lorillard Tobacco Co. v. Am. Legacy Found*, 903 A.2d 728, 738 (Del. 2006)).  *See State of Delaware Dep't of Nat. Res. And Env't Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 225 A.3d 1251, 1260–61 (Del. 2020) (Valihura, J., dissenting) ("Delaware case law is well settled that undefined words are given their plain meaning based upon the definition provided by a dictionary.").

[85] *Disposition*, Black's Law Dictionary (11th ed. 2019).  "Disposition" also contains specific definitions for certain types of dispositions, such as testamentary, ambulatory, and informal.  *See id.*

**A-383**

another."[86]  Similarly, American Heritage defines "disposition" as "[a]n act of disposing;

a bestowal or transfer to another."[87]  Cambridge Dictionary defines "disposition" as "the

process of selling something or formally giving it to someone" and "the way in which a

formal process, such as a business deal or a matter dealt with in a court of law, is

completed."[88]  Collins similarly defines "disposition" as "a selling or giving away, as of

property."[89]    Finally,  Ballentine's  Law  Dictionary  defines  "disposition"  as  "[a]n

arrangement.  A transfer of property.  The power of disposal."[90]  We conclude, as explained

further  below,  that  the  term,  "other  disposition,"  includes  the  transfer  of  assets

contemplated in the Omnibus Agreement.

    The Omnibus Agreement effects a transfer and assignment of all rights, title and

interest in all of Stream's assets for the benefit of Stream's creditors.  This is evident from

the language of the agreement itself as it recites:

> WHEREAS, SLS and Hawk have each agreed to stay the [f]oreclosure and
> satisfy and extinguish each of the SLS Notes and the Hawk Notes in their
> entirety subject to the Company *assigning all right, title and interest in and
> to all assets of the Company* to a newly-formed holding company ("Newco")
> established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk
> Notes.[91]

---

[86] *Disposition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disposition (last visited Apr. 19, 2022).

[87]        *Disposition*,        The        American        Heritage        Dictionary, https://www.ahdictionary.com/word/search.html?q=disposition (last visited Apr. 19, 2022).

[88]                    *Disposition*,                Cambridge                Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disposition (last visited May 27, 2022).

[89] *Disposition*, Collins, https://www.collinsdictionary.com/us/dictionary/english/disposition (last visited May 27, 2022).

[90] *Disposition*, Ballentine's Law Dictionary (3d ed. 2010).

[91] A136 (Omnibus Agreement WHEREAS clause) (emphasis added).

Further, Section 1.1(a) of the Omnibus Agreement provides:

Each of SLS and Hawk shall agree to stay the [f]oreclosure *and satisfy and extinguish*, in their entirety, the SLS Notes and the Hawk Notes, respectively (collectively, the "Discharged Indebtedness"), upon the Company's immediate conveyance, *transfer*, delivery and *assignment, of all right, title and interest of the Company in, to or under all of the rights, properties and assets of the Company* (including those of any direct or indirect subsidiary of the Company) of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the business, as the same shall exist on the date hereof, *to Newco*, including, but not limited to, all right, title and interest of the Company (or any direct or indirect subsidiary of the Company) in, to and under the assets listed or described below (the "Transferred Assets")[.]"[92]

An assignment of all rights, title and interest in the assets of the Company to Newco is a "disposition" because it is a type of transfer or relinquishment of property. Dictionary definitions of "assignment" reinforce this conclusion. Black's Law Dictionary defines "assignment" as: "[t]he transfer of rights or property."[93] Merriam-Webster defines "assignment" as: "the transfer of property *especially*: the transfer of property to be held in trust or to be used for the benefit of creditors."[94] The American Heritage Dictionary defines "assignment" to mean: "[t]he transfer of a claim, right, interest or property from one to another."[95] Thus, "disposition" includes the assignment of Stream's assets to Newco (SeeCubic) under the Omnibus Agreement, thereby triggering the Class B Vote Provision.

---

[92] A137 (Omnibus Agreement § 1.1(a)) (emphasis added).

[93] *Assignment*, Black's Law Dictionary (11th ed. 2019).

[94] *Assignment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/assignment (last visited May 10, 2022) (emphasis in original).

[95] *Assignment*, The American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=assignment (last visited May 10, 2022).

30

**A-385**

Further, the assignment of all rights, title, and interest in Stream's assets is a "disposition" because it effects a "relinquishing of property" in consideration for a resolution, settlement, or determination of certain claims. For example, Section 1.2 of the Omnibus Agreement provides:

1.2 Dismissal of Lawsuit and Foreclosure Action

In consideration of the Transactions contemplated by Section 1.1 of this Agreement and such other agreements as made be made [sic] among the parties hereto and upon consummation thereof, (i) the Investors hereby irrevocably agree to *forbear from including any claims against the Company or any of the Transferred Assets as part of the Lawsuit*, and (ii) each of the SLS and the Company *agree to dismiss their applicable claims or responses in the Foreclosure Action*.[96]

Transferring assets in consideration for resolving or settling certain claims falls within the common dictionary definitions of "disposition" set forth above. Thus, the transactions set forth in the Omnibus Agreement unambiguously effect a "disposition" as that term is commonly used.

SeeCubic disagrees, and argues that the term "other disposition" in this context is limited by the concept of *nonscitur a sociis*, a canon of construction that suggests words grouped together in a list should be given related meaning in light of the words around it.[97] SeeCubic asserts that an "other disposition" must mean something akin to a "sale" or a "lease" and that it "does not unambiguously include a transfer of assets to secured creditors

---

[96] A140 (Omnibus Agreement § 1.2) (emphasis added). Further, the recitals in the Omnibus Agreement (including the one quoted above) make clear that the agreement was intended to resolve the issues relating to Stream's default on the SLS and Hawk notes.

[97] Answering Br. at 19 ("Here, the undefined term 'other disposition' is limited to a similar meaning as the terms 'sale' and 'lease.'").

31

**A-386**

in satisfaction of debt."[98]  We disagree that "other disposition" is ambiguous.  Rather, as

shown above, the plain meaning of "other disposition" includes the transactions

contemplated in the Omnibus Agreement.  "When the contractual provision is clear and

unambiguous, the court will give the provision's terms their plain meaning."[99]

If any of the canons of construction applied, it would be the "elementary canon of

contract construction" where "the intent of the parties must be ascertained from the

---

[98] *Id.*  SeeCubic also argues that if "'other disposition' were intended to encompass all dispositions
of Stream's assets without limitation, the terms 'sale' and 'lease'–which are dispositions—would
be superfluous." *Id.* at 20.

[99] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 57 (citing *Hallowell v. State Farm Mut. Auto. Ins.
Co.*, 443 A.2d 925, 926 (Del. 1982)).  *See BlackRock Credit Allocation Income Tr.*, 224 A.3d at
977 ("Under the applicable interpretation rules, if the bylaw's language is unambiguous, the court
need not interpret it or search for the parties' intent."); *see also Norton v. K-Sea Transp. Partners
L.P.*, 67 A.3d 354, 365 n.56 (Del. 2013) ("[W]hile we will construe an ambiguous partnership
agreement against the drafter under the *contra proferentem* doctrine, that doctrine only applies if
the partnership agreement is ambiguous." (citing *SI Mgnt. L.P. v. Wininger*, 707 A.2d 37, 43
(Del.1998))); *Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) ("If the statute is
unambiguous, there is no room for interpretation, and the plain meaning of the words controls."
(*Ingram v. Thrope*, 747 A.2d 545, 547 (Del. 2000))); *Grand Ventures, Inc. v. Whaley*, 632 A.2d
63, 66 (Del. 1993) ("Where the intent of the legislature is clearly reflected by unambiguous
language in the statute, the language itself controls." (quoting  *Spielberg v. State*, 558 A.2d 291,
293 (Del. 1989))); Norman J. Singer & Shambie Singer, 2A *Sutherland Statutes and Statutory
Construction* § 46:4 (7th ed.), Westlaw SUTHERLAND (database updated Nov. 2021) ("If a court
does find that a statute is not clear and unambiguous, then it may look to a wide variety of intrinsic
and extrinsic sources to discover the meaning of legislative language, including the maxims
*expressio unius est exclusio alterius*, *ejusdem generis*, and *noscitur a sociis*, as well as legislative
history . . . ." (footnote omitted)).  In any event, our interpretation of the term "other disposition"
respects the *noscitur a sociis* canon because it treats disposition, sale, and lease similarly—mainly
as methods of transferring and assigning the right to use or own an asset.  By specifying that "other
disposition[s]" of assets would trigger the Class Vote Provision, the drafters made clear that
"sale[s]" and "lease[s]" were themselves dispositions.

**A-387**

language of the contract."[100]  Reading the agreement as a whole,[101] other provisions within

the Omnibus Agreement shed light on what the parties meant by "other disposition."  We

note, for example, that the Charter's definition of "Transfer" as it pertains to Class B Voting

Stock, defines "Transfer" as:

> *any sale, assignment, transfer, conveyance, hypothecation or other transfer*
> *or disposition of such share or any legal or beneficial interest in such share,*
> *whether or not for value and whether voluntary or involuntary or by*
> *operation of law; provided, however, that the following shall not be*
> *considered a "Transfer"*: (x) the granting of a proxy to officers or directors
> of the Company at the request of the Board of Directors of the Company in
> connection with actions to be taken at an annual or special meeting of
> stockholders, or (y) entering into a voting trust, agreement or arrangement
> (with or without granting a proxy) with the Founders.[102]

This definition reinforces that any assignment, transfer, conveyance, or hypothecation of

the Class B shares is a "disposition" of such share, whether or not in value and whether or

not voluntary or involuntary.

One could argue that the definition of "Transfer" provided above shows that the

drafters knew how to ensure that specific types of transfers would pertain to dispositions

of Class B *stock*.  It follows that one may find it significant that these events are not also

specifically addressed in the context of transactions involving corporate *assets*, particularly

---

[100] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 56 (quoting *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992)).  *See Cox Commc'ns Inc.*, 2022 WL 619700, at *5 (explaining that this Court reviews "questions of contract interpretation *de novo*, with the objective of determining the intent of the parties from the language of the contract" (footnote omitted) (citing *Exelon Generation Acquisitions, LLC*, 176 A.3d at 1267)).

[101] *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 918 n.28 (Del. 2021) ("Delaware courts 'read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage[.]'" (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

[102] A131 (Charter § IV.D.6(a)(iv)) (emphasis added).

**A-388**

in the definition of Asset Transfer.  However, the terms in the more expanded "Transfer" definition dealing with transfers of Class B Voting stock are entirely consistent with the plain meaning and common definitions of "disposition." [103]   Reading the provisions as a whole, we see no inconsistency in these provisions and in construing "other disposition" to plainly encompass the contemplated transfer and assignment of Stream's assets for the benefit of its creditors in furtherance of a resolution of certain claims.[104]

  *B.  There Is No Common Law "Board-Only" Insolvency Exception to Section 271.*

  We have concluded that the Omnibus Agreement unambiguously contemplates a transaction constituting an "Asset Transfer" triggering the Class Vote Provision.  We clarify a final point, namely, whether there exists today an insolvency exception to Section 271.  We conclude that any such exception that might have existed has been superseded.

  The Vice Chancellor engaged in a thoughtful analysis of the common law pre-dating the enactment of Section 271 and its predecessor.  Relying primarily on some treatises and

---

[103] *See Alta Berkeley VI C.V.*, 41 A.3d at 385–86 ("[I]t is well established that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." (quoting *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998))); *see also Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." (citing *Osborn*, 991 A.2d at 1159–60)).

[104] We are mindful that an overly broad reading of the phrase "other disposition" could render certain exceptions within the definition of "Acquisition" superfluous, if these exceptions were read to fall into the catch-all definition of Asset Transfer.  For example, the term "disposition" likely does not encompass "(x) any consolidation or merger effected exclusively to change the domicile of [Stream]," or "(y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by [Stream] or any successor or indebtedness of [Stream] is canceled or converted or a combination thereof."  A126 (Charter § IV.D.4(b)(i)). Otherwise, these exceptions would be rendered meaningless.  Therefore, the phrase "other disposition" must have some limits.  However, we need not attempt to delineate what they are.

34

**A-389**

case law from other jurisdictions, the court determined that a board-only insolvency

exception existed, despite the lack of any precedent in Delaware.  These authorities ranged

in date from 1926 to 1948, with no case cited after 1948 upholding such an exception.

In its P.I. Opinion, the Court of Chancery cited the following treatises:

- 1 Charles Fisk Beach, Jr., *Company Law:  Commentaries on the Law of Private Corporations* §§ 357, 358 (1891) (For "a failing company the rule is different, and sale of the whole property may be made by the directors.");[105]

- Thomas Conyngton & R.J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927) (footnote omitted) ("The directors may, however, without authorization of the stockholders, sell the corporate assets if necessary to pay the corporate debt, and they may, in the absence of statutory or other prohibitions, make an assignment for the benefit of creditors.");[106]

- Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946) (footnote omitted) ("If a corporation is insolvent or in failing condition[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale[,] even without the vote or consent of the shareholders.  They may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy.");[107]

- 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 10.7 at 10–34 (3d ed. 1998 & 2011 Supp.) (acknowledging a "failing business" exception to the common law general rule that directors have no authority to sell out the entire property of the corporation and terminate its business).[108]

---

[105] *Stream TV*, 250 A.3d at 1035.

[106] *Id.*

[107] *Id.*

[108] *Id.* at 1036.  In its Modification Opinion, the Court of Chancery supplemented this list with citations to the Cook, Purdy and later Noyes and Cox & Hazen treatises discussed herein.  *See Stream TV*, 2021 WL 5816820, at *8–9, 11.

35

**A-390**

The Court of Chancery cited six cases from other jurisdictions,[109] and two Delaware

cases, namely, *Butler v. New Keystone Copper Co.*, a case from 1915, and *Allied Chemical*

*& Dye Corp. v. Steel & Tube Co.*, a case from 1923.[110]   In *Butler*, the Court of Chancery

confronted a litigation involving a sale of assets that occurred prior to the enactment of any

statute addressing a sale of assets.  Chancellor Curtis stated that

> the general rule as to commercial corporations seems to be settled that neither
> the directors nor the stockholders of a prosperous, going concern have power
> to sell all, or substantially all, the property of the company if the holder of a
> single share dissent.  But if the business be unprofitable, and the enterprise
> be hopeless, the holders of a majority of the stock may, even against the
> dissent of the minority, sell all the property of the company with a view to
> winding up the corporate affairs.[111]

*Butler* bases its holding on the majority exception to the general rule requiring stockholder

unanimity and does not address a board-only insolvency exception.

The court then cited *Allied Chemical* for the proposition that, when Section 271 was

enacted, the General Assembly did not intend to govern a transfer of assets by a failing

firm.[112]   Specifically, the court stated that "[t]he General Assembly enacted the statutory

predecessor to Section 271 to make clear that the board of directors of a corporation, with

---

[109] *See Stream TV*, 250 A.3d at 1035 (citing *City Nat. Bank v. Fuller*, 52 F.2d 870, 872–73 (8th Cir. 1931); *Autauga Coop. Leasing Ass'n v. Ward*, 250 Ala. 229, 33 So. 2d 904, 906 (1948)); *Sherrard State Bank v. Vernon*, 243 Ill. App. 122, 128 (Ill. App. Ct. 1926); *Oskaloosa Sav. Bank v. Mahaska Cnty. State Bank*, 205 Iowa 1351, 219 N.W. 530, 533 (1928); *Candor v. Mercer Cnty. State Bank*, 257 Ill. App. 192, 197–98 (Ill. App. Ct. 1930); *Howard v. Republic Bank & Tr. Co.*, 76 S.W.2d 187, 191 (Tex. Civ. App. 1934).

[110] *See id.* at 1036–37 (citing *Butler*, 93 A. 380; *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486 (Del. Ch. 1923)).

[111] *Butler*, 93 A. at 382; *Stream TV*, 250 A.3d at 1036.

[112] *Stream TV*, 250 A.3d at 1041.

36

**A-391**

the approval of a majority of its stockholders, could sell all of the firm's assets, even if the corporation was profitable and solvent."[113]   According to the court, because the common law did not prohibit the board of directors of an *insolvent* or *failing* firm from transferring its assets to creditors, "the General Assembly did not need to establish that point by statute."[114]

We have independently surveyed the law, and we concur that the weight of treatise authority, supported by cases from various states, supports the existence, at least in the early part of the twentieth century, and at least in certain jurisdictions, of certain common-law rules governing sales of all assets, including the following:

- If a corporation is solvent and profitable, then a sale of all assets requires unanimous approval by all stockholders.

- If a corporation is solvent but unprofitable and without prospect of becoming profitable, then a sale of all assets may be made with the approval of a majority of the stockholders.

- If a corporation is insolvent, then a sale of all assets may be made by the directors without stockholder approval.

At least five treatises, published before the Delaware General Assembly's enactment of Section 271's predecessor in 1917, support the existence of these rules.

First, Charles Fisk Beach, in his 1891 treatise, states that, "a majority of the shareholders of a prosperous corporation can not sell out the property and invest in other

---

[113] *Id.* (citing *Allied Chem.*, 120 A. at 490).

[114] *Id.*

**A-392**

enterprises against the wishes of the minority."[115]  He observes that, "in [the] case of a failing company the rule is different, and sale of the whole property may be made by the directors."[116]

Second, an 1898 treatise by William W. Cook states that "[n]either the directors nor a majority of the stockholders have power to sell all the corporate property as against the dissent of a single stockholder, unless the corporation is in a failing condition."[117] Arguably this passage supports the existence of the board-only exception by negative implication.  The 7th edition of Cook's treatise (published in 1913) cites *Common Sense Mining & Milling Co. v. Taylor* with approval,[118] in which the Missouri Supreme Court held that a "corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."[119]

Third, a 1905 treatise, authored by James Hart Purdy, repeats that a majority of the shareholders of a prosperous corporation cannot sell against the wishes of the minority, but that in the case of a failing company, the sale may be made by the directors.[120]

---

[115]  1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891).

[116] *Id.*

[117] William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 1337 (4th ed. 1898) (emphasis omitted).

[118] William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 2604 n.2 (7th ed. 1913).

[119] *Common Sense Mining & Milling Co. v. Taylor*, 247 Mo. 1, 152 S.W. 5, 10–11 (1912).

[120] James Hart Purdy, *Treatise on the Law of Private Corporations* § 830, at 1243–44 (1905). Purdy does not cite Beach.  Purdy does add two additional case citations, namely, *Miners' Ditch Co. v. Zellerbach*, 37 Cal. 543, 99 Am. Dec. 300 (1869); *Bartholomew v. Derby Rubber Co*., 69 Conn. 521, 38 A. 45 (1897).

**A-393**

Fourth, the 1909 treatise by Thompson & Thompson states that at common law, "neither the directors nor the majority of the stockholders of a prosperous corporation, able to achieve the objects of its creation, had power to sell or otherwise dispose of all the property without the unanimous consent of all stockholders."[121] But this treatise notes that the majority of stockholders may dispose of all the corporate property "where the continuation of the business would be at a loss and where there was no prospect or hope that the enterprise could be made profitable."[122] The treatise further explains that the board may dispose of all the corporate property when "by reason of its embarrassed or insolvent condition[, the corporation] is unable either to pay its debts or to secure capital and funds for the further prosecution of its enterprise," especially where creditors are pressing their claims and threatening litigation.[123]

Fifth, according to a 1909 treatise by Walter Chadwick Noyes, "[t]he general rule that a majority cannot sell the entire assets of a prosperous corporation is based upon the principle that a majority cannot control corporate powers to defeat corporate purposes."[124] The treatise distinguishes between a "losing" corporation – one in which "the further prosecution of the business of the corporation would be unprofitable"[125] – and an insolvent

---

[121] 3 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Private Corporations* § 2421, at 342 (2d ed. 1909).

[122] *Id.* § 2424, at 345.

[123] *Id.* § 2418, at 336.

[124] Walter Chadwick Noyes, *A Treatise on the Law of Intercorporate Relations* § 111, at 210 (rev. 2d ed. 1909).

[125] *Id.* at 211.

**A-394**

corporation.  Because the disposal of all the assets of a losing corporation furthers the

corporate purpose, the treatise notes that it may be accomplished by a majority of the

stockholders.[126]  The directors, on the other hand, are "equally without implied authority

to wind up [a corporation's] affairs and dispose of its assets" in a solvent corporation *and*

in a "losing, but not insolvent, corporation."  As the treatise explains, in a losing

corporation, the transfer of all assets "involves primarily the relations between a

corporation and its stockholders."[127]  But in an insolvent corporation, such transfer is a

matter of "the relations between a corporation and its creditors."[128]  "In the absence of a

controlling statute or by-law of the corporation, the directors have power to authorize an

assignment of the property of an insolvent corporation for the benefit of its creditors."[129]

Two later treatises also acknowledge the existence of a board-only insolvency

exception.  First, *Ballantine on Corporations* (1946) states that "[i]f a corporation is

insolvent or in failing condition[,] the board of directors have authority to sell the entire

assets in order to pay the debts and avoid the sacrifice of an execution sale even without

the vote or consent of the shareholders."[130]

Ballantine observes that under statutes adopted in more than forty states, "a

---

[126] *Id.*

[127] *Id.* § 112, at 212.

[128] *Id.* at 213 ("The assignment of property by an insolvent corporation for the purpose of paying its debts is a very different action from so disposing of its property while solvent as to make its continued exercise of its franchises impossible." (citing *Vanderpoel v. Gorman*, 140 N.Y. 563, 568, 35 N.E. 932, 934 (1894))).

[129] *Id.*

[130] Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946).

prosperous and going [concern] corporation may with the vote or consent of its board of directors and two-thirds of its voting shareholders or some other specified majority, sell and convey all or substantially all [of] its property rights."[131]  These provisions were adopted to relax the strict common law unanimity rule.  "Some of these statutory requirements apply even though the corporation is insolvent, particularly if the sale is made for the purpose of reorganization and continuance of the business in another corporation rather than for the purpose of liquidation."[132]  However, "[i]n other states expressly or by implication the requirements of such a statute are held not to apply to insolvent corporations."[133]

Second, Cox and Hazen's *Treatise on the Law of Corporations* states that, "[i]f a corporation is insolvent or in failing condition, the common law recognizes the authority of the board of directors to sell the entire assets without the vote or consent of the shareholders in order to pay the debts of the corporation and avoid the sacrifice of an execution sale.  The directors may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy."[134]

Cases from at least fifteen states, from the late 1800's to the early 1900's, support

---

[131] *Id.* § 282, at 668.

[132] *Id.* Notably, Ballantine observes that, "if the purpose of a sale is [a] reorganization or recapitalization as contrasted with liquidation and dissolution, that class voting should be required as much as in [the] case of merger or consolidation.  *Id.* at 669.

[133] *Id.* at 668.  *See also infra* note 171 (citing Fletcher noting that courts in different jurisdictions vary on whether such statutory provisions have altered the common law rules for corporations in financial distress).

[134] 4 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 22:4 (3d ed., rev. Dec. 2021), *available at* Westlaw (Dec. 2021 update) (footnote omitted).

the existence of the board-only insolvency exception in those jurisdictions during that time:

Alabama,[135] California,[136] Connecticut,[137] Illinois,[138] Indiana,[139] Iowa,[140] Massachusetts,[141]

---

[135] *Autauga Coop. Leasing Ass'n*, 33 So. 2d at  906 (Prior to passage of a state statute in 1911, if corporation was "insolvent or in failing condition, the directors or a majority of its stockholders could sell all its property without any special procedure."); *Chamberlain v. Bromberg*, 83 Ala. 576, 581, 3 So. 434, 435 (1888) ("We think it too clear to admit of discussion, unless our statutes after noticed have made a change, that the Alabama Insurance Company, being unable to meet its debts, had the power to make an assignment for the benefit of its creditors, if done in good faith; that the board of directors, as its governing body, was the proper authority to execute that power . . . .").

[136] *Miners' Ditch Co.*, 37 Cal. at 593 (citing with approval *Sargent v. Webster*, 54 Mass. 497, 498 (1847)).

[137] *Mills v. Tiffany's*, 123 Conn. 631, 640, 198 A. 185, 189 (1938) (noting that a statute requiring approval by vote of two-thirds of the stockholders was inapplicable to "a sale of all its assets by a corporation which is insolvent or in failing circumstances made for the purpose of closing up its affairs" (citing *Bassett v. City Bank & Tr. Co.*, 116 Conn. 617, 165 A. 557 (1933))); *Chase v. Tuttle*, 55 Conn. 455, 12 A. 874, 875–76 (1888) (upholding directors' assignment of an insolvent corporation's assets for the benefit of creditors).  The court in *Mills* suggested that the insolvency exception would not apply if the purpose of the sale was the continuation of the business in another corporation and not the bona fide winding up of its business.  *Mills*, 198 A. at 189.

[138] *Candor*, 257 Ill. App. at 197–98 ("The general rule is that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the directors may dispose of the assets without the sanction of the stockholders, when it is deemed of imperative necessity." (citing *Oskaloosa Sav. Bank*, 219 N.W. at 530)).

[139] *De Camp v. Alward*, 1876 WL 6785, at *3 (Ind. May 1, 1876) (Assignment for the benefit of creditors "may be made by the board of directors, without the express authority or consent of the stockholders." (citing *Dana v. Bank of U.S.*, 1843 WL 5023 (Pa. Jan. 1, 1843))).

[140] *Oskaloosa Sav. Bank*, 219 N.W. at 533 ("[I]t is an exception to the general rule that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the power of the directors to alienate the property is conceded where it is regarded as of imperative necessity.").

[141] *Sargent*, 54 Mass. at 497 ("The directors of an insolvent manufacturing corporation have authority to convey all the property of the corporation to one of its creditors, upon condition that he shall apply the property to the payment of his claim, and pay over the surplus, if any, to the treasurer of the corporation."); *In re E.T. Russell Co.*, 291 F. 809, 816 (D. Mass. 1923) (Assignment of all assets to creditor for payment of debts "is something the directors have power to do[,]" and also stating that a "sale" does not include an assignment for the benefit of creditors and, thus, "the powers of the corporation to execute assignments for the benefit of creditors are not conferred by law upon the stockholders.").

42

**A-397**

Michigan,[142] Minnesota,[143] Missouri,[144] Montana,[145] New York,[146] Pennsylvania,[147]

---

[142] *Boynton v. Roe*, 114 Mich. 401, 407, 72 N.W. 257, 259 (1897) ("It is well settled in this state than an insolvent corporation has the right to make a general assignment of its property for the benefit of its creditors, unless prohibited by its charter or a statute of the state. The directors may make such assignment for the benefit of creditors without the assent of the stockholders." (citation omitted)). *But see Michigan Wolverine Student Coop. v. Wm. Goodyear & Co.*, 314 Mich. 590, 600, 22 N.W.2d 884, 888 (1946) ("We are not in accord with the proposition that in this State the directors of a domestic corporation may sell all or substantially all of the assets of the corporation without the consent or approval of the holders of a majority of the shares, on the ground that the corporation was 'in financial distress' or 'in a failing condition.'").

[143] *Tripp v. Northwestern Nat'l Bank*, 41 Minn. 400, 403, 43 N.W. 60, 61 (1889) ("The weight of authority seems to be in favor of the proposition that the board of directors of a corporation to which the general management of its affairs is committed, without particular restriction, may authorize a general assignment of the corporate property to be made for the benefit of creditors when the condition of its affairs is such as to reasonably justify such a course, as in the case of insolvency.").

[144] *Common Sense Mining & Milling Co.*, 152 S.W. at 10–11 ("The corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."); *Calumet Paper Co. v. Haskell Show-Printing Co.*, 144 Mo. 331, 45 S.W. 1115, 1115 (1898) ("Where there is nothing in the charter or by-laws of an insolvent corporation prohibiting it, the board of directors of such a corporation may make an assignment of its property for the benefit of its creditors." (citing *Chew v. Ellingwood*, 1885 WL 7913, at *2 (Mo. Apr. 1, 1885); *Descombes v. Wood*, 91 Mo. 196, 4 S.W. 82, 85 (1887)); *Hutchinson v. Green*, 91 Mo. 367, 1 S.W. 853, 855 (1886) ("[W]hen the corporation becomes crippled, and unable to meet its obligations in the usual course of business, it is competent for the directors to make an assignment, and this they may do without the consent of the stockholders."); *Chew*, 1885 WL 7913, at *7 ("The right of the directors of a bank in failing circumstances to make an assignment for the benefit of creditors, where there is nothing in the charter or general laws forbidding it, we think, is clear.").

[145] *Wortman v. Luna Park Amusement Co.*, 61 Mont. 89, 201 P. 570, 571 (1921) ("To summarize some of the rules of common law so far as applicable to the instant case, a solvent and prosperous corporation could sell all of its assets only by unanimous consent of its stockholders; *if insolvent* and unable to execute the purposes of its creation, *by the directors* if the best interests of the stockholders demanded; in the proper pursuit of its business, and within the purposes of its creation, sell any or all assets even against the dissent of a minority or perhaps a majority of its stockholders." (emphasis added)).

[146] *Vanderpoel*, 140 N.Y. at 576 ("The corporation had the power to make an assignment. It was a corporate act and neither the statute nor any by-law, so far as the record shows, provided that it should be otherwise done than by the president and secretary or treasurer, under the authority of the board of directors.").

[147] *Ardesco Oil Co. v. N. Am. Oil & Mining Co.*, 66 Pa. 375, 382, 1871 WL 10959, at *6 (Pa. Jan. 3, 1871) ("[A]n insolvent corporation may make a general assignment for the benefit of

**A-398**

Texas,[148] and Wisconsin.[149]  Some authorities that reject the board-only insolvency

exception do so on the basis of state statutes.[150]

Yet no Delaware case expressly addresses or adopts the board-only insolvency

exception.[151]  The closest Delaware came to addressing the exception was in *Butler v. New*

*Keystone Copper Co.*[152]  Although the Chancellor in *Butler* did not mention the board-only

exception, he did cite two treatises that generally acknowledged the exception:  Thompson

---

creditors, and this power may be exercised by the directors, unless special provision to the contrary is made in the charter[.]" (citing *Dana*, 1843 WL 5023, at *8).

[148] *Birmingham Drug Co. v. Freeman*, 15 Tex. Civ. App. 451, 454, 39 S.W. 626, 628 (1897) ("[A]n insolvent corporation may make a general assignment for the benefit of its creditors, and this may be exercised by the directors, or under their authority.").

[149] *Goetz v. Knie*, 103 Wis. 366, 79 N.W. 401, 402 (1899) (acknowledging cases where "it was held that the board of directors of an insolvent corporation has power to make a voluntary assignment of all its property for the benefit of its creditors, without the authority or consent of its stockholders, unless restrained by its charter or other legal enactment.").

[150] *See, e.g.*, *Kyle v. Wagner*, 45 W. Va. 349, 32 S.E. 213, 214 (1898) (The court noted the existence of "numerous authorities" for the board-only insolvency exception but held that this rule was abrogated in West Virginia by statute providing for voluntary dissolution and windup of corporations by the stockholders instead of assignment of assets by directors.  Thus, the court held that the directors had no authority to direct the assignment of the entire property without the consent of the stockholders.).

[151] Although defendants raised the issue in *Russell v. Morris*, the Court of Chancery declined to address whether § 271 applied to "the sale of assets by a failing company facing an emergency situation" because it found that no emergency existed.  1990 WL 15618, at *4–5 (Del. Ch. Feb. 14, 1990) ("Defendants also contend that the transaction is valid and Russell's motion must be denied because § 271 does not apply to a sale of assets by a failing company facing an emergency situation.  Even assuming such an exception exists under our law, I need not address it here because the facts clearly indicate that no emergency requiring three hours notice of a board meeting existed."), *appeal refused*, 577 A.2d 754, 1990 WL 84682 (Del. 1990) (ORDER).

[152] *Butler*, 93 A. 380.

& Thompson's *Commentaries on the Law of Private Corporations* and Cook's *A Treatise on the Law of Corporations Having a Capital Stock*.[153]

Both *Butler* and *Allied* addressed circumstances under which a corporation could sell its assets with majority stockholder approval. We understand the Vice Chancellor's response, set forth in his final opinion in this matter, namely, that if a sale of assets obtained majority stockholder approval, "then the court did not need to address whether the corporation's condition was sufficiently dire that the directors alone would have had authority to effectuate the sale."[154] But we note that in *Allied Chemical*, Chancellor Wolcott observed that Section 64(a), the predecessor to Section 271(a), "remains in the law to-day [sic] and fixes in statutory form the rule imposed on *all* corporations organized under the general act by which they are to be governed *whenever* the question of the sale of their entire assets is under consideration."[155]

Therefore, *Butler* and *Allied Chemical* can also be read to suggest that Section 271's predecessor provided the only default rule and did not save room for a "board only" insolvency exception for transactions otherwise falling within the statute's ambit. We think this is the better view. For one thing, given the complete absence of any Delaware case support, it is not entirely clear that the exception was ever adopted in Delaware in the first

---

[153] *Butler* cites to Sections 2471 and 2424 of the Thompson & Thompson treatise. However, the reference to the board-only exception is in Section 2429 which the court in *Butler* did not cite.

[154] *Stream TV*, 2021 WL 5816820, at \*8. The Vice Chancellor acknowledged that "*Butler* did not specifically involve the insolvency-based exception that permits directors to sell all of a corporation's assets without stockholder approval." *Id.* at \*10. This was also true of *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 595–96 (1921).

[155] *Allied Chem.*, 120 A. at 490 (emphasis added).

**A-400**

place.  It follows, that before addressing whether a statute supersedes the common law, it must be established that the exception was indeed part of the common law in that jurisdiction.[156]  Ascertaining the initial question of what the common law *is* often is not an easy task.[157]  Stream argues that Delaware chose to adopt a majority vote exception instead of an insolvency exception.[158]  It argues that our General Assembly then codified the majority exception set forth in *Butler* in Section 64a.

---

[156] It is a fundamental principle of State sovereignty that the common law decisions of some jurisdictions are merely persuasive authority in the law of another jurisdiction until that State's courts adopt it. *See, e.g.*, *Casey v. Beeker*, 321 So. 3d 662, 670 (Ala. 2020) (concurring opinion) (discussing how treatises are only persuasive authority, may differ in applicability by jurisdiction, and can vary in persuasiveness based on the relevance and age of the source); *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 82, 69 N.E.3d 834, 859 ("[D]ecisions from other state courts and secondary sources are not binding on [the Supreme Court of Illinois] . . . ."); *Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*, 331 Mich. App. 416, 425, 952 N.W.2d 576, 581 n.2 (2020) ("Treatises are not binding authority but may be considered persuasive." (citing *Fowler v. Doan*, 683 N.W.2d 682, 686 (Mich. Ct. App. 2004))).  *See generally* A. W. B. Simpson, *The Rise and Fall of the Legal Treatise: Legal Principles and the Forms of Legal Literature*, 48 U. Chi. L. Rev. 632, 676 (1981) ("From the beginning, the treatise in America had to contend with the considerable number of different jurisdictions in which the law was administered, each state potentially possessing its own common law.  This obviously presented an obstacle to the exposition of a universal common law by the text writers.").

[157] This is evidenced by the painstaking work done by the American Law Institute in formulating the various Restatements of the Law.  For example, as the recent draft of the Restatement of the Law of Corporate Governance, Tentative Draft No. 1 (April 2022) notes at its outset that Restatements "aim at clear formulations of the common law . . . ," and that the Restatement process seeks first to "ascertain the nature of the majority rule."  *Id*. at x.  "If most courts faced with an issue have resolved it in a particular way, that is obviously important to the inquiry."  *Id.*  The draft further observes that:

> Like a Restatement, the common law is not static.  But for both a Restatement and the common law the change is accretional.  Wild swings are inconsistent with the work of both a common-law judge and a Restatement.  And while views of which competing rules lead to more desirable outcomes should play a role in both inquiries, *the choices generally are constrained by the need to find support in sources of law.*

*Id.* at x–xi (emphasis added).

[158] Opening Br. at 31–34.

Even if we were to determine that a board-only insolvency exception was part of our common law at one time, the pivotal question is whether it survived the enactment of Section 64a. As explained below, we do not believe it did, assuming, *arguendo*, it existed.

In 1917, the Delaware General Assembly responded to *Butler*'s affirmation of the common law unanimity rule by enacting Section 64a. This section superseded the common law rule requiring unanimous consent to the sale, lease or exchange of all the property and assets of the corporation. Instead, it provided for a majority vote of the outstanding stock:

> Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions as its board of directors deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of a majority of the holders of the voting stock issued and outstanding, provided, however, that the certificate of incorporation may require the vote or written consent of a larger proportion of the stockholders.[159]

When Delaware comprehensively revised its General Corporation Law in 1967, Section 64a was renumbered Section 271(a), and language was added to clarify that the provision covered sales, leases, or exchanges of "substantially all" assets and that permissible consideration included "money or other property."[160] The General Assembly

---

[159] 29 Del. Laws ch. 113, § 17 (1917). Section 64a was amended in 1925 to replace the phrase "a majority of the holders" with "the holders of a majority" and "a larger proportion of the stockholders" with "a larger proportion of the stock issued and outstanding." 34 Del. Laws ch. 112, § 13 (1929). In 1929, the statute was amended again to allow the consideration to include "shares of stock in, and/or other securities of, any other corporation or corporations." 36 Del. Laws ch. 135, § 19 (1925).

[160] 56 Del. Laws ch. 50, § 271 (1967).

also added Section 272.[161]   Section 272 clarified that Section 271 does not apply to mortgages or pledges of corporate assets.[162]   The Delaware General Corporation Law Revision Committee, the group tasked with drafting the comprehensive revisions, considered adding a specific exception for sales in the ordinary course of a corporation's business, but ultimately decided not to do so.[163]   Other provisions were eliminated as unnecessary or redundant.[164]

---

[161] 56 Del. Laws ch. 50, § 272 (1967); *see* 8 *Del. C.* § 272.

[162] 3 Robert S. Saunders, Allison L. Land, Jennifer C. Voss, & Cliff C. Gardner, *Folk on the Delaware General Corporation Law* § 272.01 (7th ed., 2022-1 Supp.); *accord* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 10.1 (4th ed. 2022-1 Supp.).

[163] *See* Samuel Arsht, *Memorandum to the Corporation Law Revision Committee on Folk Report on Proposed 1967 Amendments* (Sept. 14, 1965) ("Folk points out many states and Model Act expressly dispense with stockholder approval for sales of all assets in usual course of business and for mortgages or pledges, unless charter requires it.  He suggests appropriate language to this effect at page 209."); *Minutes of the Twenty-Second Meeting of Delaware Corporate Law Study Committee* (Sept. 14, 1965) ("Disapproved the recommendation with respect to sale of all assets in the course of business.").

[164] For example, as the Vice Chancellor observed, prior to 1967, the DGCL contained a provision that authorized "[s]ales of the property and franchises" of a corporation "under a decree of Court . . . ." *Stream TV*, 250 A.3d at 1038 (alteration in original).  That provision did not require either board approval or a stockholder vote to consummate a sale of assets to a secured creditor by decree.  "As part of the 1967 revision, the General Assembly eliminated this provision," likely because it is "unnecessary" given the rights afforded to secured creditors. *Id.* Section 271 was subsequently amended five times.  None of the amendments bears on this analysis. 57 Del. Laws ch. 148, § 30 (1969) (Amended to remove the reference to stockholder approval by written consent, as this was made redundant by § 228, and to add that the notice to stockholders of a meeting to vote on a proposed transaction under § 271 must state that this is the purpose of the meeting.); 64 Del. Laws ch. 112, § 55 (1983) (adding a clause to cover non-stock corporation); 65 Del. Laws ch. 127, § 9 (1985) (inserting "the holders of" into § 271(a) between "resolution adopted by" and "a majority of the outstanding stock"); 75 Del. Laws ch. 30, § 28 (2005) (adding subsection (c), which permits transfers of all or substantially all assets of a parent corporation to a wholly-owned subsidiary without a stockholder vote); 77 Del. Laws ch. 253, § 58 (2010) (As part of a comprehensive revision of the DGCL to address nonstock corporations, Section 271(a) was revised to provide that, in addition to members who are entitled to vote for the election of a nonstock corporation's governing body, any other members given the right to vote on the sale of all or substantially all of

48

**A-403**

The Vice Chancellor concluded that Section 271 superseded only one aspect of the common law rule, namely, the unanimity requirement but "did not supersede the common law's recognition that directors could sell the assets of an insolvent or failing firm without stockholder approval."[165]  We disagree.  In *A.W. Financial Services, S.A. v. Empire Resources, Inc*.,[166] this Court set forth the analysis we employ when determining whether the enactment of a statute has superseded the common law.[167]  We applied the following three-pronged inquiry: (1) does explicit language in the statute supersede or limit the common law; (2) does the statutory scheme evidence a legislative intent to occupy the field; and (3) does the statutory scheme actually conflict with the common law.[168]

The plain language of Section 271 suggests the answer to the first two questions as Section 271 applies to "*[e]very corporation . . .*," and requires a vote by the holders of a majority of the corporation's outstanding shares when their corporation engages in a sale, lease, or exchange of "all or substantially all of its property and assets."[169]  The creation of Section 64a's majority vote rule indisputably replaced the common law unanimity rule.[170]

---

the corporation's assets under the corporation's certificate of incorporation or by-laws are also entitled to do so.).

[165] *Stream TV*, 2021 WL 5816820, at *13.

[166] 981 A.2d 1114 (Del. 2009).

[167] *Id.* at 1123.  The concept of "'[s]uperseder' describes circumstances where a statute replaces or ousts ('supersedes') the common law." *Id.* at 1121.  *See Cline v. Prowler Indus. of Maryland, Inc.*, 418 A.2d 968, 977–78 (Del. 1980) (analyzing whether it was the General Assembly's intent to supersede the doctrine of strict tort liability in cases involving a sale of goods when it adopted the Uniform Commercial Code).

[168] *A.W. Fin. Servs., S.A.*, 981 A.2d at 1123.

[169] 8 *Del. C.* § 271(a) (emphasis added).

[170] One might logically view the statute as a restriction, rather than expansion of stockholder rights. *See Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376 (Del. Ch. 2004) ("The origins of §

**A-404**

The question is whether the rule's exceptions were abrogated as well. We think the better view is that, when the common law unanimity rule was superseded, so too was any insolvency exception to that rule.[171] This conclusion is reinforced by the plain language of Section 271, which contains no exceptions and is not ambiguous.[172] As such, the language

271 did not rest primarily in a desire by the General Assembly to protect stockholders by affording them a vote on [the] transactions previously not requiring their assent. Rather, § 271's predecessors were enacted to address the common law rule that invalidated any attempt to sell all or substantially all of a corporation's assets without unanimous stockholder approval.").

[171] Cases from other jurisdictions are mixed on whether similar statutes apply to a sale of all or substantially all assets by the directors of an insolvent corporation. In *Mills v. Tiffany's*, the Supreme Court of Errors of Connecticut held that a Connecticut statute, providing that a corporation "may sell, lease, or exchange all its assets when that action is authorized by a vote of two-thirds of the outstanding stock of each class at a meeting duly warned and held for the purpose[,]" did not apply to a sale of all assets of an insolvent corporation made for the purpose of winding up its affairs. 198 A. at 189. That court cited *Basset v. City Bank & Trust Co.*, which explained that the statute was intended to supersede the common law unanimity rule and thus, transactions to which that general rule did not apply at common law were "outside the scope and purpose of the statute[.]" 165 A. at 561. However, in *Michigan Wolverine Student Cooperative*, the Supreme Court of Michigan stated that "[t]he statute does not authorize the board of directors of a corporation to sell all or substantially all of the corporate assets whenever, in the opinion of the directors, the corporation is not a going and prosperous concern, or is in a failing condition. If a corporation is no longer a going concern the statute provides several methods whereby the corporation may wind up its affairs, dispose of its assets, and cease to exist. None of these methods authorizes a board of directors to wind up corporate affairs and dispose of the assets without action by the stockholders, or by a court." *Michigan Wolverine Student Coop.*, 22 N.W.2d at 888. Yet this is *dicta* because the Supreme Court of Michigan ultimately assumed, *arguendo*, there was room in the statute for such an exception, but found that the corporation was solvent, and therefore, that the common law exception did not apply (even assuming it existed and survived the enactment of Michigan's § 271 analogue). *See also* 6A Fletcher Cyc. Corp. § 2949.21 (2021) (observing that "[a] question may arise concerning what bearing these statutory provisions have on the common-law rules regarding a corporation in financial distress or in a failing condition. Some of these statutory requirements have been held to apply even though a corporation is insolvent. On the other hand, in some jurisdictions, expressly or by implication, the requirements of such statutes have been held not to apply to insolvent corporations." (footnotes omitted)).

[172] *See Balma v. Tidewater Oil Co.*, 214 A.2d 560, 562 (Del. 1965) (stating that "[w]ords in a statute must be given ordinary meaning[,]" and that "[c]ourts have discretion to construe statutes only when they are obscure or doubtful in their meaning. Where its language is clear and unambiguous, a statute must be held to mean that which it plainly states, and no room is [left] for construction.").

of the statute should be conclusive of the General Assembly's intent.[173]  In this sense, a
"board only" insolvency exception is inconsistent with a statutory default majority vote
rule.[174]  Thus, we conclude that Section 271 was intended to occupy the field and that no
such insolvency exception survives, assuming *arguendo*, that it existed in the first place.[175]

As a matter of policy, unearthing a "board only" insolvency exception cited only
decades ago, and never by any Delaware court, would foster uncertainty and potential
inconsistency in a context where predictability is crucial for corporations that have availed
themselves of Delaware law.  "Our General Assembly has [] recognized the need to
maintain balance, efficiency, fairness, and predictability in protecting the legitimate
interests of all stakeholders, and to ensure that the laws do not impose unnecessary costs
on Delaware entities."[176]  Promoting stability in our DGCL is and remains of paramount

---

[173] *See Dewey Beach Enters., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307
(Del. 2010) ("If [a statute] is unambiguous, no statutory construction is required, and the words in
the statute are given their plain meaning."); *Grand Ventures, Inc.*, 632 A.2d at 68 (observing that,
"[i]n the absence of any ambiguity, the language of the statute must be regarded as conclusive of
the legislature's intent[,]" and in such a circumstance, "[t]he judicial role is then limited to an
application of the literal meaning of the words"); *Coastal Barge Corp. v. Coastal Zone Indus.
Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985) (explaining that if a statute is unambiguous, "the
Court's role is then limited to an application of the literal meaning of the words." (citing *Delaware
Solid Waste Auth. V. News-Journal Co.*, 480 A.2d 628, 634 (Del. 1984))).

[174] *See also* Balotti & Finkelstein, *supra* note 162, § 10.7 ("As a practical matter, in many instances
federal bankruptcy statutes and other statutes governing creditors' rights have displaced the
common law exception by providing explicit methods for addressing proposed asset dispositions
by failing businesses.").

[175] *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 606 (Del. Ch.), *aff'd,* 316 A.2d 619 (Del. 1974)
("If the sale is of assets quantitatively vital to the operation of the corporation and is out of the
ordinary and substantially affects the existence and purpose of the corporation, then it is beyond
the power of the Board of Directors.").

[176] *Salzberg*, 227 A.3d at 136.

51

**A-406**

importance.[177]    Stability and predictability are not advanced by reading Section 271 to

embody a common law exception that was never the basis of a single holding by any

Delaware court nor by other courts, according to the parties, for decades.

Instead, we think, the focus should be on the statute's plain language.  As we said

in *Salzberg*, the "most important consideration for a court in interpreting a statute is the

words the General Assembly used in writing it."[178]    As to Section 271 in particular, this

notion was reinforced by the Court of Chancery when then-Vice Chancellor Strine wrote:

---

[177] In aid of this goal, for example, Article IX of the Delaware Constitution requires a two-thirds supermajority vote of both chambers of our General Assembly to amend the DGCL.  Del. Const. art. IX, § 1 ("No general incorporation law, nor any special act of incorporation, shall be enacted without the concurrence of two-thirds of all the members elected to each House of the General Assembly.").

[178] *Salzberg*, 227 A.3d at 113 (quotation marks omitted).  As we note above, we need not reach the question of whether a private foreclosure transaction, such as the one here, falls within the plain language of Section 271, and specifically, whether it would qualify as a "sale, lease or exchange" within the meaning of Section 271.  The Vice Chancellor, relying on dictionary definitions, provided the following observations:

> Black's Law Dictionary contains an extensive section on the term "sale."  The hallmarks of the various definitions include (i) the status of the parties as "buyer" and "seller," (ii) the exchange of money or other property in return for goods and services, and (iii) a transfer or title.  *See Sale*, Black's Law Dictionary (11th ed. 2019).  Black's Law Dictionary distinguishes a "sale" from a "foreclosure sale," defining "foreclosure sale" to mean "[t]he sale of mortgaged property, authorized by a court decree or a power-of-sale clause, to satisfy the debt."  In a separate entry, Black's Law Dictionary defines the term "foreclosure" as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property."

> Black's Law Dictionary defines "exchange" to mean "[t]he act of transferring interests, each in consideration for the other," and defines the related term "bargained-for-exchange" to mean "[a] benefit or detriment that the parties to a contract agree to as the price of performance."  As with the definition of a "sale," the hallmarks of these definitions include a voluntary transfer of interests between similarly situated parties.

**A-407**

[O]ur courts arguably have not always viewed cases involving the interpretation of § 271 through a lens focused by the statute's plain words. Nonetheless, it remains a fundamental principle of Delaware law that the courts of this state should apply a statute in accordance with its plain meaning, as the words that our legislature has used to express its will are the best evidence of its intent.  To analyze whether the vote requirement set forth in § 271 applies to a particular asset sale without anchoring that analysis to the statute's own words involves an unavoidable risk that normative preferences of the judiciary will replace those of the General Assembly.[179]

Accordingly, we clarify that there presently is no insolvency exception embedded in Section 271.

Because we have concluded that the Charter provision and Section 271 are materially different, we have not looked to Section 271 to interpret the Charter.  And the parties have identified no public policy that would detract from our analysis of the Charter.[180]  Rather, enforcing the unambiguous Charter provision is consistent with our

---

*Stream TV*, 250 A.3d at 1040 (alterations in original) (emphasis omitted).  *See also In re E.T. Russell Co.*, 291 F. at 816 ("I am unable to extend the meaning of the word 'sale,' so that it will include an assignment for the benefit of creditors.").

[179] *Hollinger Inc.*, 858 A.2d at 376–77 (footnotes omitted).

[180] As we noted earlier, the Court of Chancery identified a single public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest."  *Stream TV*, 250 A.3d at 1042.  The court cited to then Vice-Chancellor Strine's transcript ruling in *Gunnerman v. Talisman Capital Talon Fund, Ltd.* where he observed that the DGCL distinguishes between financing transactions, mortgage transaction, collateral transactions, and sales of assets.  *Id.* at 1043 (citing *Gunnerman v. Talisman Cap. Talon Fund, Ltd.*, C.A. No. 1894-VCS (Del. Ch. July 12, 2006) (TRANSCRIPT)).  Following this reasoning, the court, in its P.I. Opinion, reasoned that interpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL.  *Id.* at 1021.  We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271.  Moreover, Section 272 is a default rule that corporations can alter in their charters, which Stream has done here.

**A-408**

policy of seeking to promote stability and predictability in our corporate laws,[181] and with recognition that Delaware is a contractarian state.[182]

## IV. CONCLUSION

For the reasons stated herein, we **VACATE** the injunction, **REVERSE** the declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[181] *See Salzberg*, 227 A.3d at 137 ("The policies underlying the DGCL include certainty and predictability, uniformity, and prompt judicial resolution to corporate disputes.").

[182] *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (2015) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties." (quoting *NACCO Indus., Inc. v. Applican Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009))); *see also A & J Cap., Inc. v. L. Off. Of Krug*, 2018 WL 3471562, at *6 (Del. Ch. July 18, 2018) ("Delaware's pro-contractarian policy in the alternative entity space is alive and well.").

**A-409**

# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

J. TRAVIS LASTER
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 14, 2022

Andrew Dupre, Esquire
McCarter & English
405 North King Street, 8th Floor
Wilmington, DE 19801

Jenness E. Parker, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801

RE:    *Stream TV Networks, Inc. v. Seecubic, et al.,*
       C.A. No. 2020-0766-JTL

Dear Counsel:

There are three motions pending:

- A motion for entry of a final order filed by Stream TV Network, Inc.

- A motion for a status quo order filed by Seecubic, Inc.

- A motion to expedite filed by Seecubic.

Based on my review of the motions and Seecubic's supplemental counterclaims, derivative complaint, and third-party claims (the "Supplemental Claims"), it appears to me that the only matters that warrant expedited consideration in the near term are the motion for a status quo order and the motion to expedite. I would like to schedule a hearing on those motions for Wednesday, July 20, 2022, at 12:45 p.m. I will be hearing the application during a break in trial, so I can only allot thirty minutes for the hearing. Each side will have fifteen minutes for its presentation. Because I will be in the midst of an in-person trial, I would like to hold the hearing using the zoom videoconferencing system.

The motion for entry of a final order should be briefed in due course. For the reasons stated in my order dated July 5, 2022, it is my intent to enter a *partial* final judgment in accordance with Rule 54(b) that implements the mandate from the Delaware Supreme Court. I would suggest that briefing be completed within three weeks. I would hope that the parties might be able to agree as to form on an implementing order, although that would require removing certain tendentious paragraphs from Stream's proposed order. For example, it is not clear to me how or why the court would order the bond turned over to Stream without a proceeding to determine the amount of the damages. It may well be that Stream will show that its damages from the improvidently entered injunction warrant recovery of the entire bond, but that remains to be seen. It is also not clear to me why Seecubic would not agree to restore Stream's assets in light of the Delaware Supreme Court's decision, subject to any separate relief that Seecubic might seek here or in the

**A-410**

EXHIBIT C

*Stream TV Networks, Inc. v. Seecubic, et al.,*
C.A. No. 2020-0766-JTL
July 14, 2022
Page 2 of 2

foreclosure action. It is thus not clear to me that a mandatory injunction is necessary. It rather seems to me that the appropriate step is to enter a partial final judgment as to the declaratory relief that flows from the Delaware Supreme Court mandate. If Seecubic fails to respect the implications of the declaratory relief, then an application for mandatory injunctive relief would be a logical next step. Perhaps with this guidance, the parties can reach agreement on a form of order that would moot the motion.

It also seems likely that there is a motion to dismiss coming. Stream made clear in its opposition to the motion to file the Supplemental Claims that it believes they fail to state claims on which relief can be granted. I am inclined to think that the outcome of the hearing on the motions to expedite and for a status quo order will help clarify the schedule for briefing and considering such a motion.

Sincerely yours,

*/s/ J. Travis Laster*

J. Travis Laster
Vice Chancellor

JTL/krw
cc:    All counsel of record and parties (by *File & ServeXpress*)

1

   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

---------------------------------------
STREAM TV NETWORKS,                      :
             Plaintiff,                  :
        v                                : C. A. No.
                                         : 2020-0766-JTL
SEECUBIC, INC.,                          :
                                         :
             Defendant.                  :
---------------------------------------
SEECUBIC, INC.,                          :
             Counterclaim and            :
             Third-Party Plaintiff,      :
        v                                :
                                         :
STREAM TV NETWORKS, INC.,                :
                                         :
             Counterclaim Defendant,     :
                                         :
        and                              :
                                         :
MATHU RAJAN and RAJA RAJAN,              :
                                         :
             Third-Party Defendants.     :
---------------------------------------

                      - - -
                   Chancery Court Chambers
                   Leonard L. Williams Justice Center
                   500 North King Street
                   Wilmington, Delaware
                   Wednesday, July 20, 2022
                   12:45 p.m. ampm
                      - - -
BEFORE: HON. J. TRAVIS LASTER, Vice Chancellor
                      - - -

 ORAL ARGUMENT and RULINGS OF THE COURT ON SEECUBIC'S
  POST-REMAND MOTION TO PRESERVE THE STATUS QUO AND
        MOTION TO EXPEDITE  -HELD VIA ZOOM

--------------------------------------------------------
                CHANCERY COURT REPORTERS
           Leonard L. Williams Justice Center
         500 North King Street - Suite 11400
              Wilmington, Delaware 19801
                   (302) 255-0523

26

1   the assets and all that.

2                       We need to be able to raise money and

3   sign commercial contracts and otherwise behave

4   normally.  That's what we need to do.

5                       THE COURT:  All right.

6                       I'm going to go ahead and give you an

7   answer now, in the interest of time.  I very much

8   appreciate counsel's presentations.  It's always good

9   to see you-all, even under the current circumstances.

10                      We are here on remand after the

11  Delaware Supreme Court's reversal of a decision in

12  which I declared that the omnibus agreement was valid.

13  My understanding of the state of play is not that the

14  omnibus agreement is valid pending some type of

15  stockholder vote.  I think the omnibus agreement, at

16  this point, is not valid.

17                      I do agree that it required

18  stockholder approval to become valid, as held by the

19  Delaware Supreme Court.  It didn't receive stockholder

20  approval.  And so at this point, I don't view the

21  omnibus agreement as in play anymore.  I think it just

22  hasn't gone into effect.

23                      That's my starting point.  What flows

24  from that is that I do think title to the assets

CHANCERY COURT REPORTERS

**A-413**

 1   should be at Stream.  I think, technically, title to

 2   the assets never left Stream, and I think, at this

 3   point, equitable title to the assets has to be viewed

 4   as at Stream.

 5              In terms of the TRO situation, that

 6   puts us in a fundamentally different position than we

 7   were when we were last together over 18 months ago.

 8   At that point, I thought and understood that there was

 9   a litigable dispute over who actually had the right to

10   control the assets, with Stream on one side saying,

11   "This agreement is invalid, we have control of them,"

12   and SeeCubic on the other side saying, "No, the

13   omnibus agreement gives us equitable title to the

14   assets."

15              And my view was that the irreparable

16   harm in that situation flowed from the fact that you

17   had two people, each one of whom asserted they had the

18   right to own and determine the fate of these assets.

19   I thought, therefore, that a status quo order was

20   necessary to make sure that neither side did anything

21   while that issue was contested.

22              We got to a point where I held that

23   the assets were validly SeeCubic's under the omnibus

24   agreement.  That is the decision that has been

28

1  reversed.  And so, in my view, we're in a world where

2  title right now, both equitable and legal, to the

3  extent that one can wind the clock back, is in the

4  hands of Stream.

5              Then the question becomes what am I

6  being asked to do?  And technically what I'm being

7  asked to do today is to allow SeeCubic to keep the

8  assets pending the result of a foreclosure proceeding.

9  I don't think I can do that.  That may well be the

10  status quo today, in that SeeCubic has the assets, but

11  the reality is, based on the Delaware Supreme Court

12  decision, SeeCubic, right now, shouldn't have the

13  assets.

14              Now, that doesn't mean that SeeCubic

15  has lost whatever other rights it has.  Whatever

16  creditor rights SeeCubic had or may have been assigned

17  independent of the omnibus agreement, those rights

18  still exist.  Those rights, as I understand it, are

19  being enforced in the foreclosure action in Superior

20  Court.  And those rights, again, as I understand it,

21  are of a magnitude where, at least in theory, Stream

22  could raise money to satisfy that debt and then go on

23  free of that claim.

24              I don't know whether they can or not,

CHANCERY COURT REPORTERS

**A-415**

29

1 | but by virtue of being the proper owner of these
2 | assets, I think they have the right to try.  In other
3 | words they should get to, if they want to, seek to
4 | raise capital based on these assets and try to satisfy
5 | the debts that they owe.
6 | I don't think that there's any basis
7 | for any type of relief that would leave these assets
8 | in SeeCubic's hands.
9 | Then I get to the point of, well, what
10 | types of claims does SeeCubic actually have.  And I
11 | think SeeCubic has colorable claims -- I would even
12 | say fairly litigable claims -- for breach of duty and
13 | unjust enrichment.  The unjust enrichment claim seems
14 | particularly litigable because I've read the *Fleer*
15 | case.
16 | It seems to me there's a setting
17 | where, depending on how the facts come out, SeeCubic
18 | could have a sizable claim for increasing the value of
19 | the company.  I also understand that Stream doubtless
20 | will argue that what SeeCubic actually has done is
21 | harm the value of the company.  That's a factual
22 | dispute.  We've got to have some type of hearing on
23 | that.  I can't decide it today.
24 | Then the question becomes, in my mind,

**A-416**

35

1    I want the parties to try to move forward with some

2    type of Rule 54(b) order that implements the Delaware

3    Supreme Court's decision.

4                I think that order needs to result in

5    these assets being moved back to Stream.  If you-all

6    were able to agree on some type of person to help you

7    transition, I would happily enter that type of order.

8    It seems to me like a good idea.  And if someone wants

9    to apply for it and the other people want to resist

10   it, we can go that way too.  But at least for purposes

11   of today, I'm denying the application, and you'll have

12   to move forward on that basis.

13               I apologize for not being able to take

14   any questions or discuss things with you further.

15   I've got a bunch of people waiting for me upstairs and

16   I need to go back and continue this trial.

17               I hope you-all have a good rest of the

18   afternoon.  Thank you for your time.

19               ATTORNEY PARKER:  Thank you, Your

20   Honor, for your time.

21               ATTORNEY DUPRE:  Thank you, Your

22   Honor.

23          (Proceedings concluded at 1:29 p.m.)

24                      –  –  –

CHANCERY COURT REPORTERS

**A-417**

36

```
 1                      CERTIFICATE
                        _____
 2

 3              I, JULIANNE LaBADIA, Official Court

 4   Reporter for the Court of Chancery of the State of

 5   Delaware, Registered Diplomate Reporter, Certified

 6   Realtime Reporter, and Delaware Notary Public, do

 7   hereby certify the foregoing pages numbered 3 through

 8   35, contain a true and correct transcription of the

 9   proceedings as stenographically reported by me at the

10   hearing before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated.

12              IN WITNESS WHEREOF, I have hereunto

13   set my hand at Wilmington this 21st day of July, 2022.

14

15

16

17                   /s/ Julianne LaBadia
                     ---------------------------
18                      Julianne LaBadia
                      Official Court Reporter
19                 Registered Diplomate Reporter
                    Certified Realtime Reporter
20                    Delaware Notary Public

21

22

23

24
```

GRANTED

EFiled: Aug 09 2022 01:29PM EDT
Transaction ID 67914383
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| STREAM TV NETWORKS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 2020-0766 JTL |
| | ) |
| SEECUBIC, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |
| SEECUBIC, INC., | ) |
| | ) |
| Counterclaim and | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| STREAM TV NETWORKS, INC., | ) |
| | ) |
| Counterclaim Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| MATHU RAJAN and RAJA RAJAN, | ) |
| | ) |
| Third-Party Defendants. | ) |

## [PROPOSED] ORDER GRANTING STREAM TV NETWORKS, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER

WHEREAS, on August 1, 2022 Plaintiff/Counterclaim Defendant Stream TV Networks, Inc. ("Stream") filed a Motion for a Temporary Restraining Order (the "TRO Motion"); and

WHEREAS, the Court, having considered the TRO Motion, all responses thereto, and all further related arguments and submissions;

IT IS HEREBY ORDERED this _____ day of _____, 2022 that:

1.      The TRO Motion is GRANTED.

2.      Effective immediately and until further Order from this Court, SeeCubic, Inc. ("SeeCubic"), including all those acting in concert with SeeCubic, is hereby ENJOINED from taking any action to sell Stream's Assets (as defined in the TRO Motion) pending the Court's decision on Stream's Renewed Entry of Partial Final Judgment under Rule 54(b) (Dkt. 252).


_____
The Honorable J. Travis Laster

2

| | |
|---|---|
| This document constitutes a ruling of the court and should be treated as such. | |
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | J Travis Laster |
| **File & Serve Transaction ID:** | 67888677 |
| **Current Date:** | Aug 09, 2022 |
| **Case Number:** | 2020-0766-JTL |
| **Case Name:** | CONF ORD ON DISC - STREAM TV NETWORKS, INC. v. SEECUBIC, INC. |
| **Court Authorizer:** | J Travis Laster |

**Court Authorizer Comments:**

Stream has a colorable claim to its assets and faces a threat of irreparable harm if it must address creditors' claims without the benefit of its assets. Accordingly, absent any further rulings by the court, the order of events will be as follows:

1. The court will review the parties' submissions and enter a Rule 54(b) order that provides for SeeCubic to restore Stream's assets to Stream.
2. SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b) order.
3. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream. SeeCubic must do so based on a status quo where Stream has title to and possession of its assets, not a status quo in which SeeCubic acquired possession based on a decision that the Delaware Supreme Court has held is erroneous.
4. Any party may seek to modify this order for good cause shown. If SeeCubic wishes to exercise creditors' rights, it must file an affirmative application spelling out how it acquired those rights, explaining the applicable law governing those rights, and seeking leave to exercise those rights.

**/s/ Judge J Travis Laster**

**A-421**

EFiled: Sep 28 2022 10:01AM EDT
Transaction ID 68178443
Case No. 2020-0766-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STREAM TV NETWORKS, INC.    )    C.A. No. 2020-0766-JTL
OMNIBUS AGREEMENT LITIGATION    )

### MEMORANDUM OPINION

Date Submitted: September 21, 2022
Date Decided: September 28, 2022

Steven P. Wood, Andrew S. Dupre, Brian R. Lemon, Sarah E. Delia, Stephanie H. Dallaire, Travis J. Ferguson, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendant Stream TV Networks, Inc. and for Third-Party Defendants Mathu Rajan and Raja Rajan.*

Jenness E. Parker, Bonnie W. David, Lilianna Anh P. Townsend, Trevor T. Nielsen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Eben P. Colby, Marley Ann Brumme, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts; *Attorneys for Defendants and Counterclaim Plaintiff SeeCubic, Inc.*

Steven L. Caponi, K&L GATES LLP, Wilmington, Delaware; *Attorney for Interested Party Hawk Investment Holdings Ltd.*

**LASTER, V.C.**

**EXHIBIT F**

There once was an agreement between Stream TV Networks, Inc., its secured creditors, and fifty-two of its stockholders (the "Omnibus Agreement"). In the Omnibus Agreement, the parties agreed that Stream would transfer all of its assets (the "Legacy Stream Assets") to a newly formed entity controlled by Stream's secured creditors. In exchange, the secured creditors agreed to extinguish their claims against Stream. As part of the deal, Stream's minority stockholders received the right to exchange their shares in Stream for shares in the new entity, and Stream received the right to one million shares of common stock in the new entity. The creditors subsequently formed SeeCubic, Inc. as the entity contemplated by the Omnibus Agreement.

When Stream entered into the Omnibus Agreement in May 2020, it was insolvent and failing. Stream had defaulted on its secured debt. Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream had even failed to make the payments necessary to maintain the patents on its technology, which were essential to its business. Stream's equity was under water and valueless.

Realizing that without a solution, Stream and its stockholders would be left with nothing, a majority of the members of Stream's board of directors (the "Board") approved the Omnibus Agreement. After Stream entered into the Omnibus Agreement, Stream's controlling stockholders reasserted their control and reconstituted the Board. They searched for every argument they could think of for refusing to comply with the Omnibus Agreement.

In September 2020, Stream filed this action, seeking a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. SeeCubic

**A-423**

counterclaimed, seeking a declaration that the Omnibus Agreement was valid and an injunction against Stream trying to interfere with it.

In December 2020, the trial court issued a decision that rejected a barrage of arguments by Stream. The court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted). After the issuance of the Injunction Decision, SeeCubic acquired the Legacy Stream Assets and built a business based on them, turning a failing firm into a viable venture. In September 2021, the court granted a motion for summary judgment declaring the Omnibus Agreement to be a valid agreement. The court entered a partial final judgment in favor of SeeCubic, and Stream appealed.

In June 2022, the Delaware Supreme Court reversed the trial court's decision, vacated the partial final judgment, and declared that the Omnibus Agreement could not have become effective without the approval of the holders of a majority of the Class B shares of Stream. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022) (the "Supreme Court Decision"). The high court remanded for further proceedings. The mandate issued on July 1. Dkt. 237 (the "Mandate").

Stream and SeeCubic disagreed about how to implement the Mandate. Stream argued that the Mandate necessitated the rescission of all of the actions that SeeCubic had taken under the color of the Omnibus Agreement. Stream maintained that anything short of the immediate return of the Legacy Stream Assets would be an affront to the Delaware

2

**A-424**

Supreme Court. SeeCubic argued that it had other claims against Stream and that the court should defer returning any of the Legacy Stream Assets to Stream pending adjudication of those claims.

On August 7, 2022, the trial court entered a partial final judgment which determined that in light of the Mandate, the Omnibus Agreement did not validly transfer legal title to any of the Legacy Stream Assets from Stream to SeeCubic. Dkt. 266 (the "Partial Final Judgment"). The court directed the parties to "cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4.

When the court implemented the Partial Final Judgment, SeeCubic was making efforts to assert the rights of Stream's secured creditors. The secured creditors maintained that they held a security interest in all of the Legacy Stream Assets and that they could levy on the Legacy Stream Assets to satisfy Stream's outstanding debt, which they claimed exceeded £350 million. They asserted that SeeCubic could retain the Legacy Stream Assets as their designee and agent for purposes of exercising the secured creditors' rights.

The Partial Final Judgment enjoined SeeCubic and those acting in concert with it from taking any action to "use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." *Id.* ¶ 5 (the "Post-Remand Injunction"). The Post-Remand Injunction prevented the secured creditors from acting in concert with SeeCubic to exercise their creditors' rights.

**A-425**

Hawk Investment Holdings Ltd. ("Hawk") is a secured creditor of Stream. Hawk has moved to modify the Post-Remand Injunction to enable Hawk to exercise its creditors' rights. Dkt. 274 (the "Motion").

In its Motion, Hawk details the expansive rights it possesses as a secured creditor, including a security interest in all of the Legacy Stream Assets and a specific pledge of the stock of Stream's wholly owned subsidiaries. The pertinent security agreements provide that after a default by Stream, Hawk has the right to require Stream to marshal and turnover the Legacy Stream Assets so that Hawk can levy on them for purposes of satisfying Stream's debt. The security agreements make clear that Hawk is not limited to pursuing a judicial foreclosure. Although Hawk can follow that course, Hawk also can enforce their rights by extra-judicial means.

Hawk correctly notes that the fact of Stream's default has been established. In the Injunction Decision, this court found that Stream defaulted under the terms of its secured debt no later than February 2020. 250 A.3d at 1023. That finding was not challenged on appeal, and the Supreme Court Decision adopted it. 279 A.3d at 323 n.17.

Hawk has designated SeeCubic as its agent and designee for administering its rights, including for holding the Legacy Stream Assets that are the collateral for the secured debt. Hawk argues that in light of its rights, any unwinding of the transfer of the Legacy Stream Assets under the Omnibus Agreement would be a futile act. With Hawk having made SeeCubic its designee, the Legacy Stream Assets may visit with Stream temporarily, but soon will find themselves back with SeeCubic.

**A-426**

In related filings, SeeCubic has supported Hawk's request for relief and argued that leaving SeeCubic in possession of the Legacy Stream Assets has the additional benefit of avoiding difficulties in identifying which of SeeCubic's assets are Legacy Stream Assets. SeeCubic maintains that it acquired some of Stream's assets by means independent of the Omnibus Agreement, so SeeCubic's ownership of those assets is not affected by the Partial Final Judgment. SeeCubic also argues that it has improved other assets such that they are no longer entirely Stream Legacy Assets. SeeCubic views both categories of assets as "Disputed Assets" and argues that they need not be returned to Stream.

The Post-Remand Injunction is a form of injunctive relief. A court of equity has discretion to modify an injunction for good cause shown. *Cf. Berkowitz v. MacPherson*, 1995 WL 1799136, at *1 (Del. Ch. July 24, 1995) (noting the "power of a court of equity to modify an injunction in the light of changed circumstances").

In exercising its discretion, the court has started by considering what ideally should happen as a result of the Mandate. In a world without transaction costs, the optimal course would be to restore the status quo as it existed in fall 2020, before the issuance of the Injunction Decision and the implementation of the Omnibus Agreement. At that point in time, Stream held the Legacy Stream Assets, and SeeCubic was an empty shell. The secured creditors had filed a foreclosure action in Delaware Superior Court, but they had not yet exercised any extra-judicial rights. If the court could re-establish that state of the world, then the parties could go forward as if the Injunction Decision did not issue. At that point, the secured creditors could litigate their foreclosure action and pursue any extra-

5

**A-427**

judicial rights that they might have. For its part, Stream could defend against the secured
creditors' actions and attempt to raise capital if it believed it could pay off its debt.

In the real world, that outcome is unachievable. Eighteen months have passed since
the issuance of the Injunction Decision. During that time, SeeCubic has operated the
business based on the Legacy Stream Assets and transformed its operations. It is thus not
possible to restore the parties to the status quo ante. And transaction costs abound. Yet
unwinding the transfer of the Legacy Stream Assets is nevertheless the closest possible
alternative. The Partial Final Judgment seeks to achieve that result.

Rescinding a transaction is not easy. If it were highly likely that SeeCubic would
end up holding the Legacy Stream Assets as Hawk's designee, then a round trip of the
Legacy Stream Assets from SeeCubic to Stream and back again would be a futile act. A
court of equity will not require a party to engage in a futile act. In addition to being
pointless, the transaction costs necessary to pursue a futile effort generate a deadweight
loss for society. In that scenario, modifying the Partial Final Judgment could be warranted.

In determining whether good cause exists to modify the Partial Final Judgment, the
court therefore has considered three additional factors:

- How difficult will it be to effectuate a transfer of the Legacy Stream Assets from
  SeeCubic to Stream?

- How strong are the creditors' rights that Hawk possesses (taking into account
  any ability Stream may have to cure its default or raise defenses)?

- What is the harm that Stream or Hawk/SeeCubic will suffer if the court does not
  adopt its preferred manner of proceeding?

6

**A-428**

The idea behind considering these factors is that if it is comparatively easy to effectuate a transfer of Legacy Stream Assets from SeeCubic to Stream, and if the secured creditors will not face a risk of significant harm from the transfer, then the parties should take that step. But if it is relatively difficult to transfer the Legacy Stream Assets from SeeCubic to Stream, and if Stream will not face a risk of significant harm without the transfer, then it would make more sense to allow Hawk to exercise its rights as a creditor.

The first factor is largely dispositive. The parties' submissions make clear that there is a comparatively easy means of transferring the vast bulk of the Legacy Stream Assets from SeeCubic to Stream. That outcome can be achieved by causing SeeCubic to transfer to Stream the equity in what had been Stream's principal operating subsidiary, Technovative Media, Inc. SeeCubic exercised its rights under the Omnibus Agreement through a similar transfer, and it makes sense to unwind that action by reversing that transfer. There will be follow-on issues to resolve, but the transfer offers a means of substantially implementing the Mandate in a single step.

Hawk and SeeCubic have argued that SeeCubic holds some assets that are Disputed Assets, either because they are not Legacy Stream Assets, or because they are not easily segregated from Legacy Stream Assets. SeeCubic's claims on this point seem somewhat exaggerated. In any event, in light of the Mandate, the more important consideration is to require SeeCubic to return Stream's assets expeditiously. If that results in Disputed Assets being returned to Stream, then the implications of that outcome can be addressed in due course. SeeCubic is protected by its ability to pursue an unjust enrichment claim against

7

**A-429**

Stream, and SeeCubic also can assert claims to recover specific Disputed Assets (or the incremental value by which SeeCubic improved them).

The second factor—the strength of the creditors' rights—is also significant, but it does not outweigh the first factor. The court believes that the rights that secure creditors' rights are strong and may well result in Stream having to transfer the Legacy Stream Assets back to SeeCubic in its capacity as Hawk's designee and agent. If it were difficult to restore the Legacy Stream Assets, then that fact would weigh heavily in favor of allowing Hawk to exercise its rights. At a minimum, the court might seek additional information, because much of the factual record is now two years old. Before determining how to proceed, the court might hold an evidentiary hearing to gain better insight into the current state of affairs, or the court might appoint a special master to investigate the situation. But because there is a relatively easy means of restoring the bulk of the Legacy Stream Assets to Stream, it is not necessary to delve deeply into those issues.

The last factor weighs in favor of Stream and against Hawk (and SeeCubic). For obvious reasons, both sides want to possess the Legacy Stream Assets pending the resolution of this dispute. As a result of the Mandate, Stream has equitable title to the Legacy Stream Assets. With that equitable ownership interest comes the right to use the Legacy Stream Assets to conduct business and make efforts to satisfy the claims of Hawk and Stream's other creditors. If Stream does not get the Legacy Stream Assets back, Stream will lose that opportunity forever. Stream therefore faces a threat of irreparable harm.

SeeCubic also faces a degree of harm because it has been running a business using the Legacy Stream Assets for the past eighteen months. As a result of the Supreme Court

8

**A-430**

Decision, however, SeeCubic currently has no equitable right to carry on that business. SeeCubic's interests currently are derivative of Hawk's, and Hawk's only interest is that of a creditor. If Hawk gets paid, then its interests are satisfied. Hawk's interests also can be remedied through the exercise of its creditors' rights after the return of the Legacy Stream Assets. The risk of harm that SeeCubic and Hawk face is not irreparable. If Hawk's rights are as strong as they appear, Hawk faces limited risk.

SeeCubic also does not face irreparable harm to the extent that transferring the Legacy Stream Assets back to Stream requires transfers of Disputed Assets. The court has permitted SeeCubic to assert a claim for unjust enrichment based on the value it has conferred on Stream during the eighteen months when SeeCubic ran a business using the Legacy Stream Assets. That value could be considerable, given that SeeCubic claims to have turned around a failing firm. SeeCubic also can recover the specific value associated with any Disputed Assets that were transferred back to Stream.

Having considered these factors, the court concludes that good cause does not exist to modify the Partial Final Judgment. Hawk's motion is therefore DENIED.

**A-431**

EFiled: Sep 30 2022 08:00AM EDT
Transaction ID 68190440
Case No. 2020-0766-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STREAM TV NETWORKS, INC.   )  C.A. No. 2020-0766-JTL
OMNIBUS AGREEMENT LITIGATION   )

### ORDER REGARDING MOTION FOR MANDATORY INJUNCTION

WHEREAS,

A.    Stream TV Networks, Inc. ("Stream") has filed a Motion for Mandatory Injunction (the "Motion").

B.    The Motion seeks the return of specific assets that SeeCubic, Inc. acquired under an agreement between Stream, its two secured creditors, and fifty-two of its stockholders (the "Omnibus Agreement").

C.    The Delaware Supreme Court has held that the Omnibus Agreement was not valid. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022). The mandate issued July 1, 2022 (the "Mandate").

D.    On August 7, 2022, this court entered a partial final judgment which determined that in light of the Mandate, the Omnibus Agreement did not validly transfer legal title to any of the Legacy Stream Assets from Stream to SeeCubic. Dkt. 266 (the "Partial Final Judgment"). The court directed the parties to "cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4.

E.    On September 28, 2022, the court issued a memorandum opinion addressing a motion to modify the Partial Final Judgment filed by Hawk Investment Holdings Ltd. Dkt. 306 (the "Modification Opinion").

F.    In the Modification Opinion, the court explained that it was necessary to prioritize the return of Stream's assets over (i) the rights of Stream's creditors and (ii) the claims of SeeCubic to hold assets that did not exclusively comprise Legacy Stream Assets.

G.    The reasoning of the Modification Opinion applies to the Motion.

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1.    Stream seeks a mandatory injunction requiring SeeCubic to keep in effect software licenses for twelve users identified in Exhibit A to the Motion (the "Twelve Users"). This aspect of the Motion is denied without prejudice.

a.    Originally, it appeared that Stream was seeking an injunction requiring SeeCubic to renew the licenses to the software that the Twelve Users currently are using (the "Current SeeCubic Software"). It now appears that Stream seeks a mandatory injunction requiring SeeCubic to provide the Twelve Users with the ability to use Stream's software as it existed in December 2020 (the "Legacy Stream Software").

b.    The record does not reveal whether it is feasible for SeeCubic to comply with such an order. SeeCubic has told Stream that it updated the Legacy Stream Software to create the Current SeeCubic Software. SeeCubic has represented that it did not retain a copy of the Legacy Stream Software. Even if SeeCubic still possessed a copy of the Legacy Stream Software, the current record does not establish whether SeeCubic could push out, or the Twelve Users could use, the Legacy Stream Software.

c.    Factual disputes accordingly prevent the granting of mandatory relief.

d.    Parties can and do engage in remedial discovery. The parties have leave to conduct discovery into the status of the Legacy Stream Software and the Current

SeeCubic Software. An obvious step would be for Stream to conduct a Rule 30(b)(6) deposition of SeeCubic on these topics.

        e.     Although the court has denied Stream's request for mandatory relief, Stream has demonstrated an entitlement to prohibitive relief sufficient to ensure that the Twelve Users can continue to use the Current SeeCubic Software. Pending further order of the court, SeeCubic is enjoined from taking any action to cut off or otherwise terminate the Twelve Users' ability to use the Current SeeCubic Software. The injunction shall lift once Stream has an adequate opportunity to provide the Twelve Users with substitute software coverage.

        2.     The Motion seeks a mandatory injunction requiring SeeCubic to return Ultra-D Technology Demonstrator Samples that existed in whole or in part prior to December 8, 2020 (the "Sample Displays"). SeeCubic shall return the Sample Displays to Stream within ten days.

        a.     As the Modification Opinion explains, to the extent it is relatively easy to return assets to Stream, SeeCubic must return them. The record indicates that it is relatively easy to return the Sample Displays. SeeCubic has not argued that it would be burdensome to return the Sample Displays, only that it should not have to return them.

        b.     SeeCubic contends that certain assets do not qualify as Legacy Stream Assets and need not be returned to Stream (the "Disputed Assets"). Stream argues that the Sample Displays are Disputed Assets because SeeCubic either (i) modified them after December 2020 or (ii) acquired them from Stream's landlord, which had taken possession of the Sample Displays that were left in Stream's Silicon Valley office after Stream

**A-434**

abandoned the premises and failed to pay its rent. As the Modification Opinion explains, SeeCubic can seek to recover the Sample Displays or the incremental value that SeeCubic added to them either through its overarching claim for unjust enrichment or through a specific claim based on the Sample Displays. In light of the Mandate, the first priority is to return the Sample Displays to Stream.

   c. SeeCubic's counsel may retain copies of any documentation relating to the Sample Displays that is necessary to support SeeCubic's pursuit of a claim. SeeCubic may not use information relating to the Sample Displays for any other purpose, including for any business purpose.

  3. The Motion seeks a mandatory injunction requiring SeeCubic to return all Ultra-D Mass Production Line optical bonding equipment stored at Hold Jumper (Suzhou) Packing Co., No.1 XiangJie Street, Suzhou New District, JiangSu Province, CHINA 215129 (the "Bonding Equipment"). SeeCubic shall return the Bonding Equipment to Stream within ten days.

   a. As the Modification Opinion explains, to the extent it is relatively easy to return assets to Stream, SeeCubic should be required to return them. The record indicates that it is relatively easy to return the Bonding Equipment to Stream. SeeCubic has not argued that it would be burdensome to return the Bonding Equipment, only that it should not have to return it.

   b. SeeCubic appears to contend that the Bonding Equipment is a Disputed Asset because SeeCubic satisfied Stream's debt to the landlord who owned the premises where the bonding equipment was housed after Stream abandoned the premises

- 4 -

**A-435**

and failed to pay rent. SeeCubic can seek to recover the Bonding Equipment or the incremental value that SeeCubic conferred through its general claim for unjust enrichment or through a specific claim based on the Bonding Equipment. In light of the Mandate, the first priority is to return the Bonding Equipment to Stream.

        c.    SeeCubic's counsel may retain copies of any documentation relating to the Bonding Equipment that is necessary to support SeeCubic's pursuit of a claim. SeeCubic may not use information relating to the Bonding Equipment for any other purpose, including for any business purpose.

    4.    The Motion seeks a mandatory injunction requiring SeeCubic to permit Stream to copy information from the Dell PowerEdge M640 Servers housed by MotivIT, LLC in San Jose, California (the "Server Information"). SeeCubic shall provide Stream with a copy of the Server Information within ten days.

        a.    SeeCubic contends that the servers are a Disputed Asset because SeeCubic gained title to the servers by means other than through the Omnibus Agreement. Stream is not interested in the servers themselves. Stream wants the Server Information, which includes the Legacy Software.

        b.    As the Modification Opinion explains, to the extent it is relatively easy to return assets to Stream, SeeCubic should be required to return them. SeeCubic has not asserted that it would be burdensome to provide the Server Information, only that it should not be required to do so.

        c.    SeeCubic seems to maintain that the Server Information itself is a Disputed Asset because SeeCubic has updated the Legacy Stream Software and otherwise

**A-436**

generated information that is now part of the Server Information. SeeCubic can seek to recover the Server Information or the incremental value that SeeCubic conferred either through its general claim for unjust enrichment or through a specific claim based on the Server Information. In light of the Mandate, the first priority is to provide the Server Information to Stream.

    d.  The court is only requiring SeeCubic to provide Stream with a copy of the Server Information. SeeCubic's counsel may retain a copy of the Server Information to support SeeCubic's pursuit of a claim. SeeCubic may continue to use the Server Information to comply with this court's directive that SeeCubic not take steps to interfere with services being provided to the Twelve Users. After Stream has established service for the Twelve Users, Stream shall notify SeeCubic of that fact. From that point on, SeeCubic may not use the Server Information for any purpose other than pursuing a claim, including for any business purpose.

    5.  The Motion seeks a mandatory injunction requiring SeeCubic to return all lenses, designs, and other materials housed at Matsunami Glass Ind., Ltd., 2-1-10 Yasaka-cho, Kishiwada City, Osaka, 596-0049, Japan (the "Lenses"). SeeCubic shall provide Stream with the Lenses within ten days.

    a.  As the Modification Opinion explains, to the extent it is relatively easy to return assets to Stream, SeeCubic should be required to return them. SeeCubic has not asserted that it would be burdensome to provide Stream with the Lenses, only that it should not be required to do so.

**A-437**

      b.    SeeCubic maintains that at least some of the Lenses are Disputed Assets because they were based on SeeCubic designs generated after December 2020. SeeCubic can seek to recover the Lenses or any incremental value that SeeCubic conferred either through its general claim for unjust enrichment or through a specific claim based on the Lenses. In light of the Mandate, the first priority is to return the Lenses to Stream.

      c.    SeeCubic's counsel may retain documentation relating to the Lenses to support SeeCubic's pursuit of a claim. SeeCubic may not use the documentation relating to the Lenses for any other purpose, including for any business purpose.

      6.    As an adjunct to the mandatory relief set forth in this order, SeeCubic and any persons acting in concert with it are prohibited from taking any steps to interfere with Stream's ability to recover the Sample Displays, the Bonding Equipment, the Server Information, or the Lenses (the "Returned Assets"), subject to SeeCubic's right to retain a copy of the Server Information and documentation relating to the Returned Assets for the purposes set forth in this decision.

      7.    SeeCubic argues generally that to obtain the mandatory relief set forth in this order, Stream must "establish the legal right [it] seeks to protect or the duty [it] seeks to enforce." *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1120 (Del. Ch. 1990). The *Stahl* court addressed the issuance of a mandatory injunction on a preliminary basis, not a mandatory injunction designed to implement final relief. In this case, the Partial Final Judgment has established Stream's right to relief.

      8.    SeeCubic also argues that Stream must show irreparable harm to obtain the permanent injunctive relief that it seeks. Delaware decisions have generally treated the

requirements for permanent injunctive relief as synonymous with preliminary injunctive

relief, except as requiring actual success on the merits rather than a probability of success

on the merits. *See, e.g., Christiana Town Ctr., LLC v. New Castle Ctr.*, 2003 WL 21314499,

at \*2 (Del. Ch. June 6, 2003); *Draper Commc'ns, Inc. v. Del. Valley Broads. Ltd. P'ship*,

505 A.2d 1283, 1288 (Del. Ch. 1985). Based on that easy transposition, Delaware decisions

treat irreparable harm as a requirement for injunctive relief that issues as part of a final

judgment or in support of a final order. But that simplified analysis is just that—too simple.

       9.      The weight of authority demonstrates that for purposes of final relief, a party

must show that the party entitled to permanent injunctive relief lacks an adequate remedy

at law.[1] A showing of irreparable harm is one way to demonstrate the inadequacy of a

remedy at law. It is not the only way. As Judge Posner has explained,

> when, as in this case, the issue is whether to grant a permanent injunction,
> not whether to grant a temporary one, the burden is to show that damages are
> inadequate, not that the denial of the injunction will work irreparable harm.
> "Irreparable" in the injunction context means not rectifiable by the entry of

---

[1] *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 2944 (3d ed.), Westlaw (database updated Apr. 2022) ("[I]t should be noted that although
a serious threat of irreparable injury usually must be shown on an application for a
temporary-restraining order or a preliminary injunction, irreparable injury is not an
independent requirement for obtaining a permanent injunction; it is only one basis for
showing the inadequacy of the legal remedy." (footnotes omitted)); C.J.S. *Injunctions* § 42,
Westlaw (database updated Sept. 2022) ("To be entitled to a permanent injunction, the
petitioner must demonstrate that there is no adequate remedy at law, a balance of the
equities favoring the moving party, and success on the merits."); 42 Am. Jur. 2d *Injunctions*
§ 26, Westlaw (database updated Aug. 2022) ("A legal remedy is inadequate, so as to
warrant a permanent injunction, when a party is unlikely to be made whole by an award of
monetary damages or some other legal remedy, or the legal remedy is not as practicable
and efficient toward the ends of justice as an injunction.").

a final judgment. It has nothing to do with whether to grant a permanent
injunction, which, in the usual case anyway, *is* the final judgment.

*Walgreen Co. v. Sara Creek Prop. Co., B.V.*, 966 F.2d 273, 275 (7th Cir. 1992) (citations

omitted).[2]

10.    What Stream really must show is the inadequacy of a remedy at law. As

explained in the Modification Opinion, Stream lacks an adequate remedy at law. Indeed,

assuming that a showing of irreparable harm were required, the Modification Opinion

explains why Stream faces a threat of irreparable harm, while SeeCubic and Stream's

secured creditors do not.

11.    A court of equity always has the power to impose conditions on a grant of

injunctive relief. *See, e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1091 (Del. Ch.

2004) (imposing condition on grant of injunctive relief), *aff'd*, 872 A.2d 559 (Del. 2005)

---

[2] *Accord, e.g.*, *Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th
Cir. 1994) ("Irreparable injury is required for preliminary injunctions, but once actual
success on the merits has been established, a party is entitled to relief as a matter of law
irrespective of the amount of irreparable injury which may be shown. Irreparable injury is
not an independent requirement for obtaining a permanent injunction [as opposed to a
preliminary injunction or temporary restraining order]; it is only one basis for showing the
inadequacy of the legal remedy." (cleaned up)); *Crane v. Ind. High School Athletic Ass'n*,
975 F.2d 1315, 1326 (7th Cir. 1992) ("To justify entry of a permanent injunction, [plaintiff]
had to prove that he had no adequate legal remedy. He was not required, however, to show
irreparable injury." (citations omitted)); *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d
Cir. 1985) ("Though the appropriateness of both permanent and preliminary injunctions
depends on equitable considerations and the adequacy of monetary relief, irreparable injury
is not an independent requirement for obtaining a *permanent* injunction . . . ." (cleaned
up)); *Crutchfield v. U.S. Army Corps of Eng'rs*, 192 F. Supp. 2d 444, 456 n.16 (E.D. Va.
2001) ("[I]n the context of a permanent injunction, it is not necessary for the moving party
to show that it will be irreparably harmed by the failure to grant the injunction." (cleaned
up)).

**A-440**

To protect SeeCubic's right to assert its claims, the relief granted in this order is conditioned on Stream using its best efforts to preserve the value of the Returned Assets. Stream's use of the Returned Assets is limited to the ordinary course of its business. Before Stream enters into a material transaction that encompasses the Returned Assets, Stream shall give thirty-days written notice to SeeCubic.

12.    The return of the assets is also conditioned on Stream posting the bond in the amount of $1 million. That was the amount used for the injunction SeeCubic obtained, and that injunction enabled SeeCubic to acquire the Legacy Stream Assets. A similar amount is appropriate for the Returned Assets. The bond shall be available to pay any damages SeeCubic suffers as a result of the relief imposed by this order and shall be released at the final disposition of this action.

*/s/ J. Travis Laster*
Vice Chancellor Laster
September 30, 2022

**A-441**

EFiled: Oct 03 2022 02:38PM EDT
Transaction ID 68202938
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STREAM TV NETWORKS, INC.    )    C.A. No. 2020-0766-JTL
OMNIBUS AGREEMENT LITIGATION    )

## OPINION

Date Submitted: October 2, 2022
Date Decided: October 3, 2022

Steven P. Wood, Andrew S. Dupre, Brian R. Lemon, Sarah E. Delia, Stephanie H. Dallaire, Travis J. Ferguson, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendant Stream TV Networks, Inc. and for Third-Party Defendants Mathu Rajan and Raja Rajan.*

Jenness E. Parker, Bonnie W. David, Lilianna Anh P. Townsend, Trevor T. Nielsen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Eben P. Colby, Marley Ann Brumme, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts; *Attorneys for Defendants and Counterclaim Plaintiff SeeCubic, Inc.*

Steven L. Caponi, K&L GATES LLP, Wilmington, Delaware; *Attorney for Interested Party Hawk Investment Holdings Ltd.*

**LASTER, V.C.**

Stream TV Networks, Inc. ("Stream") has filed a motion for emergency post-judgment relief (the "Emergency Motion"). Stream maintains that SeeCubic, Inc. and Hawk Investment Holdings Ltd. ("Hawk") acted in concert to transfer 100% of the equity of Technovative Media, Inc. ("Technovative"), comprising 1,000 shares of its common stock (the "Shares"), from SeeCubic to Hawk. The Emergency Motion contends that this conduct was contumacious because the court had made clear in a partial final judgment entered under Rule 54(b) (the "Partial Final Judgment") and in other rulings that SeeCubic was supposed to transfer its assets to Stream. Those rulings did not envision a choreographed transfer in which SeeCubic caused Technovative to list Stream as the owner of the Shares, while at the same time ensuring that Hawk could deploy its rights as a secured creditor to seize the Shares before Stream could react.

As a remedy, the Emergency Motion seeks an order canceling Hawk's ownership of the Shares and vesting ownership in Stream. Stream also seeks an injunction barring SeeCubic and anyone acting in concert with it from interfering with Stream's ownership of the Shares until further order of the court.

This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to

**A-443**

the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's.

In what appears to be a remedy of first impression, the court cancels Hawk's purported ownership of the Shares and vests ownership in Stream. The court also grants injunctive relief barring SeeCubic, Hawk, and Stastney from interfering with Stream's ownership of the shares or the rights associated with them, but only for a period of ten days. At the end of ten days, the injunction will lift. At that point, SeeCubic, Hawk, and Stastney can exercise any rights they believes that they possess. Stream can respond as it sees fit.

## I.       FACTUAL BACKGROUND

There once was an agreement among Stream, SLS, Hawk, and fifty-two of Stream's stockholders (the "Omnibus Agreement"). In the Omnibus Agreement, Stream agreed to transfer all of its assets (the "Legacy Stream Assets") to a newly formed entity controlled by SLS and Hawk. In return, SLS and Hawk agreed to extinguish Stream's secured debt. SLS and Hawk subsequently formed SeeCubic as the entity contemplated by the Omnibus Agreement. As part of the deal, Stream's minority stockholders received the right to exchange their shares in Stream for shares in SeeCubic, and Stream received the right to one million shares of common stock in SeeCubic.

A committee of Stream's board of directors (the "Resolution Committee") negotiated and approved the Omnibus Agreement. When the Resolution Committee caused Stream to enter into the Omnibus Agreement, Stream was insolvent and failing. Stream had defaulted on its secured debt. Stream also carried more than $16 million in trade debt

2

**A-444**

and had fallen months behind on payments to customers and suppliers. Stream had even failed to make the payments necessary to maintain the patents on its technology, which were essential to its business. As the holders of debt secured by all of Stream's assets, SLS and Hawk had the power to take everything and leave Stream and its stockholders with nothing. By causing Stream to enter into the Omnibus Agreement, the Resolution Committee ensured that Stream and its stockholders got something.

Stream's controlling stockholders—the Rajan brothers—objected to the Omnibus Agreement. Using their stockholder-level power as the holders of Stream's super-voting Class B common stock, they reconstituted the board of directors and reasserted control over Stream. They immediately set about raising every challenge to the Omnibus Agreement that they could think of.

In September 2020, Stream filed this action, seeking a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. SeeCubic counterclaimed, seeking a declaration that the Omnibus Agreement was valid and an injunction against Stream trying to interfere with it.

In December 2020, the court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted). After the issuance of the Injunction Decision, SeeCubic acquired the Legacy Stream Assets. In September 2021, the court granted a motion for summary

**A-445**

judgment and declared the Omnibus Agreement to be a valid agreement. The court entered a partial final judgment in favor of SeeCubic, and Stream appealed.

In June 2022, the Delaware Supreme Court declared that the Omnibus Agreement could not have become effective without the approval of the holders of a majority of the Class B common stock. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022). The high court remanded the case for further proceedings. The mandate issued on July 1. Dkt. 237 (the "Mandate").

On August 7, 2022, the court entered the Partial Final Judgment. Dkt. 266. That order held that in light of the Mandate, the Omnibus Agreement did not validly transfer legal title to any of the Legacy Stream Assets from Stream to SeeCubic. The court directed the parties to "cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4 (the "Transfer Obligation").

When the court implemented the Partial Final Judgment, SeeCubic was making efforts to assert Hawk's rights as a secured creditor. SeeCubic argued that Hawk held a security interest in all of the Legacy Stream Assets and could levy on those assets to satisfy Stream's outstanding debt, which Hawk claimed exceeded £350 million. SeeCubic maintained that it would be a futile act to return the Legacy Stream Assets to Stream, only to have Hawk seize them again. And because SLS and Hawk had appointed SeeCubic as their designee for the purpose of exercising their creditors' rights, the Legacy Stream Assets would make a quick round trip from SeeCubic to Stream and back again.

**A-446**

SeeCubic advanced these arguments because the Partial Final Judgment enjoined SeeCubic and those acting in concert with it from taking any action to "use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." *Id.* ¶ 5 (the "Post-Remand Injunction"). At a minimum, the Post-Remand Injunction created uncertainty as to whether SeeCubic and the secured creditors could exercise their creditors' rights.

In an effort to clarify maters, Hawk intervened and moved to modify the Post-Remand Injunction to confirm that the secured creditors could exercise their rights. Dkt. 274 (the "Modification Motion"). Stream filed a competing motion to enforce the Partial Final Judgment. Dkt. 297 (the "Motion to Enforce"). The latter motion asked the court to exercise its equitable powers and the explicit authority provided under Court of Chancery Rule 70(a) to cancel SeeCubic's ownership of the Shares and vest title in Stream. *Id.* at 3.

Seeking to induce a decisional sequence in which the court ruled on the Modification Motion first, SeeCubic did not respond to the Motion to Enforce. On September 27, 2022, the court entered an order stating: "The court intends to rule promptly on the Motion to Enforce, filed by Stream TV Networks, Inc. on September 9, 2022. As yet, no opposition to that motion has been filed. Given the nature of the motion, any opposition should have been filed by now. In any event, any opposition is due not later than noon on Friday, September 30, 2022." Dkt. 303.

On September 28, 2022, the court issued an opinion in which it denied the Modification Motion. Dkt. 306 (the "Modification Denial"). One of the factors the court considered in denying the Modification Motion was the relative ease with which SeeCubic

5

**A-447**

could achieve substantial compliance with the Transfer Obligation by causing SeeCubic to transfer the Shares to Stream. *Id.* at 7. The court also explained that Stream faced irreparable harm because unless it got back the Legacy Stream Assets, Stream would not be able to use the Legacy Stream Assets "to conduct business and make efforts to satisfy the claims of Hawk and Stream's other creditors." *Id.* at 8. The Modification Denial made clear that the secured creditors could not act in concert with SeeCubic to exercise their rights until after SeeCubic returned the Legacy Stream Assets to Stream.

At that point, the handwriting was on the wall. Unless SeeCubic advanced an exceptionally persuasive and as-yet unpresented argument in response to the Motion to Enforce, the court would order SeeCubic to transfer the Shares to Stream. And the court would not permit the secured creditors to act until Stream had enjoyed some opportunity to exercise the rights associated with the Shares and re-establish an approximation of the status quo that existed before the Injunction Decision.

Anticipating that outcome, SeeCubic and Hawk planned a series of coordinated acts in which SeeCubic would transfer the Shares to Stream in a manner that would enable Hawk to seize them by acting before Stream could respond. The Shares would end up in the hands of Hawk, just as SeeCubic and Hawk wanted.

As part of their plan, SeeCubic sent Hawk a letter dated September 29, 2022. Acting in its capacity as the designee of SLS and Hawk for the purpose of exercising their rights as secured creditors, SeeCubic made the following request:

> SeeCubic hereby request and directs that, upon receiving notice that the [Shares] have been registered in the name of [Stream], Hawk enforce remedies in respect of the Collateral pursuant to the Stream Security

**A-448**

Agreements and the Uniform Commercial Code, including without
limitation, … having the [Shares] registered in the name of Hawk [and]
voting the [Shares] as directed by SeeCubic.

Dkt. 316 Ex. A (the "September 29 Letter").

At 11:45 a.m. on September 30, 2022, SeeCubic informed the court that "this
morning, SeeCubic caused Technovative to transfer title to the common stock of
Technovative from SeeCubic to Stream." Dkt. 310 at 2. SeeCubic provided a copy of its
stock ledger evidencing the transfer of the Shares from SeeCubic to Stream. *Id.* Ex. A.
SeeCubic took the position that because it had taken this step, it had complied with the
Transfer Obligation, and the Motion to Enforce was moot.

Twenty-three minutes later, in a letter attached to an email sent at 12:08 p.m.,
Hawk's counsel instructed Stastney, acting in his capacity as a director and officer of
Technovative, to register the Shares in the name of Hawk. Dkt. 312 Ex. A. The letter
consisted of two pages of dense legalese. *Id.* It could not have been drafted in the twenty-
three minutes that elapsed between the filing of SeeCubic's letter to the court and the
sending of the email. SeeCubic and Hawk plainly planned the sequence in advance, as
demonstrated by the September 29 Letter.

In an email sent three minutes later, at 12:11 p.m., Stastney wrote: "Received and
acknowledged, attached please find a copy of the updated official stock ledger of
Technovative. We will await Hawk's further instructions." *Id.* Stastney could not have
reviewed Hawk's letter, considered its implications, and updated Technovative's stock
ledger in the three minutes that elapsed between the sending of Hawk's email and his
response. Hawk and Stastney plainly planned the sequence in advance.

7

**A-449**

At 1:18 p.m. on September 30, 2022, Hawk informed the court that it had issued a "Proxy Notice" to a "Technovative officer/director demanding that Hawk be listed as the holder of record of all Technovative stock in the Technovative share registry." Dkt. 311 at 1. Hawk reported that the "officer/director" had complied with the request. Hawk also informed the court that it had acted by written consent as Technovative's sole stockholder to remove all of the existing directors of Technovative, amend the Technovative bylaws to reduce the number of directors, and elect Stastney as Technovative's sole director. Hawk stated that as a result of its exercise of those rights, Hawk had assumed control over Technovative and intended to proceed to exercise its remaining rights as a secured creditor, including proceeding with a sale pursuant to Article 9 of the Uniform Commercial Code. *Id.* at 2.

Hawk's written consent consisted of three pages of carefully drafted legalese. Dkt. 315 Ex. C. The consent attached a set of amended and restated bylaws for Technovative that consisted of fourteen pages of carefully drafted legalese. Hawk could not have drafted the written consent and bylaws, served them on Technovative, and then written the court in the sixty-seven minutes between Stastney's email response and counsel's letter. Hawk had the written consent and the bylaws ready to go, because everything had been stage managed in advance.

At 3:04 p.m. on September 30, 2022, Stream filed the Emergency Motion. Dkt. 312. Stream asserted that SeeCubic, Hawk, and Stastney acted in concert to effectuate a transfer of the Shares from SeeCubic to Hawk in a contumacious violation of the Partial Final Judgment and the Post-Remand Injunction. Stream maintained that the court plainly

8

**A-450**

contemplated that Stream would have control over the Shares for an interval measured in days rather than minutes. Stream explained that SeeCubic and Hawk necessarily acted in concert to orchestrate the sequence of events that occurred between 11:45 a.m. and 1:18 p.m.

As relief, the Emergency Motion seeks an order vesting ownership of the Shares in Stream. It also seeks an order enjoining SeeCubic and anyone acting in concert with SeeCubic, including Hawk and Stastney, from interfering with Stream's ownership of the Shares until further order of the court.

The court directed SeeCubic and Hawk to respond to the Emergency Motion within twenty-four hours, with their filings due on a Saturday. The court afforded Stream the opportunity to reply on Sunday. In the best tradition of this court, counsel complied.

SeeCubic reiterated that it sought to comply with the Partial Final Judgment by transferring the Shares. Dkt. 316. SeeCubic stressed that it had transferred the Shares to Stream and not to Hawk. SeeCubic acknowledged the September 29 Letter and its instruction that Hawk enforce its creditors' rights after receiving notice that the Shares had been transferred. To counsel's credit, SeeCubic did not try to hide the fact that it gave Hawk a heads up about what was coming so that Hawk could be prepared to exercise its rights before Stream could respond.[1]

---

[1] One suspects that there may have been more communications behind the scenes.

9

**A-451**

Hawk explained that it had "implemented a reasoned strategy to exercise its contractual rights as a secured creditor of Stream" and that it had "strived to ensure that it was in full compliance with the Court's various orders, instructions, and mandates." Dkt. 315 ¶ 1. Hawk stressed that it had always made clear its intention to exercise its rights as a secured creditor as soon as possible, so when the transfer of the Shares created the opportunity, Hawk acted. *Id.* ¶ 2. Hawk represented that it intended to file promptly a petition under Section 225 of the Delaware General Corporation Law, 8 *Del. C.* § 225, to resolve the validity of Hawk's exercise of its creditors' rights at the trial court level. *Id.* ¶ 3. Hawk represented that to the extent it had failed to comply with the court's orders, it would take whatever steps were necessary to remedy the situation, but asked that any ruling provide clear guidance as to when Hawk could exercise its contractual rights. *Id.* ¶ 4.

Hawk responsibly acknowledged that it "could have waited longer to exercise its rights" and given Stream an opportunity to act, but Hawk maintained that anything Stream did would breach its contractual obligations to the secured creditors, and Hawk saw no need to afford Stream an opportunity to engage in a contractual breach. *Id.* ¶ 23. According to Hawk, "[b]y acting swiftly, Hawk avoided the unnecessary step of Stream ignoring— without justification—Hawk's Proxy Rights." *Id.*

Hawk also commendably acknowledged that the court "may wish to maintain the status quo pending resolution of the anticipated Section 225 Action." *Id.* ¶ 25. Hawk offered to enter into "a voluntary status quo order that would preclude any actions that would encumber the [Legacy Stream Assets] pending resolution of the Section 225 Action." *Id.*

10

**A-452**

In its reply, Stream cast SeeCubic and Hawk as having engaged in "a scam that did not satisfy any of the actual written injunction obligations." Dkt. 317 ¶ 2.b. Stream stressed that that Hawk had asked to exercise its creditors' rights in the Modification Motion. Then, after the court issued the Modification Denial, SeeCubic and Hawk engineered a transaction that achieved the result Hawk had sought. *Id.*

Stream also suggested that the court had "misjudged the underlying morality narrative" and was viewing the secured creditors as "white hat entities," while presumably casting Stream's principals in the black hat roles. *Id.* ¶ 5 n.3. The court has not approached this case at any point with an eye towards making the good guys win and the bad guys lose. Rather, the court has sought to enforce the governing legal framework. Before the issuance of the Delaware Supreme Court's decision, the court viewed the Omnibus Agreement as providing that framework, and the court therefore sought to enforce it. It is true that Stream's principals did not enhance their credibility when they sought to evade the Injunction Decision and to create what this court previously described as "litigation chaos." *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820, at *1 (Del. Ch. Dec. 8, 2021) (subsequent history omitted). Eventually, however, Stream ended up with its current counsel, pursued an appeal, and secured a reversal of this court's decision. Regardless of how a trial judge might regard the opposite substantive outcome, that is how the system is supposed to work.

Since the Delaware Supreme Court's decision, the court has sought to implement the Mandate while at the same time recognizing that the secured creditors possess what appear to be powerful rights. It is true that the court has not provided Stream with the

11

**A-453**

immediate relief it has demanded, but that is not because of any bias against Stream's principals or favoritism towards the secured creditors. The court rather has sought to navigate the difficulties that rescinding a transaction invariably presents while taking into account the implications of the secured creditors' rights.

## II.   LEGAL ANALYSIS

The Emergency Motion seeks to hold SeeCubic, Hawk, and Stastney in contempt. Courts have inherent authority to impose contempt sanctions as a means of enforcing their orders. *DiSabatino v. Salicete*, 671 A.3d 1344, 1348 (Del. 1996) ("Courts have 'an inherent contempt authority, . . . as a power necessary to the exercise of all others.'" (quoting *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994))). The power "is essential to the administration of justice." *Id.* (quoting *Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 795 (1987)). Court of Chancery Rule 70(a) codifies this court's inherent authority to enter contempt sanctions for noncompliance. The rule recognizes that the court may "adjudge [a] party in contempt" if the party "fails to comply within the time specified" with "a judgment direct[ing] a party to . . . perform any . . . specific act." Ct. Ch. R. 70(a).

To be held in contempt, a party must be bound by an order, have notice of it, and nevertheless violate it. *Arbitrium v. Johnston,* 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 2009). Notably, intent is not an element of an application to enforce an order by holding a party in contempt. "The moving party is not required to show that the violation was willful or intentional, but the intentional or willful nature of a contemnor's acts may be considered in determining the appropriate sanction." *Litterst v. Zenph Sound Innovations, Inc.*, 2013 WL 565137, at *3 (Del. Ch. Oct. 17, 2013) The contemnor must know about the order, but

12

**A-454**

it is not a defense for contemnor to claim that it did not intend to violate the order or that the contemnor misunderstood the order. *See Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 1998 WL 892642, at *6 (Del. Ch. Dec. 11, 1998) ("Thus, if the respondents' actions are violative of this Court's Order, their state of mind is immaterial for purposes of contempt adjudication, but the intentional or willful nature of their acts may be considered in determining the appropriate sanction.").

Whether a party should be held in contempt is a discretionary matter for the Court. *Dickerson v. Castle*, 1991 WL 208467, at *3 (Del. Ch. Oct. 15, 1991). The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way." *Id.* at *4 (internal quotation omitted).

## A. SeeCubic, Hawk, And Stastney Are In Contempt.

Through the Transfer Obligation, the Partial Final Judgment ordered SeeCubic to transfer the Legacy Stream Assets to Stream. SeeCubic, Hawk, and Stastney plainly knew about it.

Through the Post-Remand Injunction, the Partial Final Judgment ordered SeeCubic not to act in concert with any other parties for the purpose of using Legacy Stream Assets for any purpose outside of the ordinary course of business. SeeCubic, Hawk, and Stastney plainly knew about it. Indeed, they sought to modify it so that Hawk could enforce its rights as a secured creditor.

Rather than complying with the Transfer Obligation and the Post-Remand Injunction, SeeCubic, Hawk, and Stastney acted in concert to evade those obligations. For

13

**A-455**

months, SeeCubic failed to comply the Transfer Obligation. SeeCubic raised arguments about how difficult it was to comply. SeeCubic also advanced arguments about creditors' rights. It is now clear how easy it was for SeeCubic to comply. All it took was an updated stock ledger restoring title to the Shares to Stream.

Once it became clear that the court would order SeeCubic to transfer the Shares to Stream, SeeCubic, Hawk, and Stastney coordinated to ensure that the Shares would end up in Hawk's hands. The choreographed sequence of events took place during an extended lunch hour, starting at 11:45 a.m. and ending at 1:18 p.m. It was not possible for Hawk and Stastney to have taken the actions they did without advance notice, preparation, and an overarching plan.

Those actions violated the Transfer Obligation and the Post-Remand Injunction by ensuring that the Shares ended up with Hawk rather than Stream. The parties' actions in this case resemble the events in *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647 (Del. Ch. Nov. 17, 2014). There, an entity (Related Sub) entered into a stipulated order under which it committed to hold $11.8 million on behalf of another entity (Network) pending the outcome of an arbitration between the owners of Network. *Id.* at *6. One of the disputants (Samson) controlled Network. After the arbitral panel ruled against Samson, Related Sub could have released the funds to Network in a manner that would have enabled the prevailing party to assert its rights to all of the released funds. Instead, Related Sub coordinated with Samson so that he could immediately distribute the money to the investors in Network, including himself, before the prevailing party could assert its rights. Samson was thus able to wire $5.8 million to himself and a colleague that they otherwise could not

14

**A-456**

have received. The court held that the parties' coordinated conduct violated the stipulated order. *Id.* at *37. SeeCubic, Hawk, and Stastney essentially did the same thing.

SeeCubic and Hawk have argued in response that their actions did not change the facts on the ground because Hawk is only the nominal holder of the Shares, with Stream remaining the equitable owner. They insist that Hawk only possesses title for the purposes of exercising its rights as a creditor, with actual title passing to the successful bidder in an Article 9 sale. Hawk points out that Stream will be able to participate in the sale and could be the successful bidder. Hawk also points out that Stream will be entitled to receive any proceeds from the sale to the extent they exceed the amount of the secured debt.

That is all true, but SeeCubic and Hawk's coordinated effort still changed the facts on the ground. The Partial Final Judgment envisioned Stream having the opportunity respond to the secured creditors with the benefit of the Legacy Stream Assets. Through their choreographed actions, SeeCubic, Hawk, and Stastney prevented Stream from ever having that chance.

## B.    The Remedy

As a remedy for the contumacious conduct, Stream seeks two forms of relief. First, Stream seeks an order divesting Hawk of its ownership of the Shares and vesting ownership in Stream. Second, Stream seeks an injunction barring SeeCubic and any party acting in conjunction with SeeCubic from interfering with Stream's ownership of the Shares pending further order of the Court.

"A trial judge has broad discretion to impose sanctions for failure to abide by its orders" but its "decision to impose sanctions must be just and reasonable." *In re*

15

**A-457**

*TransPerfect Glob., Inc.*, 2019 WL 5260362, at *13 (Del. Ch. Oct. 17, 2019) (internal quotations omitted) (quoting *Gallagher v. Long*, 940 A.2d 945 (Del. 2007) (TABLE) (citing *Lehman Cap. v. Lofland*, 906 A.2d 122, 131 (Del. 2006) (internal citations omitted)); *see also In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990); *Rittenhouse Assocs. v. Frederic A. Potts & Co., Inc.*, 382 A.2d 235, 236 (Del. 1977). In selecting contempt sanctions, the court is "obligated to use the least possible power adequate to the end proposed." *TransPerfect*, 2019 WL 5260362, at *13.

A remedy for contempt may be either civil or criminal. A contempt remedy is civil in nature if it serves to coerce compliance with the order being violated or to remedy injury suffered by other parties as a result of the contumacious behavior. *Del. State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978). A contempt remedy is criminal in nature if it is punitive. *Id.* If the court seeks to impose a criminal sanction for contempt, then additional requirements apply. *Id.*

In this case, the sanctions that the court will impose seek only to remedy the non-compliance. Their only effect is to enforce the Partial Final Judgment in a manner that recreates the closest possible approximation of the state of affairs that existed in fall 2020, before the issuance of the Injunction Decision.

### 1.    The Ownership Remedy

The menu of remedies that a court has available to enforce its orders includes the ability to declare the ownership of property that is within the court's jurisdiction. Court of Chancery 70(a) states: "If real or personal property is within the jurisdiction of the Court, the Court in lieu of directing a conveyance thereof may enter a judgment divesting the title

of any party and vesting it in others and such judgment has the effect of a conveyance executed in due form of law." Ct. Ch. R. 70(a).

Shares of stock in a Delaware corporation are personal property within the jurisdiction of the Court. *See* 8 *Del. C.* §169. Technovative is a Delaware corporation. The Shares are therefore within the jurisdiction of the court.

The parties have not cited, and research has not revealed, a ruling in which the court has invoked its authority under Rule 70(a) to address the ownership of shares. That does not mean it has not happened. The form of relief is straightforward and could have been implemented in an unreported order.

In any event, the fact that a particular form of relief is unprecedented does not mean it is unwarranted or unavailable. "[W]here the circumstances of the case are such as to require the application of equitable principles, the fact that no precedent can be found in which relief may be granted under a similar state of facts is no reason for refusing relief." *Modern Dust Bag Co., Inc. v. Com. Tr. Co.*, 91 A.2d 469, 469 (Del. Ch. 1952). *"*Extraordinary facts will sometimes call for extraordinary remedies." *Cantor v. Fitzgerald*, 2001 WL 536911, *3 n.18 (Del. Ch. May 11, 2001). "[O]nce a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action." *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) (citations omitted). Equity requires the court "to adapt the relief granted to the requirements of the case so as to give to the parties that to which they are entitled." *Id.*

17

**A-459**

Divesting Hawk of its purported ownership of the Shares is a fair and equitable result. It remedies the choreographed transfer of the Shares from SeeCubic to Hawk and achieves the outcome intended by the Partial Final Judgment. Accordingly, Hawk is divested of title to the Shares, which is vested in Stream.

As with the Partial Final Judgment itself, this ruling is without prejudice to the ability of Hawk and SLS to exercise their rights as secured creditors. They must exercise those rights, however, after Stream has had a fair opportunity to assert control over its assets. That reality leads the court to impose a further remedy.

### 2.    The Injunctive Remedy

A court can enter injunctive relief to enforce its orders. The Transfer Obligation is an example of a mandatory injunction. The Post-Remand Injunction is an example of a prohibitive injunction. To ensure that parties fulfill the intent of the Partial Final Judgment, additional albeit limited injunctive relief is warranted.

The court's goal since the issuance of the Mandate has been to restore the parties as closely as possible to the state they occupied in fall 2020, before the issuance of the Injunction Decision. At that point, Stream owned the Legacy Stream Assets, including the Shares. The secured creditors were pursuing an action to foreclose on the Legacy Stream Assets in Delaware Superior Court, but they had not yet exercised any of their extra-judicial rights. To the extent that the secured creditors had sought then to exercise their extra-judicial rights, Stream would have owned the Legacy Stream Assets and potentially been in a position to resist. The creditors did not have Stastney as their man on the inside to carry out their demands.

18

**A-460**

The current situation therefore does not restore the status quo. By acting as they did, SeeCubic, Hawk, and Stastney took advantage of the privileged position that they held as a result of the Injunction Decision. In an effort to perpetuate that privileged position, they choreographed the events of September 30, 2022. But the Delaware Supreme Court has determined that the Injunction Decision was erroneous, so SeeCubic, Hawk, and Stastney never should have enjoyed the privileged position that they occupied, and they should not have been able to perpetuate that privileged position through a choreographed transfer of the Shares.

An injunction is necessary to restore a first approximation of status quo as it existed in fall 2020 and to create an environment in which Stream has the ability to take control over its assets and prepare to respond to the secured creditors' exercise of their rights. The question is how long that injunction should last.

Stream asks for an indefinite injunction that would endure until the court orders otherwise. Stream has not articulated grounds for an injunction of such duration. One might surmise that after being without the Legacy Stream Assets for eighteen months, Stream believes that it should have a lengthy period to get back on its feet before confronting its creditors.

The problem with that outcome is that in fall 2020, when the Injunction Decision issued, Stream was failing and had defaulted on its secured debt. Although SLS and Hawk had not yet exercised their extrajudicial rights, they had the ability to do so at any time.

The equities of the case warrant restoring Stream to the position it occupied in fall 2020. The equities do not warrant putting Stream in a substantially better position than it

19

**A-461**

was in back then. As a practical matter, Stream will be in a better position, because SeeCubic turned around what had been a failing business, and Stream is getting that business back. That near term outcome is unavoidable and is part of what will necessitate the adjudication of SeeCubic's claim for unjust enrichment, at least to the extent Stream retains its assets. Stream need not receive further benefits in terms of an indefinite stay from this court.

An injunction with a duration of ten days is sufficient. That result gives Stream ten more days than it had in fall 2020. Stream is therefore better off, but not appreciably so.

For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in concert with them are enjoined from taking any action to interfere with Stream's ownership of the Shares. During that period, Stream may freely exercise the rights associated with the Shares. Once the eleventh day, the starting gun will fire, and SeeCubic, Hawk, and Stastney may pursue whatever rights they believe they have.

### III.    CONCLUSION

The Emergency Motion is granted in part. Title to the Shares is vested in Stream. For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in conjunction with them are enjoined from interfering with Stream's ownership of the Shares or with Stream's exercise of rights associated with the Shares.

20

**A-462**

2017/1

# THE TAKEOVER PANEL

## HEARINGS COMMITTEE

**ARTHUR LEONARD ROBERT MORTON ("MR MORTON")**

**AND**

**JOHN BENJAMIN GARNER ("MR GARNER")**

**RULING OF THE HEARINGS COMMITTEE ("THE COMMITTEE")**

<u>Introduction</u>

1.　　These proceedings were initiated by the Executive of the Takeover Panel ("the Executive") against Mr Morton and Mr Garner for breach of section 9(a) of the Introduction to The City Code on Takeovers and Mergers ("the Code").　The preamble to section 9 of the Introduction to the Code says that the section "sets out the rules according to which persons dealing with the Panel must provide information and assistance to the Panel". Section 9(a) then provides as follows:

> "The Panel expects any person dealing with it to do so in an open and co-operative way. It also expects prompt co-operation and assistance from persons dealing with it and those to whom enquiries and other requests are directed. In dealing with the Panel, a person must disclose to the Panel any information known to them and relevant to the matter being considered by the Panel (and correct or update that information if it changes). A person dealing with the Panel or to whom enquiries or requests are directed must take all reasonable care not to provide incorrect, incomplete or misleading information to the Panel…".

2.　　The Executive's case against Messrs Morton and Garner is that they systematically provided to the Executive information which they knew to be false in the course of an investigation by the Executive into a potential breach by Mr Morton of an obligation to announce a mandatory offer under Rule 9 of the Code. According to the Executive, the false information provided to it by Messrs Morton and Garner was intended to deceive the Executive into believing that a purchase of shares in Hubco

**A-463**

**EXHIBIT I**

Investments plc ("Hubco") by a company owned by the trustees of a Morton family trust had actually been made on behalf of Mr Garner as beneficiary pursuant to a prior agreement between Mr Morton and Mr Garner under which Mr Garner undertook to pay for the shares as and when he came into the funds to do so. According to the Executive, Messrs Morton and Garner invented the agreement in order to avert a perceived risk that the purchase had had the effect of increasing to more than 30% of Hubco's issued share capital the holdings of companies either owned by trustees of Morton family trusts or by Mr and Mrs Morton directly, thereby exposing Mr Morton to an obligation to extend an offer under Rule 9 of the Code to the other Hubco shareholders.

3.      The Executive submitted to the Committee that the attempted deception of the Executive in the course of its investigation was so serious and so prolonged as to merit "cold-shouldering" of Messrs Morton and Garner for periods of six years and four years respectively.

4.      Messrs Morton and Garner denied any intention to provide incorrect or false information to the Executive. They admitted that certain information which they provided to the Executive in the course of its investigation was incorrect. They accepted in particular that a promissory note, which they told the Executive had been signed and dated by Mr Garner at the time of the alleged agreement in order to acknowledge his debt, had in fact been created some 20 months later and only after Mr Morton had been made aware of the possible adverse implications of the purchase of the Hubco shares. However, both Mr Morton and Mr Garner denied that they had knowingly provided false information regarding the date and provenance of the promissory note. Messrs Morton and Garner also continued to maintain that they had indeed reached an agreement shortly before the purchase of the Hubco shares to the effect that the shares would be purchased for Mr Garner as beneficiary and held on his behalf by the purchasing company as nominee until such time as Mr Garner came into funds to pay for them and they could be transferred into his name.

<u>The hearing before the Committee</u>

5.      The members of the Committee listed in the Appendix hereto heard this matter on 14 December 2016. The Executive was represented by Messrs Slaughter and May

**A-464**

who instructed Mr Edmund Nourse QC of counsel. Mr Morton was represented by Messrs Corker Binning who instructed Mr Christopher Coltart QC of counsel and Mr Garner was represented by Messrs Hickman and Rose who instructed Mr Jason Mansell of counsel. In response to enquiries before the hearing from the Secretary to the Committee, it became apparent that no party to the proceedings intended to call witnesses and that neither Mr Morton nor Mr Garner intended to attend in person. Mr Morton is now in very poor health and this was cited as the reason for his non-attendance and for his inability to take an active part in the proceedings. The Committee returns to this later.

6.     The legal teams of Mr Morton and Mr Garner indicated that they did not propose to attend or to participate in that part of the hearing which was directed to determining questions of breach of section 9(a) of the Introduction to the Code. They proposed that there should be a separate hearing on sanctions if the Executive were to prove its case on breach of the Code.

7.     In light of these developments, the hearing was set down on the basis that questions relating to breach of the Code would be heard and determined during the morning of 14 December with a view to hearing matters relating to sanctions during the afternoon if the Executive were to succeed in proving its case on breach to the satisfaction of the Committee. Messrs Morton and Garner's legal teams were invited to attend the morning session, even if they had no intention of actively participating, as the evidence relating to breach and the Committee's view of it could be expected to be relevant to questions of sanctions if such questions were to arise.  In the event, Mr Garner's legal team attended the morning hearing as observers but Mr Morton's legal team chose to await the outcome of that hearing before attending the sanctions hearing.

8.     Having heard the Executive present its case on breach of the Code during the morning of 14 December and having considered the evidence adduced by the Executive, the Committee found the case proved to its satisfaction. The Committee then announced its broad factual findings in summary form to enable the various legal teams to address questions of sanctions on the basis of those findings. In summary, for reasons which are explained in detail below, the Committee found that:

3

**A-465**

(i)   the agreement alleged to have been entered into between Messrs Morton and Garner before purchase of the Hubco shares was a fiction – no such agreement had been entered into;

(ii)   both Mr Morton and Mr Garner had repeatedly attempted to mislead the Executive into believing that there had been such an agreement when they knew such a claim to be false;

(iii)   Mr Morton deliberately attempted to mislead the Executive by falsely claiming that the alleged agreement between himself and Mr Garner had been evidenced by a promissory note signed at the time by Mr Garner. When he made such claims, Mr Morton knew them to be untrue;

(iv)   for his part, Mr Garner deliberately attempted to mislead the Executive by providing it with a promissory note which he had signed and back-dated to the date of the alleged agreement and which he incorrectly and repeatedly claimed to have been signed and entered into on the date inscribed on the promissory note. When he made such claims, Mr Garner knew them to be untrue; and

(v)   in breach of section 9(a) of the Introduction to the Code, Mr Garner and Mr Morton separately and on repeated occasions provided information to the Executive which they knew to be incorrect and misleading.

9.   In the event, Mr Garner attended the afternoon hearing along with his legal team and addressed the Committee briefly in addition to the submissions of Mr Mansell. In Mr Morton's absence submissions on the issue of sanctions were made on his behalf by Mr Coltart QC.

Breach of the Code – the facts

10.   Having considered carefully the evidence adduced by the Executive, the Committee finds the facts to be as follows.

11.   Mr Morton is 74 years old and is a resident of Jersey. After an initial career in accountancy he branched out into commerce and became an extremely successful

businessman and investor. Mr Morton is habitually known as Bob Morton, not to be confused with one of his sons, Robert Morton.

12.   Mr Garner is another resident of Jersey. He is 35 years old and a friend of Mr Morton's son, Robert. After obtaining a degree in Economics from Durham University he worked for about five years for a Swiss-based private equity firm before setting up with friends Alethia Capital, a private equity vehicle. He moved to Jersey in 2011 and in 2014, after Alethia had been disbanded and its assets liquidated, Mr Garner set up ATD Capital, a holding company of which he is the sole owner. During the last few years Mr Garner has set up and developed an online retail company in which, throughout the period relevant to these proceedings, Mr Morton or his family companies have been substantial investors.

13.   Mr Morton or the trustees of his family trusts own and control various companies. They comprise or include:

(i)   Hawk Investment Holdings Limited ("Hawk"), a Guernsey company which is wholly owned by Mr Morton and his wife;

(ii)   Seraffina Holdings Limited ("Seraffina"), a BVI company which is owned by Morton PTC Limited ("Morton PTC") as trustee for The Charles Trust – a trust for the benefit of Mr Morton's son, Charles; and

(iii)   Groundlinks Limited ("Groundlinks"), a BVI company owned by Morton PTC as trustee for The Andrew Trust  - a trust for the benefit of Mr Morton's son, Andrew.

14.   Albany Trustee Company Limited ("Albany") is a company incorporated and based in Guernsey. Its employees include Anthony Holt ("Mr Holt") and Nicky Chippendale ("Ms Chippendale").  Albany administers and manages the Morton family trusts and the companies owned by the trusts or by Mr and Mrs Morton personally. In this capacity its acts as administrator for Morton PTC, Hawk, Seraffina and Groundlinks.

5

**A-467**

Case 2:24-cv-06397-JMC Document 1-9 Filed 11/06/24 Entered 11/06/24 19:01:37 of 278
Exhibit I    Page 6 of 26

15.    Hubco was incorporated in England and Wales on 14 November 2011. It was admitted to trading on PLUS (now ISDX) on 31 January 2012. At admission, 28.32% of the issued share capital of Hubco was placed with Seraffina. On 27 November 2012, Seraffina transferred to Hawk approximately half of its shares representing 14.12% of Hubco's share capital. Accordingly, Morton family companies owned just under 30% of the issued share capital of Hubco along with their attendant voting rights, that being the percentage of voting rights relevant for triggering Rule 9 mandatory offers. Hubco's placing agent was Hub Capital Partners Limited ("Hub Capital"), a corporate finance advisory firm and itself the holder of shares of Hubco.

16.    On 17 July 2013 on Mr Morton's direction, Groundlinks purchased 300,000 shares of Hubco, representing 3.38% of Hubco's issued share capital. This purchase took the holdings of Groundlinks and other Morton family companies with which it stood to be seen as acting in concert to more than 30% of Hubco's issued share capital. As these are the shares that are now alleged to have been purchased on behalf of Mr Garner pursuant to an agreement reached between Messrs Morton and Garner shortly before the purchase, it is relevant to ascertain whether there was any suggestion at the time or whether there was other contemporary evidence that the shares were purchased by Groundlinks as nominee or bare trustee on behalf of Mr Garner.

17.    There is no such evidence. On the contrary, the contemporary documents indicate that the transaction involved a straightforward purchase by Groundlinks of shares owned by Hargreave Hale Limited ("Hargreave"), another major shareholder in Hubco. There is no contemporary reference (whether in the documents or transcripts of telephone calls) to the alleged agreement between Messrs Morton and Garner or to any trust or indebtedness which are now said to have been the result of such agreement. As explained below, the contemporary evidence indicates that, on the instructions of Mr Morton, Groundlinks purchased the shares outright and not on trust for Mr Garner.

18.    At the beginning of July 2013, Hargreave told Richard Feigen ("Mr Feigen"), a director of Hub Capital, that Hargreave wanted to dispose of 1.15 million shares of Hubco. It appears that Mr Feigen then spoke to Mr Morton and suggested that he purchase Hargreave's shares. On 17 July 2013 Giles Hargreave telephoned Tom

Davies ("Mr Davies"), an investment manager at Investec Wealth & Investment Limited ("Investec"), and told him that Hargreave was now only looking to sell 300,000 shares of Hubco. Investec acted as broker for Mr Morton and his family companies. Mr Davies then emailed Mr Morton, telling him that Hargreave now only needed to sell 300,000 shares rather than the 1.15 million discussed previously and was offering the price of 8p per share. Mr Davies ended his email by asking Mr Morton *"Can you please let me know what you would like to do and which a/c we would be booking these to"*. Accordingly, on 17 July there was a very substantial change in the number of shares on offer: this is significant given that Messrs Morton and Garner later represented to the Executive that their agreement to purchase the Hubco shares on Mr Garner's behalf had been concluded six days earlier, namely on 11 July. About an hour after Mr Davies had sent his email, Mr Morton telephoned Mr Davies and agreed to purchase the Hubco shares through Groundlinks. The relevant part of the conversation went as follows:

*"DAVIES: 300,000 and he would do that at 8p.*

*MORTON: 300,000 at 8p, so it's 24 grand.*

*DAVIES: 24 grand that's all. But if you wanted to buy any more he'd be interested in, he would certainly discuss that.*

*MORTON: No.*

*DAVIES: But he has to sell 300,000 today.*

*MORTON: Well, we would do the 300 and… ummm… I suggest you put that into, ummm, Groundlinks.*

*DAVIES: Ok, perfect.".*

19. Shortly after this call Mr Davies made a file note of his conversation with Mr Morton and copied that by email to his colleague, Mr Hollier (who was Mr Morton's principal point of contact at Investec). The email stated that *"He said he was happy to buy the 300k at 8p for Groundlinks…"*. Investec duly executed the purchase on 17 July on behalf of Groundlinks. Mr Davies then emailed Ms Chippendale, copying in Mr Holt at Albany who, as administrators of the Morton family trusts, needed to know that a company owned by the trustees of one of the family trusts had made the purchase. Mr Davies's email said *"30,000 [sic] Hubco Investments were purchased*

7

**A-469**

*for Groundlinks today at a price of 8p per share …"*. It is evident that Albany, the trust managers, were not told by Investec that a trust company had purchased these shares on behalf of Mr Garner, who was not a beneficiary. There was no apparent justification for Morton PTC (which owned Groundlinks as trustee of The Andrew Trust) spending trust money for Mr Garner's benefit.

20.   It is also apparent that Mr Morton said nothing to the trustees or to the family beneficiaries to suggest that the Hubco shares had been purchased on behalf of Mr Garner. Thus on 18 July 2013 the Morton PTC investment committee met at St. Peter Port, Guernsey. Mr Morton and his wife, their four sons and Mr Holt and Ms Chippendale from Albany were all present. The minutes of the meeting record the following:

> *"**<u>Hubco Investments Plc</u>***
> *Seraffina Holdings Limited: 1,250,000 shares (cost £125,128)*
> *Hawk Investments Holdings Limited: 1,250,000 shares (cost £125,128)*
> *Groundlinks Limited: 300,000 shares (cost £24,245)*
>
> *BM noted that the Hubco shares had been split equally between Seraffina and Hawk but that Groundlinks had invested in 300,000 shares yesterday.*
>
> *This is a cash shell for reverse takeovers."*.

The minutes of meetings of the Morton PTC investment committee on 11 February 2014 and 1 December 2014 were the same in material respects. Had there been an agreement between Messrs Morton and Garner for the Hubco shares to be purchased on behalf of Mr Garner, Mr Morton would undoubtedly have been obliged to obtain the consent of the trustees. At the very least, he would have mentioned it.

21.   Nothing of note then happened until 23 February 2015, some 18 months after the Hubco shares had been purchased, when the Takeover Panel announced Mr Morton's public statement of censure for a failure to make an offer under Rule 9 of the Code (Panel Statement 2015/3). That matter concerned the acquisition of 39.1% of the voting rights of Armour Plc ("Armour") by a group described in the Takeover Panel Statement as "the Morton Concert Party". The acquisition arose from a placing of new Armour shares and was "whitewashed" under Note 1 of the Notes on Dispensations from Rule 9. The whitewash circular described the Morton Concert

**A-470**

Party as comprising, amongst others, Seraffina, Hawk and Groundlinks in addition to Mr Morton and his wife. Each of the three companies was described as owned by the trustees of trusts for one or other of Mr Morton's sons.

22.    Additional shares of Armour then became available at attractive prices and Mr Morton told the Panel that he was asked if he would like to buy them. Mr Morton told the Executive that he declined the offer because he knew that to accept it would trigger an obligation under Rule 9.1(b) to extend an offer for all the issued shares of Armour not owned by the Morton Concert Party. Instead, however, during August 2011 Mr Morton arranged for these shares to be purchased in the names of his four sons, taking the view that they were not members of the Morton Concert Party. Mr Morton then made gifts to each of his sons in sums of money equal to the purchase price of the shares. Separately, in June 2011, Mr Charles Morton had also purchased some Armour shares on his own account. Mr Morton disclosed none of this to the Executive. Under Rule 9.1(b) the effect of these purchases was to increase the shareholding of the Morton Concert Party within the 30% to 50% range of Armour's issued share capital and to trigger an obligation to extend an offer to other shareholders under Rule 9.1(b) of the Code. Mr Morton attempted to avoid this obligation by the devices described.

23.    Before this statement of public censure, Mr Morton had twice been privately censured by the Panel. On one such occasion the misconduct in question had amounted to a breach of section 9(a) of the Introduction to the Code, the terms of which had then been drawn to his attention.

24.    The Panel's public statement of censure of Mr Morton on 23 February 2015 caused Investec to undertake a review of previous transactions in which they had acted for Mr Morton. On 25 February 2015 Mr Hollier telephoned Mr Morton to tell him that the July 2013 purchase of Hubco shares had taken the interests of the Morton family to 31.6% of the Hubco issued share capital. The material part of that telephone conversation was as follows:

A-471

"*EH: It looks like that took the percentage from about 28.2 to 31.6.*

*RM: [Snort]*

*EH: Yeah. So my compliance department have asked if you could seek advice on that now you are aware and if you could notify the Takeover Panel and get their …*

*RM: [Incredulous laughter]*

*EH: … opinion on where you stand.*

*RM: Oh dear.*

*EH: Sorry to be the bearer of bad news.*

*RM: Shit. That's the one that's… where's that listed on?*

*EH: It's listed on the ISDX Market which used to be …*

*RM: ISDX.*

*EH: … which used to be Plus Markets. I don't know if it was Plus Markets when the trades were done. So I'm not sure.*

*RM: [Sigh]. Right, right, right, right, right, right, right, right, right. Oh fuck.*

*EH: So, I'm guessing you weren't aware of that and I wasn't aware of that and obviously having everything analysed has brought that up.*

*RM: Christ, I wasn't aware of it either. Just a cash shell sitting there.*

*EH: I know, so obviously, I've been asked to call you to notify you as obviously we found out this morning and I think the Firm's position is we need to notify you as soon as we realise that there's an issue there and obviously they've asked if you can notify the Takeover Panel and obviously seek their…*".

25. The recording of this conversation was played back to the Committee at the hearing. Mr Morton's reaction to the news suggests that he believed that the Groundlinks purchase of Hubco shares had, or could have, triggered a Rule 9 obligation. It was also evident that the advice of Investec's compliance department was that he consult the Takeover Panel. What is conspicuous by its absence from this conversation was any suggestion by Mr Morton that Groundlinks had purchased, and now held, the Hubco shares on behalf of Mr Garner.

26. Mr Morton evidently contacted his solicitor, Colin Maltby ("Mr Maltby"), who on 26 February 2015 emailed Ms Chippendale at Albany saying *"Please could you send me details of the acquisition made by Groundlinks of around £40,000 [sic] worth of Hubco stock in 2013? …"*.

10

**A-472**

27.    During the morning of 27 February 2015 Mr Morton again spoke on the phone to
       Mr Hollier. During this conversation Mr Morton claimed for the first time that the
       Hubco shares were being held on trust, the alleged reason for that being that Mr
       Morton had, at the time of purchase, been alive to the need to avoid acquiring an
       interest of 30%. The material part of that conversation went as follows:

> *"RM: And I've been researching that other matter that you mentioned to me.*
>
> *EH: OK.*
>
> *RM: And it appears that Groundlinks is holding the shares that it has got in trust
> so in terms of transferring them to the beneficiary should we put that through
> the market through you or should we do it off market or what?*
>
> *....*
>
> *RM: So what I did after you, you know, said all that I sort of did a bit of digging
> and research to find out, sort of, what the hell happened because I know when
> we, sort of, did it all in the first place that we were restricted to 29.9 and we
> could not go over that in any shape or form whatsoever.*
>
> *EH: OK. So they were bought on behalf of someone else?*
>
> *RM: Yep. OK.".*

28.    It is relevant to note that Mr Morton did not identify the third party beneficiary on
       whose behalf the Hubco shares were allegedly held. It is also difficult to understand
       what "research" Mr Morton could have done since talking to Mr Hollier a few days
       earlier as there were no documents at all that evidenced either the trust to which he
       referred or any other arrangement with a third party. In an email sent to Mr Morton
       at 17:21 on 27 February 2015 (and copied to Mr Holt and Ms Chippendale at Albany)
       Mr Hollier said that he had discussed the matter with his compliance department
       who could not advise on whether Mr Morton had breached any Takeover Panel rules
       and advised that he speak to the Takeover Panel to clarify the situation.

29.    At 08:46 GMT on 28 February 2015 Mr Garner telephoned Mr Morton from Austria
       where he was on a skiing holiday. This conversation was not recorded but they spoke
       for over 23 minutes. At 09:33 on the same day (about 23 minutes after the phone call
       concluded) Mr Garner emailed Mr Morton as follows:

11

**A-473**

*"Dear Mr Morton,*

*I apologise for the delay in sending this email but I am now in a position to pay for the 300,000 shares in HubCo Investments PLC which you very kindly bought on my behalf and which you are holding for me.*

*I will inform my broker first thing on Monday morning and that he should expect a call from Investec with the bargain being 300,000 shares in Hubco at 8p per share.*

*His details are:*

*[address of Richard Davies at Redmayne Bentley, Mr Garner's brokers]*

*Again – thank you for doing this for me, and I hope the delay in payment hasn't caused you any embarrassment.*

*Thanks,*

*John".*

30.   Mr Morton persistently claimed to the Executive that this email from Mr Garner was spontaneous and unprompted. The Committee does not accept this: it believes that Mr Garner's email was a response to a request from Mr Morton that Mr Garner confirm in writing an arrangement of the sort that Mr Morton had described on the previous day to Investec.  There is no record of any other conversation between Messrs Morton and Garner in the period from 25 to 28 February 2015 and the probability is (although this will never be known for certain) that it was during the call on the morning of 28 February that Mr Morton suggested to Mr Garner that he send to him an email along the lines of that sent soon afterwards at 09:33.

31.   On 2 March 2015 the Groundlinks shares of Hubco were sold and transferred to Mr Garner.

32.   On 23 March 2015 Hawk purchased 8,360 of Mr Garner's shares of his online retail company for a price of £25,990.60. By this means Mr Garner was effectively reimbursed for his purchase of Groundlinks' Hubco shares, albeit his own shareholding in the online retail company was reduced as a result.

33.   Mr Garner's email to Mr Morton of 28 February was forwarded later on the same day to Mr Hollier of Investec and to Mr Holt and Ms Chippendale of Albany. By this means, they came to know for the first time the identity of the third party on whose behalf Groundlinks was alleged to have purchased and held the Hubco shares.

12

**A-474**

On the previous day Ms Chippendale had emailed Mr Morton's solicitor, Mr Maltby, asking for details of the transaction and how it was to be ratified. She said:

*"Mr Morton has indicated that Groundlinks are holding these shares for a third party which we were not aware of until now. Are you able to provide relevant details and rationale etc? As you will appreciate, had we been aware, we would also have required due diligence on the third party and put an agreement in place.*

*Once you provide details, we can agree how to ratify this".*

Mr Maltby replied on 1 March saying that they would need *"a simple Declaration of Trust and Promissory Note effective from the date of purchase".*

34.   No declaration of trust was ever drawn up, but on 19 March 2015 Mr Maltby drafted a promissory note (hereinafter, the "Promissory Note"). By the Promissory Note, Mr Garner as borrower promised to pay Groundlinks as lender the sum of £24,245 on demand along with interest thereon, payable monthly with effect from 17 July 2013 at the rate of 1.5% above National Westminster Bank base rate. The Promissory Note was undated.

35.   On 23 March 2015 Mr Maltby emailed Mr Garner attaching the Promissory Note and asking him to sign it.  On 27 April Mr Maltby emailed Mr Garner asking whether he had *"Any news on that date?".*  In response to that enquiry Mr Garner apologised for the delay and said:

*"Here is a scan of the original that I dug out. I signed it on the 17th July 2013. I have the original here in my office...".*

The document attached to Mr Garner's email appears to be an exact copy of the Promissory Note drafted by Mr Maltby on 19 March save that it had been signed by Mr Garner and dated in manuscript *"17/7/2013".*

**A-475**

## Investigation by the Executive

36. Meanwhile, on 16 April 2015 Investec had reported the Groundlinks purchase of Hubco shares to the Executive, it having become clear by then that Mr Morton was not going to report the matter himself despite Investec's advice that he should do so.

37. On 21 April 2015 the Executive spoke to Mr Morton on the telephone. A note of that conversation records Mr Morton as saying that he did not think a bid obligation had been triggered as the shares had been transferred to the beneficial owner. Mr Morton explained that Mr Garner was a friend of his son, Robert. Mr Morton said that Mr Garner had been short of money in July 2013 so that the purchase of the Hubco shares had been funded by him (Mr Morton) by way of a promissory note. Mr Garner had since raised funds by selling shares in another business and that had enabled him to purchase the shares from Mr Morton.

38. On 22 April 2015, at Mr Morton's request, Mr Maltby emailed the Executive, attaching the undated Promissory Note and confirming on behalf of his client that the Hubco shares had been purchased by Groundlinks as nominee for Mr Garner who was "*unable to afford to pay for same and who entered into the attached Promissory Note*".

39. On 7 May 2015, in response to a list of questions emailed by the Executive to Mr Morton, Mr Morton confirmed by email that:

   > "*...3. The terms of the bare trust were that we would loan John Garner the funds to acquire the shares pending his realisation of sufficient funds to pay for them, in the meantime we would hold them as nominee and vote according to his wish.*
   >
   > *4. This was a verbal arrangement supported by the promissory note and the shares...*".

40. On 8 May 2015 there was a lengthy telephone interview of Mr Morton by the Executive which was recorded in full. In the course of that interview Mr Morton maintained that it was his awareness of the Rule 9 implications if his family group's shareholding in Hubco were to reach 30% that prompted the purchase of the shares on trust for Mr Garner. He told the Executive that once the Promissory Note had been signed it had been held by Mr Maltby. He also maintained that in December 2014 Mr Garner had phoned him to say that he had received enquiries from potential

investors in his online retail company and he had agreed to sell some of the shares in order to raise cash. Mr Morton said to the Executive that he had then told Mr Garner that he thought that to be *"a great idea because it means you can take up the Hubco shares as well and we can clear this promissory note out the way…"*.

41.    There is no doubt, therefore, that Mr Morton attempted to mislead the Executive into believing that the Promissory Note had been produced and signed at about the time of the July 2013 purchase and that it had recorded an existing debt at the time when Mr Garner spoke of his plans for clearing it in December 2014. None of this was true: on 28 August 2015, at a late stage of the investigation, Mr Maltby told the Executive that he had drafted the Promissory Note on 19 March 2015.

42.    On 27 May 2015, when the provenance of the Promissory Note was still unknown to the Executive, the Executive interviewed Mr Garner. This interview was recorded in full. He told the Executive that Mr Morton had offered to lend him the money on a promissory note until such time as he could pay for the shares. He said that the arrangement between him and Mr Morton had been discussed and agreed over dinner at the end of June or beginning of July 2013. According to Mr Garner, Mr Maltby had then sent through the paperwork. Mr Garner maintained that he had dug through his folders and found the copy of the Promissory Note which he had signed. He then went on to tell the Executive that he had signed the Promissory Note on 17 July 2013 and he knew that to be the case because that was the date on the document and his practice was to date a document on the date he signed it. On the following day, Mr Garner emailed the Executive attaching, amongst other documents, the signed and dated Promissory Note. All this was a lie: Mr Garner had been sent the Promissory Note on 23 March 2015 as an attachment to an email from Mr Maltby with a request that he sign it.

43.    On 8 June 2015 Mr Garner wrote a detailed formal letter to the Executive saying that he had been unused to the "questioning style" of interview to which he had been subjected and was now taking the opportunity to "answer factually and accurately the points raised". Unfortunately, Mr Garner's letter did nothing of the sort: he proceeded to embroider the story which he had previously given to the Executive. He said in the letter that the share purchase agreement had been made over dinner

15

**A-477**

with Mr Morton at the Corbiere Phare restaurant in Jersey in July 2013. He went on to say that Mr Morton told him that some shares in Hubco might be available and offered to lend him the money on the basis that he would repay it at the end of the year, by when Mr Garner envisaged being in funds. Mr Morton said he would get his lawyer, Mr Maltby, to send a promissory note: this, Mr Garner claimed, had been duly sent to him and he had executed it and sent a copy to Groundlinks at the postal address on the promissory note. He went on to say *"You have a copy of this document".* The document referred to was a copy of the Promissory Note sent to Mr Garner on 23 March 2015 which he had subsequently signed and dated 17 July 2013 and which had since been provided to the Executive as an attachment to an email from Mr Garner sent on 28 May 2015. Mr Garner confirmed this story in substance when he was interviewed in person by the Executive on 11 August 2015.

44.   Mr Morton was interviewed again by the Executive on 14 August 2015. During this interview, which was conducted by phone, he told the Executive that the agreement to purchase the Hubco shares on behalf of Mr Garner had been reached over dinner at the Corbiere Phare restaurant on 11 July 2013. He claimed to have instructed Mr Maltby to draft a promissory note and send it to Mr Garner and the Promissory Note had been signed by Mr Garner at about the time the shares had been purchased on 17 July 2013.

45.   The story about the Promissory Note then began to unravel. On 14 August 2015 the Executive emailed Mr Morton with various demands, including that he instruct Mr Maltby to make himself available to answer the Executive's questions and that he instruct him to provide copies of all his documents relating to the July 2013 purchase of the shares in Hubco, the arrangement with Mr Garner and the Promissory Note. Mr Morton was also asked to produce his mobile telephone records. Mr Morton was also directed to instruct the relevant employees of Albany to produce their documents and to make themselves available to answer the Executive's questions.

46.   On 23 August 2015 Mr Morton emailed the Executive saying that he had spoken to Albany and to Mr Maltby and that:

16

**A-478**

*"Many of the assumptions which I have made in our telephone discussions appear to be mistaken now that I have managed to obtain firm evidence and I apologise for these obvious memory failures, which are now a daily occurrence and hastening my retirement".*

47.    On 28 August 2015 at 13:40 Mr Garner emailed the Executive referring to an earlier email and saying:

*"I have been concerned about my assumptions surrounding the promissory note. I have spoken to Colin Maltby and he has advised me that I sent a signed copy of the note to him on 23rd March 2015…".*

Mr Garner went on to apologise for the incorrect information he had previously provided regarding the Promissory Note. He said that he now had consulted with Mr Morton in an effort to jog both of their memories as to the circumstances surrounding the Promissory Note.

48.    As mentioned previously, on 28 August 2015 Mr Maltby told the Executive that he had drafted the Promissory Note on 19 March 2015. This was said during a phone call with the Executive during the afternoon of 28 August and confirmed soon afterwards in an email timed at 15:05.

49.    It is clear, therefore, that Messrs Morton and Garner only retracted their previous stories regarding the Promissory Note and its provenance when it became apparent to them that the true position was about to be revealed as a result of the Executive's insistence that Mr Maltby and Albany produce their relevant documents and answer questions. The Committee has no hesitation in rejecting the claims, made by Mr Morton and Mr Garner severally, that the untruths previously told to the Executive had been the result of wrong "assumptions" innocently made. The Committee has concluded that Mr Morton and Mr Garner both lied systematically about the date on which the Promissory Note was produced and signed and the circumstances in which it came to be created. When these lies were told, the events in question were very recent. Subsequently, in July 2016, Mr Morton suffered an acute episode of illness and he has experienced severe chronic health problems ever since, but at the material

17

**A-479**

times his health and age afforded no conceivable excuse for the dishonest misrepresentations made systematically to the Executive. For his part, Mr Garner's participation in this dishonest story was as sustained and enthusiastic as Mr Morton's.

50.    It is also to be noted that when telephone records were produced during August 2015 they revealed what had hitherto been denied, namely that Messrs Morton and Garner did speak to each other before Mr Garner sent his email of 28 February 2015.

51.    Hitherto the Executive had been investigating a potential breach of the mandatory offer obligation set out in Rule 9 of the Code. The investigation, however, now took a curious turn. On 23 September 2015 the Executive obtained a copy of the Hubco share register. This showed that by July 2013, when Groundlinks purchased 300,000 shares of Hubco, Mr Morton and persons or parties with whom he or his family companies had apparently acted in concert already owned in aggregate more than 50% of Hubco's issued share capital. This more extensive Morton concert party included employees or directors of Hubco and Hub Capital. The result (subject to a possible complicating factor which had been removed when Groundlinks' shares in Hubco were sold to Mr Garner) was that under Rule 9 the more extensive Morton concert party had been free all along to purchase additional shares of Hubco without triggering an obligation to extend an offer for the remaining shares.

52.    This discovery prompted the Executive to interview both of Messrs Morton and Garner again. They were interviewed separately and in person on different dates in October 2015.   During these interviews the Executive explained in detail the development referred to in paragraph 51 above and that, as a result, neither Mr Morton nor Mr Garner were any longer being investigated for breach of the mandatory offer obligations in Rule 9 of the Code. Both Mr Morton and Mr Garner were told, however, that the Executive was very concerned by the manner in which they had conducted themselves towards the Executive and by the untrue information that had been provided to date. The attention of both men was drawn to the obligations on those dealing with the Takeover Panel or to whom enquiries are directed under section 9(a) of the Introduction to the Code. Both men were asked whether they still contended that Groundlinks had purchased the Hubco shares in

18

**A-480**

July 2013 pursuant to an arrangement between Messrs Morton and Garner that they would be purchased and held on behalf of Mr Garner. Mr Morton and Mr Garner both confirmed their previous evidence that there had been such an arrangement.  By now both Mr Morton and Mr Garner claimed that the relevant agreement had been made, not over dinner at Corbiere Phare on 11 July 2013 (it transpired that Mr Garner had left Jersey by the evening of 11 July), but over breakfast on the same day at a restaurant called El Tico.

53.    As previously stated, the Committee has concluded that there never was any such agreement. Purchasing the Hubco shares through Groundlinks (a company which the Executive had previously found to be a member of the Morton concert party) and holding those shares as nominee for Mr Garner made no sense when, as Mr Morton claimed, a driving factor in concluding the arrangement was to avoid acquiring 30% or more of Hubco's issued share capital. It would have made more sense simply to lend Mr Garner the money to enable him to purchase the shares in his own name while executing a promissory note. Mr Morton suggested that purchasing the shares in the name of Groundlinks afforded some form of security, albeit he claimed to have trusted Mr Garner to honour the debt.   In the Committee's view, the question of security was introduced by Mr Morton in an attempt to justify an arrangement which had no apparent commercial rationale. But be that as it may, one would have expected some agreement to have been reached regarding interest on the debt, even if it was simply an agreement to waive the payment of interest. But interest was not discussed at all until the subject was raised during March 2015 in the course of exchanges between Mr Maltby and Albany.

54.    Furthermore, there was absolutely no contemporary documentary record of the agreement – not even a brief email from Mr Garner expressing his thanks for the favour done to him. The fact that Messrs Morton and Garner later collaborated to produce a dishonestly back-dated promissory note in an attempt to claim that the debt had been acknowledged at the time, casts further doubt on the existence of the agreement. The content of Mr Morton's telephone conversation with Investec on 17 July 2013 is also inconsistent with an agreement to purchase the Hubco shares on trust for Mr Garner. Investec, who had to execute and record the transaction, were given the impression that this was a straightforward purchase on behalf of one of the

Morton family trust companies. And the minutes of the Morton PTC investment committee meeting on the following day would undoubtedly have recorded a purchase by a company owned by the trustee of The Andrew Trust on behalf of a non-beneficiary had there been such a transaction. Mr Holt and Ms Chippendale of Albany both attended this meeting but were told nothing. Just as significant is the fact that the minutes of the Morton PTC investment committee meeting on 2 March 2015 did, for the first time, record that Groundlinks' shares in Hubco *"were held as nominee for John Garner".*

55.    In the meantime, having been alerted to the Rule 9 problem by Investec on 25 February 2015, it was not until 27 February 2015 that Mr Morton told Investec (after doing some "research") that the Hubco shares had been purchased on behalf of a third party. But even then, and notwithstanding his "research", Mr Morton did not identify the third party. It was not until 28 February, following a phone call with and email from Mr Garner, that Mr Morton identified the beneficiary. The truth is, in the Committee's judgment, that Mr Garner's email of 28 February 2015 was a put-up job purporting to recognise in retrospect an agreement which had never existed.

56.    It should be noted that there were other features of the claim to have reached an agreement on 11 July 2013 that led the Committee to reject it. Thus the alleged date, time and place of agreement tended to change under the pressure of scrutiny. Furthermore, the number of Hargreave shares offered for sale changed very substantially on the day that Groundlinks made the purchase without causing Mr Morton to revert to Mr Garner for confirmation that he still wished to proceed. Finally, Mr Morton and his family companies were and are very substantial investors in Mr Garner's online retail company: this was the case by February 2015 and the Morton family investments subsequently increased considerably. This was disclosed to the Executive. What was not disclosed to the Executive (and what became apparent only at an advanced stage of its investigation) was Hawk's purchase on 23 March 2015 of shares of Mr Garner in his online retail company for an amount more or less equal to that which Mr Garner had paid three weeks previously for the transfer to him of Groundlinks' shares in Hubco.

**A-482**

Sanctions

57.     The most serious disciplinary power exercisable by the Takeover Panel is to cold-shoulder an offender by declaring the offender to be a person who in the opinion of the Panel is not likely to comply with the Code. Such a declaration triggers the consequence described in section 11(b)(v) of the Introduction to the Code, namely that, while the sanction remains effective, under the rules of the FCA and certain professional bodies, their members become obliged in certain circumstances not to act for the person in question in a transaction subject to the Code. The seriousness of this sanction is evident from the fact that it has only been used twice before during the Takeover Panel's history.

(1) Mr Morton

58.     Notwithstanding the exceptional nature of this sanction, in light of the findings of fact made by the Committee in this case it is inevitable that it should declare Mr Morton to be an offender who in the Committee's opinion is not likely to comply with the Code. Mr Morton's counsel realistically recognised in addressing the Committee that cold-shouldering was inevitable in his client's case and that the sole issue was the duration of the sanction.

59.     It was submitted on Mr Morton's behalf that six years, the period sought by the Executive, was too long a period having regard in particular to three matters:

(i)     in contrast to the only two previous cases in which offenders had been cold-shouldered, there was in this case no underlying breach of a Rule 9 obligation to make a mandatory offer and, consequently, no damage to other shareholders through failing to make an offer;

(ii)    in _Principle Capital Investment Trust_ ("PCIT") (Takeover Appeal Board Statement 2010/1), the sole case of cold-shouldering to have occurred since time limits had been attached to the sanction, the period upheld on appeal to the Takeover Appeal Board was three years – and it was submitted that that was a worse case than Mr Morton's; and

**A-483**

         (iii)  it was said that Mr Morton's ill health and age and the fact that he was now in the twilight of a successful business career ought to be taken into account in his favour.

60.    The Committee has considered carefully each of these points and the personal position of Mr Morton generally. It is true that it transpired that there was no breach of an obligation to make a mandatory offer pursuant to Rule 9 in this case and that this feature distinguishes it from both previous cases in which offenders have been cold-shouldered. However, detriment to other persons, including shareholders, is only one of many criteria which the Takeover Panel may take into account in exercising its disciplinary powers. The Panel cannot effectively perform its statutory duty to enforce the Code and regulate the conduct of takeovers unless those who deal with it and to whom it directs enquiries take care to ensure that the information they provide to the Panel is correct, complete and not misleading. That such persons should at least act honestly and in good faith in their dealings with the Panel goes without saying and is vital to the efficacy of the regulatory regime. These obligations underpin the Code and compliance with them is essential if the Executive is to function effectively.

61.    Mr Morton's conduct in systematically lying to the Executive and in inventing an agreement to purchase Hubco's shares on trust for Mr Garner is no less serious because it later transpired that the whole matter could have been sorted out satisfactorily had he acted honestly and reported the facts to the Executive as he was advised to do at the outset. The particularly egregious misconduct in this case was Mr Morton's collaboration with Mr Garner in providing to the Executive the dishonestly back-dated Promissory Note which purported to acknowledge a fictitious transaction. That dishonesty was no less considered or culpable because it turned out to be unnecessary.

62.    It is also true that in PCIT the Takeover Appeal Board rejected a cross-appeal by the Executive seeking cold-shouldering for five years and upheld the sanction imposed by the Committee that the offenders should be cold-shouldered for three years. The Committee also acknowledges that PCIT was a case in which an attempt was made to mislead the Panel into believing that the share purchase in question had not

triggered a Rule 9 obligation because it had been made coincidentally by an independent party unconnected with those who were acting in concert. However, it is relevant to note that in rejecting the cross-appeal the Takeover Appeal Board observed that, had it *"had to consider the matter entirely afresh, it may very well have been minded to impose a period of five years"*. The persons cold-shouldered in the PCIT case had no previous record of Code contraventions.

63.  In the Committee's judgment Mr Morton's dishonesty in his dealings with the Executive was particularly sustained and serious. It must also have regard to the fact that, by the time this matter was reported to the Executive, Mr Morton had been disciplined on three previous occasions for breaches of the Code. On one such occasion he had been warned of the importance of taking care to provide correct and complete information to the Executive and on another he had been publicly censured for attempting to conceal an obligation to make a Rule 9 mandatory offer. Finally, Mr Morton not only misled the Executive himself, he involved Mr Garner in the enterprise, a friend of his son who had reason to be grateful to Mr Morton for his support for his online retail company and who is now facing a heavy price for having been induced to support him in putting forward an untrue, concocted story. It is right to note that Mr Morton bitterly regrets the damage which he has done to Mr Garner and the Committee accepts this expression of regret as genuine.

64.  Mr Morton is unfortunately in very poor health. At the hearing before the Committee it was common ground that his health problems were accurately summarised in a letter dated 30 November 2016 from his solicitors, Corker Binning, to the Secretary to the Committee. The Executive invited the Committee to draw an adverse inference from Mr Morton's failure to attend the hearing, but it declines to do so. What is significant, however, is that neither Mr Morton nor Mr Garner instructed their legal teams to challenge the Executive's case on breach of the Code or to test by cross-examination any aspect of the evidence. The Committee concludes that the position taken was realistic and simply recognised that the evidence produced by the Executive was irrefutable. While Mr Morton's ill health affords a good reason for his non-attendance at the hearing, it provides no excuse for his conduct during the Executive's investigation, all of which pre-dated the onset of his current problems.

65.     Having considered carefully all the circumstances, the Committee declares in accordance with section 11(b)(v) of the Introduction to the Code that in its opinion Mr Morton is someone who is not likely to comply with the Code. This sanction and the cold-shouldering which it triggers will remain effective for six years from the date of this Ruling, that being 21 December 2016.

(2) Mr Garner

66.     Mr Garner presents a more difficult case. Unlike Mr Morton, he has no previous record of contravening the Code. Furthermore, it is to be inferred from the Committee's findings of fact that Mr Garner was initially brought into all this by Mr Morton to back up his story and that this probably occurred sometime between 25 and 28 February 2015. When he agreed to support Mr Morton's fictitious story of an agreement to purchase shares on his behalf, Mr Garner probably did not foresee the extent to which it would involve systematically lying to a statutory regulator, although he must from the outset have appreciated that (as was the case) the purpose of inventing the story was to save Mr Morton having to make a mandatory offer under the Code for the remaining shares of Hubco – otherwise the fictitious agreement could have made no sense at all.

67.     The Committee also received a number of character references for Mr Garner from distinguished referees praising his work with the online retail company and stating that his misconduct in this case was out of character. In addition, the submissions made by Mr Coltart in relation to the exceptional nature of cold-shouldering as a sanction and the conclusions to be drawn from PCIT as a "comparable" were also made by Mr Mansell on behalf of Mr Garner. Mr Mansell also submitted that, since Mr Garner's business career is at a relatively early stage of development, cold-shouldering would have a greater adverse impact on him than on Mr Morton who was in the twilight of his career. This too, it was submitted, the Committee should take into account.

68.     In these circumstances, the Committee gave anxious consideration to whether, consistent with its duty of enforcing the Code and the system of regulation that it promulgates, it could accede to the plea to impose some sanction on Mr Garner other

than cold-shouldering. The Committee was driven to the conclusion that it could not accede to this course. Having become involved in promoting the fictitious story of an agreement to purchase Hubco shares on trust for himself, Mr Garner's role in misleading the Executive was at least as prominent and sustained as that of Mr Morton. Two aspects of Mr Garner's conduct tell particularly badly against him. He actually signed and dishonestly misdated the Promissory Note and then provided it to the Executive in an attempt to mislead the Executive into believing that the document did what it purported to do, namely acknowledge a debt incurred by Mr Garner in July 2013. Dishonestly misdating, and then proffering, a document in order to deceive a statutory regulator into believing that it was a contemporary acknowledgement of a debt can only merit the most serious sanction open to the Panel – particularly given that the debt itself was fictitious. In addition, Mr Garner then compounded the position by taking the opportunity to write a lengthy and considered letter to the Executive on 8 June 2015, ostensibly in order to put the record straight but in fact to lie in a more detailed, and what he hoped would be a more convincing, fashion.  Mr Garner's age and level of experience afford no excuse. At the time he had been in business for about 10 years, much of that time spent in the financial industry.

69.    The Committee has come to the conclusion that Mr Garner should be cold-shouldered, not for four years as the Executive submits, but for a period of two years. Accordingly the Committee declares in accordance with section 11(b)(v) of the Introduction to the Code that in its opinion Mr Garner is someone who is not likely to comply with the Code. This sanction and the cold-shouldering which it triggers will remain effective for two years from the date of this Ruling, that being 21 December 2016.

70.    Pursuant to Rule 7.1 of its own Rules of Procedure the Committee extended the time for lodging a Notice of Appeal to the Takeover Appeal Board until 16:30 on Friday 6 January 2017. No appeal was lodged within that time.

10 January 2017

**A-487**

# APPENDIX
## HEARINGS COMMITTEE MEMBERS

The members of the Hearings Committee who constituted the Committee for the purpose of the hearing were:

| **Present:** | Michael Crane QC | Chairman |
|---|---|---|
| | David Challen | Deputy Chairman |
| | Lord Morris of Handsworth | |
| **The Association of Financial Markets in Europe** | Mark Warham | Rothschild |
| **The Association of Financial Markets in Europe (Corporate Finance Committee)** | Charles Wilkinson | Deutsche Bank |
| **The Confederation of British Industry** | Peter Swabey | ICSA |
| **The Quoted Companies Alliance** | Tim Ward | QCA |
| | | |
| **Secretary to the Hearings Committee** | Charles Penney | Addleshaw Goddard |

**A-488**

**nicole.maneen@visualsemi.com**

| | |
|---|---|
| **From:** | Leslie Beth Baskin <lbaskin@sgrvlaw.com> |
| **Sent:** | Saturday, April 13, 2024 10:07 AM |
| **To:** | Edmond George (Edmond.George@obermayer.com); Michael.vagnoni@obermayer.com; 'Steven Coren' |
| **Cc:** | 'mathu rajan'; nicole.maneen@visualsemi.com; Jeffrey Kaiser |
| **Subject:** | Stream TV-- Urgent Issue |
| | |
| **Importance:** | High |
| | |
| **Flag Status:** | Flagged |

Good morning-- We were just told by reputable contacts from the Netherlands group that they have been making samples and getting them to SeeCubic at SeeCubic's request.  We believe that this is in violation of the TRO and the Philips and Rembrandts licenses.  Those licenses do not allow sub-licensing.  This means that  SeeCubic of DE and the Netherlands are in violation of Court rulings  and for some reason continue  to get away with this and adversely affect the Estate.   We are having some problem raising funds from some of our likely investors as they are aware of this and losing all faith in this Chapter 11 process.  We would like to discuss this with you immediately.

You should also know that the representatives of SeeCubic are calling  Stream shareholders to try to get investment money and as previously stated, using the 3D technology in which they have no rights.  They are not supposed to be doing any of the 3D technologies at all! Judge Coleman in fact ruled as such. As aforestated,  they should not be making samples, or making representations, or talking to companies about this 3D technology as if they own the rights.  If true, and based upon what has been presented to us, we believe this is impairing the Estate to which you have a fiduciary duty to protect .

Let me emphasize that VSI is 110% focused on getting the funding which you require but this is information coming from investors who are willing to put in the money but is giving them valid pause for concern because the misinformation campaign is flooding them and is depriving us of our hopes to move forward.  I am sending you a copy of an email ( see below) which was sent to us and which is representative of what the other side is sending to potential investors and customers --which needs to be stopped.

Please let me know when you can discuss this.  I would like to include Nicole on the call as she can answer most of your questions regarding these issues.  Please let me know. Thanks, Leslie

---

**From:** Marc Dannenberg <mdandml@hotmail.com>
**Sent:** Saturday, April 13, 2024 7:27 AM
**To:** mathu rajan <mathu.rajan@visualsemi.com>; Dan Rink <dan.rink@visualsemi.com>; nicole.maneen@visualsemi.com; suby.joseph@visualsemi.com
**Subject:** SeeCubic won the assets?


**Ken Hanover**

**EXHIBIT J**

**A-489**

to me

Marc:

Well it looks like the litigation is about ovah! The Rajans got squat, no debt was converted into equity, and SeeCubic will own all of the assets.


Hey what's up, it looks like SeeCubic won the assets.  You didn't raise anywhere near 10 million dollars for VSI.   I can honestly say i don't care.  This was always a battle between horrible people and worse than horrible people...the problem is nobody knew who was who.

Nicole I never had any problems with you until I heard you were talking shit about me.   People who talk shit about me typically lose in the end.   I hope you land on your feet in a place far far away from Mat Rajan.

Best,
Marc



**Leslie Beth Baskin, Esquire**
## Spector Gadon Rosen Vinci P.C.
**T** +1 215-241-8926
**F** +1 215-531-9145
**E** lbaskin@sgrvlaw.com

**www.sgrvlaw.com**    1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

**A-490**

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Monday, May 6, 2024 5:08 PM
**To:** Michael Vagnoni (michael.vagnoni@obermayer.com) <Michael.vagnoni@obermayer.com>;
George, Edmond <Edmond.George@obermayer.com>
**Cc:** Eben P. Colby - Skadden, Arps, Slate, Meagher & Flom LLP (eben.colby@skadden.com)
<eben.colby@skadden.com>; steven.caponi@klgates.com; ademarco@devlinlawfirm.com;
ntwallace@aol.com; steve@rembrandt3d.com; Leslie Beth Baskin <lbaskin@sgrvlaw.com>;
Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** FW: TRO violation


{EXTERNAL EMAIL} This message originated outside of your organization.

Michael and George:


I have attached an email from Mathu Rajan alleging an upcoming meeting utilizing technology protected
by the current TRO.  Do you know anything about SeeCubic violating the TRO by showing prototypes that
should belong to Stream?


We also note that the latest monthly statements included a reference to payments to Philips.  I assume
this was for product royalties related to product covered by the Philips license.  To our knowledge, every
product made by Stream or its subsidiaries that needs a Philips license has also utilized Rembrandt
technology.  What products were covered by this Philips payments?  When were they made and
transferred?  Who authorized and made the transfer of products that precipitated payment of the fees to
Philips? Why was a license fee paid to Philips but none of Rembrandt license fees paid?


I have copied Eben Colby and Steve Caponi and I am requesting a phone conference to discuss the
situation and consent to expedited discovery to provide documents and/or testimony to understand
what if any technology has been demonstrated.   I am open for such a call tomorrow after 3:00pm or
anytime Wednesday.


Obviously, our first concern is whether Rembrandt's technology was utilized, but as a creditor, we are
also concerned whether any of the assets of the estate were used outside the estate.


If we can not reach an agreement on the nature of discovery, we will ask for a conference with the judge
to seek expedited discovery before the upcoming hearing on the TRO.

**EXHIBIT K**

To that end, we demand of all parties that all documents, texts, emails, and records of all phone calls, WhatsApp texts, communications of any sort related to use of technology covered by the TRO and/or owned by Stream or its subsidiaries be preserved.  Specifically, we request that if any meetings are to take place that those meetings be recorded and that the names and contact information of all those in attendance (whether in person or remotely) be collected and retained.  We will use any failure to do so as evidence of your knowledge that your activities violate the existing TRO and the IP rights of Rembrandt.

I look forward to hearing from you.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*

*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Mathu Rajan <mathu.rajan@visualsemi.com>
**Sent:** Monday, May 6, 2024 3:27 PM
**To:** bud.robertson@visualsemi.com; Christopher Michaels <michaels@bpmlegal.com>
**Cc:** ntwallace@aol.com; nicole.maneen@visualsemi.com; ademarco@devlinlawfirm.com; steve@rembrandt3d.com
**Subject:** TRO violation

Dear Chris:

**A-492**

It has come to our attention that SeeCubic, Inc. ("SCI") continues to act in violation of the temporary restraining order issued by the bankruptcy court on January 5, 2024 (Adversary Docket No. 119). Recent demonstrations of Glasses-Free 3D technology have been made by SCI to its investors in London, and more are scheduled in Jersey, UK tomorrow Tuesday, May 7, 2024 in defiance of the court order. This is being done in an attempt to raise funds that SCI intends to use for a settlement with Stream TV that will have a negative impact on creditors like Rembrandt 3D. As you know, this is a pattern of behavior by SCI that you have observed consistently since the Delaware Supreme Court struck down the Omnibus Agreement and ordered the reversal of its effects nearly two years ago. SCI continues to damage Stream TV and its creditors by operating in the shadows overseas where it believes its activities will go unnoticed and without consequence.

Thanks,

Mathu

Sent from my iPhone

**A-493**

**From:** William Homony <bhomony@mctllp.com>
**Sent:** Tuesday, September 10, 2024 4:01 PM
**To:** bud@streamacquisitiongroup.com
**Cc:** 'Nicole Maneen' <nicole@streamacquisitiongroup.com>; 'Suby Joseph'
<suby@streamacquisitiongroup.com>
**Subject:** RE: Philips - breach of contract

Bud, the TRO is no longer in effect.  I settled that issue.

During Q1 no displays were delivered. As a result, the reporting is empty.
During Q2 two (2) 12.3-inch display demonstrators were delivered to a customer.

Please have Suby submit the appropriate reports through the Philips portal.  Once the reporting is
remitted, I will be adding myself as the primary licensee contact in the database.

Regards,

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

**EXHIBIT L**



**300 Barr Harbor Dr., Suite 420**
**West Conshohocken, PA 19428**
**Phone: (610) 940-1094**
**www.ssgca.com**

**ACQUISITION OPPORTUNITY: GLASSES-FREE 3D TECHNOLOGY**
**STREAM TV NETWORKS, INC. AND OTHER DIRECT AND INDIRECT ASSETS**

**Transaction Summary**

Stream TV Networks, Inc. and Technovative Media, Inc. (collectively, "Stream" or the "Company") filed for protection under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania on March 15, 2023 (jointly administered Case No. 23-10763 (AMC)). The Company is currently operating as a debtor-in-possession and is presently under the control of a Chapter 11 Trustee ("Trustee") pursuant to 11 U.S.C. § 1104 of the U.S. Bankruptcy Code. Upon consideration of the Trustee, SSG was retained as the exclusive investment banker to market the Company's assets and solicit competing offers to the proposed stalking horse credit bid, which is approximately **$150 million**. The bid deadline will be determined at a later date, pending approval of the bid procedures by the bankruptcy court. The proposed sale will be pursuant to Section 363 of the U.S. Bankruptcy Code and will be on an "as is, where is" basis.

**Company Overview**

Stream, through both its U.S. and foreign subsidiaries, is the owner and developer of a cutting-edge technology stack comprising proprietary hardware, optics and software that delivers an advanced glasses-free 3D ("GF3D") display experience. Branded as Ultra-D™, the technology can be applied to numerous display devices, including digital signage and advertising, laptops, smartphones, tablets, automotive panels, monitors, game players and televisions. The Company's extensive intellectual property portfolio covers key technological advancements in optical solutions, display manufacturing, 3D image rendering, and optical stack design, providing robust protection for the Company's innovations. The technology can be licensed and embedded into partner hardware, enabling devices to display both native 2D content and immersive 3D content. Beyond hardware integration, the Company's rendering software can enhance the depth of standard 2D media, creating new viewing opportunities for legacy video. Lastly, to facilitate native 3D content creation, the Company has developed software development kits and plugins for gaming and other widely used platforms in the industry.

**Situational Overview**

Since its founding in 2009, Stream has raised and invested over $150 million in research and development, consistently advancing its technology over the past 15 years. During this period, the Company made significant technological advancements, securing numerous patents, enhancing image resolution, expanding the range of addressable display sizes, developing prototypes, and integrating software and hardware components into early models. Starting in 2019, the Company faced a series of contested and ongoing legal disputes with its stakeholders, which prevented the Company from commercializing its technology. As a result of these issues, the Company filed for protection under Chapter 11 of the U.S. Bankruptcy Code in order to manage liquidity and resolve outstanding secured debt and stakeholder litigation in a controlled forum. Following contested legal issues and limited progress among parties, the appointment of a Trustee was granted, and a settlement was reached to move forward with a sale of the Company's assets.

**Assets Overview**

Stream was founded to develop and commercialize its proprietary Ultra-D™ technology, which enables glasses-free 3D viewing. To support this effort, Stream established Technovative, a wholly owned subsidiary, which in turn directly or indirectly controls several entities, including SeeCubic B.V. ("SCBV"), a Netherlands-based company that serves as the primary research and development hub for the business. Together, these subsidiaries own and hold rights to various technologies, including Ultra-D. The development of Ultra-D was partially based on intellectual property licensed from Koninklijke Philips Electronics, including a portfolio of patents related to glasses-free 3D technology. In certain circumstances, the Trustee may be asked to sell equity interests in specific downstream entities with respect to the sale.

**Unique Features and Diverse Applications of Technology**

The Company's technology offers an attractive opportunity with the following attributes:

- No special glasses or eye-wear required
- Provides 3D viewing from any viewpoint
- Tech is independent of display technology
- Proprietary tech enhances standard 2D content

- Multiple viewers can watch content simultaneously
- Robust patent portfolio
- Scalable across multiple devices and screen sizes
- Proprietary manufacturing techniques

       

*To receive additional information, please request a Confidentiality Agreement from any of the individuals listed below:*

| **J. Scott Victor** | **Teresa C. Kohl** | **Craig D. Warznak** | **Alexander D. Lamm** | **Samuel P. Charlton** |
|---|---|---|---|---|
| *Managing Director* | *Managing Director* | *Senior Vice President* | *Senior Associate* | *Senior Analyst* |
| (610) 940-5802 | (610) 940-9521 | (610) 940-3615 | (610) 940-3882 | (610) 940-1072 |
| jsvictor@ssgca.com | tkohl@ssgca.com | cwarznak@ssgca.com | alamm@ssgca.com | scharlton@ssgca.com |

A-495

**EXHIBIT M**

Case 23-10763-amc Doc 447-14 Filed 10/29/24 Entered 10/29/24 21:50:57 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 1 of 184

1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| | : |
| IN RE: | : Case No.  23-10763 |
| | : |
| STREAM TV NETWORKS, INC.   CH: 11 | : ADV. No.  23-00057 |
| | : |
| Stream Tv Networks, Inc. Vs | : Philadelphia, Pennsylvania |
| Shadron L Stastney | : October 6, 2023 |
| | : 11:14 a.m. |
| Motion For Preliminary Injunction | : |
| Request For Temporary Restraining | : |
| Order Filed By Alastair Crawford, | : |
| Delaware And Other Law Firms | : |
| Representing And Acting In | : |
| Concert With John Doe(S) And/Or | : |
| Jane Doe(S), Jane Doe(S), John | : |
| Doe(S), Asaf Gola, Kevin Gollop, | : |
| Hawk Investment Holdings Limited, | : |
| Investment Banks Employed By John | : |
| Doe(S) And/Or Jane Doe(S), | : |
| Krzysztof Kabacinski, Arthur | : |
| Leonard Robert "Bob" Morton, | : |
| Seecubic B.V., Sls Holdings Vi, | : |
| Llc, Shadron L Stastney, | : |
| Seecubic, Inc., Patric Theune | : |
| Represented By Rafael X. | : |
| Zahralddin | : |

. . . . . . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                    Keith Kodosky, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   600 Peachtree Street NE
                                   Suite 4700
                                   Atlanta, GA 30308
                                   404-991-2183

                                   Kevin F. Shaw
                                   Lewis Brisbois Bisgaard & Smith
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-295-9436

Case 23-10763-amc Doc 497-11 Filed 10/29/23 Entered 10/29/23 22:36:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 2 of 184

2

APPEARANCES:

For Hawk Investment Holdings    Steven Caponi, Esq.
Ltd:                            K&L Gates
                                600 N. King Street, Suite 901
                                Wilmington, DE 19801
                                302-416-7080


For SeeCubic, Inc.:             Eben P. Colby, Esq.
                                Marley Anne Brumme, Esq.
                                Skadden Arps Slate Meagher &
                                Flom, LLP
                                500 Boylston Street, 23rd Floor
                                Boston, MA 021116
                                617-573-4800


For Shadron Stastney:           Terence M. Grugan, Esq.
                                Emilia McKee-Vassallo, Esq.
                                1735 Market Street
                                51st Floor
                                Ballard Spahr
                                Philadelphia, PA 19103
                                215-864-8320


For SLS Holdings VI, LLC:       Davis Lee Wright, Esq.
                                Robinson Cole, LLP
                                1201 North Market Street
                                Wilmington, DE 19801
                                302-516-1703


For Rembrandt:                  Andrew Peter Demarco
                                Devlin Law Firm, LLC
                                1526 Gilpin Avenue
                                Wilmington, DE 19806
                                302-449-9010


Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

Case 24-10763-amc 397 Doc 443-11 Document 11 Filed 10/29/24 Filed 04/16/25 09/23 Page 250 of 278 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 3 of 184

3

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Shadron Stastney
  (By Mr. Kodosky)        86              166
  (By Mr. Colby)               148
  (By Mr. Caponi)            164

Case 23-10763-amc 397 Doc 443-1 Document 10/09/23 Filed 04/16/26 26 59:57 27 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 4 of 184

4

```
 1   OCTOBER 6, 2023                              11:14 A.M.

 2             THE BAILIFF:  All rise.

 3             THE COURT:  Good morning.

 4             MR. KODOSKY:  Good morning.

 5             MR. CAPONI:  Good morning.

 6             THE COURT:  Please be seated.  All right.  All right.

 7             What happened to all the binders?  Did you move them?

 8   All the binders, I looked and they're all gone.  They're in my

 9   office, right?

10             THE BAILIFF:  Yeah.

11             THE COURT:  Oh, I don't need them.  I was just --

12             THE BAILIFF:  Yeah.  I was going to say, that's not

13   for this, right?

14             THE COURT:  No, no, no, no, no, no, no.  We don't

15   need the binder.  All right, counsel.  This is Stream TV Media

16   bankruptcy, and this is a hearing on a request for a temporary

17   restraining order preliminary injunction filed by the Debtors.

18             Counsel for the Debtor -- and counsel, before we

19   begin, I will just say, you're going to have to bear with me

20   because I'm recovering from the flu.  I'm already three days

21   into Tamiflu, so I should not be contagious, but I just want to

22   warn you, should I get a little tired, we may have to take a

23   break, okay?  All right.  Hold on one second.  Okay.  Okay.

24             Counsel for the Debtors?

25             MR. KODOSKY:  May I appease the Court, Your Honor?
```

Case 23-20763-amc397 Doc 483-11 Document 1697-23 Filed 10/28/23 Filed 04/16/25 09 26 57 278 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 5 of 184

5

```
 1              THE COURT:  Yes.

 2              MR. KODOSKY:  My name is Keith Kodosky.  I'm a

 3   partner with the Atlanta office of Lewis Brisbois.

 4              THE COURT:  And could you spell that for me, Counsel?

 5              MR. KODOSKY:  Yes, Your Honor.  It's K-O-D-O-S-K-Y.

 6              THE COURT:  Okay.  And you --

 7              MR. KODOSKY:  I'm joined here today --

 8              THE COURT:  Um-hum.

 9              MR. KODOSKY:  -- with Mr. Matthew Rajan and Mr.

10   Charles Roberts.

11              MR. ROBERTSON:  Robertson.

12              MR. KODOSKY:  Robertson.

13              THE COURT:  And they're both --

14              MR. KODOSKY:  With the Debtors.

15              THE COURT:  But they're not counsel?  They're just

16   witnesses?

17              MR. KODOSKY:  Correct.  I am joined by Kevin Shaw and

18   Andrew Trinowsky.

19              THE COURT:  Counsel?  Yes, Counsel for the Debtors?

20              MR. KODOSKY:  Yes, Your Honor.

21              THE COURT:  Okay.  So there's Kevin?

22              MR. KODOSKY:  Shaw, Your Honor.  Sierra, Hotel,

23   Alpha, Whiskey.

24              THE COURT:  Okay.  And your counsel for Debtors.

25              You've been here before, correct, Mr. Shaw?
```

Case 23-10763-amc Doc 397 Filed 06/26/24 Entered 06/26/24 09:14:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 6 of 184

6

| | |
|---|---|
| 1 | MR. SHAW:  Yes, Your Honor. |
| 2 | THE COURT:  Okay.  And who is the other co-counsel? |
| 3 | MR. KODOSKY:  Andrew -- |
| 4 | MR. ROBERTSON:  I'm just a law clerk. |
| 5 | THE COURT:  Oh, okay.  Well, I upgraded you. |
| 6 | MR. KODOSKY:  Your Honor, we're very pleased to |
| 7 | announced that he passed the Bar yesterday. |
| 8 | THE COURT:  For Delaware? |
| 9 | MR. ROBERTSON:  Yes, ma'am.  Delaware. |
| 10 | THE COURT:  Oh.  I remember when I was going -- do |
| 11 | they still make you kind of scroll through for your number to |
| 12 | see if you -- when you want to confirm that you've been |
| 13 | admitted, they have it listed by number and you have to go |
| 14 | through and see if your number is on there? |
| 15 | MR. ROBERTSON:  Oh, it's by name.  It's actual name. |
| 16 | THE COURT:  Oh, well hmm.  Well, that's great, |
| 17 | because when I did it, you had to scroll through and look for |
| 18 | your number. |
| 19 | MR. ROBERTSON:  Oh, wow. |
| 20 | THE COURT:  And I thought I knew what my number was, |
| 21 | but I wasn't sure.  It was on there. |
| 22 | MR. ROBERTSON:  Thank you, Your Honor. |
| 23 | MR. KODOSKY:  It's like a closing. |
| 24 | THE COURT:  What? |
| 25 | MR. KODOSKY:  It's like a school closing, except for |

```
 1   a number.

 2          THE COURT:  Right.  I was going through and I was

 3   like looking and just kind of slowly, but at least now you know

 4   to look for your name.  Well, my daughter gets hers today.

 5          MR. ROBERTSON:  Oh, wow.  Thank you, Your Honor.  I

 6   appreciate it.

 7          THE COURT:  Thank you.  Congratulations.  So now we

 8   can say he's more than a law clerk.

 9          MR. ROBERTSON:  Yes, yes.

10          THE COURT:  He just hasn't been formally admitted.

11          Did you do the list -- do they still make you do that

12   list of tasks?

13          MR. ROBERTSON:  Oh, yeah.  Definitely.

14          THE COURT:  Oh, yeah.  Well, have fun with that.

15   Okay.  That is not a good process, but, you know, it's -- I

16   think it's just hazing, but in any event, I can say that.

17          All right.  I'm sorry, Counsel.  Go ahead.

18          MR. KODOSKY:  No worries, Your Honor.  As our first

19   witness, we have, in compliance with the Court's direction,

20   filed this morning, witness and exhibit lists.

21          THE COURT:  Um-hum.

22          MR. KODOSKY:  As our first witness, we would call Mr.

23   -- I apologize if I'm --

24          THE COURT:  We're not there.  What I'm going to do

25   right now is I'm going to get appearances from each side.
```

Case 23-10763-amc Doc 1437-11 Filed 10/28/24 Entered 10/28/24 12:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 8 of 184

8

```
 1                    MR. KODOSKY:  Okay.

 2                    THE COURT:  And then we're going to have an initial

 3    hearing as to why this is an emergency.

 4                    MR. KODOSKY:  Okay.

 5                    THE COURT:  Because I have some questions.

 6                    MR. KODOSKY:  Okay.

 7                    THE COURT:  I have a whole list of questions.

 8                    MR. KODOSKY:  Okay.

 9                    THE COURT:  So we may get to, you know -- this may

10    not -- well, assuming my questions are answered, then we may

11    need some evidence.  If they're not, I may be able to, based on

12    the record that I have before me, make a ruling.  I don't know

13    yet.

14                    MR. KODOSKY:  Okay.

15                    THE COURT:  But that's where I am, okay?

16                    All right.  Let me see who's here for the opposing

17    party.

18                    MR. KODOSKY:  Thank you, Your Honor.

19                    THE COURT:  Um-hum.

20                    MR. COLBY:  Good morning, Your Honor.  Eben Colby and

21    Marley Brumme from Skadden Arps on behalf of SeeCubic.  Also

22    joined by one of our paralegals, Melissa Lau, L-A-U.

23                    THE COURT:  Okay, paralegal.

24                    MR. COLBY:  And finally, from SeeCubic, Shad

25    Stastney, Mr. Stastney has been here before.
```

```
 1              THE COURT:  And who are you here for, Mr. Colby,
 2   again?
 3              MR. COLBY:  SeeCubic, Inc.
 4              THE COURT:  Okay.  Anybody else entering their
 5   appearance in this matter?
 6              MR. COLBY:  Yeah.  There's some new faces here today,
 7   Your Honor.
 8              THE COURT:  Okay.
 9              MR. GRUGAN:  Good morning, Your Honor.  Terence
10   Grugan from Ballard Spahr.
11              THE COURT:  Terence?  What's your name again?  Last
12   name, sir?
13              MR. GRUGAN:  Grugan, Your Honor.  G-R-U-G-A-N.
14              THE COURT:  And you're from Ballard.  And who do you
15   represent?
16              MR. GRUGAN:  I represent Mr. Stastney in his personal
17   capacity.
18              THE COURT:  Now, are you involved with representing
19   Mr. Stastney?  I know that tentatively that there's this
20   adversary against lots of people.  I don't look at those things
21   until I have to, but I know they exist.  Are you representing
22   him in that matter or solely for today?
23              MR. GRUGAN:  In the adversary matter.  I would enter
24   my appearance on behalf of Mr. Stastney individually.
25              THE COURT:  All right.
```

Case 23-10763-amc 39-7 Doc 1487-11 Filed 10/29/24 Filed 04/16/25 00/23 29 56 50 27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 10 of 184

10

```
 1              MR. GRUGAN:  Yep.

 2              THE COURT:  As I say, I don't go perusing the dockets

 3   and creating trouble for myself.

 4              MR. KODOSKY:  Yeah.  And Your Honor, just to clarify,

 5   I believe the motion was filed in the adversary proceeding.

 6              THE COURT:  Right.  I know that, but --

 7              MR. KODOSKY:  Okay.

 8              THE COURT:  -- I wasn't sure that whether an

 9   appearance had been entered yet for Mr. Stastney.  Again, I

10   don't -- I would not get that information until some matter

11   came, either a motion to dismiss or an answer was filed.  And

12   once an answer is filed, I issue a scheduling order.  I'm

13   nowhere near that, so I don't even know, to be perfectly

14   honest, who the Defendants are, other than what's in the title.

15   Okay.  All right.

16              And you are here, sir?

17              MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

18   from Robinson & Cole. I'm here on behalf of SLS Holdings VI,

19   LLC.

20              THE COURT:  SLS Holdings VI, LLC?

21              MR. WRIGHT:  LLC, Your Honor.  Yes.

22              THE COURT:  And I'm sorry.  Your last name, again,

23   Counsel?

24              MR. WRIGHT:  Wright, W-R-I-G-H-T.

25              THE COURT:  Okay.
```

Case 23-10763-amc Doc 1447-11 Filed 06/26/25 Entered 06/26/25 19:50:27 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 11 of 184

11

1        MR. WRIGHT:  Thank you.

2        THE COURT:  Thank you. Mister --

3        MR. CAPONI:  Your Honor, good morning, again.  Steve

4  L. Caponi from K&L Gates on behalf of Hawk.

5        THE COURT:  And is Hawk a Defendant in the adversary?

6        MR. CAPONI:  There are no other Defendants at this

7  point in time, Your Honor.

8        THE COURT:  Okay.  Again, I don't know who -- other

9  than, you know, the original just looking at the caption, I

10  have no clue who's the Defendant.  I know there's a lot of

11  names.  Okay.  Anybody else who -- oh, okay.

12        MR. DEMARCO:  Yes, Your Honor.  Andrew DeMarco from

13  Devlin Law Firm, here for Rembrandt.

14        THE COURT:  Rembrandt.  Okay. Anybody else?  I think

15  that covers everyone in the courtroom.  All right.

16        MR. KODOSKY:  Your Honor --

17        THE COURT:  Um-hum.

18        MR. KODOSKY:  -- just while we're on the issue of

19  appearances, I would note for the record that the adversary

20  proceeding was filed against a number of other individuals and

21  a company.  They are also, supposedly, subject of the TRO

22  motion, but they're not here.  They don't have counsel here.

23  Based on our view, it doesn't look like they've been properly

24  served.  It's a little hard to see how we could proceed on a

25  TRO motion against them where they haven't been properly

 1  served.  I'll just make that notation for the record, but so

 2  that would --

 3          THE COURT:  Well, that's their burden.  They have to

 4  show that --

 5          MR. KODOSKY:  You took the words right out of my

 6  mouth, Your Honor.

 7          THE COURT:  That's on them, so I mean, I've read your

 8  pleadings.  And again, that's what took a bit, because unlike

 9  law firms, I don't have 10 associates to research issues and go

10  through.  So it's, you know -- so it took us a bit,

11  particularly since, you know, I'm a little under the weather.

12  So that's my story as to why we're starting a little later than

13  I anticipated. Oh, can you not hear me?  Can you hear me now?

14  Okay.  I apologize.  Again, and counsel, I will, again,

15  reiterate that if I start to feel unwell, I am going to take a

16  little time out, okay?  All right.

17          So Mr. Kodosky, you've heard my -- the initial, I

18  guess, inquiry would be, is who are we proceeding against

19  today, and what's the emergency with respect to -- I'm assuming

20  each one of these named Defendants, which is -- hold on.  Let

21  me -- I do have a pleading binder.  It's not going to have --

22  let's see what we have in ours, which is going to be the

23  original complaint.  So I have the original complaint that was

24  filed, and it names a number of -- I mean, my original, if I

25  just look at it on my docket sheet, it's just going to say

Case 23-20763 Doc 897 Doc 447-11 Filed 10/29/23 Filed 04/16/25 Entered 10/29/23 23:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 13 of 184

13

 1  Stream TV and Technovative versus Stastney, SLS, et al.  So I

 2  do have a copy of the original complaint that lists all of the

 3  Defendants.

 4          So let's start with who is the Debtor seeking a TRO

 5  against?

 6          MR. KODOSKY:  The TRO was filed against all of the

 7  Defendants, Your Honor.

 8          THE COURT:  Um-hum.

 9          MR. KODOSKY:  But admittedly, we are still in the

10  process of serving some of the overseas individuals and

11  entities.  We have before us with the Court today, Mr. Stastney

12  and Hawk and SLS and SCI.

13          THE COURT:  Wait.  I thought Hawk wasn't a Defendant

14  in this matter.

15          Did I miss something, Mr. Caponi?

16          MR. CAPONI:  I believe Hawk is a Defendant.

17          THE COURT:  I thought you said Hawk -- Hawk is

18  named --

19          MR. KODOSKY:  Hawk is here.

20          MR. CAPONI:  Hawk is named.

21          THE COURT:  Yeah.  You said they weren't a Defendant

22  -- to your knowledge, they weren't a Defendant yet, but

23  apparently, Hawk Investment Holdings -- is that -- you know you

24  guys have different names for these companies, so I don't know.

25  Is this the one that's your client?  Is this something

```
 1   different?  I don't know, but I thought you said they were not
 2   a Defendant yet.
 3           MR. CAPONI:  Hawk Investment Holdings Limited, Your
 4   Honor?
 5           THE COURT:  Yes.  Is that something different than
 6   the Hawk we've been talking about?
 7           MR. CAPONI:  No.  That's who I represent in this
 8   proceeding.
 9           THE COURT:  Okay.  So they are a named Defendant?
10           MR. CAPONI:  They are a named Defendant, Your Honor,
11   and they have filed a proof of claim in this case.  And I know
12   that there have been questions raised or at least eluded to
13   about, you know, jurisdiction.  Our position is, is that, for
14   example, Hawk or SLS or SCI, they've filed proofs of claim,
15   they're here, there shouldn't be a question of jurisdiction.  I
16   believe the Court's bigger concern is why now, the urgency
17   question.
18           THE COURT:  Well, before we get to the urgency, what
19   about these other people who have -- I haven't heard anyone
20   say.  So Mister -- I gave you another name, counsel.
21           MR. CAPONI:  Sorry?
22           THE COURT:  I made up a different name for you.  I
23   made you Steven Kobe [phonetic].  I'm like, who is that.  For
24   Hawk's.
25           MR. CAPONI:  Hawk, yes.
```

Case 23-20763-vam6397D0u488-De-Filed 10/09/23 File 04/46/25/00/29-29756/50 27Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 15 of 184

15

```
 1              THE COURT:  Yes.  That --

 2              MR. CAPONI:  Yes.

 3              THE COURT:  I'm sorry, Mr. Caponi.

 4              MR. CAPONI:  All right.

 5              THE COURT:  I know I wrote Kobe.  I don't know why.

 6   Between Kobe and DeMarco, those seem to be our favorite last

 7   names for this hearing.  All right.

 8              So Mr. Caponi, Hawk is a named Defendant in the

 9   matter.  I had written that --

10              MR. CAPONI:  Correct, Your Honor.

11              THE COURT:  -- they weren't, and you said to your

12   knowledge they weren't, but apparently they are named.  All

13   right.

14              So what about Arthur Leonard "Bob" Morton?

15              MR. KODOSKY:  Overseas Defendant, Your Honor.  We are

16   still in the process of serving him and the other individuals

17   overseas, which is not critical for today's purposes.

18              THE COURT:  So you're not looking for relief against

19   Mr. Morton?

20              MR. KODOSKY:  The most important thing, Your Honor,

21   is we're asking for relief against Mr. Stastney and the

22   companies that he's in charge of, and he's actually --

23              THE COURT:  Well, let's identify specifically who

24   we're talking about.  So you're seeking relief against Mr.

25   Stastney individually, correct?
```

Case 23-10763-amc Doc 897-11 Filed 10/29/23 Entered 10/29/23 23:54:37 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 16 of 184

16

```
 1              MR. KODOSKY:  Correct.

 2              THE COURT:  And which companies?  Which we believe is

 3    SeeCubic what?

 4              MR. KODOSKY:  I'm sorry.  SLS Holdings VI, LLC.

 5              THE COURT:  Hold on.  SLS VI Holdings, LLC, who is

 6    represented by Mr. Wright here, correct?

 7              MR. KODOSKY:  Correct.

 8              MR. WRIGHT:  Yes, Your Honor.

 9              THE COURT:  All right.  Who else?

10              MR. KODOSKY:  SeeCubic, Inc.

11              THE COURT:  Represented by Mr. Colby.  And Stastney

12    is represented by Mr. Grugan from Ballard.

13              Did I pronounce your last name right?

14              MR. GRUGAN:  Grugan.  That's it, Your Honor.

15              THE COURT:  All right.  Okay, because I'm a little

16    off.  I'm spelling names probably not correctly, but just bear

17    with me.

18              All right.  Who else are we asking for relief for?

19              MR. KODOSKY:  Hawk Investment Holdings Limited.

20              THE COURT:  And that's Mr. Caponi's client.

21    Investment Limited.  Okay.

22              And who else?

23              MR. KODOSKY:  Any agents of any of the above, Your

24    Honor.  Servants, employees, attorneys, others acting on their

25    behalf.
```

Case 23-10763-amc Doc 1447-11 Filed 10/09/24 Entered 10/09/24 20:56:50 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 17 of 184

17

```
 1              THE COURT:  All right.  Now, what about -- who is
 2    Patric Theune?
 3              MR. KODOSKY:  He is --
 4              THE COURT:  Is he here?  Is he --
 5              MR. KODOSKY:  Overseas.
 6              THE COURT:  -- represented?
 7              MR. KODOSKY:  Overseas.
 8              THE COURT:  Okay.  And you're looking for some relief
 9    against him?
10              MR. KODOSKY:  Once he's served.  If --
11              THE COURT:  Well, I can't do anything with them
12    today.
13              Now, what about SeeCubic B.V.?  Is somebody here for
14    them?  Because I heard Mr. Colby say SeeCubic, Inc.
15              MR. KODOSKY:  Correct.  SeeCubic, Inc. is the
16    Delaware entity --
17              THE COURT:  Um-hum.
18              MR. KODOSKY:  -- that is involved --
19              THE COURT:  Um-hum.
20              MR. KODOSKY:  -- formed by the secured creditor.
21    SeeCubic B.V. is one of the Dutch entities --
22              THE COURT:  Oh.
23              MR. KODOSKY:  -- that's the R&D entity that we've
24    been talking about for some months that's in the Netherlands.
25              THE COURT:  So who is representing them?
```

Case 23-10763-amc Doc 1437-11 Filed 10/28/24 Entered 10/28/24 23:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 18 of 184

18

```
 1              MR. KODOSKY:  They have not been served, Your Honor.
 2              THE COURT:  Okay.  So they haven't served.  And I
 3   don't know how that is -- is that service required by the Hague
 4   Convention?  Is service required -- I don't know.  I'm assuming
 5   if they are a signatory to the Hague Convention that they are
 6   going to have to be served in accordance with whatever that is,
 7   which is translated and all those other different steps you
 8   have to -- so right now, we do not have SeeCubic B.V., we do
 9   not have Patric Theune, and we don't have the name -- all these
10   named individuals, Mr. Morton, Mr. Crawford, Mr. Kabacinski,
11   Mr. Gollop, ASAF Gola, and obviously all these other -- Jane
12   Doe(s) of Delaware.  What's Delaware?  Delaware, another law
13   firm?  What does that mean?  John Doe(s), Jane Doe(s) Delaware.
14   So John and Jane Doe(s) of Delaware, or is Delaware just the
15   State of Delaware?  I don't know.
16              Again, I have not -- I guess, you know, that would've
17   required me to go through the complaint and see who the parties
18   are and how they're identified.  Oh, okay.  Preliminary
19   statement, jurisdiction and venue.  Oh, okay.  They're under
20   Defendants, they're all identified in the parties, and let's
21   see who we see in this.  Miscellaneous.  Jane Doe(s),
22   Defendant, John Doe(s), law firms employed by John Doe(s) and
23   Jane Doe(s).  Defendant law firms are operating -- oh, on the
24   Delaware law employed.  Okay, I get it.
25              All right.  So it seems to me right now, today, all
```

 1 | we have is Mr. Stastney individually, SLS VI Holdings, LLC,

 2 | SeeCubic, Inc, and Hawk Investments Limited.  Those are the

 3 | only parties that are here and you acknowledge have been

 4 | properly served?

 5 |         MR. KODOSKY:  Correct, Your Honor.

 6 |         THE COURT:  Okay.  I'm sorry.  Can you hear me now?

 7 |         MR. KODOSKY:  Yes.

 8 |         THE COURT:  I'll endeavor to get it as close to

 9 | possible to the mic.  Is that okay, John?

10 |         UNIDENTIFIED SPEAKER:  It's better.

11 |         THE COURT:  All right.

12 |         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

13 |         THE COURT:  It's a little closer.  All right.

14 |         So you agree that those are the only four of the

15 | Defendants are presently before this Court --

16 |         MR. KODOSKY:  With the only caveat, Your Honor -- you

17 | mentioned SeeCubic B.V.

18 |         THE COURT:  Um-hum.

19 |         MR. KODOSKY:  Mr. Stastney has, as I believe the

20 | Court is aware, has been appointed director as of essentially

21 | two weeks ago of that entity, over in the Netherlands.

22 |         THE COURT:  Okay.

23 |         MR. KODOSKY:  So whether or not they're here today by

24 | virtue of his appearing in the courtroom today, obviously we're

25 | still working through service issues and so forth, but I

Case 23-20763-swe7 Doc 487-11 Filed 10/25/23 Entered 10/25/23 12:58:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 20 of 184

20

1    just --

2             THE COURT:  But it's not without notice.

3             MR. KODOSKY:  I just at least for the --

4             THE COURT:  Right.  I mean, it's not like these other

5    people who may be unaware of any of this stuff --

6             MR. KODOSKY:  Correct, Your Honor.

7             THE COURT:  -- or anything, that while they may not

8    have been formally served, it's not without notice to at least

9    a director.

10            MR. KODOSKY:  Correct.

11            THE COURT:  No.  I mean, they don't have to appear.

12   I mean, it's like anything else.  It's like, you know,

13   bankruptcy, I might know of it, but if you don't serve me or

14   give me the proper information, I don't really have to

15   participate, but I get it.  I get what you're saying.

16            All right.  So that's number one.  So I don't see how

17   I can issue any ruling.  I mean, actually, you can issue a TRO,

18   ex parte, without notice to anybody --

19            MR. KODOSKY:  Right.

20            THE COURT:  -- with an order that the hearing be held

21   within its designated time period, but nobody asked for ex

22   parte relief.  They asked for a hearing, which is what I went

23   from the very beginning, when I looked at that, it says, what

24   kind of relief were you looking for, and it says TRO/injunctive

25   relief.  So I wasn't quite sure if you were trying to do just a

Case 23-20763-dmc Doc 443-11 Filed 10/25/23 Entered 10/25/23 09:59:37 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 21 of 184

21

 1  TRO or a combined hearing, or exactly what the Plaintiffs were

 2  asking for.  So can you tell me exactly what you are asking

 3  this Court to do and in what context?

 4         MR. KODOSKY:  Absolutely, Your Honor.  We have asked

 5  for a temporary restraining order to be entered for a period of

 6  14 days, as allowed under Bankruptcy Rule 7065 and Federal Rule

 7  of Civil Procedure 65, and then following the 14 day period, we

 8  would ask the preliminary injunction and permanent injunction

 9  be entered pending the final adjudication of this matter.

10         THE COURT:  Okay.  And then the preliminary

11  injunction, what is that, 28 days?

12         MR. KODOSKY:  I'm sorry?

13         THE COURT:  What's that, 28 days for a preliminary

14  injunction?

15         MR. KODOSKY:  I didn't hear you, Your Honor.

16         THE COURT:  Oh.

17         MR. KODOSKY:  I'm sorry.

18         THE COURT:  And the preliminary injunction is also

19  limited in time, is it not?

20         MR. KODOSKY:  We would ask for the preliminary

21  injunction to last until the final order in this case, Your

22  Honor.  The final judgment.

23         THE COURT:  I don't know.

24         MR. KODOSKY:  The Court has the discretion to enter a

25  preliminary injunction for a lesser time period, but we are

Case 23-20763-dob 97 Doc 487-11 Filed 10/29/23 Entered 04/16/25 00/22 36:57 27 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 22 of 184

22

1  asking, given the nature of the relief that we're seeking, for

2  it be entered until final judgment in this case.

3          THE COURT:  Hmm, okay.  Again, because of the way it

4  was titled, I wasn't quite sure exactly.  I knew it was an ex

5  parte relief.  That was the one thing I was certain of.

6          Okay.  And you believe, and while an evidentiary

7  hearing is not required for a TRO, it makes sense when there's

8  disputed facts for the Court to make an -- to have an

9  evidentiary basis upon which to make its decision, if the Court

10  finds that that record needs to be made.

11         And so that's the first thing I'm sort of trying to

12  figure out before we get into all of this testimony, is -- and

13  I don't think I need testimony to tell me what the Debtor

14  believes was the basis for the -- why we needed to do this TRO

15  and why it was an emergency.  I'm not understanding what is the

16  emergency.  I've read both party's pleadings and I'm walking

17  away confused.

18         So counsel, why don't you just, in the initial

19  matter, tell me why you believe that this was, you know -- what

20  is the emergency?  I'm not understanding.

21         MR. KODOSKY:  Well, there's several bases for that,

22  Your Honor.  First of which is that we've recently been

23  informed and -- permission to approach, Your Honor?  We've been

24  informed --

25         THE COURT:  Well, no.  Just tell me because I'm not

Case 23-20763-ber Doc 437-11 Filed 10/26/23 Entered 10/26/23 09:36:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 23 of 184

23

1  looking at evidence right now.

2          MR. KODOSKY:  We've been informed by Philips that

3  they're not giving out anymore licenses, and they also are in

4  the process of selling a big chunk of the patents, and we're at

5  a very real risk, Your Honor, of losing our license from

6  Philips, based on the conduct of these Defendants.  The fox is

7  in charge of the hen house, Your Honor, as of two weeks ago.

8  Mr. Stastney is in charge of -- he's been appointed a director

9  of SCBV, which is new information.  If --

10          THE COURT:  Well, I get that's new.  That's new from

11  two weeks ago, correct?

12          MR. KODOSKY:  Correct.

13          THE COURT:  All right.  That I get is new, but I'm

14  not quite sure how that translates into an emergency, but

15  you're going to have to tell me.  At least tell me.  I'm not

16  looking at evidence, no.  I'm just trying to get a feel for

17  whether this is something that I even need to have a hearing

18  on, or something that based on the pleadings that I've seen,

19  putting aside whatever the parties are disputing, whether I can

20  issue a ruling without, and then setting -- issue a TRO, and

21  then a hearing on a preliminary injunction.

22          Because the first thing I have to figure out is, is

23  this an emergency, and if it is, whether I even need to say,

24  I'm not giving a TRO because there's not an emergency and just

25  do a regularly scheduled hearing on a preliminary injunction.

Case 23-10763-amc  Doc 993-11  Filed 10/28/24  Entered 10/28/24 09:36:57  Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 24 of 184

24

 1  You know, they're the same standard, by the way, but it's just

 2  that the TRO is more of an emergency as opposed to the

 3  preliminary injunction, which is not on an emergency basis --

 4  typically not on an emergency basis.

 5          All right.  Not giving out anymore licenses.  Okay.

 6  Now, Stream has one, right?  No, or Rembrandt has one?  Who has

 7  a Philips license, your understanding?  That's all I'm asking.

 8          MR. KODOSKY:  Correct, Your Honor.  The license is

 9  held by Ultra D Ventures, and its affiliates, which includes

10  the Debtors.

11          THE COURT:  Ultra D?  Ultra D who?

12          MR. KODOSKY:  Ultra D Ventures, which is one of the

13  Stream subsidiaries.  I know Your Honor is --

14          THE COURT:  Oh, no.  I have my little handy -- no, I

15  came prepared today.

16          MR. KODOSKY:  We provided the --

17          THE COURT:  Thanks to my law clerks, I am prepared,

18  at least as prepared as I think I need to be.

19          MR. KODOSKY:  I believe --

20          THE COURT:  Okay.  Ultra D Ventures?

21          MR. KODOSKY:  Yes.  Yes, Your Honor.

22          THE COURT:  CV Corasaw [phonetic]?

23          MR. KODOSKY:  Yes, Your Honor.

24          THE COURT:  They hold licenses?

25          MR. KODOSKY:  Correct.

Case 23-10763-amc Doc 1437-11 Filed 10/29/24 Entered 10/29/24 23:36:57 Desc
Exhibit K. Stream October 2022 Appeal Transcript   Page 25 of 184

25

 1                    THE COURT:  Okay.  Somebody gave me this.  This is --
 2    somebody -- it may have actually been entered into evidence.  I
 3    don't know.  I'm sure somebody talked about it.
 4            Mr. Colby?
 5            MR. COLBY:  Yeah.  We submitted it in connection with
 6    our brief, but it also was used in the hearing on the Hawk
 7    motions.
 8                    THE COURT:  Okay.  I'm like, I didn't just pull this
 9    out of somewhere.
10            MR. COLBY:  It is in evidence in that.
11                    THE COURT:  All right.  So I see this Ultra D.  Okay,
12    okay.  Hmm.  And Ultra D is 99 percent -- according to this
13    chart, apparently is 99 percent owned by Stream TV Networks.
14            MR. KODOSKY:  Correct, Your Honor.
15                    THE COURT:  Okay.
16            MR. KODOSKY:  And importantly, as I believe the Court
17    is aware, the Philips license expressly provides that there are
18    to be no sub-licenses.  And so by virtue of the Defendants
19    running around to potential clients and customers, sub-
20    licensing the technology from Philips, they're breaching the
21    Philips license, putting our license at risk.
22                    THE COURT:  Well, they -- I mean, if I read their
23    response, they have their own direct license from Philips.
24    That's what they say.
25            MR. KODOSKY:  And that's certainly something that

Case 22-10763-amc397 Doc 1487-11 Filed 10/29/23 Filed 04/16/20/23 29:30:37 27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 26 of 184

26

 1  we're going to be asking Mr. Stastney about, because there has

 2  been no license granted from Philips to SCI or to Mr. Stastney.

 3          THE COURT:  Well, that's a dispute.  That's a

 4  dispute, I get that.  Okay.  So you believe that once Mr.

 5  Stastney was appointed on September --

 6          MR. KODOSKY:  September 20th.

 7          THE COURT:  Why did I have September 13th?  What's

 8  September 13th?

 9          MR. KODOSKY:  September 12th, Your Honor, is the date

10  that their attorneys --

11          THE COURT:  Oh, it was a hearing.  It was a hearing

12  on the 12th or the 13th?

13          MR. KODOSKY:  The 12th was whenever their attorneys

14  submitted a new claim asking that Mr. Stastney be appointed

15  director.

16          THE COURT:  Oh, okay.

17          MR. KODOSKY:  The 13th and 14th, I believe, were the

18  dates of the hearing.

19          THE COURT:  And then there was an order entered on

20  the 20th?

21          MR. KODOSKY:  And the order was entered on the 20th.

22  And if you look -- and I know that you have, Your Honor, but --

23          THE COURT:  Well, I wouldn't be so sure, but go

24  ahead.

25          MR. KODOSKY:  I've read your transcript from the

```
 1   April 14th hearing where you specifically said, I don't want
 2   anybody going to the Netherlands and telling the Netherlands
 3   court.  That claim belongs here.  And then you came back at the
 4   June 29th hearing and you said, you went back and you read the
 5   April 14th transcript and you said, there's going to be serious
 6   consequences if anybody over in the Netherlands is trying to
 7   essentially take over any of the assets, and that's exactly
 8   what they did.
 9              THE COURT:  I don't know if they did or they didn't,
10   but I will reiterate for the record that as far as this Court
11   is concerned, to the extent the Debtor contains this is assets
12   of the Debtor's estate and there's a dispute regarding that --
13   now, this belongs here.  Now, where I've sent it to, do I -- am
14   I some expert on IP?  I'm not.  Would I send it somewhere else?
15   But it's not going to be somewhere other than in this Court or
16   courts affiliated with this Court, which means the District
17   Court.
18              MR. KODOSKY:  Yes, Your Honor.
19              THE COURT:  So that's clear, and I'm not quite sure
20   if what you're saying is that the by-appointment of Mr.
21   Stastney, that court somehow is exercising control over the
22   licenses.  I'm not sure if -- unless there was some order
23   saying they could do something with it or they proposed --
24   because I will say to everyone here, to the extent anyone is
25   trying to sell, use, or do anything that belongs to the Debtor
```

Case 23-10763-amc 397 Doc 447-11 Filed 10/28/23 Entered 04/16/25 00:23:36 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 28 of 184

28

```
 1   contents, belongs in this estate, I have told everybody and I'm
 2   going to reiterate, you proceed at your own risk.
 3           MR. KODOSKY:  Right.
 4           THE COURT:  Because I am pretty sure and I'm pretty
 5   certain that if this is the Debtor's assets, no one can do
 6   anything.  I don't know if it's the Debtor's assets.  That's
 7   number one.  I don't know if it is or it isn't, but when the
 8   Debtor asserts that it is and someone decides that they're
 9   going to do something with it, proceed if you want, there's
10   going to be consequences for that.  But I have -- just because
11   he's appointed a director doesn't mean that he's doing
12   anything.  "He" meaning the company that he's been appointed as
13   director for.  So I need to talk -- how is that an emergency?
14           MR. KODOSKY:  Well, and Your Honor, one of the
15   exhibits that we attached to our motion was this subscription
16   agreement.  They are out there raising money, essentially lying
17   to investors.  There's no mention of this litigation, there's
18   no mention of any kind of question about the IP rights.
19   They're raising money to compete against us and to fund
20   litigation against us.
21           THE COURT:  Well, that's all well and good.  They can
22   go raise whatever money they want, but I've read their reply
23   and they said that they're telling potential purchasers of
24   subscription that this stuff is in dispute.
25           MR. KODOSKY:  And Your Honor, I picked up on that
```

Case 23-10763-amc Doc 1447-11 Filed 10/28/24 Entered 10/28/24 09:36:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 29 of 184

29

 1 | line in their response, as well, and if you note, there's no --
 2 | they're not citing to anything after that sentence.
 3 |         THE COURT:  Well, presumably, they're going to give
 4 | me a copy of the subscription.
 5 |         MR. KODOSKY:  We've provided a copy of the
 6 | subscription, Your Honor.
 7 |         THE COURT:  Well, that's their defense, and so it
 8 | seems to me that notwithstanding what I thought I could just --
 9 | you know, I thought I could proceed in a certain manner, which
10 | is look, okay, maybe this is an emergency, and given what I've
11 | seen in the pleadings, there is -- now there's a dispute.
12 | There's a -- the Debtors are saying Mr. Stastney, through
13 | SeeCubic B.V., is doing certain things that are basically the
14 | Debtor's assets, and that Mr. Stastney, individually, is doing
15 | action with respect to the Debtor's assets, and we need to stop
16 | him and SeeCubic B.V.
17 |         MR. KODOSKY:  And SeeCubic, Inc.
18 |         THE COURT:  And what are they -- what's their
19 | relationship?  Are they out there doing things, too?
20 |         MR. KODOSKY:  They are marketing and selling to
21 | potential clients the technology -- I've got Mr. Stastney's
22 | testimony where he describes it as, we are marketing and
23 | selling -- I can read you his --
24 |         THE COURT:  Well, no, no.  So you believe that Mr.
25 | Stastney is trying to -- well, not Mr. Stastney -- SeeCubic,

Case 23-10763-amc Doc 497-11 Filed 10/29/24 Entered 04/16/25 00:00:00 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 30 of 184

30

```
 1   Inc. --
 2            MR. KODOSKY:  SeeCubic, Inc.  Correct.
 3            THE COURT:  -- is trying to sell the license that
 4   belongs to the Debtor?
 5            MR. KODOSKY:  Absolutely.
 6            THE COURT:  And their position is, well, we haven't
 7   used anything that technically could be the Debtor's since
 8   2020.
 9            MR. KODOSKY:  Mr. Stastney, on June 23rd, at his
10   deposition, stated, "SeeCubic, Inc. sells or markets the
11   technology to potential clients on behalf of SeeCubic B.V."  So
12   SeeCubic, Inc. is working with SeeCubic B.V.  They call it
13   SeeCubic T.V., and together, they are --
14            THE COURT:  Now we've got another player?  Like I
15   can't keep these names straight.  SeeCubic B.V., SeeCubic,
16   Inc., now we have SeeCubic T.V.?
17            MR. KODOSKY:  And that's -- I don't even know that
18   that's a real organization, Your Honor, but he described it at
19   the June 29th hearing as SeeCubic B.V. and SeeCubic, Inc.
20   working together to sell this licensing -- to sell the Philips
21   Technology, essentially.
22            THE COURT:  But this is what -- in my mind how this
23   is working, and Mr. Colby, you'll be able to answer, too.
24   Originally, and this is how I see it, which is why I don't know
25   if I need any evidence because I may have enough to say what I
```

Case 23-10763-amc Doc 897-11 Filed 10/25/23 Entered 10/25/23 20:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 31 of 184

31

```
 1  need to say.  But originally as I see this, there was --
 2  somehow, there was -- Stream TV, Stream, started to develop
 3  this technology with engineers that came from Rembrandt.  I
 4  have my own thoughts about that, but that's neither here nor
 5  there.  And somehow, Rembrandt found out and they said, no,
 6  this is ours, and so they sort of fought it out and came to
 7  some agreement.
 8          In the meantime, Stream, because it's Stream and
 9  whatever, they work out some agreement.  And in the meantime,
10  Stream's subs are authorized to use the license -- or I don't
11  know how they got the license, because nobody has ever said to
12  me where the license is from Stream to these other people.  I
13  haven't seen anything.  All I recall from Mr. Stastney is
14  that's how it's always been, but that doesn't help me.  Doesn't
15  help me to follow the flow of how the license flowed.
16          MR. KODOSKY:  Your Honor --
17          THE COURT:  I don't know, and nobody has given me any
18  written documents, other than what I have from Rembrandt and
19  Stream, nothing telling me how it got to these other people,
20  other than that's how we always did it.  That's not going to
21  help me one bit, but nevertheless, getting that, you know, so
22  one of -- according to this structure here, Ultra D Ventures is
23  holding the license and they're 99.9 percent owned by Stream
24  TV.  Okay.  And what Ultra D did with it, I don't know, and how
25  they were able to do it, I don't know because I don't know what
```

 1  license they had and how they got to hold a license, and what

 2  license they're holding.

 3         I don't know.  Nobody has put that into evidence.  I

 4  haven't seen that.  Now, if they have, I may have forgotten,

 5  and I could have, but I just never -- all I know is that's how

 6  we always did.  Did what?  I do not know.

 7         Okay.  So that's number one is trying to figure out,

 8  you know, that just because the Debtor comes in here and says,

 9  this is ours doesn't mean that I get to say, oh, well nobody

10  can do anything, but it's disputed.  It's disputed who this

11  belongs to and until it's determined and the Debtor says it's

12  ours, I don't know what to tell people.

13         Now, the other issue is, and I've heard -- you know,

14  I've read their responses, and I was trying to come up with an

15  analogy with my law clerks, should I use the house or not.

16  It's complicated, but it seems to me -- and maybe I'm not --

17  maybe I'm simple-minded, I don't know.  I look at things very

18  simply.  You're building a house.  You put a foundation in.

19  The foundation uses Philips and Rembrandt.  And Stream, from

20  the testimony that I recall, Mr. Michaels said, from Rembrandt

21  -- I think his name was Michaels -- that they fixed all --

22  "they" meaning Stream -- fixed all the problems and improved

23  the product, right?

24         So now you've got floor number one.  So we've built

25  up on floor number one.  And then here comes more parties,

Case 23-10763-amc Doc 1447-11 Filed 10/29/24 Entered 10/29/24 09:56:50 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 33 of 184

33

 1   which is, I'm assuming, SeeCubic B.V. in the Netherlands, who

 2   then builds on top of that and starts putting their information

 3   in, and says, well now we've built our own floor number two,

 4   and so floor number two is ours.  We haven't used floor number

 5   one, so this belongs to us and goodbye.  Well, this is a whole

 6   house and so now I have to figure out who the heck owns this,

 7   and you can't -- the same way Stream can't tell Rembrandt and

 8   Philips, go away because they built on their foundation, I

 9   don't see how these other parties, absent some agreement that

10   somebody is going to give to me, says that we've got to build

11   on top of your house, and you agreed that we didn't owe you

12   anything and we can go do whatever we want with it.

13          That's how I see this.  I don't care what you guys

14   can complicate it with this, that and whatever.  It is that

15   simple for this Court, okay?  And so what I am looking at is

16   what does that mean in terms of a TRO?  What is somebody doing

17   with respect to floor number one?  If they're not doing

18   anything with floor number one, then why are we here?  And if

19   floor number two involves floor number one, which is the

20   Debtor, I know why we're here.  And do I have to say to the

21   people who built floor number two, whoa, stop, you're using

22   floor number one, you don't just get to go out there and do

23   whatever you want.  You've got to recognize floor number one,

24   which is why I don't understand why you guys aren't -- never

25   mind.  Because it's very simple.

Case 23-20763-amc Doc 1487-11 Filed 10/09/23 Entered 04/26/00/23 29:56:57 27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 34 of 184

34

```
 1              And Mr. Colby, I will give you an opportunity.
 2              I'm just trying to say to him, what's the emergency.
 3   Is floor number two about to cave in?  Is floor number one
 4   about to cave in because floor number two is taking stuff and
 5   not recognizing floor number one?  What is the emergency?  And
 6   that is what I'm trying to figure out.  That's number one.
 7              MR. KODOSKY:  The concern is, Your Honor, is that
 8   having been appointed the director of SCBV, they are out
 9   approaching customers, putting the license completely at risk.
10   If Philips essentially were to find out what they were doing,
11   they could revoke our license and then every -- our business --
12              THE COURT:  And the foundation crumbles and they
13   all --
14              MR. KODOSKY:  The foundation is gone at that point,
15   Your Honor.
16              THE COURT:  And everything crumbles.
17              MR. KODOSKY:  And these are bankruptcy assets that he
18   has -- with the fox in charge of the hen house over there, he
19   has no right to be putting our license with Philips --
20              THE COURT:  Well --
21              MR. KODOSKY:  -- at risk.
22              THE COURT:  -- let's put it this way.  Whether it was
23   Mr. Stastney who was the director or any -- it doesn't matter
24   to me.  I get you want to use the fox and the hen house because
25   Mr. Stastney and Mr. Rajan are rivals.  I get it.  I get
```

Case 23-20763-acb97 Doc 443-11 Filed 10/29/23 Entered 10/26/22 29:56:57 27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 35 of 184

35

 1   exactly what happened.  I know what happens, and I have my

 2   thoughts about both of them, okay?  But that's neither here nor

 3   there, but they will be in whatever I have to write up, so you

 4   guys can rest assured I'm not saying anything that I'm not

 5   willing to put in writing, okay?

 6           You know, but the bottom line is, you know, the

 7   bottom line is whether it's Mr. Stastney, whether it's a third-

 8   party, it doesn't matter to the Court who it is.  The question

 9   is, are actions being taken that involves property of the

10   estate, jeopardizes property of the estate, and I need to stop

11   that from happening.  Unless that is what's occurring, I don't

12   see how I do a TRO.  That's what I'm trying to figure out from

13   the initial inquiry that I have to make, okay.

14           All right.  Mr. Colby, you heard what my questions

15   were, you tell me.

16           MR. COLBY:  Thank you, Your Honor.  I've got a couple

17   of things for sure.  First, in response to the question you

18   just ended with, is this property of the estate?  A couple of

19   points of clarification.  The Phillips' license and -- yeah,

20   the Phillips' license, so the biggest part of the foundation,

21   if you will, is not property of the estate.  It is with the

22   Dutch entities.  They --

23           THE COURT:  How did it get to them?

24           MR. COLBY:  They are multiple levels down.

25           THE COURT:  And do they have a license?

```
 1              MR. COLBY:  I'm sorry?

 2              THE COURT:  Do they have a license with Phillips?

 3              MR. COLBY:  Yes.

 4              THE COURT:  And when did they get that license?

 5              MR. COLBY:  That is the license that we've been

 6   talking about all along.  Stream TV, the Debtor, has no license

 7   with Phillips.

 8              THE COURT:  Okay.  So who has a license with

 9   Phillips?

10              MR. COLBY:  The license with Phillips is with what

11   we've been referring to as Co-op.

12              THE COURT:  Okay.

13              MR. COLBY:  I'm sorry, Ventures, which is if you look

14   at the chart, it's the top of the right side of the page

15   entity.

16              THE COURT:  And who is the majority holder of

17   Ventures?

18              MR. COLBY:  It is held by, I believe, Technovative

19   and Media Holdings Company.

20              THE COURT:  So I thought it was -- the way this chart

21   is looking, it's not looking like it's going to Technovative.

22   Looks like --

23              MR. COLBY:  Yeah.  That line, that 99.9 percent line

24   is a bit unclear.  We didn't put this chart together.  We're

25   just relying on it but --
```

```
 1              THE COURT:  So if it's by Technovative and

 2   Technovative is a Debtor -- they're a Debtor here, are they

 3   not?

 4              MR. KODOSKY:  Yes, Your Honor.

 5              MR. COLBY:  Correct.

 6              THE COURT:  Okay.

 7              MR. COLBY:  So Ultra D Ventures has that Phillips'

 8   license.

 9              THE COURT:  Okay.

10              MR. COLBY:  Okay.  The -- just to address the house

11   analogy, which I think is useful.

12              THE COURT:  Oh, thank you.  Because I struggle to

13   come up with one that I thought was going to give me a --

14              MR. COLBY:  Well, I think it's rough -- it's useful

15   -- it's a useful structure and it's roughly right.  Except I

16   think some of the -- in the way you laid it out, some of the

17   floors are reversed.

18              THE COURT:  Okay.

19              MR. COLBY:  So the important thing here, and this has

20   been the subject of a lot of testimony in this court, is that

21   the Phillips' license and then the other sort of big important

22   piece of the IP at issue are the various pattens.  Those exist

23   in the Dutch entities.  So at Ventures and below.  In fact,

24   most of the pattens are additional levels below.

25              THE COURT:  So pattens -- who's -- they own the
```

Case 23-10763-amc Doc 1447-11 Filed 10/29/24 Entered 10/29/24 23:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 38 of 184

38

```
 1   pattens or pattens from someone else?
 2           MR. COLBY:  They own the pattens.  Ultra D
 3   Cooperative, which is --
 4           THE COURT:  Owns the pattens.
 5           MR. COLBY:  Owns the pattens, correct.
 6           THE COURT:  Okay.  But Ultra D is a 99 percent
 7   subsidiary of Technovative?
 8           MR. COLBY:  Of -- there are multiple Ultra D's.  So
 9   if you notice --
10           THE COURT:  I'm saying Tech -- Ultra D Ventures, the
11   holder of the license?
12           MR. COLBY:  Right.  Ultra D -- I'm sorry, Your Honor.
13   Yeah, is the holder of the license.  Ultra D Cooperative holds
14   the pattens.  And it's actually written right in the box there.
15           THE COURT:  Holds a new patten created by SeeCubic?
16           MR. COLBY:  Right.
17           THE COURT:  Okay.
18           MR. COLBY:  And just to be clear, because again, this
19   is a historical document.  Not something we created.  But the
20   SeeCubic there is referring to the SeeCubic B.V., so the Dutch
21   RND Research and Development entity.
22           THE COURT:  Okay.  Well, it seems to me that Ultra
23   sold all of these companies, which is why I'm not understanding
24   why everybody is fighting over Technovative.  Is that Ultra D
25   Ventures is the license that was given by -- you're saying
```

Case 23-20763-amc Doc 447-11 Filed 10/23/24 Entered 10/25/24 00:22:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 39 of 184

39

```
 1   whole license.  What license?  The Phillips' license?
 2           MR. COLBY:  The Phillips' license is executed with
 3   Ultra D Ventures.
 4           THE COURT:  Okay.  And the Phillips' license and that
 5   you're saying the pattens, they didn't include anything from
 6   Rembrandt?
 7           MR. COLBY:  So if I could just --
 8           THE COURT:  Go ahead.  I'm sorry.
 9           MR. COLBY:  Yeah.  And I'll get to Rembrandt.  The
10   Ultra D Cooperative holds the pattens.  So -- and the pattens
11   were sort of created by the research and development at
12   SeeCubic B.V.
13           THE COURT:  Okay.
14           MR. COLBY:  Okay.  So that's sort of that right hand
15   side of the chart that you're looking at.
16           THE COURT:  But they created it based on the license
17   held by Ultra D Ventures?
18           MR. COLBY:  Yeah.  So they took that Phillips
19   Technology and then they've built on it and they have their own
20   pattens.  So the point I wanted to get to there is if Phillips
21   is the foundation, the first floor wasn't made by Stream TV
22   Networks, Inc., the U.S. entity that is a Debtor.  The first
23   floor was made by the engineers in the Research and Development
24   Group in the Netherlands.
25           THE COURT:  Yes.  But with companies that were at
```

Case 23-10763-amc Doc 977-11 Filed 10/29/24 Entered 10/29/24 23:58:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 40 of 184

40

```
 1   least 99 percent owned by these Debtors?

 2          MR. COLBY:  Yes.  Multiple levels down by the time

 3   you get to them.

 4          THE COURT:  But they are subs of the Debtors.

 5          MR. COLBY:  Yeah.  Correct.

 6          THE COURT:  Okay.  But somehow -- okay, so you're

 7   saying neither Stream TV nor Technovative had any kind of --

 8   which, you know, listen.  Apparently from the testimony I've

 9   heard is that this was developed with engineers from Rembrandt.

10   Are you telling me it wasn't?

11          MR. COLBY:  So --

12          THE COURT:  Yes?  No?

13          MR. COLBY:  I think it's a more specific answer than

14   that.  I think the situation with Rembrandt is that they had

15   contributed certain components that had historically been used

16   in the Ultra D technology.  I think Mr. Michaels testified

17   about a bordering issue.  He referred to the shadow.  He talked

18   about liveliness of the image.

19          THE COURT:  Counsel.

20          MR. COLBY:  Yes?

21          THE COURT:  Did the engineers, whatever company they

22   were at, come from Rembrandt?

23          MR. COLBY:  The Dutch engineers were predominately

24   from the Phillips organization.

25          THE COURT:  So the testimony then that they -- so the
```

Case 23-20763-ccc397 Doc 448-15 Filed 10/09/23 Filed 04/15/26/00/23 29759:50 27 Desc
Exhibit K. Stream October 2028 Hearing Transcript Page 41 of 184

41

```
 1   testimony that I've heard was that they came from Rembrandt and
 2   that they brought it is not correct is what you're telling me.
 3            MR. COLBY:  I think --
 4            THE COURT:  I'm just trying to figure that out.
 5            MR. COLBY:  They're the majority of the technology
 6   here was Phillips developed Phillips engineers.  Rembrandt
 7   claims that it made certain contributions either by licensing
 8   its technology and there may have been some people in common
 9   there where there was an NDA.
10            THE COURT:  Counsel, I understood to be more than
11   some people in common.  But that's neither here nor there.  Go
12   ahead.
13            MR. COLBY:  Yeah.
14            THE COURT:  So you believe that this is totally
15   Phillips license that was held by Ultra D that then Ultra D
16   Cooperative improved upon and created -- and holds a patten,
17   correct?
18            MR. COLBY:  Correct.
19            THE COURT:  Okay.  That is the bulk of the
20   terminology.  I would also say we're not -- in terms of the
21   urgency here just to address a couple of things that came up to
22   Mr. Kodosky's comments.
23            The -- he referred to just having learned that
24   Phillips isn't giving out anymore licenses.  And in terms of
25   whether or not that is new information, and this is -- I'll
```

 1   just make a proffer.  I know it's not in evidence yet.  That's

 2   something that their claim is based on.  A communication that

 3   they received in the middle of August and we're now in October,

 4   so that undermines the immediacy and urgency of this.

 5        But perhaps more importantly, if it ends up coming

 6   into evidence, the substance of the communication is -- doesn't

 7   contain whatso ever any threat of losing the license.  In fact,

 8   it states that the existing license will not change.

 9        THE COURT:  Okay.  And they sent that to who by the

10   way?

11        MR. COLBY:  To Mr. Robertson.

12        THE COURT:  Who's Mr. Robinson (sic)?

13        MR. KODOSKY:  He's --

14        MR. COLBY:  So and then --

15        THE COURT:  Okay.  So you believe there's no

16   immediate threat?

17        MR. COLBY:  Yeah.  And so -- actually, there are a

18   number of other reasons if I might take a couple more minutes

19   of your time, Your Honor, for why there's --

20        THE COURT:  I'm the one asking the questions --

21        MR. COLBY:  Yeah.

22        THE COURT:  -- and I kind of steer you off.  So I'm

23   going to let you try it.  I'm sure you have a little -- you

24   know, you have your own roadmap, so go right ahead.

25        MR. COLBY:  Thank you.  The idea that a TRO is

Case 23-10763-amc Doc 1443-11 Filed 10/28/24 Entered 10/28/24 23:56:57 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 43 of 184

43

 1  necessary because the Debtors just learnt of ongoing business

 2  development activities that are taking place at the Dutch

 3  entities is undermined by the fact that those issues that are

 4  raised in this TRO motion have been addressed in this -- in the

 5  bankruptcy proceeding since day one.  Mr. Rajin and his first

 6  day declaration, which is filed on the docket, said exactly

 7  that.  That was in March.  The Debtors filed multiple motions

 8  regarding the return of assets and other things in the early

 9  days of the bankruptcy.  The same things that they're here

10  complaining about now trying to seek a TRO.

11         THE COURT:  Okay.  Now, let me ask you because you

12  know I'm going to interrupt you.

13         MR. COLBY:  Yeah?

14         THE COURT:  In the Rajan declaration or any of the

15  pleadings did they mention that the -- either SeeCubic, Inc.,

16  or SeeCubic B.V. or any of these -- or Mr. Stastney, were

17  trying to obtain subscriptions or license or sublicense this

18  technology?  Was that mentioned?

19         MR. KODOSKY:  He says, Your Honor --

20         MR. COLBY:  It directly -- he says that --

21         THE COURT:  And where is he saying this?  Just tell

22  me.

23         MR. COLBY:  This is -- I'm looking at paragraph --

24         THE COURT:  I mean, this is already in the record.

25  These are already in the record.

Case 23-20763-ABA Doc 397-11 Filed 10/29/24 Entered 10/29/24 09:56:37 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 44 of 184

44

```
 1              MR. COLBY:  Yeah, that's right.

 2              THE COURT:  It's not anything you guys -- but I can

 3    take judicial notice of what's filed.

 4              MR. COLBY:  Right.

 5              THE COURT:  Okay.  Hold on.

 6              MR. KODOSKY:  And I'm sorry, Your Honor.  I didn't

 7    catch what document is being read from.

 8              MR. COLBY:  This is Mr. Rajan's first day

 9    declaration.

10              THE COURT:  Hold on.

11              MR. COLBY:  We resubmitted it as part of our filing

12    today, but it's also on the docket historically.

13              THE COURT:  Counsel, just hold one second.

14              MR. COLBY:  Sure.

15              THE COURT:  All right.  So you -- you're saying that

16    on the docket at docket entry what?

17              MR. COLBY:  Let's see, 48 in the bankruptcy.

18              THE COURT:  I'm trying to figure out why I can't get

19    on there, and I have no clue why not.

20              MR. COLBY:  I'm happy to hand up a copy as well, Your

21    Honor.

22              THE COURT:  Would you and counsel share that with

23    opposing counsel and then hand it up so we all are sure that I

24    have the --

25              MR. KODOSKY:  Where are you reading from?
```

Case 23-10763-amc Doc 1447-11 Filed 10/28/24 Entered 10/28/24 23:55:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 45 of 184

45

```
 1              MR. COLBY:  I was about to go to paragraph 93.

 2              THE COURT:  Hold on.  Hold on.  I don't have it and

 3   I'm just going to give up.

 4              MR. COLBY:  93.

 5              MR. KODOSKY:  We don't need this marked, right?  You

 6   just want a copy?

 7              THE COURT:  No.  He's just -- is there any --

 8   counsel, give us one second.

 9              MR. COLBY:  Sure.

10              THE COURT:  All right, counsel.  We had a little bit

11   of technology.

12              MR. COLBY:  No worries.

13              THE COURT:  All right.  So what page do you want me

14   to go to?

15              MR. COLBY:  I'm looking at paragraph 93, which is

16   page 25 of 31 of the ECF page numbers at the top.  I guess it's

17   25 on both.

18              THE COURT:  25 of 31 you said?

19              MR. COLBY:  Yeah.

20              THE COURT:  I'm there.

21              MR. COLBY:  Okay.  And there Mr. Rajin says that,

22              "The Receiver has allowed SeeCubic to retain and even

23              take possession of certain assets, even after

24              issuance of the chancery court status quo order.

25              He's allowed SeeCubic to use and demonstrate the
```

```
 1                  Debtor's technology for its own benefit, even though
 2                  the Debtor has legal title to the intellectual
 3                  property and has not given license to SeeCubic, any
 4                  license to SeeCubic, that would allow it to do so."
 5             That is absolutely the same allegation.  That is the
 6   core of the issue.
 7             THE COURT:  Well, no.  It says to use and
 8   demonstrate.  I understood there was -- like they were going to
 9   license it to people.  And then Mr. Stastney said at that
10   hearing, I'm going to -- we going to license it to people.  And
11   this isn't showing and demonstrating it.  There was some
12   subscriptions.  My question is, where does it say that he said
13   that they were trying to issue subscriptions or to sublicenses?
14   Is that anywhere in here?
15             UNIDENTIFIED SPEAKER:  It's not, Your Honor.
16             THE COURT:  No.  That was my specific question.  Tell
17   me where does it say subscriptions and sublicense?
18             MR. KODOSKY:  It doesn't specifically reference
19   subscriptions.
20             THE COURT:  Does it --
21             MR. KODOSKY:  There's --
22             THE COURT:  Does he say anything about sublicensing?
23   He says to use and demonstrate, demonstrate, use and
24   demonstrate.  I'm not sure use and demonstrate equal
25   sublicense.
```

```
 1              MR. COLBY:  There's also a motion that was filed --

 2              THE COURT:  Okay.

 3              MR. COLBY:  -- on the docket.  It is docket number

 4   76.

 5              THE COURT:  Can you hold one second, counsel?

 6              MR. COLBY:  Sure.

 7              THE COURT:  This -- can I take a five -- just a two-

 8   minute recess?

 9              MR. COLBY:  Yeah, of course.

10              THE COURT:  This is my grandson's school.  Court is

11   in recess.

12        (Recess taken)

13              THE BAILIFF:  All rise.

14              THE COURT:  Please be seated.  Okay.  I'm sorry.  Go

15   ahead.

16              MR. COLBY:  Absolutely, Your Honor.  So I think where

17   we left off, as you were asking whether or not the Debtors had

18   previously identified this potential issue that's now the basis

19   of their TRO motion, and specifically whether or not the

20   potential SeeCubic licensing of, or sub licensing of Phillips

21   had ever been mentioned before.  And so I've got a few

22   examples.

23              I started to refer to one and I'll finish the thought

24   on that, although there's an even better one.  The one I was

25   discussing when we took the break was Docket Number 76, which
```

 1  we've -- it's on the docket, but we've also just emailed it to

 2  debtors counsel, in which debtors stated in a motion addressing

 3  a claimed stay violation.

 4          They said,

 5          "Mr. Colby further indicated he was advising his

 6          clients to continue to violate the stay, arguing a

 7          novel theory that his client had created enhanced

 8          products, and they were entitled to keep those,

 9          despite having no license from the Debtors for such

10          technology, and in violation of two existing licenses

11          to the Debtors; one from Phillips and the other from

12          Rembrandt 3D Holdings, Ltd. for underlying technology

13          upon which Streams technology is based."

14          So that's one example.  Your Honor, Mister --

15          THE COURT:  The Debtor -- they were encouraging --

16  you lost me.

17          MR. COLBY:  Sure.

18          THE COURT:  Go back to the beginning of that.

19          MR. COLBY:  Sure.  They claimed -- and this is a

20  statement that I'm reading, but obviously don't agree with --

21          MR. KODOSKY:  I'm sorry.  What page are you reading

22  from?

23          MR. COLBY:  I'm reading from page 18.  "Mr. Colby

24  further indicated he was advising his client to continue to

25  violate the stay, arguing a novel theory that his client had

```
 1  created enhanced products.  And they were entitled to keep
 2  those, despite having no license from the Debtors for such
 3  technology.  And in violation of two existing licenses to the
 4  Debtors; one from Phillips and the other from Rembrandt 3D
 5  Holdings, Ltd. for underlying technology upon which Streams
 6  Technology is based."  So same claim they're making here now in
 7  support of the TRO they made in --
 8            THE COURT:  And their claim is --
 9            MR. COLBY:  April.
10            THE COURT:  This is what I'm boiling the claim down
11  to.  I see the claim that what the emergency is, is that Mr.
12  Stastney testified at some hearing in September, that one, he
13  was going to -- that he, meaning BV, was going to sublicense,
14  and two, there was something about some subscription.
15            MR. COLBY:  Right.
16            THE COURT:  Those are the only two things that I see
17  as a basis.
18            MR. COLBY:  Okay.  And I can address that issue.
19  There is no -- that is not new.
20            THE COURT:  What's not new, the subscription or the
21  sub license?
22            MR. COLBY:  The sub license is not new.
23            THE COURT:  Okay.
24            MR. COLBY:  It's not new at all.
25            THE COURT:  Okay.
```

Case 23-10763-amc Doc 397 Dkt 447-11 Filed 10/28/24 Filed 04/16/25 00:23:58 57 278 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 50 of 184

50

```
 1            MR. COLBY:  The June 29th hearing.  So June 29th, at

 2   page 20.  Mr. Alexander asked Mr. Stastney, "And SeeCubic

 3   Inc.'s business plan is premised on being able to license the

 4   Phillips tech?"  "Answer:  Yes."

 5            THE COURT:  Okay.

 6            MR. COLBY:  And then he went on to ask about and Mr.

 7   Stastney testified about NDAs with potential clients who are

 8   interested in that technology.  So the idea that that was a

 9   long-term business plan, and that there were some initial steps

10   being taken is not new.

11            THE COURT:  Well, is it new that he's actually doing

12   it?  That's the question.  The question --

13            MR. COLBY:  No, Your Honor.

14            THE COURT:  And that's what there's -- that's what

15   I'm saying.

16            MR. COLBY:  I understand.

17            THE COURT:  Is he actually -- the fact that he says

18   he's going to, who cares what somebody's going to?  And that's

19   all I want to know from Mr. Stastney.

20            MR. COLBY:  Exactly, Your Honor.  And that's why the

21   follow-up question is important, because it asked about whether

22   or not there were existing nondisclosure agreements with

23   potential customers who are interested in that technology?  In

24   other words, is it happening now?  Is this happening now?

25            THE COURT:  And did he say yes or no?
```

Case 23-20763-a0c397 Doc 447-11 Document Filed 10/29/24 Filed 04/16/25 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 51 of 184

51

```
 1              MR. COLBY:  He said yes.

 2              THE COURT:  Okay.

 3              MR. COLBY:  That was in June.

 4              THE COURT:  Okay.

 5              MR. KODOSKY:  May I address that, Your Honor?

 6              THE COURT:  No.

 7              MR. KODOSKY:  Okay.

 8              THE COURT:  You'll get your turn.

 9              MR. COLBY:  The PPM, the private placement memo, the

10   fundraising memo, it's from 2022.

11              THE COURT:  Okay.

12              MR. COLBY:  2022.  And there's no argument it was

13   recently discovered.

14              THE COURT:  Well, are they --

15              MR. COLBY:  Because it was --

16              THE COURT:  -- doing anything with it?

17              MR. COLBY:  It's the basis of the TRO claim, Your

18   Honor.

19              THE COURT:  Counsel.

20              MR. COLBY:  It is not new.

21              THE COURT:  New.  The fact that I may tell you I'm

22   going to do something may not be new.  The fact that you

23   actually --

24              MR. COLBY:  Right.

25              THE COURT:  -- did it is what I -- and that's what I
```

 1   need to hear.

 2         MR. COLBY:  Right.

 3         THE COURT:  Did they actually do it?  Did they or did

 4   they not?  And that's what -- that's what I'm saying.  And it

 5   may be that they did.

 6         MR. COLBY:  Understand.

 7         THE COURT:  And that's why I'm saying the bottom line

 8   is they're saying Mr. Stastney went to this hearing, and he

 9   says, I'm doing it.

10         MR. COLBY:  Right.  So --

11         THE COURT:  And that's all I need to hear.

12         MR. COLBY:  Okay.  So the June 29th transcript, the

13   question and answer between Mr. Alexander and Mr. Stastney,

14   that addresses that.  That's not new.

15         THE COURT:  Okay.

16         MR. COLBY:  That's not new.

17         THE COURT:  Okay.

18         MR. COLBY:  As to your perhaps more substantive

19   question, right.  Putting aside that exigent circumstances

20   element, is it happening?  Is it something that you need to

21   worry about?  Well, that's where the decision of the Dutch

22   court is important.

23         So the decision of the Dutch court initially put an

24   independent director in the -- so first of all, just backing

25   way up.  There was also testimony, I believe that when the

 1  receiver under the Chancery courts auspices was in place, that

 2  his job was to, among other things -- and I don't have to cite

 3  for this, we can pull it up, but I believe there was testimony

 4  that his job was to sort of traffic cop projects.  And he did.

 5  And that was --

 6          THE COURT:  And when he traffic cop he consulted with

 7  Stream and he consulted --

 8          MR. COLBY:  Correct.

 9          THE COURT:  -- with BMV.  So I get that.

10          MR. COLBY:  So yes, it's happening.  And they've

11  known it's happening back to the receiver days.

12          THE COURT:  So who's the traffic cop now?

13          MR. COLBY:  Okay.  Good question.  So in the Dutch

14  proceedings, initially there was an independent director

15  appointed.

16          THE COURT:  And he resigned.  I know.

17          MR. COLBY:  He resigned.  You've got that, right?

18          THE COURT:  Uh-huh.

19          MR. COLBY:  And so now the Dutch court weighing the

20  remaining two options, Mr. Stastney or Mr. Rajan felt that the

21  -- I'm sorry, Mr. Park was put up, not Mr. Rajan -- felt that

22  the better choice that was in the best interest of the Dutch

23  entities and preserving the value of the Dutch entities, was

24  Mr. Rajan.  And here's the important --

25          THE COURT:  You're not Mr. Rajan.

Case 23-10763-amc Doc 1447-11 Filed 10/29/24 Entered 10/29/24 19:36:30 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 54 of 184

54

```
 1              MR. COLBY:  I'm sorry.  Mr. Stastney.

 2              THE COURT:  I know.

 3              MR. COLBY:  Of all the people to confuse.  Was Mr.

 4    Stastney.

 5              THE COURT:  Maybe from your point, but never mind.

 6    Again, I digress.  I need to stop.  Go ahead.

 7              MR. COLBY:  Okay.  And what's important about that

 8    decision is it also has a protocol in place for how to fulfill

 9    the responsibilities of that director position.  And it --

10              THE COURT:  What does it say?  Do I have that?  Are

11    you going to -- is that --

12              MR. COLBY:  We submitted it.  It's --

13              THE COURT:  Because, you know, I'm trying not to, you

14    know --

15              MR. COLBY:  I understand.  And I think that this

16    falls clearly within what the Court can take judicial notice

17    of.  This is the decision of the Dutch court also references in

18    orders that the protocol be followed.  They're two separate

19    documents, but it's all part of the same decision.

20              And it says,

21              "First, the independent director is impartial and

22              acting under the supervision of the Dutch court.  The

23              court is supervising us.  Second, the independent

24              director acts in the interest of the Dutch companies.

25              The continuity of its business, taking into account
```

Case 23-10763-amc Doc 997 Filed 10/29/24 Entered 04/16/25 09:23:50 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 55 of 184

55

```
 1              the interests of all the stakeholders."
 2              And I'm only reading the highlights, not the entire
 3   thing word for word.
 4              "The companies allocate their human resources and R&D
 5              facilities on internal projects, building blocks,
 6              external projects, proof of concepts and in due
 7              course support and purchase orders, support in
 8              business development and strategic discussion partner
 9              on the go to market strategy and customer
10              fulfillment.
11              "The companies will continue pending internal
12              projects and external projects and take on new
13              external projects proposed by any of the parties, if
14              considered to be in the interest of the companies.
15              The companies have to be the beneficiaries of all
16              projects."
17              So that alone completely undermines the argument that
18   there could be some irreparable harm here absent a TRO from
19   this Court.  It says, "And under the supervision of the court
20   that any projects, any work involving those technologies needs
21   to be done for the benefit of those Dutch entities, those Dutch
22   entities are the property of the estate multiple levels down."
23   And so there is no potential harm from this arrangement to the
24   estate, to the Debtors.
25              THE COURT:  That's assuming counsel, because it says
```

1  interest of everyone involved.  What is it that they're

2  proposing to do that -- and I need to hear that.  What is it

3  that everybody claims they're going to do?

4         MR. COLBY:  Right.

5         THE COURT:  And if what their claim they're going to

6  do involves the interest of the Debtor, that's property of the

7  Debtor's estate, which you said is -- right now, right now on

8  the books and records of both -- of at least Technovative the

9  owners are who they are, okay.  Until something's done

10 otherwise, we are where we are today.  And so what I'm hearing

11 and I am -- I hope you guys probably understand what I'm

12 saying, I just want to hear, because you -- somebody told me

13 this was Mr. Stastney saying it at a hearing.

14        MR. COLBY:  Yeah.

15        THE COURT:  Do we have a transcript from the hearing?

16 And if we don't have the transcript, Mr. Stastney needs to come

17 over here and tell me exactly what his intentions are --

18        MR. COLBY:  Right.

19        THE COURT:  --  for me to determine whether this is -

20 - a TRO is warranted?  And if I find that it's not, it's not,

21 but it'll be pretty clear that I want him to tell me what he's

22 going to -- that's all I need.

23        MR. COLBY:  Understood.  And I appreciate that, Your

24 Honor.  I think, you know, I submit -- we submit, as you know,

25 that the Court can actually decide this on a number of basis

```
 1    without even getting to evidence.  But if you feel that you

 2    have to know exactly what the projects are, we can put on that

 3    evidence.

 4            THE COURT:  No.  I don't want to know what the

 5    projects are.

 6            MR. COLBY:  Okay.

 7            THE COURT:  What they have posited is that the basis

 8    for the TRO is based on what Mr. Stastney --

 9            MR. COLBY:  Right.

10            THE COURT:  -- told the court he was going to do.

11            MR. COLBY:  Right.

12            THE COURT:  And presumably, nobody's given me a

13    transcript, because you're saying that's not what he said.  And

14    they're saying that's what -- I don't know what he said.

15            MR. COLBY:  Interestingly, and I was surprised to

16    hear this, I suspect the Court may be as well.  They don't do

17    transcripts of the court proceedings in the Netherlands.

18            THE COURT:  Well, is it recordings or something?

19    Nobody writes anything?

20            MR. COLBY:  You can request a summary of it, but it's

21    not transcribed.

22            THE COURT:  So then how am I supposed to know what

23    Mr. Stastney said?

24            MR. COLBY:  Well, that may mean that you need to hear

25    it firsthand.  But I think for the reasons that I just
```

Case 23-20763-anca 06397 Doc 1443-11 Document 1229/23 Filed 04/16/26/00/23 29 56 50 27 Desc
Exhibit K. Stream October Bit 2029 Page 58 of 184script    Page 58 of 184

58

 1   identified, I think that there's ample basis to deny the

 2   request for a --

 3           THE COURT:  No, it's not.  Because they have said, he

 4   went and told the Dutch court he was going to proceed in a

 5   specific fashion.  And unless somebody tells me that that court

 6   said, oh, that's fine, you can do it.  I need to figure out if

 7   what he intends to do in any way will be -- cause irreparable

 8   harm to the estate, and it may be that it doesn't.

 9           MR. COLBY:  Sure.

10           THE COURT:  But I don't know that.

11           MR. COLBY:  So Your Honor, I think that the fact that

12   the Debtor has the burden here --

13           THE COURT:  Then

14           MR. COLBY:  -- plays into the --

15           THE COURT:  Then they need to -- they were about to

16   call Mr. Stastney when I said, whoa, we have to have some

17   discussion.  So let's cut -- we don't need all this other well,

18   he said, she said, and they're the -- and Phillips says this

19   and Phillips -- just tell me what he plans to do.  And what did

20   he say?  Presumably he's going to tell me the same thing he

21   told them.  And I don't know if he is, I would assume he is.  I

22   have no basis to believe he wouldn't.

23           MR. COLBY:  Right.  Well --

24           THE COURT:  And then I can tell from that.

25           MR. COLBY:  Okay.  I can make a proffer and, like,

 1 | Your Honor, you may have to hear it for yourself.  But you
 2 | know, we submitted a declaration for Mr. Stastney.  And he says
 3 | SeeCubic has not sublicensed any Ultra D technology, including
 4 | but not limited to any technology covered by Phillips'
 5 | intellectual property rights to any third party.  SeeCubic
 6 | itself does not intend to sublicense -- does not currently
 7 | intend to sublicense any Ultra D technology.
 8 |            THE COURT:  Current.  That's the word currently.
 9 |            MR. COLBY:  Right.
10 |            THE COURT:  Okay.
11 |            MR. COLBY:  That's all you can get a TRO for.
12 |            THE COURT:  Right.
13 |            MR. COLBY:  You can't get a TRO for something
14 | somebody might think they want to do in the future.
15 |            THE COURT:  Exactly.
16 |            MR. COLBY:  Right.  You know, SeeCubic itself does
17 | not currently intend to sublicense any Ultra D technology,
18 | including but not limited to any technology covered by
19 | Phillips' intellectual property rights to any third party.
20 | So --
21 |            THE COURT:  We have Phillips -- counsel, see this is
22 | this is what I'm not understanding.  Phillips had what it had.
23 | Everybody took the Phillips license and they developed it.
24 | They added things to it.  We had Mr. Michael say that they --
25 | from Rembrandt saying that the people from Stream from BVD

Case 23-10763-amc 397 Doc 447-11 Filed 10/09/24 Entered 04/16/26 00/23 29:16:30 27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 60 of 184

60

 1   whoever it is SeeCubic, whoever the entities were.  They took

 2   the Phillips basic license and improved it.  So of course

 3   Phillips that -- that's not my question.

 4          Are they going to license sublicense the improved

 5   Phillips license?  Because what Phillips gave people was the

 6   ability.  So that's different in my mind.  That's different in

 7   my mind, Counsel, because there is no doubt that the Phillips

 8   license is not what is existing today, the Phillips original

 9   license.  And so I need to know what the intentions are with

10   respect to the improved Phillips license.

11          MR. COLBY:  Okay.

12          THE COURT:  And that's what I want to know.  So this

13   semantics about the -- nah, no, no, no.  That's not what I want

14   to hear.  I want to know what the intentions are with respect

15   to the license that currently exist.

16          MR. COLBY:  Your Honor, and I will apologize in

17   advance because I'm not an intellectual property attorney.

18          THE COURT:  Well, neither am I.

19          MR. COLBY:  But I think -- but I think that two

20   things; one, the reason why we reference the Phillips license

21   is because that is front and center in the purported bases for

22   the TRO.  We're responding to what they say the exigent

23   circumstances are.  I'm not playing semantics.  We're

24   responding to the Debtor's claim, right.  Mr. Kodosky stood up

25   here and said this is a threat to the Phillips license.