Case 23-10763-amc Doc 793-14 Filed 10/08/23 Entered 10/08/23 10:57:28 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 61 of 184

61

```
 1              THE COURT:  Well --

 2              MR. COLBY:  They can't sublicense.  Now, they're

 3   wrong about that.

 4              THE COURT:  I don't know about that.  I have --

 5              MR. COLBY:  But that's facts.

 6              THE COURT:  Now, I don't know how that has any -- the

 7   fact that Phillips -- and I will say this.  What the fact that

 8   Phillips not want to sublicense have to do anything with the

 9   Debtor?

10              MR. COLBY:  So

11              THE COURT:  Or anybody?

12              MR. COLBY:  So and I think this is where perhaps my

13   not being an intellectual property lawyer may come into play.

14   But I think if you're going to license the technology as it

15   currently exists, you may be licensing your own intellectual

16   property that you layered on top, right.

17              THE COURT:  Uh-huh.

18              MR. COLBY:  But I think you also need to sublicense

19   the underlying technology developed by Phillips.

20              THE COURT:  I get that.

21              MR. COLBY:  Okay.

22              THE COURT:  But that's not my concern.

23              MR. COLBY:  Okay.  Now, I --

24              THE COURT:  My concern --

25              MR. COLBY:  I apologize, because I'm misunderstanding
```

```
 1   your concern.
 2           THE COURT:  No.  My concern is, I don't care about
 3   the Phillips license.
 4           MR. COLBY:  Okay.
 5           THE COURT:  Because the Debtor doesn't own the
 6   Phillips license.  Phillips owns the Phillips license.  Would
 7   the dispute from my point of view --
 8           MR. COLBY:  Yep.
 9           THE COURT:  -- is there has been improvements to the
10   Phillips license, and the dispute is who owns --
11           MR. COLBY:  Got it.
12           THE COURT:  -- the improved license?
13           MR. COLBY:  Okay.  Well, I --
14           THE COURT:  And so that's why I just need to know.
15           MR. COLBY:  Got it.  I will -- so there's two types
16   of intellectual property at play.  You have the license, which
17   is the agreement -- you know, the agreement to use somebody
18   else's technology, but then you have -- there is -- I'm not
19   sure there's such thing as an improved license.  I think you
20   have the license, and then you have your stuff, right.  That's
21   a very technical term, but you have your --
22           THE COURT:  Yeah.  Your stuff.
23           MR. COLBY:  -- intellectual property and if your
24   question is, do we -- does SeeCubic intend to license the Dutch
25   entities stuff, right?  Their improvements, their patents or
```

Case 23-10763-amc Doc 743-1 Filed 11/06/23 Entered 11/06/23 20:50:52 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 63 of 184

Case 23-10763-amc Doc 437-1 Filed 10/06/23 Entered 10/06/23 09:50:37 Desc
Exhibit B it 2022 Page 63 of 184

63

```
 1    whatever, then I will reread that sentence with a different

 2    emphasis.

 3              THE COURT:  Okay.

 4              MR. COLBY:  SeeCubic has not sublicensed any Ultra D

 5    technology.

 6              THE COURT:  Okay.

 7              MR. COLBY:  Including the Phillips license.

 8              THE COURT:  Okay.

 9              MR. COLBY:  SeeCubic itself does not currently intend

10    to sublicense any Ultra D technology.  Okay.

11              THE COURT:  Okay.

12              MR. COLBY:  Including the Phillips license.  Now,

13    there are these ongoing, you know, business developmental

14    efforts that I talked to you about before.  That is Ultra D.

15    And Ultra D, in the -- and that is the SeeCubic BV.  And in the

16    course of those ongoing projects, you know, they may -- and

17    these are developmental projects, this is not selling things

18    out into the market.  This is proof of concept stuff.  You

19    know, they may need to give user licenses or things like that

20    to others, but they're not licensing the technology for

21    somebody else to go out and manufacture a product that includes

22    the --

23              THE COURT:  And when you say user license, user

24    license for what?

25              MR. COLBY:  It's sort of like, if you buy -- I think
```

Case 23-10763-amc Doc 743-11 Filed 11/06/23 Filed 01/05/20/24 Page 36 of 278 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 64 of 184

64

1   we made this analogy.  It's like, if you buy a copy of

2   Microsoft Word, it just allows you as a user to use it.  So for

3   -- there was actually lots of testimony about this earlier in

4   the summer.  For a product, you know, a demo model, like Mr.

5   Michaels gave us a little tutorial about this.  For a demo

6   model of something, you know, you give it to somebody to try

7   out.  You have to give them one of those user licenses so they

8   can test it out.

9            THE COURT:  Well, that's limited for that -- only to

10  test it for a better word.

11           MR. COLBY:  Correct.  There's no right now nobody is

12  at a stage, I think this has been part of our point all along,

13  where they can just start manufacturing products for the

14  commercial market that includes all this technology.  That's

15  just off in the distance.  You might have potential partners

16  who might want to do that someday that are trying to figure out

17  if it works.  So there are no exigent circumstances.  That's

18  the lay of the land.

19           THE COURT:  Now what about the subscriptions?  What

20  is it that they're telling people in the subscriptions?

21           MR. COLBY:  Oh, the PPMs.  Yeah.  So that's what I

22  was referring to before.  That is broadly speaking.  As you've

23  heard, there are a couple of different visions for how this

24  technology might be brought to market, right.  You've heard all

25  summer from the Debtors about the plan to manufacture, you

Case 23-10763-amc Doc 747-11 Filed 11/06/23 Entered 11/06/23 20:50:07 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 65 of 184

65

 1  know, many millions of TVs.  And you heard from Mr. Stastney in
 2  June, that they felt that couldn't be economically done.  And
 3  so the idea was to eventually license the technology to people
 4  who are actually good at manufacturing TVs, right, rather than
 5  try to compete against LG by making your own TVs.
 6          THE COURT:  I don't remember him saying that, but go
 7  ahead.
 8          MR. COLBY:  He did.
 9          THE COURT:  Okay.
10          MR. COLBY:  And that sort of brings me back to the
11  subscription agreements and those sorts of things.  There's
12  nothing new there.  That broad concept of how the business, you
13  know, that vision for the business has been out there.  The
14  subscription agreements that they refer to are from 2022.
15  2022.
16          THE COURT:  So there are -- so this is what I want to
17  know.  What was said at the hearing that made whatever -- I
18  don't know, because I don't know what Mr. Stastney said --
19          MR. COLBY:  Correct.  Correct.
20          THE COURT:  -- at the hearing that made those
21  potentials actuals.  And that's what they're saying to me.
22          MR. COLBY:  Yeah.
23          THE COURT:  He said he's actually going to do this,
24  or he's actually doing it.
25          MR. COLBY:  So there may be two things at play here.

Case 23-10763-amc Doc 743-11 Filed 10/06/23 Entered 10/06/23 20:56:52 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 66 of 184

Case 23-10763-amc Doc 447-1 Filed 01/05/24 Page 66 of 278 Desc
Exhibit B it 2022 Page 66 of 184 script    Page 66 of 184

66

```
1    One, I don't believe that the recitation of what Mr. Stastney

2    said at the hearing, as it's recited in the declarations from

3    Mr. Rajan and Mr. Robertson.  I just don't think those are

4    accurate.

5            THE COURT:  Okay.

6            MR. COLBY:  Okay.

7            THE COURT:  But we don't know if they are or aren't

8    because we don't have a recording.  And if they were there,

9    that's a whole different story.  Because if they said they

10   personally heard it, then it's going to be their word versus

11   Stastney's word and I got to figure out who's telling what.

12           MR. COLBY:  Right.

13           THE COURT:  And it's not even who's telling what,

14   it's that, you know, you -- I hate to say this, because this is

15   just so cliche.  It's like the elephant.  You standing in the

16   back, it's his tail.  You standing in the front, it's his ears.

17           MR. COLBY:  Right.

18           THE COURT:  But nobody is not telling me who is the

19   whole elephant.  And I've got to figure out who the whole

20   elephant is, because I see the elephant.

21           MR. COLBY:  Sure.

22           THE COURT:  I don't see the parts.

23           MR. COLBY:  And there may be like, Your Honor, you

24   asked about the subscription agreements, and there may be kind

25   of a compression of time here.  So and I don't think it's not
```

```
 1   any secret because Mr. Stastney testified about these kind of

 2   long term visions for the project here in this court.  Okay.

 3   But that long-term plan that doesn't warrant a TRO.

 4           THE COURT:  Unless he's actually implementing the

 5   long-term plan.

 6           MR. COLBY:  And that's where the current projects,

 7   that's the state of play.  They are on that step of that long-

 8   term plan.  That step is, let's figure out if we can build this

 9   thing and it works and the customer is like, right.

10           THE COURT:  I get that.

11           MR. COLBY:  Like a potential partnership.  You know,

12   you bring your whatever to the table, we bring ours and see if

13   we can make something good.  Right.  So that's where that is.

14   That's it.  That's all.

15           THE COURT:  So they're -- so what you're saying is

16   nobody's out here saying give us money, and we'll give you some

17   entry, because I'm assuming that's what the subscription is.

18   Because then I will tell you if that's what they're doing, and

19   not disclosing that this is a disputed ownership, I would be

20   concerned because -- for two reasons.  If you're telling people

21   it's disputed, you're telling them.

22           MR. COLBY:  Right.

23           THE COURT:  But if you're not and the Debtor knows

24   and they don't say anything, and eventually as the Debtors, I

25   don't want anybody coming back here with a claim against the
```

1   Debtor.  So that's where I'm at.

2              MR. COLBY:  Okay.

3              THE COURT:  And it may be easy to address if that's

4   what they're actually doing with very limited, this is what you

5   need to do.

6              MR. COLBY:  So --

7              THE COURT:  Okay.

8              MR. COLBY:  -- the subscription agreement, right.

9   For example, again, no surprise.  It's from 2022.  Okay.

10  Incidentally, it was from a period of time when --

11             THE COURT:  But you know what, let's just get some

12  testimony in.  Because you're telling me I have already said --

13             MR. COLBY:  Well, Your Honor --

14             THE COURT:  -- that I need some evidence.  Now you

15  guys can argue all you want.  We're going to get to the

16  evidence so you can talk or you can put the evidence in, or you

17  can allow them to put the evidence in and you cross examine.

18             But I am telling you, I cannot make a decision

19  without first getting evidence.  You're saying look at -- and I

20  -- and every time you tell me something I said well, I need to

21  know.  I need to see.

22             MR. COLBY:  Sure.

23             THE COURT:  And without evidence I can't do that.  So

24  I get your point.  You can make all the arguments you want.

25  But at the end of the day, I need some evidence.  So you guys

Case 23-10763-amc Doc 747-14 Filed 01/06/23 Entered 05/20/24 23:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 69 of 184

69

 1  can do what you want, you can waste your time.  I'm telling

 2  you, you only getting -- you know, I'm going to have a certain

 3  time I'm going to start not being able to function here.

 4          MR. COLBY:  Understand, Your Honor.  So maybe I'll

 5  just finish up then by -- just to finish the thought on the --

 6          THE COURT:  Subscription.

 7          MR. COLBY:  -- subscription.

 8          THE COURT:  This is from 19 -- from 2022.

 9          MR. COLBY:  '22.  And it is in fact, it was admitted

10  in the hearing on the Hawk motions.  It is at ECF 264.  I

11  believe the actual -- I'm sorry, 264 is the list.

12          THE COURT:  Okay.  You said ECF --

13          MR. COLBY:  Yes.

14          THE COURT:  -- 264.

15          MR. COLBY:  Yes.

16          THE COURT:  So the actual subscription is part of

17  that is listed there, or is it actually --

18          MR. COLBY:  So yeah.  So there's two points.  In the

19  this is not news category.  It was on the Debtor's exhibit list

20  at 264 in June.

21          THE COURT:  Uh-huh.

22          MR. COLBY:  Okay.  And then, secondly, it was among

23  the documents that the parties have agreed could be admitted

24  into evidence.

25          THE COURT:  Okay.  And that's fine and well, but the

 1  question is, what's going on with it now?  I don't care what

 2  it's dated.  I want to know what's going on now?

 3        MR. COLBY:  It describes the sort of long-term goal

 4  for the technology.

 5        THE COURT:  I get it.

 6        MR. COLBY:  And that's still what's going on now.

 7        THE COURT:  But my question --

 8        MR. COLBY:  Yeah.

 9        THE COURT:  -- Mr. Colby, is are they selling

10  subscriptions?  I don't care what it said.  If it was in the

11  court yesterday.

12        MR. COLBY:  Just to be clear --

13        THE COURT:  The question is what are they doing, if

14  anything?

15        MR. COLBY:  Just to be clear what we're talking about

16  in terms of subscription agreements.  Because I hear it and I

17  think, technology, but it's -- this is --

18        THE COURT:  No, no.

19        MR. COLBY:  Yeah.  This is --

20        THE COURT:  That's not what I think.

21        MR. COLBY:  -- investors.

22        THE COURT:  I think an investment.

23        MR. COLBY:  Right.  Yeah.  Exactly.  Yeah.

24        THE COURT:  That we're selling investment interest to

25  third parties.

Case 23-10763-amc Doc 787-14 Filed 10/28/23 Entered 10/28/23 15:57:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 71 of 184

71

```
1              MR. COLBY:  Yeah.

2              THE COURT:  Or outsiders.

3              MR. COLBY:  Just that's investment interest in

4   SeeCubic Inc.  In my client.

5              THE COURT:  I get it.

6              MR. COLBY:  Okay.  Not to any -- okay.

7              THE COURT:  But counsel, they are -- I would think

8   that Mr. Stastney would know better than to go try to sell

9   interest in any one of the two debtors.

10             MR. COLBY:  Right.

11             THE COURT:  My question is, is when the subscriptions

12  are being -- if they're being sold, what is it that the parties

13  believe -- what is it that the parties believe they are

14  investing in?

15             MR. COLBY:  Oh, sure.

16             THE COURT:  What's the representations that are --

17  because this is my concern.

18             MR. COLBY:  Yeah.

19             THE COURT:  If there's a subscription out there that

20  says we're selling and we believe you should invest because we

21  have --

22             MR. COLBY:  Got it.

23             THE COURT:  -- this technology, and it's ours, and

24  this is all that we're doing.  And the Debtor knows about it,

25  or anybody who has an interest and says -- doesn't say
```

Case 23-10763-amc Doc 787-14 Filed 10/29/23 Entered 10/29/23 09:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 72 of 184

72

 1 | anything, let these people come in and invest.

 2 |         MR. COLBY:  Yeah.

 3 |         THE COURT:  And later it turns out it belongs to the

 4 | Debtor or some other party.  I'm an investor.  I'm going to

 5 | have a claim against everybody, including the ultimate owner,

 6 | because you knew they were selling me this stuff, and you

 7 | didn't tell me or you didn't put me on notice.  You acquiesced.

 8 |         MR. COLBY:  Sure.  Your Honor, actually, I'm not -- I

 9 | don't think that's not what's going on.  And I don't think

10 | that's true, because what's going on -- and this has been

11 | discussed in this court, this was part of that record earlier.

12 | You know, what SeeCubic is, is a vehicle to hold those rights

13 | of the secured creditors.  So what people are investing in is

14 | whatever rights the secured creditors have to ultimately

15 | foreclose.  They're not directing -- they're not investing

16 | directly in the technology, or in Stream or in anything like

17 | that --

18 |         THE COURT:  But that's -- but whether you're saying

19 | this directly or not, the basis for the investment that is

20 | being disclosed to parties is that we are developing this and

21 | we want you to invest in it.  It's not about -- so to say it's

22 | -- no, that's what it is.

23 |         MR. COLBY:  No.

24 |         THE COURT:  And so again, I need to hear from --

25 | somebody call Mr. Stastney.  He can tell me what he told the

Case 23-10763-amc Doc 787-14 Filed 10/28/24 Entered 10/28/24 19:16:57 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 73 of 184

73

 1  court.  And if somebody else was there, they can tell me.  And

 2  then I got to figure out, was this an emergency or not?  Plain

 3  and simple.  So that's where I am.

 4          MR. COLBY:  Okay.  All right.  And then I guess just

 5  one last, you know, there's also this sort of element of the

 6  basis for the TRO that is based on Rembrandt's technology.  I

 7  would just remind the Court that Rembrandt has its own IP case.

 8  There's no irreparable harm to Rembrandt here.  Rembrandt has

 9  its own IP case.

10          THE COURT:  Well, I'm not -- my --

11          MR. COLBY:  Rembrandt's --

12          THE COURT:  Any decision I make is not going to be

13  based on any irreparable harm to Rembrandt.

14          MR. COLBY:  Okay.

15          THE COURT:  Because first of all, Rembrandt and the

16  Debtors have two separate claims here.  One is your -- this is

17  mine and you're using it.  And it's property of the estate, and

18  I didn't tell you, you could use it.  And irreparable harm may

19  be if you go out and use my asset and sell it, I don't have it

20  anymore.  Rembrandt's claim is you're using my assets and

21  you're not paying me.  And I want you to pay, which is why the

22  district court says you can get monetary damages.  Apples and

23  oranges from my perspective.  Okay.  So I'm not even

24  considering whether there's some sort of harm to Rembrandt.

25          Rembrandt has to take that up in the district court

Case 23-10763-amc Doc 887-14 Filed 10/26/23 Entered 10/26/23 14:57:27 Desc
Exhibit K. Stream October 2022 Hearing Transcript Page 74 of 184

74

 1  who again, who has already decided to the extent that they're

 2  correct, that these parties are using their assets or their

 3  license without properly compensating them or even without

 4  their authority.  They can get money for that.  That's not what

 5  the Debtor is asking for.  So that's not even on the table for

 6  me.  Okay.  All right.

 7          MR. COLBY:  Glad to hear.  Okay.  So I think if we're

 8  going to jump to testimony, I know we just had a little break,

 9  but it may make sense for the parties to --

10          THE COURT:  That's fine, Counsel.

11          MR. COLBY:  -- take a lunch break and then --

12          THE COURT:  Right.  That's fine.

13          MR. COLBY:  Yield the floor when we come back.

14          THE COURT:  Right.  Yes.  We definitely don't want to

15  be where I was last time where I was lightheaded because I

16  hadn't eaten or that I was hangry and Mr. Caponi had to be the

17  recipient of my hangry.  So let's take a break.

18          MR. COLBY:  I don't even remember it.

19          THE COURT:  I said Mr. Caponi.

20          MR. COLBY:  Oh, okay.

21          THE COURT:  I didn't say you.  I was looking at -- or

22  maybe I said the wrong name.  But I said Mr. Caponi.

23          MR. COLBY:  Oh, right.

24          THE COURT:  All right.  So how long do you guys want

25  for lunch?

Case 23-10763-amc Doc 987-14 Filed 10/29/23 Entered 10/29/23 09:55:57 Desc
Exhibit K. Stream October 2022 Hearing Trial Transcript    Page 75 of 184

75

```
 1              MR. COLBY:  2:00?

 2              THE COURT:  2:00.  That's fine.  It gives me time to

 3  eat my little soup.  All right.  Court is in recess --

 4              MR. COLBY:  Thank you.

 5              THE COURT:  -- until 2:00.  Thank you, counsel.

 6       (Recess taken)

 7              THE COURT:  Okay.  I think where we left off was that

 8  debtor, I think you wanted to respond whether you think you

 9  wanted to respond to a -- oh, yeah, I'm sorry.  Can you hear

10  me?  All right.  I thought I made it clear that I thought the

11  best way to proceed and the best use of our time was just to

12  proceed with the evidence, unless you think there's a little

13  preference or is there something else you want to add in

14  response or what you're going to present to what Mr. Colby has

15  outlined?

16              MR. KODOSKY:  Yeah.  I think we're ready to call our

17  first witness, Your Honor.

18              THE COURT:  Okay.  Well, let's back off.  How many

19  witnesses you think you need to call?

20              MR. KODOSKY:  Well, Mr. Stastney.  These two

21  gentlemen both heard what he said in connection with the

22  Amsterdam court.

23              THE COURT:  They were there.

24              MR. KODOSKY:  They were there.

25              THE COURT:  Okay.  Then that's fine.  That's --
```

```
 1              MR. KODOSKY:  And Your Honor actually, and I do a
 2   want to step back for a second.  You know, we received his --
 3   Mr. Stastney's declaration last night in which He basically
 4   says --
 5              THE COURT:  Okay.  Uh-huh.
 6              MR. KODOSKY:  -- I wanted to move to exclude that,
 7   because it's hearsay.  Those -- the statements in there about
 8   what he's personally said over in Amsterdam --
 9              THE COURT:  Uh-huh.
10              MR. KODOSKY:  -- are hearsay.  We were able to offer
11   testimony because it's a party admission.  Whereas Mr.
12   Stastney, he can't testify as to what he personally testified
13   to.  He's here to give testimony.  We can ask him questions
14   here in court today about what his -- what he's doing over
15   there.  But for him to submit a declaration containing
16   statements that he said, that's hearsay.  No exception applies.
17              THE COURT:  Why -- okay.  Well, I had a little --
18   here's my evidence book.  All right.  You believe it's hearsay
19   on the what -- on the -- because what?  It's an out of court --
20   what?  The truth of the matter that's being asserted?
21              MR. KODOSKY:  Correct.
22              THE COURT:  And that it doesn't meet any of the
23   hearsay exceptions?
24              MR. KODOSKY:  Correct.
25              THE COURT:  Okay.
```

Case 2:20-bk-10263-... Doc 487-14 Filed 10/09/23 Entered 10/09/23 09:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 77 of 184

77

```
 1              Mr. Colby, I'm sure you're prepared to address that.
 2   Hey, we have a new person.
 3              MR. COLBY:  Yeah.
 4              THE COURT:  Welcome.  Behind you.
 5              MS. MCKEE-VASSALLO:  Good afternoon, Your Honor.
 6   Emilia McKee-Vassallo on behalf of Mr. Stastney from Ballard
 7   Spahr.
 8              THE COURT:  Oh, you replacing Mister -- okay.  And
 9   your name again, ma'am?
10              MS. MCKEE-VASSALLO:  Emilia, E-M-I-L-I-A --
11              THE COURT:  Hold on, hold on.  Let me get her.
12   That's a good advantage of being in here.  I can see everybody.
13   And okay, we have Mr. Terrence Grogan from -- for Mr. Stastney.
14   And your name is Camilla.
15              MS. MCKEE-VASSALLO:  Emilia with an E.  McKee-
16   Vassallo.  Yes, Your Honor.
17              THE COURT:  Okay.  You know why -- you already
18   answered before I asked.  What's your last name?
19              MS. MCKEE-VASSALLO:  McKee-Vassallo.
20              THE COURT:  Could you spell your last name?  The
21   second?
22              MS. MCKEE-VASSALLO:  Vassallo.  V as in Victor, A-S-
23   S-A-L-L-O.
24              THE COURT:  Okay.
25              MS. MCKEE-VASSALLO:  Thank you, Your Honor.
```

Case 23-10763-amc Doc 437-11 Filed 10/29/23 Entered 10/29/23 18:57:27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 78 of 184

78

```
 1                    THE COURT:  Thank you.  All right.

 2                    MR. KODOSKY:  And if I may, Your Honor, one other

 3    point.  Just a minor point.

 4                    THE COURT:  Hold on.  I have to start taking notes.

 5                    MR. KODOSKY:  Sorry.

 6                    THE COURT:  Hold on.  So far, I have not seen a lot

 7    of my hearings that are pretty -- I don't want to use the word

 8    contentious, but have the breadth of the issues are pretty

 9    large.  I often have people from the -- not like in Delaware,

10    obviously.  But we have people from the media.  So that's why I

11    asked because I wasn't sure if that's who she was.  Okay.  All

12    right.  October 6.  Okay.  What was the second point, counsel?

13                    MR. KODOSKY:  The second point was going to be I

14    heard Mr. Colby talk about the June 29th hearing testimony

15    given by Mr. Stastney.

16                    THE COURT:  Uh-huh.

17                    MR. KODOSKY:  I just wanted to remind the Court that

18    June 28th Mr. Rajan, my client, was the director of the

19    subsidiaries.  He was removed on the 29th that day, and in his

20    place was appointed an independent director.  And so with an

21    independent director in place, there is in theory, someone, a

22    neutral, a policeman that's not going to be doing what it

23    shouldn't be done in terms of licensing the Phillips -- any of

24    the technology.

25                    THE COURT:  Step back.  Step back.  Mr. Stastney
```

Case 1:23-cv-00639-DOM-TEC-14 Document 10029/23 Filed 11/05/20/24 29:59:57278 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 79 of 184

79

```
 1   testified when?

 2          MR. KODOSKY:  The 29th.

 3          THE COURT:  Okay.  On June 29 he -- that's when --

 4          MR. KODOSKY:  Yes, Your Honor.

 5          THE COURT:  And Mr. Rajan was removed the same day?

 6          MR. KODOSKY:  Yes.  If Your Honor goes back and looks

 7   at the transcript.  The very -- the transcript begins by them

 8   showing up that day and saying late breaking news, Your Honor,

 9   Mr. Rajan was just removed this morning by the Amsterdam court.

10   And during the course of that transcript, Your Honor said

11   what's going on over there?  And these attorneys all stood up

12   and said, we don't know.  We're not involved over the

13   Netherlands, we'll find out let you know.  They didn't.  The

14   independent --

15          THE COURT:  I don't -- okay.

16          MR. KODOSKY:  The independent director was appointed.

17   And then after Rembrandt said, wait a minute.  Mr. Jones Day

18   attorney, Mr. independent director, you're not able to license

19   this technology that contains Rembrandt technology built into

20   it.  He resigned.  And then after that is whenever they filed a

21   new petition

22          THE COURT:  They who?

23          MR. KODOSKY:  -- over in the Netherlands courts.

24          THE COURT:  They who?

25          MR. KODOSKY:  The Defendants.  Mr. Stastney on behalf
```

Case 2:23-ap-06390-DAM Doc 437-14 Filed 10/28/23 Entered 10/28/23 09:30:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 80 of 184

80

 1  of the Dutch subsidiaries.  If the Court looks at the petition
 2  that was filed over in Amsterdam, it wasn't the Amsterdam
 3  courts doing all this on their own initiative.  It was Mr.
 4  Stastney, purportedly on behalf of each of the different Dutch
 5  subsidiaries, which you know, our position was not appropriate
 6  for him to be doing.  Because what happened was, was they
 7  successfully had Mr. Rajan removed in favor of an independent
 8  director who resigned.
 9          THE COURT:  Well, the independent I get it.  The
10  parties are at loggerheads.
11          MR. COLBY:  And then replay on September 12th is
12  whenever they filed the amended petition saying to the
13  Amsterdam court, Mr. Rajan has been removed.  The independent
14  director has resigned, we asked that Mr. Stastney be appointed.
15          THE COURT:  Well, couldn't -- why wasn't another
16  independent -- the court only does what they're asked.
17          MR. KODOSKY:  And the last thing that I want --
18          THE COURT:  I don't know -- you don't know the answer
19  to that, and I don't need to know.  They filed the petition and
20  the court granted the request.
21          MR. KODOSKY:  The last point that I want to make on
22  that, Your Honor, is the Amsterdam court didn't say Mr.
23  Stastney is appointed director of these Dutch subsidiaries
24  forever.  It said until a judge, a U.S. judge orders otherwise.
25  And so --

```
 1                 THE COURT:  It says that?

 2                 MR. KODOSKY:  We've attached the order to our --

 3                 THE COURT:  Counsel, I don't go through all those.  I

 4    just read what you like.  Okay.  And I figured I'm going to get

 5    a record, because I did not think that I had sufficient

 6    information to rule on the papers.  That's why I scheduled a

 7    hearing.

 8                 MR. KODOSKY:  It's attached as Exhibit --

 9                 THE COURT:  Well, I'm sure they were probably talking

10    about the Delaware and not me.

11                 MR. KODOSKY:  Well, no.  Well --

12                 THE COURT:  I don't have anything to do with that.

13    Anyway.  Well, I'm not going to speculate without seeing the

14    order.  Without knowing what was put before that judge.  I

15    don't know what that court knew or didn't know.

16                 MR. KODOSKY:  I would just refer the court to Exhibit

17    G to our --

18                 THE COURT:  Well, are you going to put it in the

19    record?  Okay.

20                 MR. KODOSKY:  Yes.

21                 THE COURT:  Because as I said, if I could rule on the

22    papers I would have, and I didn't feel that I could, so we need

23    to have an evidentiary record.  Okay.  So defendant -- and

24    appointed -- and was appointed.  Okay.  So but the bigger

25    question is, is that you believe that Mr. Stastney's
```

1  declaration is inadmissible because it's hearsay.

2          MR. KODOSKY:  The portions that talk about his

3  testimony over in Amsterdam, Your Honor.  The portions of his

4  declaration that say these guys, Mr. Rajan and Mr. Robertson

5  are wrong about what I said over there.  I said this.  I said

6  that.  The I said this and I said that part is hearsay.

7          THE COURT:  Well, can't you ask him what he said?

8          MR. KODOSKY:  The point, Your Honor, is the

9  declaration -- and we can and we will, but the declaration that

10 he submitted yesterday, we moved to exclude the portions in

11 there that concern his Amsterdam testimony.  And we would just

12 ask that if the Court does take a look back at that, that it

13 not include that in connection with its ruling.  He's here.

14 We're able to ask him our questions.  And there's no exception

15 to the hearsay that's contained in the declaration.

16         THE COURT:  And is that in his individual capacity or

17 is that in his capacity as a representative of SeeCubic Inc.?

18 Because that's who -- or SeeCubic -- who's here today?  Let me

19 back up a little bit here.  SeeCubic Inc. is the party that is

20 here today.  So is he -- who's the -- who's the declaration

21 submitted on behalf of SeeCubic, Inc.?  Or was it submitted on

22 behalf of himself?

23         MR. KODOSKY:  I believe it was submitted on behalf of

24 himself.  But all the defendants, the ones that are here today

25 have joined in in connection with each other's responses.

```
 1              THE COURT:  Well, if it's on behalf of himself, then
 2   doesn't that mean -- then counsel for Mr. Stastney, what's your
 3   position?  Because he's saying to the extent that he's
 4   supporting his -- he's offering his declaration in support of
 5   his -- Mr. Stastney as an individual that that should not --
 6   that anything that he said in the court, which we don't have --
 7   apparently there's no transcript.
 8              Apparently, according to Mr. Colby, they don't do
 9   transcripts.  So they're saying that that is -- should be
10   stricken as a hearsay which is an out of court statement of
11   truth of which he wants me to take -- to accept.  But I guess
12   the question is -- anyway, that's his position.  What's was
13   your response with respect only as his -- to the extent.
14              MR. KODOSKY:  The Amsterdam --
15              THE COURT:  How about we get -- how about we call Mr.
16   Stastney?
17              MR. KODOSKY:  Works for me, Your Honor.
18              THE COURT:  And we get it in and we figure it out.
19              MR. KODOSKY:  Yeah.  Works for me.
20              THE COURT:  Because I don't have it.  And I'm like,
21   just operating in a vacuum here.  But Ms. McKee-Vassallo?  I'm
22   butchering your name, Counsel.
23              MS. MCKEE-VASSALLO:  That's it, Your Honor.
24              THE COURT:  Okay.  We may -- you should be prepared
25   to -- because he's asserting it in two capacities.  Okay.
```

Case 2:23-ap-01639-DM 4:87-14 Document 106/28/23 Filed 10/28/23 Entered 06/28/23 14:57:27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 84 of 184

84

1   Because one may be okay in his capacity as the representative

2   of the party, but in his individual it may not.  I don't know.

3   I don't know the answer, because I didn't see that -- I didn't.

4   I looked at it.  Well, first of all, we was filed.

5            MR. KODOSKY:  Right.

6            THE COURT:  So we were doing our best as again, we

7   don't have ten associates to do research for us all night.

8            MR. COLBY:  Your Honor, so both parties submitted

9   declarations.  I think, in the event that the Court was able to

10  decide on the papers by looking at the, you know, competing --

11  as one does, the competing declarations.  I think since we're

12  here doing live testimony, we're perfectly fine putting on the

13  substance of those paragraphs through live testimony.

14           THE COURT:  That's what I'm asking.  Can't you ask

15  him about it?

16           MR. COLBY:  Yes.

17           THE COURT:  They're not -- and nobody's saying here's

18  his declaration.  And that's the same reason why I couldn't

19  rule because you're saying it said one thing, he's saying he's

20  saying another.  It's disputed facts.  Okay.  All right.  Call

21  your -- yes, Counsel.

22           MR. WRIGHT:  Your Honor, Davis Wright on behalf of

23  SLS.  I just want to make clear to the extent that declaration

24  comes in in any shape or form.  SLS did not sign on to that.

25  In fact, the declaration says it's Mr. Stastney on behalf of

Case 23-10763-amc Doc 437-11 Filed 10/29/23 Entered 10/29/23 09:36:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 85 of 184

85

1    SeeCubic.  So I take issue with counsel's representation that

2    all of the defendants signed on to that declaration.  And I'll

3    make more of that when we get to legal argument later, Your

4    Honor.

5           THE COURT:  Okay.  So you didn't file anything.  You

6    meaning SLS did not file anything in support of that.

7           MR. WRIGHT:  SLS filed an objection to the TRO.

8           THE COURT:  Okay.

9           MR. WRIGHT:  But we did not reference Mr. Stastney's

10   declaration as part of that.

11          THE COURT:  Okay.  All right.

12          All right.  Counsel, call your witness.

13          MR. KODOSKY:  Thank you, Your Honor.  We call Mr.

14   Stastney.

15              SHADRON STASTNEY, DEFENDANT, SWORN

16          THE CLERK:  Would you please state and spell your

17   name for the record?

18          THE WITNESS:  Shadron, S-H-A-D-R-O-N, Stastney, S-T-

19   A-S-T-N-E-Y.

20          THE CLERK:  And if you would please state your

21   address?

22          THE WITNESS:  392 Taylor Mills Road, Marlboro, New

23   Jersey 07747.

24          MR. KODOSKY:  Permission to proceed, Your Honor.

25          THE COURT:  Yes.  And I messed up all of those

Case 23-10763-amc Doc 987-14 Filed 10/29/23 Entered 11/29/20/29 30:57:27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 86 of 184

86

1   spelling, but that's okay.  You may proceed, Counsel.

2                     DIRECT EXAMINATION

3   BY MR. KODOSKY:

4   Q    Good afternoon, Mr. Stastney.

5   A    Afternoon.

6   Q    Mr. Stastney, you're the chief executive officer and

7   chairman of SeeCubic of Delaware, correct?

8   A    That is correct.

9   Q    And you were present in the courtroom earlier before lunch

10  and heard counsel for I believe that SeeCubic did testify or

11  that had stated the PPM or I'm sorry, the subscription

12  agreement was from 2022.  Did you not?

13  A    I don't recall that.

14  Q    All right.  When was the subscription agreement issued?

15  A    I don't know what you're talking -- which subscription

16  agreement you're talking about?

17          MR. KODOSKY:  Permission to approach, Your Honor?

18          THE COURT:  Well, just -- are we marking it or you

19  want to just -- you want to --

20          MR. KODOSKY:  We're marking it.  Yes.

21          THE COURT:  Okay.  Mark it as Debtor 1.  I mean,

22  because this is not going to be followed up by -- you know, we

23  starting new numbers all over again.  Because when I came -- I

24  forgot when I came and my desk was -- my -- it was clear with

25  no binders.  I was almost shocked and I forgot we're done with

 1  that portion.  And all of this has been exchanged?

 2          MR. KODOSKY:  Yes, Your Honor.

 3          THE COURT:  Okay.  And all of the list was filed and

 4  on the record this morning, right?

 5          MR. KODOSKY:  Yes, Your Honor.  And this --

 6          THE COURT:  Is it in this binder?

 7          THE CLERK:  It's the list.

 8          MR. COLBY:  It's attached to our motion.  It's

 9  Exhibit I.

10          MR. KODOSKY:  Did you have them already printed out,

11  you said?

12          THE COURT:  No.  I have the list printed out from

13  this morning.  Not those.  Yes.  If you have a copy for me,

14  that's fine.  All right.  Now, we -- did we print out all the

15  exhibits to the -- hold on.  I have a binder that has

16  everything.  Because my one equivalent associate doing the work

17  of ten of yours.

18      (Court and counsel confer)

19          THE COURT:  Okay.  All right.  So I do not have any

20  of the exhibits attached.  I have the list, but it would have

21  been three binders had we printed them out.  And we weren't

22  trying to kill any trees.  Yes, I can pull them up on -- now

23  that I'm able to access the -- okay, but it's probably better

24  that I get a copy so that I have exactly the exhibit that

25  everybody is referring to when you -- the parties want to mark.

Case 23-10763-amc Doc 787-14 Filed 10/29/23 Entered 11/15/20/24 Page 38:57:278 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 88 of 184

88

```
 1   Okay.  This is D-1.

 2   BY MR. KODOSKY:

 3   Q    Mr. Stastney, you've been handed what's been marked as

 4   Exhibit D-1?

 5   A    Yes.

 6   Q    If you'll take a moment to look at that.

 7   A    Okay.

 8   Q    Do you recognize that document, sir?

 9   A    I do.

10   Q    What is it?

11   A    It is a subscription agreement for debt of SeeCubic Inc.

12   of Delaware.

13   Q    And it's not from 2022, correct?

14   A    This is not.

15   Q    This is from last week?

16   A    This is from October 1st, 2023.

17   Q    All right.  And so this is SeeCubic Inc. raising money,

18   correct?

19   A    Correct.

20   Q    If you'll turn with me, please, sir, to page, bottom

21   right-hand corner of page 7 of 17.  Actually, before I ask you

22   any questions about page 7 of 17, did SeeCubic, Inc. disclose

23   to potential investors or to investors that it has been sued by

24   the Debtors in this case?

25   A    Yes.
```

```
 1   Q    It discloses that within its subscription agreements?

 2   A    No.  Not within the subscription agreement.

 3   Q    Where does SeeCubic, Inc. disclose that it's been sued by

 4   the Debtors who allege, among other things, that SeeCubic, Inc.

 5   and yourself and others have misappropriated the Debtors trade

 6   secrets?

 7   A    We don't disclose that because we don't believe that to be

 8   true, but -- number one.  Number two, the investors in this

 9   round are all existing investors, actually a very small number

10   of them, who have been investors with SeeCubic, Inc. for years

11   and are kept regularly up to date on all the -- on all the

12   developments in both the business and the legal.  There is no

13   new investor.  There has been no new investor in SeeCubic, Inc.

14   in quite some time.

15   Q    With due respect, Mr. Stastney, my question was, where

16   does SeeCubic, Inc. disclose to investors or potential

17   investors that it's wrapped up in litigation over allegedly

18   misappropriated trade secrets involving the Debtors?

19   A    We have those -- we have those conversations directly with

20   investors regularly.

21   Q    If you'll take a look at page 7 of 17 of Exhibit D-1,

22   what's been marked as Exhibit D-1.  And I direct your attention

23   to subparagraph F at the top of the page.  Please let me know

24   when you're there.

25   A    I am.
```

Case 23-10763-amc Doc 487-14 Filed 10/28/23 Entered 10/28/23 19:30:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 90 of 184

90

```
 1              THE COURT:  Wait a minute, where are we at?

 2              MR. KODOSKY:  Page 7 of 17, Your Honor.  Subparagraph

 3  or five subparagraph F.

 4              THE COURT:  Okay.

 5              MR. KODOSKY:  Top of the page.

 6              THE COURT:  So we're on -- wait a minute.  Oh, at the

 7  bottom page 7 of 17.

 8              MR. KODOSKY:  8 of 18.  Yes, Your Honor.  For --

 9              THE COURT:  And at the top 8 of 18.  At the -- where

10  it says documented.  Well, never mind.

11              MR. KODOSKY:  Yes, Your Honor.

12              THE COURT:  Okay.  Page 7 of 17 on the bottom.  Okay,

13  because I will be looking for this.  And that is 5-F, correct?

14              MR. KODOSKY:  That is correct, Your Honor.

15              THE COURT:  Paragraph 5-F.  Okay.

16  BY MR. KODOSKY:

17  Q    There is no disclosure in subparagraph 5-F that SeeCubic,

18  Inc. is wrapped up in trade secret litigation involving

19  debtors.  Will you agree with me on that?

20  A    There's no -- there's no disclosure of any kind here.

21  Q    In the middle of the paragraph, Do you see where it says,

22  there is potential,

23              "There is no potentially interfering patent or patent

24              application of any other party, and to the knowledge

25              of the company, no product of the company infringes
```

Case 1:22-cv-10063-DJC Doc #: 87-14 Filed 10/28/23 Entered 10/28/23 09:36:57 Page 31 of 278 Desc
Exhibit K. Stream October 2021 Hearing Transcript   Page 91 of 184

91

```
 1              in any respect any license, permit, franchise

 2              authorization, patent copyright, proprietary

 3              software, service mark, trademark, trade name, or

 4              other right owned by any other person, except as

 5              would not reasonably be expected to have a material

 6              adverse effect."

 7         Do you see where I'm reading from?

 8  A    I do.

 9  Q    And it also states at the beginning of paragraph F that

10  there's,

11              "No action, suit, proceeding, claim, or investigation

12              before or by any court, public board, governmental

13              agency, self-regulatory organization or body pending

14              or to the best of the knowledge of the company

15              threatened against the company, or involving any of

16              its respective assets, or to the best knowledge of

17              the company involving any of their respective

18              officers or directors that would be expected to have

19              a materially adverse effect."

20         Do you see that?

21  A    I do.

22  Q    Who crafted that language?

23  A    I don't know.

24  Q    You're the chief executive officer of SeeCubic, Inc. that

25  is raising money by virtue of this subscription agreement and
```

Case 23-10763-amc Doc 987-14 Filed 10/29/23 Entered 10/29/23 20:35:17 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 92 of 184

92

1   you don't know who drafted this language?

2   A    This language has existed in our subscription agreements

3   for some time.  I don't recall exactly who drafted it.

4   Q    How long has SeeCubic, Inc. been raising money with

5   subscription agreements that did not disclose trademark

6   misappropriation litigation?

7   A    Subscription agreements never disclose those things.  It's

8   the PPM's or the discussions that go with the subscription

9   agreements that disclose those things.

10  Q    Who is SeeCubic TV, sir?  You offered testimony in a prior

11  hearing about SeeCubic TV.  Do you recall that?

12  A    No.  There is no such thing as SeeCubic TV.  I never

13  offered that testimony.

14  Q    Have you reviewed the declaration submitted by Mr.

15  Robertson in this case?

16  A    I have not.

17  Q    You were involved in the day-to-day work at the

18  Netherlands level during the pendency of this bankruptcy?

19  A    I'm not involved in the day-to-day work.  No.

20  Q    And you're not aware that any work being done over the

21  Netherlands is being done with SeeCubic, Inc. and SeeCubic BV

22  doing business with clients at SeeCubic TV?  You don't recall

23  giving that testimony at the June 27th, 2000 hearing?

24  A    I do not.

25  Q    In this litigation?

Case 23-10763-amc Doc 787-14 Filed 10/28/23 Entered 10/28/24 20:30:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 93 of 184

93

1    A    I do not recall that.  No.

2    Q    You have a sublicense business model?

3    A    Yes.

4    Q    SeeCubic, Inc. sells and markets the Ultra D technology to

5    potential clients on behalf of SeeCubic BV?

6    A    That's correct.

7    Q    What type of revenue do you expect to generate in the next

8    three years?

9    A    Very difficult to predict.  Depends on how the existing

10   proof of concept projects with customers pan out.  But we're

11   optimistic that we in that time frame will be able to start a

12   commercial project.

13   Q    You've heard or you've seen the declaration submitted by

14   Mr. Rajan and Mr. Robertson about your testimony over in

15   Amsterdam, that you all have 11 or 12 client projects,

16   including Hyundai?

17   A    I did not see that testimony.

18   Q    Do you have 11 or 12 projects including Hyundai?

19   A    No.

20   Q    How many projects do you have?

21   A    We currently have SCBV currently has three projects.

22   Q    Who are the three projects with?

23   A    Those are subject to NDA and I can't disclose them.

24   Q    Well, you're not willing to disclose to my client who you

25   are potentially going to be sublicensing the technology to?

```
 1   A    I don't understand that question.  I'm sorry.
 2          MR. KODOSKY:  Your Honor, we would ask that this
 3   portion of the transcript, if necessary, be kept under seal.
 4   But we believe that we're entitled to know who the projects
 5   that they are potentially breaching the Phillips licensing
 6   agreement with, instead of being told that it's subject to a
 7   nondisclosure agreement, and not having any way of knowing or
 8   protecting our license agreement with Phillips.
 9          THE COURT:  Okay.  Right now you are cross-examining
10   Mr. Stastney as the representative of SeeCubic, Inc., correct?
11          MR. KODOSKY:  As well as the director of SeeCubic BV.
12          THE COURT:  Okay.
13          MR. KODOSKY:  One of our subsidiaries.
14          THE COURT:  And for which, Mister -- I haven't seen
15   the order, but that he is supposed to act in the interest of
16   all parties as the independent director.
17          MR. KODOSKY:  Exactly, Your Honor.
18          THE COURT:  I don't know what I do with that.
19          Mr. Colby, what you think I do with that?
20          MR. COLBY:  I think those very same fiduciary duties
21   would counsel Mr. Rajan -- I'm sorry, Mr. Stastney, to maintain
22   the confidentiality of those projects pursuant to the NDA, not
23   only from the public generally, but I think, given the somewhat
24   contentious nature of the business relationship between the
25   parties here, it would be prudent for him to adhere to the
```

 1  protocol that had been established way back under the receiver

 2  where the projects were on a sort of a no names basis, where

 3  the side parties weren't disclosing each others --

 4          THE COURT:  Well, that's not in the -- I don't know

 5  what the procedure was with the --

 6          MR. COLBY:  I also think that there have been a

 7  number of times over the course of the testimony that's come in

 8  over the summer, where the shoe was on the other foot.  Mr.

 9  Rajan had customer relationships or things that he did not want

10  to disclose.  We respected that.  So I think given the -- sort

11  of the course of conduct between the parties, there is no basis

12  to upset that applecart now.

13          There's concerns about the -- legitimate concerns

14  about interfering with those projects that we have.  And so we

15  think they should be maintained confidential.  In fact, if it's

16  in the best interest of the projects to do so, and we think it

17  is, then Mr. Stastney is bound by his fiduciary obligations to

18  maintain the confidentiality of those projects.

19          THE COURT:  Well, let me ask you this, because you're

20  referencing and it's not in the record.  I can only tell what

21  you guys are saying is that the neutral party, the court

22  appointed receiver was given the information and the three

23  parties were working together.  Are you telling me during that

24  process, that information was not given to the receiver?

25          MR. COLBY:  Correct.  No, it was given to the

Case 23-10763-amc Doc 937-14 Filed 10/28/23 Entered 10/28/23 20:36:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 96 of 184

96

1   receiver.  It was not given to the other party.  So the

2   identity of any customers that SeeCubic brought to the table

3   was not given to Stream, and vice versa.

4          THE COURT:  Okay.  So that information technically

5   could be given just to me.

6          MR. COLBY:  Just to you, but not --

7          THE COURT:  And then not to them.  And then I could

8   compare that to what they've told me their customers are.  And

9   then I can figure out whether there is some potential issue

10  here.  So I mean, because this is what the issue is, is that

11  you are using our assets to go in and do -- they're not selling

12  anything, but they're giving what I understand both of these

13  parties are giving to -- what was the word that you used?

14         They're assigning -- they're giving them information

15  for a demo, I'm going to call them demos.  And they're

16  assigning -- I'm not going to use them.  And so I don't know

17  who's giving -- and it may not be a matter of who they're

18  giving it to.  It may matter to this Court what they're giving

19  them.  That's all.

20         MR. COLBY:  Your Honor.  So first of all, Mr.

21  Stastney, as I read earlier, and I think if they -- if he gets

22  asked the question will testify that these unnamed parties,

23  customers are not being given licenses.

24         THE COURT:  No.  But they've been given information

25  regarding the license.  Whether they're being given one or not

Case 23-10763-amc Doc 988-14 Filed 10/28/23 Entered 10/28/23 09:36:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 97 of 184

97

```
 1   they're being -- the information is being shared.  The same way
 2   they're sharing information.
 3            MR. COLBY:  Secondarily.
 4            THE COURT:  Uh-huh.
 5            MR. COLBY:  The, again, there's no -- that the
 6   identity of the customers is not relevant to the issue of
 7   irreparable harm.
 8            THE COURT:  It may be if it's the same -- if it's
 9   their customers also.
10            MR. COLBY:  No.  Your Honor, I think, again, I
11   proffered earlier and Mr. Stastney will address these projects
12   are being done at the SeeCubic BV level.
13            THE COURT:  I get -- Counsel --
14            MR. COLBY:  That are with SeeCubic BV.  So it's not
15   their customers, our customers.  It's all happening in these
16   entities.
17            THE COURT:  But the underlying issue is that whoever
18   SeeCubic -- first of all, it's SeeCubic, Inc. that we're
19   talking about.
20            MR. COLBY:  Correct.
21            THE COURT:  Okay.  And SeeCubic, Inc. isn't the one
22   who is doing this?  Is it not?  Isn't the one who's giving the
23   -- I'm using the word demos to potential customers?  Is it not?
24            MR. COLBY:  No.  SeeCubic BV.
25            THE COURT:  I know.  I know the answer.
```

```
 1              MR. COLBY:  Yeah.

 2              THE COURT:  So I'm not -- he's here as -- who's he

 3   testifying for?

 4              MR. COLBY:  Well, Mr. Stastney now has two

 5   capacities.

 6              THE COURT:  Uh-huh.

 7              MR. COLBY:  He is the chairman and CEO of SeeCubic,

 8   Inc. of Delaware.

 9              THE COURT:  Uh-huh.

10              MR. COLBY:  And by virtue of the Netherlands court, a

11   director of or the director of SeeCubic BV.

12              THE COURT:  Okay.  And it's -- and we're talking

13   about that -- well, we were talking about some subscriptions.

14   Now, we're talking and he said, are you involved in the day to

15   day of SeeCubic BV.  He says no, he's not.

16              So I'm assuming he's now shifted to Mr. Stastney's

17   role as the independent court-appointed independent director

18   for SeeCubic BV.  Correct, Mr. Counsel?  You asking him

19   questions as in his capacity as the officer, the director,

20   independent, I guess equivalent to the receiver in -- for

21   SeeCubic BV?

22              MR. KODOSKY:  We're asking him questions in

23   connection with his role individually and as chairman and CEO

24   of SeeCubic, Inc. and as director of SeeCubic BV.

25              THE COURT:  Okay.  I think when you ask him
```

 1  questions, it would be helpful if you ask him and you would

 2  identify in what capacity you're asking the question.  Unless

 3  you think they're all one and the same, which I don't know.

 4  Maybe so, maybe not.  But it would make sense.

 5          I thought you were asking him as the -- you

 6  originally started for SeeCubic, Inc. asking him questions on

 7  the subscription.  And then you changed and started asking him

 8  regarding SeeCubic BV, which then I understood and I'm not sure

 9  if that's what you meant, but I understood it was in his

10  capacity as the independent director.  Where -- is that what

11  you were doing?

12          MR. KODOSKY:  My specific question was relating to

13  who is -- who is this -- who is this technology being licensed

14  to and by whom?  And he won't tell us.

15          THE COURT:  Well, he says -- well, wait a minute.

16  Let's start back.  How about is it being licensed?  I

17  understand it's being given as a demo -- I'm using the word

18  demos.  I don't know if that's the correct terminology.  But

19  this is being shared with in a proof of concept.  I got proof

20  of proof.  I know it's not that.

21          MR. KODOSKY:  Correct.

22          THE COURT:  Some sort of proof of concept with three

23  projects they're working on.  Okay.  And those three projects

24  are with parties that they have NDA with, correct?  That's what

25  he's saying.  And so -- and that he's not at liberty to

 1  disclose.  And so that clearly to me, is in his capacity as the

 2  direct independent director because it can't be as his SeeCubic

 3  Inc. because what do they have to do in terms of the projects?

 4         MR. KODOSKY:  And I believe, Your Honor, that

 5  SeeCubic, Inc. is involved.  And may have permission to

 6  approach with the June 29th hearing transcript which I'm going

 7  to mark as Defendant's Exhibit Number 2 where --

 8         THE COURT:  Wait a minute.  Number 2, and then you

 9  can ask him to read it or you can read it and -- I don't know.

10  What do you want to do with it?

11     (Counsel confer)

12         MR. KODOSKY:  Your Honor, we don't have a copy of the

13  27th hearing transcript.  I'm going to move on.

14         THE COURT:  Okay.

15  BY MR. KODOSKY:

16  Q    Mr. Stastney, you're familiar with Stream TVs business

17  model, are you not?

18  A    I am.

19  Q    Stream sales modules which is chips and 3D film?

20  A    They aspire to.  Yes.

21  Q    Sometimes actual products?

22  A    Rarely.

23  Q    SeeCubic Delaware put into its subscription agreements

24  and/or its PPM's that it had a sublicensing model of the

25  technology, correct?

```
 1   A    That's correct.

 2   Q    SeeCubic Delaware mentioned in the subscription agreements

 3   and/or the PPM's sublicensing the optical stack, correct?

 4   A    I don't recall that.

 5   Q    SeeCubic Delaware mentioned in the subscription agreements

 6   and/or the PPM sublicensing the IP cores, correct?

 7   A    No.

 8            MR. KODOSKY:  Permission to approach, Your Honor.

 9            THE COURT:  You can just hand it to the ESR.  You can

10   hand it to him and then he'll mark it.  It's already marked?

11            MR. KODOSKY:  It is.

12            THE COURT:  All right.  And you shared with opposing

13   counsel?

14            MR. KODOSKY:  It's on their list as well.

15            THE COURT:  All right.  And if you have a copy for

16   the Court, that would be well.

17            MR. KODOSKY:  Thank you.

18            THE COURT:  Okay.

19            MR. KODOSKY:  Thank you, Your Honor.

20            THE COURT:  Thank you, counsel.  Okay.  Well, we're

21   going to mark that.  And hand that to the witness.

22            THE WITNESS:  Thank you.

23            THE COURT:  Okay.  You may proceed, counsel.

24   BY MR. KODOSKY:

25   Q    Thank you, Your Honor.  Mr. Stastney, do you recognize
```

```
 1   what has been marked for identification as Defendant's Exhibit

 2   Number 2?

 3   A    I do.

 4   Q    What is it?

 5   A    It is an investment memorandum from Q2 of 2022 of

 6   SeeCubic, Inc.

 7   Q    This -- if you'll please turn to page 13, bottom right

 8   here.

 9           THE COURT:  Wait a minute.  Counsel, hold on.  I'm

10   trying to take notes here and I'm just starting another page.

11   So this is D2, and this a prior replacement memorandum of this

12   PPM you guys have been referring to?

13           MR. KODOSKY:  Yes.

14           THE WITNESS:  From Q2 of 2022, so it's in a little --

15           THE COURT:  Oh, SeeCubic, Inc., right?

16           THE WITNESS:  Uh-huh.

17           THE COURT:  Okay.

18   BY MR. KODOSKY:

19   Q    Mr. Stastney, if you'll turn to bottom right hand corner,

20   page 13?

21   A    Sure.

22   Q    Let me know when you're there please.

23   A    Uh-huh.  I am.

24   Q    Do you see on page 13 where SeeCubic, Inc.'s business

25   model is described?
```

```
 1   A     I do.

 2   Q     The first line of that section where it states SeeCubic

 3   will focus on licensing its technology, both the device and the

 4   content?

 5   A     I do.

 6   Q     And on the next page under revenue where it states the

 7   company intends to generate revenue by licensing its technology

 8   to brand partners, such as consumer electronics brands --

 9         THE COURT:  Wait.  Where are we counsel?  This is the

10   business one.

11         MR. KODOSKY:  I'm sorry, page 14 under revenue.

12         THE COURT:  Uh-huh.

13   BY MR. KODOSKY:

14   Q     Where it states that the company intends to generate

15   revenue by licensing its technology to brand partners such as

16   consumer electronics brands, automotive brands, where there are

17   tier one suppliers, mobile device manufacturers, et cetera, and

18   licensing its technology to content owners or producers for

19   creation of content.  Do you see where I'm reading from?

20   A     I do.

21   Q     What gives SeeCubic, Inc. the right to license any

22   technology that includes the Phillips technology?

23   A     Well, at the time of this PPM, which was Q2 of 2022,

24   SeeCubic, Inc. owned all of the subsidiaries.  This was during

25   the pendency of the omnibus agreement.  So at this time, the
```

Case 23-10763-amc Doc 483-14 Filed 10/28/23 Entered 10/28/23 19:54:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 104 of 184

104

```
 1  company referred to SeeCubic, Inc. and its subsidiaries, which

 2  included SeeCubic B.V. and Ultra D Ventures, and that gave it

 3  the right to do so.

 4  Q    And that was ultimately declared void by the Delaware

 5  Supreme Court, correct?

 6  A    The -- yes.  The omnibus agreement was after this declared

 7  void.

 8  Q    SeeCubic, Inc.'s business model hasn't changed as a result

 9  of the Delaware Supreme Court invalidating the omnibus

10  agreement, has it?

11  A    It has.

12  Q    It has or it has not?

13  A    It has.

14  Q    Is SeeCubic, Inc. now going to manufacture its own

15  products?

16  A    No. But SeeCubic, Inc. is not licensing anything any

17  longer.  Ever since the Receiver was put in place and

18  subsequently under the independent director.  And subsequently

19  now, SeeCubic B.V. enters directly into transactions with any

20  customers only.  And it is the one that licenses the technology

21  to the extent necessary.

22  Q    What -- how does SeeCubic, Inc. have the right to license

23  any technology when the Phillips agreement specifically says

24  that it cannot be licensed?

25  A    The Phillips agreement specifically does not say that.
```

Case 23-10763-amc Doc 787-14 Filed 10/06/23 Entered 10/06/23 09:46:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 105 of 184

105

 1  You refer only to the 2011 agreement.  You did not refer to the
 2  2014 amendment also enacted by Stream, which specifically
 3  contemplates sublicensing because Stream has also realized that
 4  there may be situations where it would need the sublicense.
 5  Q    And we'll look at the Phillips license agreement and the
 6  2014 amendment.  Our client has quite a different understanding
 7  of what that agreement entails.  How does SeeCubic, Inc. make
 8  money if it's not manufacturing products and it's not licensing
 9  any technology, how does SeeCubic, Inc. get paid for anything?
10  A    At this point, SeeCubic, Inc. doesn't get paid for
11  anything.  It's a startup company that's investing in
12  technology development.
13  Q    Do you see where it states below in that revenue section
14  where it says for consumer electronic brands, automotive
15  brands, et cetera, the company will license both an optical
16  stack design customized for each new type of panel based on
17  panel configuration and a customized set of software to drive
18  that panel?
19  A    I do.
20  Q    Does SeeCubic, Inc., no longer intend to do that?
21  A    SeeCubic, Inc. does not intend to do that for the time
22  being.  SeeCubic B.V. must do that now.
23  Q    And so, everything that is stated in this revenue section
24  about how SeeCubic, Inc. planned to move forward and actually
25  make money you're saying is now no longer valid?

Case 23-10763-amc Doc 487-14 Filed 10/29/23 Entered 10/29/23 09:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 106 of 184

106

1   A    Essentially, it's SeeCubic B.V., which is the one that --

2   to the extent that there are any commercial contracts that

3   would arise during the period of the legal dispute, SeeCubic

4   B.V. would be the one to earn that money.  That was what was

5   put in place by the Receiver, continued by the independent

6   director, and is continued now under the order of the Dutch

7   court.

8   Q    And how many customers has SC B.V. licenses technology

9   too?

10  A    None.

11  Q    Has SeeCubic, Inc. raised any money through the

12  subscription agreement that we looked at?

13  A    It has.

14  Q    How much money has it raised?

15  A    Approximately $2.5 million dollars.

16  Q    Without any disclosure of this litigation?

17  A    That's incorrect.

18        MR. COLBY:  Objection.

19        THE WITNESS:  The litigation was disclosed.  It was

20  not disclosed in the subscription agreement where it never

21  would have been.  The investors in this round include Hawk and

22  include the investors who were most familiar with the company's

23  situation.

24  BY MR. KODOSKY:

25  Q    How many investors have contributed towards that two-and-

Case 23-10763-amc Doc 487-14 Filed 10/28/23 Entered 11/20/23 09:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 107 of 184

107

```
 1   a-half million dollars that's been raised?

 2   A    Eight.

 3   Q    Who are they?

 4          MR. COLBY:  Objection, Your Honor.  Again,

 5   confidential.  No need for it in this context.

 6          THE WITNESS:  Well, he didn't say it was

 7   confidential --

 8          MR. COLBY:  Not relevant.

 9          THE COURT:  You said they were.

10          MR. COLBY:  Yes, that's the --

11          THE COURT:  Did he say it was confidential?  Come on,

12   Mr. Colby.  Now, I'm giving everybody leeway.

13          THE WITNESS:  I am under GPDR, which is the European

14   data privacy rule.  I am not allowed to disclose that

15   information.

16   BY MR. KODOSKY:

17   Q    So you won't tell us about any projects.  You won't tell

18   us who's invested in the company.  You won't tell us

19   essentially anything that would allow us to understand what

20   risks are Phillips license agreement is under by virtue of what

21   you all are doing over in the Netherlands?

22   A    The investors in SeeCubic, Inc. have no claim on the

23   Phillips license beyond the assets of SeeCubic, Inc., which is

24   a secured debt.  The only assets of SeeCubic, Inc. currently,

25   other than those that we've developed separately, are is the
```

1   debt of the secured creditors?  The secured creditors will

2   either get assets or cash or nothing for that secured debt.

3   All of that is perfectly well understood by the investors.  So

4   I'm happy to disclose to the Court anything the Court would

5   like to know that's provided for in those rules.  But I can't

6   disclose it beyond that.

7   Q    What does the two-and-a-half million dollars that's been

8   raised being used for?

9   A    To continue the operations of SeeCubic B.V. and SeeCubic,

10  Inc.

11  Q    Your Honor, we would request -- you mentioned what was it

12  GEVR that provides -- that prohibits you from identifying who

13  the investors are?

14  A    I believe it's GPDR.

15          MR. COLBY:  GDPR.

16          THE WITNESS:  Is it GDPR?

17          THE COURT:  What is it?  G what?

18          THE WITNESS:  GDPR, Mr. Colby said.  I thought it was

19  GPDR, but I could be wrong.

20          THE COURT:  And what does GDPR to your knowledge?

21          THE WITNESS:  It is the --

22          MR. COLBY:  Your Honor, it's the European Union Data

23  Privacy Law.

24          THE WITNESS:  The investors are from the European

25  Union.

Case 2:23-cv-06397-DOJ-JPR Document 1-14 Filed 10/29/23 Page 49 of 278 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 109 of 184      109

Case 2:21-bk-10639-DOJ Doc 483-1 Filed 10/20/24 Entered 10/20/24 20:50:57 Desc
Exhibit B Page 109 of 184

```
 1              THE COURT:  Well, I'm assuming you have it since you

 2  guys were going to rely on it that you would be -- going to

 3  hand it up to me.

 4              MR. COLBY:  Your Honor, it is extensive and

 5  extraordinarily complicated.

 6              THE COURT:  Well --

 7              MR. COLBY:  I'd be happy to --

 8              THE COURT:  -- I can figure out complicated.

 9              MR. COLBY:  No, I understand.  My point is only that

10  I don't carry a copy around with me.

11              THE COURT:  Well, let me just say this counsel.  To

12  the extent that you were going to rely on that law, and you

13  were going to cite it to this Court, it is pretty clear that I

14  don't have it either and that you were going to, Mr. Stastney

15  -- because I'm pretty sure he didn't -- well, maybe he did.

16  Maybe he told you about it.  It doesn't matter.  You guys want

17  to assert it as a basis for not disclosing, you need to be

18  prepared to give it to me.  You have it?

19              MR. COLBY:  I understand, Your Honor.  I didn't --

20  I'm not offering this testimony and I didn't anticipate that

21  this issue would come up.

22              THE COURT:  Well, you stood up and said he cannot.

23  He's prohibited.  He didn't even say he couldn't.  So you

24  interjected and before he even said I cannot, I'm barred, and

25  you obviously knew the basis as to why because you just gave
```

```
 1   him the correct acronym.
 2          MR. COLBY:  Actually, Your Honor, I'm familiar with
 3   the acronym because I was required to do some law firm training
 4   on it.  I stood up to object because I thought that the
 5   investors were subject -- that that was subject to its own
 6   confidentiality agreement.  That was my thought.  I either was
 7   mistaken or Mr. Stastney had a different basis in mind.  But
 8   we're not --
 9          THE COURT:  Well, he didn't.  So I'm telling you to
10   the extent that he's excerpting it, somebody needs to give me
11   the law because how am I supposed to rule on whether in fact it
12   is precluded?  I'm supposed to do that in a vacuum?  He's
13   asserting it.  He's the representative.  And I think he was
14   saying he's doing it in the capacity as SeeCubic, Inc., who is
15   your client.  So somebody needs to give this to me.
16          MR. COLBY:  Happy to work on that.
17          THE COURT:  All right.  I don't know how I'm supposed
18   to rule if I don't know something about, you know -- as you
19   said, it's pretty thick.  It's difficult to read.  I don't know
20   about it.
21          MR. COLBY:  I think it's -- I also think that the
22   questions are not relevant.  Who invested in SeeCubic is not
23   relevant to whether -- to the issue here today, whether or not
24   there is some risk of imminent harm to the Debtors.
25          THE COURT:  Well, my understanding that the risk of
```

Case 23-10763-amc Doc 487-14 Filed 10/09/23 Entered 10/09/23 10:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 111 of 184

Case 23-10763-amc Doc 487-14 Filed 10/09/23 Entered 10/09/23 10:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 51 of 278

111

 1   imminent harm to the Debtor is that they are out -- they

 2   meaning I don't know if it's SeeCubic -- presumably SeeCubic,

 3   Inc., because I have not heard SeeCubic B.V. is selling

 4   subscriptions that would allow some interested -- some

 5   purchaser to assert some interest in the license.  What I've

 6   heard him say is we're not doing that, okay.  And the other

 7   issue is that they are -- they meaning either SeeCubic, Inc.,

 8   or SeeCubic B.V., or Mr. Stastney individually are licensing to

 9   other third-parties information that is property of the

10   Debtor's estate.  That's all I am --

11           MR. COLBY:  Understand.  None of which have to do

12   with who made with who may be investing in SeeCubic, Inc.  None

13   of those issues have anything to do with who may be investing

14   in SeeCubic, Inc.

15           THE COURT:  Well it may be --

16           MR. COLBY:  They're investing -- I'm sorry.  They're

17   investing in the right -- I'm sorry.  I didn't mean to cut you

18   off.

19           THE COURT:  Go ahead.

20           MR. COLBY:  I wasn't quite done.  They're investing

21   in the right that Hawk and SLS have as secured creditors.

22           THE COURT:  Well, but counsel, the document that we

23   were looking at doesn't say that.  So he's questioning him, and

24   Mr. Stastney is, well, we're not doing that anymore.  So

25   that's --

 1              MR. COLBY:  Sure.  The document we're looking at,

 2  Your Honor, is from 2022.  The state of the world was very

 3  different.

 4              THE COURT:  I get what is, counsel.  He's free to ask

 5  him about it.  He's free to say who were they and what's going

 6  on.  I'm going to allow it for that to see if it relates.

 7              MR. COLBY:  The question was about current investors.

 8  So we'll work on the GDPR issue and figure out whether that can

 9  be disclosed.

10              THE COURT:  Well -- right, but let's be clear.

11              MR. COLBY:  But I don't think it's relevant.

12              THE COURT:  Well, it's relevant to the extent he said

13  he raised $2.5 million.  When did he raise it?  Was it recent?

14  Was it all in '22?  Let him ask the questions.

15              MR. COLBY:  Well, I understand.  Look, he testified

16  that it was recent.  But this 2022 PPM doesn't make current

17  fundraising relevant to the harm.  The current fundraising is

18  investing in rights as secured creditors.

19              THE COURT:  But counsel --

20              MR. COLBY:  There's no connection between that and

21  whether or not they're going to suffer irreparable harm.

22              THE COURT:  I don't know that.  They need to make

23  their record and that's what he's doing.  Either he's going to

24  make it or he's not.

25              MR. COLBY:  Well, I'm merely suggesting that there's

 1  some -- there are some outrebounds of what's relevant to the

 2  immediate issue of the supposed irreparable harm and I think

 3  we've reached those outrebounds.

 4          THE COURT:  Counsel, he's saying that this is

 5  irrelevant because you have gone beyond the bonds because this

 6  is from quart Q22, and it has nothing to do with today or what

 7  happened on the 13th.

 8          MR. KODOSKY:  I was actually asking about the two-

 9  and-a-half million dollars that he said that was just raised.

10  Well, he didn't really say when it was raised.  I asked in

11  connection with the subscription agreement, how much was

12  raised?  And he said two-and-a-half million dollars.  And I

13  said how many investors?  He said eight.  I asked who the

14  investors were, and he said I'm not answering that.

15          THE COURT:  No.  He said I'm not allowed to answer

16  it --

17          MR. KODOSKY:  I'm sorry, Your Honor.

18          THE COURT:  -- because of because of QDPR.  He did

19  say -- he did mention Hawks.

20          MR. KODOSKY:  He did mention Hawk.

21          THE COURT:  Right.

22          MR. KODOSKY:  Who apparently is one of the eight that

23  contributed towards the two-and-a-half million dollars.

24          MR. CAPONI:  If I could be heard, Your Honor?

25          THE COURT:  Yes you may, Mister -- I'm not going to

Case 1:20-cv-06393-DJW Doc 437-14 Filed 10/28/23 Entered 10/28/24 09:54:57 Desc
Exhibit K. Stream October 2023 Hearing Transcript Page 114 of 184

114

 1  call you Mr. Colby.

 2         MR. CAPONI:  Caponi, Your Honor.  Thank you.

 3         THE COURT:  Caponi.

 4         MR. CAPONI:  Your Honor, the disclosure of Hawk is no

 5  violations as I'm sitting here.  But the issue Your Honor I

 6  have goes to relevance.  The investors in SeeCubic, Inc., the

 7  Delaware entity, Weber's investing in that entity is not

 8  engaged at the SC B.V. level.  It is not engaged in any

 9  licensing.  It is not engaged in any day-to-day operations, so

10  I don't see that there's any relevance.

11         Secondarily, throughout the course of this dispute,

12  there has been aggressive activity on behalf of Mr. Rajan and

13  those associated with Mr. Rajan to go after any sources of

14  liquidity.  So one of the ways that this war has been fought in

15  addition to being fought in the Netherlands, in this court,

16  it's if you can scare away investors, then the company lacks

17  resources to pursue its interest and you can win.  So my

18  client --

19         THE COURT:  Which company?  Which company lacks

20  resources?

21         MR. CAPONI:  Excuse me, Your Honor?

22         THE COURT:  You're saying which company lacks

23  resources?

24         MR. CAPONI:  The one.  I mean, what has been

25  happening over the course since I've been involved in the last

 1  year-and-a-half is that the -- when they are able to identify

 2  the identity of investors in SeeCubic, Inc., there is a --

 3  campaign to harass these individuals to dissuade them from

 4  investing in the future.  Given that, there's -- I don't see

 5  any connection whatsoever between who invested in SeeCubic,

 6  Inc. and the TRO.  I don't see the relevance.  And I'm

 7  informing the Court that that information from my client's

 8  perspective is very sensitive because it's being -- every time

 9  it's disclosed its weaponized and I --

10          THE COURT:  Weaponized against your client?

11          MR. CAPONI:  Yes.  My client -- my client is a

12  substantial investor.

13          THE COURT:  Oh, I already know that.

14          MR. CAPONI:  Right.  So, Your Honor, if my -- if this

15  investment goes down because others run away, my client is

16  going to be the one that's hurt the most and my client has a

17  substantial interest in not having the pool of investors

18  further harassed any more than they've already been harassed.

19          THE COURT:  Well, from what I'm understanding from

20  Mr. Stastney, the eight investors are the same people who have

21  been investing.  So I'm not quite sure what -- that is already

22  know, so I don't know what the point is from anybody.

23          MR. CAPONI:  And that has not been disclosed.  I

24  mean, Hawk's investment is well known.

25          THE COURT:  No.  You just said they were the same

Case 23-10763-amc Doc 737-14 Filed 10/29/23 Entered 10/29/23 19:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 116 of 184

Case 2:2023-cv-00639-DJC-JPR Document 1-5 Filed 05/22/23 Page 56 of 278

116

```
 1   people.   There was nobody new.
 2            MR. CAPONI:  I'm just telling Your Honor --
 3            MR. COLBY:  He did that say, Your Honor.  But I don't
 4   think Mr. Stastney said that was previously expressly disclosed
 5   to Stream TV.  He did not say that.
 6            THE COURT:  Well then if it wasn't previously
 7   disclosed, how they harassing anybody?
 8            MR. COLBY:  Because --
 9            MR. CAPONI:  They've been harassing my client.  And
10   every time they --
11            THE COURT:  You and -- listen.
12            MR. CAPONI:  They suspect that there's someone
13   investing.  Your Honor, let me just -- if I can for one second,
14   Your Honor.  The investors in SeeCubic -- in Stream and then
15   SeeCubic, Inc. for the most part are very wealthy European
16   individuals.  These aren't corporations.  And they are familiar
17   with one another.  That's kind of how this works.  I made an
18   investment.  You may want to get in on this.  So Mr. Rajan was
19   exposed to this circle through my client Hawk.  And when he
20   believes that someone of those wealthy individuals may be
21   investing --
22            THE COURT:  You mean representative of Hawk because
23   Hawk's an entity; is it not?
24            MR. CAPONI:  Excuse me, Your Honor?
25            THE COURT:  When you say was introduced by your
```

```
 1   client, do you mean a representative of Hawk or --
 2            MR. CAPONI:  Of Hawk.  Yes, Your Honor.
 3            THE COURT:  Okay.
 4            MR. CAPONI:  And so, when Mr. Rajan believes that
 5   someone in that circle may be investing, the get barraged and
 6   harassed and then my client hears about it whether they're
 7   investors or not and it's sort of along the lines of thank you
 8   very much for making your problem my problem, and it scares
 9   these people away.  So Mr. Rajan to date does not know how the
10   eight investors are.  We don't want him to know because once he
11   finds out, rather than attacking 30 people, he's going to
12   attack eight.  And given that it has no relevance to this
13   proceeding, I don't know why we're talking about it.
14            THE COURT:  Okay.
15            MR. CAPONI:  Thank you, Your Honor.
16            THE COURT:  Counsel, response?  Oh, yes?  He said
17   it's irrelevant.
18            MR. COLBY:  Yeah.
19            THE COURT:  Irrelevant.  Why is this relevant?  What
20   does this have to do with the issue as I see it is what I
21   thought was that certain facts or certain things transpired at
22   the hearing in the Netherlands.  And then based on what
23   transpired at that time, there was a need to get a temporary
24   restraining order and then at some point either a preliminary
25   or permanent injunction, prohibiting whatever happened or was
```

Case 1:23-cv-00639-JDW-LAS   Document 187-14   Filed 10/09/23   Filed 10/15/23   Page 58 of 278   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 118 of 184

118

```
 1   said to be happening at that hearing.
 2           How is who is investing in SeeCubic, Inc. relevant to
 3   that issue before me?
 4           MR. CAPONI:  Your Honor, my clients are going to
 5   testify that over in Amsterdam, they heard Mr. Stastney say
 6   that he was involved -- they had 11 or 12 clients lined up,
 7   including Hyundai.  Within a week after that testimony was
 8   given this subscription agreement went out seeking to raise
 9   money.  We don't know -- I haven't had a chance to ask him yet
10   how many people this subscription agreement was sent to.  We
11   know that there's been eight total investors.  We don't know
12   who those investors are.  The subscript --
13           THE COURT:  I got my own information on GDPR.  Okay,
14   hold on.  Let me take a little look at that.  Boy, for someone
15   without ten associates, we're doing pretty good.
16           Well, for one thing, the GDPR only applies to
17   processing data of a natural person.  This is all says natural
18   person, that or relating to institutional investors is not
19   covered.  Although information relating to their employees or
20   individual plan participants might be.  So I'm not quite sure.
21   Just a quick -- I'll figure that out.  But just a quick review
22   says it applies to natural persons?
23           MR. KODOSKY:  I'm sorry, natural persons?
24           THE COURT:  Natural persons.  So presumably these
25   investors must be natural persons, although Hawk isn't one.
```

```
 1              MR. KODOSKY:  Hawk is not one.  There are other non-
 2    individuals, let's call them that, that have invested towards
 3    that two-and-a-half million dollars that's been raised.
 4              THE COURT:  You're still arguing on relevance?
 5              MR. COLBY:  No, Your Honor.  I was just going to make
 6    the point that because of the complexity of GDPR, I think Mr.
 7    Stastney can answer that question, are there other entities?
 8    But before we go further, we would appreciate the opportunity
 9    to just nail down this issue a little bit further for the
10    Court's benefit.
11              THE COURT:  Counsel, without disclosing any attorney-
12    client privilege, I'm presumed that you prepped Mr. Stastney
13    for his testimony today, did you not?
14              MR. COLBY:  That we -- I'm sorry, I couldn't hear.
15              THE COURT:  You prepped him.  You prepared him?
16              MR. COLBY:  Briefly, Your Honor.
17              THE COURT:  Yeah, well I would -- okay.  I'm getting
18    more confident, but tell me briefly, Mr. Colby.  I'm sure you
19    did a good job.  You didn't briefly do it.
20              MR. COLBY:  You might be surprised at how briefly.
21              THE COURT:  Oh.  Well, okay.  But in any event, just
22    a cursory review of this suggest that it only applies to
23    natural persons.  So I think he can just say how many natural
24    persons.  And then we'll figure out later whether that --
25    assuming it's relevant.
```

```
 1              MR. COLBY:  Yeah, I'm fine with that.
 2              THE COURT:  Assume how many nonnatural -- when we're
 3   nonnatural we mean like not a person of those eight investors?
 4              THE WITNESS:  I'm going to say roughly four.  Our
 5   through entities and four are directly in individual capacity.
 6              THE COURT:  So four are entities and four are
 7   persons?
 8              THE WITNESS:  Uh-huh.
 9              THE COURT:  A natural.  What did they call them?
10              THE WITNESS:  A natural person.
11              THE COURT:  Natural persons, okay.  Now, back counsel
12   to the issue of relevancy.  Counsel have both argued that this
13   is irrelevant to your, you're the Debtor's request for a TRO
14   because what does that have to do with whatever it is that you
15   believe of the Debtor is being harmed and will -- and the
16   Debtor will suffer irreparable harm.  What does the fact that
17   SeeCubic, Inc. is getting investors in SeeCubic, Inc., which
18   Mr. Stastney says is going to be used to invest in both
19   SeeCubic B.V. and SeeCubic, Inc.?  What is the relevance to
20   this matter today?
21              MR. KODOSKY:  Your Honor, the relevance is that
22   they're out there raising money based on these subscriptions
23   that contain absolutely no discussion of this trade secret
24   litigation where we allege that our crown jewel, the Phillips
25   license is at risk.  If Phillips finds out what these guys are
```

Case 23-10763-amc Doc 487-14 Filed 10/28/23 Entered 10/28/23 00:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript Page 121 of 184

121

 1    doing over in the Netherlands, we're done.

 2         THE COURT:  Well, I don't know.  Listen.  There's a

 3    dispute over who owns the Phillips license.  And from what I

 4    can gather, the Phillips license, and I'm not expert on IP, but

 5    based on the testimony, Phillips licenses and people or people,

 6    entities, whoever it is that they license it to, the licensees,

 7    are free to take that technology and develop it further and do

 8    whatever they heck they do with it and pay Phillips some sort

 9    of royalty or whatever it is that it's called that they're

10    paying.

11         So I'm trying to figure out how -- I get what part of

12    the Debtor's argument is, is that what is being licensed that

13    are potentially licensed because Mr. Stastney is saying they're

14    not licensed in anything.  What is potentially being licensed

15    is a -- I'm not sure what the proper word for it, but the

16    technology that is being licensed is the base.  I'm going to go

17    back to my little building example.  Is the foundation is the

18    Phillips license.  Rembrandt did something to it, so they built

19    on it.  And then Stream or the entities or somebody, they then

20    said -- Rembrandt says you're using my license.  You're using

21    my technology.  You guys -- you meaning Stream and all their

22    little subsidiaries.

23         They then agreed, okay, this new -- it's not -- I use

24    the word improve, but it's now a different then what it was

25    originally.  Because originally it was Phillips, and Phillips

Case 23-10763-amc Doc 887-14 Filed 10/29/23 Entered 10/29/23 09:30:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 122 of 184

Case 23-10763-amc Doc 837-14 Filed 10/29/23 Entered 10/29/23 09:30:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 122 of 184    122

 1  couldn't figure out -- from my understanding, they couldn't

 2  figure out how to get the bugs out.  Rembrandt tried.  They

 3  couldn't get -- they got some of it done and then their

 4  information, they alleged, was taken to Stream or Stream

 5  subsidiaries because its engineers went over there and there's

 6  no testimony to the contrary that they didn't.

 7         And Rembrandt and then said, okay, you took -- you

 8  built upon -- you know, we had a foundation.  We built a floor.

 9  You went and built floor number two.  And then we built floor

10  number -- we built floor number one Phillips.  We built floor

11  number one.  And then you, you, I don't know who you is, but

12  they cut a deal with Stream saying you built something, and you

13  owe us some money because you took what we built on.

14         And then these other parties are saying the exact

15  same thing.  Well, we only used what you had, and we built our

16  own.  And the Debtor is saying, well, this was ours that you

17  used.  And the same thing that Rembrandt said to Stream, Stream

18  is saying to these other people, namely the SeeCubic B.V. that

19  you can't do that because it's ours and you took ours and built

20  whatever you have.  And so, this building doesn't belong to

21  you, and you can't license it.  You can't do anything with it.

22         And my question is, is what -- I'm assuming is that

23  the Debtor is saying this is our asset and now you're taking

24  it.  And I don't care what you put on top of it, it's ours.

25  And you can't use it to go sell the license to somebody else.

Case 2:23-cv-00639-DJC-JDP Document 187-14 Filed 10/28/24 Entered 10/28/24 09:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 123 of 184

123

 1  And my question is what is the imminent date -- the imminent

 2  harm or what is it that it's doing that is going to cause some

 3  harm?  And you're saying they're going out and licensing it to

 4  people.  They're trying to sell it.  They're trying to -- I

 5  don't know what they're doing with it.

 6         And that's my question is what -- I'm trying to

 7  figure out what is it that triggered this.  And so, they're

 8  saying whoever invested is -- now you're saying they use it for

 9  subscription agreements.  Okay, we can talk about that.  You're

10  saying that they're using it to license.  And Mr. Stastney is

11  saying we're not selling anything.  At least not with respect

12  to these licenses because that's different now.  And we're not

13  licensing anybody.  We're just giving them proof of --

14         THE WITNESS:  Concept.

15         THE COURT:  -- concept, so --

16         MR. KODOSKY:  And, Your Honor, our position is that

17  the SC B.V. has no rights under the Phillips license agreement

18  to be sublicensing this technology to anybody.  When the

19  independent director that was appointed, Mr. Jasper Burkenbosch

20  (phonetic) received the complaint or the notice from Rembrandt

21  in August, he resigned.

22         THE COURT:  Okay, I got that.  I got that.  So what

23  are these people doing now?  When I say these people, I mean

24  all of the Defendants that you want me to issue a TRO.  What

25  are they doing now that is different then when the -- the first

Case 23-10763-amc Doc 437-14 Filed 10/09/23 Entered 10/09/23 09:54:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 124 of 184

Case 22-10763-amc Doc 483-14 Filed 11/29/23 Entered 11/29/23 09:54:57 Desc

124

 1   independent director, he resigned because he -- whatever he --

 2   for whatever reason.  I don't know.  It's not in the -- I mean,

 3   we all can speculate unless he put something in writing.  We

 4   all can -- you can say, well, we believe he did this and we --

 5   I don't know why he did it unless you have something in

 6   writing, I don't know what to tell you.

 7           So again, my question is, what is it that you -- that

 8   Mister -- because we need to just stick to what did you say?

 9   What did you mean?  And then I get to hear from Mr. Stastney

10   what he says he said.  And then I'll hear from the other two

11   people that tell me this is what he said.  And then it's a

12   credibility issue because if he -- if they say he said I am

13   doing this now and I find that this is implicating the Debtor's

14   assets, we got a problem.  And if I don't find that he did any

15   of those things, then I don't know what the emergency is.  So

16   can we just kind of focus on that?

17           MR. KODOSKY:  I'll try, Your Honor.

18           THE COURT:  Okay.  So I will sustain the -- your

19   objection as to relevancy and we're going four outside of --

20   there's like a little box here that I think we need to stay

21   within.  And I'm not quite sure who -- it's relevant as to when

22   they investments may have happened.  What they told people they

23   were going to give them.  As to whether this involves the

24   Debtor's assets that they're trying to get people to invest in.

25   I get that.

Case 23-10763-amc Doc 437-14 Filed 10/06/23 Entered 10/06/23 09:36:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 125 of 184

Case 1:21-cv-01639-DNH-TWD Document 1030 Filed 05/09/24 Page 66 of 278   125

```
 1              But we need to tell me what happened September 13th
 2   and what they're doing you believe that they -- the record will
 3   show that they were doing.  They meaning Mr. Stastney,
 4   SeeCubic, Inc.  Who else is on here?  Hawk.  I don't know what
 5   Hawk did.  Maybe by investing.  I have no clue.  Okay.  But at
 6   least the four people, four entities, and one person who you
 7   believe I should issue Stastney individually.  I get it.  SLS
 8   VI Holdings, SeeCubic, Inc., that's Mr. Stastney, and Hawk
 9   investments.  And you need to tell me why I wouldn't -- what is
10   it that they're doing that I need to enjoin, okay.
11   BY MR. KODOSKY:
12   Q    Who were you shopping at -- are you shopping the
13   technology?
14   A    I don't know what that means.
15   Q    Are you -- meaning with potential clients offering to
16   license the source code and optical design stack, and other
17   pieces of technology?
18   A    No.  We are not meeting with clients and offering to
19   license them the technology.
20   Q    When you say we, does that include both S -- SeeCubic,
21   Inc. and SeeCubic B.V.?
22   A    Yes.
23   Q    So neither is SeeCubic, Inc. nor SeeCubic B.V., it's your
24   testimony here today, you all are not offering to potential
25   clients to license the technology to those clients?
```

Case 2:23-cv-00639-DJC-JDP Document 113 Filed 10/26/23 Entered 10/26/23 09:56:07 Page 66 of 278 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 126 of 184

126

 1   A     At this point, all we are doing is offering to complete a

 2   proof-of-concept project with them.

 3   Q     What do you mean by a proof-of-concept project?

 4   A     We take their specifications and create a product.

 5   Q     SC B.V. is creating the products?

 6   A     SC B.V. is creating the products.

 7   Q     For sale?

 8   A     No.  For proof of concept for those clients to see if the

 9   technology is something that they may want to license in the

10   future.  But none of that is happening now.

11   Q     And so, if my client is correct that SC B.V. does not have

12   the right to license technology that has Phillips technology

13   embedded in it or Rembrandt technology embedded in it, would

14   you agree, sir, that you are putting those agreements in

15   jeopardy by building products, protocol projects for these

16   potential clients using that technology embedded in it?

17   A     No.  Phillips is specifically aware of exactly what we

18   were doing because we have discussed with Phillips exactly what

19   we are doing.  Phillips was aware of that when Mr. Rajan was

20   still at SC B.V. in the discussions with Bosch.  Phillips is

21   still aware of that.  They are fully aware of our business

22   model, and they have no objections to it.

23   Q     What basis --

24   A     Rembrandt on the other hand, does not have any protectable

25   IP in this situation.  The analogy that's been used is somewhat

```
 1   incorrect in that regard.
 2   Q    Who at Phillips has signed off on what you all are doing?
 3   A    The responsible party at Phillips for the license.
 4   Q    Who is that?
 5   A    His name is Alexander Damveld (phonetic).
 6   Q    The same Alexander Damveld that said there are no licenses
 7   available at this point?
 8   A    I don't know what you're referring to.
 9   Q    Are you aware that that gentlemen has informed my client
10   within the last month that there are no additional licenses
11   being made?
12        MR. COLBY:  Objection, Your Honor, just to the extent
13   that that's a proffer of evidence.  That would be hearsay.  I
14   think if the question could be --
15        THE COURT:  Rephrased.
16        MR. COLBY:  -- rephrased.
17   BY MR. KODOSKY:
18   Q    Have you personally had conversations with Mr. Damveld?
19   A    Yes.
20   Q    When?
21   A    2021.
22   Q    Okay.  So you have not spoken with Mr. Damveld in 2023?
23   A    I have not.
24   Q    So if you've not spoken with Mr. Damveld in 2023, how does
25   he know what you all were doing over there right now?
```

 1   A    Because our business model hasn't changed.

 2   Q    Well, I thought that you said that your business model has

 3   changed from 2022 whenever in the product placement with the

 4   astronaut on the front you talked about your business model

 5   included sublicensing the technology?

 6   A    And I said the way in which it changed, which was the

 7   party doing the sublicensing is not SeeCubic, Inc. any longer.

 8   It's SeeCubic B.V.  But otherwise, I confirmed for you that the

 9   business model was the same.

10   Q    And the only reason that SC B.V. is the party that's now

11   offering the sublicensing as opposed to SeeCubic, Inc. is

12   because you've been named within the last two weeks the

13   director of SC B.V., correct?

14   A    That is 100 percent inaccurate.  The reason that SC B.V.

15   is doing it is because the Receiver in October of 2022 decided

16   that it would be in every party's best interest if SC B.V. did

17   the agreements with customers.  That exact protocol was adopted

18   by the independent director, and that is the protocol that I'm

19   bound to follow by the court under the court's most recent

20   ruling.

21   Q    Mr. Stastney, you referred to the Receiver.  The Receiver

22   was in place before the Delaware Supreme Court ruled, correct?

23   A    Incorrect.  The Receiver was in place well after the

24   Delaware Supreme Court ruled.

25   Q    Okay.

1   A    The Delaware Supreme Court ruled in June of 2022, and the

2   Receiver was put in place by the chancery court in October of

3   2022.

4   Q    All right. And so, you're saying that the Receiver

5   allowed SC B.V. to sublicense the technology to clients?

6   A    The Receiver allowed SC B.V. to do exactly what it has

7   been doing since 2018, which is develop proof of concept

8   projects to potentially entice customers to license the

9   technology to include in their offerings.

10  Q    The independent director did not agree to continue with

11  your all's business model, correct?

12  A    Incorrect.

13  Q    He resigned?

14  A    I said incorrect. He did agree to continue it and that's

15  exactly what the protocol provided.

16  Q    Well, he resigned correct?

17  A    Those are two different questions.

18  Q    It's one question. He resigned, correct?

19  A    The independent director resigned, right.

20  Q    And with you as a director and making the decisions

21  essentially at this point for SC B.V., who's to police your

22  conduct?

23  A    The court. Specifically, the Amsterdam court. I am to

24  abide by a protocol and provide regular reports to the

25  Amsterdam court.

Case 23-10763-amc Doc 987-14 Filed 10/29/23 Entered 10/29/24 09:50:57 Desc
Exhibit K. Stream October 2023 Hearing Transcript Page 130 of 184

130

1   Q   How often do you have to  provide reports?

2   A   It does not say specifically.  It says regularly.

3   Q   Have you provided any reports to the Amsterdam court to

4  this point?

5   A   No.  Not since September 20th.  No, I have not.

6   Q   All right.  So in the two, three weeks, you have not

7  accounted at all to the Amsterdam court in terms of what you

8  all are doing over there?

9   A   That's correct.

10   Q   Are there any scheduled communications with the Amsterdam

11  court as to what is going on with the henhouse?  You heard my

12  fox in charge of the henhouse characterization earlier.  Is

13  there any further hearings scheduled with the Amsterdam court

14  regarding these matters?

15   A   No hearings.  I'll rely on my Dutch counsel to tell me as

16  and when I should be updating the court.

17   Q   Is there any order saying what a schedule would be for you

18  to notify the court over there as to what's going on?

19   A   I believe I answered that already.

20       THE COURT:  That's --

21       THE WITNESS:  I said no.  There's no schedule.  It's

22  to be --

23  BY MR. KODOSKY:

24   Q   So you're essentially self-policing yourself, correct?

25   A   Incorrect.

```
 1   Q    How am I incorrect?

 2   A    Because I'm overseen by a court with a specific protocol

 3   to follow.

 4   Q    How many customers have you spoken with about potentially

 5   developing these protocol projects?

 6   A    I apologize.  Who am I in this regard and you mean proof

 7   of concept projects?

 8   Q    Correct.

 9   A    When you say you, in what role?

10   Q    Start with SeeCubic, Inc.

11   A    SeeCubic, Inc., not me personally.  But SeeCubic, Inc. has

12   probably talked to 50, 100.

13   Q    A hundred customers?

14   A    Potential customers.

15   Q    And what have those conversations concerned?  Putting the

16   technology in automobiles, for example?

17   A    Some have been with automobile companies or tier one

18   suppliers.

19   Q    And televisions?

20   A    Some of them regarding televisions.

21   Q    And have you personally been the one having these

22   conversations?

23   A    I have had some and our SCI staff has had others.

24   Q    When you say SCI staff, who is that?

25   A    Those are our employees who have relationships with the
```

Case 23-10763-amc Doc 788-14 Filed 10/09/23 Entered 10/09/23 10:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 132 of 184

132

1   various companies or are building relationships with the

2   companies to explain to them what we do and assess whether

3   they're interested.  They're salespeople.

4   Q    So SeeCubic, Inc., has salespeople?

5   A    Yes.

6   Q    How many?

7   A    Well, I'll say five sort of full time and a lot of people

8   help out.

9   Q    And they're offering the services of SCBV to these

10  clients?

11  A    Yes.

12  Q    Is SCBV speaking with clients about licensing the

13  technology to those clients?

14  A    No.

15  Q    Are you individually speaking with potential clients?

16  A    At times, yes.

17  Q    How many?

18  A    I don't know the answer to that.  But many.

19  Q    More than --

20  A    I mean, I've certainly spoken with 20 or 25.

21  Q    All right.  And if you've spoken with 20 or 25 and

22  SeeCubic, Inc. has salespeople out there that have spoken with

23  you said 100, maybe 100 or more?

24  A    Fifty to a hundred, probably.

25  Q    And if our client's position is correct that that's

Case 2:23-cr-00639-DJW-11  Document 437-14  Filed 10/28/23  Entered 10/28/23 09:50:57  Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 133 of 184

133

 1  jeopardizing the Phillips licensing agreement, your answer is,

 2  is that there's somebody at Phillips who you haven't spoken

 3  with since 2021 that's fine with what you all are doing?

 4  A    Yes.

 5  Q    Mr. Stastney, you were barred by FINRA in 2013; is that

 6  correct?

 7  A    I don't recall whether I was barred by FINRA, but I

 8  entered into an SEC -- a settlement with the SEC in 2013.

 9  That's correct.

10  Q    And that was for roughly $2.8 million?

11  A    That's correct.

12  Q    You were fined?

13  A    That's correct.

14  Q    And that was for an undisclosed profit that you had made

15  in connection with a purchase transaction?

16  A    That was for an undisclosed principal transaction.

17  Q    Right.  And that bar has not been lifted in the past 10

18  years, correct?

19  A    I have never reapplied.

20  Q    Is the Amsterdam court aware of that?

21  A    I believe that was briefed by your clients, yes.

22         MR. KODOSKY:  May I have a minute, Your Honor?

23         THE COURT:  Sure.

24      (Counsel confer)

25  BY MR. KODOSKY:

Case 23-12063-DJV Doc 487-14 Filed 10/28/23 Entered 10/28/23 09:54:57 Desc
Exhibit K. Stream October 2023 Hearing Transcript   Page 134 of 184

134

1    Q    Mr. Stastney, were you offering sublicensing to the

2    potential customers that you all have been meeting with?

3    A    No.

4    Q    No sublicensing at all?

5    A    All we've been offering to clients at this point is proof

6    of concept projects.

7    Q    But if the proof of concept is successful -- has the proof

8    of concept actually worked with any client to this point?

9    A    No.

10   Q    So nobody has decided to do any business with you all

11   after these projects have been built?

12   A    We haven't completed any of them yet.

13   Q    How long have you all been working on these projects?

14   A    In terms of actually working on them, the first one

15   started earlier this year.

16   Q    In 2023?

17   A    Uh-huh.

18   Q    After the Supreme Court invalidated the omnibus agreement

19   is when the projects first started?

20   A    The conversations were happening before that, but that's

21   when the actual projects commenced based on the contracts.

22   Yeah.

23   Q    And has the work been completed at this point?

24   A    The work has not been completed.

25   Q    When do you anticipate the work is going to be completed?

1    A    Somewhere between around the end of the year or after.

2    Q    Is the bonding equipment being used in connection with

3    those projects?

4    A    It is not.

5    Q    Where is the bonding equipment these days?

6    A    It's in a warehouse in China.

7    Q    Have you had any conversations with the landlord about the

8    bonding equipment in that warehouse?

9    A    No.  I have not.

10    Q    And you deny telling the landlord not to release it to my

11    clients?

12    A    I deny telling the landlord not to release the equipment

13    to your clients.  Yes.

14    Q    Have you spoken with clients in the past about

15    sublicensing?

16    A    That's what I assumed your question was previously and the

17    answer is no.

18    Q    Okay.  And so these client discussions you're having, you

19    said you've personally had more than 25 of them.  If you're not

20    discussing sublicensing, what's the purpose of having a

21    protocol built if the end result is not to sublicense the

22    technology to them?

23    A    The purpose is to take the first step, which is does our

24    technology work within their build, within their -- with their

25    chosen equipment.  And until that's done and completed, there's

 1  really nothing to discuss on the sublicensing terms.  We've

 2  never gotten to that point.

 3  Q    When do you expect to get to that point?

 4  A    At some point after when they've gotten the proof of

 5  concept project completed and have had a chance to assess

 6  whether they want to move forward with a commercial

 7  application.

 8  Q    And I guess my question to you, sir, is when do you expect

 9  the first proof of concept project to be completed?

10  A    I think I've answered that also.  But that was the end of

11  the year or early next year.

12  Q    I didn't hear the answer earlier to that.  So before the

13  end of 2023 or beginning of 2024, you all expect to have the

14  first of these proof of concept projects completed?

15  A    That's correct.

16  Q    And then at that point, do you anticipate having

17  sublicensing discussions with the potential clients?

18  A    Only if they decide to move forward with the commercial

19  application.  After some period of evaluating the proof of

20  concept project.

21  Q    And if they do want to move forward, then you all would

22  sublicense the technology to them?

23  A    That's a bridge we'll have to cross when we get there.

24  Q    Well, maybe.  The Court is going to have some say in that

25  in terms of whether or not you all are able to move forward

1  with sublicensing technology despite what the terms of the

2  agreement say.  But I just want to make sure that I'm clear

3  that that's your intention, is to get these proof of concept

4  projects completed and then move forward with the sublicensing,

5  correct?

6  A    My intention is to complete the proof of concept projects

7  and then hope that the clients approve of them and want to move

8  forward.

9  Q    And the sublicensing would be done not by SeeCubic, Inc.,

10 but instead by SCBV?

11 A    That's correct.

12 Q    An affiliate, a subsidiary of the Debtors in this case?

13 A    That's correct.

14 Q    And so if by moving forward with those projects and

15 potentially sublicensing the technology, any of the licensing

16 agreements with Rembrandt or with Phillips are jeopardized,

17 that's not a concern of yours?

18 A    That's not my understanding of what actually is the case.

19 Q    You're not concerned at all about the Phillips agreement?

20 A    Based on everything I'm saying that we're doing or propose

21 to do, I have no concerns about the Phillips agreement.

22 Q    Have you personally disclosed what you're doing to the

23 Phillips people?

24 A    Yes.

25 Q    In 2023?

```
1   A    No.

2   Q    Have you had any discussions with the Phillips people

3   since the Delaware Supreme Court said that you all don't own

4   the assets?

5   A    I have not.

6   Q    Have you asked any strategic companies for money, three to

7   five million dollars each?

8   A    Yes.

9   Q    Who?

10            THE COURT:  Who's asking the --

11            MR. KODOSKY:  I'm sorry?

12            THE COURT:  Who said who?

13            MR. KODOSKY:  I did.

14            THE COURT:  Oh.  Okay.  All right.  I might be

15   getting a little delirious.  So the question was did you ask

16   any strategic?

17            MR. KODOSKY:  Companies.

18            THE COURT:  And presumably, he knew what you meant by

19   strategic because he answered.

20            THE WITNESS:  We have NDAs with each of those

21   strategic companies.

22   BY MR. KODOSKY:

23   Q    With who?

24   A    We have NDAs with each of those strategic companies?

25   Q    How many?
```

Case 23-10763-amc Doc 887-14 Filed 10/26/23 Entered 10/26/23 09:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 139 of 184

139

```
 1   A     Four.

 2   Q     What is the money being given for?

 3   A     The money is not being given yet.  We're only discussing.

 4         THE COURT:  And can we be clear for the record who's

 5   we?

 6         THE WITNESS:  I'm sorry?

 7         THE COURT:  Who is we?  We is?

 8         THE WITNESS:  SeeCubic, Inc.

 9         THE COURT:  Okay.

10         MR. KODOSKY:  SeeCubic, Inc.  This is SeeCubic, Inc.,

11   in this case.  I have no further questions at this point, Your

12   Honor.

13         THE COURT:  Okay.  I'm guessing -- well, I'm assuming

14   he called him over cross.  So you're going to have to examine

15   him, Mr. Colby.  Are you going to examine?  You have some

16   questions?

17         MR. COLBY:  Yes, Your Honor.  If now is a good time

18   for a short break, I'd just confer with co-counsel.

19         THE COURT:  Right.

20         MR. COLBY:  We've been going for an hour or two.

21         THE COURT:  And counsel, does anybody think we're

22   going to finish today?

23         MR. COLBY:  Well, I think we could finish right now

24   because I don't think the Debtors have come close to carrying

25   their burden.
```

Case 2:23-cv-00639-DJM-LRC Document 187-14 Filed 10/28/23 Entered 10/28/23 09:30:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 140 of 184

Exhibit 1028 Page 140 of 184          140

```
 1              THE COURT:  Well, they haven't called all their
 2   witnesses, counsel.
 3              MR. COLBY:  Where I was going is I think the rest of
 4   the answer is better directed to them and not to me because I
 5   don't know how long it's going to take them to put on their
 6   case.
 7              THE COURT:  Well, let's back off.  That was directed
 8   to everyone.  I actually just happened to be looking at you,
 9   Mr. Colby, because I was turned this direction.
10              MR. COLBY:  Okay.
11              THE COURT:  We have one witness that we have not even
12   finished. There are two more witnesses, Mr. Rajan and Mister --
13              MR. KODOSKY:  Robertson.
14              THE COURT:  -- Robertson.  I don't know how long --
15   presumably, let's say they each take a half an hour for cross
16   -- direct, half an hour for cross.  Or maybe you have 10
17   minutes.  I don't know.
18              MR. COLBY:  Yeah.
19              THE COURT:  But that's still two -- we're talking
20   about, I don't know, how long do you think for Mr. Stastney
21   here?  Maybe 20 minutes for you?  That still takes us to
22   4:00-something.  And then, these two gentlemen, I would love
23   to -- I'm not doing an all-nighter like I've done before.  And
24   either they're going to carry their case or they won't.  The
25   question is, I'm not sure that we're going to get through it
```

 1  before 5:30, 6:00 tonight and I'm not inclined to do that,

 2  given where I am.

 3          MR. COLBY:  Understand.  I think probably all of our

 4  predominant concern is if you're not feeling well, we'll finish

 5  whenever you like.  I think also, in addition to the time

 6  allocations that you just referenced, there's the possibility

 7  if not likelihood that after Mr. Rajan and Mr. Roberson, we

 8  would want a rebuttal witness.  Might be Mr. Stastney or

 9  somebody else.

10          THE COURT:  Yes.  There we go.

11          MR. COLBY:  And I'd be delighted of opposing counsel

12  let us have the last word, but they probably would have some

13  follow-up questions.  So you'll probably --

14          THE COURT:  So I'm just saying for timing.  And I

15  would love to say we can continue on Monday, but I don't think

16  so.  That's a holiday. I would come, but I think the court's --

17          MR. KODOSKY:  I would, Your Honor.

18          THE COURT:  Well, the court is closed.  I don't think

19  my staff is coming.

20          MR. KODOSKY:  Sorry.

21          THE COURT:  I don't think -- because I actually

22  realize I didn't have any trials.  And now that the judicial

23  council has mandated that all evidentiary hearings be in

24  person, you know, all of those trials that I was having during

25  COVID when people could do Zoom trials are suddenly settling.

Case 23-10763-amc Doc 487-14 Filed 10/20/23 Entered 10/20/23 18:57:27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 142 of 184

Case 2:20-cv-06393-DMG-PLA Document 525-4 Filed 05/13/20 Page 83 of 278

142

 1 | So I have lots of openings on my calendar.  I think my calendar
 2 | is opening up -- don't I have a trial -- oh, was it a trial
 3 | today that I gave to them?  Okay.
 4 |         And my trial on Tuesday is -- anyway, I'm saying that
 5 | only because, I will be honest, my medication is wearing off.
 6 | And notwithstanding my doctor's orders that I take the week
 7 | off, I did not.  So I wanted to get this done.  But there's
 8 | only so much that I can physically do, so.
 9 |         MR. DEMARCO:  Would Tuesday work for Your Honor?
10 |         THE COURT:  I'm trying to pull up my calendar.  Do
11 | you know what's on our calendar?  What?  It should be -- I
12 | don't and I purposely had -- doing COVID and Zoom trials, I
13 | often had my phone with me because that was the way I
14 | communicated with my staff.  And so I kind of got accustomed to
15 | doing that.  But it looked while we were in court that I'm not
16 | paying attention or that I'm on my phone.  So I have purposely
17 | left my phone in my chambers so that I now have to go back to
18 | looking at my laptop for information, to communicate with my
19 | staff in chambers and to communicate -- Eileen, are you on?
20 |         THE CLERK:  Yes, Judge, I am.
21 |         THE COURT:  All right.
22 |         THE CLERK:  Yes, Judge.  We did set a trial on
23 | Tuesday, but that's been rescheduled to November.  And that was
24 | to start at 12:30.
25 |         THE COURT:  Okay.

```
 1                THE CLERK:  So we have that spot open.

 2                THE COURT:  Again, as I said, everybody trying to

 3   settle now because they don't want to come and see me.  So we

 4   do have Tuesday if we have to.  I will go as late as I can, but

 5   I will be honest, I'm not -- I'm starting to not feel well.

 6                MR. KODOSKY:  Sure.

 7                THE COURT:  Yes, counsel?

 8                MR. DEMARCO:  Your Honor, I apologize.  I just wanted

 9   to jump in real quick.  I'm traveling for business next Tuesday

10   through Friday.  I would have the following Monday and Tuesday

11   available, which is I believe 16th and the 17th.  But I've

12   already committed on another business trip for next week.

13                THE COURT:  Okay.  So you're not available at all?

14                MR. DEMARCO:  I'm not available on Tuesday.  I have a

15   flight at 8:00 Tuesday morning.

16                THE COURT:  Okay.  Because I was wondering, and I

17   don't know the answer.  I have to reach out to someone in the

18   administrative office to find out what in-court means.  Does it

19   mean only I have to be here?  Does it mean everybody has to be

20   here?  I don't know.  Because some counsel may want to

21   participate by Zoom, which I think -- which we were prepared to

22   do today with me being in another courtroom if I was still

23   contagious.  But I'm not, so I'm in here. So I don't know what

24   that means.  If that means for people who say we can

25   participate but we can't get here, but you can't be here at
```

Case 2:23-ap-06397 Doc 487-14  Filed 10/09/23  Entered 10/09/23 09:34:57  Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 144 of 184

144

```
 1   all.  So that's irrelevant.

 2            MR. DEMARCO:  I mean, I maybe could try Zoom later in

 3   the week, Your Honor.  I'd have to really juggle that.

 4            THE COURT:  No.

 5            MR. DEMARCO:  But certainly Tuesday, I'll be on a

 6   plane traveling.

 7            THE COURT:  Okay.  Eileen, what do we have?

 8            THE CLERK:  For what day, Judge?  For the following

 9   week?

10            THE COURT:  Yes.

11            THE CLERK:  We have the 16th available.

12            THE COURT:  What day of the week is that?

13            THE CLERK:  Monday.  October 16th is a Monday.

14            THE COURT:  And we have nothing that day?

15            THE CLERK:  We did have a case, TH Properties.  Hold

16   on one second, let me just make sure.

17            THE COURT:  That got continued to file an amended --

18   they're going to file an amended disclosure statement and --

19   amended disclosure statement and a continued hearing on their

20   motion for relief, correct?

21            THE CLERK:  Yes.  That's correct.  And that's not

22   until November 8th.

23            THE COURT:  Right.  So --

24            THE CLERK:  So we have October 16th available.

25            THE COURT:  And counsel, you said when will you be
```

```
 1   available?

 2           THE CLERK:  I am available on Monday, the 16th, and

 3   Tuesday, the 17th.

 4           THE COURT:  What do we have on the 17th, Eileen?

 5           THE CLERK:  17th, we have just our normal 10:30,

 6   which we're available after 11:30.

 7           THE COURT:  And counsel, on those days, assuming I'm

 8   fine, we can go late.  I mean, as late as the -- as long as the

 9   marshals don't -- or the CSOs don't kick us out, we can go as

10   late as necessary.  It's unfortunate today's just not one of

11   those days that I can do that.

12           MR. WRIGHT:  Your Honor, from my personal

13   perspective, I will rearrange things to block out that day for

14   Your Honor.

15           THE COURT:  For the 16th?

16           MR. WRIGHT:  Either day.

17           THE COURT:  16th or 17th?

18           MR. WRIGHT:  Whichever day, I can --

19           THE COURT:  The 16th would be all day.  I don't have

20   anything.  We'd start at 10:30 and we can go as late.  And I'll

21   check with the CSOs, but we probably can go as late as 8:00.

22   And hopefully, we can finish up today.  It's 4:00. Let me, you

23   know, you wanted to take a little break.  I can go.  I need to

24   take some more medication and then we'll see how long I can go.

25           MR. COLBY:  It's also a logical breaking point before
```

Case 1:23-ap-00639-DM-1 Doc 34 Filed 10/30/23 Entered 10/30/23 16:57:27 Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 146 of 184

Case 2:22-cv-01273-JAD-BNW Document 82-14 Filed 05/13/24 Page 86 of 278    146

```
 1   I start up again.

 2           THE COURT:  Right.  Because you're going to cross --

 3   well, examine Mr. Stastney.

 4           MR. COLBY:  Examine, correct.

 5           THE COURT:  And then, we'll stop there.

 6           MR. COLBY:  Yep.

 7           THE COURT:  And then, you can start at the next

 8   hearing with your two other witnesses.  And then hopefully, if

 9   you have a rebuttal witness, we can get that all done within

10   eight or ten or however many hours.

11           MR. COLBY:  Well, no.  I was saying given that it's

12   almost 4:00, I could start today.  I don't know -- we don't

13   know how long we're going to go, but I don't know that I would

14   finish.

15           THE COURT:  Well, we can go until at least -- let me

16   just figure out how -- I mean, typically, I go until 6:00,

17   6:30, even though, you know, it's a little over.  I just don't

18   know if today, I can go that --

19           MR. COLBY:  Okay.  And the other consideration, and

20   I'm raising it, Mr. Kodosky could raise it himself.  It doesn't

21   look like it's going to happen.  We were trying to finish up

22   before flights had to be met.

23           THE COURT:  Oh, what time are your flights?

24           MR. COLBY:  Which is not me, but I think they have

25   some 7:00 flights.
```

```
 1            MR. KODOSKY:  And that's the other thing I was going

 2  to mention, Your Honor, is one of the two gentlemen, Mr.

 3  Robertson, he's here from Nevada.  And so I don't know if the

 4  Court would be inclined at all to maybe permit him to be

 5  examined by Zoom as opposed to in court on the 17th?  But the

 6  16th, if necessary, he could do.  But he was on a red-eye

 7  flight this morning, Your Honor, that left Nevada at, like,

 8  midnight and got into --

 9            THE COURT:  Right.  So we aren't going to --

10            MR. KODOSKY:  -- morning early.

11            THE COURT:  So he's not even going to get on the

12  stand today.

13            MR. KODOSKY:  Right.

14            THE COURT:  So I think maybe we figure out -- what

15  I'll do is I'll take a break, come back, and I hate when I go

16  back because I end up starting talking to my law clerks about

17  things and we go a little over.  So let's come back at 4:15.

18  That gives you like 25 minutes.  So you guys sort of -- maybe

19  you can between, among yourselves figure out what timing works

20  for everybody.

21            MR. KODOSKY:  Okay.

22            THE COURT:  Because he's got to leave anyway.

23            MR. KODOSKY:  We've both got -- he's got a flight --

24  I'm up from Atlanta, Georgia.  My flight is at 7:00-something,

25  his is at 7:00-something.
```

Case 1:20-cr-00639-DC-JRC Document 87-14 Filed 10/29/23 Entered 10/29/23 23:33:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 148 of 184

148

```
 1              THE COURT:  Counsel, you need to be at the airport by

 2  5:30.

 3              MR. CAPONI:  Your Honor, I was going to suggest that

 4  since courtroom time is scarce, if we could -- we could always

 5  deal with scheduling tomorrow when we come back, get the

 6  witnesses up and down, and then deal with the lawyer stuff when

 7  we're not burdening Your Honor and --

 8              THE COURT:  Well, that's fine with me.  That's why

 9  they pay me that huge salary, so I can come here and listen to

10  this.  That's my favorite line.  I'm sorry.  We're going to be

11  in recess until 4:15.

12      (Recess taken)

13              THE BAILIFF:  All rise.

14              THE COURT:  Please be seated.  You may proceed.

15              MR. COLBY:  Thank you.

16                       CROSS-EXAMINATION

17  BY MR. COLBY:

18  Q    Mr. Stastney, do you recall Mr. Kodosky asked you a

19  question about whether or not you were involved in the day-to-

20  day work at SeeCubic BV?

21  A    Yes.

22  Q    Okay.  I have a different question.  My question is, do

23  you have an understanding of what the day-to-day work is that's

24  going on at SeeCubic BV?

25  A    Yes.
```

1   Q    There was testimony before the break about conversations

2   with customers.  And I want to focus in particular on -- did

3   you testify in the hearing in the Netherlands about ongoing

4   conversations with potential customers?

5   A    I believe we may have discussed that there were some.

6   Yes.

7   Q    Okay.  All right.  Did you provide an approximate number?

8   A    I don't recall doing that.

9   Q    All right.  You also testified before the break about

10  conversations with approximately 50 to 100 potential customers.

11  Do you remember using that number?

12  A    I do.

13  Q    Over what period of time did those conversations take

14  place?

15  A    Over three years.

16  Q    Three years.  Okay.  Have you had any conversations with

17  potential customers in the last, I guess it would be three

18  weeks since the decision on the -- in the case in the

19  Netherlands?

20  A    No.

21  Q    There were some questions about your obligations to report

22  to the court in the Netherlands.  Do you recall that?

23  A    I do.

24  Q    In the hearing in the Netherlands proceeding, did you

25  describe for the court there the projects that were ongoing at

```
 1   SeeCubic BV?
 2   A    I did not.
 3   Q    I'm sorry?
 4   A    I did not.
 5   Q    Okay.  In terms of that reporting, is Mr. Rajan a party to
 6   that proceeding?
 7   A    He was.
 8   Q    Okay.  And is proceeding ongoing in any way?
 9   A    The court's oversight continues.
10   Q    Okay.  And if anybody has an issue with either your -- if
11   anybody has an issue with your conduct as the director of SCBV,
12   is there an opportunity to raise that with the court?
13   A    My understanding is that there is.
14   Q    Okay.  And if there's an issue with the frequency or
15   substance of your reporting to the court, is there an
16   opportunity for that to be raised with the court?
17   A    I wouldn't expect that there is.
18   Q    Okay.  Do you have an understanding as to whether or not
19   Mr. Rajan or anybody else from Stream could raise any issues
20   they see with your fulfilment of those duties with the court?
21   A    My understanding is that they could.
22   Q    I want to talk -- you made some references about the
23   Phillips license.
24   A    Yes.
25   Q    And what's your understanding of what the Phillips license
```

 1  allows the licensee to do?

 2  A    So the Phillips license as amended, allows the licensee to

 3  incorporate or utilize the know-how and software that was

 4  developed by Phillips to the extent that there is any.  And

 5  also to include features which rely on the patents that were

 6  developed by Phillips in producing and selling technology.

 7        MR. COLBY:  Okay.  So let's take a look at it, if I

 8  might, Your Honor, the Phillips license.

 9        THE COURT:  The what?

10        MR. COLBY:  The Phillips license.

11        THE COURT:  Okay.

12        MR. COLBY:  So these will be SC-1 and SC-2 license

13  and the amendment.  You guys have copies, right?  Okay.

14  BY MR. COLBY:

15  Q    Can you take a look at SC-1, Mr. Stastney.

16  A    Yes.

17  Q    Do you recognize that document?

18  A    Yes, I do.

19  Q    What is it?

20  A    This is the original 2011 technology license agreement

21  between Phillips and Ulta D Cooperative.

22  Q    Okay.  And does this appear to be a true and correct copy

23  of that license?

24  A    It does.

25  Q    It does.  Okay.

```
 1              MR. COLBY:  Any objection to moving into evidence?

 2              MR. KODOSKY:  No.  No objection to moving it into

 3   evidence.

 4              THE COURT:  Okay.  Admitted.

 5       (Debtor's Exhibit SC-1 admitted into evidence)

 6   BY MR. COLBY:

 7   Q    And while we're taking care of housekeeping, Mr. Stastney,

 8   if you could look at SC-2.

 9   A    Okay.

10   Q    Do you recognize that -- take your time, but the question

11   is, do you recognize that document?

12   A    Yes, I do.

13   Q    What is it?

14   A    It is the 2014 amendment to the original 2011 technology

15   license agreement between Phillips and Ulta D Cooperative?

16   Q    And does it appear to be a true and correct copy of that

17   document?

18   A    It does.

19              MR. COLBY:  I'd like to move that into evidence as

20   well.

21              THE COURT:  Any objection?  Admitted.

22       (Debtor's Exhibit SC-2 admitted into evidence)

23              MR. COLBY:  Thank you.

24   BY MR. COLBY:

25   Q    Okay.  So Mr. Stastney, there's been a lot of testimony
```

```
 1   about sublicensing and the Phillips amendment.  What's your

 2   understanding as to -- I'm sorry, in the Phillips license.

 3   What's your understanding as to whether or not sublicensing

 4   would be permitted under the Phillips agreements?

 5   A    My understanding is that it would.

 6   Q    What's that based on?

 7   A    That's based on particularly the 2014 amendment to the

 8   technology license agreement, which was put in place primarily

 9   for that purpose.

10   Q    Are you referring to anything in particular in the 2014

11   amendment, SC-2?

12   A    Yes.  The addition of Clause 2.15, which was added to

13   essentially the operative sections of the agreement by the

14   technology license amendment.

15   Q    Okay.  And what's your understanding of provision 2.15?

16   A    2.15 is an agreement between Phillips and Ultra D, such

17   that Phillips agrees to offer licenses, essentially sublicenses

18   to third party users on reasonable conditions to enable Ultra D

19   in this case and its affiliates to incorporate their technology

20   in third party units.

21        MR. COLBY:  Okay.  And how does that relate to the --

22   I'll strike that.

23   BY MR. COLBY:

24   Q    Okay.  Moving on, Mr. Stastney.

25   A    Sure.
```

1   Q    Do you recall when you were here testifying in June,

2   testifying about a license that SeeCubic, Inc. has?

3   A    Yes.

4   Q    Okay.  What is that license?

5   A    That is an end user license that allows SeeCubic, Inc. to

6   possess demo units and essentially use them.

7   Q    Okay.  Is that the same as a sublicense in the way we've

8   been talking about it here today?

9   A    It is not.

10  Q    How are they different?

11  A    A sublicense is something that would allow a manufacturer

12  of product to incorporate the technology in a broad number of

13  products for sale.  An end-user license is essentially, what

14  each of the buyers of those products would need to have through

15  their manufacturer that enables you to own it, to have it, and

16  use it.

17  Q    Okay.  And do you have an understanding as to whether or

18  not that end-user license is permitted under the Phillips

19  agreements?

20  A    My understanding is that it is.

21  Q    And what's that understanding based on?

22  A    It is a product that was made by Stream TV effectively and

23  delivered pursuant to the license.

24  Q    Just want to ask briefly about the proceeding in the

25  Netherlands.  Were you present?

```
 1   A    I was physically present.  Yes.

 2   Q    In the courtroom?

 3   A    I was.

 4   Q    Was it a in-person hearing?

 5   A    It was an in-person hearing.

 6   Q    Was Mr. Rajan present?

 7   A    He was not physically present.

 8   Q    Did he appear?

 9   A    He appeared via Zoom.

10   Q    Was Mr. Robertson present?

11   A    He was not physically present.

12   Q    Did he appear?

13   A    He appeared via Zoom.

14   Q    Were the proceedings -- what language were the proceedings

15   conducted in?

16   A    Primarily Dutch.

17   Q    Okay.  And were there translators --

18   A    Yes.

19   Q    -- or interpreters present?

20   A    Yes.  Both on the Zoom call and in the courtroom.

21   Q    How would you describe the quality of your recollection of

22   your testimony in the Netherlands proceedings?

23   A    Quite good.  It was very brief.  It was less than three

24   minutes.

25   Q    And is your testimony here today consistent with the
```

Case 23-10763-amc Doc 987-14 Filed 10/28/23 Entered 10/28/23 09:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 156 of 184

Case 23-10763-amc Doc 987-14 Filed 10/28/23 Entered 10/28/23 09:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 156 of 184

156

```
 1   testimony that you offered in the Netherlands proceeding?

 2   A    It is.

 3           MR. COLBY:  I'm going to hand up what will be Exhibit

 4   SC-3.  It's the protocol.

 5           MR. KODOSKY:  I'm sorry?

 6           MR. COLBY:  The protocol.

 7           MR. KODOSKY:  I don't have a copy.

 8   BY MR. COLBY:

 9   Q    Do you have SC-3 three in front of you, Mr. Stastney?

10   A    I do.

11   Q    Do you recognize this document?

12   A    Yes, I do.

13   Q    What is it?

14   A    This is the protocol that the independent director

15   circulated for his resignation.

16   Q    Okay.  And does it have any application to you?

17   A    Yes.  The court in the Netherlands specifically asked if

18   we would be willing to abide by this.  The answer was yes.  And

19   then made abiding by this a part of its order.

20   Q    Is this a true and correct copy of the protocol?

21   A    It appears to be.  Yes.

22           MR. COLBY:  Okay.  Any objection?

23           MR. KODOSKY:  No.

24           MR. COLBY:  I'd like to move it into evidence, Your

25   Honor.
```

```
 1                THE COURT:  No objections, counsel?

 2                MR. KODOSKY:  None, Your Honor.

 3                THE COURT:  Admitted.

 4        (Debtor's Exhibit SC-3 admitted into evidence)

 5   BY MR. COLBY:

 6   Q    Mr. Stastney, what's your understanding of how this

 7   protocol applies to you?

 8   A    According to the court's decision in Amsterdam, I am bound

 9   to abide by this during my time as director of the Netherlands

10   entities and until a qualifying event occurs, which would

11   remove this from the court's jurisdiction.

12   Q    Okay.  And what does it require you to do or not do?

13   A    Quite a bit.  Generally speaking, to continue to operate

14   the business in the best interests of the Dutch entities.  To

15   continue operating generally in the ordinary course.  To

16   continue to work to fund the entities sufficiently.  To conduct

17   all relationships between any of the parties only at arm's

18   length.  To treat both stakeholders of Stream and SeeCubic

19   equally in terms of access to the human resources of SeeCubic

20   BV based on the merit of the projects proposed.  And to

21   entertain projects from both entities and assess them based on

22   merit to determine how to allocate those human resources.

23   Q    And do you intend to abide by that protocol?

24   A    Yes, I do.

25                MR. COLBY:  I'd like to mark Exhibit SC-4.
```

```
 1                  MR. KODOSKY:  What is it?

 2                  MR. COLBY:  It's the opinion.

 3                  MR. KODOSKY:  Okay.

 4                  MR. COLBY:  Thank you.

 5   BY MR. COLBY:

 6   Q    Mr. Stastney, do you recognize Exhibit SC-4?

 7   A    Yes, I do.

 8   Q    What is it?

 9   A    It appears to be a translation of the Court's decision as

10   of the 20th of September.

11   Q    Okay.  And flip through the whole thing.  Is -- is there a

12   Dutch version as well?

13   A    Yes, sorry.  At the end -- at the end of the Dutch

14   version, yep.

15   Q    All right.  And are -- how are you familiar with this

16   document?

17   A    I received it from our Dutch counsel after it was issued.

18   Q    Does this appear to be a true and correct copy of the

19   opinion and the machine translation?

20   A    It does.

21                  MR. COLBY:  Move to admit this document into

22   evidence, Your Honor.

23                  THE COURT:  Counsel, any objection?

24                  MR. KODOSKY:  No objection, Your Honor.

25                  THE COURT:  Admitted.
```

Case 23-10763-amc Doc 487-14 Filed 10/29/23 Entered 10/29/23 09:50:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 159 of 184

159

 1        (Debtor's Exhibit CR-4 admitted into evidence)

 2            MR. COLBY:  Thank you.

 3   BY MR. COLBY:

 4   Q    What's your understanding, Mr. Stastney of for how long

 5   you are appointed as the independent director of SeeCubic BV?

 6   A    I believe that's until a final decision has been issued

 7   with regard to the party that is entitled to name the director

 8   and the final decision in the U.S.

 9   Q    Okay.  Do you have an understanding as to where that

10   decision will come from?

11   A    I don't believe it was specific in the --

12   Q    Got it.  Okay.  I don't have any other questions about

13   that.

14   A    Yep.

15   Q    You were asked earlier, Mr. Stastney about a 2023

16   subscription agreement.  Do you recall that?

17   A    I do.

18   Q    And that, I believe, was marked as D-1, Exhibit Debtor 1.

19   What's the function of this document?

20   A    To specify the terms on which investors will invest and to

21   gather their information so that we have the appropriate

22   records of who invested.

23   Q    Got it.  And Mr. Kodosky asked you about paragraph 5-F on

24   page 8, at the top of the page, page 7 on the bottom of the

25   page.  Do you recall those questions?

Case 23-20763-abc397Doc 437-1 Document 443-1 Filed 10/28/23 Filed 04/18/26 00/23 29:56:57 27 Desc
Exhibit K. Stream October 6028 Pagealing Transcript    Page 160 of 184

160

1    A    I do.

2    Q    And so let's take a look at F, please.  And there is a --

3    the first sentence of paragraph F references action suit

4    proceedings.  Do you see that long sentence?

5    A    I do.

6    Q    Okay.  And it was read for the Court earlier.  I won't --

7    I won't reread it.  But what's your understanding of what that

8    sentence communicates?

9    A    It communicates that there are no types -- none of these

10   things, the long list, which I won't reread, which would be

11   expected to have a materially adverse effect to SeeCubic Inc.

12   Q    Okay.  And SeeCubic Inc is involved in litigation,

13   correct?

14   A    It is.

15   Q    All right.  How do you reconcile, if -- if you do, the

16   statement in the first sentence of paragraph F with the

17   existence of the various litigations that SeeCubic is involved

18   in?

19   A    Well, I -- again, I think that the critical thing is that

20   last clause which is expected to have a material adverse

21   effect.

22   Q    Yeah.

23   A    The -- the lawsuits, all of them, essentially involve the

24   same fact situation, which is what we're here to talk about.

25   And the position of SeeCubic Inc is as an owner of the secured

 1  creditor's claims.  And as such, it has a fairly protected

 2  position.  If the bankruptcy continues, the secured creditors

 3  continue to have their claims against the estate, against the

 4  debtors, and we'll either be repaid or will receive the assets,

 5  presumably, at the end of the day. If through some other method

 6  the asset collection takes place, again, either they will be

 7  repaid or receive the assets.  All -- none of that would result

 8  in a material adverse effect.  And just based on the

 9  probabilities of those outcomes versus other outcomes, we don't

10  expect that any of those things would have a material adverse

11  effect.

12  Q    Okay.  If it was suggested that this is incomplete or

13  misleading to a reader, how would you respond to that?

14  A    I think this is entirely accurate as written.

15  Q    The second sentence references potentially interfering

16  patent or patent application, and it goes on.  I won't subject

17  us all to a full rereading.  What's your understanding of what

18  that sentence means?

19  A    The same thing.  It's once again qualified by expected to

20  have a materially adverse effect.  So number one, SeeCubic Inc

21  doesn't have any patents or patent applications itself.  If

22  this is referring to the patent or patent applications of

23  SeeCubic BV, then based on the analysis that we've done and the

24  license with Phillips particularly, we feel that this is a

25  perfectly accurate statement.

```
 1   Q     Okay.
 2               MR. COLBY:  Just one minute, Your Honor.
 3               THE COURT:  Uh-huh.
 4   BY MR. COLBY:
 5   Q    Mr. Stastney, what's your understanding of whether or not
 6   either of the Debtors here own any of the intellectual property
 7   associated with the Ultra D technology?
 8   A    I believe the only intellectual property that they may own
 9   is a trademark or two.  Other than that, all of the
10   intellectual property sits with either the Curacao subsidiary
11   or the Dutch subsidiaries.
12   Q    Okay.  And in that response when you say the intellectual
13   property, what intellectual property are you referring to?
14   A    The patents, the know-how, the software, predominantly.
15   Q    Okay.  And which entities hold that intellectual property?
16   A    I believe the patents are held by Ultra D Ventures.  Any
17   new patents that get created in SeeCubic BV get transferred
18   there as created.  SeeCubic BV through the employees and the
19   operations has the know-how, and SeeCubic BV also has the
20   software.
21   Q    Okay.  Our Exhibit SE-5.  Take a minute to -- oh, you
22   don't even have it yet.  Mr. Stastney, have you had a chance to
23   review SE-5?
24   A    Yes.
25   Q    What is it?
```

Case 23-20763-CMB Doc 443-11 Filed 10/20/23 Entered 10/20/23 15:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 163 of 184

163

Case 23-20763-CMB Doc 397 Doc 443-11 Filed 10/20/23 Entered 10/20/23 15:56:57 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 163 of 184

```
 1   A    It appears to be a list of patents owned by Ultra D

 2   Cooperative originally, as of 19 December 2022.

 3   Q    Okay.  Do you recognize this document?

 4   A    I do.

 5   Q    Does it appear to be a true and correct copy of the list

 6   you just described?

 7   A    As of 19 December 2022, it does.

 8   Q    Okay.

 9        MR. COLBY:  I'd like to move it into evidence, Your

10   Honor.  SE-5.

11        THE COURT:  Counsel?

12        MR. KODOSKY:  No objection, Your Honor.

13        THE COURT:  Admitted.

14     (Debtor's Exhibit SE-5 admitted into evidence)

15        MR. COLBY:  Yep.

16   BY MR. COLBY:

17   Q   Mr. Stastney, does this -- does SE-5 reflect where and

18   what entity those patents are held?

19   A    Yes, it does.

20   Q    Okay.  And what -- what entity is that?

21   A    Ultra D Cooperative.

22   Q    Is that consistent with your understanding?

23   A    Yes, it is.

24        MR. COLBY:  Your Honor, those are the only questions

25   I have at this time.  I believe Mr. Caponi may have a couple,
```

```
 1   but.

 2             THE COURT:  Okay.

 3             MR. CAPONI:  Good afternoon, Your Honor.

 4             THE COURT:  Okay.

 5                          CROSS-EXAMINATION

 6   BY MR. CAPONI:

 7   Q    Good afternoon, Mr. Stastney.

 8   A    Good afternoon.

 9   Q    Just a few questions for you.  With regard to Hawk

10   Investment Holdings Limited, what if any role does that entity

11   have in the day-to-day operations of SeeCubic BV?

12   A    None.

13   Q    And the same question as it pertains to Bob Morton.

14   A    He has no role in the day-to-day operations.

15             THE COURT:  To who?

16             MR. CAPONI:  Bob Morton.  He's one of the Defendants

17   listed in the --

18             THE COURT:  Okay.

19             MR. CAPONI:  TRO.  Robert Morton is his correct name

20   in the caption.

21   BY MR. CAPONI:

22   Q    And then the same with regard to Alastair Crawford.  What,

23   if any, role does he have in the day-to-day operations of

24   SeeCubic BV?

25   A    He has no role in the day-to-day operations.
```

```
 1   Q    I want to now focus on SeeCubic, Inc, the Delaware entity.
 2   What role, if any, does Hawk Investments Holdings Limited have
 3   in the operations of SeeCubic, Inc?
 4   A    None.
 5   Q    And same question with respect to Robert Morton.  What
 6   role, if any, does he have in the operations of SeeCubic, Inc?
 7   A    None.
 8   Q    Okay.  And lastly, does Alastair Crawford have any role in
 9   the operations of SeeCubic, Inc?
10   A    None.
11   Q    So to the extent that SeeCubic BV is engaging in any
12   activity worthy of an injunction, would Hawk Investments, is
13   your understanding, have any role in encouraging or directing
14   that activity?
15   A    It would not.
16   Q    How about with respect to Bob Morton?
17   A    He would not.
18   Q    And the same question as with Mr. Crawford?
19   A    He would not.
20   Q    Okay.  And if we go back -- if lastly, we go to SeeCubic,
21   Inc, the Delaware entity.  If it -- the Court determines that
22   it's engaged in some conduct that's worthy of an injunction,
23   would Hawk Investments have any role in directing that
24   activity?
25   A    They do not.
```

Case 23-20763-acm  Doc 447-13  Filed 10/28/23  Entered 10/28/23 16:56:57  Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 166 of 184

166

1   Q    And how about with respect to Robert Morton?

2   A    He does not.

3   Q    And the same thing, lastly, with Mr. Crawford?

4   A    He does not.

5   Q    Thank you.

6          THE COURT:  Anything further on cross-examine -- I'm

7   calling it cross-examination because that's what it is.

8          MR. CAPONI:  I have no further questions, Your Honor.

9          THE COURT:  All right.  Any redirect, counsel?

10         MR. KODOSKY:  A few, Your Honor.

11                     REDIRECT EXAMINATION

12  BY MR. KODOSKY:

13  Q    Mr. Stastney, you were asked some questions about -- if

14  you still have in front of you, I believe it was SC-1,

15  technology license agreement?

16  A    Yes.

17  Q    Do you have any involvement in negotiating the terms of

18  the technology license agreement between Phillips and Ultra D

19  Cooperative back in 2011?

20  A    Hold on, let me get the right one.  I was a director of

21  the company at the time.  And the funding that paid the initial

22  license fee came from SLS.  Other than that, no.

23  Q    So you had no involvement with negotiating the terms of

24  the agreement, correct?

25  A    Correct.

```
 1   Q    And you're aware that this agreement in 2011 expressly
 2   prohibits any sublicensing, correct?
 3   A    Yes.
 4   Q    You know where in the agreement subleasing -- sublicensing
 5   is spoken to?
 6   A    I would have to flip through.  I'm sorry.
 7   Q    Have you located anything?
 8   A    I'm going through page by page to make sure that I get
 9   everything that's relevant.
10   Q    Just because a couple of us have flights today, Mr.
11   Stastney, if I can point you to section 2.2.
12   A    Sure.
13   Q    On page 7 of 69.
14   A    Uh-huh.
15   Q    Do you see where I'm at?
16   A    I do.
17   Q    Do you see where it says subject to full and unconditional
18   compliance by Ultra D and its affiliates, and you would agree
19   that Stream is an affiliate of Ultra D, correct?
20   A    I would.
21             THE COURT:  Okay.  Section 2 point what, counsel?
22             MR. KODOSKY:  I'm sorry, Your Honor.  2.2.
23             THE COURT:  Uh-huh.
24   BY MR. KODOSKY:
25   Q    Where it states, "Subject to full and unconditional
```

 1  compliance by Ultra D and its affiliates."  And you just stated

 2  you agree that Stream is an affiliate of Ultra D?

 3  A    Yep.  Both Stream and SeeCubic BV are.

 4  Q    With its obligations under this agreement, it goes on to

 5  say, "Phillips hereby grants to Ultra D and its affiliates a

 6  worldwide, nonexclusive, nontransferable license," -- what's

 7  your understanding of nontransferable license, sir?

 8  A    That it can't be transferred.

 9  Q    "-- under the licensed software without the," and it goes

10  on to state, "without the right to grant sublicenses."  Do you

11  see that?

12  A    I do.

13  Q    Is this the provision or are there other provisions in

14  here that expressly prohibit sublicenses?

15  A    Well, this is a -- I believe this is the provision.  But

16  this is the grant of rights, and it carves out from that the

17  right to grant sublicenses.

18  Q    All right.  So you'd agree with me that based on that

19  provision, those sublicenses were permitted, correct?

20  A    That's correct, based on that provision.

21  Q    Let's take a look a SC-2, I believe it was, which was the

22  2014 amendment.  Do you still have that in front of you?

23  A    I do.

24  Q    Did you have any involvement in 2014 with negotiating the

25  terms of the amendment to technology license agreement?

1    A    I did not.

2    Q    Who at Stream would have negotiated this amendment?

3    A    I believe it was signed by Raja Rajan.  I don't know who

4    negotiated it.

5    Q    Is Mr. Raja Rajan in court with us today?

6    A    Is who?

7    Q    Do you know Mr. Rajan?  Raja?

8    A    I do.

9    Q    Okay.  Is he here with us today?

10   A    Raja Rajan is not here with us today, no.

11   Q    Is he related to Mathu Rajan?

12   A    I believe he's Mathu's brother.

13   Q    Okay.  So Mathu's brother is the individual that

14   negotiated the amendment to the Phillips license agreement in

15   -- it looks like it's got a date of December 8th, 2014,

16   correct?

17   A    I don't know who negotiated it.  I know that he signed it.

18   Q    Do you know why it was negotiated?

19   A    Yes, I do.

20   Q    Why?

21   A    In order to provide the additional parallel licensing

22   agreements and accomplish a couple of other things, one of

23   which was to add additional intellectual property that had been

24   developed into the technology license, and one was to move the

25   license from Ultra D Cooperative to Ultra D Ventures.

Case 23-10763-amc Doc 1397 Filed 06/23/25 Entered 06/25/25 16:50:27 Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 170 of 184

170

 1   Q    What's your understanding based on in terms of the

 2   reasoning for this amendment?

 3   A    The way this amendment was described to me when I was a

 4   board member and investor of Stream TV.

 5   Q    By whom?

 6   A    By Mathu Rajan.

 7   Q    By Mathu or Roger --

 8   A    Raja?

 9   Q    Or Raja.

10   A    By Mathu.

11   Q    Okay.  If you take a look at the second page of SC-2, the

12   first full paragraph beginning with the word "subsequently."

13   A    Uh-huh.

14           THE COURT:  Wait, where are we?

15           MR. KODOSKY:  On page 2 of SC-2, the amendment -- the

16   December 8th, 2014, amendment.

17           THE COURT:  Uh-huh.

18   BY MR. KODOSKY:

19   Q    You've seen this agreement before today, Mr. Stastney?

20   A    I have.

21   Q    Do you have a copy of this agreement in your files?

22   A    I probably do.

23   Q    From the time that you were employed by Stream?

24   A    I believe from the time after when -- during the period of

25   the omnibus agreement.

```
 1   Q    Okay.  So your -- your testimony is that after the omnibus

 2   agreement -- omnibus agreement, that's whenever you would have

 3   received a copy of this agreement for your files?

 4   A    I don't remember exactly, but certainly at that point.

 5   Q    Have you read this agreement before today?

 6   A    I have.

 7   Q    Tell me where in this agreement, this amendment,

 8   sublicensing is permitted.

 9   A    This is -- this is essentially what sublicensing is.  So

10   basically the parties both acknowledge that for certain

11   applications and uses of 3D technology, third party users may

12   need to obtain a license under the intellectual property rights

13   related to 3D display technology, conversion, and rendering

14   technology, and 3D format.  The parties both confirm their

15   willingness to offer licenses under said respective

16   intellectual property rights with respect to such applications

17   and uses to third party users on reasonable conditions.

18   Q    All right.  And it goes on in the next paragraph to state,

19   that in the event that Ultra D becomes engaged in negotiation

20   with any third party regarding a license --

21            THE COURT:  Where -- where are we at, counsel?

22            MR. KODOSKY:  On page 1, Your Honor.

23            THE COURT:  Oh, okay.  I'm on page -- okay.

24            MR. KODOSKY:  The paragraph that begins "In the event

25   that Ultra D becomes engaged in negotiation --"
```

Case 23-10763-amc Doc 397 Doc 443-18 Filed 10/20/23 Filed 04/16/25 Entered 10/20/23 09:56:57 Desc
Exhibit K. Stream October 2028 Appealing Transcript   Page 172 of 184

172

```
 1              THE COURT:  Uh-huh.
 2              MR. KODOSKY:  "-- with any third party regarding a
 3   license in respect of such applications and uses, and it
 4   believes that the third party may also be using Phillips
 5   technology, it will notify Phillips in writing about such third
 6   party."
 7   BY MR. KODOSKY:
 8   Q    Do you see where I'm reading from, sir?
 9   A    I do.
10   Q    As SeeCubic Inc or SC BV to your knowledge ever notified
11   Phillips in writing about any third-party using Phillips'
12   technology?
13   A    I don't know if SeeCubic BV notified Phillips regarding
14   the Bosch POC.  But none of the POCs that we're working on have
15   gotten to the point where we're actually engaged in
16   negotiations regarding a license in respect to such
17   applications.
18   Q    You've never had any negotiations with any customer or
19   potential customer regarding licensing?
20   A    Other than Bosch that I'm aware of, no.  And when you say
21   we, I'm speaking on behalf of SeeCubic Inc and SeeCubic BV.
22   Q    And it goes on to state, "Phillips may give its consent
23   which consent will not be unreasonably withheld to Ultra D to
24   point out to such third party that Phillips also holds
25   intellectual property rights relevant for such applications and
```

```
 1   uses."  Do you see that?

 2   A    I do.

 3   Q    There's nothing in this agreement that says that if Ultra

 4   D builds upon the Phillips technology that they don't have to

 5   all of a sudden obtain permission from Phillips anymore,

 6   correct?

 7   A    Correct.

 8   Q    And on page 2 of this agreement, in the paragraph that

 9   begins with the word "subsequently," I'm looking at the line 1,

10   2, 3, 4 -- third line down where it says,

11             "Ultra D shall treat Phillips's license terms and

12             conditions as confidential information and Ultra D

13             represents that the perspective licensee shall do the

14             same.  In the event the perspective licensee wishes

15             to conclude parallel license arrangements with both

16             Ultra D and Phillips, Ultra D and Phillips shall both

17             negotiate a separate license with such third party."

18             Do you see that?

19   A    I do.

20   Q    What's your understanding of that provision?

21   A    That to the extent that there's a party who is interested

22   in utilizing technology which uses both Ultra D and Phillips

23   IP, that Ultra D is allowed to show the standard Phillips terms

24   under confidentiality, must be under a NDA.  But Phillips

25   ultimately will negotiate the terms of that sublicense with any
```

1   third party directly.

2   Q    And it says, "For the voidance of doubt, all licenses

3   under the Phillips technology will be negotiated between

4   Phillips and the prospective licensee", correct?

5   A    I believe that's what I just said, yeah.

6   Q    It doesn't say Ultra D will negotiate any licenses.

7   A    I believe it does in the sentence right above.  "In the

8   event the prospective licensee wishes to conclude parallel

9   license arrangements with both Ultra D and Phillips, Ultra D

10  and Phillips shall both negotiate a separate license with such

11  third party."

12  Q    But then the next sentence that says, "For the avoidance

13  of doubt, all licenses under the Phillips technology will be

14  negotiated between Phillips and the prospective licensee,"

15  correct?

16  A    Correct.

17  Q    So in other words, SC BV does not have the right to

18  license Phillips' technology to anybody.  Only Phillips has the

19  right under this amendment to do that, correct?

20  A    That's correct.  And it has agreed to do so under

21  reasonable terms and conditions.

22  Q    And to this point, Phillips has never been contacted as

23  far as you're aware other than you mentioned Bosch, regarding

24  any negotiations regarding the licensing of its technology,

25  correct?

1  A    That's correct because there have not been any.

2  Q    But there hasn't been any to this point, but that's what

3  you're all working towards, correct?  By working on these

4  protocol projects?

5  A    Yes.  This entire agreement, this Phillips license and the

6  economics under the Phillips license contemplate that

7  ultimately the technology will be commercialized.

8  Q    Okay.

9  A    And that's the point in which Phillips actually gets money

10  for its license.  So yes, this entire license structure was put

11  in place contemplating that at some point we would have a

12  commercial customer who would get pay -- who would pay the

13  Phillips license.

14  Q    And you'll acknowledge, sir, that to this point, nobody

15  has negotiated with Phillips regarding any licenses, correct?

16  A    So far there have been no licenses to negotiate.

17  Q    And as far as -- do you know whether or not Phillips is

18  even -- actually, let me ask you.  Were you aware that Phillips

19  is in the process or has sold patents and is no longer making

20  any licenses available?

21  A    I'm aware that there have been negotiating and may have

22  sold their patent portfolio.  I do not know whether they're no

23  longer making any licenses available.

24  Q    Right.

25  A    Since they have an obligation to do so under this

1   agreement.

2   Q   Let me ask you a few questions, sir, about this protocol.

3   Were you involved in this protocol -- negotiating the terms of

4   this protocol?

5   A   It was not negotiated.  The independent director asked

6   both myself and Mathu, I believe proposed a protocol.  Asked

7   for feedback from both S -- SeeCubic Inc and from Stream, and

8   then disseminated the protocol.

9   Q   This was sometime here in the summer of 2023?

10  A   That's correct.

11  Q   After Mr. Rajan was removed on June 29th?

12  A   That's correct.

13  Q   And before the independent director resigned?

14  A   That's correct.

15  Q   There's -- there's certain provisions in here, for

16  example, I believe this is the exhibit marked SE-3.

17  A   Okay.

18  Q   At the top of the first page there, Roman Numeral -- or

19  subparagraph V where it says all payments to be approved by

20  independent director, and then in parenthesis, remove SEI.  You

21  understand SEI to mean SeeCubic Inc, correct?

22  A   I do.

23  Q   Remove SEI related persons from bank register.  Do you see

24  that?

25  A   I do.

1   Q     Have you removed all SEI related persons from the bank

2   register?

3   A     Yes.  No SEI people can approve payments.

4   Q     On -- let me ask you, on page 2 of this, the understanding

5   is, in paragraph number one, in subparagraph two, it's talking

6   about each project requires a budget showing sufficient

7   proceeds for the companies to cover at least all direct and

8   indirect costs.  Do you see that?

9   A     I do.

10  Q     Have there been any budgets -- written budgets prepared to

11  this point?

12  A     Yes.

13  Q     And it goes on to say, the purchase contract between the

14  companies and the relevant party, including confidentiality and

15  protection of trade secrets.  Do you see that?

16  A     I do.

17  Q     Have there been purchase contracts that have been entered

18  between -- who -- who is the companies in reference to that

19  sentence?

20  A     I believe the Dutch entities.

21  Q     Have there been any purchase contracts that have been

22  executed to this point including confidentiality and protection

23  of trade secret provisions?

24  A     Yes.

25  Q     How many?

```
 1  A    Two have been entered so far.

 2  Q    I'm sorry?

 3  A    Two have been entered so far.

 4  Q    And am I correct that you would refuse to identify who

 5  those contracts have been entered into?

 6  A    One is Hyundai.  That's already been made publicly

 7  available.  The other one, yes, I would refuse.

 8  Q    Who is the one with?

 9  A    Hyundai Mobis.

10  Q    I'm sorry?

11  A    Hyundai Mobis, the one who you mentioned earlier.

12  Q    Okay.  In reference to paragraph five on page two, do you

13  see where it states that the independent director will use its

14  best efforts to keep information which he receives from either

15  party confidential.  Do you see that?

16  A    I do.

17  Q    Am I correct that if SCI or SeeCubic of Delaware or I

18  guess it would be SeeCubic of Delaware, has projects that it

19  wants to propose, that would be to you, correct?

20  A    Correct.

21  Q    And if the Debtors have projects that they want to

22  propose, then they would have to propose those to you, correct?

23  A    Or as directed by me, and -- and the process that we've

24  planned to put in place and we'll seek approval from the Dutch

25  court for that, is that they'll go to the employees, to the
```

```
 1  extent that a name is needed, it will be given only to the

 2  staff of the BV, and I won't receive that name.  I'll receive

 3  the details and the analysis of the project to determine its

 4  feasibility, but not the name.

 5  Q    Where does it state that in this protocol?

 6  A    It doesn't.

 7  Q    What's that based on then?

 8  A    That's based on -- this protocol was set up for the

 9  independent director.  That's based on Dutch counsel's advice

10  on how best to effectuate the spirit of the protocol,

11  understanding that I am with one of the parties.

12  Q    Right.  And so I guess my question to you, or my point was

13  that this protocol to the extent that -- would you agree that

14  there were certain provisions in this protocol that made more

15  sense whenever there was an independent director involved as

16  opposed to essentially the chairman and CEO of one of the two

17  parties?

18  A    Yeah.  There are certain provisions that have to be

19  modified to effectuate the spirit, and we're in the process of

20  doing that.

21  Q    Where in the process have you been doing that?

22  A    In discussions with Dutch counsel about what's going to be

23  sufficient for the Court, and then we'll propose it to the

24  Court.

25  Q    So the independent -- or so the middleman, the policeman,
```

```
 1   essentially you, are speaking to -- when you say Dutch counsel,

 2   are you speaking with Dutch counsel for, for example, the

 3   Debtors?

 4   A    No, we're speaking with our Dutch counsel.

 5   Q    When you say our Dutch counsel, who's "our" in that

 6   sentence?

 7   A    Both -- both the Dutch entities and SeeCubic Inc.

 8   Q    So you're -- you're speaking with counsel for nobody from

 9   the Debtors, but you're speaking with counsel for the Dutch

10   entities and SeeCubic Inc.  Is that understood to be correct?

11   A    In terms of formulating an approach, which they will then

12   propose to the Court for the Court's approval per the mandate.

13   Q    Where is that referenced in this protocol anywhere?  In

14   fact, were any reference about what the court approval of what

15   you all are doing is listed?

16   A    That is in the decision, not in the protocol.

17   Q    The decision that was shown to you and marked as, I

18   believe, SC Exhibit 5 -- D -- I'm sorry, SC-5, was it?

19           THE COURT:  Four.

20           MR. KODOSKY:  Four.

21   BY MR. KODOSKY:

22   Q    And I don't have a lot of questions about that decision.

23   You're referring to the September 20th, 2023, decision that put

24   you in charge, correct?

25   A    That made me the director, yes.
```

1  Q    I would ask you to take a look at page 14, section 5.21.

2  Please let me know when you're there.

3  A    Okay.  Yes.

4  Q    Do you see where it states that the provisions to be made

5  regarding the management of the companies will apply for the

6  same period as stipulated in the judgment, namely -- and then

7  below, A and B, it says or until a judge decides otherwise.  Do

8  you see that?

9  A    I do.

10  Q    Doesn't say a Netherlands judge or an Amsterdam judge, it

11  says a judge, correct?

12  A    In the English translation, yes.

13  Q    Could be a bankruptcy court judge, correct?

14  A    I don't know.

15        MR. KODOSKY:  No further questions, Your Honor.

16        THE COURT:  Recross?

17        MR. COLBY:  I was pausing because I was thinking if

18  it's technically a recross.  But I have no questions of any

19  nature at this time.  Thank you.

20        THE COURT:  Counsel?

21        MR. CAPONI:  No further questions, Your Honor, sorry.

22        THE COURT:  Are you -- have any further questions for

23  this -- or may I release this witness?

24        MR. KODOSKY:  We may excuse the witness.

25        THE COURT:  All right.  You're excused, Mr. Stastney.

```
 1              THE WITNESS:  Thank you, Your Honor.

 2              THE COURT:  All right.  I think this would be a good

 3    time to sort of pause the hearing and continue it to another

 4    date, and at which time you'll call -- you meaning the Debtors,

 5    will call -- will call their other two witnesses, and then Mr.

 6    Kodosky, you will call your other two witnesses.  If there's

 7    any rebuttal, we'll do that, and hopefully by that point I'll

 8    be able to issue -- make a decision on, one, whether there's a

 9    need for a TRO and if there isn't then, no.  But -- and then

10    we'll go from there.

11              I expect to be able to rule.  I know that if I do

12    grant one, that's a lot of work I have to do to justify that.

13    Either way, lots of things, but you know.  So anything else

14    other than setting a date for the future -- for the continued

15    hearing?  Is there anything for today with respect to the

16    testimony of evidence?

17              MR. KODOSKY:  None from our -- none from our

18    standpoint, Your Honor.

19              THE COURT:  All right.  Have the parties during the

20    break had an opportunity to discuss a new date?

21              MR. COLBY:  We did not, Your Honor.  I think our

22    side, however, is generally okay with that date of the 16th.

23              THE COURT:  The 16th.  16 works for everybody?

24              MR. KODOSKY:  I think so, Your Honor.

25              THE COURT:  Okay.  And that -- let's aim for 10:00.
```

```
 1   10:00 on the -- well, you know what, I don't know if my -- does

 2   that work for you guys, because I don't know if you're going to

 3   be in another -- you're not necessarily assisting in another

 4   courtroom on that date, right?  Because sometimes I know you

 5   have to cover a little bit?  Okay.

 6          All right.  Let's aim for 10:00 on the 16yh and we'll

 7   go from 10:00 to 6:00, 7:00, unless the CSOs kick us out before

 8   then, okay.

 9          MR. KODOSKY:  Thank you, Your Honor.

10          THE COURT:  All right.  Thank you, counsel.  So I

11   think court is adjourned until Tuesday at 10:30.

12          Thank you and everyone have a good weekend.

13          MR. CAPONI:  You too, Your Honor.  Thank you.

14          MR. KODOSKY:  Hope you feel better.

15      (Proceedings adjourned at 5:21 p.m.)

16

17

18

19

20

21

22

23

24

25
```

Case 23-20763-abc 397 Doc 443-11 Document 10/28/23 Filed 04/16/25 00/23 Page 150:57 278 Desc
Exhibit K. Stream October Exhibit 2028 Page 184 of 184 Transcript   Page 184 of 184

184

C E R T I F I C A T E


       I hereby certify that the foregoing is a true and
correct transcript from the electronic sound recording of the
proceedings in the above-entitled matter.




*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

Case 23-10763-amc Doc 788-15 Filed 11/06/24 Entered 11/06/24 Page 125 of 278
Case 2:20-cv-03897-DMG Document 108-5 Filed 01/15/25 Page 125 of 278 Desc
CONFIDENTIAL
Exhibit O    Page 1 of 68

# TECHNOLOGY LICENSE AGREEMENT

This Technology License Agreement ("the Agreement") is entered into on December 8, 2011 ("the Effective Date") by and between Koninklijke Philips Electronics N.V., a company duly incorporated under the laws of The Netherlands , having its registered office in Eindhoven, The Netherlands ("Philips"),

and

Ultra-D Coöperatief U.A., a company duly incorporated under the laws of The Netherlands, having its registered office in Amsterdam, The Netherlands ("UTLRA-D")

Philips and ULTRA-D are also referred to individually as a "Party" and collectively as the "Parties".

## RECITALS

A.    Philips has developed valuable know-how and software and owns certain Intellectual Property Rights relevant to the 3D Technology including 3D Display Technology (as defined hereinafter) and 3D content creation and conversion technology.

B.    ULTRA-D and its Affiliates wish to develop, manufacture, produce, use, import, export, sell, offer to sell, lease, operate, license, otherwise make available or otherwise dispose of 3D Displays, 3D Rendering Boxes, 3D Content Creation Tools, 3D Content and Real-Time Conversion Software Products based on the 3D Technology.

C.    ULTRA-D has requested from Philips a license under Philips' Intellectual Property Rights relating to the 3D Technology and has further requested Philips to make available know-how and software relating to the 3D Technology in order to enable ULTRA-D or any of its Affiliates to develop, manufacture, produce, use, import, export, sell, offer to sell, lease, operate, license, otherwise make available or otherwise dispose of Licensed Products.

D.    Philips is willing to grant ULTRA-D and its Affiliates a license under the relevant Intellectual Property Rights and to make available know-how and software relating to the 3D Technology on the terms and conditions set forth in this Agreement.

The Parties hereby agree as follows:

## 1.    DEFINITIONS

The following terms when used in this Agreement shall have the meanings ascribed thereto below:

1.1    **"3D Content"** means 3D video or pictures in the depth based, or multiview-based format, solely for use on and by Licensed Displays.

**EXHIBIT O**

1.2    **"3D Content Creation Tools"** means content creation software that offline and in a semi-automatic manner (a) converts a 2D content format (picture or video) into a content format that includes depth information or (b) renders a content format with depth information including 3D computer graphics and real-time computer graphics into a stereo or multi-view content format suitable for playing on a 3D Displays and/or stereo 3D displays.

1.3    **"3D Display"** means an auto-stereoscopic display configured to display images which a viewer perceives as images extending in three dimensions making use of any part of the 3D Display Technology.

1.4    **"3D Display Technology"** means Philips' know-how and expertise, software and intellectual property rights relevant to auto-stereoscopic 3D lenticular display modules, including 3D module design, lens design, lens manufacturing, 3D module manufacturing, and 3D video processing (3D rendering).

1.5    **"3D Rendering Box"** means a hardware device that is meant to be connected to a 3D-output device which includes a 3D Display and/or any other type of 3D display and is capable of rendering multiview content out of 2D or 2D+depth content (pictures or video).

1.6    **"3D Technology"** has the meaning as set forth in the recitals of this Agreement.

1.7    **"Affiliate(s)"** means any one or more legal entities: (i) owned or controlled by Philips or ULTRA-D, (ii) owning or controlling ULTRA-D, or (iii) owned or controlled by the legal entity owning or controlling ULTRA-D, but any such legal entity shall only be considered an Affiliate of Philips or ULTRA-D for as long as such ownership exists, but any such legal entity shall only be considered an Affiliate of Philips or ULTRA-D for as long as such ownership exists. For the purposes of this definition, a legal entity shall be deemed to own or control another legal entity if more than 50% (fifty per cent) of the voting stock of the latter legal entity, ordinarily entitled to vote in the meetings of shareholders of that entity (or, if there is no such stock, more than 50% (fifty per cent) of the ownership in the latter legal entity) is held directly or indirectly by the owning legal entity.

For ULTRA-D its Affiliates at the Effective Date of this Agreement are set forth in Schedule A. In the event an Affiliate is no longer owned by ULTRA-D, ULTRA-D shall immediately inform Philips of the termination of such ownership and Schedule A shall be amended accordingly.

1.8    **"Agreement"** means this Technology License Agreement between Philips and ULTRA-D, dated December 8, 2011, and includes any Schedules hereto and any permitted amendments to the main part of this Technology License Agreement or any Schedule hereto.

1.9    **"Change of Control"** shall mean the occurrence of any of the following events: (a) any consolidation or merger of a Party with or into any other entity in which the holders of such Party's outstanding shares immediately before such consolidation or merger do not, but immediately after such consolidation or merger, do retain stock,

*Rh*

representing a majority of the voting power of the surviving entity or stock representing a majority of the voting power of an entity that wholly owns, directly or indirectly, the surviving entity; (b) the sale, transfer or assignment of securities of a Party representing a majority of the voting power of all of such Party's outstanding voting securities to an acquiring party or group; or (c) the sale of all or substantially all of a Party's assets.

1.10   **"Real-Time Conversion Software Product"** means software which is developed by ULTRA-D or any of its Affiliates that converts real-time 2D or 3D Stereo to 3D multiview of digital images, creates multiview images from either an initial 2D image or a 3D stereo image, and allows depth adjustment, such software to be implemented in (programmable) integrated circuits or software code.

1.11   **"End-User"** means a person who uses or wishes to use Licensed Products for a private or non-commercial purpose. End User does not include a person engaged or who intends to become engaged in development, manufacturing, distribution, wholesale or retail of Licensed Products.

1.12   **"Executable Code"** means any part or all of the machine-executable version of the Licensed Software, which results from compiling the Source Code into Object Code and linking, loading or assembling (or other similar process), as required, the Object Code into machine language, executable form.

1.13   **"Improvement(s)"** means findings, improvements, enhancements, discoveries, inventions, additions, modifications, formulations, derivative works, or changes (whether or not patented or patentable) with respect to the Licensed Patents/Licensed Know-How developed by or for ULTRA-D or any of its Affiliates after execution of this Agreement  and including but not limited to any Modification of the Licensed Software.

1.14   **"Intellectual Property Rights"** means Patents, utility certificates, utility models, design rights, copyrights, database rights and all registrations, applications, renewals, extensions, combinations, divisions, continuations or reissues of any of the foregoing.

1.15   **"Licensed Display"** means a 3D Display which is manufactured, sold or otherwise disposed of by ULTRA-D or any of its Affiliates or any other licensee of Philips' 3D Display Technology.

1.16   **"Licensed Know-How"** means the (technical) information (including trade secrets if applicable but excluding the Licensed Patents), drawings and other material relevant to the development and / or manufacture of Licensed Products, owned or controlled by Philips and which Philips is free to disclose and license without any obligation for payment or other consideration to a third party at the Effective Date, as specified in Schedule C.

1.17   **"Licensed Patents"** means: (a) the Patents owned by Philips as of the Effective Date as listed in Schedule B and, (b) any Patents which are filed within 3 years of the Effective Date, provided that: (i) the patentable subject matter of such Patents is directly related to 3D Technology and where the invention results directly from

research and development activities funded by Philips' Intellectual Property & Standards organization, and further provided that (ii) Philips has amended Schedule B to insert such additional Patents and provided written notice of such amendment to ULTRA-D, and further provided that, in respect of both (a) and (b), that Philips has the free right to license such Patents, not requiring payment or other consideration to any third party, and that such Patents have not been and are not to be submitted to and included in a patent pool supporting an international accepted standard (e.g. BD, HDMI, MPEG). For the avoidance of doubt, Philips reserves the right to submit any of the Licensed Patents in any such patent pool and to appoint any third party to license such Patents.

1.18   **"Licensed Products"** means the following:
   (i)     3D Content; and
   (ii)    3D Displays; and
   (iii)   3D Rendering Boxes;
           to be developed, manufactured, produced, used, imported, exported, sold, offered to sell, leased, operated, otherwise made available or otherwise disposed of by ULTRA-D or its Affiliates incorporating or using any of the Licensed Patents, Licensed Software or Licensed Know-How and in accordance with the provisions hereof; and
   (iv)    3D Content Creation Tools; and
   (v)     Real-Time Conversion Software Products;
           to be developed, produced, used, imported, exported, sold, leased, operated, licensed, otherwise made available or otherwise disposed of by ULTRA-D or any of its Affiliates incorporating and/or using any of the Licensed Patents, solely in combination with the Licensed Software and/or Licensed Know-How, and in accordance with the provisions hereof. For the avoidance of doubt, each copy of the 3D Content Creation Tools and/or Real-Time Conversion Software Products imported, exported, sold, leased, operated, licensed, otherwise made available or otherwise disposed of by ULTRA-D or its Affiliates to its customers shall count as a separate Licensed Product.

1.19   **"Licensed Software"** means the software provided by Philips to ULTRA-D as further described in Schedule C, and all copies or derivative works thereof.

1.20   **"Licensed Technology"** shall mean the Licensed Patents, Licensed Know-How and Licensed Software.

1.21   **"Modification"** means any reconfiguration, alteration, enhancement, translation, transformation or other derivative work of the Licensed Software.

1.22   **"Object Code"** means all or any portion of the machine-readable or machine language version of the Licensed Software.

1.23   **"Open Source Software"** means any software that is licensed under Open Source License Terms. As illustrative examples, any software under any version of the GNU General Public License, the GNU Lesser General Public License, the Mozilla Public License, the Berkely Software Distribution (BSD) license, the Apache Software License and the MIT/X11 license are regarded as Open Source Software.

1.24   **"Open Source License Terms"** means the terms in any license that require as a condition of use, modification and/or distribution of a work:

(a) the making available of source code or other materials preferred for modification; or

(b) the granting of permission for creating derivative works; or

(c) the reproduction of certain notices or license terms in derivative works or accompanying documentation; or

(d) the granting of a royalty-free license to any party under intellectual property rights regarding the work and/or any work that contains, is combined with, requires or otherwise is based on the work.

1.25   **"Patent(s)"** means any and all patents (including but not limited to patents of implementation, improvement, or addition, utility model and appearance design patents, and inventors certificates, as well as divisions, reissues, continuations, renewals, and extensions of any of these), applications for patents, and patents that may issue on such applications.

1.26   **"Royalty Reporting Form"** means a written statement in the form as attached hereto as Schedule E, signed by a duly authorized officer on behalf of ULTRA-D.

1.27   **"Source Code"** means the compilable and/or human-readable version of the Licensed Software, including without limitation, all comments and procedural code, associated flow charts, concepts, algorithms, technology and other written instructions.

## 2.   GRANT OF RIGHTS

2.1   Subject to ULTRA-D's compliance with its obligations under this Agreement, Philips hereby grants to ULTRA-D and its Affiliates during the term of this Agreement a worldwide, non-exclusive, non-transferable license, without the right to grant sub-licenses, under the Licensed Patents and the Licensed Know-How in order for ULTRA-D and its Affiliates to:

a.   develop and subsequently manufacture, 3D Displays, 3D Rendering Boxes and Real-Time Conversion Software Products and to use, import, export, sell, offer to sell, lease, operate, license, otherwise make available or otherwise dispose of 3D Displays, 3D Rendering Boxes and Real-Time Conversion Software Products so manufactured on a world-wide basis; and

b.   develop and subsequently produce, 3D Content and to use, import, export sell, offer to sell, lease, operate, otherwise make available or otherwise dispose of 3D Content so produced on a worldwide basis with the exception of the United States of America for 3D Content that includes 3D adult video content; and

c.   develop and subsequently produce, 3D Content Creation Tools and to use, import, export, sell, offer to sell, lease, operate, license, otherwise make available or otherwise dispose of 3D Content Creation Tools to content producers who can develop, produce and sell or otherwise dispose of 3D content with the exception of the United States of America for 3D content that

includes 3D adult video content. 3D Content Creation Tools will in any event and on a non-exclusive basis be compatible with a 3D format that Philips is currently supporting or that Philips may solely or jointly develop with a third party in the future. Such 3D format to be implemented by ULTRA-D and its Affiliates within a reasonable time period.

2.2    Subject to full and unconditional compliance by ULTRA-D and its Affiliates with its obligations under this Agreement, Philips hereby grants to ULTRA-D and its Affiliates, a worldwide, non-exclusive, non-transferable license under the Licensed Software without the right to grant sublicenses, to:

    a.    test, evaluate, and make derivative works of the Source Code portions of the Licensed Software and to compile such Source Code portions and derivative works thereof into Object Code, solely as strictly necessary to achieve, or to enhance, (i) interoperability between the Licensed Software (including any Modification thereof) and the subsequent integration of the Licensed Software (including any Modification thereof) in the Licensed Products; and

    b.    test, evaluate, and reproduce the Object Code portions of the Licensed Software for integration of the Licensed Software (including any Modification thereof), in Executable Code form only, in the Licensed Products; and

    c.    test, demonstrate, license or otherwise commercially exploit these Licensed Products to its customers, for subsequent distribution to, and ultimate use thereof by End-Users; and

    d.    maintain and support Licensed Products sold or licensed to End-Users, including, but not limited to, by performing error-correction and/or End-User support on the Licensed Software (including any Modification thereof) integrated in these Licensed Products, and by testing and evaluating the integrated Licensed Software; and

    e.    make as many copies of the Licensed Software (including any Modification thereof) as reasonably required for exercise of the rights granted under this Agreement.

2.3    The rights granted to ULTRA-D and its Affiliates pursuant to Section 2.1 include the right for ULTRA-D to have Licensed Products manufactured in whole or in part by a third party manufacturer solely for the account of ULTRA-D or its Affiliates and the subsequent sale by ULTRA-D or its Affiliates provided that:

    (i)    ULTRA-D notifies Philips of its initial third party manufacturers at the Effective Date and thereafter of subsequent third party manufacturers;

    (ii)    Philips has given its prior written approval. At Philips' sole discretion, such approval shall include a specification of the rights included under Section 2.2 that a third party manufacturer will be permitted to perform to manufacture and sell Licensed Products. Such approval shall not be unreasonably withheld. Approved third party manufacturers shall be included in Schedule A.

    (iii)    ULTRA-D will properly identify such third party manufacturer, the specific manufacturing facility(ies) and location(s);

(iv)   ULTRA-D will indicate the quantities of Licensed Products so manufactured and purchased in the Royalty Reporting Form to be submitted to Philips hereunder; and

(v)   ULTRA-D warrants that it has entered into a legally binding arrangement with such third party manufacturer whereby such third party manufacturer is bound to the same confidentiality obligations as set forth in this Agreement, as well as an undertaking not to 'reverse engineer', as set forth in this Agreement.

ULTRA-D acknowledges and accepts that any breach by the third party manufacturer of these obligations shall be considered a breach by ULTRA-D under this Agreement.

2.4   The rights granted to ULTRA-D hereunder shall include:

(i) any End-User's right to use the Licensed Software (including any Modification thereof) integrated in Executable Code form only for its own personal use or within its normal business operations, and such right of use shall survive the expiration or termination of this Agreement; and

(ii) the right for a person or entity to use the Licensed Software (including any Modification thereof) integrated in Executable Code form only for use within its normal business operations and distribution to End-Users.

2.5   ULTRA-D acknowledges that it has been informed by Philips that the Licensed Software contains certain Open Source Software and that such Open Source Software has not been specifically identified. ULTRA-D shall be solely responsible for compliance with any and all applicable Open License Terms.

Specifically, but without limitation, ULTRA-D shall ensure that appropriate notices are included in documentation and that source code is delivered to all those to whom ULTRA-D distributes the software where the license provisions of such Open Source Software so require.

2.6   ULTRA-D further acknowledges that it has been informed by Philips that the Licensed Software operates in combination with certain commercial software, developed and owned by third parties and that such third party commercial software has not been specifically identified. ULTRA-D shall be solely responsible for compliance with any and all applicable licence terms of any such third party commercial software (including, without limitation, payment of royalties, if applicable).

2.7   It is expressly acknowledged and agreed that the Licensed Software is licensed to ULTRA-D and not sold. It is further acknowledged and agreed that Philips owns and shall continue to own all rights, title and interest in the Licensed Software, as well as all derivative works of each of the foregoing that were created by Philips, or by any third party for the benefit of Philips, except as expressly set forth otherwise in this Agreement. It is expressly understood that derivative work or Improvements of the Licensed Software, created by ULTRA-D or its Affiliates are the sole property of ULTRA-D and/or its Affiliates. ULTRA-D shall take all reasonable measures to protect Philips' (intellectual) property rights in at least the same way as ULTRA-D protects its own rights, but shall have no obligation whatsoever to take any affirmative action or enforce any intellectual property and/or related rights granted thereto under this agreement. In the event ULTRA-D becomes aware of any

infringement of Philips' (intellectual) property rights, ULTRA-D shall notify Philips of such infringement. Other than the limited license granted to ULTRA-D hereunder, no other right or license under any intellectual property rights of Philips and/or its Affiliates or any intellectual property residing in the Licensed Software is granted and any implied licenses are expressly excluded.

2.8   To the maximum extent permitted by applicable law, ULTRA-D or any of its Affiliates shall not, and shall not permit any third party to:

   a.   copy, reproduce or distribute Licensed Software (including any Modification thereof), other than in a form incorporated in Licensed Products as specifically permitted under this Agreement;

   b.   assign, sub-license, lease, rent, loan, transfer, disclose, or otherwise make available the Licensed Software (including any Modification thereof) other than in a form incorporated in Licensed Products as specifically permitted under this Agreement;

   c.   remove or circumvent the protection of the Licensed Software.

2.9   ULTRA-D or any of its Affiliates shall not perform any actions with regard to the Licensed Software in a manner that would require the Licensed Software or any derivative work thereof to be licensed under Open Source License Terms. These actions shall include without limitation:

   (a)   combining the Licensed Software or a derivative work thereof with open source software, by means of incorporation or linking or otherwise; or

   (b)   using open source software to create a derivative work of the Licensed Software.

2.10   ULTRA-D or any of its Affiliates shall not remove or alter any copyright notices or other proprietary rights notices, legends or marking(s) contained in or affixed to the Licensed Software provided hereunder (including any Modifications thereof). ULTRA-D shall reproduce such notices, legends and marking(s) and shall affix such notices, legends and marking(s) to any and all media containing a copy or any portion of the Licensed Software provided hereunder (including any Modifications thereof), in the same manner as these were affixed to the original media.

2.11   ULTRA-D or any of its Affiliates shall not make, nor permit its customers to make, or publish any representations, warranties, or guarantees on behalf of Philips, its Affiliates and/or its third party suppliers/licensors in relation to the Licensed Software without Philips' express prior written consent.

In the event that ULTRA-D or any of its Affiliates owns any intellectual property rights relevant to the Licensed Technology and upon the written request of Philips, ULTRA-D or any of its Affiliates undertake to negotiate and grant, at its/their sole discretion, a license to Philips and or its Affiliates under such intellectual property rights on reasonable, non-discriminatory conditions to be negotiated in good faith to use such intellectual property rights in the exploitation of the Licensed Technology (including Improvements thereof).

**A-687**

2.12  ULTRA-D or any of its Affiliates shall notify Philips promptly of any Improvement(s) to the Licensed Technology. In consideration of the undertakings set forth in Sections 2.1 and 2.2, ULTRA-D or any of its Affiliates undertake to negotiate and grant, at its/their sole discretion agrees, a license to Philips and its Affiliates on reasonable, non-discriminatory conditions to be negotiated in good faith to use any and all Improvements to the Licensed Technology and to develop, manufacture, license, sell or otherwise dispose of any 3D content, 3D displays, 3D rendering boxes, 3D content creation tools and/or real-time conversion software products embodying such Improvement(s) to the Licensed Technology or manufactured using any such Improvement(s).

2.13  As a material inducement for Philips to enter into this Agreement and to grant the licenses herein contained, it is acknowledged and agreed by the Parties that all 3D Content, 3D Displays, 3D Rendering Boxes, 3D Content Creation Tools and Real-Time Conversion Software Products developed, manufactured, produced used, imported, exported, sold, offered to sell, leased, operated, licensed, otherwise made available or otherwise disposed of by or for ULTRA-D and its Affiliates shall qualify as Licensed Products and shall be royalty-bearing in accordance with the provisions hereof, unless ULTRA-D can clearly demonstrate that the products made did not use any of the Licensed Technology.

2.14  In the event that Philips would sell, assign or otherwise transfer ownership of the Licensed Technology or any part thereof to a third party, Philips shall notify such third party of this Agreement and negotiate that the rights and licenses granted to ULTRA-D and its Affiliates pursuant to this Agreement shall remain in full force and effect as being a prior commitment.

## 3.    DELIVERY OF LICENSED KNOW-HOW AND LICENSED SOFTWARE

3.1  Upon execution of this Agreement, Philips will make available the Licensed Know-How and Licensed Software to ULTRA-D and its Affiliates in accordance with a jointly defined and mutually agreed hand-over plan. Such delivery may occur by means of access to a server, electronic transfer, delivery of a storage medium or by such other means as agreed by the Parties.

3.2  Philips will provide support to ULTRA-D and its Affiliates for making available the Licensed Know-How and Licensed Software with a maximum of 100 hours, such support shall be provided between the Effective Date of this agreement and 6 calendar months thereafter.

## 4.    PAYMENT AND REPORTING

4.1  In consideration of the delivery of the Licensed Know-How and the Licensed Software, ULTRA-D shall make a series of six non-refundable, non-recoupable payments amounting to a total of EUR 2,500,000.- (two million five hundred thousand Euros) to Philips. The payments shall be due in accordance with the

schedule set forth in Schedule F and shall be payable with a payment term of 30 (thirty) calendar days.

4.2     In further consideration of the rights granted hereunder by Philips to ULTRA-D, for all Licensed Products developed, manufactured, produced, imported, exported, sold, leased, operated, licensed, otherwise made available or otherwise disposed of by ULTRA-D or any of its Affiliates, ULTRA-D shall pay to Philips a royalty in accordance with the table set forth in Schedule D on each Licensed Product licensed, imported, exported, sold, leased, or otherwise disposed of.

Royalties shall be due and payable on all Licensed Products manufactured and/or produced prior to, but remaining in stock at the date of expiration or termination of this Agreement. Within 30 days after expiration or termination of this Agreement ULTRA-D shall submit to Philips a Royalty Reporting Form stating the number of Licensed Products in stock at the time of expiration or termination of this Agreement.

4.3     All payments by ULTRA-D to Philips under this Agreement shall be made in Euros to the Euro Account with CITIBANK in London (or such other bank account as Philips may specify) under the following references:

Bank Account No. 8923019
in the name of Koninklijke Philips Electronics N.V. – Licenses –
Citibank N.A., London,
SWIFTCODE CITIGB2L,
IBANcode GB61CITI18500808923019,
Sortcode 185008, Ref: "Royalties 3D Technology - Wave 2009PJT01549"

(or such other bank account as Philips may specify).

4.4     Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, ULTRA-D shall submit to Philips (even in the event that no Licensed Products have been manufactured, produced, used, imported, exported, licensed, sold, offered to sell, leased, operated, otherwise made available or otherwise disposed of by ULTRA-D or any of its Affiliates) a Royalty Reporting Form for ULTRA-D and any of its Affiliates and third party manufacturers, duly completed and signed by an authorized representative of ULTRA-D.

4.5     ULTRA-D shall pay the royalties due to Philips hereunder within 30 calendar days after the end of each calendar quarter during the term of this Agreement.

4.6     In no event shall ULTRA-D have the right to set off any payments due hereunder against any claim, of whatever nature, it or any of its Affiliates may have against Philips or any of Philips' Affiliates.

4.7     Any payment under this Agreement that is not made on or before the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof), or the maximum amount permitted by law, whichever is lower, without any notification being required.

4.8   All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by ULTRA-D. In the event that the governmental authorities of any country imposes any withholding taxes on payments made by ULTRA-D to Philips hereunder and requires ULTRA-D to withhold such tax from such payments, ULTRA-D may deduct such tax from such payments, provided that ULTRA-D shall promptly provide Philips with tax receipts issued by the relevant tax authorities.

4.9   ULTRA-D shall submit to Philips, within 90 calendar days after the end of ULTRA-D's fiscal year, a statement signed by its certified external accountant, confirming that all quarterly royalty statements as submitted by ULTRA-D to Philips during the preceding fiscal year, are true, complete and accurate in every respect. The correctness of this statement may be verified by Philips by means of a work paper review, conducted by one of the certified public auditors selected by Philips. ULTRA-D shall procure that its accountant provides full cooperation with said work paper review. This statement shall not affect the right of Philips to inspect the books and records of ULTRA-D from time to time in accordance with Section 4.10.

4.10   In order that the royalty statements provided for in this Section 4 may be verified, ULTRA-D shall keep complete and accurate books and records relating to the manufacture, production, use, import, export, sale, offer to sell, leasing, operating, licensing, otherwise making available or other disposal of Licensed Products by ULTRA-D and any of its Affiliates and shall keep the books and records available for a period of 5 years following the manufacture, production, use, import, export, sale, offer to sell, leasing, operating, licensing, otherwise making available or other disposal of each Licensed Product.

4.11   Philips shall have the right to inspect the books and records of ULTRA-D from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a certified public auditor appointed by Philips. Philips shall give ULTRA-D written notice of such inspection at least 14 calendar days prior to the inspection. ULTRA-D shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that, in the event that ULTRA-D has failed to submit royalty statements and/or yearly written statement(s) by its external accountant, as provided for in Section 4.9 and this Section 4.11 in respect of the period to which the inspection relates or in the event that any discrepancy or error of 3% (three per cent) or more of the monies actually due is established, the cost of the inspection shall be borne by ULTRA-D, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

4.12   Philips' right inspection as set out in Section 4.11 shall survive termination or expiration of this Agreement for 5 years after termination or expiration of this Agreement.

4.13   Without limiting any other provision of this Agreement, ULTRA-D shall provide all relevant additional information as Philips may reasonably request from time to time,

Case 2:20-cv-08807-DMC   788   Filed 11/08/24   Entered 11/15/25   Page 136 of 278
Case 2:24-cv-00097-DMC   Document 11-3   Filed 01/15/25   Page 136 of 278   Desc
Exhibit O    Page 12 of 68

so as to enable Philips to ascertain that ULTRA-D has correctly paid the royalties on Licensed Products due hereunder.

4.14    Any information provided by ULTRA-D to Philips or its auditors under this Section 4 in writing and marked as Confidential shall be treated by Philips as confidential, save that the foregoing shall not prevent Philips from using such confidential information in connection with the enforcement of its rights under this Agreement.

## 5.    TERM AND TERMINATION

5.1    This Agreement shall enter into force on the Effective Date and shall remain in force for 15 years unless terminated earlier in accordance with its provisions.

5.2    Without prejudice to Sections 5.3 and 5.4, a Party may terminate this Agreement at any time by means of written notice to the other Party in the event that the other Party breaches or otherwise fails to perform any of its obligations under this Agreement provided that such breach or failure is not remedied within 30 calendar days after receipt of a notice specifying the nature of such failure and requiring it to be remedied. Such right of termination shall not be exclusive of any other remedy or means of redress to which the non-defaulting Party may be lawfully entitled and all such remedies shall be cumulative.

5.3    In the event that this Agreement requires the approval or validation by competent governmental authorities and no such approval or validation is obtained by the Parties within 60 days from the Effective Date, a Party may terminate this Agreement by written notice to the other.

5.4    Philips may terminate this Agreement forthwith by means of notice in writing to ULTRA-D in the event that:
   a)    a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of ULTRA-D; or
   b)    ULTRA-D makes any voluntary arrangement with its creditors or ULTRA-D becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law; or
   c)    ULTRA-D or any of its Affiliates brings a claim of infringement of any of ULTRA-D's or any of ULTRA-D's Affiliates' patents based on Improvements against Philips or any of Philips' Affiliates; or
   d)    A Change of Control occurs in relation to ULTRA-D. For the avoidance of doubt, Philips shall not unreasonably terminate this Agreement in the event of a Change of Control.

5.5    ULTRA-D may terminate this Agreement forthwith by means of notice in writing to Philips in the event that:
   a)    a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of Philips; or

a)     Philips makes any voluntary arrangement with its creditors or ULTRA-D becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law; or

b)     a Change of Control occurs in relation to Philips. For the avoidance of doubt, ULTRA-D shall not unreasonably terminate this Agreement in the event of a Change of Control;

c)     within 5 (five) business days after the Effective Date by means of a written notice to Philips in the event Philips disapproves of any third party manufacturer pursuant to Section 2.3 and as proposed by ULTRA-D in accordance with Schedule A; or

d)     ULTRA-D has paid the total amount of EUR 2,500,000 (two million and five hundred thousand Euros) as set forth in Section 4.1. and demonstrates to Philips' reasonable satisfaction that ULTRA-D does not use any of the Licensed Patents in any of the Licensed Products developed, manufactured, produced, imported, exported, sold, leased, operated, licensed, otherwise made available or otherwise disposed of by ULTRA-D or any of its Affiliates.

5.6     Any termination or expiration shall not affect any royalty payment or other obligation under this Agreement accrued prior to such termination.

5.7     Upon the termination of this Agreement by Philips for any reason pursuant to the provisions hereof, ULTRA-D shall immediately cease the (a) use of the Licensed Technology, and (b) development, manufacture, production, use, import, export, sale, offer to sell, leasing, operating, licensing, otherwise making available or other disposal of Licensed Products. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable. For the avoidance of doubt, ULTRA-D will be relieved of any payment obligations from the effective termination date under this Agreement that are not considered outstanding payments.

## 6. CONFIDENTIALITY

6.1     ULTRA-D or any of ULTRA-D's Affiliates shall during the term of this Agreement and for a period of 5 years thereafter, not disclose to any third party any information acquired from Philips or any of Philips' Affiliates in connection with this Agreement, or use such information for any other purpose than the development, manufacture, production, use, import, export, sale, offer to sell, leasing, operating, licensing, otherwise make available or other disposal of Licensed Products in accordance with this Agreement. This obligation shall not apply to the extent information so acquired:

a)     was known to ULTRA-D or any of ULTRA-D's Affiliates prior to the date on which such information was acquired from Philips or any of Philips' Affiliates, as shown by records of ULTRA-D or any of ULTRA-D's Affiliates or otherwise demonstrated to Philips' satisfaction within 14 calendar days following the disclosure of such information by Philips;

A-692

b)  is or becomes part of the public domain through no fault of ULTRA-D or any of ULTRA-D's Affiliates;

c)  is lawfully obtained by ULTRA-D or any of ULTRA-D's Affiliates from a third party who was, at the moment of disclosure, not bound by similar confidentiality obligations.

Notwithstanding anything to the contrary, ULTRA-D may disclose that the Agreement has been executed and in effect.

6.2  ULTRA-D or any of ULTRA-D's Affiliates shall protect all information acquired from Philips or any of Philips' Affiliates against any unauthorized disclosure in the same manner and with the same degree of care, but not less than a reasonable degree of care, with which it protects confidential information of its own.

6.3  ULTRA-D and any of ULTRA-D's Affiliates acknowledges that the Source Code of the Licensed Software contains valuable, proprietary trade secrets of Philips, and ULTRA-D and any of ULTRA-D's Affiliates agree to:

a.  ensure that every person with access to the Source Code of the Licensed Software has signed a written confidentiality agreement, prior to any such access, which is legally sufficient and effective to bind such person to all of the confidentiality obligations of Section 6;

b.  not allow any remote access to the Source Code of the Licensed Software, and not place or permit to be placed on any public website; and

c.  promptly notify Philips of any unauthorized access to the Source Code of the Licensed Software, or any unauthorized use or disclosure of the Source Code of the Licensed Software.

6.4  Any information provided by ULTRA-D to Philips with respect to its Affiliates and third party manufacturers shall be treated by Philips as confidential, save that the foregoing shall not prevent Philips from using such information in connection with the enforcement of its rights under this Agreement.

6.5  The obligations concerning confidentiality contained in this Section 6 shall survive termination of this Agreement.

## 7.  NO WARRANTY AND LIABILITY

7.1  The Licensed Patents, Licensed Know-How, Licensed Software and all information made available by Philips under this Agreement are provided on an "AS IS" basis. Philips makes no representation or warranty as to the validity of the Licensed Patents, or the suitability of the Licensed Patents, Licensed Know-How and/or Licensed Software for any particular purpose nor with regard to the ability of ULTRA-D or any of its Affiliates to develop, manufacture, produce, use, import, export, sell, offer to sell, lease, operate, license, otherwise make available or otherwise dispose of Licensed Products using the Licensed Patents, Licensed Know-How and/or Licensed Software, nor with regard to the quality and/or performance of such Licensed Products or otherwise in relation to the Licensed Patents, Licensed Know-How and/or Licensed Software.

**A-693**

7.2   It is acknowledged by ULTRA-D that third parties may own intellectual property rights in the field of 3D Technology, in Licensed Products. Philips makes no warranty whatsoever that the development, manufacture, production, use, import, export, sale, offer to sell, leasing, operating, licensing, otherwise make available or other disposal of Licensed Products does not infringe or will not cause infringement of any intellectual property rights other than the Licensed Patents.

7.3   Philips and its Affiliates shall not be liable for any damages of whatever nature howsoever resulting from the use of the Licensed Patents, Licensed Know-How and/or Licensed Software or otherwise in connection with this Agreement.

7.4   Philips and its Affiliates shall be fully indemnified and held harmless by ULTRA-D from and against any and all third party claims in connection with Licensed Products developed, manufactured, produced, used, imported, exported, sold, offered to sell, leased, operated, licensed, otherwise make available or otherwise disposed of by or for ULTRA-D or any of its Affiliates.

7.5   In the event that a court of competent jurisdiction renders judgment against Philips notwithstanding the limitation of liability of Philips as set out in this Section 7, in no event shall Philips' aggregate liability to ULTRA-D in connection with this Agreement exceed the lower amount of either the aggregate amount of the fees paid by ULTRA-D to Philips under this Agreement over the 12 months immediately preceding the event that gave rise to a claim or EUR 200.000 (two hundred thousand euro).

7.6   Any claim for damages by ULTRA-D against Philips or any of Philips' Affiliates under or in connection with this Agreement must be filed within 12 months from the date of the event giving rise to any such claim and Philips and its Affiliates shall not be liable for any claim for damages brought or filed by ULTRA-D after said 12 month period. Further, and notwithstanding anything to the contrary provided in this Agreement, in no event shall Philips or any of its Affiliates be liable vis-à-vis ULTRA-D, ULTRA-D's Affiliates or its/their customers for any damages of whatever nature after the expiration or early termination of this Agreement.

7.7   Philips shall not be liable to ULTRA-D, its employees, directors, shareholders, agents or any third party for any indirect or consequential, incidental, punitive or special, damages (including, but not limited to, damages for loss of profit, for business interruption or for personal injury) arising out of or in any way related to or in connection with this Agreement, even if the other Party has been advised of the possibility of such damages.

7.8   The foregoing states the entire liability of Philips for any actual or alleged infringement of third party intellectual property rights hereunder.

## 8.    EXCLUSIONS

Nothing contained in this Agreement shall be construed:

PH

(a)  as granting, by implication, estoppel or otherwise, a license to any intellectual property, know-how or trade secrets other than stipulated in Clause 2.1 and 2.2; or

(b)  as a warranty or representation by Philips and/or its Affiliates as to the validity or scope of any patent rights licensed hereunder; or

(c)  as imposing any obligation to file any patent application, to secure any patent or to maintain any patent in force; or

(d)  as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips or any of Philips' Affiliates; or

(e)  as conferring any right upon ULTRA-D to use in advertising, publicity or otherwise, any trademark or trade name, or any contraction, abbreviation or simulation thereof, of Philips and/or its Affiliates; or

(f)  as imposing on either Party any obligation to instigate any suit or action for infringement of any of the Licensed Patents or to defend any suit or action brought by any third party which challenges or relates to the validity of any such patents. ULTRA-D shall have no right to instigate any such suit or action for infringement of any of the Licensed Patents, nor to defend any suit or action which challenges or relates to the validity of any such Licensed Patents.


## 9.   EXPORT CONTROLS

ULTRA-D and its Affiliates shall use the 3D Technology in accordance with export control laws and regulations applicable to the goods, countries and persons or entities that Seecubic is trading in or with. ULTRA-D represents and undertakes that the 3D Technology will not be exported or re-exported to any person or country prohibited under export control laws and regulations. ULTRA-D shall indemnify Philips against any claim or damages resulting from ULTRA-D's conduct in contravention of the aforementioned export control laws and regulations.


## 10.   NOTICES

10.1   Any notice, other than the Royalty Reporting Forms, required under this Agreement to be sent by either Party shall be given in writing by means of a letter, facsimile directed:

in respect of Philips to:
Philips Intellectual Property & Standards
P.O. Box 220
5600 AE Eindhoven
The Netherlands
F.a.o. General Manager 3D Wave
Fax no.: + 31 40 27 45267

In respect of ULTRA-D to:
Park Forum 1035
5657 HJ Eindhoven
The Netherlands
F.a.o. CEO ULTRA-D B.V.

or such other address as may have been specified in writing by either Party to the other.

## 11.    NO ASSIGNMENT

11.1    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Notwithstanding the foregoing sentence, this Agreement may not be delegated or assigned by ULTRA-D, in whole or in part, to any third party without the written consent of an authorized representative of Philips, whose consent shall not be unreasonably withheld. Philips may delegate or assign this Agreement to any third party upon 7 days written notice to ULTRA-D.

## 12.    INDEPENDENT CONTRACTORS

12.1    The Parties are and intend to remain independent contractors. Nothing in this Agreement shall be construed as an agency, joint venture or partnership between the Parties.

## 13.    ENTIRE AGREEMENT

13.1    This Agreement sets forth the entire understanding and agreement between the Parties as to the subject matter of this Agreement and supersedes, cancels and merges all prior agreements, negotiations, commitments, communications and discussions between the Parties as to the subject matter hereof.

13.2    Neither Party shall be bound by any obligation, warranty, waiver, release or representation, except as expressly provided herein, or as may subsequently be agreed by a written instrument, signed by duly authorized representatives of each of the Parties.

## 14.    NO WAIVER

14.1    Neither the failure nor the delay of either Party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either Party to enforce each and every provision of this Agreement.

## 15.    APPLICABLE LAW AND JURISDICTION

15.1    This Agreement shall be governed by and construed in accordance with the laws of The Netherlands.

15.2    Any dispute between the Parties in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to the competent courts of The Hague, The Netherlands, provided always that, in case

Philips is the plaintiff, Philips may at its sole discretion submit any such dispute either to the competent courts in the venue of any of ULTRA-D's Affiliates' registered office. ULTRA-D hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the Parties have caused this Agreement to be signed on the date first written above.

Koninklijke Philips Electronics N.V.

Ultra-D Coöperatief U.A.

R.J. Peters
Chief Intellectual Property Officer

Name: RAJA RAJAN
Title: AUTHORIZED DIRECTOR

## List of Schedules

| Schedule A | ULTRA-D's Affiliates and Third Party Manufacturers |
| Schedule B | Licensed Patents |
| Schedule C | Licensed Software and Licensed Know-How |
| Schedule D | Royalty Rates |
| Schedule E | Royalty Reporting Form |
| Schedule F | Payment Schedule |

## Schedule A
## ULTRA-D's Affiliates and Third Party Manufacturers

ULTRA-D shall notify Philips of its Affiliates and third party manufacturers pursuant to Section 2.3, at the Effective Date. Philips shall have the right to approve or disapprove of such third party manufacturers in writing. Affiliates and approved third party manufacturers shall be listed in this Schedule A. In the event Philips disapproves of any notified third party manufacturer ULTRA-D shall have the right to terminate the Agreement in accordance with Section 5.5.

The approved list of Affiliates and third party manufacturers may be amended from time to time upon the request of ULTRA-D and with written approval by Philips, not to be unreasonably withheld.

In the event, an Affiliate is no longer owned by ULTRA-D, ULTRA-D shall immediately inform Philips of the termination of such ownership and Schedule A shall be amended accordingly. For the avoidance of doubt, in such event the rights granted to such Affiliate pursuant to Section 2 of this Agreement shall terminate immediately upon termination of such ownership and such Affiliate shall cease the use of the Licensed Technology and the development, manufacture, production, use, import, export, sell, offer to sell, lease, operate, license, otherwise making available or other disposal of Licensed Products in accordance with Section 5.7. Further, upon termination of ownership of such Affiliate, any and all amounts outstanding hereunder shall remain due and payable.

### Affiliates:

1. SeeCubic, B.V
2. Technovative Ventures, B.V.
3. An Asian wholly owned new company subsidiary being created now and name to be provided to Philips once created.
4. A European wholly owned new company subsidiary being created now and name to be provided to Philips once created.
5. An Indian wholly owned new company subsidiary being created now and name to be provided to Philips once created.

### Third party manufacturers:

See separate list, attached.

**A-699**

Third Party Manufacturers as of:                    December 6, 2011

The identities and all information relating to them are being provided on a CONFIDENTIAL BASIS.  Use or disclosure of them (particularly to other companies licensing Philips who may be referred to use the services of the companies listed below will cause harm). Additionally if Philips contacts any of these companies with regard to anything relating to ULTRA-D, it could jeopardize the relationship between Ultra-D and the companies below.

| Company | Headquarters | Locations |
|---|---|---|
| Anteryon | Zwaanstraat 2a<br>Building RAB & RAX<br>5651 CA Eindhoven<br>The Netherlands | Eindhoven |
| Chimei Innolux Corporation | No. 160 Kesyue Rd.<br>Chu-Nan Site, Hsinchu Science Park, Jhunan Township<br>Miaoli County, Taiwan | Taiwan; Guangdong, Nanjing, Shanghai & Ningbo, China; Kanagawa, Japan; Hoofddorp, Netherlands; Singapore; San Jose, CA; Willich, Germany |
| Compal Electronics, Inc and their TV and phones group | No. 581 Juikuang Road<br>Neihu District, Taipei | Taipei, Taiwan; Nanjing, China; Kunshan, China; California; Austin, Texas; São Paulo, Brazil; Vietnam; Lodz, Poland |
| HannStar Display Corp | 12F, No. 480 Ruiguang Road<br>Neihu District, Taipei, Taiwan | Taipei, Wugu, Tainan, Kaohsiung, Taiwan; Nanjing, China |
| Leadtek Research Inc. | 18F, No.166, Jian-Yi Rd,<br>Chung-Ho Dist.,<br>New Taipei City 23511 | Taipei, Taiwan;   Tokyo, Japan; Shanghai, China and Russia |
| Neways Advanced Applications B.V. | Science Park Eindhoven 5004,<br>5692 EA Son<br>P.O. Box 57, 5690 AB Son,<br>The Netherlands | Netherlands; Wuxi, China (Neways Wuxi Electronics – sister company) |
| Pegatron Corp | No 150 Lide Road<br>Beitou District<br>Taipei City, 112 | Manufacturing sites: Chongqing, China; Suzhou, China; Shanghai, China, Taipei, Taiwan; Ostrava, Czech; Juarez, Mexico; Service Centers: Chiba, Japan; Sao Paolo, Brazil; Indiana, USA; Design Centers: Shanghai, China; Taipei, Taiwan; Local Support: California, USA |
| Philips Innovation Services | High Tech Campus 75656<br>AE Eindhoven<br>The Netherlands | Eindhoven |
| Quanta Computer Inc. | No. 211. Wen Hwa 2nd Rd.<br>Kuei Shan Hsiang<br>Tao Yuan Shien, Taiwan | Shanghai, China; Jiangsu, China; Aachen, Germany; Nashville, Tennessee; Fremont, California, Tao Yuan Shien, Taiwan |
| Shern Yeong Precise Optical Co., Ltd. (SYPO) | No.315, Siangjhong Rd.,<br>Dongcheng Village, Dongshan Township, Yilan County 269,<br>Taiwan (R.O.C.) | Yilan, Taiwan |
| SKC Haas Display Films Company | 12F Union Steel Bldg., 890 Daechi-dong, Kangnam-gu, Seoul 135-524, Korea | Cheonan, Korea and Suzhou, China |
| Unihan Corporation | No 150 Lide Road<br>Beitou District<br>Taipei City, 112 | Manufacturing sites: Chongqing, China; Suzhou, China; Shanghai, China, Taipei, Taiwan; Ostrava, Czech; Juarez, Mexico; Service Centers: Chiba, Japan; Sao Paolo, Brazil; Indiana, USA; Design Centers: Shanghai, China; Taipei, Taiwan; Local Support: California, USA |
| Hisense Electric Co. | No.218 Qian Wangang Road<br>Economic & Development Zone<br>Qingdao, SDG 266555, China | Connaught, HK; Selangor, Malaysia; Tel Aviv, Israel; Tokyo, Japan; India; Indonesia; Saudi Arabia; Mechelen, Belgium; Dusseldorf, Germany; Victoria, Australia; Suwanee, GA; Mississauga, ON; Johannesburg, South Africa |

## Schedule B
## Licensed Patents

| Family | Right | Country | Earliest priority date | Filing date | Grant date | Application Nr. | Publication Nr. | Grant number |
|--------|-------|---------|------------------------|-------------|------------|-----------------|-----------------|--------------|
| 1987P00179 | 1987P00179 .US02 | United States of America | 26/11/1987 | 16/11/1990 | 05/08/2003 | 07/617303 | | 6604005 |
| 1987P00179 | 1987P00179 .US04 | United States of America | 30/11/1987 | 07/06/1995 | 15/09/1998 | 08/487621 | | 5808887 |
| 1994P00694 | 1994P00694 .US | United States of America | 06/09/1994 | 08/09/1994 | 24/10/2006 | 08/325045 | | 7125505 |
| 1994P00694 | 1994P00694 .US01 | United States of America | 06/09/1994 | 08/09/1994 | 06/12/2011 | 11/409760 | 2006-0254318 | 8069701 |
| 1994P00694 | 1994P00694WEDE | Germany | 06/09/1994 | 01/09/1995 | 08/01/2003 | 59528066.2 | 734314 | 69528334.6 |
| 1994P00694 | 1994P00694WEFR | France | 06/09/1994 | 01/09/1995 | 08/01/2003 | 59528066.2 | 734314 | 0734314 |
| 1994P00694 | 1994P00694WEGB | United Kingdom | 06/09/1994 | 01/09/1995 | 08/01/2003 | 59528066.2 | 734314 | 0734314 |
| 1994P00694 | 1994P00694WDCN | China | 05/09/1994 | 01/09/1995 | 03/04/2002 | 95191063.9 | 1157247 | 95191063.9 |
| 1994P00694 | 1994P00694WDJP | Japan | 06/09/1994 | 01/09/1995 | 23/06/2006 | 96-509152 | 97-503534 | 3819520 |
| 1994P00694 | 1994P00694WOKR | Republic of Korea | 09/05/1994 | 01/05/1995 | 20/11/2003 | 96-702194 | 96-6705666 | 407874 |
| 1995P00090 | 1995P00090 .US | United States of America | 05/07/1995 | 25/06/1996 | 12/09/2000 | 08/670377 | | 6118504 |
| 1995P00090 | 1995P00090WEDE | Germany | 05/07/1995 | 12/06/1996 | 17/10/2001 | 59514378.1 | 783825 | 69616006.4 |
| 1995P00090 | 1995P00090WEFR | France | 05/07/1995 | 12/06/1996 | 17/10/2001 | 59514378.3 | 783825 | 0783825 |
| 1995P00090 | 1995P00090WEGB | United Kingdom | 05/07/1995 | 12/06/1996 | 17/10/2001 | 59514378.3 | 783825 | 0783825 |
| 1995P00090 | 1995P00090WOJP | Japan | 05/07/1995 | 12/06/1996 | 14/08/2017 | 97-504938 | 98-503469 | 4010044 |
| 1995P00090 | 1995P00090WOKR | Republic of Korea | 05/07/1995 | 12/06/1996 | 29/01/2004 | 97-701421 | 97-6705903 | 0418146 |
| 1995P00705 | 1995P00705 .US | United States of America | 19/12/1995 | 18/12/1996 | 27/02/1999 | 08/768484 | | 5929859 |
| 1995P00705 | 1995P00705WEDE | Germany | 19/12/1995 | 09/12/1996 | 12/06/2002 | 96919270.3 | 809913 | 69621778.3 |
| 1995P00705 | 1995P00705WEFR | France | 19/12/1995 | 09/12/1996 | 12/06/2002 | 96919270.3 | 809913 | 0809913 |
| 1995P00705 | 1995P00705WEGB | United Kingdom | 19/12/1995 | 09/12/1996 | 12/06/2002 | 96919270.3 | 809913 | 0809913 |
| 1995P00705 | 1995P00705WOJP | Japan | 19/12/1995 | 09/12/1996 | 16/10/2009 | 97-522624 | 99-501188 | 4392060 |
| 1995P00705 | 1995P00705WOKR | Republic of Korea | 19/12/1995 | 09/12/1996 | 11/08/2004 | 97-705714 | 10-1998-6700317 | 0445209 |
| 1996P00711 | 1996P00711 .JP | Japan | 23/02/1996 | 24/02/1997 | 06/04/2017 | 97-16896 | 97-236777 | 3940456 |
| 1996P00711 | 1996P00711 .JP01 | Japan | 23/02/1996 | 24/02/1997 | 30/01/2009 | 07-694284 | 07-169067 | 4253345 |
| 1996P00711 | 1996P00711 .JP02 | Japan | 23/02/1996 | 24/02/1997 | 07/01/2011 | 08-268132 | 09-053771 | 4656080 |
| 1996P00711 | 1996P00711 .JP03 | Japan | 23/02/1996 | 24/02/1997 | | 2010-240903 | | |
| 1996P00711 | 1996P00711 .JP04 | Japan | 23/02/1996 | 24/02/1997 | | 2011-231483 | | |
| 1996P00711 | 1996P00711 .KR | Republic of Korea | 23/02/1996 | 24/02/1997 | 14/04/2004 | 97-6580 | | 0429091 |
| 1996P00711 | 1996P00711 .US | United States of America | 23/02/1996 | 12/02/1997 | 16/05/2000 | 08/798676 | | 6064424 |
| 1996P00711 | 1996P00711PDE | Germany | 23/02/1996 | 13/02/1997 | 22/01/2003 | 57200399.0 | 791847 | 69718534.6 |
| 1996P00711 | 1996P00711PFR | France | 23/02/1996 | 13/02/1997 | 22/01/2003 | 57200399.0 | 791847 | 0791847 |
| 1996P00711 | 1996P00711GB | United Kingdom | 23/02/1996 | 13/02/1997 | 22/01/2003 | 57200399.0 | 791847 | 0791847 |
| 1996P00446 | 1996P00446 .US | United States of America | 07/06/1996 | 05/06/1997 | 08/02/2000 | 08/869941 | | 6023363 |
| 1996P00446 | 1996P00446WEDE | Germany | 07/06/1996 | 29/05/1997 | 07/08/2002 | 97922863.9 | 843940 | 69714031.4 |
| 1996P00446 | 1996P00446WEFR | France | 07/06/1996 | 29/05/1997 | 07/08/2002 | 97922863.9 | 843940 | 0843940 |
| 1996P00446 | 1996P00446WEGB | United Kingdom | 07/06/1996 | 29/05/1997 | 07/08/2002 | 97922863.9 | 843940 | 0843940 |
| 1996P00446 | 1996P00446WOJP | Japan | 07/06/1996 | 29/05/1997 | 30/11/2007 | 98-500368 | 99-511316 | 4047367 |
| 1996P00072 | 1996P00072 .US | United States of America | 14/11/1996 | 06/11/1997 | 30/01/2000 | 08/964101 | | 6063600 |
| 1996P00072 | 1996P00072WEDE | Germany | 14/11/1996 | 13/10/1997 | 14/04/2004 | 57942159.1 | 877666 | 69718647.9 |
| 1996P00072 | 1996P00072WEFR | France | 14/11/1996 | 13/10/1997 | 14/04/2004 | 57942159.1 | 877666 | 0877666 |
| 1996P00072 | 1996P00072WEGB | United Kingdom | 14/11/1996 | 13/10/1997 | 14/04/2004 | 57942159.1 | 877666 | 0877666 |
| 1996P00072 | 1996P00072WENL | Netherlands | 14/11/1996 | 13/10/1997 | 14/04/2004 | 57942159.1 | 877666 | 0877666 |
| 1996P01223 | 1996P01223 .US | United States of America | 21/11/1996 | 19/11/1997 | 11/04/2000 | 08/972977 | | 6048317 |
| 1996P01223 | 1996P01223WEDE | Germany | 21/11/1996 | 20/10/1997 | 08/01/2003 | 57943112.9 | 877991 | 69718251.6 |
| 1996P01223 | 1996P01223WEFR | France | 21/11/1996 | 20/10/1997 | 08/01/2003 | 57943112.9 | 877991 | 0877991 |
| 1996P01223 | 1996P01223WEGB | United Kingdom | 21/11/1996 | 20/10/1997 | 08/01/2003 | 57943112.9 | 877991 | 0877991 |
| 1996P01223 | 1996P01223WOJP | Japan | 21/11/1996 | 20/10/1997 | 29/01/2008 | 98-523384 | 00-504453 | 4075290 |
| 1997P01313 | 1997P01313 .US | United States of America | 02/05/1997 | 28/04/1998 | 06/11/2007 | 09/067910 | | 7292238 |
| 1997P01313 | 1997P01313WEDE | Germany | 02/05/1997 | 19/05/1998 | 29/01/2003 | 58907091.7 | 944877 | 69811652.8 |
| 1997P01313 | 1997P01313WEFR | France | 02/05/1997 | 19/05/1998 | 29/01/2003 | 58907091.7 | 944877 | 0944877 |
| 1997P01313 | 1997P01313WEGB | United Kingdom | 02/05/1997 | 19/05/1998 | 29/01/2003 | 58907091.7 | 944877 | 0944877 |
| 1997P01313 | 1997P01313WOJP | Japan | 02/05/1997 | 19/05/1998 | 13/06/2008 | 98-529351 | 00-513847 | 4133885 |
| 1997P00056 | 1997P00056 .US | United States of America | 23/07/1997 | 21/07/1998 | 05/10/2004 | 09/119891 | | 6801243 |
| 1997P00056 | 1997P00056WE | Europe | 23/07/1997 | 09/07/1998 | | 98526497.1 | 934546 | |
| 1997P00056 | 1997P00056WOJP | Japan | 23/07/1997 | 09/07/1998 | 09/07/2008 | 98526497.1 | 934546 | 4315226 |
| 1997P00056 | 1997P00056WOKR | Republic of Korea | 23/07/1997 | 09/07/1998 | 25/01/2006 | 10-1999-7000258 | 10-2000-0048570 | 0548062 |
| 1998P01606 | 1998P01606 .US | United States of America | 01/04/1998 | 30/01/1999 | 27/08/2002 | 09/281351 | | 6442303 |
| 1998P01606 | 1998P01606WEDE | Germany | 01/04/1998 | 22/03/1999 | 09/05/2007 | 99942625.7 | | 69936029.3 |
| 1998P01606 | 1998P01606WEFR | France | 01/04/1998 | 22/03/1999 | 09/05/2007 | 99942625.7 | | 0968906 |
| 1998P01606 | 1998P01606WEGB | United Kingdom | 01/04/1998 | 22/03/1999 | 09/05/2007 | 99942625.7 | | 0968906 |
| 1998P01606 | 1998P01606WOCN | China | 01/04/1998 | 22/03/1999 | 14/01/2004 | 99800874.5 | 1273001 | 99800874.5 |
| 1998P01606 | 1998P01606WOJP | Japan | 01/04/1998 | 22/03/1999 | 26/12/2008 | 99-549098 | 03-508146 | 4236788 |
| 1998P01606 | 1998P01606WOKR | Republic of Korea | 01/04/1998 | 22/03/1999 | 28/09/2006 | 10-1999-7011294 | 10-2001-0015243 | 10-0632195 |
| 1998P00571 | 1998P00571 .TW | Taiwan | 30/06/1998 | 01/02/2000 | 23/04/2003 | 089101981 | | 168770 |
| 1998P00571 | 1998P00571 .US | United States of America | 30/06/1998 | 30/06/1999 | 07/12/2002 | 09/107918 | | 6490183 |
| 1998P00571 | 1998P00571WEDE | Germany | 30/06/1998 | 14/06/1999 | 05/11/2003 | 99923456.7 | 1038275 | 69912576.6 |
| 1998P00571 | 1998P00571WEFR | France | 30/06/1998 | 14/06/1999 | 03/11/2003 | 99923456.7 | 1038271 | 1038271 |
| 1998P00571 | 1998P00571WEGB | United Kingdom | 30/06/1998 | 14/06/1999 | 03/11/2003 | 99923456.7 | 1038271 | 1038271 |
| 1998P00571 | 1998P00571WOCN | China | 30/06/1998 | 14/06/1999 | 24/03/2004 | 99801455.9 | 1272698 | 99801455.9 |
| 1998P00571 | 1998P00571WOJP | Japan | 30/06/1998 | 14/06/1999 | 26/08/2009 | 00-557434 | 02-519782 | 4364436 |
| 1998P00571 | 1998P00571WOKR | Republic of Korea | 30/06/1998 | 14/06/1999 | 17/10/2006 | 10-2000-7001524 | 10-2001-0025290 | 10-0637612 |
| 1999P01459 | 1999P01459 .US | United States of America | 31/05/1999 | 24/03/2000 | 23/04/2003 | 09/554207 | | 6625304 |
| 1999P01459 | 1999P01459WE | Europe | 31/05/1999 | 09/03/2000 | | 00967672.0 | 1062702 | |
| 1999P01106 | 1999P01106WECN | Germany | 10/12/1999 | 23/11/2000 | 03/03/2004 | 00981152.0 | 1155672 | 60038706.9 |
| 1999P01106 | 1999P01106WEFR | France | 10/12/1999 | 23/11/2000 | 03/03/2004 | 00981152.0 | 1155672 | 1155672 |
| 1999P01106 | 1999P01106WEGB | United Kingdom | 10/12/1999 | 23/11/2000 | 03/03/2004 | 00981152.0 | 1155672 | 1155672 |
| 1999P01106 | 1999P01106WOCN | China | 10/12/1999 | 23/11/2000 | 27/04/2005 | 00806052.3 | 1346460 | 00806052.3 |
| 1999P01106 | 1999P01106WOJP | Japan | 10/12/1999 | 23/11/2000 | 10/12/2010 | 01-544127 | 03-516700 | 4751694 |
| 1999P01106 | 1999P01106WOKR | Republic of Korea | 10/12/1999 | 23/11/2000 | 17/12/2007 | 10-2001-7010134 | 10-2001-0103255 | 10-788179 |
| 2000P00227 | 2000P00227 .US | United States of America | 03/05/2000 | 20/04/2001 | 03/05/2005 | 09/838852 | 2001-0045851 | 6888540 |
| 2000P01555 | 2000P01555 .US | United States of America | 18/05/2000 | 07/05/2001 | 30/01/2006 | 09/850349 | 2002-0009211 | 6982646 |
| 2000P01555 | 2000P01555WEDE | Germany | 18/05/2000 | 26/04/2001 | 12/07/2006 | 01951856.1 | | 60221445.9 |
| 2000P01555 | 2000P01555WEFR | France | 18/05/2000 | 26/04/2001 | 12/07/2006 | 01951856.1 | | 1290895 |
| 2000P01555 | 2000P01555WEGB | United Kingdom | 18/05/2000 | 26/04/2001 | 12/07/2006 | 01951656.1 | | 1290895 |
| 2000P01555 | 2000P01555WOCN | China | 18/05/2000 | 26/04/2001 | 27/04/2005 | 01801321.X | 1381144 | 01801321.X |
| 2000P01555 | 2000P01555WOJP | Japan | 18/05/2000 | 26/04/2001 | 14/01/2011 | 01-586926 | 2003-534742 | 4663201 |
| 2000P01555 | 2000P01555WOKR | Republic of Korea | 18/05/2000 | 26/04/2001 | 22/03/2008 | 10-2002-7000734 | | 10-0808395 |
| 2000P01278 | 2000P01278 .US | United States of America | 07/06/2000 | 06/06/2001 | 16/03/2008 | 09/545854 | 2002-0064310 | 7560850 |
| 2000P01278 | 2000P01278WE | Europe | 07/06/2000 | 27/08/2001 | | 01969670.7 | 1374174 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2008P00851 | 2008P00851WOKR | Republic of Korea | 02/06/2008 | 27/05/2009 | | 10-2010-7029725 | | |
| 2008P00851 | 2008P00851WORU | Russian Federation | 02/06/2008 | 27/05/2009 | | 2010154064 | | |
| 2008P00851 | 2008P00851WOUS | United States of America | 02/06/2008 | 27/05/2009 | | 12/993868 | 2011-0075256 | |
| 2008P00332 | 2008P00332WE | Europe | 27/06/2008 | 26/06/2009 | | 08787701.7 | 2304966 | |
| 2008P00332 | 2008P00332WOBR | Brazil | 27/06/2008 | 26/06/2009 | | PI 0910144-6 | | |
| 2008P00332 | 2008P00332WOCN | China | 27/06/2008 | 26/06/2009 | | 200980134253.1 | 102277601 | |
| 2008P00332 | 2008P00332WOIN | India | 27/06/2008 | 26/06/2009 | | 485/CHENP/2011 | | |
| 2008P00332 | 2008P00332WOJP | Japan | 27/06/2008 | 26/06/2009 | | 11-515710 | | |
| 2008P00332 | 2008P00332WOKR | Republic of Korea | 27/06/2008 | 26/06/2009 | | 10-2011-7001840 | | |
| 2008P00332 | 2008P00332WORU | Russian Federation | 27/06/2008 | 26/06/2009 | | 2011102977 | | |
| 2008P00332 | 2008P00332WOUS | United States of America | 27/06/2008 | 26/06/2009 | | 12/997885 | 2011-0164016 | |
| 2008P00750 | 2008P00750WE | Europe | 24/07/2008 | 15/07/2009 | | 09786610.7 | 2307907 | |
| 2008P00750 | 2008P00750WOCN | China | 24/07/2008 | 15/07/2009 | | 200980128940.0 | 102103610 | |
| 2008P00750 | 2008P00750WOJP | Japan | 24/07/2008 | 15/07/2009 | | 2011-519264 | | |
| 2008P00750 | 2008P00750WOKR | Republic of Korea | 24/07/2008 | 15/07/2009 | | 10-2011-7004009 | | |
| 2008P00750 | 2008P00750WOUS | United States of America | 24/07/2008 | 15/07/2009 | | 13/055434 | 2011-0122012 | |
| 2008P00935 | 2008P00935 AU | Australia | 25/07/2008 | 17/07/2009 | | 2011302552 | | |
| 2008P00935 | 2008P00935 CN | China | 25/07/2008 | 17/07/2009 | | 201110123678.5 | 102137270 | |
| 2008P00935 | 2008P00935 ID | Indonesia | 25/07/2008 | 17/07/2009 | | W-00 2010 00275 | 511488 | |
| 2008P00935 | 2008P00935 IN | India | 25/07/2008 | 16/05/2011 | | 5354/CHENP/2011 | | |
| 2008P00935 | 2008P00935 KR | Republic of Korea | 25/07/2008 | 17/07/2009 | | 10-2011-7018100 | | |
| 2008P00935 | 2008P00935 MX | Mexico | 25/07/2008 | 17/07/2009 | | 2011/000785 | | |
| 2008P00935 | 2008P00935 US01 | United States of America | 25/07/2008 | 08/06/2011 | | 13/125436 | 2011-0252103 | |
| 2008P00935 | 2008P00935WE | Europe | 25/07/2008 | 17/07/2009 | | 09786635.4 | 2308240 | |
| 2008P00935 | 2008P00935WE 01 | Europe | 25/07/2008 | 17/07/2009 | | EP11164108.8 | 2362671 | |
| 2008P00935 | 2008P00935WOAU | Australia | 25/07/2008 | 17/07/2009 | | 2009275163 | | |
| 2008P00935 | 2008P00935WOBR | Brazil | 25/07/2008 | 17/07/2009 | | PI 0911014-3 | | |
| 2008P00935 | 2008P00935WOCN | China | 25/07/2008 | 17/07/2009 | | 200980128938.X | 102106153 | |
| 2008P00935 | 2008P00935WOIN | India | 25/07/2008 | 17/07/2009 | | 1077/CHENP/2011 | | |
| 2008P00935 | 2008P00935WOJP | Japan | 25/07/2008 | 17/07/2009 | | 2011-519268 | | |
| 2008P00935 | 2008P00935WOKR | Republic of Korea | 25/07/2008 | 17/07/2009 | | 10-2011-7004126 | | |
| 2008P00935 | 2008P00935WOMY | Malaysia | 25/07/2008 | 17/07/2009 | | PI 2011000532 | | |
| 2008P00935 | 2008P00935WORU | Russian Federation | 25/07/2008 | 17/07/2009 | | 2011106942 | | |
| 2008P00935 | 2008P00935WOUS | United States of America | 25/07/2008 | 17/07/2009 | | 13/054879 | 2011-0128551 | |
| 2008P00935 | 2008P00935WOVN | Viet Nam | 25/07/2008 | 17/07/2009 | | 1-3011-00698 | | |
| 2008P00937 | 2008P00937WE | Europe | 28/07/2008 | 22/07/2009 | | 09786660.2 | | |
| 2008P00937 | 2008P00937WOCN | China | 28/07/2008 | 22/07/2009 | | 200980129684.2 | 102113015 | |
| 2008P00937 | 2008P00937WOIN | India | 28/07/2008 | 22/07/2009 | | 1256/CHENP/2011 | | |
| 2008P00937 | 2008P00937WOJP | Japan | 28/07/2008 | 22/07/2009 | | 2011-526625 | | |
| 2008P00937 | 2008P00937WOKR | Republic of Korea | 28/07/2008 | 22/07/2009 | | 10-2011-7004286 | | |
| 2008P00937 | 2008P00937WOUS | United States of America | 28/07/2008 | 22/07/2009 | | 13/055727 | 2011-0125113 | |
| 2008P00936 | 2008P00936 TW | Taiwan | 26/08/2008 | 24/08/2009 | | 098132611 | 201018011 | |
| 2008P00936 | 2008P00936WE | Europe | 26/08/2008 | 17/08/2009 | | 09786950.7 | 2319248 | |
| 2008P00936 | 2008P00936WOBR | Brazil | 26/08/2008 | 17/08/2009 | | PI 0912953-7 | | |
| 2008P00936 | 2008P00936WOCN | China | 26/08/2008 | 17/08/2009 | | 200980133116.5 | 102132571 | |
| 2008P00936 | 2008P00936WOIN | India | 26/08/2008 | 17/08/2009 | | 1909/CHENP/2011 | | |
| 2008P00936 | 2008P00936WOJP | Japan | 26/08/2008 | 17/08/2009 | | 2011-524487 | | |
| 2008P00936 | 2008P00936WOKR | Republic of Korea | 26/08/2008 | 17/08/2009 | | 10-2011-7006762 | | |
| 2008P00936 | 2008P00936WORU | Russian Federation | 26/08/2008 | 17/08/2009 | | 2011111557 | | |
| 2008P00936 | 2008P00936WOUS | United States of America | 26/08/2008 | 17/08/2009 | | 13/059996 | 2011-0149057 | |
| 2008P01291 | 2008P01291 TW | Taiwan | 25/09/2008 | 24/09/2009 | | 098132651 | 201016907 | |
| 2008P01291 | 2008P01291WE | Europe | 25/09/2008 | 23/09/2009 | | 09787375.3 | 2358145 | |
| 2008P01291 | 2008P01291WOCN | China | 25/09/2008 | 23/09/2009 | | 200980137747.9 | 102165456 | |
| 2008P01291 | 2008P01291WOJP | Japan | 25/09/2008 | 23/09/2009 | | 2011-528492 | | |
| 2008P01291 | 2008P01291WOKR | Republic of Korea | 25/09/2008 | 23/09/2009 | | 10-2011-7009231 | | |
| 2008P01291 | 2008P01291WOUS | United States of America | 25/09/2008 | 23/09/2009 | | 13/119771 | 2011-0181368 | |
| 2008P01298 | 2008P01298 TW | Taiwan | 25/09/2008 | 22/09/2009 | | 098131856 | 201021141 | |
| 2008P01298 | 2008P01298WE | Europe | 25/09/2008 | 18/09/2009 | | 09787257.8 | 2342693 | |
| 2008P01298 | 2008P01298WOCN | China | 25/09/2008 | 18/09/2009 | | 200980137740.7 | 102165495 | |
| 2008P01298 | 2008P01298WOJP | Japan | 25/09/2008 | 18/09/2009 | | 2011-528472 | | |
| 2008P01298 | 2008P01298WOKR | Republic of Korea | 25/09/2008 | 18/09/2009 | | 10-2011-7009069 | | |
| 2008P01298 | 2008P01298WOUS | United States of America | 25/09/2008 | 18/09/2009 | | 13/119269 | 2011-0169823 | |
| 2008P01273 | 2008P01273 TW | Taiwan | 10/10/2008 | 08/10/2009 | | 098134162 | 201015708 | |
| 2008P01273 | 2008P01273WE | Europe | 10/10/2008 | 01/10/2009 | | 09787841.9 | 2352940 | |
| 2008P01273 | 2008P01273WOCN | China | 10/10/2008 | 01/10/2009 | | 200980139884.9 | 102177721 | |
| 2008P01273 | 2008P01273WOJP | Japan | 10/10/2008 | 01/10/2009 | | 2011-530597 | | |
| 2008P01273 | 2008P01273WOKR | Republic of Korea | 10/10/2008 | 01/10/2009 | | 10-2011-7010892 | | |
| 2008P01273 | 2008P01273WOUS | United States of America | 10/10/2008 | 01/10/2009 | | 13/123588 | 2011-0199465 | |
| 2008P01630 | 2008P01630 TW | Taiwan | 21/10/2008 | 19/10/2009 | | 098135501 | 201027979 | |
| 2008P01630 | 2008P01630WE | Europe | 21/10/2008 | 16/10/2009 | | 09744167.6 | 2351577 | |
| 2008P01630 | 2008P01630WOBR | Brazil | 21/10/2008 | 16/10/2009 | | PI 0914400-5 | | |
| 2008P01630 | 2008P01630WOCN | China | 21/10/2008 | 16/10/2009 | | 200980141634.1 | 102204261 | |
| 2008P01630 | 2008P01630WOIN | India | 21/10/2008 | 16/10/2009 | | 3401/CHENP/2011 | | |
| 2008P01630 | 2008P01630WOJP | Japan | 21/10/2008 | 16/10/2009 | | 2011-531621 | | |
| 2008P01630 | 2008P01630WOKR | Republic of Korea | 21/10/2008 | 16/10/2009 | | 10-2011-7011555 | | |
| 2008P01630 | 2008P01630WORU | Russian Federation | 21/10/2008 | 16/10/2009 | | 2011120445 | | |
| 2008P01630 | 2008P01630WOUS | United States of America | 21/10/2008 | 16/10/2009 | | 13/125572 | 2011-0199406 | |
| 2008P01631 | 2008P01631 TW | Taiwan | 21/10/2008 | 19/10/2009 | | 098135502 | 201021544 | |
| 2008P01631 | 2008P01631WE | Europe | 21/10/2008 | 15/10/2009 | | 09743915.4 | 2340527 | |
| 2008P01631 | 2008P01631WOBR | Brazil | 21/10/2008 | 15/10/2009 | | PI 0914486-6 | | |
| 2008P01631 | 2008P01631WOCN | China | 21/10/2008 | 15/10/2009 | | 200980141867.6 | 102197413 A | |
| 2008P01631 | 2008P01631WOIN | India | 21/10/2008 | 15/10/2009 | | 3395/CHENP/2011 | | |
| 2008P01631 | 2008P01631WOJP | Japan | 21/10/2008 | 15/10/2009 | | 2011-531635 | | |
| 2008P01631 | 2008P01631WOKR | Republic of Korea | 21/10/2008 | 15/10/2009 | | 10-2011-7011370 | | |
| 2008P01631 | 2008P01631WORU | Russian Federation | 21/10/2008 | 15/10/2009 | | 2011120439 | | |
| 2008P01631 | 2008P01631WOUS | United States of America | 21/10/2008 | 15/10/2009 | | 13/124283 | 2011-0199379 | |
| 2008P01426 | 2008P01426 TW | Taiwan | 28/10/2008 | 26/10/2009 | | 098136208 | 201027980 | |
| 2008P01426 | 2008P01426WE | Europe | 28/10/2008 | 26/10/2009 | | 09744475.8 | 2340648 | |
| 2008P01426 | 2008P01426WOBR | Brazil | 28/10/2008 | 26/10/2009 | | PI 0914462-9 | | |
| 2008P01426 | 2008P01426WOCN | China | 28/10/2008 | 26/10/2009 | | 200980143024.X | 102197653 | |
| 2008P01426 | 2008P01426WOIN | India | 28/10/2008 | 26/10/2009 | | 3366/CHENP/2011 | | |
| 2008P01426 | 2008P01426WOJP | Japan | 28/10/2008 | 26/10/2009 | | 2011-532766 | | |
| 2008P01426 | 2008P01426WOKR | Republic of Korea | 28/10/2008 | 26/10/2009 | | 10-2011-7012002 | | |
| 2008P01426 | 2008P01426WORU | Russian Federation | 28/10/2008 | 26/10/2009 | | 2011121668 | | |
| 2008P01426 | 2008P01426WOUS | United States of America | 28/10/2008 | 26/10/2009 | | 13/125584 | 2011-0199465 | |
| 2008P01427 | 2008P01427 TW | Taiwan | 28/10/2008 | 26/10/2009 | | 098136204 | 201031127 | |
| 2008P01427 | 2008P01427WE | Europe | 28/10/2008 | 21/10/2009 | | 09743931.9 | 2342900 | |
| 2008P01427 | 2008P01427WOBR | Brazil | 28/10/2008 | 21/10/2009 | | PI 0914466-3 | | |
| 2008P01427 | 2008P01427WOCN | China | 28/10/2008 | 21/10/2009 | | 200980143021.6 | 102204262 | |
| 2008P01427 | 2008P01427WOIN | India | 28/10/2008 | 21/10/2009 | | 3368/CHENP/2011 | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2008P01427 | 2008P01427WO-JP | Japan | 28/10/2008 | 22/10/2009 | | 2011-532755 | | |
| 2008P01427 | 2008P01427WOKR | Republic of Korea | 28/10/2008 | 21/10/2009 | | 10-2011-7011982 | | |
| 2008P01427 | 2008P01427WORU | Russian Federation | 28/10/2008 | 21/10/2009 | | 2011121150 | | |
| 2008P01427 | 2008P01427WOUS | United States of America | 28/10/2008 | 21/10/2009 | | 13/125857 | 2011-0205226 | |
| 2008P01296 | 2008P01296 TW | Taiwan | 04/11/2008 | 02/11/2009 | | 098137138 | 201523619 | |
| 2008P01296 | 2008P01296WE | Europe | 04/11/2008 | 03/11/2009 | | 09756183.1 | 2347597 | |
| 2008P01296 | 2008P01296WOCN | China | 04/11/2008 | 03/11/2009 | | 200980143577.6 | 102204264 | |
| 2008P01296 | 2008P01296WOJP | Japan | 04/11/2008 | 03/11/2009 | | 2011-533918 | | |
| 2008P01296 | 2008P01296WOKR | Republic of Korea | 04/11/2008 | 03/11/2009 | | 10-2011-7012656 | | |
| 2008P01296 | 2008P01296WOUS | United States of America | 04/11/2008 | 03/11/2009 | | 13/127287 | 2011-0211343 | |
| 2008P01676 | 2008P01676 TW | Taiwan | 04/11/2008 | 02/11/2009 | | 098137434 | 201029441 | |
| 2008P01676 | 2008P01676WE | Europe | 04/11/2008 | 02/11/2009 | | 09756850.5 | 2347586 | |
| 2008P01676 | 2008P01676WOCN | China | 04/11/2008 | 02/11/2009 | | 200980143579.5 | 102203829 | |
| 2008P01676 | 2008P01676WOIN | India | 04/11/2008 | 02/11/2009 | | 3645/CHENP/2011 | | |
| 2008P01676 | 2008P01676WOJP | Japan | 04/11/2008 | 02/11/2009 | | 2011-533918 | | |
| 2008P01676 | 2008P01676WOKR | Republic of Korea | 04/11/2008 | 02/11/2009 | | 10-2011-7012662 | | |
| 2008P01676 | 2008P01676WOUS | United States of America | 04/11/2008 | 02/11/2009 | | 13/127263 | 2011-0210969 | |
| 2008P01730 | 2008P01730 TW | Taiwan | 24/11/2008 | 25/11/2009 | | 098139772 | 201103310 | |
| 2008P01730 | 2008P01730WE | Europe | 24/11/2008 | 18/11/2009 | | 09764076.7 | 2368370 | |
| 2008P01730 | 2008P01730WOCN | China | 24/11/2008 | 18/11/2009 | | 200980148861.5 | | |
| 2008P01730 | 2008P01730WOIN | India | 24/11/2008 | 18/11/2009 | | 4176/CHENP/2011 | | |
| 2008P01730 | 2008P01730WO-JP | Japan | 24/11/2008 | 18/11/2009 | | 2011-536986 | | |
| 2008P01730 | 2008P01730WOKR | Republic of Korea | 24/11/2008 | 18/11/2009 | | UN6NOWA | | |
| 2008P01730 | 2008P01730WOUS | United States of America | 24/11/2008 | 18/11/2009 | | 13/127801 | 2011-0211306 | |
| 2008P01835 | 2008P01835F TW | Taiwan | 02/12/2008 | 30/11/2009 | | 098140846 | 201030672 | |
| 2008P01835 | 2008P01835WE | Europe | 02/12/2008 | 28/11/2009 | | 09775200.1 | 2374108 | |
| 2008P01835 | 2008P01835WOCN | China | 02/12/2008 | 26/11/2009 | | 200980146288.4 | | |
| 2008P01835 | 2008P01835WOIN | India | 02/12/2008 | 26/11/2009 | | 4972/CHENP/2011 | | |
| 2008P01835 | 2008P01835WO-JP | Japan | 02/12/2008 | 26/11/2009 | | 2011-538090 | | |
| 2008P01659 | 2008P01659WOKR | Republic of Korea | 02/12/2008 | 26/11/2009 | | 10-2011-7015105 | | |
| 2008P01659 | 2008P01659WOUS | United States of America | 02/12/2008 | 26/11/2009 | | 13/131968 | 2011-0227914 | |
| 2008P01643 | 2008P01643 TW | Taiwan | 09/12/2008 | 09/12/2009 | | 098142117 | 201030679 | |
| 2008P01643 | 2008P01643WE | Europe | 09/12/2008 | 03/12/2009 | | 09774757.0 | 2377036 | |
| 2008P01643 | 2008P01643WOCN | China | 09/12/2008 | 03/12/2009 | | 200980148411.1 | | |
| 2008P01643 | 2008P01643WO-JP | Japan | 09/12/2008 | 03/12/2009 | | 2011-539162 | | |
| 2008P01643 | 2008P01643WOKR | Republic of Korea | 09/12/2008 | 03/12/2009 | | 10-2011-7015091 | | |
| 2008P01643 | 2008P01643WOUS | United States of America | 09/12/2008 | 03/12/2009 | | 13/133487 | 2011-0243443 | |
| 2008P01701 | 2008P01701WE | Europe | 15/12/2008 | 10/12/2009 | | 09795362.9 | 2377323 | |
| 2008P01701 | 2008P01701WOCN | China | 15/12/2008 | 10/12/2009 | | 200980150424.3 | | |
| 2008P01701 | 2008P01701WOIN | India | 15/12/2008 | 10/12/2009 | | 4889/CHENP/2011 | | |
| 2008P01701 | 2008P01701WO-JP | Japan | 15/12/2008 | 10/12/2009 | | 2011-540312 | | |
| 2008P01701 | 2008P01701WOKR | Republic of Korea | 15/12/2008 | 10/12/2009 | | 10-2011-7016213 | | |
| 2008P01701 | 2008P01701WOUS | United States of America | 15/12/2008 | 10/12/2009 | | 13/139345 | 2011-0242270 | |
| 2008P01673 | 2008P01673 TW | Taiwan | 18/12/2008 | 11/11/2009 | | 098142915 | 201017317 | |
| 2008P01673 | 2008P01673WE | Europe | 18/12/2008 | 11/11/2009 | | 09795615.7 | 2380355 | |
| 2008P01673 | 2008P01673WOCN | China | 18/12/2008 | 11/11/2009 | | 200980151311.X | | |
| 2008P01673 | 2008P01673WO-JP | Japan | 18/12/2008 | 11/12/2009 | | 2011-541681 | | |
| 2008P01673 | 2008P01673WOKR | Republic of Korea | 18/12/2008 | 11/12/2009 | | 10-2011-7016509 | | |
| 2008P01673 | 2008P01673WOUS | United States of America | 18/12/2008 | 11/12/2009 | | 13/139765 | 2011-0248994 | |
| 2008P01532 | 2008P01532WE | Europe | 19/12/2008 | 14/12/2009 | | 09796083.2 | 2380358 | |
| 2008P01532 | 2008P01532WOCN | China | 19/12/2008 | 14/12/2009 | | 200980151037.1 | | |
| 2008P01532 | 2008P01532WOIN | India | 19/12/2008 | 14/12/2009 | | 4958/CHENP/2011 | | |
| 2008P01532 | 2008P01532WO-JP | Japan | 19/12/2008 | 14/12/2009 | | 2011-541681 | | |
| 2008P01532 | 2008P01532WOKR | Republic of Korea | 19/12/2008 | 14/12/2009 | | 10-2011-7016351 | | |
| 2008P01532 | 2008P01532WOUS | United States of America | 19/12/2008 | 14/12/2009 | | 13/139882 | 2011-0249099 | |
| 2008P01779 | 2008P01779 TH | Thailand | 19/12/2008 | 14/12/2009 | | | | |
| 2008P01779 | 2008P01779 TW | Taiwan | 19/12/2008 | 17/12/2009 | | | | |
| 2008P01779 | 2008P01779WE | Europe | 19/12/2008 | 14/12/2009 | | 098143436 | 201041000 | |
| 2008P01779 | 2008P01779WOAU | Australia | 19/12/2008 | 14/12/2009 | | 09796086.4 | 2380357 | |
| 2008P01779 | 2008P01779WOBR | Brazil | 19/12/2008 | 14/12/2009 | | 2009329113 | | |
| 2008P01779 | 2008P01779WOCA | Canada | 19/12/2008 | 14/12/2009 | | PI 0917764-7 | | |
| 2008P01779 | 2008P01779WOCN | China | 19/12/2008 | 14/12/2009 | | 2747106 | | |
| 2008P01779 | 2008P01779WOID | Indonesia | 19/12/2008 | 14/12/2009 | | 200980131822.5 | | |
| 2008P01779 | 2008P01779WOIN | India | 19/12/2008 | 14/12/2009 | | W-00 2011.02166 | | |
| 2008P01779 | 2008P01779WO-JP | Japan | 19/12/2008 | 14/12/2009 | | 4955/CHENP/2011 | | |
| 2008P01779 | 2008P01779WOKR | Republic of Korea | 19/12/2008 | 14/12/2009 | | 2011-541682 | | |
| 2008P01779 | 2008P01779WOMX | Mexico | 19/12/2008 | 14/12/2009 | | 10-2011-7016477 | | |
| 2008P01779 | 2008P01779WOMY | Malaysia | 19/12/2008 | 14/12/2009 | | 2011/006498 | | |
| 2008P01779 | 2008P01779WORU | Russian Federation | 15/12/2008 | 14/12/2009 | | PI 2011062810 | | |
| 2008P01779 | 2008P01779WOUS | United States of America | 19/12/2008 | 14/12/2009 | | 3011129788 | | |
| 2008P01779 | 2008P01779WOVN | Viet Nam | 19/12/2008 | 14/12/2009 | | 13/139935 | 2011-0249757 | |
| 2008P01043 | 2008P01043 TW | Taiwan | 22/12/2008 | 21/12/2009 | | 1-2011-01511 | | |
| 2008P01043 | 2008P01043WE | Europe | 22/12/2008 | 16/12/2009 | | 098143942 | 201030175 | |
| 2008P01043 | 2008P01043WOCN | China | 22/12/2008 | 16/12/2009 | | 09756460.3 | 2380046 | |
| 2008P01043 | 2008P01043WO-JP | Japan | 22/12/2008 | 16/12/2009 | | 200980151088.X | | |
| 2008P01043 | 2008P01043WOKR | Republic of Korea | 22/12/2008 | 16/12/2009 | | 2011-541698 | | |
| 2008P01043 | 2008P01043WOUS | United States of America | 22/12/2008 | 16/12/2009 | | 10-2011-7017010 | | |
| 2009P00133 | 2009P00133 TW | Taiwan | 20/01/2009 | 18/01/2010 | | 13/141229 | 2011-0255159 | |
| 2009P00133 | 2009P00133WE | Europe | 20/01/2009 | 13/01/2010 | | 099101236 | | |
| 2009P00133 | 2009P00133WOBR | Brazil | 20/01/2009 | 13/01/2010 | | 10701918.4 | 2386666 | |
| 2009P00133 | 2009P00133WOCN | China | 20/01/2009 | 13/01/2010 | | PI1005140-1 | | |
| 2009P00133 | 2009P00133WOIN | India | 20/01/2009 | 13/01/2010 | | 201080004996.3 | | |
| 2009P00133 | 2009P00133WO-JP | Japan | 20/01/2009 | 13/01/2010 | | 5788/CHENP/2011 | | |
| 2009P00133 | 2009P00133WOKR | Republic of Korea | 20/01/2009 | 13/01/2010 | | 2011-545823 | | |
| 2009P00133 | 2009P00133WORU | Russian Federation | 20/01/2009 | 13/01/2010 | | 10-2011-7018095 | | |
| 2009P00133 | 2009P00133WOUS | United States of America | 20/01/2009 | 13/01/2010 | | 2011134888 | | |
| 2009P00344 | 2009P00344 TW | Taiwan | 20/01/2009 | 13/01/2010 | | 13/145283 | 2011-0279845 | |
| 2009P00344 | 2009P00344WE | Europe | 20/01/2009 | 13/01/2010 | | 099101241 | 201105105 | |
| 2009P00344 | 2009P00344WOCN | China | 20/01/2009 | 13/01/2010 | | 10701916.8 | 2385645 | |
| 2009P00344 | 2009P00344WO-JP | Japan | 20/01/2009 | 13/01/2010 | | 201080004995.9 | | |
| 2009P00344 | 2009P00344WOKR | Republic of Korea | 20/01/2009 | 13/01/2010 | | 2011-545821 | | |
| 2009P00344 | 2009P00344WOUS | United States of America | 20/01/2009 | 13/05/2010 | | 10-2011-7018099 | | |
| 2009P00389 | 2009P00389 TW | Taiwan | 20/01/2009 | 18/01/2010 | | 13/145187 | 2011-0293240 | |
| 2009P00389 | 2009P00389WE | Europe | 20/01/2009 | 14/01/2010 | | 099101244 | 201103311 | |
| 2009P00389 | 2009P00389WOAU | Australia | 20/01/2009 | 14/01/2010 | | 10701925.9 | 2388765 | |
| 2009P00389 | 2009P00389WOBR | Brazil | 20/01/2009 | 14/01/2010 | | 2010307508 | | |
| 2009P00389 | 2009P00389WOCA | Canada | 20/01/2009 | 14/01/2010 | | PI1005134-1 | | |
| 2009P00389 | 2009P00389WOCN | China | 20/01/2009 | 14/01/2010 | | 2745896 | | |
| 2009P00389 | 2009P00389WOIN | India | 20/01/2009 | 14/01/2010 | | 201080004957.8 | | |
| 2009P00389 | 2009P00389WO-JP | Japan | 20/01/2009 | 14/01/2010 | | 5790/CHENP/2011 | | |
| | | | | | | 2011-545834 | | |

A-711

| | | | | | | |
|---|---|---|---|---|---|---|
| 2009PF00589 | 2009P00589WO KR | Republic of Korea | 26/01/2009 | 14/01/2010 | 10-2011-7019280 | |
| 2009PF00589 | 2009P00589WO MX | Mexico | 26/01/2009 | 14/01/2010 | 2011/007645 | |
| 2009PF00589 | 2009P00589WO RU | Russian Federation | 26/01/2009 | 14/01/2010 | 2011134872 | |
| 2009PF00589 | 2009P00589WO US | United States of America | 26/01/2009 | 14/01/2010 | 13/145430 | |
| 2009PF00358 | 2009P00358 TW | Taiwan | 18/02/2009 | 12/02/2010 | 099104721 | 201043001 |
| 2009PF00358 | 2009P00358 WE | Europe | 18/02/2009 | 11/02/2010 | 10706364.4 | 2399399 |
| 2009PF00358 | 2009P00358WO CN | China | 18/02/2009 | 11/02/2010 | 201080003877.9 | |
| 2009PF00358 | 2009P00358WO IN | India | 18/02/2009 | 11/02/2010 | 6487/CHENP/2011 | |
| 2009PF00358 | 2009P00358WO JP | Japan | 18/02/2009 | 11/02/2010 | 2011-549720 | |
| 2009PF00358 | 2009P00358WO KR | Republic of Korea | 18/02/2009 | 11/02/2010 | 10-2011-7021889 | |
| 2009PF00358 | 2009P00358WO US | United States of America | 18/02/2009 | 11/02/2010 | 13/201809 | |
| 2009PF00257 | 2009P00257 TW | Taiwan | 17/03/2009 | 13/03/2010 | 099107502 | 201040690 |
| 2009PF00257 | 2009P00257WE | Europe | 17/03/2009 | 09/03/2010 | 10710963.1 | |
| 2009PF00257 | 2009P00257WO CN | China | 17/03/2009 | 09/03/2010 | UNKNOWN | |
| 2009PF00257 | 2009P00257WO JP | Japan | 17/03/2009 | 09/03/2010 | I62010/051004 | |
| 2009PF00257 | 2009P00257WO KR | Republic of Korea | 17/03/2009 | 09/03/2010 | 10-2011-7024389 | |
| 2009PF00257 | 2009P00257WO US | United States of America | 17/03/2009 | 09/03/2010 | 13/256451 | |
| 2009PF00410 | 2009P00410 EP-01 | Europe | 25/03/2009 | 27/01/2009 | 09159465.8 | |
| 2009PF00410 | 2009P00410WE | Europe | 25/03/2009 | 22/03/2010 | 10712565.0 | |
| 2009PF00410 | 2009P00410WO CN | China | 25/03/2009 | 22/03/2010 | 201080013576.6 | |
| 2009PF00410 | 2009P00410WO JP | Japan | 25/03/2009 | 22/03/2010 | I62010/051119 | |
| 2009PF00410 | 2009P00410WO KR | Republic of Korea | 25/03/2009 | 22/03/2010 | 10-2011-7025052 | |
| 2009PF00410 | 2009P00410WO US | United States of America | 25/03/2009 | 22/03/2010 | 13/258901 | |
| 2009PF00408 | 2009P00408 TW | Taiwan | 26/05/2009 | 25/05/2010 | 099118704 | 201105111 |
| 2009PF00408 | 2009P00408WE | Europe | 26/05/2009 | 21/05/2010 | 10727906.9 | |
| 2009PF00408 | 2009P00408WO CN | China | 26/05/2009 | 21/05/2010 | UNKNOWN | |
| 2009PF00408 | 2009P00408WO JP | Japan | 26/05/2009 | 21/05/2010 | I62010/052285 | |
| 2009PF00408 | 2009P00408WO KR | Republic of Korea | 26/05/2009 | 21/05/2010 | I62010/052285 | |
| 2009PF00408 | 2009P00408WO US | United States of America | 26/05/2009 | 21/05/2010 | 13/322227 | |
| 2009PF00619 | 2009P00619 TW | Taiwan | 26/05/2009 | 25/05/2010 | 099116702 | 201105110 |
| 2009PF00619 | 2009P00619EP-02 | Europe | 26/05/2009 | 04/04/2010 | 10159467.9 | |
| 2009PF00619 | 2009P00619WE | Europe | 26/05/2009 | 07/05/2010 | 10719629.7 | |
| 2009PF00619 | 2009P00619WO BR | Brazil | 26/05/2009 | 07/05/2010 | 016110045373 | |
| 2009PF00619 | 2009P00619WO CN | China | 26/05/2009 | 07/05/2010 | UNKNOWN | |
| 2009PF00619 | 2009P00619WO IN | India | 26/05/2009 | 07/05/2010 | I62010/052025 | |
| 2009PF00619 | 2009P00619WO JP | Japan | 26/05/2009 | 07/05/2010 | I62010/052025 | |
| 2009PF00619 | 2009P00619WO KR | Republic of Korea | 26/05/2009 | 07/05/2010 | I62010/052025 | |
| 2009PF00619 | 2009P00619WO RU | Russian Federation | 26/05/2009 | 07/05/2010 | I62010/052025 | |
| 2009PF00619 | 2009P00619WO US | United States of America | 26/05/2009 | 07/05/2010 | 13/322182 | |
| 2009PF00755 | 2009P00755 TW | Taiwan | 28/05/2009 | 25/05/2010 | 099116712 | 201107835 |
| 2009PF00755 | 2009P00755WE | Europe | 28/05/2009 | 21/05/2010 | 10727901.0 | |
| 2009PF00755 | 2009P00755WO BR | Brazil | 28/05/2009 | 21/05/2010 | UNKNOWN | |
| 2009PF00755 | 2009P00755WO CN | China | 28/05/2009 | 21/05/2010 | UNKNOWN | |
| 2009PF00755 | 2009P00755WO IN | India | 28/05/2009 | 21/05/2010 | I62010/052268 | |
| 2009PF00755 | 2009P00755WO JP | Japan | 28/05/2009 | 21/05/2010 | I62010/052268 | |
| 2009PF00755 | 2009P00755WO KR | Republic of Korea | 28/05/2009 | 21/05/2010 | I62010/052268 | |
| 2009PF00755 | 2009P00755WO RU | Russian Federation | 28/05/2009 | 21/05/2010 | I62010/052268 | |
| 2009PF00755 | 2009P00755WO US | United States of America | 28/05/2009 | 21/05/2010 | 13/322997 | |
| 2009PF00756 | 2009P00756 TW | Taiwan | 26/06/2009 | 23/06/2010 | 099120508 | 201105113 |
| 2009PF00756 | 2009P00756WO | PCT | 26/06/2009 | 21/06/2010 | I62010/052794 | WO2010/150174 |
| 2009PF00757 | 2009P00757WO | PCT | 26/06/2009 | 21/06/2010 | I62010/052790 | WO2010/150166 |
| 2009PF01452 | 2009P01452WO | PCT | 02/10/2009 | 21/09/2010 | I62010/054251 | WO2011/039679 |
| 2009PF01690 | 2009P01690WO | PCT | 30/10/2009 | 30/09/2010 | I62010/054407 | WO2011/051840 |
| 2009PF00754 | 2009P00754 TW | Taiwan | 03/11/2009 | 21/10/2010 | 099112510 | |
| 2009PF00754 | 2009P00754WO | PCT | 03/11/2009 | 27/10/2010 | I62010/054857 | WO2011/055176 |
| 2009PF01229 | 2009P01229 TW | Taiwan | 03/11/2009 | 05/11/2010 | 099137538 | |
| 2009PF01328 | 2009P01229WO | PCT | 03/11/2009 | 28/10/2010 | I62010/054888 | WO2010/051160 |
| 2009PF01431 | 2009P01431 TW | Taiwan | 13/11/2009 | 10/11/2010 | 099138724 | |
| 2009PF01451 | 2009P01451WO | PCT | 13/11/2009 | 08/11/2010 | I62010/055054 | WO2011/058492 |
| 2009PF01362 | 2009P01362WO | PCT | 13/11/2009 | 03/11/2010 | I62010/055018 | WO2011/058483 |
| 2010PF00254 | 2010P00254 TW | Taiwan | 09/02/2010 | 08/02/2011 | 100104163 | |
| 2010PF00254 | 2010P00254WO | PCT | 09/02/2010 | 02/02/2011 | I62011/036455 | WO2011/098936 |
| 2010PF00330 | 2010P00330 TW | Taiwan | 06/04/2010 | 06/04/2011 | 100111881 | |
| 2010PF00330 | 2010P00330WO | PCT | 06/04/2010 | 91/05/2011 | I62011/031383 | WO2011/125005 |
| 2010PF00077 | 2010P00077 TW | Taiwan | 21/05/2010 | 18/05/2011 | 100117462 | |
| 2010PF00077 | 2010P00077WO | PCT | 21/05/2010 | 17/05/2011 | I62011/052143 | WO2011/145045 |
| 2010PF00078 | 2010P00078 TW | Taiwan | 21/05/2010 | 18/05/2011 | 100113459 | |
| 2010PF00078 | 2010P00078WO | PCT | 21/05/2010 | 13/05/2011 | I62011/052167 | WO2011/145031 |
| 2010PF00868 | 2010P00868 TW | Taiwan | 30/06/2010 | 27/06/2011 | 100123492 | |
| 2010PF00568 | 2010P00568WO | PCT | 30/06/2010 | 24/06/2011 | I62011/052782 | |
| 2010PF01044 | 2010P01044EP | Europe | 06/07/2010 | 18/11/2010 | 10191769.4 | |
| 2010PF01044 | 2010P01044WO | PCT | 06/07/2010 | 05/07/2011 | I62011/052976 | |
| 2010PF00327 | 2010P00327 TW | Taiwan | 12/07/2010 | 11/07/2011 | 100124502 | |
| 2010PF00527 | 2010P00527WO | PCT | 12/07/2010 | 04/07/2011 | I62011/052938 | |
| 2010PF00716 | 2010P00716 TW | Taiwan | 12/07/2010 | 11/07/2011 | 100124465 | |
| 2010PF00716 | 2010P00716WO | PCT | 12/07/2010 | 06/07/2011 | I62011/052993 | |
| 2010PF00017 | 2010P00017WO | PCT | 28/07/2010 | 27/07/2011 | I62011/053153 | |
| 2010PF00924 | 2010P00924 TW | Taiwan | 09/08/2010 | 08/08/2011 | 100128245 | |
| 2010PF00924 | 2010P00924EP-01 | Europe | 09/08/2010 | 27/05/2011 | 11167806.2 | |
| 2010PF00924 | 2010P00924WO | PCT | 09/08/2010 | 04/08/2011 | I62011/053476 | |
| 2010PF00830 | 2010P00830 TW | Taiwan | 21/09/2010 | 19/05/2011 | 100133651 | |
| 2010PF00830 | 2010P00830WO | PCT | 21/09/2010 | 13/09/2011 | I62011/053594 | |
| 2010PF00823 | 2010P00823 TW | Taiwan | 22/09/2010 | 20/09/2011 | 100133822 | |
| 2010PF00823 | 2010P00823WO | PCT | 22/09/2010 | 19/09/2011 | I62011/054081 | |
| 2010PF01298 | 2010P01298EP | Europe | 03/12/2010 | 03/12/2010 | 10193850.8 | |
| 2010PF01298 | 2010P01298EP-01 | Europe | 03/12/2010 | 04/05/2011 | 11164718.6 | |
| 2010PF01298 | 2010P01298WO | PCT | 03/12/2010 | 02/12/2011 | I62011/055428 | |
| 2011PF00051 | 2011P00051EP | Europe | 18/02/2011 | 18/02/2011 | 11154964.6 | |
| 2011PF00243 | 2011P00243EP | Europe | 23/02/2011 | 23/02/2011 | 11155521.3 | |
| 2011PF00045 | 2011P00036EP | Europe | 19/04/2011 | 19/04/2011 | 11162954.5 | |
| 2011PF00456 | 2011P00456EP | Europe | 20/04/2011 | 20/04/2011 | 11163135.9 | |
| 2011PF00571 | 2011P00571EP | Europe | 30/05/2011 | 30/05/2011 | 11168099.7 | |
| 2011PF00572 | 2011P00572EP | Europe | 30/05/2011 | 30/05/2011 | 11168109.4 | |
| 2011PF00573 | 2011P00573EP | Europe | 22/06/2011 | 22/06/2011 | 11170972.1 | |
| 2011PF00561 | 2011P00561EP | Europe | 22/06/2011 | 22/06/2011 | 11170962.2 | |
| 2011PF00562 | 2011P00562EP | Europe | 22/06/2011 | 22/06/2011 | 11170962.0 | |
| 2011PF00727 | 2011P00727EP | Europe | 22/06/2011 | 22/06/2011 | 11170966.5 | |
| 2011PF01018 | 2011P01018 US | United States of America | 24/08/2011 | 24/08/2011 | 61/526721 | |
| 2011PF01047 | 2011P01047 US | United States of America | 10/10/2011 | 10/10/2011 | 61/545219 | |
| 2011PF01543 | 2011P01543 US | United States of America | 01/11/2011 | 01/11/2011 | 61/553984 | |
| 2010PF00834 | 2010P00834 US | United States of America | 09/11/2011 | 09/11/2011 | 61/557442 | |
| 2010PF00834 | 2010P00834 US01 | United States of America | 14/11/2011 | 14/11/2011 | 61/559300 | |

## Schedule C
## Licensed Know-How and Licensed Software

1. The Licensed Know-How is based on the 3D Technology, developed (i) by the former Philips incubator 3DSolutions and (ii) by the Philips Research organization in direct support of the former Philips incubator 3D Solutions and Philips' Intellectual Property & Standards organization, and implemented in several prototypes.

2. The Licensed Know-How includes:
   a) available technical documentation on product design, manufacturing process description and equipment specifications;
   b) available rendering firmware; and
   c) available 3D content creation software.

3. The Licensed Know-How will be provided "AS IS" and is handled over by enabling access for ULTRA-D's employees to the documentation, firmware and software relevant to the 3D Technology.

4. Details on the technical documentation on product designs, manufacturing process description and equipment specifications:
   a) all documentation which is available in archives including TPD archive, Software archive  complete with compilable and linkable source code, Departmental archive; and
   b) lens design software.

5. Details on rendering firmware:
   a) Firmware archive (including schematics of Hydra, Spartak, SpartakPlus, SpartakNext, SpartakNext-HDMI); and
   b) Firmware download tool.

6. Details on the 3D content creation software:
   a) Display Control Tool;
   b) Player API
   c) MediaPlayer9
   d) Settings API
   e) MediaSequencer
   f) WOWzone application
   g) WOWvx Player;
   h) WOWvx BlueBox Spacer;
   i) WOWvx BlueBox server
   j) WOWvx BlueBox configurator
   k) WOWvx BlueBox Compositor;
   l) BlueBox server configuration scripts
   m) DirectX visualize
   n) OpenGL control & visualiser
   o) B3D source filter
   p) 3DS MAX rendering plugin;
   q) Maya rendering plugin;
   r) Red Box; and

**A-713**

s) Description of the software
t) Documentation where available.

7. 3D prototype equipment and the use of 3D prototype equipment are not included in the Licensed Know-How. At the request of ULTRA-D and its Affiliates, Philips will enable ULTRA-D and its Affiliates to rent 3D prototype equipment owned by a Philips Affiliate and managed by Philips' Intellectual Property & Standards organization for use at the location such equipment is installed at reasonable conditions to be negotiated in good faith.

8. Equipment, prototype displays, components or other types of physical subjects are not included in the Licensed Know-How.

9. Philips remains the owner of the Licensed Know-How. Where available, a copy of the documentation, firmware and software in executable as well as in compilable source code form will be provided.

10. The hand-over period will end 6 months after the Effective Date of the Agreement.

CONFIDENTIAL

### Schedule D
### Royalty Rates

The following applies to the royalty rates for 3D Displays, 3D Rendering Boxes and Real-Time Conversion Software Products:

The applicable royalty rate of a particular quarter will be determined by calculating the rolling aggregate volume of such Licensed Products sold or otherwise disposed of by ULTRA-D or any of its Affiliates in the particular quarter plus the preceding three quarters. For the avoidance of doubt a quarter means January to March, April to June, July to September, October to December during each year.

1.    Royalty fee applicable to 3D Content

   5% on Total Net Turnover.

   "**Total Net Turnover**" shall mean all revenue generated by or for ULTRA-D or any of its Affiliates through the sale or other disposal of 3D Content less duties and sales taxes actually incurred by ULTRA-D and any of its Affiliates in relation to the 3D Content provided.

2.    Royalty fee applicable to 3D Displays (Euro per unit):

| 4 quarter volume | Size | | | | | | |
|---|---|---|---|---|---|---|---|
| | Up to 6" | 6"-9.9" | 10"-13.9" | 14"-18.9" | 20"-26.9" | 27"-36.9" | 37" and up |
| < 50,000 units | 1 | 2 | 3 | 5 | 7 | 9 | 12 |
| 50,001 <> 250,000 units | 0.7 | 1.4 | 2.1 | 3.5 | 4.9 | 6.3 | 8.4 |
| > 250,001 units | 0.5 | 1 | 1.5 | 2.5 | 3.5 | 4.5 | 6 |

3.    Royalty fee applicable to 3D Rendering Boxes:

| 4 quarter volume | |
|---|---|
| < 50,000 units | 9 |
| 50,001 <> 250,000 units | 6.3 |
| > 250,001 units | 4.5 |

4.    Royalty fee applicable to 3D Content Creation Tools:

10% of all net revenues generated by the import, export, sell, offer to sell, lease, operate, license, otherwise make available of other disposal of 3D Content Creation Tools by ULTRA-D or any of its Affiliates.

5.    Royalty fee applicable to Real-Time Conversion Software Products (Euro per unit):

CONFIDENTIAL

| 4 quarter volume | Product application | |
| --- | --- | --- |
| | TV, PC, notebook, Tablet PC | Others (e.g. smart phone, picture frame) |
| < 50,000 units | 1 | 0.5 |
| 50,001 <> 250,000 units | 0.5 | 0.3 |
| > 250,001 units | 0.25 | 0.2 |

**Schedule E**
**Royalty Reporting Form**

Koninklijke Philips Electronics N.V.
c/o Philips Intellectual Property & Standards
GSA and Licenses Administration Department
P.O. Box 220
5600 AE Eindhoven
The Netherlands
Fax no.: + 31 40 27 45267

Date:
Company name:
Manufacturing site:
City:
Country:

**Reference: Royalties**

This is to provide you with our royalty statement under the Technology Licensing
Agreement of [date] between our companies, which covers the relevant business of Licensed
Products for the [1st, 2nd, 3rd, 4th] calendar quarter of [year]. The total fee is to be calculated
in conformity with [reference].

| Licensed Product, (serial number) | Description | Applicable Royalty Rate | Calculation of Applicable Royalty Amount | | Total Royalty fee due in Euro |
|---|---|---|---|---|---|
| | | | | | |
| | | | | Gross amount due | |
| | | | | Less withholding tax (if applicable) | |
| | | | | Net amount due | |

I attest that the above is true, complete and accurate.

Signed on behalf of ULTRA-D
Name:
Title:

**A-717**

## Schedule F
## Payment Schedule

Pursuant to Section 4.1 a series of six non-refundable, non-recoupable payments amounting to a total of EUR 2,500,000 (two million and five hundred thousand Euros) shall be paid by ULTRA-D to Philips. The payments shall be due in accordance with the schedule set forth below and shall be payable with a payment term of 30 (thirty) calendar days.

"**Milestone 1**" means that ULTRA-D has sold, leased or otherwise disposed of its first type 3D Display.

"**Milestone 2**" means that ULTRA-D has sold, leased or otherwise disposed of its second type 3D Display. For the avoidance of doubt, second type of 3D Display shall mean a display with a different size or design as its first type 3D Display.

- Payment 1: EUR 100,000 (one hundred thousand Euros) upon the Effective date but only after initial approval of the Third Party Manufacturers; and

- Payment 2: EUR 100,000 (one hundred thousand Euros) within one (1) month after the Effective Date; and

- In the event, Milestone 1 has been met within 4 months after the Effective Date:

  Payment 3: EUR 300,000 (three hundred thousand Euros) within 4 months after the Effective Date; and

  Payment 4: EUR 500,000 (five hundred thousand Euros) within 9 months after the Effective Date

  OR

  In the event, Milestone 1 has not been met within 4 months after the Effective Date:

  Payment 3: EUR 300,000 (three hundred thousand Euros) at Milestone 1 but in any event no later than 7 months after the Effective Date; and

  Payment 4: EUR 500,000 (five hundred thousand Euros) within 5 months after Milestone 1 but in any event no later than 12 months after the Effective Date.

- In the event, Milestone 2 has been met within 3 months after Payment 4:

  Payment 5: EUR 500,000 (five hundred thousand Euros) within 3 months after Payment 4; and

  Payment 6: EUR 1,000,000 (one million Euros) within 6 months after Payment 4.

  OR

  In the event, milestone 2 has not been met:

**A-718**

Payment 5: EUR 500,000 (five hundred thousand Euros) at Milestone 2 but in any event no later than 18 months after the Effective Date; and

Payment 6: EUR 1,000,000 (one million Euros) within 3 months after Payment 5 but in any event no later than 21 months after the Effective Date.

Confidential

## AMENDMENT TO TECHNOLOGY LICENSE AGREEMENT

This amendment ("**Amendment**") is entered into on December **8**, 2014 ("**Signing Date**") and serves to amend the Technology License Agreement (the "**Agreement**") between Koninklijke Philips Electronics N.V. (now: Koninklijke Philips N.V.) ("**Philips**"), and Ultra-D Cooperative U.A. ("**ULTRA-D**"), dated December 8, 2011.

Philips and ULTRA-D are also referred to individually as a "**Party**" and collectively as the "**Parties**".

Any capitalized term used in this Amendment shall have the same meaning as ascribed to it in the Agreement.

## RECITALS

A.    The Parties each dispute each other's position with regard to the Agreement.

B.    The Parties wish to settle their disagreement and wish to amend the Agreement as set forth in this Amendment, subject to the provisions hereof.

A new clause 2.15 is hereby added to the Agreement, to read as follows:

2.15 (a) Parallel License Arrangements.

The Parties both acknowledge that for certain applications and uses of 3D technology, third party users may need to obtain a license under the Intellectual Property Rights related to 3D display technology, conversion and rendering technology and 3D video format of ULTRA-D ("**ULTRA-D Technology**") and under intellectual property rights related to 3D display technology of Philips ("**Philips Technology**"). The Parties both confirm their willingness to offer licenses under said respective intellectual property rights with respect to such applications and uses to third party users, on reasonable conditions.

In the event that ULTRA-D becomes engaged in negotiations with any third party regarding a license in respect of such applications and uses and it believes that the third party may also be using Philips Technology, it will notify Philips in writing about such third party. Philips may give its consent, which consent will not be unreasonably withheld, to ULTRA-D to point out to such third party that Philips also holds intellectual property rights relevant for such applications and uses.

After Signing Date, both Parties will agree upon a list of third parties to whom ULTRA-D will offer its products (including the Super Drive Train) and / or its license under the ULTRA-D Technology; and in any such offers ULTRA-D shall refer to the Philips Technology. It is

**A-720**

Confidential

intended to agree upon the list within 30 days after Signing Date. The list will be added as Schedule A – part II of this Amendment and may be amended from time to time.

Subsequently, Philips shall provide its standard license terms and conditions to ULTRA-D, thereby enabling ULTRA-D to show this to prospective licensees with whom ULTRA-D is engaged in license negotiations in respect to ULTRA-D Technology. ULTRA-D shall treat Philips' license terms and conditions as confidential information and ULTRA-D represents that the prospective licensee shall do the same. In the event the prospective licensee wishes to conclude parallel license arrangements with both ULTRA-D and Philips, ULTRA-D and Philips shall both negotiate a separate license with such third party. For the avoidance of doubt, all licenses under the Philips Technology will be negotiated between Philips and the prospective licensee. The conclusion and execution of such license agreement is the responsibility of Philips.

The Parties acknowledge that third parties are free to approach Philips concerning a license under the Philips Technology and/or Dolby concerning a license under the Dolby3D Technology directly. However, in the event that a third party is already engaged in negotiations relating to parallel license arrangements with both ULTRA-D and Philips, Philips will not discourage and will also ask Dolby not to discourage such third party from concluding a license agreement with ULTRA-D. In the event that either Party determines that parallel license arrangements are no longer a viable business option, that Party has the right to terminate the parallel license arrangements and has the right to approach the third party separately concerning a license under its technology. Such Party shall inform the other Party in writing about such termination and upon such termination, such third party will be removed from Schedule A part II.

### 2.15(b) Support.

In the event a third party has obtained a separate technology license from both ULTRA-D and Philips, ULTRA-D shall provide technical support to such third party as necessary and as agreed between ULTRA-D and such third party. Philips shall not provide such technical support, unless ULTRA-D and Philips agree otherwise.

### 2.15(c) Super Drive Train License.

In the event that a third party wishes to conclude parallel license arrangements with ULTRA-D and Philips, ULTRA-D shall develop a conversion and rendering implementation ("**Super Drive Train**"), consisting of ULTRA-D algorithms, that shall be compatible with the Dolby3D format. The Super Drive Train shall be included in the ULTRA-D Technology as licensed to third parties which are engaged in parallel license agreement with both ULTRA-D and Philips.

In the event that a third party, which is engaged in parallel license arrangements with both ULTRA-D and Philips, informs ULTRA-D that it is not willing to accept a drive train which is compatible with the Dolby3D format, Philips may, at its sole discretion and without prejudice to its prior contractual commitments, decide to proceed with the parallel license arrangements

Confidential

excluding the Dolby3D format and to offer a license under the Philips Technology; such decision to proceed not to be withheld unreasonably.

Schedule F to the Agreement is hereby amended and shall now read as:

Pursuant to Section 4.1, a series of non-refundable, non-recoupable payments amounting to a total of EUR 2,500,000 (two million and five hundred thousand Euros) shall be paid by ULTRA-D to Philips allocated as twenty percent (20%) for each three year segment ("**Segment**") of the fifteen (15) year term as set forth in section 5.1 of the Agreement.

It is confirmed that prior to the Signing Date, ULTRA-D has already made payments to an amount that totals EUR 500,000 (five hundred thousand Euros) plus 19% VAT amounting to EUR 595,000 (five hundred and ninety-five thousand Euros).

ULTRA-D shall pay the remaining amount of EUR 2,000,000 (two million Euros) it allocates for the second through fifth Segments in accordance with the schedule set forth below:

[a] Payment of EURO 1,000,000 (one million Euros), which will be payable as follows:

- [a1] EUR 250,000 (two hundred fifty thousand Euros) within 30 days after payment of the balance of the Interest as defined below ;

- [a2] EUR 250,000 (two hundred fifty thousand Euros) within 30 days after payment a1;

- [a3] EUR 250,000 (two hundred fifty thousand Euros) within 30 days after payment a2; and

- [a4] EUR 250,000 (two hundred fifty thousand Euros) within 30 days after payment a3.

[b] Payment of EUR 1,000,000 (one million Euros) after commencement of Production by ULTRA-D (as defined below), which will be payable as follows

- [b1] EUR 250,000 within 30 days after commencement of Production;

- [b2] EUR 250,000 (two hundred fifty thousand Euros) within 30 days after payment b1;

- [b3] EUR 250,000 (two hundred fifty thousand Euros) within 30 days after payment b2; and

- [b4] EUR 250,000 (two hundred fifty thousand Euros) within 30 days after payment b3.



**A-722**

Confidential

For the purposes of this Amendment, "**Production**" shall mean sale with delivery of an
aggregate of sixty five thousand (65,000) units of an ULTRA-D Technology-based 3D displays.
Free of charge samples with sales value of 0 (zero) euro shall be excluded from the aggregated
volume.

Upon signature of this Amendment, Philips will cancel the previously issued invoices numbered
201290194, 201390138, and 201390186 and issue a credit invoice to ULTRA-D.

For each of the new payments outlined above, Philips will issue an invoice to ULTRA-D
excluding VAT.

Further arrangements:

**Payment of Interest.** By way of compromise as regards to Philips' claim for interest under the
Agreement on the outstanding amount of EUR 2,000,000 (two million Euros), the Parties agree
on a payment by ULTRA-D to Philips of the sum of EUR 250,000 (two hundred fifty thousand
Euros) ("**Interest**") of which EUR 100,000 has been received by Philips at Signing Date.
ULTRA-D agrees to pay the balance of Interest within 10 days after the Signing Date. The
payment of Interest shall not include VAT. The payment of the Interest by ULTRA-D shall not
be construed as an acknowledgement by ULTRA-D, whether implied or otherwise, of any breach
under the Agreement.

**Remedies.** In the event ULTRA-D fails to comply with any payment by any of the dates set forth
in Schedule F, this Amendment shall automatically become null and void. Without prejudice to
any other remedy Philips may be lawfully entitled to, Philips shall be entitled to any and all
remedies Philips may have under the Agreement.

**Assignment.** Philips hereby provides consent, under Section 11, specifically 11.1 of the
Agreement, to the assignment of the entire Agreement and this entire Amendment from ULTRA-
D to ULTRA-D Ventures, C.V. a company created under the laws of Curacao with a principal
registered office at Abraham de Veerstraat #2, Curacao (to registered agent Vistra (Curacao),
N.V.), which company has been and continues to be an Affiliate of ULTRA-D from the outset of
the Agreement.  Hereafter, all references in the Agreement and this Amendment to "ULTRA-D"
shall refer to ULTRA-D Ventures, CV and no longer ULTRA-D Cooperative U.A. By its
signature below, ULTRA-D Ventures, CV will be bound by the rights and obligations of
ULTRA-D in the Agreement and amendments thereto including this Amendment. Other than
such assignment as specified no further assignments are permitted without the written consent of
Philips as provided in Section 11.1 of the Agreement.  A separate writing will also confirm such
assignment.



**A-723**

Confidential

**Royalties.** The Parties hereby agree to amend the royalty rates as set out in Schedule D of the Agreement. Schedule D of the Agreement shall now read as attached to this Amendment.

Added to Section 4.2 of the Agreement shall be:

In the event that ULTRA-D sells Licensed Products to a third party that already holds a royalty-bearing license under the Licensed Technology, ULTRA-D shall request Philips in writing to confirm whether such third party already holds a license under the Licensed Technology and whether the Licensed Products are covered by that license. In the event Philips confirms that the third party has a royalty bearing license under the Licensed Technology covering the Licensed Products, the sales of such Licensed Products from ULTRA-D to that specific third party shall not be royalty bearing under this Agreement as long as the license agreement between the third party and Philips exists. For avoidance of doubt: ULTRA-D shall report on all Licensed Products sold and/or otherwise disposed of to third parties having a royalty bearing license under the Licensed Technology from Philips in accordance with Section 4.2.

Two years after Signing Date, Parties will convene to review whether it is appropriate to adjust the royalty rates as described in Schedule D.

**Licensed Patents.** The Parties hereby agree to amend the patent list as set out in Schedule B of the Agreement. Schedule B of the Agreement shall now read as attached to this Amendment.

**Sale of Licensed Patents.** In the event that Philips decides to sell the Licensed Patents ("**Sale**"), it shall inform ULTRA-D in writing and shall provide ULTRA-D with written information that is relevant to evaluate such sale (such relevant information hereinafter called "**Sale Information**"). Philips may also inform other third parties about such sale. ULTRA-D shall have the option to submit an offer to acquire the Licensed Patents ("**Option**"), such Option to be exercised by written notice to Philips within fourteen (14) business days after receipt of Philips' written Sale Information. If ULTRA-D exercise its Option to submit an offer within such fourteen (14) business days, Philips shall consider the offer made by ULTRA-D in reasonable comparison to the offers made by third parties. Notwithstanding anything to the contrary herein, (a) Sale Information shall contain no less information than given to third parties about the sale and (b) the time to exercise the Option shall be a minimum of fourteen (14) business days as provided but in no event be less than the time given to third parties to submit an offer or reoffer.

**Notices.** Section 10.1 of the Agreement shall be supplemented to add addresses for notices to ULTRA-D shall also include hereafter notice to:

Stream TV Networks Inc.
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103

**A-724**



Confidential

Attention: Raja Rajan, Esquire

And a copy to:
DLA Piper Nederland N.V.
Amstelveenseweg 638
1081 JJ Amsterdam
P.O. Box 75258
1070 AG Amsterdam
The Netherlands
Attention: to Paulus Merks Reference: Stream TV Networks, Inc/ULTRA-D

Except as explicitly varied in this Amendment, all provisions of the Agreement shall remain in full force and effect.

AS WITNESS, the Parties have caused this Amendment to be signed on the date first written above.

**Koninklijke Philips N.V.**

0 9 DEC. 2014

Name: Brian Hinman
Title: Chief Intellectual Property Officer

**ULTRA-D Cooperatief U.A.**

Name: RAJA RAJAN
Title: Authorized Director

**ULTRA-D Ventures, C.V.**

Name: RAJA RAJAN
Title: Member Management / Board



**A-725**

Confidential

## Schedule A II to Amendment

Companies of Schedule A to be included within 30 days after Signing Date for the Super Drive
Train License Approach.



Confidential

## Schedule B

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 1994PF00694 | 1994PC0094MVEFR | FR | Granted | 1994-sep-09 | 1995-sep-01 | 2003-jan-08 | 9502859B.2 | 0734314-A1 | 0734314 |
| 1994PF00694 | 1994PC0094WOKR | KR | Granted | 1994-sep-09 | 1995-sep-01 | 2003-nov-20 | 96-702194 | 96-0705666 | 409874 |
| 1994PF00694 | 1994PC0094WODE | DE | Granted | 1994-sep-09 | 1995-sep-01 | 2003-jan-08 | 59508598.2 | 0734314-A1 | 695203334.6 |
| 1994PF00694 | 1994PC0094 US | US | Granted | 1994-sep-09 | 1995-sep-08 | 2000-okt-24 | 08/525045 | | 7123505 |
| 1994PF00694 | 1994PC0094WOJP | JP | Granted | 1994-sep-09 | 1995-sep-01 | 2006-jun-23 | 98-509352 | 57-306554 | 3818520 |
| 1994PF00694 | 1994PC0694 US01 | US | Granted | 1994-sep-09 | 1995-sep-08 | 2011-dec-06 | 11/458710 | 2004-0234318-A1 | 8069701 |
| 1994PF00694 | 1994PC0694WOOCN | CN | Granted | 1994-sep-09 | 1995-sep-01 | 2002-apr-08 | 95191083.9 | 1137247-A | 95193063.3 |
| 1994PF00694 | 1994PC0094WOEGB | GB | Granted | 1994-sep-09 | 1995-sep-01 | 2003-jan-08 | 95928598.2 | 0734314-A1 | 0734314 |
| 1995PF00260 | 1995PC0260WOEFR | FR | Granted | 1995-jul-05 | 1996-jun-12 | 2001-okt-17 | 98914378.3 | 0783825-A1 | 0783825 |
| 1995PF00260 | 1995PC0260 US | US | Granted | 1995-jul-05 | 1996-jun-25 | 2003-sep-12 | 08/670377 | | 6118584 |
| 1995PF00260 | 1995PC0260WOEGB | GB | Granted | 1995-jul-05 | 1996-jun-12 | 2001-okt-17 | 96914378.3 | 0783825-A1 | 0783825 |
| 1995PF00260 | 1995PC0260WOXKR | KR | Granted | 1995-jul-05 | 1996-jun-12 | 2004-jan-29 | 97-701421 | 97-0705907 | 0418168 |
| 1995PF00260 | 1995PC0260WOOJP | JP | Granted | 1995-jul-05 | 1996-jun-12 | 2007-sep-14 | 97-504558 | 98-505689 | 4010564 |
| 1995PF00260 | 1995PC0260WODE | DE | Granted | 1995-jul-05 | 1996-jun-12 | 2001-okt-17 | 96914378.3 | 0783825-A1 | 69616006.4 |
| 1995PF00705 | 1995PC0705WODE | DE | Granted | 1995-dec-19 | 1996-dec-09 | 2002-jun-12 | 96939278.3 | 0809913-A1 | 69621778.3 |
| 1995PF00705 | 1995PC0705WOEGB | GB | Granted | 1995-dec-19 | 1996-dec-09 | 2002-jun-12 | 96939278.3 | 0809913-A1 | 0809913 |
| 1995PF00705 | 1995PC0705WOXKR | KR | Granted | 1995-dec-19 | 1996-dec-09 | 2004-aug-11 | 97-705734 | 10-1998-07002317 | 0445209 |
| 1995PF00705 | 1995PC0705 US | US | Granted | 1995-dec-19 | 1998-dec-18 | 1999-jul-27 | 08/768484 | | 5929859 |
| 1995PF00705 | 1995PC0705WOEFR | FR | Granted | 1995-dec-19 | 1996-dec-09 | 2002-jun-12 | 96939278.3 | 0809913-A1 | 0809913 |
| 1995PF00705 | 1995PC0705WOOJP | JP | Granted | 1995-dec-19 | 1996-dec-09 | 2008-okt-16 | 97-521624 | 99-501188 | 4192060 |
| 1996PF00711 | 1996PC0711EPFR | FR | Granted | 1996-feb-23 | 1997-feb-13 | 2003-jan-22 | 97030269.0 | 0791847-A1 | 0791847 |
| 1996PF00711 | 1996PC0711EPGB | GB | Granted | 1996-feb-23 | 1997-feb-13 | 2003-jan-22 | 97300269.0 | 0791847-A1 | 0791847 |
| 1996PF00711 JP | 1996PC0711 JP | JP | Granted | 1996-feb-23 | 1997-feb-24 | 2007-apr-06 | 97-38896 | 57-236777 | 3940456 |
| 1996PF00711 | 1996PC0711EP01 | DE | Granted | 1996-feb-23 | 1997-feb-13 | 2003-jan-22 | 97200269.0 | 0791847-A1 | 69716534.6 |
| 1996PF00711 | 1996PC0711 #P04 | JP | Granted | 1996-feb-23 | 1997-feb-24 | 2013-sep-30 | 2011-231483 | | 5307046 |
| 1996PF00711 | 1996PC0711 KR | KR | Granted | 1996-feb-23 | 1997-feb-24 | 2004-apr-14 | 97-6180 | | 0429091 |
| 1996PF00711 | 1996PC0711 #PC1 | JP | Granted | 1996-feb-23 | 1997-feb-24 | 2000-jan-30 | 07-034244 | C7-188097 | 4253345 |
| 1996PF00711 | 1996PC0711 #P03 | JP | Granted | 1996-feb-23 | 1997-feb-24 | 2011-dec-16 | 2010-240303 | | 4885300 |
| 1996PF00711 | 1996PC0711 US | US | Granted | 1996-feb-13 | 1997-feb-22 | 2000-mei-16 | 08/798678 | | 6064404 |
| 1996PF00711 | 1996PC0711 #PC2 | JP | Granted | 1996-feb-23 | 1997-feb-24 | 2011-jan-07 | 08-368132 | 09-051771 | 4659080 |
| 1996PF00072 | 1996PC0072WEGB | GB | Granted | 1996-nov-14 | 1997-okt-13 | 2004-apr-14 | 97942158.1 | 0877966-A1 | 0877966 |
| 1996PF00072 | 1996PC0072WENL | NL | Granted | 1996-nov-14 | 1997-okt-13 | 2004-apr-14 | 97942159.1 | 0877966-A1 | 0877966 |
| 1996PF00072 | 1996PC0072WEDE | DE | Granted | 1996-nov-14 | 1997-okt-13 | 2004-apr-14 | 97942159.1 | 0877966-A1 | 69738647.9 |
| 1996PF00072 | 1996PC0072 US | US | Granted | 1996-nov-14 | 1997-nov-06 | 2000-mei-30 | 08/964103 | | 6069950 |
| 1996PF00072 | 1996PC0072WEFR | FR | Granted | 1996-nov-14 | 1997-okt-13 | 2004-apr-14 | 97942159.1 | 0877966-A1 | 0877966 |
| 1997PF00656 | 1997PC0656WEGB | GB | Pending | 1997-jul-23 | 1998-jul-09 | | 98926497.1 | 0934546-A1 | |
| 1997PF00656 | 1997PC0656WE | | Pending | 1997-jul-23 | 1996-jul-09 | | 98926497.1 | 0934546-A1 | |
| 1997PF00656 | 1997PC0656WODE | DE | Pending | 1997-jul-23 | 1998-jul-09 | | 98926497.1 | 0934546-A1 | |
| 1997PF00656 | 1997PC0656WOKR | KR | Granted | 1997-jul-23 | 1998-jul-09 | 2006-jan-25 | 10-1999-7002258 | 10-2000-0266579 | 0548462 |
| 1997PF00656 | 1997PC0656WOJP | JP | Granted | 1997-jul-23 | 1998-jul-09 | 2008-nov-07 | 99-503574 | 03-503073 | 4213226 |
| 1997PF00656 | 1997PC0656 US | US | Granted | 1997-jul-23 | 1998-jul-21 | 2004-okt-05 | 09/119091 | | 6801243 |
| 1997PF00656 | 1997PC0656WEFR | FR | Pending | 1997-jul-23 | 1998-jul-09 | | 98928497.1 | 0934546-A1 | |
| 1998PF00571 | 1998PC0571WOKR | KR | Granted | 1998-jun-30 | 1999-jun-14 | 2006-okt-17 | 10-2001-7001924 | 10-2001-0233190 | 10-0637612 |
| 1998PF00571 | 1998PC0571 US | US | Granted | 1998-jun-30 | 1998-jun-30 | 1998-jun-30 | 09/107918 | | 6496183 |
| 1998PF00571 | 1998PC0571WOJP | JP | Granted | 1998-jun-30 | 1999-jun-14 | 2002-dec-17 | 08/107918 | 02-519792 | 4364434 |
| 1998PF00571 | 1998PC0571WODE | DE | Granted | 1998-jun-30 | 1999-jun-14 | 2003-nov-06 | 99922458.7 | 3038271-A1 | 69912576.6 |
| 1998PF00571 | 1998PC0571WOOCN | CN | Granted | 1998-jun-30 | 1999-jun-14 | 2004-okt-24 | 99801455.9 | 1277098-A | 998014559 |
| 1998PF00571 | 1998PC0571WEFR | FR | Granted | 1998-jun-30 | 1999-jun-14 | 2003-nov-05 | 99922458.7 | 3038271-A1 | 1036271 |
| 1998PF00571 | 1998PC0571WEGB | GB | Granted | 1998-jun-30 | 1999-jun-14 | 2005-nov-05 | 99922458.7 | 3038271-A1 | 1036271 |
| 1998PF00571 | 1998PC0571 TW | TW | Granted | 1998-jun-30 | 2000-feb-03 | 2003-apr-22 | 089101389.1 | | 198772 |
| 1999PF01459 | 1999PC01459WE | | Pending | 1999-mrt-31 | 2000-mei-09 | | 00907672.0 | 1082702-A1 | |
| 1999PF01459 | 1999PC01459 US | US | Granted | 1999-mrt-31 | 2000-mrt-24 | 2003-sep-23 | 09/534208 | | 6625304 |
| 2000PF01555 | 2000PC01555WOCN | CN | Granted | 2000-mei-19 | 2001-apr-26 | 2005-abr-17 | 01801323.X | 1361344-A | 01801323.X |
| 2000PF01555 | 2000PC01555WODE | DE | Granted | 2000-mei-19 | 2001-mei-19 | 2005-jun-25 | 01933456.1 | | 60111463.9 |
| 2000PF01555 | 2000PC01555WOKR | KR | Granted | 2000-mei-19 | 2001-apr-26 | 2006-feb-22 | 10-2002-7000734 | | 10-0806395 |
| 2000PF01555 | 2000PC01555WOJP | JP | Granted | 2000-mei-19 | 2001-apr-26 | 2011-jun-14 | 01-586928 | 2003-534742 | 4663201 |
| 2000PF01555 | 2000PC01555WEFR | FR | Granted | 2000-mei-19 | 2001-mei-19 | 2006-jul-12 | 01833456.1 | | 1290895 |
| 2000PF01555 | 2000PC01555 WE | US | Granted | 2000-mei-19 | 2001-mei-07 | 2003-jan-03 | 09/630349 | 2002-0009711-A1 | 6985604 |
| 2000PF01555 | 2000PC01555WEGB | GB | Granted | 2000-mei-19 | 2001-apr-28 | 2006-jul-12 | 01833456.1 | | 1290895 |
| 2000PF01864 | 2000PC01864 US | US | Granted | 2000-dec-30 | 2001-dec-13 | 2004-sep-07 | 10/024401 | 2002-0108457-A1 | 6787987 |
| 2001PF01733 | 2001PC01733WE | | Pending | 2001-mei-17 | 2002-mei-16 | | 02727928.0 | 1402477-A | |
| 2001PF01733 | 2001PC01733WOKR | KR | Granted | 2001-mei-17 | 2002-mei-16 | 2010-jan-13 | 10-2003-7000756 | | 10-0937882 |
| 2001PF01733 | 2001PC01733WOCN | CN | Granted | 2001-mei-17 | 2002-mei-16 | 2009-aug-19 | 02801721.8 | 1468323-A | 02801721.8 |
| 2001PF01733 | 2001PC01733 US | US | Granted | 2001-mei-17 | 2002-mei-16 | 2008-sep-30 | 10/149703 | 2003-0035583-A1 | 7130277 |
| 2001PF01725 | 2001PC01725 KR | KR | Granted | 2001-okt-11 | 2002-sep-18 | 2011-feb-16 | 10-2010-7004320 | | 10-1018876 |
| 2001PF01725 | 2001PC01725WOKR | KR | Granted | 2001-okt-11 | 2002-sep-18 | 2012-jul-10 | 10-2004-7005082 | | 10-1160245 |
| 2001PF01725 | 2001PC01725WOCN | CN | Granted | 2001-okt-11 | 2002-sep-18 | 2010-jun-30 | 02820017.9 | 1568024-A | 02820017.9 |
| 2001PF01725 | 2001PC01725 US | US | Granted | 2001-okt-11 | 2002-okt-08 | 2002-okt-08 | 10/267060 | | 7187344 |
| 2001PF01725 | 2001PC01725WOEGB | GB | Granted | 2001-okt-11 | 2002-sep-18 | 2013-jan-26 | 02765271.8 | | 1436865 |
| 2001PF01725 | 2001PC01725WODE | DE | Granted | 2001-okt-11 | 2002-sep-18 | 2013-jan-26 | 02765271.8 | | 60229589.9 |
| 2001PF01725 | 2001PC01725WEFR | FR | Granted | 2001-okt-11 | 2002-sep-18 | 2011-jun-26 | 02765271.8 | | 1436865 |
| 2001PF01725 | 2001PC01725WOJP | JP | Granted | 2001-okt-11 | 2002-sep-18 | 2006-jun-27 | 03-537183 | 05-506778 | 4145794 |
| 2002PF01063 | 2002PC0063WOU5 | US | Granted | 2002-jan-07 | 2002-dec-09 | 2007-jan-23 | 10/500350 | 2005-0093852-A1 | 7167388 |
| 2002PF01063 | 2002PC0063WEDE | DE | Granted | 2002-jan-07 | 2002-dec-09 | 2010-jul-21 | 02765855.4 | | 60237113.9 |





**A-727**

Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2002PF01063 | 2002PO1063WEVES | US | Granted | 2002-jan-07 | 2002-dec-09 | 2010-jul-21 | 02785858.4 | | 1446301 |
| 2002PF01063 | 2002PO1063WOIPR | EA | Granted | 2002-jan-07 | 2002-dec-09 | 2009-sep-11 | 10-2004-7010567 | | 10-0918007 |
| 2002PF01063 | 2002PO1063WEIT | IT | Granted | 2002-jan-07 | 2002-dec-09 | 2010-jul-21 | 02785858.4 | | 1446301 |
| 2002PF01063 | 2002PO1063WEGB | GB | Granted | 2002-jan-07 | 2002-dec-09 | 2010-jul-21 | 02785858.4 | | 1446301 |
| 2002PF01063 | 2002PO1063WOCN | CN | Granted | 2002-jan-07 | 2002-dec-09 | 2007-mrt-07 | 02829402.9 | 3833082-A | 02829402.9 |
| 3002PF01063 | 2002PO1063WOJP | JP | Granted | 2002-jan-07 | 2002-dec-09 | 2009-jun-12 | 2003-558794 | | 4322121 |
| 3002PF01063 | 2002PO1063WEFR | FR | Granted | 2002-jan-07 | 2002-dec-09 | 2010-jul-21 | 02785858.4 | | 1446301 |
| 2002PF01190 | 2002PO1190WOCN | CN | Granted | 2002-feb-20 | 2002-feb-20 | 2008-nov-05 | 03804133.9 | 1751239-A | 03804233.9 |
| 2002PF01190 | 2002PO1190WOJP | JP | Granted | 2002-feb-20 | 2003-feb-06 | 2011-mei-13 | 05-517991 | 05-517991 | 4739676 |
| 2002PF01190 | 2002PO1190WEFR | FR | Granted | 2002-feb-20 | 2003-feb-06 | 2013-jul-17 | 03700453.8 | 1478964-A | 1478964 |
| 2002PF01190 | 2002PO1190WEDE | DE | Granted | 2002-feb-20 | 2003-feb-06 | 2013-jul-17 | 03700453.8 | 1478964-A | 603 44 503.9 |
| 2002PF01190 | 2002PO1190WEGB | GB | Granted | 2002-feb-20 | 2003-feb-06 | 2013-jul-17 | 03700453.8 | 1478964-A | 1478964 |
| 2002PF01190 | 2002PO1190WVOUS | US | Granted | 2002-feb-20 | 2003-feb-06 | 2007-dec-11 | 10/505490 | 2005-0253779-A1 | 7307672 |
| 2002PF01190 | 2002PO1190WOKR | KR | Granted | 2002-feb-20 | 2003-feb-06 | 2010-apr-02 | 10-2004-7012873 | | 10-0952184 |
| 2002PF01190 | 2002PO1190WEIR | IR | Granted | 2002-feb-20 | 2003-feb-06 | 2013-jul-17 | 03700453.8 | 1478964-A | 1478964 |
| 2002PF01946 | 2002PO1946WOCN | CN | Granted | 2002-jul-05 | 2003-jun-18 | 2009-dec-02 | 03818185.6 | 1666142-A | 03818185.6 |
| 2002PF01946 | 2002PO1946WOUS | US | Granted | 2002-jul-05 | 2003-jun-18 | 2008-jul-01 | 10/520339 | 2005-0254113-A1 | 7394506 |
| 2002PF01946 | 2002PO1946WOJP | JP | Granted | 2002-jul-05 | 2003-jun-18 | 2011-jun-10 | 04-519042 | | 4758099 |
| 2002PF01946 | 2002PO1946WOKR | KR | Granted | 2002-jul-05 | 2003-jun-18 | 2011-feb-14 | 10-2005-7000370 | | 10-1016250 |
| 2002PF01946 | 2002PO1946WE | | Pending | 2002-jul-05 | 2003-jun-18 | | 03702829.4 | 1525530-A | |
| 2002PF00533 | 2002PO0533WE | | Granted | 2002-jul-31 | 2003-jul-09 | 2014-sep-10 | EP03740961.2 | 1527613-A | 1527613 |
| 2002PF00533 | 2002PO0533WOKR | KR | Granted | 2002-jul-31 | 2003-jul-09 | 2011-jun-30 | 10-2005-7001747 | | 10-1008525 |
| 2002PF00533 | 2002PO0533WEIT | IT | Granted | 2002-jul-31 | 2003-jul-09 | 2014-sep-10 | EP03740961.2 | 1527613-A | 1527613 |
| 2002PF00533 | 2002PO0533WEFR | FR | Granted | 2002-jul-31 | 2003-jul-09 | 2014-sep-10 | EP03740961.2 | 1527613-A | 1527613 |
| 2002PF00533 | 2002PO0533WOUS | US | Granted | 2002-jul-31 | 2003-jul-09 | 2010-sep-18 | 10/522464 | 2006-0021950-A1 | 7804886 |
| 2002PF00533 | 2002PO0533WEES | ES | Granted | 2002-jul-31 | 2003-jul-09 | 2014-sep-10 | EP03740961.2 | 1527613-A | 1527613 |
| 2002PF00533 | 2002PO0533 US | US | Granted | 2002-jul-31 | 2010-aug-18 | 2012-sep-18 | 12/858499 | 2011-0058604-A1 | 8270477 |
| 2002PF00533 | 2002PO0533WEDE | DE | Granted | 2002-jul-31 | 2003-jul-09 | 2014-sep-10 | EP03740961.2 | 1527613-A | 603 46 732.5 |
| 2002PF00533 | 2002PO0533WOJP | JP | Granted | 2002-jul-31 | 2003-jul-09 | 2011-jan-15 | 03818215.7 | 1672432 | 03818215.7 |
| 2002PF00533 | 2002PO0533WEGB | GB | Granted | 2002-jul-31 | 2003-jul-09 | 2014-sep-10 | EP03740961.2 | 1527613-A | 1527613 |
| 2002PF00533 | 2002PO0533WOJP | JP | Granted | 2002-jul-31 | 2003-jul-09 | 2012-mrt-23 | 04-521649 | 05-535203 | 4954473 |
| 2002PF00533 | 2002PO0533WEIR | IR | Granted | 2002-jul-31 | 2003-jul-09 | 2014-sep-10 | EP03740961.2 | 1527613-A | 1527613 |
| 2002PF02536 | 2002PO2536WEIDE | DE | Granted | 2002-okt-22 | 2003-okt-20 | 2013-feb-16 | 03751150.8 | | 60336073.4 |
| 2002PF02536 | 2002PO2536WEINL | NL | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WOCN | CN | Granted | 2002-okt-22 | 2003-okt-20 | 2012-mrt-07 | 2003801818133.X | 1706223-A | 2003801818133.X |
| 2002PF02536 | 2002PO2536WEIT | IT | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | 2813061D | 1557072 |
| 2002PF02536 | 2002PO2536WOHN | IN | Granted | 2002-okt-22 | 2003-okt-20 | 2008-jun-23 | 660/CHENP/2005 | | 221424 |
| 2002PF02536 | 2002PO2536WORU | RU | Granted | 2002-okt-22 | 2003-okt-20 | 2008-apr-10 | 2005115489 | 05-115469-A | 2321957 |
| 2002PF02536 | 2002PO2536WEDK | DK | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536 JP01 | JP | Granted | 2002-okt-22 | 2003-okt-20 | 2014-apr-15 | 2012-25145 | | 5529183 |
| 2002PF02536 | 2002PO2536WEIR | IR | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | TR20110093474 |
| 2002PF02536 | 2002PO2536WOJP | JP | Granted | 2002-okt-22 | 2003-okt-20 | 2012-apr-20 | 2004-546276 | | 4975250 |
| 2002PF02536 | 2002PO2536WEAT | AT | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | E498981 |
| 2002PF02536 | 2002PO2536WEFR | FR | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WEIT | IT | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WOBR | BR | Pending | 2002-okt-22 | 2003-okt-20 | | PI 0315552-8 | | |
| 2002PF02536 | 2002PO2536WOBE | BE | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WECH | CH | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536 US01 | US | Pending | 2002-okt-22 | 2013-feb-11 | | 13/763755 | US-2013-0148710-A1 | |
| 2002PF02536 | 2002PO2536WEGB | GB | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WEES | ES | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WEFI | FI | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WEGR | GR | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WESE | SE | Granted | 2002-okt-22 | 2003-okt-20 | 2011-feb-16 | 03751150.8 | | 1557072 |
| 2002PF02536 | 2002PO2536WOKR | KR | Granted | 2002-okt-22 | 2003-okt-20 | 2011-mei-26 | 10-2005-7006736 | | 10-1038442 |
| 2002PF02536 | 2002PO2536WOUS | US | Granted | 2002-okt-22 | 2003-okt-20 | 2013-mrt-05 | 10/532825 | 2006-0015826-A1 | 8391371 |
| 2002PF02733 | 2002PO0733WOJP | JP | Granted | 2002-okt-23 | 2003-okt-01 | 2010-apr-02 | 04-544337 | 06-513586 | 4485851 |
| 2002PF02733 | 2002PO0713WOCN | CN | Granted | 2002-okt-23 | 2003-okt-01 | 2010-jan-20 | 2003801018174.6 | 1798266 | 2003801018174.6 |
| 2002PF02733 | 2002PO0713WOKR | KR | Granted | 2002-okt-23 | 2003-okt-01 | 2010-mei-20 | 10-2005-7006878 | | 10-0960254 |
| 2002PF02733 | 2002PO0713WEDE | DE | Granted | 2002-okt-23 | 2003-okt-01 | 2013-mrt-13 | 03809395.3 | 1574079-A | 60340527.0 |
| 2002PF02733 | 2002PO0713WOUS | US | Granted | 2002-okt-23 | 2003-okt-01 | 2007-mrt-29 | 10/531935 | 2006-0082575-A1 | 7224355 |
| 2002PF02733 | 2002PO0713WEFR | FR | Granted | 2002-okt-23 | 2003-okt-01 | 2013-mrt-13 | 03809395.3 | 1574079-A | 1574079 |
| 2002PF02733 | 2002PO0713WEGB | GB | Granted | 2002-okt-23 | 2003-okt-01 | 2013-mrt-13 | 03809395.3 | 1574079-A | 1574079 |
| 2002PF09021 | 2002PO9021WE | | Pending | 2002-dec-30 | 2003-dec-24 | | 03778631.1 | 1582074-A | |
| 2002PF09021 | 2002PO9021WOJP | JP | Granted | 2002-dec-30 | 2003-dec-24 | 2010-mei-14 | 04-563003 | 06-512833 | 4508476 |
| 2002PF09021 | 2002PO9021WOCN | CN | Granted | 2002-dec-30 | 2003-dec-24 | 2012-mrt-08 | 2003804079903.X | 1745586-A | 2003804079903.X |
| 2002PF09021 | 2002PO9021WOUS | US | Granted | 2002-dec-30 | 2003-dec-24 | 2010-mrt-30 | 10/540272 | 2006-0076180-A1 | 7689031 |
| 2003PF01070 | 2003PO1070WOHN | IN | Pending | 2003-jan-17 | 2003-dec-30 | | 1595/CHENP/2005 | | |
| 2003PF01070 | 2003PO1070WOKR | KR | Granted | 2003-jan-17 | 2003-dec-30 | 2011-jul-29 | 10-2005-7013149 | | 10-1054274 |
| 2003PF01070 | 2003PO1070WOUS | US | Granted | 2003-jan-17 | 2003-dec-30 | 2013-dec-03 | 10/541137 | 2006-0056679-A1 | 8599409 |
| 2003PF01070 | 2003PO1070WE | | Pending | 2003-jan-17 | 2003-dec-30 | | 03768071.7 | 1588323-A | |
| 2003PF01129 | 2003PO1129WOCN | CN | Granted | 2003-jan-30 | 2003-dec-16 | 2009-jun-17 | 2003801019377.0 | 1745586-A | 2003801019377.0 |
| 2003PF01129 | 2003PO1129WOJP | JP | Granted | 2003-jan-30 | 2003-dec-16 | 2013-nov-11 | 04-567473 | 06-514455 | 4860156 |

A-728



Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2003FF01129 | 2003F00123WOKN | IN | Granted | 2003-jan-30 | 2003-dec-16 | 2006-aug-20 | 01732/CHENP/05 | | 222685 |
| 2003FF01129 | 2003F01129 US01 | US | Pending | 2003-jan-30 | 2003-dec-16 | | 13/184928 | US-2013-0330979-A1 | |
| 2003FF01129 | 2003F0112PWOKR | XR | Granted | 2003-jan-30 | 2003-dec-16 | 2010-nov-11 | 10-2005-7014039 | | 10-0994347 |
| 2003FF01129 | 2003F0112PWOUS | US | Granted | 2003-jan-30 | 2003-dec-16 | 2011-aug-03 | 10/543434 | 2006-0148269-A1 | 8006348 |
| 2003FF01129 | 2003P01129WE | | Pending | 2003-jan-30 | 2003-dec-16 | | 03780532.2 | 1590964-A | |
| 2003FF01236 | 2003P01236WE | | Pending | 2003-feb-21 | 2004-feb-11 | | 04730110.0 | 1597907-A | |
| 2003FF01236 | 2003P01236WOCN | CN | Granted | 2003-feb-21 | 2004-feb-11 | 2012-feb-01 | 200480004808.1 | 1751325-A | 200480004808.1 |
| 2003FF01236 | 2003P01236WOUS | US | Granted | 2003-feb-21 | 2004-feb-11 | 2010-mrt-30 | 10/545646 | 2006-0158729-A1 | 7688509 |
| 2003FF01236 | 2003P01236WO01P | JP | Granted | 2003-feb-21 | 2004-feb-11 | 2011-mrt-18 | 06-502576 | | 4705014 |
| 2003FF01391 | 2003P01391WE | | Pending | 2003-mrt-31 | 2004-mrt-26 | | 04733685.1 | 1823543-A | |
| 2003FF01391 | 2003P0139PJWO01P | JP | Granted | 2003-mrt-31 | 2004-mrt-26 | 2010-dec-03 | 06-306771 | | 4637827 |
| 2003FF01391 | 2003P0139PJWOCN | CN | Granted | 2003-mrt-31 | 2004-mrt-26 | 2012-jan-18 | 200480039932.4 | 1746537-A | 200480039932.4 |
| 2003FF01391 | 2003P01391WOUS | US | Granted | 2003-mrt-31 | 2004-mrt-26 | 2009-apr-14 | 10/550881 | 2006-0262558-A1 | 7518661 |
| 2003FF01869 | 2003P01869WOUS | US | Granted | 2003-jun-13 | 2004-jun-03 | 2010-mrt-16 | 10/560006 | 2007-0116383-A1 | 7679676 |
| 2003FF01869 | 2003P01809WE | | Pending | 2003-jun-13 | 2004-jun-03 | | 04735651.8 | 1636987-A | |
| 2003FF01869 | 2003P01869WO01P | JP | Granted | 2003-jun-13 | 2004-jun-03 | 2011-apr-28 | 06-516641 | | 4734239 |
| 2003FF01869 | 2003P01869WOKR | KR | Granted | 2003-jun-13 | 2004-jun-03 | 2013-dec-19 | 10-2005-7023975 | | 10-1098300 |
| 2003FF01869 | 2003P01869WOCN | CN | Granted | 2003-jun-13 | 2004-jun-03 | 2010-sep-29 | 200480036250.9 | 1806439-A | 200480036250.9 |
| 2003PF00546 | 2003P00546WE | | Pending | 2003-jul-31 | 2004-jul-22 | | 04744227.2 | 1652388-A | |
| 2003PF00546 | 2003P00546WOCN | CN | Granted | 2003-jul-31 | 2004-jul-22 | 2011-apr-06 | 200480022178.0 | 1830218-A | 200480022178.0 |
| 2003PF00546 | 2003P00546WOKR | KR | Granted | 2003-jul-31 | 2004-jul-22 | 2012-jun-29 | 10-2006-7001843 | | 10-1163085 |
| 2003PF00546 | 2003P00546WOUS | US | Granted | 2003-jul-31 | 2004-jul-22 | 2009-nov-17 | 10/566548 | 2006-0187179-A1 | 7619604 |
| 2003PF00546 | 2003P00546WO01P | JP | Granted | 2003-jul-31 | 2004-jul-22 | 2012-nov-04 | 2006-521707 | | 4855934 |
| 2003PF00689 | 2003P00689WOCN | CN | Granted | 2003-sep-27 | 2004-sep-23 | 2008-nov-05 | 200480027946.1 | 1856720-A | 200480027946.1 |
| 2003PF00689 | 2003P00689 TW | TW | Granted | 2003-sep-27 | 2004-sep-24 | 2010-okt-21 | 089129084 | 200523504 | 1352058 |
| 2003PF00689 | 2003P00689WO01P | JP | Granted | 2003-sep-27 | 2004-sep-23 | 2013-nov-11 | 2005-527552 | | 4861180 |
| 2003PF00689 | 2003P00689WOKR | KR | Granted | 2003-sep-27 | 2004-sep-23 | 2012-mrt-05 | 10-2006-7005656 | | 10-1125035 |
| 2003PF00689 | 2003P00689WOUS | US | Granted | 2003-sep-27 | 2004-sep-29 | 2011-jan-25 | 10/573084 | 2007-0109811-A1 | 7876397 |
| 2003PF00689 | 2003P00689WE | | Pending | 2003-sep-27 | 2004-sep-23 | | 04770067.9 | 1709467-A | |
| 2003PF02439 | 2003P0349WO01P | JP | Granted | 2003-okt-30 | 2004-sep-22 | 2010-jun-18 | 06-535911 | | 4533895 |
| 2003PF02439 | 2003P0349WODE | DE | Granted | 2003-sep-30 | 2004-sep-22 | 2007-sep-06 | 04770055.4 | | 602004008794.7 |
| 2003PF02439 | 2003P0439WOGB | GB | Granted | 2003-sep-30 | 2004-sep-22 | 2007-sep-06 | 04770055.4 | | 1673276 |
| 2003PF02439 | 2003P0439WOFR | FR | Granted | 2003-sep-30 | 2004-sep-22 | 2007-sep-06 | 04770055.4 | | 1673276 |
| 2003PF02439 | 2003P0439WOCN | CN | Granted | 2003-sep-30 | 2004-sep-22 | 2010-apr-06 | 30/573598 | 2007-0095530-A1 | 76892640 |
| 2003PF02439 | 2003P02439WOCN | CN | Granted | 2003-sep-30 | 2004-sep-22 | 2009-jan-07 | 200480028290.5 | 1860505-A | 200480028290.5 |
| 2003PF00836 | 2003P00836WOGB | GB | Granted | 2003-nov-07 | 2004-nov-03 | 2013-jan-09 | 04799054.4 | 1682932-A | 1682912 |
| 2003PF00836 | 2003P00836WOCN | CN | Granted | 2003-nov-07 | 2004-nov-03 | 2009-jun-24 | 200480261246.5 | 1875302-A | 200480261246.5 |
| 2003PF00836 | 2003P00836WOUS | US | Granted | 2003-nov-07 | 2004-nov-03 | 2008-dec-01 | 30/578071 | 3007-0281639-A1 | 7626643 |
| 2003PF00836 | 2003P00836WO01P | JP | Granted | 2003-nov-07 | 2004-nov-03 | 2012-feb-03 | 06-537544 | | 4917892 |
| 2003PF00836 | 2003P00836WODE | DE | Granted | 2003-nov-07 | 2004-nov-03 | 2009-nov-19 | 04799054.4 | 1682932-A | 60 2004 040 744.5 |
| 2003PF00836 | 2003P00836WOFR | FR | Granted | 2003-nov-07 | 2004-nov-03 | 2013-jan-09 | 04799054.4 | 1682932-A | 1682912 |
| 2003PF00912 | 2003P00912 US01 | US | Granted | 2003-dec-08 | 2011-sep-14 | 2012-nov-20 | 13/232315 | US-2012000269-A1 | 8314897 |
| 2003PF00912 | 2003P00912WO01P | JP | Granted | 2003-dec-08 | 2004-dec-02 | 2011-okt-21 | 08-542104 | | 4813366 |
| 2003PF00912 | 2003P00912WOGB | GB | Granted | 2003-dec-08 | 2004-dec-02 | 2011-okt-11 | 10/583215 | 2008-0278640-A1 | 8035762 |
| 2003PF00912 | 2003P00912WE | | Pending | 2003-dec-08 | 2004-dec-02 | | 04801447.6 | 1693275-A | |
| 2003PF00912 | 2003P00912WOCN | CN | Granted | 2003-dec-01 | 2009-dec-02 | 2012-jun-30 | 200480035751.1 | 1890968-A | 200480035751.1 |
| 2003PF00912 | 2003P00912WOKR | KR | Granted | 2003-dec-01 | 2009-dec-02 | 2013-jan-26 | 10-2006-7010581 | | 10-1228844 |
| 2004PF00031 | 2004P0031WF01 | US | Granted | 2004-jan-09 | 2005-jan-06 | 2010-sep-21 | 10/586482 | 2009-0021824-A1 | 7796648 |
| 2004PF00031 | 2004P0031WEFR | FR | Granted | 2004-jan-09 | 2005-jan-06 | 2008-apr-16 | 05702604.9 | | 1706778 |
| 2004PF00031 | 2004P0031WO2P | JP | Granted | 2004-jan-09 | 2005-jan-06 | 2010-sep-24 | 06-548527 | | 4594327 |
| 2004PF00031 | 2004P0031WODE | DE | Granted | 2004-jan-09 | 2005-jan-06 | 2008-apr-16 | 05702604.9 | | 602003 50600097.9 |
| 2004PF00031 | 2004P0031WOCN | CN | Granted | 2004-jan-09 | 2005-jan-06 | 2010-mei-12 | 200580002163.2 | 1310499-A | 200580002163.2 |
| 2004PF00031 | 2004P0031WEGB | GB | Granted | 2004-jan-09 | 2005-jan-06 | 2008-apr-16 | 05702604.9 | | 1706778 |
| 2004PF00061 | 2004P0061WOKR | KR | Granted | 2004-feb-17 | 2005-feb-07 | 2012-nov-26 | 3384/CHENP/2006 | | 257992 |
| 2004PF00061 | 2004P0061WO01P | JP | Granted | 2004-feb-17 | 2005-feb-07 | 2012-jun-06 | 06-553726 | 2037-521589 | 4898458 |
| 2004PF00061 | 2004P0061WEGB | GB | Granted | 2004-feb-17 | 2005-feb-07 | 2008-jan-02 | 05702808.2 | | 1718079 |
| 2004PF00061 | 2004P0061WEFR | FR | Granted | 2004-feb-17 | 2005-feb-07 | 2008-jan-02 | 05702808.2 | | 1718079 |
| 2004PF00061 | 2004P0061WOUS | US | Granted | 2004-feb-17 | 2005-feb-07 | 2011-okt-11 | 30/597976 | 3007-0146232-A1 | 8036411 |
| 2004PF00061 | 2004P0061WODE | DE | Granted | 2004-feb-17 | 2005-feb-07 | 2008-jan-02 | 05702808.2 | | 602005004125.7 |
| 2004PF00061 | 2004P0061WOCN | CN | Granted | 2004-feb-17 | 2005-feb-07 | 2008-dec-08 | 200580005096.X | 1922631-A | 200580005096.X |
| 2004PF00061 | 2004P0061WOKR | KR | Granted | 2004-feb-17 | 2005-feb-07 | 2012-sep-12 | 10-2006-7016649 | | 10-1183863 |
| 2004PF00060 | 2004P0060WOFR | FR | Granted | 2004-mrt-12 | 2005-mrt-04 | 2012-sep-19 | 05708943.5 | 1728116-A | 1728116 |
| 2004PF00060 | 2004P0060WOGB | GB | Granted | 2004-mrt-12 | 2005-mrt-04 | 2012-sep-19 | 05708943.5 | 1728116-A | 1728116 |
| 2004PF00060 | 2004P0060WODE | DE | Granted | 2004-mrt-12 | 2005-mrt-04 | 2012-sep-19 | 05708943.5 | 1728116-A | 602005006189.9 |
| 2004PF00060 | 2004P0060WOUS | US | Pending | 2004-mrt-12 | 2005-mrt-04 | | 30/598649 | 3037-0177006-A1 | |
| 2004PF00060 | 2004P0060WOCN | CN | Granted | 2004-mrt-12 | 2005-mrt-04 | 2009-feb-11 | 200580007884.7 | 1930512A | 200580007884.7 |
| 2004PF00060 | 2004P0060WOKR | KR | Granted | 2004-mrt-12 | 2005-mrt-04 | 2013-aug-07 | 3761/CHENP/2006 | | 256891 |

A-729

Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2004PF00X0 | 2004P0000XWOJP | JP | Granted | 2004-mrt-12 | 2005-mrt-04 | 2011-feb-10 | 07-500478 | | 4682186 |
| 2004PF00784 | 2004PO0784WOJP | JP | Granted | 2004-apr-13 | 2005-apr-04 | 2013-jun-24 | 07-507878 | 2007-534012 | 4768716 |
| 2004PF00784 | 2004PO0784WEGB | GB | Granted | 2004-apr-13 | 2005-apr-04 | 2012-jul-20 | 05718626.4 | 1730585-A | 1718589 |
| 2004PF00784 | 2004PO0784WEFR | FR | Granted | 2004-apr-13 | 2005-apr-04 | 2013-jul-20 | 05718626.4 | 1730585-A | 1718589 |
| 2004PF00784 | 2004PO0784WEDE | DE | Granted | 2004-apr-13 | 2005-apr-04 | 2013-jul-20 | 05718626.4 | 1730585-A | 602005025072.9 |
| 2004PF00784 | 2004PO0784 JP | JP | Granted | 2004-apr-13 | 2005-apr-04 | 2013-mrt-01 | 2011-88257 | | 5200077 |
| 2004PF00784 | 2004PO0784WOCN | CN | Granted | 2004-apr-13 | 2005-apr-04 | 2010-jan-06 | 200580012280.5 | 1943245-A | 200580012280.5 |
| 2004PF00784 | 2004PO0784WOUS | US | Granted | 2004-apr-13 | 2005-apr-04 | 2013-mrt-20 | 10/599790 | 2008-0916302-A1 | 8139104 |
| 2004PF00753 | 2004PO0753WOJP | JP | Granted | 2004-apr-14 | 2005-apr-04 | 2013-nov-11 | 2007-507898 | 2007-530022 | 4861908 |
| 2004PF00753 | 2004PO0753WEDE | DE | Granted | 2004-apr-14 | 2005-apr-08 | 2010-okt-13 | 05718674.4 | | 602005024322.1 |
| 2004PF00753 | 2004PO0753WOCN | CN | Granted | 2004-apr-14 | 2005-apr-08 | 2010-mrt-12 | 200580011256.1 | 1942502-A | 200580011256.1 |
| 2004PF00753 | 2004PO0753WOUS | US | Granted | 2004-apr-14 | 2005-apr-08 | 2010-okt-26 | 10/999821 | 2008-0267527-A1 | 7822265 |
| 2004PF00753 | 2004PO0753WEGB | GB | Granted | 2004-apr-14 | 2005-apr-08 | 2010-okt-13 | 05718674.4 | | 1718331 |
| 2004PF00753 | 2004PO0753WEFR | FR | Granted | 2004-apr-14 | 2005-apr-08 | 2010-okt-13 | 05718674.4 | | 1718331 |
| 2004PF01809 | 2004PO1809WEIT | IT | Granted | 2004-aug-17 | 2005-aug-04 | 2009-jun-04 | 05774146.4 | | 1782628 |
| 2004PF01809 | 2004PO1809WOUS | US | Granted | 2004-aug-17 | 2005-aug-04 | 2010-nov-23 | 11/573571 | 2007-0222895-A1 | 7839378 |
| 2004PF01809 | 2004PO1809WEFR | FR | Granted | 2004-aug-17 | 2005-aug-04 | 2008-jun-04 | 05774146.4 | | 1782628 |
| 2004PF01809 | 2004PO1809WOCN | CN | Granted | 2004-aug-17 | 2005-aug-04 | 2010-dec-29 | 200580028317.5 | 101006732-A | 200580028317.5 |
| 2004PF01809 | 2004PO1809WOKR | KR | Granted | 2004-aug-17 | 2005-aug-04 | 2012-jul-10 | 10-2007-7000536 | | 10-1168248 |
| 2004PF01809 | 2004PO1809WOEDE | DE | Granted | 2004-aug-17 | 2005-aug-04 | 2008-jun-04 | 05774146.4 | | 602005007961.2 |
| 2004PF01809 | 2004PO1809WOJP | JP | Granted | 2004-aug-17 | 2005-aug-04 | 2012-dec-07 | 07-526665 | 04-510408 | 5150255 |
| 2004PF01809 | 2004PO1809WEGB | GB | Granted | 2004-aug-17 | 2005-aug-04 | 2008-jun-04 | 05774146.4 | | 1782628 |
| 2004PF01809 | 2004PO1809WEE3 | E3 | Granted | 2004-aug-17 | 2005-aug-04 | 2008-jun-04 | 05774146.4 | | 1782628 |
| 2004PF01809 | 2004PO1809WOKN | IN | Pending | 2004-aug-17 | 2005-aug-04 | | 703/CHENP/2007 | | |
| 2008PF01190 | 2004P01190WEDE | DE | Granted | 2004-okt-13 | 2005-sep-26 | 2013-apr-10 | 05784801.2 | 1805545-A | 60 2005 039 050.1 |
| 2008PF01190 | 2004P01190WEFR | FR | Granted | 2004-okt-13 | 2005-sep-26 | 2013-apr-10 | 05784801.2 | 1805549-A | 1805549 |
| 2008PF01190 | 2004P01190WETR | TR | Granted | 2004-okt-13 | 2005-sep-26 | 2013-apr-10 | 05784801.2 | 1805549-A | 1805549 |
| 2008PF01190 | 2004P01190WEGB | GB | Granted | 2004-okt-13 | 2005-sep-26 | 2013-apr-10 | 05784801.2 | 1805549-A | 1805549 |
| 2008PF01190 | 2004P01190WOUS | US | Granted | 2004-okt-13 | 2005-sep-26 | 2013-mrt-03 | 11/576920 | 2007-0247708-A1 | 7908332 |
| 2008PF01190 | 2004P01190WOIN | IP | Pending | 2004-okt-13 | 2005-sep-26 | | 2013-132084 | | |
| 2004PF02190 | 2004P02190WOCN | CN | Granted | 2004-okt-13 | 2005-sep-26 | 2013-feb-06 | 200580034913.4 | 101040200-A | 200580034913.4 |
| 2004PF02350 | 2004P02350WEDE | DE | Granted | 2004-okt-26 | 2005-okt-21 | 2011-apr-06 | 05818850.4 | | 600005027375.4 |
| 2004PF02350 | 2004P02350WEFR | FR | Granted | 2004-okt-26 | 2005-okt-21 | 2011-apr-06 | 05818850.4 | | 1807806 |
| 2004PF02350 | 2004P02350WOCN | CN | Granted | 2004-okt-26 | 2005-okt-21 | 2011-apr-13 | 200580096903.4 | 101048803-A | 200580096903.4 |
| 2004PF02350 | 2004P02350WOJP | JP | Granted | 2004-okt-26 | 2005-okt-21 | 2011-jun-17 | 07-537466 | | 4762994 |
| 2004PF02350 | 2004P02350WEUS | US | Pending | 2004-okt-26 | 2005-okt-23 | | 11/577745 | 2009-0073170-A1 | |
| 2004PF02350 | 2004P02350WEGB | GB | Granted | 2004-okt-26 | 2005-okt-21 | | 05818850.4 | | 1807806 |
| 2004PF02499 | 2004PO2499WEUS | IN | Pending | 2004-nov-16 | 2005-nov-08 | | 2071/CHENP/2007 | | |
| 2004PF02499 | 2004PO2499WEGB | GB | Granted | 2004-nov-16 | 2005-nov-08 | 2008-mei-14 | 05802412.6 | | 1815441 |
| 2004PF02499 | 2004PO2499WOUS | US | Granted | 2004-nov-16 | 2005-nov-08 | 2010-nov-13 | 11/718917 | 2008-0187222-A1 | 7840270 |
| 2004PF02499 | 2004PO2499WEDE | DE | Granted | 2004-nov-16 | 2005-nov-08 | 2008-mei-14 | 05802412.6 | | 602005006536.8 |
| 2004PF02499 | 2004PO2499WEFR | FR | Granted | 2004-nov-16 | 2005-nov-08 | 2008-mei-14 | 05802412.6 | | 1815441 |
| 2004PF02499 | 2004PO2499WEIT | IT | Granted | 2004-nov-16 | 2005-nov-08 | 2008-mei-14 | 05802412.6 | | 1815441 |
| 2004PF02499 | 2004PO2499WOJP | JP | Granted | 2004-nov-16 | 2005-nov-08 | 2011-aug-05 | 07-540788 | | 4790072 |
| 2004PF02499 | 2004PO2499WEES | ES | Granted | 2004-nov-16 | 2005-nov-08 | 2008-mei-14 | 05802412.6 | | 1815441 |
| 2004PF02499 | 2004PO2499WOCN | CN | Granted | 2004-nov-16 | 2005-nov-08 | 2011-mei-18 | 200580039226.1 | 101061519-A | 200580039226.1 |
| 2004PF02491 | 2004PO2491WOJP | JP | Granted | 2004-nov-18 | 2005-nov-07 | 2012-apr-06 | 07-542377 | | 4964119 |
| 2004PF02491 | 2004PO2491WOUS | US | Granted | 2004-nov-18 | 2005-nov-07 | 2012-jul-03 | 11/719234 | 2009-0295689-A1 | 8212948 |
| 2004PF02491 | 2004PO2491WEDE | DE | Granted | 2004-nov-18 | 2005-nov-07 | 2009-aug-12 | 05800635.4 | | 602005016007.8 |
| 2004PF02491 | 2004PO2491WOCN | CN | Granted | 2004-nov-18 | 2005-nov-07 | 2014-jul-30 | 200580039292.9 | 101051415-A | 200580039292.9 |
| 2004PF02491 | 2004PO2491WEGB | GB | Granted | 2004-nov-18 | 2005-nov-07 | 2009-aug-12 | 05800635.4 | | 1815288 |
| 2004PF02491 | 2004PO2491WEFR | FR | Granted | 2004-nov-18 | 2005-nov-07 | 2009-aug-12 | 05800635.4 | | 1815288 |
| 2005PF00521 | 2005PO0521WEDE | DE | Granted | 2005-mrt-17 | 2006-mrt-14 | 2012-sep-26 | 06718095.7 | 1862016-A | 602010609126140.6 |
| 2005PF00521 | 2005PO0521 TW | TW | Granted | 2005-mrt-17 | 2006-mrt-14 | 2013-sep-01 | 095108565 | 200204 18 | I407772 |
| 2005PF00521 | 2005PO0521WOKR | KR | Granted | 2005-mrt-17 | 2006-mrt-14 | 2013-mei-07 | 10-2007-7020901 | | 10-1263667 |
| 2005PF00521 | 2005PO0521WOCN | CN | Granted | 2005-mrt-17 | 2006-mrt-14 | 2010-jan-20 | 200680026360.X | 101142823A | 200680026360.X |
| 2005PF00521 | 2005PO0521WOJP | JP | Granted | 2005-mrt-17 | 2006-mrt-14 | 2012-aug-10 | 08-501476 | | 5058967 |
| 2005PF00521 | 2005PO0521WOUS | US | Granted | 2005-mrt-17 | 2006-mrt-17 | 2013-feb-26 | 11/908430 | 2008-0191969-A1 | 8384747 |
| 2005PF00521 | 2005PO0521WEFR | FR | Granted | 2005-mrt-17 | 2006-mrt-17 | 2012-sep-26 | 06718095.7 | 1862016-A | 1862016 |
| 2005PF00521 | 2005PO0521WEGB | GB | Granted | 2005-mrt-17 | 2006-mrt-17 | 2012-sep-26 | 06718095.7 | 1862016-A | 1862016 |
| 2005PF00617 | 2005PO0617WOUS | US | Granted | 2005-apr-19 | 2006-apr-12 | 2013-sep-06 | 11/911561 | 2008-0192067-A1 | 8013873 |
| 2005PF00617 | 2005PO0617WEGB | GB | Granted | 2005-apr-19 | 2006-apr-12 | 2008-dec-03 | 06727910.9 | | 1875440 |
| 2005PF00617 | 2005PO0617 JP | JP | Granted | 2005-apr-19 | 2006-apr-12 | 2013-nov-08 | 2013-281020 | | 5406249 |
| 2005PF00617 | 2005PO0617WEFR | FR | Granted | 2005-apr-19 | 2006-apr-12 | 2008-dec-03 | 06727910.9 | | 1875440 |
| 2005PF00617 | 2005PO0617WORU | RU | Granted | 2005-apr-19 | 2006-apr-12 | 2010-dec-20 | 2007142457 | 2007142457-A | 2407224 |
| 2005PF00617 | 2005PO0617WOCN | CN | Granted | 2005-apr-19 | 2006-apr-12 | 2008-dec-30 | 200680021969.4 | 101180858-A | 200680021969.4 |
| 2005PF00617 | 2005PO0617WEDE | DE | Granted | 2005-apr-19 | 2006-apr-12 | 2008-dec-03 | 06727910.9 | | 602005034033.4 |
| 2005PF00950 | 2005PO0950WOCN | CN | Granted | 2005-apr-29 | 2006-apr-20 | 2013-nov-16 | 200680014611.5 | 101187371-A | 200680014611.5 |
| 2005PF00950 | 2005PO0950WOIN | IN | Pending | 2005-apr-29 | 2006-apr-20 | | 4854/CHENP/2007 | | |
| 2005PF00950 | 2005PO0950WOUS | US | Granted | 2005-apr-29 | 2006-apr-20 | 2012-mrt-13 | 11/912440 | 2008-0204550-A1 | 8134590 |
| 2005PF00950 | 2005PO0950WE | | Pending | 2005-apr-29 | 2006-apr-20 | | 06757987.7 | | |
| 2005PF00950 | 2005PO0950WOJP | JP | Granted | 2005-apr-29 | 2006-apr-20 | 2013-jun-21 | 08-508366 | | 5294845 |
| 2005PF00950 | 2005PO0950 TW | TW | Granted | 2005-apr-29 | 2006-apr-26 | 2012-okt-21 | 095134829 | 200711482-A | I375457 |
| 2005PF00950 | 2005PO0950WOKR | KR | Granted | 2005-apr-29 | 2006-apr-20 | 2013-mrt-18 | 10-2007-7024415 | | 10-1246645 |



**A-730**

Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2036F00890 | 2305P0089OWE | | Pending | 2036-mei-03 | 2006-mel-03 | | 067281385 | 1882368-A | |
| 2036F00890 | 2305P0089OWOCN | CN | Granted | 2036-mei-13 | 2006-mel-03 | 2013-jul-24 | 2008800165807 | 101176354-A | 2008000165807 |
| 2036F00890 | 2305P0089OWOUS | US | Granted | 2036-mei-13 | 2006-mel-13 | 2013-jun-34 | 11/913877 | 2008-0252638-A1 | 7963196 |
| 2036F00890 | 2305P0089OWOJP | JP | Granted | 2036-mei-13 | 3006-mel-03 | 2013-nct-08 | 08-530689 | | 5213701 |
| 2036FOL816 | X305P0083OWOJP | JP | Granted | 3035-jun-23 | 2005-jun-19 | 2013-dez-13 | 08-537662 | | 5415726 |
| 2036FOL816 | X305P0816OWOUS | US | Granted | 2005-jun-23 | 7006-jun-19 | 2014-nov-04 | 11/993339 | 2010-0154351-A1 | 8679823 |
| 2036FOL816 | X305P0819OWOCN | CN | Pending | 2035-jun-23 | 3006-jun-19 | | 200680022544 1 | 101203891-A | |
| 2036FOL816 | X305P0816OWIN | IN | Pending | 3035-jun-23 | 2006-jun-19 | | 5951/CHENP/2007 | | |
| 2036FOL816 | 2305P01816WE | | Pending | 2035-jun-23 | 2006-jun-19 | | 06765780.9 | | |
| 2036FOL824 | 2305P01824WE | | Pending | 2035-jun-23 | 2006-jun-20 | | 06765784.1 | 1897380-A | |
| 2036FOL824 | 2305P01824WOCN | CN | Granted | 2035-jun-23 | 2006-jun-30 | 2012-jan-11 | 2008600224044 | 101204097 | 2006800224004-4 |
| 2036FOL824 | 2305P01824WORU | RU | Granted | 2035-jun-23 | 2006-jun-20 | 2013-jan-30 | 2008102383 | | 2469028 |
| 2036FOL824 | 2305P01824WOJP | JP | Granted | 2035-jun-23 | 2006-jun-20 | 2012-jun-22 | 08-517669 | | 5020947 |
| 2036FOL824 | 2305P01824WOIN | IN | Pending | 2035-jun-23 | 2006-jun-30 | | 5951/CHENP/2007 | | |
| 2036FOL824 | 2305P01824WOUS | US | Granted | 2035-jun-23 | 2006-jun-30 | 2012-mei-29 | 11/917958 | 2010-0214391-A1 | 8189034 |
| 2008F01202 | 3308P01202WE | | Pending | 2805-jul-14 | 2006-jul-12 | | 06780056.5 | 1905247-A | |
| 2008F01202 | 2805P01202WOCN | CN | Granted | 2805-jul-14 | 2006-jul-12 | 2011-mei-25 | 200680025197.8 | | 200680025197.8 |
| 2008F01202 | 3308P01202WOJP | JP | Granted | 2005-jul-14 | 2006-jul-14 | 2014-jan-30 | 08-523019 | 08-503155 | 5449770 |
| 2008F01202 | 3308P01202WOUS | US | Pending | 2805-jul-14 | 2006-jul-12 | | 11/995574 | | |
| 2036F01254 | 2305P0125-WOCN | CN | Granted | 2805-aug-11 | 2006-aug-02 | 2013-mrt-06 | 200680029066.7 | | 200680029066.7 |
| 2036F01254 | 2005P01254 JP | JP | Pending | 2805-aug-11 | 2006-aug-02 | | 2013-087253 | | |
| 2036F01254 | 3305P01254WE | | Pending | 2805-aug-11 | 2006-aug-02 | | 06780082.7 | 1915677-A | |
| 2036F01254 | 2305P0125-WOJP | JP | Pending | 2805-aug-11 | 2006-aug-02 | | 08-525688 | | |
| 2036F01254 | 3305P01254WOUS | US | Granted | 2805-aug-11 | 2006-aog-02 | 2014-apr-01 | 12/053118 | 2010-0138779-A1 | 8689135 |
| 2036F02336 | 2005P02336WOCN | CN | Granted | 2805-aug-19 | 2006-aug-17 | 2030-dec-22 | 200680030198.1 | 101243894 | 200680030198.1 |
| 2036F02356 | 2008P02356WOJP | JP | Granted | 2805-aug-19 | 2006-aug-17 | 2013-sep-20 | 08-526691 | | 5366547 |
| 2036F02356 | 2008P02356WEFR | FR | Granted | 2805-aug-19 | 2006-aug-17 | 2012-mrt-28 | 06795677.1 | 1923882A | 1923882 |
| 2036F02356 | 2006P02356WORU | RU | Granted | 2805-aug-19 | 2006-aug-17 | 2011-jul-30 | 2008130492 | | 2424631 |
| 2036F02356 | 2006P02356WOGB | GB | Granted | 2805-aug-19 | 2006-aug-17 | 2012-mrt-28 | 06795677.1 | 1923882A | 1923882 |
| 2036F02356 | 2008P02356WOUS | US | Granted | 2805-aug-19 | 2006-aug-17 | 2012-jun-26 | 12/063899 | 2008-0225114-A1 | 8208011 |
| 2036F02356 | 2005P02356WOIN | IN | Pending | 2805-aug-19 | 2006-aug-17 | | 815/CHENP/2008 | | |
| 2036F02356 | 3008P02356WIDE | DE | Granted | 2805-aug-19 | 2006-aug-17 | 2012-mrt-28 | 06795677.1 | 1923882A | 602000185000.0 |
| 2036F02371 | 2008P02371WOCN | CN | Granted | 2805-sep-09 | 2006-sep-08 | 2011-sep-14 | 200680032682.3 | 101254427-A | 200680032682.3 |
| 2036F02371 | 3305P02371WE | | Pending | 2005-sep-09 | 2006-sep-08 | | 06795987.8 | 1927021-A | |
| 2036F02371 | 2005P0237iWOIN | IN | Pending | 2009-sep-09 | 2006-sep-08 | | 1176/CHENP/2008 | | |
| 2036F02371 | 3008P02371WOJP | JP | Granted | 2305-sep-09 | 2006-sep-09 | 2012-dec-23 | 08-525762 | | 5160426 |
| 2036F02371 | 2008P02371WOUS | US | Pending | 2005-sep-09 | 2006-sep-08 | | 12/065778 | 2010-0195203-A1 | |
| 2006F01828 | 2305P01828WEGB | GB | Granted | 2006-sep-16 | 2006-sep-11 | 2030-okt-10 | 06808177.4 | | 1929792 |
| 2006F01828 | 2308P01828WEDE | DE | Granted | 2006-sep-16 | 2006-sep-11 | 2030-nov-10 | 06808277.4 | | 602000618164.7 |
| 2006F01828 | 2305P01828WE | | Granted | 2006-sep-16 | 2006-sep-11 | 2030-nov-10 | 06808277.4 | | 1929792 |
| 2006F01828 | 3305P01828WOUS | US | Granted | 2305-sep-16 | 2006-sep-11 | 2012-sep-04 | 12/066662 | 2008-0218855-A1 | 8259141 |
| 2006F01828 | 3305P01828WEFR | FR | Granted | 2305-sep-16 | 2006-sep-11 | 2030-nov-10 | 06808277.4 | | 1929792 |
| 2006F01828 | 3305P01828WOCN | CN | Granted | 2305-sep-16 | 2006-sep-11 | 2012-mei-30 | 200680033681.0 | 101263712-A | 200680033681.0 |
| 2006F01828 | 2305P01828WOJP | JP | Granted | 2305-sep-16 | 2006-sep-11 | 2012-apr-27 | 08-530695 | | 4981805 |
| 2006F02545 | 2008P02545WODE | DE | Granted | 3009-aug-23 | 2006-aug-31 | 2009-jun-17 | 06795848.8 | | 602000027968.2 |
| 2006F02545 | 2008P02545WOUS | US | Granted | 2005-aug-24 | 2006-aug-31 | 2013-sep-10 | 12/067964 | 2006-0252639-A1 | 8533439 |
| 2006F02545 | 2008P02545WEFR | FR | Granted | 2005-aug-24 | 2006-aug-31 | 2009-jun-17 | 06795848.8 | | 1953360 |
| 2006F02545 | 2005P02545WOKN | IN | Pending | 2005-sep-24 | 2006-aug-31 | | 1538/CHENP/2006 | | |
| 2006F02545 | 2008P02545WEGB | GB | Granted | 2005-sep-25 | 2006-aug-31 | 2009-jun-17 | 06795848.8 | | 1953368 |
| 2006F02545 | 2008P02545WOJP | JP | Granted | 2005-sep-28 | 2006-aug-31 | 2012-jul-20 | 08-532911 | | 5043018 |
| 2006F02545 | 2005P02545WOCN | CN | Granted | 2005-sep-24 | 2006-aug-31 | 2010-aug-11 | 200680033005.8 | 101278557-A | 200680033005.8 |
| 2006F00327 | 2008P00327WOUS | US | Granted | 2005-nov-02 | 2006-okt-26 | 2010-dec-07 | 12/030416 | 2008-0278809-A1 | 7681859 |
| 2006F00327 | 2005P00327WOIN | IN | Pending | 2005-nov-02 | 2006-okt-26 | | 2161/CHENP/2008 | | |
| 2006F00327 | 2008P00327WEFR | FR | Granted | 2005-nov-02 | 2006-okt-26 | 2012-dec-12 | 06809715.3 | 1946180-A | 1946180 |
| 2006F00327 | 2005P00327WEGB | GB | Granted | 2005-nov-02 | 2006-okt-26 | 2012-dec-12 | 06809715.3 | 1946180-A | 1946180 |
| 2006F00327 | 3305P00327WOCN | CN | Granted | 2005-nov-02 | 2006-okt-26 | 2012-nov-14 | 200880041112.5 | 101300020-A | 200880041112.5 |
| 2006F00327 | 3308P00327WOJP | JP | Granted | 2005-nov-02 | 2006-okt-26 | 2012-okt-18 | 08-538467 | | 5112326 |
| 2006F00327 | 3308P00327WEDE | DE | Granted | 2005-nov-02 | 2006-okt-36 | 2012-dec-12 | 06809715.3 | 1946180-A | 602000031620.9 |
| 2005F02260 | 2005P02260WEGB | GB | Granted | 2005-nov-04 | 2005-okt-34 | 2010-okt-21 | 0682126.1 | | 1946566 |
| 2005F02260 | 2008P02260WEDE | DE | Granted | 2005-nov-04 | 2005-okt-31 | 2010-sep-01 | 0682126.1 | | 602000016635.4 |
| 2005F02260 | 2005P02260WOCN | CN | Granted | 2005-nov-04 | 2005-okt-31 | 2010-jun-09 | 200680041071.X | 101300085-A | 200680041071.X |
| 2005F02260 | 2005P02260WEFR | FR | Granted | 2005-nov-04 | 2005-okt-31 | 2010-sep-01 | 0682126.1 | | 1946566 |
| 2005F02260 | 2005P02260WOUS | US | Pending | 2005-nov-04 | 2005-okt-31 | | 12/091944 | 2008-0291268-A1 | |
| 2006F02425 | 2005P02425WOGB | GB | Granted | 2005-nov-03 | 2005-okt-30 | 2009-sep-16 | 0682124.5.5 | | 1949171 |
| 2006F02425 | 2005P02425WODE | DE | Granted | 2005-nov-03 | 2005-okt-30 | 2009-sep-16 | 0682124.5.5 | | 602000016196.6 |
| 2006F02425 | 2005P02425WOCN | CN | Granted | 2005-nov-08 | 2005-okt-30 | 2010-dec-08 | 200680041977.1 | 101505311 | 200680041977.1 |
| 2006F02425 | 3005P02425WOJP | JP | Granted | 2005-nov-09 | 2005-okt-30 | 2014-jun-13 | 08-538550 | | 5558000 |
| 2006F02425 | 2005P02425WEFR | FR | Granted | 2005-nov-09 | 2005-okt-30 | 2009-sep-16 | 0682124.5.5 | | 1949171 |
| 2005F02425 | 2005P02425WOUS | US | Granted | 2005-nov-08 | 2006-okt-30 | 2012-mrt-13 | 12/092672 | 2008-0216604-A1 | 8112927 |
| 2005F02399 | 2008P02399WE | | Pending | 2005-nov-23 | 2006-nov-17 | | 06821483.2 | 1955553 | |
| 2005F02399 | 2005P02399WOCN | CN | Granted | 2005-nov-23 | 2006-nov-17 | 2013-jan-26 | 200680043936.6 | 101313596-A | 200680043936.6 |
| 2005F02399 | 2005P02399WOJP | JP | Pending | 2005-nov-23 | 2006-nov-17 | | 08-541864 | | |
| 2005F02399 | 2008P02399WOUS | US | Pending | 2005-nov-23 | 2006-nov-17 | | 12/094628 | 2008-0309756-A1 | |
| 2005F02259 | 3008P02259WE | | Pending | 2005-dec-01 | 2006-nov-27 | | 06831058.7 | 1958459-A | |

A-731



Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2005PF02259 | 2005PF02259 US01 | US | Pending | 2005-dec-02 | 2013-sep-26 | | 14/388307 | 2014-0168/206-A1 | |
| 2005PF02259 | 2005P0225BWOCN | CN | Granted | 2005-dec-02 | 2006-nov-27 | 2010-sep-01 | 2006800453787 | 101322418-A | 2006800453787 |
| 2005PF02259 | 2005P0225BWOUS | US | Granted | 2005-dec-02 | 2006-jan-07 | 2064-jan-07 | 12/085176 | 2009-0153652-A1 | 8624364 |
| 2005PF02262 | 2005P02262WORU | RU | Granted | 2005-dec-02 | 2006-nov-27 | 2011-feb-10 | 2008128927 | | 2411890 |
| 2005PF02262 | 2005P02262WOCN | CN | Granted | 2005-dec-02 | 2006-nov-27 | 2013-mrt-27 | 2006800453217 | 101322155-A | 2006800453217 |
| 2005PF02262 | 2005P02262WOJP | JP | Granted | 2005-dec-02 | 2006-nov-27 | 2013-aug-31 | 08-542501 | | 5076670 |
| 2005PF02262 | 2005P02262WOKR | IN | Pending | 2005-dec-02 | 2006-nov-27 | | 2756/CHENP/2008 | | |
| 2005PF02262 | 2005P02262WOKR | KR | Granted | 2005-dec-02 | 2006-nov-27 | 2016-feb-23 | 10-2016-7016367 | | 10-1370354 |
| 2005PF02262 | 2005P02262WEDE | DE | Granted | 2005-dec-02 | 2016-dec-02 | 2006-nov-27 | 0683957.3 | 1958149-A | 602006027231.6 |
| 2005PF02262 | 2005P02262WOUS | US | Granted | 2005-dec-02 | 2006-dec-02 | 2012-dec-04 | 12/095683 | 2008-0305894-A1 | 8325230 |
| 2005PF02262 | 2005P02262WEFR | FR | Granted | 2005-dec-02 | 2006-nov-27 | 2012-jan-18 | 0683957.3 | 1958149-A | 1958149 |
| 2005PF02262 | 2005P02262WEGB | GB | Granted | 2005-dec-02 | 2006-nov-27 | 2012-jan-18 | 0683957.3 | 1958149-A | 1958149 |
| 2005PF02704 | 2005P02704WOUS | US | Granted | 2005-dec-13 | 2006-dec-12 | 2050-sep-21 | 12/086935 | 2008-0316379-A1 | 7800703 |
| 2005PF02704 | 2005P02704WOJP | JP | Granted | 2005-dec-13 | 2006-dec-12 | 2013-jun-28 | 08-545218 | | 5301283 |
| 2005PF02704 | 2005P02704WOCN | CN | Granted | 2005-dec-13 | 2006-dec-12 | 2013-jul-31 | 2006800470312.0 | 101331776-A | 2006800470312.0 |
| 2005PF02704 | 2005P02704WE | | Pending | 2005-dec-13 | 2006-dec-12 | | 06842444.9 | 1966415-A | |
| 2005PF02966 | 2005P02966WOCN | CN | Granted | 2005-dec-14 | 2006-dec-04 | 2013-nov-16 | 2006800471222.X | 101331420-A | 2006800471222.X |
| 2005PF02966 | 2005P02966WOUS | US | Granted | 2005-dec-14 | 2006-dec-04 | 2012-apr-03 | 12/097395 | 2008-0316380-A1 | 8349542 |
| 2005PF02966 | 2005P02966WEFR | FR | Granted | 2005-dec-14 | 2006-dec-04 | 2011-apr-27 | 06832668.8 | | 1963906 |
| 2005PF02966 | 2005P02966WOJP | JP | Granted | 2005-dec-14 | 2006-dec-04 | 2013-jan-11 | 08-545161 | | 5173830 |
| 2005PF02966 | 2005P02966WEGB | GB | Granted | 2005-dec-14 | 2006-dec-04 | 2011-apr-27 | 06832668.8 | | 1963906 |
| 2005PF02969 | 2005P02969WEDE | DE | Granted | 2005-dec-20 | 2006-dec-04 | 2011-apr-27 | 06832668.8 | | 602006021823.8 |
| 2005PF02969 | 2005P02969WOJP | JP | Granted | 2005-dec-20 | 2006-nov-22 | 2012-jul-13 | 2008-546698 | | 5039053 |
| 2005PF02969 | 2005P02969WEFR | FR | Granted | 2005-dec-20 | 2006-nov-22 | 2011-mrt-23 | 06821528.4 | | 1946643 |
| 2005PF02969 | 2005P02969WOCN | CN | Granted | 2005-dec-20 | 2006-nov-22 | 2010-dec-08 | 2006800480172.5 | 101341453 | 2006800480172.5 |
| 2005PF02969 | 2005P02969WOUS | US | Granted | 2005-dec-20 | 2006-nov-22 | 2011-nov-22 | 12/097771 | 2008-0266472-A1 | 8058216 |
| 2005PF02969 | 2005P02969WEDE | DE | Granted | 2005-dec-20 | 2006-nov-22 | 2011-mrt-23 | 06821528.4 | | 602006020972.3 |
| 2005PF02969 | 2005P02969WEGB | GB | Granted | 2005-dec-20 | 2006-nov-22 | 2011-mrt-23 | 06821528.4 | | 1946643 |
| 2005PF02970 | 2005P02970WEDE | DE | Granted | 2005-dec-20 | 2006-nov-28 | 2013-jul-27 | 06831985.4 | 1967014-A | 602006021429.5 |
| 2005PF02970 | 2005P02970WOUS | US | Granted | 2005-dec-20 | 2006-nov-28 | 2014-apr-22 | 12/097776 | 2008-0297586-A1 | 8704884 |
| 2005PF02970 | 2005P02970WEFR | FR | Granted | 2005-dec-20 | 2006-nov-28 | 2013-jul-27 | 06831985.4 | 1967014-A | 1967014 |
| 2005PF02970 | 2005P02970WOJP | JP | Granted | 2005-dec-20 | 2006-nov-28 | 2013-okt-31 | 08-546709 | | 5384113 |
| 2005PF02976 | 2005P02976WOCN | CN | Granted | 2005-dec-20 | 2006-nov-28 | 2012-jun-20 | 2006800483740.5 | 101341782-A | 2006800483740.5 |
| 2005PF02976 | 2005P02976WEGB | GB | Granted | 2005-dec-20 | 2006-nov-28 | 2013-jul-27 | 06831985.4 | 1967014-A | 1967014 |
| 2005PF02976 | 2005P02976WE | | Pending | 2005-dec-20 | 2006-dec-11 | | 06832285.9 | 1967017-A | |
| 2005PF02976 | 2005P02976WOCN | CN | Granted | 2005-dec-20 | 2006-dec-11 | 2015-jan-22 | 2005800482292.X | 101444305-A | 2006800482292.X |
| 2005PF02976 | 2005P02976WOJP | JP | Granted | 2005-dec-20 | 2006-dec-11 | 2013-jul-05 | 08-546714 | | 5305612 |
| 2005PF02976 | 2005P02976WOUS | US | Granted | 2005-dec-20 | 2006-dec-11 | 2013-jul-13 | 12/097781 | 2008-0266387-A1 | 8493440 |
| 2005PF00320 | 2005P00320WOCN | CN | Granted | 2005-dec-20 | 2006-dec-08 | 2010-dec-08 | 2005800048482.1 | 101341763A | 2005800048482.1 |
| 2005PF00320 | 2005P00320WE | | Pending | 2006-dec-20 | 2006-dec-13 | | 06842485.4 | 1967018-A | |
| 2005PF00320 | 2005P00320WOJP | JP | Granted | 2005-dec-20 | 2006-dec-30 | 2013-aug-02 | 08-546748 | | 5329213 |
| 2005PF00320 | 2005P00320WOUS | US | Granted | 2005-dec-20 | 2006-dec-30 | 2013-dec-11 | 12/097778 | 2004-0259233-A1 | 8330881 |
| 2006PF00564 | 2006P00564WORN | IN | Pending | 2006-feb-27 | 2007-feb-16 | | 4460/CHENP/2008 | | |
| 2006PF00564 | 2006P00564WE | | Pending | 2006-feb-27 | 2007-feb-16 | | 07709308.1 | 1991563-A | |
| 2006PF00564 | 2006P00564WOJP | JP | Granted | 2006-feb-27 | 2007-feb-16 | 2012-jun-08 | 08-553919 | | 5011316 |
| 2006PF00564 | 2006P00564WOCN | CN | Granted | 2006-feb-27 | 2007-feb-16 | 2013-mrt-13 | 200780030979.1 | 101390131A | 200780030979.1 |
| 2006PF00564 | 2006P00564WOKR | KR | Granted | 2006-feb-27 | 2007-feb-16 | 2013-dec-19 | 10-2008-7021542 | | 10-1345364 |
| 2006PF00564 | 2006P00564WOUS | US | Granted | 2006-feb-27 | 2007-feb-16 | 2012-aug-28 | 12/280377 | 2009-0315780-A1 | 8253740 |
| 2006PF00574 | 2006P00574WOUS | US | Granted | 2006-feb-28 | 2007-feb-05 | 2011-dec-06 | 12/280573 | 2009-0016640-A1 | 8073292 |
| 2006PF00574 | 2006P00574WOCN | CN | Granted | 2006-feb-28 | 2007-feb-05 | 2012-ocl-16 | 200780037028.6 | 101395634-A | 200780037028.6 |
| 2006PF00674 | 2006P00674WOJP | JP | Granted | 2006-feb-28 | 2007-feb-05 | 2012-jun-08 | 08-556879 | | 5011319 |
| 2006PF00674 | 2006P00674WORN | IN | Pending | 2006-feb-28 | 2007-feb-05 | | 4536/CHENP/2008 | | |
| 2006PF00674 | 2006P00674WE | | Pending | 2006-feb-28 | 2007-feb-05 | | 07705793.3 | 1991958-A | |
| 2006PF00738 | 2006P00738WORN | IN | Pending | 2006-mrt-03 | 2007-feb-26 | | 4649/CHENP/2008 | | |
| 2006PF00738 | 2006P00738WORU | RU | Granted | 2006-mrt-03 | 2007-feb-26 | 2012-feb-10 | 2008139308 | | 2447298 |
| 2006PF00738 | 2006P00738WOCN | CN | Granted | 2006-mrt-03 | 2007-feb-26 | 2011-apr-20 | 200780037667.2 | 101395928A | 200780037667.2 |
| 2006PF00738 | 2006P00738WED1 | DE | Granted | 2006-mrt-03 | 2007-feb-26 | 2011-feb-23 | 07705845.9 | | 602007012666.5 |
| 2006PF00738 | 2006P00738WOUS | US | Granted | 2006-mrt-03 | 2007-feb-26 | 2011-jul-26 | 12/281001 | 2009-0033812-A1 | 7986374 |
| 2006PF00738 | 2006P00738WEGB | GB | Granted | 2006-mrt-03 | 2007-feb-26 | 2011-feb-23 | 07705845.9 | | 1984767 |
| 2006PF00738 | 2006P00738WEFR | FR | Granted | 2006-mrt-03 | 2007-feb-26 | 2011-feb-23 | 07705845.9 | | 1984767 |
| 2006PF00738 | 2006P00738WOJP | JP | Granted | 2006-mrt-03 | 2007-feb-26 | 2013-jan-11 | 08-556896 | | 5173845 |
| 2006PF00913 | 2006P00913WE | | Pending | 2006-mrt-31 | 2007-mrt-13 | | 07733242.5 | 2005757-A | |
| 2006PF00913 | 2006P00913WOCN | CN | Granted | 2006-mrt-31 | 2007-mrt-13 | 2011-dec-14 | 200780012472.7 | 10141852C | 200780012472.7 |
| 2006PF00913 | 2006P00913WORU | RU | Granted | 2006-mrt-31 | 2007-mrt-23 | 2011-okt-20 | 2008143205 | 13 | 2431558 |
| 2006PF00913 | 2006P00913WOUS | US | Pending | 2006-mrt-31 | 2007-mrt-13 | | 12/294515 | 2010-0331889-A1 | |
| 2006PF00913 | 2006P00912WOJP | JP | Granted | 2006-mrt-31 | 2007-mrt-23 | 2013-jul-19 | 08-502193 | | 5312955 |
| 2006PF00913 | 2006P00913WORN | IN | Pending | 2006-mrt-31 | 2007-mrt-23 | | 5248/CHENP/2008 | | |
| 2006PF00921 | 2006P00921WOKR | KR | Pending | 2006-mrt-31 | 2007-mrt-23 | 2013-dec-18 | 10-2008-7026820 | | 10-1345344 |
| 2006PF00921 | 2006P00921WOCN | CN | Granted | 2006-mrt-31 | 2007-mrt-23 | 2013-jan-16 | 200780017005.3 | 10140383-A | 200780017005.3 |
| 2006PF01207 | 2006P01207WOKR | KR | Pending | 2006-mei-09 | 2007-mei-07 | | 07733787.9 | 2018629-A | |
| 2006PF01207 | 2006P01207WOKR | KR | Pending | 2006-mei-09 | 2007-mei-07 | | 10-2008-7027340 | | |
| 2006PF01207 | 2006P01207WORN | IN | Pending | 2006-mei-09 | 2007-mei-07 | | 6069/CHENP/2008 | | |
| 2006PF01207 | 2006P01207WOJP | JP | Granted | 2006-mei-09 | 2007-mei-07 | 2012-mrt-18 | 09-508630 | | 4949463 |
| 2006PF01207 | 2006P01207WOUS | US | Pending | 2006-mei-09 | 2007-mei-07 | | 12/299692 | 2009-0179920-A1 | |

A-732



Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2006PF00890 | 2006PO0890AV0US | US | Granted | 2006-jun-08 | 2007-mei-29 | 2014-sep-03 | 12/303964 | 2010-0128527-A1 | 8830549 |
| 2006PF00890 | 2006PO0890WE | | Pending | 2006-jun-08 | 2007-mei-29 | | 07734037.8 | 2033052-A | |
| 2006PF00890 | 2006PO0890WOCN | CN | Granted | 2006-jun-08 | 2007-mei-29 | | 200790021439.0 | 101467306-A | |
| 2006PF00891 | 2006PO0891WE | | Pending | 2006-jun-08 | 2007-mei-29 | | 07736038.6 | 2039053-A | |
| 2006PF00891 | 2006PO0891WOIP | JP | Pending | 2006-jun-08 | 2007-mei-29 | | 09-513815 | | |
| 2006PF00891 | 2006PO0891WOUS | US | Granted | 2006-jun-08 | 2007-mei-29 | 2012-mei-29 | 12/303971 | 2010-0130524-A1 | 8186833 |
| 2006PF01634 | 2006PO1634WOCN | CN | Granted | 2006-aug-17 | 2007-aug-14 | 2012-mei-30 | 200790030047.7 | 101507288-A | 200790030047.7 |
| 2006PF01634 | 2006PO1634WEDE | DE | Granted | 2006-aug-17 | 2007-aug-14 | 2011-okt-19 | 07805399.8 | 2055139-A | 602007011104.6 |
| 2006PF01634 | 2006PO1634WOIP | JP | Granted | 2006-aug-17 | 2007-aug-14 | 2013-jul-12 | 2009-524294 | | 5311498 |
| 2006PF01634 | 2006PO1634WEFR | FR | Granted | 2006-aug-17 | 2007-aug-14 | 2011-okt-19 | 07805399.8 | 2055130-A | 2055110 |
| 2006PF01634 | 2006PO1634WOUS | US | Granted | 2006-aug-17 | 2007-aug-14 | 2013-jul-26 | 12/377680 | 2010-0165223-A1 | 7846375 |
| 2006PF01634 | 2006PO1634WEGB | GB | Granted | 2006-aug-17 | 2007-aug-14 | 2011-okt-19 | 07805399.8 | 2055130-A | 2055110 |
| 2006PF01851 | 2006PO1851WOKR | KR | Granted | 2006-aug-24 | 2007-apr-13 | 2014-feb-12 | 10-2009-7003425 | | 10-1377728 |
| 2006PF01851 | 2006PO1851WOUS | US | Granted | 2006-aug-24 | 2007-apr-11 | 2013-mrt-19 | 12/376575 | 2010-0181022-A1 | 8398798 |
| 2006PF01851 | 2006PO1851WEGB | GB | Granted | 2006-aug-24 | 2007-apr-11 | 2010-mrt-03 | 07735468.4 | | 2064580 |
| 2006PF01851 | 2006PO1851WEDE | DE | Granted | 2006-aug-24 | 2007-apr-11 | 2010-mrt-03 | 07735468.4 | | 602007005151.7 |
| 2006PF01851 | 2006PO1851WOCN | CN | Granted | 2006-aug-24 | 2007-apr-11 | 2011-jun-15 | 200790031504.8 | 101506719-A | 200790031504.8 |
| 2006PF01851 | 2006PO1851 US01 | US | Granted | 2006-aug-24 | 2007-apr-11 | 2014-jul-08 | 13/771454 | US-2013-0160942-A1 | 13771454 |
| 2006PF01851 | 2006PO1851WEFR | FR | Granted | 2006-aug-24 | 2007-apr-11 | 2010-mrt-03 | 07735468.4 | | 2064580 |
| 2006PF01851 | 2006PO1851 TW | TW | Granted | 2006-aug-24 | 2007-aug-21 | 2014-aug-01 | 096130893 | 200817726-A | 1447499 |
| 2006PF01534 | 2006PO1534WE | | Pending | 2006-sep-19 | 2007-sep-18 | | 07826425.6 | 2067954-A | |
| 2006PF01534 | 2006PO1534WOBR | BR | Pending | 2006-sep-19 | 2007-sep-18 | | PI 0714455-7 | | |
| 2006PF01534 | 2006PO1534WOIR | IR | Pending | 2006-sep-19 | 2007-sep-18 | | 2042/CHENP/2009 | | |
| 2006PF01534 | 2006PO1534WORU | RU | Granted | 2006-sep-19 | 2007-sep-18 | 2012-nov-20 | 2009114735 | 2009114735-A | 2467497 |
| 2006PF01534 | 2006PO1534WOUS | US | Pending | 2006-sep-19 | 2007-sep-18 | | 12/441541 | 2009-0267956-A1 | |
| 2006PF01534 | 2006PO1534WOCN | CN | Granted | 2006-sep-19 | 2007-sep-18 | 2013-jul-27 | 200780034835.7 | 101632313-A | 200780034835.7 |
| 2006PF01534 | 2006PO1534WOIP | JP | Granted | 2006-sep-19 | 2007-sep-18 | 2013-dec-06 | 09-527955 | | 5427035 |
| 2006PF01678 | 2006PO1678WE | | Pending | 2006-sep-28 | 2007-sep-21 | | 07826452.6 | 2074852-A | |
| 2006PF01678 | 2006PO1678WOCN | CN | Granted | 2006-sep-28 | 2007-sep-21 | 2011-jul-06 | 200790036456.1 | 101522924-A | 200790036456.1 |
| 2006PF01678 | 2006PO1678WOUS | US | Pending | 2006-sep-28 | 2007-sep-21 | | 12/442722 | 2010-0091012-A1 | |
| 2006PF01678 | 2006PO1678WOIN | IN | Pending | 2006-sep-28 | 2007-sep-21 | | 2288/CHENP/2009 | | |
| 2006PF01678 | 2006PO1678WOIP | JP | Pending | 2006-sep-28 | 2007-sep-21 | | 09-529819 | | |
| 2006PF01869 | 2006PO1869WOIN | IN | Pending | 2006-okt-11 | 2007-okt-08 | | 2536/CHENP/2009 | | |
| 2006PF01869 | 2006PO1869WOKR | KR | Granted | 2006-okt-11 | 2007-okt-08 | 2014-feb-27 | 10-2009-7009885 | | 10-1377736 |
| 2006PF01869 | 2006PO1869WE | | Pending | 2006-okt-11 | 2007-okt-08 | | 07826874.9 | 2109052-A | |
| 2006PF01869 | 2006PO1869 US01 | US | Pending | 2006-okt-11 | 2014-apr-29 | | 14/264108 | | |
| 2006PF01869 | 2006PO1869WOCN | CN | Granted | 2006-okt-11 | 2007-okt-08 | 2012-mej-28 | 200790038125.1 | 101662793-A | 200790038125.1 |
| 2006PF01869 | 2006PO1869WOUS | US | Granted | 2006-okt-11 | 2007-okt-08 | 2004-apr-29 | 12/444704 | 2010-0118119-A1 | 8711205 |
| 2006PF01888 | 2006PO1869 JP01 | JP | Pending | 2006-okt-11 | 2007-okt-08 | | 2013-12923 | | |
| 2006PF01887 | 2006PO1887WOIP | JP | Granted | 2006-okt-30 | 2007-okt-26 | 2014-jan-24 | 2009-534035 | | 5462629 |
| 2006PF01887 | 2006PO1887WOIR | IN | Pending | 2006-okt-30 | 2007-okt-26 | | 3006/CHENP/2009 | | |
| 2006PF01887 | 2006PO1887WE | | Pending | 2006-okt-30 | 2007-okt-26 | | 07826876.4 | 2080385-A | |
| 2006PF01887 | 2006PO1887WOUS | US | Granted | 2006-okt-30 | 2007-okt-26 | 2013-jan-22 | 12/447525 | 2010-0067864-A1 | 8358301 |
| 2006PF01887 | 2006PO1887WOCN | CN | Granted | 2006-okt-30 | 2007-okt-26 | 2013-jul-06 | 200790040749.7 | 101536534-A | 200790040749.7 |
| 2006PF02157 | 2006PO2157WOCN | CN | Granted | 2006-nov-21 | 2007-nov-15 | 2012-okt-03 | 200790093263.4 | 101542529-A | 200790043262.4 |
| 2006PF02157 | 2006PO2157WOUS | US | Granted | 2006-nov-21 | 2007-nov-15 | 2012-dec-25 | 12/514484 | 2010-0046837-A1 | 8340422 |
| 2006PF02157 | 2006PO2157WE | | Pending | 2006-nov-21 | 2007-nov-15 | | 3325/CHENP/2009 | | |
| 2006PF02157 | 2006PO2157WE | | Pending | 2006-nov-21 | 2007-nov-15 | | 07849156.0 | 2087466A | |
| 2006PF02257 | 2006PO2257WOIP | JP | Pending | 2006-nov-21 | 2007-nov-15 | | 2009-537725 | | |
| 2006PF01585 | 2006PO1535WOUS | US | Pending | 2006-dez-04 | 2007-dec-03 | | 12/517224 | 2010-0090717-A1 | |
| 2006PF01585 | 2006PO1535WOCN | CN | Granted | 2006-dez-04 | 2007-dec-03 | 2013-jul-06 | 200790046992.0 | 101589626A | 200790046992.0 |
| 2006PF01535 | 2006PO1535WOIP | JP | Granted | 2006-dez-04 | 2007-dec-03 | 2013-aug-30 | 2009-538847 | | 5354038 |
| 2006PF01535 | 2006PO1535WOIN | IN | Pending | 2006-dez-04 | 2007-dec-03 | | 3866/CHENP/2009 | | |
| 2006PF01535 | 2006PO1535WE | | Pending | 2006-dez-04 | 2007-dec-03 | | 07849338.0 | 1108688-A | |
| 2006PF00049 | 2006PO0049WEKR | KR | Pending | 2006-dez-18 | 2008-dec-11 | | 10-2009-7014732 | | |
| 2006PF02049 | 2006PO0049WEFR | FR | Granted | 2006-dez-18 | 2007-dec-11 | 2010-nov-10 | 07849411.9 | | 2123051 |
| 2006PF02049 | 2006PO0049WEIT | IT | Granted | 2006-dez-18 | 2007-dec-11 | 2010-nov-10 | 07849411.9 | | 2123051 |
| 2006PF02049 | 2006PO0049WOMX | MX | Granted | 2006-dez-18 | 2007-dec-11 | 2011-jul-06 | 3039/306/04 | | 184107 |
| 2006PF02049 | 2006PO0049WEES | ES | Granted | 2006-dez-18 | 2007-dec-11 | 2010-nov-10 | 07849411.9 | | 2123051 |
| 2006PF02049 | 2006PO0049WOCN | CN | Granted | 2006-dez-18 | 2007-dec-11 | 2011-nov-16 | 200790046641.4 | 101563926-A | 200790046641.4 |
| 2006PF02049 | 2006PO2049WORU | RU | Granted | 2006-dez-18 | 2007-dec-11 | 2012-sep-20 | 2009127749 | | 2461977 |
| 2006PF02049 | 2006PO0049WOIN | IN | Pending | 2006-dez-18 | 2007-dec-11 | | 4143/CHENP/2009 | | |
| 2006PF02049 | 2006PO2049WOUS | US | Granted | 2006-dez-18 | 2007-dec-11 | 2013-nov-12 | 12/518988 | 2010-0027686-A1 | 8582666 |
| 2006PF02049 | 2006PO0049 US01 | US | Pending | 2006-dez-18 | 2013-okt-09 | | 14/049080 | US-2014-0079330-A3 | |
| 2006PF02049 | 2006PO0049WETR | TR | Granted | 2006-dez-18 | 2007-dec-11 | 2010-nov-10 | 07849411.9 | | 2011 00552 T4 |
| 2006PF02049 | 2006PO0049WEGB | GB | Granted | 2006-dez-18 | 2007-dec-11 | 2010-nov-10 | 07849411.9 | | 2123051 |
| 2006PF02049 | 2006PO0049WEDE | DE | Granted | 2006-dez-18 | 2007-dec-11 | 2010-nov-10 | 07849411.9 | | 602007010514.5 |
| 2006PF02049 | 2006PO0049WEPL | PL | Granted | 2006-dez-18 | 2007-dec-11 | 2010-nov-10 | 07849411.9 | | 2123051 |
| 2006PF00309 | 2006PO0309 US01 | US | Pending | 2006-dez-19 | 2007-dec-13 | | 15/408068 | US-2012-0153517-A1 | |
| 2006PF00309 | 2006PO0309WOUS | US | Pending | 2006-dez-19 | 2007-dec-19 | | 12/519346 | | |
| 2006PF00391 | 2006PO0391WOIP | JP | Granted | 2006-dez-19 | 2007-dec-12 | 2013-mei-31 | 2009-542300 | | 5265015 |
| 2006PF00391 | 2006PO0391WEFR | FR | Granted | 2006-dez-19 | 2007-dec-12 | 2010-jun-16 | 07849451.5 | | 2095173 |
| 2006PF00391 | 2006PO0391WOCN | CN | Granted | 2006-dez-19 | 2007-dec-12 | 2011-nov-16 | 200790047117.6 | 101566873-A | 200790047117.6 |
| 2006PF00391 | 2006PO0391WEGB | GB | Granted | 2006-dez-19 | 2007-dec-12 | 2010-jun-16 | 07849451.5 | | 2095173 |





**A-733**

Confidential

| FAMILY | RIGHT | VERSION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2006PF02393 | 2006PO2393WEDE | DE | Granted | 2005-dec-19 | 2007-dec-12 | 2010-jan-18 | 078494X1.5 | | 602007207238.7 |
| 2006PF02393 | 2006PO2393WOUS | US | Granted | 2006-dec-19 | 2006-dec-12 | 2012-aug-14 | 12/518918 | 2010-0013480-A1 | 8240854 |
| 2007PF00106 | 2007PO0106WO1P | JP | Granted | 2007-jan-12 | 2008-jan-14 | 2014-mrt-28 | 09-545257 | | 5508024 |
| 2007PF00106 | 2007PO0106WOCN | CN | Granted | 2007-jan-12 | 2008-jan-04 | 2014-aug-27 | 200800023902.2 | 101584200A | 200800318382.2 |
| 2007PF00106 | 2007PO0106WOUS | US | Granted | 2007-jan-12 | 2008-jan-04 | 2013-okt-29 | 12/521886 | 2010-0314585-A1 | 8571301 |
| 2007PF00106 | 2007PO0106WOIN | IN | Pending | 2007-jan-12 | 2008-jan-04 | | 4638/CHENP/2009 | | |
| 2007PF00106 | 2007PO0106WE | | Pending | 2007-jan-12 | 2008-jan-04 | | 0870019T.0 | 2105026-A | |
| 2007PF01036 | 2007PO1036WOCH | CH | Granted | 2007-apr-17 | 2008-apr-14 | 1012-mrt-21 | 2008400512592.3 | 101875379-A | 200840012592.3 |
| 2007PF01036 | 2007PO1036WOGB | Gb | Granted | 2007-apr-17 | 2008-apr-17 | 2011-aug-31 | 08737026.1 | 2140504-A | 2140504 |
| 2007PF01036 | 2007PO1036WO1P | JP | Granted | 2007-apr-17 | 2008-apr-14 | 2014-mrt-03 | 2010-503637 | | 5545884 |
| 2007PF01036 | 2007PO1036WOUS | US | Pending | 2007-apr-17 | 2008-apr-14 | | 12/595230 | 2010-014944-A1 | |
| 2007PF01036 | 2007PO1036WOKR | KR | Pending | 2007-apr-17 | 2008-apr-17 | | 10-2009-7023630 | | |
| 2007PF01036 | 2007PO1036WOIN | IN | Pending | 2007-apr-17 | 2008-apr-14 | | 6603/CHENP/2009 | | |
| 2007PF01036 | 2007PO1036WETR | TR | Granted | 2007-apr-17 | 2008-apr-17 | 1011-aug-31 | 08737826.1 | 2140804-A | TR 2011 11278 T4 |
| 2007PF01036 | 2007PO1036WEDE | DE | Granted | 2007-apr-17 | 2008-apr-14 | 2013-aug-31 | 08737826.1 | 2140804-A | 602008009321.2 |
| 2007PF01036 | 2007PO1036 JP | JP | Pending | 2007-apr-17 | 2008-apr-14 | | 2014-085313 | | |
| 2007PF01038 | 2007PO1038 TW | TW | Pending | 2007-apr-17 | 2008-apr-15 | | 097113657 | 200900827-A | |
| 2007PF01038 | 2007PO1038WOFR | FR | Granted | 2007-apr-17 | 2008-apr-14 | 2013-aug-31 | 08737026.1 | 2140804-A | 2140804 |
| 2007PF01070 | 2007PO1070WOKR | KR | Pending | 2007-mei-11 | 2008-mei-05 | | 10-2009-7025742 | | |
| 2007PF01070 | 2007PO1070WOGB | GB | Granted | 2007-mei-11 | 2008-mei-05 | 2012-feb-01 | 08738076.2 | 2153669 | 2153669 |
| 2007PF01070 | 2007PO1070WOIN | IN | Granted | 2007-mei-11 | 2008-mei-05 | | 7128/CHENP/2009 | | |
| 2007PF01070 | 2007PO1070WOUS | US | Granted | 2007-mei-11 | 2008-mei-05 | 2013-nov-19 | 12/599362 | 2010-0329920-A1 | 8588514 |
| 2007PF01070 | 2007PO1070WEDE | DE | Granted | 2007-mei-11 | 2008-mei-05 | 2012-feb-01 | 08738076.2 | 2153669 | 602008011085.1 |
| 2007PF01070 | 2007PO1070WO1P | JP | Granted | 2007-mei-11 | 2008-mei-05 | 2012-nov-22 | 10-507011 | | 5138091 |
| 2007PF01070 | 2007PO1070WOCH | CH | Granted | 2007-mei-11 | 2008-mei-05 | 2012-mei-02 | 200880015625.8 | 101682794-A | 200880015625.8 |
| 2007PF01070 | 2007PO1070WEFR | FR | Granted | 2007-mei-11 | 2008-mei-05 | 2012-feb-01 | 08738076.2 | 2153669 | 2153669 |
| 2007PF00572 | 2007PO0572WE | | Pending | 2007-jun-26 | 2008-jun-19 | | 08763388.9 | 2163103A | |
| 2007PF00572 | 2007PO0572WOCN | CN | Granted | 2007-jun-26 | 2008-jun-19 | 2012-jun-20 | 200880021844.7 | 101690349-A | 200880021844.7 |
| 2007PF00572 | 2007PO0572WOUS | US | Granted | 2007-jun-26 | 2008-jun-19 | 2013-jan-01 | 12/665093 | 2010-0195716-A1 | 8345751 |
| 2007PF00572 | 2007PO0572WO1P | JP | Granted | 2007-jun-26 | 2008-jun-19 | 2013-nov-08 | 10-514199 | | 5406183 |
| 2007PF00572 | 2007PO0572WOKR | KR | Pending | 2007-jun-26 | 2008-jun-19 | | 10-2010-7001680 | | |
| 2007PF00572 | 2007PO0572WOIN | IN | Pending | 2007-jun-26 | 2008-jun-19 | | 366/CHENP/2010 | | |
| 2007PF00572 | 2007PO0572WORU | RU | Granted | 2007-jun-26 | 2008-jun-19 | 2013-jul-10 | 2010400255 | | 2487488 |
| 2007PF00630 | 2007PO0630WOUS | US | Pending | 2007-jul-03 | 2008-jun-24 | | 12/667241 | 2010-0182410-A1 | |
| 2007PF00630 | 2007PO0630WOIN | IN | Pending | 2007-jul-03 | 2008-jun-24 | | 535/CHENP/2010 | | |
| 2007PF00630 | 2007PO0630WEDE | DE | Granted | 2007-jul-03 | 2008-jun-24 | 2011-apr-27 | 08774466.8 | | 602008006555.3 |
| 2007PF00630 | 2007PO0630WO1P | JP | Granted | 2007-jul-03 | 2008-jun-24 | 2012-feb-10 | 10-514205 | | 4921591 |
| 2007PF00630 | 2007PO0630WOCN | CH | Granted | 2007-jul-03 | 2008-jun-24 | 2012-jul-18 | 200880023390.1 | 10172048D-A | 200880021390.1 |
| 2007PF00630 | 2007PO0630WEGB | GB | Granted | 2007-jul-03 | 2008-jun-24 | 2011-apr-27 | 08774466.8 | | 2174293 |
| 2007PF00630 | 2007PO0630WOIT | IT | Granted | 2007-jul-03 | 2008-jun-24 | 2011-apr-27 | 08774466.8 | | 2174293 |
| 2007PF00630 | 2007PO0630WEFR | FR | Granted | 2007-jul-03 | 2008-jun-24 | 2011-apr-27 | 08774466.8 | | 2174293 |
| 2007PF01472 | 2007PO1472WOUS | US | Granted | 2007-jul-26 | 2008-jul-18 | 2014-okt-07 | 12/666038 | 2010-0194856-A1 | 8854425 |
| 2007PF01472 | 2007PO1472WOCH | CH | Granted | 2007-jul-26 | 2008-jul-18 | 2013-apr-24 | 200880100657.8 | 101812087-A | 200880100657.8 |
| 2007PF01472 | 2007PO1472WOFR | FR | Granted | 2007-jul-26 | 2008-jul-18 | 2011-jun-22 | 08789359.0 | 2174511-A | 2174511 |
| 2007PF01472 | 2007PO1472WOKR | KR | Pending | 2007-jul-26 | 2008-jul-18 | | 10-2010-7004007 | | |
| 2007PF01472 | 2007PO1472WEGB | GB | Granted | 2007-jul-26 | 2008-jul-18 | 2013-jun-22 | 08789359.0 | 2174511-A | 2174511 |
| 2007PF01472 | 2007PO1472WO1P | JP | Granted | 2007-jul-26 | 2008-jul-18 | 2011-dec-16 | 10-517520 | | 4886898 |
| 2007PF01472 | 2007PO1472WOIN | IN | Pending | 2007-jul-26 | 2008-jul-18 | | 922/CHENP/2010 | | |
| 2007PF01472 | 2007PO1472WEDE | DE | Granted | 2007-jul-26 | 2008-jul-18 | 2013-jun-22 | 08789359.0 | 2174511-A | 602008007627.2 |
| 2007PF00840 | 2007PO0840WE | | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204049A | |
| 2007PF00840 | 2007PO0840WEGB | GB | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204049A | |
| 2007PF00840 | 2007PO0240 USD1 | US | Pending | 2007-sep-24 | 2014-sep-03 | | 14/478230 | | |
| 2007PF00840 | 2007PO0840WO1F | JP | Pending | 2007-sep-24 | 2008-sep-16 | | 10-515470 | | |
| 2007PF00840 | 2007PO0840WOKR | KR | Pending | 2007-sep-24 | 2008-sep-16 | | 10-2010-7008565 | | |
| 2007PF00840 | 2007PO0840 CA | CA | Pending | 2007-sep-24 | 2008-sep-16 | | 2700499 | | |
| 2007PF00840 | 2007PO0840WEES | ES | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204049-A | |
| 2007PF00840 | 2007PO0840WSFR | FR | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204049-A | |
| 2007PF00840 | 2007PO0840WEIE | IE | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204049-A | |
| 2007PF00840 | 2007PO0840WOID | ID | Pending | 2007-sep-24 | 2008-sep-16 | | W-00201000828 | | |
| 2007PF00840 | 2007PO0840WOMX | MX | Granted | 2007-sep-24 | 2008-sep-16 | 2013-mrt-22 | MX/A/2010/03159 | | 306150 |
| 2007PF00840 | 2007PO0840WOCN | CN | Pending | 2007-sep-24 | 2008-sep-16 | | 200880108524.5 | 101816179-A | |
| 2007PF00840 | 2007PO0840WORU | RU | Granted | 2007-sep-24 | 2008-sep-16 | 2014-jun-10 | 2010116176 | 2010116176-A | 2518408 |
| 2007PF00840 | 2007PO0940 AU | AU | Granted | 2007-sep-24 | 2008-sep-16 | 2013-nov-21 | 2008303276 | | 2008303276 |
| 2007PF00840 | 2007PO0940 EG | EG | Pending | 2007-sep-24 | 2008-sep-16 | | 458/2010 | | |
| 2007PF00840 | 2007PO0940WSAT | AT | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204043-A | |
| 2007PF00840 | 2007PO0940WSSE | SE | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204043-A | |
| 2007PF00840 | 2007PO0940WOBR | BR | Pending | 2007-sep-24 | 2008-sep-16 | | PI 0817182-0 | | |
| 2007PF00840 | 2007PO0840WOUS | US | Granted | 2007-sep-24 | 2008-sep-16 | 2014-okt-07 | 12/526645 | 2010-0110163-A1 | 8854427 |
| 2007PF00840 | 2007PO0940WOHU | HU | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204043-A | |
| 2007PF00840 | 2007PO0840WOSX | SK | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204043-A | |
| 2007PF00840 | 2007PO0840WENL | NL | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204043-A | |
| 2007PF00840 | 2007PO0840WETR | TR | Pending | 2007-sep-24 | 2008-sep-16 | | 08807668.2 | 2204043-A | |
| 2007PF00840 | 2007PO0840WOIN | IN | Pending | 2007-sep-24 | 2008-sep-16 | | 2159/CHENP/2010 | | |
| 2007PF00840 | 2007PO0940 MY | MY | Pending | 2007-sep-24 | 2008-sep-16 | | 2010001217 | | |



**A-734**



Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2007FF00940 | 2007P00940WEIT | IT | Pending | 2007-sep-24 | 2008-sep-16 | | 08807868.2 | 2204043-A | |
| 2007FF00940 | 2007P00940WEPL | PL | Pending | 2007-sep-24 | 2008-sep-16 | | 08807868.2 | 2204043-A | |
| 2007FF00940 | 2007P00940ZA | ZA | Pending | 2007-sep-24 | 2008-sep-16 | | 2010/02896 | | |
| 2007FF00940 | 2007P00940WEDE | DE | Pending | 2007-sep-24 | 2008-sep-16 | | 08807868.2 | 2204043-A | |
| 2007FF01262 | 20C7P01262WE | | Pending | 2007-okt-02 | 2008-sep-30 | | 08807953.0 | 2194035-A | |
| 2007FF01262 | 2007P01262WOKR | KR | Pending | 2007-okt-02 | 2008-sep-30 | | 10-2010-7009582 | | |
| 2007FF01262 | 2007P01262 TW | TW | Pending | 2007-okt-02 | 2008-sep-30 | | 097137515 | 200923422A | |
| 2007FF01262 | 2007P01262WOUS | US | Pending | 2007-okt-02 | 2008-sep-30 | | 12/680128 | 2010-0239739-A1 | |
| 2007FF01262 | 2007P01262WOCN | CN | Granted | 2007-okt-02 | 2008-sep-30 | 2013-aug-21 | 200880409946.4 | 101836480-A | 200880109946.4 |
| 2007FF01262 | 2007P01262WOJP | JP | Pending | 2007-okt-02 | 2008-sep-30 | | 10-527580 | | |
| 2007FF01684 | 2007P01684WOUS | US | Granted | 2007-okt-11 | 2008-okt-02 | 2013-mei-21 | 12/681837 | 2010-0215251-A1 | 8447096 |
| 2007FF01684 | 2007P01684WOKN | KN | Pending | 2007-okt-11 | 2008-okt-02 | | 2869/CHENP/2010 | | |
| 2007FF01684 | 2007P01684WOJP | JP | Granted | 2007-okt-11 | 2008-okt-02 | 2014-jul-11 | 10-528311 | | 5575650 |
| 2007FF01684 | 2007P01684WORU | RU | Granted | 2007-okt-11 | 2008-okt-02 | 2013-okt-27 | 2010118466 | 2010118466-A | 2497196 |
| 2007FF01684 | 2007P01684WEDE | DE | Granted | 2007-okt-11 | 2008-okt-02 | 2012-dez-12 | 08807867.0 | 2201766-A | 60 2008 020 834.6 |
| 2007FF01684 | 2007P01684WOKR | KR | Pending | 2007-okt-11 | 2008-okt-02 | | 10-2010-7012239 | | |
| 2007FF01684 | 2007P01684WEGB | GB | Granted | 2007-okt-11 | 2008-okt-02 | 2012-dez-12 | 08807867.0 | 2201766-A | 2201784 |
| 2007FF01684 | 2007P01684WOCN | CN | Granted | 2007-okt-11 | 2008-okt-02 | 2012-mei-30 | 200880111024.7 | 101832008-A | 200880111024.7 |
| 2007FF01684 | 2007P01684WEFR | FR | Granted | 2007-okt-11 | 2008-okt-02 | 2012-dez-12 | 08807867.0 | 2201766-A | 2201784 |
| 2007FF01261 | 2007P01261WEFR | FR | Granted | 2007-nov-02 | 2008-okt-27 | 2013-jan-02 | 08843083.7 | 2218261-A | 2218261 |
| 2007FF01261 | 2007P01261WOCN | CN | Granted | 2007-nov-02 | 2008-okt-27 | 2013-jun-12 | 200880114165.4 | 101843305-A | 200880114165.4 |
| 2007FF01261 | 2007P01261WOKR | KR | Pending | 2007-nov-02 | 2008-okt-27 | | 10-2010-7012116 | | |
| 2007FF01261 | 2007P01261WOJP | JP | Granted | 2007-nov-02 | 2008-okt-27 | 2014-apr-04 | 10-531817 | | 5514115 |
| 2007FF01261 | 2007P01261WOUS | US | Granted | 2007-nov-02 | 2008-okt-27 | 2016-feb-11 | 12/739420 | 2010-0245406-A1 | 8648792 |
| 2007FF01261 | 2007P01261WEDE | DE | Granted | 2007-nov-02 | 2008-okt-27 | 2013-jan-02 | 08843083.7 | 2218261-A | 602008021495.4 |
| 2007FF01261 | 2007P01261WEGB | GB | Granted | 2007-nov-02 | 2008-okt-27 | 2013-jan-02 | 08843083.7 | 2218261-A | 2218261 |
| 2007FF01261 | 2007P01261WOIN | IN | Pending | 2007-nov-02 | 2008-okt-27 | | 3106/CHENP/2010 | | |
| 2007FF00937 | 2007P00937W0JN | IN | Pending | 2007-dec-14 | 2008-dez-10 | | 4275/CHENP/2010 | | |
| 2007FF00937 | 2007P00937WOUS | US | Granted | 2007-dec-10 | 2008-dec-10 | 2014-feb-26 | 12/746951 | 2010-0300442-A1 | 8660402 |
| 2007FF00937 | 2007P00937 TW | TW | Pending | 2007-dec-14 | 2008-dec-11 | | 097148278 | 200935903-A | |
| 2007FF00937 | 2007P00937WOCN | CN | Granted | 2007-dec-14 | 2008-dec-10 | 2015-mrt-08 | 200880120016.3 | 101897195-A | 200880120916.3 |
| 2007FF00937 | 2007P00937WORU | RU | Granted | 2007-dec-14 | 2008-dec-10 | 2014-feb-10 | 2010129059 | | 2506708 |
| 2007FF00937 | 2007P00937WOBR | BR | Pending | 2007-dec-14 | 2008-dec-10 | | PI 0820739-9 | | |
| 2007FF00937 | 2007P00937WOKR | KR | Pending | 2007-dec-14 | 2008-dec-10 | | 10-2010-7015529 | | |
| 2007FF00937 | 2007P00937WOJP | JP | Granted | 2007-dec-14 | 2008-dec-10 | 2014-jul-11 | 10-537576 | | 5575650 |
| 2007FF00937 | 2007P00937 US01 | US | Pending | 2007-dec-14 | 2014-feb-25 | | 14/189077 | 2014-0294150-A1 | |
| 2007FF01979 | 2007P01979WOMX | MX | Granted | 2007-dec-18 | 2008-dec-15 | 2013-feb-05 | MX/A/10/006667 | | 307217 |
| 2007FF01979 | 2007P01979WOUS | US | Pending | 2007-dec-18 | 2008-dec-15 | | 12/808685 | 2010-0315489-A1 | |
| 2007FF01979 | 2007P01979WOIN | IN | Pending | 2007-dec-18 | 2008-dec-15 | | 4357/CHENP/2010 | | |
| 2007FF01979 | 2007P01979WORU | RU | Granted | 2007-dec-18 | 2008-dec-15 | 2014-mei-20 | 2010129514 | 2010129514-A | 2516499 |
| 2007FF01979 | 2007P01979WE | | Pending | 2007-dec-18 | 2008-dec-15 | | 08861393.0 | 2235056-A | |
| 2007FF01979 | 2007P01979WOBR | BR | Pending | 2007-dec-18 | 2008-dec-15 | | PI 0820848-4 | | |
| 2007FF01979 | 2007P01979 US | US | Pending | 2007-dec-18 | | | | | |
| 2007FF01979 | 2007P01979WOCN | CN | Granted | 2007-dec-18 | 2008-dec-15 | 2012-dec-26 | 200880121615.2 | 101904175-A | 200880121615.2 |
| 2007FF01979 | 2007P01979WOJP | JP | Pending | 2007-dec-18 | 2008-dec-15 | | 10-539000 | | |
| 2007FF01979 | 2007P01979WOKR | KR | Pending | 2007-dec-18 | 2008-dec-15 | | 10-2010-7015661 | | |
| 2007FF01499 | 2007P01499WOJP | JP | Pending | 2007-dec-20 | 2008-dec-17 | | PI 0822031-8 | | |
| 2007FF01439 | 2007P01439WOJP | JP | Granted | 2007-dec-20 | 2008-dec-17 | 2016-jun-06 | 2010-539018 | | 5953330 |
| 2007FF01439 | 2007P01439WORJ | KR | Pending | 2007-dec-20 | 2008-dec-17 | | 10-2010-7015794 | | |
| 2007FF01439 | 2007P01439WE | | Pending | 2007-dec-20 | 2008-dec-17 | | 08864113.9 | 2235957-A | |
| 2007FF01439 | 2007P01439WOCN | CN | Granted | 2007-dec-20 | 2008-dec-17 | 2013-mei-29 | 200880123645.3 | 101904176-A | 200880123645.3 |
| 2007FF01439 | 2007P01439WOUS | US | Granted | 2007-dec-20 | 2008-dec-17 | 2013-apr-30 | 12/808719 | 2010-0218153-A1 | 8422801 |
| 2007FF01374 | 2007P01374WEDE | DE | Granted | 2007-dec-26 | 2008-dec-19 | 2014-jun-18 | 08867911.3 | 2235685-A | 2235685 |
| 2007FF01374 | 2007P01374WOKR | KR | Pending | 2007-dec-26 | 2008-dec-19 | | 10-2010-7016415 | | |
| 2007FF01374 | 2007P01374WOIN | IN | Pending | 2007-dec-26 | 2008-dec-19 | | 4540/CHENP/2010 | | |
| 2007FF01374 | 2007P01374WE | | Granted | 2007-dec-26 | 2008-dec-19 | 2014-jun-18 | 08867911.3 | 2235685-A | 2235685 |
| 2007FF01374 | 2007P01374WEGB | GB | Granted | 2007-dec-26 | 2008-dec-19 | 2014-jun-18 | 08867911.3 | 2235685-A | 2235685 |
| 2007FF01374 | 2007P01374WOUS | US | Granted | 2007-dec-26 | 2008-dec-19 | 2014-mei-06 | 12/809078 | 2990-0271464-A1 | 8717355 |
| 2007FF01374 | 2007P01374WEFR | FR | Granted | 2007-dec-26 | 2008-dec-19 | 2014-jun-18 | 08867911.3 | 2235685-A | 2235685 |
| 2007FF01374 | 2007P01374WEIT | IT | Granted | 2007-dec-26 | 2008-dec-19 | 2014-jun-18 | 08867911.3 | 2235685-A | 2235685 |
| 2007FF01374 | 2007P01374WOCN | CN | Granted | 2007-dec-26 | 2008-dec-19 | 2015-okt-23 | 200880123012.6 | 101911324-A | 200880123012.6 |
| 2007FF01374 | 2007P01374WOJP | JP | Pending | 2007-dec-26 | 2008-dec-19 | | 10-540199 | | |
| 2008FF00091 | 2008P00091WEFR | FR | Granted | 2008-feb-11 | 2009-feb-06 | 2013-apr-10 | 09713035.7 | 2243300-A | 2243300 |
| 2008FF00091 | 2008P00091WOIN | IN | Pending | 2008-feb-11 | 2009-feb-06 | | 5521/CHENP/2010 | | |
| 2008FF00091 | 2008P00091WOJP | JP | Granted | 2008-feb-11 | 2009-feb-06 | 2012-apr-13 | 10-545598 | | 4971505 |
| 2008FF00091 | 2008P00091WOKR | KR | Pending | 2008-feb-11 | 2009-feb-06 | | 10-2010-7020019 | | |
| 2008FF00091 | 2008P00091WOCN | CN | Granted | 2008-feb-11 | 2009-feb-06 | 2013-jan-29 | 200980104793.9 | 101946521-A | 200980104793.9 |
| 2008FF00091 | 2008P00091WEGB | GB | Granted | 2008-feb-11 | 2009-feb-06 | 2013-apr-10 | 09713035.7 | 2243300-A | 2243300 |
| 2008FF00091 | 2008P00091WOBR | BR | Pending | 2008-feb-11 | 2009-feb-06 | | PI 0908372-3 | | |
| 2008FF00091 | 2008P00091WOUS | US | Pending | 2008-feb-11 | 2009-feb-06 | | 12/865805 | 2011-0001903-A1 | |
| 2008FF00091 | 2008P00091 PW | TW | Pending | 2008-feb-11 | 2009-feb-09 | | 098104206 | 200952463-A | |
| 2008FF00091 | 2008P00091WETR | TR | Granted | 2008-feb-11 | 2009-feb-06 | 2013-apr-10 | 09713035.7 | 2243300-A | 2243300 |
| 2008FF00091 | 2008P00091WORIJ | RU | Granted | 2008-feb-11 | 2009-feb-06 | 2013-aug-20 | 2010137789 | 2010137789-A | 2490817 |
| 2008FF00091 | 2008P00091WEDE | DE | Granted | 2008-feb-11 | 2009-feb-06 | 2013-apr-10 | 09713035.7 | 2243300-A | 2243300 |



**A-735**

Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2008PF00853 | 2008P00853WO1KR | KR | Pending | 2008-jun-02 | 2009-mei-27 | | 10-2010-7029725 | | |
| 2008PF00853 | 2008P00853WO1CN | CN | Granted | 2008-jun-02 | 2009-mei-27 | 2015-apr-14 | 200880150347.7 | 102047189-A | 200980130347.7 |
| 2008PF00853 | 2008P00851 TW | TW | Pending | 2008-jun-02 | 2009-jun-02 | | 098118246 | 201003123A | |
| 2008PF00853 | 2008P00853WO1IN | IN | Granted | 2008-jun-02 | 2009-mei-27 | 2014-feb-20 | 2010154064 | 2010154064-A | 2507550 |
| 2008PF00853 | 2008P00851WE | | Pending | 2008-jun-02 | 2009-mei-27 | | 09757639.5 | 2384398-A | |
| 2008PF00853 | 2008P00853WO1RR | RR | Pending | 2008-jun-02 | 2009-mei-27 | | PI 0909609-4 | | |
| 2008PF00853 | 2008P00853WO1US | US | Pending | 2008-jun-02 | 2009-mei-27 | | 12/993868 | 2011-0075256-A1 | |
| 2008PF00853 | 2008P00853WO1JP | JP | Pending | 2008-jun-02 | 2009-mei-27 | | 11-512250 | | |
| 2008PF00853 | 2008P00853WO1IN | IN | Pending | 2008-jun-02 | 2009-mei-27 | | 8241/CHENP/2010 | | |
| 2008PF00932 | 2008P00932WO1KR | KR | Pending | 2008-jun-27 | 2009-jun-26 | | 10-2011-7001840 | | |
| 2008PF00932 | 2008P00932WO1US | US | Granted | 2008-jun-27 | 2009-jun-26 | 2014-jul-15 | 12/997865 | 2011-0164006-A1 | 8780188 |
| 2008PF00932 | 2008P00932WO1CN | CN | Granted | 2008-jun-27 | 2009-jun-26 | 2017-mei-12 | 200980124252.2 | 102077801-A | 200980124252.2 |
| 2008PF00932 | 2008P00932WO1EN | EN | Pending | 2008-jun-27 | 2009-jun-26 | | 489/CHENP/2011 | | |
| 2008PF00932 | 2008P00932WO1JP | JP | Granted | 2008-jun-27 | 2009-jun-26 | 2014-jul-04 | 11-515710 | | 5571662 |
| 2008PF00932 | 2008P00932WO1BR | BR | Pending | 2008-jun-27 | 2009-jun-26 | | PI 0910144-6 | | |
| 2008PF00932 | 2008P00932WE | | Pending | 2008-jun-27 | 2009-jun-26 | | 09769776.7 | 2304866-A | |
| 2008PF00932 | 2008P00932WORU | RU | Granted | 2008-jun-27 | 2009-jun-26 | 2014-jan-27 | 2011102977 | 2011102977-A | 2505937 |
| 2008PF01733 | 2008P01733WO1CN | CN | Pending | 2008-jul-24 | 2009-jul-22 | | 200980128655.x | 102106152 | |
| 2008PF01733 | 2008P01733 TW | TW | Pending | 2008-jul-24 | 2009-jul-24 | | 098125142 | 201010/0409-A | |
| 2008PF01733 | 2008P01733WE | | Pending | 2008-jul-24 | 2009-jul-24 | | 09786470.1 | 2308243-A | |
| 2008PF01733 | 2008P01733WO1BR | BR | Pending | 2008-jul-24 | 2009-jul-22 | | PI0913016-0 | | |
| 2008PF01733 | 2008P01733WO1US | US | Pending | 2008-jul-24 | 2009-jul-22 | | 13/054521 | 2011-0122131-A1 | |
| 2008PF01733 | 2008P01733WO1IN | IN | Pending | 2008-jul-24 | 2009-jul-22 | | 1075/CHENP/2011 | | |
| 2008PF01735 | 2008P01733WO1JP | JP | Granted | 2008-jul-24 | 2009-jul-21 | 2014-jun-27 | 2011-519274 | | 5567562 |
| 2008PF01735 | 2008P01733WO1MY | MY | Pending | 2008-jul-24 | 2009-jul-22 | | PI 2011000321 | | |
| 2008PF01733 | 2008P01733WO1KR | KR | Pending | 2008-jul-24 | 2009-jun-22 | | 10-2011-7004033 | | |
| 2008PF01733 | 2008P01733WO1RU | RU | Granted | 2008-jul-24 | 2009-jun-22 | 2014-jun-10 | 2011100470 | 2011100470-A | 2519057 |
| 2008PF00915 | 2008P00915WEP101 | PL | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11354108.8 | 2362673-A1 | 2362671 |
| 2008PF00915 | 2008P00835WO1CN | CN | Granted | 2008-jul-25 | 2009-jul-17 | 2013-dec-18 | 200980128656.X | 102104153-A | 200980128936.X |
| 2008PF00915 | 2008P00935WO1IN | IN | Pending | 2008-jul-25 | 2009-jul-17 | | 1077/CHENP/2011 | | |
| 2008PF00915 | 2008P00835WO1VN | VN | Pending | 2008-jul-25 | 2009-jul-17 | | 1-2011-00458 | | |
| 2008PF00915 | 2008P00835 CN | CN | Granted | 2008-jul-25 | 2009-jul-17 | 2014-sep-03 | 201130123678.5 | 102137270-A | 201110123678.5 |
| 2008PF00915 | 2008P00915WEE503 | ES | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00915 | 2008P00835WO1AU | AU | Pending | 2008-jul-25 | 2009-jul-17 | | 2009575163 | | |
| 2008PF00915 | 2008P00835 AU | AU | Granted | 2008-jul-25 | 2009-jul-17 | 2012-jul-05 | 2011202552 | | 2011202552 |
| 2008PF00915 | 2008P00933WEGB01 | GB | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00915 | 2008P00935WO1BR | BR | Pending | 2008-jul-25 | 2009-jul-17 | | PI 0911814-3 | | |
| 2008PF00915 | 2008P00915WO1JP | JP | Pending | 2008-jul-25 | 2009-jul-17 | | 2011-518248 | | |
| 2008PF00915 | 2008P00915WORU | RU | Granted | 2008-jul-25 | 2009-jul-17 | 2014-mei-27 | 2011100842 | 2011100842-A | 2517402 |
| 2008PF00915 | 2008P00915 ID | ID | Pending | 2008-jul-25 | 2009-jul-17 | | W-00 2010-00278 | 061488-A | |
| 2008PF00915 | 2008P00915WE | | Pending | 2008-jul-25 | 2009-jul-17 | | 09786535.4 | 2308240-A | |
| 2008PF00935 | 2008P00935WE1TR01 | FR | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WEHU01 | HU | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WE5E01 | SE | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WE5K01 | SK | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WE1TR01 | TR | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362873-A1 | 2362671 |
| 2008PF00935 | 2008P00935WO1KR | KR | Pending | 2008-jul-25 | 2009-jul-17 | | 10-2011-7004128 | | |
| 2008PF00935 | 2008P00935 IN | IN | Pending | 2008-jul-25 | 2011-mei-16 | | 3354/CHENP/2011 | | |
| 2008PF00915 | 2008P00935 US01 | US | Pending | 2008-jul-25 | 2011-jun-08 | | 13/155436 | 2011-0292189-A1 | |
| 2008PF00935 | 2008P00935WE1T01 | IT | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WE1NL01 | NL | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WO1US | US | Granted | 2008-jul-25 | 2009-jul-17 | 2013-aug-13 | 13/054973 | 2011-0128351-A1 | 8508582 |
| 2008PF00915 | 2008P00935 KR | KR | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-30 | 10-2011-7018100 | | 10-1315081 |
| 2008PF00915 | 2008P00935WEBE01 | BE | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WEDE01 | DE | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 60 2009 018 830.0 |
| 2008PF00935 | 2008P00935 MX | MX | Granted | 2008-jul-25 | 2009-jul-17 | 2013-jul-03 | 2011/00X785 | | 313056 |
| 2008PF00935 | 2008P00935WO1MY | MY | Pending | 2008-jul-25 | 2009-jul-17 | | PI 2011000322 | | |
| 2008PF00915 | 2008P00935 MX01 | MX | Granted | 2008-jul-25 | 2013-apr-15 | 2013-dec-13 | MX/A/2013/004198 | | 316397 |
| 2008PF00935 | 2008P00935WEAT01 | AT | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362673-A1 | 2362671 |
| 2008PF00935 | 2008P00935WE2R001 | RO | Granted | 2008-jul-25 | 2009-jul-17 | 2013-sep-11 | 11364108.8 | 2362671-A1 | 2362671 |
| 2008PF00917 | 2008P00917WE | | Pending | 2008-jul-28 | 2009-jul-21 | | 0978668D.2 | | |
| 2008PF00917 | 2008P00957WO1IN | IN | Pending | 2008-jul-28 | 2009-jul-22 | | 1298/CHENP/2011 | | |
| 2008PF00917 | 2008P00917WO1JP | JP | Pending | 2008-jul-28 | 2009-jul-22 | | 2011-520629 | | |
| 2008PF00917 | 2008P00937WO1US | US | Pending | 2008-jul-28 | 2009-jul-22 | | 13/055777 | 2010/0123113-A1 | |
| 2008PF00917 | 2008P00937WO1CN | CN | Pending | 2008-jul-28 | 2009-jul-22 | | 200980129684.2 | X02313015-A | |
| 2008PF00917 | 2008P00937WO1KR | KR | Pending | 2008-jul-28 | 2009-jul-22 | | 10-2011-7004298 | | |
| 2008PFQ1291 | 2008P012915VE | | Pending | 2008-sep-25 | 2009-sep-23 | | 09767173.5 | 2338345-A | |
| 2008PFQ1291 | 2008P01291 TW | TW | Pending | 2008-sep-25 | 2009-sep-24 | | 098132851 | 201030807-A | |
| 2008PFQ1291 | 2008P01291WO1CN | CN | Granted | 2008-sep-25 | 2009-sep-23 | 2016-aug-13 | 200980157747.9 | 102165496-A | 200980157747.9 |
| 2008PFQ1291 | 2008P01291WO1US | US | Pending | 2008-sep-25 | 2009-sep-23 | | 13/119773 | 2011-0181568-A1 | |
| 2008PFQ1291 | 2008P01291WO1KR | KR | Pending | 2008-sep-25 | 2009-sep-23 | | 10-2011-7009281 | | |
| 2008PFQ1291 | 2008P01291WO1JP | JP | Granted | 2008-sep-25 | 2009-sep-23 | 2014-apr-25 | 2011-528482 | | 5527856 |
| 2008PFQ1298 | 2008P01298WEGB | GB | Granted | 2008-sep-25 | 2009-sep-18 | 2012-jul-25 | 09787237.8 | 2342693-A | 2342693 |
| 2008PFQ1298 | 2008P01298WO1JP | JP | Granted | 2008-sep-25 | 2009-sep-18 | 2014-jul-25 | 2011-528472 | | 5583127 |

**A-736**


Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2008PF01296 | 2008P01296WOXR | XR | Pending | 2006-sep-25 | 2006-sep-18 | | 10-2013-7008069 | | |
| 2008PF01296 | 2008P01296WODE | DE | Granted | 2006-sep-25 | 2009-sep-18 | 2012-Jul-25 | C97E7237.8 | 2342699-A | 602008008551.4 |
| 2008PF01296 | 2008P01296WETR | TR | Granted | 2006-sep-25 | 2009-sep-18 | 2012-Jul-25 | C97E7237.8 | 2342699-A | TR 2012 12087 T4 |
| 2008PF01296 | 2008P01296WOCN | CN | Pending | 2006-sep-25 | 2009-sep-18 | | 200980177417 | 102285495-A | |
| 2008PF01296 | 2008P01296WOUS | US | Pending | 2006-sep-25 | 2009-sep-18 | | 13/118269 | 2013-0199823-A1 | |
| 2008PF01296 | 2008P01296WEES | ES | Granted | 2006-sep-25 | 2009-sep-18 | 2012-Jul-25 | C97E7237.8 | 2342699-A | 2342699 |
| 2008PF01296 | 2008P01296WEFR | FR | Granted | 2006-sep-25 | 2009-sep-18 | 2012-Jul-25 | C97E7237.8 | 2342699-A | 2342699 |
| 2008PF01296 | 2008P01296WEPL | PL | Granted | 2006-sep-25 | 2009-sep-18 | 2012-Jun-25 | C97E7237.8 | 2342699-A | 2342699 |
| 2008PF01296 | 2008P01296 TW | TW | Pending | 2006-sep-25 | 2009-sep-22 | | 098101956 | 200821543-A | |
| 2008PF01296 | 2008P01296WEIT | IT | Granted | 2006-sep-25 | 2009-sep-18 | 2012-Jul-25 | C97E7237.8 | 2342699-A | 2342699 |
| 2008PF01273 | 2008P01273WOUS | US | Pending | 2006-okt-10 | 2009-okt-01 | | 13/123588 | 2011-0199485-A1 | |
| 2008PF01273 | 2008P01273WOXR | XR | Pending | 2006-okt-10 | 2009-okt-01 | | 10-2013-7030282 | | |
| 2008PF01273 | 2008P01273WE | | Pending | 2006-okt-10 | 2009-okt-01 | | C97E7345.9 | 2332340-A | |
| 2008PF01273 | 2008P01273WOCN | CN | Pending | 2006-okt-10 | 2009-okt-01 | | 200980139984.9 | 102177721-A | |
| 2008PF01273 | 2008P01273WOJP | JP | Granted | 2006-okt-10 | 2009-okt-01 | 2014-Jul-11 | 2011-530597 | | SS75778 |
| 2008PF01273 | 2008P01273 TW | TW | Pending | 2006-okt-10 | 2009-okt-06 | | 098134162 | 201019708-A | |
| 2008PF01630 | 2008P01630WOJP | JP | Granted | 2008-okt-23 | 2009-okt-16 | 2014-Jun-27 | 2011-531621 | | SS67578 |
| 2008PF01630 | 2008P01630WOUS | US | Pending | 2008-okt-23 | 2009-okt-16 | | 13/125372 | 2011-0199459-A1 | |
| 2008PF01630 | 2008P01630WE | | Pending | 2008-okt-23 | 2009-okt-16 | | 09744187.8 | 2353377-A | |
| 2008PF01630 | 2008P01630WOIN | IN | Pending | 2008-okt-23 | 2009-okt-16 | | 3401/CHENP/2011 | | |
| 2008PF01630 | 2008P01630WOCN | CN | Pending | 2008-okt-23 | 2009-okt-16 | | 200980141634.3 | 102204261-A | |
| 2008PF01630 | 2008P01630WOBU | BU | Granted | 2008-okt-23 | 2009-okt-16 | 2014-Jun-10 | 2011120445 | 2011120445-A | 2519433 |
| 2008PF01630 | 2008P01630WOBR | BR | Pending | 2008-okt-23 | 2009-okt-16 | | PI 0914450-5 | | |
| 2008PF01630 | 2008P01630WOKR | KR | Pending | 2008-okt-23 | 2009-okt-16 | | 10-2011-7011335 | | |
| 2008PF01630 | 2008P01630 TW | TW | Pending | 2008-okt-23 | 2009-okt-19 | | 098135301 | 201027975-A | |
| 2008PF01631 | 2008P01631WOBU | BU | Granted | 2008-okt-23 | 2009-okt-15 | 2014-apr-20 | 2011120459 | 2011120459-A | 2513894 |
| 2008PF01631 | 2008P01631WOKR | KR | Pending | 2008-okt-23 | 2009-okt-15 | | 3799/CHENP/2011 | | |
| 2008PF01631 | 2008P01631 TW | TW | Pending | 2008-okt-23 | 2009-okt-19 | | 098135302 | 201021544-A | |
| 2008PF01631 | 2008P01631WODE | DE | Granted | 2008-okt-23 | 2009-okt-23 | 2013-sep-25 | 09743918.4 | 2340527-A | 60 2009 039 050.8 |
| 2008PF01631 | 2008P01631WOCN | CN | Pending | 2008-okt-23 | 2009-okt-15 | | 200980141867.6 | 102197415-A | |
| 2008PF01631 | 2008P01631WOUS | US | Pending | 2008-okt-23 | 2009-okt-15 | | 13/124283 | 2011-0199379-A1 | |
| 2008PF01631 | 2008P01631WOBR | BR | Pending | 2008-okt-23 | 2009-okt-15 | | PI 0914496-6 | | |
| 2008PF01631 | 2008P01631WOJP | JP | Granted | 2008-okt-23 | 2009-okt-15 | 2013-Jan-11 | 2011-533639 | | 5173028 |
| 2008PF01631 | 2008P01631WOKR | KR | Pending | 2008-okt-23 | 2009-okt-15 | | 10-2013-7011370 | | |
| 2008PF01631 | 2008P01631WETR | TR | Granted | 2008-okt-23 | 2009-okt-15 | 2013-sep-25 | 09743918.4 | 2340527-A | 2340527 |
| 2008PF01631 | 2008P01631WEGB | GB | Granted | 2008-okt-23 | 2009-okt-15 | 2013-sep-25 | 09743918.4 | 2340527-A | 2340527 |
| 2008PF01426 | 2008P01426WOUS | US | Pending | 2008-okt-28 | 2009-okt-26 | | 13/125064 | 2011-0193688-A1 | |
| 2008PF01426 | 2008P01426WOKR | KR | Pending | 2008-okt-28 | 2009-okt-26 | | 10-2011-7012002 | | |
| 2008PF01426 | 2008P01426WE | | Pending | 2008-okt-28 | 2009-okt-26 | | 09744479.8 | 2340648-A | |
| 2008PF01426 | 2008P01426WORU | RU | Pending | 2008-okt-28 | 2009-okt-26 | | 2011123868 | 2011123868-A | |
| 2008PF01426 | 2008P01426WOBR | BR | Pending | 2008-okt-28 | 2009-okt-26 | | PI 0914482-0 | | |
| 2008PF01426 | 2008P01426WOCN | CN | Pending | 2009-okt-28 | 2009-okt-26 | | 200980143024.X | X02197053-A | |
| 2008PF01426 | 2008P01426WOIN | IN | Pending | 2008-okt-28 | 2009-okt-26 | | 3566/CHENP/2011 | | |
| 2008PF01426 | 2008P01426WOJP | JP | Granted | 2008-okt-28 | 2009-okt-26 | 2014-apr-04 | 2011-532766 | | 5514219 |
| 2008PF01426 | 2008P01426 TW | TW | Pending | 2008-okt-28 | 2009-okt-26 | | 098134208 | 201027980-A | |
| 2008PF01296 | 2008P01296WOUS | US | Pending | 2006-nov-04 | 2009-okt-26 | | 13/127267 | 2011-0211043-A1 | |
| 2008PF01296 | 2008P01296WE | | Pending | 2006-nov-04 | 2009-nov-03 | | 09744183.1 | 2347597-A | |
| 2008PF01296 | 2008P01296WOJP | JP | Pending | 2006-nov-04 | 2009-nov-03 | | 2011-503938 | | |
| 200xPF01296 | 2008P01296 TW | TW | Pending | 2006-nov-04 | 2009-nov-02 | | 098137138 | 201023819-A | |
| 2008PF01296 | 2008P01296WOCH | CH | Granted | 2008-nov-04 | 2009-nov-03 | 2014-Jul-23 | 200980143977.6 | 102204364-A | 200980143977.6 |
| 2008PF01296 | 2008P01296WOKR | KR | Pending | 2008-nov-04 | 2009-nov-03 | | 10-2011-7012656 | | |
| 2008PF01678 | 2008P01678WOJP | JP | Granted | 2008-nov-04 | 2009-nov-02 | 2014-aug-01 | 2011-533916 | | 5567894 |
| 2008PF01678 | 2008P01678WOCH | CN | Granted | 2008-nov-04 | 2009-nov-02 | 2013-nov-06 | 200980143979.5 | 102203829-A | 200980143979.5 |
| 2008PF01678 | 2008P01678WOKR | KR | Pending | 2008-nov-04 | 2009-nov-02 | | 10-2011-7012662 | | |
| 2008PF01678 | 2008P01678WE | | Pending | 2008-nov-04 | 2009-nov-02 | | C9756850.3 | 2347386 | |
| 2008PF01678 | 2008P01678WOIN | IN | Pending | 2008-nov-04 | 2009-nov-02 | | 3843/CHENP/2011 | | |
| 2008PF01678 | 2008P01678WOUS | US | Granted | 2008-nov-04 | 2009-nov-02 | 2013-mei-21 | 13/127263 | 2011-0210699-A1 | 8447343 |
| 2008PF01678 | 2008P01678 TW | TW | Pending | 2008-nov-04 | 2009-nov-02 | | 098137430 | 201023443-A | |
| 2008PF01633 | 2008P01633 TW | TW | Pending | 2008-nov-24 | 2009-nov-23 | | 098139730 | 201057982-A | |
| 2008PF01633 | 2008P01633WOJP | JP | Pending | 2008-nov-24 | 2009-nov-19 | | 2011-536989 | | |
| 2008PF01633 | 2008P01633WOKR | KR | Pending | 2008-nov-24 | 2009-nov-19 | | 10-2011-7014453 | | |
| 2008PF01633 | 2008P01633WE | | Pending | 2008-nov-24 | 2009-nov-19 | | C9761018.4 | 2374279 | |
| 2008PF01633 | 2008P01633WOUS | US | Pending | 2008-nov-24 | 2009-nov-19 | | 13/130498 | 2011-0225563-A1 | |
| 2008PF01633 | 2008P01633WOCH | CN | Pending | 2008-nov-24 | 2009-nov-19 | | 200980146890.4 | | |
| 2008PF01875 | 2008P01875WOCH | CH | Pending | 2008-nov-24 | 2009-nov-20 | | 200980146875.X | 102224737-A | |
| 2008PF01875 | 2008P01875WOUS | US | Pending | 2008-nov-14 | 2009-nov-20 | | 13/130406 | 2011-0234754-A1 | |
| 2008PF01875 | 2008P01875WOJP | JP | Pending | 2008-nov-24 | 2009-nov-20 | | 2011-536995 | | |
| 2008PF01875 | 2008P01875WOKR | KR | Pending | 2008-nov-24 | 2009-nov-20 | | 10-2011-7014353 | | |
| 2008PF01875 | 2008P01875WE | | Pending | 2008-nov-24 | 2009-nov-20 | | 09764990.8 | 1374280 | |
| 2008PF01875 | 2008P01875 TW | TW | Pending | 2008-nov-24 | 2009-nov-23 | | 098139759 | 201026018-A | |
| 2008PF01730 | 2008P01730 TW | TW | Pending | 2008-nov-24 | 2009-nov-23 | | 098139772 | 201103310-A | |
| 2008PF01730 | 2008P01730WE | | Pending | 2008-nov-24 | 2009-nov-18 | | C9764076.7 | 1368370 | |
| 2008PF01730 | 2008P01730WOCH | CN | Pending | 2008-nov-24 | 2009-nov-18 | | 200980146681.5 | | |
| 2008PF01730 | 2008P01730WOJP | JP | Pending | 2008-nov-24 | 2009-nov-18 | | 2011-536986 | | |



Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2008PF01730 | 2008P01730WOKR | KR | Pending | 2008-nov-18 | 2009-nov-18 | | 10-2011-7014360 | | |
| 2008PF01730 | 2008P01730WOIN | IN | Pending | 2008-nov-24 | 2009-apr-18 | | 4179/CHENP/2011 | | |
| 2008PF01730 | 2008P01730 JP | JP | Pending | 2008-nov-24 | 2008-nov-18 | | | | |
| 2008PF01730 | 2008P01730WOUS | US | Granted | 2008-nov-24 | 2009-nov-18 | 2013-dec-10 | 13/127801 | 2011-0215806-A1 | 8606076 |
| 2008PF01701 | 2008P01701WOCN | CN | Pending | 2008-dec-15 | 2009-dec-30 | | 200980150434.3 | 102246629-A | |
| 2008PF01701 | 2008P01701WOJP | JP | Pending | 2008-dec-15 | 2008-dec-30 | | 2011-540312 | | |
| 2008PF01701 | 2008P01701WOUS | US | Granted | 2008-dec-15 | 2009-dec-30 | 2014-Jul-01 | 13/129365 | 2011-0242279-A1 | 8767046 |
| 2008PF01701 | 2008P01701WE | | Pending | 2008-dec-15 | 2009-dec-30 | | 09795502.9 | 2377325 | |
| 2008PF01701 | 2008P01701WOKR | KR | Pending | 2008-dec-15 | 2009-dec-30 | | 10-2011-7016213 | | |
| 2008PF01701 | 2008P01701WOIN | IN | Pending | 2008-dec-15 | 2009-dec-30 | | 4483/CHENP/2011 | | |
| 2008PF01673 | 2008P01673WEFR | FR | Granted | 2008-dec-18 | 2009-dec-11 | 2013-feb-20 | 08763415.7 | 2380355-A | 2380355 |
| 2008PF01673 | 2008P01673WETR | TR | Granted | 2008-dec-18 | 2009-dec-11 | 2013-feb-20 | 08763815.7 | 2380355-A | 2380355 |
| 2008PF01673 | 2008P01673WOJP | JP | Pending | 2008-dec-18 | 2009-dec-11 | | 2011-541681 | | |
| 2008PF01673 | 2008P01673WEDE | DE | Granted | 2008-dec-18 | 2009-dec-11 | 2013-feb-20 | 08796615.7 | 2380355-A | 60 2009 013 522.8 |
| 2008PF01673 | 2008P01673WEGB | GB | Granted | 2008-dec-18 | 2009-dec-11 | 2013-feb-20 | 08796815.7 | 2380355-A | 2380355 |
| 2008PF01673 | 2008P01673WOCN | CN | Pending | 2008-dec-18 | 2009-dec-11 | | 200980151111.X | 102257629-A | |
| 2008PF01673 | 2008P01673WOUS | US | Granted | 2008-dec-18 | 2009-dec-11 | 2014-aug-26 | 11/136765 | 2013-0248994-A1 | 8817082 |
| 2008PF01673 | 2008P01673 TW | TW | Pending | 2008-dec-18 | 2009-Dec-15 | | 098142915 | 201027357-A |
| 2008PF01673 | 2008P01673WOKR | KR | Pending | 2008-dec-18 | 2009-dec-11 | | 10-2011-7016309 | |
| 2008PF01532 | 2008P01532WE | | Pending | 2008-dec-19 | 2009-dec-14 | | 08766089.2 | 2380358 | |
| 2008PF01532 | 2008P01532WOUS | US | Pending | 2008-dec-19 | 2009-dec-14 | | 13/139882 | 2011-0249099-A1 | |
| 2008PF01532 | 2008P01532WOCN | CN | Granted | 2008-dec-19 | 2009-dec-14 | 2014-okt-01 | 200980151037.1 | 102257627-A | 200980151037.1 |
| 2008PF01532 | 2008P01532WOIN | IN | Pending | 2008-dec-19 | 2009-dec-14 | | 4958/CHENP/2011 | |
| 2008PF01532 | 2008P01532WOJP | JP | Pending | 2008-dec-19 | 2009-dec-14 | | 2011-541683 | |
| 2008PF01532 | 2008P01532WOKR | KR | Pending | 2008-dec-19 | 2009-dec-14 | | 10-2011-7016355 | |
| 2008PF01561 | 2008P01561 TW | TW | Pending | 2008-dec-19 | 2009-dec-06 | | 2011-541670 | |
| 2008PF01561 | 2008P01561WE | | Pending | 2008-dec-19 | 2009-dec-19 | | 098143170 | 201047849-A |
| 2008PF01561 | 2008P01561WOKR | KR | Pending | 2008-dec-19 | 2009-dec-06 | | 10-2011-7016735 | |
| 2008PF01561 | 2008P01561WOUS | US | Pending | 2008-dec-19 | 2009-dec-06 | | 13/140148 | US-2011-0318648-A1 |
| 2008PF01561 | 2008P01561WE | | Pending | 2008-dec-19 | 2009-dec-08 | | 09795557.9 | 2380356-A |
| 2008PF01561 | 2008P01561WOCN | CN | Pending | 2008-dec-19 | 2009-dec-08 | | 200980151031.4 | 102257629-A |
| 2008PF01779 | 2008P01779WOKR | KR | Pending | 2008-dec-19 | 2009-dec-14 | | 10-2011-7016477 | |
| 2008PF01779 | 2008P01779WORU | RU | Pending | 2008-dec-19 | 2009-dec-14 | | PI 2011203810 | |
| 2008PF01779 | 2008P01779 JP | JP | Pending | 2008-dec-19 | 2009-dec-14 | | 2011123798 | 2011129788-A |
| 2008PF01779 | 2008P01779WE | | Pending | 2008-dec-19 | 2009-dec-14 | | 09796088.4 | 2380357-A |
| 2008PF01779 | 2008P01779WOBR | BR | Pending | 2008-dec-19 | 2009-dec-14 | | PI 0017764-7 |
| 2008PF01779 | 2008P01779WOCA | CA | Pending | 2008-dec-19 | 2009-dec-14 | | 2747106 |
| 2008PF01779 | 2008P01779WOJP | JP | Pending | 2008-dec-19 | 2009-dec-14 | | 2013-541682 |
| 2008PF01779 | 2008P01779WOCN | CN | Pending | 2008-dec-19 | 2009-dec-14 | | 200980151002.5 | 102257825-A |
| 2008PF01779 | 2008P01779WOIN | IN | Pending | 2008-dec-19 | 2009-dec-14 | | 4953/CHENP/2011 |
| 2008PF01779 | 2008P01779WOXD | ID | Pending | 2008-dec-19 | 2009-dec-14 | | W-00 2011 01166 | 061.3813-A |
| 2008PF01779 | 2008P01779WOMX | MX | Pending | 2008-dec-19 | 2009-dec-14 | | 2011/006498 |
| 2008PF01779 | 2008P01779 TH | TH | Pending | 2008-dec-19 | 2008-dec-14 | | |
| 2008PF01779 | 2008P01779WOUS | US | Pending | 2008-dec-19 | 2009-dec-14 | | 13/139925 | 2011-0249757-A1 |
| 2008PF01779 | 2008P01779WOVN | VH | Pending | 2008-dec-19 | 2009-dec-14 | | 1-2011-01531 |
| 2008PF01779 | 2008P01779 TW | TW | Pending | 2008-dec-19 | 2009-dec-17 | | 098143456 | 201043000-A |
| 2008PF01779 | 2008P01779WOAU | AU | Pending | 2008-dec-19 | 2009-dec-14 | | 2009329113 |
| 2009PF00133 | 2009P00133WOIN | IN | Pending | 2009-jan-20 | 2010-jan-13 | | 5788/CHENP/2011 |
| 2009PF00133 | 2009P00133WORU | RU | Pending | 2009-jan-20 | 2010-jan-13 | | 2011134088 | RU2011134088 |
| 2009PF00133 | 2009P00133WOKR | KR | Pending | 2009-jan-20 | 2010-jan-13 | | 10-2011-7018095 |
| 2009PF00133 | 2009P00133WE | | Pending | 2009-jan-20 | 2010-jan-13 | | 10701918.4 | 2389666-A |
| 2009PF00133 | 2009P00133WOBR | BR | Pending | 2009-jan-20 | 2010-jan-13 | | PI1005146-5 |
| 2009PF00133 | 2009P00133WOCN | CN | Pending | 2009-jan-20 | 2010-jan-13 | | 201080004996.3 | 102292995-A |
| 2009PF00133 | 2009P00133 TW | TW | Pending | 2009-jan-20 | 2010-jan-18 | | 099101236 |
| 2009PF00133 | 2009P00133WOUS | US | Pending | 2009-jan-20 | 2010-jan-13 | | 13/145283 | 2013-0279645-A1 |
| 2009PF00133 | 2009P00133WOJP | JP | Pending | 2009-jan-20 | 2010-jan-13 | | 2011-545823 |
| 2009PF00389 | 2009P00389WOBR | BR | Pending | 2009-jan-20 | 2010-jan-14 | | PI1005134-1 |
| 2009PF00389 | 2009P00389WOXR | KR | Pending | 2009-jan-20 | 2010-jan-14 | | 5793/CHENP/2011 |
| 2009PF00389 | 2009P00389WOIP | JP | Pending | 2009-jan-22 | 2010-jan-14 | | 2011-545824 |
| 2009PF00389 | 2009P00389WOMX | MX | Granted | 2009-jan-20 | 2010-jan-14 | 2012-dec-04 | 2011/007045 | | 305777 |
| 2009PF00389 | 2009P00389WORU | RU | Pending | 2009-jan-20 | 2010-jan-14 | | 2011134872 | RU2011134872 |
| 2009PF00389 | 2009P00389 TW | TW | Pending | 2009-jan-20 | 2010-jan-18 | | 099101244 | 201103111-A |
| 2009PF00389 | 2009P00389WOUS | US | Pending | 2009-jan-20 | 2010-jan-14 | | 13/145420 | US02012-0269154-A1 |
| 2009PF00389 | 2009P00389WE | | Pending | 2009-jan-20 | 2010-jan-14 | | 10701925.9 | 2389765-A |
| 2009PF00389 | 2009P00389WOCN | CN | Granted | 2009-jan-20 | 2010-jan-14 | 2014-sep-17 | 201080004997.8 | 102292995-A | 201080004997.8 |
| 2009PF00389 | 2009P00389WOAU | AU | Pending | 2009-jan-20 | 2010-jan-14 | | 2009207505 |
| 2009PF00389 | 2009P00389WOCA | CA | Pending | 2009-jan-20 | 2010-jan-14 | | 2749896 |
| 2009PF00389 | 2009P00389WOXR | KR | Pending | 2009-jan-20 | 2010-jan-14 | | 10-2011-7019280 |
| 2009PF01265 | 2009P01265WE | | Pending | 2009-feb-17 | 2010-feb-09 | | 10705951.4 | 2390398-A |
| 2009PF01265 | 2009P01265WOCN | CN | Pending | 2009-feb-17 | 2010-feb-17 | | 201080008320.9 | 102318352-A |
| 2009PF01265 | 2009P01265WOIN | IN | Pending | 2009-feb-17 | 2010-feb-09 | | 6485/CHENP/2011 |
| 2009PF01265 | 2009P01265WOUS | US | Pending | 2009-feb-17 | 2010-feb-09 | | 13/201736 | US-2013-0264891-A1 |
| 2009PF01265 | 2009P01265WOMX | MX | Granted | 2009-feb-17 | 2010-feb-09 | 2013-apr-01 | 2011-008009 | | 308302 |
| 2009PF01265 | 2009P01265WORU | RU | Pending | 2009-feb-17 | 2010-feb-09 | | 2011134194 | RU2011134194 |

**A-738**



Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2009PF01265 | 2009P01265WOKR | KR | Pending | 2005-feb-17 | 2010-feb-09 | | 10-2011-7021454 | | |
| 2009PF01265 | 2009P01265 TW | TW | Pending | 2005-feb-17 | 2010-feb-12 | | 099106896 | 201043002-A | |
| 2009PF01265 | 2009PO1265WOID | ID | Pending | 2005-feb-17 | 2010-feb-09 | | W-00 2011 02940 | 0515050-A | |
| 2009PF01265 | 2009P01265WOMN | MN | Pending | 2005-feb-17 | 2010-feb-09 | | P12013038129 | | |
| 2009PF01265 | 2009P01265WOVN | VN | Pending | 2005-feb-17 | 2010-feb-09 | | 1-2011-02482 | | |
| 2009PO01265 | 2009P01265WOAU | AU | Pending | 2005-feb-17 | 2010-feb-09 | | 2010215135 | | |
| 2009PF01265 | 2009PO1265WOBR | BR | Pending | 2005-feb-17 | 2010-feb-09 | | PI 1006691-2 | | |
| 2009PF01265 | 2009P01265WOJP | JP | Pending | 2005-feb-17 | 2010-feb-09 | | 2013-549734 | | |
| 2009PFO0237 | 2009POO237WOUS | US | Pending | 2009-mrt-17 | 2010-mrt-09 | | 13/256451 | US-2012-0007899-A1 | |
| 2009PFO0237 | 2009PO0237WOKR | KR | Pending | 2009-mrt-17 | 2010-mrt-09 | | 10-2011-7024309 | | |
| 2009PFO0237 | 2009P00237WOCN | CN | Pending | 2009-mrt-17 | 2010-mrt-09 | | 201080012493.1 | 102356424-A | |
| 2009PFO0237 | 2009PO0237WOJP | JP | Pending | 2009-mrt-17 | 2010-mrt-09 | | 2012-500341 | | |
| 2009PF00237 | 2009P00237TWE | | Pending | 2009-mrt-17 | 2010-mrt-09 | | 107106615 | 2409294 | |
| 2009PF00237 | 2009P00237 TW | TW | Pending | 2005-mrt-17 | 2010-mrt-15 | | 099107502 | 201040990-A | |
| 2009PF00736 | 2009PO0736WOCA | CA | Pending | 2009-mei-18 | 2010-mei-12 | | 2762585 | | |
| 2009PF00736 | 2009P00736WOJP | JP | Pending | 2009-mei-18 | 2010-mei-12 | | 2012-511343 | | |
| 2009PF00736 | 2009PO0736WOMK | MX | Pending | 2009-mei-18 | 2010-mei-12 | | MX/A/2011/012223 | | |
| 2009PF00736 | 2009P00736WORU | RU | Pending | 2009-mei-18 | 2010-mei-12 | | 2011151601 | 2011151601-A | |
| 2009PF00736 | 2009P00736 TW | TW | Pending | 2009-mei-18 | 2010-mei-17 | | 099115702 | 201105109-A | |
| 2009PF00736 | 2009P00736WOIN | IN | Pending | 2009-mei-18 | 2010-mei-12 | | 9309/CHENP/2011 | | |
| 2009PF00736 | 2009P00736WOKR | KR | Pending | 2009-mei-18 | 2010-mei-12 | | 10-2011-7030038 | | |
| 2009PF00736 | 2009P00736WOCN | CN | Pending | 2009-mei-18 | 2010-mei-12 | | 201080019300.4 | 102428706-A | |
| 2009PF00736 | 2009P00736WOID | ID | Pending | 2009-mei-18 | 2010-mei-12 | | W-00 2011 04198 | | |
| 2009PF00736 | 2009PO0736WE | | Pending | 2009-mei-18 | 2010-mei-12 | | 10726256-0 | 3433429-A | |
| 2009PF00736 | 2009P00736WOSG | SG | Granted | 2009-mei-18 | 2010-mei-12 | 2014-jun-15 | 201108066-6 | | 175863 |
| 2009PF00736 | 2009P00736WOVN | VN | Pending | 2009-mei-18 | 2010-mei-12 | | 1-2011-03322 | | |
| 2009PF00736 | 2009P00736WOBR | BR | Pending | 2009-mei-18 | 2010-mei-12 | | PI 1007695-6 | | |
| 2009PF00736 | 2009P00736 US | US | Pending | 2009-mei-18 | 2010-mei-17 | | 12/781494 | 2010-0289875-A1 | |
| 2009PF00736 | 2009P00736WOAU | AU | Pending | 2009-mei-18 | 2010-mei-12 | | 2010230873 | | |
| 2009PF00619 | 2009PO0619WOIN | IN | Pending | 2009-mrt-28 | 2010-mrt-07 | | 9569/CHENP/2011 | | |
| 2009PF00619 | 2009PO0619WOUS | US | Pending | 2009-mrt-28 | 2010-mrt-07 | | 13/322182 | US-2012-0062993-A1 | |
| 2009PF00619 | 2009P00619 TW | TW | Pending | 2009-mrt-28 | 2010-mrt-23 | | 099118702 | 201105110-A | |
| 2009PF00619 | 2009PO0619WOBR | BR | Pending | 2009-mrt-28 | 2010-mrt-07 | | PI 1009164-6 | | |
| 2009PF00619 | 2009PO0619WOCN | CN | Pending | 2009-mei-28 | 2010-mrt-07 | | 201080013608.6 | 102450026-A | |
| 2009PF00619 | 2009PO0E19WE | | Pending | 2009-mrt-28 | 2010-mrt-07 | | 10719629.7 | 2436189-A | |
| 2009PF00619 | 2009PO0619WOJP | JP | Pending | 2009-mei-28 | 2010-mrt-07 | | 2012-512480 | | |
| 2009PF00619 | 2009PO0619WOKR | KR | Pending | 2009-mei-28 | 2010-mrt-07 | | 10-2011-7030979 | | |
| 2009PF00619 | 2009PO0619WORU | RU | Pending | 2009-mei-28 | 2010-mrt-07 | | 2011153745 | RU2011153745 | |
| 2009PF00408 | 2009PO0408WE | | Pending | 2009-mei-28 | 2010-mei-21 | | 10727906.9 | 2436181 | |
| 2009PF00408 | 2009PO0408WOCN | CN | Pending | 2009-mei-28 | 2010-mei-21 | | 201080023397.6 | 102450024-A | |
| 2009PF00408 | 2009PO0408WOJP | JP | Pending | 2009-mei-28 | 2010-mei-21 | | 2012-512499 | | |
| 2009PF00408 | 2009PO0408WOKR | KR | Pending | 2009-mei-28 | 2010-mei-21 | | 10-2012-7031130 | | |
| 2009PF00408 | 2009PO0408 TW | TW | Pending | 2009-mei-28 | 2010-mei-25 | | 099115704 | 201105113-A | |
| 2009PF00408 | 2009PO0408WOUS | US | Granted | 2009-mei-28 | 2010-mei-23 | 2013-sep-17 | 13332227 | US-2012-0154897-A1 | 8537293 |
| 2009PF00757 | 2009PO0757WOCN | CN | Pending | 2009-jun-26 | 2010-jun-21 | | 201080020824.4 | 102804027 A | |
| 2009PF00757 | 2009PO0757WOEN | EN | Pending | 2009-jun-26 | 2010-jun-21 | | 522/CHENP/2012 | | |
| 2009PF00757 | 2009P00757WOJP | JP | Pending | 2009-jun-26 | 2010-jun-21 | | 2012-516923 | | |
| 2009PFO0757 | 2009P00757WE | | Pending | 2009-jun-26 | 2010-jun-26 | | 10730240.8 | 2446316-A | |
| 2009PFO0757 | 2009PO0757WOUS | US | Pending | 2009-jun-26 | 2010-jun-26 | | 13380409 | US-2012-0090034-A1 | |
| 2009PFO0757 | 2009PO0757WOBR | BR | Pending | 2009-jun-26 | 2010-jun-26 | | PI 1009771-0 | | |
| 2009PFO0757 | 2009PO0757WORU | RU | Pending | 2009-jun-26 | 2010-jun-26 | | 2011152638 | 2012102638-A | |
| 2009PFO0757 | 2009PO0757WOKR | KR | Pending | 2009-jun-26 | 2010-jun-21 | | 10-2012-7001558 | | |
| 2009PFO0756 | 2009PO0756WOCN | CN | Pending | 2009-jun-26 | 2010-jun-21 | | 201080030877.1 | 102598671-A | |
| 2009PFO0756 | 2009PO0756WOBR | BR | Pending | 2009-jun-26 | 2010-jun-21 | | PI 1010077-6 | | |
| 2009PFO0756 | 2009PO0756WOIN | IN | Pending | 2009-jun-26 | 2010-jun-21 | | 18209/652794 | | |
| 2009PFO0756 | 2009PO0756WOJP | JP | Pending | 2009-jun-26 | 2010-jun-21 | | 2012-518028 | | |
| 2009PFO0756 | 2009PO0756WE | | Pending | 2009-jun-26 | 2010-jun-21 | | 10730146.5 | 2446697 A | |
| 2009PFO0756 | 2009P00756 TW | TW | Pending | 2009-jun-26 | 2010-jun-26 | | 099120908 | 201105113-A | |
| 2009PFO0756 | 2009PO0756WOUS | US | Pending | 2009-jun-26 | 2010-jun-21 | | 13/380164 | US-2012-0092399-A1 | |
| 2009PFO0756 | 2009PO0756WOKR | KR | Pending | 2009-jun-26 | 2010-jun-21 | | 10-2012-7001700 | | |
| 2009PFO0756 | 2009PO0756WORU | RU | Pending | 2009-jun-26 | 2010-jun-21 | | 2012102589 | 2012102589-A | |
| 2009PF01197 | 2009P01197WOCA | CA | Pending | 2009-jul-27 | 2010-jul-21 | | 2769305 | | |
| 2009PF01197 | 2009P01197WOSG | SG | Granted | 2009-jul-27 | 2010-jul-21 | 2013-apr-15 | 201200296-0 | | 178004 |
| 2009PF01197 | 2009PO1197WOVN | VN | Pending | 2009-jul-27 | 2010-jul-21 | | 1-2012-00417 | | |
| 2009PF01197 | 2009P01197WE | | Pending | 2009-jul-27 | 2010-jul-21 | | 10740997.4 | 2460263-A | |
| 2009PF01197 | 2009P01197 TW | TW | Pending | 2009-jul-27 | 2010-jul-26 | | 099124587 | 201130291-A | |
| 2009PF01197 | 2009PO1197WOBR | BR | Pending | 2009-jul-27 | 2010-jul-21 | | BR 11 2012 001606-7 | | |
| 2009PF01197 | 2009PO1197WOCN | CN | Pending | 2009-jul-27 | 2010-jul-21 | | 201080013589.5 | 102474037-A | |
| 2009PF01197 | 2009PO1197WOID | ID | Pending | 2009-jul-27 | 2010-jul-21 | | W-00 2012 00297 | 2012/02768-A | |
| 2009PF01197 | 2009PO1197WOJP | JP | Pending | 2009-jul-27 | 2010-jul-21 | | 2012-522394 | | |
| 2009PF01197 | 2009PO1197WOAU | AU | Pending | 2009-jul-27 | 2010-jul-21 | | 2010277256 | | |
| 2009PF01197 | 2009PO1197WORU | RU | Pending | 2009-jul-27 | 2010-jul-21 | | 2012106339 | 2012106339-A | |
| 2009PF01197 | 2009P01197WOUS | US | Pending | 2009-jul-27 | 2010-jul-21 | | 13/386687 | US-2012-0120194-A1 | |
| 2009PF01197 | 2009P01197WOIN | IN | Pending | 2009-jul-27 | 2010-jul-21 | | 979/CHENP/2012 | | |



**A-739**

Confidential

| FAMILY | RIGHT | RSION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2009FF01197 | 2009F0119TWOER | KR | Pending | 2009-Jul-27 | 2010-Jul-21 | | 10-2012-7004849 | | |
| 2009FF01197 | 2009F0119TWOMX | MX | Granted | 2009-Jul-27 | 2010-Jul-21 | 2013-nov-19 | MX/A/2012/001103 | | 315447 |
| 2009FF01199 | 2009F01199WOJP | JP | Pending | 2009-Jul-27 | 2010-Jul-20 | | 2012-522289 | | |
| 2009FF01199 | 2009F01199WOBRU | RU | Pending | 2009-Jul-27 | 2010-Jul-20 | | 2012130868 | 2012326868-A | |
| 2009FF01199 | 2009F01199WOKR | KR | Pending | 2009-Jul-27 | 2010-Jul-20 | | 10-2012-7004705 | | |
| 2009FF01199 | 2009F01199WE | | Pending | 2009-Jul-27 | 2010-Jul-20 | | 10740092.5 | 2480360-A | |
| 2009FF01199 | 2009F01199 TW | TW | Pending | 2009-Jul-27 | 2010-Jul-26 | | 09912459 I | 201130252-A | |
| 2009FF01199 | 2009F01199WOUS | US | Pending | 2009-Jul-27 | 2010-Jul-20 | | 13/386493 | US-2012-0120200-A1 | |
| 2009FF01199 | 2009F01199WOCN | CN | Pending | 2009-Jul-27 | 2010-Jul-20 | | 201080033503.1 | 102474658-A | |
| 2009FF01465 | 2009F0146SWOBR | BR | Pending | 2009-sep-16 | 2010-sep-08 | | BR 11 2012 005589-7 | | |
| 2009FF01465 | 2009F0146SWOCN | CN | Pending | 2009-sep-16 | 2010-sep-08 | | 201080041623.8 | 102484738-A | |
| 2009FF01465 | 2009F0146SWOKR | KR | Pending | 2009-sep-16 | 2010-sep-08 | | 10-2012-7008418 | | |
| 2009FF01465 | 2009F0146SWOUS | US | Pending | 2009-sep-16 | 2010-amp-08 | | 13/496600 | US-3012-0206453-A1 | |
| 2009FF01465 | 2009F0146SWORU | RU | Pending | 2009-sep-16 | 2010-amp-08 | | 2012114878 | RU2012114878 | |
| 2009FF01465 | 2009F0146SWOJW | JW | Pending | 2009-sep-16 | 2010-sep-08 | | 1966/CHENP/2012 | | |
| 2009FF01465 | 2009F0146SWOJP | JP | Pending | 2009-sep-16 | 2010-amp-08 | | 2012-529374 | | |
| 2009FF01465 | 2009F01465 TW | TW | Pending | 2009-sep-16 | 2010-sep-13 | | 099130890 | 201125353-A | |
| 2009FF01465 | 2009F0246SWE | | Pending | 2009-sep-16 | 2010-sep-09 | | 10760061.2 | 2478705-A | |
| 2009FF01452 | 2009F01452WOBR | BR | Pending | 2009-okt-02 | 2010-sep-21 | | BR1120120071150-7 | | |
| 2009FF01452 | 2009F0145WOCN | CN | Granted | 2009-okt-02 | 2010-sep-21 | 2014-aug-20 | 201080044808.X | 102549507-A | 201080044808.X |
| 2009FF01452 | 2009F0145ZWOKR | KR | Pending | 2009-okt-02 | 2010-sep-21 | | 10-2012-7013133 | | |
| 2009FF01452 | 2009F0145ZWE | | Pending | 2009-okt-02 | 2010-sep-21 | | 10761505.4 | 2483750-A | |
| 2009FF01452 | 2009F0145ZWOJW | JW | Pending | 2009-okt-02 | 2010-sep-21 | | 2500/CHENP/2012 | | |
| 2009FF01452 | 2009F0145ZWOJP | JP | Pending | 2009-okt-02 | 2010-sep-21 | | 2012-531506 | | |
| 2009FF01452 | 2009F01452WORU | RU | Pending | 2009-okt-02 | 2010-sep-21 | | 2012117572 | 2012117572-A | |
| 2009FF01452 | 2009F0145ZWOUS | US | Pending | 2009-okt-02 | 2010-sep-21 | | 13/499319 | US-2012-0186341-A1 | |
| 2009FF01690 | 2009F01690WOBR | BR | Pending | 2009-okt-30 | 2010-sep-30 | | BR 11 2012 009707-3 | | |
| 2009FF01690 | 2009F01690WOJP | JP | Granted | 2009-okt-30 | 2010-sep-30 | 2014-mrt-28 | 3012-535967 | | 5508538 |
| 2009FF01690 | 2009F01690WORU | RU | Pending | 2009-okt-30 | 2010-sep-30 | | 2012122204 | 2012122204-A | |
| 2009FF01690 | 2009F01690WOIN | IN | Pending | 2009-okt-30 | 2010-sep-30 | | 2969/CHENP/2012 | | |
| 2009FF01690 | 2009F01690WOUS | US | Pending | 2009-okt-30 | 2010-sep-30 | | 13/503413 | US-2012-0206511-A1 | |
| 2009FF01690 | 2009F01690WOKR | KR | Pending | 2009-okt-30 | 2010-sep-30 | | 30-2012-7013526 | | |
| 2009FF01690 | 2009F01690WOCN | CN | Pending | 2009-okt-30 | 2010-sep-30 | | 201080046668.4 | 102597865-A | |
| 2009FF01690 | 2009F01690WE | | Pending | 2009-okt-30 | 2010-sep-30 | | 10771135.4 | 2494405-A | |
| 2009FF00754 | 2009F00754WOCN | CN | Pending | 2009-nov-03 | 2010-okt-27 | | 201080049757.X | 102577406-A | |
| 2009FF00754 | 2009F0075SWOKR | KR | Pending | 2009-nov-03 | 2010-okt-27 | | 10-2012-7014129 | | |
| 2009FF00754 | 2009F00754WOBR | BR | Pending | 2009-nov-03 | 2010-okt-27 | | BR 11 2012 010179-0 | | |
| 2009FF00754 | 2009F00754WORU | RU | Pending | 2009-nov-03 | 2010-okt-27 | | 2012122707 | 2012122707-A | |
| 2009FF00754 | 2009F00754WOUS | US | Pending | 2009-nov-03 | 2010-okt-27 | | 13/504992 | US-2012-0212498-A1 | |
| 2009FF00754 | 2009F00754WE | | Pending | 2009-nov-03 | 2010-okt-27 | | 10776437.5 | 2457274 | |
| 2009FF00754 | 2009F00754WOJP | JP | Pending | 2009-nov-03 | 2010-okt-27 | | 2012-535993 | | |
| 2009FF00754 | 2009F00754 TW | TW | Pending | 2009-nov-03 | 2010-nov-01 | | 099137510 | 201142786-A | |
| 2009FF00754 | 2009F00754WOIN | IN | Pending | 2009-nov-03 | 2010-okt-27 | | 3417/CHENP/2012 | | |
| 2009F01451 | 2009F01451 TW | TW | Pending | 2009-nov-13 | 2010-nov-18 | | 099136724 | 201132336-A | |
| 2009F01451 | 2009F0145JWOJP | JP | Pending | 2009-nov-13 | 2010-nov-08 | | 2012-538450 | | |
| 2009F01451 | 2009F0145JWOUS | US | Pending | 2009-nov-13 | 2010-nov-08 | | 13/508739 | US-2012-0229603-A1 | |
| 2009F01451 | 2009F0145JWOKR | KR | Pending | 2009-nov-13 | 2010-nov-08 | | 10-2012-7015217 | | |
| 2009F01451 | 2009F0145JWE | | Pending | 2009-nov-13 | 2010-nov-08 | | 10783528.6 | 2499611 A | |
| 2009F01451 | 2009F0145JWOCN | CN | Granted | 2009-nov-13 | 2010-nov-08 | 2014-mei-07 | 201080051413.2 | 102598646-A | 201080051413.2 |
| 2009F01724 | 2009F01724WOKR | KR | Pending | 2009-dec-14 | 2010-dec-10 | | 10-2012-7018302 | | |
| 2009F01724 | 2009F01724 TW | TW | Pending | 2009-dec-14 | 2010-dec-13 | | 099143557 | 201134193-A | |
| 2009F01724 | 2009F01724WOIN | IN | Pending | 2009-dec-14 | 2010-dec-10 | | 4535/CHENP/2012 | | |
| 2009F01724 | 2009F01724WORU | RU | Pending | 2009-dec-14 | 2010-dec-10 | | 2012129915 | RU2012129915-A | |
| 2009F01724 | 2009F01724WOBR | BR | Pending | 2009-dec-14 | 2010-dec-10 | | BR 11 2012 014369-1 | | |
| 2009F01724 | 2009F01724WOJP | JP | Pending | 2009-dec-14 | 2010-dec-10 | | 2012-542675 | | |
| 2009F01724 | 2009F01724WOUS | US | Pending | 2009-dec-14 | 2010-dec-10 | | 13/515377 | US-2012-0293610-A1 | |
| 2009F01724 | 2009F01724WE | | Pending | 2009-dec-14 | 2010-dec-10 | | 10809081.4 | 1514215-A | |
| 2009F01724 | 2009F01724WOCN | CN | Pending | 2009-dec-14 | 2010-dec-10 | | 201080056829.3 | 102640596-A | |
| 2010F01724 | 2010F00254 TW | TW | Pending | 2010-feb-09 | 2011-feb-08 | | 100104363 | 201143368-A | |
| 2010F00254 | 2010F00254WOKR | KR | Pending | 2010-feb-09 | 2011-feb-02 | | 10-2012-7023286 | | |
| 2010F00254 | 2010F00254WOBR | BR | Pending | 2010-feb-09 | 2011-feb-02 | | BR 11 2012 019812 0 | | |
| 2010F00254 | 2010F00254WOIN | IN | Pending | 2010-feb-09 | 2011-feb-02 | | 6802/CHENP/2012 | | |
| 2010F00254 | 2010F00254WORU | RU | Pending | 2010-feb-09 | 2011-feb-02 | | 2012138335 | 2012138335-A | |
| 2010F00254 | 2010F00254WOUS | US | Pending | 2010-feb-09 | 2011-feb-02 | | 13/577698 | US-2012-0314028-A1 | |
| 2010F00254 | 2010F00254WOCN | CN | Pending | 2010-feb-09 | 2011-feb-02 | | 201180008878.4 | 102742283-A | |
| 2010F00254 | 2010F00254WE | | Pending | 2010-feb-09 | 2011-feb-02 | | 11707702.2 | 2534846-A | |
| 2010F00254 | 2010F00254WOJP | JP | Pending | 2010-feb-09 | 2011-feb-02 | | 2012-551722 | | |
| 2010F00330 | 2010F00330WOJP | JP | Pending | 2010-apr-06 | 2011-mrt-31 | | 2013-503199 | | |
| 2010F00330 | 2010F00330WOUS | US | Pending | 2010-apr-06 | 2011-mrt-31 | | 13/634638 | US-3013-0222535-A1 | |
| 2010F00330 | 2010F00330 TW | TW | Pending | 2010-apr-06 | 2011-apr-06 | | 100111891 | | |
| 2010F00330 | 2010F00330WOIN | IN | Pending | 2010-apr-06 | 2011-mrt-31 | | 7985/CHENP/2012 | | |
| 2010F00330 | 2010F00330WORU | RU | Pending | 2010-apr-06 | 2011-mrt-31 | | 2012146945 | RU2012146945 A | |
| 2010F00330 | 2010F00330WOCN | CN | Pending | 2010-apr-06 | 2011-mrt-31 | | 201180016944.2 | 102823291-A | |
| 2010F00330 | 2010F00330WOKR | KR | Pending | 2010-apr-06 | 2011-mrt-31 | | 10-2012-7026841 | | |



Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2010PF00390 | 2010PF0030WE | | Pending | 2010-apr-06 | 2013-mrt-31 | | 11717028.2 | 2556677 | |
| 2010PF00390 | 2010PF00330WDBR | BR | Pending | 2010-apr-06 | 2013-mrt-31 | | BR 11 2012 025257-4 | | |
| 2010PF00078 | 2010PF00078WE | | Pending | 2010-mei-21 | 2013-mei-11 | | 11715703.2 | 2572133 | |
| 2010PF00078 | 2010PF00078WKR | KR | Pending | 2015-mei-21 | 2013-mei-11 | | 10-2013-7033063 | | |
| 2010PF00078 | 2010PF00078WOCN | CN | Pending | 2010-mei-21 | 2013-mei-15 | | 201180025274.0 | 102908827-A | |
| 2010PF00078 | 2010PF00078 TW | TW | Pending | 2010-mei-21 | 2013-mei-18 | | 100117459 | 201207433-A | |
| 2010PF00078 | 2010PF00078WOJP | JP | Pending | 2010-mei-21 | 2013-mei-21 | | 2013-510707 | | |
| 2010PF00078 | 2010PF00078WORU | RU | Pending | 2010-mei-21 | 2013-mei-13 | | 2012165589 | 2012165589-A | |
| 2010PF00078 | 2010PF00078WDBR | BR | Pending | 2010-mei-21 | 2013-mei-13 | | BR 11 2012 029373-0 | | |
| 2010PF00078 | 2010PF00078WOIN | IN | Pending | 2010-mei-21 | 2013-mei-13 | | 9288/CHENP/2012 | | |
| 2010PF00078 | 2010PF00078WDUS | US | Pending | 2010-mei-21 | 2013-mei-13 | | 13/698305 | US-2013-0057359-A1 | |
| 2010PF00077 | 2010PF00077WOJP | JP | Pending | 2010-mei-21 | 2013-mei-17 | | 9286/CHENP/2012 | | |
| 2010PF00077 | 2010PF00077WDUS | US | Pending | 2010-mei-21 | 2013-mei-17 | | 13/698692 | US-2013-0201226-A1 | |
| 2010PF00077 | 2010PF00077WE | | Pending | 2010-mei-21 | 2013-mei-17 | | 11728899.4 | 2572511 A | |
| 2010PF00077 | 2010PF00077 TW | TW | Pending | 2010-mei-21 | 2013-mei-18 | | 100117402 | 201211654-A | |
| 2010PF00077 | 2010PF00077WKR | KR | Pending | 2010-mei-21 | 2013-mei-17 | | BR 11 2012 029068 D | | |
| 2010PF00077 | 2010PF00077WOCN | CN | Pending | 2010-mei-21 | 2013-mei-17 | | 201180025136.5 | 102899415-A | |
| 2010PF00077 | 2010PF00077WORU | RU | Pending | 2010-mei-21 | 2013-mei-17 | | 2012155993 | 2012155993 | |
| 2010PF00077 | 2010PF00077WOIN | KR | Pending | 2010-mei-21 | 2013-mei-17 | | 10-2012-7033195 | | |
| 2010PF00077 | 2010PF00077WOJP | JP | Pending | 2010-mei-21 | 2013-mei-17 | | 2015-510711 | | |
| 2010PF00066 | 2010PF0066WE | | Pending | 2010-jun-30 | 2011-jun-24 | | 117383 1.9 | 2588915-A | |
| 2010PF00066 | 2010PF0066WOCN | CN | Pending | 2010-jun-30 | 2011-jun-24 | | 201180082500.6 | 102999436-A | |
| 2010PF00066 | 2010PF0066WOIN | IN | Pending | 2010-jun-30 | 2011-jun-24 | | 307L3/CHENP/2012 | | |
| 2010PF00066 | 2010PF0066WOKR | KR | Pending | 2010-jun-30 | 2011-jun-24 | | 10-2013-7032211 | | |
| 2010PF00066 | 2010PF0066WDBR | BR | Pending | 2010-jun-30 | 2011-jun-24 | | BR 11 2012 033336-0 | | |
| 2010PF00066 | 2010PF0066WOJP | JP | Pending | 2010-jun-30 | 2011-jun-24 | | 2013-517620 | | |
| 2010PF00066 | 2010PF00668 TW | TW | Pending | 2010-jun-30 | 2011-jun-27 | | 100122492 | 201223006-A | |
| 2010PF00066 | 2010PF0066WDUS | US | Pending | 2010-jun-30 | 2011-jun-27 | | 13/806859 | US-2013-0093862-A1 | |
| 2010PF00066 | 2010PF0066WORU | RU | Pending | 2010-jun-30 | 2011-jun-24 | | 2013103607 | 2013103627 | |
| 2010PF00716 | 2010PF00716 TW | TW | Pending | 2010-jul-12 | 2013-jul-11 | | 100124495 | | |
| 2010PF00716 | 2010PF00716WOID | ID | Pending | 2010-jul-12 | 2013-jul-06 | | W-00 2013 00085 | 2014/00308-A | |
| 2010PF00716 | 2010PF00716WOMX | MX | Pending | 2010-jul-12 | 2013-jul-06 | | MX/A/2013/000348 | | |
| 2010PF00716 | 2010PF00716WOCN | CN | Pending | 2010-jul-12 | 2013-jul-08 | | 201180034077.6 | 103026713-A | |
| 2010PF00716 | 2010PF00716WOIN | IN | Pending | 2010-jul-12 | 2013-jul-06 | | 612/CHENP/2013 | | |
| 2010PF00716 | 2010PF00716WOKR | KR | Pending | 2010-jul-12 | 2013-jul-08 | | 10-2013-7020005 | | |
| 2010PF00716 | 2010PF00716WDBR | BR | Pending | 2010-jul-12 | 2013-jul-06 | | BR 11 2013 000580-7 | | |
| 2010PF00716 | 2010PF00716WOJP | JP | Pending | 2010-jul-12 | 2013-jul-06 | | 2013-518192 | | |
| 2010PF00716 | 2010PF00716WOUS | US | Pending | 2010-jul-12 | 2013-jul-06 | | 13/808204 | US-2013-0306099-A1 | |
| 2010PF00716 | 2010PF00716WORU | RU | Pending | 2010-jul-12 | 2013-jul-12 | | 2013105715 | 2013105715-A | |
| 2010PF00716 | 2010PF00716WE | | Pending | 2010-jul-12 | 2013-jul-06 | | 11743389.8 | 2569079-A | |
| 2010PF00527 | 2010PF00527 TW | TW | Pending | 2010-jul-12 | 2013-jul-11 | | 100124302 | 201223402-A | |
| 2010PF00017 | 2010PF00217WOBR | BR | Pending | 2010-jul-28 | 2013-jul-27 | | BR 11 2013 001624-0 | | |
| 2010PF00017 | 2010PF00017WOIN | RU | Pending | 2010-jul-28 | 2013-jul-27 | | 2013108806 | 2013108906-A | |
| 2010PF00017 | 2010PF00017WOCN | CN | Pending | 2010-jul-28 | 2013-jul-27 | | 201180036962.7 | 103001287 | |
| 2010PF00017 | 2010PF00017WOKI | IN | Pending | 2010-jul-28 | 2013-jul-27 | | 646/CHENP/2013 | | |
| 2010PF00017 | 2010PF00017WE | | Pending | 2010-jul-28 | 2013-jul-27 | | 11740542.4 | 2569932-A | |
| 2010PF00017 | 2010PF00017WOKR | KR | Pending | 2010-jul-28 | 2013-jul-27 | | 10-2013-7034779 | | |
| 2010PF00017 | 2010PF00017WOUS | US | Pending | 2010-jul-28 | 2013-jul-27 | | 13/812196 | US-2013-0120887-A1 | |
| 2010PF00017 | 2010PF00017WOJP | JP | Pending | 2010-jul-28 | 2013-jul-27 | | 2013-521276 | | |
| 2010PF00924 | 2010PF00924 TW | TW | Pending | 2010-aug-09 | 2013-aug-06 | | 100128245 | 201212490-A | |
| 2010PF00924 | 2010PF00924WOJP | JP | Pending | 2010-aug-09 | 2013-aug-04 | | 2013-523487 | | |
| 2010PF00924 | 2010PF00924WOKR | KR | Pending | 2010-aug-09 | 2013-aug-04 | | 10-2013-7005912 | | |
| 2010PF00924 | 2010PF00924WOCN | CN | Pending | 2010-aug-09 | 2013-aug-06 | | 201180036637.4 | 103009081-A | |
| 2010PF00924 | 2010PF00924WOUS | US | Pending | 2010-aug-09 | 2013-aug-06 | | 13/814348 | US-2013-0135487-A1 | |
| 2010PF00823 | 2010PF00823WOIN | IN | Pending | 2010-sep-22 | 2011-sep-19 | | 2088/CHENP/2013 | | |
| 2010PF00823 | 2010PF00823WOUS | US | Pending | 2010-sep-22 | 2011-sep-19 | | 13/824446 | US-2014-0309706-A1 | |
| 2010PF00823 | 2010PF00823WOBR | BR | Pending | 2010-sep-22 | 2011-sep-19 | | BR 11 2013 028248 7 | | |
| 2010PF00823 | 2010PF00823WOCN | CN | Pending | 2010-sep-22 | 2011-sep-19 | | 2011800N5772.1 | 103109226-A | |
| 2010PF00823 | 2010PF00823WOJP | JP | Pending | 2010-sep-22 | 2013-sep-19 | | 2013-539822 | | |
| 2010PF00823 | 2010PF00823WOKR | KR | Pending | 2010-sep-22 | 2011-sep-19 | | 10-2013-7009631 | | |
| 2010PF00623 | 2010PF00823WE | | Pending | 2010-sep-22 | 2011-sep-19 | | 11768181.6 | 2619623-A | |
| 2010PF00623 | 2010PF00813 TW | TW | Pending | 2010-sep-22 | 2011-sep-22 | | 100133402 | 201217855-A | |
| 2010PF00623 | 2010PF00823WORU | RU | Pending | 2010-sep-22 | 2011-sep-19 | | 2013118258 | | |
| 2010PF03043 | 2010PF03043WE | | Pending | 2010-nov-04 | 2011-okt-25 | | 11783516.7 | 2636222 A | |
| 2010PF03043 | 2010PF03043WUS | US | Pending | 2010-nov-04 | 2011-okt-25 | | 13/881001 | US-2013-0222377-A1 | |
| 2010PF03043 | 2010PF03043WOJP | JP | Pending | 2010-nov-04 | 2011-okt-25 | | 2013-537229 | | |
| 2010PF03043 | 2010PF03043WOCN | CN | Pending | 2010-nov-04 | 2011-okt-25 | | 201180081185.9 | 103181171-A | |
| 2010PF01298 | 2010PF01298WOJP | JP | Pending | 2010-dec-03 | 2011-dec-02 | | 2013-541485 | | |
| 2010PF01298 | 2010PF01298WORU | RU | Pending | 2010-dec-03 | 2011-dec-02 | | 2013129864 | | |
| 2010PF01298 | 2010PF01298WOIN | IN | Pending | 2010-dec-03 | 2011-dec-02 | | 4702/CHENP/2013 | | |
| 2010PF01298 | 2010PF01298WE | | Pending | 2010-dec-03 | 2011-dec-02 | | 11797107.2 | 2647209-A | |
| 2010PF01298 | 2010PF01298WOCN | CN | Pending | 2010-dec-03 | 2013-dec-02 | | 201180058165.X | 103205247-A | |
| 2010PF01298 | 2010PF01298WOUS | US | Pending | 2010-dec-03 | 2013-dec-02 | | 13/890447 | US-2013-0250066-A1 | |
| 2010PF01298 | 2010PF01298WOBR | BR | Pending | 2010-dec-03 | 2013-dec-02 | | BR 11 2013 013488 0 | | |




Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2010PF01298 | 2010PF01298 TW | TW | Pending | 2010-dec-03 | 2011-dec-02 | | 100344480 | 201242336 A | |
| 2010PF01298 | 2010PF01298WOKR | KR | Pending | 2010-dec-03 | 2011-dec-02 | | 10-2013-7017329 | | |
| 2011PF00011 | 2011PF00011WOCN | CN | Pending | 2011-feb-18 | 2012-feb-13 | | 201280026239.4 | 103348687 A | |
| 2011PF00011 | 2011PF00011WOIN | IN | Pending | 2011-feb-18 | 2012-feb-13 | | 7152/CHENP/2013 | | |
| 2011PF00011 | 2011PF00011WOUS | US | Pending | 2011-feb-18 | 2012-feb-13 | | 14/000125 | US-2014-0002897-A1 | |
| 2011PF00011 | 2011PF00011WOID | ID | Pending | 2011-feb-18 | 2012-feb-13 | | W-00 2013 03755 | | |
| 2011PF00011 | 2011PF00011WOMX | MX | Pending | 2011-feb-18 | 2012-feb-13 | | MX/A/2013/009387 | | |
| 2011PF00011 | 2011PF00011WORU | RU | Pending | 2011-feb-18 | 2012-feb-13 | | 2013342345 | | |
| 2011PF00011 | 2011PF00011WE | | Pending | 2011-feb-18 | 2012-feb-13 | | 12705451.8 | 2676447-A | |
| 2011PF00011 | 2011PF00011WOJP | JP | Pending | 2011-feb-18 | 2012-feb-13 | | 2013-554000 | | |
| 2011PF00011 | 2011PF00011 TW | TW | Pending | 2011-feb-18 | | | | 201240041-A | |
| 2011PF00011 | 2011PF00011WOBR | BR | Pending | 2011-feb-18 | 2012-feb-13 | | BR 11 2013 020715 9 | | |
| 2011PF00011 | 2011PF00011WOKR | KR | Pending | 2011-feb-18 | 2012-feb-13 | | 10-2013-7024564 | | |
| 2011PF00243 | 2011PF00243WOUS | US | Pending | 2011-feb-23 | 2012-feb-16 | | 14/000340 | US-2013-0321573-A1 | |
| 2011PF00243 | 2011PF00243WOEGB | GB | Pending | 2011-feb-23 | 2012-feb-16 | | 1270670X.1 | 2679014-A | |
| 2011PF00243 | 2011PF00243WETR | TR | Pending | 2011-feb-23 | 2012-feb-16 | | 1270670X.1 | 2679014-A | |
| 2011PF00243 | 2011PF00243WOJP | JP | Pending | 2011-feb-23 | 2012-feb-16 | | 2013-554961 | | |
| 2011PF00243 | 2011PF00243 TW | TW | Pending | 2011-feb-23 | 2012-feb-22 | | 101105910 | 201243782 A | |
| 2011PF00243 | 2011PF00243WOIN | IN | Pending | 2011-feb-23 | 2013-feb-16 | | 7454/CHENP/2013 | | |
| 2011PF00243 | 2011PF00243WORU | RU | Pending | 2011-feb-23 | 2012-feb-16 | | 2013342827 | | |
| 2011PF00243 | 2011PF00243WOBR | BR | Pending | 2011-feb-23 | 2012-feb-16 | | BR 11 2013 021276 4 | | |
| 2011PF00243 | 2011PF00243WEDE | DE | Pending | 2011-feb-23 | 2012-feb-16 | | 1270670X.1 | 2679014-A | |
| 2011PF00243 | 2011PF00243WEFR | FR | Pending | 2011-feb-23 | 2012-feb-16 | | 1270670X.1 | 2679014-A | |
| 2011PF00243 | 2011PF00243WOCH | CH | Pending | 2011-feb-23 | 2012-feb-16 | | 2012800C162.2 | 103380624-A | |
| 2011PF00243 | 2011PF00243WE | | Pending | 2011-feb-23 | 2012-feb-16 | | 1270670X.1 | 2679014-A | |
| 2011PF00206 | 2011PF00206WOMX | MX | Pending | 2011-apr-19 | 2012-apr-10 | | MX/A/2013/012099 | | |
| 2011PF00206 | 2011PF00206WOKR | KR | Pending | 2011-apr-19 | 2012-apr-30 | | PCT/IB2012/051746 | | |
| 2011PF00206 | 2011PF00206 TW | TW | Pending | 2011-apr-19 | | | | 201301120-A | |
| 2011PF00206 | 2011PF00206WOCN | CN | Pending | 2011-apr-19 | 2013-apr-10 | | 2012800501 X | 103050864 A | |
| 2011PF00206 | 2011PF00206WOUS | US | Pending | 2011-apr-19 | 2012-apr-30 | | 14/009188 | US-2014-0028584-A1 | |
| 2011PF00206 | 2011PF00206WE | | Pending | 2011-apr-19 | 2012-apr-30 | | 12718395.1 | 2700065-A | |
| 2011PF00206 | 2011PF00206WOBR | BR | Pending | 2011-apr-19 | 2012-apr-30 | | BR 11 2013 026616 3 | | |
| 2011PF00206 | 2011PF00206WOJP | JP | Pending | 2011-apr-19 | 2012-apr-30 | | 2014-505749 | | |
| 2011PF00206 | 2011PF00206WOID | ID | Pending | 2011-apr-19 | 2012-apr-30 | | W-00 2013004805 | | |
| 2011PF00206 | 2011PF00206WORU | RU | Pending | 2011-apr-19 | 2012-apr-30 | | 2013151682 | | |
| 2011PF00206 | 2011PF00206WOIN | IN | Pending | 2011-apr-19 | 2012-apr-30 | | 8688/CHENP/2013 | | |
| 2011PF00456 | 2011PF00456WOBR | BR | Pending | 2011-apr-20 | 2012-apr-13 | | BR 11 2013 026618 0 | | |
| 2011PF00456 | 2011PF00456WOJP | JP | Pending | 2011-apr-20 | 2012-apr-13 | | 2014-505757 | | |
| 2011PF00456 | 2011PF00456WOCN | CN | Pending | 2011-apr-20 | 2012-apr-13 | | 2012800190772 | 103477646 A | |
| 2011PF00456 | 2011PF00456WOIN | IN | Pending | 2011-apr-20 | 2012-apr-13 | | 8685/CHENP/2013 | | |
| 2011PF00456 | 2011PF00456WE | | Pending | 2011-apr-20 | 2012-apr-13 | | 13720618.3 | 2700237-A | |
| 2011PF00456 | 2011PF00456WOKR | KR | Pending | 2011-apr-20 | 2013-apr-13 | | 10-2013-7030068 | | |
| 2011PF00456 | 2011PF00456 TW | TW | Pending | 2011-apr-20 | 2012-apr-20 | | 101114263 | 201301863-A | |
| 2011PF00456 | 2011PF00456WOID | ID | Pending | 2011-apr-20 | 2012-apr-13 | | W-00 2013 004804 | | |
| 2011PF00456 | 2011PF00456WOMX | MX | Pending | 2011-apr-20 | 2012-apr-13 | | MX/A/2013/012070 | | |
| 2011PF00456 | 2011PF00456WORU | RU | Pending | 2011-apr-20 | 2012-apr-13 | | 2013151445 | | |
| 2011PF00456 | 2011PF00456WOUS | US | Pending | 2011-apr-20 | 2012-apr-13 | | 14/000955 | US-2014-0028009-A1 | |
| 2011PF02571 | 2011PF02571WORU | RU | Pending | 2011-mei-30 | 2012-mei-15 | | 2013157957 | | |
| 2011PF02571 | 2011PF02571WOCN | CN | Pending | 2011-mei-30 | 2012-mei-15 | | 201280028298.3 | 103562777-A | |
| 2011PF02571 | 2011PF02571WOBR | BR | Pending | 2011-mei-30 | 2012-mei-15 | | BR 11 2013 030401 4 | | |
| 2011PF02571 | 2011PF02571WOUS | US | Pending | 2011-mei-30 | 2012-mei-15 | | 14/118958 | US-2014-0078274-A1 | |
| 2011PF02571 | 2011PF02571WE | | Pending | 2011-mei-30 | 2012-mei-15 | | 12725308.9 | 2715493-A | |
| 2011PF02571 | 2011PF02571 TW | TW | Pending | 2011-mei-30 | 2012-mei-29 | | 101119213 | 201303773-A | |
| 2011PF02571 | 2011PF02571WOIN | IN | Pending | 2011-mei-30 | 2012-mei-15 | | 9533/CHENP/2013 | | |
| 2011PF02571 | 2011PF02571WOJP | JP | Pending | 2011-mei-30 | 2012-mei-15 | | 2014-513274 | | |
| 2011PF00573 | 2011PF00573WOCN | CN | Pending | 2011-jun-22 | 2012-jun-07 | | 201280030494.7 | CA 103603306-A | |
| 2011PF00573 | 2011PF00573WORU | RU | Pending | 2011-jun-22 | 2012-jun-07 | | 2014101702 | | |
| 2011PF00573 | 2011PF00573 TW | TW | Pending | 2011-jun-22 | 2012-jun-20 | | 101122095 | 201307864 A | |
| 2011PF00573 | 2011PF00573WOBR | BR | Pending | 2011-jun-22 | 2012-jun-07 | | BR 11 2013 032590 9 | | |
| 2011PF00573 | 2011PF00573WOIN | IN | Pending | 2011-jun-22 | 2012-jun-07 | | 9997/CHENP/2013 | | |
| 2011PF00573 | 2011PF00573WOUS | US | Pending | 2011-jun-22 | 2012-jun-07 | | 14/126101 | US-2014-0111855-A1 | |
| 2011PF00573 | 2011PF00573WE | | Pending | 2011-jun-22 | 2012-jun-07 | | 12730053.8 | 2724543 A | |
| 2011PF00573 | 2011PF00573WOJP | JP | Pending | 2011-jun-22 | 2012-jun-07 | | 2014-516463 | | |
| 2011PF00642 | 2011PF00642WOCN | CN | Pending | 2011-jun-22 | 2012-jun-19 | | 201280034451.9 | 103600907 | |
| 2011PF00642 | 2011PF00642WORU | RU | Pending | 2011-jun-22 | 2012-jun-19 | | 3014103713 | | |
| 2011PF00642 | 2011PF00642WOJP | JP | Pending | 2011-jun-22 | 2012-jun-19 | | 2014-516473 | | |
| 2011PF00642 | 2011PF00642WOBR | BR | Pending | 2011-jun-22 | 2012-jun-19 | | BR 11 2013 0326504 | | |
| 2011PF00642 | 2011PF00642WE | | Pending | 2011-jun-22 | 2012-jun-19 | | 12735041.1 | 2724584 A | |
| 2011PF00642 | 2011PF00642WOUS | US | Pending | 2011-jun-22 | 2012-jun-19 | | 14/125407 | US-2014-0131654-A1 | |
| 2011PF00642 | 2011PF00642WOIN | IN | Pending | 2011-jun-22 | 2012-jun-19 | | 9995/CHENP/2013 | | |
| 2011PF00642 | 2011PF00642 TW | TW | Pending | 2011-jun-22 | 2012-jun-22 | | 101122541 | 201308982-A | |
| 2011PF00727 | 2011PF00727WE | | Pending | 2011-jun-22 | 2012-jun-18 | | 12735039.5 | 2724542 A | |
| 2011PF00727 | 2011PF00727WOCN | CN | Pending | 2011-jun-22 | 2012-jun-18 | | 201280034467.X | CN 103659135-A | |
| 2011PF00727 | 2011PF00727 TW | TW | Pending | 2011-jun-22 | 2012-jun-21 | | 101122598 | 201305561-A | |



A-742

Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2011PF00727 | 2011P00727/EP | | Pending | 2011-Jun-22 | 2011-Jun-22 | | 11170868.5 | | |
| 2011PF00727 | 2011P00727/WO/US | US | Pending | 2011-Jun-22 | 2012-Jun-18 | | 14/129228 | US-2014-0118509-A1 | |
| 2011PF00727 | 2011P00727/WO/JP | JP | Pending | 2011-Jun-22 | 2012-Jun-18 | | 2014-516472 | | |
| 2011PF01018 | 2011P01018 TW | TW | Pending | 2011-aug-24 | 2012-aug-22 | | 101130598 | | |
| 2011PF01018 | 2011P01018/WO/IN | IN | Pending | 2011-aug-24 | 2012-avg-17 | | 1061/CHENP/2014 | | |
| 2011PF01018 | 2011P01018/WO/US | US | Pending | 2011-aug-24 | 2012-avg-17 | | 14/237560 | | |
| 2011PF01018 | 2011P01018/WO/CN | CN | Pending | 2011-aug-24 | 2012-aug-17 | | 201280041120.5 | 103748874 | |
| 2011PF01018 | 2011P01018/WO/BR | BR | Pending | 2011-aug-24 | 2012-aug-17 | | BR 11 2014 003429 5 | | |
| 2011PF01018 | 2011P01018/WO/JP | JP | Pending | 2011-aug-24 | 2012-aug-17 | | 2014-526580 | | |
| 2011PF01018 | 2011P01018/WE | | Pending | 2011-aug-24 | 2012-aug-17 | | 12781102.9 | 2749084-A | |
| 2011PF01018 | 2011P01018/WO/RU | RU | Pending | 2011-aug-24 | 2012-aug-17 | | 2014110958 | | |
| 2011PF01018 | 2011P01018 US | US | Pending | 2011-aug-24 | 2013-aug-24 | | 63/526723 | | |
| 2011PF03047 | 2011P03047/WE/GB | GB | Pending | 2011-okt-10 | 2012-okt-05 | | 12799281.6 | 2745269-A | |
| 2011PF03047 | 2011P03047/WE/FR | FR | Pending | 2011-okt-10 | 2012-okt-05 | | 12799281.6 | 2745269-A | |
| 2011PF03047 | 2011P03047/WO/IN | IN | Pending | 2011-okt-10 | 2012-okt-05 | | 2296/CHENP/2014 | | |
| 2011PF03047 | 2011P03047/WO/BR | BR | Pending | 2011-okt-10 | 2012-okt-05 | | 112014008270 7 | | |
| 2011PF03047 | 2011P03047/WE/IR | TR | Pending | 2011-okt-10 | 2012-okt-05 | | 12799281.6 | 2745269-A | |
| 2011PF03047 | 2011P03047/WO/US | US | Pending | 2011-okt-10 | 2012-okt-05 | | 14/350117 | 2014-0285623-A1 | |
| 2011PF03047 | 2011P03047/WE | | Pending | 2011-okt-10 | 2012-okt-05 | | 12799281.6 | 2745269-A | |
| 2011PF03047 | 2011P03047/WO/CN | CN | Pending | 2011-okt-10 | 2012-okt-05 | | 201280049776.1 | | |
| 2011PF03047 | 2011P03047/WO/JP | JP | Pending | 2011-okt-10 | 2012-okt-05 | | 2014-534038 | | |
| 2011PF03047 | 2011P03047/WO/RU | RU | Pending | 2011-okt-10 | 2012-okt-05 | | 2014118585 | | |
| 2011PF03047 | 2011P03047/WE/DE | DE | Pending | 2011-okt-10 | 2012-okt-05 | | 12799281.6 | 2745269-A | |
| 2011PF01543 | 2011P01543/WO/IN | IN | Pending | 2011-okt-31 | 2012-okt-23 | | 2034123937 | | |
| 2011PF01543 | 2011P01543/WO/JP | JP | Pending | 2011-nov-01 | 2012-okt-23 | | 2014-537784 | | |
| 2011PF01543 | 2011P01543 TW | TW | Pending | 2011-nov-01 | 2012-okt-31 | | 101140399 | | |
| 2011PF01543 | 2011P01543/WO/CN | CN | Pending | 2011-nov-01 | 2012-okt-23 | | 201280053602.3 | | |
| 2011PF01543 | 2011P01543/WE | | Pending | 2011-nov-01 | 2012-okt-23 | | 12801634.2 | 2774378 A | |
| 2011PF01543 | 2011P01543/WO/IN | IN | Pending | 2011-nov-01 | 2012-okt-23 | | 3412/CHENP/2014 | | |
| 2011PF01543 | 2011P01543/WO/US | US | Pending | 2011-nov-01 | 2012-okt-23 | | 14/354040 | | |
| 2011PF01543 | 2011P01543/WO/BR | BR | Pending | 2011-nov-01 | 2012-okt-23 | | BR 11 2014 0100808 | | |
| 2010PF00834 | 2010P00834/WO/US | US | Pending | 2011-nov-09 | 2012-okt-30 | | 14/356889 | 2014-0300711-A1 | |
| 2010PF00834 | 2010P00834/WE | | Pending | 2011-nov-09 | 2012-okt-30 | | 12789612.2 | 2777291-A | |
| 2010PF00834 | 2010P00834/WO/IN | IN | Pending | 2011-nov-09 | 2012-okt-30 | | 3497/CHENP/2014 | | |
| 2010PF00834 | 2010P00834 TW | TW | Pending | 2011-nov-09 | 2012-nov-08 | | 101141564 | | |
| 2010PF00834 | 2010P00834/WO/JP | JP | Pending | 2011-nov-09 | 2012-okt-30 | | 2014-540583 | | |
| 2010PF00834 | 2010P00834/WO/RU | RU | Pending | 2011-nov-09 | 2012-okt-30 | | 2014123915 | | |
| 2010PF00834 | 2010P00834/WO/BR | BR | Pending | 2011-nov-09 | 2012-okt-30 | | BR 11 2014 010848 3 | | |
| 2010PF00834 | 2010P00834/WO/CN | CN | Pending | 2011-nov-09 | 2012-okt-30 | | 201280055170.9 | 103918257-A | |
| 2011PF02471 | 2011P02471/WO/CL | CL | Pending | 2011-nov-24 | 2012-nov-19 | | 1256-2014 | | |
| 2011PF02471 | 2011P02471/WO/VN | VN | Pending | 2011-nov-24 | 2012-nov-19 | | 1-2014-02067 | | |
| 2011PF02471 | 2011P02471/WS | | Pending | 2011-nov-24 | 2012-nov-19 | | 203491029 | | |
| 2011PF02471 | 2011P02471/WO/AE | AE | Pending | 2011-nov-24 | 2012-nov-19 | | P540/14 | | |
| 2011PF02471 | 2011P02471/WO/US | US | Pending | 2011-nov-24 | 2012-nov-19 | | 14/354806 | 2014-0300697-A3 | |
| 2011PF02471 | 2011P02471 TW | TW | Pending | 2011-nov-24 | 2013-nov-19 | | 101143325 | | |
| 2011PF02471 | 2011P02471/WO/AU | AU | Pending | 2011-nov-24 | 2012-nov-19 | | 2012342093 | | |
| 2011PF02471 | 2011P02471/WO/MY | MY | Pending | 2011-nov-24 | 2012-nov-19 | | PI 2014701312 | | |
| 2011PF02471 | 2011P02471/WO/PE | PE | Pending | 2011-nov-24 | 2012-nov-19 | | 000741-2014/DIN | | |
| 2011PF02471 | 2011P02471/WO/ID | ID | Pending | 2011-nov-24 | 2012-nov-19 | | P-00 2014 02844 | | |
| 2011PF02471 | 2011P02471/WE | | Pending | 2011-nov-24 | 2012-nov-19 | | 12812376.7 | 2783534 A | |
| 2011PF02471 | 2011P02471/WO/MA | MA | Pending | 2011-nov-24 | 2012-nov-19 | | PV/37035 | | |
| 2011PF02471 | 2011P02471/WO/BR | BR | Pending | 2011-nov-24 | 2012-nov-19 | | BR 11 2014 012258 3 | | |
| 2011PF02471 | 2011P02471/WO/IN | IN | Pending | 2011-nov-24 | 2012-nov-19 | | 3717/CHENP/2014 | | |
| 2011PF02471 | 2011P02471/WO/MX | MX | Pending | 2011-nov-24 | 2012-nov-19 | | MX/A/2014/005149 | | |
| 2011PF02471 | 2011P02471/WO/NG | NG | Pending | 2011-nov-24 | 2012-nov-19 | | UNE/K/OV/IN | | |
| 2011PF02471 | 2011P02471/WO/CN | CN | Pending | 2011-nov-24 | 2012-nov-19 | | 201280057693 7 | 103947196-A | |
| 2011PF02471 | 2011P02471/WO/JP | JP | Pending | 2011-nov-24 | 2012-nov-19 | | 2014-542909 | | |
| 2011PF02471 | 2011P02471/WO/RU | RU | Pending | 2011-nov-24 | 2012-nov-19 | | PCT/IB2012/056539 | | |
| 2012PF01764 | 2012P01764/WE | | Pending | 2011-nov-24 | 2012-nov-19 | | 12812377.5 | 2752090 A | |
| 2012PF01764 | 2012P01764/WO/ID | ID | Pending | 2011-nov-24 | 2012-nov-29 | | P 00 2014 02943 | | |
| 2012PF01764 | 2012P01764/WO O1 | | Pending | 2011-nov-24 | | | | | |
| 2012PF01764 | 2012P01764 TW | TW | Pending | 2011-nov-24 | 2012-nov-39 | | 101143124 | | |
| 2012PF01764 | 2012P01764/WO/BR | BR | Pending | 2011-nov-24 | 2012-nov-19 | | BR 11 2014 012303 9 | | |
| 2012PF01764 | 2012P01764/WO/CN | CN | Pending | 2011-nov-24 | 2012-nov-19 | | 201280057670.6 | 103955766 | |
| 2012PF01764 | 2012P01764/WO/MX | MX | Pending | 2011-nov-24 | 2012-nov-19 | | MX/A/2014/006130 | | |
| 2012PF01764 | 2012P01764/WO/RU | RU | Pending | 2011-nov-24 | 2012-nov-19 | | 2014125425 | | |
| 2012PF01764 | 2012P01764/WO/US | US | Pending | 2011-nov-24 | 2012-nov-19 | | 14/359824 | | |
| 2012PF01764 | 2012P01764/WO/IN | IN | Pending | 2011-nov-24 | 2012-nov-19 | | 3716/CHENP/2014 | | |
| 2012PF01764 | 2012P01764/WO/JP | JP | Pending | 2011-nov-24 | 2012-nov-19 | | 2014-542970 | | |
| 2012PF01764 | 2012P01764/WO/AU | AU | Pending | 2011-nov-24 | 2012-nov-19 | | 2012342094 | | |
| 2012PF01764 | 2012P01764/WO/CL | CL | Pending | 2011-nov-24 | 2012-nov-19 | | 2014-01359 | | |
| 2012PF01764 | 2012P01764/WO/PE | PE | Pending | 2011-nov-24 | 2012-nov-24 | | 000729-2014/DIN | | |
| 2012PF01764 | 2012P01764/WO/AE | AE | Pending | 2011-nov-24 | 2012-nov-19 | | PCT/IB2012/056540 | | |
| 2012PF01764 | 2012P01764/WO/MY | MY | Pending | 2011-nov-24 | 2012-nov-19 | | PCT/IB2012/056540 | | |



**A-743**

Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2012FF00329 | 2012PO0329 TW | TW | Pending | 2012-apr-05 | 2013-apr-03 | | 102112228 | | |
| 2012FF00329 | 2012PO0329WO8R | BR | Pending | 2012-apr-05 | 2013-apr-05 | | BR 11 2014 0244103 | | |
| 2012FF00329 | 2012PO0329WOCN | CN | Pending | 2012-apr-05 | 2013-apr-05 | | 201380058746.9 | | |
| 2012FF00329 | 2012PO0329WOJP | JP | Pending | 2012-apr-05 | 2013-apr-05 | | | | |
| 2012FF00329 | 2012PO0329WORU | RU | Pending | 2012-apr-05 | 2013-apr-05 | | PCT/IB3013/052725 | | |
| 2012FF00329 | 2012PO0329WOXN | IN | Pending | 2012-apr-05 | 2013-apr-05 | | PCT/IB3013/052725 | | |
| 2012FF00329 | 2012PO0329WOUS | US | Pending | 2012-apr-05 | 2013-apr-05 | | 14/387775 | | |
| 2012FF00329 | 2012PO0329WE | | Pending | 2012-apr-05 | 2013-apr-05 | | 13726807.8 | | |
| 2012FF00329 | 2012PO0329WOKR | KR | Pending | 2012-apr-05 | 2013-apr-05 | | PCT/IB3013/052725 | | |
| 2012FF00330 | 2012PO0330WOKR | KR | Pending | 2012-apr-13 | 2013-apr-30 | | PCT/IB3013/052857 | | |
| 2012FF00330 | 2012PO0330 TW | TW | Pending | 2012-apr-13 | 2013-apr-12 | | 102113340 | | |
| 2012FF00330 | 2012PO0330WO8R | BR | Pending | 2012-apr-13 | 2013-apr-30 | | BR 11 2014 025064 2 | | |
| 2012FF00330 | 2012PO0330WOJP | JP | Pending | 2012-apr-13 | 2013-apr-30 | | TO BE ADVISED | | |
| 2012FF00330 | 2012PO0330WORU | RU | Pending | 2012-apr-13 | 2013-apr-30 | | PCT/IB3013/052857 | | |
| 2012FF00330 | 2012PO0330WOUS | US | Pending | 2012-apr-13 | 2013-apr-30 | | 14/391415 | | |
| 2012FF00330 | 2012PO0330WOCN | CN | Pending | 2012-apr-13 | 2013-apr-30 | | PCT/IB3013/052857 | | |
| 2012FF00330 | 2012PO0330WOXN | IN | Pending | 2012-apr-13 | 2013-apr-30 | | PCT/IB3013/052857 | | |
| 2012FF00330 | 2012PO0330WE | | Pending | 2012-apr-13 | 2013-apr-30 | | 13727358.3 | | |
| 2011PF02006 | 2011PO2006 TW | TW | Pending | 2012-apr-24 | 2013-apr-23 | | 102114441 | | |
| 2011PF02006 | 2011PO2006WOMX | MX | Pending | 2012-apr-24 | 2013-apr-22 | | MX/A/2014/012615 | | |
| 2011PF02006 | 2011PO2006WOKR | KR | Pending | 2012-apr-24 | 2013-apr-22 | | 10-2014-7025457 | | |
| 2011PF02006 | 2011PO2006WOHD | ID | Pending | 2012-apr-24 | 2013-apr-22 | | P 00 2014 06145 | | |
| 2011PF02006 | 2011PO2006WOXN | IN | Pending | 2012-apr-24 | 2013-apr-22 | | PCT/IB2013/053163 | | |
| 2011PF02006 | 2011PO2006WORU | RU | Pending | 2012-apr-24 | 2013-apr-22 | | PCT/IB2013/053163 | | |
| 2011PF02006 | 2011PO2006WE | | Pending | 2012-apr-24 | 2013-apr-22 | | 13727368.6 | | |
| 2011PF02006 | 2011PO2006WOZA | ZA | Pending | 2012-apr-24 | 2013-apr-22 | | PCT/IB2013/053163 | | |
| 2011PF02006 | 2011PO2006WOBR | BR | Pending | 2012-apr-24 | 2013-apr-22 | | PCT/IB2013/053163 | | |
| 2011PF02006 | 2011PO2006WOJP | JP | Pending | 2012-apr-24 | 2013-apr-22 | | TO BE ADVISED | | |
| 2011PF02006 | 2011PO2006WOCN | CN | Pending | 2012-apr-24 | 2013-apr-22 | | PCT/IB2013/053163 | | |
| 2011PF02006 | 2011PO2006WOUS | US | Pending | 2012-apr-24 | 2013-apr-22 | | 14/396495 | | |
| 2011PF02007 | 2011PO2007 TW | TW | Pending | 2012-apr-24 | 2013-apr-24 | | 102114682 | | |
| 2011PF02007 | 2011PO2007WOJP | JP | Pending | 2012-apr-24 | 2013-apr-16 | | TO BE ADVISED | | |
| 2011PF02007 | 2011PO2007WOMX | MX | Pending | 2012-apr-24 | 2013-apr-16 | | MX/A/2014/012616 | | |
| 2011PF02007 | 2011PO2007WE | | Pending | 2012-apr-24 | 2013-apr-16 | | 13726518.5 | | |
| 2011PF02007 | 2011PO2007WO8R | BA | Pending | 2012-apr-24 | 2013-apr-16 | | PCT/IB2013/053020 | | |
| 2011PF02007 | 2011PO2007WOUS | US | Pending | 2012-apr-24 | 2013-apr-16 | | 14/396796 | | |
| 2011PF02007 | 2011PO2007WOCN | CN | Pending | 2012-apr-24 | 2013-apr-16 | | PCT/IB2013/053020 | | |
| 2011PF02007 | 2011PO2007WOKD | KD | Pending | 2012-apr-24 | 2013-apr-16 | | P-CO 2014 06374 | | |
| 2011PF02007 | 2011PO2007WORU | RU | Pending | 2012-apr-24 | 2013-apr-16 | | PCT/IB2013/053020 | | |
| 2011PF02007 | 2011PO2007WOXN | IN | Pending | 2012-apr-24 | 2013-apr-16 | | PCT/IB2013/053020 | | |
| 2011PF02007 | 2011PO2007WOZA | ZA | Pending | 2012-apr-24 | 2013-apr-16 | | PCT/IB2013/053020 | | |
| 2011PF02143 | 2011PO2143WO | | Pending | 2012-mei-02 | 2013-mei-02 | | PCT/IB2013/053461 | WO2013/164778 | |
| 2011PF02143 | 2011PO2143WE | | Pending | 2012-mei-02 | 2013-mei-02 | | 13729086.2 | | |
| 2011PF02143 | 2011PO2143WOUS | US | Pending | 2012-mei-02 | 2013-mei-02 | | 14/397406 | | |
| 2011PF02143 | 2011PO2143WOCN | CN | Pending | 2012-mei-02 | 2013-mei-02 | | PCT/IB2013/053461 | | |
| 2011PF02143 | 2011PO2143WOJP | JP | Pending | 2012-mei-02 | 2013-mei-02 | | PCT/IB2013/053461 | | |
| 2012PF00518 | 2012PO0518 TW | TW | Pending | 2012-jun-03 | 2013-mei-33 | | 102118253 | | |
| 2012PF00518 | 2012PO0518WO | | Pending | 2012-jun-01 | 2013-mei-23 | | PCT/IB2013/054263 | 2013379190-A | |
| 2012PF00768 | 2012PO0768WOBR | BR | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00768 | 2012PO0768WORU | RU | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00768 | 2012PO0768 TW | TW | Pending | 2012-jul-18 | 2013-jul-18 | | 102125822 | | |
| 2012PF00768 | 2012PO0768WOXN | IN | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00768 | 2012PO0768WOUS | US | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00768 | 2012PO0768WOKR | KR | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00768 | 2012PO0768WOCN | CN | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00768 | 2012PO0768WE | | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00768 | 2012PO0768WOJP | JP | Pending | 2012-jul-18 | 2013-jul-15 | | PCT/IB2013/055816 | | |
| 2012PF00940 | 2012PO0940WOBR | BR | Pending | 2012-jul-30 | 2013-jul-12 | | PCT/IB2013/055750 | | |
| 2012PF00940 | 2012PO0940WOJP | JP | Pending | 2012-jul-30 | 2013-jul-12 | | PCT/IB2013/055750 | | |
| 2012PF00940 | 2012PO0940WOUS | US | Pending | 2012-jul-30 | 2013-jul-12 | | PCT/IB2013/055750 | | |
| 2012PF00940 | 2012PO0940WORU | RU | Pending | 2012-jul-30 | 2013-jul-12 | | PCT/IB2013/055750 | | |
| 2012PF00940 | 2012PO0940WE | | Pending | 2012-jul-30 | 2013-jul-12 | | PCT/IB2013/055750 | | |
| 2012PF00940 | 2012PO0940WOCN | CN | Pending | 2012-jul-30 | 2013-jul-12 | | PCT/IB2013/055750 | | |
| 2012PF00940 | 2012PO0940WOXN | IN | Pending | 2012-jul-30 | 2013-jul-12 | | PCT/IB2013/055750 | | |
| 2012PF01186 | 2012PO1186WO | | Pending | 2012-okt-26 | 2013-okt-18 | | PCT/IB2013/059429 | 2014/084388 | |
| 2012PF01412 | 2012PO1412WORU | RU | Pending | 2012-nov-07 | 2013-nov-07 | | PCT/IB2013/059964 | | |
| 2012PF01412 | 2012PO1412WOJP | JP | Pending | 2012-nov-07 | 2013-nov-07 | | PCT/IB2013/059964 | | |
| 2012PF01412 | 2012PO1412WOBR | BR | Pending | 2012-nov-07 | 2013-nov-07 | | PCT/IB2013/059964 | | |
| 2012PF01412 | 2012PO1412WOUS | US | Pending | 2012-nov-07 | 2013-nov-07 | | PCT/IB2013/059964 | | |
| 2012PF01412 | 2012PO1412WOCN | CN | Pending | 2012-nov-07 | 2013-nov-07 | | PCT/IB2013/059964 | | |
| 2012PF01412 | 2012PO1412WOXN | IN | Pending | 2012-nov-07 | 2013-nov-07 | | PCT/IB2013/059964 | | |
| 2012PF01412 | 2012PO1412WE | | Pending | 2012-nov-07 | 2013-nov-07 | | PCT/IB2013/059964 | | |
| 2012PF01412 | 2012PO1412 TW | TW | Pending | 2012-nov-07 | 2013-nov-06 | | 102140417 | | |
| 2012PF00504 | 2012PO0504WO | | Pending | 2012-nov-16 | 2013-sep-04 | | PCT/IB2013/058273 | 2014/078587-A | |





**A-744**

Confidential

| FAMILY | RIGHT | REGION | STATUS | PRIORITY DATE | FILING DATE | GRANT DATE | APPL. NUMB. | PUBL. NUMB. | GRANT NUMB. |
|---|---|---|---|---|---|---|---|---|---|
| 2012PF00769 | 2012PF00769WO | | Pending | 2012-nov-16 | 2013-okt-25 | | PCT/IB2013/059659 | 2014 078599 A | |
| 2012PF01414 | 2012PF01414WO | | Pending | 2013-feb-06 | 2013-nov-13 | | PCT/EP 2013/073733 | WO 2014/131560 | |
| 2012PF01414 | 2012PF01414 TW | TW | Pending | 2013-feb-06 | 2013-nov-25 | | 102142868 | | |
| 2012PF02119 | 2012PF02119 TW | TW | Pending | 2013-feb-06 | 2013-feb-06 | | UNKNOWN | | |
| 2012PF02119 | 2012PF02119WO | | Pending | 2013-feb-06 | 2014-jan-22 | | PCT/EP2014/051156 | WO 2014/132012 | |
| 2013PF00909 | 2013PF00909WO-BR | BR | Pending | 2013-feb-06 | 2014-jan-27 | | PCT/IB2014/058564 | | |
| 2013PF00909 | 2013PF00909WO-US | US | Pending | 2013-feb-06 | 2014-jan-27 | | PCT/IB2014/058564 | | |
| 2013PF00909 | 2013PF00909WO-RU | RU | Pending | 2013-feb-06 | 2014-jan-27 | | PCT/IB2014/058564 | | |
| 2013PF00909 | 2013PF00909WO-JP | JP | Pending | 2013-feb-06 | 2014-jan-27 | | PCT/IB2014/058564 | | |
| 2013PF00909 | 2013PF00909WO-CN | CN | Pending | 2013-feb-06 | 2014-jan-27 | | PCT/IB2014/058564 | | |
| 2013PF00909 | 2013PF00909WO-IN | IN | Pending | 2013-feb-06 | 2014-jan-27 | | PCT/IB2014/058564 | | |
| 2013PF00909 | 2013PF00909 TW | TW | Pending | 2013-feb-06 | 2014-feb-06 | | 103103960 | | |
| 2013PF00909 | 2013PF00909WE | | Pending | 2013-feb-06 | 2014-jan-27 | | 14704576.7 | | |
| 2012PF01854 | 2012PF01354WO | | Pending | 2013-mrt-11 | 2014-feb-25 | | PCT/IB2014/059221 | 2014/140973-A | |
| 2012PF01354 | 2012PF01354 TW | TW | Pending | 2013-mrt-11 | | | 103108500 | | |
| 2012PF01855 | 2012PF01355 TW | TW | Pending | 2013-mrt-11 | 2014-mrt-11 | | 103108500 | | |
| 2012PF01355 | 2012PF01355WO | | Pending | 2013-mrt-11 | 2014-mrt-07 | | PCT/IB2014/059527 | 2014/141018-A | |
| 2012PF01358 | 2012PF01358 TW | TW | Pending | 2013-mrt-11 | 2014-mrt-11 | | 103108467 | | |
| 2012PF01358 | 2012PF01358WO | | Pending | 2013-mrt-11 | 2014-mrt-11 | | PCT/IB2014/059631 | 2014/141053 A | |
| 2012PF01395 | 2012PF01395 TW | TW | Pending | 2013-mrt-12 | 2014-mrt-12 | | 103108787 | | |
| 2012PF01395 | 2012PF01395WO | | Pending | 2013-mrt-12 | 2014-mrt-07 | | PCT/IB2014/059530 | 2014/141019-A | |
| 2013PF00320 | 2013PF00320WO | | Pending | 2013-mrt-22 | 2014-mrt-19 | | PCT/EP2014/055481 | 2014/147100 A | |
| 2013PF00320 | 2013PF00320 TW | TW | Pending | 2013-mrt-22 | 2014-mrt-22 | | 103113758 | | |
| 2013PF00731 | 2013PF00731 TW | TW | Pending | 2013-apr-04 | 2014-mrt-06 | | 103107711 | | |
| 2013PF00731 | 2013PF00731WO | | Pending | 2013-apr-04 | 2014-apr-04 | | PCT/EP2014/056847 | | |
| 2013PF00662 | 2013PF00662WO | | Pending | 2013-apr-05 | 2014-apr-04 | | PCT/US14/32955 | WO 2014/165744 A | |
| 2013PF00787 | 2013PF00787WO | | Pending | 2013-apr-25 | 2014-apr-21 | | PCT/EP 2014/058033 | | |
| 2013PF00787 | 2013PF00787 TW | TW | Pending | 2013-apr-25 | 2014-apr-25 | | 103115057 | | |
| 2013PF00910 | 2013PF00910 TW | TW | Pending | 2013-mei-10 | 2014-mei-09 | | 103116029 | | |
| 2013PF00910 | 2013PF00910WO | | Pending | 2013-mei-10 | 2014-apr-30 | | PCT/IB2014/061094 | | |
| 2013PF00567 | 2013PF00567WO | | Pending | 2013-jun-03 | 2014-mei-21 | | PCT/EP 2014/060469 | | |
| 2013PF00567 | 2013PF00567 TW | TW | Pending | 2013-jun-03 | 2014-jun-03 | | 103119258 | | |
| 2013PF00733 | 2013PF00733 TW | TW | Pending | 2013-jul-02 | 2014-jun-30 | | 103122578 | | |
| 2013PF00732 | 2013PF00732WO | | Pending | 2013-jul-02 | 2014-mei-28 | | PCT/EP 2014/061164 | | |
| 2013PF00734 | 2013PF00734WO | | Pending | 2013-sep-03 | 2014-aug-15 | | PCT/EP 2014/067952 | | |
| 2013PF01610 | 2013PF01610WO | | Pending | 2013-sep-30 | 2014-sep-23 | | PCT/EP 2014/070244 | | |
| 2013PF01480 | 2013PF01480WO | | Pending | 2013-okt-14 | 2014-okt-14 | | PCT/EP 2014/071948 | | |



**A-745**

Confidential

## Schedule D

The applicable royalty rate of a particular quarter will be determined by calculating the rolling aggregate volume of such Licensed Products sold or otherwise disposed of by ULTRA-D or any of its Affiliates in a particular quarter plus the preceding three quarters. For the avoidance of doubt a quarter means January to March, April to June, July to September, October to December during each year.

The following applies to the royalty rates for 3D Displays, 3D Rendering Boxes and Real-Time Conversion Software Products:

1.    Royalty fee applicable to 3D Content

5% on Total Net Turnover. In case the Total Net Turnover for 3D Content equals or exceeds EUR 20,000,000 (twenty million Euros) in any calendar year, the remaining royalty for that year shall be reduced by one percent (1%) for each additional EUR 20,000,000 (twenty million Euros). (For the avoidance of doubt only, if in a calendar year EUR 50,000,000 (fifty million Euros) Total Net Turnover was obtained then it would be royalty based on 5% for the first EUR 20,000,000 (twenty million Euros), 4% for the second EUR 20,000,000 (twenty million Euros), and 3% for the remaining EUR 10,000,000 (ten million Euros)).

**"Total Net Turnover"** shall mean all revenue generated by or for ULTRA-D or any of its Affiliates through the sale or other disposal of 3D Content less duties and sales taxes actually incurred by ULTRA-D and any of its Affiliates in relation to the 3D Content provided.

2.    Royalty fee applicable to 3D Displays (Euro per unit):

|  | Size | | | | | | |
|---|---|---|---|---|---|---|---|
|  | Up to 6" | 6"-9.9" | 10"-13.9" | 14"-18.9" | 20"-26.9" | 27"-36.9" | 37" and up |
| Euro | 0.5 | 1 | 1.5 | 2.5 | 3.5 | 4.5 | 6 |

3.    Royalty fee applicable to 3D Rendering Boxes:
   • In the event a 3D Rendering Box is sold separate from a 3D Display: 4.5 Euro



Confidential

- In the event a 3D Rendering Box is sold as part of a system including a 3D Display: 0 Euro

4.    Royalty fee applicable to 3D Content Creation Tools:

10% on Total Net Turnover generated by the import, export, sell, offer to sell, lease, operate, license, otherwise make available of other disposal of 3D Content Creation Tools by ULTRA-D or any of its Affiliates.. In case the Total Net Turnover for 3D Content Creation Tools equals or exceeds EUR 20,000,000 (twenty million Euros) in any calendar year, the remaining royalty for that year shall be reduced by one percent (1%) for each additional EUR 20,000,000 (twenty million Euros). (For the avoidance of doubt only, if in a calendar year EUR 50,000,000 (fifty million Euros) Total Net Turnover was obtained then it would be royalty based on 5% for the first EUR 20,000,000 (twenty million Euros), 4% for the second EUR 20,000,000 (twenty million Euros), and 3% for the remaining EUR 10,000,000 (ten million Euros).

5.    Royalty fee applicable to Real-Time Conversion Software Products (Euro per unit):

| | Product application | |
|---|---|---|
| 4 quarter Volume | TV, PC, notebook, Tablet PC | Others (e.g. smart phone, picture frame) |
| < 50,000 units | 1 | 0.5 |
| 50,001 <> 250,000 units | 0.5 | 0.3 |
| > 250,001 units | 0.25 | 0.2 |



**A-747**

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (this "Agreement") is entered into as of May 23, 2021 (the "Effective Date"), by and among, **Stream TV Networks, Inc.**, a Delaware corporation (the "Company" or "Stream TV"), **Mathu Rajan** ("M. Rajan"), and **Raja Rajan** ("R. Rajan," and, together with the Company and M. Rajan, collectively, the "Company Parties"), on the one side, and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt") on the other side. Each of the Company Parties and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party".

### BACKGROUND

Stream TV is a Philadelphia-based new media company created to serve a consumer market seeking enhanced entertainment and communications experiences through devices with unlimited accessibility and superior quality;

Rembrandt is the successor to 3DFusion Corp. ("3D Fusion");

On January 6, 2017, Rembrandt filed suit against the Company in the Supreme Court of New York, New York County, which the Company removed to the U.S. District Court for the Southern District of New York captioned Rembrandt 3D Holding LTD v. Stream TV Network, Inc., et al., No. 17 Civ. 00882 (RA) (KHP) (S.D.N.Y.) (the "Litigation");

This Agreement details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, existing as of the effective date of May 23, 2021 ("Effective Date"). This Agreement is subject to the Protective Order (Docket No. 60) signed by the Parties in the Litigation.

Without admitting liability for any claim or damages, the Parties to this Agreement desire to settle the Litigation and agree to enter this Settlement Agreement and Mutual Release.

NOW THEREFORE, in consideration of the mutual promises, covenants, undertakings and agreements set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

| | | |
|---|---|---|
| 1. | Confidentiality: | The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Agreement. |
| 2. | Costs and Expenses | Each Party shall be responsible for its own costs and expenses in negotiating the terms of this Agreement. |
| 3. | Law: | This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles. |
| 4. | Commencement | Commencement of this intended settlement shall be triggered upon the execution of this Agreement and the Warrant |

Agreement (Exhibit A) (which is incorporated herein by reference) and the attached Stipulation Of Voluntary Dismissal Pursuant To F.R.C.P. 41(a)(1)(A)(ii) (Exhibit B) which will be executed immediately after execution of this Agreement.

5. General Release

a. Each of the Company Parties and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys do hereby fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises, obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have, or have had, past, present, or future, against Rembrandt and its predecessors, successors, affiliates, subsidiaries, agents, officers, directors, members, managers, employees, owners and shareholders, relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

b. Upon payment of all payments under Section 15. Consideration, each of Rembrandt and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys agree to fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have,

or have had, past, present, or future, against any of the Company Parties and their respective predecessors, successors, affiliates, subsidiaries, agents, officers, directors, employees, and shareholders (and, in the case of M. Rajan and R. Rajan, their respective heirs, personal representatives, executors, and administrators) relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

6. Products

(a) Provision of 4K Units – Stream TV will ship to Rembrandt 100 of the following units: Display/Monitor Model: SC65D21Q-4K 65" Ultra-D Display (the "4K Units"). It is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice.  Stream will pay transportation and all importation costs of these units. Upon execution of this Agreement Stream TV will notify Rembrandt if it will not be able to deliver any of the 4K Units and $5,250.00 will be added to the consideration under Section 15. A. for each 4K Unit that Stream TV can not provide upon execution or Stream TV will agree to provide additional 8K prototype units as a replacement for the 4K units to be delivered at up to 10 units/month starting seven months after Prototype Commencement.

(b) High Resolution Units

(1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with eight prototypes as follows:

i) the first unit within one month of the first prototype created by Stream TV of an 8K resolution unit after execution of this Agreement ("Prototype Commencement");

ii) 2 units on or before three months from Prototype Commencement;

iii) 2 units on or before four months from Prototype Commencement; and

iv) 3 units on or before six months from

**A-750**

Prototype Commencement.

Stream TV will warehouse such 4K and 8K units (for the 4K units and prototypes of the 8K) in facilities until shipping is requested by Rembrandt to a destination within the United States. Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes. Stream TV will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream TV is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream TV may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, and otherwise at standard commercial terms, the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus and 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of term.

Such minimum right of first refusal is cumulative and if Stream TV is not in production or Rembrandt does not use such right within a given month it carries over to future months. Rembrandt may purchase additional units by paying standard commercial terms with most favored nation status on a per unit price basis and similar shipping terms.   At present the following products defined in the attached specification sheets provided by Stream TV on June 13, 2019 are Standard Products attached hereto as Exhibit B, which is incorporated herein by reference.)

(3) Title for each of the Units shall transfer to Rembrandt, and risk of loss will be assumed by Rembrandt, upon delivery of each such Unit.

(4) Tax Matters.  Rembrandt shall be solely responsible for any taxes chargeable to the purchaser of goods in connection with or arising out of the transfer of the Units. Stream TV shall be solely responsible for any taxes chargeable to the seller of goods in connection with or arising out of the transfer of the Units.

| | |
|---|---|
| 7.  OEM | Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications. |
| | White Label - Rembrandt may brand product purchased from Stream TV with Rembrandt trademarks.  Rembrandt will not remove any patent number marking applied by Stream. |
| 8.  Term | The Term of the Agreement shall continue through December 31, 2030. |
| 9.  Rembrandt Grant of Rights | Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A to this |

{00843971.DOCX 1}

**A-752**

Agreement for Rembrandt.

| | |
|---|---|
| 10. Stream Grant of Rights | Stream TV hereby grants Rembrandt a non-exclusive license to any existing Stream technologies that Stream TV has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein.  Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable. |
| 11. Field | The licensed field of use from Rembrandt to Stream TV is all applications |
| | The licensed field of use from Stream TV to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed.  Sale to any distributor in any territory is permitted for the Field. |
| 13. Co-Marketing | Rembrandt and Stream TV shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party. |
| | Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration: |

a) Upon execution of this Agreement, Stream TV agrees to pay to Rembrandt the lump sum of one million five hundred twenty eight thousand ($1,528,000) USD and is due immediately.

b) Stream TV is providing  warrants equal to X% of the outstanding stock in Stream TV after Stream TV has raised at least sixty million dollars in capital in excess of all outstanding debt and currently liabilities, with provision of a cashless exercise price at a $$Y value per warrant, pursuant to the attached Warrant Agreement (Exhibit A), which is incorporated herein by reference.

"X%" shall be equal to the 2,000,000/(the number of shares in Stream TV outstanding on April 9, 2019). "$Y value" shall be equal to (the book equity value of Stream TV at issuance)/(the number of shares in Stream TV outstanding at issuance)

c) Stream TV will pay Rembrandt a monthly fee ("Monthly Payment") beginning with the execution of the Agreement for the full Term of this Agreement, according to the following schedule:

    a. 12 months @ $28,000/per month
    b. 12 months @ $32,000/per month
    c. 12 months @ $36,000/per month
    d. 79 months @ $40,000/per month

    The monthly payments shall be accelerated upon a merger, acquisition, or change of control. No acceleration by IPO.

16. Payments

Stream TV shall pay each Installment and Monthly Payment by wire transfer of immediately available funds to an account designated by Rembrandt in writing below, or otherwise designated by Rembrandt in writing and delivered to mathu@streamacquistiongroup.com:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

17. Representations and Warranties

The Parties represent and warrant to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed of learned during the pendency of the Litigation.

Stream TV represents and warrants that it has not revived and will not revive any abandoned patents or patent applications that were abandoned prior to the Effective Date.

Each of the Parties hereby represents and warrants to the others that, as of the Effective Date, (i) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate or company action on its behalf, (iii) this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with the terms

{00843971 DOCX 1}

of this Agreement, (iv) each individual signing this Agreement in a representative capacity acknowledges and represents that he/she is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated Party; and (v) the agreements and understandings identified herein constitute all of the agreements and understandings between and among the Parties with respect to the subject matter hereof.

18. Notices

Notices required by this Agreement shall be submitted either by any form of overnight courier or by hand delivery, and simultaneously by e-mail, as follows:

To Stream TV, Raja Rajan Mathu Rajan:
Stream TV Networks, Inc
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
Attention:  General Counsel, Mathu and Raja Rajan individually

and

XXX

To Rembrandt:
128 Bull Hill Road
Newfield, New York  14867
Attention: Stephen Blumenthal
Email: Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York  10017
Attention: Chi Eng
Email: chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St, 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

{00843971.DOCX 1}

**A-755**

19. Advice of Counsel — Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys.

20. Entire Agreement — It is expressly understood and agreed that this Agreement along with all of the following documents: 1) the Warrant Agreement; and 2) the Protective Order in the Litigation (Docket No. 60) constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement.  Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement.

21. Severability — If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired,  and shall remain in full force and effect.

22. Binding Effect — This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries,  parents, successors,  shareholders,  members,  partners,  general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, directors, members or shareholders of

{00843971 DOCX 1}

A-756

any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns.

23. Waiver and
    Amendment

No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto.

24. Further Assurances

Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement.

25. Costs

The Parties acknowledge that each Party is to bear its own costs, fees, and expenses, including attorneys' fees, incurred in connection with the dispute giving rise to this Agreement.

26. Dispute Resolution

In the event of a dispute arising from this Settlement Agreement, the parties agree to resolve such dispute in good faith within fifteen (15) business days of receipt of notice of such dispute. If the parties fail to resolve such dispute, the parties consent to initially seek mediation by the Court in the Litigation, which Court the parties also agree shall maintain jurisdiction over any dispute arising from this Agreement.

27. Right to Attorney's
    Fees in Case of
    Breach

In the event of any dispute or litigation arising out of or concerning this Agreement, the prevailing Party shall be entitled to an award against the non-prevailing Party of its reasonable attorney's fees and costs.

28. Headings

The various headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

29. Counterparts and Transmission of Signatures

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Original signatures transmitted by electronic mail or facsimile shall be deemed to be original signatures. No Party shall be bound hereby unless and until all other Parties have executed this Agreement.

30. Authorized Signature

Each individual signing this Agreement in a representative capacity acknowledges and represents that he is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated corporation, partnership, limited liability company, trust or other entity.

31. Joint Preparation

This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements.

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of Defendants:**          **Signed for and on behalf of Plaintiff:**

_____                    _____

Signature                                           Signature
STREAM TV NETWORK, INC.,                            REMBRANDT 3D HOLDING LTD

By: Mathu Rajan, Chief Executive Officer            By: Stephen Blumenthal, President/CEO

Date: May 23, 2021                                  Date: May 23, 2021

_____

Signature
Mathu Rajan, Individually

Date: May 23, 2021

_____

Signature
Raja Rajan, Individually

Date: May 23, 2021

**A-759**

SCHEDULE A

1. Know how and trade secrets related to methodology for:
   a. efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology
   b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
   c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. The patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

Exhibit A


(Warrant Agreement)

A-761

# WARRANT

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE COMPANY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

 Warrant Certificate No.:
 Original Issue Date:

FOR VALUE RECEIVED, Stream TV Networks, Inc., a Delaware USA corporation (the "**Company**"), hereby certifies that Rembrandt 3D Holdings, Ltd ("Rembrandt") is a Nevis corporation with an office at 128 Bull Hill Road, Newfield, New York 14867, or its registered and permitted assigns (the "**Holder**"), is entitled to purchase from the Company XXX (XXX) duly authorized, validly issued, fully paid and non-assessable shares of Common Stock at a purchase price per share of $YYY (the "**Exercise Price**"), all subject to the terms and conditions set forth below in this Warrant. Certain capitalized terms used herein are defined in **Section 1** hereof.

1. Definitions. As used in this Warrant, the following terms have the respective meanings set forth below:

 "**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to **Section 3** hereof, multiplied by (b) the Exercise Price in accordance with the terms of this Warrant.

 "**Board**" means the board of directors of the Company. "**Business Day**" means any day, except a Saturday, Sunday or legal holiday, on which banking institutions in New York City are authorized or obligated by law or executive order to close.

 "**Common Stock**" means the Class A Common Stock, par value $0.00001 per share, of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged or reclassified following the date hereof.

"**Exercise Date**" means the date on which the conditions to such exercise as set forth in **Section 3** shall have been satisfied at or prior to 5:00 p.m., New York time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Agreement, the Warrant and the Aggregate Exercise Price.

"**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act.

"**Liquidity Event**" means any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or an Initial Public Offering (IPO) or sale of the Company by either stock or assets that is at least a change of control transaction.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization or government or department or agency thereof.

"**Termination Date**" means the date the Warrant expires, unless exercised earlier as provided herein, and such date being 5:00 p.m., New York City time, on the twentieth (20th) anniversary of the date hereof.

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Shares**" means the shares of Common Stock purchasable upon exercise of this Warrant in accordance with the terms of this Warrant. 2. Term of Warrant. Subject to the terms and conditions hereof, the Holder may only exercise this Warrant, in whole or in part, for the Warrant Shares purchasable hereunder during the Exercise Period. The "**Exercise Period**" shall be from the Liquidity Event until the Termination Date. In the event that the Company is a party to a Liquidity Event or otherwise has knowledge thereof, the Company shall provide advance written notice thereof to Holder. 3. Exercise of Warrant.

(a) **Exercise Procedure**. This Warrant may be exercised, in whole or in part, at the option of the Holder, on any Business Day during the Exercise Period, for the Warrant Shares, upon:

(i) surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft or destruction), together with an Exercise Agreement in the form attached hereto as **Exhibit A** (an "**Exercise Agreement**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii) payment to the Company of the Aggregate Exercise Price in accordance with **Section 3(b)**.

(b) **Payment of the Aggregate Exercise Price**. Payment of the Aggregate Exercise

Price shall be made, at the option of the Holder, by either of the following methods:

(i) delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to the following account of the Company: HSBC Bank USA NA, 120 Broadway, New York NY 10271, USA, Fed ABA Routing # 021001088, SWIFT Code # MRMDUS 33, Account #221049207 (Stream TV Networks, Inc.) or otherwise to an alternative account designated in writing in advance by the Company, in the amount of such Aggregate Exercise Price; or

(ii) by instructing the Company to issue Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula:

$$X = Y (A - B) \div A$$

Where
:

$X$ = the number of Warrant Shares to be issued to the Holder.

$Y$ = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a).

$A$ = the fair market value of one Warrant Share as of the applicable Exercise Date; whereby for purposes of this section "fair market value" shall be defined as (i) the average of the closing sale prices of the Common Stock for the five (5) trading days immediately prior to (but not including) the Exercise Date in the event that the Company's Common Stock is traded on an exchange or is quoted on an over the counter market, or in the absence of a trading market for the Common Stock, then (ii) as the Holder and the Company agree, or in the absence of such an agreement, by arbitration in accordance with the rules then standing of the American Arbitration Association, before a single arbitrator to be chosen from a panel of persons qualified by education and training to pass on the matter to be decided

$B$ = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

(c) **Delivery of Stock Certificates**. Upon receipt by the Company of the Exercise Agreement, surrender of this Warrant and payment of the Aggregate Exercise Price (in

accordance with **Section 3(b)** hereof), the Company shall, as promptly as practicable, and in any event within three (3) Business Days thereafter, execute (or cause to be executed) and deliver (or cause to be delivered) to the Holder a certificate or certificates representing the Warrant Shares issuable upon such exercise. The stock certificate or certificates so delivered shall be, to the extent possible, in such denomination or denominations as the exercising Holder shall reasonably request in the Exercise Agreement and shall be registered in the name of the Holder or, subject to compliance with **Section 4** below, such other Person's name as shall be designated in the Exercise Agreement. This Warrant shall be deemed to have been exercised and such certificate or certificates of Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d) **Fractional Shares**. The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant. As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Exercise Price of one Warrant Share on the Exercise Date.

(e) **Valid Issuance of Warrant and Warrant Shares**. With respect to the exercise of this warrant, the Company hereby represents, covenants and agrees that:

(i) This Warrant is duly authorized and validly issued. (ii) All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid and non-assessable.

(f) **Conditional Exercise**. Notwithstanding any other provision hereof, if an exercise of this Warrant is to be made in connection with a Liquidity Event, such exercise may at the election of the Holder be conditioned upon the consummation of such Liquidity Event, in which case such exercise shall not be deemed to be effective until immediately prior to the consummation of such Liquidity Event.

(g) **Reservation of Shares**. Immediately prior to the exercise of this Warrant, the Company shall reserve and keep available out of its authorized but unissued Common Stock, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid

and non-assessable shares of Common Stock upon the exercise of this Warrant.

(h) **Adjustment of Exercise Price.** In the event of changes in the outstanding Common Stock by reason of stock dividends, split-ups, recapitalizations, reclassifications, combinations or exchanges of shares, separations, reorganizations, liquidations, or the like, the number and class of shares available under the Warrant in the aggregate and the Exercise Price shall be correspondingly adjusted to give the Holder of the Warrant, on exercise for the same aggregate Exercise Price, the total number, class, and kind of shares as the Holder would have owned had the Warrant been exercised prior to the event and had the Holder continued to hold such shares until after the event requiring adjustment. The form of this Warrant need not be changed because of any adjustment in the number of Warrant Shares subject to this Warrant. Prompt notice of any adjustment made pursuant to this **Section 3(h)** shall be given to the Holder.

(i) **Combination.** While this Warrant is outstanding, in the event of a Combination (as defined below), each Holder shall have the right to receive upon exercise of the Warrant the kind and amount of shares of capital stock or other securities or property which such Holder would have been entitled to receive upon or as a result of such Combination had such Warrant been exercised immediately prior to such event (subject to further adjustment in accordance with the terms hereof). In the event of a Combination in which the Company is not the surviving entity, the Company shall provide that the surviving or acquiring Person (the "Successor Company") in such Combination will assume by written instrument the obligations under this Section 3(i) and the obligations to deliver to the Holder such shares of stock, securities or assets as, in accordance with the foregoing provisions, the Holder may be entitled to acquire. "Combination" means an event in which the Company consolidates with, mergers with or into, or sells all or substantially all of its assets to another Person, where "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

(j) **Market Stand-Off**. Holder shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale in relation to, any Common Stock (or other securities) of the Company held by Holder, for a period of time specified by the managing underwriter(s) (not to exceed one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act. Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriter(s) which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to such Common Stock (or other securities) until the end of such period. As a pre-condition

to any proposed transfer of this Warrant or any Common Stock issued hereunder, any proposed transferee of the Holder (or any subsequent transferee of this Warrant or any such shares of Common Stock) will be required to agree to the terms of this **Section 3(i)** and the Company may refuse to recognize or register and purported transfer that is not made in compliance with the terms hereof. 4. Transfer of Warrant. This Warrant shall not be transferred (in whole or in part) without the prior written consent of the Company, which consent shall not be unreasonably withheld.

5. Holder Not Deemed a Stockholder; Limitations on Liability. Except as otherwise specifically provided herein, prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose by virtue of being the Holder of this Warrant alone, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

6. Replacement on Loss; Division and Combination.

(a) **Replacement of Warrant on Loss**. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to the Company and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company, at the Holder's expense, shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for the same number of Warrant Shares as the Warrant so lost, stolen, mutilated or destroyed; provided, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b) **Division and Combination of Warrant**. Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance

with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall, at the Company's expense, execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for the same number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

7. Warrant Register. The Company shall keep and properly maintain at its principal executive offices books for the registration of the Warrant and any transfers thereof. The Company may deem and treat the Person in whose name the Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

8. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing.

9. Cumulative Remedies. The rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity or otherwise.

10. Equitable Relief. Each of the Company and the Holder acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

11. Entire Agreement. This Warrant constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant and the Subscription Agreement, the statements in the body of this Warrant shall control.

12. Successor and Assigns. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted

assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

13. No Third-Party Beneficiaries. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

14. Headings. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

15. Amendment and Modification; Waiver. Except as otherwise provided herein, this Warrant may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

16. Severability. If any term or provision of this Warrant is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

17. Governing Law. This Warrant shall be governed by and construed in accordance with the internal laws of the State of Delaware USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware USA or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware USA.

18. Submission to Jurisdiction. Any legal suit, action or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware in each case located in the city of Wilmington, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by certified or registered mail to such party's address

set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

19. Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

20. No Strict Construction. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

[Signature appears on following page.]

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original
Issue Date.

STREAM TV NETWORKS,
INC.

By: _____

Name: Raja Rajan

Title: Chief Operating Officer

**A-771**

## EXHIBIT A

## FORM OF EXERCISE AGREEMENT

TO: STREAM TV NETWORKS, INC.

ATTENTION:
LEGAL

(1) The undersigned hereby elects to purchase _____ shares of the Common Stock of Stream TV Networks, Inc. (the "**Company**") pursuant to the terms of the attached Warrant, and tenders herewith payment of the Exercise Price in full, together with all applicable transfer taxes, if any.

- OR -

The undersigned hereby elects to purchase _____ shares of the Common Stock of the Company pursuant to the terms of the net exercise provisions set forth in **Section 3(b)(ii)** of the attached Warrant, and shall tender payment of all applicable transfer taxes, if any.

(2) Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

_____

(Name)

_____

_____

(Address)

(3) The undersigned represents that (i) the aforesaid shares of Common Stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the shares of Common Stock issuable upon exercise of this Warrant have not been registered under

the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid shares of Common Stock may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the shares for the number of years prescribed by Rule 144, that among the conditions for use of the Rule is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid shares of Common Stock unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel satisfactory to the Company, stating that such registration is not required.

(Date) (Signature)

(Print name)

**A-773**

Exhibit B

(Standard Products)

Exhibit B


(Standard Products)


{00843971.DOCX 1}

25

 

## 65" 8KL 16 Million Pixel
## Landscape Mode Ultra-D Display

We think the final customer will want these specs once they make it as final goods for the commercial industry.

| Feature | Description |
|---|---|
| Panel Features: 2D mode*<br><br>*From 2D Panel Spec | • 65" 16 Million Pixel TFT LCD with LED Backlight<br>• Landscape Mode Display<br>• Supports 4320 x 3840@60Hz<br>• Displays up to 10-bit 1.07 Billion Colors<br>• High Brightness up to 500cd/m2<br>• Ultra-High contrast ratio (4000:1) |
| Panel Features: 3D mode | • Proprietary Ultra-D 3D Optical System delivers a Seamless Viewing Experience<br>• Proprietary Rendering Module delivers Ultra-D converted content up to 3D Full UHD with High Brightness up to 350 nits<br>• Real Time Conversion technology enables playback of legacy content to Glasses Free 3D<br>• Horizontal 3D Viewing Angle: 90°<br>• Vertical 3D Viewing Angle: 40°<br>• User Adjustable Depth Control<br>• Software Switchable 2D/3D<br>• Optimum viewing distance 3 – 5 Meters |
| HDMI Input<br>Resolutions, Framerates and Formats | • HDMI 1.4 and 2.1 Compatible<br>• HDCP 1.4 and 2.1 Support<br>• 480p60, 576p50, 720p50, 720p60, 720p60 3DFP, 1080p24, 1080p60, 1080p24 3DFP, 480i60, 576i50, 1080i50, 1080i60, 4K30, 4K60, 8K60<br>• Supports 2D & 3D Stereo (Top/Bottom & Side by Side & Frame Packed) |
| Wireless Connectivity | • Wi-Fi 802.11ac, BT to Support NFC, RS232 |
| Real Time Video Conversion (Via HDMI) | • Manually configurable for 2D-as-2D, 2D to Ultra-D, and 3D Stereo to Ultra-D (Top/Bottom & Side by Side)<br>• Automatic detection of 3D S/S Frame Packed |
| Content Playback | • HDMI, USB, LAN or WiFi |
| Event Logging | • Playlist status<br>• Software update status<br>• Monitor/Display Status |
| Remote Control | • IR Based |
| User interface | • On Screen Key Guide |
| Software Update | • Software update via USB, Ethernet or Wi-Fi |
| I/O | • 2X USB, 3X HDMI 1.4a/2.1,<br>• 1X RJ45, RS232, 1X 3.5mm Stereo Audio O/P |
| Status Indicators | • Power Off/On/Sleep/Standby LED |
| Device Interactive Support | • CEC, Ethernet Control & Communications, RS232 Control |
| Region Allocation: | • China, NA, SA, EU, India, Mid East |
| Power Requirements | • 110~240V, Sleep Mode, Standby Mode |
| Other | • RoHs compliant |
| Certifications | • UL, C-UL, FCC, CE, CCC |
| Warranty | • 1-year commercial warranty |
| Display Dimensions/Wt. | • TBD |

(00843765.DOCX 1)65" 8KL Digital Signage Specification Sheet
Subject to Change

Thursday, June 13, 2019                                        Version 1

26 

**A-776**

## Specifications (c)

| Feature | Description |
|---|---|
| Panel Features: 2D mode* <br> *From 2D Panel Spec | • Color Active Matrix TFT Module <br> • 4K (H:3840 x V:2160) 15.6" Display <br> • Component Depth: 8-Bit 16.7M Colors <br> • Pixel Arrangement: RGB Vertical Stripe <br> • Pixel Density:285 PPI <br> • Contrast Ratio: 1000:1 <br> • Brightness: 300 nit |
| Ultra-D™ Module Features (a) | • Proprietary Ultra-D™ Glasses Free 3D Optical Stack <br> • Proprietary Ultra-D™ Glasses Free 3D Rendering <br> • Horizontal 3D Viewing Angle: 120° <br> • Vertical 3D Viewing Angle: 40° <br> • Optimum viewing distance 35mm to 42mm |
| Viewing Orientation | • Ultra-D™: Horizontal <br> • 2D Horizontal |
| Module Thickness | • |
| Module Input | • VESA eDP Interface |
| Module Power Draw | • ASIC: <br> • IP: |
| Region Allocation: | • |
| Certifications | • |
| Module Dimensions/Wt. | • |

(a) Ultra-D™ Feature
(b) Optional Ultra-D™ Feature
(c) Subject to Change

**A-777**



### 15.6″ Ultra-D™ Glasses-Free 3D Display Module Brief

General Description:

The 15.6″ Ultra-D™ Glasses-Free 3D Display Module incorporates a 15.6″ 4K TFT Panel integrated with Stream TV Networks Ultra-D™ 3D Optical Stack and Proprietary Ultra-D™ 3D Rendering technology.

**Target Use Cases**

- Consumer Gaming Entertainment Product such as a Laptop or Mini PC
- Commercial Digital Signage Display for Kiosk or a Small Footprint Requirement

**Optimal Viewing**

- 35cm – 42cm

**Deliverable Implementations** [c]

- Optics & IP
  Optics: Display panel with StreamTV™ proprietary lens
  IP: TSMC (10 or 7 nm), or Hard Macro



**A-778**

```
                UNITED STATES BANKRUPTCY COURT

            FOR THE DISTRICT OF PENNSYLVANIA

                                    :
IN RE:                              : Case No.  23-10763
                                    :
STREAM TV NETWORKS, INC.   CH: 11   : ADV. No.  23-00057
AND TECHNOVATIVE MEDIA,             :
INC.                                : Philadelphia, Pennsylvania
                                    : November 7, 2024
Motion to Reconsider (related       : 11:14 a.m.
Documents Order on Motion to        :
Approve Compromise under Rule       :
9019) Filed by Visual               :
Semiconductor, Inc. Represented     :
by Donald N. David (Counsel)        :
                                    :
. . . . . . . . . . . . . . . . . . :
```

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Trustee:            Michael D. Vagnoni, Esq.
                            Obermayer Rebmann Maxwell &
                            Hippel LLP
                            Centre Square West
                            1500 Market Street, Suite 3400
                            Philadelphia, PA 19102
                            215-665-3066

                            Steven M. Coren, Esq.
                            Kaufman Coren & Ress, P.C.
                            Two Commerce Square
                            Suite 3900
                            2001 Market Street
                            Philadelphia, PA 19103-2713

For Rembrandt:              Andrew Peter Demarco
                            Devlin Law Firm, LLC
                            1526 Gilpin Avenue
                            Wilmington, DE 19806
                            302-449-9010

                            Chris Michaels

<u>APPEARANCES</u> (Continued):

For VSI:                        John H. Thompson
                                Akerman
                                750 Ninth Street, N.W.
                                Suite 750
                                Washington, D.C. 20001
                                202-393-6222

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   NOVEMBER 7, 2024                              10:00 A.M.
 2            THE COURT:  Perfect timing, gentlemen.  Morning,
 3   Steve.
 4            MR. COREN:  Good morning.  How are you, Judge?
 5            THE COURT:  I'm doing okay.  Hanging in.  Vagnoni?
 6            MR. VAGNONI:  Good morning, Your Honor.
 7            THE COURT:  Good morning.  All right.  Well Pam, it's
 8   10:00.
 9            THE CLERK:  Okay.  All right.  Today's Thursday,
10   November 7th, the 10:00 list.  The only matter on the list is
11   Stream TV Network's motion to reconsider the motion to approve
12   compromise filed by VSI.  Appearances please.
13            MR. VAGNONI:  Morning, Your Honor.  Michael Vagnoni
14   and Ed George on behalf of William Homony, the Chapter 11
15   Trustee.  Also with us today is Steve Coren, special counsel
16   for the Trustee.
17            MR. COREN:  Right.
18            THE COURT:  Okay.
19            MR. THOMPSON:  Good morning, Your Honor.  John
20   Thompson of Akerman LLP on behalf of VSI.  Morning.
21            THE COURT:  All right.  Well maybe no one else wants
22   to make their appearance known.
23            MR. DEMARCO:  Good morning, Your Honor.  This is
24   Andrew DeMarco with Devlin Law Firm here for Rembrandt.
25            THE COURT:  Okay.  All right.  Drive safely.
```

1              MR. DEMARCO:  Oh, I'm parked, Your Honor.

2              THE COURT:  Okay.  All right.  Okay.  All right.

3    Well, if no one else wants to enter their appearance.  I have

4    read all of the briefs, and I guess I just wanted to see if

5    there were any additional arguments that were different than

6    the arguments already set forth in the briefs.  So if you do,

7    I'd like to hear them.

8              MR. THOMPSON:  Your Honor, I would like to make a

9    presentation if I may, right?  We've asked for a consideration

10   for some important and very fundamental reasons.  In short, we

11   believe that the Court should reconsider the 9019 settlement

12   agreement because it is fatally flawed.  There are a number of

13   points of new information that the Court was not privy to in

14   making its decision to enter the order approving the 9019

15   settlement agreement.  And therefore, we think that it, again,

16   is flawed for a number of reasons.

17             The first is that the Trustee didn't complete his

18   assignment as issued to him through the Court's appointment

19   order.  And as a result, the Hawk party's claims and the

20   conversion of their notes were never truly investigated or

21   vetted by the Trustee despite protestations to the contrary.

22             Accordingly, the allowance of the secured claim in

23   the amount of $180 million, $150 million of that being

24   permitted to a credit bid is patently unreasonable in our view.

25             As set forth in greater detail in our objection, the

 1  Trustee's settlement to the sale motion, the Trustee's

 2  settlement agreement sets up a framework for sale process

 3  that's both unworkable from a legal and practical perspective

 4  and unfair to all stakeholders, including potential competing

 5  bidders and unsecured creditors because it establishes an

 6  unlevel playing field that advantages the Hawk parties, the

 7  stalking horse, to the detriment of all others.

 8          Finally, the 9019 settlement agreement failed to

 9  negotiate and provide a fiduciary out to permit the

10  consideration of any debtor deal that might arise after the

11  entry of disagreement with the Hawk parties. Specifically,

12  better deals that would ensure administrative solvency for the

13  estates, achieve meaningfully better recoveries for all

14  creditors, including unsecured creditors.  And we've seen the

15  negative fallout from the failure to secure such a fiduciary

16  out time and time again in this case, even if the Court has

17  not. As Trustees similarly rejected reasonable and considerably

18  better offers after offers in favor of some blind lot loyalty

19  to Hawk's outcome and the 9019 settlement.

20          Those aren't just VSI offers to be clear, Your Honor.

21  Those are offers coming from multiple parties and interests in

22  the case.  The bottom line is the Trustee is unwilling or

23  unable to take yes for an answer and achieve a better result

24  for the Debtor's estates and a better recovery for creditors of

25  those estates based upon the unreasonable and unwavering

1  allegiance to this 9019 settlement agreement.

2         That's never made any -- and that settlement

3  agreement has never made any sense, but it's definitely one

4  that does not make sense now in wake of the multiple offers and

5  compromise that would improve outcomes for all parties and do

6  so in a fair way.

7         Accordingly, we believe that the Court should grant

8  our motion to reconsider, vacate its prior order approving the

9  9019 settlement.  Your Honor, I'll take your questions if you

10  have any.

11         THE CLERK:  Judge, you're on mute.

12         THE COURT:  I'm sorry about that.  I don't have any

13  questions, but thank you, Mr. Thompson.

14         MR. THOMPSON:  Thank you.

15         THE COURT:  Mr. Vagnoni, Mr. Coren, you're welcome to

16  respond but you don't have it.  It's totally up to you.

17         MR. VAGNONI:  Your Honor, Michael Vagnoni on behalf

18  of the Trustee.  I'll keep it simple.  This is a situation

19  where the Trustee was given a mandate by the bankruptcy court.

20  I know counsel with VSI just indicated without any evidence

21  that the Trustee didn't fulfill his function.  We disagree

22  wholeheartedly.  We -- since the beginning of this case, I

23  think Your Honor is well aware that not only did the Court

24  appoint a Trustee, but the Court also granted relief from the

25  automatic stay to Hawk to go forward with the 225 action, which

```
 1   they attempted to do.

 2          He gave the Court -- the Trustee, a very short

 3   timeframe.  During which time the Trustee met with all of the

 4   parties who were at play here, met with VSI, or the Debtor.  We

 5   couldn't really tell which.  But with Mr. Rajan's group on

 6   multiple occasions.  Met with Hawk.  Met with SeeCubic, Inc.

 7   And met with Rembrandt.  And the result of those meetings and

 8   the shortened timeframe that we had to operate in and extensive

 9   -- and this speaks a little bit to the conversion issue that

10   Mr. Thompson alluded to.  Met with the Debtor's chancery court

11   attorney, Andy Dupre, at McCarty & English who now is at

12   Akerman.

13          And we're left with the very clear impression and

14   opinion that the 225 action was careless at best, and could

15   result in and would likely result in the estate having no

16   assets for unsecured creditors.

17          Because of that, Your Honor, the Trustee entered into

18   a settlement agreement with Hawk that would guarantee money

19   into the estate, and would get, our hope is, money to unsecured

20   creditors.  The multiple offers that Mr. Thompson alluded to --

21   again, I'm not sure what offers he's talking about, but we have

22   spent time with VSI to vet the proposals that they would like

23   to make and have found them to be lacking in evidentiary

24   support.  And the Trustee has chosen to move forward with the

25   Hawk settlement.
```

1          The Court evaluated that settlement at the 9019

2     hearing.  Found that the Trustee met all the Martin factors,

3     and approved the settlement.  We don't believe that VSI has

4     established grounds for this Court to reconsider to the extent

5     that 8008 would permit that.  And we believe that the motion

6     should be denied in its entirety.

7          THE COURT:  Okay.  Thank you, Mr. Vagnoni.

8          MR. VAGNONI:  Mr. George, I think that you're not on

9     mute, so when you're not on mute, we hear all of your email

10    rings, your phone calls.

11         THE COURT:  Okay, good.  All right.  Thanks, Mr.

12    George.  All right.  Mr. Coren, did you want to add anything to

13    that?

14         MR. COREN:  Yes.  I would just briefly, Your Honor.

15    Because the notion that we didn't do our due diligence or

16    investigation is preposterous.  I was hired to do just that.

17    And in fact, I participated in some of those meetings, reviewed

18    lots of the documents, interviewed the Debtor's counsel in the

19    225 action at length.  Looked at the materials from that case.

20    And I rendered a judgment and an opinion and gave advice, which

21    I will only talk of at the highest level to the Trustee.

22         And I wholeheartedly, given that analysis and my

23    experience and my review, concluded that this settlement was in

24    the best interest of the estate.  Wholeheartedly support that

25    there were serious risks as Mr. Vagnoni points out, which if

1  they didn't go well for the estate, would have resulted in the

2  estate having nothing.  I viewed those risks as real, and we

3  did an analysis of them, and I cancelled the trustee

4  accordingly.  And I did weigh in and participate in looking at

5  what are referred to as subsequent offers that -- in the

6  judgment of Mr. Thompson or his client he thinks are better to

7  the estate.  And I counseled along with bankruptcy counsel, the

8  Trustee.  And in my view to the extent that I looked at the

9  support for them, much of them was a illusory much like that,

10  which was present to Judge Coleman and she wholeheartedly

11  rejected it.

12       So I support the settlement.  I counseled the Trustee

13  accordingly as bankruptcy counsel.  And reject wholeheartedly

14  the notion that he did not perform his functions under the

15  bankruptcy code and the mandate.  He did precisely that as did

16  his professionals.  Thank you.

17       THE COURT:  Thanks, Mr. Coren.  Okay.  Well, I'm

18  going to take the matter under advisement.  I hope to have out

19  an opinion and order on this I hope in the next week or so.  So

20  you'll see that soon, all right.  Thank you all for your

21  presentation today and I'll talk to you guys soon.

22       MR. THOMPSON:  Your Honor, before -- I think you

23  indicated at the last hearing last week that you would rule

24  with respect to the motion to quash.

25       THE COURT:  Yeah.

```
 1              MR. THOMPSON:  With a specific request, with a
 2   specific regard to the sale and the procedures order.
 3              THE COURT:  Yes.  And so, that will be part of the
 4   opinion and order, my ruling on the discovery.
 5              MR. THOMPSON:  Will be part of your consideration to
 6   -- of the reconsideration motion?
 7              THE COURT:  So I'm going to rule on the motion for
 8   reconsideration.  And I'm also going to rule on the discovery
 9   in connection with the reconsideration. But there is also
10   outstanding discovery regarding the bid procedures and things
11   like that.  So I'm going to just rule on the discovery with
12   regard to the motion for reconsideration topic.
13              MR. THOMPSON:  Okay.  But the sale topic is different
14   from the reconsideration topic, Your Honor, with respect to
15   discovery.
16              THE COURT:  Yes, absolutely.
17              MR. THOMPSON:  Right.
18              THE COURT:  So there's, you know, there were three
19   topics for discovery.  One I've already ruled on, right?
20              MR. THOMPSON:  Correct.
21              THE COURT:  And now there's the discovery in
22   connection with today's hearing.  And then there's also
23   discovery in connection with the bid procedure motion.
24              MR. THOMPSON:  Yes, Your Honor.  The bid procedure
25   motion, of course, is going forward on the 13th.  And the
```

 1  question is whether we will get an opportunity to have the

 2  discovery, in particular the deposition discovery, that we

 3  asked for and need in advance of that hearing.  For the reasons

 4  we set forth in our objection filed last night, it's pretty

 5  critical.  And I would hope that the Court would see the need

 6  to have that discovery done in advance of the hearing as it's

 7  only really helpful I would think to Your Honor before the

 8  hearing.

 9       (Telephone ringing)

10            THE COURT:  Mr. Thompson, are you having technical

11  difficulties there?

12            MR. THOMPSON:  I'm trying to decline the call, Your

13  Honor.

14            THE COURT:  That's okay.

15            MR. VAGNONI:  Your Honor, it remains the Trustee's

16  position that that discovery on a procedures motion is not

17  appropriate under the circumstances and is once again designed

18  to delay these proceedings, which the Trustee hopes to wrap up

19  as soon as possible.

20            MR. THOMPSON:  Your Honor, I reject that contention

21  in the main, right?  We're not doing anything to delay this

22  process.  It's actually quite to the contrary.  We've asked

23  that the Trustee for some time now respect to discovery on

24  these topics, all of which we think go to the Trustee's

25  inability to sell these assets as set forth in our sale

1   objection.

2          And we frankly think that the issues raised are of

3   pretty monumental importance to the case at large.  And the

4   idea that nobody would be able to cross-examine this Trustee

5   about his judgment and his understanding of the assets that he

6   purports to want to sell through a 363 sale.  It's just so

7   quite exceptional.  I don't see that as merely a process issue,

8   and I would hope that the Court does not have.

9          MR. DEMARCO:  Your Honor, if I may very briefly?

10          THE COURT:  Yeah, Mr. DeMarco?

11          MR. DEMARCO:  Yes.  Hi.  I just wanted to note that

12   we agree, that Rembrandt agrees and joins with the request for

13   that discovery as we filed in our objection and as Mr. Thompson

14   noted.  And if Your Honor wishes to hear more about our

15   position, we are happy to discuss as well.  But I wanted to

16   note that we join for the same reasons.

17          THE COURT:  Okay.  Thank you, Mr. DeMarco.  I mean,

18   I'll be candid with both you and Mr. Thompson.  I'm not

19   persuaded by your motion for reconsideration.  And in all of my

20   years of practice, I have never once seen discovery requested

21   in connection with a motion for bid procedure.  I've just never

22   seen it.  Given the fact that this Trustee was appointed by

23   Judge Coleman and was clearly, in my opinion, the most

24   objective party here, they've got no skin in the game.  They

25   just want to make the right calls.  It's just a really high

```
 1   burden for VSI and Rembrandt to overcome. While I appreciate
 2   your zealous advocacy, you know, I am inclined to deny the
 3   motion for reconsideration and deny the discovery in connection
 4   with that and the bid procedure motion.
 5         MR. THOMPSON:  The bid procedure and sale motion,
 6   right, Your Honor? I mean, so the sale -- there's no discovery
 7   in connect with the sale.
 8         THE COURT:  At this point, I mean, you know, I'll put
 9   together an order.  But at this point, I just -- I've never
10   seen -- I've never even seen a request.
11         MR. THOMPSON:  Your Honor, I would just direct your
12   attention to the cases that were cited in our objection, which
13   are manifold.  And all of them involve --
14         THE COURT:  I'm not saying it's never done.  But Mr.
15   Thompson, you have to understand that you've come into this
16   case relatively recently, and the parties have been around.
17   And I've seen some of the actions that they've taken.  Not on
18   your watch.  And that has affected my view of your client.
19         And like I said, you know, all of those cases that
20   you may have cited, I think that their facts are probably quite
21   different than the facts that I have before me, which is that
22   I've got a Trustee, right?  I mean, the appointment of a
23   Chapter 11 Trustee.  It's a very extraordinary event.  I've
24   only done it once in my career.  And when you do it, you do it
25   because you absolutely have to do it.  Because you're balancing
```

1   the interests of having a completely independent person, you

2   know, making these calls.

3          So given that extraordinary event, you know, I'm

4   going to give the Trustee a great deal of deference.  I just

5   am, okay?

6          MR. MICHAELS:  Your Honor, this is Chris Michaels for

7   Rembrandt.

8          THE COURT:  Yes.

9          MR. MICHAELS:  This -- I appreciate your comments

10  about this being an extraordinary case.

11         THE COURT:  Yeah.

12         MR. MICHAELS:  I have been involved from the very

13  beginning.  Rembrandt has been litigating its intellectual

14  property disputes.  Thought it had settled those.  All parties

15  in this matter, Chadron Stastney, Matthew Rajan, all signed off

16  on a settlement agreement saying, yes.  Our trade secrets have

17  been included in Ultra-D.  Our patents cover the products are

18  being sold.  And the Trustee is moving forward planning to sell

19  our technology, right?  I mean, we -- our question is very

20  simple, right?  Have you removed Rembrandt's technology from

21  the very assets that are trying to be sold?  If the answer is

22  yes, let's figure that out.  We've offered numerous times to do

23  that in an expedited and effectual way, to no avail.  And we

24  have asked if they're not in there, what are you doing with

25  respect to assumption or rejection of our license, to no

1    definitive answer.

2              And we are now saying, we now see from the Trustee's

3    papers that SSG is offering assets for sale.  That is patent

4    infringement under section 271.  If, and only if, they are not

5    covered by the license we issued Stream.  And this is -- this

6    should be basic question.  Are you assuming our license?  Are

7    they covered or are they committing patent infringement?

8    Absent any discovery, absent any assumption or rejection of our

9    license, we are left to go litigate a patent infringement case

10   against SSG because they're the ones that are actively

11   offering. All of the employees at SSG that are doing that are

12   likewise guilty of patent infringement.

13             And unless, of course, the Trustee has assumed

14   Rembrandt's license, then they're covered by the license.

15   These are basic questions that should be answers.  And I don't

16   under -- I've never been involved in a case where a trustee or

17   debtor in possession didn't answer them.  So I appreciate that

18   this is a very unique situation, but it's also simply resolved,

19   right?  From our perspective, the Trustee could provide basic

20   information that would move this case forward and tell us

21   whether or not we need to file additional litigation or not.

22             But, you know, we're not new to raising these

23   concerns, right?  I mean, there is a settlement agreement.

24   We've been -- we are part of the TRO mentioned directly.  And

25   so, I think that our request for these basic things are things

1    that can certainly be resolved in a week or two.  I mean, they

2    can decide.  I mean, are you assuming it or are you rejecting

3    the license?  That's a one sentence answer.  You know, is that

4    -- so we think the request for discovery is reasonable in this

5    context, especially how many issues that it can resolve.  I

6    can't image there's going to be any bidders, save the stalking

7    horse bidder, they're going to come in and walk themselves into

8    all these IP disputes.

9              And, you know, Rembrandts here.  But, I mean, forget

10   Rembrandt.  I mean, Phillips has 1,500 plus patents at issue,

11   most of which they've sold off to Leia that is actively trying

12   to license those out. I mean, companies don't walk into almost

13   certain patent infringement cases with companies like Phillips

14   to enforce, right?  This is, this is absolutely guaranteed to

15   this ambiguity in what the assets are and whether or not they

16   need licenses or have licenses from Phillips and Rembrandt is a

17   virtual certainty that anybody is going to either not bid or

18   just walk away from this.  This is designed for failure.

19             And quite frankly, we talked about the concern about

20   an action in chancery court to determine whether or not some

21   debt was owed.  And that's a trivial expense for litigation.

22   Patent infringement costs the average for a case of this size

23   is somewhere between 7 and $15 million dollars.  Where is the

24   estate going to get the money to defend, right?  I mean, it's

25   going to render this estate with almost absolute certainty

1    administratively insolvent as soon as Rembrandt acts.  And

2    we're all on -- all of Rembrandt's attorneys by the way are on

3    contingency fee, and originally signed on for a patent

4    infringement action.  So it's not like Rembrandt doesn't have

5    counsel that's going to enforce.  But I don't see that the

6    estate has prepared itself for litigation in multiple

7    jurisdictions, right?

8              So I -- with respect, I think this is a unique

9    situation that has potentially unique issues that would warrant

10   this basic discovery.

11             THE COURT:  Okay.

12             MR. VAGNONI:  Your Honor, I'm not sure what role Mr.

13   Michaels or Mr. DeMarco play in VSI's motion for

14   reconsideration.  They -- there were a number of misstates made

15   by Mr. Michaels just now that I can address.  The -- you know,

16   the issue of the settlement agreement, I don't -- I don't think

17   I know which one he's talking about because the one I know Chad

18   Stasney did not sign and was not a party to.

19             The issue of all the patent infringement claims he

20   allegedly has would only be an issue if the Debtor had sold

21   TVs, which it clearly hasn't.  There are no operations in the

22   Debtor.  What the Debtor is selling is its assets, including

23   interests in foreign subsidiaries that have technology.  And

24   there -- we don't know of any technology that Rembrandt has

25   sold or that Rembrandt has in that technology nor are we

1  selling that technology.  We're selling the subsidiary.

2         That being said, there is little or no evidence, I

3  would say no evidence for the vast majority of what Mr.

4  Michaels just said. We're here on a 9019 hearing, and I don't

5  know what his comments lend to that.

6         MR. THOMPSON:  Your Honor, I must respond to what Mr.

7  Vagnoni just said.  In that, first of all, we're actually

8  talking about what this Court asked to be placed at the end of

9  this hearing.  So I don't think it's about the 9019

10 reconsideration.  But rather with the respect to discovery

11 related to the sale and bid procedures motion filed by this

12 Trustee.

13        THE COURT:  I agree.  Mr. Vagnoni, they're talking

14 about, you know, he -- Mr. Thompson had invited me to comment

15 on the discovery related to the procedures motion --

16        MR. VAGNONI:  Understood.

17        THE COURT:  -- that's coming up.  So I think that

18 they're kind of highlighting issues and obstacles that they

19 believe that the Trustee faces in connection with that, and why

20 they think it's, you know, I should grant some discovery.  So I

21 think that's really what the focus was of Mr. Michaels.

22        MR. THOMPSON:  That's right, Your Honor.  And I think

23 it's important to note based upon what Mr. Vagnoni just said.

24 We have no contentions about what the Trustee is selling or is

25 not selling.  I wish the Trustee knew what he is selling.  I

```
 1   wish his advisors knew what they were selling.  I don't believe
 2   they do.  And as set forth in our objection pretty clearly, and
 3   as had been made clear on the record on June 5th, the Trustee
 4   does not understand these assets.  He does not understand the
 5   implications, let alone the encumbrances upon some of these
 6   assets, including the rights that Rembrandt has just raised.
 7            And so, if they -- if the Trustee did, we would be
 8   having a different discussion right now.  But he doesn't, and
 9   his advisors don't.  And that's important.
10            MR. VAGNONI:  Pretty clearly as to what the Trustee
11   is selling.
12            THE COURT:  All right.  Well, I mean, I think what
13   I'm hearing them say, Mr. Vagnoni, is that they don't think you
14   know what you're selling.  But do you know what you're selling
15   as part of this motion?
16            MR. VAGNONI:  As part of the --
17            THE COURT:  The motion for the bid procedures.
18            MR. VAGNONI:  Absolutely.  The Trustee is selling all
19   of the assets of the Debtors, including their equitable rights
20   in the foreign subsidiaries that they -- that they have.  That
21   is what they're selling.
22            MR. THOMPSON:  Are they selling the right to license?
23            MR. VAGNONI:  I'm not -- I don't think I'm on the
24   stand here.  And I don't think that -- no.  The Trustee is not
25   selling a license.
```

 1          MR. THOMPSON:  Okay.  Well, that's what it says in

 2   SSTs teaser.

 3          MR. VAGNONI:  I don't believe so.  And again, we're

 4   not here on that today.

 5          MR. THOMPSON:  Well, that's why we need discovery is

 6   what I would argue, Your Honor.  Because it says very clearly

 7   in the SSG teaser that what the Trustee is purporting to sell

 8   are the capabilities to license the so-called Ultra-D

 9   technology, which incorporates other people's IP, including,

10   but not limited to Rembrandts.  And that's why we think it

11   destroys value. And that's why we think the Trustee doesn't

12   understand what its selling.  And that's why we think we need

13   discovery.

14          MR. MICHAELS:  Your Honor, with respect to the teaser

15   that it was put out, it references the very Phillips license

16   that specifically prohibits a transfer under a change of

17   control provision, right?  There's huge numbers of patents that

18   we have sent the Trustee as part of our discussions and we

19   filed it with our papers a list of assets that we needed to

20   understand the status of that had been licensed from Phillips.

21   A blue box software for example.  I mean, there's a huge

22   laundry list of assets that were provided by Phillips that were

23   used to create and are used to implement the Ultra-D

24   technology.  Are those included or not?  Are those -- those are

25   -- if they're not included by the way, you can't be using

 1  Rembrandt's technology because ours is reliant on that -- those

 2  software and that no how and that technology.

 3          So if we answered that question, right, that they

 4  have put front and center in their marketing piece, we would

 5  know whether or not Rembrandt's technology is included.

 6  Because if it's not, if they're not using the Phillips

 7  technology, they're not, we're not involved, right?  We back

 8  right off.  They get rid of us.  We are not making any motions.

 9  So these are basic, basic, factual pieces of information that

10  are -- they have made front and center.  I mean, we certainly

11  have been raising them for years.  But they've said right in

12  their paper, in their marketing materials, that this is subject

13  to a Phillips license.

14          THE COURT:  Mr. Michaels, thank you for that.  So Mr.

15  Vagnoni, I guess what I'm hearing Mr. Thompson and Mr. Michaels

16  saying is they want to drill down into the weeds, understand

17  exactly what is being sold so that they understand what's

18  happening and if there's going to be future litigation.  And

19  so, they seem confused about that.  I think it's certainly fair

20  for them to understand exactly what is being sold.  I myself

21  haven't got into the weeds about the schedules in terms of

22  exactly what's being sold.  But I think that that's certainly

23  something that they need to know.

24          And I'm not going to put you on the spot here today,

25  but certainly I'd like them to understand exactly what's being

```
 1   sold so that they can take whatever litigation positions that
 2   are necessary and then they can make arguments to me.  But it
 3   sounds like they don't know that.  And it sounds like you might
 4   not want to be in the position to answer that, but I think it's
 5   a fair request to understand what's being sold as part of this
 6   sale.
 7            So I'm going to rule on the motion for
 8   reconsideration and the discovery related to that.  I'm going
 9   to urge Mr. Vagnoni to get back to Mr. Thompson and Mr.
10   Michaels about exactly what's, you know, what's being sold.
11   And then my hope is that when we meet again that Mr. Thompson
12   and Mr. Michaels will report to me that they know what's being
13   sold, and that they can raise whatever issues come up as a
14   results of that.  And then the Court will address it then,
15   okay?
16        (Proceedings adjourned at 10:30 p.m.)
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

        I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_John Buckley_____
John Buckley, CET-623
Digital Court Proofreader

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

In re:

Stream TV Networks, Inc., *et al.*

Debtors.[1]

Chapter 11

Bky. No. 23-10763 (AMC)

## ORDER

**AND NOW**, on May 6, 2024, William Homony (the "Trustee"), in his capacity as chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. and Technovative Media Inc. (together, the "Debtors"), filed a motion (the "Settlement Motion")[2] seeking approval of a settlement agreement and mutual release (the "Settlement") with Hawk Investment Holdings, Ltd. ("Hawk"), as collateral agent, and Seecubic, Inc. ("SCI" and together with Hawk and the Trustee, the "Parties").

**AND,** pursuant to the Settlement, the Parties agreed to resolve pending litigation in the Delaware District Court (the "Section 225 Action") and this Court (the "Adversary Action"), by, among other things, (a) granting Hawk an allowed secured claim in the amount of $180 million, subject to dollar-for-dollar increase for any amounts funded to Debtor-affiliate SeeCubic, B.V. ("SCBV") between appointment of the Trustee and closing on a sale of the Debtors' assets (the "Sale"), (b) allowing SCI to credit bid $150 million of Hawk's allowed secured claim in connection with the Sale, (c) providing for the withdrawal of the asserted secured claims of SLS Holdings and SCI upon the entry of an order approving the Settlement Motion, and (d) providing for certain bid procedures in connection with the Sale (the "Bid Procedures").

**AND**, on May 20, 2024, Visual Semiconductor, Inc. ("VSI") and Rembrandt 3D Holding

---

[1] This case is being jointly administered with the case of *In re Technovative Media, Inc.* (Case No. 23-10764) (AMC).

[2] Bankr. Docket No. 630.

**A-802**

Ltd. ("Rembrandt") each filed objections to the Settlement Motion (respectively, the "VSI Settlement Objection" and the "Rembrandt Settlement Objection," and together, the "Settlement Objections").[3]

 **AND**, on June 5, 2024, the Court held an evidentiary hearing (the "Settlement Hearing") on the Settlement Motion and the Settlement Objections, after which it entered an order (the "Settlement Order") granting the Settlement Motion and approving the Settlement.[4]

 **AND**, on June 20, 2024, Rembrandt filed a notice of appeal of the Settlement Order to the Eastern District of Pennsylvania District Court (the "Appeal").[5]

 **AND**, also on June 20, 2024, VSI filed a motion to reconsider the Settlement Order (the "Reconsideration Motion").[6]

 **AND**, on July 5, 2024, the Trustee filed an objection to the Reconsideration Motion (the "Reconsideration Objection").[7]

 **AND**, on July 26, 2024, VSI filed a notice[8] of its intention to take the Trustee's deposition and requested the Trustee's production of documents in advance thereof, which notice was amended on August 24, 2024[9] and again on October 25, 2024[10] (collectively, the "VSI Discovery Requests").

 **AND**, on August 29, 2024, the Trustee filed an expedited motion to quash the VSI Discovery Requests and for a protective order (the "Motion to Quash").[11]

 **AND,** on September 4, 2024, VSI filed an objection to the Motion to Quash (the "VSI Quash

---

[3] Bankr. Docket Nos. 642, 643.

[4] Bankr. Docket No. 653.

[5] Bankr. Docket No. 685.

[6] Bankr. Docket No. 686.

[7] Bankr. Docket No. 700.

[8] Bankr. Docket No. 712.

[9] Bankr. Docket No. 718.

[10] Bankr. Docket No. 771.

[11] Bankr. Docket No. 724.

Objection") combined with a motion to compel the Trustee to respond to the VSI Discovery
Requests (the "Motion to Compel").[12]

    **AND**, on October 30, 2024, the Court held a hearing on the Motion to Quash, the VSI Quash
Objection, and the Motion to Compel, following which it entered an order (the "First Quash Order")
(a) quashing the VSI Discovery Requests with respect to Deposition Topics 1 through 6 and
Document Requests 1 through 18 (the "Quashed Discovery Requests"), (b) suspending a ruling on
the Additional Deposition Topics and Additional Document Requests (the "Remaining VSI
Discovery Requests") pending resolution of the Reconsideration Motion, and (c) denying the
Motion to Compel with respect to the Quashed Discovery Requests.[13]

    **AND**, on November 7, 2024, the Court held a hearing on the Reconsideration Motion, the
Reconsideration Objection, and the Remaining VSI Discovery Requests (the "Reconsideration
Hearing").

    **AND**, upon consideration of the arguments and positions of the parties as set forth in their
pleadings and at the Reconsideration Hearing.

    **IT IS HEREBY ORDERED** that:

    1.    The Reconsideration Motion is **DENIED**.

    2.    The Motion to Quash is **GRANTED** with respect to the Remaining VSI Discovery
Requests

    3.    The Motion to Compel is **DENIED** with respect to the Remaining Discovery
Requests.

    4.    By the Reconsideration Motion, VSI has sought clarification and reconsideration of
the Settlement Order on several grounds (the "Reconsideration Grounds"): (a) to provide for a

---

[12] Bankr. Docket No. 728.

[13] Bankr. Docket No. 777.  The terms "Deposition Topics", "Document Requests", "Additional Deposition Topics", and
"Additional Discovery Requests" have the meaning given to them in the First Quash Order.

"fiduciary out" permitting the Trustee to rescind the Settlement if it should later be determined that

entry into it or execution of its terms would result in a breach of the Trustee's fiduciary duties, (b)

requesting clarification that entry of the Settlement Order is without prejudice to parties' ability to

object to the Sale process or bidding procedures or to their ability to seek reconsideration of the

allowance of Hawk's claim pursuant to Bankruptcy Rule 3008 and §502(j), and (c) based on alleged

misstatements by the Trustee and its counsel at the Settlement Hearing regarding the alleged

purchase orders VSI procured for the Debtors' product (the "Alleged VSI Purchase Orders") and

SCBV's ability to use a license from Koninklijke Philips Electronics ("Philips") in light of the

temporary restraining order[14] this Court issued in January 2024.

5.      The Court denies VSI's request for revision or supplementation of the Settlement

Order to include a "fiduciary out" provision.  Such a provision was neither requested nor considered

in connection with the Court's resolution of the Settlement Motion, and in light of the Court having

already determined that the Settlement represents a proper exercise of the Trustee's business

judgment,[15] it will not insert one *ex post facto* at the request of an objecting party.

6.      The Court denies VSI's request for clarification that the Settlement Order is without

prejudice to parties' ability to object to the Sale process or bidding procedures or to their ability to

seek reconsideration of the allowance of Hawk's claim pursuant to Bankruptcy Rule 3008 and

§502(j).  The provisions of the approved Settlement and the Settlement Order say what they say and

may be relied upon by the parties.  VSI, Rembrandt, or any other party in interest may object to the

Sale on whatever grounds they deem appropriate, and the Trustee and other parties may respond as

they see fit.  The Court will rule on those objections.  It will not, however, provide specific

clarifications to the Settlement Order regarding actions that may or may not be taken by parties with

---

[14] Adv. Pro. No. 23-00057, Docket No. 119.

[15] Bankr. Docket No. 670 (Settlement Hearing Trans. at 85:15 to 85:20).

**A-805**

respect to the Sale or otherwise.

7.      Finally, the Court rejects VSI's argument that approval of the Settlement should be reconsidered based on alleged misstatements by the Trustee and its counsel at the Settlement Hearing regarding the Alleged VSI Purchase Orders and SCBV's ability to use a license from Philips.  The Court determined that the Settlement was reasonable, fair, and in the best interests of the Debtors' estate based on the totality of the evidence presented at the Settlement Hearing, including the Trustee's analysis of potential success on the merits in the Section 225 Action and the Adversary Proceeding.  Any misstatements regarding the Alleged VSI Purchase Orders and the Philips license, to the extent they were even made, were immaterial to the Court's determination that the Settlement was an appropriate exercise of the Trustee's business judgment in light of the totality of the circumstances.

8.      Having found that none of the Reconsideration Grounds are meritorious, and therefore denying the Reconsideration Motion, the Court finds it is appropriate to quash the Remaining VSI Discovery Requests.  The Court finds that each of the Additional Deposition Topics and Additional Document Requests relate to the grounds for VSI's Settlement Objection and Reconsideration Motion.  In approving the Settlement, the Court overruled VSI's Settlement Objection, and has now denied its request to reconsider that approval.  The Remaining VSI Discovery Requests therefore seek testimony and documents on matters already determined by the Court, and the Trustee's request to quash them is granted.  VSI's motion to compel responses is consequently denied.  This Order granting the Motion to Quash and denying the Motion to Compel shall also serve as a protective order barring VSI from seeking responses with respect to the Remaining VSI Discovery Requests.

**Dated: November 14, 2024**

_____
Honorable Ashely M. Chan
Chief United States Bankruptcy Judge

**A-806**

```
                    UNITED STATES BANKRUPTCY COURT

                  FOR THE DISTRICT OF PENNSYLVANIA

                                     :
IN RE:                               : Case No.  23-10763
                                     :
STREAM TV NETWORKS, INC.   CH: 11 :
AND TECHNOVATIVE MEDIA,              :
INC.                                 : Philadelphia, Pennsylvania
                                     : November 13, 2024
                                     : 11:00 a.m.
. . . . . . . . . . . . . . . . . :


               BEFORE THE HONORABLE ASHELY M. CHAN
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:


 For SeeCubic, Inc.:          Marley Brumme, Esq.
                              Skadden Arps Slate Meagher &
                              Flom, LLP
                              500 Boylston Street, 23rd Floor
                              Boston, MA 021116
                              617-573-4800


 For Rembrandt:               Andrew Peter Demarco
                              Devlin Law Firm, LLC
                              1526 Gilpin Avenue
                              Wilmington, DE 19806
                              302-449-9010


                              Christopher Michaels

 For SSG Capital Advisors:    Samuel Charlton

 For VSI:                     John H. Thompson
                              Akerman
                              750 Ninth Street, N.W.
                              Suite 750
                              Washington, D.C. 20001
                              202-393-6222


 For Hawk Investment Holdings Steven Caponi, Esq.
 Ltd.:                        Margaret Westbrook, Esq.
                              K&L Gates
                              600 N. King Street, Suite 901
                              Wilmington, DE 19801
                              302-416-7080
```

```
                                    Jonathan N. Edel, Esq.
                                    300 South Tryon St., Suite 1000
                                    Charlotte, NC 28202

 For the Trustee:                   Michael D. Vagnoni, Esq.
                                    Obermayer Rebmann Maxwell &
                                    Hippel LLP
                                    Centre Square West
                                    1500 Market Street, Suite 3400
                                    Philadelphia, PA 19102
                                    215-665-3066

                                    Steven M. Coren, Esq.
                                    Kaufman Coren & Ress, P.C.
                                    Two Commerce Square
                                    Suite 3900
                                    2001 Market Street
                                    Philadelphia, PA 19103-2713
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
 1   NOVEMBER 13, 2024                              11:00 A.M.

 2             THE COURT:  Okay.  Is there anyone else on the phone

 3   who is here for a case other than Stream TV?  Okay.  Thank you.

 4             Party who just joined the call, the last four digits

 5   6443.  Could you identify -- I'm sorry, 6643, could you

 6   identify yourself, please?

 7             MR. CHARLTON:  Yes.  Samuel Charlton with SSG Capital

 8   Advisers.

 9             THE CLERK:  Yes, with the last four digits 4063.  Can

10   I have your last name, please?

11             All rise.

12             THE COURT:  Morning.  Please be seated.  Court is now

13   in session.  All right.  This is the call on the 11:00 list.

14   The only matter remaining on the list is number 23, Stream TV

15   Networks and we have several parties on the phone and in the

16   courtroom.

17             Do you want to start with the people in the

18   courtroom, first?

19             UNIDENTIFIED SPEAKER:  Uh-huh.  Yeah, let's start

20   with the people in the courtroom.

21             THE COURT:  Okay.  We're going to start with the

22   people in the courtroom and get everyone's appearances.

23             Appearances, please, on Stream TV.

24             UNIDENTIFIED SPEAKER:  Come sit at the table.

25   Welcome.
```

```
 1              MR. THOMPSON:  Morning, Your Honor.  John Thompson of
 2  Akerman on behalf of VSI and with me today is my colleague Adam
 3  Swick and retired Judge Nick Clark from the Western District of
 4  Texas.
 5              THE COURT:  Welcome.
 6              MR. CLARK:  Morning, Your Honor.
 7              THE COURT:  It's good to see you.
 8              MR. CLARK:  Thank you.
 9              MR. DEMARCO:  Good morning, Your Honor.  This is
10  Andrew DeMarco from Devlin Law Firm here representing
11  Rembrandt.  Also here with me is Christopher Michaels from
12  Brown and Michaels who will be handling any argument today.
13              THE COURT:  Welcome.
14              MR. CAPONI:  Good morning, Your Honor.  Steven Caponi
15  from K&L Gates on behalf of Hawk.
16              THE COURT:  Okay.
17              MS. BRUMME:  Good morning, Your Honor.  Marley Ann
18  Brumme of Skadden Arps on behalf of SeeCubic.
19              THE COURT:  Okay.  Great.  I thought you guys were
20  going on the phone.  You're going to be outnumbered.
21              MR. CAPONI:  Yeah.
22              THE COURT:  No, you're here.  Okay.  All right.
23  We're just entering appearance, so come on up and say hello.
24              MR. VAGNONI:  Good morning, Your Honor.  Michael
25  Vagnoni on behalf of Bill Homony, Chapter 11 Trustee.  I have
```

```
 1   with me Ed George and Steve Coran from Coran and Ress.

 2              THE COURT:  Okay.

 3              MR. CORAN:  Morning.

 4              THE COURT:  Good morning.  All right.  How about the

 5   people on the phone?  Did you want to note your appearance if

 6   there's anywhere there?

 7              Do we have anyone?

 8              UNIDENTIFIED SPEAKER:  Yeah.  Yeah.

 9              THE COURT:  We do?  The parties on the line, if every

10   -- if you could each speak one at a time and tell us who you're

11   here for on Stream TV and enter your appearances, please.

12              MR. EDEL:  This is Jonathan Edel from K&L Gates on

13   behalf of Hawk Investment Holdings.

14              THE COURT:  Okay.  Anyone else or you think that's

15   it?

16              UNIDENTIFIED SPEAKER:  They might just be observing.

17              THE COURT:  Okay.  Fine.

18              All right.  Well, welcome back, everybody.  I know

19   we're here on the reconsideration, which I will -- I guess I

20   just wanted to address the discovery issue.  So the last time

21   we were talking on the phone, you guys had raised an issue

22   about the assets that were being sold and you had concerns

23   about whether there were licenses and I think Mr. Vagnoni, I

24   was giving you a week to try to clarify for them what assets

25   were going to be sold.
```

```
 1            So have you had any productive conversations
 2   hopefully with them?
 3            MR. VAGNONI:  Your Honor, we took your direction from
 4   the last hearing, and we provided both VSI, accounts for VSI
 5   and accounts with Rembrandt.  A fairly exhausted list of what
 6   the assets are.  Not just the assets that we are -- that the
 7   Trustee is selling, but the assets that are embedded in the
 8   downstream subsidiaries whose equity we are selling as well.
 9            That, I think, would have satisfied the Court's
10   concern in that regard.  I have a copy of what we sent.  I
11   didn't bring multiple copies.  It's very thick.  But we did
12   provide that.  We did also receive a email on Friday of last
13   week asking for a meet and confer to discuss what discovery
14   would be taking place.
15            We did not engage in that meet and confer.  We didn't
16   take your comments last week as we thought everything was
17   quashed to that point based on your ruling.  So we did not meet
18   and confer.  We were preparing for the hearing.  But we -- and
19   we did not engage in any discovery again, because we thought
20   the discovery request had been quashed by Your Honor.
21            But again, we did provide them with a listing --
22            THE COURT:  Okay.  Well, let me --
23            MR. VAGNONI:  -- on the --
24            THE COURT:  -- see if they feel like they have a
25   better understanding.
```

```
 1              So do you gentlemen have a better understanding of
 2    exactly what's being sold?
 3              MR. MICHAELS:  We have no better understanding.  Most
 4    simply, are they accepting -- assuming, rejecting saying that
 5    the Rembrandt contract is invalid, valid?  What is their
 6    position?  Where is our IP?  Have they removed it?
 7              They're disclosure, this voluminous thing they
 8    described has a single sentence that says, "software," right?
 9    There's no discussion of -- we have asked over and over again,
10    are you in control of the software professional development
11    system?  I.E., do you have the username and password?  No
12    response.
13              THE COURT:  Uh-huh.
14              MR. MICHAELS:  We have no idea what they have.  More
15    so, we're the ones that have provided a far more extensive list
16    of what assets we believe could be in that estate and we've
17    told them what documents we're relying upon and asked them,
18    what is the status of each of these individuals assets?  No
19    response.
20              THE COURT:  Okay.  So --
21              MR. MICHAELS:  We are no more clear than we have --
22              THE COURT:  -- I've been with you guys up until this
23    point.  But now, you know, they've got some serious concerns.
24    You know, their belief is that the sale of the asset is going
25    to violate all of these rights.  It's going to spawn all of
```

1  this litigation about the licenses, right?  That's their

2  concern.

3           And I'm willing to consider a sale of this, but at

4  the very basic level, we need to understand exactly what is

5  being sold, right?  And it sounds like today they don't know.

6           So he just said that you said it's software.  Do you

7  have something more specific than just the word software in

8  terms of this being sold?

9           MR. VAGNONI:  There was -- Your Honor, first of all,

10  let me just address a couple of things that Mr. Michaels said.

11  I think he indicated once again to the Court that he hasn't

12  been made aware of whether or not the sale will include an

13  assumption and assignment of the Rembrandt license.

14           Paragraph 27 of our motion clearly indicates that

15  that license is not part of the sale transaction.  It is not

16  going to be acquired by the stock and horse purchaser.

17  However, if there is a competitive bid, a bid that is a

18  superior bid to the stock and horse bid that wants the

19  Rembrandt license, absolutely we would entertain an assumption.

20  There would have to be discussion about what --

21           THE COURT:  Okay.  So let's -- what we're going to do

22  today, just so I have an idea, we're just going to take this

23  issue by issue.  So you're saying that the license is not part

24  of the sale --

25           MR. VAGNONI:  That's correct.

```
 1              THE COURT:  -- but you would contemplate bids on it.
 2   I'm not sure how you'd write that into the bid procedure, but
 3   we can talk about that in a minute.
 4              So what's your response to that?
 5              MR. MICHAELS:  It's not an assignable license.  It's
 6   not their option to decide to sell it or not.  That's -- and
 7   neither is the Phillips license.  It is -- we have -- we did
 8   not need Mr. Vagnoni to explain to us whether or not our
 9   license was assignable.  It is absolutely note and all the case
10   law is --
11              THE COURT:  Okay.  Well --
12              MR. MICHAELS:  -- if I don't mind?
13              THE COURT:  Yeah.
14              MR. MICHAELS:  Our issue isn't that the contract is
15   -- that they're attempting to assign it.  They are clear
16   they're not attempting to assign the contract.  It's the
17   intellectual property that is the basis of that.  I mean,
18   saying I'm not handing you a piece of the car, the car title
19   is, you know, that -- but I'm going to hand them the keys to
20   the Lamborghini.  I mean, we're concerned about the keys and
21   the Lamborghini, not the piece of paper that says we own it.
22   We already have that.  I don't need them to tell me we have
23   that.
24              THE COURT:  Yeah.  Yeah, yeah.
25              MR. THOMPSON:  Your Honor, if I might add?
```

```
1              THE COURT:  Yeah.

2              MR. THOMPSON:  There's a real problem with the bid

3    procedures in addition to those that Mr. Michaels rose --

4    raised.  In this circumstance, Mr. Vagnoni has just told the

5    Court as his email to us told us that they are, I guess,

6    excluding the asset that is the Rembrandt license.  The reasons

7    you just heard.  It doesn't matter whether they wanted to

8    assume it and assign it, they could not.

9              But in this circumstance, right, they're suggesting

10   that some other party out there might come in and bid for it.

11   Well, how do we have a bid process where --

12             THE COURT:  Yeah, yeah.  Okay.

13             MR. THOMPSON:  -- some other parties actually

14   consider --

15             THE COURT:  Well, tell me this.  If he -- if we have

16   -- let's say we have the bid, we had the auction, right, and

17   Hawk's the only one that shows up and under their purchase

18   agreement, they're not going to get it.  Then does that take

19   care of your issue entirely because --

20             MR. MICHAELS:  Not in any way, Your Honor.  I mean,

21   we have listed out a huge number of trade secrets.  We have a

22   bunch of patents.  The very assets that they have listed where

23   they've talked about TV's, prototypes, demos, those are all --

24   were all alleged back in 2017 to have been covered by

25   Rembrandt --
```

 1          THE COURT:  All right.  So let me just, like -- I'm

 2    sorry.  Let me just be more specific.  So I want to take it

 3    issue by issue.

 4          MR. MICHAELS:  Uh-huh.

 5          THE COURT:  So at least I understand.  So he had

 6    thrown out this comment that he's not attending to sell certain

 7    licenses unless someone else bids for it.  So with regard to

 8    those licenses, if there's no other bidder and the stocking

 9    horse gets it, Hawk gets it, then with regard to that license,

10    then I think we're all in agreement that the license isn't

11    being sold at all, right?

12          So I think you wouldn't have an issue if there's no

13    stocking horse -- if it's just a stocking horse bidder and

14    there's no other bidders with regard to the license.

15          MR. MICHAELS:  With respect, we would.  The issue

16    with the license -- it's not a question of will they assume or

17    reject it in the future.  It's SSG offering for sale

18    Rembrandt's patented technology.  That's a violation of Section

19    271.  That's present today patent infringement -- you -- they

20    do not have a license to the Rembrandt technology.

21          THE COURT:  Hold on a second.  Who is that person?

22          All right.  So I would ask everyone on the phone line

23    to try to mute your phone because we're -- someone's not muted,

24    so we're hearing everything in the courtroom that's going on

25    there.  So could everyone just take a moment?  How do they mute

1   their line?

2           UNIDENTIFIED SPEAKER:  Star six.

3           THE COURT:  So if you could just hit star six,

4   everyone on the line, I'd appreciate that.

5           MR. VAGNONI:  Your Honor, if I may -- raise that

6   issue for a very specific reason.  SSG is not offering that

7   license for sale.  That is not part of the AP --

8           THE COURT:  So when we say license, let's just drill

9   down a little bit.  License of what?

10          MR. VAGNONI:  Absolutely.  Very vague.

11          THE COURT:  License of what?

12          MR. VAGNONI:  There is a 2021 settlement agreement

13  that a single line in it that is a -- called a grant of rights.

14  In that grant of rights, Rembrandt reports to give the rights

15  -- the nonexclusive rights to use their intellectual property.

16          By the way, that settlement agreement was entered

17  into the day or the day before Rembrandt -- they became a

18  creditor by virtue of that and then were a petitioning creditor

19  in Stream's failed involuntary bankruptcy in Delaware.  We take

20  significant issue with that agreement as a whole.  But let's

21  just take it as it is.  That license agreement comes out of a

22  settlement agreement.  And like I said, the -- SSG is not

23  offering that for sale.  However, in the -- which you'll hear

24  about when we get to testimony.

25          In negotiations with VSI and with Rembrandt, it's

1   been made clear to us that if a transaction was to occur with

2   VSI, that the Rembrandt license would have no problem being

3   assumed.

4          And in fact, there are -- there is a post-petition

5   agreement that was entered into by Rembrandt Stream and VSI

6   that was not court approved that purported to do just that.

7   Give VSI rights in that license.  And exclude Streams

8   subsidiaries from the use of that technology pursuant to that

9   license.

10          So that is why I indicated to the Court that if there

11   was a transaction that was a higher and better bid, which VSI

12   and Rembrandt are free to bid in this process.  They've been

13   free all along.  They've had access to the data room if they

14   wanted it.

15          The VSI is the only person who's taken up that offer.

16   That is what I was referring to.  Not that it was generally

17   assignable.  We don't think anybody has interest in it and we

18   also don't think we are selling any assets that have that --

19   Rembrandt intellectual property in that -- in the asset.

20          MR. MICHAELS:  Your Honor, I'd like -- I apologize.

21   I'd really like a chance to finish answering your question that

22   you had asked previously.

23          THE COURT:  Yes, that's fine.

24          MR. MICHAELS:  So the -- you asked whether the issue

25   would be resolved if the Hawk party's just didn't take -- it

1  isn't a question of SSG selling our license.  It isn't an

2  active patent infringement.  The active patent infringement is

3  offering for sale in a patented invention on why Rembrandt,

4  right?

5          And the TVs, all of the assets that Mr. Vagnoni

6  clearly lists are being offered for sale.  That is the active

7  patient infringement.  SSG has committed patent infringement.

8  All five of those individuals have committed patent

9  infringement.  The Trustee has committed patent infringement

10 unless they can show that they have a license.

11         So when Rembrandt is asking about the status of its

12 license, it is, are we suing those individuals and those

13 entities tomorrow?  They -- it is -- if they have a license, we

14 can't.  That is a full and absolute complete defense.

15         The agreement that Mr. Vagnoni's referring to is

16 Streams former counsel, almost immediately after filing the

17 petition contacted Rembrandt and said, we know we need a

18 license to your technology as an administrative claim.  We need

19 to resolve this.  And we signed a settlement amendment that

20 extended the time that prevented the estate from becoming

21 administratively insolvent due to the fees that were going to

22 be due to Rembrandt.

23         They have said they're not honoring that settlement

24 amendment.  The arrears are $3 million.  Does the estate have

25 $3 million to have that license?

1          THE COURT:  So I'm trying to -- I feel like there's

2    litigation that's going to be spawned, right, by -- under the

3    licenses and I'm just trying to have a very basic understanding

4    of what is purportedly being sold by the Debtor.

5          MR. THOMPSON:  They don't know, Your Honor.

6          THE COURT:  I --

7          MR. THOMPSON:  And that's --

8          THE COURT:  -- and I get that.  And I -- so I'm -- I

9    think that we have, like first thing -- what happened?  Okay.

10   Good.  Thank you for muting everybody.

11         So the first step to me seems that we should at least

12   come to an agreement, or at least I need to understand what is

13   being sold.  So can we just focus on that for instance.

14         All right.  So I think one of the comments -- and so,

15   you said before, like, they had described software or something

16   that was, like, their general description.  So did you, Mr.

17   Vagnoni, describe on some schedule that software is going to be

18   sold as part of this?

19         MR. VAGNONI:  Your Honor, I will -- if I may, to

20   preface what -- the answer to that question.  What the Trustee

21   is selling is all of the assets of Stream, which are clearly

22   listed in schedules, which are a public document they have

23   access to.

24         Mr. Rajan, who is the head of VSI, signed those

25   scheduled, I believe, and he certainly took part in preparing

1  them.  So he should know exactly what is in those schedules.

2  The other assets that are being sold in the APA are the equity

3  interest and all the subsidiaries of Technovative.

4          The software, the intellectual property, the license

5  to Phillips, all of that is contained in downstream

6  subsidiaries.  We are not selling those assets per say.  We're

7  selling the equity in those assets.

8          And this is typical of a case where a Chapter 11 or

9  Chapter 7 Trustee walks into a mess and sees that it's

10  spiraling out of control and tries to bring some control to the

11  situation and get the estate some money before there is no

12  money.

13          THE COURT:  Okay.  So again, my focus for right now

14  is, I'm just trying to understand what the assets are.  So he's

15  telling me that he's purporting to sell the equity and the

16  entities that presumably are in possession perhaps of your

17  property, is that your understanding there?

18          MR. MICHAELS:  Mr. Vagnoni just described the process

19  as typical, right?  An IP -- a technology case of this sort,

20  purporting to sell intellectual property rights is anything but

21  typical.  And I think --

22          THE COURT:  Okay.  So let's just focus on -- I just

23  want to drill down on what assets are being sold.  So he's told

24  me that he's selling equity in entities that presumably possess

25  your intellectual property.  Can we agree on that?

```
 1              MR. MICHAELS:  Yes.

 2              THE COURT:  Okay.  Good.  All right.  That's

 3   progress.

 4              MR. MICHAELS:  That's one -- I mean, that's one

 5   aspect of what he said.

 6              THE COURT:  Okay.  Fine.  That's one aspect.  Okay.

 7   So tell me -- so your concern, though, is that when he purports

 8   to sell the equity in these companies, then the buyer who takes

 9   possession of the -- like, they buy the equity, right?  Now,

10   they're going to own, you know, via that equity, everything,

11   you know, tangible and intangible that those entities own.  And

12   your -- and so your position is that some of the assets that

13   they own are your property?

14              MR. MICHAELS:  Yes.

15              THE COURT:  Okay.

16              MR. EDEL:  Your Honor, if I may --

17              THE COURT:  Yeah.

18              MR. EDEL:  -- since I'm representing Hawk.  The --

19   Mr. Vagnoni is correct.  We're -- the stalking horse is

20   acquiring the equity.  Stream is a holding company.  All the

21   operating entities, the main operating entities in the

22   Netherlands and requiring the stock that owns the stock that

23   owns the stock that owns that entity.  The fundamental dispute

24   here is that Rembrandt believes that its trade secrets, its

25   knowledge, its know-how is embedded in everything that Stream
```

1    does.

2            So every TV that it has, every computer that it

3    touches, somehow can -- you know, involves their intellectual

4    property.  Now, there's intellectual property such as patents.

5    Rembrandt brought patent litigation many years ago, but it was

6    dismissed, and they have not asserted a patent case.

7            They're really talking about the intellectual

8    property.  We disagree.  We believe that the technology that

9    Stream developed through its operating subsidiaries overseas is

10    -- belongs to Stream.  If my client acquires the stock, it's

11    acquiring that entity, the good, the bad, and the ugly.

12            And if that means that entity, if Rembrandt believes

13    that entity has put intellectual property into a TV or trade

14    secrets, we'll duke it out after the fact.  But what this is

15    all about, this is Rembrandt and attached to the hip of Mr.

16    Rajan trying to stop at every opportunity this case moving

17    forward.

18            THE COURT:  Okay.  I know.

19            MR. EDEL:  Rembrandt --

20            THE COURT:  You believe there's spoilers and I --

21            MR. EDEL:  Well, Your Honor, I think it's -- it's not

22    just, I think.  As Mr. Vagnoni indicated, they entered into a

23    settlement.  They're standing before Your Honor before today

24    trying to hold up this sale.  Rembrandt entered into an

25    agreement during the pendency of the bankruptcy and amended it

```
 1  with Mr. Rajan where they identified all of their technology,

 2  all of their knowhow, how they believed it was being used in

 3  everything and said, if Mr. Rajan gets the company, all is good

 4  in the world.  No one else is allowed to have it.

 5          And then come before the Court today and say, we have

 6  no idea how he's using our stuff.  Well, they had a pretty good

 7  idea when they were executing documents, you know, in the

 8  shadows during the pendency of a bankruptcy.  But now they want

 9  to come, Mr. Rajan, who founded the company, ran the company

10  until he was -- you know, the Court determined he was

11  uncredible and removed him.  And throughout the entire pendency

12  of the second bankruptcy which dismisses fraudulent at the aide

13  of Rembrandt to today, they're attached at the hip.

14          This is, with all due respect to the Court, my client

15  has been through this process for many, many years.  It's a

16  very simple sale.  Nobody else, and I think this cannot be

17  lost, nobody else is interested in these assets.  No one has

18  come forward to the pendency of the bankruptcy.

19          THE COURT:  All right.  But we aren't going to get

20  into this.  But from what I understood, the data room is not

21  complete.  I mean, there's --

22          MR. MICHAELS:  That's right, Your Honor.

23          MR. EDEL:  The --

24          MR. MICHAELS:  That's by design.

25          MR. EDEL:  -- data room is not complete because the
```

```
 1   data room does not include the fraudulent documents Mr. Rajan
 2   created during the bankruptcy, for example --
 3           THE COURT:  Okay.  Well --
 4           MR. EDEL:  -- these purchase orders that don't exist.
 5           THE COURT:  I would like to just -- I would like to
 6   be able to have civil conversations here today.  And I
 7   understand you guys don't like each other.  I know that.  So to
 8   the extent that we could -- I understand.  Like, I call it
 9   spoilers.  You think that they're spoilers.  You guys think
10   that they're selling your assets, and everyone is really
11   annoyed with each other.  I get the sentiment.  I understand
12   that.
13           Okay.  But it doesn't help me get to the point.  So
14   let me tell you what I think is one possibility here, right?
15   So Mr. Vagnoni wants to sell the equity in these companies, if
16   there's -- if we get to the point of a sale and there's no
17   other bidders and Hawk picks up these assets, then under 363
18   when he gets all this stuff, to the extent that you think that
19   he's misusing it, then you're going to sue Hawk, right?  Aren't
20   you going to sue Hawk?
21           MR. MICHAELS:  We already have.  They're in --
22           THE COURT:  Yeah.  Yeah.
23           MR. MICHAELS:  -- we're in litigation in Delaware.
24   But I think what I'm trying to be clear here is that Mr.
25   Vagnoni has -- they're talking about a bunch of equity, and
```

1  he's also put on their asset list that they are selling devices

2  that are accused of being -- infringing over on Rembrandt's

3  patterns and Stream, under the guidance of DLA Piper, took a

4  license.

5        Stream again renewed that -- negotiated again are

6  Armstrong T -- they advised them to do that.  Lewis Brisbois,

7  same thing.  We have numerous law firms evaluating these claims

8  and saying this was a good idea.  We have Mr. Homony testify.

9  He's done no investigation as to whether this is a good idea or

10  not.  And they ignored the issue.

11        They have not -- if the Rembrandt is not valid, we're

12  hearing, you know, testimony that may or may not -- this

13  Rembrandt license may or may not be valid.  It was, you know,

14  executed in 2021 right before a bankruptcy.

15        So if it's not valid, that means all the activity

16  that the estate to date are infringing a patent.  I just want

17  to be clear that that's the argument, is that this estate goes

18  almost instantaneously administratively insolvent.  And we are

19  looking for and we will ask the Courts -- the District Courts

20  to enjoin any transfer of our intellectual property.

21        Now we have licensed Stream.  We have -- we are

22  arguing that the license is valid but cannot be transferred.

23  You may not transfer our intellectual property.  You take a

24  ring, and you put it in a box and say, well, I'm just selling

25  this box, whatever may be in it.

 1          You know, we've evaluated what's inside the box.

 2   What's inside of SeeCubic B.V. is Rembrandt technology.  We've

 3   gone through that multiple law firms representing Stream.  And

 4   we have determined that a license was necessary.  And SSG does

 5   not get covered by ignorance.  There's no, I didn't know, Your

 6   Honor.  It defends patent infringement.

 7          They are actively offering for sale assets that

 8   include that were directly laid out in the complaints back in

 9   2017.  And while Mr. Caponi said it was dismissed, it was a

10   jurisdictional.  Every patent case under *TC Heartland*, the

11   Supreme Court case was dismissed and had to be brought in the

12   home state of the corporation.

13          And we immediately entered mediation, and they

14   insisted the DLA Piper's counsel and Streams officers, most

15   notably, Shadron Stastney, insisted that the patents be

16   included in the license agreement.

17          So this idea that they weren't important to Stream is

18   not supported by the facts in any way, shape, or form.  And we

19   are asking for clarity, is the Trustee operating and is SSG

20   operating under the license?  I.E. they therefore can't be sued

21   for trying to sell a TV covered by one of our patterns.

22          THE COURT:  Okay.  It sounds like they want to sell

23   equity and entities who have hard assets that contain your

24   intellectual property.  So the owner of the equity will

25   presumably then own these hard assets that have your

1  intellectual property embedded in them.  That's what I

2  understand?

3          MR. EDEL:  That's Your Honor, that's if it indeed a

4  -- a bidder is capable of determining what they're buying or

5  what the assets underneath that equity.

6          UNIDENTIFIED SPEAKER:  Your Honor?

7          MR. EDEL:  We have a whole list -- excuse me.  We

8  have a whole list of items that purport to the assets of the

9  Debtors.  I'm telling you today that that is an incomplete list

10  that was filed on this docket reported to this set of assets

11  that are being sold, that's substantially all of the assets of

12  the Debtors and we can show that.

13          More than that, the data room is breath of lots of

14  information.  And the process -- and I know Your Honor wants to

15  focus on the assets, I will focus on the assets, but as Mr.

16  Caponi tried to raise the broader issues.  The broader issue

17  here is that this trustee has agreed to transfer this set of

18  assets to one party and one party only and that is the Hawk

19  parties, right?

20          And they've done pursuant to 9019 settlement

21  agreement that purports just to be a settlement agreement, but

22  it's a sub rosa plan, because there's no other entity out

23  there, whether they be a strategic buyer or another competitor

24  of a Stream TV that would be interested in these assets under

25  these conditions based upon these encumbrances.  And it's not

```
 1   just --

 2              THE COURT:  Okay.  So gentlemen --

 3              MR. EDEL:  -- not --

 4              THE COURT:  -- let's just take a moment here.  So in

 5   terms of the bid procedures, I have concerns I think that you

 6   guys raised.  Some legitimate concerns, which we'll get to,

 7   right?

 8              So I see, like, several different areas that need to

 9   be addressed over time.  The first is, you need to know what is

10   being sold.  They're selling the equities that contain the

11   equity of entities that own the tangible property that has your

12   intellectual property.  So now you know.  They're -- that's

13   what they're trying to sell.

14              So the first step is, I'd just like to get some

15   clarity and make sure that we're all on the same page as to

16   exactly what's being sold.  Then we'll go through the bid

17   procedures and all of the many objections, some of which I

18   thought were meritorious.  But some of the issues that you're

19   raising are really important issues.

20              But to me, they appear closer to sale issues, right?

21   It's going to be a huge issue when you object to the sale,

22   right?  I'm going to -- it looks like I'm going to need some

23   briefs on all of the very important issues that you have to

24   raise.  But those are issues that, you know, that I think are

25   more appropriately dealt with then, right?
```

```
 1              So in terms of, you want discovery.  So the discovery
 2     that you want, I think it's important for you to get discovery
 3     if it's necessary on what assets are being sold.  But we have
 4     that -- we now have that nailed down.
 5              So let's focus first on what exactly is being sold.
 6     So you're selling the equity that has hard assets, that has
 7     their intellectual property embedded in it.  So let's --
 8              MR. VAGNONI:  Allegedly, Your Honor.  There's been
 9     no --
10              THE COURT:  Oh, okay.
11              MR. VAGNONI:  -- there's been --
12              THE COURT:  That's fine.  I understand you're not
13     conceding anything.  But I just want, for clarity sake, to
14     understand what it -- you know, what's being sold.
15              MR. MICHAELS:  Your Honor, their agent, SSG, as
16     investment banker, sent out a teaser that purported to sell the
17     capability of making licenses of the Ultra-D technology.
18     Rembrandt's technology or IP is in it and so is Phillips.
19              THE COURT:  Okay.  So what we're -- so that's not --
20     what I'm talking about, like, a hard asset.  Now you're talking
21     about some technology, is that --
22              MR. MICHAELS:  In some cases, it is a hard asset.
23     There are -- this lens technology they patented.
24              MR. SWICK:  Your Honor, Adam Swick, Akerman on behalf
25     of Visual Semi, VSI.  The issue is they have a stalking horse
```

```
1    bidder that has been at odds with the former debtor --

2            THE COURT:  Clearly.  Yeah.

3            MR. SWICK:  Yeah, yeah.  And so, they took control of

4    the Debtors' assets, they broke into the Debtors' offices,

5    stole TVs, they stole intellectual property.  They've been

6    using them.  They've been showing.  There's emails and letters

7    and we'd love to get discovery from the Trustees, because we

8    believe the Trustee knows all of this.

9            And so, they have TVs in different locations.  They

10   have different hard assets.  All this is purporting to be sold

11   by the Trustee who hasn't gotten it back, because that's the

12   stalking horse and they need the stalking horse to be able to

13   go out and raise money to fulfil their obligations.  And as of

14   the filings last night, the stalking horse doesn't have the

15   money to pay for the 363 as it is right now.

16           So yeah, what we need is discovery on where are all

17   these TVs?  They're all over the world.  They're in the

18   different offices of SeeCubic and the Hawk parties.  I mean,

19   Mr. Caponi up here, he represents the Hawk party's and Robert

20   Morten (phonetic), who's subject to a cold shoulder, which is

21   the worst crime of moral turpitude in the U.K.  It's supposed

22   to end your career and that's who these guys have hitched their

23   wagon to.  So we just need discovery to find the assets so we

24   -- if they want us to participate in a 363 sales process, how

25   are we going to do that if we don't know where the TVs are?
```

1  Who's --

2            THE COURT:  Okay.

3            MR. SWICK:  -- using them?

4            THE COURT:  So again, let's just focus back on what I

5  care about.  What I care about is, I want to know what they're

6  purportedly selling.

7            MR. SWICK:  They don't know.

8            THE COURT:  Okay.  And I know you say that.  But why

9  don't we just go through all of the concerns you have about the

10 identity of the assets?

11           Yes?

12           UNIDENTIFIED SPEAKER:  Your Honor, going -- sort of

13 taking a broad step back, how we ended up here.  My client has

14 a security interest.  Again, Stream's the holding company.  Has

15 no assets, other than stock and subsidiaries.

16           My client's security interest was primarily in the

17 stock and subsidiaries, not in the assets of the subsidiaries.

18 The 225 action, which we settled through the 9019, we were a

19 day away from taking control of that stock.

20           This settlement and this sale is effectively the same

21 thing.  It's selling the stock.  The companies that -- whatever

22 assets are in those companies that my client shows up and there

23 was TVs -- before my client and everybody else shows up,

24 there's TVs there, they own them.  If they're not, they don't.

25           It's the stock.  They want to drill down into -- and